# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION

| | | |
|---|---|---|
| **ANDRE LEE THOMAS,** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **NO. 4:09-CV-644 MHS** |
| | § | |
| **RICK THALER, DIRECTOR** | § | |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, INSTITUTIONAL DIVISION** | § | |
| **Respondent.** | § | |

---

# PETITION
# FOR A WRIT OF HABEAS CORPUS

---

# THIS IS A DEATH PENALTY CASE

Maurie Levin
Texas Bar No. 00789452
University of Texas School of Law
727 East Dean Keeton
Austin, TX  78705
512.232.7795
512.232.9171 (fax)

Don Bailey
Texas Bar No. 01520480
309 N. Willow
Sherman, TX  75090
903.892.9185
903.891.8304 (fax)

Gregory M. Weyandt
MN State Bar No. 116324
Surya Saxena
MN State Bar No. 339465
Marilyn Clark
MN State Bar No. 386615
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
612.340.2600
612.340.2868 (fax)

**Counsel for Andre Lee Thomas**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

PROCEDURAL HISTORY................................................................................................3

STATUS OF CONFINEMENT.........................................................................................4

STATEMENT OF FACTS ................................................................................................5

    I.        Mr. Thomas's History .......................................................................5

    II.       Pleas for Help Before the Murders ..................................................9

    III.      The Murders and Their Aftermath .................................................10

    IV.     Defense Counsel .............................................................................16

    V.      The Issues for and the Parties' Retention of Experts for Trial .......18

    VI.     The Trial..........................................................................................18

THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT....................25

    I.        The Structure and Function of 28 U.S.C. §2254(d)........................25

    II.       Evaluation of State Court Factual Findings Under AEDPA...........31

STRICKLAND V. WASHINGTON ................................................................................33

CLAIMS FOR RELIEF ..................................................................................................36

    **I.**        Mr. Thomas Was Deprived Of His Right To A Fair Trial Under The Due Process Clause Of The Fourteenth Amendment To The United States Constitution Because He Was Not Competent To Stand Trial..........................................................................................36

    II.       Defense Counsels' Failure to Move for a Competency Hearing Following Mr. Thomas's Return from Vernon State Hospital was Constitutionally Ineffective. ..........................................................39

    III.      Race Dynamics Pervaded Every Aspect of Mr. Thomas's Trial in Violation of the Sixth and Fourteenth Amendments. .....................45

    IV.     Mr. Thomas's Jury was Selected in a Racially Discriminatory Manner in Violation of his Rights under the Sixth and Fourteenth Amendments to the United States Constitution. ...............................53

    V.      The Defense's Failure to Challenge the State's Jury Shuffle and Disparate Questioning of the only African American Venire Member to Make It to Voir Dire Constituted Ineffective Assistance of Counsel under the Sixth and Fourteenth Amendments. ..............63

    VI.     The Presence of Jurors Opposed to Interracial Relationships Deprived Mr. Thomas of a Fair Trial and Violated His Right to Equal Protection under The Sixth and Fourteenth Amendments....................82

i

VII.      Defense Counsel's Failure to Inquire into Racial Prejudice
          Deprived Mr. Thomas of His Constitutional Right to Effective
          Assistance of Counsel. ........................................................................85

VIII.     The State Withheld Evidence that Undermined Its Theory of
          Substance-Induced Psychosis in Violation of *Brady v. Maryland*. ..............100

IX.       Defense Counsels' Failure to Hire an Expert in
          Neuropharmacology was Constitutionally Ineffective. ................................111

X.        Defense Counsel's Failure to Obtain a Neuropsychological
          Examination and the Testimony of a Neuropsychologist was
          Constitutionally Ineffective. ..........................................................117

XI.       Defense Counsels' Reliance on the State's Experts to Prove Key
          Issues was Constitutionally Ineffective. ..............................................120

XII.      Defense Counsel's Failure to Elicit Opinions on Sanity from Drs.
          Harrison and McGirk Further Rendered Its Counsel
          Constitutionally Ineffective. ..........................................................124

XIII.     Defense Counsels' Failure to Present Evidence of or Seek a Jury
          Instruction on Diminished Capacity Constituted Constitutionally
          Ineffective Assistance of Counsel. ...................................................128

XIV.      Defense Counsels' Performance at the Punishment Phase of Mr.
          Thomas' Trial was  Constitutionally Ineffective. ....................................139

XV.       The Trial Court Placed Unconstitutional Limitations on Mr.
          Thomas's Presentation of Mitigating Evidence. .....................................220

XVI.      Sentencing Mr. Thomas to Death Violates the Prohibition on Cruel
          and Unusual Punishment Set Forth in The Eighth Amendment to
          the United States Constitution Because Mr. Thomas is Indisputably
          and severely mentally Ill. ..............................................................224

XVII.     As Mr. Thomas is no Longer a Future Danger, his Death Sentence
          Violates the Eighth and Fourteenth Amendments. ..................................234

XVIII.    Defense Counsels' Copious Failures In Handling Expert Witnesses
          Further Deprived Mr. Thomas Of Effective Assistance Of Counsel. ............244

XIX.      Defense Counsel's Repeated Failure to Object to Inadmissible
          Evidence was Constitutionally Ineffective. ..........................................280

XX.       Counsel Was Constitutionally Ineffective for Failing to Object to
          the Court's Erroneous Instruction on, and the Entire Evidence
          Regarding, Voluntary Intoxication as there was No Intoxication
          and It Should Have Never Infected the Trial. .......................................287

XXI.      The Cumulative Evidence of Counsel's Copious Failures at Both
          Phases of Mr. Thomas's Trial Unequivocally Constitutes
          Constitutionally Ineffective Assistance of Counsel. ................................299

XXII.     The State Violated Mr. Thomas's Due Process Rights under the
          Fifth, Sixth and Fourteenth Amendments when the State

Knowingly Presented False and Misleading Testimony in
Violation of *Napue v. Illinois* and its Progeny..............................................300

XXIII.    The Trial Court's Refusal to Define "Reasonable Doubt" Denied
Mr. Thomas His Right to Due Process under the Fourteenth
Amendment..................................................................................................310

XXIV.    Mr. Thomas was Deprived of his Fifth Amendment Privilege
Against Self-Incrimination because the Jury Used Mr. Thomas's
Decision not to Testify Against Him in Imposing a Sentence of
Death. .........................................................................................................315

XXV.    Mr. Thomas's Death Sentence is Unconstitutional under *Roper v.
Simmons* because the State Used Prior Convictions Based on Acts
Committed by Mr. Thomas when he was a Juvenile to Establish an
Aggravating Factor. ....................................................................................318

XXVI.    Mr. Thomas was Deprived of his Right to a Fair Trial under the
Sixth Amendment because his Attorney had a Conflict of Interest
that was not Waived.....................................................................................322

XXVII.    Mr. Thomas's Appellate Counsel was Constitutionally Ineffective. .............330

CONCLUSION........................................................................................................333

PRAYER FOR RELIEF ..........................................................................................333

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Wiggins v. Smith,
   123 S. Ct. 2527 (2003) ................................................................................................261

Williams v. Taylor,
   529 U.S. 362 (2000) ............................................................................................ passim

Abdul-Kabir v. Quarterman,
   127 S. Ct. 1654 (2007) .................................................................................220, 224

Adams v. Texas,
   448 U.S. 38 (1980) ..................................................................................................85

Ake v. Oklahoma,
   470 U.S. 68 (1985) .........................................................................................262, 270

Alcorta v. Texas,
   355 U.S. 28 (1957) ................................................................................................300

Aldridge v. United States,
   283 U.S. 308 (1931) ...............................................................................................90

Andrade v. Lockyer,
   538 U.S. 63 (2003) ................................................................................................30

Antwine v. Delo,
   54 F.3d 1357 (8th Cir. 1995) ...............................................................44, 247, 249

Atkins v. Virginia,
   536 U.S. 304 (2002) ............................................................................................ passim

Awkal v. Mitchell,
   559 F.3d 456 (6th Cir. 2009) ...............................................................................122

Batson v. Kentucky,
   476 U.S. 79 (1986) ............................................................................................ passim

Beaver v. Thompson,
   93 F.3d 1186 (4th Cir. 1996) .........................................................................326, 327

Beck v. Bowersox,
   257 F.3d 900 (8th Cir. 2001) .................................................................................31

Beets v. Scott,
   65 F.3d 1258 (5th Cir. 1995) .........................................................................326, 327

*Blackmon v. Scott*,
22 F.3d 560 (5th Cir 1994) ......................................................................300, 301

*Blanton v. Quarterman*,
543 F.3d 230 (5th Cir 2008) ...............................................................................57

*Bollenbach v. United States*,
326 U.S. 607 (1946) ...........................................................................................296

*Bonin v. Calderon*,
59 F.3d 815 (9th Cir. 1995) ...............................................................................327

*Bouchillon v. Collins*,
907 F.2d 589 (5th Cir. 1990) .................................................35, 39, 44, 219

*Boyle v. Johnson*,
93 F.3d 180 (5th Cir. 1996) ......................................................................301, 304

*Bradley v. Duncan*,
315 F.3d 1091 (9th Cir. 2002) ................................................................. passim

*Brady v. Maryland*,
373 U.S. 83 (1963) ..................................................................................... passim

*Brady v. United States*,
397 U.S. 742 (1970) ...........................................................................................329

*Brecht v. Abrahamson*,
507 U.S. 619 (1993) ...................................................................................297, 298

*Breighner v. Chesney*,
301 F.Supp.2d 354 (M.D.Pa. 2004) ....................................................................33

*Brewer v. Quarterman*,
127 S. Ct. 1706 (2007) ...............................................................................220, 224

*Broders v Heise*,
924 S.W.2d 148 (Tex. 1996) ...................................................................... passim

*Broxton v. State*,
909 S.W.2d 912 (Tex. Crim. App. 1995) ..........................................................296

*Brubaker v. Dickson*,
310 F.2d 30 (9th Cir. 1962) ...............................................................................136

*Bryant v. Scott*,
28 F.3d 1411 (5th Cir. 1994) .............................................................................267

*Buckner v. Polk,*
    453 F.3d 195 (4th Cir. 2006) ........................................................35, 219

*Burdine v. Johnson,*
    262 F.3d 336 (5th Cir. 2002) ............................................................258

*Busby v. Dretke,*
    359 F.3d 708 (5th Cir. 2004) ............................................................332

*Butler v. State,*
    1988 WL 63526 (Tenn. Ct. Crim. App. June 23, 1988) ................................ passim

*Calloway v. State,*
    699 S.W.2d 824 (Tex. Crim. App. 1985)....................................................328

*Canaan v. McBride,*
    395 F.3d 376 (7th Cir. 2005) .............................................................26

*Caro v. Calderon,*
    165 F.3d 1223 (9th Cir. 1999) ...........................................115, 119, 120

*Carpenter v. Vaughn,*
    296 F.3d 138 (3rd Cir. 2002) ...........................................................287

*Carter v. Kentucky,*
    450 U.S. 288 (1981)....................................................................315

*Chatom v. White,*
    858 F.2d 1479 (11th Cir. 1988) ........................................................267

*Childress v. Johnson,*
    103 F.3d 1221 (5th Cir. 1997) ..........................................................31

*Ciak v. United States,*
    59 F.3d 296 (2d Cir. 1995)........................................................326, 327

*Clark v. Arizona,*
    548 U.S. --- (2006).....................................................................133

*Cobb v. Georgia,*
    658 S.E.2d 750 (Ga. 2008)..............................................................255

*Coker v. Georgia,*
    433 U.S. 584 (1977)....................................................................242

*Com v. Baumhammers,*
    960 A.2d 59 (Pa. 2008).................................................................233

*Combs v. Coyle,*
   205 F.3d 269 (6th Cir. 2000) ................................................122

*Commonwealth v. Legg,*
   711 A.2d 430 (Pa. 1998) ....................................................133

*Cooper Tire & Rubber Co. v. Mendez,*
   204 S.W.3d 797 (Tex. 2006)................................................254

*Cooper v. Oklahoma,*
   517 U.S. 348 (1996)...........................................................36

*Corcoran v. Indiana,*
   774 N.E.2d 495 (Ind. 2002) ...............................................233

*County v. State,*
   812 S.W.2d 303 (Tex.Crim.App.1989)...................................61

*Cowles v. State,*
   510 S.W. 3d 608 (Tex. Crim. App. 1974)......................130, 132

*Cuyler v. Sullivan,*
   446 U.S. 335 (1980)..............................326, 327, 328, 329

*Daniels v. Woodford,*
   428 F.3d 1181 (9th Cir. 2005) ...........................................135

*Daubert v. Merrell Dow Pharmaceuticals,*
   509 U.S. 579 (1993)...........................................250, 266, 270

*Davis v. Alabama,*
   596 F.2d 1214 (5th Cir. 1979) ...........................................135

*Davis v. Secretary for the Dep't of Corr.,*
   341 F.3d 1310 (11th Cir. 2003) ......................................65, 67

*Davis v. State,*
   831 S.W.2d 426 (Tex. App. 1992).................................300, 301

*Dawan v. Lockhart,*
   31 F.3d 718 (8th Cir. 1994) ...............................................327

*Dickson v. Quarterman,*
   453 F.3d 643 (5th Cir. 2006) ...............................105, 106, 108

*Dobbs v. Zant,*
   720 F. Supp. 1566 (N.D. Ga. 1989)....................................317

*Duncan v. Walker*,
    533 U.S. 167 (2001) ..................................................................................................32

*Dusky v. United States*,
    362 U.S. 402 (1960) ...........................................................................................36, 38

*Earls v. McCaughtry*,
    379 F.3d 489 (7th Cir. 2004) ......................................................................267, 268

*Early v. Packer*,
    537 U.S. 3 (2002) .....................................................................................................28

*East v. Johnson*,
    123 F.3d 235 (5th Cir. 1997) .........................................................104, 105, 106, 108

*Eddings v. Oklahoma*,
    455 U.S. 104 (1982) .......................................................................214, 220, 222, 224

*Ege v. Yukins*,
    380 F.Supp.2d 852 (E.D.Mich. 2005) ..................................................................267

*Enmund v. Florida*,
    458 U.S. 782 (1982) ..............................................................................................242

*Estelle v. Smith*,
    451 U.S. 454 (1981) ..............................................................................................316

*Ethicon, Inc. v. Martinez*,
    835 S.W.2d 826 (Tex. Ct. App. 1992) ..................................................................281

*Evans v. Cockrell*,
    285 F.3d 370 (5th Cir. 2002) ................................................................................262

*Evitts v. Lucey*,
    469 U.S. 387 (1985) ..............................................................................................239

*Ex parte Blue*,
    230 S.W.3d 151 (Tex. Crim. App., 2007) ...........................................................240

*Ex parte Elizondo*,
    947 S.W.2d 202 (Tex. Crim. App. 1996) .............................................................241

*Ex parte Gonzales*,
    204 S.W.3d 391 (Tex. Crim. App. 2006) .............................................................140

*Ex parte Nailor*,
    149 S.W.3d 125 (Tex. Crim. App. 2004) .............................................................125

*Ex Parte Prejean*,
625 S.W.2d 731 (Tex. Crim. App. 1981)...........................................................................329

*Ex parte Thomas*,
Cause No. 051858-15-A ....................................................................... passim

*Ex parte Thomas*,
No. WR-69859-01, 2009 WL 693606 (Tex. Crim. App. Mar. 18, 2009)...................... passim

*Ex parte Torres*,
943 S.W.2d 469 (Tex. Crim. App. 1997)...........................................................................33

*Fairow v. State*,
943 S.W.2d 895 (Tex. Crim. App. 1997)..........................................................................125

*Familia-Consoro v. United States*,
160 F.3d 761 (1st Cir. 1998)...........................................................................326, 327

*Fields v. Thaler*,
2009 WL 3764003 (5th Cir. 2009) ...........................................................................57, 324

*Ford v. Wainwright*,
477 U.S. 399 (1986)...........................................................226, 234, 236, 237

*Frye v. United States*,
293 F.1013 (9th Cir. 1923) ...........................................................................250

*Fuller v. State*,
423 S.W.2d 924 (Tex. Crim. App. 1968)...........................................................125, 281

*Furman v. Georgia*,
408 U.S. 238 (1972)...........................................................................237, 238

*Giglio v. United States*,
405 U.S. 150 (1972)...........................................................104, 300, 301

*Glasgow v. State*,
No. 05-04-00074-CR, 2005 WL 906129 (Tex. Ct. App. 2005) ...........................................284

*Godfrey v. Georgia*,
446 U.S. 420 (1980)...........................................................................81, 288

*Gomez v. United States*,
490 U.S. 858 (1989)...........................................................................64

*Gonzalez v. Crosby*,
125 S.Ct. 2641 (2005)...........................................................................27

*Gov't of Virgin Islands v. Forte*,
   865 F.2d 59 (3d Cir. 1989)..................................................................................65, 66, 67

*Gray v. Estelle*,
   616 F.2d 801 (5th Cir. 1980) ........................................................323, 325, 326, 329

*Guidry v. Dretke*,
   397 F.3d 306 (5th Cir. 2005) ........................................................................................31

*Ham v. South Carolina*,
   409 U.S. 219 (1973)............................................................................................ passim

*Hedgpeth v. Pulido*,
   129 S.Ct. 530 (2008)................................................................................................297

*Hicks v. Howton*,
   ___ F. Supp. 2d ___, 2009 WL 4030755 (D. Ore. Nov. 20, 2009) ......................332

*Hines v. State*,
   3 S.W.3d 618 (Tex. Ct. App. 1999) ........................................................................317

*Hodge v. Hurley*,
   426 F.3d 368 (6th Cir. 2005) ............................................................................35, 219

*Holland v. United States*,
   348 U.S. 121 (1954)................................................................................................311

*Hopt v. Utah*,
   120 U.S. 430 (1887)................................................................................................311

*Hovey v. Ayers*,
   458 F.3d 892 (9th Cir. 2006) ........................................................128, 248, 249

*Hughes v. United States*,
   258 F.3d (6th Cir. 2001) ............................................................................................95

*Humanik v. Beyer*,
   871 F.2d 432 (3d Cir.), *cert. denied*, 493 U.S. 812 (1989)..................................130

*Hummel v. Rosemeyer*,
   564 F.3d 290 (3d Cir. 2009)......................................................................................44

*Illinois v. Flewellen*,
   652 N.E.2d 1316 (Ill. Ct. App. 1995) ......................................................284, 285

*in Penry v. State*,
   903 S.W.2d 715 (Tex. Crim. App. 1995)................................................................130

*In re J.G.,*
   195 S.W.3d 161 (Tex. Ct. App. 2006) .................................................................283

*In re Winship,*
   397 U.S. 358 (1970) ...............................................................................130, 312

*Jackson v. Dretke,*
   181 Fed. Appx. 400 (5th Cir. 2006) ..............................................57, 68, 95, 132

*Jackson v. State,*
   160 S.W.3d 568 (Tex. Crim. App. 2005) ..........................................131, 132

*Jacobs v. Horn,*
   395 F.3d 92 (3d Cir. 2005) ..........................................................................135

*James v. State,*
   763 S.W.2d 776 (Tex. Crim. App. 1989) ..........................................................328

*Jaynes v. State,*
   673 S.W.2d 198 (Tex. Crim. App. 1984) ..........................................................295

*Jennings v. Woodford,*
   290 F.3d 1006 (9th Cir. 2002) .....................................................................136

*Johnson v. Armontrout,*
   961 F.2d 748 (8th Cir. 1992) .........................................................................95

*Johnson v. California,*
   545 U.S. 162 (2005) ......................................................................................62

*Johnson v. Zerbst,*
   304 U.S. 458 (1938) ....................................................................................329

*Joseph v. Coyle,*
   469 F.3d 441 (6th Cir. 2006) .....................................................287, 288, 290

*Judge v. Beard,*
   611 F. Supp. 2d 415 (E.D. Pa. 2009) ..........................................................332

*Jurek v. Texas,*
   428 U.S. 262 (1976) ....................................................................................237

*Kansas v. Marsh,*
   126 S. Ct. 2516 (2006) ......................................................................220, 224

*Kennedy v. Louisiana,*
   128 S.Ct. 2641 (2008) .................................................................................225

*Kirkpatrick v. Whitley,*
   992 F.2d 491 (5th Cir. 1993) ...........................................................288, 301, 308

*Koon v. Cain,*
   277 Fed. Appx. 381 (5th Cir. 2008)...........................................................115, 116

*Kotteakos v. United States,*
   328 U.S. 750, 66 S.Ct. 1239 (1946)...........................................................297, 298

*Kyles v. Whitley,*
   514 U.S. 419 (1995)..................................................................106, 213, 215

*Kyles v. Whitley,*
   514 U.S. 419,432-433 (1995) ...........................................................104, 106

*Ladd v. Cockrell,*
   311 F.3d 349 (5th Cir. 2002) ...................................................................55, 65

*Lambert v. Blackwell,*
   387 F.3d 210 (3d Cir. 2004)............................................................................33

*Lewis v. Dretke,*
   355 F.3d 364 (5th Cir. 2003) .........................................................................154

*Livingston v. Johnson,*
   107 F.3d 297 (5th Cir. 1997) .........................................................................299

*Lockett v. Ohio,*
   438 U.S. 586 (1978)..............................................................................passim

*Lopez v. State,*
   779 S.W.2d 411 (Tex. Crim. App. 1989)......................................................297

*Loyd v. Whitley,*
   977 F.2d 149 (5th Cir. 1992) .........................................................................271

*Lynch v. State,*
   952 S.W.2d 594 (Tex. Ct. App. 1997) ...........................................................130

*Mak v. Blodgett,*
   970 F.2d 614 (9th Cir.1992) .........................................................................299

*Market Co. v. Hoffman,*
   101 U.S. 112 (1879).........................................................................................32

*Mason v. Balcom,*
   531 F.2d 717 (5th Cir. 1976) ..................................................................134, 135

*Massaro v. United States*,
538 U.S. 500 (2003)...........................................................................................33

*Mays v. State,*
2007 Tex. App. LEXIS 2752 (Tex. Ct. App. April 11, 2007) ..............................132

*Mays v. State*,
726 S.W.2d 937 (Tex. Crim. App. 1986)...............................................................54

*McKoy v. North Carolina*,
494 U.S. 433 (1990).........................................................................................220

*McPherson v. Kentucky*,
171 S.W.3d 1 (Ky. 2005)....................................................................................67

*Medina v. California*,
505 U.S. 437 (1992)...........................................................................................36

*Miller v. Webb,*
385 F.3d 666 (6th Cir. 2004) ..............................................92, 94, 95, 100

*Miller-El v. Cockrell*
537 U.S. 322 (2003)............................................................... passim

*Miller-El v. Dretke,*
361 F.3d 849 (5th Cir. 2004) ..............................................................................56

*Miller-El v. Dretke,*
542 U.S. 936 (2004).............................................................................................56

*Miller-El v. Dretke,*
545 U.S. 231 (2005)............................................................... passim

*Moore v. Johnson,*
194 F.3d 586 (5th Cir. 1999) ............................................................................299

*Moore v. Johnson,*
194 F.3d 589 (5th Cir. 1999) ..............................................................271, 273

*Morgan v. Illinois,*
504 U.S. 719 (1992).............................................................. passim

*Motley v. Collins*,
18 F.3d 1223 (5th Cir.) ....................................................................................288

*Munoz v. U.S.,*
No. 07-CV-2080, 2008 WL 2942861 (E.D.N.Y. Jul. 28, 2008)..........................283

*Murphy v. Dretke,*
    416 F.3d 427 (5th Cir. 2005) ................................................................57, 67

*Murray v. Carrier,*
    477 U.S. 478 (1986)...............................................................................35

*Napue v. Illinois,*
    360 U.S. 264 (1959)...................................................................... passim

*Nero v. Blackburn,*
    597 F.2d 991 (5th Cir. 1979) ....................................................35, 67, 95

*Nethery v. State,*
    692 S.W.2d 686 ......................................................................................291

*Offord v. State,*
    No. SC05-1611, 2007 Fla. LEXIS 951 (Fla. May 24, 2007)...................232

*Ohio Adult Parole Authority v. Woodard,*
    523 U.S. 272 (1998)...............................................................................240

*Ohio v. Scott,*
    748 N.E.2d 11 (Ohio 2001).....................................................................233

*Oklahoma vs. Walter Martin,*
    No. 71-523 ..............................................................................................164

*Olmstead v. L.C.,*
    527 U.S. 581 (1999)...............................................................................224

*Owens v. State,*
    916 S.W.2d 713 (Tex. Crim. App. 1996)................................................99

*Paradis v. Arave,*
    240 F.3d 1169 (9th Cir. 2001) ......................................................104, 105

*Paulson v. State,*
    28 S.W.2d 570 (Tex. Crim. App. 2000)......................310, 311, 312, 315

*Penry v. Johnson,*
    532 U.S. 782 (2001).......................................................................30, 329

*Penry v. Lynaugh,*
    492 U.S. 302 (1989)...............................................................................214

*People v. DeLucia,*
    229 N.E.2d 211 (N.Y. 1967).................................................................317

*People v. LaValle*,
   817 N.E.2d 341 (N.Y. 2004)...................................................................232

*Potter v. State*,
   216 S.W. 886 (Tex. Crim. App. 1919)..................................................87, 88, 100

*Powers v. Ohio*,
   499 U.S. 400 (1991).........................................................................52, 63

*Presley v. State*,
   750 S.W.2d 602 (Mo. Ct. App.)..............................................................92

*Reyes v. Scribner*,
   No. CV 06-7958-ODW (AGR), 2008 WL 2113240.........................................283

*Rice v. Collins*,
   126 S.Ct. 969 (2006)..........................................................................32

*Riggs v. United States*,
   209 F.3d 828 (6th Cir. 2000) ............................................................326, 327

*Rios Delgado v. U.S.*,
   117 F. Supp.2d 582 (W.D. Texas 2000) .....................................................267

*Ristaino v. Ross*,
   424 U.S. 589 (1976)....................................................................87, 89, 96, 100

*Rivera v. State*,
   82 S.W.3d 64 (2002)...........................................................................96

*Roberts (Harry) v. Louisiana*,
   431 U.S. 633 (1977)..........................................................................213

*Roberts (Stanislaus) v. Louisiana*,
   428 U.S. 325 (1976)..........................................................................213

*Rodriguez v. Hoke*,
   928 F.2d 534 (2d Cir.1991)..................................................................299

*Roise v. State*,
   7 S.W.3d 225 (Tex. App. 1999).........................................................250, 254, 275

*Rompilla v. Beard*,
   545 U.S. 374 (2005) ...................................................................... passim

*Roper v. Simmons*,
   543 U.S. 551 (2005) ...................................................................... passim

*Rose v. Mitchell*,
   443 U.S. 545 (1979)..............................................................................................63

*Rose v. Mitchell*,
   443 U.S. 545 (1979)..............................................................................................62

*Sawyer v. Whitley*,
   505 U.S. 333 (1992)............................................................................................240

*Sells v. United States*,
   539 U.S. 166 (2003)..............................................................................................37

*Sessums v. Texas*,
   129 S.W.3d 242 (Tex. Ct. App. 2004) ...............................................................255

*Shilling v. State*,
   977 S.W.2d 789 (Tex. Ct. Crim. App. 1998).......................................................99

*Showers v. Beard*,
   586 F. Supp. 2d 310 (M.D. Pa. 2008) ................................................................332

*Smith v. Massey*,
   235 F.3d 1259 (10th Cir. 2000) .........................................................................304

*Smith v. State*,
   648 S.W.2d 695 (Tex. Ct. Crim. App. 1983).......................................................54

*Smith v. State*,
   779 S.W.2d 417 (Tex. Ct. Crim. App. 1989).....................................................238

*Smith v. White*,
   815 F.2d 1401 (11th Cir. 1987) .........................................................................327

*Soffar v. Dretke*,
   368 F.3d 441 (5th Cir. 2004) .......................................................114, 115, 116, 119

*State v. Berry*,
   233 S.W.3d 847 (Tex. Ct. Crim. App. 2007).....................................................239

*State v. DeLeon*,
   971 S.W.2d 701 (Tex. Ct. Crim. App. 1998)..............................................104, 106

*State v. Delibero*,
   692 A.2d 981 (N.J. 1997).....................................................................................133

*State v. Griffin*,
   670 P.2d 265 (Wash. 1983)..................................................................................133

*State v. Hall*,
    958 S.W.2d 679 (Tenn. 1997) ........................................................134

*State v. Joseph*,
    590 S.E.2d 718 (W.Va. 2003) ........................................................133

*State v. Ketterer*,
    855 N.E.2d 48 (Ohio 2006) .....................................................229, 233

*State v. Lamere*,
    112 P.3d 1005 (Mont. 2005) ............................................92, 95, 100

*State v. Thomas*,
    Cause No. 051858 ....................................................................4, 311

*State v. Tilton*,
    72 P.3d 735 (Wash. 2003) ..............................................................133

*State v. Walkup*,
    220 S.W.3d 748 (Mo. 2007) ..........................................................134

*Strickland v. Washington*,
    466 U.S. 668 (1984) ................................................................ passim

*Strickler v. Greene*,
    527 U.S. 263 (1999) ......................................................................104

*Suniga v. State*,
    733 S.W.2d 594 (Tex. Ct. Crim. App. 1987) ...................................99

*Taylor v. Maddox*,
    366 F.3d 992 (9th Cir. 2004) ..........................................................33

*Taylor v. State*,
    856 S.W.2d 459 (Tex. Crim. App. 1994) .................................291, 296

*Taylor v. State*,
    885 S.W.2d 154 (Tex. Crim. App. 1994) ...........................289, 291, 293

*Tennard v. Dretke*,
    542 U.S. 274 (2004) ...............................................................220, 222

*Thomas v. State*,
    No. AP-75218, 2008 WL 4531976 (Tex. Crim. App. Oct. 8, 2008) .................3, 40, 315, 316

*Thompson v. Oklahoma*,
    487 U.S. 815 (1988) ......................................................................242

*Trop v. Dulles,*
    356 U.S. 86 (1958)................................................................231, 242

*Tumey v. Ohio,*
    273 U.S. 510 (1927)..................................................................82, 83

*Turner v. Murray,*
    476 U.S. 28 (1986).................................................................. passim

*U.S. ex rel Duncan v. O'Leary,*
    806 F.2d 1307 (7th Cir. 1986) ...............................................326, 327

*U.S. v. Oliver,*
    468 F.Supp.2d 980 (C.D. Ill. 2007) ........................................251, 254

*United States v. Allsup,*
    566 F.2d 68 (9th Cir. 1977) ............................................................91

*United States v. Amoral,*
    488 F.2d 148 (9th Cir. 1973) .................................................255, 276

*United States v. Bagley,*
    473 U.S. 667 (1985)..............................................104, 105, 106, 301

*United States v. Bagley,*
    474 U.S. 667 (1985)......................................................................213

*United States v. Cook,*
    45 F.3d 388 (10th Cir. 1995) .......................................................327

*United States v. Cronic,*
    466 U.S. 648 (1984)...................................................35, 66, 95, 274

*United States v. Esparza-Gonzales,*
    422 F.3d 897 (9th Cir. 2005) .........................................................58

*United States v. Fields,*
    483 F.3d 313 (5th Cir. 2007) .......................................................324

*United States v. Gambino,*
    864 F.2d 1064 (3d Cir. 1988).................................................326, 327

*United States v. Newell,*
    315 F.3d 510 (5th Cir. 2002)..................................................325, 326

*United States v. O'Keefe,*
    128 F.3d 885 (5th Cir. 1997) .................................................300, 301, 308

*United States v. Olano,*
  507 U.S. 725 (1993)...............................................................................82, 83, 84

*United States v. Phillips,*
  210 F.3d 345 (5th Cir. 2000) ..................................................................332

*United States v. Sanfilippo,*
  564 F.2d 176 (5th Cir. 1977) ..................................................................300

*United States v. Taylor,*
  139 F.3d 924 (D.C. Cir. 1998)................................................................327

*United States v. Timmreck,*
  441 U.S. 780, 99 S.Ct. 2085 (1979)........................................................297

*United States v. Williams,*
  20 F.3d 125 (5th Cir. 1994) ....................................................................310

*Vela, Jr. v. State,*
  209 S.W.3d 128 (Tex. Crim. App. 2006).........................250, 251, 268, 275

*Victor v. Nebraska,*
  511 U.S. 1 (1994)....................................................................................311

*Volkswagen of Am., Inc. v. Ramirez,*
  159 S.W.3d 897 (Tex. 2004)............................................................254, 301

*Wade v. White,*
  368 F. Supp. 2d 695 (E.D. Mich. 2005)..................................................255

*Wainwright v. Witt,*
  469 U.S. 412 (1985).....................................................................83, 85, 86

*Warner v. State,*
  969 S.W.2d 1 (Tex. Crim. App. 1998).....................................................130

*Weeks v. Angelone,*
  176 F.3d 249 (4th Cir. 1999) ....................................................................26

*Wiggins v. Smith,*
  123 S.Ct. 2527 (2003).............................................................................140

*Wiggins v. Smith,*
  539 U.S. 510 (2003).................................................................................274

*Wiggins v. Smith,*
  539 U.S. 510 (2003).................................................................................222

*Wiggins v. Smith*,
539 U.S. 510 (2003)..............................................................................passim

*Wiggins v. Smith*,
539 U.S. 510, 123 S. Ct. 2527 (2003) ................................................154

*Williams v. Taylor*,
592 U.S. 362 ..........................................................................227, 228, 321

*Williams v. Washington*,
59 F.3d 673 (7th Cir.1995) ..................................................................26, 299

*Williamson v. Ward,*
110 F.3d 1508 (10th Cir. 1997) ..........................................................38, 43

*Wilson v. Mazzuca*,
570 F.3d 490 (2d Cir. 2009)................................................................253, 256

*Wilson v. Sirmons*,
536 F.3d 1064 (10th Cir. 2008) ..........................................................passim

*Woodson v. North Carolina*,
428 U.S. 280 (1976).............................................................82, 214, 240

*Worthen v. Oklahoma*,
715 P.2d ..................................................................................................324

*Yanez v. State*,
677 S.W.2d 62 (Tex. Crim. App. 1984)................................................54

*Youngblood v. West Virginia*,
126 S.Ct. 2188 (2006)...........................................................104, 106

*Yung v. Walker*,
296 F.3d 129 (2d Cir. 2002)................................................................31

*Zuck v. Alabama*,
588 F.2d 436 (5th Cir. 1979) ..............................................................323, 326

## STATUTES

28 U.S.C. §§2254(a) ........................................................................................27

28 U.S.C. §2254(d) ..................................................................................passim

28 U.S.C. §2254(d)(1) .............................................................................passim

28 U.S.C. §2254(d)(2) .............................................................................passim

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") ..................passim

Ark. Code Ann. § 5-2-303 ................................................................134

Conn. Gen. Stat. Ann. 52a.46a(h) ....................................................232

Tex. Code Crim. Proc. Ann. art. 35.17(2) ..........................................91

Tex. Code Crim. Proc. Article 11.071 .........................................234, 240

Tex. Code Crim. Proc. art. 35.11 ......................................................54

TEX. CODE CRIM. PROC., Art. 37.071 ...........................235, 237, 238, 260

Tex. Code of Crim. Proc. Art. 38.36(a) ............................................132

Tex. Code Crim. Proc. art. 46B.004 .............................................40, 41

Tex. Code Crim. Proc. art. 46B.005 ..................................................41

Tex. Code Crim. Proc., art. 46B.084 .................................................40

Tex. Code Crim. Proc., art. 46B.102(a) .............................................40

Tex. Code Crim. Proc., art. 46B.102(c) .............................................40

Tex. Penal Code Art. 6.02 (b) .........................................................130

Tex. Penal Code Art. 6.03 ..............................................................130

Tex. Penal Code, Art. 19.02(b)(1), 19.03 ........................................130

Tex. Penal Code § 6.03 ..................................................................131

Tex. Penal Code §§ 8.01, 8.04 ......................................................295

Tex. Penal Code § 8.01(a) ..................................................20, 294, 295

Tex. Penal Code § 8.04 .......................................................289, 293, 303

Tex Penal Code § 19.02(b)(1), 19.03 .............................................131

Title 7 of the Texas Health and Safety Code ....................................40

Texas Penal Code § 8.04(a) & (d) ....................................................20

Texas Penal Code §19.03 ...............................................................237

Texas Rule of Evidence 403 ...........................................................270

Texas Rules of Evidence 606(b) ......................................................316

Texas Rule of Evidence 701 ...............................................125, 126, 281

Texas Rule of Evidence 702 ............................................................250, 252, 275, 276

Texas Rule of Evidence 703 .......................................................................122, 251

Texas Rule of Evidence 704 .......................................................................125, 126

Texas Rule of Evidence 705 ............................................................................ passim

**OTHER AUTHORITIES**

1 *National Jury Project, Inc., Jurywork: Systematic Techniques* § 2.11[2] ..................................91

138 Cong. Rec. S-4781-01 .........................................................................243

2007 Leg. (Ind. 2007) ...............................................................................232

2007 Leg. (N.C. 2007) ...............................................................................232

2007-2008 Leg. (Wa. 2007)........................................................................232

29 *Hofstra Law Review* 1209 (2001) ...........................................................64

*James Terry Roach and Jay Pinkerton v. United States*, Annual Report of the IACHR
    1986-87 ...............................................................................................242

ABA Report with Recommendation No. 122A ..........................................225

Adam Liptak, *Ruling Likely to Spur Convictions in Capital Cases*, New York Times
    (June 9, 2007)........................................................................................89

Jonathan R. Sorensen & James Marquart, *Prosecutorial and Jury Decision-Making in
    Post-Furman Texas Capital Cases* ...........................................................50

Amnesty International, *United States of America: Death by Discrimination – The
    Continuing Role of Race in Capital Cases* .................................................50

Alan Widmayer & James Marquart, *Capital Punishment and Structured Discretion:
    Arbitrariness and Discrimination after Furman*, Corr. Theory & Prac. 187 (1992) ..............50

*Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 645 (4th ed.
    1994) ("DSM-IV")................................................................................278, 279

American Bar Association's *Guidelines for the Appointment and Performance of Defense
    Counsel in Death Penalty Cases* (1989, 2003) ..................................................222

American Heritage Dictionary, Fourth Edition .........................................311

American Law Institute April 15, 2009 Resolution........................................232, 233

AMNESTY INTERNATIONAL (2003), *at* http://web.amnesty.org/library/.........................50

Amnesty International, *United States of America: Death by Discrimination – The Continuing Role of Race in Capital Cases* ............................................................50

*Case Report and Literature Review*, PSYCHIATRY MMC, October 2007 .....................................14

United States Constitution ............................................................................. passim

Henry Fradella, *From Insanity To Beyond Diminished Capacity: Mental Illness And Criminal Excuse In The Post-Clark Era*, 18 U. Fla. J.L. & Pub. Pol'y 7, 47 (April 2007) ...................................................................................................133

USA Today, http://www.usatoday.com/news/nation/2004-04-07-eye_x.htm.............................37

James M. Washington, ed., *A Testament of Hope: The Essential Writings and Speeches of Martin Luther King, Jr.* 293 (1986) .........................................................51

John Blume *et al.*, *Explaining Death Row's Population and Racial Composition* .....................49

John D. White, *A New Hand from the Same Deck of Cards: Randomness and the Intersection of Race with Gender in the Texas Jury Shuffle*, 40 S. Tex. L. Rev. 509 (1999)...............................................................................................54

John Grisham, *The Innocent Man: Murder and Injustice in a Small Town* (Random House 2006) .........................................................................................43

John H. Blume & David P. Viosin, *Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder*, *Mental Health & Experts Manual* (2001) .........................................277

Donna Kummler, *They have gone from Sherman: The Courthouse Riot of 1930 and its Impact on the Black Professional Class* .....................................................47

Mary Alice Conroy, *Risk Assessment in the Texas Criminal Justice System* .............................277

Mary Ellen Gale, Retribution, Punishment, and Death, 18 U.C. Davis L. Rev. 973, 1033 (1985).............................................................................................236

Michael M. Gallagher, *Abolishing the Texas Jury Shuffle*, 35 St. Mary's L.J. 304 (2003)...........54

Murphy, Nathan, Lee, Parsons & Gunasekera, *Oedipism: Auto-Enucleation in a schizophrenic patient* ...........................................................................14

Nolan Thompson, Sherman Riot of 1930, Handbook of Tex. Online (2004), at www.tsha.utexas.edu/handbook/online/articles/SS/ .......................................46, 47

On the Matter of the Death Penalty, April 15, 2009, available at http://www.ali.org/doc/Capital%20Punishment_web.pdf. ...................................233

Patton N. *Self-inflicted eye injuries: a review* ...........................................................14

R.N. Sing *et al.*, *Reforming the Jury System: What Do the Judges Think?*.................................54

Report 52/01 (April 4, 2001), *Juan Raul Garza v. United States*, Annual Report of the IACHR 2000 ..................................................................................................242

Report No. 48/01 (April 4, 2001), *Michael Edwards v. The Bahamas*, Annual Report of the IACHR 2000, ¶¶ 126-128 ................................................................242

Restatement (Third) of Foreign Relations Law § 102(2) (1987) ................................244

Ronald Tabak, *Symposium: Overview Of Task Force Proposal On Mental Disability And The Death Penalty*, 54 Cath. U. L. Rev. 1123, 1123 (Summer 2005) .......... 222-225, 231, 234

S.C. Miller, *Dextromethorphan Psychosis, Dependence, and Withdrawal, Addiction Biology* (Dec. 2005) .............................................................................................105

Samuel R. Sommers & Phoebe C. Ellsworth, *The Jury And Race: How Much Do We Really Know About Race And Juries? A Review Of Social Science Theory And Research* .............................................................................................................91

Sheri Lynn Johnson, *Black Innocence and the White Jury*, 83 *Mich. L. Rev.* 1611, 1675-76 (1985) .......................................................................................................91

Steven E. Barkan & Steven F. Cohn, *Racial Prejudice and Support for the Death Penalty by Whites* ......................................................................................................51

Steven F. Cohn, *et al.*, *Punitive Attitudes Toward Criminals: Racial* 16 ......................51

Texas Constitution ........................................................................85, 86, 96, 234

Texas Rule of Evidence 606 ...................................................................317, 318

United Nations Economic and Social Council, *Implementation of the Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty* ........................242

University of Pennsylvania Journal of Constitutional Law .........................................89

*Victor Rosario Congo v. Ecuador*, Report No. 63/99 (April 13, 1999), ANNUAL REPORT OF THE IACHR 1998, ¶ 42 ..............................................................................243

William J. Bowers, *et al.*, *Death Sentencing In Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition* ......................................49

William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95 (1993) .............................................243, 244

**<u>INTRODUCTION</u>**

"This is an extraordinarily tragic case."  *Ex parte Thomas*, No. WR-69859-01, 2009 WL 693606 (Tex. Crim. App. Mar. 18, 2009), slip op. at 1 (Cochran, J., concurring).  The manner and method of the crime itself – the murder and mutilation of Andre Thomas's estranged wife, their 4-year-old son, and his wife's 13-month-old daughter – speak volumes about the severity of his mental illness.  *Id*., slip op. at 1-3.  Five days after the murder, while in the Grayson County Jail, Mr. Thomas pulled out his right eye, following the literal dictates of Christ's injunction in Matthew 5:29 that "if the right eye offend thee, pluck it out and cast it from thee."  Floridly psychotic, Mr. Thomas was found incompetent to stand trial, and sent to a state hospital for the mentally ill.  Forty-seven days later he was returned to the trial court, and after his lawyers failed to contest his purported return to competency, his case proceeded to trial.

Mr. Thomas is an African American man.  His wife, Laura Boren Thomas, was Caucasian.  His son, Andre Jr., and Laura's younger child, Leyha Hughes, were both of mixed descent.  The crime, decision to pursue a death sentence, conviction, and sentencing took place in Sherman, Texas – a town that is unfortunately known in part for an infamous 1930's lynching that still defines many of the demographics and sentiments of the residents.  Four of the people that served – without objection - on Mr. Thomas's jury were openly opposed to interracial relationships and marriage.  The state littered the trial with references to negative stereotypes of African American men and thinly veiled appeals to the prejudices of members of the jury.  They did so easily, without any objections from defense counsel.

In March 2005, Mr. Thomas was found guilty of capital murder.  The state argued that Mr. Thomas's ingestion of Coricidin and marijuana in the weeks before the crime was "voluntary intoxication," that, under state law, defeated the defense's assertions of insanity.  The state was assisted by the defense team's failure to present the ample evidence of Mr. Thomas's

long standing psychosis and descent – well before the crime - into severe mental illness.

Mr. Thomas's history was also replete with pleas for help.  Neither his family – themselves struggling with mental illness, abuse, addiction, and poverty – nor the Sherman community were equipped for or interested in responding to his entreaties.  In short order, Mr. Thomas became suicidal.  In the three weeks before the crime alone he twice tried to take his own life.  The first time he was taken to a mental health facility, where staff described him as actively suicidal and highly agitated.  The facility issued an involuntary commitment order, which the local authorities never implemented.  After the second suicide attempt - two days before the crime - Mr. Thomas was taken to a local hospital.  A doctor noted that he was psychotic and suicidal, but Mr. Thomas again fled before he could be committed for observation or treatment.  On the day of the crime, he stabbed himself in the heart, fully expecting to die along with his wife and child.  Surgery after his arrest kept him alive.

The defense case at sentencing was threadbare at best.  While lead counsel had claimed responsibility for the punishment phase of trial, he did nothing to investigate, gather, or present the copious evidence that could have argued for a sentence less than death.  Second chair counsel was forced to take over and prepare a punishment phase case two days before it began.  Thus, despite a tragic wealth of evidence of Mr. Thomas's profound illness, the organicity of its origin, and his desperate – and futile – efforts to get help, very little was presented to the jury.  Despite the abundant evidence of the mental illness rampant in Mr. Thomas's family, and the extreme poverty, instability, neglect, and abuse that precluded any chance that Mr. Thomas would be provided the support or help essential to coping with an illness as profound as his, that evidence was not presented to the jury.  Without the information necessary to understand the complexity or depth of this picture, and the many reasons Andre Thomas was deserving of compassion, the jury concluded that he should be sentenced to death.

During his time on Texas' death row, Mr. Thomas's mental illness intensified.  On December 9, 2008, he gouged out his remaining eye, and ate it.

Mr. Thomas's execution would make a mockery of our system of justice.  His blind, psychotic presence on Texas' death row ridicules the system that led him there.  The minimal facts set out above, evincing the undeniable depth of his mental illness, call into question a system that would seek, obtain, or permit his death sentence.  Only a trial rife with constitutional infirmities and errors could lead to such an outcome.  This petition outlines those errors, and presents the full picture – never presented to the sentencing jury - of Mr. Thomas's mental illness, and the events and failings that led him to death row.

## PROCEDURAL HISTORY

Mr. Thomas was charged and convicted of the capital murder of Lehya Marie Hughes, a child under six years of age, in the 15th District Court of Grayson County.[1]  He was convicted on March 7, 2005.   Four days later, on March 11, 2005, the jury answered "yes" to the future danger special issue, and "no" to the mitigation special issue, and Mr. Thomas was sentenced to death.  The judgment was affirmed on direct review on October 8, 2008.  *Thomas v. State*, No. AP-75218, 2008 WL 4531976 (Tex. Crim. App. Oct. 8, 2008) (unpub.).

On June 18, 2007, Mr. Thomas filed his petition for a writ of habeas corpus in the 15th Judicial District Court of Grayson County.  Without holding an evidentiary hearing, the 15th Judicial District Court (hereinafter referred to as the "trial court" and the "state habeas court") recommended that relief be denied on March 28, 2008.  Ex. 192, *Ex parte Thomas*, No. 051858-15-A, Findings of Fact and Conclusions of Law (March 28, 2008) (Findings of Fact, hereinafter

---

[1]      Mr. Thomas was charged by indictment with the murder of Leyha Hughes in Cause No. 51858.  In a separate indictment, Mr. Thomas was charged in Cause No. 51483 with the murders of Laura (Boren) Thomas and Andre Lee Boren.  Mr. Thomas has not yet been tried for the murders charged in Cause No. 51483 and may never stand trial in that case.

referred to as "FF"; Conclusions of Law, hereinafter referred to as "CL").  On March 18, 2009, the Texas Court of Criminal Appeals ("TCCA") adopted the trial court's findings of fact and conclusions of law and denied relief.  *Ex parte Thomas*, 2009 WL 693606 (Tex. Crim. App.) (unpub.).

On November 13, 2009, after Mr. Thomas pulled out his second eye, counsel filed a successive application for a writ of habeas corpus in the Texas courts, asserting that under these new and unprecedented circumstances, Mr. Thomas no longer poses a threat of criminal violence amounting to a "continuing threat to society," and that his death sentence therefore violates the protections of the 8th and 14th Amendments to the United States Constitution.  That petition is still pending in the state courts.[2]

## STATUS OF CONFINEMENT

Mr. Thomas is confined to death row of the Institutional Division of the Texas Department of Criminal Justice.  While he customarily resides at the Polunsky Unit in Livingston, Texas, since pulling out his second eye in December 2008, he has been housed at the Jester IV Unit (for the mentally ill) in Richmond, Texas.

He is confined pursuant to a Judgment entered on March 14, 2005, by the 15th Judicial District Court of Grayson County, Texas, the Honorable James R. Fry, sitting by assignment. C.R. Vol. 5, pp. 1696-1698.[3]

---

[2]     Concurrent with this Petition counsel have filed a Motion to Stay and Abate these proceedings until the state courts rule on the pending successive state habeas application.

[3]     Citations to the Clerk's Record in *State v. Thomas*, Cause No. 051858, are in the format "C.R. Vol. __ p. ___." Citations to the reporter's record are in the format "R.R. Vol. __ p. ___." Citations to the state habeas record in *Ex parte Thomas*, Cause No. 051858-15-A, will cite to "Ex parte Thomas" and the title of the pleading, with citations to the state habeas court's findings of fact and conclusions of law (attached as Ex. 192) cited as either "FF" for Findings of Fact or "CL" for Conclusions of Law, with appropriate paragraph and page references.

4

## STATEMENT OF FACTS

The extraordinary and tragic story of Mr. Thomas's life is outlined in detail in the claims set out *infra*.  In short, Mr. Thomas's life is a case study in mental illness, neglect, and abuse. Not surprisingly, this triad was prevalent not only in his life, but in that of his siblings, parents, aunts, uncles, cousins, grandparents, and great aunts and uncles.  The existence of this multigenerational pattern underscores the severity and organicity of the illness Mr. Thomas suffers, its existence long before the crime, and the manner in which it led him to commit the murders for which he is on death row.  It is an enormously compelling story, both in explaining the crime, and humanizing Mr. Thomas.

Because of counsel's deficiencies, it is a story that was never told to Mr. Thomas's jury.

The attorney appointed as lead counsel was compromised physically and mentally from the moment of his appointment, and effectively abandoned the case.  Second chair counsel had never before litigated a capital trial, and was misled and kept in the dark by lead counsel.  The mitigation specialist lead counsel hired had also never been involved in a capital case, and was given no guidance.  The result of this "perfect storm" was that neither the evidence crucial to an understanding of Mr. Thomas's incompetence and insanity, nor the facts essential to a full appreciation of Mr. Thomas's sad life and illness – extraordinarily mitigating facts that called out for a sentence less than death – were ever investigated or presented to the jury.

## I.     Mr. Thomas's History

The mental illness in Andre Thomas's family runs vertically and horizontally.  His mother is severely mentally ill, and two of her siblings struggle with mental health issues.  There are numerous indications that Thomas's father is mentally ill, as were his father's parents.  One of Andre's brothers is a diagnosed schizophrenic, the other sufficiently mentally impaired that he receives a disability check.  Of his father's brothers, two are confirmed and one is suspected to

be mentally ill.  His maternal grandmother and great grandmother also suffered from some form of mental illness.  Much of this was on display long ago, when society's understanding of mental illness and its manifestations was far more rudimentary than today.  Given that, in addition to the poverty in which Andre's family lived, which by and large placed them outside the social service net, there are very few diagnoses to rely on.  However, the signs and symptoms are florid and marked.  The fact that the mental illness among family members is as well documented and remembered as it is testifies to its severity.[4]  *See generally* Ex. 3 ¶9; Ex. 5 ¶¶11-12; Ex. 6 ¶15; Ex. 12 ¶¶4-7; Ex. 20 ¶5; Ex. 29 ¶¶10-11; Ex. 30 ¶14; Ex. 32 ¶¶13-14; Ex. 34 ¶¶ 4, 13-14; Ex. 119 at AT 006269.

Almost every one of the family members identified above – as well as others - abused alcohol and/or drugs in an attempt at self-medication.  Alcoholism ran through the family independently, and grandparents and parents encouraged their children to drink at an early age. Many members of Andre's family were abused, abusers, or both – physically, emotionally, and in some cases, sexually.  A number were incarcerated.  By and large, the family has lived and lives in poverty, frequently severe poverty.  *See generally* Ex. 6 ¶¶11-14; Ex. 7 ¶¶ 4-5; Ex. 29 ¶¶ 5-11.

Andre was born into this history and this chaos.  He was born, his mother reports, with the gift of being able to talk to God – a gift, she believed she shared.   *See* Ex. 6 ¶¶ 9-10; Ex. 16 ¶ 8.  She also repeatedly told Mr. Thomas that she should have aborted him in *utero* – a communication that preceded at least two of Andre's early suicide attempts.  Ex. 32 ¶ 7.

Andre grew up in extreme poverty, often without running water or electricity, and with all of the siblings sleeping in one room.  Ex. 29 ¶¶10-11; Ex. 16 ¶14; Ex. 26 ¶ 5.  The family

---

[4]      A family tree charting the mental illness, addiction, and abuse rampant in Mr. Thomas's extended family is attached as Exhibit 193.

moved constantly.  His mother was hypersexual, and had no sense of appropriate boundaries, inviting numerous men into the house to have sex while her children were home.  *See* Ex. 12 ¶¶ 10-11; Ex. 19 ¶ 9; Ex. 29 ¶17; Ex. 32 ¶¶ 9, 11.  Most of these men were alcoholics, and abusive, including Andre's father.  *See* Ex. 18 ¶ 9, 13; Ex. 32 ¶¶ 3-4; Ex. 34 ¶ 8.  His mother's own mental illness was extremely debilitating, and entirely undiagnosed and untreated.  Any semblance of parenting was practically nonexistent.  For instance, Andre's mother would report that she had no idea what school Andre – or any of her children – went to as there were "too many to keep track of."  Ex. 90 at AT 004674-004675.  For months at a time, Andre was cared for only by his older brothers.

Despite this extraordinarily chaotic environment, Andre thrived in his early years, and was placed in a gifted and talented program in the First Grade.  Because of his mother's intransience, in the second grade he attended three different schools, in two states, and received excellent grades in all.  Ex. 91 at AT 006171; Ex. 92 at AT 006169; Ex. 101 at AT 006158.

However, by the time Andre was nine or ten years old, he started to suffer from auditory hallucinations.  *See* Ex. 5 (Bennett Aff.) ¶¶ 5-9.  At approximately this same age, he began drinking alcohol, and attempted suicide for the first time.  Ex. 70 at AT 012025. Within the next couple of years, he began to get in trouble for petty crimes.  These early experiences with law enforcement were also marked by his mother's continuing lack of interest in his life – even when the troubles were brought to her attention by a police officer.  Ex. 90; Ex. 98 at AT 009667-009670.

These increasing problems became even worse when Andre's most responsible older brother left home, and Andre was left to fend almost entirely for himself.  The two brothers who remained at home were both mentally ill, and verbally and physically abusive of Andre.  Ex. 5 ¶¶ 11-12.  A second suicide attempt occurred when he was thirteen years old, in the wake of his

mother's reminder that she wished she had aborted him.  Ex. 32 ¶ 8.

Nonetheless, in middle school, Andre began to excel again, and was again placed in a gifted and talented program.  Ex. 103 at AT 009678.  He diligently reported to his probation officer.  He obtained the help of a tutor for the subjects that were too challenging.  *Id*.  He sought a work permit from the courts so he could pay off his court fees and restitution.  *Id*. at AT 009680.

By the time he was sixteen, the chaos in his home had not abated, and his mother had no more interest in his life than before.  Andre nonetheless struggled to prevail.  He moved first to his brother's house, and then his father's.  While he continued to talk about suicide, he also asked for (but never received) counseling while in a juvenile detention center.  Ex. 98; Ex. 107; Ex. 110.  When his mother told him of her intention to move to Oklahoma, Andre contacted his probation officer, went before a judge himself, was placed back in detention, reported auditory hallucinations, and once again attempted suicide.  Ex. 109; Ex. 110.

It was also when he was sixteen that his son, Andre Jr., was born.  Andre withdrew from school, got his GED, and began working multiple jobs.  On his eighteenth birthday he married Andre Jr.'s mother, Laura Boren.  Two weeks later, Andre's mother, with whom they were living, kicked them out of her house.  Four months later, Andre and Laura Boren had separated.  Andre continued to work, and tried to help support Andre Jr.

However, by the time Andre was nineteen, his mental illness worsened.  He was increasingly upset by the voices in his head, and the perception that he was "not right".  The auditory hallucinations increased, as well as the constant feeling of déjà vu.  Ex. 18 ¶¶ 6-8, 10-13, 23; Ex. 24 ¶¶ 5-6; Ex. 32 ¶¶ 15-16; Ex. 34 ¶ 21.  He reached out to family members and professionals for help, but none was forthcoming.  As he became more depressed and desperate, he drank more frequently.  Ex. 118.  After a cycle of stays in the Sherman jail, suicide attempts,

and efforts to return to work and a normal life, his mental illness deepened, and the inevitable descent into its grips thwarted his naïve efforts to cope with an illness that is consuming and unstoppable even with the best of care.

Thus, in the months prior to the killings, despite having experienced auditory hallucinations previously, Mr. Thomas found the voices in his head escalating in frequency and severity.  Ex. 12 (Gonzalez Aff.); Ex. 28 (E.Ross Aff.); Ex. 34 (Ross Wade Aff.).  They not infrequently drove him to tears ("The voices, the voices won't stop."  Ex. 12).  He became fixated on the dollar bill, claiming it contained the meaning of life in some mysterious code.  Ex. 18 (Ingle Aff.) ¶ 7, 13; R.R. Vol. 44 Supp. Hrg.[5] Ex. 21 at 9, R.R. Vol. 33 p. 104 and Ex. 55.  He placed duct tape over his mouth and refused to speak for days.  Ex. 13 (Gripon Aff.); Ex. 40 (Hays Interview) at AT010747.  He experienced prolonged instances of what a normal person might call "déjà vu," which, he said, forced him to relive days and weeks at a time over and over again.  Ex. 24 (Luper Aff.) ¶ 5.

## II.    Pleas for Help Before the Murders

In a continuing pattern of suicide attempts that began when Andre was nine years old, he harmed himself twice within the three weeks prior to the murders.  *Ex parte Thomas*, 2009 WL 693606 at *1-*2.  First, he tried to kill himself by overdosing on Coricidin and other medications.  *Id*.  Although a neighbor then took him to the local MHMR facility, he was never treated.  *Id*.  Two days before the killings, Mr. Thomas overdosed on medication and stabbed himself.  He was eventually seen by Dr. William Bowen at Texoma Medical Center, who concluded that Mr. Thomas was paranoid, hallucinating and suicidal, and – as he later testified - that he believed that Mr. Thomas was "really mentally ill."  Ex. 128 at AT 003002-003009.  Mr. Thomas, however, was left alone while Dr. Bowen applied for an Emergency Detention order,

---

[5]        Reporter's Record ("R.R.") Volume ("Vol.") 44 Suppression Hearing ("Supp. Hrg.")

and he left the hospital and wandered home.  Staff from the Texoma Medical Center notified the Police Department, and an Emergency Detention Order was issued and signed, ordering that Mr. Thomas be apprehended immediately.  R.R. Vol. 46, Defense Exhibit 10, pp. 1-3.  That Order was never executed.

### III.   The Murders and Their Aftermath

On Saturday morning March 27, 2004, between approximately 6:35 and 7:09 a.m., Andre Thomas killed Laura Boren Thomas, their four-year-old son Andre Jr., and Laura's 13-month-old daughter Leyha Hughes.  He killed them because God told him to, and because he believed Laura was Jezebel (the wife of the devil), Andre Jr. the anti-Christ, and Leyha a related evil spirit.  R.R. Vol. 44 at Supp. Hrg. State's Ex. 21 at 8; *Id.* at Supp. Hrg. State's Ex. 23 at 2.  He brought three knives with him, using a different knife on each victim because he was convinced it was crucial to his religious mission that he not "cross-contaminate" their blood.  R.R. Vol. 44 at Supp. Hrg State's Ex. 21 at 8; R.R. Vol. 45 at State's Ex. 66.  He then attempted to cut each of their hearts out.  He removed the hearts of the two children, but only managed to remove a part of one of Laura's lungs.  *See generally* R.R. Vol. 28, pp. 123-149; R.R. Vol. 45 at State's Exs. 51-60.

Laura's body was left posed spread eagle, with blood smears on the inside of her legs.  R.R. Vol. 27 p. 137; R.R. Vol. 44 at State's Ex. 13.  Next to her left leg, Mr. Thomas left a one dollar bill folded lengthwise, exposing the pyramid with the eye in the middle.  R.R. Vol. 44 at State's Ex. 13.[6]

Mr. Thomas then stabbed himself in the chest, and lay down next to Laura.  R.R. Vol. 36 p. 6-14; Vol. 44, Supp. Hrg. State's Ex. 21 at 21 and State's Ex. 23 at 3 and 8.  When he did not

---

[6]     Mr. Thomas had been obsessed with the meaning of the dollar bill – and the pyramid in particular – for some time.  *See infra.*

die as he expected, he walked home, carrying the victims' organs "stuffed" in his pockets.   R.R. Vol. 44 at Supp. Hrg. State's Ex. 23 at 3-4.

Upon arriving home, he put the three knives – unwashed – in the sink, and changed, leaving his bloody clothes on the floor of his bedroom.  R.R. Vol. 27  pp. 141-144; R.R. Vol. 45 at State's Ex. 66.  He then went over to his father's trailer to call Laura.  When he could not find her phone number, he called Laura's parents.  He did not reach them, but left the following message:

> Um, Sherry [Mrs. Boren], this is Andre.  I need yall's help.
> Something bad is happening to me and it keeps happenin' and I
> don't know what's going on.  I need some help.  I, I think I'm in
> hell, and um, I need help.  Somebody needs to come and help me.
> I need help bad.  I'm desperate and, um, I'm afraid to go to sleep.
> So, when you get this message, come by the house, please.  Hello?

R.R. Vol. 30, pp. 143-148; R.R. Vol. 45 at State's Exs. 85 & 86.

He then returned to his trailer, and told his girlfriend Carmen Hayes and his cousin Isaiah Gibbs what he had done.  Ex. 52 at AT010598-600; Ex. 53; Ex. 40 at AT010745; Ex. 51 at AT005337-8.  When Ms. Hayes asked him "why," Mr. Thomas said that "he thought Laura was Jezebel and he has had this happen before.  He thinks he relives days and weeks."  Ex. 52 & Ex. 53; Ex. 40 at AT010746; Ex. 51 at AT005338.

Ms. Hayes dropped Mr. Thomas off at the Sherman Police Department where he confessed to the crime.  R.R. Vol. 27, pp. 265-274.  Following his confession, he was taken to the hospital, where he required emergency surgery for the self inflicted stab wounds to his chest.[7]  R.R. Vol. 7 p. 109; R.R. Vol. 28 pp. 210-215; R.R. Vol. 36 pp. 6-14; Vol. 44, Supp. Hrg. State's Ex. 21 at 21 and State's Ex. 23 at 3 and 8.

---

[7] Doctors later testified that without surgery Mr. Thomas would have died at the hospital.

## A.       Mr. Thomas's Statements to the Police

Mr. Thomas was in the hospital for two days before he was discharged to the custody of the Sherman Police Department.  R.R. Vol. 7 p. 134.  While still at the hospital, and before appointment of a lawyer, Mr. Thomas told a member of the Sherman Police Department that he wanted to tell them what happened the morning of March 27, 2004.  Thus, upon his discharge, Mr. Thomas was taken to the Sherman Police Department for a videotaped interview and statement.  *See generally* R.R. Vol. 7 p. 119-131, R.R. Vol. 10 p. 4-14.  During the interview he stated numerous times that he did not "know what [was] going on anymore," and that he was being told that "everything around" him was not "real."  *See id.* at 2; 3; 4; 7; 8, 24-25; 9; 10; 13, 14; 16; 17; and 20, 26-27.  He also continued to insist that Laura, Andre Jr., and Leyha were demons, and he remained fixated on the images that appear on the dollar bill:

> Well, uh, Revelations 20 and 22 as it explains about the devil and
> him being tortured, uh, in front of the presence of holy angels
> forever and ever.  Also on the back of a dollar bill there's uh,
> there's the pyramid.  There's the pyramid with the evil eye above it
> and it says a thousand years on the bottom of the pyramid.

*Id.* at 8, 9, 22-23; R.R. Vol. 44 Supp. Hrg. Ex. 21 at 9.  A day later he stated "I am the 13th warrior on the dollar bill." R.R. Vol. 33 p. 104 and Ex. 55; *see also* R.R. Vol. 9 p. 27.

The next day, after his transfer to the Grayson County Jail, Mr. Thomas asked to speak with the police again.  He then gave an audio-taped statement to Detective Mike Ditto, Texas Ranger Tony Bennie, and Grayson County Jail Nurse Natalie Sims.  *See generally* R.R. Vol. 32, pp. 9, 22; R.R. Vol. 44 at Supp. Hrg. State's Ex. 23; R.R. Vol. 45 at State's Exs. 91 and 92.

## B.       Mr. Thomas Gouges out his Right Eye

After Mr. Thomas was released from the hospital, he was held in Grayson County Jail. In light of his recent suicide attempt and his general delusional mental state, he was housed in constant view of jail staff (in a glass-enclosed holding cell), only provided finger foods in

Styrofoam containers, was not given a blanket, only given minimal clothing, and no personal property of any sort. *See generally* R.R. Vol. 33 pp. 98, 100-103; R.R. Vol. 46 at Def. Trial Ex. 8.

Clinical Staff notes at the time reflect that his mental condition was worsening. On March 30, 2004, Nurse Natalie Sims reported Mr. Thomas stating:

> "I am the 13th warrior on the dollar bill" – "I am the chosen one to free us from evil; tell me what I have to do to be ready" – "My wife & kids aren't dead, their hearts have been freed from evil" – "this is deja vu from all reality"

Nurse Sims interpretation of Mr. Thomas's behavior was that he was "delusional in thinking." Her notes also state that Mr. Thomas "gestures wildly, voice increased in pitch and tone." The plan was to offer Zyprexa 10 mg, a powerful anti-psychotic medication, but Mr. Thomas refused the medication. *See generally* R.R. Vol. 33 pp. 103-104; Ex. 55.

On March 31, 2004, Nurse Sims observed that Mr. Thomas "continues in delusional thinking." She added he was "belligerent" and notes "wild gesturing is escalating." She reported Mr. Thomas as saying, "Make me a Marine," – "I will save man from evil" – "this is all a circle" – "What can I do to prove I'm ready to save everybody." Finally, under "Plan" she notes "Per Dr. Bell continue to offer Zyprexa 10 mg" and if inmate is agreeable give "Geodon 20 mg." *See generally* R.R. Vol. 33 pp.106-107, 171-76; Ex. 160.

Mr. Thomas continued to refuse medication. When jail staff sought authorization from Mr. Hagood, he refused. Ex. 60 at AT 18378.

On April 2, 2004, Mr. Thomas was in his cell reading his Bible. After reading Matthew 5:29 ("If the right eye offends thee, pluck it out"),[8] Mr. Thomas gouged out his right eye with his

---

[8]     One version of the Bible reads, "If your right eye causes you to sin, gouge it out and throw it away.  It is better for you to lose one part of your body than for your whole body to be thrown into hell." *Matthew* 5:29.

fingers.[9]  *See generally* R.R. Vol. 33 pp. 19, 31-32, 111; R.R. Vol. 46 at Def. Exs. 9-13.

### C.     Mr. Thomas is Found Incompetent to Stand Trial

Three days later, Mr. Thomas's counsel R.J. Hagood moved for a competency

examination.  Supp. C.R. Vol. 1 pp. 21-22.  The court granted the motion the same day and

appointed Psychologist Dr. James Harrison to evaluate Mr. Thomas.  Supp. C.R. Vol. 1 pp. 23-

24.  On April 15, 2004, Dr. Harrison submitted a comprehensive 11-page report.  He found that

Mr. Thomas's psychosis was organic, diagnosing him with Schizophreniform Disorder, and

concluding that Mr. Thomas was incompetent to stand trial.  Ex. 60.

On April 26, 2004, the State moved to have Mr. Thomas examined for trial competency

by one of its own experts, Dr. Peter Oropeza.  Supp. C.R. Vol. 1 pp. 25-26.  Dr. Oropeza

concluded his opinion was "similar" to "other evaluators," as he diagnosed Mr. Thomas as

falling somewhere "along the Schizophrenic spectrum" and ruled out the possibility that Mr.

Thomas's symptoms resulted from substance abuse.[10]  Ex. 65 at 7.  Dr. Oropeza went on to

explain:

> Altogether, present symptoms include disorganized speech, erratic
> and bizarre behavior, mood problems and depression, possible

---

[9]     The rare phenomenon of autoenucleation is also known as "Oedipism," after Sophocles story of Oedipus, who takes out both his eyes after finding out that he has slept with his mother and killed his father.  The psychiatric literature indicates that it is commonly associated with religious and sexual delusions, and that patients often refer to concepts of sin, evil, guilt and atonement as their motives for self-harm.  *See* Fan and Fink, *Autoenucleation:  A Case Report and Literature Review*, PSYCHIATRY MMC, October 2007 (citations omitted).  One author speculates that "the eyes may act as a symbol of the self onto which conflicts, fears, and guilt are displaced; and, thus, by elimination or mutilation of the eye, relief from these feelings is obtained." Patton N. *Self-inflicted eye injuries: a review*. EYE 2004;18:867–72.  Thus, "[i]n cases of Oedipism the patient experiences a sense of atonement that is so profound that the remaining eye is at risk of the same fate." Murphy, Nathan, Lee, Parsons & Gunasekera, *Oedipism:  Auto-Enucleation in a schizophrenic patient.* LR J PSYCH MED 2006; 23(4); 159-160.

[10]     Dr. Oropeza was referring to Dr. Harrison's conclusions as well of those of Grayson County Jail Psychologist McGirk who, following evaluations of Mr. Thomas on March 30 and 31 and April 5, 2004, diagnosed him as suffering from Paranoid Schizophrenia, and ruled out any substance-induced psychosis.

> continued delusional ideation (e.g. aliens, picture of winged
> girlfriend who may beat him up, thoughts that jailers are laughing
> at him), and possible auditory hallucinations . . . I am of the
> opinion that at present he appears **Incompetent to Stand Trial**,
> based on his current mental state.

*Id.* at 8 (emphasis in original).  He recommended that Mr. Thomas "be transferred to a secure inpatient facility in order to receive more intensive psychiatric treatment."  *Id.*

Because both the court-appointed expert and the State's expert agreed that Mr. Thomas was incompetent to stand trial, the parties waived a trial on competency.  On June 16, 2004, the court declared Mr. Thomas incompetent.  C.R. Vol. 3 p. 1025-1033.  The next day, the court ordered Mr. Thomas to the North Texas State Hospital – Vernon Maximum Security Unit ("Vernon"), a maximum security psychiatric facility of the MHMR network.  Supp. C.R. Vol. I, pp. 12-13; C.R. Vol. 3 at 00981-982.

At the time of his arrival at Vernon, Mr. Thomas was taking medications consistent with a diagnosis of schizophrenia.  Ex. 66 at AT008389.  Likewise, the doctors at Vernon – as had all previous doctors – initially diagnosed Mr. Thomas as paranoid schizophrenic.[11]  The Admission/Screening Report included the following notes about Mr. Thomas's arrival condition:

> When the patient was asked what events brought him to this
> facility, he responded, "they're trying to dope me up."  The patient
> appeared to be lethargic or sedated . . . He stated that he wanted to
> go to sleep.  He frequently lowered his head and spoke in a low
> voice that was difficult to understand . . . He reported that he had
> "bad dreams of scorpions and tarantulas trying to eat me but I will
> not let them."

Ex. 66 at AT 008393-94.  A similar note in the file from a conversation with Mr. Thomas on June 24, 2004 noted that:

> Patient stated he was hearing the voice of a voice [sic] telling him

---

[11]     Mr. Thomas's March 24, 2005 intake record from the Polunsky facility, which houses death row, reflects that the doctors at Vernon at least initially diagnosed Mr. Thomas with paranoid schizophrenia.  *See* Ex. 175 at 1.

15

> a girl was going to burn in a fire in a car accident.  He stated these
> voices are in his head, he hears voices of a God that if he does not
> shut up he would burn in hell, and demons were laughing at him.

Ex. 69.

While Mr. Thomas was at Vernon, his diagnosis changed. Utilizing the terminology and

numbering system of the *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition ("*

*DSM-IV")*, the doctors at Vernon eventually produced a diagnosis of "Substance-Induced

Psychosis with Delusions 292.11," "Substance-Induced Psychosis with Hallucinations 292.12,"

and "Polysubstance Dependence 304.80."  Ex. 67.  After 47 days of treatment, Mr. Thomas was

proclaimed competent to stand trial for capital murder on the basis of this new diagnosis of

substance-induced psychosis.  Ex. 68.

There is no ruling in the record prior to the commencement of trial in which the Court

affirmatively finds Mr. Thomas competent to stand trial.  *See generally* C.R. Vol. 1-5; Supp.

C.R. Vol. 1.  On August 13, 2004, Mr. Thomas was arraigned, at which time he pleaded not

guilty by reason of insanity.  C.R. Vol. 1 p. 11.  Neither at his arraignment, nor at any other time

after Mr. Thomas's return from Vernon did defense counsel contend that he was incompetent to

stand trial.  *Id.*

## IV.    Defense Counsel

Mr. Thomas's defense team was made up of lawyers R.J. Hagood ("Mr. Hagood") and

Bobbie Peterson ("Ms. Peterson," now Bobbie Cate), mitigation specialist Shelli Schade ("Ms.

Schade"), investigator Gene Omundson ("Mr. Omundson"), and paralegal Leah Eastep ("Ms.

Eastep").  Mr. Hagood was lead counsel; Ms. Peterson sat as second chair.  At the time of her

appointment as Mr. Hagood's co-counsel, Ms. Peterson had never been involved in a capital

case.  Ex. 27 (Peterson Aff.) ¶ 3.  The defense team's mitigation specialist, Ms. Schade, also had

no prior capital experience.  Ex. 30 (Schade Aff.) ¶ 2.

Prior to and during Mr. Thomas's trial, Mr. Hagood was suffering from chronic pancreatitis, which affected his performance during trial.  Ex. 15 ¶ 7; Ex. 27 (Peterson Aff.) ¶ 36; Ex. 9 (Eastep Aff.) ¶ 11.  Ms. Peterson was not aware of Mr. Hagood's health problems.  Ex. 27 (Peterson Aff.) ¶ 36.

Prior to opening her own law firm, Ms. Peterson worked as a prosecutor for Grayson County and Dallas County.  Ex. 27 (Peterson Aff.) ¶ 2.  During that time, she prosecuted Mr. Thomas as a juvenile for automobile theft.  R.R. Vol. 7 pp. 4-5.

Since Mr. Hagood was lead counsel and had previous experience in death penalty cases, Ms. Peterson expected him to make assignments and provide guidance and direction to the rest of Mr. Thomas's defense team.  Ex. 27 (Peterson Aff.) ¶ 5.  Likewise, Mr. Hagood was the person on the defense team responsible for meeting and otherwise communicating with Mr. Thomas.  Ex. 15 (Hagood Aff.) ¶ 4.  Mr. Hagood and Ms. Peterson decided that Ms. Peterson would be responsible for the guilt-innocence phase of the trial, with the exception of experts, who would be Mr. Hagood's province, and Mr. Hagood would be responsible for the punishment phase.  Ex. 15 (Hagood Aff.) ¶ 5; Ex. 27 (Peterson Aff.) ¶ 6.

Long before trial, upon request of the state, the records from Vernon Hospital were produced to both the State and the defense.  C.R. Vol. 1 pp. 26-28.  Those records revealed, among other things, the diagnoses of the Vernon doctors that Mr. Thomas purportedly was suffering from a substance-induced psychosis.  *See generally*, C.R. Vol. 2 pp. 220-722 and C.R. Vol. 3 p. 964 through Vol. 4 p. 1520.  In addition, in October, 2004, the State filed a "Motion To Have Blood Evidence Examined" noting that preliminary testing revealed "a chemical referred to as DXM (dextromethorphan)," an active ingredient in Coricidin.

Despite these red flags, the defense team made no effort to retain a neuropharmacologist, toxicologist, or similar expert qualified to address issues related to the effect, if any, that

17

Coricidin had on Mr. Thomas's behavior the morning of March 27, 2004.  It was not until the middle of trial that Ms. Peterson emailed Ms. Schade, stating, "Hey girl:  we need the name & number of a pharmacologist, local preferred, who can testify about this DXM.  We got blindsided today Kerrye called Dr. Scarano!!"  Ex. 84.

**V.      The Issues for and the Parties' Retention of Experts for Trial**

On December 21, 2004, the State purported to identify 71 experts.  C.R. Vol. 1 pp. 207-217.  Essentially, for the guilt/innocence phase of the trial the State was relying on three core experts:  Drs. David Axelrad and Victor Scarano, and psychologist Dr. Peter Oropeza.  Dr. Shannon Miller was also disclosed, although his purpose and knowledge base was unclear.  *See generally* C.R. Vol. 1 pp. 20-22, 51; R.R. Vol. 2 p. 3.

The State's expert witnesses for the punishment phase were less obvious pretrial.  As it turned out, the State called two purported experts for the penalty phase that were disclosed on the expert witness list, although neither prepared a report in advance of their testimony.  Those two witnesses were Brent O'Bannon, a licensed professional counselor who interacted with Mr. Thomas in 1999, when he was 16, and Royce Smithey, the Chief Investigator for the Special Prosecution Unit for the State of Texas that helps Texas district attorneys prosecute crimes committed in prisons.  *See generally* R.R. Vol. 40 pp. 19-53; R.R. Vol. 41 pp. 161-216.

The defense team also retained three experts for the guilt/innocence phase of the trial:  psychiatrists Drs. Edward Gripon and Jay Crowder, and psychologist Richard Rogers.  Ex. 72 .  The defense did not initially retain any experts for the mitigation phase of the case, *Id.*; Ex. 27 ¶ 31; Ex. 30 ¶10, and did not retain a neuropharmacologist.

**VI.     The Trial**

Mr. Thomas pled not guilty by reason of insanity to the charges of capital murder.  Jury selection began on January 10, 2005.  *See, e.g.,* R.R. Vol. 12 pp. 4-92.  While only 12 out of 322

total venire members were African American, many of them, initially, were in the first three rows.  Ex. 15 ¶ 14; Ex. 27 ¶ 15-16; Ex. 74; Ex. 79.  However, the state then requested a jury shuffle, and 10 of the 12 African-American venire members were moved beyond the first 100 seats, effectively eliminating them from the jury-selection process.  *See* Ex. 27 ¶ 16; Ex. 79; *see also* R.R. Vol. 11, 59-78; *see also generally* R.R. Vol. 12-26.  The defense did not challenge the jury shuffle or request its own shuffle, as was their right.  Ex. 27 ¶ 17.

The State's questioning of Ms. Willis, the one African-American venire member reached during voir dire, differed significantly from its questioning of white members, and ultimately served as a tactic to generate a cause to strike.  R.R. Vol. 22 pp. 42, 44–47, 50–54.  Defense counsel did not object to these tactics.

Defense counsel also failed to ask 13 out of the 14 jurors selected to serve a single question about potential racial bias.  While this failing by itself was egregious, it was aggravated by the fact that three of the impaneled jurors stated on their questionnaires that they "oppose people of different racial backgrounds marrying and/or having children."  *See* Ex. 75 ¶ 105; Ex. 76 ¶ 105; Ex. 78 ¶ 105.  Defense counsel failed to ask any of these jurors about those responses.  A fourth juror not only said that he opposed interracial marriage, but stated that he was "vigorously" against it, was "not afraid to say so," and added  "I don't believe God intended for this." Ex. 77 ¶ 105.  In response, defense counsel only asked, in the broadest terms, whether his views would affect his deliberations on guilt-or-innocence or sentencing.

The jury eventually chosen was all white.

## A.      The Guilt/Innocent Phase Case as Presented by the State

The State advanced two logically-inconsistent theories as to why Mr. Thomas was guilty of the crimes for which he was charged.  First, the State contended that Mr. Thomas was voluntarily intoxicated through the use of alcohol, marijuana, and Coricidin, and that such

intoxication induced the psychosis he suffered during the crimes.  This approach was designed presumably to take advantage of Texas' voluntary intoxication law.[12]  *See generally* R.R. Vol. 27 pp. 14-64; R.R. Vol. 37 pp.14-28, 72-113.

The State also asserted that Mr. Thomas acted with premeditation, arguing that he was driven to kill by his frustration over Laura's refusal to get back together with him, the fact that she had cheated on him, and because she was very protective over his visitation with Andre Jr. To that end, the State argued, Mr. Thomas was sane and knew that his conduct was wrong when he engaged in the killings, and therefore the jury should reject his insanity plea.  *See generally* R.R. Vol. 27 pp. 14-64; R.R. Vol. 37 pp.14-28, 72-113.

The voluntary intoxication theory required a two-step presentation.  First, the state called a series of fact witnesses who testified that Mr. Thomas was a regular user of alcoholic beverages (principally a daily drinker of at least one "40" – a 40 ounce malt liquor beer), a smoker of "blunts" (cigars filled with marijuana rather than tobacco), and a sometime abuser (on three occasions) of Coricidin in March 2004, the month of the murders.  *See, e.g.,* R.R. Vol. 28 p. 6-123; R.R. Vol. 28 pp. 163-166; R.R. Vol. 29 p. 147; R.R. Vol. 29 pp. 186-187; R.R. Vol. 29 pp. 200-201; R.R. Vol. 29 pp. 224-226; and R.R. Vol. 29 p. 234.

Second, the State offered the expert testimony of Drs. Victor Scarano and David Axelrad, who testified that at the time of the crime Mr. Thomas suffered from substance-induced psychosis.  *See e.g.,* R.R. Vol. 31 pp. 63-130; R.R. Vol. 34 pp. 55-167; and Vol. 35 pp. 75-132. A key aspect of the State's voluntary intoxication theory as presented through its experts was

---

[12]      Tex. Penal Code § 8.01(a) states that, "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of *severe mental illness or defect, did not know that his conduct was wrong*" (emphasis added).  Texas Law also provides that "Voluntary intoxication does not constitute a defense to the commission of crime" and "intoxication" means "disturbance of mental or physical capacity resulting from the introduction of any substance into the body."  Texas Penal Code § 8.04(a) & (d).

that, at least on March 5 and March 26, following the use of Coricidin, Mr. Thomas became

potentially psychotic and sought help.  Accordingly, the State's experts contended there was a

causal relationship between the ingestion of Coricidin, and Mr. Thomas's psychosis.  *See, e.g.,*

R.R. Vol. 31, pp. 113-115.

### B.      Defense Ineffectiveness in the Guilt/Innocence Phase

Mr. Thomas's defense team was ineffective at the guilt/innocence phase of trial in

numerous ways.

Defense counsel failed to talk to Mr. Thomas's family members, neighbors, teachers and

friends, all of who would have revealed the long and substantial history of Mr. Thomas's mental

illness, as well as that of many other members of his family.  *See, e.g.,*  Ex. 3 ¶¶ 7-10; Ex. 4 ¶¶

10-12; Ex. 7 ¶ 7; Ex. 12 ¶¶ 5-7; Ex. 16 ¶ 7; Ex. 18 ¶¶ 21-22; Ex. 19 ¶¶ 3, 5 & 9; Ex. 20 ¶ 5; Ex.

21 ¶ 5; Ex. 22 ¶ 10; Ex. 29 ¶ 11; Ex. 32 ¶¶ 7, 9 & 13-14; Ex. 34 ¶¶ 4, 19.  As such, they were

hamstrung in their ability to challenge the state's experts' assertions that Mr. Thomas's psychosis

was substance induced.

With regard to both lay and expert testimony, the defense repeatedly failed to make

appropriate objections that could have kept substantial and highly prejudicial testimony from

contaminating the jury's understanding of the case.  Fundamentally, the defense failed to object

at all to the state's voluntary-intoxication theory.  Generally, the defense failed to (1) object to

questions posed to witnesses who lacked proper foundation to testify on fundamental issues in

the case, such as whether Mr. Thomas was suffering from psychosis the morning of the slayings;

(2) object to grossly leading, misleading, overbroad, and speculative questions throughout the

trial; (3) object to irrelevant questions posed to lay witnesses regarding whether Mr. Thomas

knew right from wrong in unrelated matters that had nothing to do with the *relevant* inquiry

regarding whether he knew his conduct was wrong during the 30 minutes in which the slayings

occurred; and (4) object to seriously prejudicial hearsay.  *See infra.*

With respect to expert testimony, the defense team was ineffective both in preparing for, and cross examining, the State's experts.  Separate and apart from the failure to keep out the issue of alleged voluntary intoxication of Mr. Thomas altogether, the defense could have, and should have, attempted to prevent the State's experts from testifying as to their substance-induced psychosis theories because they lacked both the foundation and the expertise necessary to validate their opinions.  They failed to do so.  R.R. Vol. 31 pp. 38-43.

More importantly, the defense team was ineffective in failing to present its own critical expert testimony.  In one instance, they called the state's expert witness (Dr. Scarano) as their own, and through leading questions elicited testimony damaging to Mr. Thomas.  *See generally* R.R. Vol. 35 pp. 75-132.  Their presentation of their one and only defense expert, Dr. Gripon, was fundamentally misguided.  They failed to provide Dr. Gripon with all critical documents in the case; did not ask him to conduct psychological testing; and asked him at the eleventh hour to address the State's substance-induced psychosis theory even though Dr. Gripon felt such issues would have been better directed to a pharmacologist.  *See* Ex. 13 (Gripon Aff.) ¶ 14.

Finally, the defense team did not retain a pharmacology expert, even though that was strongly recommended, Ex. 15 (Hagood Aff.) ¶ 29; Ex. 30 (Schade Aff.) ¶ 30, or a neuropsychologist, who could have identified the organic and irrefutable nature of Mr. Thomas's schizophrenia, and the additional brain damage compounding the underlying and severe mental illness.

Thus, the jury heard a case that did not comport with the facts.  Counsel's failures resulted not from strategic decisions, but from the failure to properly prepare and investigate the facts essential to an accurate understanding and presentation of the relevant issues.

### C.     Defense Ineffectiveness at the Punishment Phase of Trial.

Closing arguments in the guilt-innocence phase took place on Friday, March 4, 2005. The jury began deliberating on Monday, March 7, 2005, at 9:00 a.m.  It took them less than an hour to return a verdict of guilty.  R.R. Vol. 38 pp. 4-7.  At 1:30 that afternoon, the punishment phase began.  R.R. Vol. 38 p. 7.

Despite the clear agreed-upon division of responsibilities between Mr. Hagood and Ms. Peterson, Mr. Hagood did little, if anything, to prepare for the punishment phase.  Ex. 27 (Peterson Aff.) ¶ 29; Ex. 9 (Eastep Aff.) ¶ 34; Ex. 30 (Schade Aff.) ¶ 5.  Likewise, Mr. Hagood did not provide any guidance or direction to the inexperienced mitigation specialist, and met with her only twice, once briefly to give Ms. Schade an overview of the case (where he told her to "just work on the case"), and once over a brief lunch.  Ex. 15 (Hagood Aff.) ¶ 21; Ex. 30 (Schade Aff.) ¶¶ 3-4.  Ms. Schade did not draft a social history or mitigation report – an action standard for the mitigation work up in any capital case - she only prepared a timeline of Mr. Thomas's life.  Ex. 30 (Schade Aff.) ¶¶ 11 & 13.  Most of the records the defense reviewed were not obtained through independent means, but rather were records the State gathered and produced in discovery.  Ex. 30 (Schade Aff.) ¶ 13.

Mr. Hagood did not share with his co-counsel the fact that he had failed to prepare for the penalty phase of their client's capital trial until two days before the penalty phase began.  Ex. 27 (Peterson Aff.) ¶ 6; Ex. 9 (Eastep Aff.) ¶ 4.  Ms. Peterson was thus forced to take the lead on the mitigation case, even though she had no experience presenting a penalty phase case of a capital trial.  Ex. 27 (Peterson Aff.) ¶¶ 29 & 31; Ex. 9 (Eastep Aff.) ¶ 34; Ex. 30 (Schade Aff.) ¶ 5.  Left to cobble together a case at the last minute, in the wake of a patently inadequate investigation, defense counsel contacted a fraction of the potential witnesses who could have provided insight into Mr. Thomas and his longstanding mental illness.  Ex. 27 ¶ 7; Ex. 30 (Schade Aff.) ¶ 13.  The

few family members who were called to testify were entirely unprepared, and their limited testimony was incomplete and unpersuasive.

Attempts to get penalty phase experts involved did not commence until roughly two weeks before the punishment portion of the trial began.  On February 8, 2005, the defense initiated contact with Dr. Kate Allen, an M.S.W., to ask if she would testify as a mitigation expert.  Ex. 1 (Allen Aff.) ¶ 4.  The defense did not contact Larry Fitzgerald until approximately February 16, 2005, asking if he would testify regarding the Texas prison system and Mr. Thomas's eligibility for parole.  Ex. 11 ¶ 5.  These were the only two experts contacted by defense counsel for the mitigation phase.

Dr. Allen was woefully unprepared by the defense.  When she was first retained, she was told to get in touch with Ms. Schade to obtain the documents she would need to review.  She testified that she was of the opinion that Mr. Thomas was schizophrenic, but had traits of borderline personality disorder and antisocial personality disorder.  R.R. Vol. 41 pp. 48-49, 57.  The State then cross-examined Dr.  Allen, pointing out that she had formed her opinion of Mr. Thomas before interviewing him and that there was a wealth of documents she did not review.  R.R. Vol. 41 pp. 80, 104-106, 133-134.

Following Dr. Allen's testimony, Mr. Hagood called Mr. Fitzgerald to the stand.  R.R. Vol. 41 p. 135.  Following voir dire of Mr. Fitzgerald by the State, however, Mr. Hagood inexplicably decided not to call him to the stand.  R.R. Vol. 41 p. 148.  The defense then rested.  R.R. Vol. 41 p. 148.

In short, nothing was presented that even began to present the profound and extensive picture of mental illness, dysfunction, abuse, and neglect that was the hallmark of Mr. Thomas's life.

The State called three rebuttal witnesses and rested its case on the morning of March 11,

24

2005.  Each side then gave its closing argument, and the jury began deliberating.  They deliberated for approximately one hour before returning a verdict of death.  R.R. Vol. 42, pp. 4-87; C.R. Vo. 1 at 000007 (1-8).

Mr. Thomas has remained profoundly mentally ill during his time on death row.  On December 9, 2008, he gouged out his remaining eye and ate it whole.  See Exs. 178-180.

## THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

**I.      The Structure and Function of 28 U.S.C. §2254(d).**

While it is not uncommon for litigants, and even courts, to use terms like "deference" and "standard of review" as shorthand when describing §2254(d), these terms are actually both incorrect and misleading.  Such shorthand terms connote a legal prism through which the merits of disputed claims, as altered by the effects of the prism, must be examined and resolved. While using the "reasonableness" components of §2254(d)(1) or (2) in such a manner might promote a respondent's interest in minimizing the scrutiny with which a habeas petitioner's constitutional claims are examined by a federal habeas court, doing so would be inconsistent with the plain language of the statute, and its application by the Supreme Court.  Rather, as discussed below, §2254(d) not only permits, but requires a more exacting inquiry into the constitutional merits of a petitioner's claims.

Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding.

Pursuant to the plain language of the statute's opening sentence, the threshold question is whether the particular claim under federal habeas review "was adjudicated on the merits in State court proceedings."  If the state court to which the claim was previously presented failed to resolve the merits of a claim entirely, or failed to reach any component of the standard prescribed for the claim by federal law, then §2254(d) is inapplicable to the federal court's analysis of the claim or component.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] analysis"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins*) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo") (internal citation omitted); *see also*, *e.g.*, *Weeks v. Angelone*, 176 F.3d 249, 258-260 (4th Cir. 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim, . . . our review of questions of law and mixed questions of law and fact is de novo"); *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005) ("When a state court is silent with respect to a habeas corpus petitioner's claim, that claim has not been "adjudicated on the merits' for purposes of §2254(d). As a practical matter, a federal court cannot apply . . . §2254(d) in the absence of any state court decision on the issue").

For claims or portions of claims that were adjudicated on the merits by a state court, the first step in correctly applying §2254(d) is to recognize that it is concerned with limiting a federal habeas court's authority to grant relief once a federal constitutional violation has been found to exist, not with attempting to influence the federal court's discharge of its Article III

mandate to determine the existence vel non of constitutional error.[13]  That §2254(d) speaks to the availability of a remedy, rather than to the existence of an error for which a remedy might be warranted, is clear for at least two reasons.  First, the opening clause of the statute – "An application for a writ of habeas corpus . . . shall not be granted" – is an express direction to withhold the writ unless certain conditions are met; it says nothing, however, that purports to modify the ways in which federal courts analyze or resolve the constitutional questions which are necessarily anterior to any consideration of a possible remedy.

Second, when Congress created the limitation on relief in §2254(d) as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it made no changes to §2254(a), which confers federal habeas jurisdiction only for the circumscribed purpose of determining whether a habeas petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Taken together, §§2254(a) and (d) thus form a framework in which federal courts remain both authorized and obligated to determine the existence of constitutional violations in the first instance, but may no longer remedy such violations by issuing the writ of habeas corpus unless they further find one or more of the conditions enumerated in §2254(d)(1) or (2) to be satisfied.  *See Gonzalez v. Crosby*, 125 S.Ct. 2641, 2648 n.4 (2005) (defining a "merits" decision in a habeas case as "a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§2254(a) and (d)").

With this framework, the function of subdivisions (1) and (2) of §2254(d) is straightforward.  Whereas the opening lines of §2254(d) establish the general proposition that habeas relief "shall not be granted . . . unless" certain conditions are met, subdivisions (1) and (2)

---

[13]      *See, e.g.*, *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000) (§2254(d) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("The requirements for habeas relief established by 28 U.S.C. §2254(d) are thus satisfied").

enumerate in broad terms what those conditions are.  Subdivision (1) authorizes a federal court to remedy a constitutional violation where the state court's "adjudication of the claim . . . resulted in a decision that was contrary to . . . clearly established Federal law," or "involved an unreasonable application of[] clearly established Federal law."  Subdivision (2) further authorizes a grant of relief where the state court's "adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Considered collectively and in the context of the statute as a whole, the "contrary to," "unreasonable application of," and "unreasonable determination of the facts" clauses of subdivisions (1) and (2) establish three broad categories of defects, any one of which, if found to exist in a state court's decision rejecting a claim the federal court later determines to be meritorious, will permit the federal court to issue the writ.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (state court adjudication can survive §2254(d)(1) only where "neither the reasoning nor the result of the state court decision contradicts" Supreme Court precedents).  Importantly, it is only the actual contents of the state court's decision, and not any *post hoc* reasoning that a respondent may offer as an alternative means for justifying the outcome of the state court proceeding, that is relevant to the §2254(d) analysis.  *See Wiggins*, 539 U.S. at 529-530 (justifications for state court's denial of relief offered by respondent in federal habeas proceedings but not relied upon in actual state court decision have "no bearing" on federal court's analysis under §2254(d)).[14]

---

[14]      In *Wiggins*, the Supreme Court examined whether trial counsel had made an informed strategic decision not to investigate certain matters relating to the petitioner's background.  The state court had denied relief on the mistaken belief that records counsel reviewed contained information about these matters, such that counsel possessed the information necessary to make an informed choice to investigate no further.  After establishing that the records counsel possessed actually did not contain the information the state court believed them to contain, the

By conditioning the availability of federal habeas relief not only on a finding that the petitioner's constitutional rights were violated, but on the further determination that the state court's failure to recognize or remedy the error was attributable to a material defect in its adjudication of the claim, §2254(d) effectively strikes a balance between insulating adequate state court decisions from federal interference and maintaining the availability of federal habeas relief where the state court's adjudication was demonstrably flawed.  This requirement of state court error in failing to find an actual constitutional violation plus an identifiable analytical mistake to which that error is attributable is precisely what Justice O'Connor meant when she explained that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *(Terry) Williams v. Taylor*, 529 U.S. 362, 411 (2000).

That federal habeas review of claims previously adjudicated on the merits in state court involves the sort of two-tiered analysis described above – as opposed to a more superficial "reasonableness" examination suggested by terms like "deference" or "standard of review" – is confirmed by the Supreme Court's decisions granting relief in cases governed by §2254(d).  For example, in *Williams*, *supra*, the Court engaged in a thorough, detailed examination of the constitutional merits of the petitioner's ineffective assistance of counsel claim, followed by an equally thorough examination of the ways in which the Virginia Supreme Court's adjudication of that claim was "contrary to" federal law (by applying the wrong constitutional rule to the

---

Supreme Court went on to reject the respondent's effort to rely upon a theory for denying relief that had not been part of the state court's rationale.  Noting that the respondent's theory had not been part of the reasoning set forth in the state court's decision, the Court declared that "[r]espondents' interpretation of [trial counsel's] postconviction testimony [as indicating the possibility that trial counsel obtained the same information from a different source] therefore has no bearing on whether the Maryland Court of Appeals' decision reflected an objectively unreasonable application of *Strickland*."  *Wiggins*, 539 U.S. at 529-530.

29

petitioner's claim) and also "involved an unreasonable application of" federal law (by, inter alia, failing to consider all of the evidence relevant to the claim). *See Williams*, 529 U.S. at 390-398. Likewise, in both *Rompilla* and *Wiggins*, the Court first undertook its own detailed review of the merits of the petitioners' contentions that their trial counsel were ineffective for failing to adequately investigate, *see Rompilla*, 545 U.S. at 381-387; *Wiggins*, 539 U.S. at 519-527, and then performed a careful analysis of the ways in which the state courts' decisions rejecting the petitioners' claims were based on an "unreasonable determination of the facts," and involved an "unreasonable application of" federal law. *See Rompilla*, 545 U.S. at 389-390; *Wiggins*, 539 U.S. at 527-534. The Court took the same approach in *Miller-El v. Dretke*, 545 U.S. 231 (2005), again conducting a painstaking evaluation of the merits of the petitioner's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), before further concluding that the state court's rejection of that claim was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding," such that federal habeas relief was appropriate.[15]

In short, when considering petitioner's claims for relief this Court must not merely determine whether it can be said at a glance that the state court's rejections of those claims it adjudicated on the merits were "contrary to" federal law, or somehow "unreasonable" in their treatment of the law or the facts. Rather, for all claims subject to §2254(d), the Court must determine for itself (a) whether petitioner's constitutional rights were violated, and if they were (b) whether the state court's failure to recognize and remedy those violations can be attributed to one or more defects within the categories enumerated in §2254(d)(1) or (2). Where these two

---

[15]      To be sure, there are cases in which a petitioner's inability to satisfy §2254(d) may be so obvious – either because he relies upon a rule which has not been "clearly established . . . as determined by the Supreme Court," *Penry v. Johnson*, 532 U.S. 782, 795 (2001), or because the relevant federal standard affords state courts such wide latitude that only an exceptionally poor decision by the state court could conceivably be sufficient to authorize relief, *see Andrade v. Lockyer*, 538 U.S. 63, 71-73 (2003) – that the reviewing court need not pause long over a particular claim. However, such is not the case with respect to any of Petitioner's claims.

questions are resolved in petitioner's favor, relief must be granted.

## II.   Evaluation of State Court Factual Findings Under AEDPA.

As the Supreme Court demonstrated in *Wiggins*, and more recently in *Miller-El*, a faithful

application of §2254(d)(2) cannot be accomplished without looking beneath a state court's

factual "findings" and assessing the reasonableness of the conclusions reached by the state court

in light of the evidence that was before that court.  *Miller-El*, 545 U.S. at 266; *Wiggins*, 539 U.S.

at 528; *see also*, *e.g.*, *Guidry v. Dretke*, 397 F.3d 306, 328 (5th Cir. 2005) (granting relief in

capital case where state court's decision was based on factual finding that ignored countervailing

record evidence; under "§2254(d)(2), the district court concluded properly that the state court's

adjudication of the claim was based on an unreasonable determination of the facts"); *Yung v.*

*Walker*, 296 F.3d 129, 136 (2d Cir. 2002) ("[T]he focus of §2254(d)(2)" is "on whether the

[state] court's factual findings are supported by sufficient evidence"); *Beck v. Bowersox*, 257

F.3d 900, 901 (8th Cir. 2001) (§§2254(d)(2) and (e)(1) "require meaningful federal court review

of the evidentiary record considered by the state courts"); *Childress v. Johnson*, 103 F.3d 1221,

1226 n.7 (5th Cir. 1997) ("While the measure of deference afforded state court factual findings is

substantial, we note that it is not absolute. Section 2254(d)(2) authorizes issuance of the writ if

the state court decision 'was based on an unreasonable determination of the facts in light of the

evidence presented'").

Moreover, while §2254(e)(1) provides that "a determination of a factual issue made by a

State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence," this presumption is

likewise far from absolute.  In fact, Congress clearly contemplated that habeas petitioners would

challenge, and federal courts would consider, whether state court factual determinations are

supported by the record when it enacted §2254(f) ("If the applicant challenges the sufficiency of

the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein . . .").  If an examination of the sufficiency of the evidentiary support for a state court's factual findings were off limits under §2254(d)(2) or §2254(e)(1), it would make no sense to provide, in an adjacent subdivision of the same statute, a mechanism for facilitating review of precisely that question.  Furthermore, if federal courts are required by §2254(e)(1) to take state court factual determinations at face value, then *Wiggins* and *Miller-El* – both of which involved detailed examinations of the state court record and determinations by the Supreme Court that the state court's findings were not supported – were decided incorrectly.

On the surface, some tension appears to exist between §2254(e)(1), under which state court factual findings are to be presumed correct, and §2254(d)(2), which can only be read as requiring federal habeas courts to look beneath a state court's factual findings to assess their reasonableness in light of the record that was before the state court.  *See Rice v. Collins*, 126 S.Ct. 969, 974 (2006) (acknowledging but declining to resolve dispute over whether both §2254(e)(1) and §2254(d)(2) should apply to a particular state court factual determination).  As several courts have recently explained (*see infra*), however, this tension largely dissolves when the two provisions are viewed with a practical eye, and in light of the principle that a "statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879) (citation omitted) (quoted in *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Under such a reading, it becomes clear that the function of §2254(e)(1), which is situated immediately preceding the provision limiting the availability of federal evidentiary hearings, *see* §2254(e)(2), is to define the substantial burden a prisoner must bear when seeking to disprove a state court's factual finding using evidence that was not before the state courts.  On the other hand, where the evidentiary record before the federal court is the same as the record considered

32

by the state court, §2254(d)(2) – with its focus on the reasonableness of factual determinations "in light of the evidence presented in the state court proceeding" – provides the sole mechanism for dealing with a petitioner's contention that a state court's resolution of (or failure to resolve) a factual issue was objectively unreasonable.  *See generally Lambert v. Blackwell*, 387 F.3d 210, 235-237 (3d Cir. 2004); *Taylor v. Maddox*, 366 F.3d 992, 999-1008 (9th Cir. 2004); *Breighner v. Chesney*, 301 F.Supp.2d 354, 366 (M.D.Pa. 2004).

The specific ways in which these AEDPA provisions interplay with the claims raised are discussed within the body of each claim, *infra*.

## STRICKLAND V. WASHINGTON

The Constitution of the United States guarantees to every criminal defendant the right to effective assistance of counsel.  *See* U.S. Const. amends. VI, XIV, § 1.  An application for a writ of habeas corpus is the appropriate vehicle to investigate ineffective-assistance claims.  *Massaro v. United States*, 538 U.S. 500, 503-04 (2003).  Indeed, "in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims."  *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997).

In *Strickland v. Washington*, the Supreme Court stated:

> The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled.

466 U.S. 668, 685 (1984) (quotations and citations omitted).  *Strickland* established that an applicant is entitled to relief for ineffective assistance of counsel if he satisfies the following two prongs:

> (1) that trial counsel's performance was deficient, meaning that the performance fell below an objective standard of reasonableness—a standard determined with reference to prevailing professional standards and from counsel's actual point of view during the

representation; and

(2) that but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different.

*Id.* at 687–91.

Thus, an applicant is entitled to relief based on ineffective assistance of counsel if he demonstrates (1) trial counsel's performance was deficient, meaning that the performance fell below an objective standard of reasonableness; and (2) but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different.  *Id.* at 687–88.  Courts should determine "whether counsel's assistance was reasonable [after] *considering all the circumstances*."  *Id.* at 688 (emphasis added).  Capital defense is sufficiently specialized and regulated to have a national standard, reflected both in the Eighth Amendment and the Guidelines of the American Bar Association.  *See Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 397.  With respect to prejudice, a petitioner is not required to make a separate or additional showing that his counsel's deficient performance rendered his trial "fundamentally unfair."  *Williams*, 529 U.S. at 397.[16]  A "reasonable probability" the result would have been different is a "probability *sufficient* to undermine confidence in the outcome" at trial.  *Id.* at 695.  This test is not outcome determinative.  The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case.  *Strickland*, 466 U.S. at 693-94.  Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the

---

[16]    The state habeas court's conclusion that the "ultimate focus of the [prejudice] inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," CL ¶ 12, and every place that standard is applied, is contrary to clearly established law.  *See Williams*, 529 U.S. at 397.

evidence to have determined the outcome." *Id.* (emphasis supplied).  Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[17]  The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court.  *Id.* at 405-06.[18]

While courts hesitate to designate any error as ineffective assistance *per se*, it is possible that a single egregious error of omission by an applicant's counsel constitutes ineffective assistance as a matter of law.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986); *United States v. Cronic*, 466 U.S. 648, 658–62 (1984); *Nero v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979).

Trial counsel's numerous failures, as set forth below, each constitute deficient performance rising to the level of such an egregious error.

---

[17]     In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard."  *Id.* at 595.  Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard."  *Id.*; *see also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

[18]     At numerous points throughout its Findings and Conclusions, the trial court imposes a "preponderance of the evidence" standard on the prejudice prong of Mr. Thomas' claims of ineffective assistance of counsel.  *See, e.g.*, CL ¶¶ 30, 31, 44, 78, 84, 91, 93, 96, 100, 103, 109.  By the clear language of *Williams*, *every one of these conclusions is contrary to clearly established Supreme Court law*, and not entitled to the deference of this Court.  Likewise, where the trial court grafts a preponderance standard on an element of Mr. Thomas' constitutional claims for relief where such an evidentiary standard is not part of the elements of the underlying claim, that conclusion is contrary to the Supreme Court law upon which the claim is based, and not entitled to the deference of this Court.  The trial court's assertions that this is required by state law, CL 17, does not protect such findings or conclusions from being denied the deference that is might otherwise be due when the court applies the correct Supreme Court law.

## CLAIMS FOR RELIEF

I.   **Mr. Thomas Was Deprived Of His Right To A Fair Trial Under The Due Process Clause Of The Fourteenth Amendment To The United States Constitution Because He Was Not Competent To Stand Trial.**

The first of the many egregious errors in Mr. Thomas's case was the trial court's erroneous determination that, despite glaring evidence to the contrary, Mr. Thomas was competent to stand trial.  This error was compounded by the defense's failure to do anything to raise the issue.  As discussed below, these errors deprived Mr. Thomas of his constitutional rights, and relief is warranted.

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992).  The test for competency is whether the defendant has the ability to understand the charges against him and the ability to communicate effectively with defense counsel.  *Dusky v. United States*, 362 U.S. 402, 402 (1960).  A defendant must only prove incompetence by a preponderance of the evidence.  *Cooper v. Oklahoma*, 517 U.S. 348, 355-56 (1996).

To begin, Mr. Thomas had only recently plucked out his eye, and been declared to be schizophrenic and psychotic (regardless of the source).  Members of the defense team who had contact with him during the trial observed that he was unable to understand the proceedings against him, and was unable to communicate effectively with his attorneys.  Shelli Schade stated that Mr. Thomas was very childlike, quiet and sad, and it was difficult to engage him in conversation.  Ex. 30 ¶ 12.  Mr. Thomas had difficulty understanding what his defense team needed from him, and he could not identify or locate witnesses.  *Id.*  Ms. Schade also observed that Mr. Thomas appeared drugged during trial because he had a flat affect, was soft-spoken, and he did not make a lot of eye contact.  *Id.* ¶ 17.  Ms. Peterson stated that Mr. Thomas was

unresponsive, disinterested, and unhelpful.  Ex. 27 ¶ 38.  Leah Eastep stated that Mr. Thomas

just ate Skittles, or anything else sweet, all day long.  Ex. 9 ¶ 37.

     All the experts agreed that Mr. Thomas was clearly psychotic at the time of the

commission of the crime.  Disagreement focused on the cause of the psychosis.  In response to

this mental illness, which caused national headlines when Mr. Thomas pulled out his right eye,[19]

the Grayson County Jail medical staff was successful in drugging Mr. Thomas to the maximum

extent allowed by giving him 40 mg of Zyprexa a day.  Zyprexa is the trade name for

Olanzapine, which is used for the acute and maintenance treatment of schizophrenia and related

psychotic disorders.  Mr. Thomas began receiving 10 mg of Zyprexa on June 24, 2004.  Ex 161.

The following day, the dosage was doubled to 20 mg.  Ex. 162 at AT 008810.  Five days later,

on June 30, 2004, the dosage was increased to the maximum normal recommended dosage of 30

mg.  Ex.163 at AT 008529.  Seven days later, Mr. Thomas began receiving 40 mg a day.  *Id.*

Thus, in a matter of less than two weeks, Mr. Thomas was placed on a dosage that exceeds what

is considered a maximum normal therapeutic amount, and remained on that amount throughout

his criminal proceedings, without following the drug protocol recommended for Zyprexa[20]

     While treating the underlying psychosis a person can be medicated to the point of sanity

and competence even against their will, but only to the extent that they pose a danger to

themselves or others.  *See Sells v. United States,* 539 U.S. 166 (2003).  As the trial court

recognized, antipsychotic drugs like Zyprexa can have a "sedation-like" effect and may affect

thought processes.  FF ¶ 95 (citing *Riggins v. Nevada*, 504 U.S. 127, 143 (1992) (Kennedy, J.,

---

[19]    *See* Murder Suspect Plucks out Own Eye in Texas Jail Cell;
http://www.usatoday.com/news/nation/2004-04-07-eye_x.htm

[20] For the treatment of schizophrenia, the usual oral starting dosage is 5-10 mg once daily with a
potential to increase to 10 mg once daily within 5-7 days, thereafter adjust by 5-10 mg per day at
one-week intervals, up to a maximum of 20 mg per day; doses of 30-50 mg per day have been
used.  However, a typical dosage range is 10-30 mg per day.

concurring)).  However, when a jail overmedicates a person, that person can go beyond competence into a vegetative state that makes them unable to assist their attorneys or understand the proceedings.  *See Williamson v. Ward,* 110 F.3d 1508, 1518 (10th Cir. 1997).

While the state court acknowledged the sedation-like effects of Zyprexa, it incorrectly found that Mr. Thomas was competent to stand trial.  This finding is contrary to the evidence that Mr. Thomas's Zyprexa dosage was increased much faster than recommended, and that Mr. Thomas was receiving more than the maximum normal recommended dosage during trial.  The trial court's competency finding is also contrary to the testimony of Ms. Schade, Ms. Peterson, and Ms. Eastep that Mr. Thomas was uncommunicative, unresponsive, and disinterested in the trial proceedings.

Indeed, there is very little support for any of the trial court's findings on this issue.  The affidavit Mr. Hagood provided to the state, in which he stated that he believed Mr. Thomas was competent during trial, *Ex parte Thomas,* State's Ex. A at 4, is contradicted first and foremost by his earlier affidavit.  In that (earlier) affidavit, Mr. Hagood stated that it was his opinion that he should have challenged the Vernon State Hospital competency report, and he should have requested a new competency hearing prior to trial.  Ex. 15 at ¶ 10.  The trial court relies on this statement in its findings.  *See* FF ¶ 96.  Mr. Hagood's second affidavit is also contradicted by the testimony of Ms. Schade, Ms. Peterson, and Ms. Eastep.

Nonetheless, the trial court concludes that Mr. Thomas was "competent to stand trial." CL ¶ 46.  In stating the standard for determining competency, the trial court cites only state law cases, and fails to mention the seminal *Dusky* standard.  CL ¶ 47.  In part, the court states that "to raise the issue of competency, there must be evidence of recent severe mental illness or bizarre acts by the defendant. . . ."  *Id*.  The court then concludes that "the record does not support the applicant's claim that he was incompetent to stand trial or that his attorney was ineffective for

failing to raise the competency issue a second time."

It is less than clear what the trial court bases its conclusions on.  It is hard to imagine more extreme evidence of "recent severe mental illness" or "bizarre acts" than those exhibited by Mr. Thomas.  While acknowledging the statements in Mr. Hagood's earlier affidavit, the court then appears to ignore them altogether.  The court additionally fails to address in any manner the conflicts between Mr. Hagood's two affidavits, and conflicts with the affidavits of Ms. Peterson, Ms. Schade, and Ms. Eastep.  The trial court did note that it did not observe Mr. Thomas to be incompetent during the very brief exchange between the Court and Mr. Thomas regarding Ms. Peterson's former representation.  FF ¶ 93.

In short, the state court's findings of fact are entirely unreasonable in light of the evidence presented, and resulted in a decision that was contrary to and an unreasonable application of federal law.  A state court's observation of a defendant's demeanor is insufficient to determine competency.  *Bouchillon v. Collins*, 907 F.2d 589, 593-94 (5th Cir. 1990).  Yet Mr. Thomas's demeanor is all that the state habeas court is relying on to support its conclusion that Thomas was competent.  The remaining evidence before the trial court contradicts both the findings and the resulting conclusions.  The trial court's opinion is not entitled to the deference of this Court.

## II.    Defense Counsels' Failure to Move for a Competency Hearing Following Mr. Thomas's Return from Vernon State Hospital was Constitutionally Ineffective.

On June 16, 2004, the district court ruled that Mr. Thomas was incompetent to stand trial. Mr. Thomas was sent to the North Texas State Hospital – Vernon Campus for treatment.  On July 27, 2004, the state hospital informed the court that the treatment had been successful, and Mr. Thomas was returned to the jail to stand trial.  After Mr. Thomas' return from Vernon, defense counsel never challenged his competence.  Defense counsel's failure to investigate Mr.

Thomas's competence following the state hospital's revised diagnosis of him, and counsel's failure to request a competency hearing violated both the performance and prejudice elements of *Strickland*. *See* 466 U.S. at 687.

Under Article 46B.084 of the Texas Code of Criminal Procedure, a party has fifteen days to object to a hospital's competency finding. If a party objects, then the matter must be set for a hearing. Tex. Code Crim. Proc., art. 46B.084. The defense has the choice of having the hearing before either the judge or a jury. *Id.* If after a hearing the defendant is found incompetent and the charges are not dismissed, then the court must follow the civil commitment process. Tex. Code Crim. Proc., art. 46B.084(e). Under the civil commitment process, the court is required to hold a hearing to determine whether the defendant should be committed to a mental health facility. Tex. Code Crim. Proc., art. 46B.102(a). If the court enters an order committing the defendant, then the defendant must receive treatment according to the provisions of Subtitle C, Title 7 of the Texas Health and Safety Code. Tex. Code Crim. Proc., art. 46B.102(c).

Mr. Hagood stated in the affidavit he provided to habeas counsel that the defense team should have objected to the competency finding when Mr. Thomas returned from the state hospital. Ex. 15 (Hagood Aff) ¶ 10. Nonetheless, they failed to do so. *Id.*; *see also Thomas*, 2008 WL 4531976 at *13-14 & n.50 ("…the record reflects that neither the appellant nor the State had objected, either in writing or in open court, to the findings of Dr. Black's report" finding Thomas competent upon leaving Vernon). The failure to object to the state hospital's findings resulted in prejudice to Mr. Thomas, as he lost his right to a jury hearing on competence, and he lost the protections of the civil commitment process.

In addition to failing to object to the state hospital's findings, the defense team squandered several additional opportunities to bring Mr. Thomas's incompetence to the court's attention. Under Article 46B.004 of the Texas Code of Criminal Procedure, Mr. Thomas's

attorneys had the ability to file a motion to raise the issue of their client's incompetence at any time they were aware that Mr. Thomas was unable to understand the proceedings and to communicate effectively with his attorneys.  This motion would trigger an informal inquiry by the court, and if the court determined that there was evidence to support a finding of incompetence, it was obligated to order an examination.  Tex. Code Crim. Proc. art. 46B.005. Following this examination, Mr. Thomas would have been entitled to the procedural protections of a jury trial on the issue of his competency and the civil commitment process.  Considering the nature of the killings, and the gouging out of his own eye, a reasonable jury likely would have rejected the claim that Mr. Thomas's schizophrenia had been cured and found him incompetent.

Yes, on the first day of trial, before jury selection began, Mr. Ashmore made the following statement to the court:

> In any event, Your Honor, upon being returned from Vernon, there is no suggestion by either side that this defendant is anything but competent.  He has been on medication now for a significant period of time.  Vernon has found that he is competent.  This defendant has been examined by, I know, two psychiatrists and a psychologist of the State, and none of whom believe he is anything but fully competent and sane.

R.R. Vol. 11 p. 6.  Defense counsel, seated next to a psychotic one eyed client who was so heavily drugged he could barely stay awake, said nothing.  *Id.* at 7-8.

As the affidavits of Bobbie Peterson, Shelli Schade, and Leah Eastep demonstrate, Mr. Thomas was unable to understand the nature of the proceedings, and he was unable to assist his counsel.  *See* Ex. 27 ¶ 38; Ex. 30 ¶¶ 12, 17; Ex. 9 ¶ 37.  Even though Mr. Thomas was incompetent to stand trial, his attorneys did not bring a motion pursuant to Article 46B.004 of the Texas Code of Criminal Procedure at any time during the trial.  This failure was constitutionally deficient.

Later, at the close of the prosecution's guilt phase case-in-chief, Mr. Hagood further

compounded the problem by engaging in the following colloquy with the court:

> THE COURT: That's not what I'm asking.  Are you – is it your position he is currently not competent to stand trial, such we would have to impanel a second jury?
>
> MR. HAGOOD:        No.

R.R. Vol. 33 p. 8.  In a similar vein during the same hearing, Mr. Hagood answered the court's

questions as follows:

> THE COURT:  My understanding is, Counsel – you correct me if I'm wrong.  I don't want to put words in your mouth.  I want to make sure the record is clear.  You are not – your current – it's not your current position that he is not competent to stand trial.  It is your position that there was a previous adjudication of incompetency; is that correct?
>
> HAGOOD:  That's right.
>
> THE COURT:  So, you're making no allegation and no contention that Mr. Thomas is currently incompetent to stand trial.
>
> HAGOOD:  Not that I can offer since the experts have examined him, Your Honor.  He is still on the antipsychotic medication, the maximum dose, and that's been brought out in court.  I don't have anything additional.

R.R. Vol. 33 pp. 14-15.

These repeated failures to raise the competence issue, even upon invitation from the

court, demonstrate that Mr. Hagood and the defense team utterly failed to consider the

competency standards applicable to Mr. Thomas and the procedure for requesting a competency

hearing.  Despite the fact that they were representing a psychotic client who had plucked out his

own eye, despite the acknowledgement that their client was drugged to the point of being unable

to communicate with them, no member of the defense was prepared enough to even consider

requesting a competency hearing.

Mr. Thomas's case is similar to the case of Ron Williamson, a once promising baseball

prospect who spiraled into mental illness until he found himself in the Ada, Oklahoma jail

charged with capital murder.  His attorney knew that Mr. Williamson was on heavy psychotic medication to the point where "he appeared to be too drowsy on occasions" to be interviewed, and his attorney thought he might be overmedicated.  Nonetheless, he failed to seek a competency determination.[21]  *See Williamson v. Ward,* 110 F.3d 1508, 1518 (10th Cir. 1997); *see also* John Grisham, *The Innocent Man: Murder and Injustice in a Small Town,* (Random House 2006) (a non-fiction account of Williamson's life and *Williamson v. Ward*).  The Tenth Circuit found the failure to act on behalf of the client to be ineffective assistance of counsel that required the reversal of the death sentence and the granting of a new trial.  *Williamson,* 110 F.3d at 1518.

The foregoing facts demonstrate numerous instances of ineffective assistance of counsel for failure to seek a competency hearing.  Mr. Hagood failed to talk to the doctors at the state hospital regarding the basis for their finding of competency, and if he talked to them, it was only a cursory discussion.  Ex. 15 (Hagood Aff.) ¶ 9.  Defense counsel failed to timely object to the state hospital's findings on competency.  They failed to raise the issue of competency at any time after Mr. Thomas was returned from Vernon.  Finally, Mr. Hagood rendered ineffective assistance by responding to the court's question on competence that he had nothing "that I can offer."

Minimal investigation regarding the opinions of the state's experts or even asking those assisting in the defense would have provided much that he could have offered about Thomas's ability to assist in his own defense and his general lack of cognition.  Had defense counsel even attempted to investigate Vernon's diagnosis or Mr. Thomas's demeanor upon his return, they would have at least been in a position to make a reasoned judgment about whether to challenge

---

[21]     Mr. Williamson's attorney did care enough that he sought to have the medicine regulated, something Mr. Thomas's attorneys apparently did not consider, or did not care to request for their client's benefit.

his competency determination.  But having done nothing, there can be no question that counsel failed to meet any standard for constitutionally effective counsel.  Mr. Thomas was prejudiced by these failures, as he was incompetent and unable to assist counsel at the time of his trial.  Had his attorneys rendered effective assistance, this would have been made clear.

It is ineffective assistance of counsel to fail to investigate a client's competency when the attorney is on notice of the client's history of mental illness.  *Bouchillon*, 907 F.2d at 597-98.  It is also ineffective assistance of counsel to stipulate to the client's competency when the attorney has information to the contrary.  *Hummel v. Rosemeyer*, 564 F.3d 290, 305 (3d Cir. 2009); *see also Antwine v. Delo*, 54 F.3d 1357, 1367-68 (8th Cir. 1995) (finding ineffective assistance of counsel when counsel failed to request a second medical examination or present expert evidence of mental impairment, even though defendant acted oddly at the time of the offense and denied using drugs, reasoning that this conduct was "more like inadequate trial preparation than a strategic choice" and stating that counsel should have followed through on the unanswered questions on defendant's mental health).  Based on the foregoing, Mr. Thomas's counsel committed multiple errors with respect to investigating and challenging competency.

The state habeas court's findings on this issue are unreasonable in light of the evidence that was (and was not) presented.  The court fails entirely to reconcile the conflicting evidence, including Mr. Hagood's two contradictory affidavits, and those of Mr. Peterson, Ms. Eastep, and Ms. Schade.  The court finds that "[a]t no time did Ms. Peterson (Cate) suggest that [Mr. Thomas] was unable to understand her," FF ¶ 94, yes Ms. Peterson testified via affidavit that Thomas was "unresponsive" and "could not assist in any meaningful way with his defense."  Ex. 27 ¶38.  The state habeas court's parsing of words to reach the conclusion that Thomas allegedly could understand his defense counsel is directly contrary to the testimony before the court.  The trial court's findings are not entitled to the deference of this Court.

44

The state habeas court's conclusion of law that Mr. Thomas's counsel was not ineffective for failing to raise competency on Mr. Thomas's return from Vernon, CL ¶ 49, is directly contrary to, and an unreasonable application of *Strickland*. The state habeas court was presented with evidence from Thomas's own defense team explaining that he was, among other things, "unresponsive" and "could not assist in any meaningful way with his defense." *See, e.g.*, Ex. 27 ¶ 38; *see also* Ex. 30 ¶¶ 12, 17; Ex. 9 ¶ 37. It was also presented with evidence that defense counsel did nothing to evaluate or investigate whether Vernon's sudden change in diagnosis was warranted. As such, the trial court's conclusions were an unreasonable application of clearly established Supreme Court law. The trial court's findings and conclusions do not bar the relief to which Mr. Thomas is entitled.

## III.   Race Dynamics Pervaded Every Aspect of Mr. Thomas's Trial in Violation of the Sixth and Fourteenth Amendments.

The race dynamics in this case are undeniable. Mr. Thomas is an African-American man convicted of murdering his estranged (Caucasian) wife, their son, and her mixed-race daughter by another man. After a jury shuffle which moved the majority of the African Americans to the back of the venire pool, the state employed disparate questioning to excuse for cause the only African American prospective juror who made it to voir dire. In the end, Mr. Thomas was tried by an all white jury. Four of the seated jurors stated on their questionnaires that they were opposed to interracial relationships. *See* Ex. 75 ¶ 105; Ex. 76 ¶ 105; Ex. 77 ¶ 105; Ex. 78 ¶ 105. The state littered the trial itself with racial stereotypes, and arguments that appealed to the stated prejudices of the jury. No one – neither the defense, nor the prosecution, nor the Court – spoke of or addressed the glaring racial dynamics that informed the entire trial.

As in many parts of the country, particularly in the South, such trials do not take place in a vacuum. This is certainly true in Mr. Thomas's case. Seventy-five years prior to his trial,

45

George Hughes, an African-American man accused of raping a white woman, was lynched by a white mob demanding vigilante justice.  A contemporaneous account in *Time* tells the horrific story:



**Monday, May. 19, 1930**

## RACES: No. 5; Treason

A determined mob's efforts to stage 1930 lynching No. 5 succeeded last week, after police, Texas rangers, militia, had fought to prevent it.

George Hughes, 41, a Negro, stood in the prisoners' box in the courthouse at Sherman, "Athens of Texas" (1920 population, 15,031), famed locally for its cultured, 95% white people, its two colleges, 27 churches, fine schools. He pleaded guilty to the charge of assaulting white Mrs. Drew Farlow, young farmer's wife. Outside in the square milled a crowd of Shermanites and thrillseekers from the environs. They knew that: 1) No matter what the prisoner said, Texas law requires a taking of testimony; 2) Mrs. Farlow, as a witness, was to be carried to the courthouse on a stretcher. There she was! As she entered, so did the crowd, soon a howling mob. Four Texas rangers adjourned court with tear gas bombs.

There was a big steel vault in the county clerk's office. "Take your choice," the sheriff told Hughes, "be locked in there, or run for it." The Negro chose the vault.

Governor Dan Moody, apprized of the situation, sent 70 militiamen, was reported to have telegraphed: "Protect the Negro, but don't shoot anybody."

"That means they'll get the Negro," said Ranger Captain Frank Hamer.

They did. Hurling bricks, bottles, shooting guns, they broke the cordon of troops, set the courthouse aflame, hacked the hose of arriving firemen. In the fracas, John Melton and Floyd Barker were shot by comrades. The $60,000 building was demolished. George Hughes, in his vault, eventually roasted to death.

When the fire had cooled, the mob was still hot. With dynamite and acetylene torches it opened the vault. Hughes's still-limp body was chained, dragged about town, strung up, burned.

RACES: No. 5; Treason, Time, May 19, 1930; see also Beth Crabb, May 1930:  White Man's Justice for a Black Man's Crime, 75 J. of Negro Hist.  29 (1990); Nolan Thompson, Sherman Riot of 1930, Handbook of Tex. Online (2004), at

www.tsha.utexas.edu/handbook/online/articles/SS/ jcs6.html.

After the mob lynched George Hughes' corpse, they burned down the black section of town.  "The mob also burned down the drugstore and other businesses in the area and prevented firemen from saving the burning buildings.  By daybreak of May 10, most of the town's black businesses, as well as a residence, lay in ashes.  Among the businesses burned were the offices of a dentist, a doctor, and a civil rights lawyer. . . ."  *Id.*

The legacy of the events of May 9, 1930 is far-reaching.  After the lynching and the decimation of the black community, most African Americans left Sherman, including those who had comprised a relatively substantial middle class.  To this day, that community has not been rebuilt.  As of the mid-1990's, "Sherman is not currently viewed by many blacks or Hispanics as a friendly place to live and raise a family. . . [Many who work in] the Sherman area choose to live in other, nearby cities because they do not feel comfortable in Sherman."  1994 Management Audit, cited in Kumler, Donna, *They have gone from Sherman: The Courthouse Riot of 1930 and its Impact on the Black Professional Class*, Ph.D. Thesis, Univ. of North Tex., 1995, pp.198-199.  These sentiments can be traced at least in part back to the 1930's lynching.

> Alexander Bate, local black educator and civil rights leader, when asked in 1986 why Sherman had no black professional class as in the 1920s, remarked:  Sherman got a bad name when they had this riot – everywhere.  For twenty years I tried to get a black doctor her out of two black medical schools.  Nobody wanted to come this way.  Yes, they knew what had happened.  When you go to some town someplace, they'll say 'uh-oh!  You can miss Sherman!  That's that bad place!  Even now [1986] you hear that every once in a while."

*Id.* at 196.

> Since they were burned out, there is a fear that runs deep in the heart of individuals who have lived through that, and trying to get them to unite to build a base for black business to come into this area is very, very difficult. . . The power base is still within the majority society.. . All the attorneys are white; all the judges are white; the police department for the most part is white. . . Anytime you talk to anyone about why you don't have a black business come to Sherman, it always goes back to what happened and the fear of it happening again because the powers that still lie with the majority society."

*Id.* at197, recounting author's 1986 interview with Andrew White, president of Grayson County

NAACP chapter (resurrected after 17 years).   Indeed, as of 1995, there were no black attorneys

who practiced in Sherman, and no black doctors who practiced and lived there.  *Id*. at p.191.  As

for the educational system, the Sherman ISD had to implement an "aggressive" plan to attract

minority professionals to Sherman, and the process has been difficult and halting.  *Id*. at pp.194-

195.  As Ms. Kumler summarizes:  "Sherman has suffered over the years for the events of May

1930."  *Id*. at p.199.

During the investigation of Mr. Thomas's case, residents of Sherman raised the 1930

lynching, and talked about the charged racial dynamics they feel are still prevalent, and, in some

cases, how they informed Mr. Thomas's prosecution:

> I think things might have been different had Andre been white, or
> Laura black.  There are people in Sherman who have very negative
> attitudes towards interracial dating.  Once, my wife and I were out
> to dinner and an interracial couple entered the restaurant.  At this
> point, a white man seated in the booth behind me told his wife,
> "look at the white trash with the nigger."

Ex. 4 ¶ 8 (City of Sherman employee).  One of Andre's uncles, who lives in Georgia stated:

> I have also experienced or observed several incidents of racism in
> the Sherman, Texas area.  I believe that the racial problems are
> worse in that area than they are in Georgia.  For example, at a local
> Sherman gas station, I observed white families being able to pump
> gas and pay afterwards, but black families being told they had to
> pay before they pumped the gas.  I have also seen the way white
> people in Sherman treat black people, especially the older
> generations.  For example, some white people in Sherman will not
> talk to or socialize with black people and act afraid of them.  I have
> also observed interracial couples treated poorly in the area.

Ex. 21 ¶ 7.  One of Mr. Thomas's friends, a white woman, described the trouble she encountered

for associating with African-Americans:

> I was not allowed to return to my parents' home because they had
> disowned me after I had dated Floyd, a black man.  My family also
> had problems with the fact that I was even friends with Andre,
> since he too is black.

Ex. 18 ¶ 2.  One of Mr. Thomas's aunts also encountered racism in the Sherman area, specifically with reference to Andre:

> During the months leading up to my nephew Andre's trial, I experienced several instances of racial prejudice.  Once, I was standing in line at the supermarket and saw Andre's picture on a newspaper.  The man behind me in line saw his picture, too, and remarked, "That motherfucking nigger should fry."  The cashier told him that the man in the picture was my nephew, but he did not apologize for his statement.  A co-worker of mine at Dillingham Elementary told me, "All niggers are the same; they're always wanting to slice each other up."

Ex. 2 ¶¶ 3-5.

Studies support the common-sense assertion that the fact that Mr. Thomas is African-American and the victims were white and mixed-race had an influence on the outcome of his trial.  Mock jury studies of capital sentencing generally indicate that "white mock jurors have the strongest tendency to impose death as punishment in cases where the defendant is black and the victim is white."  William J. Bowers, *et al.*, *Death Sentencing In Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 *U. Pa. J. Const. L.* 171, 184 (2001).  Death sentence rates in cases where the defendant is African-American and the victim is white far exceed those in which both the defendant and victim are black and in those in which both defendant and victim are white; African-American defendants who kill white victims receive death sentences at the highest rate.[22]  John Blume *et al.*, *Explaining Death Row's Population and Racial Composition*, 1 J. *Empirical Legal Stud.* 165, 166 (2004).  This stems partially from the reluctance of prosecutors to seek death in cases with African-American victims, and fervor for seeking death in cases with African-American defendants accused of killing whites.  *Id.*

---

[22] This study limited the sample to defendants sentenced after 1976, in order to avoid the effects of early uncertainty in the post-*Furman* modern death penalty era.  John Blume *et al.*, *Explaining Death Row's Population and Racial Composition*, 1 J. EMPIRICAL LEGAL STUD. 165, 168 (2004).

Research from the 1980s determined that, in Texas, a murder of a white victim was over five times more likely to result in a death sentence than the murder of an African-American. Jonathan R. Sorensen & James Marquart, *Prosecutorial and Jury Decision-Making in Post-Furman Texas Capital Cases*, 18 *N.Y.U. Rev. L. & Soc. Ch.* 743 (1990-91).; Alan Widmayer & James Marquart, *Capital Punishment and Structured Discretion:  Arbitrariness and Discrimination after Furman*, *Corr. Theory & Prac.* 187 (1992).  A study released in 2000, suggested that these trends continue to occur.  That research showed that while 0.8% of murder victims in Texas were white women, 19.3% of the defendants arriving on Texas' death row between January 1, 1995 and December 31, 1999 were found guilty of killing white women. Amnesty International, *United States of America:  Death by Discrimination – The Continuing Role of Race in Capital Cases*, Amnesty International (2003), at web.amnesty.org/library/ index/engamr510462003 (*citing* Texas Defender Service, *A State of Denial:  Texas Justice and the Death Penalty* (2000)).

Furthermore, 78% of 301 prisoners executed in Texas between December 1982 and April 10, 2003 were executed for crimes with white victims.  None of the 301 persons executed during that time period were whites convicted of killing African-Americans.  Amnesty International, *United States of America:  Death by Discrimination – The Continuing Role of Race in Capital Cases*, AMNESTY INTERNATIONAL (2003), *at* http://web.amnesty.org/library/ index/engamr510462003.

Mr. Thomas submits that these facts, specifically and generally, must be taken into account when evaluating the effect of the numerous ways in which racial bias played a role in his trial.  The white jurors, 1/3 of whom were opposed to interracial relationships lived in a town that has been shaped, in part, by the most violent and racist act there is.  To this day, that lynching (of a black man for the alleged rape of a white woman) remains in the minds of many

members of the African American community in Sherman – many of whom encounter explicit

racism in their every day lives, and who encountered racist commentary specifically in  reference

to Mr. Thomas's trial.  Those twelve jurors, chosen carefully by the prosecution, reside in that

same community.[23]

During the trial, the prosecution repeatedly used race coded language  when talking about

what Mr. Thomas was in the habit of consuming (referring to him drinking "40's," or 40 oz. cans

of "malt liquor" and smoking "blunts") – language that would not be used to describe the habits

of white people, and that specifically invokes a culture of (black) violence.[24]  During closing

arguments, the state specifically appealed to the fears of the jury, making a thinly veiled but

powerful reference to the jury's (white) daughters, and how Andre might eventually date or

"prey" on them, too, if he were ever released.

> Are you going to take a risk that at age 61, when this man is
> eligible for … parole, if he was to be released, are you going to
> take the chance that he would come back to Grayson County, and
> he is 40 years more violent from being in that prison, and he is 40
> years without regular access to drugs and alcohol with a substance-
> abuse personality and predisposition, and he is still antisocial, and
> he's still a person who has refused to take medication and must

---

[23] During the habeas investigation, members of the defense team spoke to members of the jury.
One juror, in declining to talk about the case, stated: "I don't want to say anything that would
give that boy another second of life."  Of course, "boy" is a highly demeaning manner of
referring to black men.  As Martin Luther King Jr. wrote in "Letter from Birmingham City Jail":
"[W]hen you are humiliated day in and day out by nagging signs that read 'white' and 'colored';
when your first name becomes 'nigger,' your middle name becomes 'boy' (however old you are)
and your last name becomes 'John'; * * * when you are forever fighting a degenerating sense of
'nobodiness'; then you will understand why we feel it difficult to wait." James M. Washington,
ed., *A Testament of Hope: The Essential Writings and Speeches of Martin Luther King, Jr.* 293
(1986).

[24] Racially biased views of African-American criminality can infect juror decision-making and
undermine a defendant's right to an impartial jury. Research of punitive attitudes towards
criminals, for example, indicates that white support for harsher punishments, including capital
punishment, of African-American defendants is influenced by racial prejudice.  *See, e.g.*, Steven
E. Barkan & Steven F. Cohn, *Racial Prejudice and Support for the Death Penalty by Whites*, 31
J. Res. Crime & Delinquency 202, 202-203 (1994); Steven F. Cohn, *et al.*, *Punitive Attitudes
Toward Criminals: Racial* 16 *Consensus or Racial Conflict?*, 38 J. Soc. Probs. 287, 294 (1991).

> have medication to not be a danger.  Are you going to take the risk
> about him asking your daughter out, or your granddaughter out?
> After watching the string of girls that came up here and apparently
> could talk him into – that he could talk into being with him, are
> you going to take that chance?[25]

R.R. Vol. 42 pp. 41-42.

These central pieces of Mr. Thomas's trial, individually and in combination, rendered his trial unconstitutional, in violation of the clear law of the Supreme Court.  "The Fourteenth Amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the State is most compelling in the judicial system."  *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (citing *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)).  Indeed, the Supreme Court has repeatedly emphasized that it is the responsibility of all actors in the justice system, especially in death penalty cases, to "eliminat[e] racial discrimination from the courtroom."  *Id.* at 413.  This mandate was not followed in Mr. Thomas's case.

Viewed broadly, and in the context not only of the history of Sherman, Texas, but of race relations in this country, Mr. Thomas's trial, conviction, and death sentence cannot be deemed constitutional.  The race differences between Mr. Thomas, Ms. Boren, and the deceased children, the racially biased attitudes and opinions of the jurors, the State's use of race coded language and appeals to the fears and prejudices of the jury, and defense counsel's failures combined to create a trial so rife with race dynamics that it violated the Sixth and Fourteenth Amendments. [26]  They also must be considered when evaluating the following claims individually.

---

[25] The "string of girls" that testified were all Caucasian, some of them Mr. Thomas's former girlfriends, some of them his friends.

[26] There are neither Findings nor Conclusions relevant to this claim.  The impact of the Findings and Conclusions relevant to Claims **, infra, and which are touched on herein, are addressed within the body of the specific claim.

IV.  **Mr. Thomas's Jury was Selected in a Racially Discriminatory Manner in Violation of his Rights under the Sixth and Fourteenth Amendments to the United States Constitution.**

Mr. Thomas submits that the state's request for a jury shuffle in his case was made with the intent to remove African Americans from the portion of the venire most likely to be presented for individual voir dire.  He further submits that the state's disparate questioning of the only African American venire member reached during voir dire (as a result of the jury shuffle) similarly violated Mr. Thomas's constitutional rights.  Separately and in combination, these actions by the state violated Mr. Thomas's rights under the Sixth and Fourteenth Amendments to an impartial jury and to the equal protection of the laws.

Trial counsel's failure to object to the state's request for a shuffle and the disparate questioning was constitutionally ineffective.  *See infra.*   That failure precluded the errors from being raised on direct appeal, and prejudiced Mr. Thomas.

A.  **The State's Requested Jury Shuffle was Intended to, and Did, Remove African Americans from the Front of the Venire.**

The trial court determined in its findings of fact that "[t]he State timely requested a jury shuffle," that "[t]here were more African-Americans in the first one hundred venire men prior to the shuffle," and that "[t]he State requested the shuffle based on the appearance of several of the venire men in the first one hundred."  The trial court further determined that "[a]s a result of the State's shuffle, only two of the 102 potential jurors questioned during voir dire were African American," and "[a]ll members of Mr. Thomas's jury were white."  FF ¶¶ 65-67; 70-71.  These findings are supported by the evidence.  *See* Ex. 27 (Peterson Aff.) ¶¶15-16; Ex. 15 (Hagood Aff.) ¶¶14-15.

The trial court also found that "[t]here is no evidence that the request for a shuffle was racially motivated."  FF ¶ 68.  This finding is not supported by the record.  Indeed, it is belied by the court's own findings.   The pre-shuffle racial composition of the venire in Thomas's case

unequivocally gives rise to an inference that the State's requested jury shuffle was racially motivated.  *See* Ex. 27 (Peterson Aff.) ¶15-16; Ex. 15 (Hagood Aff.) ¶14-15.  The disparate questioning of the one African American venireman supports this conclusion.  At a minimum, the bare facts establish an inference of purposeful discrimination.

The "jury shuffle" is a unique facet of the Texas jury-selection process whereby either party, based solely upon visual inspection of the venire, may request that the court randomly reseat the entire panel.  *See* Tex. Code Crim. Proc. art. 35.11 (West 2007).  Both the defendant and the State have the absolute right to one jury shuffle.  *Smith v. State*, 648 S.W.2d 695, 696 (Tex. Crim. App. 1983).  The shuffle need not be carried out in the courtroom, although it is the better practice to do so.  *Mays v. State*, 726 S.W.2d 937, 947 (Tex. Crim. App. 1986), *cert. denied*, 484 U.S. 1079 (1988).

While the practice was originally intended to ensure randomness in the jury-selection process, *See Yanez v. State*, 677 S.W.2d 62, 68 (Tex. Crim. App. 1984) (*en banc*), the jury shuffle has fallen on widespread judicial and scholarly disfavor, with courts and commentators alike touting the procedure as inherently rife with potential for unlawful discrimination.  *See* R.N. Sing *et al.*, *Reforming the Jury System: What Do the Judges Think?*, 63 Tex. B.J. 948, 951 (2000) (opining that Texas should generally eliminate the practice of shuffling jurors); *see generally* Michael M. Gallagher, *Abolishing the Texas Jury Shuffle*, 35 St. Mary's L.J. 304 (2003) (noting that the jury shuffle is widely viewed as a procedure that enables racial discrimination in the jury-selection process and arguing for its abolition); John D. White, *A New Hand from the Same Deck of Cards: Randomness and the Intersection of Race with Gender in the Texas Jury Shuffle*, 40 S. Tex. L. Rev. 509 (1999) (discussing the use of the jury shuffle as a vehicle for invidious racial discrimination and calling upon the Texas legislature to modify or abandon the practice).

54

In particular, criminal defendants have repeatedly argued that prosecutors strategically use the jury shuffle to remove racial minorities to the back of the venire, thereby effectively excluding minorities from the jury-selection process and, in turn, violating the Equal Protection Clause.  In 2002, even before the *Miller-El* cases discussed below, the Fifth Circuit Court of Appeals recognized the potential constitutional implications.  *See Ladd v. Cockrell*, 311 F.3d 349, 354 (5th Cir. 2002) ("[T]he purposes behind *Batson* seem implicated by jury-shuffling to disperse potential jurors of a particular race who are near the front of the venire.  Allowing this would hinder efforts to achieve a fair and impartial jury, sanction an attempt to exclude potential jurors on account of race, and diminish public confidence in the fairness of criminal trials and convictions.").

In 2003, the Supreme Court turned its attention to the jury shuffle as evidence of race discrimination in *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322 (2003).  In *Miller-El I*, the Court addressed the quantum of proof necessary for a post-conviction relief applicant to obtain a certificate of appealability ("COA") where the applicant's claim rests on a *Batson* violation.  *See id.* at 335–36.  The Court determined that under the applicable "substantial showing" standard, the Fifth Circuit erred in denying a COA where the applicant demonstrated, *inter alia*, that the "prosecution had requested [jury] shuffles when there were a predominate number of African-Americans in the front of the panel."  *Id.* at 333–34.  In reversing the Fifth Circuit, the Court stated, "We agree with petitioner that the prosecution's decision to seek a jury shuffle when a predominate number of African-Americans were seated in the front of the panel … raise[s] a suspicion that the State sought to exclude African-Americans from the jury."  *Id.* at 346.  In light of this and other evidence of purposeful discrimination in the jury-selection process, the Court found that the merits of the petitioner's *Batson* claim were "debatable by jurists of reason" and, in turn, an appeal was in order.  *Id.*

In remanding the case, the *Miller-El I* Court noted that although it had found a COA was warranted, the petitioner would ultimately need to demonstrate by clear and convincing evidence that the trial court's denial of his *Batson* claim was incorrect in order to obtain habeas relief. *Id.* at 347. On remand, the Fifth Circuit granted the applicant's COA, but subsequently rejected the petitioner's *Batson* claim on the merits. *See Miller-El v. Dretke*, 361 F.3d 849 (5th Cir. 2004). On June 28, 2004, the Supreme Court again granted *certiorari* to determine whether the petitioner had sufficiently demonstrated an equal-protection violation under *Batson*. *See Miller-El v. Dretke*, 542 U.S. 936 (2004) (granting petitioner's writ of certiorari). As *Miller-El I* made clear, the petitioner's jury-shuffle evidence would feature heavily in the Court's analysis of the petitioner's *Batson* claim on the merits.

Under *Batson*, a defendant may establish a prima facie case of discrimination in the jury-selection process by "the totality of the relevant facts" regarding the prosecution's conduct during *voir dire*. *See Batson*, 476 U.S. at 94, 96. Once the defendant makes out a prima facie case, the burden shifts to the State to offer a neutral explanation for its conduct. *Id.* at 97. To meet this burden, "the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons." *Id.* at 98. It is then the trial court's duty to determine if the defendant has established purposeful discrimination. *Id.* In *Miller-El v. Dretke* ("*Miller-El II*"), decided on June 13, 2005, the Court established that under *Batson*'s standards, the prosecution's use of the jury shuffle under certain circumstances is a factor demonstrating racial discrimination in the jury-selection process. *See* 545 U.S. 231, 255–56 (2005).

In *Miller-El II*, the Court reiterated its finding in *Miller-El I* that a prosecutor's request to shuffle the jury when a predominant number of African Americans are seated near the front of the panel "raise[s] a suspicion that the State sought to exclude African-Americans from the jury." *Id.* at 253–54 (noting that "[t]he first clue to the prosecutors' [discriminatory] intentions … [was]

their resort during *voir dire* to a procedure known in Texas as the jury shuffle").  The Court went on to hold that where the State fails to offer any racially neutral reason for shuffling the jury, "nothing stops the suspicion of discriminatory intent from rising to an inference."  *Id.*  The Court opined that under these circumstances, "jury shuffles conducted by the State make no sense except as efforts to delay consideration of black jury panelists to the end of the week, when they might not even be reached."  *Id.* at 265.

Along with the prosecution's jury-shuffle use, the *Miller-El II* Court discussed four additional factors supporting its finding that the State had violated the defendant's equal-protection rights.  *See id.* at 265–66.  As the Fifth Circuit recently established, however, not all five factors discussed in *Miller-El II* must be present to find an equal-protection violation under *Batson*.  *See, e.g.*, *Jackson v. Dretke*, 181 Fed. Appx. 400 (5th Cir. 2006) ("In *Miller-El*, the Court found a number of circumstances in the record that supported the *Batson* claim.  To succeed on a *Batson* claim, however, a petitioner need not submit each type of evidence addressed by *Miller-El*.").

Subsequent cases discussing *Miller-El II* have emphasized that the jury-shuffle evidence was a "decisive factor" in the Court's conclusion that an equal-protection violation had occurred.  *See, e.g.*, *Murphy v. Dretke*, 416 F.3d 427, 439 (5th Cir. 2005) (refusing to find a *Batson* violation where there was no evidence of any jury shuffles resulting in a decreased statistical presence of African Americans in the venire, noting that such jury shuffle evidence was a "decisive factor[]" in *Miller-El II*); *Fields v. Thaler,* 2009 WL 3764003 (5th Cir. 2009) (indicating there was no valid discrimination claim, and citing lack of requests for jury shuffles to support that); *Blanton v. Quarterman*, 543 F.3d 230 (5th Cir 2008) (discussing at length a jury shuffle claim and its relation to *Batson* in the wake of *Miller-El*).

*Miller-El II*'s analysis of the jury shuffle under *Batson* has led both courts and

commentators to opine that *Batson*'s equal-protection analysis now extends to jury shuffles and other jury-selection procedures as well as peremptory strikes.  *See*, *e.g.*, *United States v. Esparza-Gonzales*, 422 F.3d 897, 902–03 (9th Cir. 2005) (stating that in *Miller-El II*, the "Supreme Court recently held that jury selection procedures may give rise to an inference of discriminatory intent even though the prosecutor is not striking potential jurors," relying on the Court's jury-shuffle analysis in finding that similar potentially discriminatory use of a "struck jury system" gives rise to a claim under *Batson*).

Accordingly, as the *Miller-El* cases make clear, longstanding jurisprudence and the fundamental constitutional principles on which it relies make clear that jury-shuffle evidence alone may establish a claim of racial discrimination in jury selection.

Once a showing of racial discrimination is made, no showing of harm is required, and relief is mandated:

> Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury, *Strauder v. West Virginia, supra,* at 308, but racial minorities are harmed more generally, for prosecutors**\*238** drawing racial lines in picking juries establish "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice," *J.E.B. v. Alabama ex rel. T. B.,* 511 U.S. 127, 128, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

*Miller-El II* at 237-238.  As the Supreme Court stated in *Batson*:

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.

*Batson*, 476 U.S. 79, 88 (1986).  Accordingly, Mr. Thomas is entitled to relief.

**B.      The State Habeas Court's Determination that the Request for the Jury Shuffle was not Racially Motivated is Unreasonable in Light of the Evidence Presented.**

Even where a trial court's decisions are given deference on habeas review, that deference

is not absolute.  *See Miller-El II* at 240 ("The standard is demanding but not insatiable; as we said the last time this case was here, '[d]eference does not by definition preclude relief.'").

In its Findings of Fact and Conclusions of Law, the trial court stated:  "[t]here is no evidence that the request for a shuffle was racially motivated."  FF ¶68 (emphasis added).[27]  This finding is clearly unreasonable in light of the evidence presented, in particular the other findings made by the state court.  They include the following:

(1) There were more African Americans in the first one hundred venire men prior to the shuffle;

(2) The State requested the shuffle based on the appearance of several of the venire men in the first one hundred;

(3) "as a result of the State's shuffle, only two of the 102 potential jurors questioned during voir dire were African American; and

(4) All members of Mr. Thomas's jury were white.

FF ¶¶ 66-71.  The affidavits of trial counsel underscore these findings, which make clear that before the shuffle there was a noticeable presence of minorities among the first 100 venire members, but after the shuffle the "minorities were in the back, and there were no African-Americans in the first three rows." Ex. 27 (Peterson Aff.) ¶16; *see also* Ex. 15 (Hagood Aff.) ¶¶14-15.

The court's own findings belie the assertion that there is no evidence of racial discrimination.  In *Miller-El I* the Supreme Court unambiguously stated that the "the prosecution's decision to seek a jury shuffle when a predominate number of African-Americans were seated in the front of the panel … raise[s] a suspicion that the State sought to exclude African-Americans from the jury." *Miller-El I*, 537 U.S. at 346.  The shuffle in Petitioner's case,

---

[27] The trial court also finds that "there is no evidence that the jury's decision was racially motivated."  FF at ¶ 72.  Of course, even if there was support for that finding in the record, it is not relevant to the claim raised, which requires no proof that the jury actually chosen operated in a discriminatory manner.  *See infra*.

like that in *Miller-El* trial, "make[s] no sense except as [an] effort[] to delay consideration of black jury panelists to the end of the week, when they might not even be reached." *Miller-El II*, 545 U.S. at 265.  The Supreme Court's discussion in *Miller-El II* is enlightening here:  "The State notes in its brief that there might be racially neutral reasons for shuffling the jury...and we suppose there might be. But no racially neutral reason has been offered in this case, and nothing stops the suspicion of discriminatory intent from rising to an inference." 545 U.S. at 254–55.

Likewise, there was neither evidence of nor a finding that there was a racially neutral reason for the shuffle in Mr. Thomas's case.  The Miller-El II Court suggests that shuffles have a suspicion of discriminatory intent, which rises to an inference absent a racially neutral explanation. Miller-El II, 545 U.S. at 254–55; Miller-El I, 537 U.S. at 346.  For the trial court here to find that there was no evidence the request for jury shuffle was racially motivated is an unreasonable determination of the facts in light of the evidence.  This is particularly so when viewed in light of the approach articulated by the Supreme Court in evaluating jury shuffles.

The *Miller-El* cases looked at the setting in which the shuffles took place and the results of the shuffles in their analysis of racial motivation. *Miller-El II*, 545 U.S. at 254. In Petitioner's case, the state's request for a jury shuffle must be viewed in conjunction with the disparate questioning of the only African American venire member who made it far enough to the front of the line to be questioned in voir dire.  *See infra*.  That disparate questioning (as it is generally intended to do) resulted in a strike for cause.  *See, e.g.*, *Miller-El II*, 545 U.S. 261–63.  Thus, with one shuffle, disparate questioning of the only prospective African American juror, and inexperienced and ineffective defense counsel, the state was able to obtain an all white jury.

The state's request for a shuffle must also be viewed in light of the fact that Mr. Thomas is African American, and he was on trial for killing a white woman (his wife), their child, and her daughter by another (African American) man.  It must also be viewed in light of the fact that

throughout the trial that proceeded in front of an all white jury, four of whom had expressed their personal distaste for interracial relationships, the state used race coded language and imagery to make their case for a conviction and a sentence of death.

When viewed in context, as Miller-El II demands, the trial court's finding that there is no evidence that the state's request for a jury shuffle was racially motivated is unreasonable in light of the evidence presented.  28 U.S.C. §2254(d)(2).

> C.     **The State Habeas Court's Conclusions of Law are Contrary to or an Unreasonable Application of Clearly Established Supreme Court Law.**

The trial court concluded that the "applicant has failed to present by a preponderance of the evidence any proof of purposeful prosecutorial or jury discrimination in his particular case," citing *County v. State*, 812 S.W.2d 303, 308 (Tex.Crim.App.1989), and that "applicant has failed to prove by a preponderance of the evidence any fact which would establish purposeful discrimination by the court. . . ."  CL ¶¶ 52, 59.  Both these conclusions state the wrong standard, and are thus contrary to clearly established law of the Supreme Court.  *See* U.S.C. 2254(d)(1).

To begin, the case cited – *County v. State* – is inapposite.  *County* is a case dealing with abuse of prosecutorial discretion, specifically the decision to prosecute based on race, religion, or other arbitrary classifications.  Petitioner never alleged that there was abuse of prosecutorial discretion, and *County* is irrelevant to his actual assertions.

Secondly, petitioner is alleging a violation of his rights under the Sixth and Fourteenth Amendments of the U.S. Constitution, and is not required to show purposeful discrimination by either the jury or the court.  While Petitioner asserts that there was purposeful discrimination by the prosecutor sufficient for a showing of an equal protection violation, the state court's conclusions suggest that a showing of discrimination by the jury (or court) is necessary, or even relevant, to Petitioner's impartial jury claim under the Sixth and Fourteenth Amendment.  This,

however, is contrary to clearly established Federal law.

Mr. Thomas need not show purposeful discrimination if there was *bias* in the jury selection process and his right to a fair and impartial jury or equal protection of the laws was violated; it is irrelevant whether the jury intended to discriminate or if there was actually any discrimination. *See Rose v. Mitchell*, 443 U.S. 545, 555–59.

Moreover, Petitioner need not make a showing by a preponderance of the evidence – he need only make a prima facie case of purposeful discrimination. *Batson v. Kentucky*, 476 U.S. 79, 95–96 (1986). At a minimum, Petitioner is entitled to a hearing, at which the state may present evidence that the request for a shuffle was not racially motivated, and Mr. Thomas is permitted to present evidence in rebuttal. *See, e.g., Johnson v. California*, 545 U.S. 162, 170–73 (2005).

The state court's conclusions of law #52 and 59 are thus contrary to clearly established Federal law 28 U.S.C. §2254(d)(1).

The remaining conclusions relevant to the instant claim are the following:

#58: Texas Courts have declined to make the broad extension of Batson that applicant seeks. See Ladd v. State, 3 S.W.3d 547, 563 (Tex. Crim. App. 1999).

#59: The applicant has failed to prove by a preponderance of the evidence any fact which would establish purposeful discrimination by the court and has failed to cite any law which would support the extension of Batson to jury shuffle requests.

#63: Batson does not apply to a jury shuffle.

CL ¶¶ 58, 59, 63.

At no point does the trial court cite to or recognize the Supreme Court's decision in *Miller El I* or *II*. Instead, it cites to *Ladd v. State* - a Texas decision handed down years before either *Miller El* case was decided. Of course, both *Miller El* decisions recognize the central place of a jury shuffle analysis when a claim is made that the jury selection process was tainted by discriminatory intent. The fact that "the practice of jury shuffling might not be denominated as a

*Batson* claim because it does not involve a peremptory challenge," *Miller-El I*, 537 U.S. at 346,

only states a fact of nomenclature.    Petitioner's claim asserts the fundamental rights to an

impartial jury and the equal protection of the laws – the same principles upon which *Batson* was

based.  As the Supreme Court stated in *Miller-El II*:

> When the government's choice of jurors is tainted with racial bias,
> that "overt wrong ... casts doubt over the obligation of the parties,
> the jury, and indeed the court to adhere to the law throughout the
> trial ... ."*Powers v. Ohio,* 499 U.S. 400, 412, 111 S.Ct. 1364, 113
> L.Ed.2d 411 (1991). That is, the very integrity of the courts is
> jeopardized when a prosecutor's discrimination "invites cynicism
> respecting the jury's neutrality," *ibid.,* and undermines public
> confidence in adjudication, *Georgia v. McCollum,* 505 U.S. 42, 49,
> 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Edmonson v. Leesville
> Concrete Co.,* 500 U.S. 614, 628, 111 S.Ct. 2077, 114 L.Ed.2d 660
> (1991); *Batson v. Kentucky, supra,* at 87, 106 S.Ct. 1712. So, "[f]or
> more than a century, this Court consistently and repeatedly has
> reaffirmed that racial discrimination by the State in jury selection
> offends the Equal Protection Clause." *Georgia v. McCollum,
> supra,* at 44, 112 S.Ct. 2348; see *Strauder v. West Virginia, supra,*
> at 308, 310;*Norris v. Alabama,* 294 U.S. 587, 596, 55 S.Ct. 579, 79
> L.Ed. 1074 (1935); *Swain v. Alabama, supra,* at 223-224, 85 S.Ct.
> 824; *Batson v. Kentucky, supra,* at 84, 106 S.Ct. 1712;*Powers v.
> Ohio, supra,* at 404, 111 S.Ct. 1364.

*Miller-El II*, 545 U.S. at 238; *see also, e.g., Powers v. Ohio*, 499 U.S. 400, 415–416 (1991)

(detailing the importance of the Fourteenth Amendment's mandate that race discrimination be

eliminated from all government processes, especially the judicial system); *Rose v. Mitchell*, 443

U.S. 545, 555–59 (1979) (explaining importance of reversal if jury is found to be biased).  The

state court's conclusion that a claim of discriminatory jury selection, embodied in a request for a

jury shuffle, requires an extension of *Batson* is both contrary to and an unreasonable application

of clearly established Supreme Court law.

**V.     The Defense's Failure to Challenge the State's Jury Shuffle and Disparate
Questioning of the only African American Venire Member to Make It to Voir Dire
Constituted Ineffective Assistance of Counsel under the Sixth and Fourteenth
Amendments.**

The merits of the underlying claim – the unconstitutionality of the state's use of the jury

shuffle for discriminatory purposes - are outlined in the foregoing section.  As set forth below, defense counsel's failure to object to the State's jury shuffle and to its disparate questioning of jurors based on race rendered its counsel constitutionally ineffective.

### A.     Defense Counsels' Performance was Deficient.

A criminal defendant has the right to effective assistance of counsel at every stage of the proceedings against him, including the impaneling of the jury. *Cf. Gomez v. United States,* 490 U.S. 858, 873 (1989) (holding that voir dire is a critical stage).  Indeed, it is widely understood that the quality of advocacy during jury selection can determine the ultimate outcome of the case. (*See* ABA Guidelines, n.259, *citing* John H. Blume et al., *Probing "Life Qualification" Through Expanded* Voir dire, 29 *Hofstra Law Review* 1209, 1209 & n.1 (2001) ("The conventional wisdom is that most trials are won or lost in jury selection.").)

Trial counsel for Mr. Thomas were deficient in failing to object to the State's request for a jury shuffle, and in failing to object to the state's disparate questioning of prospective juror Diane Willis, the only African American of the venire to reach individual voir dire.  Jury selection in Mr. Thomas's case took place precisely at the time that it was occupying center stage in the equal-protection debate before the Supreme Court.  Thus, *voir dire* began in January of 2005, nearly two years after *Miller-El I* was decided and over six months after the Court granted certiorari in *Miller-El II.*  Thus, when Mr. Thomas's case commenced, the Court had *already established* that "the prosecution's decision to seek a jury shuffle "when a predominate number of African-Americans [are] seated in the front of the panel … raise[s] a suspicion that the State sought to exclude African-Americans from the jury" and, at the very least, is a factor warranting a Certificate of Appealability.  *Miller-El I*, 537 U.S. at 346.  The Supreme Court had also already held that "[i]t follows that, if the use of disparate questioning is determined by race at the outset, it is likely a justification for a strike based on the resulting divergent views would be pretextual.

In this context the differences in the questions posed by the prosecutors are some evidence of purposeful discrimination." *Id.* at 344 (citing *Batson*, 476 U.S. at 97).

Defense counsel were well aware of the placement of the African Americans in the venire before and after the State's requested shuffle.  The state's conduct raised a suspicion of unlawful discrimination in the jury-selection process.  Nonetheless, neither Mr. Hagood nor Ms. Peterson challenged the shuffle on equal-protection grounds, nor asked for their own shuffle.  Defense counsel also had to be aware that only one African American juror was questioned on voir dire, and that the state employed disparate questioning to successfully challenge her for cause.  *See infra*.  In light of the Supreme Court's contemporaneous focus on equal protection challenges in the jury selection context – including the use of the jury shuffle and disparate questioning as evidence of discrimination - no reasonable defense attorney would have failed to raise an equal-protection challenge under these circumstances.

At a minimum, a reasonable attorney would have raised an equal protection challenge to preserve this issue for appeal.  *See Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62–63 (3d Cir. 1989) (finding that defense counsel's failure to object, at the defendant's request, to the State's use of peremptory challenges to excuse white venire members in the prosecution of a white defendant for the rape of a black female was unreasonable under prevailing professional standards where the Supreme Court's decision in *Batson* was pending at the time); *Davis v. Secretary for the Dep't of Corr.*, 341 F.3d 1310, 1314 (11th Cir. 2003) (finding trial counsel ineffective in a murder case for failing to adequately preserve *Batson*  issue for appellate review where there was evidence the claim was meritorious).  Indeed, it was common practice for defense counsel to raise equal-protection challenges to similar suspect jury-shuffle requests well before *Miller-El I* and *II* were on the horizon.  *See*, *e.g.*, *Ladd*, 3 S.W.3d at 563–64; *Sims*, 1998 Tex. App. LEXIS 6688, at *2; *Garrett*, 1996 Tex. App. LEXIS 2160, at *3; *Warren*, 877 S.W.2d

at 546; *Urbano*, 808 S.W.2d at 520.  Accordingly, trial counsel's performance fell below an

objective standard of reasonableness, rendering its performance deficient.  *See Strickland*, 466

U.S. at 688 (stating that an objective standard of reasonableness is judged under "prevailing

professional norms"); *Forte*, 865 F.2d at 62–63.

> **B.** **Defense Counsel's Deficient Performance Prejudiced Mr. Thomas, Particularly when Considered in Conjunction with the State's Disparate Questioning of the one African American Prospective Juror.**

By failing to object to the State's jury shuffle request, trial counsel's deficient

performance prevented Mr. Thomas from ensuring that his rights under the Equal Protection

Clause were not violated during the jury-selection process of his capital trial.  As the Court

emphasized in *Miller-El II*, harm to the defendant is implicit when racial discrimination infects

the jury-selection process, as such discrimination necessarily compromises the defendant's right

to be tried by an impartial jury.  545 U.S. at 237.  Furthermore, the Court stated that when the

prosecution "draw[s] racial lines in picking juries," it not only harms the defendant, but also

racial minorities more generally because such practices "establish 'state sponsored group

stereotypes rooted in, and reflective of, historical prejudice.'"  *Id.* at 237–38 (quoting *J.E.B. v.

Alabama*, 511 U.S. 127, 128 (1994)).  Ultimately, "[w]hen the government's choice of jurors is

tainted with racial bias, that 'overt wrong … casts doubt over the obligation of the parties, the

jury, and indeed the court to adhere to the law throughout the trial . . . .'"  *Id.* at 238 (quoting

*Powers v. Ohio*, 499 U.S. 400, 412 (1991)).

In light of the Court's repeated admonishments that racial bias in jury selection inherently

harms defendants, minorities, and the public at large, trial counsel's deficient performance –

which prevented Mr. Thomas from ensuring such racial bias did not infect his trial – was

sufficiently egregious that prejudice may be presumed.  *See Cronic*, 466 U.S. at 658 ("There are

… circumstances that are so likely to prejudice the accused that the cost of litigating their effect

in a particular case is unjustified."); *Nero*, 597 F.2d at 994 ("Sometimes a single error is so substantial that it alone causes the attorney's assistance to fall below the Sixth Amendment standard.").

At the very least, trial counsel's failure to challenge the State's discriminatory jury selection tactics, despite the fact that *Miller-El II* was pending at the time, prejudiced Mr. Thomas by failing to preserve the equal-protection issue for appeal.  *See Forte*, 865 F.2d at 64–65  (finding that defense counsel's failure to object to the prosecutor's use of peremptory challenges to excuse white venire members, thereby failing to preserve an equal-protection issue for appeal, was prejudicial where the Supreme Court's decision in *Batson* was pending at the time).  If this issue had been properly preserved, there is a reasonable probability Mr. Thomas would have succeeded in an equal-protection challenge.  *See Strickland*, 466 U.S. at 687–88 (holding that the defendant is prejudiced where, but for counsel's deficient performance, there is a reasonable probability the outcome at trial would have been different); *Davis*, 341 F.3d at 1316 (finding counsel's deficient performance in failing to preserve a *Batson* issue for appellate review prejudiced the defendant where there was a reasonable probability of success on appeal).

As discussed above, the jury-shuffle evidence in Mr. Thomas's case raised *precisely the same concerns* the *Miller-El II* Court considered when finding the jury shuffle was a factor evincing an equal-protection violation under *Batson*.  *See* 545 U.S. at 253–56.  Subsequent cases have emphasized that this jury-shuffle evidence was a "decisive factor" in the *Miller-El II* Court's conclusion that an equal-protection violation had occurred.  *See*, *e.g.*, *Murphy*, 416 F.3d at 439 (refusing to find a *Batson* violation where there was no evidence of a jury shuffle resulting in a decreased statistical presence of African-Americans in the venire, noting that such jury shuffle evidence was a "decisive factor[]" in *Miller-El II*); *McPherson v. Kentucky*, 171 S.W.3d 1, 3–4 (Ky. 2005) (emphasizing the import of the jury-shuffle evidence to *Miller-El II's*

67

determination that an equal-protection violation was established); *see also Jackson v. Dretke*, 181 Fed. Appx. 400 (5th Cir. 2006) ("To succeed on a *Batson* claim … a petitioner need not submit each type of evidence addressed by *Miller-El*.").  Accordingly, it is reasonably probable that an equal-protection challenge based on the State's jury-shuffle request in Mr. Thomas's case would have succeeded on appeal.

Success on appeal was especially likely in Mr. Thomas's case, where jury-shuffle evidence was not the only factor indicating the State's tactics during jury selection were racially discriminatory.  *See Miller-El II*, 545 U.S. at 255 (opining that, along with jury-shuffle evidence, another "body of evidence that the State was trying to avoid black jurors [was] the contrasting *voir dire* questions posed respectively to black and nonblack panel members").  In Mr. Thomas's case, as in *Miller El II*, a side-by-side comparison reveals that the State's questioning of the one African-American venire member reached during voir dire differed significantly from its questioning of white members.  Specifically, as demonstrated below, the State's questioning of this one African-American venire member on the issue of legal insanity was confusing and misleading, which ultimately served as a tactic to generate a cause to strike.  The State did not question white venire members in this manner.  Along with the jury-shuffle evidence discussed above, the State's disparate voir dire questioning further evidences an equal-protection violation in Mr. Thomas's case, increasing the probability that an Equal Protection challenge would have succeeded on appeal.  *See id.* at 261–66 (discussing the State's use of disparate questioning to elicit a disqualifying answer from African-American venire members and finding that, along with jury-shuffle evidence, this was a factor supporting the appellant's equal-protection claim); *Jackson*, 181 Fed. Appx. 400 ("To succeed on a *Batson* claim … a petitioner need not submit each type of evidence addressed by *Miller-El*.").

When questioning white venire members on the issue of legal insanity, the State

methodically and meticulously explained the relevant legal definitions and burdens of proof,

ensuring each individual understood the intricacies of the law.  Significantly, the State repeatedly

emphasized to white venire members that the legal definition of insanity is a precise definition

that differs from competency or mental illness generally.  The State carefully parsed this legal

definition for white venire members, asking if they understood what each and every element

meant and repeating each element throughout the questioning.  Furthermore, the State repeatedly

admonished white venire members that the defense, not the State, bears the burden of proving

insanity, explaining what this burden of proof means.  Consider, for example, the following

exchange in the State's questioning of white venire member Shirley Ruth Long:

> MR. ASHMORE:  Okay. So, [the State's] got to prove a person
> did [the crime].
>
> LONG:  Right.
>
> MR. ASHMORE:  Let's assume we do that and we rest.  Now the
> defense has the burden of proof to prove insanity.  Now, I want to
> be sure we're straight on this.  We've got the burden to prove a
> defendant committed the crime.
>
> LONG:  Correct.
>
> MR. ASHMORE:  The defense, however, has the burden of
> proving that he was insane.  We do not have a burden of proof.
> You know when I told you all persons are presumed innocent?
>
> LONG:  Right.
>
> MR. ASHMORE:  Well, all people are presumed sane.  Okay?
>
> LONG:  Okay.
>
> MR. ASHMORE:  And the defense has the burden of convincing
> the jury by a preponderance of the evidence that that a person was
> insane.  Do you see how that works?
>
> LONG:  Yes.
>
> MR. ASHMORE:  We go through the first part.  We convince you
> a person committed the crime.  Now the defense has to convince
> you by a preponderance of the evidence that the person didn't

know their conduct was wrong because of a severe mental disease or defect.

LONG:  I understand.

MR. ASHMORE:  I'm going to flip up here – we've got the insanity defense right here.  It is an affirmative defense to prosecution – and we are the prosecution.  It's an affirmative defense in a case that at the time of the conduct charged – that means the time of the crime –

LONG:  Right

MR. ASHMORE:  - the actor, that is the defendant, as a result of a severe mental disease or defect – so number one, it's got to be a mental disease or defect and, number two, it's got to be severe –

LONG:  Right.

MR. ASHMORE:  - did not know that his conduct was wrong. . . .  All right.  Now, as I told you … people are presumed sane.  The defense bears the burden of proof to prove someone insane.  We have no burden to prove that somebody is sane.

LONG:  Okay.

MR. ASHMORE:  Do you understand what I'm saying?

LONG:  Yes.

MR. ASHMORE:  Just like we've got to prove someone did it and the defense doesn't have to prove they didn't, they've got to prove someone is insane.  We don't have to prove they are insane.  Do you see what I'm saying?

LONG:  Yes.

MR. ASHMORE:  Okay.  So the defense must prove insanity.  We don't have to prove sanity. . . .  If you notice on the defense – on the insanity defense, that looks at the time of the crime.  Okay.  So, the focus is on the defendant's mental condition at the time of the crime.

LONG:  I understand what you are saying.

MR. ASHMORE:  Can you see that alright?

LONG:  Yes.

MR. ASHMORE:  Now, I want to be sure that I try to make something clear to you, and I'm not real good at it.  There is a difference between sanity and competency.  Did you know that?

LONG:  Not necessarily.

MR. ASHMORE:  Okay.  Under the law of the state of Texas, sanity, okay, or insanity, is because of a severe mental disease or defect a person didn't know their conduct was wrong.

LONG:  Okay.

MR. ASHMORE:  Would you agree with me that is a pretty high standard?

LONG:  Yes, it is a high standard.

MR. ASHMORE:  Competency, on the other hand, focuses on a defendant's mental state at the time of court proceedings, at the time of trial, and it's a completely different definition.

. . . .

MR. ASHMORE:  All right.  Now, in order to find somebody is insane, what has to happen is, you've got to have this severe mental disease or defect, and that as a result of that, a person didn't know their conduct was wrong.  Okay?

LONG:  Okay.

MR. ASHMORE:  So, it's contemplated by the law that a defendant – and you understand when I say defendant that is the person charged with the crime –

LONG:  Yes.

MR. ASHMORE:  - can have a severe mental illness and not be legally insane.

LONG:  Correct.

MR. ASHMORE:  Moreover, that mental disease or defect has to prevent them from knowing their conduct was wrong.

R.R. Vol. 12 pp. 16–20.

The State took similar care in explaining the law and burdens of proof associated with the

insanity defense when questioning white venire member Douglas Alan McConkey:

71

MR. ASHMORE:  Okay.  Now I want to talk to you a little about the insanity defense.  Okay?  See if you can follow me on this.  See if I explain it okay.  If I don't, you just help me understand where I'm failing to do what I need to do.

MCCONKEY:  Okay.

MR. ASHMORE:  . . . .  So, the State, in a case where there's been a not guilty by reason of insanity, has still got to prove that the person did it, right?

MCCONKEY:  Right.

MR. ASHMORE:  Okay.  So, all I'm saying is, the fact that someone pleads not guilty by reason of insanity doesn't mean we don't have to prove they did it.  We've still got to prove it.

MCCONKEY:  I understand.

MR. ASHMORE:  So, we put on evidence that a person did the crime, and then Mr. Brown's going to stand up and say, the State rests.  Then if the defense is going to pursue the insanity defense, they have a right to put on evidence in their case-in-chief.

MCCONKEY:  Okay.

. . . .

MR. ASHMORE:  . . . .  [T]he insanity defense in the Texas Penal Code says, It is an affirmative defense to the prosecution that at the time of the conduct charged – that is, at the time of the crime, okay –

MCCONKEY:  I understand.

MR. ASHMORE:  - the actor – that's the defendant, the person charged with the crime – as a result of severe mental disease or defect did not know his conduct was wrong.

MCCONKEY:  Okay

. . . .

MR. ASHMORE:  All right.  Now, let's talk about the insanity defense.  Now, you remember a while ago, I told you people are presumed innocent.  Well, people are also presumed sane.  So, that presumption of innocence, I've got to prove someone is guilty, right?

MCCONKEY:  Right.

MR. ASHMORE:  The defense doesn't have to prove someone is not guilty.  The reverse is true on the insanity defense.  People are presumed sane, and because they are, then the defense has the burden of proof.  They've got the burden of proving to the jury that a person is insane.

MCCONKEY:  I understand.

MR. ASHMORE:  The State does not have the burden of producing evidence or the burden of persuading a jury that the person is sane.

MCCONKEY:  I understand.

MR. ASHMORE:  Okay.  So, the defendant must prove insanity. . . .

. . . .

MR. ASHMORE:  Notice that on the insanity defense, number one, it has to be a severe mental disease or defect.  And it's got to be so severe that a person really didn't know their conduct was wrong.

MCCONKEY:  I understand.

MR. ASHMORE:  Do you believe that it is possible for a person to be mentally ill and sane?

MCCONKEY:  Yes.

R.R. Vol. 12 p. 239–43, 247–49.

In yet another example, when questioning Kyle McCoy, the State once again took great pains to ensure this white venire member understood the difference between legal insanity and mental illness generally:

MR. ASHMORE:  So, in looking at the affirmative defense here, number one, they've got the burden of proof.  Number two, … insanity is determined at the time of the offense charged, okay, at the time of the crime.  Now, … insanity is a different standard.  It's a different defense and has nothing to do with competency to stand trial.  Okay?  I hear a lot of people that don't do this for a living.  They will interchange sanity and competency . . . .  [B]ut the two are different because competency has to do with your mental state

73

at the time of court proceedings, and whether you can communicate with your lawyer, and whether you have a rational and factual understanding of the proceedings.  So, it's a completely different standard.  It's a completely different focus than sanity.  Do you understand what I am saying?

MCCOY:  Yes, sir.

. . . .

MR. ASHMORE:  Do you believe that it's possible for a person to be sane [sic], that is, be mentally ill, but still know their conduct was wrong.  Okay?

MCCOY:  I think it is possible for a person to be sane and then realize their conduct was wrong.

MR. ASHMORE:  Well, no, no.  The definition of … insanity is that because of a severe mental disease or defect a person doesn't know their conduct was wrong.  Okay?  That's what insanity is.

MCCOY:  Okay.

MR. ASHMORE:  . . . .  In other words, a defendant can have a mental disease and still be sane, because that disease has to be so severe that it actually means a defendant didn't know his conduct was wrong.

. . . .

MCCOY:  I'm having trouble understanding how a person can be sane – deemed sane, yet incompetent.

. . . .

MR. ASHMORE:  I didn't say they weren't mentally ill.  Okay.  But the mental illness has got to be so bad that they don't know their conduct is wrong.  What would you think would indicate a person did or didn't know their conduct was wrong?

R.R. Vol. 12 pp. 340–43.

In a final example, when white venire member Mary Blair expressed her belief that "anybody that would kill their children is probably insane," the State *immediately and repeatedly advised* her that the legal definition of insanity involves more than mental illness:

BLAIR:  . . . .  I think anybody that would kill their children is

74

probably insane.  I didn't realize they rejected [the insanity defense in the Andrea Yates case.]  I didn't know that.

MR. BROWN:  When you say  insane, what –

BLAIR:  That is my definition of insane, anybody that would kill their children.

MR. BROWN: - if anything, what do you think of when you think of insane?

BLAIR:  Just totally out of control of your mental capacities.

BROWN:  This is the legal definition in Texas of what the insanity defense is.  And it is more than – it is more than that.  It is more than having a mental illness; we will talk a little bit about it. . . . [T]he insanity defense in Texas says, It is an affirmative defense to prosecution in a case that at the time of the conduct charged, that means at the time of the crime, the actor, or the defendant, as a result of a severe mental disease or defect did not know his conduct was wrong.  Okay.  So, you see, it says as a result of a severe mental disease or defect the actor did not know his conduct was wrong.  So, it is more than just that they were mentally ill or that they had a psychological problem.  It's got to be to such a degree that the actor did not know that his conduct was wrong.  All right.  In other words, if were going to make it a defense that if you had a mental illness you would not be criminally responsible, we've just said the actor … had a severe mental illness, period, and then wouldn't have gone on, but you see it's more than that.

R.R. Vol. 21 pp. 38–39.

The above examples are representative of the State's questioning of virtually all white venire members throughout voir dire.  Indeed, Margarete Cummings was virtually the only white venire member whose questioning on the issue of legal insanity was not comparably thorough.  Ms. Cummings, however, was quickly struck for cause because she worked at Wilson N. Jones Hospital and was present when Mr. Thomas was hospitalized following the killings.  Ms. Cummings stated that if asked to make decisions as a juror in Mr. Thomas's case, she would be unable to set aside what she had learned about him in the course of her employment at the hospital.  R.R. Vol. 13 pp. 97–99.

75

In stark contrast to this thorough and methodical questioning on the complex issue of legal insanity, the State's questioning of Diane Willis – the only African American venire member questioned – did not involve a careful and comprehensible explanation of the law. Rather, when questioning Ms. Willis, the State deliberately obfuscated both the elements of legal insanity and the related burden of proof as a tactic to create cause to strike.  Indeed, in direct contrast to its questioning of Ms. Blair, the State began Ms. Willis's voir dire on insanity by asking – *without any prior discussion whatsoever of the relevant legal definition* – whether Willis believed someone would be *legally insane* to kill their own child:

> MR. ASHMORE:  Okay.  Did – a while ago when the Judge was talking to you a little bit, he asked you if you had formed an opinion, and I thought you said insane.  What did you mean by that?
>
> WILLIS:  When a person killed their own child – children.
>
> MR. ASHMORE:  All right.  Does that – does that tend to make you think someone would be *legally insane* to do that?
>
> WILLIS:  In some ways.

R.R. Vol. 22 p. 42 (emphasis added).

When the State finally did address the relevant law with Ms. Willis, unlike its questioning of white venire members, the State did not make any attempt to break the law down into understandable pieces.  It did not restate the individual legal elements multiple times, as it did with white venire members.  Perhaps most importantly, the State did not even bother to explain – as it did repeatedly with white venire members –  that legal insanity is not the same as competence or mental illness generally.  Quite the opposite, it gave the bulk of the law to Ms. Willis only once, in a single stream of information, which arguably no lay person could fully comprehend.  It then proceeded to ask Ms. Willis about presumptions of sanity and burdens of proof, without ever offering an adequate explanation of these terms.  Perhaps most egregiously,

the *State itself* used terms such as "snapped," "nuts," and "crazy" in a manner that indicated these terms were interchangeable with legal insanity.  In so doing, the State implied that Ms. Willis's beliefs about mental illness generally were indicative of her beliefs about legal insanity and, in turn, of whether she could follow the relevant law.  The following exchange exemplifies the dramatically different approach the State took in its questioning of Ms. Willis, as opposed to white venire members, on the insanity issue, indicating its strategy to remove Ms. Willis for cause:

> MR. ASHMORE:  Insanity says, It's an affirmative defense to prosecution in a case – that means it can get a person off the hook. Okay.  That at the time of the conduct charged – what that means is, at the time of the crime, okay – the actor – that's the defendant – as a result of a severe mental disease or defect, did not know his conduct was wrong.  Okay, Now, another thing about the insanity defense is, the questionnaire tells you, is that because this is an affirmative defense, what that means is, the defense has the burden of proving someone is insane.  The State, Mr. Brown and I, don't have a burden.  Okay, … Now, here's the thing the questionnaire says, is people are presumed sane.  Okay.  Now, do you kind of understand what this defense is?

> WILLIS:  Uh-huh.

> MR. ASHMORE:  Now, having us gone over it here briefly, do you have any thoughts about that?

> WILLIS:  About the insane?

> MR. ASHMORE:  About the law.  About the insanity defense.

> WILLIS:  No.

> MR. ASHMORE:  None whatsoever?  Because most of the time when we talk about insanity, most people have a pretty good opinion about that.  Some people believe that everybody that's mentally ill ought to have a defense.  Some people believe that this is abused and it's just a cop out.  Other people say, Well, yeah, I understand the law and I understand why it's like that.  So most people in this day and time have – there's been a lot of insanity defense in the media and newspapers here in the last few years. You usually have an opinion about that.  What about you?

WILLIS:  None right offhand.

MR. ASHMORE:  None?

WILLIS:  No.

MR. ASHMORE:  Okay.  All right.  Well, let me – do you know what I mean when I say a person on trial is presumed innocent?

WILLIS:  Yes.

MR. ASHMORE:  What does that mean to you?

WILLIS:  Innocent until proven guilty.

MR. ASHMORE:  Exactly.  Now, everybody in Texas, everybody in the country, is presumed innocent when criminal charges are brought.

WILLIS:  Right.

MR. ASHMORE:  And I'm assuming you can do that in this case.  Right?  I need you to answer out for the court reporter.

WILLIS:  Yes.

MR. ASHMORE:  Now, on the other hand, persons are presumed sane.  Because, you see, we don't have to prove somebody sane.  They have got to prove somebody's insane.  Now, let me tell you what my concern is:  You told the Judge a while ago, when he asked you if you had formed an opinion, and you said, Insane, when you first started talking with the Judge.  Then, a little while ago, you told me, Well – and I'm not trying to put words in your mouth.  If this isn't accurate, you tell me – well, I kind of think people got to be somewhat insane to kill their own children, right?

WILLIS:  Yes.

MR. ASHMORE:  Well, in a case where a person is accused of killing his own child, are you going to be able to presume that person is sane.

. . . .

MR. ASHMORE:  You told the Judge that – when he said have you heard anything that's given you an opinion, you said, Insane.  Right?

WILLIS:  (Nods head.)

78

MR. ASHMORE:  And then you told me, Well, someone who kills their own children, I think they are somewhat insane.  Well, you know those are the allegations in this case, right?

WILLIS:  Yes.

MR. ASHMORE:  And you've stood around, I guess, at work or at church – where you were talking to people about this?

WILLIS:  At work and people I seen on the street.

. . . .

MR. ASHMORE:  Okay.  And I would assume, did you ever hear anybody say, Well, Lord, if he killed his own children, he's got to be crazy?  Did you hear that?

WILLIS:  I heard that, uh-huh.

MR. ASHMORE:  Did you agree with them?

WILLIS:  Yes.

MR. ASHMORE:  Okay.  All right.  So, you see where that leads us is, it sounds like to me that, as you sit here right now, you've already kind of got an opinion that the defendant in this case is insane.  Am I wrong?

WILLIS:  I feel that he has problems.

. . . .

MR. ASHMORE:  Okay.  So, I guess what I'm trying to find out in this situation, from what you have heard on the – in – read in the newspaper, heard on the TV, and these folks you've talked with in and around Denison, at work and on the street, people were talking about he was crazy, and you were thinking that he had a problem, you told the Judge you had an opinion that he was insane, you told me, to kill your own children you have got to be somewhat insane, and then, you put in your questionnaire that he snapped, meaning he went nuts, now, would I be correct in saying that it sounds like that you are going to want me to prove that this defendant is sane . . . .?

R.R. Vol. 22 p. 44–47, 50–54.

As demonstrated above, the State wholly failed to explain the complex law of insanity to

Ms. Willis in a comprehensible fashion.  This failure was undoubtedly calculated to position the

State to strike Ms. Willis for cause.

In fact, the prosecution *expressly opined* that unless the complicated law of insanity is adequately explained, venire members may erroneously indicate that they have made up their mind on guilt-innocence.  In opposing the defense's motion to strike white venire member Linda Ballard, who indicated she believed Mr. Thomas was guilty because he had been found competent, the prosecution stated as follows:

> MR. ASHMORE:  Judge, we would ask the Court to explain to her the fact that she – this gets a little complicated – the interplay with insanity.  People can still believe someone committed a crime, but in a case where there is a not guilty by reason of insanity plea, not necessarily have made up their mind on guilt-innocence, unless [legal insanity] is explained to them is how I see it.

R.R. Vol. 15 p. 107 (responding to the defense's motion to strike).

In *Miller-El II*, the Court described the prosecution's virtually identical tactic of failing to explain the law to some venire members as "trickery."  545 U.S. at 261.  The State in *Miller-El II* questioned venire members about the lowest sentence they would consider imposing for murder.  *Id.*  When addressing most venire members, the State carefully explained the relevant Texas law on minimum sentences before asking this question.  *Id.*  In some instances, however, the State did not explain this law prior to questioning, thereby "tricking" the venire members into giving answers that would generate cause to strike.  *Id.*  The State argued that this disparate questioning was not based on race, but rather on ambivalence to the death penalty expressed in the latter's questionnaires.  *Id.* at 261–62.  The Court found that where the State used this tactic on 100% of the African American venire members who expressed such ambivalence, but only on 27% of the white venire members who did so, "the implication of race in the prosecutor's choice of questioning c[ould] not be explained away."  *Id.* at 263.

Here, as in *Miller-El II*, the fact that the State used a deliberately obfuscating line of

questioning on insanity with Ms. Willis, but did not do so with the vast majority of white venire members – including Ms. Blair, who expressed *the very same belief* about insanity as Ms. Willis, *i.e.*, that someone who kills their own child must be insane – evidences that the State "more often wanted blacks off the jury." *Miller-El II*, 545 U.S. at 255, 261–63 (opining that where a line of questioning designed to elicit grounds to strike "is given to a higher proportion of blacks than whites, this is evidence that the prosecutors more often wanted blacks off the jury, absent some neutral and extenuating explanation").  This evidence, along with the jury shuffle evidence discussed above, clearly demonstrated the State's tactics during jury selection were racially discriminatory.  *See id.*

In light of the foregoing discussion, it is clear Mr. Thomas had a reasonable probability of succeeding in an equal-protection challenge on appeal.  Thus, but for trial counsel's deficient performance in failing to preserve this issue, there is a reasonable probability the outcome of Mr. Thomas's case would have been different.  *See Strickland*, 446 U.S. at 695.

C.     **The State Habeas Court's Findings and Conclusions are not a Bar to Relief.**

Many of the state habeas court's Findings and Conclusions support this claim of ineffective assistance of counsel.  For instance, the findings – outlined and discussed in the section above – which support the substantive claim likewise support the assertion of constitutionally ineffective assistance.  See FF ¶¶ 66-67, 69-71.  To the extent that there are findings that do not support the substantive claim, they are unreasonable in light of the evidence presented, as outlined supra.  The conclusions that are relevant to the substantive claim – and the nature in which they are contrary to or an unreasonable application of Supreme Court law is also discussed *supra*, and incorporated herein.

The only Findings or Conclusions directly relevant to this claim is the finding that "Applicant did not object to the shuffle" FF ¶ 69 and CL ¶ 56, and the finding that Mr. Thomas

"has not demonstrated that his counsel's performance fell below a reasonable objective standard, and he has not demonstrated that any alleged error prejudiced his defense.  For the reasons outlined above, detailing counsel's deficiency in failing to object, and the prejudice which resulted, Mr. Thomas submits that these conclusions are contrary to and an unreasonable application of clearly established law.  See 28 U.S.C. §2254(d).   It is of particular note that nowhere does the state habeas court cite to or recognize either *Miller-El* opinion.  The discussion and application of *Batson* in those Supreme Court decisions is directly relevant to an evaluation of Mr. Thomas's claims – yet is entirely ignored by the state court below.  As such, and for the reasons outlined above, state habeas court's findings and conclusions do not bar the relief to which Mr. Thomas is entitled.

## VI. The Presence of Jurors Opposed to Interracial Relationships Deprived Mr. Thomas of a Fair Trial and Violated His Right to Equal Protection under The Sixth and Fourteenth Amendments.

In *Gregg*, the Supreme Court emphasized that "death as a punishment is unique in its severity and irrevocability."  428 U.S. at 187.  Accordingly, the Court stated it "has been particularly sensitive to insure that every safeguard is observed" in determining the death penalty is appropriate in any given case.  *Id.*; *accord Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (stressing the "need for reliability in the determination that death is the appropriate punishment in a specific case").  Such safeguards undoubtedly include, at the very least, ensuring the sentencing body in a capital case is free from any biases that would prevent it from following applicable law or rendering a fair verdict.  Thus, the Sixth and Fourteenth Amendments demand "the impartiality of any jury that will undertake capital sentencing."  *Morgan v. Illinois*, 504 U.S. 719, 728 (1992); *Turner v. Murray*, 476 U.S. 28, 36 & n.9 (1986) (plurality opinion).  Indeed, trial by a biased decision-maker is an archetypal structural defect.  *See Tumey v. Ohio*, 273 U.S. 510 (1927).  As such, no showing of harm is required.  *See, e.g.*, *United States v. Olano*, 507

U.S. 725, 735 (1993) (structural errors are considered presumptively prejudicial in part because "the defendant cannot make a specific showing of prejudice arising from them").

Mr. Thomas's fate in this case - which involved a violent interracial crime, Mr. Thomas's interracial marriage to Ms. Boren, and Mr. Thomas and Ms. Boren's mixed-race child - was in the hands of an all-white jury.  Four of the people who sat on this jury *openly admitted* in their jury questionnaires that they "oppose people of different racial backgrounds marrying and/or having children."  *See* Ex. 75 ¶ 105; Ex. 76 ¶ 105; Ex. 77 ¶ 105; Ex. 78 ¶ 105.  Given the facts of Mr. Thomas's case, it is highly likely that the self-proclaimed racial biases of these four impaneled jurors prevented or substantially impaired "the performance of [their] duties … in accordance with [their] instructions and [their] oath'" in Mr. Thomas's capital trial.  *Wainwright*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45); *see also* M*organ v. Illinois,* 504 U.S. at 729.

Indeed, as the Supreme Court emphasized in *Miller-El II*, "[i]t is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy."  *Miller-El II*, 545 U.S. at 237 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880)); *see also Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  Based on the foregoing principles, the state habeas court's cursory finding that "[t]here is *no evidence* that the jury's decision was racially motivated," FF ¶ 72 (emphasis added), is patently unreasonable in light of the evidence presented.

Moreover, there is no requirement that Mr. Thomas show that the jury's decision was racially motivated, as a showing that a jury was not impartial creates structural error.  *See Tumey v. Ohio*, 273 U.S. 510 (1927); *United States v. Olano*, 507 U.S. at 735 (1993).  There is certainly no requirement that he prove "purposeful discrimination" by a "preponderance of the evidence." CL ¶ 52.  As such, the trial court's findings and conclusions are both unsupported by the

evidence, and contrary to clearly established Supreme Court law.  *United States v. Olano*, 507 U.S. 725 (1993).

As set forth above, the state habeas court received clear and unequivocal evidence that no less than four impaneled jurors harbored admitted racial bias.  *See* Ex. 75 ¶ 105; Ex. 76 ¶ 105; Ex. 77 ¶ 105; Ex. 78 ¶ 105.  On their juror questionnaires, venire members were asked three questions regarding their opinions on interracial marriage.  Questions 103 and 104 asked jurors about any opinion their religion had about interracial marriage.  Question 105 specifically asked venire members to identify their feelings about people of different racial backgrounds marrying and/or having children.  Ex. 73 ¶¶ 103, 104, 105.   Three jurors impaneled in Mr. Thomas's case – Barbara Armstrong, Charles Copeland, and Norma Hintz – stated that they "oppose people of different racial backgrounds marrying and/or having children."  *See* Ex. 75 at ¶ 105; Ex. 76 ¶ 105; Ex. 78 ¶ 105.   Impaneled juror Marty Ulmer not only admitted that he opposed interracial marriage, but emphasized that he was "vigorously" against it and was "not afraid to say so."  Ex. 77 ¶ 105.  On his questionnaire, Ulmer additionally wrote, "I don't believe God intended for this."  *Id.*

Beyond the clear evidence demonstrating that the foregoing jurors harbored admitted racial bias, as discussed *infra*, the record further shows that Mr. Thomas's counsel failed to conduct any meaningful questioning regarding racial bias – either of the foregoing or of any other venire members – during voir dire.  Significantly, the record demonstrates that neither Mr. Hagood nor Ms. Peterson asked jurors Armstrong, Copeland, or Hintz *a single question* to discern whether their admitted racial biases would affect their ability to serve as impartial jurors in Mr. Thomas's capital case.  *See generally* R.R. Vols. 16, 26, 143.  Moreover, despite juror Ulmer's overt statements against interracial marriage, indicating potential for significant racial bias, Ms. Peterson asked juror Ulmer only three general questions to discern whether he could sit

84

as a fair and impartial juror in Mr. Thomas's capital case.  R.R. Vol. 16 pp. 64–66.  Specifically, Ms. Peterson asked, in the broadest terms, whether juror Ulmer's views would affect his deliberations on guilt, innocence, or sentencing.  *See id.*  Neither Ms. Peterson nor Mr. Hagood asked juror Ulmer any pointed questions to determine whether his admitted biases would influence his ability to decide impartially the specific issues in Mr. Thomas's case.  *Id.*

In sum, the state habeas court's findings are based upon inferences that are not supported by the record evidence, and the conclusions are contrary to Supreme Court law.   The facts compel the conclusion that Mr. Thomas is entitled to relief on this claim.

## VII.   Defense Counsel's Failure to Inquire into Racial Prejudice Deprived Mr. Thomas of His Constitutional Right to Effective Assistance of Counsel.

The reasons underlying the unconstitutionality of the presence of biased jurors on Mr. Thomas's capital jury are set forth above.  Defense counsel's failure to inquire into racial prejudice during voir dire, despite the facts that racial factors were inextricably intertwined with the issues present in Mr. Thomas's trial and several venire members admittedly harbored racial biases, further violated Mr. Thomas's constitutional rights by depriving him of effective assistance of counsel under *Strickland*.

### A.   Defense Counsel's Failure to Adequately Inquire into Jurors' Racial Prejudice in Mr. Thomas's Racially Charged Capital Case Rendered Counsels' Performance Deficient.

"The Fourteenth Amendment's Due Process Clause independently requires the impartiality of any juror impaneled to try a cause."  *Morgan v. Illinois*, 504 U.S. 719, 726 (1992). Indeed, the Sixth and Fourteenth Amendments demand jury impartiality, particularly in a capital sentencing proceeding.  *Id.* at 728; *see Turner v. Murray*, 476 U.S. 28, 36 & n.9 (1986) (plurality opinion); *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *Adams v. Texas*, 448 U.S. 38, 40 (1980).

The constitutional guarantees that these amendments, as well as the Texas Constitution, afford – including not only the right to an impartial jury, but also the right to counsel –

necessarily include an adequate voir dire to identify unqualified jurors.  *See* U.S. Const. amends. VI, XIV; Tex. Const. art. I, § 10; *Morgan*, 504 U.S. at 729.  As the Court observed in *Rosales-Lopez v. United States*, "Without an adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."  451 U.S. 182, 188 (1981) (plurality opinion).

The proper standard for determining when a prospective juror may be excluded for cause because of his or her views is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45).  As the Court admonished in *Morgan v. Illinois*, "[A] capital defendant may challenge for cause any prospective juror who maintains such views.  *If even one such juror is empaneled [sic] and the death sentence is imposed, the State is disentitled to execute the sentence*."  504 U.S. at 729 (emphasis added).

The *Morgan* Court emphasized that general questions as to whether a potential juror can follow the law as instructed or remain impartial despite any biases she may have in no way suffice to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath."  *Id.* at 734–35.  In fact, the Court observed:

> It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that [his or her] beliefs … would prevent him or her from doing so.  A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such a misconception.  [Where such voir dire does not occur,] the risk that such jurors may have been empanelled … and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized."

*Id.* at 735–36 (quoting *Turner*, 476 U.S. at 36 (footnote omitted) (emphasis added) (final alteration in original)).

Ultimately, the Court stated, "[W]e have not hesitated, *particularly in capital cases*, to

find that certain inquiries [into jurors' potential biases] must be made to effectuate constitutional protections." *Id.* at 729 (emphasis added) (discussing *Ham v. South Carolina*, 409 U.S. 219, 526–27 (1973), which held that in a racially sensitive case, the Fourteenth Amendment's prohibition on racial discrimination required the trial judge to interrogate potential jurors on the issue of racial bias).

In light of the foregoing principles, it is well established that in racially charged cases, defendants have a constitutional right to specific inquiry by their counsel into possible racial bias to ensure no venire member harboring such bias is impaneled. *See Ham*, 409 U.S. at 526–27 (holding that where racial issues are inextricably bound up with the conduct of trial, the defendant has a right under the Fourteenth Amendment's Due Process Clause to have potential jurors interrogated on the issue of racial bias); *Potter v. State*, 216 S.W. 886, 888 (Tex. Crim. App. 1919) (finding that the defendant in a racially charged liable case had a constitutional right to ask potential jurors whether they would be prejudiced against him). Such inquiry is required when "under all of the circumstances of the case presented there [is] a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as (they stand) unsworne.'" *Ristaino v. Ross*, 424 U.S. 589, 596 (1976) (quoting *Coke on Littleton* 155b (19th ed. 1832)); *accord Ham*, 409 U.S. at 427.

In *Mu'min v. Virginia*, the Court opined that "the possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice." 500 U.S. 415, 424 (1991) (discussing the Court's holding in *Turner*, 476 U.S. 28, noting "that in a capital case involving a charge of murder of a white person by a black defendant such questions [as to racial prejudice] *must be asked*") (emphasis added). Accordingly, defense counsel's failure to inquire into potential racial prejudice in such a case falls below an objective standard of reasonableness.

*See Butler v. State*, 1988 WL 63526, at *2–4 (Tenn. Ct. Crim. App. June 23, 1988) (where a black defendant was accused of raping a white victim and where jury as finally sworn included no non-white members, counsel's failure to inquire into potential racial prejudice rendered its performance ineffective).

Given the highly racially sensitive nature of this case, Mr. Thomas had a constitutional right to have potential jurors questioned on the issue of racial bias.  *See Mu'min*, 500 U.S. at 424; *Ham*, 409 U.S. at 526–27; *Potter*, 216 S.W. at 888.  Under the racially charged circumstances present in this case, any reasonable defense attorney would have inquired into possible racial bias to ensure that no venire member harboring such prejudice would be impaneled and thereby infect the decision making in Mr. Thomas's capital trial.  *See Butler*, 1988 WL 63526, at *2–4.

Indeed, in *Butler v. State*, the court recognized that the principles the Supreme Court established in the foregoing cases warranted a finding of ineffective assistance under circumstances similar to those in the instant case.  *Id.*  The defendant in *Butler*, who was tried before an all-white jury, was a black man accused of raping a white woman.  *Id.* at *1–2.  In determining that counsel's failure to inquire into racial bias under these circumstances fell below an objective standard of reasonableness, the court opined:

> The issue of jury selection is closely woven in the fabric of fair trial.  It affects several of defendant's constitutional guarantees, including the right to be tried by a jury of peers, right to effective assistance of counsel, and due process as well as equal protection rights.
>
> ***
>
> It is indisputable, and common knowledge in our multi-colored community, that racial prejudice is a malady still with us.  We think, therefore, that it was altogether possible, and more likely probable, that some jurors, as they stood unsworn, harbored beliefs or attitudes which interfered with their ability to be impartial.  Furthermore, the particular facts of this case [involving an alleged rape of a white woman by a black man] created the very real danger that old prejudices could have been recalled, new ones

> created, or both.  In spite of this perilous state of affairs, not a
> single question was asked by defendant's counsel concerning
> prospective juror's potential for fairness and impartiality
> notwithstanding the racial overtones and disturbing facts.
>
> ***
>
> It was imprudent for counsel to have proceeded to trial in this case
> without having first mounted an intensive effort to moderate the
> effect of prejudice.  Whether occasioned by neglect or resolve, this
> conduct is unacceptable to us, especially in light of the ease with
> which the lurking danger could have been, and in our opinion,
> should have been, avoided or at least minimized.

*Id.* at *2–4 (discussing *Ham*, *Ristaino*, and *Turner* in finding "by a preponderance of the

evidence that defense counsel should have interrogated prospective jurors with a view toward

exposure of racial bias").

Here, as in *Butler*, "it was altogether possible, and more likely probable, that some jurors,

as they stood unsworn, harbored beliefs or attitudes which interfered with their ability to be

impartial."  *Id.* at *3.  In fact, in Mr. Thomas's case, it was even more likely than in *Butler* that

some jurors harbored prejudices that would interfere with their capacity to be impartial.  Unlike

the jurors in *Butler*, the jurors in Mr. Thomas's case were death qualified.  As Professor Brooke

Butler's recent study of over 2,000 potential jurors revealed, "death qualified jurors … are more

likely to be prejudiced – to be racist, sexist, and homophobic."  Adam Liptak, *Ruling Likely to

Spur Convictions in Capital Cases*, New York Times (June 9, 2007).  Furthermore, a 2001 study

published in the University of Pennsylvania Journal of Constitutional Law found that "race

play[s] an important role in the willingness of jurors to impose death sentences."  *Id.*  Thus, the

need for adequate voir dire to reveal potential racial biases was even more significant in Mr.

Thomas's case than it was in *Butler*.

Defense counsel's deficient performance during voir dire is further evidenced by the fact

that Nona Dodson, a jury consultant with experience in capital cases who volunteered to advise

89

Mr. Thomas's counsel, quit after counsel repeatedly failed to follow her direction.  *See* Ex. 8 ¶¶ 2–3, 8–9.  In particular, Dodson specifically advised counsel on numerous occasions to reach the *specific issues* in Mr. Thomas's case during questioning, as opposed to asking general "follow the law" questions.  *Id.* ¶ 4–6.  Dodson states that defense counsel Bobbie Peterson – who had previously worked as a prosecutor, and in fact ran for District Attorney shortly before Mr. Thomas's trial – "had the voir dire style of a prosecutor" and "did not know how to ask questions designed to reveal biases that may affect jurors in deciding the particular issues in a defendant's capital case."  *Id.* ¶ 4.  Although Dodson repeatedly gave Ms. Peterson specific questions to ask in order to ensure any such biases were revealed, she continued to ask "superficial" questions that did not reach the particular issues arising in Mr. Thomas's case.  *Id.* ¶ 5–6.  Mr. Hagood flatly refused to follow Dodson's advice.  *Id.* ¶ 7.  After working with defense counsel for several days, Dodson quit in frustration, firmly believing that "Mr. Thomas was bound to be prejudiced by the jury his counsel selected" because "the defense did not at any time adequately question jurors to reveal potential biases relevant to the issues to be decided."  *Id.* ¶ 8–9.  Dodson was so distraught by defense counsel's performance during voir dire that she left feeling "certain that Mr. Thomas's jury was not qualified to render a fair verdict and sentence."  *Id.* ¶ 9.

Ultimately, the rule of *Turner* reflects a broad consensus among trial lawyers that appropriately conducted voir dire is capable of eliciting truthful information about jurors' biases, including racial prejudice.  *Turner*, 476 U.S. at 36; *see also Aldridge v. United States*, 283 U.S. 308, 315 (1931) (rejecting argument that explicit racial questioning would harm justice system, emphasizing that "it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred").  Of course, no competent attorney would directly accuse a potential juror of being a bigot; instead, jurors' "biased attitudes must be

revealed by circumstantial evidence." *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977); *see also Turner*, 476 U.S. at 35 (authorizing voir dire on racial issues in all interracial capital cases in order to help discover "subtle, less consciously held racial attitudes" which might impact a juror's impartiality).[28]   In sum, careful questioning – especially conducted outside the presence of other jurors, as in Texas[29] – presents a reasonable chance of uncovering racial bias in prospective jurors.[30]   In Mr. Thomas's case, the defense failed to ask any meaningful questions regarding race.[31]

Indeed, defense counsel's failure to interrogate potential jurors who *specifically admitted* they were opposed to interracial relationships highlights the deficiency of counsel's performance. As previously noted, four impaneled jurors disclosed on their jury questionnaires that they "oppose people of different racial backgrounds marrying and/or having children," thereby raising overwhelming concerns that significant racial bias affected the jury's decision-making process in

[28]    Studies show that "[o]pen-ended, non-leading questions" can penetrate prospective jurors' otherwise "stereotyped and socially desirable responses" to questions about racial attitudes.  1 *National Jury Project, Inc., Jurywork: Systematic Techniques* § 2.11[2], at 2- 72.32.

[29]    "In a capital felony case in which the State seeks the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning [general] principles. . . . Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court."  Tex. Code Crim. Proc. Ann. art. 35.17(2).

[30]    *See, e.g.*, Sheri Lynn Johnson, *Black Innocence and the White Jury*, 83 *Mich. L. Rev.* 1611, 1675-76 (1985) (citing studies of voir dire by social science researchers noting that jurors are most likely to admit biases when voir dire is conducted individually and prefaced by a relaxed interview).

[31]    Even if questioning does not remove all biased jurors, the open discussion of racial bias and its potential impact on the case spurs all jurors to extra objectivity.  In controlled studies, mock juries consistently showed *less* racial bias in cases in which race was openly discussed or acknowledged as salient to the case.  Samuel R. Sommers & Phoebe C. Ellsworth, *The Jury And Race: How Much Do We Really Know About Race And Juries? A Review Of Social Science Theory And Research*, 78 *Chi-Kent L. Rev.* 997, 1012-13 (2003) (summarizing results of several published studies showing that white jurors tended to draw negative assumptions about black defendants during mock trials, and convicted them more often than white defendants given identical facts, *but* that "[o]nce concerns about racism were made salient in the experimental situation, White mock jurors rendered unbiased decisions based only on the admissible facts of the case").

Mr. Thomas's capital trial.  *See* Ex. 75 ¶ 105; Ex. 76 ¶ 105; Ex. 77 ¶ 105; Ex. 78 ¶ 105.

Furthermore, as in *Butler*, the fact that Mr. Thomas was accused of an interracial crime involving

an interracial sexual relationship "created the very real danger that old prejudices could have

been recalled, new ones created, or both."  *Butler*, 1988 WL 63526, at *3.  Accordingly, defense

counsel's failure to ask *a single question* about racial bias of thirteen out of fourteen impaneled

jurors – including three individuals who *admittedly harbored such biases* – rendered its

performance deficient.  *See id.* at *4; *see also Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004)

(finding counsel ineffective in defendant's murder case where counsel failed to question

adequately or challenge a juror who admittedly harbored some bias, stating that "the decision

whether to seat a biased juror cannot be a discretionary or strategic decision" because it amounts

to "a waiver of a defendant's basic Sixth Amendment right to trial by an impartial jury"); *State v.*

*Lamere*, 112 P.3d 1005, 1011 (Mont. 2005) (finding counsel ineffective for failing to adequately

question a prospective juror on whether she could remain impartial where the juror disclosed

information on her questionnaire that suggested she might be biased); *Presley v. State*, 750

S.W.2d 602 (Mo. Ct. App.), *cert. denied*, 488 U.S. 975 (1988) (finding counsel ineffective for

failing to question adequately or challenge a venireman who admitted bias).

Likewise, counsel's failure to ask no more than three general race-related questions of

venire member Ulmer, who admitted he was "vigorously oppose[d]" to interracial marriage and

"was not afraid to say so," before seating Ulmer on Mr. Thomas's capital jury fell below an

objective standard of reasonableness.  Defense counsel's questioning of venire member Ulmer

on the issue of racial bias was limited to the following:

> MS. PETERSON:  Now, you indicated on your questionnaire that
> you disagree with interracial marriages.
>
> ULMER:  Yes, I do.
>
> . . . .

> MS. PETERSON:  Well, how would – how do you feel about, if you were sitting on a case where the defendant or a defendant accused of capital murder was a black male, and the victim, his wife, was a white female?
>
> ULMER:  Well, I think – I think it's wrong to have those relationships, in my view, but we are all human beings and God made every one of us.  And, you know, as far as – I don't care if it is white/white, black/black, that don't matter to me.  If you've done it, you know, you are a human being, you have got to own up to your responsibility.
>
> MS. PETERSON:  So, the color of anyone's skin would not have any impact or bearing upon your deliberations?
>
> ULMER:  No, not according to that, no.
>
> MS. PETERSON:  Okay.
>
> ULMER:  Not whether they were guilty or innocent.
>
> MS. PETERSON:  Would the race of either the defendant or the victim be something you would take into consideration in determining, or considering, answering those special issues, or considering the death penalty or life imprisonment?
>
> ULMER:  No, I wouldn't judge a man for murder or something like that according to something like that, no, I would not.

R.R. Vol. 16 p. 64–66.

As outlined above, defense counsel's inquiry was limited to leading questions as to whether Ulmer's views would affect his deliberations on guilt-or-innocence or sentencing.  Such inquiry in no way sufficed to discern whether Ulmer's admitted racial bias would infect his decision making regarding the *specific issues* in Mr. Thomas's case.  *See Morgan v. Illinois*, 504 U.S. 719, 734–35 (1992) (opining that that general questions as to whether a potential juror can remain impartial despite any biases she may have in no way suffice to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath").

Significantly, defense counsel did not ask a *single specific question* to discern whether

Ulmer's admitted biases might cause him to believe, for example, that African Americans are more prone towards domestic violence, African Americans are more likely to commit violent crimes, African Americans are more likely to be a future danger if they have committed a violent crime, African Americans are more likely to lie about mental illness to escape the death penalty, or any other such questions addressing the particular issues arising in Mr. Thomas's case. Furthermore, although an experienced capital defense attorney *specifically advised them to do so*, defense counsel failed to ask (1) whether Ulmer would "be unable to consider if Mr. Thomas was insane because he is black and killed a white woman," (2) whether Ulmer felt "that black people suffer from mental illness," or (3) whether Ulmer felt "there is any difference between the mental illness that black people suffer and white people [suffer]."  *See* Ex. 82 at 10 (advising Mr. Thomas's counsel on specific issues to address during voir dire).  In light of Ulmer's admittedly "vigorous" racial bias, any reasonable defense attorney would have asked such specific questions – and, indeed, copious others – before seating Ulmer as a juror in Mr. Thomas's capital case.  *Cf. id.*

Accordingly, defense counsel's failure to question Ulmer in this manner, despite an experienced colleague's *specific direction* to do so, rendered their performance deficient.  *See, e.g.*, *Strickland*, 466 U.S. at 688 (stating that an objective standard of reasonableness is judged under "prevailing professional norms").

### B.    Defense Counsel's Deficient Performance Prejudiced Mr. Thomas.

Defense counsel's deficient performance in failing to interrogate venire members regarding potential racial bias, despite the racially charged nature of Mr. Thomas's trial, was an error so egregious that prejudice may be presumed.  *See Webb*, 385 F.3d at 676 (finding that where defense counsel was ineffective for failing to adequately voir dire, thereby failing to ensure an impaneled juror was not biased, prejudice was presumed); *Butler*, 1988 WL 63526, at

*4 (presuming prejudice where defense counsel failed to voir dire on racial bias in the

defendant's racially charged case); *Lamere*, 112 P.3d 1005, 1013 ("[E]rrors in the jury selection

process are 'structural' in nature and, therefore, affect the very framework within which a trial

proceeds. . . .  We hold that counsel's deficient performance [in failing to question adequately a

venire member who indicated potential bias] constituted a structural error, and prejudice is

therefore presumed."); *see also Cronic*, 466 U.S. at 658–62; *Nero*, 597 F.2d at 994 (5th Cir.

1979); *Jackson*, 766 S.W.2d at 508.

　　　　Courts virtually universally view a defense attorney's failure to take action in response to

evidence of juror bias harmful to his client as a presumptively unreasonable trial strategy.  *See,*

*e.g.*, *Johnson v. Armontrout*, 961 F.2d 748, 756 (8th Cir. 1992) ("[F]ailure to attempt to bar the

seating of obviously biased jurors constituted ineffective assistance of counsel of a fundamental

degree."); *Hughes  v. United States*, 258 F.3d at 453, 462 (6th Cir. 2001) (finding counsel's

failure to pursue further inquiry upon learning of potential juror's bias cannot be justified

because it is "simply a failure 'to exercise the customary skill and diligence that a reasonably

competent attorney would provide.'" (quoting *Johnson*, 961 F.2d at 754)); *Webb*, 385 F.3d at

675-76 (rejecting defense counsel's proffered strategic justifications and holding that "the

decision whether to seat a biased juror cannot be a discretionary or strategic

decision. . . .  [because] there is no sound trial strategy that could support what is essentially a

waiver of a defendant's basic Sixth Amendment right to trial by an impartial jury." (citations

omitted)).  Indeed, courts have repeatedly found reversible error where trial courts have refused

to allow voir dire on racial bias in racially charged cases such as Mr. Thomas's, recognizing that

without such voir dire "there is a reasonable possibility that racial ... prejudice might have

influenced the jury."  *Rosales-Lopez*, 451 U.S. at 191; *accord Ham*, 409 U.S. at 427; *Ristaino*,

424 U.S. at 596; *see also Rivera v. State*, 82 S.W.3d 64, 67 (2002) ("The right to pose proper

questions during voir dire is included within the right to counsel under the Texas Constitution. We must reverse the judgment unless we determine beyond a reasonable doubt that the error did not contribute to the punishment." (citations omitted)); *McGee*, 35 S.W.3d at 300–01 (stating that failure to allow a proper voir dire question "is the type of error that we rarely believe will be harmless," and holding that the trial court's refusal to allow the defense to determine whether any prospective jurors "would consider prior convictions a basis for conviction even if the court instructed to the contrary" constituted reversible error).

A finding of prejudice is especially warranted here, given that *four impaneled jurors* in Mr. Thomas's capital case admittedly harbored racial bias. Defense counsel's failure to adequately question these jurors clearly created a risk – if not a virtual certainty – that racial bias would infect the jury's deliberations, which is "unacceptable in light of the ease with which that risk could have been minimized." *Morgan*, 405 U.S. at 735–36 (quoting *Turner*, 476 U.S. at 36). As the Court made clear in *Morgan*, if *even a single impaneled juror* harbors views that would prevent or substantially impair the performance of his duties as a juror and the death sentence is imposed, "the State is disentitled to execute the sentence." 504 U.S. at 729. There were four such jurors in Mr. Thomas's case. Accordingly, prejudice must be presumed.

### C.  The State Habeas Court Unreasonably Applied the Law to the Facts when it Determined that Defense Counsel's Failure to Adequately Question Venire Members Regarding Racial Bias Neither Constituted Ineffective Assistance nor Prejudiced Mr. Thomas.

The state habeas court made no factual findings whatsoever with respect to defense counsel's deficient performance during voir dire or with respect to any related prejudice. Thus, this Court need not defer to any factual findings with respect to this claim. Despite this lack of factual analysis, the state habeas court concluded that Mr. Thomas "failed to overcome the presumption that trial counsel was effective during voir dire questioning," CL ¶ 54, and "has not

demonstrated that any alleged error prejudiced his defense," *id.* ¶ 55. The court's conclusions were an unreasonable application of *Strickland* because they demonstrate that the state habeas court apparently failed to consider any of the salient evidence Mr. Thomas presented.

In reaching the foregoing conclusions, the state habeas court failed to consider the particular facts legally relevant to the issues of whether defense counsel's questioning during voir dire was deficient and/or prejudiced Mr. Thomas – namely, the specific evidence showing the defense's failure to engage in any meaningful inquiry regarding racial bias in Mr. Thomas's racially charged capital trial. Significantly, the state habeas court failed to address the fact that defense counsel failed to ask *a single question* designed to uncover potential racial bias when questioning 13 of the 14 jurors ultimately seated, although several of these individuals *admitted* to harboring racial bias. Likewise, the state habeas court failed to address the fact that the defense engaged in only cursory questioning of venire member Ulmer, who admitted he was "vigorously oppose[d]" to interracial marriage and "was not afraid to say so," before seating Ulmer on Mr. Thomas's capital jury. Finally, and significantly, the court failed to consider the defense's admission that its "failure to ask few, if any, follow up questions of the members of the jury who had indicated on their jury questionnaires that they were opposed to interracial marriage" was not the result of any trial strategy, but rather "was not intentional; [the defense] simply didn't do it." Ex. 15 (Hagood Aff.) ¶ 16.

Rather, relying upon authority from the Texas courts of appeals, the state habeas court generally concluded that "[t]he fact that another attorney might have pursued other areas of questioning during voir dire will not support a finding of ineffective assistance." *See* CL ¶¶ 53-54. The state habeas court similarly concluded, in summary fashion, that Mr. Thomas did not demonstrate that the errors alleged prejudiced his defense. *See id.* ¶ 55. By failing to address the key facts set forth above in either prong of its *Strickland* analyses, the state habeas court's

conclusions constituted an unreasonable application of federal law governing ineffective assistance. *See Wiggins*, 529 U.S. at 397-98; *see also Bradley v. Duncan*, 315 F.3d 1091, 1100 (9th Cir. 2002) (finding state court's decision involved an unreasonable application of federal law when it "failed to consider the facts relevant to the due process prejudice prong").

Significantly, the Texas decisions upon which the state habeas court relied in reaching its conclusions did not involve, as was the case in Mr. Thomas's trial, the defense's failure to question admittedly biased venire members on the issue of race in a capital case riddled with racial aspects arising in a town rife with racial tensions. *See CL ¶¶ 53-54.* In *Delrio v. State*, for example, the court addressed whether the defense's failure to strike for cause a venire member who admitted that he could not be impartial because he knew the defendant constituted ineffective assistance. *See* 840 S.W.2d 443, 445 (Tex. Crim. App. 1992). The court concluded that the defense may have believed the juror's admitted partiality in fact favored his client, and thus the court determined that the defense's failure to strike the juror for cause constituted a trial strategy. *See id.* at 446. As an initial matter, the issue of partiality addressed in *Delrio* is not comparable to the racial bias issues in Mr. Thomas's case, as the latter could not, under any circumstances, be viewed as "favorable" to Mr. Thomas. Furthermore, and importantly, the dissent in *Delrio* emphasized that the majority's decision regarding the defense's failure to strike an admittedly biased juror was in fact contrary to well-settled federal law:

> "I respectfully dissent because the aggressive and assertive majority turns the jury system upside down." Jones v. State, 815 S.W.2d 667, 681 (Tex.Cr.App.1991) (White, J., dissenting). In the majority opinion, the constitutional guarantees of a fair and impartial jury under the Sixth Amendment to the United States Constitution and Art. I, § 10 of the Texas Constitution have taken a back seat to judicial speculation and result-oriented jurisprudence. In a few short pages the majority has torn down a foundation that required many years to build.
>
> An impartial jury and a fair trial is what the state demands, and in

> her demands she is no respecter of persons. She has one law for
> all,-the high and the low, the rich and the poor, the friendless, the
> most debased and hardened of criminals. The greater and more
> horrible the crime charged the greater and more imperative the
> necessity that these safe-guards – these landmarks of the law –
> should be constantly looked to and kept steadily in view, lest,
> perchance, they should be forgotten, denied, or ignored in those
> natural promptings of a manly, it may be, and certainly a human,
> instinct, which, standing appalled and outraged at the very
> contemplation of such heinous iniquity, condemned the suspected
> criminal in advance, and mainly, perhaps, through the magnitude
> and turpitude of his imputed crime.

*See id.* at 446-47 (citing *Steagald v. State*, 22 Tex. App. 464, 3 S.W. 771, 781 (1886)).

The three other Texas appellate court decisions the state habeas court relied upon are likewise inapposite.  *See Owens v. State*, 916 S.W.2d 713, 717 (Tex. App. – Waco 1996) (acknowledging that "[t]he fact that another attorney might have pursued a different course of action" is not, standing alone, sufficient to support a finding of ineffective assistance of counsel, but ultimately finding that defense counsel's failure to object to or request a limiting instruction regarding a prior inconsistent statement the State presented fell below the "objective standard of reasonableness under prevailing professional norms" where no trial strategy justified this failure); *Shilling v. State*, 977 S.W.2d 789, 791 (Tex. App. – Fort Worth 1998) (finding the defense was not ineffective in failing to challenge a juror who stated he opposed probation); *Suniga v. State*, 733 S.W.2d 594, 600 (Tex. App. – San Antonio 1987) (finding the defense not ineffective in failing to question venire member regarding information disclosed on the juror questionnaire where there was nothing in the record to demonstrate that the information disclosed "would have made any difference in the defense's case").

In sum, contrary to the implication inherent in the state habeas court's reliance upon the foregoing cases in reaching its generic conclusions, all lines of questioning in voir dire are not created equal.  As set forth above, under well-settled federal law, questioning regarding racial

bias is of particular import – especially in cases such as Mr. Thomas's – as such questioning

serves an essential role in safeguarding defendants' Sixth and Fourteenth Amendment rights to a

fair trial.  *See Mu'min*, 500 U.S. at 424; *Morgan*, 504 U.S. at 729, 735-36; *Ham*, 409 U.S. at

526–27; *Ristaino*, 424 U.S. at 596; *Potter*, 216 S.W. at 888.  As other courts applying *Strickland*

have emphasized, failure to conduct any inquiry whatsoever into racial bias under circumstances

similar to those present here is not justified by any defense "strategy" and, where such a failure

occurs, prejudice may be presumed.  *See*, *e.g.*, *Webb*, 385 F.3d at 676; *Butler*, 1988 WL 63526,

at *2-4; *Lamere*, 112 P.3d 1005, 1013.  Because the state habeas court failed to grapple in any

manner whatsoever in its *Strickland* analyses of defense counsel's voir dire questioning with the

salient facts related to racial bias, Mr. Thomas is entitled to relief under Section 2254(d)(1).  *See*

*Wiggins*, 529 U.S. at 397-98; *Bradley*, 315 F.3d at 1100.

## VIII.  The State Withheld Evidence that Undermined Its Theory of Substance-Induced Psychosis in Violation of *Brady v. Maryland*.

Mr. Brown and Mr. Ashmore went into the prosecution of Andre Thomas with the

purpose of winning at all costs.[32]  In Mr. Thomas's case, the prosecution faced a serious hurdle,

as the defendant was plainly insane.  Mr. Brown and Mr. Ashmore's strategy was to argue that

Andre Thomas might be crazy, but, if so, it was because he was drinking "40's," smoking

"blunts" of marijuana and was high on DXM (dextromethorphan), the active ingredient in

Coricidin.  To this end, the State, through Mr. Ashmore, found the one expert in the United

States on DXM-induced psychosis, Dr. Shannon Miller.  After retaining Dr. Miller, the State

---

[32]     This Court is familiar with Mr. Brown's penchant for winning at all cost from the case of
Boyd Warden.  In *Warden v. Brown,* 4:07-cv-061, Mr. Brown was presented with the
exculpatory statements of several horrified witnesses who observed three police officers
repeatedly beat Mr. Warden, a retired railroad worker who was sitting in his truck when the
police approached and started assaulting him.  Instead of investigating statements as he
promised, Mr. Brown twice tried to prosecute Mr. Warden on trumped up charges. After two not
guilty verdicts, a federal civil rights action was brought against Mr. Brown and the officers. The
case was settled with Mr. Brown and the three officers after mediation.

discovered that his testimony was favorable to the defense.  Instead of turning that information

over, the State buried their contacts with Dr. Miller, and turned nothing over.   In state habeas

proceedings, the State quashed Mr. Thomas's counsels' efforts to speak with Dr. Miller.  The

affidavits submitted by the state on this point are self serving and misleading.  Habeas counsel

were hampered in their efforts to fully develop the evidence, despite diligent efforts to do so.

The trial court's findings and conclusions on this issue are clearly not supported by the evidence,

and an unreasonable application of Supreme Court law.

### A.     Relevant Facts.

On or about September 16, 2004, the State filed a motion seeking production of all

Mr. Thomas's hospital records from Vernon.  The motion was not opposed by the defense, and

the parties agreed that such records would be produced to both the State and the defense.  C.R.

Vol. 1 p. 26-27.  The Court granted the motion the same day.  *Id.* at 28.  Thereafter, voluminous

records were produced from Vernon that revealed, among other things, the diagnoses of the

Vernon doctors that Mr. Thomas purportedly was suffering from a substance-induced psychosis.

*See generally*, C.R. Vol. 1 p. 220-722 and C.R. Vol. 3 p. 964-1520.

On October 20, 2004, the State filed a "Motion to Have Blood Evidence Examined."  In

that Motion, the State represented that preliminary testing of Mr. Thomas's blood drawn on

March 27, 2004, revealed "a chemical referred to as DXM (dextromethorphan)."  The lab

reported, however, that it was "unable to quantify the amount of DXM in the defendant's blood."

C.R. Vol. 1 p. 48-49.   Therefore, due to the small amount of blood available for testing, the State

requested that it be allowed to test for DXM at a lab of its choice while allowing a defense expert

to observe the testing.  The defense agreed to that approach, and the Court granted the motion.

*See generally* R.R. Vol. 4 p. 4-6.

Following the granting of its motion, the State began looking for an expert

knowledgeable about the effects of DXM.  On or about November 24, 2004, the State received a proposed contract from Dr. Shannon C. Miller of Forensic Addiction and Psychiatric Services.  Ex. 81.  Dr. Miller holds himself out on his website and in his C.V. as an expert on DXM.  Ex. 39; Ex. 36; Ex. 87; Ex. 88.

Joe Brown, the Grayson County District Attorney, signed the contract on behalf of the State/County on January 3, 2005.  Mr. Brown crossed out Paragraph 2c of Dr. Miller's standard form contract in which Dr. Miller asks for full access to all pertinent records.  Instead, the State seemed to be looking for specific advice regarding the effects of DXM when ingested in amounts above the recommended doses.  Notably, the State also altered Paragraph 3b, deleting the word "nonrefundable" from the Retainer Fee provision that previously read "Advanced payment of a *nonrefundable* retainer."  *See generally* Ex. 81 (emphasis added).

On or about January 10, 2005, the State sent Dr. Miller a retainer check for $3,750.00 representing 10 hours of work at his hourly rate of $375/hour.  Ex. 81.

A few weeks earlier, on or about December 21, 2004, Dr. Miller was disclosed as an expert witness to the defense.  C.R. Vol. 1 p. 207-217.  The defense, nonetheless, undertook no investigation into who Dr. Miller was or what he might testify about.  Ex. 15 at ¶ 31.

Significantly, it appears the State would later receive advice from Dr. Miller that it did not deem useful to its theory that Mr. Thomas suffered from substance-induced psychosis caused by DXM.  This can be inferred from the fact that on or about February 5, 2005, the State received test results from the Medtox Laboratory in Minnesota that became the basis for the Stipulation regarding the amount of DXM in Mr. Thomas's bloodstream the morning of the slayings.  *See* Ex. 83.  Thereafter, Dr. Miller never appeared as a witness for the prosecution at trial.  *See* R.R. Vol. 27-42.  Furthermore, apparently the State quickly put the brakes on Dr. Miller's work at about the time of the State's receipt of the Medtox results.  Records show that

102

Dr. Miller spent only about two paid hours on the case.  After the conclusion of the trial, on or about March 29, 2005, Dr. Miller refunded to Grayson County approximately $3,112.50, or about 8 hours of time out of his initial retainer of $3,750, representing 10 hours of work at his rate of $375/hour.  *See* Ex. 81.  The State has never disclosed the information given to them by Dr. Miller.  Ex. 15 at ¶ 31.

State habeas counsel for Mr. Thomas contacted Dr. Miller during preparation for the filing of the State application to see if Dr. Miller would like to be retained to assist Mr. Thomas. Dr. Miller is the one expert in the United States on the effects of DXM in causing psychosis.  Dr. Miller was receptive to the idea but had to check with the District Attorney, Joe Brown, to determine if he could ethically assist Mr. Thomas given his prior agreement with Mr. Brown and Mr. Ashmore.  Subsequently, Dr. Miller allowed that he would not be available to assist Mr. Thomas because of his prior agreement with Mr. Brown and Grayson County.  Habeas counsel filed for discovery and an evidentiary hearing in order to compel the testimony of Dr. Miller. Judge Fry denied these motions and instead relied upon the self-serving affidavits of Mr. Ashmore and Mr. Brown.  However, these affidavits on their face reveal facts that support Mr. Thomas's assertions.  Mr. Ashmore admits that he is the one who contacted Dr. Miller and determined that Dr. Miller "indicated that the cases that he had dealt with where he had seen psychosis did involve larger amounts of DXM and "*he questioned whether the amount of DXM in this case could produce psychosis.*" *Ex parte Thomas,* State's Ex. G ¶ 11 (emphasis added).

Instead of disclosing this to the defense, Mr. Brown and Mr. Ashmore immediately shut down Dr. Miller.  They assert that they mentioned Dr. Miller's views while at lunch with Mr. Hagood, but Mr. Hagood asserts that he was never told what Dr. Miller's opinions were.  Ex. 15 (Hagood Aff.) ¶ 31.  Mr. Ashmore and Mr. Brown minimized Dr. Miller's potential role by putting him on the potential witness list only as "Shannon Miller" – never disclosing to the

defense team the exculpatory nature of his opinions.

Mr. Hagood noted that he was not aware of, nor did he investigate the possible significance of Dr. Miller even though his name was on the State's witness list.  If he would have known, he would have certainly followed up.  Ex. 15 (Hagood Aff.) ¶ 31.

Ms. Peterson noted that Mr. Hagood was handling the experts, thus she spent very little time early on in the case on expert issues. Ex. 27 (Peterson Aff) ¶ 9.

### B.      Mr. Thomas is Entitled to Relief.

"The suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Due process requires the prosecution to provide exculpatory evidence even if the accused does not request it. *United States v. Bagley*, 473 U.S. 667, 683-84 (1985).  The rule in Brady encompasses both impeachment and exculpatory evidence.  *Id*. at 676; *Giglio v. United States*, 405 U.S. 150, 154 (1972).  There are three components to a Brady violation: (1) the state failed to disclose evidence regardless of the prosecutor's good faith or bad faith; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is material to guilt or punishment.  *See Youngblood v. West Virginia*, 126 S.Ct. 2188, 2190 (2006); *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999); *Kyles v. Whitley*, 514 U.S. 419,432-433 (1995); *United States v. Bagley*, 473 U.S. 667, 683 (1985); *East v. Johnson*, 123 F.3d 235, 237 (5th Cir. 1997).

*Brady* evidence encompasses any favorable evidence known to the State including the prosecutor, the police, and the investigators. *Youngblood*, 126 S.Ct. at 2190.  Expert's opinions or statements can also be *Brady* evidence.  *State v. DeLeon*, 971 S.W.2d 701, 706-707 (Tex. App. 1998); *Paradis v. Arave*, 240 F.3d 1169, 1177-79 (9th Cir. 2001), as can notes of the expert's preliminary findings. *Id.*.  Such evidence also includes verbal statements, *Flores*, 940

S.W.2d at 191, and evidence that undermines the State's key witnesses. *See Bagley*, 473 U.S. at 684; *Dickson v. Quarterman*, 453 F.3d 643, 647-48 (5th Cir. 2006); *East*, 123 F.3d at 239-40; *Flores*, 940 S.W. 2d at 192.

In a pre-trial hearing in this case, the State acknowledged its *Brady* duty to "produce [the State's] reports of [the State's] testifying experts, things of that nature – obviously, even if it's work product, even if it's consulting expert, if it's mitigating or exculpatory."  R.R. Vol. 3 p. 6 (emphasis added).  The State, however, does not appear to have lived up to its acknowledged duty in connection with the likely views held by Dr. Shannon Miller in this case about whether DXM caused the psychosis Thomas experienced on March 27, 2004.  Had those views been disclosed to the defense, as they should have been, there is a reasonable probability that the result of Thomas's trial would have been different.

Based on the inconclusive February 2005 DXM test results, coupled with the fact that Dr. Miller has published material about the effects of DXM, Dr. Miller's views about Thomas's situation were undoubtedly favorable to the defense.  In an article Dr. Miller published about the effects of DXM, he observes that DXM's intoxicating effects last for short periods of time after the drug is taken.  *See* S.C. Miller, *Dextromethorphan Psychosis, Dependence, and Withdrawal, Addiction Biology*, 10,325-27 (Dec. 2005) (observing that DXM intoxication lasts three or four hours).  Consistent with that view, it is a reasonable assumption that Dr. Miller told the State after his review of the February 2005 DXM test results that the 6-8 Coricidin pills containing DXM taken by Mr. Thomas on March 25, 2004, followed by him vomiting, could not have played any part in the psychotic delusions that Thomas experienced some 36-40 hours later on Saturday, March 27.  *See* Ex. 23 at ¶¶ 8-17.

Any verbal or written communications by Dr. Miller to the State of such views, or to persons working on behalf of the State, would constitute *Brady* evidence that the prosecutor was

required to disclose.  *See DeLeon*, 971 S.W.2d at 706-707 (transcribed telephone opinion of

expert was *Brady* material that should have been disclosed to the defense); *Flores*, 940 S.W.2d at

191 (verbal statements of government witness were *Brady* evidence).  It is undisputed that the

State did not disclose any written or verbal statements from Dr. Miller at any time as required by

*Brady*, *see* Ex.15 ¶ 31, as the State itself had promised to do.  R.R. Vol. 3 p. 6; *see Youngblood*,

126 S.Ct. at 2190.

 The undisclosed views of Dr. Miller are material because they undermine the confidence

in the jury's findings.  Evidence is material "if there is a reasonable probability that, had the

evidence been disclosed, the result of the proceeding would have been different."  *Kyles*, 514

U.S. at 433; *Bagley*, 473 U.S. at 682; *East*, 123 F.3d at 237; *Flores*, 940 S.W.2d at 191.

Moreover, the Supreme Court in *Kyles* further refined materiality under *Brady* stating:

> materiality . . . is not a sufficiency of evidence test.  A defendant
> need not demonstrate that after discounting the inculpatory
> evidence in light of the undisclosed evidence, there would not have
> been enough left to convict. . . . One does not show a Brady
> violation by demonstrating that some of the inculpatory evidence
> should have been excluded, but by showing that the favorable
> evidence could reasonably be taken to put the whole case in such a
> different light as to undermine the confidence in the verdict.

*Kyles*, 514 U.S. at 434-35.

 A reasonable probability is a probability sufficient to "undermine confidence in *the*

outcome." *Id*. at 434; *Quarterman*, 453 F.3d at 647 citing *Bagley*, 473 U.S. at 682.  When the

withheld evidence is contrary to the State's theory and would undermine testimony of a key

witness for the prosecution, the evidence meets the materiality standard.  *Id*. at 648-649; *East*,

123 F.3d at 239-240.  Also, evidence of a disinterested witness that supports and corroborates the

defendant's version of events is material.  *Flores*, 940 S.W.2d at 192 (holding that verbal

statements from disinterested witness that corroborated defense theory met *Brady* materiality

standard).

Dr. Miller's withheld views are material because they would have undermined the State's two key expert witnesses.  On the key issues of intoxication and the cause of Thomas's psychosis, the State's case largely rested on the shoulders of Drs. Axelrad and Scarano, who opined that Mr. Thomas did not meet Texas's legal definition of insanity.  R.R. Vol. 31 p. 100-102; R.R. Vol. 34 p. 80-83, 144-148.  They did so, in part, based on the inconclusive amounts of DXM found in Thomas's blood.  From that data, they nonetheless opined, without objection, that DXM was the principal causal factor that triggered Thomas's drug induced psychosis.  Furthermore, they testified, therefore, that Thomas was intoxicated when he committed the murders, thus disqualifying him from asserting the insanity defense based on the erroneous instructions the jury heard regarding the law of voluntary intoxication.  R.R. Vol. 31 p. 85-86; R.R. Vol. 34 p. 102-103.

The testimony of both of these experts was crucial to Thomas's conviction.  Without it, the jury had no explanation for Thomas's psychotic behavior on the day of the crime, other than his unadulterated mental illness – an illness which made a very strong case for the fact that at the time of the crimes Mr. Thomas, due to his psychosis, did not know his conduct was wrong.  Furthermore, after finding Mr. Thomas guilty, the jury was more likely to impose the death sentence if it believed he voluntarily induced his psychosis through intoxication, as contrasted with a psychosis caused by a serious mental illness.

Dr. Miller's views and testimony could have completely undermined the testimony of Drs. Scarano and Axelrad.  His views could not have been discredited like the State discredited the opinion of defense expert Dr. Edward Gripon (on grounds of lack of qualifications, insufficient information, and bias in favor of the defense).  R.R. Vol. 36 p. 103-120.  Dr. Miller's specialty is addiction medicine and his writings on DXM made him more qualified to offer an

opinion on the effects of drug addiction than any of the other experts at trial.  *See* Ex. 39.  Dr. Miller certainly was more qualified than Dr. Scarano whose knowledge of DXM came from the results page of a Google internet search.  R.R. Vol. 31 p. 56.  Also, Dr. Axelrad lacked Dr. Miller's more specific focus on drug addiction and DXM in particular.  *See* R.R. Vol. 34 (State's Ex. 97).

Moreover, statements contradicting the State's theory from an expert who had been hired by the State would have far greater weight, because Dr. Miller's views would not be viewed as biased.  Dr. Miller's views would have been from a disinterested witness corroborating the defense theory that drugs did not induce Mr. Thomas's delusional psychosis on March 27, 2004.  *See* R.R. Vol. 36 p. 99-100.  Dr. Miller's views support this theory because they undermine the only other offered reason for Thomas's delusion:  a drug-induced psychosis.  Moreover, Dr. Miller is a disinterested witness because he had nothing to gain and no financial incentive to state an opinion favorable to Thomas.  Quite to the contrary, he lost a portion of his initial retainer for expressing the truth.  *See supra*.  Such corroborative evidence from a disinterested witness satisfies *Brady*'s materiality standard.  *See Flores*, 940 S.W.2d at 192.

Because Dr. Miller's suppressed statements and opinions would have undermined the State's key witnesses, that evidence meets the standards for materiality, and a constitutional *Brady* violation has been established.  *See Quarterman*, 453 F.3d at 648-649 (*Brady* evidence was material where it undermined a key witness for the State); *East*, 123 F.3d at 239-240 (same).

C.    **The Trial Court's Findings of Fact and Conclusions of Law are Not Entitled to this Court's Deference.**

The trial court's findings of fact stated that:

20.    The blood samples and a urine sample from Mr. Thomas on the morning of the crime did not reveal any evidence of intoxication due to Mr. Thomas's ingestion of either marijuana or Coricidin on the evening of March 24, 2004….As stipulated by the

State at trial, a less than measurable amount of Dextromethorphan (DXM) was found in Mr. Thomas's blood….

* * *

74. Dr. Shannon Miller is a psychiatrist who has written extensively about DXM addiction, is a specialist on the effects of drug addiction, and is certified in addiction medicine….

* * *

76. The State prosecutors telephoned Dr. Miller and recounted the basic facts of the case to him, including the State's position. During that conversation, Dr. Miller primarily questioned whether DXM could have played a part in the kind of psychotic episode Mr. Thomas experienced on March 27, 2004….

77. There was no evidence from Dr. Shannon Miller, exculpatory or otherwise.

78. Dr. Shannon Miller states in his affidavit that he did not form an opinion concerning the applicant, his mental state, his psychosis, the cause thereof, or his sanity, because he never performed a complete evaluation of the applicant or examined all the records….

79. Mr. Ashmore's and Mr. Brown's decision was not to use Dr. Miller because of several factors including: (1) the attendant cost of having Dr. Miller come to Grayson County to evaluate and subsequently to testify, and (2) the fact that the applicant had already been fully tested and evaluated by three expert witnesses the State had already hired.

80. The affidavit of J. Kerye Ashmore is credible.

81. The affidavit of Joseph D. Brown is credible.

82. Mr. Ashmore and Mr. Brown believed the applicant had been seen by enough experts for the State and doubted the defense team would allow them to bring another expert in during the voir dire in this case to do another evaluation.

83. Dr. Miller was not requested to prepare a report.

84. Mr. Ashmore and Mr. Hagood met to discuss the State's list of expert witnesses…..Mr. Ashmore advised Mr. Hagood that the State would not be calling Shannon Miller. Mr. Hagood inquired as to why and was advised of the reasoning for the State not using Dr. Miller. During this conversation, Mr. Ashmore advised Mr.

109

> Hagood that Dr. Miller could not give an opinion without
> examining the defendant and Dr. Miller indicated the cases he had
> dealt with generally involved larger doses of DXM.

FF ¶¶ 20, 74, 76-84.

To begin, these findings fail to account for the contrary testimony of Mr. Hagood and Ms. Peterson – despite the fact that the trial court credits and relies on those affidavits for other purposes. The trial court's findings also fail to take into account the ways in which the substantive evidence contradicts the (self serving) statements of Mr. Ashmore and Mr. Brown. For instance, the three state witnesses that Mr. Ashmore and Mr. Brown decided to use, Dr. Scarano, Dr. Axelrod and Dr. Oropeza, had never had any experience with DXM induced psychosis – yet they were willing to come in and testify that Andre Thomas was the poster child for DXM induced psychosis. Yet, though the prosecution had the only known expert on DXM induced psychosis on retainer, he suddenly became a fifth wheel when he expressed the initial opinion that the cases he had reviewed involved much larger amounts of DXM and questioned whether the amount of DXM in this case could cause psychosis. These findings of fact by the state habeas court are not consistent with the record, and are unreasonable in light of the evidence presented. This Court should allow an evidentiary hearing and discovery to resolve conflicting evidence on material issues central to whether the state failed to disclose exculpatory evidence.[33]

Finally, the trial court's conclusions of law on this claim, *see* CL ¶¶ 35-44, are an unreasonable application of and contrary to clearly established federal law. To conclude that "there was no evidence from Dr. Shannon Miller, exculpatory or otherwise," CL ¶ 41, or that

---

[33] The trial court's conclusion that Mr. Thomas' "sworn allegations in his petition are insufficient to sustain his burden of proof," CL ¶39, are not only contrary to law, but particularly specious in light of the fact that Mr. Thomas was thwarted efforts to obtain proof only in possession of the state were thwarted by the state, and his requests for discovery and a hearing were denied by the trial court.

"the applicant has failed to prove that there was any evidence suppressed by the State, CL ¶ 42, relies on findings that are contradicted first by the affidavits of Mr. Ashmore and Mr. Brown – affidavits the court credits and relies upon – and/or seemingly requires the existence of hard "evidence," which is not required by the *Brady* jurisprudence.  These conclusions summarily reject, without discussing, the powerful evidence of the exculpatory nature of Dr. Miller's suppressed views, and the impact they would have had had his initial conclusion been relayed to the defense and been allowed to be developed for presentation to the jury.  Finally, these conclusions impose and evidentiary burden – a "preponderance of the evidence" – that does not exist under *Brady*.  As such, the trial court's conclusions are an unreasonable application of and contrary to clearly established Supreme Court law.

Any reasonable jurist would conclude that Dr. Miller's testimony would tilt the proceedings in favor of Andre Thomas.  Any reasonable jurist would conclude that there is a reasonable probability of a different result had Dr. Miller's opinions been disclosed.  Mr. Thomas is entitled to a new trial.  At a minimum, a discovery and evidentiary hearing are warranted.

## IX.    Defense Counsels' Failure to Hire an Expert in  Neuropharmacology was Constitutionally Ineffective.

Defense counsel's failure to hire a neuropharmacology expert to challenge the State's voluntary intoxication theory violated both the performance and prejudice elements of the *Strickland* test.  *See Strickland*, 466 U.S. at 687.  The record demonstrates that counsel's mistake was not due to a reasonable trial strategy, but rather resulted from constitutionally deficient investigation and trial preparation by the defense team.

Prior to trial, there was overwhelming evidence that Mr. Thomas was both seriously mentally ill and legally insane at the time of the crime.  Ex 25 (McGirk Aff) at ¶ 7 (commenting

that Mr. Thomas's case of paranoid schizophrenia "was the worst case [he] had ever seen").  To counter Mr. Thomas's insanity defense, the State advanced the theory that Mr. Thomas was voluntarily intoxicated, and that this intoxication led to his psychosis at the time of the murders.

The defense team was aware of the State's reliance on Mr. Thomas's ingestion of Coricidin, and had ample time to investigate this issue before trial.  Nonetheless, the defense team did not hire a neuropharmacologist to educate the team prior to trial or to oppose the State's experts at trial, though such an expert was available to the team during this time period.  *See, e.g.*, Ex. 23 (Dr. Lipman Aff) at ¶¶ 1, 4 ("I am Board Certified in neuropharmacology… I am available to consult with the attorneys representing Andre Thomas following his arrest in 2004 and subsequently, and was, in fact, consulting with attorneys in Texas in this time period.").

There is no scientific basis for the State's theory, presented at trial, that Mr. Thomas was intoxicated by alcohol, marijuana or DXM at the time of the murders.  *Id.* at ¶ 10.  Mr. Thomas's behavior before, during and after the murders did not resemble intoxication-induced psychosis, rather, it was consistent with a paranoid psychotic mental illness.  *Id.* at ¶ 15.  Because defense counsel failed to hire a neuropharmacologist or call such an expert at trial, the jury did not hear that there was no scientific basis for the State's theory that Mr. Thomas was intoxicated or that his behavior could have been caused by intoxication.  Ex. 23 (Lipman Aff.) ¶15.  Because defense counsel failed to hire a neuropharmacologist, it failed to learn that a DXM metabolism study should have been conducted on Mr. Thomas. *Id.* ¶ 12.  This inexpensive test, which was available before Mr. Thomas's trial, would have provided the defense team with the information that could have definitively challenged the State's misleading testimony regarding the significance of the toxicology evidence.  *Id.* at ¶ 13.

Instead, defense counsel called Dr. Gripon, a psychiatrist, to address the substance-induced psychosis theory.  Dr. Gripon himself believed that a pharmacologist was the proper

type of doctor to address this issue.  Ex. 13 ¶ 14.  The failure to hire a neuropharmacology expert led directly to defense counsel's failure to focus Dr. Gripon's testimony on Mr. Thomas's sanity at the time of the offense.  As a result, the jury did not hear Dr. Gripon give his expert opinion that Mr. Thomas "did not know that what he was doing was wrong" at the time of the murders, and that Mr. Thomas's psychosis was caused by schizophrenia.  *Id.* ¶ 12.

Mr. Hagood knew that neuropharmacology was not Dr. Gripon's area of expertise, and Mr. Hagood did not ask Dr. Gripon to address the issue at the time he was retained.  Ex. 15 ¶ 29. Mr. Hagood asked Dr. Gripon only a few superficial questions about the State's primary theory of Mr. Thomas's guilt.  *Id.* ¶ 39.  These facts confirm that Mr. Hagood was forced to rely on Dr. Gripon to address the substance-induced psychosis issue, not because he made a tactical decision that Dr. Gripon could properly rebut the State's theory, but because of Mr. Hagood's failure to timely investigate and retain a neuropharmacologist.  This led to deficient and inadequate preparation, missed opportunities to damage the credibility of the State's case through cross-examination, and, inexplicably, the failure to ask Dr. Gripon on direct examination whether, in his opinion, Mr. Thomas understood the difference of right and wrong when he killed three people.

Ms. Peterson's e-mail sent on February 21, 2005 is further evidence that the defense team's mistake was not due to trial strategy.  Ex. 84.  In this correspondence, Ms. Peterson finally requests mid-trial that the team's mitigation specialist recommend a pharmacology expert who could testify about DXM.  *Id.*  Ms. Peterson reveals the defense team's inadequate investigation and preparation with this statement: "We got blindsided today Kerry called Dr. Scarano!!"  Ex. 84.  As outlined above, counsel should have been well aware that the State was calling Dr. Scarano, and further aware of the nature and substance of his testimony.  Any blindside was due to inadequate preparation.

Voluntary intoxication was the State's primary theory for rebutting Mr. Thomas's insanity defense.  It was absolutely essential to rebut this theory in order to convince the jury that Mr. Thomas's paranoid schizophrenic mental illness, and that illness alone, caused his behavior. A trial strategy which does not prepare by retaining a qualified expert, educating counsel themselves with this expert and, then calling the expert in rebuttal, is unreasonable and incompetent.  Defense counsel employed no strategy at all because they simply were not sufficiently prepared to make a strategic decision.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 690-91.  Counsel's duty to investigate extends to the identification of appropriate and competent expert witnesses to support the defense's theory of the case.  *Soffar v. Dretke*, 368 F.3d 441, 478 (5th Cir. 2004). The ABA Guidelines echo this case law, stating that counsel "should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively."  ABA Commentary to Guideline 10.11, 108 (rev. ed. 2003); *see also* Guideline 5.1(e)-(f) (providing that defense counsel must be skilled in the use of expert witnesses and in the presentation of evidence bearing on the mental status of the defendant); Guideline 10.7 (providing that counsel has an obligation to conduct "a thorough and independent investigation").

The Fifth Circuit held that defense counsel in a capital murder case rendered ineffective assistance when counsel failed to investigate ballistics evidence and retain an independent ballistics expert.  *Soffar*, 368 F.3d at 476, 479.  Based on the evidence adduced at the state habeas corpus proceeding, the court concluded that an independent ballistics expert would have been available at the time of the trial to testify favorably on behalf of the defendant. *Id.* at 477. This testimony would have revealed obvious weaknesses in the State's theory of the case. *Id.* at

476; *see also Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) (holding that "[c]ounsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult," and therefore counsel rendered ineffective assistance by failing to utilize an appropriate toxicology or neurology expert to explain the defendant's organic brain damage).

Ineffective assistance of counsel has even been found in cases where the proper type of expert was hired, but under circumstances that did not allow the expert to fully develop an opinion and prepare for trial. *See, e.g.*, *Koon v. Cain*, 277 Fed. Appx. 381, 383-84, 387-88 (5th Cir. 2008) (holding that hiring a proper expert for the situation, but only one day before trial, leaving insufficient time for the expert to fully develop an opinion and prepare for trial, was ineffective assistance of counsel); *Wilson v. Sirmons*, 536 F.3d 1064, 1087 (10th Cir. 2008) (finding prejudicial ineffective assistance of counsel where counsel retained mental health expert only three weeks before trial started, which was not sufficient time to accurately diagnose the defendant; the expert was nevertheless able to make several findings, but "[a]t no point did counsel elicit Dr. Reynolds'…concrete, scientifically rooted diagnoses, including the PTSD, bipolar disorder, generalized anxiety disorder, and schizotypal personality features [of the defendant]" which prevented the jury from understanding the defendant's mental illness).

As in *Koon*, *Soffar*, and *Wilson*, counsel's failure to consult with a neuropharmacologist in this case cannot be explained as a reasonable trial strategy.  Like the ballistics evidence in *Soffar* and the psychiatric evidence in *Koon*, the scientific evidence in this case relating to DXM was central to the State's theory of Mr. Thomas's guilt.  And, like *Koon* and *Soffar*, the record in this case reflects that the defense team had access to a favorable expert witness at the time of the trial.  Rather than a strategic decision to forgo a neuropharmacologist, counsel's actions in this case resulted from a failure to reasonably investigate the State's main trial theory and rebut the State's theory using an appropriate expert witness.  Therefore, as in *Koon* and *Soffar*, in this case

defense counsel's failure to hire a key expert witness fell below an objective standard of reasonableness for attorneys under the circumstances.

Like the defendants in *Koon* and *Soffar*, Mr. Thomas suffered substantial prejudice due to counsel's critical mistake.  There is a strong probability that the jury would not have found guilt beyond a reasonable doubt had the defense team presented testimony from a neuropharmacologist that the State's intoxication theory was without scientific merit.  This testimony, in addition to the ample evidence of Mr. Thomas's schizophrenia and his inability to know right from wrong at the time of the crime, would have amounted to a persuasive case that Mr. Thomas was not guilty by reason of insanity, sparing him a death sentence.

For the foregoing reasons, the state habeas court's conclusory, unreasoned, and unsupported conclusion that defense counsel's performance was not constitutionally deficient is not entitled to deference by this Court because it is directly contrary to established federal law, *i.e.*, *Strickland*. *See* CL ¶ 88.  Defense counsel utterly failed to perform any investigation, as required by *Strickland*, regarding the possibility of consulting with a neuropharmacologist despite ample reason to pursue such an expert's opinions.  Defense counsel did not make any reasonable decision that it would be unnecessary to pursue the possibility of hiring a neuropharmacologist, counsel simply did not consider whether to do so, despite Dr. Gripon's belief that a neuropharmacologist was the correct type of expert needed for this case.  *See*, *e.g.*, Ex. Exs. 13 ¶ 14; 15 ¶¶ 29-30.  Defense counsel's failure to even consider consulting with or hiring this needed expert, and failure to call such an expert at trial, meets both prongs of *Strickland*.  Because the state habeas court failed to consider the foregoing relevant facts in reaching its cursory conclusion on this issue, its findings and conclusions are not entitled to the deference of this Court.

**X.    Defense Counsel's Failure to Obtain a Neuropsychological Examination and the Testimony of a Neuropsychologist was Constitutionally Ineffective.**

Defense counsel's failure to secure a neuropsychological examination to provide evidence of Mr. Thomas's mental impairment also violated both the performance and prejudice elements of the *Strickland* test.  *See Strickland*, 466 U.S. at 687.  Mr. Thomas's mental impairment is entirely separate from and in addition to his paranoid schizophrenic mental illness. When both are present, they create a kind of "perfect storm," causing a person to lose grip on reality and substantially impair judgment. (*see* opinion of Dr. Gur, *infra*).

Below is a graph of the functioning of Mr. Thomas's brain, using an imaging algorithm developed with funding from the National Institute of Mental Health and validated in peer-reviewed articles. *See* Ex. 14.  A normal brain would be uniformly orange to pink. Abnormality is represented in increasing degrees of impairment moving from purple (somewhat impaired) to dark blue (severely impaired).  The graph shows that Mr. Thomas has significant organic brain damage to the right side of his brain as a result of previous injuries and organic factors.  *Id.*



Despite supposedly preparing an insanity defense, Mr. Thomas's counsel did not seek to present any empirical evidence of Mr. Thomas's impaired mental functioning, which a neuropsychological examination such as that conducted by Dr. Gur could have revealed.  *See* Ex. 27 ¶ 39. *See* Ex. 15 ¶ 34.

Had Mr. Thomas's counsel hired a qualified neuropsychologist, they would have known, and they could have presented evidence to the jury, that Andre Thomas suffers from severe organic brain malfunction. *See* Ex. 35; *See* Ex. 14.[34]  This was a critical failure by the defense counsel that cannot be ascribed to strategy, since establishing the permanent and long standing nature of Mr. Thomas's mental impairment was a key element of the defense they intended to

---

[34]  As Dr. Gur notes in his affidavit, these findings are based upon several days of testing by himself and Dr. Young in the prison environment but must be affirmed through structural and functional neuroimaging.  Thus, in conjunction with this state application for writ of habeas corpus, Mr. Thomas sought to be transferred to a medical facility where such neuroimaging could be accomplished.

establish.  This omission was clearly prejudicial to Mr. Thomas.  As Dr. Gur, a well respected

neuropsychologist who specializes in brain development and injury noted:

> Based upon my observation and work and a review of Dr. Young's
> work, it is my opinion that Mr. Thomas suffers from schizophrenia
> of the paranoid type and, significantly, he has brain impairments in
> addition to those associated with that mental illness. This "double
> whammy" is most likely a result of genetic and environmental
> factors and has substantially impaired his judgment and hold on
> reality during commission of the crimes at issue in this case.

*See* Ex. 14.  The omission rises to the level of ineffective assistance of counsel.

This claim has constitutional merit for the reasons set forth above with respect to defense

counsel's failure to investigate the possibility of hiring a neuropharmocologist, and therefore, the

basis for this claim will not be repeated in their entirety, but rather incorporated herein.  It is

enough to say that counsel's duty to investigate extends to the identification of appropriate and

competent expert witnesses to support the defense's theory of the case.  *Soffar*, 368 F.3d at 478.

As noted above in the cases of *Soffar*, 368 F.3d at 476, 479 and *Calderon*, 165 F.3d at

1226, "[c]ounsel have an obligation to conduct an investigation which will allow a determination

of what sort of experts to consult."  The failure to do that in those cases led those courts to hold

counsel rendered ineffective assistance by failing to utilize appropriate experts.

Like the defendants in *Calderon* and *Soffar*, Mr. Thomas suffered substantial prejudice

due to counsel's critical omission.  There is a strong probability the jury would have returned a

verdict of not guilty by reason of insanity if the defense team had done its homework and

presented testimony from an expert neuropsychologist that Mr. Thomas has organic brain

impairment which affected his judgment and his perception of reality.  This testimony, in

addition to the ample evidence of Mr. Thomas's schizophrenia and his inability to know right

from wrong at the time of the crime, would have amounted to a persuasive case that Mr. Thomas

was not guilty by reason of insanity, sparing him a death sentence.

The state habeas court did not enter any conclusions of law with respect to whether defense counsel met the deficiency prong of *Strickland*.  Thus, this Court should perform a de novo review of the factual assertions underpinning this claim.  The state habeas court's conclusory, unreasoned, and unsupported conclusion that Mr. Thomas failed to prove by a preponderance of the evidence that defense counsel's deficient performance prejudiced his defense, *see* CL ¶ 91, is directly contrary to federal law and an unreasonable application of the same.  As noted *supra*, imposition of a "preponderance of the evidence standard" is by itself contrary to Supreme Court law.  *See Williams*, 529 U.S. at 405-406.  As in *Caro*, defense counsel's failure to even consider whether a neuropsychologist could present positive testimony regarding the defendant's organic brain damage most certainly had a profoundly negative impact on the case.  If the jury had been presented with the type of vivid, incontrovertible evidence of Thomas's brain damage, they would have been much more likely to find Thomas insane, or at a minimum to place less weight on the State's substance-induced psychosis theory.  Such evidence would have inured to Mr. Thomas's benefit at the second stage of trial as well, as evidence of organic brain damage is highly mitigating.  Defense counsel's failure to even consider this type of compelling expert testimony was deficient and prejudicial under *Strickland*.  The state habeas court's conclusory, unsupported conclusion to the contrary is contrary to and an unreasonable application of *Strickland*, as illustrated by *Calderon* and the other authorities cited *supra*.

## XI.     Defense Counsels' Reliance on the State's Experts to Prove Key Issues was Constitutionally Ineffective.

As outlined *supra*, the defense called Drs. Axelrad and Scarano during the defense's case-in-chief in an apparent effort to prove that Mr. Thomas was not sane at the time of the crime.  Calling two of the State's experts adversely as defense witnesses on an issue that is as expert intensive as insanity, demonstrates that Mr. Hagood and Ms. Peterson were not pursuing a

strategy but, rather, were grasping at straws in order to counter the State's allegation of drug induced psychosis.  Such a decision was ill-advised and based on an insufficient prior investigation of the likely testimony of the State's experts, and concomitant issues, which, unsurprisingly, was purely beneficial to the State and adverse to Petitioner.  Indeed, Defense counsel knew that Drs. Scarano and Axelrad had reached opinions supporting the State's theory of the case – and thus directly contrary to the testimony that of defense.  Not surprisingly, when Mr. Hagood called these witnesses to testify, he simply elicited the damaging opinions that he knew they held.  No conceivable trial strategy justifies calling adverse witnesses to testify about opinions that are diametrically opposed to the defendant's theory.

The fact is that the defense had their own expert, Dr. Gripon, as well as the neutral fact witnesses Drs. McGirk and Harrison at their disposal, to provide testimony regarding Mr. Thomas's sanity.  Moreover, by calling the State's experts before their own, the defense assisted the State in drawing first blood in the sanity determination, making counsels' actions in calling Drs. Scarano and Axelrad that much more inexplicable.  Instead of forcing the State to rebut the defense's insanity case, the dynamics were such that the defense found themselves rebutting the State's sanity presentation.  No reasonable criminal attorney would have adopted such an upside down approach to the fulcrum issue in the case.  Trial counsel's decision to call these adverse witnesses during Thomas's case-in-chief demonstrates a failure to fully investigate the likely testimony of these State-retained experts.

As discussed above, Dr. Scarano's opinion that Mr. Thomas's mental illness was substance-induced lacked a scientific basis.  *See supra*.  Mr. Hagood compounded the prejudice inherent in Scarano's baseless testimony – discussed above – by failing to challenge this unsupported opinion and recalling Dr. Scarano in the defense's case-in-chief.  This provided Dr. Scarano an opportunity to reiterate his damaging and unsubstantiated views.  By calling him as a

defense witness, counsel also gave him an imprimatur of reliability and neutrality – lending even more credence to his incredible opinions.

Defense counsel knew from Dr. Axelrad's report that he held an opinion adverse to Mr. Thomas.  Reasonable, prepared counsel would have waited to see if the State even called Dr. Axelrad in the State's case-in-chief, and then been prepared to request voir dire under Rule 705 of the Texas Rules of Evidence.  After eliciting the flimsy bases for Dr. Axelrad's opinion that Mr. Thomas's mental disorders were drug-induced, the defense could have moved for a *Daubert* hearing under Rules 702 and 703.  *See supra*.  Instead, the defense called him and provided him an unchallenged forum to offer his damaging and unsubstantiated opinion to the jury.

In cases where defense counsel has at least investigated an expert's likely testimony but then elicited testimony that contradicts the defense's main argument, other courts have found ineffective assistance of counsel.  *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (defense counsel provided constitutionally deficient representation where counsel put an expert on the stand during the defense's case in chief who contradicted defense's primary defense, stating that "[r]egardless of whether Combs's counsel should have known or instead actually knew [the expert's] opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable"); *see also Awkal v. Mitchell*, 559 F.3d 456, (6th Cir. Ohio 2009) (ruling that counsel was ineffective for calling expert who testified that the defendant was *sane,* eviscerating defense's main argument constituted objectively deficient performance which prejudiced the outcome regardless of whether counsel knew or should have known what the expert's opinion was prior to trial), *rehrg. enbanc granted and ruling stayed and vacated by* 2009 U.S. App. LEXIS 17145 (Jul. 29, 2009).

Defense counsel's conduct here is far worse than that of the attorneys in the above cases. Not only did Mr. Thomas' counsel fail to investigate and learn what the state's experts would

likely say, he also proceeded to elicit that most damaging, unknown testimony at trial.  Indeed, as the cases cited above show, defense counsel was constitutionally ineffective purely for calling a witness that ultimately contradicted Mr. Thomas's main defense.  Trial counsel's failure to investigate what the state's experts would say at trial – and failure to recognize the obvious reality that the state's experts would testify favorably for the state – merely compounds the ineffective nature of defense counsel's representation.  It also confirms the obvious prejudice that resulted from defense counsel corroborating the state's position in the defense's case-in-chief.

The conclusions of the state court below are not entitled to the deference of this Court, as they result in a decision that is an unreasonable application of *Strickland*.  The trial court made no finding of fact regarding whether trial counsel employed a "strategy" in deciding to call the State's expert witnesses adversely.  Further, the state habeas court did not make any finding regarding whether trial counsel had sufficiently investigated the likely results of calling the State's experts adversely before doing so.  In light of the lack of these findings, the state habeas court unreasonably applied *Strickland* in ruling that "[t]he applicant has failed to prove by a preponderance of the evidence that Mr. Hagood was not employing trial strategy in calling two of the State's experts in the defense's case-in-chief."  CL ¶ 94.

*Strickland* merely requires the applicant to prove that trial counsel's representation fell below an objective standard of reasonableness; it does not require affirmative proof (and certainly not by a preponderance standard) that trial counsels' decisions were not strategic.  Further, *Strickland* explicitly requires defense counsel to "make reasonable investigations or…make a reasonable decision that…investigation[] unnecessary."  66 U.S. at 691.  Here, however, Mr. Thomas has presented ample evidence that Mr. Hagood did not perform a sufficient investigation of the State's experts' likely testimony before making the decision to call them during Petitioner's case-in-chief.  While Mr. Hagood now, in hindsight, argues that he in

fact elicited some favorable testimony from the State's expert witnesses after calling them adversely, *Ex parte Thomas*, State's Ex. *, p.12, Mr. Hagood has not averred that he believed, based on any investigation, that he could advance Thomas's case by eliciting helpful testimony from the State's experts.  Moreover, this post-facto rationale is belied by the facts of the case and the testimony.  Indeed, trial counsel's limited consideration of the State's experts' likely testimony unsurprisingly indicated that these witnesses would only serve to bolster the State's case.  There is no evidence in the record, and no finding by the state habeas court that trial counsel made a decision based on a full investigation that re-calling these State experts would, on balance, help Mr. Thomas's case more than hurt it.  Instead, the evidence shows that trial counsel called these witnesses because they failed to properly prepare their own expert witnesses to provide coherent testimony on the sanity issue.  Trial counsel merely compounded their ineffective performance by using the only witnesses they knew of that had performed a complete sanity evaluation for trial, without regard to whether those witnesses would advance their client's interests.  This constituted ineffective assistance of counsel under *Strickland*, and the trial court's conclusions to the contrary are contrary to and an unreasonable application of *Strickland*.

**XII.**    **Defense Counsel's Failure to Elicit Opinions on Sanity from Drs. Harrison and McGirk Further Rendered Its Counsel Constitutionally Ineffective.**

Drs. Harrison and McGirk were the first two psychologists who had contact with Mr. Thomas after the crimes for the purpose of evaluating his mental state.  The failure to even elicit their opinions regarding Mr. Thomas's sanity at the time of the crimes, which was the crucial issue in this case, violated both the performance and prejudice elements of the *Strickland* test.  *See Strickland*, 466 U.S. at 687.  Counsel's failure to elicit these opinions was not due to a reasonable trial strategy (or any strategy at all), but rather resulted from their failure to understand the relevant legal elements of their core defense – insanity – and the incompetence of

lead defense counsel.

Whether counsel's performance was reasonable is based on the prevailing norms of practice. *Id.* at 688. Defense counsel in a capital murder case should have substantial knowledge and understanding of the relevant state law governing capital cases, they should have the requisite skill in the investigation, preparation, and presentation of evidence bearing upon mental status, and they should ensure that a full record is made of all legal proceedings in connection with a relevant claim in the case. *See*, *e.g.*, ABA Guideline 5.1(B)(2)(a) & (e); ABA Guideline 10.8(B)(2).

Under Rule 701 of the Texas Rules of Evidence, even if a witness is not testifying as an expert, the witness may still testify in the form of an opinion as long as that opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Under Rule 704, a lay witness may also offer an opinion on an ultimate issue in the case. *Ex parte Nailor*, 149 S.W.3d 125, 134-35 (Tex. Crim. App. 2004). These Rules of Evidence permit a lay witness to testify about a defendant's mental state. *Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997). A lay witness may also express an opinion on whether the defendant knew his conduct was wrong. *Fuller v. State*, 423 S.W.2d 924, 928 (Tex. Crim. App. 1968).

For the first element of Rule 701, the witness must have personal knowledge of the events on which his opinion is based. *Fairow*, 943 S.W.2d at 898. Dr. Harrison first interviewed Mr. Thomas nine days after the killings, and he spent over four hours interviewing and observing Mr. Thomas to prepare his competency report. Ex. 17 ¶ 13. Dr. McGirk first interviewed Mr. Thomas on March 30, 2004, which was two days after the crime occurred. Ex. 25 ¶ 3. Dr. McGirk interviewed and observed Mr. Thomas many times before trial for the purpose of evaluating and treating Mr. Thomas's mental health. *Id.* Therefore, both of these witnesses had

sufficient personal knowledge to satisfy the first element of Rule 701.

As to the second element of Rule 701, the crucial fact in issue was whether Mr. Thomas was sane at the time of the crimes.  Drs. Harrison and McGirk could have testified about their observations of Mr. Thomas's behavior and ability to understand right from wrong when they were with him; it would have been within the discretion of the trial judge as to whether either or both of these doctors could have offered opinions, based on appropriate foundation regarding sanity and ability to understand right from wrong at the time of the killings.

Despite the clear, established principles of Rules 701 and 704, Mr. Thomas's counsel failed to ask Drs. Harrison and McGirk for their opinions on these issues when they testified in court.  This omission represents a failure to meet the minimum standard of representation under *Strickland* because defense counsel lacked even the basic understanding of the relevant state law. If the defense had asked Dr. Harrison his opinion, Dr. Harrison would have testified that Mr. Thomas did not know his conduct was wrong. Ex. 17 ¶ 22.  Dr. Harrison would have also testified that Mr. Thomas was not sane at the time of the murders because he was suffering from psychosis.  *Id.* ¶ 40.  If the defense had asked Dr. McGirk his opinion, Dr. McGirk would have testified that Mr. Thomas was not sane at the time he committed the crimes.  Ex. 25 ¶ 11.  Dr. McGirk would have also testified that Mr. Thomas did not know his conduct was wrong at the time he killed Laura, Andre Jr., and Leyha.  *Id.* ¶ 10.  At the time of the crimes, Mr. Thomas believed that he was killing manifestations of the Devil instead of people.  *Id.*  Even if the court had prevented such opinions from being offered, testimony regarding Mr. Thomas's conditions and bizarre beliefs within days of the killings would have been persuasive testimony regarding sanity.

Counsel's failures in their questioning of Drs. McGirk and Harrison cannot be considered strategic.  Whether counsel was unprepared – and thus did not know the opinions of the two

doctors who had seen and treated Mr. Thomas in the time frame surrounding the crime – or was aware of their opinions but failed to elicit them, the failure to introduce such important evidence from respected doctors was a glaring error that amounted to constitutionally deficient performance which certainly prejudiced Mr. Thomas.  Drs. McGirk's and Harrison's effective silence inevitably left the impression that they would testify Mr. Thomas was sane at the time of the crimes or they were not qualified to opine on the issue of sanity.  Thus, Mr. Thomas was not only deprived of relevant testimony key to the core issue in the case, but counsel's failures additionally left a negative impression by virtue of what the Doctors were not asked.  Mr. Thomas was thus prejudiced by his counsel's deficient performance.

In similar situations, several courts have found counsel to be deficient for failing to elicit helpful opinions from experts in support of their arguments.  For example, in *Wilson*, 536 F.3d 1064 the court found prejudicial ineffective assistance of counsel.  Counsel in that case had retained a mental health expert only three weeks before trial started, however, the expert was nevertheless able to make several findings and reach several helpful conclusions.  *Id.* at 1075. But on direct examination, counsel asked the expert only generally about the expert's tests.  *Id.* The expert testified that the defendant had a severe mental and personality disorder, but counsel asked no further questions about specific results and conclusions, despite the fact that the expert was ready to give additional helpful testimony.  *Id.* at 1076.  "At no point did counsel elicit Dr. Reynolds' more concrete, scientifically rooted diagnoses, including the PTSD, bipolar disorder, generalized anxiety disorder, and schizotypal personality features."  *Id.*  The court found that counsel did not have a "strong strategic reason" to forego presenting such evidence, as required by the ABA Guidelines.  *Id.* at 1091 (citing ABA Guidelines 11.8.6 (1989)).  This kept the jury from understanding the defendant's mental illness and supported the court's finding that counsel's performance fell prejudicially short of *Strickland's* requirement for effective

representation.  *Id.* at 1093; *see also Hovey v. Ayers*, 458 F.3d 892, 929 n.3 (9th Cir. 2006) (finding that defendant was prejudiced by counsel's failure to elicit testimony from an expert about mental health records that described defendant's delusions and grandiose ideas and were consistent with the expert's observations and diagnosis.  The testimony and records would have helped demonstrate to the jury that medical professionals repeatedly had concluded that the defendant was seriously mentally disturbed).

The state habeas court's conclusion of law that Mr. Thomas did not prove by a preponderance of the evidence that Mr. Hagood was not "employing trial strategy in not requesting sanity opinions from Dr. Harrison or Dr. McGirk," CL ¶ 97, is directly contrary to and an unreasonable application of federal law.  Mr. Hagood cannot articulate any strategic reason not to elicit an opinion that Mr. Thomas was insane – the core defense in the case – from experts that formed the opinions that Thomas was not insane at the time.  Consistent with the above-cited cases applying *Strickland*, counsel's performance is clearly ineffective and prejudicial where counsel fails to present available expert testimony that corroborates an important part of his client's defense.  There is simply no basis in the record to suggest that Hagood's decision not to elicit these favorable opinions from Drs. Harrison and McGirk was based on any strategy at all.  Rather, the record shows that Mr. Hagood was – in all respects as in this one – completely unprepared to represent his client.  He did not know what these experts would testify to or was incapable of eliciting their positive testimony.  That constituted a severe violation of *Strickland* – one that was unreasonable for the state habeas court not to recognize and remedy.

## XIII.   Defense Counsels' Failure to Present Evidence of or Seek a Jury Instruction on Diminished Capacity Constituted Constitutionally Ineffective Assistance of Counsel.

The trial court found that prior to the beginning of the trial on the merits, Mr. Hagood

was presented with a memorandum on the admissibility of evidence of the defendant's diminished mental capacity to counter State evidence aimed at proving that Mr. Thomas had the requisite *mens rea* to be found guilty of capital murder.  *See* Ex. 15 ¶ 12; FF ¶ 98.   The trial court further found that Mr. Hagood did not share this information with co-counsel, *see* Ex. 27 ¶ 12; FF ¶ 99, nor did he further investigate, or attempt to present a diminished capacity option to the jury.  Ex. 15 ¶ 12; FF ¶ 99.  The court further found that Mr. Hagood made a strategic call to allege only the insanity defense and not to attempt to claim that Mr. Thomas had a diminished capacity and thus could only be found guilty of a lesser included offense, and not of the specific intent crime of capital murder.  *See* FF ¶ 102.

Evidence of Mr. Thomas's diminished capacity would have significantly impacted the jury's decision, because it could have negated the integral *mens rea* element of the capital murder charge Mr. Thomas faced.  Under *Strickland*, Mr. Thomas received ineffective assistance from counsel as a result of this failure, warranting a new trial.

Here, Mr. Thomas's trial counsel fell well below all reasonable standards for effective assistance by failing to present or even investigate diminished capacity evidence.  *See, e.g.*, ABA Guidelines, commentary to Guideline 10.7 (stressing that due to the unique nature of death penalty cases and the challenges presented by them, it is important that counsel "investigate and re-investigate possible defenses").  Trial counsel's failure to consider diminished capacity evidence robbed the jury of two key options:  (1) acquitting Mr. Thomas for the State's failure to prove *mens rea*; and (2) convicting Mr. Thomas of a lesser included murder charge not punishable by death.   Thus, the result of the trial likely would have been different absent counsel's ineffective assistance to Mr. Thomas.

## A.    Texas Recognizes the Availability of a Diminished-Capacity Defense.

Although the general rule in Texas is that evidence of a defendant's diminished mental

capacity is not admissible on the question of guilt unless it is offered as part of the affirmative defense of insanity, Texas recognizes the well-established "diminished capacity" exception to this rule.  Evidence of the defendant's diminished mental capacity is admissible to show that the defendant did not form the requisite *mens rea* to be found guilty of a "specific intent" crime like capital murder.[35]  *See Cowles v. State,* 510 S.W. 3d 608, 609 (Tex. Crim. App. 1974) ("an exception to [the] rule [that evidence of mental illness is inadmissible as to guilt or innocence applies] where specific intent is an [e]lement of the offense for which the accused is being tried, as in the different degrees of murder and the 'with intent' crimes")*; Warner v. State,* 969 S.W.2d 1, 1 n.1 (Tex. Crim. App. 1998) (citing *Cowles,* 510 S.W.2d at 610); *see also discussion in Penry v. State,* 903 S.W.2d 715, 767-69 (Tex. Crim. App. 1995) (Maloney, J., concurring) (diminished capacity does not exist as an affirmative defense, but may be raised to show the absence of the required *mens rea* for an offense in which a specific intent must be proven by the State).

Unlike with the affirmative defense of insanity, the defense does not have the burden to prove diminished mental capacity.  *See Humanik v. Beyer,* 871 F.2d 432, 443 (3d Cir.), *cert. denied,* 493 U.S. 812 (1989).  Rather, where the diminished capacity defense is raised, the State retains its burden to prove *mens rea* beyond a reasonable doubt.  *Id; In re Winship*, 397 U.S. 358,

---

[35]     The principle of criminal intent can be traced to the age-old maxim, *actus non facit reum, nisi mens sit rea* −  "an act does not make the actor guilty, unless the mind be guilty; that is, unless the intent be criminal.  The intent and the act must both concur to constitute the crime."  Lord Kenyon, C.J., 7 Term 514 (*quoted* in *Lynch v. State*, 952 S.W.2d 594, 597 (Tex. Ct. App. 1997)).  At common law, there were a multitude of criminal states of mind for different crimes, but Texas has adopted the four standard types of *mens rea* first set forth in the Model Penal Code.  *See* Tex. Penal Code Art. 6.02 (b) ("Culpable mental states are classified according to relative degrees, from highest to lowest, as follows: (1) intentional; (2) knowing; (3) reckless; [and] (4) criminal negligence.").  The first of these four mental states are categorized as "specific intent" states of mind because they require that the defendant specifically meant to bring about the result of the crime or specifically knew that her actions would reasonably cause the result of the crime.  *See* Tex. Penal Code Art. 6.03; *see also Cowles*, 510 S.W. 3d at 609.  Capital murder is a specific intent offense that requires proof that that the defendant "intentionally or knowingly causes the death of an individual."  Tex. Penal Code, art. 19.02(b)(1), 19.03.

361-363 (1970). Thus, the diminished capacity option is a "failure-of-proof defense" not an affirmative defense. *Jackson v. State,* 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). Diminished capacity evidence is merely used either to (1) demonstrate that the State has not proved the mental state required by the penal code beyond a reasonable doubt; or (2) that the defendant can only be found guilty of a lesser included offense that requires a less specific form of criminal intent. *See, e.g.*, *id.*

Under the latter theory, the defense may seek a "lesser included offense instruction" where it may be clear that the defendant has acted negligently or recklessly (and therefore committed manslaughter or some other lesser offense) but has not acted knowingly or intentionally and therefore cannot be convicted of murder. *See id* at 573; *compare* Tex Penal Code § 19.02(b)(1), 19.03 (A person commits Capital Murder where he "*intentionally or knowingly* causes the death of an individual"), *with* § 19.04 (A person commits manslaughter "if he *recklessly* causes the death of an individual"), *and* §19.05 (A person commits criminally negligent homicide "if he causes the death of an individual by *criminal negligence*") (emphasis added).[36] Thus, where a lesser included offense instruction is provided, the jury has the added

---

[36]   *See also* Tex. Penal Code § 6.03 DEFINITIONS OF CULPABLE MENTAL STATES:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b)  A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c)  A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such  nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(d)  A person acts with criminal negligence, or is criminally negligent, with respect to

option – along with convicting on the charged offense or acquitting – of convicting the defendant of a lesser offense with a lesser punishment.

Since Mr. Thomas's trial, two significant Texas decisions have confirmed the propriety of using evidence of diminished mental capacity to negate *mens rea* and to seek a lesser included offense instruction.  First, in *Jackson*, the Texas Court of Criminal Appeals recognized that the 1974 *Cowles* decision allowed the introduction of diminished capacity evidence to show a lack of *mens rea*.  160 S.W.3d 568, 573.  *Jackson* further recognized that evidence of diminished capacity is admissible under Tex. Code of Crim. Proc. Art. 38.36(a) in arguing for a lesser included offense instruction.  160 S.W.3d at 574 ("the trial judge has discretion to determine whether evidence of mental illness may be presented….[and] if such evidence is admitted, the trial judge has the discretion to determine whether the evidence supports a lesser included offense instruction.").

Additionally, in *Mays v. State,* 2007 Tex. App. LEXIS 2752 (Tex. Ct. App. April 11, 2007), trial counsel presented the trial court with the decision in *Jackson* and requested to be allowed to present evidence at the guilt-innocence phase on diminished capacity in order to seek a lesser included offense jury instruction.  The trial court refused to allow counsel to present evidence of diminished capacity and this resulted in Mr. Mays accepting a guilty plea while preserving the issue for appeal.  *Id.* at 3-4.  The Texarkana Court of Appeals held that it was error for the trial court to bar the presentation of evidence of diminished capacity "en toto" given the holding of *Jackson.   Id.* at 10-11.

---

circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

**B.**     **Defense Counsel's Failure to Present Diminished Capacity Evidence was not an Objectively Reasonable Strategy.**

As demonstrated by the above authorities, the use of diminished capacity evidence to negate *mens rea* is a well-established option under Texas law – one that Mr. Thomas's counsel should have at least considered, but they did not.  Indeed, the diminished capacity option is a well-accepted trial strategy in most U.S. jurisdictions, making it the type of argument trial counsel should have been aware of and one that they at minimum should have investigated.  *See* Henry Fradella, *From Insanity To Beyond Diminished Capacity: Mental Illness And Criminal Excuse In The Post-Clark Era*, 18 U. Fla. J.L. & Pub. Pol'y 7, 47 (April 2007) (diminished capacity evidence is admissible to negate intent in over half of all U.S. jurisdictions)[37]; *see also, e.g.*, *Commonwealth v. Legg*, 711 A.2d 430, 433-34 (Pa. 1998) (*finding ineffective assistance of counsel* where counsel did not investigate or present diminished capacity evidence that could have negated specific intent and led to conviction on lesser included offense of third degree murder) (emphasis added).  *State v. Tilton*, 72 P.3d 735, 739 (Wash. 2003) ("Failure of defense counsel to present a diminished capacity defense where the facts support such a defense has been held to satisfy both prongs of the *Strickland* test.") (internal citation omitted); *State v. Griffin*, 670 P.2d 265 (Wash. 1983) (must give jury a diminished capacity instruction whenever there is evidence that defendant had diminished capacity that could have affected ability to form requisite intent); *State v. Joseph*, 590 S.E.2d 718 (W.Va. 2003) (evidence of diminished capacity admissible to negate *mens rea* for specific intent crimes); *State v. Delibero*, 692 A.2d 981 (N.J. 1997) (noting that the state retains the burden of proof where the defendant offers diminished capacity evidence, which is admissible whenever it is relevant to prove that the defendant did not

---

[37]     Although the Supreme Court recently held in *Clark v. Arizona*, 548 U.S. ---, (2006) that Arizona's decision to preclude evidence of diminished capacity evidence for the purpose of negating *mens rea* was constitutional, *Clark* has no bearing on the diminished capacity defense in states such as Texas, which has expressly reaffirmed the availability of this option.

have a state of mind which is an element of the offense) (citing N.J.S.A. 2C:4-2); *State v. Walkup*, 220 S.W.3d 748, 754-756 (Mo. 2007) (*en banc*) (acknowledging availability of diminished capacity defense and relevance of diminished capacity evidence to whether defendant had culpable state of mind); *State v. Hall*, 958 S.W.2d 679, 688-90 (Tenn. 1997) (same); Ark. Code Ann. § 5-2-303 (same).

Indeed, not only is the diminished capacity option well known in the case law, but Mr. Hagood was provided a memorandum prior to trial detailing the availability of this option.  It was not objectively reasonable for Mr. Hagood to ignore the possibility of advancing the diminished capacity option after being specifically informed of its potential merit in this case. Mr. Hagood had "a duty to make reasonable investigations or to make a reasonable decision that ma[de]…investigation[] unnecessary." *Strickland*, 466 U.S. at 691.  But Mr. Hagood never told his co-counsel about the memorandum, never researched applicable case law, and never investigated facts that could support the defense. Ex. 15 at ¶ 12.[38]  Mr. Hagood did not make any "reasonable decision" to ignore the diminished capacity option—he overlooked the option entirely.  As such, his performance fell well below the objective professional standard that governed his representation.

In *Mason v. Balcom*, 531 F.2d 717 (5th Cir. 1976), *reh'g denied*, 534 F.2d 1407 (5th Cir. 1976), the court held that the unexplained failure of the 18–year–old defendant's appointed attorney, a judge of the small claims court, to, inter alia, explore the defense of intoxication and to investigate potential defenses such as duress and coercion was supportive of a finding of inadequate representation of counsel under the "reasonably effective assistance" test, where the

---

[38]    In the affidavit Mr. Hagood provided to state habeas counsel, he stated that he "just did not remember" his thinking on the question of diminished capacity, (Ex. 15 at ¶ 12), his memory appears to have been refreshed by the time the state obtained their affidavit from him.  *See Ex Parte Thomas*, State's Ex. A at 17.  Such conflicts in the evidence undermine the viability of the trial court's findings of fact.

defendant claimed that he was drunk when arrested and that his codefendant persuaded him to commit the offenses and gave him drugs. Criticizing the "assembly–line" nature of the representation afforded by counsel, the court affirmed an order granting habeas corpus relief after a hearing.

In similar circumstances, courts have routinely found counsel ineffective.  *See Mason v. Balcom*, 531 F.2d 717 (5th Cir. 1976), *reh'g denied*, 534 F.2d 1407 (5th Cir. 1976) (unexplained failure of the 18–year–old defendant's appointed attorney to, *inter alia*, explore the defense of intoxication and to investigate potential defenses such as duress and coercion was supportive of a finding of inadequate representation of counsel under the "reasonably effective assistance" test, where the defendant claimed that he was drunk when arrested and that his codefendant persuaded him to commit the offenses and gave him drugs; criticizing the "assembly–line" nature of the representation afforded by counsel, the court affirmed an order granting habeas corpus relief after a hearing); *Davis v. Alabama*, 596 F.2d 1214 (5th Cir. 1979), *reh'g denied*, 601 F.2d 586 (5th Cir. 1979) *and judgment vacated on other grounds*, 446 U.S. 903, 100 S. Ct. 1827, 64 L. Ed. 2d 256 (1980) (counsel was ineffective for failing to investigate his insanity defense applying the ABA Standards for Criminal Justice, § 4.1); *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) (capital murder defendant was prejudiced by counsel's ineffective assistance under Sixth Amendment at guilt phase of trial, where although it was clear that defendant shot two police officers there was evidence that defendant's mental state at time of offense could have been used as defense to first degree murder under diminished capacity standard, in that defendant suffered from severe mental illness and possible brain damage); *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005) (defendant was prejudiced by counsel's failure to investigate further and discover evidence of defendant's mental retardation, brain damage, and other impairments that could have prevented him from forming specific intent to kill victim, as required to support defendant's

diminished capacity defense under Pennsylvania law; there was reasonable probability that, had psychiatrist and clinical psychologist and neurophysiologist, who evaluated defendant in preparation for his Post Conviction Relief Act (PCRA) appeal, testified as to their opinion that defendant suffered from mental disorders that deprived him of capacity to form specific intent to kill victim, jury would have found defendant guilty of third degree murder, not first degree murder); *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002) (trial counsel's deficient performance, in failing to investigate defendant's history of mental illness and drug abuse for purposes of determining possibility of mental defense strategy, prejudiced defendant at capital murder trial where there was reasonable probability that jury would have found reasonable doubt as to defendant's ability to form intent required for first–degree murder conviction had mental health and drug abuse evidence been presented); *Brubaker v. Dickson*, 310 F.2d 30 (9th Cir. 1962) (finding that counsel's conduct was indicative of ineffective assistance of counsel where counsel failed to investigate diminished capacity and intoxication defense possibilities by making no effort to uncover the murder defendant's personal history, or to make any inquiries of his family, friends, or employers, despite that electroencephalographic examinations made subsequent to the criminal defendant's conviction revealed organic brain damage and there was medical opinion indicating that the defendant was seizure–prone and had a compulsive personality marked by strong emotional instability and by hypersensitivity to alcohol).

### C.   Had Defense Counsel Offered Diminished-Capacity Evidence, there is a Reasonable Probability that Mr. Thomas Would not Have Been Found Guilty of Capital Murder.

There was ample evidence that Mr. Thomas's mental illness, poor impulse control, and delusional state at the time of the homicide:  (1) made him *incapable of forming the requisite intent* to be found guilty of capital murder; and (2) illustrated that he *actually did not form such intent*.  Thus, if trial counsel had considered and raised diminished capacity evidence with the

goal of showing the lack of a culpable state of mind, it is highly likely the jury would have either acquitted or convicted on a lesser offense.

It is undisputed that Mr. Thomas believed that he was not killing people, but rather the demons that had taken the shape of humans.  Indeed, the objective evidence regarding the crime shows that Mr. Thomas did not intend to kill people.  For instance, Mr. Thomas's method of killing – using three separate knives to avoid cross-contamination of the demons' blood – shows that his intent was not to kill human beings, but rather to banish biblical villains from the hearts of his family.  Additionally, Mr. Thomas explained to Detective Mike Ditto that he believed his ex-wife and the children were trying to frustrate his angelic mission when they interrupted his listening of religious programming.  Ex. 171 ¶¶ 7-8.

Mr. Thomas's conduct, when viewed together with evidence of his diminished mental capacity caused by delusional schizophrenic symptoms, very reasonably could have been interpreted by the jury as falling short of the specific intent required by Texas' capital murder statute.  Had defense counsel sought a lesser included offense instruction, or at the very least simply informed the jury that Mr. Thomas's diminished capacity mitigated the essential element of *mens rea*, the outcome of the guilt phase likely would have been different.  At minimum, defense counsel's failure to consider this well-known strategy should undermine this Court's confidence in the accuracy of the verdict.  Thus, under *Strickland*, this Court should overturn Mr. Thomas's conviction for ineffective assistance of trial counsel.

### D.   The State Habeas Court's Finding that there is Allegedly Insufficient Evidence Relevant to this Claim for Relief is Based on an Unreasonable Determination of the Facts.

The trial court's finding that Mr. Thomas allegedly did not identify sufficient admissible evidence showing that if he is guilty, he was only guilty of a lesser-included offense and not capital murder, FF ¶ 103, is an unreasonable determination of the facts in light of the evidence

137

presented in the State court proceeding.  The court received overwhelming evidence that Mr.

Thomas was so delusional before, during and after the murders that he did not even believe he

was killing human beings.  Rather, in his delusional system, he believed he was killing demons.

He even attempted to call the murdered victims after they were dead, believing them to still be

alive.  This and the voluminous other evidence that Thomas did not have any specific intent to

kill the victims (but rather only intended to kill imaginary delusions) would provide a reasonable

basis for a jury to find that the state could not meet its burden to prove the specific intent element

of capital murder, and that if guilty, Thomas was only guilty of a lesser included offense.

> **E.     The State Habeas Court's Ruling that the Defense was not Ineffective Despite
> its Failure to Raise a Diminished-Capacity Defense was Contrary to, or
> Involved an Unreasonable Application of, *Strickland*.**

The state habeas court's denial of this claim for relief was directly contrary to

*Strickland's* requirement that defense counsel "make reasonable investigations or…make a

reasonable decision that…investigation[] unnecessary."  66 U.S. at 691.  The trial court

specifically found that Mr. Thomas's lead trial counsel, Mr. Hagood, was presented with a

memorandum outlining the diminished capacity defense.  As discussed above, Mr. Hagood did

nothing to research the diminished capacity defense or determine whether there were sufficient

facts to prove the defense.  He also made no reasonable decision that an investigation was

unnecessary; he merely ignored the diminished capacity memo he received.  The trial court's

denial of this claim for relief is therefore in direct conflict with *Strickland*, which required

Hagood to either investigate the diminished capacity defense, or have some articulable,

reasonable basis for failing to do so.

Alternatively, the state habeas court's denial of this claim for relief was, at minimum, an

unreasonable application of *Strickland*, in that the court apparently believed that Hagood could

completely ignore a possible diminished capacity without having any reasonable basis for doing

so.  *Strickland* requires defense counsel to base their decisions on information received after a reasonable investigation of the legal issues and/or the facts.  There is no evidence in the record suggesting that Mr. Hagood or Ms. Peterson gave any thought at all to the diminished capacity defense – despite the fact that it could have prevented the imposition of a death sentence for their client.  Thus, the State habeas court's denial of this claim was, at minimum, based on an unreasonable application of *Strickland*.

## XIV.   Defense Counsels' Performance at the Punishment Phase of Mr. Thomas' Trial was Constitutionally Ineffective.

The story of Mr. Thomas's tragic life was never told to the jury that sentenced him to death.  The divisions among the defense team, and the handicaps and inexperience of his trial attorneys, precluded the investigation into and development of the abundant mitigation evidence that was available.  In a classic case of inexcusably deficient performance, defense counsel did not begin putting a mitigation case together until they were in the midst of trial.  Very few witnesses were contacted, records were only cursorily reviewed, and none of the minimal information that was gleaned was effectively presented.  Despite glaring signs of mental illness – and litigation around the issue at the first phase of trial – attempts to present such information for its mitigating value at the second phase were weak and incomplete at best.  The minimal number of family members who testified for the defense in the second phase did more harm than good, as they had not been properly prepared, and because the defense team had not done the investigation necessary to reveal the true story about Mr. Thomas and his family, and their long history of illness and abuse.  Counsel's failure to investigate, develop and present a reliable social history of Mr. Thomas's life caused false and misleading testimony about Mr. Thomas to be presented through lay and expert witnesses.  These inaccuracies and untruths were argued by the prosecution, and were considered by the jury in condemning Mr. Thomas to death.

Mr. Thomas's experiences – and those of his family – could have aided the jury in understanding the impetus for a crime whose facts alone shout mental illness, and helped to humanize Mr. Thomas.  In short, Mr. Thomas's life story – the story never told to his jury - is powerfully mitigating.  If that story had been told, there is a reasonable probability that the outcome of the proceedings would have been different.  Indeed, the absence of that story – an absence resulting from counsels' deficiencies - resulted in a trial that was fundamentally unfair.

The trial court's findings below are unreasonable in light of the evidence presented.  Indeed, the findings essentially credit only the version of events asserted in the affidavit given to the state by RJ Hagood, despite the fact that it is contradicted by the affidavits of co-counsel, her legal assistant, the mitigation specialist, defense experts, and approximately 20 lay witnesses.  The trial court's conclusions of law requiring a showing of prejudice by a "preponderance of the evidence" is a standard that the Supreme Court has explicitly rejected as contrary to Supreme Court law.  *See Williams*, 529 U.S. at 405-406.  The trial court's findings and conclusions are not entitled to the deference of this Court.

A.      **The Legal Standard.**

Analysis of these claims is governed by *Strickland*, as explicated in *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 123 S.Ct. 2527, 2536 (2003), and *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).  Petitioner must show that "in light of all the circumstances, the identified acts or omissions [by counsel] were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  The defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms."  *Id*. at 688.  In evaluating a claim that counsel failed to adequately investigate, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id*. at 691.  The

focus of the inquiry is "not whether counsel should have presented a mitigation case" but "whether the investigation supporting counsel's decision to introduce mitigation evidence . . . was itself reasonable." *Wiggins*, 123 S.Ct. at 2536 (emphasis in original).  Thus, a decision cannot be deemed tactical unless it is grounded in sufficient facts which in turn result from an investigation that is adequate for that purpose.

Applicant also must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*.  This test is not outcome determinative.  The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case.  *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  *Id*. (emphasis supplied).  Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.

The Supreme Court recently took great pains to apply the Strickland standard in three cases addressing effective representation at the sentencing phase of a capital trial.  *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).  This trio of decisions addressed death penalty cases tried in the 1980's, and the Supreme Court held in each instance that the clearly established law of *Strickland* mandated a finding of ineffective assistance of counsel and thus the AEDPA posed no bar to relief.

The significance of these decisions cannot be overstated.  While they apply clearly established law, they are a detailed set of instructions to lower courts on the proper application of

141

*Strickland* to capital sentencing proceedings. That the Court deemed such instruction necessary is evident from the fact that it devoted its scarce resources to taking not one but *three* relatively unremarkable capital cases and modeling how to adjudicate claims of ineffective assistance of counsel.

These cases have clarified considerably the "clearly established law" applicable to capital cases adjudicated in state court after *Strickland*. The following principles are now inherent in *Strickland* and its progeny:

**<u>Performance:</u>**

- Capital defense is sufficiently specialized and regulated to have a national standard, reflected both in the 8th Amendment and the ABA guidelines. *Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 397.

- While there is no set of per se rules or checklist for capital representation, defense counsel must – in every case – engage in a thorough social history investigation. The ABA guidelines reflect the "well-defined norms" of the national standard for mitigation investigation, and thus the floor below which local practices may not descend. *Wiggins*, 539 U.S. at 524-25; *Rompilla*, 545 U.S. at 380.

- Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation. *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527-28.

- The fact that counsel performed some, or even extensive investigation, does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388-89; *Wiggins*, 539 U.S. at 527, 534.

- Federal courts, even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. *Wiggins*, 539 U.S. at 526-27.

- The duty to investigate and prepare for the punishment phase also includes rebutting the prosecution's case in aggravation. Counsel must, at a minimum, secure the information in possession of law enforcement. Rompilla, 545 U.S. at 385-87.

**<u>Prejudice:</u>**

- Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability. *Rompilla*, 545 U.S. at

393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

- The operative question is whether there's a reasonable probability that one juror would have voted differently. *Wiggins*, 539 U.S. at 537.

- When assessing prejudice from counsel's error or omissions, reviewing courts must look at all of the evidence in the aggregate, including the evidence adduced at trial and the evidence adduced in post-conviction proceedings. *Wiggins*, at 536; *Williams*, at 397-98.

- Courts should not focus on trial counsel's post-trial statements regarding whether they would have used the mitigating evidence adduced in post-conviction proceedings, the relevant inquiry is whether a competent attorney would have introduced it. *Wiggins*, 539 U.S. at 535.

- The failure to discover mitigation undermines the outcome even in highly aggravated cases. The failure to provide any context or explanation for an aggravated case may render the proceeding unreliable. The idea that considerable aggravation is a *per se* bar to finding prejudice is no longer viable after *Williams* and *Rompilla*, both of which were highly aggravated cases.

- Prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility. *Williams*, 529 U.S. at 398.

- Courts must look at all consequences that would have flowed from competent performance, including the impact on the work of expert witnesses. *Rompilla*, 545 U.S. at 592-93.

- When assessing prejudice federal courts need not make the state-law evidentiary findings that would have been at issue at sentencing, courts merely evaluate the totality of the evidence adduced at trial and in the habeas proceedings. Thus, a petitioner can use reliable hearsay to prove prejudice. *Wiggins*, 539 U.S. at 536.

In *Williams*, *Wiggins*, and *Rompilla*, the Supreme Court scrupulously enforced the right to effective assistance of counsel in capital sentencing proceedings, even under the deferential scheme of AEDPA.[39]  These cases must be considered in evaluating Mr. Thomas's claim, and they compel relief.

---

[39]    The trial court does not cite *Williams*, *Wiggins*, or *Rompilla* in its Findings and Conclusions.

**B.     Trial Counsels' Minimal and Last-Minute Preparation for, and Presentation of, the Defense Case at Punishment was Constitutionally Deficient.**

**1.     The Defense Team was Leaderless, Fractured, and Lethally Unprepared.**

There is no dispute about the division of labor between Mr. Hagood and Ms. Peterson: Mr. Hagood was responsible for the expert witnesses and the punishment phase; Ms. Peterson was responsible for the lay witnesses to be presented at the culpability phase.  Ex. 27 ¶ 6; Ex. 9 ¶ 4; Ex. 15 ¶ 5.

In September 2004, Mr. Hagood hired Shelli Schade to be the mitigation specialist.  Ex. 30 ¶ 2.  Unfortunately, Mr. Thomas's case was Ms. Schade's first capital murder trial.  Ex. 30 ¶ 2.  Despite her inexperience, Mr. Hagood failed to give Ms. Schade any guidance with respect to what he expected of her, or what he wanted her to do.  Ex. 30 ¶¶ 3-4, 8-9.  There is no evidence that he directed her to speak to any witnesses (specifically or generally), request any records, or give her any guidance as to what records she might seek.

Because of the lack of direction and guidance, Ms. Schade did not know what to do and, thus, did very little true mitigation work.  Ex. 27 ¶ 31; Ex. 9 ¶ 16-17.  She requested very few records, and failed to request many that were clearly significant (and that any experienced mitigation specialist would have known to gather).  She – and the defense team as a whole – failed to comprehensively review or digest the records that were made available by the state through discovery.[40]  Eventually – after trial had started - she developed a "Madness Timeline," based on information she obtained from Mr. Thomas, with minimal recourse to the records obtained from the State in discovery.  Ex. 27 ¶ 31.[41]  The entire universe of people she

---

[40]     The state turned all discovery over to Mr. Hagood.  Apparently, there were times when Mr. Hagood failed to share it with his co-counsel.  What he did turn over appeared undisturbed.  *See* Ex. 27 at ¶ 35; Ex. 9 at ¶¶ 6; 7.

[41]     At the time Ms. Schade turned her timeline over to Dr. Allen ten days before the

interviewed about Mr. Thomas consisted of just four people:  Danny Thomas, Doris Gonzalez, Brian Thomas and Eric Ross.  Ex. 30 ¶ 13.  The witnesses Ms. Schade did talk to were poorly prepared to testify, and evinced a profound misunderstanding of their role.  As their testimony – and subsequent habeas investigation – reveals, those interviews did not begin to touch the mitigation information that was available.

Other than hiring Ms. Schade, it does not appear that Mr. Hagood prepared at all for the punishment phase of Mr. Thomas's trial.  Other than the four people interviewed by Ms. Schade, not a single family member, friend, church official, teacher, or community member were contacted by the defense team.  See, e.g., Ex. 2, 3, 5, 6, 7, 10, 16, 18,[42] 19, 20, 21, 22, 24, 26, 29, 32, 34.  Andre's brother, Eric Ross, testified for the prosecution, but didn't know if he was testifying for the defense or the prosecution.  Ex. 28.  Mr. Thomas's father, Danny Thomas, was subpoenaed by the prosecution, and although he told Ms. Peterson that he wanted to testify in support of his son, the defense never met with him in advance of trial, nor asked him about his son's background, upbringing, or illness.  Ex. 32, ¶¶ 18-21.  As co-counsel Bobbie Peterson explains:

> Late in the trial, Mr. Hagood asked me who we had for the punishment phase.  I was completely taken aback because my understanding was that Mr. Hagood was responsible for mitigation and punishment phase.  At that point, I realized that we were not prepared for the punishment phase.

Ex. 27 ¶ 29. Leah Eastep's recollections were similar:

> Ms. Peterson and I understood that Mr. Hagood was preparing the punishment phase case.  We only found out that was not true very late in the trial, and had to scramble to try to get something ready – all while we were in trial everyday – working up to 20 hours a day during the weekends.

---

punishment phase began, the timeline was incomplete.  Ex. 1 at ¶¶ 8-9.
[42] Ms. Ingle testified after *she* contacted defense counsel.

Ex. 9 ¶ 24.

Ms. Peterson had no experience trying a death penalty case and no experience with mitigation. Ex. 27 ¶¶ 4, 31. Moreover, Ms. Peterson was forced to throw together a punishment case while still maintaining her responsibilities for the guilt-innocence phase. She was overwhelmed. Moreover, given the paucity of investigation that had been conducted to date, she could not, two days before trial, have provided constitutionally adequate representation.

In mid-February, between the completion of voir dire and the commencement of the guilt-innocence phase, the defense attempted to line up two experts to testify on Mr. Thomas's behalf at the punishment phase: Dr. Kate Allen and Larry Fitzgerald. Ex. 167. Dr. Allen was first contacted by the defense team on February 8, 2005, to testify regarding the possibility that Mr. Thomas would be a future danger, and his moral culpability. C.R. Vol. 5; Ex. 1 ¶ 4; Exs. 167 & 168. The motion to have her appointed was not filed until February 21, 2005, and the order granting same was not signed until February 23, 2005 – almost ten days after the culpability phase of Mr. Thomas's trial had begun. C.R. Vol. 5 p. 1606-1609. Mr. Fitzgerald was first contacted on behalf of the defense on or about February 16, 2005, to provide expert testimony regarding future dangerousness (once incarcerated), the prison classification Mr. Thomas would be assigned and the date he would be eligible for parole. Ex. 11 ¶ 5; C.R. Vol. 5 pp. 1610-1613.[43]

Closing arguments in the guilt-innocence phase were conducted on Friday, March 4, 2005. R.R. Vol. 37 p. 14-112. The jury began deliberating on Monday, March 7, 2005. R.R. Vol. 38 p. 5. During the intervening weekend, Ms. Peterson worked up to twenty hours per day to try and put together a punishment case, even though she had never presented a mitigation case

---

[43]     Just as disturbing as their late retention is the fact that Mr. Hagood failed to notify the State of the defense's intention to call either Dr. Allen or Mr. Fitzgerald. Ex. 169.

before and was unsure what to do.  Ex. 27 (Peterson Aff.) ¶ 31.  Once again, Mr. Hagood was

conspicuously absent from this process.  Ex. 27 (Peterson Aff.) ¶ 31.

> ### 2. The Defense Case Presented at Punishment was Ill Prepared, Uninformed, and Inaccurate, and Failed to Give the Jury any Sense of Mr. Thomas's Mental Illness, or the Abuse and Neglect he Suffered as a Child.

The defense team presented all of its punishment phase evidence in the span of one full

day, from mid-morning on March 9, 2005, to just after lunch on March 10, 2005.  R.R. Vol. 40 p.

73 – Vol. 41 p. 135.  During its case, the defense called seven lay witnesses and one expert

witness.  *Id.*  Of the twenty-seven state and defense witnesses who testified during the entire

punishment phase, Ms. Peterson, who had no experience trying a mitigation case, questioned

twenty-one.  Ex. 27 at ¶ 32.  Mr. Hagood – who everyone on the defense team had understood

was responsible for the entire punishment phase – questioned the remaining six witnesses.

### a. Lay witness testimony.

Each of the lay witnesses presented by the defense gave similar, cursory, descriptions of

Mr. Thomas, describing him as kind, funny, helpful, and reserved.  Subsequent investigation has

revealed that while these descriptions may have been accurate in some instances, they fell

woefully short of presenting an accurate or complete picture.  Some of the testimony presented

was, simply, erroneous.  A number of the state's witnesses were members of Mr. Thomas's

family who, subsequent investigation has revealed, felt misled by the state, confused by what

was being asked of them, abandoned by defense counsel, embarrassed, or suffering from their

own illnesses.  Little if any of the testimony provided even a glimpse of the wealth of mitigation

that was available, had counsel performed an adequate investigation.

The defense's first witness, Steve Atkins, had only very limited interaction with Mr.

Thomas and did not know him well.  Mr. Atkins met Mr. Thomas when Mr. Thomas was

between nine and eleven years old, R.R. Vol. 40 p. 74, when he was working at an MHMR

outpatient facility.  The essence of Mr. Atkins' testimony was that Mr. Thomas and his brothers would sometimes show up at the outpatient facility looking for food and company.  R.R. Vol. 40 p. 77-80.  His testimony was at times incoherent, and clearly unprepared.

The second witness, Leander Williford, was no more compelling than Mr. Atkins.  Mr. Williford worked with Mr. Thomas at the cemetery.  R.R. Vol. 40 p. 83.  He testified that he and Mr. Thomas worked well together, that he never observed anything strange or unusual about him, that Mr. Thomas was kind, willing to help anyone, and funny, and that he did not observe anything irrational in the months preceding the murders.  R.R. Vol. 40 p. 84-86.  Again, the defense presented testimony that was misleading at best, and entirely unpersuasive if not irrelevant in light of the enormity of Mr. Thomas's mental illness and the horrific crime.

The next witness was Danny Ross, Mr. Thomas's brother.  On direct, Mr. Ross testified that he and his older brother Eric had a lot of responsibility for the younger brothers when their mother was not around, having to cook and make sure their homework was done.  R.R. Vol. 40 p. 89-90.  He also testified that the family moved a lot when he was younger and that he sometimes used his paycheck to pay the bills.  R.R. Vol. 40 pp. 90-91.  When asked if he had ever seen a violent side of Mr. Thomas, Mr. Ross testified, "No, I hadn't, no.  He's, like, one of the only brothers, probably I could say, that, when we were growing up, we never did fistfight. We could always talk.  We never fought."  R.R. Vol. 40 pp. 97.  On cross-examination, however, the State effectively neutralized, even countered, Mr. Ross's testimony.  The State was able to elicit testimony that Mr. Thomas's mother worked hard to provide for her sons, that Thomas had a large support system from which he could seek help and that they had a loving, close-knit family.  R.R. Vol. 40 p. 98-113.  When the prosecutor passed the witness, he had effectively painted the picture of a defendant who had had the benefit of a large support system and close family, but had inexplicably taken a violent path.  As the defense had not done the investigation

to know that this was entirely untrue, they had no recourse, and did little, if anything, to rehabilitate Mr. Ross – or the case - on redirect.  R.R. Vol. 40 pp. 113-115.

Following a recess for lunch, the defense called Wendy Ross, Danny Ross' wife.  She testified that Mr. Thomas's family didn't "like their personal problems to be known to other people.  Basically their personal problems are theirs."  R.R. Vol. 40 p. 120.  When asked what she noticed that was different about Mr. Thomas in the months prior to the murders, Ms. Ross replied she noticed "[t]he anxiety that he had…The anxiety.  The anxiety attacks.  I noticed that major—that was a major difference and the not really wanting to talk to anybody—yeah."  R.R. Vol. 40 p.125.  Ms. Ross said she never had any fears about Mr. Thomas watching her children. R.R. Vol. 40 p. 124.  On cross-examination, the prosecutor, as he did with Mr. Ross, elicited testimony that Mr. Thomas had a close-knit family and that if Mr. Thomas had asked for help from any of his family members, they would have helped him.  R.R. Vol. 40 pp. 128, 132-133. Finally, the prosecutor asked:

> Q.     But you never worried about [your children] being over
>        there around the defendant, right?
>
> A.     No.
>
> Q.     All right.  So, I'm assuming you thought he knew right
>        from wrong, didn't you?
>
> A.     Correct.

R.R. Vol. 40 pp. 134-135.  Again, the testimony was incomplete to the point of inaccuracy.  The defense declined the opportunity to re-examine the witness.

The defense then called Scott Hamel, a childhood friend of Mr. Thomas.  R.R. Vol. 40 p. 136.  Mr. Hamel testified that he noticed a change in Mr. Thomas after Mr. Thomas lost his job at the City.  R.R. Vol. 40 p. 140.  He said that Mr. Thomas really wanted his job back and that he was depressed, slept a lot and read the Bible.  R.R. Vol. 40 p. 141.  Mr. Hamel also relayed an

incident where Mr. Thomas asked Mr. Hamel for help, and Mr. Hamel drove him to MHMR, where Mr. Thomas only stayed about five or ten minutes.  R.R. Vol. 40 p. 141.  He ended his testimony by saying that Mr. Thomas would try to help anyone.  R.R. Vol. 40 p. 143.  The State, on cross-examination, turned Mr. Hamel's testimony around and created the inference that Mr. Thomas was angry about losing his job and angry that Laura would not give him a divorce, thus leading to the murders.  R.R. Vol. 40 p. 154-156.  The defense asked very few questions on re-direct.  R.R. Vol. 40 p. 156-157.

Doris Gonzales, Mr. Thomas's paternal aunt, was next.  She testified that Mr. Thomas's mother would talk about the Bible with him and his brothers and take them to church.  R.R. Vol. 40 p. 161.  When asked if she had noticed a change in Mr. Thomas in the month prior to March 27, 2004, she said only that at one point, Mr. Thomas "was very distraught, crying a lot."  R.R. Vol. 40 p. 165.  She also testified that Mr. Thomas's mother would sometimes dress inappropriately around her sons and that Mr. Thomas's father used to have a drinking problem.  R.R. Vol. 40 p. 168-169.  Finally, she relayed some of the events that occurred in March 2004, including the death of her sister, Mr. Thomas's aunt, Angel.  R.R. Vol. 40 p. 173.  On cross-examination, the State elicited testimony that Mr. Thomas's father tried to teach his children right from wrong.  R.R. Vol. 40 p. 175.

The final lay witness for the defense was Roger Braziel, a corporal with the Grayson County Jail.  The entire gist of his testimony was that, since returning from Vernon State Hospital, Mr. Thomas had been calmer and less agitated, that there had been no incident or disciplinary reports since his return, that Mr. Thomas did not have to be restrained, and that Mr. Thomas was still on medication.  R.R. Vol. 40 p. 176-177.  The prosecutor brought forth on cross-examination an incident in January 2005 in which a deputy overheard Mr. Thomas tell his father that, if he had the opportunity, he would try to grab the gun of one of the guards.  R.R.

Vol. 40 p. 178-179.

### b.      Expert witness testimony.

The next day, the defense called its one and only expert during the punishment case, Dr. Kate Allen.  Based on the minimal evidence that was provided to her by defense counsel, Dr. Allen testified that Andre was schizophrenic, that he has substance dependence, and that he has "traits" of two personality disorders (borderline personality disorder and antisocial personality disorder), and that while his parents were, for the most part, present, they were unable to meet Mr. Thomas's needs.  She also testified that "with medication" schizophrenics are not found to be violent.  *See* R.R. Vol. 41 p. 31-71.

On cross examination, Dr. Allen was excoriated because defense counsel had not provided her with the documents and evidence she needed to prepare properly for her testimony.  The State lambasted her for her lack of familiarity with "thousands of pages" of relevant documents, questioned her methods, conclusions, and credibility as a witness.  *See* R.R. Vol. 41 p. 71-123; 129-134.

Finally, Mr. Fitzgerald was presented as an expert witness, and taken on voir dire by the State.  R.R. Vol. 41 p. 136.  Following intense questioning by the State, the trial judge ruled that that Mr. Fitzgerald was qualified to testify as an expert.  Ex. 11 ¶ 8.  Mr. Hagood, however, never called Mr. Fitzgerald as a witness.  Instead, the defense rested its punishment case without putting Mr. Fitzgerald on to testify.  Ex. 11 ¶ 9.

### c.      Failure to prepare lay and expert witnesses.

Not surprisingly, in light of the late stage of preparation for the second phase of trial, Mr. Hagood's abdication of responsibility, and Ms. Peterson's and Ms. Schade's inexperience, the defense team failed to prepare their punishment phase witnesses to testify.

Standing alone, the testimony of the lay witnesses evinces counsels' lack of preparation.

At numerous points, Ms. Peterson does not appear to know what the witnesses are about to say, or is taken aback by their response.[44]  None of the witnesses are prepared for the State's cross examination, when their words are often twisted to offer testimony in support of the state's theory.  The erroneous information conveyed is left uncorrected.  In short, the case presented was, ultimately, damaging to the defense case.

The expert testimony does nothing to correct this failure, and the lack of preparation is again obvious.  As late as February 21 and 23, 2005, roughly two weeks before she testified, Dr. Allen – who Ms. Peterson had routed to Ms. Schade - was still requesting the documents she needed to review to prepare for her testimony.  Exs. 168 and 170.  At that point, Dr. Allen had not seen any records about the case, and knew only what she had been told at the time of her retention.  She did not receive any documents for review until February 27, 2005, a mere 11 days before she testified.  Even then, the defense only provided a fraction of the relevant documents, and failed to apprise Dr. Allen that there were voluminous records that she had not been given.  Dr. Allen, in turn, relied on Ms. Schade to give her everything she needed to properly prepare – and assumed that had been done.  Ex. 1 ¶¶ 6-14.  Defense counsel further provided very little guidance to Dr. Allen on the defense's overall strategy or the goals for her testimony.  Ms. Peterson only spoke with Dr. Allen about her testimony the night before (while Dr. Allen was driving to Sherman) and the morning of her court appearance.  Ex. 1 ¶ 13; Ex. 27 ¶ 40.

The defense team did equally little to prepare Mr. Fitzgerald for his testimony.  Ms. Peterson met with Mr. Fitzgerald briefly, giving him a thumbnail sketch of the crime, and Mr. Thomas's personality and criminal history.  Ex. 11 ¶ 6.  Mr. Fitzgerald did the remaining preparation independently.  Ex. 11 ¶ 6.  He researched the media coverage regarding the case to

---

[44] This is not surprising, given that she was required to prepare for the punishment phase of trial in the two days before it began.

gather further information.  Ex. 11 ¶ 6.  Trial counsel did not provide Mr. Fitzgerald with any

indication of the questions that might be asked.  Ex. 11 ¶ 6.

The events that led to Mr. Fitzgerald not, ultimately, testifying, further evince the lack of

preparation and understanding of his role and what he had to offer.  In part due to Mr. Hagood's

failure to timely notify the state that Dr. Allen and Mr. Fitzgerald were testifying, and partly

because neither Ms. Peterson nor Mr. Hagood appeared to have a full grasp of his qualifications

or the nature of his testimony, his qualifications were intensely examined – and put into question

- on voir dire.  The decision to not put him on was similarly uninformed:

> We did not consider a *Daubert* gatekeeping hearing to attempt to
> exclude the state from presenting the testimony of Royce Smithey.
> I think this was in part because we were having trouble getting
> Larry Fitzgerald qualified as an expert, and we needed someone
> through whom we could get in the videotape portraying maximum
> security prison conditions.  The state agreed we could get that in
> through Mr. Smithey, and we did not put on Mr. Fitzgerald.

Ex. 27 ¶ 28.  Thus, the defense lost entirely the benefit of what Mr. Fitzgerald had to say, and

ended up putting on their evidence – the videotape – without proper foundation, background, and

through a hostile witness who undermined the usefulness of the videotape.

In the end, trial counsel mounted no real punishment defense, calling just a handful of

unprepared witnesses, and grossly failing to prepare their one expert properly - Dr. Allen - for

her testimony.  Because the defense team had not done even a minimal investigation and had

done the bulk of the preparations in the weekend between the guilt and punishment phases of

trial, the witnesses that were presented – lay and expert – gave not just an extraordinarily

incomplete picture, but a false and misleading one.

### 3.    Counsel's Performance was Constitutionally Deficient.

As set forth above, it is well-settled that counsel must conduct a reasonable investigation

in order to provide effective assistance under the Sixth Amendment.  *Strickland v. Washington*,

466 U.S. 668, 690-91 (1984).  In a capital case, counsel's duty to investigate includes the responsibility to seek out mitigating evidence for use in the penalty phase, in the event the defendant is convicted of a death-eligible crime.  *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2537 (2003) (counsel is bound to undertake "efforts to discover all reasonably available mitigating evidence"); *Williams v. Taylor*, 529 U.S. 362, 396-97 (2000) (trial counsel in a capital case must "conduct a thorough investigation of the defendant's background") (citing 1 ABA Standards for Criminal Justice § 4-4.1 & Commentary, § 4-55 (2nd ed. 1980)).  "[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a reasonably substantial, independent investigation into potential mitigating circumstances." *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003) (citing *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc)).

In *Williams v. Taylor*, 529 U.S. at 390, the U.S. Supreme Court addressed the issue of whether trial counsel was constitutionally ineffective for failing to investigate and present available mitigating evidence at the punishment phase of a capital murder trial.  The Court discussed the fact that trial counsel failed to conduct an investigation into his client's home life; failed to review records compiled about the client and his family; failed to review prison records that would have indicated his ability to adapt to a structured environment; and failed to interview people who had positive relationships with the defendant.  *See id.*, 529 U.S. at 395-96.  The Court stated that counsel is obligated to investigate character and background evidence in a capital case.  *Id.* at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary p. 4-55 (2d ed.1980)).

In *Wiggins*, the Supreme Court again pointed to the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases as a guide on what constitutes defense counsel's obligations.  539 U.S. at 522.  Regarding the

punishment phase, the Guidelines state:

> [T]he defendant's psychological and social history and his
> emotional and mental health are often of vital importance to the
> jury's decision at the punishment phase.  Creating a competent and
> reliable mental health evaluation consistent with prevailing
> standards of practice is a time-consuming and expensive process.
> Counsel must compile extensive historical data, as well as obtain a
> thorough physical and neurological examination.  Diagnostic
> studies, neuropsychological testing, appropriate brain scans, blood
> test or genetic studies, and consultation with additional mental
> health specialists may also be necessary.

(Guidelines at 956-57).[45]  *See also* Texas Guideline 11.1(A)(3) (noting that defense counsel

must determine well in advance of trial the evidence and experts the State will use during the

punishment phase; detailing the investigation that must be conducted well before the punishment

phase begins).

    With respect to investigation generally, the Guidelines mandate that "[c]ounsel at every

stage have an obligation to conduct thorough and independent investigations relating to the

issues of both guilt and penalty."  The Commentary elaborates:

> Counsel's duty to investigate and present mitigating evidence is
> now well established.  The duty to investigate exists regardless of
> the expressed desires of a client.  Nor may counsel sit idly by,
> thinking that investigation would be futile.
>
> Because the sentencer in a capital case must consider in mitigation
> "anything in the life of the defendant which might militate against
> the appropriateness of the death penalty for the defendant, penalty
> phase preparation requires extensive and generally unparalleled
> investigation into personal and family history.  In the case of the
> client, this begins with the moment of conception.  Counsel needs

---

[45]     The Guidelines also recognize the critical importance of having a mitigation specialist on
the team.  However, that person is understood to possess clinical and information-gathering skills
and training that most lawyers simply do not have. . . . They have the clinical skills to recognize
such things as congenital, mental or neurological conditions, to understand how these conditions
may have affected the defendant's development and behavior, and to identify the most
appropriate experts to examine the defendant or testify on his behalf."  Guidelines at 960.  Ms.
Schade did not possess these skills, and cannot be deemed to have met any reasonable standard
of care.

to explore:

(1)    Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2)    Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3)    Educational history (including achievement, performance, behavior, and activities), special educational need (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4)    Military service (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5)    Employment and training history (including skills and performance, and barriers to employability);

(6)    Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

(7)    It is necessary to locate and interview the client's family members (who may suffer form some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. … Records should be required concerning not only the client, but also his parents, grandparents, siblings and children.

Ex. 27 (Guidelines at 1021-23, 1024 (internal punctuation omitted)); *see also* Guideline

10.11(A), (F)(2) (providing that "counsel have a continuing duty . . . to seek information that

supports mitigation" and prepare expert witnesses to testify regarding the defendant's

psychological condition that may lessen the defendant's culpability for the crime).  Guidelines

11.1(A)(3); 11.7(A); 11.7(F).

Mr. Thomas's trial counsel did not begin to meet the standards set out in either the ABA or the Texas Guidelines.  At the time of Mr. Thomas's trial – two years after the *Wiggins* decision had issued and the revised Guidelines had been published – it was well established that a thorough investigation was the standard of practice.  To say that this did not happen in Mr. Thomas's case would be a drastic understatement.  Despite the neon signs pointing to an extensive multi-generational history of mental illness, abuse, addiction and neglect, the defense team failed to perform any but the most minimal investigation.  The reasons – counsel's illness and inexperience, discord among the team, and a highly inexperienced mitigation specialist – are compelling, but irrelevant – and serve only to underscore the fact that defense counsels' failures were neither strategic nor tactical.

In light of the glaring signs of illness and abuse, this failure was especially flagrant.  This was not a case where counsel performed an investigation sufficient to make a decision about what should or should not be presented or investigated further.  Mr. Thomas's defense team did virtually no meaningful mitigation investigation, despite the numerous indicators that extensive mitigating evidence was available.[46]  A reasonable investigation would have uncovered the extensive family history of illness and abuse discovered by habeas counsel, recognized its relevance to understanding the depth and breadth of Mr. Thomas's mental illness, and presented both to the jury as a highly compelling case for sparing Mr. Thomas's life.  The rich and detailed information that was available, had a proper investigation been conducted, is reflected in the social history set out below.

---

[46]  Indeed, counsel spent a substantial amount of time litigating the questions of Mr. Thomas's mental illness at the guilt phase of trial.  Counsel certainly cannot say they were unaware of this evidence.  Nonetheless, they failed to prepare or present it as independently compelling mitigating evidence at the second phase of Mr. Thomas's trial.

C.      **The Mitigation that Could have been Presented had Counsel Provided Constitutionally Effective Assistance.**

The inadequacy of counsel that led to Mr. Thomas' death sentence is demonstrated not only by what is in the trial record, but in what is not there.  Defense counsel not only failed to properly prepare the few mitigation witnesses who did testify, they failed to locate or talk to the many other witnesses who would have provided a look into Mr. Thomas's life, failed independently to request records that are vital to a punishment defense, and failed to obtain the proper experts for mitigation.  Had defense counsel performed reasonably, they would have discovered compelling evidence of severe and persistent mental illness in both Mr. Thomas's maternal and paternal family history.  Many members of Mr. Thomas's family, friends and community leaders were available at the time of Mr. Thomas's capital trial and penalty phase to inform counsel, experts, and jurors about Mr. Thomas's life.  Here is what they would have provided on Mr. Thomas's behalf, had they simply been asked:

1.      **Social History**[47]

a.      **Maternal family history.**

Mr. Thomas's maternal grandmother, Vivian Joan Ross, was born in 1931.  Ms. Ross was the fourth child of Alice Pugh and John Henry Edwards.  Ms. Pugh had five children of her own, and then married Walter Johnson, who also had five children.  Ms. Pugh and Mr. Johnson then had two more sons, Walter, Jr. and Earl.  Ms. Pugh eventually left Mr. Johnson, because he was hopelessly unfaithful.  Walter, Jr. was the closest sibling to Ms. Ross, separated by four years in age.  Mr. Johnson is an important source of information about Mr. Thomas's background:

> I am the half-brother of Andre Thomas's maternal grandmother, Vivian Joanne Ross.  I call her Joanne.  Joanne was my closest sibling. Joanne had a problem with alcohol from a pretty young age.  When she got drunk, Joanne would change and become

---

[47] A Family Tree outlining Andre's extended maternal and paternal family is attached as Exhibit 193.  It also charts the mental illness and substance abuse rampant on both sides of the family.

> mean.  When I was about sixteen I remember Joanne being drunk
> and saying very abusive, bad things to our mother.  When Joanne
> was in her drunken state she was mean to everybody.

Ex. 22 at ¶ 2.

Ms. Ross was sexually involved with many men throughout her lifetime.  She gave birth

to nine children who were fathered by five different men.  Kevin Ross, Vivian's second child,

reports Vivian's marital history and his family history.

> My mother, Vivian Joan, had nine children by five different men.
> She gave birth to her first son, Ron Brinson, when she was
> fourteen years old.  I was born five years later.  I never knew my
> father and do not know his name.  I do not have any full siblings.
> When I was four years old, my mother married Johnny Ross.  They
> had three children.  Their first was Pam, who was born when I was
> five.  One year later, Greg was born, and the next year, Rochelle
> was born.  My mother and Johnny Ross broke up.  About two
> years later my mother had Alice, with another man.  Then a year
> later, my mother and her boyfriend, Roscoe Johnson, who was a
> married man, had my sister Denise.  Within the next four years my
> mother and Roscoe had two more children, Margie and Roscoe Jr.

Ex. 29 at ¶ 3.

Ms. Ross was still living at home with her parents at the time Ronnie Jr. was born, so he

was largely raised by his father's family, due to Ms. Ross's inability to support her children by

herself.  As Ronnie Jr. states:

> My mother was not able to work because she had to take care of
> her nine children.  Unfortunately, she could not depend on any of
> the five men who fathered her children.  They gave little, if any,
> financial or emotional support, so we were very poor and she
> struggled to provide for us.   She was on welfare.

Ex. 7 at ¶ 3.  *See also* Ex. 22 at ¶ 6.

Ms. Ross had many different men around and slept with many of them.  Kevin Ross later

observed this same propensity in Mr. Thomas's mother Rochelle:

> Like our mother, Rochelle is never without a man.  Rochelle's
> children saw her with many men.  Rochelle has got to have
> someone around who she has sex with.  If she wakes up and she

159

> does not have someone, she goes out to find another man.  She
> tends to find men who are like her, who have got to have sex.  My
> mother said Rochelle was oversexed.

Ex. 29 at ¶ 17.

One of the men Ms. Ross was with was Johnny Ross, a mean and abusive drunk.  Johnny

had been married prior to meeting Ms. Ross and had multiple children from his first marriage.

Despite Johnny's violent past and multiple indicators that his violent nature was likely to

continue, Vivian married Johnny, and had three more children with him, Pam, Gregory, and

Rochelle.

> Johnny Ross would beat my mother [Vivian] regularly.  Johnny
> was Rochelle's biological father and Andre's biological
> grandfather.  He was a mean and abusive man and often acted
> irrationally and did bizarre things.  For example, one time he threw
> what little food we had out in the yard and would not allow us to
> eat it.  Johnny Ross was an alcoholic.  More than once he got
> drunk and threatened to kill my mother with his gun.  It was
> terrifying.  When this happened my mother would run for help.

Ex. 7, ¶. 4-5.  Johnny continued to abuse Ms. Ross, even during her pregnancies.  Pam Ross

Borens was a victim of Johnny Ross's abuse before she was even born:

> When my mother was pregnant with me, my father was drunk and
> pushed her over.  She fell and my foot was broken in utero.  My
> mother was supposed to have my foot re-broken and re-set after
> my birth but she never did.  My foot is still messed up.

Ex. 6 at ¶ 6.

Gregory Ross, Ms. Ross's fourth child, was sexually molested when he was a young

child by a man in the neighborhood.  Ms. Ross then placed him in a boy's home.  When Gregory

returned home, he began sniffing glue and gas, and drinking heavy amounts of alcohol:

> Gregory sniffed glue from an early age.  My mother told me a man
> in the neighborhood raped Gregory when he was little so my
> mother put Gregory in a boy's home.

Ex. 6 at ¶ 12.

> My brother Greg sniffed gas and glue from the time he was ten
> years old.  He drank alcohol and smoked marijuana from an early
> age, and always had mental problems.

Ex. 29 at ¶ 11.

Rochelle Ross, Mr. Thomas's mother, was Ms. Ross's fifth child:

> Rochelle was born right in the middle of nine kids and she needed
> special attention.  She was very wild and always did whatever she
> wanted to do.  Rochelle lives in her own world.  She does not
> always stop to think what is best for her or for anyone around her.
> Rochelle often blows up for no rational reason.

Ex. 6 at ¶ 13.  According to family members, Rochelle was born with a "gift."  Rochelle believes

Mr. Thomas has this same gift:

> Rochelle believes that she has special powers to see into the future
> and to talk to people who have died.  She also believes that Andre
> has a gift because he can hear God.

Ex. 16 at ¶ 8.  This gift of hearing God is prevalent in Ms. Ross's family:

> My mother Vivian, and Rochelle, and my daughter Latitia all have
> the gift of hearing God.  God speaks to them in dreams and in
> visions.  My mother did not handle the gifts – they handled her.
> She drank alcohol because she did not want to hear or see.  She
> lived in between worlds.  When my mother talked about her
> visions, it was like a screen dropped in front of her face.  One time
> she had a vision that her baby brother was going to die if he
> completed his plan to move to California.  He did move, and
> within the next year he was shot and killed by his wife.  Rochelle
> is psychic and can practice physiognomy.  Rochelle is obsessed
> with what she thinks God is telling her to do.

Ex. 6 at ¶¶ 9-10.

Ms. Ross's children suffered from her excessive drinking and many of them became

alcoholics. In addition to the genetic predilection, Ms. Ross encouraged her children to drink at a

young age:

> At least five of my mother's nine children have problems with
> alcohol.   When I was little, my mother would make all of her
> children "cordial" drink.  We had to learn how to drink alcohol
> properly.  This made me cry.  I hated alcohol.

Ex. 6 at ¶ 11.  Each one of Ms. Ross's nine children has struggled with either alcohol abuse,

substance abuse, mental illness, or some combination of the three:

> My family may have generational curses.  There was mental illness
> in my mother's family.  Most of my mother's children are
> alcoholics and have depression.  I started drinking at age fifteen,
> and became a heroin addict after I got out of the service.  I suffered
> from depression after being in the Air Force.  My older brother,
> Ron, has been an alcoholic and has suffered from depression his
> whole life.  My sister Pam suffers from depression.  My brother
> Greg sniffed gas and glue from the time he was ten years old.  He
> drank alcohol and smoked marijuana from an early age, and
> always had mental problems.  Rochelle drank alcohol and suffered
> from depression.  She lost a kidney in her twenties.  Denise has
> always been depressed.  Denise's first husband molested their
> daughter, Gerica, so Denise divorced him.   Roscoe Jr., started
> drinking heavily when he went into the Navy. He has used meth
> and alcohol and is still an alcoholic.  Our youngest sister, Margie,
> has always suffered a great deal from depression.

Ex. 29 at ¶ 11.  Denise also recalls the familiar history of mental illness:

> There is a history of mental illness in Andre's background.  My
> mother, Andre's grandmother, used to tell me to be careful about
> how close I stepped to the line of mental illness, because you could
> fall over into the madness. I have battled depression, which
> became severe after my mother died in 1997.  My mother's father,
> Papa John, had a sister who was found in her yard one day, buck
> naked, watering the lawn.  Another sister of Papa John had a
> grandson in Oklahoma City who videotaped his own suicide.  I
> have contemplated suicide, and I take anti-depression medication.

Ex. 34 at ¶ 4.

After Rochelle was born, Ms. Ross and Johnny Ross split up, Ms. Ross conceived her

sixth child, with an unknown man, and then had three more children by a married man, Roscoe

Johnson.  Roscoe Johnson died and Ms. Ross quickly met another man, Walter Martin, and

married him in 1970.  After Ms. Ross and Walter married, they moved the family to Summit,

Oklahoma where Ms. Ross's father lived.  Ms. Ross and her family lived in extreme poverty.

Ex. 29 at ¶ 7.  Her children also lived in constant fear of Walter Martin, an abusive alcoholic who

often beat Ms. Ross and her children:

> When I was seventeen I joined the Air Force and left home. My mother married Walter Johnson around this time. Walter was very violent, and I escaped having to be around him. He was a mean drunk. He drank excessively and fought violently with my mother and with my brother Greg. One time he hit my mother in the eye so hard that her eye was never the same. My mother drank alcohol, but when Walter was abusive she would drink more, so she could cope. She always had a lot of men around. Ron and I had left my mother's house, but the rest of my brothers and sisters had to live with Walter. He terrorized my sisters and they were very afraid of him. I always suspected he physically and sexually molested my sisters. My mother and Walter would have big fights, and he would leave and go to Colbert, Oklahoma, where he was from. I always heard he messed around with a lot of women when he would go on these trips away from my mother. I even heard about him messing around with a woman right in Muskogee.

Ex. 29 at ¶¶ 5-6. Denise also vividly remembers Ms. Ross's and Walter's alcohol abuse and the

extremely chaotic environment:

> In November 1969, my mother married her second husband, Walter Martin. They both abused alcohol. Every weekend they drank from Friday afternoon all the way through Sunday. They would scream, curse and fight between one another and towards us.

Ex. 34 at ¶ 8. Alice also reports how difficult it was to live with Vivian and Walter, being

subject to the abuse of Walter and the neglect of Vivian:

> Walter was a mean drunk and he often physically attacked my mother. We kids would try to break up the fights, but my mother would tell us to stay out of it. There was nothing we could do to protect our mother. One time Walter and my brother Gregory were in a fight. Walter stabbed Gregory. My mother told us not to help him.

Ex. 16 at ¶¶ 4-5. Ms. Ross and Walter constantly fought about Walter's sexual abuse of Vivian's

daughters:

> Rochelle and some of my other sisters were sexually molested by Walter Martin. My mother tried to catch him doing it. They fought about this and Walter left for several years.

Ex. 6 at ¶ 14. When Walter returned, his abuse of Ms. Ross and her family continued to escalate.

One night in 1973, Ms. Ross and Walter went to a local juke joint and took young Gregory along

with them.  When they returned home to the rest of the family, Ms. Ross and Walter were in a

violent argument:

> During one of Walter's fights with my mother, he killed my
> younger brother Greg.  Greg was seventeen years old.  Walter was
> charged with manslaughter, but somehow he got off.  I was in the
> service in Thailand at the time.  I flew home for the funeral.  Not
> long after Walter killed Greg, I got out of the service.  My first day
> home I was drinking with my brothers in the back yard.  My
> mother and Walter were next door.  My mother came up to me,
> crying, and said that Walter had just told her that he "planted" one
> of her sons, and he was going to "plant another one."  He meant he
> was going to kill me.  Then Walter started to pick on me.  One of
> my friends who was with me at the time had his father's pistol.  I
> took the pistol and shot Walter in the stomach.  He was not hurt
> very badly.  My mother fell down on Walter, because she did not
> want me to shoot him again and kill him.  She said it was not worth
> me going to jail.  I turned myself in for shooting Walter.  I had to
> spend only a couple of nights in jail, I think because everyone,
> including the sheriff, knew that Walter had gotten away with
> killing Greg.

Ex. 29 at ¶¶ 8-9. (*see Oklahoma vs. Walter Martin*, District Court of Muskogee, Oklahoma No.

71-523).  Gregory told the full story to his sister Alice, shortly before his death some two weeks

after he was shot:

> One night my mother and Walter were drunk and in a fight.
> Walter ended up shooting Gregory, and later he died.  Before
> Gregory died, he told me that Walter had the gun pointed at my
> mother's head, and so Gregory pulled it down to his stomach and
> that's when the gun went off.  Gregory told me he was tired of
> being beat and stabbed and hurt by Walter.  Gregory was seventeen
> when he died.

Ex. 16 at ¶ 6.  As his closest sibling in age, Rochelle was very close to Gregory and never

recovered from the shock of his murder:

> My mother and Walter were fighting and Walter pulled a gun on
> my mother.  Gregory, who was seventeen, tried to defend her.
> Walter shot Gregory.  Gregory told me about this, shortly before
> he died two and a half weeks later.  Walter did not go to jail for
> shooting Gregory.  Rochelle was very close to Gregory and never

got over his death.

Ex. 6 at ¶ 14.  Denise also reports the extreme difficulty Rochelle had with Gregory's death: "Rochelle was very close to Gregory and was devastated when he died." Ex. 34 at ¶ 9.

Shortly before his death, Gregory told Pam his concerns about their mother's sanity:

> Right before Gregory died, he told me that our mother was "not right in the head" and that she needed to be committed. Mother did have a lot of mental problems.  She just could not handle God's messages.  She may have seemed cheerful, but inwardly she was very depressed.

Ex. 6 at ¶ 15.  Unfortunately, Ms. Ross never received the help she desperately needed for her mental problems and continued to subject Rochelle and her siblings to her violent, alcohol-induced rages and endless abuse.  Walter and Ms. Ross's disregard for Rochelle's well-being continued when they introduced Rochelle to Danny Thomas, a drinking buddy of Walter's. Consistent with her early life in the shadow of three abusive alcoholics (Vivian, Walter and Johnny Ross), Rochelle quickly moved to Denison, Texas, to be with Danny Thomas, who also was an abusive alcoholic.

### b.       Paternal family history.

The pervasive alcoholism, substance abuse, mental illness, physical abuse, sexual abuse, neglect and poverty that is prevalent in Mr. Thomas's maternal lineage is also present in Mr. Thomas's paternal family history.  Mr. Thomas's paternal grandparents, Marvin and Emma Thomas, were married in the 1940's.  Mr. Thomas's father, Donovan "Danny" Thomas was the oldest of nine children.  Danny was born on November 1, 1948.  Danny spent the majority of his childhood in Denison, Texas.  In the 1960's, he was drafted into the Army, and soon began abusing alcohol:

> In April 1969 I was drafted into the military.  It was a bad time to be in the military; there were a lot of racial problems. It was a hard time. I started drinking a lot in the military.

Ex. 32 at ¶ 3.  Danny's alcohol (and later drug) abuse continued for many years.

Marvin and Emma's next child, Angel, also went on to abuse drugs and alcohol.  Angel lived near Danny for the majority of her adult life.  Consequently, Mr. Thomas and his brothers were very close to her.  Angel developed a lung condition and fought an arduous and painful battle for several years, before dying about two weeks prior to the day Laura Boren Thomas, Andre Boren and Leyha Hughes's lives were taken.  Family members recalled how difficult Angel's death was for Mr. Thomas:

> Andre was very close to my sister Angel Thomas.  She died approximately two weeks before March 27, 2004.  Her death upset Andre very much.  He was crying uncontrollably at her funeral and was inconsolable.

Ex. 12 at ¶ 3.  A younger sister, Konta, was raised partially by Angel, due to Emma Thomas's absences.  Konta also remembers the close relationship between Angel and Mr. Thomas:

> I returned home during the month before the crime for my sister Angel's funeral.  I was very close to Angel, as she helped raise me.  My mother would have to sneak out of the house in order to work to support her many children.  When she would be away, Angel would take care of me.  Andre was also very close to his Aunt Angel.

Ex. 19 at ¶ 6.

The next child born to Marvin and Emma was Doris.  Doris was the closest to her parents, until their deaths.  Doris's parents relied on her to take care of her younger siblings and also confided in her regarding issues that were inappropriate for a child to hear.  Marvin and Emma Thomas openly discussed their own sex life with their children, including Mr. Thomas's impotence later in life.  This hypersexuality is evident in many members of the Thomas family.  Multiple female members of the family, including Angel, her siblings Teresa and Konta, and Angel's daughter Kim were sexually abused and raped by Marvin Thomas during their childhoods.

Ronnie Thomas was Marvin and Emma' fourth child.  Like his older brother Danny, he also served in the military.  He also developed an alcohol problem early in his life and now is suffering the consequences of his heavy drinking.  At age 49, he has developed alcohol-induced dementia and, according to his family and doctors, has the brain of a 75-year old with Alzheimer's.  He is currently hospitalized at the VA hospital in Dallas, Texas.  According to his doctors, he will never again be able to live on his own.

After Ronnie, Emma had 5 more children: Emmett, Terry Joe and Teresa (who are fraternal twins), Konta and Craig.  Konta's father – not Marvin Thomas – advised her to leave Sherman, Texas early on:

> I left the Sherman, Texas area in the eleventh grade in order to make a fresh start for myself. My father told me that in order to make something of myself, it would be best to get far away from that area.  I took his advice and joined the military in order to leave home.  It was important for me to do this, because so many members of the family had mental problems and drug and alcohol addictions.  I needed to separate myself from this.  Leaving home was a good decision for me; I now have a successful nursing career and family in Georgia.

Ex. 19 at ¶ 3.

Marvin and Emma's youngest child, Craig, was born with severe mental problems, and has received a disability check since the day he was born.  Craig is currently incarcerated at the Texas Department of Criminal Justice Hodge Unit, where prisoners with mental retardation are housed.  It is also possible that Craig suffers from some cognitive disabilities.  *See* Ex. 12 at ¶ 4.

### c.    Chaotic childhood.

Rochelle and Danny Thomas were married on April 15, 1975.  In the years prior to their marriage, Danny Thomas's drug and alcohol abuse had steadily increased.  Criminal court records indicate that he was arrested repeatedly for possession of marijuana, as well as DUI.  Not surprisingly, Rochelle and Danny's marriage was rife with problems from the very start:

> Rochelle had a hard time with Dan.  He ran around with women on her.  His people were into witchcraft and he also practiced it. Dan was also known to do some strange things that Rochelle thought was witchcraft.  One time God told Rochelle to go home early from church.  She walked into the house while Dan was cooking and found him urinating in the stew he was making for everybody.

Ex. 16 at ¶ 11.  Other extended family members also worried about the domestic violence

between Rochelle and Danny, and believed that Danny may have been mentally ill:

> Danny was an alcoholic and there was a lot of domestic violence in his relationship with Rochelle.  Danny always talked fast, and a whole lot.  He always seemed like there was something not right about him.  He had a tremor - an involuntary thing going on with his head.  He may have had mild mental retardation.

Ex. 34 at ¶¶ 13-14.

> My sister Rochelle started going with Danny Thomas when I was still living at home.  Danny was mentally off.  He would get a weird look on his face and he would talk to himself and curse himself.  He was always talking under the mouth.

Ex. 20 at ¶ 5.

Rochelle continued to have sex with many different men, including a man – identity

unknown - who is believed to be Eric Ross' father.  Knowing Rochelle was incapable of properly

raising children, Pam tried to convince Rochelle to allow her to adopt Eric, but Rochelle would

not allow it:

> Our sister Pam wanted to adopt Eric, with Rochelle's permission, but then Rochelle changed her mind.  Much later, when Rochelle got pregnant with her youngest son, Juan, she contacted me and told me she did not want to have the baby.  She asked me if my husband and I would adopt the baby when he was born.  We said yes.  When the baby came she changed her mind.  I worry very much about Juan because he is being raised in such an unstable environment.

Ex. 34 at ¶ 11.

Eric grew up quickly, as he was forced to be a parental figure to all four of his younger

brothers.  His first half-brother, Danny Ross, was born a year after Eric.  The identity of Danny's

father is also unknown.  Danny Ross also was forced into parental responsibilities at an early

age, due to the absence of parental supervision by Rochelle and Danny Thomas.  It is believed

that Rochelle's third child, Brian Thomas, was Danny Thomas's biological son.  Brian was born

on July 7, 1980.  James Thomas, the next brother, who is also believed to be the biological son of

Danny Thomas, was born on February 10, 1982.  Rochelle's fifth son, Mr. Thomas, was born on

March 17, 1983.

Mr. Thomas suffered verbal abuse from Rochelle beginning at a very young age, likely as

a result of her own battle with mental illness:

> Rochelle constantly battled her own mental problems.  When
> Andre was growing up, Rochelle regularly told him that she should
> have aborted him.  This led to his first suicide attempt that I am
> aware of….  These incidents greatly distressed Andre.  He asked
> me about this repeatedly throughout many years and it clearly
> upset him that his mother wished that he had not been born.

Ex. 32 at ¶ 7.

Rochelle and her sons attended Harmony Baptist Church in Sherman, Texas.  The church

often provided financial assistance to Rochelle because she was unable to pay her bills.  The

current pastor, Clifton Eaton, was familiar with Rochelle and her sons:

> Rochelle did not seem very stable…she also seemed to move
> frequently.  Rochelle was always very poor.  My church has
> provided her with financial assistance so that she could pay her
> utilities.

Ex. 10 at ¶¶ 4-5.  Wanda Banks, the director of Harmony Academy, a childcare center located at

Harmony Baptist Church, also knew Rochelle and her family well:

> I have known Andre Thomas since he was age three or four.  I first
> met Andre in the mid 1980's.  Andre's family lived in extreme
> poverty throughout Andre's childhood.  Andre's mother Rochelle
> had a hard time keeping a job, and the church often loaned
> Rochelle money to pay her utility bills.  Despite the church's
> assistance, Andre's family often had no electricity or running water

at their house.  Once, when Rochelle and her boys were living across the street from the church, several church members discovered that Rochelle was taking buckets of water from the church's outside spigot in order to bathe her boys and have water to drink.

Ex. 3 at ¶¶ 3, 5.  Rochelle's brother Kevin also observed Rochelle's minimal parenting skills:

Rochelle was a very irresponsible mother.  When all the rest of Rochelle's siblings and I had children, it made us grow up.  Having children changed us into more mature people.  Of all my siblings, Rochelle was the only one who raised her own kids sometimes without electricity, in very poor living conditions.  She moved her children constantly, and this was very hard for them. Rochelle gave her sons no guidance or discipline.  She neglected them and often did not know where they were.  Her decisions never made much sense.  She would move to a new place and try to get welfare. Even though she needed the money, if they asked her too many questions she would just leave.  She would rather give up the welfare money than have someone ask her questions.  She is extremely paranoid.  One time I went to visit Rochelle, but she lived so deep in the country that someone she knew had to take me where she was living because there is no way I could have found it. Rochelle's decisions to move did not take into consideration what was best for her kids. Her oldest son, Eric, was forced to help his younger brothers cope with the constant moving and Rochelle's lack of stability.

Ex.29 at ¶¶ 15-16.

Pastor Clifton Eaton observed Danny Thomas's absence from the boy's lives:

I am not aware that Andre Thomas ever had a stable father figure in is life.  I did not even know that Danny Thomas, Andre's father, existed until Andre's trial.  I was surprised to learn that Rochelle had a husband because as long as I have known her, she has always had different boyfriends. She has always had many different men in her life.

Ex. 10 at ¶ 4.  Danny Thomas wanted to spend more time with his children when they were young, but was unable to because of Rochelle's constant moving:

Between the time Andre was 3 and the time he was about 10, Rochelle would leave wherever she was living for months at a time and take the kids, including Andre, with her.  It meant I didn't see the kids much.  She did this on many occasions until she finally settled the family in the Sherman, Texas area.  I began having

170

more contact with the children after Andre was 10.

Ex. 32 at ¶ 6.

Danny Thomas and Rochelle constantly split up, then got back together only to split up again a few days later.  The lack of stability in their marriage contributed to the chaotic environment that surrounded Mr. Thomas and his brothers.  During this same time period, Danny Thomas's alcohol abuse increased:

> Once, in 2003, Rochelle told me that Danny Thomas used to have a drinking problem.  Rochelle said Danny was in the Vietnam War and he has flashbacks, like he is still in Vietnam.  Rochelle said when Andre and his brothers were kids, Danny would get drunk and have a flashback to the war.  He would grab his gun, yell "Kill!" and then shoot off the gun.  Once, Danny did this and shot off his gun in the house; he shot the gun into the upstairs, right next to where Andre and his brothers were sleeping.  Rochelle said she tried to calm him [Danny] down by boiling water on the stove for Danny to take a bath.  Danny spilled the boiling water all over him and burned himself badly.  Rochelle said she was praying that God would make Danny stop shooting the gun and that the boiling water being spilled on him was just his karma getting him.  Rochelle told me that Danny used to drink all the time when the boys were little.

Ex. 18 at ¶ 9.  Danny Thomas was also verbally abusive to Mr. Thomas, his brothers, and his nephews, Floyd and Brandon Patterson (Teresa's children):

> Danny Thomas used to mess with us and flip out his knife.  He would say "I'm going to cut off your weiner (sic)."

Ex. 26 at ¶ 4.  The neglect and abuse of Mr. Thomas and his brothers was brought to the attention of Child Protective Services in 1986 after an incident that involved James Thomas burning his leg on a space heater:

> When Dan and Rochelle separated, Dan caused problems for her concerning their children. When they split up, James was about four years old.  Around that time, he backed up against the stove door and burned his legs.  Dan called CPS.  They took James away from Rochelle and put him in foster care.  From that time on Rochelle was never the same.  Before this happened, Rochelle would cook dinner and was sort of domestic.  After they took

171

> James away she stopped cooking.  After they went to court over
> the custody of James, the court decided Rochelle didn't burn James
> intentionally and they gave him back to Rochelle.  Still, she was
> never the same after that.  My mother would say Rochelle had a
> nervous breakdown at that point.

Ex. 16 at ¶ 12.  Rochelle's sister Denise also noticed a change in Rochelle, but also felt Rochelle

was reckless with her children even prior to this incident:

> For the first few years of her motherhood, Rochelle was sometimes
> domestic, but often wild.  She would even hitchhike when she was
> pregnant.  When she and Danny first broke up, the boys were
> pretty small.  Shortly after they split up, James got burned on a
> stove.  Danny tried to use this against Rochelle by calling CPS, and
> James was put into foster care. Rochelle eventually got James
> back, but after that she was never the same.  After that, she was
> never there as a mother and could not provide for the boys.  Since
> Eric and Danny Ross were the oldest, they were forced to take care
> of the younger boys.  Rochelle did not guide or teach the boys
> properly.  She would let them be out all hours of the night and did
> not even know or seem to care where they were.

Ex. 34 at ¶ 15.

In 1986, shortly after Dan and Rochelle split up for the last time following the CPS

incident, Danny Thomas was committed by a court order to a Wichita Falls Hospital for

alcoholism.  He had been involved in a physical fight while drinking.  Ex. 89 at AT 005683.  The

boys were left to take care of themselves, with little supervision by Rochelle.  When Rochelle

was at home with her boys, she often was distracted from her parental responsibilities by the

many men coming by the house for sex.  Mr. Thomas's maternal aunt, Doris, recalled that Mr.

Thomas and his brothers were often present for these visits to the house by strange men:

> Andre and his brothers were present when all of these different
> men came to the house to have sex with Rochelle.  Rochelle and
> her sons all lived in close quarters, and the boys were around
> Rochelle and these men often.  Rochelle would often walk around
> naked in front of Andre and his brothers.

Ex. 12 at ¶ 11.  Doris also experienced Rochelle's propensity to spend time with strange men

first hand when Doris briefly lived with Rochelle:

> I lived with Rochelle Thomas for several months in Muskogee,
> Oklahoma.  Rochelle always had many men coming by the
> apartment and would often walk around with hardly any clothing
> on or completely naked.  Once, someone rang the doorbell and
> Rochelle answered the door wearing only a short robe with no
> underpants.  Rochelle was in the company of several different men.
> Rochelle always had some man hanging around.

Ex. 12 at ¶ 10.  Danny Thomas and Rochelle often argued about this behavior:

> Rochelle's mental illness also surfaced in her conduct in front of
> the children and me.  Rochelle often walked around in front of
> Andre and his brothers with no shirt on or completely naked.  This
> happened repeatedly, starting when the boys were very young and
> continuing for several years.  The boys were forced to ask their
> mother to put on clothes, and she usually refused to do so.
> Rochelle and I often disagreed about this behavior (her walking
> around naked in front of the boys), and once I was taken to the
> Mental Health & Mental Retardation ("MHMR") hospital to talk
> about it.  Rochelle's behavior did not change. Rochelle had sexual
> relations with a very large number of men while were we married
> and after we were separated.  She was not selective when choosing
> sexual partners, and would bring them home while our children
> were there.  She still has sex with a lot of men.

Ex. 32 at ¶ 9-10.

Despite the chaotic environment he returned home to each day, Andre thrived at school.

He received excellent grades in both kindergarten and first grade.  Ex. 101 at AT 006158.

Beginning in first grade, teachers and administrators recognized Mr. Thomas's natural

intelligence and he was placed into the Gifted and Talented Program.  However, due to

Rochelle's transient nature, she and her children moved back to Muskogee, Oklahoma in 1990.

Rochelle later testified that she did not know where Mr. Thomas went to elementary school, nor

did she know at what age he started or who any of his teachers were, evidencing her lack of

interest in the lives of her children.  Ex. 90 at AT 004665-6.  As an explanation for why she had

no idea where Mr. Thomas went to school or who his teachers were, Rochelle stated she has so

many kids, she just could not say where Mr. Thomas went to school.  Ex. 90 at AT 004675.  Mr.

Thomas nonetheless continued to receive excellent grades.  His second grade report card for the

fall semester states that Mr. Thomas "is a delightful and strong student."  Ex. 91 at AT 006171.

In March 1991, Rochelle moved her children back to Denison, Texas.  After staying there just

over a month, she moved again back to Sherman.  Mr. Thomas attended three different schools

in three different cities in two different states for second grade and still obtained excellent grades

at each school.  Ex. 101 at AT 006158; Ex. 92 at AT 006169; Ex. 91 at AT 006171.  Family

members recalled Rochelle's habit of constantly moving the children and how harmful it was to

Rochelle's kids, including young Mr. Thomas:

> Like our mother, Rochelle got involved with men who would not
> provide for her and her children.  Rochelle was always moving
> around, trying to make ends meet.  Moving around was hard for
> Rochelle's children.  They would make friends and the next thing
> they knew, they were moving again.  They never had the security
> or stability that children need to develop the right way.

Ex. 7 at ¶ 8.  Extended family members who attempted to take an interest in Rochelle's sons

often were unable to even locate them because Rochelle moved around so often:

> In the early nineties, Rochelle and the children sort of disappeared
> from the family.  Of course this was hard on all of us who cared
> about Rochelle and her kids.  Something bad happened between
> Rochelle and our mother.  Rochelle would disappear with her boys
> for several years at a time.  No one in the family knew where they
> were.  When my husband and I would drive from Muskogee down
> to Dallas to see my sister Margie and brother Kevin, we would
> stop in Sherman where we thought Rochelle was living to try to
> find her.  The only way we knew how to find her was to go see
> Eric and Danny at work at Popeye's.  If they were not working that
> day there was no way to find Rochelle.

Ex. 34 at ¶ 16.  Walter Johnson, Rochelle's uncle, also recalled Rochelle's tendency to move the

boys often.  Later, he observed this first-hand when Rochelle and her youngest son Juan were

constantly moving around.  Walter recalled how Rochelle had this same tendency when Mr.

Thomas was a young boy:

> When I moved out of Rochelle's house in 2002, I left my van parked at her house
> with a lot of my stuff in it.  I went to California for a little while.  Rochelle called
> me and said someone wanted to buy the van, and said I should send the title to

174

her.  I sent it, and the next thing I knew they had thrown all of my stuff away and had sold the van.  I really needed that van.  All of a sudden I had nothing.  The second time Rochelle and I lived together was after Andre was arrested for the murders.  Rochelle and her youngest son, Juan, came to stay with me where I was living at the time in Coffeeville, Kansas, for about six months.  Rochelle did not give Juan any guidance or a sense of how a person is supposed to act.  It's not a wonder that her boys have had problems dealing with other people and had trouble with the law.  The boys didn't have male role models and during our short time together I tried to have some positive influence on Juan.  He liked me and we had a bond.  It made Rochelle mad if I told Juan to behave, and she was jealous of the bond I developed with him.  As always, Rochelle eventually moved on.  All this moving around is very hard on Juan.  Rochelle did the same thing with her other sons, including Andre.  I know this had a bad effect on them because they never stayed anywhere long enough to get settled in school, make friends or just be stable.  Rochelle did not know how to keep a proper home.  She never kept track of possessions.  One of the times after I lived with her, I left her with some nice things when I moved out, like a nice television and some furniture.  When she left that apartment she just left all of that stuff there.  She just didn't care.  It was just time to move on.

Ex. 22 at ¶¶ 11-14.  Mr. Thomas's maternal aunt, Konta, believes that this constant relocation and constant stream of strange men involved in Rochelle's life was harmful to Mr. Thomas and his brothers:

I think a lot of Andre's problems also stem from his mother, Rochelle Ross.  Since the time that my brother Danny married her, I have suspected that she had had mental problems.  She acts erratic and never stays long in one place.  She also has had sexual relationships with many different men. I also think Rochelle had a problem with alcohol and/or drugs.  I believe she took a number of drugs, both psychiatric and street drugs, during Andre's childhood.  Also, she was not around a lot of the time to properly raise her sons.

Ex. 19 at ¶ 9.

Rochelle moved the boys around so often and at such short notice, the extended family was unable to help raise the children, despite their desires to remove the children from Rochelle's unstable environment.  Rochelle's sons were instead led to believe, by statements from their mother, that the rest of the family was not interested in them and in fact looked down on them:

175

> Rochelle raised her sons telling them that their aunts and uncles
> were rich and that they looked down on the boys.  This was not
> true.  We had more stable environments for our children than she
> did, but we still loved her children and did not look down on them.
> Recently, Andre's brother James wrote to me and asked if it was
> true that Rochelle's boys were considered the black sheep and that
> everyone else thought they were better than Rochelle and her sons.
> I wish all of Rochelle's boys could know that no one ever meant to
> smite [sic] them, that they were loved.  It was only because
> Rochelle would not stay in one place that we were not able to help
> raise those boys.

Ex. 34 at ¶ 17.  Mr. Thomas's paternal cousin, Floyd Patterson, recalled there was never enough

room or food for Mr. Thomas and his brothers:

> Andre and his brothers had it rough when we were growing up.
> They never had enough room in their houses.  I used to sleep over
> all the time and I always had to sleep on the floor with Andre and
> his brothers because there were not enough beds.  Andre and his
> brothers grew up eating potatoes.  I remember only eating potatoes
> most of time I stayed with Andre's family.

Ex. 26 at ¶ 5.

Often the homes Mr. Thomas and his family lived in were infested by insects as well:

> Rochelle told me that one time their trailer was infested with
> roaches so they set off chemical bombs to get rid of them.  Instead
> of using just one or two, they used six or eight, which was way too
> many.  As soon as the bombs stopped spraying, Rochelle, Andre
> and some of his brothers went right back into the trailer.  Even
> though their eyes were burning and they had trouble breathing,
> they stayed in the trailer and went to sleep with the chemicals still
> in the air.  Later I wondered if this had a bad affect on Andre's
> mind.

Ex. 16 at ¶ 14.

Further evidence of the extreme poverty and neglect in which Mr. Thomas and his

brothers were raised is found in Mr. Thomas's medical record.  Beginning in 1989, when Mr.

Thomas was 6 years old, he was in and out of the emergency rooms on numerous occasions,

indicative of extreme negligence on the part of his parents.  On June 17, 1989, Mr. Thomas was

taken to the ER for an abscess on his knee and several insect bites.  On August 5, 1989, Mr.

176

Thomas returned to the ER for a swollen insect bite on his head.  Ex. 93 at AT 001406-001408.

Mr. Thomas's injuries became more severe and were symptomatic of ongoing neglect, if not

abuse.

> When Andre was little he locked himself inside an empty
> refrigerator.  Eventually Rochelle realized he was missing.  When
> she finally found him, his eyes were bugging out.

Ex. 16 at ¶ 9.  In February 1992, Mr. Thomas was taken to the ER for a laceration on his scrotum

and abrasion on his penis, both supposedly the result of a "fall off of his bicycle."  These injuries

necessitated sutures.  Ex. 94 at AT 001409-001416.  Also in February 1992, Mr. Thomas was

taken to the ER for a swollen face, attributed to an allergic reaction to Claritin.  Ex. 95 at AT

ER001417-001423.

Mr. Thomas's resiliency and ability to raise himself was pushed to the limits in 1993

when he was ten years old.  One night, Mr. Thomas was at home working on his homework and

helping his mother cut potatoes for dinner.  He accidentally placed the butter knife he was using

to cut the potatoes into his school bag, along with the homework he had been working on.  A

classmate saw the knife the following day at school and informed the teacher.  Rochelle was

called by the school administration, which informed her of the issue.  Her response was to beat

Mr. Thomas for four hours with an electrical cord.

Mr. Thomas also suffered physical abuse at the hands of his older brothers.  While Eric

Ross and Danny Ross attempted to care for Mr. Thomas and raise him, James and Brian Thomas,

who are mentally ill themselves, repeatedly assaulted Mr. Thomas.  Mr. Thomas's closest friend,

Christopher Bennett, witnessed many of these assaults:

> I have …known Brian Thomas, Andre's brother, since around the
> time I met Andre.  Brian was cruel to Andre.  Brian regularly made
> fun of Andre and started fights with him… I have also known
> James Thomas, Andre's brother, for almost as long as I have
> known Andre.  James was also cruel to Andre.  James would say

> hurtful things to Andre and physically assaulted him.  James acted
> crazy and aggressive, in a similar manner to Brian.

Ex. 5 at ¶¶ 11-12.

Mr. Thomas's abysmal childhood, marked by abuse, neglect and extreme poverty,

steadily worsened with the emergence of odd behavior and statements, early signs of his mental

illness, which alienated both his peers and family:

> Andre was different that the other kids I knew growing up.  For
> example, when Andre was 9 years old, he decided he was Raden, a
> character in the Mortal Kombat Video Game.  I believe Andre
> truly thought he was Raden.  Even when Andre was 18 years old,
> he still told people that he was part of Raden and Raden was part
> of him.

Ex. 5 at ¶ 3. Mr. Thomas's maternal uncle, Todd Johnson, who dealt with mentally ill individuals

on a day-to-day basis as a function of his job in the military, also believed Mr. Thomas was

suffering from a mental illness:

> My wife, Konta Johnson, is Andre Thomas's aunt.  I have known
> Andre since 1985, when I married Konta.  Andre was about two
> years old.  I served in the military for over twenty years.  During
> this time, one of my jobs was with the military police.  I also
> served as an investigator for the military prosecutors.  During both
> of these jobs, I came into contact with mentally ill individuals, as
> well as substance abusers.  Sometimes, when a new recruit would
> join, I would have to send him to get a psychological evaluation,
> based on my thoughts that he might have mental problems.  I
> learned how to spot mental problems fairly easily after spending
> time around these individuals.  I have thought that Andre had some
> sort of chemical imbalance or mental illness for years.  The older
> he got, the more pronounced these problems became.  I recognized
> Andre's signs and symptoms as mental illness based on my
> experience dealing with mentally ill individuals during my time in
> the military.  I did not view his problems as those caused by drugs;
> his symptoms were much more in line with those of people
> suffering from mental problems…On one occasion when I was in
> Sherman, Texas for one of my wife's family events, it was raining
> heavily.  Everyone but Andre ran for shelter or used an umbrella,
> but Andre just stood there staring off into space in the pouring rain.
> He seemed out of it, like he was a million miles away.

Ex. 21 at ¶¶ 2-4 and 6.

Mr. Thomas's odd behavior was, in fact, indicative of a serious mental illness, which increased steadily in its severity until the tragic night when Laura Boren, Andre Boren and Leyha Hughes' lives were taken.

**d.      Emergence of Andre's mental illness.**

After years of attempting to cope using the minimal support system he had, Mr. Thomas finally was unable to handle the abuse, impoverished living conditions, and neglect, and in 1993 began drinking alcohol to numb his pain.  Ex. 70 at AT 002025.  Of course, Mr. Thomas had observed many members of his family, including his mother and father, use alcohol to self-medicate mental illness.  He was also highly at risk for alcohol dependency.  Around the same time, Mr. Thomas attempted suicide for the first time by cutting his own wrists.  Ex. 70 at AT 002025.  The alcohol abuse and suicide attempts concurrently emerged with auditory hallucinations.  A close friend of Mr. Thomas's remembered Mr. Thomas telling him about hearing "voices" beginning at age 9 or 10.  He also remembered Mr. Thomas's mental illness increasing in severity each year:

> When Andre was about 9 or 10, he began talking to me and some of our friends about demons.  Andre told us that these demons spoke to him and would tell him to do things, bad things, and that it scared him.  Andre said he had to beat the demons.  When Andre told these stories, we made fun of him because we did not know any better.  Andre's stories were strange and made us uncomfortable.  During this same time, Andre used to talk back to the demons, even in front of me and a few other friends.  Andre's voice would change and he would look very odd.  When talking to the demons, Andre would be sweaty and his eyes looked different than usual; they were intense and bizarre.  Andre would jump around and appeared terribly nervous when the demons were talking to him or when he was talking to the demons.  When we were kids, sometimes Andre and I (and our other friends) would drink or smoke marijuana.  I had the opportunity to observe Andre when he was drunk, when he was high, and when he was sober.  Andre's encounters and conversations with the demons happened both when he was high (or drunk) and when he was sober…When Andre started hearing the demons, around age 9 or 10, his

179

> personality seemed to change.  Each year after that, Andre seemed
> more strange.  He continued to tell me more and more about the
> demons as the years went on.

Ex. 5 at ¶¶ 5-9.  Mr. Thomas later reported that he drank alcohol because it helped him with his

depression and decreased his fear of people listening to his thoughts.  Mr. Thomas said that he

heard voices whether he was drinking or not but drinking alcohol made the voices less

frightening.  Ex. 96.

Mr. Thomas's maternal aunt, Konta, also began to suspect Mr. Thomas was mentally ill.

In her training as a nurse, Konta learned about various mental illnesses and noticed some of these

symptoms in Mr. Thomas:

> I began to suspect that Andre had some form of mental illness
> when he was a teenager.  He had several behaviors that indicated
> to me that something was not right with his head.

Ex. 19 at ¶ 5.

During this same time, Mr. Thomas's involvement with the juvenile justice system

began.  Mr. Thomas was arrested for a variety of petty crimes.  In May 1994, Mr. Thomas and

his brother James were arrested on charges of criminal mischief and criminal trespassing for an

incident involving the damage of several golf carts at Austin College in Sherman, Texas.  In

early June 1994, Mr. Thomas was arrested for theft charges.  He was picked up by the police at

11:58 PM, even though he was only 11 years old.  Mr. Thomas was given 12 months probation

and ordered to pay restitution, probation and court fees.  When Mr. Thomas originally met with

the probation officer to determine the case plan, no parent or guardian was present.  Ex. 97 at AT

009602.  Mr. Thomas consistently met with his probation officer, despite Rochelle's lack of

support.  She often failed to bring him to appointments, stating, for example, that it was "too

cold" for him to be outside, or that she needed him to take care of her younger son Juan.

Throughout Mr. Thomas's involvement with the juvenile justice system, Rochelle was often

absent from hearings and meetings with probation officers, and was largely uninterested in the lives of her children.  Indeed, she often was completely unaware of Mr. Thomas's activities or whereabouts.  Ex. 90; Ex. 98 at AT 009667-009670.

Mr. Thomas's precarious living situation abruptly became much worse for him when Eric Ross, his older brother who cared for him and raised him, moved out of the house in 1995.  Mr. Thomas's family situation quickly deteriorated.

Rochelle's oldest son, Eric, helped raise his younger brothers, and after he left home his younger brother Danny took on some of that responsibility.  After Danny left, the younger boys were on their own.  There was never really a father figure for Mr. Thomas and the others.  Ex. 16 at ¶ 13.

James Thomas was arrested on August 26, 1995, after he was found sniffing lighter fluid and barely able to speak.  Just two days later, he was arrested again, this time for assault charges, after punching and kicking several staff members at Piner Middle School, where he and Mr. Thomas both currently attended.  Ex. 99 at 006391; Ex. 100 at AT 006388-90.

In Mr. Thomas's early teenage years, Rochelle began dating McCloud Luper.  McCloud provided some stability for Mr. Thomas, as Mr. Thomas saw him as a stepfather, but McCloud always felt Mr. Thomas did not receive enough support from Rochelle and Danny:

> I have known Andre Thomas since he was a very young boy.  I met him through his parents, Danny and Rochelle Thomas.  Andre was a good, sweet kid when he was growing up.  After Danny and Rochelle split up, I dated Rochelle.  Andre was a teenager during the time I was dating his mother.  Andre told me that he considered me his stepfather on multiple occasions.  I fulfilled the stepfather role for Andre by trying to provide him with advice and listening to his concerns and problems.  I informed him, however, that I could not tell him what to do; I told him that was Danny and Rochelle's role.  However, Andre told me that he thought I cared for him more than his own father and mother did.

Ex. 24 at ¶ 2.

Mr. Thomas's academic performance plummeted.  The pressure of taking care of himself, with little or no parental guidance or supervision, took a heavy toll on his schooling.  Mr. Thomas received much lower grades than in prior years and remarkably, this once "gifted student" was retained in the seventh grade at Piner Middle School.  Mr. Thomas missed 12 days of school in his second semester of 7th grade, 24 days in the first semester of his second year of seventh grade and 12 days in the second semester of that year.  Ex. 101 at AT 006156-006167.

In August 1996, Child Protective Services was again called to investigate Rochelle Thomas for the medical neglect of James.  Ex. 102 at DW000579-DW000606.  The case was labeled as "high risk," due to the fact that in the preceding month, James Thomas had been hospitalized for approximately 10 days with kidney and liver failure.[48]  At this time, the investigator came to Rochelle's home and observed James to be swollen and suffering from severe itching.  James's body was covered in welt like marks and he was very uncomfortable.  His skin was red, raw, and scaly.  It was unclear why Rochelle had not taken James back to the doctor, and the only conclusion of the authorities was medical neglect on her part.  The investigator also reported that James was "wanting help but is afraid of [mother, Rochelle]."  The report also states that the investigator was given information that Rochelle could be violent.  Ex. 102.

When Mr. Thomas was 13 years old, Rochelle again commented to him that she wished she had aborted him as a baby.  Mr. Thomas, upset by his mother's cruel comments, went to his father's house and in front of his father, indicated both in words and action that he intended to commit suicide.  Danny, instead of intervening to help Mr. Thomas, suggested a more efficient method:

---

[48]      The etiology of James Thomas's renal failure is unknown.  The hospital records indicate James was originally brought in for a severe allergic reaction; however, it is unclear if the allergic reaction was the cause of his renal failure.

> Andre's first suicide attempt that I observed was after Rochelle
> told him that she wished she had aborted him.  I believe this
> occurred when Andre was around 13.  Andre came over to my
> house and was crying and told me about Rochelle telling him she
> wished she had aborted him instead of letting him be born.  He
> went to my sink and got a butcher knife and began sawing on his
> wrist.  I told him, "hell if you want to kill yourself go out on the
> freeway and jump in front of a 18 wheeler."  He continued to cry
> and saw on his arm, so I knew he was serious.  So, I told him he
> needed to "make long cuts down his arm so it would split open" if
> he really wanted to kill himself.  He left and began walking across
> the field still crying.  He was walking like an old man.

Ex. 32 at ¶ 8.

In February 1997, Mr. Thomas experienced another significant loss: the death of his

maternal grandmother, Ms. Ross.  Family members noticed Mr. Thomas's marked depression:

> Andre was very close to my mother, his grandmother.  It was like
> she was the only one he had ever been able to really talk to, and he
> lost that very important support when she died.  He had a big
> downfall after she died.  He was thirteen years old.  He was trying
> to cope because his mama was not there for him and his grandma
> had died.

Ex. 34 at ¶ 20.

Despite these losses, Mr. Thomas managed to raise his grades and was again enrolled in

the Gifted and Talented classes at Piner Middle School.  After being placed on probation in

September 1997, Mr. Thomas continued to work diligently at school.  In early November, he

reported to his probation officer that although he was doing poorly in two classes, he was

receiving tutoring in the mornings from his teacher and was still enrolled in the Gifted and

Talented Program.  Ex. 103 at AT 009678.  Later that same month, Mr. Thomas reported to his

probation officer that he was staying at his brother's house because his own home was too cold.

The probation officer reported that Mr. Thomas's home had no gas.  Ex. 103 at AT 009678.

Several days later, Mr. Thomas spoke to a judge, attempting to obtain a work permit to pay off

his restitution, probation and court fees, but was told that 14 was too young to work.  Ex. 103 at

AT 009680.

### e.    Steady decline in functioning.

In July 1998, Mr. Thomas was arrested on a curfew violation.  Rochelle was called to pick Mr. Thomas up, but never arrived.  Mr. Thomas waited at the police station for over an hour, and finally the police called Rochelle to inquire as to her whereabouts.  It was only then that Rochelle informed the police she did not have transportation to come pick up Mr. Thomas, and sent Eric Ross over instead.  Ex. 104 at 000282-284.   Later that same month, Mr. Thomas was placed in the Juvenile Detention Center (JDC) in Sherman for a citation of Disorderly Conduct/Language, the result of swearing at the staff while completing his community service hours at a worksite.  Ex. 98.  While in the center, Mr. Thomas reached out for help and informed his juvenile probation officer that he felt he needed counseling.  Mr. Thomas stated that he could not focus in school and due to this, his grades fell.  He also mentioned thoughts of suicide, and was placed on suicide watch.  Ex. 98.  He was nonetheless released the following day with no mental health services, and driven home by a probation officer, as Rochelle failed to pick him up.  When Mr. Thomas arrived at home, the probation officer attempted to inform Rochelle of Mr. Thomas's situation and the staff's medical/suicide concerns, and noted that Rochelle "acted as if she didn't want to believe it."  Ex. 98.  Again, in spite of Rochelle's lack of support, Mr. Thomas continued to meet with his probation officer in order to satisfy the terms of his probation.  Mr. Thomas also called his probation officer in order to determine the full amount of his fees because he wanted to pay them off with money earned at his job as a dishwasher at Red Lobster.  In December, Rochelle called the probation officer to inform him that Mr. Thomas would not be able to report because she felt it was too cold for him to go outside and she did not have a way to transport him to the office.  Ex. 98.  During that same month, Mr. Thomas's girlfriend of several years, Laura Boren, informed him that she was pregnant with his child.  Mr.

Thomas was excited to be a father and worked diligently at his job in order to make money now to provide for his family.

In early 1999, Mr. Thomas continued to meet with his probation officer, despite his constant moving between homes.  Child Protective Services was called in January 1999 to investigate an alleged neglect charge involving Rochelle and Juan, her youngest son.  Ex. 105.  Mr. Thomas was also living with Rochelle at this time.  The CPS investigator reported that Rochelle, Juan and Mr. Thomas lived in a home with no utilities.  However, Rochelle had connected a gas line directly to the utility gas line, bypassing the meter and stealing gas from the city.  The home had no running water, but Rochelle went to the fire hydrant and stole water from the city.  The investigator also observed three year-old Juan running around outside without shoes.  While the CPS worker was present, Juan defecated in his clothing and Rochelle simply took him outside, despite the cold January temperatures, and washed him down with a hose.  The investigator observed that Juan had already developed behavior problems, as he would scream when he did not get his way and Rochelle did not discipline him in any way.  The investigator concluded that the health of Juan was in danger, due to living in a home with no utilities, Rochelle's inappropriate means of washing him, and the absence of any discipline.  Ex. 105.

On March 9, 1999, Mr. Thomas reported to his probation officer that he was now living with his brother Eric because he did not get along with his mother's new boyfriend.  Ex. 106.  A week later, Mr. Thomas called in to report and stated that he was ill and now staying with his father.  Ex. 106.  During the spring, Mr. Thomas attended three separate schools: Sherman Alternative Education Services Alternative Learning Center, Sherman Alternative Education Services Alternative Learning Placement and Sherman Alternative Education Services Alternative Learning Academy.  In May, Rochelle was informed that Mr. Thomas would be expelled from the Alternative Learning Center and placed in the Alternative Learning Academy.

185

Rochelle was also reminded of her parental responsibility to provide adequate supervision for Mr. Thomas.  Ex. 107.

This neglect and lack of consistency in Mr. Thomas's life led him to inform his juvenile probation officer, Mike Polk, that he wanted to "do himself in."  Mr. Thomas was subsequently evaluated and recommended for a medical evaluation and counseling, neither of which he received while at the Juvenile Detention Center.  Ex. 108 at AT 003080-1.  Just eight days later, Mr. Thomas again requested anger management and other counseling and still received no mental health services.  Ex. 110.  He was released to Rochelle, who informed him of her plans to move to Oklahoma.  Mr. Thomas contacted his probation officer, but was told that he could not leave. He was also advised that a Directive to Apprehend had been issued for him.  Ex. 109 at AT 009764.  With no parent or guardian present, Mr. Thomas, now sixteen years old, went before the judge himself and was then detained in the Juvenile Detention Center.  Ex. 109 at AT 009764.  Once again, Mr. Thomas attempted suicide while detained at the Juvenile Detention Center and was placed on a high suicide watch.  Mr. Thomas reported auditory and visual hallucinations to the Juvenile Detention Center Staff, only to be ignored.  Ex. 110.  Almost a month later, Mr. Thomas was finally evaluated by Brent O'Bannon, who reported that Mr. Thomas felt lonely, suspicious, inferior, unpopular and different from others.  R.R. Vol. 44; State's Exhibit 9 p. 1-4.[49]  Shortly thereafter, Mr. Thomas was charged with violating the terms of his probation, due to his inability to pay his restitution and probation fees.  It was recommended that Mr. Thomas be sent to boot camp.  Ex. 111 at AT 009749.  However, he was found medically disqualified, due to a femoral hernia and was instead released to Rochelle, who had recently returned from her brief stint of living in Oklahoma, and placed on probation for 15

---

[49]     During Mr. Thomas's trial, Brent O'Bannon recanted these statements and asserted that Mr. Thomas was merely trying to get attention.

months.  Ex. 112.

Soon after he returned home, Mr. Thomas submitted an application to withdraw from Sherman High School and then took the GED for his diploma.  Mr. Thomas's son, Andre Lee Boren, was born on August 31, 1999.  Mr. Thomas, Little Andre and Laura all moved in together after Little Andre was brought home from the hospital.  Mr. Thomas, sixteen years old, worked at several jobs, attempting to care for his family.  Five months later, Mr. Thomas, Laura and their son all moved into the home of Paul and Sherry Boren, Laura's parents.  They moved out after only two weeks and moved in with Rochelle Thomas.  On Mr. Thomas's 18th birthday, March 17, 2001, he and Laura married.  Approximately two weeks after the ceremony, Rochelle kicked Mr. Thomas, Laura and Little Andre out of her house.  Laura and her son moved back in with her parents and Mr. Thomas moved in with his brother.  Mr. Thomas and Laura separated in July 2001.  Mr. Thomas took a job with the City of Sherman doing seasonal maintenance work in September 2001.  It was quickly apparent that Mr. Thomas was not well-suited for maintenance work, as he visited the emergency room on two separate occasions, suffering a severe allergic reaction after mowing the lawn.  Ex. 113 at 001500**;** Ex. 114 at AT 001492.  However, Mr. Thomas continued to work.

Despite Mr. Thomas's earnest efforts, Mr. Thomas's mental health adversely affected his ability to work.  Rickey Bell, one of Mr. Thomas's co-workers and supervisors for the City of Sherman, remembered Mr. Thomas's strange behavior:

> I was Andre's supervisor when Andre worked at the West Hill Cemetery for the City of Sherman from 2002 to 2004.  I sometimes worked one-on-one with Andre, when preparing for a funeral, and other times, I supervised Andre and the other workers by keeping an eye on them while they worked.  From the time I started working with Andre in 2002, I thought that he was mentally ill. On a few separate occasions, Andre told me that he was going to kill himself.  I believe that he seriously intended to commit suicide. Each time, I talked to him about how the Bible instructs that this

would cause him to deprive himself of entering God's kingdom and would have Andre read the Bible. This seemed to satisfy Andre, at least temporarily, to where he would not kill himself…Andre would sometimes lay down in the graves after they were dug, but before the caskets were placed inside them. I asked Andre why he did this, and he told me that he just wanted to see what it was like to be in the grave.

Ex. 4 at ¶¶ 2-4 and 6.  Rochelle's boyfriend, McCloud Luper, also noticed a significant change in

Mr. Thomas's behavior during this time:

On one occasion in 2002 or early 2003, after Rochelle and I had broken up, Andre came over to my house. A friend of mine and I were sitting on my front porch, talking. Andre walked up to us and told me that he was living the same days over and over again. He stated, " I've been here before just like this, I've walked up just like this and you were sitting here talking to Otis." I told Andre, "that can't be," but Andre kept insisting that he had lived that day before, "over and over." My friend and I looked at each other, knowing this wasn't true. I told Andre that he had not been to my house before and that we had not had the same conversation before. Andre told me that he was experiencing the same events over and over. He was acting very bizarre and talking in circles. He then told me that his mother had ran off and asked me for help finding her. I told him that I had no idea where Rochelle was and he started crying and acting frantic. He said that his father would not help him. He kept begging me to help him. I was not sure what help he wanted, but I thought he needed some mental health care because he was not right in the head.

I had not seen Andre for quite a while prior to the events described in paragraph 5 [the above paragraph]. That was the only time I had seen Andre act crazy like that. Before that, he always seemed like a normal, good kid.

Ex. 24 at ¶¶ 5-6.  Eric Ross, Mr. Thomas's oldest brother and former caregiver, noticed a change

in his behavior as well:

I think Andre has psychological problems. I first thought this in approximately 2002.

Ex. 28 at ¶ 3.  Mr. Thomas's friend, Amy Ingle, also observed Mr. Thomas's strange behavior:

Andre worked for the City of Sherman in the city's cemetery, digging graves and keeping the grounds. He would tell me that he could not get the smell of the cemetery and of digging graves off

of him.  He said he did not enjoy his work because of this problem.
I never smelled this so-called "cemetery smell."

Ex. 18 at ¶ 5.

While Amy and other friends attempted to encourage Mr. Thomas to seek help for his

mental problems, James Thomas was causing further difficulties for his brother.  James shot a

pellet gun at Laura's car and hit Laura, greatly aggravating Mr. Thomas and trying to provoke

him.  Ex. 115 at AT009645; Ex. 116 at AT 009647.  Mr. Thomas did not give in to James and

avoided a confrontation.  Mr. Thomas and Isaiah Gibbs, a friend of Mr. Thomas's and Laura's,

walked in on James and Laura having sex.  Isaiah remembered Mr. Thomas being very upset and

crying.  Ex. 117 at 0011353.  Mr. Thomas, extremely hurt by the fact that his wife was sleeping

with his brother, experienced another blow when he was laid off from his job with the City of

Sherman because the seasonal work had ended in early January.  At the end of January, with no

employment and little contact with his estranged wife and his son, Mr. Thomas was depressed

and was drinking heavily.  He was arrested on outstanding warrants and taken to Grayson

County Jail.  Upon intake, he reported that he drank two "40's" a day.  The interviewer reported

that Mr. Thomas talked rapidly and seemed extremely sad, apathetic, helpless or hopeless.  Mr.

Thomas was put on suicide watch for 6 days.  Ex. 118.

While Mr. Thomas was incarcerated, his older brother Brian Thomas, was diagnosed

with Schizophrenia.  Ex. 119 at AT 006269.  According to family and friends, Brian had always

acted strange:

> I have known Brian Thomas, Andre's brother since around the
> time I met Andre…Brian had an unusual demeanor.  His body
> language was very strange and he frequently looked and acted
> crazy.

Ex. 5 at ¶ 11.  Family and friends also believed James Thomas acted strange:

> I have also known, James Thomas, Andre's brother, for almost as
> long as I have known Andre…James acted crazy and aggressive, in

a similar manner to Brian.  I believe James was not mentally well.

Ex. 5 at ¶ 12.  Doris Gonzalez also observed strange behavior on the part of James and Brian

Thomas, consistent with their being seriously mentally ill:

> Two of Andre's brothers, James Thomas and Brian Thomas, have been certified to be mentally ill.  I have been around these boys, my nephews, since they were born, and they all have engaged in crazy acts from time to time.  Most notably, Brian Thomas is a diagnosed schizophrenic.  Rochelle Thomas, Andre's mother, often told me that Brian was my baby, meaning I was responsible for taking care of him.  Brian often came over to my house when he was younger.  Once, in approximately the winter of 2004, I started a bath for him and he got Pine-Sol and poured some of the Pine-Sol in the tub.  I stopped him and asked him what he was doing.  He told me that this was the way Rochelle gave him a bath.  Once, Brian was sleeping overnight at the MICU at the hospital in Sherman because it was so cold outside, and he had nowhere else to go.  Brian was kicked out by the security guards at the hospital, and he came to stay at my house.  At this time, Brian told me that Rochelle was living in a three or four bedroom house with plenty of room in a different town.  Rochelle told me that since the boys are grown, she should not have to mess with them.

Ex. 12 at ¶¶ 5-7.  Mr. Thomas's maternal aunt corroborates these perceptions.

> Brian was not right, either.  He was diagnosed with schizophrenia.  There is a lot of mental illness in the family, especially in Rochelle's kids.  Andre and his brothers Brian and James all show signs of something being really wrong with their minds.  In 1998, Rochelle sent Brian to stay with me in Muskogee because she was worried that some people in Sherman were out to get him.  At that time Brian told me that he was schizophrenic and was supposed to be taking medication.

Ex. 34 at ¶¶ 18-19.

> I have also thought that the majority of Andre's brothers – James, Brian, and Danny – also had some sort of mental problem.  Each of them exhibited strange and unusual behaviors and they also seemed depressed.

Ex. 21 at ¶ 5.  Danny Thomas also was aware that several of his sons were mentally ill.

> …Our son, James Thomas has never been right in the head.  James receives a disability check from the government because his mental illness prevents him from holding a job.  I do not know

what happened to Andre and his brothers when they were little but
I know all three, Andre, James and Brian, have shown mental
illness signs as they grew up.  Additionally, our son Brian has been
extremely introverted throughout his life.  Although our other sons
would play together when they were little, Brian would not play
with them and would remain on his own.  Brian has been
diagnosed as schizophrenic.

Ex. 32 at¶¶ 13-14.  Rochelle and Danny not only failed to seek or provide care for their mentally

ill sons, but Rochelle never even informed her family members of Brian's mental illness, even

though she knew he was capable of violence:

Rochelle never warned me that her son Brian, was mentally ill.
One night when I was staying with them, Brian suddenly got very
upset for no reason and started to yell at me to get my stuff out of
the house.  I was afraid he was going to hurt me physically.  I
pushed him out of the room and slept with my door locked.
Rochelle calmed Brian down.  She said he got out of hand when he
did not take his medication.  Brian was seriously mentally ill.
Sometimes he would be watching television and all of a sudden he
would change from being quiet to being very upset, for no reason
at all.

Ex. 22 at ¶ 10.  Wanda Banks, the family friend from Harmony Baptist Church, also recalled

Brian's mental illness:

I believe Brian Thomas, Andre's brother, also has mental
problems.  In my experience, Brian's behavior is strange and often
does not make any sense.  For example, Brian once came to my
house asking for some food because he was very hungry.  When I
prepared a meal for him, however, he hardly ate any of it.  Brian
was not behaving normally at this time.  One another occasion,
Brian called 911 because he thought someone was in his house.
When the responders arrived, they did not find any intruders.  In
investigating the scene, the investigators realized Brian was seeing
or hearing things that were not there.  The last time I saw Brian, he
was acting strangely and talking about odd things that did not
make any sense.

Ex. 3 at ¶ 9.  Family members did not seem to notice the emergence of Mr. Thomas's own

mental illness because Brian's illness was so readily apparent and so many in the family were

mentally ill themselves.  Rochelle Thomas never acknowledged that any of her sons had any

mental problems; she later testified that she never knew of any of her children exhibiting any strange behavior indicative of mental problems, or of any of her children receiving services for mental health problems.  Ex. 90 at AT 004703.

In April of 2002, Mr. Thomas was again hired by the City of Sherman for seasonal maintenance Despite his allergies, Mr. Thomas continued mowing  grass for the city, even after another visit to the emergency room for an allergic reaction.  Ex. 120 at AT 001508.  Mr. Thomas again was laid off due to seasonal employment ending in December of 2002, R.R. Vol. 45; State's Exhibit 83 p. 13.  One week after being laid off, Mr. Thomas called the police to report that he was assaulted by his brother, Brian Thomas.  Brian shoved Mr. Thomas into a wall, causing a whiplash reaction.  Ex. 121 at AT 000327.

Approximately one month later, another altercation between Brian and Mr. Thomas occurred.  Mr. Thomas was listening to music in his room and Brian came in and demanded Mr. Thomas turn the music down because Brian believed it was sending evil spirits through the wall. Brian then began punching Mr. Thomas, and he stabbed Brian in self-defense.  Later, the police were informed that Brian had a gun under his bed and Mr. Thomas was afraid Brian would use it on him.  Ex. 122 at AT000080.  Mr. Thomas was taken to jail and Brian was admitted to Vernon State Hospital where he remained for several months.  Ex. 123 at AT 000031.  Although Mr. Thomas was in jail and Brian was committed to a mental hospital, never at any point did Rochelle talk to either of her sons to find out what had happened or try to get either of them the counseling or help they clearly needed.  Ex. 90 at AT 004676-004679.  Rochelle later testified that she did not want to know what had happened between Brian and Andre, so she never asked. Rochelle also testified that she learned what the altercation was about by reading it in the local paper.  Ex. 90 at AT004679.

While in jail, Andre was placed on suicide watch after admitting to the staff that the last

time he was in jail, he attempted to kill himself by slitting his wrists with his own fingernails.

R.R. Vol. 44, Defense Exhibit 1 p. 1.

In April, Mr. Thomas was released after he was no-billed by the grand jury, R.R. Vol. 46;

Defense Exhibit 30 p. 1.  Just six days after he was released from jail after the finding of self-

defense, Mr. Thomas again applied to work seasonal maintenance for the City of Sherman.  He

was hired in early May of 2003, R.R. Vol. 45; State's Exhibit 83 p. 8.  After steadily working for

almost nine months, Mr. Thomas lost his City job and his ability to provide for his son.  R.R.

Vol. 45, State's Exhibit 83 p. 2.  Laura began restricting Little Andre's visits to his father's

home, due to Mr. Thomas's inability to pay his utilities to maintain heat and electricity.

Although Rochelle did not attempt to find help for Mr. Thomas, she did notice a change in his

behavior:

> Rochelle told me that Andre had been acting strange for quite
> some time before the murders.  She said he would often talk to
> himself and have conversations with people who were not
> there…When he couldn't see his son Juicy [Andre Jr.] anymore, he
> lost all hope.  Andre is very, very sick.

Ex. 34 at ¶ 21.  Eric Ross noticed Mr. Thomas's unusual sleeping habits during this time:

> Andre would sometimes be awake for up to three days at a time in
> the year or two preceding the crime.

Ex. 28 at ¶ 5.  Danny Thomas also noticed Mr. Thomas's strange behavior.

> In the three months prior to his arrest, Andre also began
> compulsively working on his car, even in the middle of the night
> when it was dark outside.  He was always trying to fix the car, but
> it was not apparent that the car was broken.  He also expressed a
> number of times that he was in a circle that he needed to – but
> couldn't - break out of.

Ex. 32 at ¶ 16.  Other friends and family also quickly began to notice a marked change in his

behavior and demeanor, and a rapid deterioration in functioning.

> Since late 2003, however, he [Andre] became more weird with
> each passing month.  Everyone talked about him having problems,

> but no one helped him.  Andre was always dyeing his hair odd
> colors – orange, green, red, and other strange colors.  I asked him
> why he did this, and he said he just liked it that way.  He also wore
> strange clothes, like army clothing…Since I met Andre [in 1998], I
> always thought he was different.  It seemed to me like he was
> fighting something mental for a long time.  He did not talk very
> much and it seemed like he was just trying to keep his problems
> under wraps.  It seemed like Andre was always trying really hard
> to contain his issues inside him.

Ex. 18 at ¶¶ 6, 23.

### f.      Psychotic behavior.

Amy Ingle recalled the remarkable changes she observed in Mr. Thomas after he was

fired for the final time:

> After Andre lost his job in late January 2004, he started acting
> more and more strange.  He really went haywire.  Since Andre lost
> his job and did not have any money, Andre and I and some friends
> used to play dice at Andre's trailer and bet money on the game.
> Once, Andre won an $100 bill and immediately placed it in an
> ashtray and lit it on fire, while yelling "Money is the root of all
> evil!"  He burnt up the entire $100 bill, despite being broke.

Ex. 18 at ¶ 7.  Mr. Thomas also began to speak about the Bible more and more often, yet he

made little or no sense.  Much earlier in life, beginning when Mr. Thomas was very young, he

took an interest in the Bible and biblical stories.  However, over time Mr. Thomas's focus on the

Bible changed from positive to negative:

> When I knew Andre in 1995, 1996, and 1997, he regularly spoke
> to me about God.  He often talked about Judgment Day and the
> Apocalypse.

Ex. 31 at ¶ 3.

> In the three months before Andre was arrested, I noticed a
> complete change in his behavior.  He became highly preoccupied
> with the Bible, especially with the Book of Revelation and with the
> ideas of good and evil, the end of the world, and heaven that are
> described in that part of the Bible.  Andre began asking lots of odd
> questions about these biblical subjects that did not make sense.  He
> began being confused all of the time, for no apparent reason.
> During this time I often told him that he needed to try to control

himself, because he was acting strangely, but nothing changed.

Ex. 32 at ¶ 15.  Rochelle's former boyfriend, McCloud Luper, believes Rochelle is to blame for

Mr. Thomas's misunderstanding of the Bible, along with Mr. Thomas and Rochelle's mental

illnesses:

> I believe that Andre's mother Rochelle is the root of many of
> Andre's problems.  I think she messed with his head.  Once, a
> preacher who was Danny Thomas's uncle, told me that Rochelle
> messed Andre up when it came to the Bible.  I also believed this to
> be true.  Rochelle yelled at Andre about the Bible on several
> occasions.  They would get in fights about what the Bible meant.  I
> did not think that the way either of them thought about the Bible
> made much sense…I think both Andre and Rochelle have
> something wrong with them mentally.  I think whatever was wrong
> with Andre, Rochelle made it worse.  Several other people in the
> community have talked to me about how Rochelle is crazy and a
> bad person.

Ex. 24 at ¶ 3.  Christopher Bennett, Mr. Thomas's childhood friend, also recalled Mr. Thomas's

obsession with the Bible and hyper-religiosity:

> Since I have known Andre, he always talked about the Bible and
> was extremely intense when he talked about it.  Andre often spoke
> of the Seven Deadly Sins, and the way he talked about them
> sometimes frightened me.  Andre also talked about how the world
> would end if everyone turned bad.  He said that if there was a
> nuclear war and everyone pushed the buttons that set off the global
> warheads, the whole world would end.  Other times, Andre talked
> about things that made no sense at all…Andre used to tell me that
> God spoke to him often.  Andre said that God was trying to show
> Andre a different way than what the demons were showing him.

Ex. 5 at ¶¶ 4, 8.  Mr. Thomas would frequently talk about the Bible while working at the

cemetery:

> Andre frequently talked about the Bible, but he always had strange
> and negative interpretations of the Scriptures.  Andre's
> interpretations did not make sense to me, and did not make sense
> to his other co-workers.

Ex. 4 at ¶ 5.  Mr. Thomas told Rose Soto, his current girlfriend, that he was living the

same seven days over and over.  Rose also reported that Mr. Thomas read the Bible often in the

195

months preceding March 2004 and that he acted very strange.  R.R. Vol. 36 p. 31-35.  Amy Ingle

experienced Rochelle's erratic discussions with Mr. Thomas regarding the Bible firsthand.  Like

McCloud Luper, Amy believes Rochelle exacerbated many of Mr. Thomas's existing problems

with her own hyper-religiosity.  Mr. Thomas also confided in Amy regarding many of his

religious preoccupations and delusions:

> Shortly after I met Andre, I met Rochelle Thomas, Andre's
> mother.  She acts very crazy and hypocritical.  For example, I met
> Rochelle many times and she often preached the Bible and talked
> in a manner I found just plain crazy. I believe Rochelle Thomas
> messed with Andre's head.  Often Rochelle would call and talk to
> Andre about the Bible.  Once, in early February 2004, I was at
> Andre's father's trailer and Andre called Rochelle.  While Andre
> was talking to his mother, he grabbed a huge Bible that Danny
> Thomas had in his trailer and began flipping through the pages
> very quickly.  He started talking really fast, reading the passages
> out loud that he and Rochelle had talked about.  He would start
> preaching in a way that I found to be crazy…

> On or about the beginning of February 2004, Andre Thomas told
> me, "I have demons in me and I really need some holy water."
> Andre then took me to St. Mary's Catholic Church in Sherman.  I
> stayed in the car and Andre went in.  When he came out of the
> church, his head was dripping wet.  I asked him why his head was
> wet.  Andre told me that he asked if he could take some holy water
> with him, and the people at the church said no, so he dipped his
> hands and his whole head in it.

> Immediately after the holy water incident described above in
> paragraph 10, Andre took me to a cemetery in Sherman.  He
> walked me to a huge mausoleum.  I asked him if we were going to
> go in, and he said no, he was scared of it.  He asked me to read the
> words printed on it.  I read them to him.  Andre kept nodding his
> head when I was reading.  Andre asked me if I knew what the
> words meant.  I told him I did not.  Andre kept telling me, "Amy,
> you get it!"  He was talking about the words I had just read that
> were written on the mausoleum.  I said, "No, Andre, I don't get it.
> Get What?"  Andre kept saying, "No, you get it, Amy, you get it!"
> He kept saying it over and over; he really believed I knew what it
> meant.  He seemed to think there was some secret meaning to the
> statement on the mausoleum, and that I, too, understood this
> meaning.  In reality, I had no idea what he was talking about.

> While we were in the cemetery that day, Andre told me he thought

196

> I was an angel.  He did not use "angel" in the way that a normal
> person calls someone who is kind.  I understood him to be using
> "angel" as in an angel who actually came from heaven and was not
> human.

Ex. 18 at ¶¶ 8, 10-13.

Mr. Thomas's auditory hallucinations, which he experienced for the first time more than

a decade prior to 2004, increased in severity during the months leading up to March 2004:

> Once, several months before the end of March 2004, I was at the
> home of Danny Thomas, Andre's father.  I heard someone crying
> in the bathroom.  I asked who it was, and I was told it was Andre.
> Andre came out of the bathroom crying and sat down on the couch
> across from me.  He could not stop crying.  Andre was holding his
> head, and I asked him what was wrong.  Andre shook his head and
> told me, "The voices, the voices won't stop."

Ex. 12 (D. Gonzales Aff.) at ¶ 13.  Mr. Thomas also confided in his oldest brother, his former

caregiver, about his auditory hallucinations:

> Andre used to talk to me about how God told him to do things.
> Once, in approximately February 2004, Andre told me that God
> told him to walk all night along the railroad tracks.

Ex. 28 at ¶ 4.  Mr. Thomas's maternal uncle Kevin Ross understood it much differently and

correctly attributed the "voices" to Mr. Thomas's mental illness: "Mr. Thomas thinks he hears

God's voice, but he is really very mentally ill."  Ex. 29 at ¶ 20.  Denise also understood that Mr.

Thomas was mentally ill:

> Vivian, Rochelle and Andre all have a special gift, a special
> relationship with God. God talks to them in dreams and by giving
> them visions. It must be very difficult for Andre to handle his gift
> since he is mentally ill.

Ex. 34 at ¶ 5.

As Mr. Thomas's mental health worsened, friends and family began to avoid him, even

more so than they had previously.  Amy Ingle observed Mr. Thomas's extended family at length,

while she was dating Mr. Thomas's paternal cousin, Floyd Patterson:

197

I first met Andre in 1998. I began spending an extensive amount of time with him and the Thomas family in either July or August of 2003 at which time I became good friends with him. At the time, I was involved in a physically abusive relationship with Andre's paternal cousin, Floyd Patterson. Andre protected me from Floyd by allowing me to stay at his residence. I was not allowed to return to my parents' home because they had disowned me after I had dated Floyd, a black man. My family also had problems with the fact that I was even friends with Andre, since he too is black.

Another time I saw Andre in 2003 when I was over at Danny Thomas's trailer. Floyd brought me there to meet his family. Everyone was outside talking and Andre walked out of his trailer wearing camouflage clothing. He walked straight through the party without talking to anyone and went to the stores behind Danny's house. I asked who he was and several people said, "Oh that's just crazy Andre." Soon after, he walked back through the party, again without speaking to anyone. Andre was always very different. People would hang out and talk around him, but Andre did not really participate in the conversations. He was an outcast, even in his own family…Andre wanted his family to accept him for who he was, but he felt that his father did not accept him because he was different.

From around February 1, 2004, to the time of the crimes, people would avoid Andre because he was talking about his weird theories about the dollar bill containing the answers to the meaning of life, demons, and other strange things that did not make sense to me.

Ex. 18 at ¶¶ 2-3, 18.

Throughout much of Mr. Thomas's late childhood and adolescence, according to friends and family, Mr. Thomas was also not very talkative. His increasingly animated conversations about his "theories" on life were therefore noticeable:

Andre had lots of strange theories about life and other things. Andre did not talk very much, so the things he said stuck out because he was not talkative and because they were crazy. During March 2004, he often told me about these theories, but they never made any sense to me. They were crazy. Andre would sometimes take long walks and would come back and be in a completely different mind state. He sometimes would walk off and say he had to go to the library to do research on his theories. Andre was always telling me, "The dollar bill contains the meaning of life." He would always stare at dollar bills and tell me, "I figured it out! I figured it out!" Andre insisted that it was something in the eyes

> of the man on the dollar bill.  Andre told me, " Everyone has a
> purpose.  I wonder what mine is."  I tried to listen to Andre's
> theories but they never made any sense.

Ex. 18 at ¶ 13.

Although she refused to help Mr. Thomas obtain treatment, it was clear that Rochelle was

aware that Mr. Thomas's behavior.  She confided in her friend from church, Wanda Banks:

> On several occasions, Andre's mother Rochelle has confided in me
> about Andre's behavior.  Based on what Rochelle has told me, I
> believe Andre Thomas has mental problems.  I am very familiar
> with the signs and symptoms of mental illness because my sister
> has struggled with a mental illness for years.

Ex. 34 at ¶ 7.

On February 10, 2004, Carmen Hays moved to Sherman, Texas.  She quickly met Mr.

Thomas through mutual acquaintances, Kim and Zack Young and Kim Baird.  R.R. Vol.27 p.

180.  Mr. Thomas periodically talked with Zack Young, the 15 year-old son of Kim Young,

asking Zack about suicide, about the best way to stab yourself, and finally asking Zack to kill

him.  Ex. 124 at 004748-4753.  Soon after they met, Carmen and Mr. Thomas began dating.

Carmen, recently divorced and depressed, was a heavy substance abuser.  On March 3, 2004,

Carmen introduced Mr. Thomas to using Coricidin.  According to Carmen's testimony, Mr.

Thomas took six to eight pills on March 3, while she took 10.  R.R. Vol. 27 p. 192-194.  Later

that same day, Carmen broke up with Mr. Thomas after Mr. Thomas repeatedly told people that

he believed Carmen was a man. Mr. Thomas believed this because James told him that Carmen

was a man.

On March 5, Mr. Thomas was taken to the mental health clinic by Zack Young.  Mr.

Thomas stated to the staff, "If I can't talk to someone now, I will throw myself in front of a bus."

Additionally, Mr. Thomas stated that "Life is too much for me and I want to die right now."  Mr.

Thomas stated that he would shoot himself and also asked the staff to kill him, and stated he

hated the sound of his own voice and needs help.  The staff then told Mr. Thomas to report to the

emergency room.  Mr. Thomas, who was highly delusional at this point, did not report to the

Wilson N. Jones Emergency Room.  An Emergency Detention Order was signed by a judge,

ordering that Mr. Thomas be immediately apprehended and transported to the Wilson N. Jones

Emergency Room as he was at a substantial risk of serious harm to himself or others and that he

must be immediately restrained.  R.R. Vol. 46; Defense Exhibit 7 p. 1-3.  No one ever came to

Mr. Thomas's home, or the home of any of his relatives to apprehend him.

On March 6, 2004, Mr. Thomas's aunt Angel died of a lung condition.  She and Mr.

Thomas were very close.  As stated previously, her death upset Mr. Thomas very much.  At her

funeral, Mr. Thomas discussed his mental problems with his Aunt Konta, who is a nurse and

who had suspected for some time that Mr. Thomas was mentally ill:

> At Angel's funeral, Andre approached me and asked how I was
> doing.  I told him that I was doing okay and inquired as to how he
> was doing.  He told me he wasn't doing well at all and that he had
> been back and forth to the doctor's.  I asked him what was wrong,
> and he pointed to his head and said he was having a lot of
> problems with his thoughts and stuff.

Ex. 19 at ¶ 7.  During this month, Mr. Thomas's paranoia increased immensely also:

> In March 2004, Andre thought someone stole his coat from him.
> He insisted that Rose Soto, his girlfriend at that time, had stolen his
> coat and was using it to do some voodoo on him.  He could not
> explain to me what the voodoo was but he knew that was why
> Rose had stolen his coat.  In actuality, one of his cousins had taken
> the coat to wear during the colder weather.

Ex. 18 at ¶ 15.

Mr. Thomas believed God told him not to talk, so he placed duct tape over his mouth for

days at a time:

> Sometime in March 2004, before the crimes, I went over to
> Andre's trailer because he told me he would install my stereo in
> my car for me.  When I got there, Andre had duct tape over his
> mouth.  I asked if he could put my radio in and he nodded.  He

> would not remove the duct tape from his mouth to speak, and
> instead just gestured or nodded to communicate with me the entire
> time I was at his trailer.  He put the radio in my car for me and
> wore the duct tape on his mouth the whole time.  He wore the duct
> tape on his mouth for three days.  One day, during these three days
> that Andre was wearing the duct tape over his mouth.  I went over
> to his trailer and Andre was cutting words and letters out of the
> Bible and making them into sentences.  He also had a notebook
> where he wrote a bunch of stuff.  The writing in the notebook was
> going in all different directions on the page.  The words and
> sentences did not make any sense.

Ex. 18 at ¶¶ 16-17.  Danny Thomas and Danny Ross also observed Mr. Thomas wearing the duct

tape:

> Andre's father, Danny Thomas, and his brother, Danny Ross, told
> me that before the murders, Andre walked around for two weeks
> with duct tape over his mouth.  Even before he used the duct tape,
> he told them he was afraid to talk because he might say something
> evil.  Everyone in the family knew there was something wrong
> with his mind.

Ex. 29 at ¶ 20.  Rochelle also observed Mr. Thomas wearing the duct tape, but she never asked

him why he was wearing it, nor did she offer to get him help; Rochelle later testified that she did

not do any of these things because she thought Mr. Thomas wearing the duct tape was "crazy" so

she did not want to know why he was wearing the tape.  Ex. 90 at 004688.  Danny Thomas

believed Mr. Thomas's behavior began to change long before he observed Mr. Thomas wearing

duct tape.

> Andre's conduct changed long before he met Carmen, his
> girlfriend.  I first noted Andre changing after he married Laura.  He
> continued to demonstrate increased signs of odd behavior
> throughout the years.  In the months leading up to Laura and the
> children's death, Andre would walk around with duct tape on his
> mouth and he would be talking nonsense when his mouth was not
> taped.  I did not know what was wrong with him.

Ex. 32 at ¶ 17.

Mr. Thomas and Carmen got back together on March 5, just a few days after their first

break-up.  R.R. Vol. 27 p. 197-200, 206.  On Mr. Thomas's 21st birthday, Carmen celebrated by

giving Mr. Thomas eight to ten Coricidin pills, and taking ten herself.  Just a few hours later, Mr.

Thomas vomited, expelling the pills and alcohol from his body.  *Id.* at P. 213; R.R. Vol. 28 p. 71-

72.  On March 23, Carmen moved into Mr. Thomas's trailer with him.  The following day,

Carmen broke up with Mr. Thomas once more, again stating that she had heard that Mr. Thomas

thought she might be a man.  Shortly thereafter, they reconciled.  Carmen's rationale for this

reconciliation was "I just…it sounds so bad, but I just care about him so much and I thought I

could help him with his mental situation and suicide attempt because I had been there before

myself and I thought I could help him out with it."  Ex. 54 at 010735.  A few hours after

reconciling, at approximately 1:30 pm, Mr. Thomas abruptly stopped speaking.  Ex. 52 at

AT010599.  Carmen Hays later told police that Mr. Thomas stopped talking for 24 hours because

he thought that he was the devil and if he stopped talking, everything would be alright with the

world.  Ex. 51 at AT 005332-005343.

       The next day, March 24, Mr. Thomas visited Kim Young at his home.  Kim observed Mr.

Thomas talking to his hand, the floor and asking Kim if he heard voices, too.  Mr. Thomas asked

Kim about committing suicide.  Ex. 125 at AT 004739.  Mr. Thomas also talked to Bryant

Hughes about committing suicide and told Bryant that he was a fallen angel and that he had to

open the gates of hell.  Ex. 126**;** Ex. 52.  Later on this same day, around 5 p.m., Carmen and Mr.

Thomas went to the store to purchase Coricidin, Smirnoff and beer or malt liquor.  After

consuming these items, Mr. Thomas and Carmen went to visit little Andre at Laura Boren and

Bryant Hughes' apartment.  On the way over to Laura's, Mr. Thomas began to feel ill and

vomited in a park.  When they arrived at Laura's apartment, Laura told Mr. Thomas he could not

visit his son unless he was sober, so Mr. Thomas and Carmen left.

       At approximately 11:30 that evening, Mr. Thomas stabbed himself with a small knife

after experiencing auditory and visual hallucinations. When Mr. Thomas called for his mother,

lying on his bed bleeding from a self-inflicted stab wound, Rochelle simply walked back, looked

in on Mr. Thomas and then went back to bed.  Rochelle later testified that it was dark in Mr.

Thomas's room, because they did not have any money for electricity, so she could not tell what

was wrong with him and did not care enough to find out.  Ex. 90 at 004720.  Before stabbing

himself, Mr. Thomas asked God to forgive him for his sins and stated that he wanted to go to

heaven and fly with the angels.  He did not however go to the hospital until 6:30 the next

morning.  Because Mr. Thomas did not die, he felt immortal.  Ex. 52 at AT 010624.

On March 26 at 6:30 AM, Rochelle finally, recognizing her son's deteriorating condition

attempted to obtain help for her son -- by dropping him off at the emergency room:

> Rochelle also told me that about three days before the crimes, she
> sought help for Andre's mental problems at Wilson N. Jones
> Hospital in Sherman, Texas, but rather than caring for Andre, the
> hospital staff let Andre leave.  In dealing with my sister's mental
> illness, I also tried to get help at Wilson N. Jones Hospital and had
> a very similar experience.

Ex. 3 at ¶ 8.  When he arrived at Texoma Medical Center-Behavioral Health Clinic, Mr. Thomas

told a nurse that he needed help and had needed help his whole life.  Ex. 127 at 002911-002930.

Mr. Thomas was seen by Dr. William Bowen, whose report stated that Mr. Thomas was

paranoid, hallucinating and suicidal.  Dr. Bowen later testified that he thought Mr. Thomas was

"really mentally ill.  Ex. 128 at AT 003002-003009.  Mr. Thomas was also seen at this time by

Sherrie St. Cyr, a social worker.  Her report stated that Mr. Thomas appeared disheveled and

hopeless and was experiencing delusions and religious preoccupations.

> "Pt [Patient] states he cut on his chest this AM trying to 'cross over
> into heaven'; pt [patient] psychotic; - thinks something like
> Holodeck on Star Trek is happening to him; 'I don't know if I
> volunteered for this or if I was forced to' – referring to his life . . . .

Ex. 49; Ex. 129 at AT 003024-003026.  The form also stated that Mr. Thomas was at risk for

suicide.  Sherrie St. Cyr's diagnosis was "psychosis" and also indicated that Mr. Thomas was

exhibiting poor judgment.  Ex. 129 at AT 003024-003026. Mr. Thomas was nonetheless then left

alone while Dr. Bowen applied for an Emergency Detention order.  Before 9:30 am, feeling that

no one was helping him, he left the hospital and walked home.  Staff from the Texoma Medical

Center paged Mr. Thomas at 9:30 with no answer.  At 9:55, the Denison Police Department was

notified. An Emergency Detention Order was issued and signed, ordering that Mr. Thomas be

apprehended immediately, R.R. Vol. 46; Defense Exhibit 10 p. 1-3.  No officers ever appeared at

Mr. Thomas's home or the homes of any other family member.

> After leaving the center, Mr. Thomas spoke with Amy Ingle:

>> I spent time with Andre after he returned from the Texoma
>> Behavioral Health Center.  He was nervous that he had told them
>> "too much" about his theories.  I asked him what he had said but
>> he could not tell me; he just kept repeating that he had said "too
>> much."  He still was not making sense to me.  Immediately after
>> leaving me, Andre took off walking by himself.  He looked very
>> scared.

Ex. 18 at ¶ 19.  When Mr. Thomas returned home from the center, he broke up with Carmen

Hays for the final time.  The next morning, at 6 AM, he left his trailer after telling Rochelle that

"God told him to walk".  Ex. 90 at AT 004714.  Rochelle later testified that Mr. Thomas waking

up at 6 AM and telling her that God told him to walk did not cause her to worry, she did not

think anything of it.  Ex. 90 at AT 004715.  Mr. Thomas walked for several miles, to the

apartment of Laura and Andre Boren, and Bryant and Leyha Hughes.  He passed Bryant Hughes

who was on his way to work at Burger King.  Bryant waved hello to Mr. Thomas, who

interpreted this gesture as a sign that Bryant understood the mission.  Mr. Thomas believed,

based on the delusional content of his thoughts, that Laura was Jezebel and that a demon

inhabited his son.  Mr. Thomas, carrying three knives, based on the delusion that using the same

knife twice would "contaminate" the blood, took the lives of Laura Boren, Andre Boren and

Leyha Hughes, and then attempted to take his own life.  When he returned home several hours

later, he was crying and upset, with his chest bleeding.  He then told Carmen and Isaiah Gibbs, an acquaintance who was at Mr. Thomas's trailer when he returned, that he had killed his son, Laura and her daughter because "this is what God wanted me to do."  Ex. 117 at AT 001246-001248.

### g.    Behavior after the crime.

After confessing to the crime and asking if he would be forgiven, Mr. Thomas informed Sherman police officers that he was hurt.  He was taken to the hospital and underwent emergency surgery for internal bleeding.  The stab wounds had caused bleeding around the heart, and thus caused the heart to have difficulty beating.  Several of the Emergency Room doctors later testified that the wounds were deep and serious, and also reflected a serious suicidal intention.  Without surgery, it is likely that Mr. Thomas would have died on the table.  Ex. 130 at AT 001516-001520, 001528, 001691, 001810; Ex. 131 at AT 001018-001094; R.R. Vol. 32 at 4 (State's Ex. 90).  While en route to the hospital, Mr. Thomas spoke to the EMT: "I just don't know what's going on.  I just don't understand.  I just wanted to die to pay for my sins."  Ex. 52 at AT 004303, 004306; Ex. 132 at AT 004480, 010147; Ex. 133 at AT 004483; Ex. 134 at AT 010148.

In the following days, Mr. Thomas was referred to a mental health professional by the jail staff.  On March 30 and 31, he was evaluated by Dr. C. Robin McGirk.  He told Dr. McGirk that the government had been involved in monitoring his activities and that there were cameras behind his eyelids transmitting his thoughts to others.  Mr. Thomas also spoke about déjà vu and being able to see Laura as if she were alive.  As Mr. Thomas perceived it, the experience of her death was an illusionary or an imaginary event resulting from other thoughts being injected into his mind through government experiments.  Dr. McGirk concluded his report by stating that it appeared Mr. Thomas had been developing psychotic symptomology over a span of time that

predates the murders of Laura, Leyha and Andre.  Ex. 57 at AT 002013-002018.  Later in the day

on March 30, Mr. Thomas informed the jail staff that he was "the 13th warrior on the dollar bill"

and that he was "the chosen one to free us from evil."  He also informed the staff that his wife

and the children were not dead, but in fact their hearts were freed from evil and all of this is just

déjà vu.  R.R. Vol. 44; Defense Exhibit 3 p. 1.  Mr. Thomas also spoke about the demons to

friends and family who visited him in jail:

> After the crimes, when I visited Andre in jail, he would talk to me
> about demons.  He would see demons.  Once during this time, he
> wrote me a letter telling me that the reason that he killed his son
> was because his son had a demon in him and Andre had to kill him
> to get rid of the demon.  I believe Andre truly believed this.

Ex. 18 at ¶ 20.

Mr. Thomas's delusional thinking became increasingly severe.  On April 1, he informed

the jail medical staff that he was very tired, but could not sleep because Dr. McGirk had told him

to observe everything carefully from his cell.  Mr. Thomas was fearful that if he went to sleep, he

would have missed something for Dr. McGirk.  Ex. 135 at AT 004757-004758.  The very next

day, Mr. Thomas removed his own right eye with his fingers, saying: "The Bible says if your

right eye offends thee, you are to pluck it out, so I did."  Mr. Thomas later told staff that it was

God's will for him and he had to do it in order to be saved from burning in hell.  Mr. Thomas

could not understand why he did not die and continually asked the jail nursing staff why he did

not die; the staff could not provide an answer that satisfied his delusional thinking.  Ex. 136 at

AT 000360-000361; Ex. 137 at AT 000365; Ex. 138 at AT 000363-000364; and Ex. 139 at AT

004760-004763.  On the night of April 2, after being treated at Wilson N Jones Medical Center

for the enucleation of his right eye, Mr. Thomas was placed in a restraint chair during the day

and slept on a backboard with restraints at night, in order to keep him from hurting himself.  Mr.

Thomas asked the jail nurse if he could go see his wife to ask her to forgive him, also stating that

the kids had forgiven Mr. Thomas but his wife had not.  Ex. 140 at AT 001811-001827; Ex. 136 at AT 000362.

On April 15, Dr. James Harrison submitted a report concluding that Mr. Thomas had paranoid and grandiose delusions, a tendency to leap from topic to topic and was hearing voices. He concluded that Mr. Thomas was incompetent to stand trial, R.R. Vol. 44; Defense Exhibit 5 p. 1-12.  On the same day, Dr. McGirk again met with Mr. Thomas.  His report states:

> Delusional content of discussion duirng (sic) this contact was quite
> similar to that observed on previous dates with mention of
> recurring nature of events which he was observing, while
> emphasizing that he was attempting to pay close attention to
> everything that was going on in order to be able to "pass whatever
> kind of test this is," adding that he thought he had already done
> enough but would continue to monitor events so that he could
> fulfill whatever great purpose was intended for him.

Ex. 141 at AT 010276.  Twenty-five days after the restraints were originally placed on Mr. Thomas for his safety, they were removed, at the suggestion of Dr. Harrison.  Ex. 142 at AT 010287.  Later that day, Mr. Thomas was seen scratching around his remaining eye.  Mr. Thomas told jail staff that he was having bad dreams and did not want to talk about them.  Ex. 143 at AT 004258-004260.  The following day on April 28, Mr. Thomas was seen digging around his good eye and the restraints were once again placed on him.  The jail staff also noted that Mr. Thomas was shaking very hard, had a wild stare and did not appear to know where he was or his surroundings.  Mr. Thomas also told a staff member that he felt anxious, and that he thought everyone else was an angel but he himself could not fly.  Mr. Thomas then asked why he felt different from everyone else.  Ex. 143 at AT 004248, 010298-010303; Ex. 144 at AT 018180-018181.

Mr. Thomas's extreme paranoia continued, as evidenced by his comments to the jail staff on May 1.  Mr. Thomas said, "I don't want to be in this program any longer.  I don't want people

studying me, I don't want to be here in this program.  I'm normal, I could understand if I had

wings why I'd be here, but I'm normal."  Ex. 145 at AT 001231.  Throughout the following

month, jail staff observed a decrease in Mr. Thomas's mental capacity and a marked increase in

his auditory and visual hallucinations.  On May 15, an officer observed Mr. Thomas swearing at

a picture he was holding and saying "I know you are here, so don't just sit in the picture and

smile like that.  Ex. 145 at AT 001231."  Similarly, on June 9, staff observed Mr. Thomas talking

to "someone who is talking in Mr. Thomas's ear" and stating "You're fuckin' crazy man.  I'm

not doing that."  A short time later, Mr. Thomas sat up and stated "I'm sorry forever man,

Hallelujah, Amen.  You hear me?  I'm fuckin' sorry forever.  Hallelujah, Amen."  The very next

day, Mr. Thomas stated, again to no one, "Why are you trying to fuck me over bitch?...Damn!

What's wrong with you?  Don't be like that.  Don't even try to talk to God…I think this is some

fucked up crap, man.  Oooh-Rah!  Mr. President, I'm going to whip some ass when I get out of

here."  He repeated this statement verbatim three times and then later twice said, "There she is!"

followed by long giggles.  Ex. 146 at 004787-004788.

Mr. Thomas's mental deterioration was further evidenced on June 22, when jail staff

observed Mr. Thomas vigorously rubbing his mittened hands (which were placed in mittens for

his own protection from enucleating his second eye) together under his knees.  When asked what

he was doing, Mr. Thomas responded "I am making two cars have sex."  Ex 147 at 004790.  Mr.

Thomas was finally admitted into the Spruce/Competency Unit of North Texas State Hospital on

June 23.  Upon his admittance, Mr. Thomas informed the staff that "voices" piss him off and that

he knows he can read people's minds.  He also stated that the voices sometimes tell him to do

things, and that is why he stabbed himself in the chest.  Ex. 148 at AT 008371**;** Ex. 66 at AT

008409, Ex. 149 at 008801-2.

Throughout his stay at the State Hospital, Mr. Thomas continually experienced auditory

and visual hallucinations and exhibited delusional thought patterns.  On June 24, Mr. Thomas told the staff that he heard the voice of God in his head and God told him if he didn't shut up, that he would burn in hell.  Mr. Thomas also reported hearing the voice of Allah and that he could hear the demons laughing at him.  Ex. 69 at AT 008546**;** Ex. 150 at AT 008807.  A few days later, Mr. Thomas reported to the staff that he would take out his left eye if God commanded him to do so, and he was confused as to why he was incarcerated when he did what God had commanded him to do.  He told the staff that by taking the lives of Laura, Andre and Leyha, he "did them a favor by killing the demons."  Ex. 151 at AT 008549, Ex. 152 at AT 008813.  Mr. Thomas even expressed his delusions to two visitors, former classmates of his, by telling them that little Andre was a demon and that was why this [the crime] happened.  He also told his visitors that, "The war was already won, that is why I had to do what I had to do.  Ex. 153 at AT 008550."  Mr. Thomas's delusions continued during his stay at North Texas State Hospital.  Ex. 154 at AT 008816; Ex. 155 at AT 009064; Ex. 156 at AT 009069.  He persistently continued to express the same delusional religious concerns and auditory hallucinations during interviews with hospital staff members throughout his stay at the hospital.  One doctor who evaluated Mr. Thomas during this time stated that he believed Mr. Thomas was in "terrible psychic pain" and was psychotic.  Ex. 157 at AT 008820; Ex. 158 at AT 008509-10.

Despite all evidence to the contrary, on July 22, Dr. B. Thomas Gray evaluated Mr. Thomas and concluded that Mr. Thomas was competent to stand trial.  Mr. Thomas was discharged on August 8 and sent back to Grayson County Jail to await his trial.

## 2.    Expert Testimony.

Had counsel adequately prepared Dr. Allen for her expert testimony, she would have had time to fill in the vast gaps of missing information in the mitigation report, which was critical to the argument that Mr. Thomas should be spared the death penalty.  Ex. at ¶ 8.  Her credibility

would not have been destroyed as a result of defense counsels' failures.  She would have come to understand that numerous members of Mr. Thomas's family, including his mother, were extremely mentally ill, and did not provide a stable home for Mr. Thomas.  *Id.* at ¶ 17. Moreover, an understanding of Mr. Thomas's complete social history would have led Dr. Allen to testify unequivocally that Mr. Thomas suffered from "profound schizophrenia, psychosis, and organic brain damage" and would have precluded any diagnoses of personality disorders.  *Id.* at ¶¶ 18-19.  Dr. Allen would have testified that Mr. Thomas had no control over his actions at the time of the crime and did not understand his conduct was wrong due to his longstanding and persistent mental illness.  *Id.* at ¶ 20.

Had he testified, Mr. Fitzgerald would have opined that, based upon Thomas's criminal history and the circumstances surrounding the conviction, Thomas would not have even been eligible to be considered for parole for a minimum of forty years.  Ex. 11 at ¶ 10.  Furthermore, Fitzgerald was prepared to testify regarding the classification system of the Texas Department of Criminal Justice.  Ex. 11 at ¶ 11.  Under that system, every offender is assigned a security level, with G1 (General Population 1) being the lowest security level, to G5, and Ad. Seg. 1 (Administrative Segregation 1) to Ad. Seg. 3, being the highest.  Ex. 11 at ¶ 11.  Mr. Fitzgerald's opinion, which he never got to express, was that the least restrictive classification Mr. Thomas could have advanced to was a G3 level and that Mr. Thomas would never have been allowed to work outside the penitentiary.  Ex. 11 at ¶ 12.  Mr. Fitzgerald would also have testified that TDCJ routinely incarcerates offenders under extremely restrictive conditions, thereby limiting the incidents of crimes within the penal system.  Ex. 11 at ¶ 13.  Finally, Mr. Fitzgerald was prepared to give a detailed overview of the day in the life of an inmate and to show the jury a video that chronicles the inner workings of the penal system.  Ex. 11 at ¶ 15.

Moreover, crucial expert involvement and evidence was available, had counsel thought to

seek it out.  When representing someone as severely mentally ill as Andre, appropriate expert assistance is crucial.  *See, e.g.*, ABA Guideline 10.11(F)(2); ABA Guideline 11.1(A)(3); 11.7(F).  Habeas counsel elicited the assistance of three experts who provided pivotal insights into Mr. Thomas's background, behavior, and illness.

Jan Vogelsang, M.S.W., B.C.D., provided insight into the specialized areas of "family cohesion" and biopsychosocial development, with particular attention paid to the differences in how minority families treat members who are mentally ill – and how such treatment may affect the perceptions and descriptions of the symptoms of the illness.  Ex. 33 at ¶¶ 3; 4 and 8.  While Ms. Vogelsang did not conduct an exhaustive review of Mr. Thomas's case, she saw enough to know that Ms. Vogelsang's insights and expertise would have been crucial to explaining the explanations and attitudes of Mr. Thomas's family toward his symptoms and illness, and Mr. Thomas's behavior in the prodromal phases of his illness.

The line between cultural beliefs and mental illness is a very delicate one. Cultural beliefs must be taken into consideration when determining the presence of a mental disorder and the impact of that disorder within the family.  In Mr. Thomas's family, mental illness was so common and accepted that patently bizarre behavior was tolerated, misunderstood, and ignored, to the detriment of Mr. Thomas's ability to fortify his efforts to control his prodromal (the early phases that mark the beginning of the full onset of a mental illness) symptoms and delusional system.  Ex. 33 at ¶ 10.

Misunderstood, Mr. Thomas's family's testimony was utilized by the state to argue that Mr. Thomas did not have a difficult background, and that any mental illness was exaggerated for purposes of manipulation.  With expert assistance, that testimony, and more, could have been used to explain the negative environment in which Andre attempted to cope with his debilitating illness.

As Jan Vogelsang states:

Mr. Thomas's parents' (Rochelle and Danny Thomas) own symptoms of mental illness, hypersexuality, impaired reasoning, perceptual disorders, self-medication with drugs and alcohol, and hyperreligiosity further precluded them from being able to intervene in their sons' social deterioration and religious delusions. . . . Family support can be the only safety net or reality check a person beset with delusions may have.  Mr. Thomas's family support was a facade, with huge holes created by the family's own paranoia, delusions, and neglect. Andre became increasingly psychotic, moving in the years leading up to the crime from the prodromal phase into the active phase of his psychosis.  In response, his family only isolated him further.

Ex. 33 at ¶¶ 11 and 13.

Neuropsychological testing was demanded by Mr. Thomas's extreme mental illness. Since conducted by experts retained by habeas counsel, it reveals the depth of Andre's illness, as well as the organic brain damage which underscores and aggravates the schizophrenia Mr. Thomas suffers.  *See* Exs. 14 and 35.  The testing and interpretation of the test data by qualified experts reveals that Mr. Thomas suffers from paranoid schizophrenia, and that he has "brain impairments in addition to those associated with that mental illness."  *See* Ex. 14 at ¶ 5.  The brain damage that he has suffered is "severe and significant" and likely results "both from mental illness and likely head injury."  *Id*. at ¶ 10.  Moreover, "[i]nformation that is known about Andre Thomas's brain dysfunction was made more severe by circumstances of his childhood development."  Ex. 35 at ¶ 63.  These dramatic impairments hampered his ability to appreciate the context of his acts (during the murders) and the depth of his illusions.  Ex. 14 at ¶ 10; Ex. 35 at ¶¶ 46-49.  They were longstanding, and explain Mr. Thomas's behavior from an early age. Ex. 35 at ¶¶ 78-80; 97-100.  Moreover, these findings would have conclusively rebutted the state's assertions that Mr. Thomas has been malingering or "faking" his symptoms and delusions.  Ex. 35 at ¶ 16-17.  Moreover, they would have made clear the relevance of the multi-generational pattern of mental illness, rendering highly relevant the evidence of, *e.g.*, Brian Thomas's illness that the state was successful in keeping out.  *See* Ex. 35 at ¶ 96.  Such expert

views would have lent undeniable and critical support to the defense case at both phases of Mr.

Thomas's trial.  The defense team's failure to avail themselves of such critical expert assistance

was undeniably deficient, and prejudicial.

> **D.** **Mr. Thomas was Prejudiced by his Counsel's Deficient Punishment Phase Performance.**

To meet the second, or "prejudice" prong of the *Strickland* test, Applicant must show "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  *Strickland*, 466 U.S. at 694.  A "reasonable probability" is "a

probability sufficient to undermine confidence in the outcome."  *Id*.  The constitutional test for

prejudice under Strickland is the same as the test for materiality under *United States v. Bagley*,

474 U.S. 667 (1985):

> The question is not whether the defendant would more likely than
> not have received a different verdict with the evidence, but
> whether in its absence he received a fair trial, understood as a trial
> resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 534.  Thus, if "there is a reasonable probability that at least one juror would

have struck a different balance," the petitioner has established prejudice.  *Wiggins*, 539 U.S. 510,

537 (2003).

The importance of sufficiently investigating and presenting mitigating evidence in a

capital case cannot be overstated.  In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court

established that the principle emanates from the "fundamental respect for humanity

underlying the Eighth Amendment.  [This regard mandates the] . . . consideration of the

character and record of the individual offender and the circumstances of the particular offense as

a constitutionally indispensable part of the process of inflicting the penalty of death."  *Id*. at 304;

*see also Roberts (Harry) v. Louisiana*, 431 U.S. 633 (1977); *Roberts (Stanislaus) v. Louisiana*,

428 U.S. 325 (1976).

Only through a process that requires the sentencer to "consider, in fixing the ultimate punishment of death[,] the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind," *Woodson v. North Carolina*, 428 U.S. at 304, can capital defendants be treated "as uniquely individual human beings."  *Id*.  As Justice O'Connor has explained, "evidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citation omitted).  *See also Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) (evidence of a "turbulent family history [is] particularly relevant" to an individualized sentencing determination.).

Thus, the definition of "mitigating" is extremely broad.  In *Lockett*, the Court defined a mitigating circumstance as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604.  When assessing the potential impact of the mitigating evidence, the *Williams* Court emphasized that whether the mitigating evidence might have resulted in a different outcome is an entirely separate question from whether it negates future dangerousness or the prosecution's case for death eligibility:

> While [evidence of Williams' voluntary surrender, co-operation with the police and remorse], coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, *or* the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability.  *See Boyde v. California*, 494 U.S. 370, 387, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).  The circumstances recited in his several confessions are consistent with the view that in each case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation. ***Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut***

*the prosecution's death-eligibility case*.[50]

*Id*. at 398 (emphasis added).  The Court made it clear that prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility.  The question is not whether there is sufficient evidence to justify a death sentence, *see e.g. Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (the *Brady* and *Strickland* prejudice test is "not a sufficiency of evidence test"), it is whether the totality of the mitigating evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability."  *Williams*, 529 U.S. at 398.

The deficient performance of Mr. Thomas's counsel was undoubtedly harmful.  The prejudice was twofold: not only was the jury not given the extensive mitigating history that existed, they were given an inaccurate picture that belied the real story, and permitted the state to paint the most aggravated picture of Mr. Thomas possible.  In fact, there was a profoundly compelling story to be told about Mr. Thomas's life, his struggles with his longstanding and overwhelming mental illness, and the abuse and neglect that made it impossible for him to get the help he needed.  Had counsel conducted an appropriate and timely investigation, this information would have been revealed, and could have been presented to the jury.  Had counsel consulted with and retained appropriate experts, he would have been able to show the jury the undisputed depth of his illness, its longstanding nature, the role it played in the crime, and Mr. Thomas's undeniable insanity at the time.  It is information that is essential not only to understanding – and humanizing – Mr. Thomas, but also to understanding how he came to commit this tragic offense and his reduced culpability.  It is, in short, mitigating in the most essential – and constitutional – sense, and could have provided a powerful reason for at least one

---

[50] This is particularly true in Texas cases because the jury is asked to assess the defendant's future dangerousness in the first special issue.  The jury proceeds to the second special issue only if it unanimously determines that the defendant may pose a future danger.  The second special issue is an entirely separate and distinct inquiry into the defendant's moral culpability in light of any mitigating evidence.

juror to find that a sentence less than death was appropriate.   Had this evidence been presented, individually or cumulatively, there is at least a reasonable probability that the outcome of the trial would have been different.  *Strickland*, 466 U.S. at 694 (1984).  Counsel's performance denied Mr. Thomas his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments.  As a matter of fact and law, Mr. Thomas is entitled to relief.  *See Strickland; Williams; Wiggins*; *Rompilla.*

> **E.    The State Habeas Court's Findings of Fact are Unreasonable in Light of the Evidence Presented.**

The trial court's findings of fact relevant to this claim are found in FF ¶¶ 129-148.  They rely almost entirely on the affidavit given to the State by R.J. Hagood, and fail to address the glaring conflicts between Mr. Hagood's affidavit, and that of his co-counsel, Bobbi Peterson (Ex. 27), her legal assistant Leah Estep (Ex. 9), the mitigation specialist Shelli Schade (Ex. 30), defense experts Kate Allen (Ex. 1) and Larry Fitzgerald (Ex. 11), and the numerous lay witnesses who verify that they were never contacted by defense counsel.  *See* Ex. 2, 3, 5, 6, 7, 10, 16, 18, 19, 20, 21, 22, 24, 26, 29, 32, 34.  To blindly credit Mr. Hagood's affidavit in the face of contradictory affidavits from more than twenty other people is patently unreasonable.

Thus, the trial court finds that "Mr. Hagood spent many months preparing all aspects of the case.  He states that he had talked to several family members regarding the applicant's background and childhood."   FF ¶ 131.  Mr. Hagood – and the court – fail to identify a single such witness by name.  Moreover, the numerous family members who gave affidavits to habeas counsel uniformly state that they were never contacted by defense counsel.  *See* Ex. 2, 3, 5, 6, 7, 10, 16, 18, 19, 20, 21, 22, 24, 26, 29, 32, 34.

The trial court finds that "Mr. Hagood also prepared two of the applicant's brothers and his father.  They, too, had done a much better job in Mr. Hagood's office than they were able to

in court.  Mr. Hagood states that once he realized that they were not coming across well, he abandoned his questioning of those three witnesses."  FF ¶ 134.  However, only one of Mr. Thomas's brothers – Danny Ross – testified for the defense at trial, not two, and not his father. His father states in the affidavit he provided to defense counsel that he had no contact with Mr. Hagood prior to trial, and that Mr. Hagood only talked to him once, when he saw him in Court. Thus the trial court's findings are contrary to the record, and evidence offered by other witnesses.

The Trial Court finds that "Mr. Hagood states that he instructed Ms. Schade to do as much backgrounds as possible."  However, Mr. Hagood failed to supervise or guide Ms. Schade, who had never before been involved in a capital case.  *See* Ex. 30.  It was Mr. Hagood's responsibility, according to the Guidelines, to see that Ms. Schade was doing an effective and thorough job.  His attempt – as the Court finds at ¶¶ 135-149 – to place blame on a mitigation specialist he failed to supervise, *see* Ex. 30, or an expert he failed to adequately prepare, *see* Ex. 1, does nothing to mitigate counsels' deficiencies.  Instead, it underscores Mr. Hagood's lethal misunderstanding of his responsibilities.  Under the law, the findings entered by the Court misconstrue the evidence, and their import is not entitled to the deference of this Court.

In finding #144 the trial court states that "Mr. Hagood concentrated on relatives and friends with current close relationships to the applicant.  Strategically, Mr. Hagood states that he did not want to introduce childhood anecdotes or the history of distant relations."  Neither the court nor Mr. Hagood specify who those relatives and friends might be.  As outlined above, this finding is directly contradicted by numerous other affidavits which belie any assertion that Mr. Hagood had any significant contact with any of Mr. Thomas's relations or friends.  Moreover, without an adequate investigation – which the facts make clear did not take place in Mr. Thomas's case - a decision to introduce – or not introduce – mitigating evidence cannot be

deemed strategic or tactical.  *See Strickland*, 466 U.S. at 690; *Wiggins*, 123 S.Ct. at 2536.

In finding #145, the trial court states that "[t]hrough his investigation and interviews and [sic] friends and family members, Mr. Hagood had been told that the applicant had engaged in the [sic] conduct as a child long before any onset of mental illness that involved cruelty to animals or setting fires."  There is no citation to support this self serving assertion in either Mr. Hagood's affidavit or the trial court's finding.

The balance of the findings essentially assert that Mr. Hagood did not present "evidence of the family background and history of mental problems and alcohol abuse," ¶ 141 because it would "cut both ways," ¶ 142, and "make him more of a future danger," ¶ 143, and he also thus did not "seek out all friends and relatives."  These findings are unsupported by the evidence and the law.  Mr. Hagood's assertions that he conducted even a minimal investigation are contradicted by the affidavits of at least twenty other witnesses.  As noted above, without an adequate investigation, no resulting decision as to paths for further investigation, or what mitigation to present, can be deemed reasonable, tactical, or strategic.  *See Strickland*, 466 U.S. at 690; *Wiggins*, 123 S.Ct. at 2536.  Finally, the Supreme Court has made it abundantly clear that "mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."  *Williams*, 529 U.S. at 398.

The trial court's findings are an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §2254(d).

**F.     The Trial Court's Conclusions of Law are Contrary to and an Unreasonable Application of Clearly Established Supreme Court Law.**

The state habeas court's minimal conclusions of law on this issue are as follows:

100.   The applicant has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense or that there is a

reasonable probability that but for counsel's unprofessional errors the result of the proceeding would be different.

102.   The applicant has failed to prove by a preponderance of the evidence that Mr. Hagood was not employing trial strategy in his selection of punishment witnesses.

103.   The applicant has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient and that he was not acting as a reasonable competent attorney in that his trial strategy was not in the range of competence required of attorneys in criminal cases in his selection and handling of punishment witnesses.

For the reasons detailed above, Mr. Thomas submits that the conclusions as to deficient performance – reliant entirely upon the court's findings of fact – are unreasonable in light of the evidence presented.  Moreover, *Strickland* does not impose an evidentiary burden on a petitioner seeking to show that his counsels' performance was constitutionally deficient.

"The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  *Strickland*, 466 U.S. at 693-94. Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[51]  *See Williams*, 529 U.S. at 405-406 (expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court); *see also Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990); *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 18 (6th Cir. 2005).  Thus, the trial court's imposition of a preponderance of the evidence

---

[51] In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard."  *Id.* at 595. Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard."  *Id.* *See also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

standard on either the deficiency or prejudice prong of Mr. Thomas's claim of ineffective

assistance of counsel is contrary to Supreme Court law, and the trial court's conclusions of law

are not entitled to the deference of this Court.  28 U.S.C**.** §2254(d).

**XV.    The Trial Court Placed Unconstitutional Limitations on Mr. Thomas's Presentation
of Mitigating Evidence.**

Almost 30 years ago, the Supreme Court held that limiting the "range of mitigating

circumstances which may be considered by the sentencer" is unconstitutional.  *Lockett v. Ohio*,

438 U.S. 586, 608 (1978).  The Eighth and Fourteenth Amendments require that the jury not be

"precluded from considering, *as a mitigating factor*, any aspect of a defendant's character" that

the accused presents as a basis for sparing his life.  *Id*. at 604 (emphasis in original).  *See also*

*Brewer v. Quarterman*, 127 S. Ct. 1706, 1709-10 (2007); *Abdul-Kabir v. Quarterman*, 127 S. Ct.

1654, 1665 (2007); *Kansas v. Marsh*, 126 S. Ct. 2516, 2525 (2006); *Eddings v. Oklahoma*, 455

U.S. 104, 110 (1982).

The threshold for mitigating evidence is low:  "[r]elevant mitigating evidence is evidence

which tends logically to prove or disprove some fact or circumstance which a fact-finder could

reasonably deem to have mitigating value."  *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)

(*quoting State v. McKoy*, 323 N.C. 1 (1988) (dissenting opinion of Exum, C.J.)).  The Supreme

Court has held that "virtually no limits are placed on the relevant mitigating evidence a capital

defendant may introduce concerning his own circumstances."  *Tennard v. Dretke*, 542 U.S. 274,

285 (2004) (*quoting Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).

At Mr. Thomas's trial, the trial court unconditionally violated these principles by limiting

the relevant mitigating evidence Mr. Thomas sought to present, and that the jury was able to

consider.  On habeas review, the state court upheld these unconstitutional limitations, thus

"result[ing] in a decision that was contrary to…clearly established Federal law…"  *See* 28 U.S.C.

§ 2254(d).

**A.    The State Court Reached a Result Contrary to Established Supreme Court Precedent when it Determined that the Trial Court Properly Precluded the Defense's Mitigation Expert from using the Term "Mitigation."**

During the trial, the prosecution requested, and was granted a " Rule 705" hearing in order to limit the evidence presented by defense expert, Kate Allen, Ph.D.  R.R. Vol. 41 p. 4. The prosecution also asked for a motion *in limine* to prohibit Dr. Allen from being asked to render any opinion concerning what is mitigating, and to forbid her from referring to "a mitigation time line, a mitigation report, a mitigation specialist [or] a mitigation expert, because that implies and carries the weight that what was being prepared, what's reviewed, or what she is saying is, in fact, mitigation."  R.R. Vol. 41 p. 22-23; *see also* C.R. Vol. 1 p. 94.  The motion *in limine* also sought to prohibit the mitigation time line from being brought before the jury.  *Id*. at P. 23.  The trial judge granted this motion in its entirety, emphasizing that the defense team's mitigation specialist could not be called a "mitigation specialist" in open court, and instead should be referred to as a "social worker."  R.R. Vol. 41 p. 24.[52]  The trial judge again unconstitutionally barred the jury from hearing or considering relevant mitigating evidence when he sustained the prosecution's objection to Dr. Allen testifying about Mr. Thomas's moral culpability.  R.R. Vol. 41 p. 123-124.  The trial judge instructed Dr. Allen to "avoid anything that says mitigation or moral culpability."  R.R. Vol. 41 p. 124.   On review, the state habeas court upheld these limitations without analysis. CL ¶ 116.

The trial court's findings merely recited the events at trial.  FF ¶¶ 101-102.[53]   Its

---

[52]    The use of the term "social worker" like Mr. Ashmore's repeated refusal to address Dr. Allen as "Dr." – was demeaning, and intended to undermine her credibility, and the weight of what she has had to offer.

[53]    The trial court alternatively found that Dr. Allen was an "expert with a degree in family counseling" and a "degree in social work" and that the exclusion of any conclusions she might offer regarding Mr. Thomas' medical treatment was proper.  FF ¶ 101; CL ¶ 120.  In fact, Dr.

conclusions of law failed to cite or analyze any Eighth or Fourteenth Amendment law – or any law for that matter – regarding the presentation of mitigation evidence.  *See* CL ¶¶ 116-120.  The trial court's conclusion that its actions at trial in prohibiting any reference to testimony as "mitigating" or Dr. Allen as a "mitigation specialist" are an unreasonable application of Supreme Court precedent, specifically the principles set forth in  *Tennard*, 542 U.S. at 285, and *Eddings*, 455 U.S. at 114, which state that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances."  Indeed, the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (1989, 2003), long referred to by the Supreme Court as the "guides to determining what is reasonable," *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (*quoting Strickland v. Washington*, 466 U.S. 668, 688 (1984)), specifically call for a "mitigation specialist" to serve on every capital defense team.  Guideline 4.1.A.1.  As such, the use of these terms in Mr. Thomas's trial should have been allowed.

**B.      The State Court Reached a Result Contrary to Supreme Court Precedent When it Determined that the Trial Court Properly Precluded the Defense's Mitigation Expert from Testifying about Mr. Thomas's Remorse.**

During the trial, the prosecution also requested in the motion *in limine* that Dr. Allen be prohibited from testifying that Mr. Thomas is remorseful and that he expressed remorse to her. Despite the numerous times the state had elicited testimony from its witnesses regarding statements made by Mr. Thomas, the trial court ruled that: Dr. Allen would be prohibited from testifying to any conversations she had with Mr. Thomas the day prior (the only time she interviewed Mr. Thomas prior to her testimony), stating:

---

Allen has a Ph.D. in sociology, a Masters in social work, and has been providing psychiatric care for over 33 years.  Ex. 1 ¶ 2.  The state habeas court (inaccurate) estimation of her skills has clearly not changed since the time that same court, presiding over the trial in this case, unconstitutionally limited Dr. Allen's testimony at trial.

> If it's in evidence – it has been previously put into evidence and
> something she relied on, that can be testified to.  She cannot testify
> to something she is relying on that has not been put into evidence.
> That is the difference, and, obviously, any conversations she would
> have had with the defendant yesterday falls into that category.

R.R. Vol. 41 p. 26-27.  Therefore, the jury was prohibited from hearing the relevant mitigating

evidence that Dr. Allen intended to testify about.

Dr. Allen stated in the Rule 705 hearing that she was going to testify about Mr. Thomas

telling her that he was "extremely sorrowful" about the murders and that he "talks to Laura and

... his son" while in his jail cell.  R.R. Vol. 41 p. 15.  Dr. Allen was also prepared to testify about

Mr. Thomas's multiple attempts to kill himself and about his feelings of being unsure whether he

was real or if other people were unreal, beginning around age ten.  R.R. Vol. 41 p. 13.  Dr. Allen

also intended to testify about Mr. Thomas's dysfunctional childhood, his lack of a father-figure,

and having to be raised by his two older brothers.  R.R. Vol. 41 p. 13-14.  Nevertheless, the jury

was unconstitutionally prohibited from hearing and considering all of this evidence – evidence

that could have resulted in a life verdict – by the trial court's error in prohibiting Dr. Allen from

testifying about her interview with Mr. Thomas.

When reviewing Mr. Thomas's habeas petition, the state court ruled that the trial court's

limitation on Dr. Allen's testimony was proper because, it concluded, Mr. Thomas's statements

to Dr. Allen were hearsay.  CL ¶ 117.  The state court failed to address the fact that Dr. Allen

was testifying as an expert and, as such, was entitled to rely on interviews conducted in

preparation for her testimony, and to testify about the content of the interview to the extent that it

informed her opinion.  In the context of her expert opinion testimony, Mr. Thomas's statements

of remorse fell outside of the hearsay rules, and Dr. Allen should have been allowed to testify

about them.

Again, this Court need not defer to the state court's findings under AEDPA, 28 U.S.C. §

2254(d), because the limitations it placed on Dr. Allen's testimony in the mitigation phase of Mr. Thomas's trial – and the conclusions of law upholding those limitations – run afoul of established Supreme Court precedent, which establishes that  limiting the "range of mitigating circumstances which may be considered by the sentencer" is unconstitutional.  *Lockett*, 438 U.S. at 608. *See also Brewer*, 127 S. Ct. at 1709-10; *Abdul-Kabir*, 127 S. Ct. at 1665; *Kansas*, 126 S. Ct. at 2525; *Eddings*, 455 U.S. at 110.  "[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence – because it is forbidden from doing so…by judicial interpretation…the sentencing process is fatally flawed." *Abdul-Kabir*, 127 S. Ct. at 1675.

**XVI.   Sentencing Mr. Thomas to Death Violates the Prohibition on Cruel and Unusual Punishment Set Forth in The Eighth Amendment to the United States Constitution Because Mr. Thomas is Indisputably and severely mentally Ill.**

> **A.   Evolving Standards Now Make It Unconstitutional to Execute the Severely Mentally Ill.**

> > It must be remembered that for the person with severe mental illness who has no treatment the most dreaded of confinements can be the imprisonment inflicted by his own mind, which shuts reality out and subjects him to the torment of voices and images beyond our own powers to describe.

*Olmstead v. L.C.*, 527 U.S. 581, 609-10 (1999).

> > [They] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan…Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins v. Virginia*, 536 U.S. 304, 318 (2002).

Both of these passages aptly describe the severely mentally ill – those who suffer from the most debilitating of mental disabilities including paranoid schizophrenia.  While the former

quotation does indeed refer to the mentally ill, the latter refers to the mentally retarded –

individuals who, along with juveniles, have now been exempted from capital punishment.  *See*

*id.* (mentally retarded); *Roper v. Simmons*, 543 U.S. 551 (2005) (juveniles).

The *Atkins* and *Roper* exceptions are based on the Supreme Court's narrowing

jurisprudence, a body of cases holding that the most extreme penalty of death must be reserved

for only the most culpable murderers.  *See Atkins*, 536 U.S. at 305 (citing *Godfrey v. Georgia*,

446 U.S. 420, 433 (1980)); *Roper*, 543 U.S. at 568 ("Capital punishment must be limited to those

offenders who commit a narrow category of the most serious crimes and whose extreme

culpability makes them the most deserving of execution.") (internal quotations omitted); *see also*

*Kennedy v. Louisiana*, 128 S.Ct. 2641, 2650 (2008) (capital punishment should "be limited to

those offenders who commit a narrow category of the most serious crimes and whose extreme

culpability makes them the most deserving of execution.") (internal quotations omitted).

Similarly less culpable, the severely mentally ill should be similarly exempted from the

ultimate sanction of death.  The severely mentally ill, like juveniles and the mentally retarded,

suffer from poor impulse control and the inability to engage in logical reasoning, to learn from

their mistakes, to conform their conduct to societal norms, and to assist in their defense.  Indeed,

the American Bar Association, the American Psychological Association (APA), the National

Alliance for the Mentally Ill and the American Psychiatric Association (APsA) all agree that

severely mentally ill defendants should be exempted from capital punishment because their

symptoms lessen their culpability.  *See* Ronald Tabak, *Symposium: Overview Of Task Force*

*Proposal On Mental Disability And The Death Penalty*, 54 Cath. U. L. Rev. 1123, 1123

(Summer 2005) (task force composed of ABA, APA, and APsA members); *see also* ABA Report

with Recommendation No. 122A, Adopted August 2006, available at

http://www.abanet.org/leadership/2006/annual/onehundredtwentytwoa.doc.

In line with the joint ABA/APA/APsA recommendation, even if this Court determines that a new trial is not warranted, Mr. Thomas's death sentence should be ruled unconstitutional under the Eighth Amendment and commuted to a sentence of life in prison.  At a minimum, Mr. Thomas's case should be remanded in the manner the Supreme Court has often employed, to allow the State of Texas to determine the proper criteria for assessing whether a defendant is severely mentally ill and to hold an evidentiary hearing to determine whether Mr. Thomas meets that standard.  See Atkins, 536 U.S. at 317 ("As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'").

**B.      The State Habeas Court's Decision on this Claim is Reviewable by this Court Under 28 U.S.C. § 2254(d).**

**1.      There are No Directly Relevant Findings of Fact.**

The trial court and counsel for State acknowledge that Thomas was suffering from severe psychosis – i.e. a complete loss of connection to reality, delusions, and hallucinations – throughout the day of the crime and for a long period thereafter.  *See* FF at ¶ 13-24, 28-33. However, the trial court did not make any factual findings regarding whether or not Mr. Thomas is, or has been at any time, mentally ill.  Therefore, this Court need not defer to any finding of the trial court with respect to this claim for relief, because the trial court made no relevant findings.

Mr. Thomas has a well-documented medical history of severe mental illness as described *supra*.  The details of the crime indicate he existed in an intricate and completely false delusional system – a system that was so real to him that he believed his family was still alive after he had killed them.  Mr. Thomas was, both at the time of the crime and at all times since, so severely mentally ill and psychotic that he removed one of his own eyes with his bare hands shortly after

the crime and then removed the other and ate it.  This second enucleation occurred at a time when Thomas could not possibly been under the influence of any drug, and after being in the care of the Texas correctional system's mental health professionals for years.  Thomas has repeatedly been diagnosed with paranoid schizophrenia.  Indeed, it is now clear that even after the trial, the State's doctors believe that Thomas remains paranoid schizophrenic.  Ex. 176.

> **2.     The Adjudication of this Claim Constitutes an Unreasonable Application of Clearly Established Federal Law.**

The state habeas court's decision not to extend *Atkins* and *Roper*'s categorical prohibitions to the severely mentally ill is an unreasonable application of clearly established federal law.  *See Williams v. Taylor*, 592 U.S. 362, 408-409 (O'Conner, J. delivering opinion of the Court with respect to Part II of the decision) (noting that §2254(d)(1)'s "unreasonable application" clause does allow federal courts to consider habeas applications founded on the trial court's unreasonable refusal to apply a legal principle to a new context where it should apply).  As fully discussed below, all of the findings underlying the Supreme Court's findings in *Atkins* and *Roper* are equally applicable to the severely mentally ill, and therefore the prohibitions announced in those cases reasonably should have been applied to the severely mentally ill by the trial court.

> **C.     Execution of The Severely Mentally Ill is Cruel and Unusual Punishment.**

*Atkins* was based on three judgments about the lesser culpability of mentally retarded defendants – judgments that apply with equal force to the severely mentally ill.  The three judgments pertained to:  (1) "the relative culpability of mentally retarded offenders" compared to other offenders, (2) "the relationship between mental retardation and the penalogical purposes served by the death penalty", and (3) the fact that "some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards."  *Id.* at 318-321.

### 1.      The Relative Culpability of the Severely Mentally Ill is less than that of the Average Offender.

The *Atkins* Court found the mentally retarded to be less culpable than the average criminal offender because they "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318. Additionally, the Court found that they are more likely than others to act on impulse rather than according to a plan, and that they are likely to go along with the ideas of others than making their own decisions. *Id.* at 318. Despite these facts, the Court noted that under laws of many states, the mentally retarded sometimes are found to be competent to stand trial and to be legally sane. *Id.* at 318. Thus, the Court concluded that while the mentally retarded should not be exempt from criminal sanctions entirely, their lesser personal culpability makes them unfit for capital punishment. *Id.* at 318.

Many have noted that the severely mentally ill, such as those with schizophrenia and bi-polar disorder, share these culpability-mitigating characteristics. "Within hours after the decision in Atkins was announced" the National Alliance for the Mentally Ill noted that Atkins's criteria applied with equal force to the mentally ill. Tabak, 54 Cath. U. L. Rev. at 1123. Like the mentally retarded, the severely mentally ill suffer from an inability to control their conduct – i.e., they have poor impulse control. Diagnostic and Statistical Manual of Mental Disorders-IV-Text Revision (2005) ("DSM-IV") at 297, 300 (regarding co-occurring psychotic symptoms of Schizophrenia). Further, the severely mentally ill, especially those with schizophrenia, are unable to adequately process information, to communicate effectively, to interpret the conduct and reactions of others, and to engage in logical reasoning. *Id.* at 297-302 (regarding and schizophrenia and related disorders).

Indeed, psychotic, schizophrenic persons – by definition – lack the ability to reason in a logical manner and adequately process information, because their reality is defined by a completely illogical, delusional system.  *See id.* at 299-300.  For instance, it is undisputed that while in custody awaiting trial, and after he plainly was not under the influence of any substance, Mr. Thomas ripped his own eye out of its socket in the misguided belief that God commanded him to do so.  This conduct was indisputably the product of wholly illogical thinking on Mr. Thomas's part, caused by his mental illness.

Following *Atkins*'s reasoning, because severely mentally ill offenders lack the faculty to behave and calculate to the level of even the average murderer, they simply cannot be held to the same standard as society's most culpable criminals.  Thus, by virtue of their lesser culpability alone, the severely mentally ill should be exempted from capital punishment.

## 2.    Executing the Severely Mentally Ill lacks any Penalogical Purpose

The Atkins Court also ruled that the mentally retarded should not be executed because their execution would not serve any valid, penalogical purpose.  *Atkins*, 536 U.S. at 319 (citing *Enmund v. Florida*, 458 U.S. 798).  Only two social purposes justify the imposition of the death penalty:  1) deterrence, and 2) retribution.  *See Atkins*, 536 U.S. at 319.  "Unless the imposition of the death penalty…measurably contributes to one or both of these goals, it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment."  *Id.* at 319 (internal quotations omitted).  Because of their unique symptoms, execution of the severely mentally ill also does not serve any valid policy goal.  *See State v. Ketterer*, 855 N.E.2d 48, 85 (Ohio 2006) (Lundberg Stratton, J. concurring).

Justice Stevens noted for the Court in *Atkins* that the same qualities that lessen the culpability of the mentally retarded prevent them from being deterred by the prospect of the death penalty.  536 U.S. at 319-20.  Their poor impulse control, deficits in logical reasoning and

other diminished capacities prevent them from reasonably altering their behavior in response to the threat of grave punishment.  *Id.*  The severely mentally ill, particularly schizophrenic patients, are equally unlikely to be deterred by the threat of execution.  A person driven by delusional beliefs cannot make a balanced, logical judgment regarding the criminal sanction that will result from particular conduct.

*Atkins* also noted that executing the mentally retarded does not do retributive justice – *i.e.*, it does not ensure that criminals get their "just deserts" – because retributive punishment must be proportional to culpability.  *Id.* at 319.  Therefore, the lesser culpability of the mentally retarded does not warrant extreme retribution.  *Id.*  The same is again true of the severely mentally ill.  Their lesser culpability – a result of their inability to logically reason, respond appropriately to social interactions, and to control impulses – makes the death penalty a disproportional punishment.

> ### 3.       The Severely Mentally Ill's Symptoms Undermine Judicial Protections.

The third basis for the ruling in *Atkins* was that the unique characteristics of the mentally retarded are likely to undermine the efficacy of many of the procedural protections that are critical to ensuring that the death penalty is applied only to the most culpable offenders, and in an even-handed, non-arbitrary manner.  *See id.* at 320-321.  The *Atkins* Court explained:

> The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), is enhanced, not only by the possibility of false confessions, but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors.  Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes.  As Penry demonstrated, moreover, reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the

> likelihood that the aggravating factor of future dangerousness will
> be found by the jury.  492 U.S. at 323-325.  Mentally retarded
> defendants in the aggregate face a special risk of wrongful
> execution.

*Id.* at 320-21.

The same significant concerns about the wrongful imposition of the death penalty are present in prosecutions of the severely mentally ill.  The severely mentally ill, like the severely retarded, are often determined by juries – even with no supporting evidence – to be highly likely to recidivate.  Tabak, 54 Cath. U. L. Rev. at 1126-29.  Further, their affect, often unchanging or flat, is typically interpreted by the jury as showing lack of remorse, even when the defendant's demeanor is a side effect of psychotropic medication administered to allow the defendant to attend the trial.  *Id.*  The severely mentally ill also often instruct their counsel not to bring up certain details of their mental illness, because of the associated social stigma and the effect such evidence may have on family members.  *Id.*  Additionally, the severely mentally ill are also more likely unwittingly to waive rights and offer confessions, particularly where delusions or illogical motivations prompted their conduct.  *See id.* at 1127.  Thus, to prevent the unjustified imposition of the death penalty on the severely mentally ill, they should be exempted from capital punishment.

### D.    Evolving Standards of Decency Warrant a Finding that Mr. Thomas's Sentence Violates the Eighth Amendment

In addition to their judgments about the lesser culpability of the mentally retarded and juveniles, Atkins and Roper also determined that our evolving standards of decency now dictate that executing these offenders is cruel and unusual.  *See Atkins*, 536 U.S. at 311-316; Roper, 543 U.S. at 561; *see also Trop v. Dulles*, 356 U.S. 86 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. ...The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.").

The evolving standards of society now also indicate that execution of the severely mentally ill is cruel and unusual punishment.  Fifteen states plus the District of Columbia have abolished the death penalty completely.  Recently, New York's Supreme Court ruled its death penalty statute unconstitutional (*see People v. LaValle*, 817 N.E.2d 341 (N.Y. 2004)) and New Jersey has enacted a moratorium on executions.  *See* N.J. P.L.2005, c.321; *see also* New Jersey Death Penalty Study Commission Report (Jan. 2007) (recommending abolition of death penalty).  The state of Connecticut prohibits the death penalty for defendants with significantly impaired mental capacity.  Conn. Gen. Stat. Ann. 52a.46a(h).  The Supreme Court of Florida recently commuted a death sentence on the grounds that the defendant's mental illness alone mitigated his culpability.  *See Offord v. State*, No. SC05-1611, 2007 Fla. LEXIS 951 at *7, *17 (Fla. May 24, 2007).  Further, at least three other states are also considering bans on capital punishment for the severely mentally ill.  *See* S.B. 24, 2007 Leg. (Ind. 2007); H.B. 1707, 2007-2008 Leg. (Wa. 2007); S.B.  5787, 2007-2008 Leg. (Wa. 2007); H.B. 553 Ed. 1, 2007 Leg. (N.C. 2007); S.B. 1067 Ed. 1, 2007 Leg. (N.C. 2007).  Of the 35 states that retain the death penalty, only eleven performed executions in 2009, and the number of death sentences each year has decreased dramatically since 1999.  Worldwide, 135 countries do not execute criminals either by law or in practice.[54]

---

[54]     And remarkably, in Fall 2009, the American Legal Institute ("ALI") effectively withdrew its support for the death penalty by eliminating § 210.6 from its Model Penal Code.  See F. Zimring, "Pulling the plug on capital punishment," Natl. Law Journal, Dec. 7, 2009.  This decision by the ALI is especially important because the ALI's original adoption of § 210.6 and its reasoning regarding the ability of courts and juries to reasonably and rationally reconcile "aggravating and mitigating" factors formed a key basis for the Supreme Court's decision in *Gregg v. Georgia* that the death penalty could be constitutionally imposed.  *See* 428 U.S. 153, 194 (1976).  The ALI's members approved a resolution removing the death penalty from the model penal code "in light of the current intractable institutional and structural obstacles to ensuring a minimally adequate system for administering capital punishment."  *See* April 15, 2009 Resolution, Adopted October 23, 2009, available at http://www.ali.org/_news/10232009.htm; *see also* Report of the Council to the Membership of

As the *Atkins* Court noted, in assessing whether standards of decency have evolved, "[i]t is not so much the number of…States that is significant, but the consistency of the direction of change."  536 U.S. at 315.  Under that paradigm, an exemption for the severely mentally ill is justified by the clear trend of disfavoring their execution.  Our evolving standards of decency now acknowledge that execution of these individuals is cruel and unusual.  Justice Pfeifer of the Ohio Supreme Court addressed this in calling for an exemption for the severely mentally ill:

> Jay D. Scott is in no other way a sympathetic man.  He is a twice-convicted murderer who does not appear to express remorse for his crimes.  But I cannot get past one simple irrefutable fact:  he has chronic, undifferentiated schizophrenia, a severe mental illness. Mental illness is a medical disease.  Every year we learn more about it and the way it manifests itself in the mind of the sufferer. At this time, we do not and cannot know what is going on in the mind of a person with mental illness.  As a society, we have always treated those with mental illness differently from those without.  In the interest of human dignity, we must continue to do so.

*Ohio v. Scott*, 748 N.E.2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting); *accord Corcoran v. Indiana*, 774 N.E.2d 495, 502 (Ind. 2002) (Rucker, J., dissenting) ("[T]he underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency"); *see also State v. Ketterer*, 855 N.E.2d 48, 85 (Ohio 2006) (Lundberg Stratton, J. concurring) (citing poll data showing public disapproval of executing the severely mentally ill and opining an exemption is appropriate); *Com v. Baumhammers*, 960 A.2d 59, 105 (Pa. 2008) (Todd, J. concurring) ("[T]he similarities between individuals with severe mental illness and those with mental retardation or juvenile status are strong enough to justify serious consideration by the country's legislators.").

In line with these well-reasoned opinions and societal trends, this court should find the

---

The American Law Institute On the Matter of the Death Penalty, April 15, 2009, available at http://www.ali.org/doc/Capital%20Punishment_web.pdf.

execution of the severely mentally ill unconstitutional.

       **E.**    **Objective Standards Exist for Identifying Severe Mental Illness.**

      The joint ABA/APA/APsA task force addressed and rejected the common argument that the severely mentally ill could not be exempted from the death penalty as a group because the mentally ill have varying symptoms with "differing degrees of permanency."   Taback, 54 Cath. U. L. Rev. at 1124.  First, there is a widely accepted methodology for assessing whether someone suffers from severe mental illnesses such as schizophrenia or bi-polar disorder – namely, the DSM-IV, which contains the standards for mental retardation that many states have used to implement Atkins.  To address the issue of varying symptoms among the mentally ill, the joint task force devised objective factors to be considered in determining whether the defendant has lessened culpability.  *See id.* at 1126-27.  The Texas Legislature can easily follow this model to implement its own methods of identifying severely mentally ill defendants, just as Texas and all other States did after *Atkins* and *Ford*.

      In sum, because of the lesser culpability of the severely mentally ill, the likelihood that they will be wrongly executed, and our evolving standards of decency, this Court should rule execution of the severely mentally ill to be unconstitutional in accordance with Atkins and Roper.

**XVII.  As Mr. Thomas is no Longer a Future Danger, his Death Sentence Violates the Eighth and Fourteenth Amendments.**

      Following the June 18, 2007, filing of Mr. Thomas's state habeas application, on December 9, 2008, Mr. Thomas - again believing the word of God compelled him to do so - gouged out his remaining eye.  As a result of this psychotic act, Mr. Thomas is now completely blind.  As set forth above, due to this new fact, on November 13, 2009, Mr. Thomas filed a Successor Petition in state court pursuant to the United States Constitution, the Texas Constitution, and Article 11.071, § 5 of the Texas Code of Criminal Procedure, which petition

presently remains pending.

In sum, based upon the new fact of Mr. Thomas's blindness, Mr. Thomas's death sentence is unconstitutional because that sentence now, more than ever, clearly violates the Eighth Amendment's prohibition of cruel and unusual punishment and the due process clause of the Fourteenth Amendment.  Simply put, as a blind man, Mr. Thomas is not capable of constituting "a continuing threat to society."  Consequently, there is no longer any legal basis for his execution.[55]  As a man whose delusions have already driven him to the unthinkable, his execution is purposeless and needless, and would thus violate both the Eighth Amendment and the Due Process clause of the Fourteenth Amendment.

### A.   Executing Mr. Thomas would not Measurably Serve the Goals of Deterrence or Retribution; His Execution is Therefore Prohibited by the Eighth Amendment.

#### 1.   Mr. Thomas's Execution would not Further the State's Goal of Deterrence.

Texas's statutory system for imposing capital punishment places paramount importance on specific deterrence or incapacitation.  After a defendant is found guilty of capital murder, Article 37.071(b)(1) requires the jury to determine "whether there is a probability that [he] would commit criminal acts of violence that would constitute a continuing threat to society."  TEX. CODE CRIM. PROC., Art. 37.071.  Any defendant for whom this special issue is answered "no" is sentenced to imprisonment for life.  *Id*.

Thus, Texas does not put to death all defendants convicted of capital murder.  Instead, the State chooses to execute only those who have been proven beyond a reasonable doubt to constitute a future danger to society.   The "future dangerousness" question can be seen as Texas's method of determining which offenders cannot be specifically deterred from further

---

[55] Mr. Thomas asserts that, because he is no longer a future danger to society, this successive application qualifies under 11.071, §5(a)(3) as well.

violent acts, and thus can only be executed.

Given Mr. Thomas's blindness, in which state he will remain until he dies, execution is no longer necessary to incapacitate him from further violent behavior.  As a blind man, his ability to threaten prison guards, staff, or the general prison population is essentially nonexistent.[56]

### 2.      Mr. Thomas's Execution would not Further the State's Goal of Retribution.

Under retributive theory, capital punishment serves as "an expression of society's moral outrage at particularly offensive conduct," *Gregg*, 428 U.S. at 183, and is "an attempt to right the balance for the wrong to the victim."  *Simmons*, 543 U.S. 551, 571 (2005).  In order for an execution to further the goal of retribution, the defendant must meaningfully understand that the state is taking his life to hold him accountable for his crime.  *See Ford v. Wainwright*, 477 U.S. 399, 421-422 (1986) ("[…] we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life.").  Thus, when a prisoner lacks the cognitive capacity to rationally answer for his conduct, his execution serves only as vengeance, not retribution.[57]

Severe mental illness serves as its own form of punishment for those who are burdened

---

[56]      Moreover, because this is a unique situation, Mr. Thomas can be spared from execution without weakening the general deterrent effect of the death penalty.  It is unreasonable to believe that prospective offenders will become more likely to commit murder because they perceive an opportunity to avoid a death sentence by gouging out both of their eyes.  Even if that were a legitimate consideration, the facts surrounding Mr. Thomas's blindness are easily distinguishable.  When he ripped out his eyes, it was a product of his severe mental illness, not a calculated move to avoid execution.  This is evinced by the fact that his right eye was removed prior to his original sentencing.  That Mr. Thomas insanely gouged out one if his eyes before he even knew whether he would receive the death penalty proves that he did not do so with the intention of escaping punishment.

[57]      "Retribution focuses on the offender's deserved punishment; revenge focuses on retaliation and tries to satisfy the victim's or society's desire to strike back at the criminal." Mary Ellen Gale, Retribution, Punishment, and Death, 18 U.C. Davis L. Rev. 973, 1033 (1985).

by it.  *See id.* at 408. (citing Blackstone for the proposition that "madness is its own punishment").  Mr. Thomas is severely mentally ill.  He believed that his victims were demons and that in carrying out their murder, he was only following God's command.  While in prison, Mr. Thomas has continued to be tormented as a result of his deteriorating mental state.  He suffers from auditory hallucinations, he has attempted to take his own life on multiple occasions, and ultimately, he removed both of his eyes with his bare hands.   Executing a man in this broken and pitiable condition does not meaningfully serve the State's goal of retribution.[58]

### B.   Executing Mr. Thomas would Violate the Eighth and Fourteenth Amendments because he is no Longer a Member of the Class of Individuals Texas has Deemed Eligible for Execution.

One of the central principles articulated by the Supreme Court in *Furman v. Georgia* was that state death penalty statutes must meaningfully limit the class of individuals who are eligible for execution.  *See Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J concurring) (stating that under current statutes "there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.").  In response, the Texas legislature sought to change its capital punishment system to reduce the potential for arbitrariness identified by *Furman*.  See *Jurek v. Texas*, 428 U.S. 262, 268-269 (1976).

Texas's first response to *Furman* was to amend its penal code to limit the types of homicide for which an offender can be charged with capital murder.[59]  *Id.*  After a defendant is convicted of capital murder, juries are asked to further narrow the group of offenders who should be subjected to the ultimate punishment by answering the "future dangerousness" question.  TEX. CODE CRIM. PROC. ANN., Art. 37.071 (Vernon Supp. 1997).  The question asks "whether there is

---

[58]    The severe and persistent nature of Mr. Thomas's mental illness is amply evidenced in his copious intake records, Correctional Managed Care reports, and other health and medical records.  *See* Exs. 172-191.

[59]    Texas Penal Code §19.03 defines capital murder as a murder as defined by Section 19.02(b)(1) in combination with one of nine enumerated circumstances or factors.

a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id*.  If the jury responds "no" to that question, the defendant is sentenced to life in prison.  *Id*.  It is only if the jury finds that there is a probability that the defendant will be a future danger that the defendant is then *eligible* for a sentence of death.[60]  *Id*. At this final point, the jury is asked to consider whether there is sufficient mitigating evidence to warrant a sentence of life imprisonment rather than death.  *Id*.

The function of the future dangerousness special issue has been authoritatively described as "further narrow[ing] the class of death-eligible offenders to less than all those who have been found guilty of an offense defined [as capital murder in Texas]."  *Smith v. State*, 779 S.W.2d 417, 420 (Tex. Crim. App. 1989) (internal citations removed).  Thus, Texas has chosen to narrow the group of people eligible for the death penalty in two stages: through the penal code's definition of capital murder and through an inquiry into future dangerousness.  By thus guiding jurors' discretion, Texas ensures that it will only execute the "worst of the worst" criminals.

> **1.    Executing a Person who is not a Member of the State-Defined Narrowed Class is Directly Opposed to *Furman's* Non-Arbitrariness Requirement and Therefore Violates the Eighth Amendment.**

Because Texas has chosen to use future dangerousness to define the group of people it is willing to execute, it cannot constitutionally execute someone, like Mr. Thomas, who is demonstrably outside that group. In *Gregg*, the Supreme Court explained that "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg,* 428 U.S. at 189.  This kind of guidance is necessary because without it "the system cannot function in a

---

[60]    Section 2 of Article 37.071 also recites another special issue, but that issue is only presented to the jury when the facts involve the law of parties.

consistent and a rational manner."  *Id.*

Texas guides jurors by removing offenders who do not pose a continuing threat to society from eligibility for the death penalty.  Mr. Thomas now belongs in that category of exempt persons.  The insane self-removal of his eyes has left him harmless.  He is easily constrained and monitored by prison officials and is of no threat to other inmates.  Executing him at this point would result in the death of a person who is beyond the narrowed scope of offenders the state made eligible for execution.[61]

### 2.    Because the State of Texas has Statutorily Prohibited the Execution of a Person who is not a Danger to Society, doing so would Violate the Due Process Clause of the Fourteenth Amendment.

When the Texas legislature enacted the future dangerousness question as part of its statutory system for implementing capital punishment, it effected a judgment that the State of Texas would not execute any offender who did not pose a continuing threat to society.   Having chosen to establish such a scheme, Texas must implement it in accordance with Due Process, even if doing so effectively grants more rights than might independently exist under the federal Constitution.  *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution - and, in particular, in accord with the Due Process Clause.").  In other words, statutory entitlements create rights, which, once given by a state, may

---

[61]      The Texas Court of Criminal Appeals has previously reformed a death sentence to one of life imprisonment where the defendant was found not to be a future danger to society.  *See State v. Berry*, 233 S.W.3d 847, 860-64 (Tex. Crim. App. 2007) (death sentence reformed to life imprisonment where there was no evidence that defendant would be a future danger in prison where there would be no children, because defendant's testimony and expert testimony suggested she was only a danger to children).  Indeed, in Berry, the Court of Criminal Appeals saw fit to reduce a death sentence based on purely subjective evidence (the defendant's testimony and an expert psychoanalysis) that a murderous defendant would no longer be a future danger.  See id.  In contrast, in this case, there can be no doubt that Mr. Thomas objectively cannot be a future danger to anyone because he is completely blind.

not be arbitrarily denied.  This principle holds particular weight where, as here, a petitioner's life interest, protected by the "life, liberty and property" language in the Due Process Clause, is at stake in the proceeding.  *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, Souter, Ginsberg, and Breyer, J.J., concurring); *id.* at 291 (Stevens, J., dissenting) (recognizing a distinct, continuing, life interest protected by the Due Process Clause in capital cases).  As the Supreme Court repeatedly has emphasized, all measures must be taken to prevent arbitrary, cruel, and unusual results in a capital trial.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976) (plurality opinion).

Texas has guaranteed its citizens that they will not be sentenced to death unless they are found to be a future danger.  While Mr. Thomas was found to be a future danger at trial, the unique circumstances of this case compel the conclusion that he is demonstrably no longer a part of that group.  To execute him would thus violate the due process guarantees that arise once this original promise is made.

In other words, Mr. Thomas, by virtue of the helplessness that flows from his blindness, is now "innocent of the death penalty."  In *Sawyer v. Whitley*, the Supreme Court analyzed this concept, and concluded that "sensible meaning is given to the term 'innocent of the death penalty' by allowing a showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance or that *some other condition of eligibility* had not been met."  *Sawyer v. Whitley,* 505 U.S. 333, 345 (1992) (emphasis added).  This interpretation has been recognized by Texas statutes and case law.  *See, e.g., Ex parte Blue*, 230 S.W.3d 151, 160 (Tex. Crim. App., 2007) (Petitioner asserting that he is a person with mental retardation may come in under provisions of Tex. Code Crim. Proc. Article 11.071 permitting successor petitions when the applicant is innocent of the death penalty).  In short, a person is innocent of the death penalty when state law makes him ineligible for execution.

As previously discussed, this Court has expressly characterized the future dangerousness special issue as narrowing the class of offenders who are eligible for the death penalty in Texas. *Smith*, at 420.  In that way, it functions no differently from aggravating factors in other jurisdictions, in the absence of which a defendant would not be subject to execution.

While future dangerousness is not a concept that ordinarily lends itself to conclusive proof or disproof, this is an exceptional – indeed, a unique – case.  Mr. Thomas's situation differs dramatically from claims in which prisoners argue that they are reformed or rehabilitated and therefore no longer pose a threat to society.  Here, Mr. Thomas has physically mutilated his body and rendered himself blind.  This change indisputably removes him from the class that Texas deems eligible for execution.  Without the benefit of sight, Mr. Thomas poses no threat to other prisoners, guards, or prison staff and is not a risk of escape.

This Court has concluded that a claim of actual innocence must be "cognizable in habeas corpus because punishment of an innocent person violates the due process clause of the United States Constitution."  *Ex parte Elizondo,* 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) (citing *State ex rel. Holmes v. Third Court of Appeals*, 885 S.W.389, 397 (Tex. Crim. App. 1994) ("such an execution would surely violate a constitutional or fundamental right").  Similarly, executing someone like Mr. Thomas, who can show that he is *ineligible* to receive the death penalty under state law, violates the Due Process clause.

### C.  To Keep Mr. Thomas - a Severely Mentally Ill Man – Under a Sentence of Death Violates International Law.

When Mr. Thomas gouged out his second eye, it became clear that the severity of his mental illness precludes his execution under international law.  His death sentence violates both international agreements—the American Declaration of the Rights and Duties of Man ("American Declaration") and the International Covenant on Civil and Political Rights

("ICCPR")—and customary international law.[62]

Article I of the American Declaration forbids the death penalty when it amounts to an arbitrary deprivation of human life.[63]  The Inter-American Commission on Human Rights interprets the American Declaration with reference to both the American Convention on Human Rights ("American Convention") and to principles adopted by the United Nations General Assembly for the protection of the human rights of persons with mental disabilities.  The American Convention holds that "certain considerations involving the person of the defendant, which may bar the imposition or application of the death penalty, must be taken into account."  I/A Ct. H.R., *Advisory Opinion OC-3/83*, para. 55.  The United Nations Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty prohibit the execution of "persons who have become insane."  United Nations Economic and Social Council, *Implementation of the Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty,* E.s.c. Res. 1989/64, U.N. Doc. E/1989/91 (1989), at 51 ¶ 1 (d).  In 1989, the Economic and Social Council expanded this protection to cover "persons suffering from…extremely limited mental competence, whether at the stage of sentence or execution,"[64] and any person "suffering from any form of mental or intellectual disabilities."  U.N. Commission on Human Rights, Question of the Death Penalty, U.N. Doc. E/CN.4/2005/L.77 (2005), para. 7(c). The U.N. Commission has

---

[62]     The Supreme Court has recognized the importance and relevance of international law and norms.  *See Atkins v. Virginia,* 536 U.S. 304, 316 (2002); *Roper v. Simmons,* 543 U.S. 551, 561 (2005); *Coker v. Georgia,* 433 U.S. 584 n.20 (1977) (plurality opinion); *Thompson v. Oklahoma,* 487 U.S. 815, 830 (1988) (plurality opinion); *Enmund v. Florida,* 458 U.S. 782, 796-796 (1982); *Trop v. Dulles,* 356 U.S. 86, 102-103 (1958).

[63]     *See, e.g.,* I/A Comm. H. R., Case 9647, Res. 3/87 (September 2, 1987), *James Terry Roach and Jay Pinkerton v. United States*, Annual Report of the IACHR 1986-87, paras. 46-49; Report 52/01 (April 4, 2001), *Juan Raul Garza v. United States*, Annual Report of the IACHR 2000, para. 90; Report No. 48/01 (April 4, 2001), *Michael Edwards v. The Bahamas*, Annual Report of the IACHR 2000, ¶¶ 126-128.

[64]     United Nations Economic and Social Council, *Implementation of the Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty,* E.s.c. Res. 1989/64, U.N. Doc. E/1989/91 (1989), at 51 ¶ 1 (d) (emphasis added).

previously relied on the United Nations definition of a person with mental disabilities as "one who in the course of his/her disability is unable to take care of his/her own person or affairs, and requires care, treatment or control for his/her own protection or that of others or of the community."[65]  Given the undisputed evidence from mental health experts who have examined Mr. Thomas over the years, his repeated commitment to an inpatient psychiatric unit while on death row, and his recent (and second) enucleation, there is no doubt that he meets this definition.

The Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions has accordingly called on retentionist states that impose the death penalty on the mentally ill to "bring their domestic criminal laws into conformity with international legal standards."[66]

The ICCPR similarly prohibits the arbitrary application of the death penalty, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness.  *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993).   In ratifying the ICCPR, the United States reserved the right to impose the death penalty under "future or existing laws."[67]  Even under the terms of the reservation, however, the execution of Mr. Thomas is forbidden; existing law, shaped by evolving standards of decency, prevent the execution of severely mentally ill persons.

Even if the United States were not bound by international agreement, the execution of

---

[65]     *Victor Rosario Congo v. Ecuador*, Report No. 63/99 (April 13, 1999), ANNUAL REPORT OF THE IACHR 1998, ¶ 42.

[66]     Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions U.N. Doc. E/CN.4/1997/60 (1996), ¶ 116.

[67]     *See* 138 Cong. Rec. S-4781-01, S4783. The Human Rights Committee objected to the reservation, concluding that it fails to accord with "the object and purpose of the document." Concluding Observations of the Human Rights Committee: United States of America, U.N. Doc. CCPR/C/79/Add.50; A/50/40, ¶¶ 266-304, 279 (1995).

Mr. Thomas would violate customary international law.  Customary international law is binding on U.S. courts absent a contrary rule set out by Congress or the Executive.  *Paquete Habana*, 175 U.S. 677, 700 (1900).  For customary international law to arise, there must be a general and consistent practice of nations that is followed through a sense of legal obligation.  Restatement (Third) of Foreign Relations Law § 102(2) (1987).  The general and consistent practice of nations is to exclude the mentally ill from the application of the death penalty.  *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100–03  (1993).  Consistent international pressure to conform with this practice demonstrates that the practice is followed through a sense of legal obligation.[68]

In sum – for all the reasons stated above – Mr. Thomas's sentence of death cannot stand, as it violates both international agreements and customary international law.

## XVIII. Defense Counsels' Copious Failures In Handling Expert Witnesses Further Deprived Mr. Thomas Of Effective Assistance Of Counsel.

As the evidence presented in this case makes clear, the acts undertaken by Mr. Thomas were not those of a sane and rational person.  Mr. Thomas is seriously mentally ill, suffering from schizophrenia.  As a result of this mental illness, he acted under the psychotic delusion that he was doing God's will on the morning of March 27, 2004.  Nonetheless, the State obtained not only a conviction of Mr. Thomas, but also a death sentence, with surprising ease.  The primary reasons both underlying this tragic result and rendering Mr. Thomas's execution unconstitutional are set forth above.

---

[68]   *See, e.g.,* The U.N. Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions has repeatedly pressured states who execute the mentally ill "to bring their domestic criminal laws into conformity with international legal standards." Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions U.N. Doc. E/CN.4/1997/60 (1996), para. 116 (pressuring states who execute the mentally ill "to bring their domestic criminal laws into conformity with international legal standards"); EU Memorandum on the Death Penalty (Feb. 25, 2000) (asserting that "internationally recognized human rights norms" forbid the execution of persons "suffering from any form of mental disorder").

Compounding the foregoing errors, the defense further deprived Mr. Thomas of his constitutional right to effective assistance of counsel by its wholesale failure to develop and implement any meaningful strategy with regard to expert witnesses or to adequately investigate the facts relevant to their opinions, both during the trial and punishment phases of Mr. Thomas's capital trial.  Defense counsel's numerous failures in this regard are set forth below.

### A. Defense Counsel's Failure to Prepare and Present Essential Testimony from Psychiatric Expert Dr. Edward Gripon was Constitutionally Ineffective.

Defense counsel called only *one* psychiatric expert witness, Dr. Edward Gripon, to testify on the core substantive issue of Mr. Thomas's capital trial – namely, that Mr. Thomas was legally insane at the time of the murders.  Then having chosen to use only one expert, the defense team failed completely to prepare Dr. Gripon and itself for the testimony to be introduced.  This failure to prepare and provide Dr. Gripon with available information regarding Mr. Thomas's sanity led to the additional failure to elicit key opinions from Dr. Gripon.  Such failures violated both the performance and prejudice elements of the *Strickland* test.  *See Strickland*, 466 U.S. at 687.  The record demonstrates these critical errors were not due to reasonable trial strategy, but rather resulted from the general incompetence and disorganization of lead defense counsel.

One reason Mr. Hagood was to handle experts at the guilt/innocence trial phase was because Ms. Peterson lacked capital experience.  Counsel themselves recognized that in a capital murder case, there is a need to be skilled in the use of expert witnesses and in the preparation and presentation of evidence bearing on the defendant's mental status.  ABA Guideline 5.1(B)(2)(e)-(f) so requires, but to the great prejudice of Mr. Thomas, Mr. Hagood failed abysmally and repeatedly in this area.

Prior to trial, Dr. Gripon requested from the defense team "any and all documents which would potentially reflect on [Mr. Thomas's] mental state at or around the time of the alleged

offense." Ex. 13 ¶ 6.  Despite this clear request, counsel did not provide Dr. Gripon with Mr. Thomas's videotaped confession, police statements regarding Mr. Thomas's demeanor immediately following the crime, and many other documents that were necessary to Dr. Gripon's evaluation of Mr. Thomas's mental state.  *Id.* ¶¶ 4, 6.  In *Rompilla v. Beard*, the Supreme Court found that the assistance of counsel was ineffective where the defense failed "to make reasonable efforts to obtain and review material that counsel [knew] the prosecution [would] probably rely on as evidence of aggravation."  545 U.S. 374, 377 (2005).  This was prejudicial to the defendant because the failure of defense counsel to provide mental health experts with the evidence, which if reviewed, would have provided "plenty of red flags" that would have encouraged further tests and helped establish the mental impairments of the defendant.  *Id*.

Similarly, Mr. Thomas's defense team failed to provide its sole psychiatric witness with key evidence – for example, the videotaped confession – which would have raised and wildly waived "red flags."  In short, the evidence the defense failed to provide would have given far greater foundation and credibility to the opinions of Dr. Gripon.  In *Smith v. Dretke*, the court, relying on *Rompilla,* emphasized that the question is not whether counsel did an investigation, but whether that investigation was adequate under professional norms, stating, "If trial counsel's investigation was unreasonable then the state habeas court's, and the district court's, deference to the strategic decision trial counsel made was also objectively unreasonable."  *Smith*, 422 F.3d 269, 278-79 (5th Cir. 2005).

The state court dealt with this failure of counsel by finding, based solely on Mr. Hagood's recollection, that Dr. Gripon received everything the defense had received in discovery.  *See* FF ¶ 186.  In doing so, the court ignored the explicit sworn affidavit of Dr. Gripon.  Ex. 13 ¶¶ 4, 6.  Such a finding is not only an unreasonable determination of the facts in

light of the evidence presented, it was also prejudicial.[69]

Counsel also failed to request that Dr. Gripon perform psychological testing on Mr. Thomas.  Ex. 15 ¶ 28.  Given the obvious evidence of Mr. Thomas's severe mental impairment, this failure fell below objective standards of reasonableness.  *See Antwine v. Delo*, 54 F.3d 1357, 1367-68 (8th Cir. 1995) (finding ineffective assistance of counsel when the defense failed to request a second medical examination or present expert evidence of mental impairment, even though defendant acted oddly at the time of the offense and denied using drugs, emphasizing that this failure was "more like inadequate trial preparation than a strategic choice" and stating that counsel should have followed through on the unanswered questions on defendant's mental health).

During trial, Mr. Hagood asked Dr. Gripon to comment on the neuropharmacological effects of DXM ingestion, even though Dr. Gripon, by his own admission, was not an expert on this issue.  Ex. 15 at ¶ 29; Ex. 13 at ¶ 14; R.R. Vol. 36 p. 108.  Counsel's incomplete questioning of Dr. Gripon regarding the State's substance-induced psychosis theory muddled the defense's argument on direct examination and opened the door to damaging testimony on cross-examination that undermined Dr. Gripon's correct diagnosis of Mr. Thomas.  R.R. Vol. 36 pp. 87-91, 104-108.  Proper preparation would have avoided this prejudicial error.

Further, on more than one occasion, Dr. Gripon informed Mr. Hagood of the questions Mr. Hagood should ask Dr. Gripon during his testimony to demonstrate the bases for his expert opinion that Mr. Thomas was legally insane.  Inexplicably, Mr. Hagood did not ask Dr. Gripon many of these vital questions.  Ex. 13 ¶¶ 9-10; Ex. 27 ¶ 26.  Despite Dr. Gripon's assistance, Mr. Hagood's questioning was unprepared and disjointed.  While Mr. Hagood succeeded in eliciting

---

[69]      The reliance by the court, when there was evidence to the contrary, on Mr. Hagood's self-serving "recollection" is to be contrasted with the court's rejection of essentially uncontradicted statements of Dr. Kate Allen as inadmissible because they allegedly were self serving.  CL ¶ 117.

Dr. Gripon's bare assertion that Mr. Thomas was suffering from schizophrenia at the time of the crime and that he did not know his conduct was wrong, counsel failed to elicit the bases for Dr. Gripon's opinion.  Ex. 13 ¶ 13; R.R. Vol 36 pp. 99-100.

In *Skaggs v. Parker,* the court found counsel who failed to obtain the assistance of a qualified expert constitutionally inadequate.  *See* 235 F.3d 261, 271 (6th Cir. 2000).  The court concluded that this failure led to confusing testimony, which distracted the jury from fully and accurately considering the defendant's mental status.  *Id.* at 272.  Here, the inadequate assistance was not the lack of qualification of the expert, but rather the failure of counsel to prepare.  The result was the same:  because of the defense's lack of proper preparation, the jury was presented with incomplete and confusing testimony, which distracted it from fully and accurately considering Mr. Thomas's mental status both during the guilt and sentencing phases of the trial.  *See Wilson v. Sirmons*, 536 F.3d 1064, 1087-93 (10th Cir. 2008) (finding ineffective assistance of counsel due to counsel's limited investigation into defendant's mental health where the defense delayed in hiring the expert and prepared him only two days before trial, which is not adequate time in case new testing should be explored, and where the defense did not provide the expert with the sources of information necessary for adequate preparation); *see also Hovey v. Ayers*, 458 F.3d 892, 929 n.3 (9th Cir. 2006) (finding that defendant was prejudiced by counsel's failure to elicit testimony from an expert about mental health records that described defendant's delusions and grandiose ideas and were consistent with the expert's observations and diagnosis, emphasizing that the testimony and records would have helped demonstrate to the jury that medical professionals repeatedly had concluded that the defendant was seriously mentally disturbed).

The defense's failure to prepare led to a series of problems that undermined Dr. Gripon and the persuasiveness of his testimony.  Failing to provide an expert such as Dr. Gripon with

important information specifically requested by the expert undermines the foundation of his opinions; the defense's failure to do so here denied Mr. Thomas the right to have an expert who could have better explained the basis for his opinions regarding psychosis, insanity, and Mr. Thomas's understanding of right and wrong behavior at the time of the crime.

The defense's lack of preparation in failing to retain and use a neuropharmacologist for assistance in cross examination of the State's witnesses, as well as to testify in the defense case, put counsel in a position where he essentially chose to "wing it" with Dr. Gripon by submitting questions on neuropharmacologic effect. Since Dr. Gripon did not have expertise in this area, Mr. Hagood was undermining the credibility of his own witness. Additionally, as discussed above, counsel failed to ask important questions supplied by Dr. Gripon. Such a lack of preparation cannot be characterized as a tactic. *See Antwine*, 54 F.3d at 1367-68; *Wilson*, 536 F.3d at 1087-93; *Hovey*, 458 F.3d at 929 n.3. Accordingly, the performance of the lawyers defending Mr. Thomas fell below any objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88.

The assertion of insanity was the central tenet of the defense case, and Dr. Gripon was the defense's only expert witness on that issue. Dr. Gripon's diagnoses and opinions were well supported by abundant evidence, including Mr. Thomas's mental health history, the circumstances of the murders, and Mr. Thomas's behavior before, during and after the murders. But for counsel's lack of preparation, omissions and other errors in the use of the only expert called to support the insanity defense, the jury would have heard Dr. Gripon clearly and directly summarize this evidence. Ex. 13 ¶ 13. These multiple failures unequivocally prejudiced Mr. Thomas. Had the defense provided Dr. Gripon with complete information and prepared questions designed to assist him in offering his opinions in an intelligent and cohesive manner, there is a reasonable probability that the jury would not have found Mr. Thomas guilty beyond a

reasonable doubt.  Based on the foregoing, the state court's finding that defense counsel was not

ineffective with respect to the manner of presentation of the insanity defense resulted in a

decision that was contrary to clearly established law as determined by the Supreme Court in

*Strickland.  See Rompilla*, 545 U.S. 374, 377.

> **B.      Defense Counsel's Failure to Lodge a *Daubert/Kelly* Objection to Dr. Victor Scarano's Testimony Constituted Ineffective Assistance of Counsel.**

The State called Dr. Victor Scarano, a forensic psychiatrist with limited, if any,

experience in the field of neuropharmacology or psychopharmacology, to lay the foundation for

the State's substance-induced psychosis theory at trial.  The State's plan to use Dr. Scarano for

this purpose, and more generally, its plan to use expert testimony to establish its substance-

induced psychosis/voluntary intoxication theory, should have been well known to defense

counsel.  Despite the fact that they had ample warning of the State's strategy, defense counsel

were allegedly "blindsided" when Dr. Scarano was called to testify, *see* Ex. 84, and failed to

even seek a Rule 702 hearing to challenge his qualifications under *Daubert v. Merrell Dow*

*Pharmaceuticals*, 509 U.S. 579 (1993), and the *Kelly/Frye* standard, *Frye v. United States*, 293

F.1013 (9th Cir. 1923).  Had they sought such a hearing, the defense would have had ample

ammunition to urge the Court to preclude Dr. Scarano from offering expert opinion testimony

about Thomas's alleged substance-induced psychosis.

The expertise of a putative expert "must be measured against the *particular opinion* the

expert is offering." *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App. 1999). (emphasis added). The

fact that a witness possesses knowledge and skills beyond that of the general public, "does not in

and of itself mean that such expertise will assist the trier of fact regarding the issue before the

court." *Broders v Heise*, 924 S.W.2d 148, 153 (Tex. 1996).  Qualification of an expert is a two-

step process.  *Vela, Jr. v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). "A witness must

first have sufficient background in a particular field." *Id.* In addition, "the proponent of the testimony has the burden to show that the expert possesses special knowledge as to the very matter on which he proposes to give an opinion." *Broders*, 924 S.W.2d at 152–53 (internal quotation and citation omitted) (emphasis added); *Vela, Jr.*, 209 S.W.3d at 131.

Dr. Scarano frequently testifies as a forensic psychiatrist and is a partner at a law firm geared toward providing such testimony to civil and criminal litigants. *See* Victor R. Scarano, 35:1 J. Am. Acad. Psychiatry Law at 10-17 (2007) (listing Dr. Scarano's employment as a partner of "Hasley Scarano, LLP, and [as] Director, Forensic Psychiatry Services, Texas Law and Psychiatry, PLLC"). But despite the fact that Dr. Scarano, in his own words, had performed nearly 1,000 forensic psychiatric evaluations between 1998 and 2004, and that at the time of the Thomas trial, Dr. Scarano's entire practice was comprised of performing forensic evaluations for litigation, there is *no evidence* that he has ever rendered a neuropharmacological opinion of the type the State called upon him to provide in this case. *See* R.R. Vol. 31 pp. 49, 50–51, 54–63.

Indeed, at a Rule 705 hearing, defense counsel learned that Dr. Scarano had virtually no legally acceptable foundation on which to provide expert testimony regarding substance-induced psychosis, particularly regarding the effects of DXM. *See* R.R. Vol. 31 pp. 56–59. Dr. Scarano openly admitted that he simply "*went on to the internet on Google and typed in Dextromethorphan*" and relied on various "reports" he found online in formulating the opinions he proffered at trial. *Id.* at 56 (emphasis added). Defense counsel did not inquire about whether the web-based, inadmissible, hearsay articles Dr. Scarano relied on were peer reviewed, published, or even whether they were the type of source experts typically relied on in the relevant discipline. *See id.*; *see also* Tex. R. Ev. 703; *U.S. v. Oliver*, 468 F.Supp.2d 980, 987 (C.D. Ill. 2007) (finding expert opinion regarding crack cocaine unreliable and irrelevant where expert had not previously testified in a similar capacity and relied on internet article that was not

peer reviewed in support of testimony).  Defense counsel also discovered that Dr. Scarano could not specifically identify a single article that he relied on in determining the likelihood or probability that DXM or marijuana or any combination of the two could cause the type of psychosis experienced by Mr. Thomas.  R.R. Vol. 31 p. 58 at 5.  Further, Dr. Scarano was unable to identify any actual experimentation or scientific testing he had performed that would tend to confirm his opinion.

Despite the fact that Dr. Scarano had no special expertise in the area of neuropharmocology and lacked any foundation for his opinion, the defense did not seek to challenge his qualifications as an expert under Rule 702.  *See id.* at 64.  Indeed, even though defense counsel had previously filed a motion leaving the door open to conduct both a Rule 705 *and* a Rule 702 hearing on Dr. Scarano's qualifications – albeit a Motion that was filed *in the related pending cause against Mr. Thomas* (*see* C.R. Vol. 1 pp. 76-86) – counsel did not follow through with a *Daubert/Kelly* challenge.  Even after the *trial court itself* acknowledged the possibility of a Rule 702 hearing on Dr. Scarano, the defense team did nothing to seek to exclude Dr. Scarano.  *See* R.R. Vol. 31 p. 41.

Dr. Scarano's subsequent trial testimony illustrates that he was testifying without any grounding in neuropharmacology or psychopharmacology.  Dr. Scarano failed to determine the rate of Mr. Thomas's metabolism to determine whether his opinion was actually feasible given Mr. Thomas's unique physiology, something he could have accomplished through a simple test.  *See* Ex. 23 ¶ 3.  He selectively ignored undisputed factual testimony regarding the manner in which DXM *actually effected Mr. Thomas* – testimony that demonstrated that Coricidin knocked Mr. Thomas out rather than made him act psychotic or violent.  *See* R.R. Vol. 29 p. 221; R.R. Vol. 30 pp. 26, 62.  Dr. Scarano also failed to explain plausibly why Mr. Thomas would have pulled out his eye long after he was completely sober, if his psychosis was solely related to drug

use.

Remarkably, defense counsel not only failed in challenging Dr. Scarano's foundation for his opinions on cross-examination, but compounded the prejudice caused by his unsubstantiated opinions by *recalling him in the defense's case-in-chief*.  No conceivable trial strategy justifies re-calling an adverse witness who has already testified that his opinion is diametrically opposed to the defendant's theory.  *See* Ex. 27 ¶ 11.  *See e.g.*, *Wilson v. Mazzuca*, 570 F.3d 490 (2d Cir. 2009) (finding that, under AEDPA, counsel was ineffective and the state court finding to the contrary was an unreasonable application of clearly established federal law where the defense elicited harmful testimony from the victim in a robbery case, namely, that the victim did not appear as a witness previously because he feared the defendant would retaliate against him, emphasizing that "[t]o ask these questions on the theory that [the witness] might say that he was not afraid of [the defendant] was 'reckless and objectively unreasonable'").

Additionally, defense counsel failed to properly investigate Dr. Scarano's previous bias toward people who use chemical substances who are also psychotic.  Dr. Scarano was an advocate long before Mr. Thomas's trial of specifically excluding any claim of insanity when a defendant voluntarily used any intoxicants.  On March 12, 2003 – a year before Mr. Thomas committed the crime for which he was convicted, in what Dr. Scarano later termed a "drug-induced psychosis" – Dr. Scarano wrote Texas legislator Larry Phillips and other legislators in an attempt to have the insanity laws changed in Texas.  Specifically, Dr. Scarano advocated narrowing the volitional arm to "eliminat[e] personality disorders, impulse control disorders, (and) intentional use of intoxicants."  *See* Ex. 43.  Dr. Scarano went further in advocating a much harsher definition of the Texas insanity defense, requiring that the defendant also prove experiencing a "severe psychotic episode" in addition to requirements of the current insanity standard.  *Id.*

Dr. Scarano's lack of suitable foundation for his opinion, and his failure to account for key variables and facts such as Mr. Thomas's own metabolism and his post-detainment enucleation of an eye, rendered Dr. Scarano's testimony unreliable and inadmissible as a matter of established law.  *See, e.g., Roise*, 7 S.W.3d at 237 ("[D]egrees, experience, and training do not qualify an expert to answer every conceivable question about psychology"); *Oliver*, 468 F.Supp.2d at 987; *Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 912 (Tex. 2004) (expert testimony unreliable where expert could not cite any scientific testing, articles, or studies supporting opinion and is therefore merely "subjective belief or unsupported speculation"); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 801 (Tex. 2006) (expert testimony is unreliable ""if there is too great an analytical gap between the data on which the expert relies and the opinion proffered").  Dr. Scarano's opinions carry even less weight when one considers the second eye enucleation after trial.[70]

Despite the foregoing, the state habeas court summarily concluded – without any consideration of the salient facts or any citation to relevant authority – that Mr. Thomas "failed to prove by a preponderance of the evidence that defense counsel was ineffective for not requesting a *Daubert/Kelly* hearing regarding Dr. Scarano."  CL ¶ 75.  This wholly unsupported conclusion is an unreasonable application of clearly established Federal law as stated in *Strickland*.

Here, defense counsel failed to provide reasonably effective assistance by failing to challenge Dr. Scarano's qualifications or the reliability or relevance of his opinion.  *See*, *e.g.*, ABA Guidelines commentary to Guideline1.1 (stating that capital counsel must be prepared to challenge the prosecution's expert witnesses).  Numerous jurisdictions have found an attorney's

---

[70]    While the jury could not have known that fact, the state habeas court was well aware of this (second) self-inflicted injury.

failure to object as a basis for an ineffective assistance of counsel claim. *See*, *e.g.*, *Wade v. White*, 368 F. Supp. 2d 695, 699-701 (E.D. Mich. 2005) (finding ineffective assistance of counsel where defense counsel failed to object to irrelevant evidence); *Cobb v. Georgia*, 658 S.E.2d 750, 752-53 (Ga. 2008) (finding ineffective assistance of counsel where defense counsel failed to object to prosecution's use of inadmissible hearsay to link defendant with murder weapon); *Sessums v. Texas*, 129 S.W.3d 242, 248 (Ct. App. Tex. 2004) (finding ineffective assistance of counsel where defense counsel failed to object to prosecution's experts' testimony that child victim was truthful).  Because trial counsel's assistance was not reasonably effective, *Strickland*'s first prong is satisfied.

*Strickland's* second prong is also satisfied because the prosecution's substance-induced psychosis argument was essential to the state's victory.  *Strickland*'s second prong requires a showing that there is a *reasonable probability* that if not for counsel's errors, the results of the proceeding would have been different.  *Id* at 694-95.  Here, defense counsel's failure to make a *Daubert/Kelly* objection and their inexplicable decision to recall Dr. Scarano had a grave impact on this case.  The State relied heavily on its substance-induced psychosis theory, and defense counsel's failure to exclude Dr. Scarano allowed the jury to hear Dr. Scarano's artificially convincing testimony lending credence to that theory.  *See Amoral,* 488 F.2d at 148 ("Scientific or expert testimony particularly courts the [danger of undue prejudice] because of its aura of special reliability and trustworthiness.").  Thus, it is more than reasonably probable that the verdict would have been different had trial counsel challenged Dr. Scarano, as Dr. Scarano was essential to the centerpiece of the State's case: substance-induced psychosis.  The state habeas court's cursory conclusion that the defense was not ineffective for failing to request a *Daubert/Kelly* hearing regarding Dr. Scarano was an unreasonable application of *Strickland* because in reaching this conclusion, the court failed to consider any of the salient evidence Mr.

Thomas presented.  *See Wiggins*, 529 U.S. at 397-98; *Bradley*, 315 F.3d at 1100.

      **C.**     **Defense Counsel's Failure to Lodge a *Daubert/Kelly* Objection to Dr. David Axelrad's Testimony Likewise Constituted Ineffective Assistance of Counsel.**

Dr. David Axelrad was named on the State's pre-trial witness list and prepared a 68-page report concluding that Mr. Thomas's psychosis was drug induced.  *See* Ex 165.  Notwithstanding the clear thrust of Dr. Axelrad's report, the defense called him in their case-in-chief in an attempt to use him to prove Mr. Thomas was insane and that his insanity *was not caused by voluntary intoxication*.  Defense counsel not only unreasonably chose to rely upon Dr. Axelrad, but in fact should have called for a Rule 705 hearing to challenge the reliability of his testimony *if* he was called by the State.  Defense counsel's bizarre approach to Axelrad's testimony – eliciting his most damaging, unsubstantiated testimony during the defense case – was not part of any reasonable trial strategy and, in turn, constituted ineffective assistance of counsel.  *See Wilson*, 570 F.3d 490 (2d Cir. 2009).

Like Dr. Scarano, Dr. Axelrad's CV is devoid of any experience in psychopharmacology or neuropharmacology, and there is no evidence that he based his opinions on any acceptable literature, studies or scientific testing.  Rather, Dr. Axelrad testified that he based his opinion, that marijuana in "very excessive doses" can cause psychosis, on various unidentified "military records" he had reviewed.  R.R. Vol. 34 p. 81, 92.  Certainly such records were not peer reviewed, and are not the type of document an expert in the field would generally rely on in making a specific judgment about a drug's tendency to cause an extremely violent psychotic break.  Even if they were, defense counsel needed to challenge the foundation behind this unsubstantiated claim.  Further, Dr. Axelrad made no attempt to justify his implicit assumption that Mr. Thomas was similar enough to the individuals addressed in these unspecified records and had taken a similarly "excessive dose" of marijuana to cause psychosis.  Yet trial counsel

made no objection.  To the contrary, defense counsel unbelievably, through leading questions, invited Dr. Axelrad to state his baseless conclusions on the record.  There is simply no "strategy" known to any trial lawyer to explain this tactic and it did prejudice Mr. Thomas.

As with Dr. Scarano, the state habeas court concluded – without any consideration of the salient facts or any citation to relevant authority – that Mr. Thomas "failed to prove by a preponderance of the evidence that defense counsel was ineffective for not requesting *Daubert/Kelly* hearing on Dr. Axelrad."  CL ¶ 78.  Here again, the state habeas court's cursory conclusion is an unreasonable application of federal law, as stated in *Strickland*.

Defense counsel's inexplicable reliance upon Dr. Axelrad – the *State's primary expert* – at trial, and its companion failure to challenge the foundations for his specious opinion, fell below objective standards of reasonableness.  Indeed, far from engaging in reasonable efforts to challenge the State's witness, defense counsel's thanking of Dr. Axelrad in the presence of the jury arguably bolstered his credibility.  *See* R.R. Vol. 34 p. 60; *see also Strickland*, 466 U.S. 668 (repeatedly noting that the purpose of the ineffective assistance of counsel doctrine is to ensure the maintenance of our adversarial process of adjudication).  Here, defense counsel abandoned the adversarial process entirely.  The defense not only undermined its own theory of the case but in fact advanced the State's prosecution by calling Dr. Axelrad, thereby confirming his credibility before the jury, instead of challenging the bases for this key witness's "expertise" or opinions.  If defense counsel had not followed this outrageous, ineffective, and unjustifiable approach, the outcome of the trial most certainly would have been different.  In light of the foregoing, as with its conclusions regarding Dr. Scarano, the state habeas court's cursory conclusion that the defense was not ineffective for failing to request a *Daubert/Kelly* hearing regarding Dr. Axelrad was an unreasonable application of *Strickland* because in reaching this conclusion, the court failed to consider any of the relevant evidence Mr. Thomas presented.  *See*

*Wiggins*, 529 U.S. at 397-98; *Bradley*, 315 F.3d at 1100.

> **D.      Defense Counsel's Failure to Call Expert Larry Fitzgerald During the Punishment Phase Denied Mr. Thomas Effective Assistance of Counsel.**

As with its treatment of experts during the guilt phase of Mr. Thomas's capital trial, the defense wholly failed to prepare for, and implemented no reasonable strategy regarding, its use of experts during sentencing.  Texas has produced a number of cases that are memorable for the horrendous representation of persons facing the death penalty.  Lawyers have gone as far as to sleep through parts of the trial.[71]  In the present case, Andre Thomas was represented by Mr. Hagood and Ms. Peterson.  Ms. Peterson always understood going into the trial that Mr. Hagood would be responsible for the punishment phase if it were necessary. She did nothing to prepare for the punishment phase prior to guilt-innocence beginning. Once the guilt-innocence phase began to turn south, Mr. Hagood turned to Ms. Peterson and asked her *"who do we have for punishment?"*  Ex. 27 (Peterson Aff.) ¶ 29 (emphasis added).

Ms. Peterson was in shock with the sudden realization that they would be facing a punishment phase in a few days and nothing had been done. Ms. Peterson went to Judge Fry in chambers, without telling Mr. Hagood, and vented against what she had just discovered and begged for additional time in an emotionally charged session for which there is no record other than the sanitized version in Ms. Peterson's affidavit and Judge Fry's findings.  *Id.* ¶ 22.  Judge Fry gave Ms. Peterson one additional week between the guilt-innocence phase and the punishment phase.  Ms. Peterson had never prepared a mitigation case for punishment and reached out to whatever experts were available.  She hired Larry Fitzgerald and Dr. Kate Allen to try to present a picture that Mr. Thomas would not be a danger to society.

Mr. Fitzgerald did the best he could in the short time allowed to prepare since he had

---

[71]   *See Burdine v. Johnson,* 262 F.3d 336 (5th Cir. 2002).

testified in numerous cases regarding the Texas Department of Criminal Justice and persons incarcerated in death row.  However, when he showed up to testify, in what will remain as one of the great blunders of this trial, Mr. Fitzgerald was not called.  Mr. Hagood made this decision, even though Ms. Peterson had been the one to prepare Mr. Fitzgerald and had all contact with him because he "*was a last minute addition*."   When asked to explain his decision after Mr. Thomas had received the death penalty, Mr. Hagood asserted that Judge Fry was doubtful about Mr. Fitzgerald's expertise.  Ex. 15 (Hagood Aff.) ¶ 33.  However, Judge Fry does not support this conclusion in his findings of fact, in which he states "defense counsel retained Mr. Larry Fitzgerald to testify, on behalf of Mr. Thomas, about the safeguards by the TDCJ to ensure that prisoners would not pose a risk of future dangerousness to other incarcerated individuals and prison employees," FF ¶ 125, and "to conclude the defense's mitigation case, Mr. Hagood called Mr. Fitzgerald…. Mr. Fitzgerald did not testify after the State's voir dire, *Id.* ¶117, and lastly, "Mr. Hagood believed that Fitzgerald did not come off as a respected expert..Mr. Hagood (sic) decision not to call Fitzgerald as a witness was trial strategy."  FF ¶¶ 218-219.  Thus, what Judge Fry calls trial strategy was Mr. Hagood's decision not to call a necessary witness to which Judge Fry had no real objection, even though Mr. Hagood states he did not call the witness because he thought Judge Fry would not allow him to testify.

Mr. Fitzgerald was first contacted on behalf of the defense on or about February 16, 2005, to provide expert testimony regarding future dangerousness (once incarcerated), the prison classification Mr. Thomas would be assigned and the date he would be eligible for parole.  Ex. 11 ¶ 5; C.R. Vol. 5 pp. 1610-1613.[72]  Defense counsel hired Larry Fitzgerald to testify on behalf of Mr. Thomas about the safeguards taken by the Texas Department of Criminal Justice to ensure

---

[72]     Just as disturbing as their late retention is the fact that Mr. Hagood failed to notify the State of the defense's intention to call either Dr. Allen or Mr. Fitzgerald.  Ex. 169.

that prisoners would not pose a risk of future dangerousness to other incarcerated individuals and prison employees.  Mr. Fitzgerald was prepared to testify that if sentenced to life imprisonment, Mr. Thomas would not be eligible to be considered for parole for at least forty years.  Following Dr. Allen's testimony, Mr. Hagood called Mr. Fitzgerald to the stand.  R.R. Vol. 41 p. 135. Following voir dire of Mr. Fitzgerald by the State, however, Mr. Hagood inexplicably did not question Mr. Fitzgerald.  R.R. Vol. 41 p. 148.  The defense then rested.  *See id.*  Defense counsel in this case inexcusably chose to rest without eliciting the testimony of Mr. Fitzgerald.  *See* Ex. 11 ¶ 11.

### 1.      Larry Fitzgerald was Qualified to Testify as a Defense Expert Regarding Future Dangerousness.

In order to sentence an individual to death the Texas Penal Code requires the State to prove beyond a reasonable doubt that the defendant poses a future risk of danger.  *See* Tex. Code Crim. Proc., Art. 37.071 (Vernon 1981).  As noted above, Larry Fitzgerald was retained by defense counsel on approximately February 16, 2005, to testify as an expert on Mr. Thomas's behalf, to issues relating to whether Mr. Thomas would pose a risk for future danger in a prison environment.  *See* Ex. 11 ¶ 5.  Specifically, Mr. Fitzgerald was hired to examine Mr. Thomas's unique circumstances and render expert testimony on the prison classification to which Mr. Thomas would be assigned and the corresponding date that he would be eligible to be considered for parole.  *Id.*

Mr. Fitzgerald worked as a public information officer from 1995 to 2003.  Ex. 11 ¶ 2.  As a public information officer and an employee of the Texas Department of Criminal Justice, Mr. Fitzgerald was allowed unlimited access to every aspect of Texas prisons and was intimately familiar with the rules, regulations, and inner workings of the Texas penal system.  *Id.*

Indicatively, defense counsel failed to even inform the State that Larry Fitzgerald would

be called as an expert witness.  Despite defense counsel's lack of timeliness, the trial court allowed Mr. Fitzgerald to take the stand.  *Id.* ¶ 7.  Following an "intense" voir dire by the State, Judge Fry informed Mr. Fitzgerald that he was qualified to testify as an expert.  *Id.*  Accordingly, the State withdrew all objections.  *Id.* ¶ 8.  Nonetheless, defense counsel inexcusably and unreasonably chose to rest its case without eliciting testimony from Mr. Fitzgerald.  *Id.* ¶ 9.  By failing to elicit this testimony, defense counsel foreclosed any opportunity to present evidence on Mr. Thomas's behalf that would rebut the State's contention that Mr. Thomas would pose a risk of future danger in prison.  They further provided the State's witness to undermine the physical evidence (the videotape) they had banked on as undermining the State's case for future dangerousness.

Mr. Hagood asserts that they chose not to call Mr. Fitzgerald based upon a "feel[ing] that Judge Fry was doubtful of Mr. Fitzgerald's expertise."  Ex. 15 ¶ 33.  Counsel should have been well aware that their own (prospective) witness had testified as an expert on future dangerousness in 12 other cases in 10 different counties and had never been disqualified from testifying.  Ex. 11 ¶ 3.  In fact, as Ms. Peterson testifies, they did not present Mr. Fitzgerald's testimony because they were "having trouble getting [him] qualified as an expert," and the State wisely agreed to let them put on the videotape they had hoped to present through the State's expert, Royce Smithey.  Ex. 27 ¶ 28.  When Smithey testified about the (defense) video, he effectively eviscerated its usefulness to the defense.  In short, defense counsel's actions with respect to Mr. Fitzgerald resulted from a lack of preparation and knowledge.

The standard for whether counsel presented a deficient case on mitigation is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce mitigating evidence…*was itself reasonable.*"  *Wiggins v. Smith*, 123 S. Ct. 2527, 2536 (2003).  Defense counsel did not do the investigation or preparation

necessary to make an informed decision about Mr. Fitzgerald's testimony; their actions (and inactions) were thus constitutionally deficient.

In order to demonstrate *Strickland* prejudice, Mr. Thomas must demonstrate that (1) the testimony would have been favorable and could have affected the outcome of the trial; and (2) Mr. Fitzgerald would have testified at trial. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  Mr. Thomas can prove both of these requirements.

Mr. Fitzgerald was on the stand and ready to testify; it is inarguable that if provided the opportunity, he would have testified at trial.  Moreover, Mr. Fitzgerald acknowledges that when he took the stand on March 10, 2005, he was willing and prepared to testify on behalf of Mr. Thomas.  Ex. 11 (Fitzgerald Aff.) ¶ 7.  In addition, Mr. Fitzgerald's testimony would not only have been favorable, but was necessary to counter the improper "rebuttal" testimony offered by the State's purported expert, Royce Smithey. *See Ake v. Oklahoma*, 470 U.S. 68, 84 (1985) (holding that the defendant's due process rights were hindered where State offered expert testimony in the future dangerousness portion of the sentencing phase of trial and defendant was unable to put forth similar expert testimony).  Mr. Smithey testified under oath that he was no longer "familiar" with some aspects of the prison system and did not testify based on Mr. Thomas's unique circumstances.  As such Mr. Fitzgerald's testimony was essential to contradict the misleading testimony offered by Mr. Smithey.

Had counsel not unreasonably revoked Mr. Thomas's right to have Mr. Fitzgerald testify on his behalf, Mr. Fitzgerald was prepared to testify that based on current sentencing regulations Mr. Thomas would have been ineligible for consideration for parole for a minimum of 40 years if sentenced to life in prison.  Ex. 11 ¶ 10.  As defense counsel did not allow Mr. Fitzgerald to testify, the jury was only allowed to consider Mr. Smithey's misleading testimony that if

sentenced to life a prisoner could be up for parole in less than forty years.

In addition, Mr. Fitzgerald was prepared to testify that Texas Department of Criminal Justice routinely incarcerates prisoners under extremely restrictive conditions, thereby limiting incidences of violence with the Texas penal system.  *Id.* ¶ 13.  Mr. Fitzgerald was well-versed in the current version of the prison classification system, and was prepared to instruct the jury on the current status of all safety precautions taken within the prison setting as they relate to the classification system.  *Id.* ¶ 11.  Instead the jury only heard Mr. Smithey's recitations of isolated incidences of violence that occurred throughout the Texas penal system.  This inevitably led the jury to the inescapable conclusion that violence within prisons was the norm rather than the exception.

Mr. Fitzgerald was prepared to render favorable testimony based on Mr. Thomas's unique personal history and criminal offense that under the current classification system, Mr. Thomas could not advance above a level of G3 classification.  *Id.* ¶ 12.  This testimony would have directly contradicted incorrect testimony offered by Mr. Smithey based upon a classification system with which he was admittedly unfamiliar.

Effective defense counsel in this case would have allowed Mr. Fitzgerald to testify, instead of leaving uncorrected the jury's misconceptions of what a life sentence meant for Mr. Thomas.  Not only did the defense inexplicably fail to allow Mr. Fitzgerald's favorable testimony, Defense counsel unreasonably permitted the state to call a rebuttal witness on this unaddressed subject.  Without Mr. Fitzgerald's testimony the jury heard that if given a life sentence Mr. Thomas would have unfettered access to weapons, drugs, and alcohol that he would be free to use in his frequent interactions with prison staff, guards, and other inmates.  Allowing such testimony to be heard without rebuttal was an inexplicable violation of counsel's ethical duty to perform as zealous advocates, as well as completely prejudicial to Mr. Thomas.

Defense counsel's unreasonable dismissal of Mr. Fitzgerald without eliciting his testimony effectively revoked Mr. Thomas's Sixth Amendment right to counsel and his Fourteenth Amendment right to due process.  If the jury had the opportunity to hear Mr. Fitzgerald's testimony, they would have been able to make an informed decision as to whether Mr. Thomas would have the opportunity to pose a risk of future danger in the Texas prison system.  Based on this testimony, the jury may have chosen to spare Mr. Thomas's life.

The defense team did equally little to prepare Mr. Fitzgerald for his testimony.  Ms. Peterson met with Mr. Fitzgerald briefly, giving him a thumbnail sketch of the crime, and Mr. Thomas's personality and criminal history.  Ex. 11 ¶ 6.  Mr. Fitzgerald did the remaining preparation independently.  *Id.*  He researched the media coverage regarding the case to simply gather further information.  *Id.*  Trial counsel did not provide Mr. Fitzgerald with any indication of the questions that might be asked.  *Id.*

The events that led to Mr. Fitzgerald not, ultimately, testifying, further evince the lack of preparation and understanding of his role and what he had to offer.  In part due to Mr. Hagood's failure to timely notify the state that Dr. Allen and Mr. Fitzgerald were testifying, and partly because neither Ms. Peterson nor Mr. Hagood appeared to have a full grasp of his qualifications or the nature of his testimony, his qualifications were intensely examined – and put into question – on voir dire.  The decision to not put him on was similarly uninformed.  Had he testified, Mr. Fitzgerald would have opined that, based upon Thomas's criminal history and the circumstances surrounding the conviction, Thomas would not have even been eligible to be considered for parole for a minimum of forty years.  Ex. 11 ¶ 10.  Furthermore, Fitzgerald was prepared to testify regarding the classification system of the Texas Department of Criminal Justice.  Ex. 11 ¶ 11.  Under that system, every offender is assigned a security level, with G1 (General Population 1) being the lowest security level, to G5, and Ad. Seg. 1 (Administrative Segregation 1) to Ad.

264

Seg. 3, being the highest.  Ex. 11 ¶ 11.  Mr. Fitzgerald's opinion, which he never got to express, was that the least restrictive classification Thomas could have advanced to was a G3 level and that Thomas would never have been allowed to work outside the penitentiary.  Ex. 11 ¶ 12.  Mr. Fitzgerald would also have testified that TDCJ routinely incarcerates offenders under extremely restrictive conditions, thereby limiting the incidents of crimes within the penal system.  Ex. 11 ¶ 13.  Finally, Mr. Fitzgerald was prepared to give a detailed overview of the day in the life of an inmate and to show the jury a video that chronicles the inner workings of the penal system.  Ex. 11 ¶ 15.

Moreover, crucial expert involvement and evidence was available, had counsel thought to seek it out.  When representing someone as severely mentally ill as Andre, appropriate expert assistance is crucial.  *See, e.g*., ABA Guideline 10.11(F)(2); ABA Guideline 11.1(A)(3); 11.7(F).  Habeas counsel elicited the assistance of three experts who provided pivotal insights into Mr. Thomas's background, behavior, and illness.

In this case, the state habeas court ultimately concluded that "the applicant has failed to prove by a preponderance of the evidence that Mr. Hagood's decision not to call Larry Fitzgerald was not trial strategy."  CL ¶ 98.  This conclusion of law is contrary to clearly established federal law.

In *Wiggins v. Smith,* the Supreme Court set out when a state determination that a trial attorney's strategic decision would be entitled to deference as set out earlier in *Strickland:*

> "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all

the circumstances,  applying a heavy measure of deference to
counsel's judgments." *Id.*, at 690-691, 80 L Ed 2d 674, 104 S Ct
2052.

539 U.S. 510, 521-522 (2003). In the present case, Mr. Hagood knew nothing about Mr.

Fitzgerald other than that he had recently been hired by Ms. Peterson. The first time he met him

was during his voir dire before Judge Fry, at which point Mr. Hagood quit. This is not a decision

based upon a "thorough investigation." Nor, a decision based upon a "less than complete

investigation." This was a decision after no investigation and expressly prohibited in *Strickland*

and *Wiggins*. Applying a heavy measure of deference does not protect Mr. Hagood in this case.

His decision cannot be justified and this Court is not bound by the State Court's findings and

conclusion in this case. Mr. Thomas received the ineffective assistance of counsel at punishment

and is thus entitled to a new punishment phase hearing.

### E.   Defense Counsel's Failure to Investigate the Qualifications of Royce Smithey or Object to his Inadmissible Testimony Constituted Ineffective Assistance.

Royce Smithey, the State's "expert" witness who was called during the sentencing phase

of trial to testify about Mr. Thomas's ability to commit future acts of violence, was wholly

unqualified to render such testimony under the *Daubert* standard.  This fact could have easily

been discovered prior to the sentencing phase, but defense counsel failed to conduct even a basic

investigation into Mr. Smithey's qualifications.  Furthermore, upon learning of his lack of

qualification during trial, defense counsel failed to object to his testimony.

Although the state habeas court considered defense counsel's errors regarding Mr.

Smithey's testimony, Mr. Thomas was not afforded just relief, due to the court's unreasonable

application of federal law and unreasonable findings of fact.  As discussed below, Mr. Thomas's

defense counsel fell far short of the Constitutional effectiveness standard set forth in *Strickland*,

and therefore Mr. Thomas did not receive a fair trial as required under the Sixth Amendment.

**1.    Defense Counsel's Failure to Prepare for or object to the Unqualified Testimony of Mr. Smithey Fell Short of Basic Professional Standards.**

The role of defense counsel entails certain minimal requirements to ensure that justice is afforded through a fair adversarial process. *Id.* at 688.  Therefore, as part of their basic role "counsel has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. In *Wiggins*, the Supreme Court ruled that failure to carry out this duty constituted ineffective representation and found that the state court's ruling to the contrary was objectively unreasonable.  539 U.S. 510 (2003) (noting that defense counsel's behavior did not comport with professional standards such as those outlined in the ABA guidelines); *see also*, *Rompilla*, 545 U.S. 374 (2005)(counsel's failure to examine file regarding defendant's prior convictions as preparation for the sentencing phase of a capital hearing was not reasonable performance); *Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) (counsel's failure to properly prepare for trial by interviewing and investigating key witnesses resulted in ineffective assistance of counsel).

In addition to the failure to perform proper investigations, the failure to object to clearly inadmissible evidence can also constitute deficient representation. *See Rios Delgado v. U.S.*, 117 F. Supp.2d 582, 589-92 (W.D. Texas 2000) (finding that a failure to object based on a number of factors could lead to a determination that counsel's performance was ineffective in violation of the Sixth Amendment). Several courts have found that failure to properly investigate and/or object to an unreliable expert constitutes deficient assistance of counsel under the *Stickland* standard.  *See*, *e.g.*, *Chatom v. White*, 858 F.2d 1479 (11th Cir. 1988); *Earls v. McCaughtry*, 379 F.3d 489 (7th Cir. 2004); *Ege v. Yukins*, 380 F.Supp.2d 852 (E.D.Mich. 2005).

In *Earls v. McCaughtry,* for example, the court found that counsel's repeated failure to object to a social worker's unqualified testimony "fell below an objective standard of

reasonableness." 379 F.3d at 494. Similarly, the defense counsel in Mr. Thomas's case clearly failed to meet the reasonable standards for effective counsel based on his failure to investigate or object to the State's clearly unqualified "expert" witness. Under Texas law, to be a qualified expert witness "[a] witness must first have sufficient background in the particular field," *Vela, Jr. v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006), and the proponent of the testimony must "show the expert possesses special knowledge as to the very matter on which he proposes to give an opinion." *Broders*, 924 S.W.2d at 152-53 (internal quotation and citation omitted). Mr. Smithey fails this test, and he therefore should have been deemed inadmissible – a fact that would have been clear to defense counsel after even the most basic level of investigation. Nevertheless, defense counsel failed to request a Daubert hearing or object to the witness.

Any objectively reasonable attorney would have concluded, based on Mr. Smithey's background and testimony, that he in no way possessed the requisite knowledge to testify regarding the matter for which the State called on him to provide an expert opinion. First and foremost, during the penalty phase of Mr. Thomas's trial, the State called Mr. Smithey to render testimony regarding Mr. Thomas's ability to commit future acts of violence in prison. *See generally* R.R. Vol. 41 pp. 153-160. However, as the state acknowledged, Mr. Smithey was only able to render general testimony on the broad subject of prison classification and prison violence. *Id* p. 153 He was unable to provide expert testimony regarding Mr. Thomas's particular propensity for future dangerousness. *Id*. In fact, Mr. Smithey admitted that he had not met Mr. Thomas, did not know Mr. Thomas, never talked to anyone in jail about Mr. Thomas, and never reviewed any jail or incident records about Mr. Thomas. *Id*. at 204 Due to Mr. Smithey's complete lack of specific knowledge regarding Mr. Thomas's propensity for future violence, which is the only relevant subject matter that such an expert could have attested to, Mr. Smithey was only able to offer non-specific testimony that every inmate had unabridged access to

weapons, drugs and alcohol. *Id.* at 161-178.  In regards to Mr. Thomas specifically, Mr. Smithey was only able to offer the unspecialized and uninformed comment that "Mr. Thomas can be as violent as he wants to be in the prison system". *Id*. at 205-206

In addition to Mr. Smithey's lack of specialized knowledge regarding Mr. Thomas, the witness also lacked the proper background or qualifications to be considered an expert in this context.   With regard to prisoner classification, Mr. Smithey admitted under oath that his knowledge on the subject of prisoner classifications was outdated. *Id*. at 159-160.  Furthermore, Mr. Smithey testified that he was "not sure" of the highest level classification Mr. Thomas could achieve with good behavior and confessed that his prior testimony about the highest level of classification that Mr. Thomas would be able to achieve was possibly incorrect. *Id*. at189-190. Also, with regard to prison violence, Mr. Smithey's actual knowledge of prison violence is questionable, as his contact with maximum security prisons was sporadic at best. *Id*. at 159  Mr. Smithey was not employed by the TDCJ, occasionally entered maximum security prisons to investigate isolated incidences of violence, and had an office medium security prison in[wording is awkward] located in northeast Texas. *Id.* at 156, 159, 162.  However, despite Mr. Smithey's obvious lack of expert qualifications and inability to provide an expert opinion regarding Mr. Thomas's defense counsel took no actions to prevent or object to the substance of Mr. Smithey's testimony. *Id* at 149-160.

Additionally, defense counsel failed to object to additional inadmissible testimony put forth by Mr. Smithey during the sentencing hearing. For example, in supporting his general claims regarding prison, Mr. Smithey cited statistics during his testimony, which indicated that the rate of disciplinary convictions for inmate on employee assaults had increased since the classification changes that were made in response to the escape of the seven individuals from the Connally Unit, a maximum security prison in Texas. *Id*. at 211-212  This statistical information

269

in no way related to Mr. Thomas specifically and was not an indicator of Mr. Thomas's alleged propensity for violence. Despite this fact, counsel failed to put forth any substantive objections regarding the relevancy or admissibility of the testimony.  *See generally id*. at 149-216.

Furthermore, as set forth above, defense counsel hired Larry Fitzgerald to testify on behalf of Mr. Thomas about the safeguards taken by the Texas Department of Criminal Justice to ensure that prisoners would not pose a risk of future dangerousness to other incarcerated individuals and prison employees.  Defense counsel inexcusably chose to rest without eliciting the testimony of Mr. Fitzgerald, despite the obvious import of his testimony to Mr. Thomas's defense. 5 Ex. 11 (Fitzgerald Aff.); *see supra* Section J.4.  Nonetheless, the State called Mr. Smithey to testify as a rebuttal witness in response *to testimony that Mr. Fitzgerald never rendered.*  Defense counsel failed to object to Mr. Smithey 's Rebuttal testimony, despite the fact that the testimony should not have been allowed under the Texas Rules of Evidence. *See* Tex. R. Evid. 403.  In short, the defense compounded its failure to present the crucial testimony of Mr. Fitzgerald by failing to object to the State's evidence provided in "rebuttal" thereto. R.R. Vol. 41 pp. 149-216.  In so doing, the defense deprived Mr. Thomas of effective assistance of counsel. *See, e.g.*, *Ake v. Oklahoma*, 470 U.S. 68, 84 (1985) (holding that the Defendant's due process rights were hindered where State offered expert testimony in the future dangerousness portion of the sentencing phase of trial and Defendant was unable to put forth similar expert testimony).

Any basic preparation on the part of defense counsel would have unearthed the lack of qualifications and expert knowledge possessed by Mr. Smithey in regards to Mr. Thomas's case. However, defense counsel clearly did not undertake even the most rudimentary investigation of Mr. Smithey, and as a result failed to request a *Daubert* hearing, subsequently object to Mr. Smithey's testimony, or provide proper contradicting expert testimony.  Defense counsel's failure to complete the basic investigation necessary to properly make objections and present

evidence at trial does not conform with professional standards and is objectively unreasonable. *See* Guidelines and Standards for Texas Capital Counsel (2006) 11.7 ("counsel at every stage of the case has the continuing duty to investigate…"); American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) 10.7 ("counsel at every stage of trial has an obligation to conduct thorough and independent investigations…"). As a result, the state court's ruling that defense counsel's representation was not deficient is an objectively unreasonable application of the clearly established doctrine for ineffective assistance of counsel as outline in *Strickland*.

### 2.      Defense Counsel's Failings with Respect to Mr. Smithey Prejudiced Mr. Thomas's Defense.

Although defendant is required to show that defense counsel's deficiencies were prejudicial to the defense, the defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case." *Strickland*, 466 U.S. at 693.  Rather, the defendant must merely show that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694. Counsel's failure to provide the jury with proper balancing of expert testimony undermines confidence in the outcome of the case. *Loyd v. Whitley*, 977 F.2d 149, 160 (5th Cir. 1992). Furthermore, the failure to investigate and interview witnesses, which in turn makes counsel unable to properly raise a defense and object to the state's case, can have a prejudicial effect. *See Moore v. Johnson*, 194 F.3d 589, 620-21 (5th Cir. 1999).

Defense counsel's series of egregious errors in regards to expert testimony during the sentencing phase of Mr. Thomas's hearing prejudiced his defense, and undermined the outcome of the sentencing determination. By not objecting to Mr. Smithey as an unqualified expert, the

jury was able to hear testimony that, although baseless, made potentially damaging inferences regarding Mr. Thomas's level of dangerousness.  Furthermore, that testimony included statistical references, which should have been objected to as inadmissible, but were not.  This inclusion of statistical evidence could have falsely lead the jury to believe that Mr. Smithey's testimony contained a trustworthy level of scientific reliability.  In addition to counsel's failure to prevent or object to Mr. Smithey's unqualified testimony, defense counsel also neglected to put forth Mr. Fitzgerald's contradicting expert testimony on the issue of future dangerousness.  Since future dangerousness is a key issue in the decision to implement a death penalty sentence counsel's failure to provide a reasonable defense in this area or at the very least prevent the State from putting forth misleading and unreliable evidence had a potentially crucial impact on the decision-making process of the jury.  There is a reasonable probability that but for defense counsel's deficient representation at least one juror would have found that Mr. Thomas did not present future dangerousness, thereby changing the outcome of the sentencing hearing. Based on this fact it is probable that defense counsel's ineffective assistance prejudiced the defense.

### 3.    The State Habeas Court's Rejection of this Claim is Based on an Unreasonable Determination of the Facts in Light of the Evidence Presented.

The state habeas court found that defense counsel failed to challenge Mr. Smithey's credentials because the defense intended to illicit information, on cross examination, from Mr. Smithey – the State's witness – which was originally intended to be put forth by the defense's own retained expert, Mr. Fitzgerald.  The information in question included videotaped footage of the prison conditions; notice that the applicant would be sent to the Connelly Unit, which was maximum security; a statement that an inmate serving life in a capital case is not housed in open housing and has other restrictions; and that there was a psychiatric unit available. The state habeas court's findings of fact imply that defense counsel's series of errors and omissions are to

be understood as an intentional tactic or trial strategy.  Although the court must respect that there are a multitude of various strategic decisions made by counsel throughout a case, a court is not required to "condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d at 604.

The finding that defense counsel purposely omitted objections to an unqualified expert in order to illicit minor information on cross examination is neither a logical nor reasonable determination based on the evidence discussed above regarding Mr. Smithey's testimony.  First, Mr. Fitzgerald could have testified to these minor matters as well as other more relevant issues regarding Mr. Thomas specifically, making him a more reasonable choice to render the testimony.  Furthermore, any benefits of the information received during Mr. Smithey's cross examination would be far outweighed by the negative effects of Mr. Smithey's direct testimony. Reasonable counsel would know that expert testimony, especially that involving statistical opinion, can be extremely convincing to a jury, and therefore counsel should have taken steps to prevent such testimony from ever reaching the ears of the jury.

The implication that defense counsel's deficiencies were strategic is further undermined by the fact that counsel failed to even object to the inadmissible testimony of Mr. Smithey during his direct. Even if there was some reason to allow Mr. Smithey's testimony, although it does not appear that there is any reasonable cost-benefit analysis to justify such a decision, professional norms and standards would require at the very least that counsel make substantive objections to Mr. Smithey's direct testimony.  The claim that counsel's deficient behavior was strategic appears to be more akin to a "*post hoc rationalization*" for ineffective representation rather than a premeditated tactic. *See Wiggins*, 539 U.S. at 527.

Overall, in light of the evidence discussed above, it is clear that the state court's factual

determinations are unreasonable.  Likewise, it is also clear that the state court unreasonably applied *Strickland* in concluding that defense counsel's representation did not constitute ineffective assistance of council because, as with the claims discussed above, the court failed to consider any of the relevant evidence Mr. Thomas presented.  *See Wiggins*, 529 U.S. at 397-98; *Bradley*, 315 F.3d at 1100.

> **F.    Defense Counsel's Failure to Challenge the Qualifications and Testimony of Dr. Peter Oropeza Constituted Constitutionally Ineffective Assistance of Counsel.**

Mr. Thomas's defense counsel failed to challenge the qualifications and testimony of Dr. Peter Oropeza, the State's expert who assessed Mr. Thomas's competency and mental state at the time of the offense.  In so doing, defense counsel violated Mr. Thomas's Sixth Amendment right to effective assistance of counsel and Fourteenth Amendment right to due process.  This claim was adjudicated on the merits in the underlying state court proceedings, however the decision of the state court involved an unreasonable application of clearly established Federal law in violation of 28 U.S.C. § 2254(d)(1).

> **1.    Defense Counsel's Conduct Fell Below an Objective Standard of Reasonableness.**

The ABA Guidelines state that defense counsel "must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and *must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination*." ABA Guideline 1.1, commentary at 5 (Rev. Ed. 2003) (emphasis added).  These guidelines have been cited by the United States Supreme Court as "guides to determining what is reasonable" for defense counsel, *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), and served as a model for the Texas Guidelines, adopted in 2006.  By failing to force the prosecution's case to "survive the crucible of meaningful adversarial testing," *United States v. Cronic*, 466 U.S. 648 (1984), Mr. Thomas's counsel fell far short of this standard.

Texas Rule of Evidence 702 has been discussed above and is functionally identical to its federal counterpart and is equally applicable to both civil and criminal cases. *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App. 1999). Thus, in a criminal case, Texas civil and federal cases may be looked to for guidance. *Id*.

Qualification of an expert is a two-step process. *Vela, Jr. v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). "A witness must first have sufficient background in a particular field. *Id*. In addition, "the proponent of the testimony has the burden to show that the expert possesses special knowledge *as to the very matter* on which he proposes to give an opinion." *Broders,* 924 S.W.2d 148, 152-53 (internal quotation and citation omitted) (emphasis added); *Vela, Jr.* , 209 S.W.3d at 131.

The record at trial contained no evidence to demonstrate that Dr. Oropeza had any training or expertise in pharmacology, in general, or regarding the effects or duration of Coricidin intoxication specifically. Neither did the record contain evidence that Dr. Oropeza was qualified to administer and interpret any of the psychological instruments administered to Mr. Thomas. Despite this lack of evidence that Dr. Oropeza met the standards to provide expert testimony, defense counsel never challenged his qualifications. Nonetheless, the appellate court found that Dr. Oropeza was qualified to provide expert testimony, based largely on an affidavit submitted by Dr. Oropeza at the time of appeal.

Defense counsel, however, had an objective duty, *at the time of trial*, to "challenge zealously the prosecution's evidence and experts through effective cross-examination." ABA Guideline 1.1, commentary at 5 (Rev. Ed. 2003); *Wiggins*, 539 U.S. at 524 (noting that these guidelines are "guides to determining what is reasonable" for defense counsel). The failure to do so constitutes ineffective assistance of counsel.

Defense counsel admit that they never adequately investigated the background of the

State's "expert," Dr. Oropeza.  *See* Ex. 15 ¶ 27.  In her affidavit, Bobbie Peterson states: "I tried to investigate the experts but was not allowed to."  Ex. 27 ¶ 10.  She also states that defense counsel "did not have a Rule 702 hearing on the experts."  *Id*.; *see also* Ex. 15 ¶ 27.

The fact that there was insufficient evidence at the time of trial to demonstrate that Dr. Oropeza was qualified to offer an expert opinion regarding Mr. Thomas's mental state should have been obvious to defense counsel had they done even cursory research.  The failure to object to Dr. Oropeza's appointment and testimony amounts to ineffective assistance of counsel.

Dr. Oropeza told that jury that, in his professional opinion, Mr. Thomas had antisocial personality disorder ("APD"), and that this meant that Mr. Thomas lacked empathy or concern for others, that he was likely to recidivate and engage in future violence, and that treatment was unlikely to be effective.  R.R. Vol. 42 pp. 8-14.  To the jury, this meant Mr. Thomas was an ideal candidate for the death penalty.  This testimony was particularly prejudicial because it came in through a supposed scientific expert.  "Scientific or expert testimony particularly courts the [danger of undue prejudice] because of its aura of special reliability and trustworthiness."  *United States v. Amoral*, 488 F.2d 148 (9th Cir. 1973).

Not only did defense counsel fail to object to Dr. Oropeza's highly prejudicial testimony; counsel failed to assess competently the bases for that testimony.  Texas Rule of Evidence 705 provides:

> Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case shall . . . be permitted to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based.  This examination shall be conducted out of the hearing of the jury.

Tex. R. Evid. 705.  Inexplicably, defense counsel waived the Rule 705 hearing with respect to Dr. Oropeza.  R.R. Vol. 42 p. 4.

Failure of counsel to request voir dire under Rule 705(b) does not create a "presumption of error." *Brown*, 974 S.W.2d at 292.  Nonetheless, the rule is violated and error may be found where counsel does not know the basis of the expert's opinions yet fails to request voir dire.  *Cf. id.* (finding no error where defense counsel knew the basis of the experts' opinions).  Here Mr. Thomas's counsel had a limited knowledge of the bases of Dr. Oropeza's opinions based on the report he submitted, however, as detailed below, they had a woeful lack of knowledge of – and never tried to find out – the particulars necessary to mount a competent challenge to those opinions.  Because they lacked a true knowledge of the bases for Dr. Oropeza's opinions, failure to conduct voir dire under Rule 705(b) was error and reflects, once again, a lack of competence.

An APD diagnosis is problematic and must not be taken at face value:

> The APD diagnosis is not only harmful, but it is frequently wrong. Sometimes the error rests on a misunderstanding of the disorder. At times, it is erroneously diagnosed because of an over-reliance on personality tests, a failure to consider the defendant's culture and background, or an inaccurate or incomplete factual basis. Too often, mental health professionals conclude that a defendant has APD for no other reason than that he has been accused of a heinous crime and may have previously committed bad acts, and the experts make no effort to understand the context in which the actions took place. In short, it is often "the lazy mental health professional's diagnosis."

John H. Blume & David P. Viosin, *Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder***,** *Mental Health & Experts Manual* (2001).  Moreover, an Axis II, or personality disorders (of which APD is one) diagnosis cannot be made without first ruling out (or at least understanding the effects of) any major Axis I mental illness.  *See*, *e.g.*, Ex. 1 a¶ 19.  Dr. Oropeza failed to do so – and defense counsel did not identify that failure.  Defense counsel should have, at minimum, delved into the validity of the tests used by Dr. Oropeza.  "The traditional psychological test battery, often including personality and cognitive testing, may be of very limited value in the context of a risk assessment."  Mary Alice Conroy, *Risk Assessment in*

*the Texas Criminal Justice System*, 2 *Applied Psych. in Crim. Justice* 147, 155 (2006).

The context and circumstances in which allegedly antisocial acts occurred is of vital importance to making an accurate diagnosis.  APD is supposed to characterize those who engaged in "a *pervasive* pattern of disregard for, and violation of, the rights of others."  *Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 645 (4th ed. 1994) ("DSM-IV") (emphasis added).  In other words, such acts must occur repeatedly in a wide range of situations.  Blume & Voisin at 72.  The diagnosis is also "supposed to characterize those who are deceitful or manipulative and who act for personal gain or pleasure without regard for the feelings of others."  *Id*. (citing DSM-IV at 645-46).  It is thus imperative that a clinician investigate, in detail, the motivation and pervasiveness of such acts before making an APD diagnosis.  *Id*.  In light of this, defense counsel should have pressed Dr. Oropeza regarding the adequacy of his investigation and validity of his diagnosis.

Dr. Oropeza should also have been questioned about other potential causes for Mr. Thomas's behavior that might preclude an APD diagnosis.  "[A]s a general rule, experts may generally not diagnose APD if there is evidence of other disorders affecting conduct."  Blume & Voisin at 72.  It is clear that Mr. Thomas suffered from mental disorders and had a history of psychotic behavior.  Dr. Oropeza noted this background in his competency evaluation as well as his assessment of Mr. Thomas's mental state at the time of the offense.  DSM-IV indicates that APD should not be diagnosed if antisocial acts result from organic causes.  DSM-IV at 632.  Given Mr. Thomas's history, counsel should obviously have questioned Dr. Oropeza regarding his diagnosis.

Mr. Thomas's apparent substance abuse problems should also have raised red flags.  Dr. Oropeza indicates that Mr. Thomas has, among other Axis I diagnoses, "[h]istory of Polysubstance Dependence" and "[h]istory of Substance Induced Psychoses with delusions and

278

hallucinations."  Ex. 166 p. 36.  Dr. Oropeza also notes that the "symptoms defendant reports and the bizarre behavior observed by others were not apparent independent of ingesting drugs." *Id*.  Indeed the prosecution based its case on the premise that Mr. Thomas was under the influence of Coricidin at the time of the offense.  Although the presence of substance-related disorders renders problematic the APD diagnosis and DSM-IV cautions against basing a diagnosis of any personality disorder solely "on behaviors that are the consequence of substance intoxication or withdrawal or that are associated with activities in the service of sustaining a dependency."  DSM-IV at 632, counsel simply did not properly prepare for Dr. Oropeza's testimony.  The failure to do so meant that counsel could not and, thus, did not, challenge the numerous opinions that failed to consider Mr. Thomas's particular condition, thereby lacking foundation.  Accordingly, competent counsel would certainly have explored this issue.

### 2.   Counsel's Deficient Performance Prejudiced Mr. Thomas's Defense.

Mr. Thomas was prejudiced by the failure of counsel to object to Dr. Oropeza's appointment and testimony and to assess the bases for that testimony.  Mr. Thomas's mental state at the time of the offense is the central issue in this case.  He admitted killing three people almost immediately after doing so.  His only defense is that he is not guilty because he was suffering from a mental defect at the time.  Dr. Oropeza was appointed as an expert on insanity evaluations.  His testimony that Mr. Thomas was sane at the time of the offense certainly had a profound effect on the jury.  Determination of sanity is beyond the ability of a lay person to assess, so jurors look to the expert for guidance.  The use of a patently unqualified expert prejudiced Mr. Thomas and the failure of defense counsel to object to that expert constitutes ineffective assistance of counsel in violation of Mr. Thomas's rights under the Sixth Amendment as well as his Fourteenth Amendment right to due process.

     **3.**     **The State Habeas Court's Determination that Defense Counsel's Failures did not Constitute Ineffective Assistance Relied on an Unreasonable Application of *Strickland v. Washington.***

Despite the foregoing, the state habeas court summarily concluded – without any consideration of the salient facts or any citation to relevant authority – that Mr. Thomas failed to prove by a preponderance of the evidence that defense counsel was ineffective for "choosing not to attack Dr. Oropeza's qualifications on non-existent grounds," CL ¶ 83, or that he was prejudiced by this failure, CL ¶ 84.  These wholly unsupported conclusions are an unreasonable application of clearly established federal law under *Strickland* because, in reaching this conclusion, the court failed to consider any of the salient evidence Mr. Thomas presented.  *See Wiggins*, 529 U.S. at 397-98; *Bradley*, 315 F.3d at 1100.

## XIX.   Defense Counsel's Repeated Failure to Object to Inadmissible Evidence was Constitutionally Ineffective.

As with its bungled handling of expert witnesses, defense counsel's repeated and continuous failure to object to plainly inadmissible evidence likewise constituted constitutionally ineffective assistance of counsel.  Neither Mr. Hagood nor Ms. Peterson were sufficiently prepared in advance of trial to enable them to lodge appropriate objections to key inadmissible evidence, including evidence that formed the foundation of the State's substance-induced psychosis theory and misleading argument that Mr. Thomas knew his actions were wrong.  Defense Counsel's failure to object to inadmissible evidence was pervasive, and showed an overall inability of counsel to identify inadmissible, damaging testimony before the damage had already been done.  Thus, the defense team's failure to object was emblematic of their overall lack of preparation and investigation.  *See, e.g*., ABA Guideline 10.7(A)(1) (providing that defense counsel has an obligation to conduct thorough and independent investigations relating both the issues of guilt and penalty); ABA Guidelines, commentary to Guideline 10.7 (stressing that due to the unique nature of death penalty cases and the challenges presented by them, it is

important that counsel "scrutinize carefully the quality of the state's case").

### A.    Defense Counsel's Failure to Object to Unfounded Lay Opinion Testimony was Constitutionally Ineffective.

Texas Rule of Evidence 701 requires a sufficient foundation for lay opinion testimony.

As explained by Texas's Third Court of Appeals:

> Rule 701 provides for the admissibility of opinions or inferences of a witness not testifying as an expert. Prior to testifying to an opinion or inference, *the witness must first lay a foundation establishing personal knowledge of the facts which form the basis of the opinion or inference*. *The opinion* or inference of the witness *must be rationally based on the witness's perception*, meaning only that it must be one which a person could normally form from observed facts. Finally, the testimony of a lay witness in the form of an opinion or inference must be helpful to a clear understanding of the witness's testimony or to the determination of a fact in issue.

*Ethicon, Inc. v. Martinez*, 835 S.W.2d 826, 831 (Tex. App.--Austin 1992) (emphasis added); *see also* Tex. R. Ev. 701.

Rule 701's well-established requirements regarding the foundation and scope of lay opinion testimony should have been well known to defense counsel, yet they repeatedly allowed lay witnesses with no foundation to opine about Mr. Thomas's mental state *at the time of the crime*.  But no lay witness at trial actually *witnessed or perceived* anything at the time of the murders.  Rather, the prosecution inappropriately sought to extrapolate lay opinions based on lay witnesses' perceptions of Thomas *before* or *after* the murders to the specific time of the murders on March 27, 2004.  *See, e.g.*, R.R. Vol. 33 p. 130-131, 133, 136, 146, 152, 169 (adverse witness N. Sims' testimony); R.R. Vol. 27 p. 171 (W. Bennie testimony).  But this type of extrapolation is decidedly the province of qualified expert witnesses, not lay witnesses.  *See, e.g.*, *Fuller v. State*, 423 S.W.2d 924, 929 (Tex. Crim. App. 1968) ("nowhere have we been able to find any opinion that would allow…nonexpert [witnesses] to say what such opinion [regarding the mental condition of the defendant] would be at a future time such as at the commission of the offense, if

such be at a different time from his observation.  To allow such an opinion would invade the realm of experts who, from their knowledge, study, and long experience, could therefrom [sic] fix a prognosis of such diseased condition of the mind and prophesy its future probable outcome").

Despite this fundamental principle, defense counsel seldom objected to adverse, lay witness opinions about Mr. Thomas's awareness of whether his actions were wrong at the time of the crime.  Those objections that were made were made after the damage resulting from unsubstantiated lay opinions had already occurred.  By their failure to investigate adequately the likely testimony of adverse witnesses before the trial, defense counsel simply failed to put themselves in a position to lodge reasoned objections.  For instance, had defense counsel performed such an investigation, they would have realized that Nurse Nancy Sims was plainly an adverse witness.  Yet, defense counsel astoundingly called her in Mr. Thomas's case-in-chief, treating her as a friendly witness and unwittingly elicited obviously damaging testimony in response to their own non-leading questions.  *See, e.g.*, R.R. Vol. 33 pp. 124-125 (Ms. Peterson eliciting narrative, repetitive testimony that Mr. Thomas *had allegedly overcome his mental illness*).  Likely because of this very error in judgment, defense counsel failed to object when the State repeatedly elicited, through egregiously leading questions, lay opinion testimony from Ms. Sims regarding Mr. Thomas's mental state at the time of the murders — testimony she had no basis to give.

Defense counsel also failed to challenge lay opinion testimony regarding the State's substance-induced psychosis theory, most notably testimony elicited by leading questions to a hospital nurse *who had just professed her lack of knowledge about Coricidin*.  *See* R.R. Vol. 34 pp. 24-25.

Under *Strickland's* first factor, defense counsel's failure to object to lay opinion

testimony ran afoul of a reasonable, minimum standard of representation, which clearly includes knowledge of the rules of evidence and the obligation to preserve objections to inadmissible evidence. *See e.g.*, *Munoz v. U.S.*, No. 07-CV-2080, 2008 WL 2942861 at *14-*23 (E.D.N.Y. Jul. 28, 2008) (trial counsel's performance was ineffective where counsel failed to object to lay testimony that government did not sufficiently lay for; evidence did not show that the witnesses had first-hand percipient knowledge of the basis for their opinions and were not basing testimony on technical or specialized knowledge.); *Reyes v. Scribner*, No. CV 06-7958-ODW (AGR), 2008 WL 2113240 at *6-*10 (trial counsel's performance fell below the objectively reasonable standard where counsel failed to object to foundationless lay opinion testimony); *See generally* Texas Guidelines at §§ 4.1, 7.1.  Further, under *Strickland's* second prong, counsel's failure to object to improper lay opinion testimony should undermine this Court's confidence in the jury's verdict, because the jury was allowed to hear inadmissible, prejudicial lay opinion testimony regarding the insanity defense and the State's substance-induced psychosis theory from witnesses who had no first-hand impressions on which to base their testimony.

### B.   Defense Counsel's Failure to Object to Overtly Leading Questioning by the State was Constitutionally Ineffective.

Just as defense counsel failed to object on foundation grounds to lay opinion testimony, they neglected to challenge the leading form of the State's questioning of their own witnesses. "The rationale for the general prohibition on leading questions when eliciting direct testimony from a witness is to prevent an attorney from testifying and then merely asking for agreement from the witness." *In re J.G.*, 195 S.W.3d 161, 183 (Tex. Ct. App. 2006).  Here, the prosecutor, Mr. Ashmore, repeatedly lead both lay and expert witnesses to merely accede to his own testimony about the ultimate issue of Mr. Thomas's mental state and regarding the State's substance-induced psychosis theory.  Yet neither Mr. Hagood nor Ms. Peterson objected to this

strategy, resulting in the jury hearing Mr. Ashmore's improper narratives rather than substantiated testimony from his witnesses.

For instance, Mr. Ashmore suggested the answer he sought to Ranger William Bennie – that Mr. Thomas allegedly calculated the fastest escape route from the murder scene.  *See* R.R. Vol. 27 p. 171.  Mr. Ashmore also lead State-retained expert Dr. Scarano to accede to Mr. Ashmore's contention that Mr. Thomas met the legal definition of voluntary intoxication prior to the murders.  R.R. Vol. 31 p. 120.  Mr. Ashmore continued to propound leading questions to several additional witnesses, including the defendant's father Danny Thomas (*see* R.R. Vol. 28 p. 155), who, after trying to assist in his son's defense and being rebuffed by defense counsel was called adversely to his son by the State.  *See* Ex. 32 ¶ 18.

Despite the obvious prejudice created by allowing Mr. Ashmore to testify on his own during the examination of numerous adverse witnesses, neither Mr. Hagood nor Ms. Peterson objected.  Their failure again fell short of the most fundamental professional standards for trial practice, and allowed the State to spoon feed the jury with its unverified version of the facts. Defense counsel's shortcomings in this regard should undermine this Court's confidence in the guilty verdict.

### C. Defense Counsel's Failure to Object to Hearsay Likewise was Constitutionally Ineffective.

Where, as here, it is obvious that there could be no reasonable trial strategy under which defense counsel withheld objections to hearsay evidence, the *Strickland* standard is met.  *See Glasgow v. State*, No. 05-04-00074-CR, 2005 WL 906129 at *5 (Tex. Ct. App. 2005) (sustaining habeas appellant's point of error for ineffective assistance of defense counsel for failure to object to obviously damaging hearsay evidence); *see also Illinois v. Flewellen,* 652 N.E.2d 1316, 1319-21 (Ill. Ct. App. 1995) (trial counsel's failure to object to hearsay damaging to client constituted

ineffective assistance of counsel).  Their lack of any strategy to withhold evidentiary objections is made apparent by a cursory review of the rank hearsay that entered the record unchallenged at trial.  Even more telling is defense counsel's own solicitation of damaging hearsay evidence on cross-examination of an adverse witness without then moving to strike the objectionable, and prejudicial hearsay.

For instance, Mr. Ashmore repeatedly elicited wholly unverifiable hearsay not falling under any exception from Bryant Hughes on direct examination.  R.R. Vol. 30 pp. 39-43.  This obviously inadmissible hearsay was aimed at developing a rational motive for Mr. Thomas's irrational murders:  that Mr. Thomas allegedly wanted Laura Boren back, and was enraged after she rejected him over the telephone.  *See id.*  Without any interruption by the defense, the prosecution was able to plant the seed of completely one-sided theme in the jury's minds.  No conceivable trial strategy would have defense counsel allow this prejudicial evidence of a possible motive enter the record when it was obviously hearsay – an out of court statement by Laura Boren related by a testifying witness to prove the truth of the matter asserted:  that Laura had reason to be frightened of Mr. Thomas, who became angry after she rejected him.  *See id.*

Indeed, defense counsel merely accentuated the negative impact of this hearsay evidence of a purported motive for the crime by soliciting further hearsay from the declarant; *i.e.,* Laura Boren, on cross examination of Mr. Hughes.  Defense counsel allowed Mr. Hughes to volunteer non-responsive hearsay regarding Laura Boren's alleged statement that Mr. Thomas told her he could "get away with killing somebody."  *See* R.R. Vol. 30 p. 77.  Defense counsel failed to preserve an objection that the answer was non-responsive or that it included inadmissible hearsay.  If the objection was lodged, it would have been clear error for the trial court to overrule it in light of the hearsay rule's plain application to this statement.

Thus, defense counsel failed Mr. Thomas by allowing plainly damaging hearsay to be

admitted unfettered.  Fundamental, minimum standards of trial representation require the ability to understand and utilize the hearsay rule to protect the interests of one's client.  But defense counsel consistently neglected their obligation to employ the rule, even where the result was the introduction of motive evidence that could not have been elicited through any other (admissible) source.  Evidence of a rational motive for seemingly irrational crimes most certainly played in to the jury's decision.

Counsel's failure to object to otherwise inadmissible testimony was error resulting in a denial of due process.  Counsel's conduct fell below an objective level of acceptance and the resulting prejudice was the admission of testimony including a hearsay statement that Mr. Thomas believed he could get away with murder.  Thus, Mr. Thomas's rights under the Sixth and Fourteenth Amendments were violated and his conviction should be reversed and a new trial ordered.

### D.     The State Court Findings and Conclusions do not Preclude Relief by this Court.

The state habeas court did not make any factual findings relevant to this claim of relief, and the only pertinent conclusion of law is based on an unreasonable application of *Strickland*. The record is clear that trial counsel did fail to object on numerous occasions as indicated above. On this record, the state habeas court denied this claim for relief stating only that "[t]he applicant has failed to prove by a preponderance of the evidence that his attorney was ineffective for not objecting to *every* objectionable question asked by the State."  CL ¶ 104 (emphasis added).[73] But Petitioner's argument on this claim for relief is not that trial counsel is deficient for not objecting to every single one of the State's objectionable questions.  Rather, this claim for relief

---

[73] Notably, the state habeas court did not make any ruling on whether the outcome of the trial may have been different if trial counsel would have objected to some or all of the testimony identified herein.

is founded on trial counsel's pervasive failure to object to multiple, critical portions of plainly

objectionable testimony that bore on the core issues in the case – sanity and motive.  Trial

counsel did not just make one or two decisions to withhold an objection on strategic grounds;

trial counsel seriously disregarded their obligation to actively object to core segments of the

prosecution's case that the State may not have been able to admit into evidence over trial

counsel's objection.  The state habeas court applied *Strickland* unreasonably by requiring

Petitioner to prove *every one* of trial counsel's failures to object constituted deficient

performance.  But such a burden is not imposed by *Strickland*.  As noted above, trial counsel fell

below an objectively reasonable standard for performance by repeatedly missing objections to

plainly objectionable, and extremely damaging testimony offered by the State.  Petitioner's

burden was satisfied, but the state habeas court applied *Strickland* unreasonably in denying this

claim for relief.

**XX.  Counsel Was Constitutionally Ineffective for Failing to Object to the Court's Erroneous Instruction on, and the Entire Evidence Regarding, Voluntary Intoxication as there was No Intoxication and It Should Have Never Infected the Trial.**

Judge Fry's instruction to the jury on voluntary intoxication was error, as it was not

warranted by the evidence, which is devoid of any proof that Mr. Thomas was intoxicated at the

time of the crime.  He was insane.  Defense counsel did not seem to recognize this fundamental

flaw, and failed to object to the instruction, and the state's reliance on the theory of voluntary

intoxication.  These failings were profoundly prejudicial.

Failure to object to an improper instruction to the jury has been deemed to fall below the

objective reasonableness standard as established in Strickland.  *See Joseph v. Coyle*, 469 F.3d

441 (6th Cir. 2006); *Carpenter v. Vaughn*, 296 F.3d 138 (3rd Cir. 2002). In *Joseph v. Coyle*, the

Sixth Circuit Court of Appeals affirmed the district court's finding that defense counsel was

ineffective for failing to object to a flawed indictment and erroneous jury instruction.  469 F.3d 441 (6th Cir. 2006). The court found ineffective assistance of counsel because defense counsel failed to meet its constitutional obligation to investigate and understand the law, as revealed by his failure to object to the misstatements of law.  *Id.* at 460.

Under *Strickland*'s second prong, a "reasonable probability" the result would have been different is merely "probability sufficient to undermine confidence in the outcome" of trial. Strickland, 446 U.S. at 695.  Because Texas law requires jurors to agree unanimously on the issues before them at both phases of the trial, the proper prejudice analysis for ineffective assistance claims is whether one juror would have chosen to vote "no."  *See, e.g.*, *Motley v. Collins*, 18 F.3d 1223, 1227 & n.3 (5th Cir.), cert. denied, 513 U.S. 960 (1994) (citing *Landry v. Lynaugh*, 844 F.2d 1117, 1120 (5th Cir.), cert. denied, 488 U.S. 900 (1988)); *see also Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (the relevant inquiry is whether one juror's mind might have been changed had counsel performed adequately).

Mr. Thomas's trial counsel fell well short of these fundamental professional standards, depriving him of the effective assistance of counsel and creating great doubt regarding the accuracy of both the guilty verdict and the death sentence.

**A.    Defense Counsel's Failure to Object to the Court's Substantive Law Instruction s and Numerous Misstatements of the Law was Objectively Unreasonable.**

**1.    Preliminary Instructions to the Venire.**

Prior to the commencement of voir dire, Judge Fry gave substantive law instructions to the entire venire.  R.R. Vol. 11 pp. 67-72.   The Court instructed as to the substantive law of capital murder, as contemplated in the State's indictment, and instructed regarding the substantive law of insanity as pleaded by Mr. Thomas as his defense.  In addition, however, the Court further instructed the panel regarding the issue of voluntary intoxication:

> … voluntary intoxication does not constitute a defense to the commission of a crime.  Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.  Therefore, if a person was intoxicated at the time of the offense, that is disturbance of mental or physical capacity resulting from the introduction of any substance into the body, such would not qualify as a defense to the commission of an offense.

R.R., Vol. 11 p. 71-72.

This instruction was erroneous and counsel's failure to recognize the error prejudiced Mr. Thomas.  The voluntary intoxication section of the Texas Penal Code relates to punishment mitigation and, when warranted by the evidentiary record, causation.  Tex. Penal Code § 8.04.  Voluntary intoxication is not a defense to the commission of crime but, "[e]vidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried."  Id. at § 8.04(b).  The Code specifies certain circumstances where a court must give a voluntary intoxication instruction in mitigation but "does not preclude the giving of [one] if circumstances … otherwise raise an issue."  *Taylor v. State*, 885 S.W.2d 154, 156 (Tex. Crim. App. 1994) (en banc).

Because the substantive law of voluntary intoxication was not raised by the State's capital murder indictment, was not part of Mr. Thomas's defense of not guilty by reason of insanity, and was not implicated by the evidence the defense should have anticipated the State was going to introduce at trial, the Court's preliminary instruction poisoned everything that was to follow.

The trial court recognized this error without admitting it. In FF ¶ 20, the trial court notes that blood and urine samples "did not reveal any evidence of intoxication."  This is a finding that cannot be reconciled with the subsequent conclusion of law that a voluntary intoxication instruction "may be warranted when the record includes evidence of intoxication" and "a

voluntary intoxication instruction given at the guilt/innocence phase is erroneous if the record is devoid of sufficient intoxication evidence." CL ¶18.  In order to attempt to smooth over this blatant inconsistency, the trial court concluded that Mr. Thomas has waived his complaint about this error. CL ¶ 20.  This issue was raised as an independent ineffective assistance of counsel claim in the state habeas application and there is no waiver.  The trial court was wrong to give the instruction, Mr. Thomas's attorneys were ineffective for failing to object, and the combination set the stage for the circus that followed, resulting in an obviously insane man being found sane and sentenced to death.

Defense counsel's failure to object to the premature preliminary instruction regarding voluntary intoxication fell below the "objective standard of reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 690.  This failure demonstrates that counsel failed to meet its constitutional obligation to investigate and understand the law. *Joseph v. Coyle*, 469 F.3d at 460. This failure to investigate and prepare precludes any later assertion that defense counsels' failings were based on the result of strategy.

## 2. The PowerPoint Presentation to the Venire.

Mr. Hagood and Ms. Peterson magnified the Court's error by joining the State in their presentation to the venire of PowerPoint slides containing very harmful misstatements of the law applicable to voluntary intoxication.  *See* Ex. 41; R.R. Vol. 21 pp. 84-87.  Of course, the defense should have opposed any reference to voluntary intoxication.  Instead, counsel not only acquiesced to the State's strategy, but endorsed it, and thereby undermined Mr. Thomas's defense in the presence of future jurors.

The PowerPoint presentation made to the venire contained two egregious misstatements of the law.  The first was, "Where there is evidence of drugs or alcohol, insanity defense is considered with intoxication instructions."  Ex. 41 at Slide 6.  That statement is a perversion of

the correct inquiry for a jury charged with determining a defendant's due process rights respecting an affirmative defense.

This quote betrays defense counsels' ignorance of *Nethery v. State*, 692 S.W.2d 686, the key precedent closely analogous to this case although it was addressing the propriety of an intoxication instruction in the punishment phase of a capital case.  *Id.*  In *Nethery*, an intoxication instruction was denied in the punishment phase of a capital case notwithstanding evidence that appellant had consumed numerous alcoholic beverages and smoked marijuana prior to committing murder.  692 S.W.2d 686 (Tex. Crim. App. 1985).  The record in *Nethery* even included appellant's statement to an investigator that he was drunk at the time of the offense. 692 S.W.2d at 701.  Reasoning that the record contained insufficient evidence of the effect of the consumed intoxicants on the appellant's mental and physical capacity because of appellant's physical acts during and after the murder, *Nethery* held that the evidence did not raise the issue of intoxication and thus did not require an intoxication charge.  *Id.* at 711; *see also Taylor v. State*, 885 S.W.2d 154, 158 (Tex. Crim. App. 1994).  Clearly *Nethery* compels the conclusion that the state's and court's statements and instructions on voluntary intoxication in Mr. Thomas' trial were in error, and counsels' failure to raise that fact was deficient.

The second misstatement in the PowerPoint presentation was both troubling and confusing.  The PowerPoint provided that, "Insanity caused by the aggravation of a pre-existing mental condition by alcohol or drugs is not a defense to a crime."  Ex. 41 at Slide 8.  As discussed *supra*, this characterization is inconsistent with the controlling cases regarding the relation between intoxication evidence and an insanity defense.  *See, e.g*., *Taylor v. State*, 856 S.W.2d 459, 472 (Tex. Crim. App. 1994) (en banc).  Contrary to the PowerPoint's explication of the law, drugs or alcohol could aggravate a pre-existing mental condition, yet a jury may still find a defendant insane if they did not "attribute" the insanity to the drugs or alcohol

independently causing the insanity.  The PowerPoint instruction precludes such an option and is thus contrary to Texas law; defense counsel's joining in this presentation, let alone their failure to object, was constitutionally deficient.

### 3.       The State's Opening Statement.

In its opening statement to the empanelled jury, the State took the license given it by Mr. Thomas's ineffective trial counsel and framed for the jurors a conception of the applicable law highly favorable to the prosecution's case theory and clearly at odds with the established law and the interests of Mr. Thomas:

> The law of the State of Texas from Section 8.04 of the Texas Penal Code says, voluntary intoxication does not constitute a defense to the commission of a crime.  In other words, you can't go out here and do a bunch of drugging and drinking and get all messed up and go kill folks and then get off for it.  But intoxication just doesn't mean being drunk or being high from drugs at the exact specific time of the crime.  It has a larger, broader meaning than that.
>
> Intoxication means disturbance of mental or physical capacity resulting from any introduction of any substance into the body. You will be instructed that in this case.  That's why we talked to you in jury selection about it.  Since intoxication means disturbance of mental capacity from putting anything into your body, and mental illness caused by or aggravated by, made worse by, intoxication, does not qualify as a defense, thank goodness, in the State of Texas.  It is not considered to be a mental illness that allows somebody to escape responsibility for the slaughter of three people.

R.R. Vol. 27 pp. 35-36 (emphasis added).

The State incorrectly stated the law to its advantage following the Court's misstatement of the law at the start of jury selection.  Even evidence sufficient to raise an issue of intoxication cannot divest a defendant of his affirmative defense of insanity.  Ignoring the showing needed to even introduce intoxication evidence, the State apparently did so in an effort to suggest that voluntary intoxication always trumps the defense of insanity when the record possesses evidence of both.  This was clear error to which defense counsel should have objected.  The Court of

Criminal Appeals held in *Taylor*, that a jury may find that a defendant was intoxicated as

contemplated under § 8.04 of the Texas Penal Code yet still be not guilty by reason of insanity

pursuant to § 8.01.  *Taylor*, 885 S.W.2d at 158.  Thus, the proper inquiry is not as the State

suggested in its opening.  Rather, intoxication can only be considered properly after a jury

decides the insanity question.  Yet the defense failed to object to this highly prejudicial

misstatement of the law.

### 4.      The State's Closing Statement.

Following the trial court's constitutionally defective jury charge, the State's closing

argument exploited the heavily emphasized and never corrected misstatements of Texas's

voluntary intoxication law to virtually foreclose a not guilty by reason of insanity verdict.  The

State made three misstatements of the law during its closing, all of which further prejudiced Mr.

Thomas in the most crucial stage of his trial.  Even at the end of trial, after all the evidence was

in, defense counsel failed to muster a single objection on the basis that  the evidence did not

support a voluntary intoxication instruction.

### a.      Closing misstatement No. 1.

The State's first misstatement was as follows:

> Because ladies and gentlemen of the jury, if you will remember,
> through voir dire, and what's in the Court's Charge, intoxication is
> a mental disturbance – disturbance of a mental faculty by the
> introduction of anything into the body.  And we covered this in
> voir dire with each and everyone of y'all.  If you have a preexisting
> condition and you take a bunch of drugs and drink and it
> aggravates it, it doesn't fall under a mental illness.  It falls under
> intoxication, which isn't a defense.  And each one of you said, We
> can follow that law, and that is why we asked it.

R.R. Vol. 37 pp. 89-90 (emphasis added).

The reference to voir dire is significant in that it underscores the prejudice - fostered by

the State – resulting from the defense team's failure to object to improper instructions from the

293

moment the trial began.  Defense counsel's errors were of both commission, (in jointly agreeing to the inaccurate PowerPoint presentation, which amounted to the defense team effectively ratifying the State's theory of the case), and omission, (in repeatedly failing to object).

The State's argument also misstates (again) Texas law, as it presumes, as Texas law requires, that the case included evidence of intoxication.  In truth, there was only evidence of prior drug abuse, not of consumption proximate to the time of the events, and no actual evidence of Mr. Thomas being intoxicated.  The State's argument thus implies that, with respect to an individual with a preexisting mental health issue, mere evidence of  intoxication will require a finding of voluntary intoxication irrespective of any other evidence.  As discussed *supra*, the proper inquiry based on the decision in *Taylor* is that the jury first decides whether a defendant was insane and then—if, and only if, the record contains evidence of intoxication—the jury evaluates whether the defendant was voluntarily intoxicated.  Only at that juncture may a jury consider whether the defendant's insanity was attributable to voluntary intoxication.  885 S.W.2d at 15.

### b.        Closing misstatement No. 2.

The State's second misstatement was as follows:

> And the defendant knew those drugs were messing him up, and he kept on voluntarily taking them.  And that is why they can't use that as a defense in this case. . . Because under the law of the state of Texas, whether you are high or whether you cause yourself to have a certain mental state by the use of intoxicants, we are not going to let you get away with slaughtering three people, and that is why we have that law, and thank goodness we live in a state to where we believe that.

R.R. Vol. 37 p. 94.

Here, the State again implies that the jury need not consider whether a person has an underlying "mental disease or defect" pursuant to Tex. Penal Code § 8.01(a) that may be the cause of insanity if they merely use drugs or alcohol, irrespective of whether the substances

actually intoxicate the individual.  The State's approach obliterated the distinction between insanity and voluntary intoxication under Texas law.  Tex. Penal Code §§ 8.01, 8.04.  Evidence of insanity or "mental disease or defect" requires the jury to determine whether the defense proved, to quote the jury charge, "by a preponderance of the evidence that he [the defendant] was insane at the time of the offense," and, if the defense did meet that burden, then "find the defendant not guilty by reason of insanity."  R.R. Vol. 37 p. 10.  To the extent any further inquiry into any question concerning intoxication is required by the evidence, that inquiry must follow the insanity determination.  *See Taylor*, *supra*.

### c.    Closing misstatement No. 3.

The State's final misstatement was as follows:

> By the way, Dr. Harrison also agreed with Dr. Gripon and said, if someone is using – is schizophrenic, they start using drugs, it is going to exacerbate the condition.  And that falls under the definition of intoxication.

R.R. Vol. 37 pp. 101-102.  (emphasis added).

A conclusory statement that the use of drugs by a defendant with a mental disease or defect, as contemplated in Tex. Penal Code § 8.01(a), automatically falls under the voluntary intoxication definition distorts the law of voluntary intoxication so that it may be applied to facts that have no proper connection to whether a defendant is insane under Texas law.  Again, the proper inquiry is governed by *Taylor*.  In order for a jury to be able to find that a defendant is both not guilty by reason of insanity and intoxicated, the jury must first arrive at the conclusion from the evidence that the defendant was insane at the time of the offense and then go on to evaluate intoxication evidence, and, if ultimately needed, conduct the *Jaynes* analysis employed by the *Taylor* Court to verify that the jury did not attribute Mr. Thomas's insanity to voluntary intoxication.  *See Jaynes v. State*, 673 S.W.2d 198, 202 (Tex. Crim. App. 1984) (holding that "the jury was free to find that appellant had no knowledge of the accident [which was appellant's

defense to hit and run charge] as long as they did not attribute that lack of knowledge to intoxication [which the record had ample evidence of]).”

Counsels’ failure to object to the state’s misstatements of the law during its closing arguments was constitutionally deficient, and prejudiced Mr. Thomas at both phases of his trial.

### B. There is a Reasonable Probability that the Result of the State Proceeding would have been Different but for Defense Counsel’s Deficient Performance in Failing to Object to the Court’s Error, and all that Followed.

The trial court’s emphasis on the issue of voluntary intoxication in front of prospective jurors, before any evidence came in, greatly prejudiced Mr. Thomas.  The State put this rope in the trial court’s hand, then took the rope and ran with it while Mr. Thomas’s attorneys gave free reign.  It is long settled that the language and conduct of the trial court is understood to have great influence on the jury.  *Cf. Bollenbach v. United States*, 326 U.S. 607 (1946) (reversing conspiracy conviction due to erroneous “last minute instruction” in jury charge, noting that “the judge’s last word is apt to be the decisive word” in a criminal trial).

Here, Mr. Thomas’s counsel failed to ever object to the Court’s voluntary intoxication instruction to the entire venire panel.  *See* R.R. Vol. 11, et seq.   That failure, of course, precluded any chance for the defense to avoid the Court’s emphasis on the role of voluntary intoxication in the prospective case.  *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995).  Similarly, the failure to object meant there could be no curative instruction, depriving the defense of any chance to undo the harm to Mr. Thomas that resulted from framing voluntary intoxication as a substantive aspect of the trial on par with the substantive law of the charged crime and the pleaded defense.  *See Taylor*, 856 S.W.2d at 471-72.   Thus, the second prong in the Strickland standard of prejudice is met, as there is a reasonable likelihood that the outcome of the trial “would have been different absent the errors.” *Strickland*, 466 U.S. at 696.

The instruction was all the more prejudicial because the record ultimately developed did

not meet the *Taylor* requirements warranting an instruction that would even allow the jury to consider finding Mr. Thomas to be intoxicated at the time of the slayings.  Thus, the impact of the Court's error at the time of voir dire was greatly magnified in reference to the ultimate record, which strongly suggests that the improper instruction severely tainted the jury's ultimate perspective on the proper legal relationship between the insanity defense and intoxication.  *Cf. Lopez v. State*, 779 S.W.2d 411, 416 (Tex. Crim. App. 1989) (noting that an improper intoxication instruction on voir dire, even over objection, warrants strong presumption that jury accepted the faulty instruction).

Collateral relief exists to correct harms suffered due to "fundamental defects or omissions inconsistent with the rudimentary demands of fair procedure."  *Brecht v. Abrahamson*, 507 U.S. 619, 640, 113 S.Ct. 1710, 1723 (1993) (Stevens, J., concurring) (citing *Sunal v. Large*, 332 U.S. 174, 178, 67 S.Ct. 1588, 1590 (1947); U*nited States v. Timmreck*, 441 U.S. 780, 783, 99 S.Ct. 2085, 2087 (1979); *Brecht*, 507 U.S. at 637-38, 113 S.Ct. at 1721-22 (Rehnquist, C.J., plurality); 507 U.S. at 640-41, 113 S.Ct. at 1723 (Stevens, J., concurring) (established that the harmless-error standard announced in *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946), applies to the habeas review of constitutional error); *Hedgpeth v. Pulido*, 129 S.Ct. 530, 530-31 (2008) (per curiam).  The harmless-error analysis under *Kotteakos* "'cannot be merely whether there was enough to support the result' in the absence of the error.  Rather, the proper question is 'whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand.'"  *Hedgpeth*, 129 S.Ct. at 535 (Stevens, J., dissenting, joined by Souter, J. and Ginsberg, J.) (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1239).

The *Kotteakos* standard places the burden on the State to prove that the error in question was harmless.  328 U.S. at 760, 66 S.Ct. at 1246.  Further, as set forth in Justice Stevens's opinion concurring with the plurality in *Brecht*, the *Kotteakos* standard requires that a "habeas

court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place. *Kotteakos* is full of warnings to avoid that result. It requires a reviewing court to decide that 'the error did not influence the jury,' (328 U.S. at 764, 66 S.Ct. at 1248) and that 'the judgment was not substantially swayed by the error,' (328 U.S. at 764, 66 S.Ct. at 1248)." *Brecht*, 507 U.S. at 642, 113 S.Ct. 1724 (Stevens, J., concurring).

As explained below, an objective evaluation of the multiple errors relating to the voluntary intoxication instruction requires the conclusion that the errors were not merely likely to sway the jury to have rendered an unconstitutional verdict. Rather, the review answers negatively Justice Scalia's question in *Sullivan v. Louisiana,* of whether "the guilty verdict actually rendered in this trial was surely unattributable to the error." 508 U.S. 275, 113 S.Ct. 2078 (1993) (discussing harmless error in deciding that an unconstitutional "reasonable doubt" instruction qualifies as structural error). There can be no confidence that Mr. Thomas's guilty verdict was rendered in a way not attributable to the erroneous instruction.

Accordingly, defense counsel's failure to object to the Court's error denied Mr. Thomas his constitutional right to effective assistance of counsel. What followed was a factual and legal fantasy that Mr. Thomas was intoxicated by "40's, blunts and DXM" which caused him to kill the victims. Judge Fry's findings say as much while attempting to say the error was waived. The trial that resulted – focusing intently on the question of voluntary intoxication – clearly prejudiced Mr. Thomas. It is undeniable that, had the evidence been excluded or, at a minimum properly presented one juror might have decided differently at either the guilt or punishment phase of the trial. Thus, Mr. Thomas is entitled to a new trial based upon defense counsels' deficient actions and the prejudice that resulted.

**XXI.  The Cumulative Evidence of Counsel's Copious Failures at Both Phases of Mr. Thomas's Trial Unequivocally Constitutes Constitutionally Ineffective Assistance of Counsel.**

As outlined above, defense counsel denied Mr. Thomas his constitutional right to effective assistance of counsel in myriad separate failures during both the guilt and sentencing phases of Mr. Thomas's capital trial.  The cumulative effect of these failings prejudiced Mr. Thomas.

The trial court concluded that Mr. Thomas "failed to provide by a preponderance of the evidence that any of Grounds 1 through 36 were actually error.  As such they cannot accumulate into reversible error."  CL ¶ 106.  This is misstatement is contrary to Supreme Court law. Cumulative error can and must be considered irrespective of whether error is shown on the individual claims.  In evaluating the prejudice resulting from counsels' numerous errors, the state habeas court was required to consider the cumulative effect of all of the alleged deficiencies taken together, rather than judging the effect of each in isolation.  *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) ("[T]he question [under *Strickland*] is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable"); *Livingston v. Johnson*, 107 F.3d 297, 308-309 (5th Cir. 1997) (noting that district court correctly considered whether habeas petitioner had suffered cumulative harm from various claimed instances of deficient attorney performance); *see also, e.g., Williams v. Washington*, 59 F.3d 673, 682 (7th Cir.1995) ("a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was [prejudicial]"); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.1991) (a "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions"); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir.1992) (finding that "significant errors . . . , considered cumulatively, compel affirmance of the district court's grant of habeas corpus).

Moreover, as outlined *supra*, to impose a "preponderance of the evidence" standard on

the *Strickland* prejudice showing is clearly contrary to Supreme Court law.  *See Williams*, 529 U.S. at 405-406.

In light of the deficient performance at both phases of Mr. Thomas trial, and the evidence that was available but never presented, there is reasonable probability that the outcome of Mr. Thomas's trial would have been different had counsel performed effectively.  At guilt, crucial aspects of the State's case would have been challenged and discredited, and a powerful case of insanity and incompetence could have been presented.  At punishment, had the mitigating and "future dangerousness" evidence been presented, there is a reasonable probability that at least one juror would have struck a different balance.  The cumulative effect of trial counsel's deficient performance compels relief.

## XXII.  The State Violated Mr. Thomas's Due Process Rights under the Fifth, Sixth and Fourteenth Amendments when the State Knowingly Presented False and Misleading Testimony in Violation of *Napue v. Illinois* and its Progeny.

A state denies a criminal defendant due process when it knowingly uses false evidence, including false testimony, to obtain a conviction.  *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997); *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir 1994).  Indeed, there is a duty upon the state to correct false evidence even if not solicited by the state.  *Napue*, 360 U.S. at 269.  This duty to correct extends to circumstances when the state allows the jury to be presented with a materially false impression.  *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Davis v. State*, 831 S.W.2d 426, 439 (Tex. App. 1992) (holding district attorney's questioning that knowingly created false impression that witness volunteered to correct her testimony was a violation of due process).  Even where the state has fulfilled its duty to disclose evidence known to be false, the state can violate due process by capitalizing on the false evidence and encouraging the jury to rely on the false evidence.  *See United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977)

(holding prosecutor violated due process by capitalizing and using false testimony in his closing to procure a conviction).  *Habeas* relief is warranted if there is a reasonable likelihood that the false testimony could have affected the jury's determination.  *United States v. Bagley*, 473 U.S. 667, 678-79 & n.9 (1985); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

To state a due process violation under the *Napue* doctrine, an applicant must show that (1) the testimony in question was actually false, (2) the state knew it was false, and (3) the testimony was material.  *See O'Keefe*, 128 F.3d at 893; *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996); *Blackmon*, 22 F.3d at 565.  In this case, the State solicited false and misleading testimony about whether Mr. Thomas was intoxicated at the time of the crime, and exploited it in violation of Mr. Thomas's due process rights.  The State also permitted misleading testimony to be presented through experts with inadequate foundation for their opinions that Coricidin taken in combination with alcohol and marijuana some 36 hours before the slayings caused Mr. Thomas to experience a substance-induced psychosis.

## A.      The State Knowingly Used False Testimony.

It is sufficient to satisfy the false and knowing elements if the testimony is false or misleading, and the state knew it and failed to correct such testimony.  *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 153-54; *Davis*, 831 S.W.2d at 439.  There is no need for the defendant to show that the witness providing the testimony "knew the testimony was false."  *See Ramirez*, 96 S.W.3d at 395.  It is further not necessary to demonstrate that the witness giving the false testimony was technically incorrect.  *Id*.  Instead, it is sufficient if the witness's testimony gives the trier of fact a false impression and the prosecutor, knowing that the impression is false, does nothing to correct it.  *See id.* at 395; *Davis*, 831 S.W. 2d at 439.

### 1.      The State and its Experts gave the False Impression that Mr. Thomas was Intoxicated on March 27, 2004.

Early on, the State began its indoctrination of the jurors with the false impression that (1)

301

Mr. Thomas was intoxicated on the day of the murders and (2) such intoxication nullified the

availability of the insanity defense.  On voir dire, the State made the following statement:

> Mr. Ashmore: Now, what do I mean by intoxication?  I think the Court will tell you that intoxication means --- Joe, if you could flip over to that next one.
>
> Intoxication means disturbance of mental or physical capacity that results from putting anything into my body.  Okay.  Now, let's look at this definition.  Intoxication means disturbance of mental or physical capacity.  Now, one of the things that means, Mr. Lashley, is, intoxication means more than just being high at the time of the crime.  What do I mean by that?  Well, one of the things that we know from this definition is the fact that voluntary intoxication isn't a defense.
>
> . . .And lets assume I go out and I snort cocaine, I drink a bunch of scotch, and I have been doing that for six months and I become psychotic.  And for two days, I don't do any drugs or alcohol, but I'm still psychotic.  And I go out and I shoot Joe Brown.  I'm not high at the exact moment I do that, but that definition of intoxication still means it is not a defense.
>
> Venireperson: Right
>
> . . .
>
> Mr. Ashmore:  But let's assume I'm bipolar, but I'm sane.  Okay.  So, my mental illness is not so bad.  It is not so severe that I don't know right from wrong.
>
> Venireperson: Right.
>
> Mr. Ashmore:  But I commence to doing a bunch of drugs and alcohol and I aggravate, or I make that preexisting mental condition a lot worse, to such an extent that I don't know my conduct was wrong.
>
> Venireperson: Right.
>
> Mr. Ashmore: That is not a defense.
>
> Venireperson: right.

R.R. Vol. 21 pp. 84-87.  This explanation of the law of intoxication is patently incorrect and

misleading.  *See infra*.

Having set up the intoxication issue by misstating the law in voir dire, the State underscored the misimpression with its false and misleading questions, in voir dire and later, and with the false and misleading testimony that it elicited from Drs. Axelrad and Scarano that Mr. Thomas was intoxicated on the day of the slayings.  *See, e.g.,* R.R. Vol. 31 p. 120 (Dr. Scarano agreeing that "whatever delusions" Mr. Thomas "suffered from . . . were substance-induced, so they fall under the intoxication definition") (emphasis added); R.R. Vol. 34 pp. 139-140 (Dr. Axelrad agreeing that his "diagnosis of substance-induced psychosis includes the legal definition of intoxication under Section 8.04 of the Penal Code") (emphasis added).  Additionally, the State's questions gave the implication that Mr. Thomas was taking drugs everyday leading up to March 27, 2004.  For example, the prosecutor asked the following question of Dr. Scarano:

> Q:    Does the fact that the defendant, again on the heels of taking Coricidin, smoking four or five blunts of marijuana *a day* and drinking--- does it surprise you that the defendant would exhibit that type of behavior?
>
> A:    No, it does not.

R.R. Vol. 31 pp. 114-115. (emphasis added).  In the following example, the State itself goes out of the way to unnecessarily insert the misleading testimony although it is not necessary to the question posed to Dr. Axelrad:

> Q:    Now, let's assume that I'm taking me a little Coricidin and I'm drinking me a couple of 40s and I roll me up about four or five blunts *a day* and I've got them soaked in formaldehyde.  Does that tend to increase the affects on me if I'm smoking wet marijuana and taking all that in connection—
>
> A:    Yes, sir.

R.R. Vol. 34 p. 126. (emphasis added).

These types of questions from the State were designed to elicit testimony from Drs. Axelrad and Scarano that left the jury no other view than to believe that Mr. Thomas was

consuming substantial amounts of alcohol and drugs daily up to and including the day of the

killings, and therefore, he had to be intoxicated on that day.  Yet, the State had undisputed

evidence in its possession that showed that Drs. Axelrad's and Scarano's testimony contending

that Mr. Thomas was intoxicated on March 27, 2004, and allegedly therefore not entitled to a

defense under Texas law due to a "voluntary intoxication," could not be true.  (The defense had

such information too; they simply overlooked it and failed to use it appropriately as they should

have done, *see supra*).

Specifically, the State introduced no evidence at trial that Mr. Thomas used alcohol,

marijuana, or Coricidin on March 27, 2004, and laboratory tests confirmed indisputably that on

that day he was not intoxicated by any of those substances.  *See supra*.  The State not only had

such lab results, and produced them to the defense, but knew that such information rendered their

questioning of its experts false and misleading.  Nonetheless, the State proceeded anyway at

great prejudice to Mr. Thomas because once the jury concluded Mr. Thomas was intoxicated,

they undoubtedly followed the voluntary intoxication instruction give to them by the Court

stating Mr. Thomas had no defense.

> **2.** **The State's Experts and Others Falsely Testified that Mr. Thomas's Intoxication and Delusions Flowed Principally from his Use of Coricidin.**

Expert opinions may be false if they offer "scientifically inaccurate testimony resulting

from reckless or intentional misconduct."  *Smith v. Massey*, 235 F.3d 1259, 1271 n.6 (10th Cir.

2000).  A mere difference of opinion among experts is not sufficient.  *Boyle*, 93 F.3d at 186.  The

consistency of the expert's testimony with the evidence is an indicator of truthfulness.  *Id*.

(holding that mere assertion of expert's past history of perjury was not sufficient to demonstrate

false testimony where the expert's "testimony was consistent with the state's physical evidence

connecting" the defendant to the murder).

Dr. Scarano's and Dr. Axelrad's opinions that Mr. Thomas's psychotic episode was a drug-induced psychosis were false and misleading because they were unsupported by the facts and were recklessly inaccurate.  Although Dr. Scarano stated his opinion several times for the prosecution, the following testimony demonstrates the prosecution's solicitation of this falsehood through leading questions:

> Q:   All right.  And do you believe you were able to determine the affect the combined use of marijuana, alcohol, and Dextromethophan had on the defendant?
>
> A:   Yes.  I believe that the combination of these medications or drugs pushed Mr. Thomas into a delusional psychosis.
>
> . . . .
>
> Q:   Okay.  Does the fact that the defendant, again on the heels of taking Coricidin, smoking four or five blunts of marijuana a day, and drinking – does it surprise you that the defendant would exhibit that type of behavior?
>
> A:   No it does not.
>
> Q:   Why is that?
>
> Q;   Because a combination of substances could easily produce a type of psychotic or delusional disorder.  In addition, there are no prior records that he went to an emergency room with these symptoms *simply by using marijuana and alcohol*.
>
> Q:   So, one thing that we do know, *it wasn't until the defendant began to take Coricidin* that he showed up at the MHMR on March 5th and in the emergency room on March 26th, correct?
>
> A:   That's correct.
>
> Q:   *And within 36 hours of taking Coricidin*, ingesting marijuana, and drinking Thursday night and on Friday, on Saturday morning we've got a dead woman and two dead kids, don't we?
>
> A:   That's correct.

R.R. Vol. 31 pp. 94, 114-115 (emphasis added).

The State solicited similar testimony from its other expert, Dr. Axelrad, whom the defense chose to call adversely.  Thus, the State questioned Dr. Axelrad with improper leading questions that should have been non-leading, since Dr. Axelrad was a friendly witness:

> Q:    Now, you have indicated that it is your diagnosis, based on your vast experience and training and education and including treating patients with substance induce psychosis that that is exactly what the defendant suffered from, correct?
>
> A:    Correct.  Yes, sir.
>
> Q:    All right.  Now, would it surprise you then that on March 26th of 2004 the defendant, after smoking marijuana, *taking eight to ten DXM* on early evening hours of Thursday, March 25th, and apparently drinking some alcohol, would it surprise you that, number one, he stabbed himself superficially at his home and number two, that when he appeared before Dr. Bowen at the TMC emergency room, that he exhibited psychotic qualities?
>
> A:    It wouldn't surprise me, because of the abuse he was experiencing and his underlying personality problems.

R.R. Vol. 34 pp. 128-29.

These opinions of Drs. Axelrad and Scarano are unsupported by the testing data conducted on Mr. Thomas following the slayings on March 27, 2004.  All testing, whether blood or urine, demonstrated conclusively that there was no evidence that Mr. Thomas was intoxicated by alcohol, marijuana, or DXM on March 27, 2004.  *See supra.  See also* Ex. 23 ¶¶ 10-13.  Most notably, the blood tests for DXM were utterly inconclusive.  Ex. 83.  Nonetheless, the defense agreed to a stipulation presented to the jury that suggested some trace amount of DXM in Mr. Thomas's blood.  Ex. 86.  The Stipulation read, "The result of that testing showed less than a therapeutic amount, basically an immeasurable amount of DXM in the blood."  *Id*.

Such an inference, albeit slight, of DXM in Mr. Thomas's blood could only hurt Mr. Thomas, and it did.  It allowed the State to suggest improperly through the expert testimony

described above as well as through Toxicologist Edwardo Padilla, again, without objection, that

Mr. Thomas was still influenced by Coricidin 40-41 hours after taking it.  This is revealed in a

hypothetical posed by the prosecutor to Padilla:

> Q:     So if I'm in this 90 percent of the population that is going
> to metabolize the DXM, kind of the normal metabolizers,
> then, if I were to take eight of those DXM, say, at around
> 5:00 or so on a Thursday afternoon, and I would have my
> blood drawn on Saturday, the following Saturday morning,
> about 10:00, that would be about 40, 41 hours, you
> wouldn't necessarily expect to see any DXM in my blood
> correct?
>
> A:     For the general population, you wouldn't expect to see any,
> no.
>
> Q:     Okay.  But in Mr. Thomas's blood, there was evidence that
> DXM was still in his blood, correct?
>
> A:     Yes, correct.

R.R. Vol. 29 p. 82 (emphasis added).

Proper reporting of the blood test results would have stated that there was no evidence of

any DXM in Mr. Thomas's blood, thus absolutely precluding Padilla's damaging testimony as

well as that of the State's experts.  *See* Ex. 23 ¶¶ 11-12.  The false and misleading discussion of

intoxicating drugs that Mr. Thomas had not taken on the day of the slayings obscured a

discussion of the facts that demonstrate that at the time of the crime, as today, Mr. Thomas

suffers from severe mental illness.  *See* Ex. 23 ¶¶ 15-18.

In short, not only did the State allow such false testimony to go uncorrected, the State

actively solicited it through the testimony of its experts, including Padilla.  The facts set forth

*supra* regarding the state's non-disclosure of the exculpatory information provided by Shannon

Miller supports the conclusion that the State knew that the testimony it did present regarding Mr.

Thomas' alleged intoxication was false.

In sum, without regard for the truth, the State knowingly elicited essentially false

testimony from a number of its witnesses, including Drs. Axelrad and Scarano and Eduardo

Padilla.  *See* R.R. Vol. 31 pp. 94, 114-115; R.R. Vol. 34 pp. 128-29; R.R. Vol. 29 p. 82.  Mr.

Thomas thus meets the first two prongs of a *Napue* showing.

> ### B.       The False and Misleading Testimony the State Presented was Material.

The false and misleading testimony of intoxication also was material – the last necessary

showing of a *Napue* violation.  The materiality standard applied to the use of false and

misleading evidence by the State is less onerous than the *Brady* materiality standard for withheld

evidence.  *Kirkpatrick*, 992 F.2d at 497.  False or misleading testimony is material "if there is

any reasonable likelihood that the false testimony could have affected the jury's verdict. . . ."  *Id.*

It is immaterial whether the false testimony directly concerns an essential element of the

Government's proof or whether it bears only upon the credibility of the witness.  *O'Keefe*, 128

F.3d at 893.

The material nature of the false and misleading testimony concerning intoxication must

be viewed in the context of the entire case.  Considered with the Court's misleading instructions

and the joint PowerPoint presentation given to the venire, the false testimony allowed the jury to

determine that Mr. Thomas was not entitled to the insanity defense.  Yet, while the mistaken

instruction that allowed the jury to believe that intoxication negated an insanity defense

altogether played a role, there was no basis to *find* intoxication without the false testimony

presented by the State.

As such, the false and misleading opinions offered by Drs. Axelrad and Scarano were

material.  As explained in the discussion of the *Brady* violation *supra,* Drs. Axelrad's and

Scarano's opinions were central to refuting the defense's theory that Mr. Thomas was insane.

*See* R.R. Vol. 31 p. 101; R.R. Vol. 34 pp. 139-40.  Without these opinions that Mr. Thomas's

psychosis was substance-induced rather than due to mental illness, the jury would not have had

an evidentiary basis for disregarding the defense's theory that Mr. Thomas was insane. Consequently, because this false testimony was key to the jury's ultimate findings, Mr. Thomas easily clears the hurdle of showing a reasonable likelihood that the false testimony could have affected the jury's verdict.  *See Napue*.

C. **The State Habeas Court's Findings were Unreasonable Determinations of the Facts in Light of the Evidence Presented.**

A number of the trial court's findings of fact were unreasonable in light of the evidence presented in the trial court proceedings.  The trial court found that in the days and weeks leading up to the murders, Mr. Thomas had been abusing marijuana, alcohol and Coricidin.  *See* FF ¶ 12. This suggests that Mr. Thomas had been continuously using marijuana, alcohol and Coricidin prior to the crime when the evidence before the court made clear that such use had occurred only on discrete occasions, and it is undisputed that he was not intoxicated at the time of the crime. *See supra*; *see also* FF ¶¶ 20, 61.  The trial court also found that there was evidence that Mr. Thomas told nurse Natalie Sims that if it had not been for the drugs, the crime would not have happened.  *See* FF ¶ 52.  Basing a finding of fact relating to intoxication and drug use and the results thereof at least partially on a statement by a defendant with no medical training or expertise is clearly unreasonable.  In addition, the trial court found (as an alleged finding of fact rather than a conclusion of law) that neither the State nor its experts presented "false or misleading evidence."  *See* FF ¶ 64.

D. **The State Habeas Court's Denial of this Claim was an Unreasonable Application of Clearly Established Federal Law.**

The trial court's conclusion that Mr. Thomas "failed to prove by a preponderance of the evidence that the State knowingly presented false and misleading testimony about whether the applicant was intoxicated at the time he murdered his estranged wife, his son with her and her baby daughter", CL ¶ 34, was contrary to clearly established Federal law, as determined by the

Supreme Court of the United States in *Napue*.  There is no requirement under Supreme Court

precedent that Mr. Thomas make this showing by a "preponderance of the evidence."  Moreover,

as described in detail above, Mr. Thomas clearly established that the testimony in question was

false, that the state knew it was false, and that there is a reasonable likelihood that the false

testimony could have affected the jury's decisions.

## XXIII. The Trial Court's Refusal to Define "Reasonable Doubt" Denied Mr. Thomas His Right to Due Process under the Fourteenth Amendment.

On March 4, 2005, Mr. Hagood submitted a Motion for a Requested Jury Instruction

Defining Reasonable Doubt.  C.R. Vol. 5 pp. 1619-21.  On the same date, the Court asked the

parties if there were any objections to the Court's jury charge.  Mr. Hagood raised an objection

that mirrored the motion for the reasonable doubt jury charge, citing the specific instruction

requested.  The Court denied the request.  R.R. Vol. 37 p. 6.  In light of the Court's failure to

instruct the jury on the definition of "reasonable doubt," a phrase that defies common meaning,

Thomas was denied due process in violation of the Fourteenth Amendment.

Thomas requested the Court give the jury the following definition of reasonable doubt:

> "Reasonable doubt" is a doubt based upon reason and common
> sense after careful and impartial consideration of all the evidence
> in the case.  Proof beyond a reasonable doubt, therefore, is proof of
> such a convincing character that you would be willing to rely and
> act upon it without hesitation in the most important of your own
> affairs.

This definition comes from the Fifth Circuit's Criminal Pattern Jury Charge.  *See United States*

*v. Williams*, 20 F.3d 125, 129 n.1 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 239 (1994).

The Texas Court of Criminal Appeals has restricted the ability of courts to define

reasonable doubt for a jury.  *Paulson v. State,* 28 S.W.2d 570 (Tex. Crim. App. 2000).  While the

*Paulson* decision does not prohibit a court from defining reasonable doubt, it requires the state to

agree to such a definition.  The actions of the Texas Court of Criminal Appeals in restricting the

ability to define reasonable doubt amounts to a denial of due process.[74]

The requirement of proof beyond a reasonable doubt in criminal cases is required by the Fifth Amendment to the United States Constitution, made applicable to the states through the due process clause of the Fourteenth Amendment. The Supreme Court has long recognized the instruction requested by Mr. Thomas as an acceptable definition of reasonable doubt. *See Hopt v. Utah,* 120 U.S. 430, 439 (1887); *Holland v. United States,* 348 U.S. 121, 138 (1954).

The decision in *Paulson* is based upon the first paragraph of the Supreme Court's decision in *Victor v. Nebraska,* 511 U.S. 1 (1994). The Supreme Court stated:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course….Indeed, so long as the court instructs the jury of the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions *must correctly convey the concept of reasonable doubt to the jury.*

*Id*. at 5 (emphasis added) (citations omitted).

The Texas Court of Criminal Appeals has interpreted this paragraph to mean that no definition is required and thus, one should not be given. However, the *Victor* decision, along with other Supreme Court and federal decisions, make clear that an instruction for reasonable doubt is warranted. It is not a phrase that has a common sense meaning. If the common citizen resorts to a dictionary for definition, "reasonable" is defined as "in accordance with reason or

---

[74]    The reasoning of the Texas Court of Criminal Appeals in *Paulson* becomes more dubious when it is considered that all other standards of proof, including the preponderance standard, are specifically defined for juries. *See, e.g., State v. Thomas,* R.R. Vol. 12 p. 181 (the prosecutor defines the preponderance standard under Texas law so the juror can understand what Mr. Thomas must prove on the insanity defense).

sound thinking."[75]  "Doubt" means "to be uncertain or skeptical about."[76]  Combining the common definitions of these common words makes an unworkable definition for the common jury, a definition that does not properly convey the definition of beyond a reasonable doubt. Thus, without further definition by a court, a jury could consider beyond a reasonable doubt as something that is more akin to the preponderance standard.

Given the context of the present trial, the court's decision to blindly follow *Paulson* denied Mr. Thomas due process.  The Supreme Court has long noted the importance of a higher standard of proof in criminal trials:

> A person accused of a crime…would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice in a civil case.

*In re Winship,* 397 U.S. 358, 363 (1970).

The instructions in the present case allowed the jurors to believe that proof beyond a reasonable doubt was equal to a preponderance of the evidence.  For example, the prosecutor gave the following explanation to the second juror selected, Kyle McCoy:

> And they are innocent until we put on evidence that convinces you that a person did what it is they're charged with doing.  The same [the defendant's burden] is true here. Persons are presumed sane but the burden of proof lies with the defense, not the State….
>
> Now, the burden of proof for the defense is what we call by a preponderance of the evidence.  And the Court will define that for you in this—in the Court's Charge that sets out all of the law, his written charge.  The Court will define that preponderance of the evidence means the greater weight of the credible evidence.

R.R. Vol. 12 pp. 342-43.  This same juror had some confusion as to what standard Mr. Thomas had to meet to prove insanity, equating the preponderance standard, which had just been defined

---

[75]      American Heritage Dictionary, Fourth Edition p. 688.

[76]      *Id*. at 258.

to him, with proof beyond a "shadow of a doubt."  R.R. Vol. 12 pp. 363-64.  The juror also

understood that the State's burden was the preponderance of evidence standard and this equated

to reasonable doubt.  Mr. McCoy specifically stated:

> Well, the evidence that was submitted prior to that, without a
> reasonable doubt whether they did it or did not do it, if they—if the
> evidence—the preponderance of the evidence in front of me
> showed that this individual committed that crime, it would be hard
> pressed for me to convict a person because of that.
>
> Mr. Ashmore: Because of what?
>
> Because of a plea—because of a doubt in my mind on whether
> they were sane or insane.

R.R. Vol. 12 p. 361.  Mr. McCoy further stated, "Let me get—the preponderance of the evidence

is that they committed murder, any lesser crime, would be more probable that they could commit

that, too?"  R.R. Vol. 12 p. 367.  Thus, the second juror selected was thoroughly confused about

the meaning of and applicability of the "preponderance of the evidence" standard and "guilt

beyond a reasonable doubt."  This confusion is exactly why a definition of reasonable doubt

made even more sense in this case, and was required under the Fifth and Fourteenth

Amendments.

   The confusion continued with the third juror selected, Mr. Russell Workman, where the

prosecutor equated the State's burden in proving guilt with the defense's burden of proof on

insanity.  R.R. Vol. 15 pp. 125-26.  With the fourth juror, Marty Ulmer, however, the State

equated proof beyond a reasonable doubt with a 95% standard.  R.R. Vol. 16 pp. 29-30.[77]  With

the seventh juror, James Pelley, the defense equated proof beyond a reasonable doubt with a 90%

standard.  R.R. Vol. 17 p. 109.

   With regards to the ninth juror, Ricky Lashley, an interesting exchange took place:

---

[77]    Mr. Ulmer was also the juror who had a problem with racial marriages and stated that,
given that a defendant is hypothetically found guilty and sane, borrowing a line from My Cousin
Vinny, the appropriate punishment would be to "hang him." R.R. Vol. 16 p. 55.

Ms. Peterson: And in your mind, what is beyond a reasonable doubt?

Mr. Ashmore: Objection.  The juror does not have to be able to define reasonable doubt, Your Honor.

The Court: I will let him answer that.

Mr. Lashley: What is mine?

Ms. Peterson: Yes, sir

Mr. Lashley: I don't really know.

Ms. Peterson: Okay.

Mr. Lashley: I guess anybody that knows right from wrong.  I don't know.

Ms. Peterson: It is one of those, you-know-it-when-you-see-it type situations?

Mr. Lashley: You know it when you see it. You see somebody walking down the street, physically you see him and he sings to himself, and you know he is not exactly right, but you don't know what is going on.

Ms. Peterson: So, you need to hear and see everything and then make a decision?

Mr. Lashley: Uh-huh

Ms. Peterson: Which is exactly correct.

R.R. Vol. 21 pp. 114-15.  Thus, Mr. Lashley apparently believed reasonable doubt involved the quality of a person's mental state.  This belief, in itself, when coupled by views of other jurors, required the Court to give a reasonable doubt instruction, not just because it was requested and warranted, but because jurors demonstrated their difficulty with the concept of reasonable doubt.

The prosecutor, Joe Brown, created further confusion in his questioning of the tenth juror, Michelle Roden.  Mr. Brown told Ms. Roden that beyond a reasonable doubt did not equate to being "morally certain in your mind."  R.R. Vol. 21 p. 249.  Mr. Ashmore used this same explanation with juror eleven, Carol Anderson.  R.R. Vol. 25 p. 128.  Lastly, Mr. Brown's

314

explanation to the twelfth juror, John Paull, was just as confusing.  Mr. Brown wrongly

explained that reasonable doubt was somewhere between the "90 to 95 yard" mark, that "some

doubt" was permitted, but that if a person has a "reasonable doubt, you have to vote not guilty *by*

*reason of insanity*."  R.R. Vol. 26 p. 27 (emphasis added).[78]

In conclusion, the jurors were given various explanations regarding the meaning of

reasonable doubt, and these explanations were erroneous.  When given the opportunity to define

reasonable doubt, they could not do so.  The Court erred in failing to instruct the jury on the

proper definition of reasonable doubt.  Additionally, the decision in *Paulson* is inconsistent with

Supreme Court precedent on this issue.

This claim was presented on direct appeal.  *See Thomas v. State*, 2008 WL 4531976 (Tex.

Crim. App.) at *14-15.  The Texas Court of Criminal Appeals' decision on this issue was

erroneous, and contrary to or an unreasonable application of clearly established law.  To begin,

the TCCA erroneously states that defense counsel requested a "*Geesa*" instruction.  In fact,

defense counsel's request was for the reasonable doubt instruction approved by the Fifth Circuit,

not a *Geesa* instruction.  Thus, the TCCA's decision is based on an erroneous assumption,

thereby undermining the analysis that followed.  The requested instruction was warranted, and

compelled by the voir dire and facts of this particular case.  Mr. Thomas is entitled to relief.

**XXIV. Mr. Thomas was Deprived of his Fifth Amendment Privilege Against Self-
Incrimination because the Jury Used Mr. Thomas's Decision not to Testify Against
Him in Imposing a Sentence of Death.**

The Fifth Amendment to the United States Constitution guarantees a criminal defendant

both the right to remain silent during trial and the right not to have the jury draw any adverse

inferences from the defendant's exercise of this privilege.  *Carter v. Kentucky*, 450 U.S. 288, 305

---

[78]      Mr. Brown's explanation would confuse a lawyer experienced in criminal practice and
certainly a juror who had no training in the law.

(1981).  The scope of this Fifth Amendment privilege applies equally to the guilt and penalty phases of a capital trial.  *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981).  When the Fifth Amendment privilege against self-incrimination is violated during the penalty phase, the remedy is to vacate the death sentence.  *Id.* at 469.

In this case, the jury foreperson, Kyle McCoy, stated that he and others on the jury considered the fact that Mr. Thomas did not express true remorse during the penalty phase of the trial.  R.R. Vol. 43 p. 16.  Mr. McCoy stated that he, and possibly others on the jury, wanted something to "hang their hat on," such as Mr. Thomas's expression of true remorse, to decide against imposing a sentence of death.  *Id.*  Apparently the trial judge overheard Mr. McCoy's statements.  R.R. Vol. 43 p. 4-5; C.R. Vol. 5 p. 1702.

The Fifth Amendment's right not to have a defendant's silence used against him extends to the penalty phase of a capital trial.  *Estelle*, 451 U.S. at 462-63.  Since Mr. McCoy, and possibly other jurors, used Mr. Thomas's silence during the penalty phase of the trial as a circumstance against him in imposing a sentence of death, the sentence must be vacated.  *See id.* at 469 (affirming the decision to vacate the defendant's death sentence).

This claim was presented on direct appeal and in state habeas.  *See Thomas v. State*, 2008 WL 4531976 at *19-21; FF ¶¶ 110-111.

On direct appeal, the TCCA found that the application of Rule 606(b) of the Texas Rules of Evidence prevented proof of the violation alleged.  *Thomas,* 2008 WL 4531976 at *19-21. This finding is unreasonable in light of the evidence of Mr. McCoy's statement that the jury considered the fact that there was no evidence of Mr. Thomas' remorse, and the ensuing statement that they were looking for something to "hang their hat on."  *Id.*; R.R. Vol. 43 p. 16.  It is also contrary to Supreme Court law in its application of a state rule of evidence to prevent proof of a serious constitutional violation.

Under Texas Rule of Evidence 606, jurors are not competent to testify that the jury "discussed the defendant's failure to testify and used that failure as a basis for convicting him." *Hines v. State*, 3 S.W.3d 618, 621 (Tex. Ct. App. 1999). Petitioner was thus unable to accumulate additional evidence to support this violation of the Fifth Amendment because it was specifically prohibited under Rule 606.

This restriction on the ability to present evidence to support the Fifth Amendment violation is unconstitutional. "[W]here the Supreme Court holds that a particular series of events, when proven, violates a defendant's constitutional rights, implicit in that determination is the right of the defendant to prove facts substantiating his claim." *People v. DeLucia*, 229 N.E.2d 211, 213 (N.Y. 1967). For instance, where there is an allegation that the death penalty has been imposed on the basis of the defendant's race, Rule 606(b) of the Federal Rules of Evidence must yield. *Dobbs v. Zant*, 720 F. Supp. 1566, 1574 (N.D. Ga. 1989), *aff'd*, 963 F.2d 1403 (11th Cir. 1991), *rev'd on other grounds by* 506 U.S. 357 (1993). In such a case, where the defendant's rights under the Equal Protection Clause have been violated, the court must accept juror testimony despite the prohibition in Rule 606. *Id.* at 1568.

The decision by the state habeas court on this issue is contrary to clearly established federal law, which prohibits imposing a sentence of death in violation of the Fifth Amendment privilege against self-incrimination. The court's decision is also unreasonable based on the evidence that a juror, Mr. McCoy, used Mr. Thomas's silence as a reason to impose this death sentence.

The state habeas court's findings on this issue are equally untenable, but for a different reason. That court found that "Kyle McCoy stated that he and others on the jury did not feel there was evidence of true remorse . . . . McCoy stated that he, and possibly others on the jury, wanted something to "hang their hat on." FF ¶ 110. The court then found that "the applicant

has failed to plead facts that the jury violated the applicant's right against self-incrimination."
FF ¶ 111.  These two statements are impossible to reconcile.  As such, the state habeas court's
findings are an unreasonable determination of the facts in light of the evidence presented, as well
as in light of the very findings made by the court.

The state habeas court's conclusions of law are unsupported by its own findings.
*Compare* FF ¶ 110 with CL ¶ 133.  To the degree that the state habeas court concludes that Rule
606 precluded the necessary proof, that application of state law to prevent a showing of a
constitutional violation is its own violation.  *See supra.*

Mr. Thomas' right against self incrimination was violated.  Neither the opinion on direct
appeal nor the findings of the state habeas court preclude the relief on this claim.

## XXV.   Mr. Thomas's Death Sentence is Unconstitutional under *Roper v. Simmons* because the State Used Prior Convictions Based on Acts Committed by Mr. Thomas when he was a Juvenile to Establish an Aggravating Factor.

At the penalty phase of Mr. Thomas's case, the State introduced a number of prior
offenses committed by Mr. Thomas when he was a juvenile.  See, e.g., R.R. Vol. 38 pp. 24-25
(felony criminal mischief over $750, and two separate offenses of criminal trespass, all arising
when Mr. Thomas was 11 years old); R.R. Vol. 38 pp. 104-106 (citation for curfew violation at
age 13); R.R. Vol. 38 pp. 28-32, 101-102, 109-112; R.R. Vol. 39 pp. 34-38 (three felony offenses
of vehicle theft when Mr. Thomas was 14 years old); R.R. Vol. 39 pp. 26-29; R.R. Vol. 39 p. 34
(arrests for curfew violations at ages 14 and 15); R.R. Vol. 39 pp. 129-131 (evading
arrest/detention while using a vehicle at age 17).  During the penalty phase, the court instructed
the jury that it may consider Mr. Thomas's background and evidence that he committed other
acts or participated in other transactions.  R.R. Vol. 42 pp. 30; 30-31.

This use of prior convictions based on acts committed by Mr. Thomas when he was a
juvenile to establish an aggravating circumstance violated the Eighth Amendment and the

principles underlying *Roper v. Simmons*, 543 U.S. 551 (2005), which prohibits the imposition of

the death penalty for crimes committed by juveniles.

On March 1, 2005, in *Roper v. Simmons*, the Supreme Court declared:

> The differences between juvenile and adult offenders are too
> marked and well understood to risk allowing a youthful person to
> receive the death penalty despite insufficient culpability.  An
> unacceptable likelihood exists that the brutality or cold-blooded
> nature of any particular crime would overpower mitigating
> arguments based on youth as a matter of course, even where the
> juvenile offender's objective immaturity, vulnerability, and lack of
> true depravity should require a sentence less severe than death.

*Id*. at 572-573.  Accordingly the Supreme Court concluded that the Eighth Amendment

precluded reliance upon criminal acts committed before age 18 from serving as a basis for the

imposition of a sentence of death.

In reaching this decision, the Court noted:

> Three general differences between juveniles under 18 and adults
> demonstrate that juvenile offenders cannot with reliability be
> classified among the worst offenders.  First, as any parent knows
> and as the scientific and sociological studies respondent and his
> *amici* cite tend to confirm, "[a] lack of maturity and an
> underdeveloped sense of responsibility are found in youth more
> often than in adults and are more understandable among the young.
> These qualities often result in impetuous and ill-considered actions
> and decisions."  .  .  . In recognition of the comparative immaturity
> and irresponsibility of juveniles, almost every State prohibits those
> under 18 years of age from voting, serving on juries, or marrying
> without parental consent.
>
> The second area of difference is that juveniles are more vulnerable
> or susceptible to negative influences and outside pressures,
> including peer pressure.  This is explained at least in part by the
> prevailing circumstances that juveniles have less control, or less
> experience with control, over their own environment.  .  .  .
>
> The third broad difference is that the character of a juvenile is not
> as well formed as that of an adult. .  .  .
>
> These differences render suspect any conclusion that a juvenile
> falls among the worst offenders.  *  *  *  From a moral standpoint
> it would be misguided to equate the failings of a minor with those

> of an adult, for a greater possibility exists that a minor's character
> deficiencies will be reformed.

*Id*. at 569-570 (citations omitted).

In the penalty phase of Mr. Thomas's trial, the State emphasized Mr. Thomas's prior convictions as aggravating circumstances and suggested that his prior criminal history is what led to the capital murder offense:

> This is no one's fault but Andre Thomas.  The evidence you have
> heard in mitigation is that he…has trouble controlling his behavior,
> that he has an ever increasing violence and a long criminal
> background, that he is at multiple times a thief, that he is a drug
> user, that he is a drug dealer, and now he is a baby killer.

R.R. Vol. 42, 40.

As the Supreme Court found in *Roper*, one of the three differences between adults and juveniles is that "the character of a juvenile is not as well formed as that of an adult."  *Roper* at 570.  Therefore, "a greater possibility exists that a minor's character deficiencies will be reformed." *Id*.

The prosecution's argument in Mr. Thomas's case was the opposite of the Supreme Court's understanding of juvenile acts.  Thus, the prosecution argued that Mr. Thomas's prior convictions showed the opposite: that he was inherently evil and could not be changed, even by strict punishment and incarceration.  These are precisely the types of argument that the United States Supreme Court sought to prevent by its holding in *Roper*:

> In some cases a defendant's youth may even be counted against
> him.  In this very case, as we noted above, the prosecutor argued
> Simmons' youth was aggravating rather than mitigating.

*Roper* at 573.

As the *Roper* court recognized, it is too easy for a jury to be swayed by prosecutor arguments and to be unaware of the developing adolescent mind and behavior.  The prosecutor used offenses committed when Mr. Thomas was between eleven and seventeen years old to

frighten the jury and to convince them that Mr. Thomas was inherently bad, that no amount of punishment would ever change him, and that the only way to stop him was to execute him.

If the principle of *Roper* is that juveniles are less culpable for their criminal acts than adults, this principle should be recognized when deciding which aggravating circumstances make a person eligible for the death penalty.  At ages eleven through seventeen, Mr. Thomas's culpability for his prior conviction was lower than if the offenses had been committed when he was an adult.  Therefore, to use these prior offenses as aggravators violates the Eighth Amendment and the principles underlying *Roper*.

The relevant conclusions of the state habeas court merely state the rule of *Roper*, and conclude that "the admission of prior offenses committed when the defendant was a juvenile does not violate the Eighth Amendment," and "[n]either the Supreme Court. . . nor the [TCCA] . . . has extended the holding in *Roper v. Simmons* to prohibit the use of juvenile offenses in the punishment stage of a capital case."  CL ¶¶ 134-136.

The state habeas court acted unreasonably in not extending *Roper*'s principles to the facts of this case to find it is unconstitutional to use juvenile offense conduct to support a finding of aggravating factors.  *See Williams v. Taylor*, 592 U.S. 362, 408-409 (O'Conner, J. delivering opinion of the Court with respect to Part II of the decision) (noting that §2254(d)(1)'s "unreasonable application" clause does allow federal courts to consider habeas applications founded on the trial court's unreasonable refusal to apply a legal principle to a new context where it should apply).  As described above, *Roper* plainly holds that a defendant cannot be sufficiently criminally culpable to be executed for any criminal conduct committed before the age of 18.  Thus, the use of juvenile offense conduct to support an aggravating factor at any penalty phase hearing should also be ruled unconstitutional under *Roper.*

**XXVI. Mr. Thomas was Deprived of his Right to a Fair Trial under the Sixth Amendment because his Attorney had a Conflict of Interest that was not Waived.**

Mr. Thomas's defense counsel was constitutionally ineffective due to an actual conflict of interest, which was not fully addressed by the trial court and was not properly waived by the defendant.  Defense attorney's actual conflict of interest due to her involvement as an assistant county attorney in a juvenile prosecution of Mr. Thomas adversely effected his defense because the juvenile prosecution was used against him.  This conflict was not properly waived.

Before going into private practice and before her representation of Mr. Thomas at his capital murder trial, defense attorney Bobbie Peterson prosecuted Mr. Thomas in juvenile delinquency proceedings in Grayson County.  R.R. Vol. 45, State's Ex. 100, at Second Am. Pet. Alleging Delinquent Conduct.  Peterson was the First Assistant County Attorney for Grayson County, and in that role was directly responsible for, and was actively involved in, the prosecution of Mr. Thomas for vehicle theft and all other prosecutions in Grayson County.  R.R. Vol. 45.  Among other things, the juvenile prosecution resulted in Mr. Thomas being placed on probation for 18 months, and required that Mr. Thomas's mother, Rochelle Thomas, pay a monthly probation fee.  *Id*.  Ms. Peterson made the decision to pursue the delinquency petition against Mr. Thomas and was directly responsible for the matter.

During the hearing on Mr. Thomas's motion to suppress, the conflict was only briefly raised:

> ASHMORE:  Your Honor, before we get started, there is one thing we discussed in chambers that I wanted of record.  The defendant as a juvenile was placed on probation on two different times.  The last time being, I believe, in 1997 for the theft of three different automobiles on three different times.  In the course of the County Attorney's office of Grayson County prosecuting the juvenile in those various juvenile matters, I had noted that Bobbie Peterson had signed several pleadings of the state in her capacity as Assistant County Attorney at that time.  Mrs. Peterson and I had talked about that and my understanding was that is that Mrs.

> Peterson has made the defendant aware of that situation and that he has no problem with it, but I wanted the Court to discuss that with him and to have that clear on the record.
>
> THE COURT:  Okay.
>
> MRS. PETERSON:  That is correct, Your Honor.  I have spoken to Mr. Thomas about the fact that I was a prosecutor and I did sign off on some petitions that he was the juvenile and he has indicated that he was aware of that and he has no problems or concerns about my representing him now and the difference in our capacities.
>
> THE COURT:  Is that correct, Mr. Thomas?
>
> Mr. Thomas:  Yes.
>
> THE COURT:  You are satisfied to have Mrs. Peterson continue as your co-counsel?
>
> MR. THOMAS:  Yes, Sir.
>
> THE COURT:  Let's have all the witnesses sworn. . . .

R.R. Vol. 7 pp. 4-5.

The juvenile conviction against Mr. Thomas was ultimately used by the Prosecutor at the capital murder trial as an aggravating factor in seeking the death penalty.  R.R. Vol. 45, State's Ex. 100.  Thus, the jury was aware that Mr. Thomas's own attorney had previously prosecuted him.  *Id*. at Second Am. Pet. Alleging Delinquent Conduct.

The Sixth Amendment guarantees the right of individuals to have counsel without conflicts of interest.  *See*, *e.g., Gray v. Estelle*, 616 F.2d 801, 803 (5th Cir. 1980) ("The principle of law that a criminal defendant is entitled to the assistance of counsel free from any conflict or interest, which conceivably could impair counsel's effectiveness, is also clearly established in our law."); *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979).

In this case, Ms. Peterson's prior prosecution of Mr. Thomas presents an actual conflict under the Sixth Amendment.  The Fifth Circuit recently examined a case involving trial counsel

323

who had also previously prosecuted the defendant as a juvenile.  *United States v. Fields*, 483 F.3d 313, 351-52 (5th Cir. 2007).  Even though the Fifth Circuit in the *Fields* case determined that there was no significant conflict of interest in that case, the court's analysis makes clear that prior prosecution of a defendant by his defense counsel can lead to an actual conflict, and one key factor in determining whether an actual conflict exists is whether counsel was actively involved in the prior prosecution.  *See id*. at 351.

In *Fields*, the defense attorney's role in the prior prosecution was limited to signing off summarily on a request to initiate delinquency proceedings; he had no substantive involvement in the case.  *Id*. at 351.  The Fifth Circuit explained:  "Importantly, this is not a case where defendant's attorney previously was actively involved in prosecuting the defendant."  *Id*.  By contrast, Ms. Peterson was directly and actively responsible for the prior juvenile proceedings against Mr. Thomas.

In *Fields*, the trial court conducted an *ex parte* hearing during which it discussed with counsel the potential conflict.  The court asked several questions, and counsel explained the nature of his role in the prior prosecution.  *Fields*, 483 F.3d at 349.  No such discussion took place in Mr. Thomas's case.

In this case, the fact that Mr. Thomas's counsel had previously prosecuted him, combined with the fact that the prior prosecution was used in his murder trial as an aggravating factor in seeking the death penalty, is sufficient to raise an actual conflict of interest.  *See Worthen v. Oklahoma*, 715 P.2d at 81.  And, although not entirely clear, it appears the State and the trial court both assumed at the motion to suppress hearing that there was a conflict of interest, but both apparently believed the conflict was adequately addressed by the parties and waived by Mr. Thomas.  R.R. Vol. 7 pp. 4-5.  There was, however, no solid waiver.

Because there was an actual conflict of interest, only a valid waiver could protect Mr.

Thomas's Sixth Amendment right to sufficient counsel.  When an actual conflict of interest is present, a trial court is obligated to conduct a thorough, detailed inquiry with the defendant before a waiver can be knowing and voluntary.  The brief, insubstantial exchange that took place in this case does not satisfy the voluntary waiver standard.

A trial court presented with a conflict of interest is obligated to address the conflict with the defendant personally and to advise the defendant of the potential dangers of having an attorney with a conflict.  *Gray*, 616 F.2d at 803-04. The record must show the basis for the defendant's waiver, including that the defendant has been advised of the nature of the conflict and of its potential consequences, and must show that the defendant has been advised that he has a right to conflict-free counsel.  *See*, *e.g., United States v. Newell*, 315 F.3d 510, 519-20 (5th Cir. 2002).  While state courts are not bound by the same specific procedures as federal courts, if the record does not demonstrate that the defendant received the requisite information, the state bears the burden of showing that the defendant's waiver was knowing and intelligent.  *Gray*, 616 F.2d at 804; *see Newell*, 315 F.3d at 521 ("And the principle that waiver requires an intentional relinquishment of known rights implicitly rejects placing that risk upon the defendant.").  To meet this burden of proof, the state must show that the defendant: "(1) was aware that a conflict of interest existed; (2) realized the consequences to his defense that continuing with counsel under the onus of a conflict could have; and (3) was aware of his right to obtain other counsel." *Gray*, 616 F.2d at 804.

In this case, the record shows that Mr. Thomas was aware of the conflict – but that is all. There is no indication of whether he understood the nature of the conflict or had the opportunity to discuss the potential consequences, and there is no indication that he was informed that he was entitled to conflict-free counsel.  As such, the trial courts findings are unreasonable in light of the evidence presented.  *See* FF ¶¶ 85-89.  Furthermore, given that Mr. Thomas had previously been

ruled incompetent to stand trial with no subsequent determination that he was competent, the

trial court should have asked Peterson when she discussed the conflict with Mr. Thomas and

should have tried to discern whether he was mentally capable of understanding what the conflict

meant at the time it was explained to him.  Had the trial court done so, it well may have

concluded Mr. Thomas was incapable of a voluntary waiver.  Under these circumstances, there

was no valid, knowing and intelligent waiver, and thus Mr. Thomas's trial was fundamentally

unfair.  *See, e.g., United States v. Newell*, 315 F.3d 510, 519-21 (5th Cir. 2002); *Gray*, 616 F.2d

at 804-05; *Zuck*, 588 F.2d at 440-41.

A.     **The Trial Court's Decision was Contrary to *Cuyler* Because the Court
       Apparently Required a Showing of Divided Loyalty, Rather than Simply
       Adverse Effect.**

The trial court's rejection of this claim was contrary to *Cuyler v. Sullivan*, 446 U.S. 335

(1980).  In *Cuyler*, the U.S. Supreme Court ruled that a habeas petitioner demonstrates

ineffective assistance of counsel, in violation of the Sixth Amendment, where there is (1) actual

conflict of interest that (2) adversely affected his lawyer's performance.  Id. at 350.[79]  Under

---

[79]     The *Cuyler* standard applies in cases of multiple representations by a defense attorney,
*see, e.g.*, *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995), but the Supreme Court has never
definitively limited *Cuyler* to multiple representations.  As a result, several circuits have chosen
not to apply such a limitation in cases of ineffective assistance of counsel based on an attorney
conflict of interest.  *See, e.g.*, *Familia-Consoro v. United States*, 160 F.3d 761 (1st Cir. 1998)
(elaborating upon *Cuyler* to require a defendant to show that (1) the attorney could have pursued
a plausible alternative defense strategy and (2) the alternative trial tactic was inherently in
conflict with or not pursued due to the attorney's other loyalties or interests); *Ciak v. United
States*, 59 F.3d 296 (2d Cir. 1995) (holding that Second Circuit follows First and Third Circuit
regarding Sixth Amendment violations based on an attorney conflict of interest); *United States v.
Gambino*, 864 F.2d 1064 (3d Cir. 1988) (adopting same two prong test as First Circuit); *Beaver
v. Thompson*, 93 F.3d 1186 (4th Cir. 1996) (holding that *Cuyler* applies in conflict of interest
cases, but under facts in the case, no actual conflict existed); *Riggs v. United States*, 209 F.3d
828 (6th Cir. 2000) ("Although the *Cuyler* standard was laid out in the context of conflicts of
interest arising from multiple representation, this circuit applies the Cuyler analysis to all Sixth
Amendment conflict-of-interest claims."); *U.S. ex rel Duncan v. O'Leary*, 806 F.2d 1307 (7th
Cir. 1986) ("This Court has applied the Cuyler standard as applying generally to a conflict of
interest claim, without limiting its application only to multiple representation conflict cases.");

conflict of interest that (2) adversely affected his lawyer's performance. *Id.* at 350.80  Under

Cuyler, a petitioner need not show actual prejudice, only adverse effect. *See id.*

The trial court's conclusions that Mr. Thomas "failed to show how his attorney's former

role as the prosecutor in his prior convictions raised anything other than a speculative conflict of

---

*Dawan v. Lockhart*, 31 F.3d 718 (8th Cir. 1994) (defendant is required to show "actual conflict" and not merely a potential conflict); *Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995) (holding that Cuyler does not include minor or potential conflicts, but only actual conflicts); *United States v. Cook*, 45 F.3d 388 (10th Cir. 1995) ("[A] defendant's right to counsel free from conflicts of interest . . . extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person."); *Smith v. White*, 815 F.2d 1401 (11th Cir. 1987) (appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action); *United States v. Taylor*, 139 F.3d 924 (D.C. Cir. 1998) (holding that a valid *Cuyler* claim requires a defendant to show that his counsel advanced his own or another client's interest to the detriment of the defendant).

---

[80]    The *Cuyler* standard applies in cases of multiple representations by a defense attorney, *see, e.g.*, *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995), but the Supreme Court has never definitively limited *Cuyler* to multiple representations.  As a result, several circuits have chosen not to apply such a limitation in cases of ineffective assistance of counsel based on an attorney conflict of interest.  *See, e.g.*, *Familia-Consoro v. United States*, 160 F.3d 761 (1st Cir. 1998) (elaborating upon *Cuyler* to require a defendant to show that (1) the attorney could have pursued a plausible alternative defense strategy and (2) the alternative trial tactic was inherently in conflict with or not pursued due to the attorney's other loyalties or interests); *Ciak v. United States*, 59 F.3d 296 (2d Cir. 1995) (holding that Second Circuit follows First and Third Circuit regarding Sixth Amendment violations based on an attorney conflict of interest); *United States v. Gambino,* 864 F.2d 1064 (3d Cir. 1988) (adopting same two prong test as First Circuit); *Beaver v. Thompson*, 93 F.3d 1186 (4th Cir. 1996) (holding that *Cuyler* applies in conflict of interest cases, but under facts in the case, no actual conflict existed); *Riggs v. United States*, 209 F.3d 828 (6th Cir. 2000) ("Although the *Cuyler* standard was laid out in the context of conflicts of interest arising from multiple representation, this circuit applies the Cuyler analysis to all Sixth Amendment conflict-of-interest claims."); *U.S. ex rel Duncan v. O'Leary*, 806 F.2d 1307 (7th Cir. 1986) ("This Court has applied the Cuyler standard as applying generally to a conflict of interest claim, without limiting its application only to multiple representation conflict cases."); *Dawan v. Lockhart*, 31 F.3d 718 (8th Cir. 1994) (defendant is required to show "actual conflict" and not merely a potential conflict); *Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995) (holding that Cuyler does not include minor or potential conflicts, but only actual conflicts); *United States v. Cook*, 45 F.3d 388 (10th Cir. 1995) ("[A] defendant's right to counsel free from conflicts of interest . . . extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person."); *Smith v. White*, 815 F.2d 1401 (11th Cir. 1987) (appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action); *United States v. Taylor*, 139 F.3d 924 (D.C. Cir. 1998) (holding that a valid *Cuyler* claim requires a defendant to show that his counsel advanced his own or another client's interest to the detriment of the defendant).

interest" and that Mr. Thomas "failed to prove an actual conflict of interest by a preponderance of the evidence," *see* CL ¶¶ 112, 113, are based on an unreasonable characterization of the evidence presented and, in turn, are an unreasonable application of clearly established law.  As such, they do not require the deference of this Court.

Mr. Thomas presented evidence that Ms. Peterson's prosecution of him presented an actual conflict.  *See supra*.  Ms. Peterson's "role as the prosecutor in his prior convictions" adversely affected Mr. Thomas's defense and was not merely "a speculative conflict of interest." Mr. Thomas cited cases proving that prior prosecution of a defendant by his defense counsel presents an actual conflict where the cases in which his counsel prosecuted the defendant were used against him for sentence enhancement.  *Ex parte Thomas*, Petition for Writ of Habeas Corpus at 311, citing *Worthen v. Oklahoma*, 715 P.2d 81, 81 (Okla. Crim. App. 1986).  The juvenile conviction was ultimately used by the prosecutor at the capital murder trial as an aggravating factor in seeking the death penalty.  The jury was aware that Thomas's own attorney had previously prosecuted him.  The conviction used as an aggravating factor came "from his own attorney" so to speak, having the adverse effect of an admission by his own attorney that Mr. Thomas deserved capital punishment.

The state habeas court adopted the State's Proposed Conclusions of Law 118 and 119, and simply ignored the evidence provided by Mr. Thomas.  *See* CL ¶¶ 112-13; State's Proposed CL ¶¶118, 119.  The State argued that a "defendant who raises no objection at trial must demonstrate that an actual conflict of interest exists that could conceivably impair his counsel's effectiveness to represent him at trial," *Calloway v. State*, 699 S.W.2d 824, 830 (Tex. Crim. App. 1985), and that the conflict cannot be speculative.  *James v. State*, 763 S.W.2d 776, 778-9 (Tex. Crim. App. 1989).  The State's legal argument and the state habeas court's conclusion are contrary to *Cuyler*, under which a defendant must show only that the conflict had an "adverse

effect," not divided loyalty. *See Cuyler*, 466 U.S. at 351.

> **B.      The Trial Court's Determination that Mr. Thomas Waived his Right to Conflict-Free Counsel Involved an Unreasonable Application of *Johnson* and *Brady* Because there was No Evidence that Mr. Thomas Intentionally Relinquished or Abandoned a Known Right with Sufficient Awareness of the Relevant Circumstances and Likely Consequences.**

Although a defendant can waive his or her right to conflict-free counsel, a valid waiver requires an "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  A valid waiver "must be both voluntary and 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'"  *Gray*, 616 F.2d at 803 (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)).  Texas courts have explained that "[s]uch a waiver of right to conflict-free counsel should include a showing that the defendant is aware of the conflict of interest, realizes the consequences of continuing with such counsel, and is aware of his right to obtain other counsel."  *Ex Parte Prejean*, 625 S.W.2d 731, 733 (Tex. Crim. App. 1981).  The Court's summary conclusion that Mr. Thomas "has waived his right to complain of any conflict" unreasonably misapplied *Johnson* and *Brady*, which require a valid waiver to exhibit an "intentional relinquishment or abandonment of a known right," *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), and "sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970).

Although the state habeas court concluded that: "Texas courts require that "[s]uch a waiver of right to conflict-free counsel should include a showing that the defendant is aware of the conflict of interest, realizes the consequences of continuing with such counsel, and is aware of his right to obtain other counsel," CL ¶111, no such showing was made at trial.  Mr. Thomas's so-called waiver was nothing more than a statement by Ashmore that Mr. Thomas was aware of the conflict, and a mere query of Mr. Thomas by the trial court whether that was correct and whether he was satisfied to have Peterson represent him.  *See* R.R. Vol. 7 pp. 4-5.  Mr. Thomas's

simple assent to the Trial Court's questions was not sufficient to show that Mr. Thomas knowingly and intelligently waived his right to a conflict-free counsel.

The state habeas court's conclusion that Mr. Thomas "waived his right to complain of any conflict," made despite no evidence that Mr. Thomas was aware of many critical circumstances, the consequences of waiver, or his rights to other counsel, involved an unreasonable application of clearly established federal law requiring a valid waiver to be based on "sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 379 U.S. at 748.  Mr. Thomas is entitled to relief on this claim.

## XXVII.        Mr. Thomas's Appellate Counsel was Constitutionally Ineffective.

The state habeas court made no factual findings with respect to Mr. Thomas' appellate counsel's performance.  Indeed, at the time the habeas court entered its recommendations, the direct appeal was still pending in front of the TCCA.  Thus, this Court need not defer to any factual findings with respect to this claim.  Despite its complete lack of any factual analysis, the state habeas court concluded that "the applicant has failed to prove that appellate counsel was not acting as a reasonably competent attorney, and his advice was not within the range of competence demanded of attorneys in criminal cases.  CL ¶ 105.  The court's determination was unreasonable because it failed to demonstrate it considered any of the evidence presented by the applicant of appellate counsel Mr. Cardwell's ineffective assistance.

On appeal, Mr. Cardwell raised only ten errors in the trial of Mr. Thomas.  Included in these ten are the claims, also asserted in the instant petition, regarding the trial court's failure to provide a "reasonable doubt" instruction and the ineffectiveness of trial counsel for failing to secure a competency hearing.  With respect to the former, Mr. Cardwell did not set out for the CCA the jury's confusion regarding the definition of reasonable doubt, *see supra* Section XXIII, and thus the claim was not properly preserved for exhaustion.  As for the competence claim, Mr.

Cardwell failed to assert that 1) defense counsel failed to object to the State Hospital competency finding within the 15-day period, as required by statute; 2) defense counsel failed to bring a motion at any point during the trial to seek another competency hearing; 3) defense counsel failed to object to Mr. Ashmore's erroneous statement on the first day of trial that Mr. Thomas was competent: and 4) trial counsel failed to inform the court, when directly asked several times at the close of the case-in-chief, that Mr. Thomas was not competent.

Beyond appellate counsel's failure to properly present the foregoing claims, Mr. Cardwell additionally failed to raise the unconstitutional limits placed on the jury's consideration of mitigating evidence and neglected to bring the following claims regarding the defense counsel's constitutionally ineffective assistance:

1. Failure to challenge the State's opening statement;

2. Failure to voir dire jurors adequately, who stated they were opposed to interracial relationships;

3. Failure to object to the giving of substantive law instruction to the venire;

4. Failure to challenge the voluntary intoxication instruction offered by the State and the Court;

5. Failure to object to the giving of an erroneous voluntary intoxication instruction to the venire;

6. Failure to object to erroneous instructions on the issues of insanity and voluntary intoxication, or a clarifying instruction explicating the interplay between;

7. Failure to object to the use of a powerpoint display before the venire, when that powerpoint reflected an erroneous statement of the law;

8. Failure to object to the state's reference in opening statement to jury instructions generally, and to the erroneous voluntary intoxication instruction in particular;

9. Failure to object to the voluntary intoxication instruction in the court's charge;

10. Calling the state's expert witnesses in an attempt to prove insanity;

11.     Repeated instances of failing to object to leading or otherwise inappropriate questions or to understand the application of the evidentiary rules in the courtroom; and

12.     Trial counsel's failure to request a diminished capacity defense.

"A criminal defendant has a constitutional right to receive effective assistance of counsel on direct appeal." *United States v. Phillips,* 210 F.3d 345, 348 (5th Cir. 2000).  A claim of ineffective assistance of counsel on direct appeal involves the same familiar two-prong analysis under *Strickland*, which requires 1) deficient performance, and 2) resulting prejudice.  *See* 466 U.S. at 687; *see also Busby v. Dretke,* 359 F.3d 708, 714 (5th Cir. 2004) (applying *Strickland* test to appellate counsel's performance).

In the present case, Mr. Cardwell failed to properly present two claims and failed to bring numerous others that were part of the record below.  Because counsel's failure resulted in prejudice to Mr. Thomas with regard to each issue, Mr. Thomas received ineffective assistance of counsel on direct appeal.  *See*, *e.g.*, *Hicks v. Howton*, ___ F. Supp. 2d ___, 2009 WL 4030755 (D. Ore. Nov. 20, 2009) (finding that under AEDPA, trial and appellate counsel were ineffective in failing to assert error in the trial court's overruling objection to the prosecutor's improper arguments in closing); *Judge v. Beard*, 611 F. Supp. 2d 415 (E.D. Pa. 2009) (finding trial and appellate counsel ineffective for failing to assert error based on the trial court's instructions that "erroneously led the jury to believe that it could not return a verdict at the penalty phase of the trial without agreeing unanimously both as to individual mitigating circumstances and the ultimate penalty"); *Showers v. Beard*, 586 F. Supp. 2d 310 (M.D. Pa. 2008) (finding that under AEDPA, trial counsel was ineffective in murder trial for failing to present rebuttal expert testimony and appellate counsel was ineffective for failing to assert this issue on direct appeal).  The state habeas court failed to consider any of the facts relevant to the issues of appellate counsel's deficient performance and the resulting prejudice to Mr. Thomas, rendering the court's

summary conclusion an objectively unreasonable application of *Strickland*. *See Wiggins*, 529 U.S. at 397-98; *Bradley*, 315 F.3d at 1100.

## CONCLUSION

The finding that Mr. Thomas's acts were those of a sane person boggles the mind. Despite the extraordinary facts of this case and Mr. Thomas's life, the State obtained a conviction and death sentence with surprising ease.  The primary reasons underlying this tragic and profoundly erroneous result – and the factors that render his death sentence unconstitutional – are set forth above.  They compel relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Mr. Thomas prays that this Court

1.      Grant The Writ Of Habeas Corpus;

2.      Grant full and complete discovery, pursuant to a subsequent motion to be served and filed, including the right to depositions and to subpoena witnesses and documents necessary to the resolution of his claims;

3.      Order an evidentiary hearing, pursuant to a subsequent motion to be served and filed, permitting the full and fair development and presentation of Mr. Thomas's claims

4.      Find that Mr. Thomas's conviction and sentence of death were imposed in violation of the Constitution and the laws of Texas and the United States and must be reversed;

5.      Grant such other relief as law and justice require.

Dated:  March 16, 2010                    Respectfully submitted,


                                          __/s/ Maurie Levin_____
                                          Maurie Levin
                                          State Bar No. 00789452
                                          University of Texas School of Law
                                          727 East Dean Keeton
                                          Austin, TX  78705
                                          TEL:  (512) 232-7795
                                          FAX:  (512) 232-9171


                                          _/s/ Don Bailey_____
                                          Don Bailey
                                          State Bar No. 01520480
                                          Attorney at Law
                                          Board Certified, Criminal Law
                                          309 N. Willow
                                          Sherman, Texas 75090
                                          TEL:  (903) 892-9185
                                          FAX:  (903) 891-8304


                                          __/s/ Gregory M. Weyandt___
                                          Gregory M. Weyandt
                                          MN Bar. No. 0116324
                                          DORSEY & WHITNEY LLP
                                          Suite 1500, 50 South Sixth Street
                                          Minneapolis, MN 55402
                                          TEL:  (612) 340-2600
                                          FAX:  (612) 340-2868


                                          *Counsel for Andre Lee Thomas*

## CERTIFICATE OF SERVICE

        I hereby certify that on this 16th day of March, 2010, I caused a true and correct electronic copy of the foregoing Application for Writ of Habeas Corpus as Counsel, and Exhibits thereto, to be served by on counsel for the state, Fredericka Sargent, Assistant Attorney General, by email delivery to Fredericka.sargent@oag.state.tx.us.  Ms. Sargent has consented to electronic service.


                                          /s/ Maurie Levin_____
                                          Maurie Levin