# Exhibit 1

## Affidavit of Kate Allen

COUNTY OF TRAVIS      )

                    ) ss:     **AFFIDAVIT of DR. KATE ALLEN, Ph.D.**

STATE OF TEXAS         )

**DR. KATE ALLEN**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Kate Allen. I am a resident of Travis County, Texas. I am over the age of 18 and otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future. This affidavit is based on my personal knowledge.

2. I have a Ph.D in family sociology from American University in Washington DC, and a Masters in Social Work from the University of Texas at Austin. I have taught in the social work schools of the University of Texas, Southwest Texas, California State University, Texas Tech, and Baylor University (where I also served as the Acting Director of the Social Work Program from 1974 – 1975). I began providing psychiatric care in a clinical setting in 1973, at Scott and White Hospital in Temple, Texas. In the ensuing 33 years I have practiced as a private psychotherapist, as the manager of a psychiatric acute care unit, and as an emergency room clinical social worker. My curriculum vitae is attached to this affidavit as Exhibit A.

3. I was retained by defense counsel for Andre Thomas to testify in the mitigation phase of the Defendant's trial for capital murder in March of 2004.

4. I was initially contacted by Mr. Thomas' defense team on February 8, 2005. Despite the short time frame, I agreed to assist on the case, because it was so obvious that Mr. Thomas was mentally ill.

5. As soon as I was retained, I asked Bobbie Peterson to send all documents relevant to my work on the case. In response, Ms. Peterson asked me to contact Shelli Schade, saying that she would have everything I needed. I thus contacted Ms. Schade, and asked for the following: her mitigation study (with summaries of any interviews conducted / witness statements), the timeline, any and all psychiatric and neuropsychiatric evaluations conducted of Mr. Thomas; any foster care, RTC, juvenile detention records, drug or alcohol evaluations, probation or parole reports or evaluations; all medical and school records; any mental health, medical or CPS reports pertinent to Mr. Thomas' biological or step parents; all statements about the crime, and all criminal offense reports, especially those which included statements by Mr. Thomas. I let Ms. Schade know I needed these documents as soon as possible.

6. I informed defense counsel (through Ms. Schade) that it was important for me to review this documentation, not only for my direct testimony, but to defend my testimony from attack by the prosecution. It was important for me to establish

that I <u>knew</u> certain information and did not rely solely upon Mr. Thomas' description of events.

7. I was under the impression that Ms. Schade had indeed done a mitigation study and a complete timeline, and that she had conducted numerous family interviews in order to do so. As it turned out, I was mistaken, for Ms. Schade had done very little by way of a mitigation workup.

8. I did not receive any documents from Ms. Schade until February 27, 2005. I was surprised at how little there was. I didn't press the fact that there were not additional records because I trusted Ms. Peterson and Ms. Schade to be responsive to my original document request, and to provide me with what I needed to conduct a complete review of the case. As it turned out, there was a lot more – at least by way of highly relevant records - that I simply had not been provided.

9. One of the things I was provided was a "Madness" Timeline, which was incomplete. The title of the document alone spoke volumes about its lack of professionalism. I wanted to, but did not say anything at the time, given the late date and limited nature of my involvement.

10. I did not find out until I was being cross examined by Mr. Ashmore at trial that there were thousands of pages of documents that I had not been provided. In fact, I had not even been told of – and thus was not previously aware of - their existence.

11. Among the things I did not receive and thus did not review were the following:

    - the grand jury testimony of any of Defendant's family members;
    - the trial testimony of Danny Thomas;
    - the diary or testimony of Carmen Hayes;
    - the witness statement of Kim Baird;
    - the testimony of Paul Boren;
    - the tapes or video of Defendant's statement to police, nor transcripts of same;
    - the offense reports;
    - the letters Mr. Thomas wrote to Laura Boren;
    - Mr. Thomas' complete medical records;
    - Mr. Thomas' complete juvenile records;
    - Mr. Thomas' complete jail records; or
    - the testimony of Mr. O'Bannon

12. Defense counsel did not apprise me of or brief me on the contents of the above documents.

13. I was given very little, if any guidance by defense counsel as to their strategy in the case, and the goals of my testimony. They clearly seemed overwhelmed with

the task before them.  As a consequence, I was not properly prepared for my testimony, or for the state's cross-examination.

14. I was aware of what seemed to be a fairly deep rift among the defense team.  Ms. Peterson and Ms. Schade seemed to be very angry with Mr. Hagood, and there did not seem to be much communication going on between the attorneys.

15. Mr. Thomas' current habeas counsel provided me with a complete social history of Andre, and the report of neuropsychologist Dr. Myla Young.  I have summarily reviewed both those documents.

16. It would have been an enormous benefit to have these reports and this information at the time of my testimony at trial.  The social history – reflecting interviews with many members of Andre's family of the sort that were never conducted pre-trial, and review of voluminous documents - makes clear that the mental illness that Andre suffers from runs through both sides of his family.  This family history is central to showing that Mr. Thomas was not suffering from a drug induced psychosis, but from a long standing illness.  It also buttresses my diagnoses at trial that Mr. Thomas suffered from schizophrenia.

17. The information provided by habeas counsel also makes clear to me that my image and understanding of Andre's family was erroneous.  I was not provided the information that would have given me an accurate picture of Andre's circumstances.  His mother was not, as I testified, a hard working church going woman; she was very mentally ill, and as such could not and did not provide a supportive or stable home for her family, let alone anyone as mentally ill as Andre.  Her religion, and delusions about god speaking to her, is an integral part of her mental illness, and a central and detrimental part of her relationship with Andre.  Contrary to my understanding from the minimal information I was provided at the time of trial, Andre's father in fact was around very little when he was growing up, was an active alcoholic, and was often abusive of Andre, to the degree that he gave Andre advice on how to best commit suicide.  Indeed, Andre's extended family, both maternal and paternal, exhibits repeated instances of mental illness and addictive behaviors, both of which have extremely strong genetic components.  It is unquestionable that this information would have been useful for me to have before I testified.

18. During my testimony, I stated that Mr. Thomas had "traits" of borderline personality disorder and antisocial personality disorder.  With the information provided by habeas counsel, I no longer think that is the case.  I felt the need to mention those traits at trial because the limited information I was given did not permit me to explain certain behaviors another way.  I qualified my testimony at trial, knowing that I did not have enough information to make a full or reliable Axis II diagnosis.

19. With the extensive evidence of extreme and longstanding mental illness and organicity I have since been provided by habeas counsel, I have no doubt that Andre does not suffer from a personality disorder, but from profound schizophrenia, psychosis, and organic brain damage. The assumptions of a professional making a diagnosis on Axis II (Personality Disorders) are that the patient has had enough normal cognitive development for a personality structure to have been established. Axis II diagnoses imply that an otherwise normal individual (without an ongoing psychotic illness starting in childhood) is able to learn and choose his responses to stress and meeting his needs. However, when he is so neurologically compromised, as is Andre, for the majority of his formative years, it becomes clear that the mental illness has been the driving factor in his development and behavior. For this reason, when an Axis I disorder the magnitude of severe, ongoing, untreated schizophrenia and organic brain damage are present from childhood, personality disorders should not be diagnosed unless it is clearly established that such was present before the onset of the schizophrenia (see DSM-IV-TR, p. 688). With the information provided to me by habeas counsel, I now realize that Andre has suffered severe mental illness since an early age. If I had had this information at the time of trial, I would not have even included personality "traits" in my diagnosis or testimony.

20. If, at the time of trial, I had been given the information provided recently by habeas counsel, I would have been able to explain to the jury that someone who suffers from the degree of mental illness Andre endures has no control over his actions, and cannot understand whether his conduct is wrong because his "reality" has no relationship to the real world. With the information provided by habeas counsel, I would have been able to explain to the jury that the concept of "acceptance of responsibility" is simply inapplicable to someone like Andre Thomas. A sense of responsibility assumes an understanding of one's actions as real, and as taking place in the real world. Andre's mental illness precludes such an understanding.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

*Kate Allen, LCSW, Ph.D.*
Signature

*Kate Allen, LCSW, Ph.D.*
Printed Name

COUNTY OF ~~GRAYSON~~ TRAVIS, STATE OF TEXAS
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 5th day of
June, 2007.

Notary Public's Signature
My commission expires 12-18-2010



KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

# Exhibit 2

# Affidavit of Teresa Baker

COUNTY OF GRAYSON )

STATE OF TEXAS )

)   Affidavit of TERESA J. BAKER
)
)

Appeared before the undersigned authority duly designated to administer oaths, Teresa J. Baker states on oath:

1. My name is Teresa J. Baker. I am a resident of Sherman, TX. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am Andre Thomas's aunt on the paternal side. I am a custodian for the Sherman Independent School District.

3. During the months leading up to my nephew Andre's trial, I experienced several instances of racial prejudice.

4. Once, I was standing in line at the supermarket and saw Andre's picture on a newspaper. The man behind me in the line saw his picture, too, and remarked, "That motherfucking nigger should fry." The cashier told him that the man in the picture was my nephew, but he did not apologize for his statement.

5. A co-worker of mine at Dillingham Elementary told me, "All niggers are the same; they're always wanting to slice each other up." This man hated black people.

6. On a separate occasion, I was locked out of a building I needed to clean and a co-worker of mine took forever to let me in, despite hearing my knocks. When he finally let me in, he commented that I was so black, he could hardly see anything but the whites of my eyes and teeth.

7. At no time prior to or during trial did any attorney, investigator, or attorney's representative speak to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_____
Signature

_____
TERESA J. BAKER
Printed Name

STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 14ᵗʰ day of
March , 2007.


Notary Public's Signature
My commission expires: 12-18-20\0

KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

# Exhibit 3

## Affidavit of Wanda Banks

COUNTY OF GRAYSON                    )
                                    )          **AFFIDAVIT OF WANDA BANKS**
STATE OF TEXAS                      )


**WANDA BANKS**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Wanda Banks. I am a resident of Grayson County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am currently the Director of Harmony Academy at Harmony Baptist Church in Sherman, Texas.

3. I have known Andre Thomas since he was age three or four. I first met Andre in the mid-1980s. At that time, I was head of the Youth Department at Harmony Baptist Church, where Andre and his family attended services. During the 1980s, I drove Andre to and from services on the church bus almost every Sunday. I knew Andre well because he often attended the youth meetings I led at the church. Andre was a bright child. He learned many Bible stories at a young age, and he knew more about the Bible than most other children his age. Andre loved talking about the Bible as a child.

4. I have known Rochelle Thomas, Andre's mother, since the early to mid-1980s. I have known Andre's brothers – Eric Ross, Danny Ross, James Thomas, and Brian Thomas – since this time as well.

5. Andre's family lived in extreme poverty throughout Andre's childhood. Andre's mother Rochelle had a hard time keeping a job, and the church often loaned Rochelle money to pay her utility bills. Despite the church's assistance, Andre's family often had no electricity or running water at their house. Once, when Rochelle and her boys were living across the street from the church, several church members discovered that Rochelle was taking buckets of water from the church's outside spigot in order to bathe her boys and have water to drink.

6. Rochelle had trouble looking after four boys. Danny Thomas, Andre's father, was not present during Andre's childhood. When Andre's oldest brother, Eric Ross, was in second or third grade, he assumed the role of a father to Andre and his brothers. Eric took care of the boys, making sure they got on the bus to go to school or church. Eric also made sure the boys had clean clothes and that their hair was nicely fixed.

7. On several occasions, Andre's mother Rochelle has confided in me about Andre's behavior. Based on what Rochelle told me, I believe Andre Thomas has mental problems. I am very familiar with the signs and symptoms of mental illness because my sister has struggled with a mental illness for years.

8. Rochelle also told me that about three days before the crimes, she sought help for Andre's mental problems at Wilson N. Jones Hospital in Sherman, Texas, but rather than caring for Andre, the hospital staff let Andre leave. In dealing with my sister's mental illness, I also tried to get help at Wilson N. Jones Hospital and had a very similar experience.

9. I believe Brian Thomas, Andre's brother, also has mental problems. In my experience, Brian's behavior is strange and often does not make any sense. For example, Brian once came to my house asking for some food because he was very hungry. When I prepared a meal for him, however, he hardly ate any of it. Brian was not behaving normally at this time. On another occasion, Brian called 911 because he thought someone was in his house. When the responders arrived, they did not find any intruders. In investigating the scene, the responders realized that Brian was seeing or hearing things that were not there. The last time I saw Brian, he was acting strangely and talking about odd things that did not make any sense.

10. Many members of the community have said hateful things about Andre since the crimes. For example, I have heard members of the community say they "want Andre dead." These comments are very hard on me. At the time of the trial, I attended classes outside of Grayson County, and I felt a sense of relief when I get out of the community and away from these sentiments.

11. At no time prior to or during Andre's trial did any attorney, investigator, or attorney's representative speak to me. I would have been happy to speak with them, had they contacted me. I would have told them the above facts contained in this affidavit and testified to them at trial.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_____
Signature

_____
Printed Name

STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 23rd day of
May, 2007.

_____
Notary Public's Signature
My commission expires: 12-18-2010

KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

# Exhibit 4

## Affidavit of Rickey Bell

COUNTY OF GRAYSON       )
                                )          Affidavit of RICKEY BELL

STATE OF TEXAS             )

Appeared before the undersigned authority duly designated to administer oaths, Rickey Bell states on oath:

1. My name is Rickey Bell. I am a resident of Sherman, TX. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am an employee of the City of Sherman, TX. I was Andre Thomas's supervisor when Andre worked at West Hill Cemetery for the City of Sherman from 2002 to 2004. I sometimes worked one-on-one with Andre, when preparing for a funeral, and other times, I supervised Andre and the other workers by keeping an eye on them while they worked.

3. From the time that I started working with Andre in 2002, I thought that he was mentally ill.

4. On a few separate occasions, Andre told me that he was going to kill himself. I believe that he seriously intended to commit suicide. Each time, I talked to him about how the Bible instructs that this would cause him to deprive himself of entering God's kingdom and would have Andre read the Bible. This seemed to satisfy Andre, at least temporarily, to where he would not kill himself.

5. Andre frequently talked about the Bible, but he always had strange and negative interpretations of the Scriptures. Andre's interpretations did not make sense to me, and did not make sense to his other co-workers.

6. Andre would sometimes lay down in the graves after they were dug, but before the caskets were placed inside them. I asked Andre why he did this, and he told me that he just wanted to see what it was like to be in the grave.

7. Andre's mother, Rochelle Thomas, also behaved strangely. She dated an old friend of mine for a while, but he wanted her to officially divorce Danny Thomas, Andre's father, if they were to continue dating. Rochelle refused to get the divorce, even though she had not lived with Danny for a long time. At this point, my friend broke up with Rochelle. She soon drove over to his house and tore the place up, destroying many pieces of his property. She continued to harass him for some time.

8. I believe that the fact that Andre Thomas was black and Laura Boren Thomas was white may have impacted the jury's verdict. I think things might have been

different had Andre been white, or Laura black.  There are people in Sherman who have very negative attitudes towards interracial dating.  Once, my wife and I were out to dinner and an interracial couple entered the restaurant.  At this point, a white man seated in the booth behind me told his wife, "look at the white trash with the nigger."

9.  Prior to, and during trial, no one ever asked me if I thought Andre Thomas was mentally ill, although I was prepared to testify that I did believe he was mentally ill.  I did not tell the judge or jury that I thought he was mentally ill, because I was only supposed to answer the questions I was asked.  I was not allowed to talk much at trial.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.


*Rickey Bell*
Signature

*Rickey Bell*
Printed Name

STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 14th day of March , 2007.


Notary Public's Signature
My commission expires: 12-15-20

KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

# Exhibit 5

# Affidavit of
# Christopher Bennet

COUNTY OF GRAYSON            )
                            )      Affidavit of CHRISTOPHER BENNETT
STATE OF TEXAS              )


**CHRISTOPHER BENNETT,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Christopher Bennett. I am a permanent resident of Grayson County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I met Andre Thomas in our very early childhood and we have been friends ever since. I have known Andre as long as I can remember. We are approximately the same age. As kids, Andre and I used to spend almost every day together.

3. Andre was different than the other kids I knew growing up. For example, when Andre was 9 years old, he decided that he was Raden, a character in the Mortal Kombat Video Game. I believe Andre truly thought he was Raden. Even when Andre was 18 years old, he still told people that he was part of Raden and that Raden was part of him.

4. Since I have known Andre, he always talked about the Bible and was extremely intense when he talked about it. Andre often spoke of the Seven Deadly Sins, and the way he talked about them sometimes frightened me. Andre also talked about how the world would end if everyone turned bad. He said that if there was a nuclear war and everyone pushed the buttons that set off the global warheads, the whole world would end. Other times, Andre talked about things that made no sense at all.

5. When Andre was about 9 or 10, he began talking to me and some of our friends about demons. Andre told us that these demons spoke to him and would tell him to do things, bad things, and that it scared him. Andre said he had to beat the demons. When Andre told these stories, we made fun of him because we did not know any better. Andre's stories were strange and made us uncomfortable.

6. During this same time, Andre used to talk back to the demons, even in front of me and a few other friends. Andre's voice would change and he would look very odd. When talking to the demons, Andre would be sweaty and his eyes looked different than usual; they were intense and bizarre. Andre would jump around and appeared terribly nervous when the demons were talking to him or when he was talking to the demons.

7. When we were kids, sometimes Andre and I (and our other friends) would drink or smoke marijuana. I had the opportunity to observe Andre when he was drunk, when he was high, and when he was sober. Andre's encounters and conversations with the demons happened both when he was high (or drunk) and when he was sober.

8.  Andre used to tell me that God spoke to him often.  Andre said that God was trying to show Andre a different way than what the demons were showing him.

9.  When Andre started hearing the demons, around age 9 or 10, his personality seemed to change.  Each year after that, Andre seemed more strange.  He continued to tell me more and more about the demons as the years went on.

10. I have also known Danny Thomas, Andre Thomas's father, since around the time I met Andre in early childhood.  There was something unusual about Danny Thomas, although as a child I did not fully understand what that was.  Danny had a strange and confused way of talking.  He seldom made sense.

11. I have also known, Brian Thomas, Andre's brother, since around the time I met Andre.  Brian was cruel to Andre.  Brian regularly made fun of Andre and started fights with him.  Brian had an unusual demeanor.  His body language was very strange and he frequently looked and acted crazy.

12. I have also known James Thomas, Andre's brother, for almost as long as I have known Andre.  James was also cruel to Andre.  James would say hurtful things to Andre and physically assaulted him.  James acted crazy and aggressive, in a similar manner to Brian.  I believe James was not mentally well.

13. At no time prior to or during Andre's trial did any attorney, investigator, or attorney's representative speak to me.  I would have been happy to testify on Andre's behalf.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.


_____
Signature

_____
Printed Name    Christopher Bennett

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 25th day of
May, 2007.


Notary Public's Signature
My commission expires:

KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

4824-2580-3009\1

# Exhibit 6

## Affidavit of Pam Ross Borens

COUNTY OF MUSKOGEE          )

                               )  ss: **AFFIDAVIT OF PAM ROSS BORENS**

STATE OF OKLAHOMA          )

       **PAM ROSS BORENS,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Pam Borens. I am a resident of Muskogee County, Oklahoma. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am the sister of Andre Thomas' mother, Rochelle Ross.

3. When my mother was very young she had her first baby, Ronnie. His father was better off than our mother was, and his family raised Ronnie most of the time. A year and a half later, my mother had a second son, Kevin, with a different man.

4. When Ronnie and Kevin were three and two years old, my mother married my father, Johnny Ross. He already had five children with his previous wife. She died during an argument when he pushed her over. She fell back, hit her head and died. My mother told me she felt like Johnny Ross just wanted to marry my mother to raise his children.

5. My mother and father had three children: me first, and then a year later my brother Gregory, and a year later, Rochelle. After my parents split up, my mother had my sister Alice with another man. Then she got involved with a married man named Roscoe Johnson. She had three more kids by him: Denise, Margie, and Roscoe Jr. Then, in 1969, my mother married Walter Martin.

6. When my mother was pregnant with me, my father was drunk and pushed her over. She fell and my foot was broken in utero. My mother was supposed to have my foot re-broken and re-set after my birth but she never did. My foot is still messed up.

7. I left Muskogee the day after I graduated from high school in 1971. I had raised five younger siblings and I wanted to get away from all that and be on my own. When I was nineteen I married a forty-nine year old man named John Stone, but he called himself Diablo. We broke up five years later. A few years later, I married Arnold Alexander. We have two grown children.

8. In 1982, Arnold and I followed a man who called himself Bishop Taylor to establish a new church in Philadelphia called Faith Temple of Deliverance. Eventually Arnold and I divorced. He had been unfaithful to me many times. He

told another man in the church, Ervin Borens, that he could have me. I married Ervin and we have a child together named Latitia. Ervin had three children from a previous marriage. It took me until August of 2006 to finally "escape" from Bishop Taylor's church, which I now realize is a cult.

9. My mother Vivian, and Rochelle, and my daughter Latitia all have the gift of hearing God. God speaks to them in dreams and in visions. My mother did not handle the gifts – they handled her. She drank alcohol because she did not want to hear or see. She lived in between worlds. When my mother talked about her visions, it was like a screen dropped in front of her face. One time she had a vision that her baby brother was going to die if he completed his plan to move to California. He did move, and within the next year he was shot and killed by his wife.

10. Rochelle is psychic and can practice physiognomy. Rochelle is obsessed with what she thinks God is telling her to do.

11. At least five of my mother's nine children have problems with alcohol. When I was little, my mother would make all of her children "cordial" drink. We had to learn how to drink alcohol properly. This made me cry. I hated alcohol.

12. Gregory sniffed glue from an early age. My mother told me a man in the neighborhood raped Gregory when he was little so my mother put Gregory in a boy's home.

13. Rochelle was born right in the middle of nine kids and she needed special attention. She was very wild and always did whatever she wanted to do. Rochelle lives in her own world. She does not always stop to think what is best for her or for anyone around her. Rochelle often blows up for no rational reason.

14. Rochelle and some of my other sisters were sexually molested by Walter Martin. My mother tried to catch him doing it. They fought about this and Walter left for several years. One time Walter came back around. My mother and Walter were fighting and Walter pulled a gun on my mother. Gregory, who was seventeen, tried to defend her. Walter shot Gregory. Gregory told me about this, shortly before he died two and a half weeks later. Walter did not go to jail for shooting Gregory. Rochelle was very close to Gregory and never got over his death.

15. Right before Gregory died, he told me that our mother was "not right in the head" and that she needed to be committed. Mother did have a lot of mental problems. She just could not handle God's messages. She may have seemed cheerful, but inwardly she was very depressed.

16. Alice's son Kevin has mental problems. He forgets things and has trouble taking care of himself.

17. At the time of Andre's trial, no one on his defense team contacted me.  If anyone had asked, I would have been very happy to tell them what I knew about Andre's life and background, to testify for Andre, or give information to the doctors who examined him.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Pam Ross-Borens_

Signature

_Pam Ross Borens_

Printed Name

COUNTY OF MUSKOGEE, STATE OF OKLAHOMA
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this __3rd__ day of __May__, 200__7__

_Chyal White_

Notary Public's Signature
My commission expires: 06-23-07

# Exhibit 7

## Affidavit of Ronnie Brinson

COUNTY OF LIVINGSTON              )
                                 ) ss: **AFFIDAVIT OF RONALD BRINSON**
STATE OF MISSOURI                )

    **RONALD BRINSON,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Ron Brinson. I am a resident of Arapaho County, Colorado. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am the oldest brother of Andre Thomas' mother, Rochelle Ross. We have the same mother, Vivian Jean Ross, but we had different fathers.

3. My mother Vivian was never married to my father. She was fourteen years old when I was born. She had nine children, fathered by five different men. My mother was not able to work because she had to take care of her nine children. Unfortunately, she could not depend on any of the five men who fathered her children. They gave little, if any, financial or emotional support, so we were very poor and she struggled to provide for us. She was on welfare.

4. At least two of these men were physically and emotionally abusive to my mother. My mother's first husband, Johnny Ross, would beat my mother regularly. Johnny was Rochelle's biological father and Andre's biological grandfather. He was a mean and abusive man and often acted irrationally and did bizarre things. For example, one time he threw what little food we had out in the yard and would not allow us to eat it.

5. Johnny Ross was an alcoholic. More than once he got drunk and threatened to kill my mother with his gun. It was terrifying. When this happened my mother would run for help.

6. My mother's second husband, Walter Martin, was also very cruel. During a fight with my mother, Walter shot and killed my younger brother, Gregory. Walter ran around with a lot of women while he was married to my mother.

7. My sister Rochelle, Andre's mother, had only two full siblings: Pam and Gregory. Gregory was emotionally and mentally troubled. He was very tense and serious. He was only seventeen years old when our stepfather Walter killed him.

8. Like our mother, Rochelle got involved with men who would not provide for her and her children. Rochelle was always moving around, trying to make ends meet. Moving around was hard for Rochelle's children. They would make friends and the

next thing they knew, they were moving again.  They never had the security or stability that children need to develop the right way.

9. My mother was an alcoholic.  Sometimes when she was drunk she was like a different person and would get much more angry than usual.  At one time I was an alcoholic.  I no longer drink hard liquor.

10. At the time of his trial, no one from Andre's defense team contacted me concerning Andre's life and his family's history.  Had they contacted me I would have told them about how difficult his mother's life was, and of the mental problems of people in his background.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Ronald Brinson_
Signature

_Ronald Brinson_
Printed Name

COUNTY OF LIVINGSTON, STATE OF MISSOURI
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _9th_ day of _May_ , 2007.

_Linda J. Ireland_
Notary Public's Signature  _Linda J. Ireland_
My commission expires:  _9/24/07_

# Exhibit 8

## Affidavit of Nona Dodson

COUNTY OF DENTON          )

                                 )    Affidavit of NONA C. DODSON

STATE OF TEXAS             )

**NONA C. DODSON,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.  My name is Nona C. Dodson.  I am a permanent resident of Carrollton, Denton County, Texas.  I am over 18 years of age and am otherwise competent to give this affidavit.  No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.  I am currently employed as a jury and trial consultant with Cathy E. Bennett & Associates, Inc.  I have worked for this company as a jury and trial consultant since 1994.  As part of my job, I regularly appear in court to assist trial counsel with voir dire and jury selection.  In this capacity, I advise counsel what questions to ask during voir dire in order to discover whether potential jurors harbor any feelings, opinions, or beliefs that might influence their decision making in a given case.  I have assisted counsel with voir dire and jury selection in numerous criminal cases, including approximately seven (7) cases involving the death penalty.  Due to my experience as a jury and trial consultant, I have appeared on both *CNN* and *Court TV*.  I have also co-authored articles on voir dire workshops and shadow juries, and I regularly lecture on voir dire and jury selection.  I have degrees in both English and Psychology, and I have also completed Master's work in Design Science.

3.  In January of 2005, I volunteered to assist, without charge, Andre Thomas's appointed trial counsel, Bobbie Peterson and R.J. Hagood, with voir dire and jury selection in Mr. Thomas's capital case.

4.  When I began working with Mr. Thomas's attorneys, it became clear to me that Ms. Peterson had no prior experience as a capital defense attorney and that Mr. Hagood's experience in this area was limited.  Ms. Peterson, for example, had the voir dire style of a prosecutor.  She did not know how to ask questions designed to reveal biases that may affect jurors in deciding the particular issues in a defendant's capital case.  Rather, she asked superficial questions as to whether potential jurors could generally follow the law.  These questions did not reveal any prejudices potential jurors may have had that would make them capable of being struck for cause.

5.  As a jury consultant, I repeatedly advised both Ms. Peterson and Mr. Hagood to reach the specific issues in Mr. Thomas's case during questioning.  Neither Ms. Peterson nor Mr. Hagood followed this advice.  Both of Mr. Thomas's attorneys continued to ask superficial, "follow the law" questions, which failed to reveal any relevant biases potential jurors may have had against the defense.

6.  Although I repeatedly gave Ms. Peterson specific questions to ask during voir dire, she either failed to ask them or did not ask the questions as they were formed.  Rather, she

would fall back on her prosecution-style voir dire, asking questions in a superficial manner that did not get at the specific issues I advised counsel to address.

7.  Mr. Hagood did not even attempt to follow my advice.  He refused to ask any of the questions I recommended during voir dire and it became clear to me that Mr. Hagood was unable to conduct a meaningful voir dire that would help the defense identify any bias potential jurors might have about Mr. Thomas and/or the death penalty and who should be struck for cause.

8.  Based on my extensive experience as a jury consultant, it was clear to me that the questions both of Mr. Thomas's attorneys were asking were not going to weed out jurors who were capable of being struck for cause.  Despite my repeated directions and advice, the defense did not at any time adequately question jurors to reveal potential biases relevant to the particular issues to be decided in Mr. Thomas's capital case.  After working with Ms. Peterson and Mr. Hagood for several days, I quit in frustration when it became apparent that they were simply not going to follow any of my suggestions.

9.  After I left the courthouse on the last day I was present for voir dire in Mr. Thomas's jury selection, I was so frustrated with Ms. Peterson and Mr. Hagood's performance during voir dire that I believed Mr. Thomas was bound to be prejudiced by the jury his counsel selected.  I felt certain that Mr. Thomas's jury was not qualified to render a fair verdict and sentence because his counsel failed to reveal, through adequate voir dire, whether jurors could be impartial in deciding the specific issues in Mr. Thomas's case.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Nona C. Dodson_

Signature

____Nona C. Dodson_____

Printed Name

STATE OF TEXAS

COUNTY OF DALLAS

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 12th day of June, 2007.



Notary Public's Signature

My commission expires:

PAULA K. JOHNSON
Notary Public
STATE OF TEXAS
My Comm. Exp. 09/19/2009

# Exhibit 9

## Affidavit of Leah Eastep

COUNTY OF GRAYSON           )
                                  )    ss:    AFFIDAVIT OF LEAH EASTEP

STATE OF TEXAS              )

**LEAH EASTEP,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.    My name is Leah Eastep.  I am a resident of Grayson County, Texas.  I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.    I am a legal assistant employed by Bobbie Peterson, and have been so employed since July of 2004.

3.    I began working on the Andre Thomas case in mid-October of 2004 under the direction of Ms. Peterson, who was appointed as second chair on the case.  R.J. Hagood had been appointed as lead counsel.

4.    From the beginning of my involvement, it was my understanding that Mr. Hagood would be responsible for the hiring and questioning of all defense experts, that Ms. Peterson would be responsible for the balance of the guilt-innocence phase, and that Mr. Hagood would be responsible for the punishment phase.

5.    The one exception in the guilt-innocence phase was the interaction with one expert, Dr. Gripon, which Mr. Hagood insisted on handling himself.

6.    Mr. Hagood received supplemental discovery from the state that he never made Ms. Peterson aware of. This came out in Court when Natalie Sims was testifying.  Apparently, Mr. Hagood had misplaced the documents Ms. Sims was testifying about, and I went and got them from the DA's office, along with the proof that RJ signed for them.

7.    RJ had his own copies of discovery, which he brought to our office. It was still bound and undisturbed when we received it.  To my knowledge, Mr. Hagood's independent file in this case consisted of one expandable red-rope folder.

8.    Mr. Hagood did not tell me about the memorandum he received regarding a diminished capacity defense.  Using diminished capacity as a defense was never mentioned by Mr. Hagood and was never discussed by the defense team.

9.    Andre's family said that they did not like RJ because they did not think he was doing the best job he could.

10.    During the trial, Mr. Hagood took numerous pills in the morning and again at lunch (a total of about 7-8, up to possibly a dozen). I do not know what the pills were for but he told me that he took pain medication.

11.    At times during the trial it seemed obvious that Mr. Hagood did not feel well and appeared to not be focused on the trial. After the trial was over, one of the jurors asked if there was something wrong with RJ and stated that several of the jurors had commented that RJ had looked very ill during the trial.

12.    Mr. Hagood hired Shelli Schade as a mitigation investigator. She was the only such person the defense team hired for mitigation.

13.    Ms. Schade put together a "madness timeline" which was full of errors and which was un-necessary redundant information.

14.    Ms. Schade was very anti-death penalty and did not like Kerye Ashmore, the Assistant District Attorney. She let these views be known throughout the trial. There was talk of having Ms. Schade testify about her mitigation work, but her vocal sentiments against the death penalty and Mr. Ashmore made it risky, so she did not testify.

15.    At one point, the jury requested that the Judge instruct Ms. Schade to quit making faces towards the jury when witnesses testified.

16.    To my knowledge, Ms. Schade did not independently gather records or do any type of in depth mitigation investigation.

17.    As far as I know, Ms. Schade did not interview extended family members. To my knowledge, she only interviewed three close members of the family, Danny Thomas, (Andre's father) Doris Gonzalez (Andre's aunt) and Brian Thomas (Andre's brother) right before trial. She also interviewed the victim's families, both the Borens and Hughes. I believe interviewing the victim's families was very counter-productive.

18.    Dr. Edward Gripon was hired as an expert by Mr. Hagood and questioned by Mr. Hagood.

19.    Mr. Ashmore's cross-examination of Dr. Gripon was thorough and rebuttable.

20.    After the cross-examination, Dr. Gripon, Mr. Hagood, and I met during the lunch break. Dr. Gripon listed specific questions that Mr. Hagood should ask Dr. Gripon to cover to rebut the issues raised by Mr. Ashmore's cross examination.

21.    When we returned, Mr. Hagood did not ask any of the questions, which shocked the defense team, including Dr. Gripon.

22.     The media called Dr. Gripon "the Defense's big gun".  It was my feeling that the "big gun" had been taken away by Mr. Ashmore, and used to shoot us with.

23.     The defense team did not have a strategy to counter the intoxication allegation by the state other than to use Dr. Gripon, as far as I was aware.

24.     Ms. Peterson and I understood that Mr. Hagood was preparing the punishment phase case.  We only found out that was not true very late in the trial, and had to scramble to try to get something ready – all while we were in trial every day – working up to 20 hours a day during the weekends.

25.     We contacted Larry Fitzgerald and Dr. Kate Allen as emergency help when we discovered there was no punishment case put together.

26.     I was aware that there were issues regarding Royce Smithey's qualifications, but do not know exactly why he was not challenged prior to testifying.

27.     Mr. Hagood and Mr. Ashmore had a good relationship and went to lunch together numerous times during the trial.

28.     Mr. Hagood was responsible for seeing Andre in jail.  I am now aware that he saw him at the jail three times during the time around jury selection and the trial.

29.     Andre refused the plea offer b/c because his mother, Rochelle Thomas, told him that "God was going to" get him out of it.

30.     Ms. Thomas became very upset when she saw Ms. Peterson was representing Andre, stating that she is the "lady who was trying to put you in jail."

31.     Ms. Thomas would not cooperate with the defense team and was very angry at Andre for "killing the babies".  Ms. Thomas fled the state to avoid testifying.

32.     The only time I talked to Ms. Thomas she asked me if I had children and told me that I had had difficulty with my first child and that God has great things in store for him.

33.     We never considered requesting a neuropsychological evaluation of Andre, that I am aware of.

34.     I feel that Ms. Peterson ended up doing 80% of the work on this case, even though she was only responsible for a portion of the guilt-innocence portion of the trial.

3

35.    We tried to investigate the state's experts, specifically Dr. Oropeza. We could not get a copy of his CV because Mr. Ashmore stated RJ had it, but RJ could not produce it.   I now understand Dr. Oropeza in particular might not have been qualified to testify.

36.    The way this case was handled bothers me deeply. Looking back, I don't feel that we did everything that should have been done. I had never worked on a death penalty case and did not know what to expect or what was supposed to have been done.

37.    Andre was on the maximum dosage of Zyprexa during the trial and wore two leg braces during court.  During the trial, he ate skittles, or anything sweet, all day long.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Leah Easley_
Signature
_Leah Easley_
Printed Name

COUNTY OF GRAYSON, STATE OF TEXAS
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _13th_ day of
_June_ , 2007.

_Helen R. Jeffcoats_
Notary Public's Signature
My commission expires: _02-09-2010_

HELEN R. JEFFCOATS
Notary Public
STATE OF TEXAS
My Comm. Exp. Feb. 9, 2010

4

# Exhibit 10

## Affidavit of Clifton Eaton

COUNTY OF GRAYSON                )
                                                  )               **AFFIDAVIT OF CLIFTON EATON**
STATE OF TEXAS                      )

      **CLIFTON EATON**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Clifton Eaton. I am a resident of Grayson County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am currently serving as pastor at Harmony Baptist Church in Sherman, Texas. I have served as pastor here since 1995.

3. Eric Ross, Andre Thomas's oldest brother, regularly attends my church. Andre and his brothers James and Brian Thomas also occasionally attended my church, but I do not know them well. From time to time, Rochelle Thomas, Andre's mother, would also come to my church. Although Eric appears stable, the rest of the family always struck me as strange. I would always know when Rochelle was in church because she would repeatedly say, "Amen!" very loudly throughout the service. When speaking with her, Rochelle is always praising the Lord.

4. I am not aware that Andre Thomas ever had a stable father figure in his life. I did not even know that Danny Thomas, Andre's father, existed until Andre's trial. I was surprised to learn Rochelle had a husband because as long as I have known her, she has always had different boyfriends. Rochelle did not seem very stable. She has always had many different men in her life, and she also seemed to move frequently.

5. Rochelle was always very poor. My church has provided her with financial assistance so that she could pay her utilities.

6. At no time prior to or during the trial of Andre Thomas did any attorney, investigator, or attorney's representative speak to me. I would have been happy to speak with them, had they contacted me. I would have told them the above facts contained in this affidavit and testified to them at trial.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Clifton Eaton_
Signature

_CLIFTON EATON_
Printed Name

STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 23rd day of
May , 2007.

Notary Public's Signature
My commission expires: 12-18-2010

KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

# Exhibit 11
# Affidavit of Larry Fitzgerald

COUNTY OF TRAVIS        )
                                    ) ss:   **AFFIDAVIT OF LARRY FITZGERALD**

STATE OF TEXAS            )


       **LARRY FITZGERALD,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.     My name is Larry Fitzgerald.  I am a resident of Travis County, Texas over 18 years of age and otherwise competent to give this affidavit.  No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.     I am retired from the Texas Department of Criminal Justice where I was employed as a Public Information Officer from 1995 to August of 2003.  As a Public Information Officer I served as the official spokesperson for the second largest prison system in the country.  I was responsible for addressing inquires from a variety of sources regarding every aspect of the Texas penal system.

3.     Prior to the start of Mr. Thomas's trial I had provided testimony in the punishment phase of 12 capital murder trials in 10 Texas counties pertaining to the safeguards taken within prisons, the prison classification system, and the expected date upon which an individual prisoner could be considered eligible for parole based on his or her individual circumstances.

4.     Every court that I appeared before allowed me to testify as an expert.

5.     On approximately February 16, 2005, I was contacted to testify on behalf of Mr. Thomas.  Specifically, I was to requested to examine Mr. Thomas's unique circumstances and render expert testimony regarding the prison classification to which Mr. Thomas would be assigned and the corresponding date when he would be eligible to be considered for parole.

6.     In order to prepare for my testimony at Mr. Thomas's trial I met briefly with Bobbie Peterson who provided a thumbnail sketch of Mr. Thomas's personality, Mr. Thomas's criminal history, and the crime for which he was convicted.  Independently, I researched the media coverage surrounding this case in order to gather further information.  Although trial counsel did not provide me with any indication of the questions that I would be asked, I was prepared to testify based upon my own research, and the information provided.  Ms. Peterson forewarned me that the prosecutor had a nasty disposition.

7.     Approximately, three weeks after I contacted to testify, on March 10, 2005, I took the stand and was prepared and willing to testify on behalf of Andre Thomas.

8.     Following an intense voir dire by the Prosecutor, Judge Fry informed me that I was qualified to testify as an expert.

9.     Immediately after the Judge informed me that I was qualified to testify as an expert, Mr. R.J. Hagood rested on behalf of the defense without allowing putting me on to testify.

10.     I was prepared to testify that on Mr. Thomas's criminal history and circumstances surrounding his conviction, Mr. Thomas would have not even been eligible to be considered for parole for a minimum of 40 years.

11.     I was prepared to explain that the Texas Department of Criminal Justice has devised a system under which each offender undergoes an extensive diagnostic process in order to be assigned to a particular security level.  Under this diagnostic process a committee reviews the offender's current offense, past criminal history, past work history, medical and dental history, military service, and conducts thorough psychological evaluations.  Upon completion of the diagnostic process, the offender is sentenced to a security level, which ranges anywhere between G1 (General Population 1), being the lowest security level, to G5, and Ad. Seg. 1 (Administrative Segregation 1) to Ad. Seg. 3, being the highest.  Following an incident in 2002, in which a number of inmates escaped from the Connally Unit, a maximum security prison, the Texas Department of Criminal Justice redesigned this classification system making it more informative and more restrictive in order to better protect unit staff and offenders, as well as the public.

12.     I was prepared to express my opinion that under the present classification system, which incorporates changes made by the Texas Department of Criminal Justice in response to the Connally incident, the least restrictive classification Mr. Thomas could have advanced to was a G3 level.  Moreover, Mr. Thomas would have never been allowed to work outside the walls of the penitentiary based upon the crime for which he was convicted.

13.     I was also prepared to testify that the Texas Department of Criminal Justice routinely incarcerates offenders under extremely restrictive condition, thereby limiting incidents of crimes within the Texas penal system.  For instance, although the Texas penal system monitors a population of over 150,000 inmates, only three to four homicides occur per year.

14.     I was also prepared to give a detailed overview about the day in the life of an inmate and show the jury a video tape that chronicles the inner workings of the penal system.

15.     To date, I am still unaware of any reasoning that would explain Mr. Hagood's choice to rest on behalf of the defense without putting me on to render testimony that would have been beneficial to Mr. Thomas.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.


Signature

LARRY Fitzgerald
Printed Name

STATE OF TEXAS
COUNTY OF TRAVIS

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _8th_ day of June, 2007/

BEVERLY RUPE
MY COMMISSION EXPIRES
January 25, 2011

3

# Exhibit 12

# Affidavit of Doris Gonzalez

COUNTY OF GRAYSON )
                                  )          Affidavit of DORIS GONZALEZ

STATE OF TEXAS )

Appeared before the undersigned authority duly designated to administer oaths, Doris Gonzalez states on oath:

1. My name is Doris Gonzalez. I am a resident of Sherman, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am Andre Thomas' paternal aunt. Danny Thomas, Andre's father, is my brother. I have known Andre since he was born.

3. Andre was very close to my sister Angel Thomas. She died approximately two weeks before March 27, 2004. Her death upset Andre very much. He was crying uncontrollably at her funeral and was inconsolable.

4. I believe Andre's paternal uncle, my brother Craig Thomas, is mentally retarded.

5. Two of Andre's brothers, James Thomas, and Brian Thomas, have been certified to be mentally ill. I have been around these boys, my nephews, since they were born, and they all have engaged in crazy acts from time to time.

6. Most notably, Brian Thomas is a diagnosed schizophrenic. Rochelle Thomas, Andre's mother, often told me that Brian was my baby, meaning I was responsible for taking care of him. Brian often came over to my house when he was younger. Once, in approximately the winter of 2004, I started a bath for him and he got Pine-Sol and poured some of the Pine-Sol in the tub. I stopped him and asked him what he was doing. He told me that this was the way Rochelle gave him a bath.

7. Once, Brian was sleeping overnight at the MICU at the hospital in Sherman because it was so cold outside, and he had nowhere else to go. Brian was kicked out by the security guards at the hospital, and he came to stay at my house. At this time, Brian told me that Rochelle was living in a three or four bedroom house with plenty of room in a different town. Rochelle told me that since the boys are grown, she should not have to mess with them.

8. Andre and his brothers took care of each other growing up, the older brothers trying to take care of the younger brothers; Rochelle also tried to take care of all of them. Eric Ross had to take care of his younger brothers often, even when he was too young for the responsibility.

9. Andre will do anything Rochelle says. Andre did not take the plea in his case because Rochelle told him not to. I went to the jail weekly to plead with him to take it, but Andre told me he was going to do what Rochelle told him to do.

10. I lived with Rochelle Thomas for several months in Muskogee, Oklahoma. During the time I was living with Rochelle, many men would come by the apartment and Rochelle would be walking around with hardly any clothing on or completely naked. Once, someone rang the doorbell and Rochelle answered the door wearing only a short robe with no underpants. ~~With Rochelle, it was one man one day and a different the next day.~~ Rochelle always had some man hanging around. *Rochelle was in the company of several different men. DSG*

11. Andre and his brothers were present when all of these different men came to the house. Rochelle and her sons all lived in close quarters, and the boys were around Rochelle and these men often. Rochelle would often walk around naked in front of Andre and his brothers.

12. Rochelle did not have much money when Andre and his brothers were growing up. I believe Rochelle found a way to make ends meet.

13. Once, several months before the end of March 2004, I was at the home of Danny Thomas, Andre's father. I heard someone crying in the bathroom. I asked who it was, and I was told it was Andre. Andre came out of the bathroom crying and sat down on the couch across from me. He could not stop crying. Andre was holding his head, and I asked him what was wrong. Andre shook his head and told me, "The voices, the voices won't stop."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Doris A. Gonzalez_
Signature

_Doris Shervarn Gonzalez_
Printed Name

STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 22ⁿᵈ day of
_May_, 2007.

_____
Notary Public's Signature
My commission expires: 12-18-2010

KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

# Exhibit 13

# Affidavit of Edward Gripon

COUNTY OF JEFFERSON )

STATE OF TEXAS )   Affidavit of Edward B. Gripon, M.D.
)

Appeared before the undersigned authority duly designated to administer oaths, Edward B. Gripon states on oath:

1. My name is Edward B. Gripon. I am a resident of Jefferson County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am board certified in general psychiatry and have added qualifications in forensic psychiatry. I have practiced psychiatry for more than 30 years. I have worked on many cases evaluating both competency to stand trial and sanity at the time of the alleged offense, both on behalf of the State and the defense, including approximately 40 to 60 death penalty cases.

3. I was retained by RJ Hagood, defense attorney for Andre Thomas in the capital murder case of Leyha Marie Hughes.

4. For purposes of my evaluation, Mr. Hagood provided me with numerous materials. Mr. Hagood represented that this was all the materials the defense had been provided by the State. I do not specifically recollect reviewing the following: Grayson County Jail records regarding raw test data from States' experts, Andre's video confession, his answering machine message of 8:42 a.m. on March 27, 2004 to Paul Boren saying that he needed help, Carmen Hayes' interview, trial testimony or police statements regarding Andre's behavior, demeanor, and affect, etc., immediately following the crimes. I did review copies of the trial transcripts for Scarano and Bowen.

5. Among other things, Mr. Hagood initially asked me to evaluate whether Andre Thomas was sane or insane at the time of the alleged crime. He also asked me whether Andre Thomas had a mental illness.

6. I did not receive nor review the items mentioned above, although I asked for any and all documents which would potentially reflect on the defendant's mental state at or around the time of the alleged offense.

7. For purposes of my evaluation, I met with Andre on two separate occasions. The first time that I met with Andre was on October 8, 2004 and then again on January 7, 2005, for a total of approximately 5-6 hours.

8. As part of my evaluation of Andre, I did not conduct psychological testing because I was not asked to do so, as well as I did not deem it was necessary in order for me to render an

opinion on the subject that I was asked to opine on.

9. Prior to the trial, I met with Mr. Hagood to prepare for my testimony. At that time, we discussed what questions Mr. Hagood would ask me when I was on the witness stand. Mr. Hagood stated that he would ask questions regarding substance-induced psychosis. I informed Mr. Hagood of questions that I should be asked. During Mr. Hagood's examination of me at trial, he did not ask many of those questions.

10. Kerye Ashmore, the Assistant District Attorney, started his cross-examination prior to lunch on the day of my testimony. During the lunch break, I listed specific questions for Mr. Hagood to ask me to cover and rebut the issues raised by Mr. Ashmore, including the crime timeline. Mr. Hagood did not ask those questions.

11. If asked those questions by Mr. Hagood, I would have testified that they supported a finding of insanity.

12. In my opinion, the psychosis that Andre was suffering from at the time of the crime, was caused by schizophrenia. This conclusion is based on my evaluation of Andre, the factual history in the case and other record evidence. At the time of trial, Andre remained schizophrenic, but was under medication. Andre's psychosis does not only emerge when he is using intoxicating substances, but is present at other times. Even if Andre had been under the influence of Coricidin, alcohol and marijuana at the time of the crime, it would not have affected his mental state to a significant extent, given the time of usage, and he would still not have known his conduct was wrong. My opinion is not affected by the fact that Andre committed some rational acts prior to and after the crime, as a psychosis does not affect all aspects of a person's life. A person can have rational and reasonable thinking in some areas and still not know that his conduct is wrong.

13. It is my opinion that at the time of the crime, Andre was psychotic and did not know that what he was doing was wrong. Mr. Hagood inexplicably never asked me the basis of my opinion at trial. That Andre was psychotic was shown by his behavior prior to the crime, including putting duct tape over his mouth and not talking for periods of time, and stabbing himself in the heart the morning before the crime; the circumstances of the crime, including the crime itself, using three different knives so as to not cross contaminate the victims and stabbing himself; his actions following the crimes, including confessing to the police and others and removing his own eye, for psychotic reasons, after being incarcerated for some time; and that when treated with medication for schizophrenia, his symptoms diminished.

14. When I was initially retained by Mr. Hagood, I was not asked to provide an opinion regarding whether Andre was suffering from a substance induced psychosis from being under the influence of Coricidin, alcohol or marijuana. Despite that fact, the defense altered course prior to my testimony and asked me to address the question of substance induced

psychosis. Detailed opinions regarding specific pharmacological issues should have been directed to a pharmacologist, i.e., a pharmacist.

15. It is my opinion that at the time of the crime, Andre's psychosis was not substance induced, either with marijuana, alcohol, or Coricidin, or a combination of one or more of these. I base this opinion on several factors: Andre had shown persistent symptoms of hallucinations or delusions at least one month before the crime; there were only trace amounts of Coricidin in Andre's blood on the day of the crime and not an amount large enough to affect his actions and any psychotic effects of the Coricidin would have worn off at the time of the crime. Andre's symptoms, at the time of the crime, were not consistent with those of someone under the influence of Coricidin, alcohol or marijuana, i.e., simple intoxication, but instead, of someone with schizophrenia; and Andre manifested similar systems for at least nine months after the crime. For example, when removing his own eye when he had not been under the influence of Coricidin, alcohol or marijuana since before the time of the crime. Therefore, he was a very mentally ill individual absent any simple intoxication.

Submitted this _____ 6th _____ day of June, 2007.

_____
Edward B. Gripon, M.D., P.A.

Signed before me on June ____ 6th ____, 2007.

_Deborah K. Deloney_
Notary for the State of Texas

DEBORAH K DELONEY
Notary Public, State Of Texas
My Commission Expires
05-24-2008

# Exhibit 14

## Affidavit of Ruben Gur

COUNTY OF PHILADELPHIA)

STATE OF PENNSYLVANIA)     ) Ss.    **AFFIDAVIT OF RUBEN C. GUR, PhD.**

    **DR. RUBEN C. GUR,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

    1.    I am a neuropsychologist, with a special focus on imaging applications to the diagnosis and study of people with behavioral disturbances associated with brain dysfunction.  I have been asked by Cliff Anderson, Esq., one of the attorneys representing Mr. Andre Thomas, to provide an affidavit describing my opinion on his mental state and diagnosis and addressing the need for performing additional brain imaging studies.

    2.    My qualifications are presented in the CV attached as Exhibit A.  I am a licensed and board certified neuropsychologist (ABPP/CN) and have been qualified as an expert in state, federal and military courts.

    3.    The documents listed in Exhibit B were provided to me for my review and consideration in connection with my work on this matter.  I also reviewed the neuropsychological testing protocol, results of such testing, the summary of those results as prepared by Dr. Myla Young, and Dr. Young's affidavit prepared in this matter.

    4.    I analyzed the results of Dr. Young's testing using published algorithms for linking brain function to neuropsychological measures, and I have interviewed and tested Mr. Thomas with more focused computerized procedures.

    5.    Based upon my observation and work and a review of Dr. Young's work, it is my opinion that Mr. Thomas suffers from schizophrenia of the paranoid type and, significantly, he has brain impairments in addition to those associated with that mental illness.  This "double

whammy" is most likely a result of genetic and environmental factors and has substantially impaired his judgment and hold on reality during commission of the crimes at issue in this case.

6.      I interviewed Mr. Thomas to examine his thought processes, elicit potentially additional information not in the records regarding possible head injury, and establish a diagnosis. Mr. Thomas presented as a friendly and cooperative yet clearly psychotic individual. His ideas of reference were evident already during formal testing. For example, among the words in the recall list he noticed "malice," and asked whether I thought it was true "that that's the sin God hates the most." His speech was tangential with frequent derailments and thought disorder was evident. He admits talking with God directly and hearing His voice, and he often has difficulties deciding whether what he hears is or is not a hallucination. When I inquired about his explanation of the crime, he explained that he went over to Laura and Bryant's apartment the evening before the crime (March 26, 2004) to show Bryant that he was immortal, since he barely bled from stabbing himself. He also wanted to listen to one of Bryant's religious tapes because he thought there were instructions in this tape about the "Illuminati," government officials trying to take over the world and have tape recorders everywhere. He wanted to see if they have any explanations, and Laura got upset he thought because Bryant was giving him some clues that she was Jezebel. His son kept distracting him from the message in the tape, so he thought he must be the anti-Christ. His mom told him demons can come in all shapes, and this could be the baby. Laura was his wife, therefore the queen, because he is a fallen Angel, but she wanted to have sex with other kings like Jezebel from the bible, so she must be Jezebel. That was the night he realized she was Jezebel. Before he thought his friend Rose could be Jezebel.

7.      He took three knives because he didn't want them to cross contaminate in case they had a blood pact. Had to take the hearts out "otherwise they (the Illuminati) "would put

2

them right back in." He said God told him to do that. He knows because he heard the voice.  It

could have been the devil talking, but then he was a fallen angel so he himself was a devil.  His

job was to save the world from Jezebel.  He went to church with Laura's parents and that was the

sermon about the evil Jezebel.  His mom told him Jezebel destroys people by drugs and sex.  On

the way to the apartment he crossed paths with Bryant, and thought Bryant gave him the signal

"do what you've got to do."  After he killed his wife Jezebel and his son the anti-Christ and the

baby he considered demon, he thought the Illuminati were "on their way as they control the

world and the police and everybody and they knew what I did and were on their way to bring

Jezebel and the kids back to life so I had to get away with the hearts. They say it's a delusion, but

delusion is when you believe something that isn't true which means you are stupid. I ain't stupid.

I'm smart."

     8.    The clinical interview supports the diagnosis of schizophrenia, paranoid type.

Evident symptoms included hallucinations, delusions and thought disorder. Some mannerisms

and ticks were also observable, but they require additional documentation to qualify as bizarre

behavior.  I saw no evidence for the negative symptoms of schizophrenia such as flat affect,

alogia (poverty of speech), or anhedonia (lack of enjoyment), although obviously he suffers from

avolition (reduced ability to initiate and persist in goal-directed behavior; it is often mistaken for

apparent disinterest, see http://www.schizophrenia.com/diag.php) given his vocational

achievements despite normal IQ.  The diagnosis is also supported by family history as amply

documented in the exhaustive social history records that had not been completed at the time of

Mr. Thomas's trial.  There is extensive documentation of genetic loading combined with

stressors and a typical age of onset at early adulthood. Also characteristic of the pretrial and early

phase is the use of street drugs in efforts either to explain away the symptoms or for self-

medication, and ambivalent efforts at seeking professional help. One should be careful not to assume that the appearance of depressive symptoms at the early stages, especially in bright individuals, indicates schizoaffective disorder (a form of schizophrenia that portends better outcome). The specific diagnosis of paranoid schizophrenia is supported by history and observation and is also characteristically associated with normal IQ. The delusional system developed over the years and seems quite entrenched at this point. Such delusional systems, once entrenched, do not respond well to typical or atypical neuroleptics (unlike other positive symptoms). At this point his confidence in the system is just marginally shaken.

9.      Quite significantly, Mr. Thomas related two incidents of head injury. His brother Brian (eventually diagnosed with schizophrenia) hit him with his fists at age 12 and he passed out. At an older age he hit a tree with a stolen car and next thing he knew there was a policeman pointing a gun and telling him to spread. Perhaps most significantly, however, his maternal Aunt, Alice Ross Harris reports that "When Andre was little he locked himself inside an empty refrigerator. Eventually Rochelle [his mother] realized he was missing. When she finally found him, his eyes were bugging out." See Harris Aff. at ¶ 9.

10.     My opinion that Mr. Thomas has severe and significant brain damage both from mental illness and likely head injury is based on an extensive social history not compiled at the time of trial, the above history, and the results of both traditional and more advanced computerized neuropsychological testing. Dr. Myla H. Young performed the traditional neuropsychological assessment. Notably, Mr. Thomas was found not to be malingering. Dr. Young's testing included all tests recommended for a valid application of the "behavioral imaging" algorithm. The process for this schematic representation of neuropsychological data was developed with funding from the National Institute of Mental Health and has been validated

4

in peer-reviewed publications.  It was shown to be clinically reliable and stable in defining and localizing affected areas of neurological impairment.[1]  The image generated by this algorithm is a true topographic display of the neuropsychological data in reference to the dysfunctional areas and severity of impairment.

11.     The behavioral image (see Figure 1) depicts three views of Mr. Thomas's brain from the left (top left panel), the right (lower left panel) and the top (right panel, with the front of the brain oriented toward the top of the panel).  The scale in the lower right of the image represents degree of impairment relative to the most intact ability. It is expressed as standard deviations away from normal regional variability, with the result that the behavioral image of a normal, intact brain would produce a fairly uniform orange-pink color.  As an be seen in Figure



Figure 1. A behavioral image of Mr. Andre Thomas

[1] Gur RC, Trivedi SS, Saykin AJ, Gur RE.  "Behavioral imaging" - a procedure for analysis and display of neuropsychological test scores: I. Construction of algorithm and initial clinical evaluation. Neuropsychiatry, Neuropsychology and Behavioral Neurology, 1988, 1, 53-60. Gur RC, Saykin AJ, Blonder LX, Gur RE.  "Behavioral imaging": II. Application of the quantitative algorithm to hypothesis testing in a population of hemiparkinsonian patients. Neuropsychiatry, Neuropsychology and Behavioral Neurology, 1988, 1, 87-96. Gur RC, Saykin AJ, Benton A, Kaplan E, Levin H, Kester DB, Gur RE. "Behavioral imaging": III.  Inter-rater agreement and reliability of weightings.  Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 1990, 3, 113-124.

1, Mr. Thomas is most severely impaired in the right hemisphere of his brain, with pronounced

impairment in the post-central temporo-parietal region, extending in the right to prefrontal and

orbital frontal areas.  The pattern of brain abnormalities is most consistent with a severe head

injury or ischemia (oxygen deprivation), but could also be a result of other disorders such as

neoplasm (tumor), temporal lobe epilepsy or cerebrovascular disease. Such alternatives can be

examined with neuroimaging. The extent and pattern of deficits exceeds what is typically found

in neurodevelopmental hereditary disorders such as schizophrenia, and presenile dementia is

unlikely at his age. This pattern of deficits reflects severely compromised integrative, memory

and "executive" functions, especially those that are non-verbally (*e.g.*, spatially or facially)

mediated. These impairments would have resulted in an inability to relate his action to the self

(right parietal), think through his actions (prefrontal), a lack of appreciation for the consequences

of his actions (superior frontal), and difficulties with impulse inhibition (orbital frontal).

12.     To further characterize his neurobehavioral profile with measures that have been

rigorously linked to regional brain function with functional neuroimaging, I tested Mr. Thomas

using the computerized neurocognitive battery (CNB).[2]  The CNB is a sequence of tests

assessing performance in nine neurobehavioral domains:  Abstraction and Mental Flexibility;

Attention; Working Memory; Verbal Memory; Face Memory; Spatial Memory; Language;

Spatial Ability; Emotion Recognition. The tests produce separate measures of accuracy and

---

[2] Gur, RC, Ragland JD, Moberg PJ, et al.  Computerized Neurocognitive Scanning:  I.
Methodology and validation in healthy people. Neuropsychopharmacology, 25, 766-776, 2001.

Gur, RC, Ragland JD, Moberg PJ, et al.  Computerized Neurocognitive Scanning:  II.  The
profile of schizophrenia, Neuropsychopharmacology, 25, 777-788, 2001.

Aliyu MH, Calkins ME, Swanson CL, et al. on behalf of the PAARTNERS study group, Project
among African-Americans to explore risks for schizophrenia (PAARTNERS):  Recruitment and
assessment methods, Schizophrenia Res, 87, 32-44, 2006.



Figure 2. The neurocognitive profile of Mr. Thomas based on the computerized testing

speed, and a combined measure of efficiency defined as correct responding per unit time. Mr.

Thomas performed diligently and scored on average and above in measures of general

intelligence. However, he showed moderate to severe impairments in domains related

specifically to fronto-temporal brain systems.  As can be seen in Figure 2, he has mild efficiency

deficits in abstraction and mental flexibility and working memory, moderate deficits in verbally

mediated reasoning and emotion processing, and severe deficits in verbal, facial and spatial

memory and in sensorimotor coordination.  These deficits indicate impaired prefrontal

(dorsolateral prefrontal integrity is related to working memory and other executive functions

relate to the more dorsal aspects of the frontal lobe while memory organization and impulse

control involve more orbital aspects), temporolimbic function (impaired memory and affect

identification), and sensorimotor regions in the fronto-parietal juncture (impaired spatial

processing and sensorimotor integration domains).  Examination of accuracy and speed measures

reveals that the normal efficiency of spatial processing was achieved by high accuracy but

abnormally slow speed. This supports right parietal dysfunction. Similarly, the sensorimotor

deficit was evident only in speed.  Slow processing speed is associated with schizophrenia but

also with other forms of brain dysfunction.

13.   Neuropsychological tests alone are insufficient to demonstrate regional brain

dysfunction.  An appropriate appraisal of his brain would include assessment with structural and

functional neuroimaging, specifically positron emission tomography (PET) and magnetic

resonance imaging (MRI). Both volumetric MRI and diffusion tensor imaging (DTI) will be optimal.

14.   To establish the presence and extent of brain dysfunction, when such dysfunction is indicated clinically or by the neuropsychlogical testing, neuroimaging studies as described above are necessary.  Structural imaging, such as can be performed with magnetic resonance imaging (MRI), can establish the anatomic integrity of the brain.  Clinical reading of the MRI can establish some diagnoses, especially focal lesions produced by tumors, cerebrovascular disease, demyelinating disorders, and some forms of dementia and severe head injuries.  Other brain disorders, including those resulting from acute asphyxia or mild traumatic brain injury, may not necessarily manifest themselves in clinically detectible changes, and volumetric analysis is needed to establish regional abnormalities.  Yet other brain disorders show minimal anatomic changes and are characterized by reduced activity in affected regions.  In disorders such as epilepsy, Parkinson's disease, mild traumatic brain injuries, and most neuropsychiatric disorders MRI shows minimal changes but regional brain activity is severely disturbed.  These brain disorders require measurements of regional brain metabolic activity such as can be obtained with positron emission tomography (PET).

15.   To summarize, I have reviewed records related to Mr. Thomas that included medical and social history as well as standard and computerized neuropsychological evaluations, and have interviewed him. Based on this evaluation I concluded that Mr. Thomas has schizophrenia of the paranoid type and, superimposed on this neurodevelopmental brain disorder, he has suffered an acquired brain injury. Specifically, he was under the delusion that his acts will save himself and the world, and his behavior before, during, and after the crime, and to a large extent to this date, is controlled by this symptom of paranoid schizophrenia and can be

understood in this context. His illness and the additional injury have resulted in significant neuropsychological deficits in areas germane to judgment and correct appraisal of reality and consequences of one's actions. Abnormalities in brain regions implicated by the neuropsychological deficits severely impaired his ability to appreciate the context of his acts. Further hampering Mr. Thomas's ability to respond appropriately to his environment are deficits associated with acquired brain injuries. The conclusions related to regional brain dysfunction are based on behavioral data and should be buttressed by structural and functional neuroimaging.

_____
Signature

RVBEN GVR
Printed Name

COUNTY OF _PHILADELPHIA_, _Montgome._
STATE OF PENNSYLVANIA

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this ___ day of June, 2007.

_____
Notary Public's Signature
My commission expires: _10-16-2008_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
John D. Collins, Notary Public
Springfield Twp., Montgomery County
My Commission Expires Oct. 16, 2008
Member, Pennsylvania Association Of Notaries

9

EXHIBIT A

CV

## EXHIBIT A

UNIVERSITY OF PENNSYLVANIA - SCHOOL OF MEDICINE
Curriculum Vitae

Date: March 2007

Ruben C. Gur, Ph.D.

HOME ADDRESS:         815 Saint George's Rd.
                      Philadelphia, PA 19119
                      Voice/Fax (215) 247-2716

OFFICE ADDRESS:       Brain Behavior Laboratory
                      Department of Psychiatry
                      10 Gates Building
                      University of Pennsylvania
                      Philadelphia, PA 19104-4283
                      gur@bbl.med.upenn.edu
                      Tel: (215) 615-3604
                      Fax: (215) 662-7903

EDUCATION:    1967-70    B.A. Hebrew University of Jerusalem
              1970-71    M.A. Michigan State University
              1971-73    Ph.D. Michigan State University
              1973-74    Postdoctoral Fellowship, Stanford University

## POSTGRADUATE TRAINING AND FELLOWSHIP APPOINTMENTS:

Doctorate:    1971       NIMH
                         Summer Traineeship, Psychiatric Clinic
                         Oakland County Juvenile Court
                         Pontiac, Michigan

              1971-72    Psychology Internship, Psychiatric Clinic
                         State Prison of Southern Michigan
                         Jackson, Michigan

              1972-73    Psychology Internship, Counseling Center
                         Michigan State University
                         East Lansing, Michigan

Postdoctorate: 1973-74   Research Associate, Department of Psychology
                         Stanford University, Stanford, California

              1974-76    Postdoctorate supervised clinical experience
                         Department of Psychiatry
                         University of Pennsylvania

MILITARY SERVICE:    1965-67    Israeli Defense Forces

Ruben C. Gur, Ph.D.                                                    Page      2

## FACULTY APPOINTMENTS:

| | |
|---|---|
| 1974-81 | Assistant Professor<br>Department of Psychology<br>University of Pennsylvania School of Medicine<br>Philadelphia, PA |
| 1981-84 | Research Associate Professor of Psychology<br>in Neurology and Psychiatry<br>University of Pennsylvania School of Medicine<br>Philadelphia, PA |
| 1984-88 | Associate Professor of Psychology in<br>Psychiatry and Neurology<br>University of Pennsylvania School of Medicine<br>Philadelphia, PA |
| 1988-Present | Professor of Psychology in Psychiatry,<br>Neurology and Radiology<br>University of Pennsylvania School of Medcine<br>Philadephia, PA |

## HOSPITAL AND ADMINISTRATIVE APPOINTMENTS:

| | |
|---|---|
| 1974-81 | Supervisor, Clinical Training Program<br>Department of Psychology<br>University of Pennsylvania School of Medicine<br>Philadelphia, PA |
| 1982-84 | Director of Neuropsychology<br>Department of Neurology<br>The Graduate Hospital<br>Philadelphia, PA |
| 1984-Present | Director of Neuropsychology and the<br>Brain Behavior Laboratory,<br>Department of Psychiatry<br>Hospital of the University of Pennsylvania<br>Philadelphia, PA |
| 2005-Present | Director of the Center for Neuroimaging in Psychiatry<br>Department of Psychiatry<br>Hospital of the University of Pennsylvania<br>Philadelphia, PA |

## BOARD SPECIALTY CERTIFICATION:

Ruben C. Gur, Ph.D.                                                                  Page    3

Diplomate in Clinical Neuropsychology
American Board of Professional Psychology

LICENSURE:                    Licensed Psychologist, Commonwealth of Pennsylvania


## AWARDS, HONORS AND MEMBERSHIP IN HONORARY SOCIETIES:

Erickson Award for Scientific Excellence for Writing in Hypnosis
Member, Sigma Xi
Elected to Fellow status, National Academy of Neuropsychologists, 1986
Elected to Fellow status, American Psychological Association, Divisions 6 & 30, 1987
Recipient of 1990 Stephen V. Logan Award, National Alliance for the
Mentally Ill (NAMI)
Elected to Fellow status, The American Psychological Society, 1992

## MEMBERSHIP IN PROFESSIONAL AND SCIENTIFIC SOCIETIES:

American Psychological Association, FELLOW
American Psychological Society, FELLOW
American College of Neuropsychopharmacology
The John Morgan Society
American Association for the Advancement of Science
International Neuropsychological Society
National Academy of Neuropsychologists
The New York Academy of Science
International Society for Neuroimaging in Psychiatry

## EDITORIAL/ADVISORY POSITIONS:

Member, NIH Study Section on Clinical Neuroscience and Biological Psychopathology (1993-
1996)
Editorial Board: Archives of Clinical Neuropsychology (1985-1997), Journal of Mental Imagery
(1984-present), Brain and Cognition (1989-present), Brain and Language (1990-present),
Neuroimaging and Behavior (1994-present). Consultant to Panel on Neurological Aspects of
Behavior: Development of a National Research Strategy for NIH (1979) Schizophrenia
Research (2004-present)
Advisory Board: The Greenwall Initiative on Imaging and Treating the Human Brain: Ethical and
Social Implications. The Center for Bioethics, University of Pennsylvania; Institute for
Strategic Threat Analysis and Response (ISTAR), University of Pennsylvania, (2002-)
The Conte Center on the Neurobiology of Suicide, Columbia University (J Mann, MD, PI).
Action Editor: Brain and Cognition (2002-present)


## ACADEMIC COMMITTEES AT THE UNIVERSITY OF PENNSYLVANIA:

1975-1977     Admissions Committee, Psychology Department
1984-1994     Research Committee, Psychiatry Department

Ruben C. Gur, Ph.D.                                               Page    4

1984-1987    Computer Task Force, Psychiatry Department
1984-1988    Chairman's Council for Planning and Development, Psychiatry Department
1990-1992    Senate Committee on Academic Freedom and Responsibility
1996-1998    Search Committee for Chair of Radiology
2000-Present Search Committee for fMRI Physicist
1999-Present University Scholars Council

## MAJOR TEACHING & CLINICAL RESPONSIBILITIES AT THE UNIVERSITY OF PENNSYLVANIA:

A. Teaching:
   1. Co-founder and Advisor, Biological Basis of Behavior Undergraduate Major program.
   2. Supervisor of postdoctoral Fellows (NIMH Training Grant) and doctoral students
   3. Member of dissertation committees.
   4. Rounds and teaching conferences for Psychiatry residents and Neuropsychology Fellows
   5. Supervisor of undergraduate Honors theses.

B. Clinical:

   1. Director of Neuropsychology, Department of Psychiatry, Hospital of the University of Pennsylvania
   2. Supervisor of interns and practicum students in neuropsychology.

## PRESENTATIONS & LECTURES BY INVITATION: (Outside Philadelphia, Past 5 years)

March 4, 2002. "Imaging Studies of Emotion Processing Examining the Effects of Age, Gender, and Disease." University of Iowa School of Medicine, Research Seminar, Iowa City, IA

March 5, 2002. "Behavioral and Neurobiologic Markers of Brain Dysfunction and Genetic Vulnerability to Schizophrenia." University of Iowa School of Medicine, Grand Rounds. Iowa City, IA

April 14, 2002.  "The Neurobiology of Sex Differences in the Symptoms and Course of Schizophrenia" Advocates for the Jewish Mentally Ill, Wynnewood, PA

May 5, 2002. "The Science of Deceit:  The Polygraph and its Progeny" Judicial In Service Training, Washington D.C.

May 22, 2002. "Functional and Structural Imaging Studies of Emotion Processing" Massachusetts General Hospital, Grand Rounds, Charlestown, MA

Oct 10, 2002. "What to do About Girls, Boys and Brains: Sex Differences From Phylogeny to Ontogeny" CAIS Commission of Women in Independent School's Annual Conference, Farmington, CT

Oct 23, 2002.  "Neurobehavioral Measures as Endophenotypic Markers in Schizophrenia"  State University of New York, Grand Rounds, Albany, NY

November 1, 2002 "Sex Differences in Learning"   Learning and the Brain Conference, Cambridge, MA

Ruben C. Gur, Ph.D.                                                          Page     5

November 2, 2002 "Imaging and Other Brain Function Issues" The Third National Seminar on
    Mental Health and the Criminal Law,  Atlanta, GA

November 29, 2002  "Integration of Behavior, Anatomy and Physiology in the Search for Neural
    Substrates of Cognitive and Emotion Processing in Healthy People"
    12th Australian Society for Psychophysiology Conference.  University of Sydney, Australia

November 8, 2002 "Bio-Cognitive Aspects of Schizophrenia" Psychology Senior Seminar,
    Haverford College, Haverford, PA

January 15, 2003 "Adolescent Brain Development, Executive Functions, and Culpability"
    American Bar Association, Washington, D.C.

February 14, 2003 "Neural Substrates of Emotion Processing"
    Psychiatric Research Society, Park City, Utah

May 12, 2003 "The New Era of Neuropsychology; Neural Systems Probed Behaviorally and with
    Imaging" Mayo Clinic, Rochester, Minnesota

May 29, 2003 "Cognitive Impairment in Schizophrenia" 43rd Annual New Clinical Drug
    Evaluation Unit, Boca Raton, FL

September 21, 2003  "The Measurement of Emotion Processing: Exploring the Dark Side of the
    Moon"  3rd US-Korean Workshop on Psychiatric Genetics, Seoul, Korea

November 29, 2003 Neuroimaging studies in schizophrenia". Keynote to Symposium: Kognitive
    Störungen bei schizophrenen Erkrankungen III: Negative and positive symptoms in
    schizophrenia - models, methods and results. Ruhr-Universität Bochum Internationales
    Begegnungszentrum, Bochum, Germany.

December 11, 2003 "Developmental Differences Between Adolescents and Adults" Illinois
    Juvenile Justice Symposium, Chicago, Illinois.

February 11, 2004 "Information Processing in Schizophrenia: an fMRI study" Psychiatric
    Research Society, Park City, Utah.

February 25, 2004 "Implications of New Brain Imaging Research to Criminal Culpability of
    Adolescents" Briefing on Adolescent Development, National Press Club, Washington D.C.

March 9, 2004 "Facial Recognition as an Endophenotypic Marker in Autism" NIH sponsored
    Autism Genetics In the Pacific Rim, University of California - Los Angeles Medical Center.
    Los Angeles, California.

April 1, 2004 "Teaching Science to Myelinating and Pruning Brains Constructed During the
    Middle Pleistocene Epoch: The Challenge of Dealing with Brain Maturation in Boys and
    Girls." NSTA, National Science Teachers Association, Atlanta, Georgia.

May 21st, 2004 "Using Brain Research in Juvenile Representation" Southwest Regional Juvenile

Ruben C. Gur, Ph.D.                                                Page     6

Defender Center's (SWJDC) 2004 Regional Summit, Zealous Advocacy = Best Interests, Houston, Texas.

June 17th, 2004 "Research in Family Schizophrenia" Harrisburg State Hospital, Harrisburg, Pennsylvania.

June 21, 2004 "Psychopharmacology of Emotions" 24th Annual Collegium Internationale Neuro-Psychopharmacolgicum (CINP) Congress-Paris.  Paris, France.

June 23, 2004 "Endophenotypic Measures in Brain Behavior Studies in Schizophrenia" Bordeaux University, Bordeaux, France.

July 24, 2004 "The Developing Brain and the Technology That Let's Us See It" 25th Annual Capital Punishment Training Conference, Warrenton, Virginia.

September 16, 2004 "Are Sex Differences in Brain Anatomy and Physiology Related to Sex Differences in Emotion Regulation, Personality, and Aggression?" Sex, Brain and Human Aggression Conference, Delmenhorst, Germany.

October 18, 2004 "Recent Discoveries of Cognitive Neuroscience Using Brain Imaging" Brain Imaging and the Cognitive Sciences Conference, Washington, D.C.

April 2, 2005 "Episodic Memory and Affective Processing in Schizophrenia" The 7th Biennial Mt. Sinai Conference on Cognition in Schizophrenia, Savannah, GA.

April 11, 2005 "Brain Development and its Relevance to the Juvenile Death Penalty" Cornell Law School; Prof Blume's class, Ithaca, NY.

April 11, 2005 "Aggression and Deception: Some Legal Implications of Recent Advances in Neuroimaging and Neuroscience, Cornell Law School, Ithaca, NY.

April 22, 2005 "Understanding Brain Development" The National Seminar on the Development and Integration of Mitigation Evidence, Salt Lake City, UT.

April 22, 2005 "Schizophrenia: The Positive and Negative Symptoms" The National Seminar on the Development and Integration of Mitigation Evidence, Salt Lake City, UT.

August 18, 2005 "Emotion: The Unwelcome Guest at the Cognitive Party" Ben Gurion University of the Negev, Beersheva, Israel.

September 10, 2005 "Brain 101: Knowing Brain Development, Function and Disorder can Save Your Client's Life." Florida Public Defenders Association: Life Over Death Conference, Orlando, FL.

November 18, 2005 "The Developing Adolescent Brain" OPD, Capital Defense Division Capital Training Seminar, Baltimore, MD.

November 28, 2005 "Emotion: The Dark Side of Cognition.  Insights from Neuroimaging Studies in Men and Women" University of Delaware, Newark, DE.

Ruben C. Gur, Ph.D.                                                          Page      7

November 28, 2005  "Verify with MRI?  Functional Imaging in the Context of Lie Detection."
    University of Delaware, Newark, DE.

February 10, 2006  "A Slice of Emotions:  Neurobehavioral and (thinly sliced) fMRI Studies"
    Psychiatric Research Society Annual Meeting, Park City, UT

April 7, 2006.  "The Developing Brain:  Judgement and Impulse Control"  Indigent Criminal
    Defense: Advanced Skills for the Experienced Practitioner Conference, Richmond, VA.

July 12, 2006.  "Sex Differences in Cerebral Function and Morphology in Mental Illness"  CINP
    Symposium, Chicago, IL

August 31, 2006.  "Neuroimaging in the Study of Cognition and Emotion"  Astra Zeneca,
    Wilmington, DE

September 15, 2006.  "Imaging in Schizophrenia"  The International Symposium on
    Schizophrenia, Gottingen Research Association for Schizophrenia, Gettingen, Germany.

September 29, 2006  "The Inherent Mitigation of Youth:  Brain Development in Adolescents and
    Young Adults.  Making the Case for Life Conference, Las Vegas, NV


ORGANIZING ROLES IN SCIENTIFIC MEETINGS:        None.

BIBLIOGRAPHY:
Research Publications, peer reviewed:
    1. Alexander LT, Gur RC, Gur RE, Patterson L.  Peer assisted learning.  Improving Human
        Performance Quarterly, 1974, 3, 175-186.

    2. Gur RC, Gur RE.  Handedness, sex and eyedness as moderating variables in the relation
        between hypnotic susceptibility and functional brain asymmetry.  Journal of Abnormal
        Psychology, 1974, 83, 635-643.

    3. Gur RC.  An attention-controlled operant procedure for enhancing hypnotic susceptibility.
        Journal of Abnormal  Psychology, 1974, 83, 635-643.

    4. Gur RE, Gur RC, Marshalek B.  Classroom seating and functional brain asymmetry.
        Journal of Educational Psychology, 1975, 67, 151-153.

    5. Gur RC, Hilgard ER.  Visual imagery and discrimination of differences between altered
        pictures simultaneously and successively presented. British Journal of Psychology,
        1975, 66, 341-345.

    6. Gur RE, Gur RC.  Defense mechanisms, psychosomatic symptomatology and conjugate
        lateral eye movements. Journal of Consulting and Clinical Psychology, 1975, 43, 416-
        420.

    7. Gur RE, Gur RC, Harris LJ.  Cerebral activation, as measured by subject`s lateral eye

movements, is influenced by experimenter location. Neuropsychologia, 1975, 13, 35-44.

8. Gur RC, Sackeim HA, Gur RE.  Classroom seating and psychopathology: some initial data. Journal of Abnormal Psychology, 1976, 85, 122-124.

9. Gur RC, Reyher J.  The enhancement of creativity via free imagery and hypnosis. American Journal of Clinical Hypnosis, 1976, 85, 237-249.

10. Sackeim HA, Packer IK, Gur RC.  Hemisphericity, cognitive set and susceptibility to subliminal perception. Journal of Abnormal Psychology, 1977, 86, 624-630.

11. Gur RE, Gur RC.  Sex differences in the relations among handedness, sighting-dominance and eye acuity. Neuropsychologia, 1977, 15, 585-590.

12. Sackeim HA, Gur RC, Saucy MC.  Emotions are expressed more intensely on the left side of the face. Science, 1978, 202, 434-436.

13. Gur RC, Sackeim HA.  Self-confrontation and psychotherapy. Psychotherapy: Theory, Research and Practice, 1978, 15, 258-265.

14. Sackeim HA, Gur RC.  Lateral asymmetry in intensity of emotional expression. Neuropsychologia, 1978, 16, 473-481.

15. Sackeim HA, Gur RC.  Self-deception, other-deception, and self-reported psychopathology. Journal of Consulting and Clinical Psychology, 1979, 47, 213-215.

16. Gur RC, Sackeim HA.  Self-deception:  A concept in search of a phenomenon. Journal of Personality and Social Psychology, 1979, 37, 147-169.

17. Sackeim HA, Nordlie JW, Gur RC.  A model of hysterical and hypnotic blindness: cognition, motivation and awareness. Journal of Abnormal Psychology, 1979, 88, 474-489.

18. Gur RC, Reivich M.  Cognitive task effects on hemispheric blood flow in humans: evidence for individual differences in hemispheric activation.  Brain and Language, 1980, 9, 78-92.

19. Gur RC, Packer IK, Hungerbuhler JP, Reivich M, Obrist WD, Amarnek WS,Sackeim HA. Differences in the distribution of gray and white matter in human cerebral hemispheres. Science, 1980, 207, 1226-1228.

20. Sackeim HA, Greenberg MS, Weiman AL, Gur RC, Hungerbuhler JP, Geschwind N. Hemispheric asymmetry in the expression of positive and negative emotions: Neurological Evidence. Archives of Neurology, 1982, 39, 210-218.

21. Gur RC, Sussman NM, Alavi A, Gur RE, Rosen AD, O'Connor M, Goldberg HI, Greenberg JH, Reivich M.  Positron emission tomography in two cases of childhood epileptic encephalopathy  (Lennox-Gastaut Syndrome). Neurology, 1982, 32, 1191-1194.

22. Gur RC, Gur RE, Obrist WD, Hungerbuhler JP, Younkin D, Rosen AD, Skolnick BE.,

Reivich M.  Sex and handedness differences in cerebral blood flow during rest and cognitive activity. Science, 1982, 217,  659-661.

23. Sussman NM, Gur RC, Gur RE, O'Connor MJ.  Mutism as a consequence of callosotomy. Journal of Neurosurgery, 1983, 59, 514-519.

24. Gur RC, Gur RE, Rosen AD, Warach S, Alavi A, Greenberg J, Reivich M.  A cognitive-motor network demonstrated by positron emission tomography. Neuropsychologia, 1983, 21, 601-606.

25. Natale M, Gur RE, Gur RC.  Hemispheric asymmetries in processing emotional expressions. Neuropsychologia, 1983, 21, 555-565.

26. Reivich M, Gur RC, Alavi A.  Positron emission tomography studies of sensory stimuli, cognitive processes and anxiety. Human Neurobiology, 1983, 2, 25-33.

27. Gur RE, Skolnick BE, Gur RC, Caroff S, Rieger W, Obrist WD, Younkin D, Reivich M. Brain function in psychiatric disorders:  I. Regional cerebral blood flow in medicated schizophrenics. Archives of General Psychiatry, 1983, 40, 1250-1254.

28. Gur RE, Gur RC, Sussman NM, O'Connor MJ, Vey MM.  Hemispheric control of the writing hand: The effect of callosotomy in a left-hander. Neurology,1984, 34, 904-908.

29. Reivich M, Alavi A, Gur RC.  Positron emission tomographic studies of perceptual tasks. Annals of Neurology, 1984, 15, 61-65 (Supplement).

30. Gur RE, Skolnick BE, Gur RC, Caroff S, Rieger W, Obrist WD, Younkin D, Reivich M. Brain function in psychiatric disorders:  II. Regional cerebral blood flow in medicated depressives. Archives of General Psychiatry, 1984, 41, 695-699.

31. Youkin D, Hungerbuhler JP, O'Connor M, Goldberg H, Burke A, Kushner M, Hurtig H, Obrist W, Gordon J, Gur RC, Reivich M. Superficial temporal-middle cerebral artery anastomosis: Effects on vascular, neurologic, and neuropsychological functions. Neurology, 1985, 35, 462-469.

32. Gur RE, Gur RC, Skolnick BE, Caroff S, Obrist WD, Resnick S, Reivich M. Brain function in psychiatric disorders: III. Regional cerebral blood flow in unmedicated schizophrenics. Archives of General Psychiatry, 1985, 42, 329-334.

33. Trivedi SS, Gur RC, Gur RE, Skolnick BE, Obrist WD, Reivich M, Herman GT. Imaging regional cerebral blood flow measured by the 133-Xenon technique. rCBF Bulletin, 1986, 9, 175-178.

34. Stern MB, Gur RC, Saykin AJ, Hurtig HI.  Dementia of Parkinson's disease and Alzheimer's disease: Is there a difference?  Journal of the American Geriatrics Society, 1986, 34, 475-478.

35. Gur RE, Resnick SM, Alavi A, Gur RC, Caroff S, Dann R, Silver F, Saykin AJ, Chawluk JB, Kushner M, Reivich M. Regional brain function in schizophrenia: I. A  positron

emission tomography study. <u>Archives of General Psychiatry</u>, 1987, <u>44</u>, 119-125.

36. Gur RE, Resnick SM, Gur RC, Alavi A, Caroff S, Dann R, Silver F, Saykin AJ, Chawluk JB, Kushner M, Reivich M.  Regional brain function in schizophrenia: II. Repeated evaluation with positron emission tomography. <u>Archives of General Psychiatry</u>, 1987, <u>44</u>, 126-129.

37. Trope I, Fishman B, Gur RC, Sussman NM, Gur RE.  Contralateral and ipsilateral control of fingers following callosotomy.  <u>Neuropsychologia</u>, 1987, <u>25</u>, 287-291.

38. Gur RC, Gur RE, Obrist WD, Skolnick BE, Reivich M.  Age and regional cerebral blood flow at rest and during cognitive activity.  <u>Archives of General Psychiatry</u>, 1987, <u>44</u>, 617-621.

39. Gur RC, Gur RE, Resnick SM, Skolnick BE, Alavi A, Reivich M.  The effect of anxiety on cortical cerebral blood flow and metabolism.  <u>Journal of Cerebral Blood Flow and Metabolism</u>, 1987, <u>7</u>, 173-177.

40. Knight H, Millman RP, Gur RC, Saykin AJ, Doherty JU, Pack AI.  Clinical significance of sleep apnea in the elderly. <u>American Review of Respiratory Disease</u>, 1987, <u>136</u>, 845-850.

41. Gur RC, Gur RE, Silver FL, Obrist WD, Skolnick BE, Kushner M, Hurtig HI, Reivich M. Regional cerebral blood flow in stroke: hemispheric effects of cognitive activity. <u>Stroke</u>, 1987, <u>18</u>, 776-780.

42. Warach S, Gur RC, Gur RE, Skolnick BE, Obrist WD, Reivich M. The reproducibility of the Xe-133 inhalation technique in resting studies: task order and sex related effects in healthy young adults.  <u>Journal of Cerebral Blood Flow and Metabolism</u>, 1987, <u>7</u>, 702-708.

43. Trivedi SS, Gur RC.  Computer graphics for neuropsychological data. <u>Proceedings of the National Computer Graphics Association</u>, 1987, <u>3</u>, 22-32.

44. Gur RC, Gur RE, Skolnick BE, Resnick SM, Silver FL, Chawluk JB, Muenz L, Obrist WD, Reivich M.  Effects of task difficulty on regional cerebral blood flow: relationships with anxiety and performance. <u>Psychophysiology</u>, 1988, <u>25</u>, 392-399.

45. Schmidt ML, Gur RE, Gur RC, Trojanowski JQ.  Intraneuronal and extracellular neurofibrillary tangles exhibit mutually exclusive cytoskeletal antigens. <u>Annals of Neurology</u>, 1988, <u>23</u>, 184-189.

46. Resnick SM, Gottlieb GL, Gur RE, Gur RC, Forciea MA, Zimmerman RA, Malamut B, Saykin AJ, Reivich M, Alavi A.  Identical twins with probable Alzheimer's Disease: behavior, anatomy and physiology. <u>Neuropsychiatry, Neuropsychology and Behavioral Neurology</u>, 1988, <u>1</u>, 61-72.

47. Gur RC, Trivedi SS, Saykin AJ, Gur RE.  "Behavioral imaging" - a procedure for analysis and display of neuropsychological test scores: I. Construction of algorithm and initial clinical evaluation. <u>Neuropsychiatry, Neuropsychology and Behavioral Neurology</u>, 1988, <u>1</u>, 53-60.

48. Gur RC, Saykin AJ, Blonder LX, Gur RE. "Behavioral imaging": II. Application of the quantitative algorithm to hypothesis testing in a population of hemiparkinsonian patients. Neuropsychiatry, Neuropsychology and Behavioral Neurology, 1988, 1, 87-96.

49. Gottlieb GL, McAllister TW, Gur RC. Depot neuroleptics in the treatment of behavioral disorders in patients with Alzheimer's disease. Journal of the American Geriatric Society, 1988, 36, 619-621.

50. Gottlieb GL, Gur RE, Gur RC. Reliability of psychiatric scales in patients with DAT. American Journal of Psychiatry, 1988, 145, 857-860.

51. Resnick SM, Gur RE, Alavi A, Gur RC, Reivich M. Positron emission tomography and subcortical glucose metabolism in schizophrenia. Psychiatry Research, 1988, 24, 1-11.

52. Trope I, Rozin P, Gur RC. Validation of the lateral limits technique with a callosotomy patient. Neuropsychologia, 1988, 26, 673-684.

53. Blonder LX, Gur RE, Gur RC. The effects of right and left hemiparkinsonism on prosody. Brain and Language, 1989, 36 193-207.

54. Trivedi SS, Gur RC. Topographic mapping of cerebral blood flow and behavior. Computers in Biology and Medicine, 1989, 19, 219-229.

55. Blonder LX, Gur RE, Gur RC, Saykin AJ, Hurtig HI. Neuropsychological functioning in hemiparkinsonism. Brain and Cognition, 1989, 9, 177-190.

56. Saykin AJ, Gur RC, Sussman NM, Gur RE. Memory deficits before and after temporal lobectomy: Effect of laterality and age of onset. Brain and Cognition, 1989, 9, 191-200.

57. Gur RE, Resnick SM, Gur RC. Laterality and frontality of cerebral blood flow and metabolism in schizophrenia: relationship to symptom specificity. Psychiatry Research, 1989, 27, 325-334.

58. Trojanowski JQ, Schmidt ML, Otvos L, Gur RC, Gur RE, Hurtig H, Lee VMY. Selective expression of epitopes in multi-phosphorylation repeats of the high and middle molecular weight neurofilament proteins in alzheimer neurofibrillary tangles. Annals of Medicine, 1989, 21, 113-116.

59. Erwin RJ, Mawhinney-Hee M, Gur RC, Gur RE. Effects of task and gender on EEG indices of hemispheric activation: similarities to previous rCBF findings. Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 1989, 2, 248-260.

60. Sperling MR, Gur RC, Alavi A, Gur RE, Resnick S, Oconnor MJ, Reivich M. Subcortical Metabolic Alterations in Partial Epilepsy. Epilepsia, 1990, 31, 145-155.

61. Gur RC, Saykin AJ, Benton A, Kaplan E, Levin H, Kester DB, Gur RE. "Behavioral imaging": III. Inter-rater agreement and reliability of weightings. Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 1990, 3, 113-124.

62.  Gur RE, Gur RC. Gender differences in regional cerebral blood flow. Schizophrenia Bulletin, 1990, 16, 247-254.

63.  Stafiniak P, Saykin AJ, Sperling MR, Kester DB, Robinson LJ, O'Connor MJ, Gur RC. Acute naming deficits following dominant temporal lobectomy: prediction by age at first risk for seizures. Neurology, 1990, 40, 1509-1512.

64.  Gur RE, Gur RC, Saykin AJ.  Neurobehavioral studies in schizophrenia: implications for regional brain dysfunction.  Schizophrenia Bulletin, 1990, 16, 445-451.

65.  Gur RC, Saykin AJ, Muenz LR, Trivedi S, Gur RE.  Response to Yeo et al.'s critique of behavioral imaging. Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 1990, 3, 304-312.

66.  Kohn MI, Tanna NK, Herman GT, Resnick SM, Mozley PD, Gur RE, Alavi A, Zimmerman RA, Gur RC.  Analysis of brain and CSF volumes from magnetic resonance imaging: methodology, reliability and validation. Radiology, 1991, 178, 115-122.

67.  Gur RE, Mozley D, Resnick SM, Levick S, Erwin R, Saykin A, Gur RC. Relations among clinical scales in schizophrenia: overlap and subtypes. American Journal of Psychiatry, 1991, 148, 472-478.

68.  Gur RC, Mozley PD, Resnick SM, Gottlieb GE, Kohn M, Zimmerman R, Herman G, Atlas S, Grossman R, Berretta D, Erwin R, Gur RE.  Gender differences in age effect on brain atrophy measured by magnetic resonance imaging. Proceedings for the National Academy of Sciences, 1991, 88, 2845-2849.

69.  Gur RE, Mozley PD, Resnick SM, Shtasel D, Kohn M, Zimmerman R, Herman G, Atlas S, Grossman R, Erwin R, Gur RC.  Magnetic resonance imaging in schizophrenia: I. Volumetric analysis of brain and cerebrospinal fluid. Archives of General Psychiatry, 1991, 48, 407-412.

70.  Saykin AJ, Gur RC, Gur RE, Mozley D, Mozley LH, Resnick SM, Kester DB, Stafiniak P. Neuropsychological function in schizophrenia: selective impairment in memory and learning.  Archives of General Psychiatry, 1991, 48, 618-624.

71.  Reinecke LJ, Kester DB, Saykin AJ, Kaplan EF, Gur RC.  Comparison of two short forms of the Wisconsin Card Sorting Test.  Archives of Clinical Neuropsychology, 1991, 6, 27-33.

72.  Kester DB, Saykin AJ, Sperling MR, O'Connor MJ, Robinson LJ, Gur RC. Acute effect of anterior temporal lobectomy on musical processing. Neuropsychologia, 1991, 29, 703-708.

73.  Shtasel DL, Gur RE, Mozley PD, Richards J, Taleff MM, Heimberg C, Gallacher F, Gur RC.  Volunteers for biomedical research: recruitment and screening of normal controls. Archives of General Psychiatry, 1991, 48, 1022-1025.

74.  Erwin RJ, Mawhinney-Hee M, Gur RC, Gur RE. Midlatency auditory evoked responses in schizophrenia. Biological Psychiatry, 1991, 30, 430-442.

75. Trope I, Rozin P, Kemler Nelson D, Gur RC.  Information processing in the separated hemispheres of callosotomy patients: does the analytic-holistic dichotomy hold?  Brain and Cognition, 1992, 19, 123-147.

76. Gur RE, Gur RC.  Neurotransmitters are important, but so is metabolism.  Neuropsychopharmacology, 1992, 7, 63-65.

77. Malamut BL, Graff-Radford N, Chawluk J, Grossman RI, Gur RC.  Memory in a case of bilateral thalamic infarction.  Neurology, 1992, 42:163-169.

78. Warach S, Gur RC, Gur RE, Skolnick BE, Obrist WD, Reivich M.  Decreases in frontal and parietal lobe regional cerebral blood flow related to habituation.  Journal of Cerebral Blood Flow and Metabolism, 1992, 12, 546-553.

79. Gur RC, Erwin RJ, Gur RE.  Neurobehavioral probes for physiologic neuroimaging studies.  Archives of General Psychiatry, 1992, 49, 409-414.

80. Erwin RJ, Gur RC, Gur RE, Skolnick BE, Mawhinney-Hee M, Smailis J. Facial emotion discrimination:  I. Task construction and behavioral findings in normals.  Psychiatry Research, 1992, 42, 231-240.

81. Gur RC, Erwin RJ, Gur RE, Zwil AS, Heimberg C, Kraemer HC.  Facial emotion discrimination:  II. Behavioral findings in depression.  Psychiatry Research, 1992, 42, 241-251.

82. Heimberg C, Gur RE, Erwin RJ, Shtasel DL, Gur RC.  Facial Emotion Discrimination:  III.  Behavioral findings in schizophrenia.  Psychiatry Research, 1992, 42, 253-265.

83. Shtasel DL, Gur RE, Gallacher F, Heimberg C, Cannon T, Gur RC. Phenomenology and functioning in first episode schizophrenia. Schizophrenia Bulletin, 1992, 18, 449-462.

84. Shtasel DL, Gur RE, Gallacher F, Heimberg C, Gur RC. Gender difference in the clinical expression of schizophrenia. Schizophrenia Research, 1992, 7, 225-232.

85. Gur RC, Jaggi JL, Ragland JD, Resnick SM, Shtasel D, Muenz L, Gur RE. Effects of memory processing on regional brain activation:  Cerebral blood flow in normal subjects.  International Journal of Neuroscience,  1993, 72, 31-44.

86. Levick SE, Lorig T, Wexler BE, Gur RE, Gur RC, Schwartz GE. Asymmetrical visual deprivation: A technique to differentially influence lateral hemispheric function. Perceptual and Motor Skills, 1993, 76, 1363-1382.

87. Crawford HJ, Gur RC, Skolnick B, Gur RE, Benson D.  Effects of hypnosis on regional cerebral blood flow during ischemic pain with and without suggested hypnotic analgesia.  International Journal of Psychophysiology, 1993, 15, 181-195.

88. Skolnick BE, Gur RC, Stern MB, Hurtig HI. Reliability of regional cerebral blood flow activation to cognitive tasks in elderly normal subjects. Journal of Cerebral Blood Flow and

Ruben C. Gur, Ph.D.                                                      Page    14

Metabolism, 1993, 13, 448-453.

89.  Gur RC, Ragland JD, Resnick SM, Skolnick BE, Jaggi J, Muenz L, Gur RE.  Lateralized
     increases in cerebral blood flow during performance of verbal and spatial tasks:
     Relationship with performance level.  Brain and Cognition, 1994, 24, 244-258.

90.  Saykin AJ, Shtasel DL, Gur RE, Kester DB, Mozley LH, Stafiniak P, Gur RC.
     Neuropsychological deficits in neuroleptic naive, first episode schizophrenic patients.
     Archives of General Psychiatry, 1994, 51, 124-131.

91.  Schneider F, Gur RC, Gur RE, Muenz L.  Standardized Mood Induction with Happy and Sad
     Facial Expressions.  Psychiatry Research, 1994, 51, 19-31.

92.  Gur RE, Mozley PD, Shtasel DL, Cannon TD, Gallacher F, Turetsky B, Grossman R, Gur
     RC.  Clinical subtypes of schizophrenia differ in brain and cerebrospinal fluid volume.
     American Journal of Psychiatry, 1994, 151, 343-350.

93.  Gur RC, Skolnick BE, Gur RE.  Effects of emotional discrimination tasks on cerebral blood
     flow: Regional activation and its relation to performance.  Brain and Cognition, 1994, 25,
     271-286.

94.  Gur RE, Jaggi JL, Shtasel DL, Ragland JD, Gur RC.  Cerebral blood flow in schizophrenia:
     Effects of memory processing on regional activation.  Biological Psychiatry, 1994, 35, 3-15.

95.  Mozley PD, Gur RE, Shtasel DL, Resnick SM, Richards J, Kohn M, Grossman R, Herman
     G, Gur RC.  Magnetic resonance imaging in schizophrenia:  II. Relationship to clinical
     measures.  Schizophrenia Research, 1994, 12, 195-203.

96.  Cowell PE, Turetsky BT, Gur RC, Grossman RI, Shtasel DL, Gur RE.  Sex differences in
     aging of the human frontal and temporal lobe.  The Journal of Neuroscience, 1994, 14,
     4748-4755.

97.  Cannon TD, Zorrilla LE, Shtasel DL, Gur RE, Gur RC, Marco EJ, Moberg P, Price RA.
     Neuropsychological functioning in siblings discordant for schizophrenia and healthy
     volunteers.  Archives of General Psychiatry, 1994, 51, 651-661.

98.  Holdnack JA, Moberg PJ, Arnold SE, Gur RE, Gur RC.  MMPI characteristics in adults
     diagnosed with ADD: A preliminary report.  International Journal of Neuroscience, 1994,
     79, 47-58.

99.  Schneider F, Gur RC, Jaggi JL, Gur RE.  Differential effects of mood on cortical cerebral
     blood flow: A [133]Xenon clearance study.  Psychiatry Research, 1994, 52, 215-236.

100. Resnick SM, Lazar J, Gur RE, Gur RC. The stability of tachistoscopic measures of
     hemispheric specialization. Neuropsychologia, 1994, 32, 1419-1430.

101. Gur RC, Mozley LH, Mozley PD, Resnick SM, Karp JS, Alavi A, Arnold SE, Gur RE. Sex
     differences in regional cerebral glucose metabolism during a resting state.  Science, 1995,
     267, 528-531.

Ruben C. Gur, Ph.D.                                                          Page    15

102.  Kareken DA, Gur RC, Mozley PD, Mozley LH, Saykin AJ, Shtasel DL, Gur RE.
      Cognitive functioning and neuroanatomic volume measures in schizophrenia.
      Neuropsychology, 1995, 9, 211-219.

103. Ragland JD, Gur RC, Deutsch GK, Gur RE.  Reliability and validity of the paired-associate
     recognition memory test: A test of declarative memory using Wisconsin card sorting
     stimuli. Psychological Assessment, 1995, 7, 25-32.

104. Arnold SE, Gur RE, Shapiro RM, Fisher KR, Moberg PJ, Gibney MR, Gur RC, Blackwell
     P, Trojanowski JQ. Prospective clinicopathologic studies of schizophrenia: accrual and
     assessment of patients. American Journal of Psychiatry, 1995, 152, 731-737.

105. Arnold SE, Franz BR, Gur RC, Gur RE, Shapiro RM, Moberg PJ, Trojanowski  JQ. Smaller
     neuron size in schizophrenia in hippocampal subfields that mediate cortical-hippocampal
     interactions.  American Journal of Psychiatry, 1995, 152, 738-748.

106. Gur RE, Mozley PD, Resnick SM, Mozley LH, Shtasel DL, Gallacher F, Arnold SE, Karp
     JS, Alavi A, Reivich M, Gur RC. Resting cerebral glucose metabolism and clinical features
     of schizophrenia. Archives of General Psychiatry, 1995, 52, 657-667.

107.  Kareken DA, Gur RC, Saykin AJ. Reading on the wide range achievement test-revised and
      parental education as predictors of IQ: Comparison with the Barona formula. Archives of
      Clinical Neuropsychology, 1995, 10, 147-157.

108. Holdnack JA, Moberg PJ, Arnold SE, Gur RC, Gur RE. Speed of processing and verbal
     learning deficits in adults diagnosed with attention deficit disorder. Neuropsychiatry,
     Neuropsychology and Behavioral Neurology, 1995, 8, 282-292.

109. Schneider F, Gur RE, Mozley LH, Smith RJ, Mozley PD, Censits DM, Alavi A, Gur RC.
     Mood effects on limbic blood flow correlate with emotional self-rating. A PET study with
     oxygen-15 labeled water. Psychiatry Research, 1995, 61, 265-283.

110. Heimberg C, Gallacher F, Gur RC, Gur RE. Diet and gender moderate clozapine-related
     weight gain. Human Psychopharmacology, 1995, 10, 367-371.

111. Saykin AJ, Gur RC, Gur RE, Shtasel DL, Flannery KA, Mozley LH, Malamut BL, Watson
     B, Mozley PD. Normative neuropsycholgical test performance: Effects of age, education,
     gender and ethnicity. Applied Neuropsychology, 1995, 2, 79-88.

112.  Saykin AJ, Stafiniak P, Robinson LJ, Flannery KA, Gur RC, O'Connor MJ, Sperling MR.
      Language before and after temporal lobectomy: Specificity of acute changes and relation to
      early risk factors. Epilepsia, 1995, 36, 1071-1077.

113.  Turetsky BT, Cowell PE, Gur RC, Grossman RI, Shtasel DL, Gur RE. Frontal and
      temporal lobe brain volumes in schizophrenia: Relationship to symptomatology and clinical
      subtype. Archives of General Psychiatry, 1995, 52, 1061-1070.

114.  Schneider F, Gur RC, Gur RE, Shtasel DL. Emotional processing in schizophrenia:

Neurobehavioral probes in relation to psychopathology. Schizophrenia Research, 1995, 17, 67-75.

115. Schneider F, Gur RE, Alavi A, Seligman MEP, Mozley LH, Smith RJ, Mozley PD, Gur RC. Cerebral blood flow changes in limbic regions induced by unsolvable anagram tasks. American Journal of Psychiatry, 1996, 153, 206-212.

116. Cowell PE, Kostianovsky DJ, Gur RC, Turetsky BI, Gur RE. Sex differences in neuroanatomical and clinical correlations in schizophrenia.  American Journal of Psychiatry, 1996, 153, 799-805.

117. Ragland JD, Censits DM, Gur RC, Glahn DC, Gallacher F, Gur RE. Assessing declarative memory in schizophrenia using wisconsin card sorting test stimuli: the paired associate recognition test. Psychiatry Research, 1996, 60, 135-145.

118. Wang GJ, Volkow ND, Fowler JS, Logan J, Gur RC, Netusil N, Hitzemann RJ, Pappas NS. Age associated decrements in dopamine $D_2$ receptors in thalamus and in temporal insula of human subjects. Life Sciences, 1996, 59, 31-35.

119. Gur RE, Petty RG, Turetsky BI, Gur RC. Schizophrenia throughout life: Sex differences in severity and profile of symptoms. Schizophrenia Research, 1996, 21 1-12.

120. Mozley LH, Gur RC, Gur RE, Mozley PD, Alavi A. The Relationship between verbal memory performance and the cerebral distribution of FDG in patients with schizophrenia. Biological Psychiatry, 1996, 40, 443-451.

121. Kareken DA, Moberg PJ, Gur RC. Proactive inhibition and semantic organization: Relationship to verbal memory in patients with schizophrenia. Journal of the International Neuropsychological Society, 1996, 2, 486-493.

122. Szymanski S, Gur RC, Gallacher F, Mozley LH, Gur RE. Vulnerability to tardive dyskinesia development in schizophrenia : An FDG-PET study of cerebral metabolism. Neuropsychompharmacology, 1996, 15, 567-575.

123.  Mozley PD, Kim H-J, Gur RC, Tatsch K, Muenz LR, McElgin WT, Kung M-P, Mu M, Myers AM, Kung HF. [I-123] IPT SPECT imaging of CNS dopamine transporters: Non-linear effects of normal aging on striatal uptake values. Journal of Nucl Medicine, 1996, 37, 1965-1970.

124. Volkow ND, Ding YS, Fowler JS, Wang GJ, Logan J, Gatley SJ, Hitzemann R, Smith G, Fields SD, Gur RC.  Dopamine transporters decrease with age.  Journal of Nuclear Medicine, 1996, 37, 554-559.

125. Ragland JD, Glahn DC, Gur RC, Censits DM, Smith RJ, Mozley PD, Alavi A, Gur RE. PET regional cerebral blood flow change during working and declarative memory: Relationship with task performance. Neuropsychology, 1997, 11, 222-231.

126.  Mozley PD, Gur RC, Swanson CL, Turetsky BI, Gur RE, Nienow T, Alavi A. [Tc-99m] ECD SPECT demonstrates that dopaminergic drugs affect cerebral blood flow in healthy

Ruben C. Gur, Ph.D.                                                          Page     17

human volunteers. <u>Journal of Nuclear Medicine</u>, 1997, <u>38</u>,  48.

127.  Finkelstein JRJ, Cannon TD, Gur RE, Gur RC, Moberg P. Attentional Dysfunctions in
      neuroleptic-naive and neuroleptic-withdrawn schizophrenic patients and their siblings.
      <u>Journal of Abnormal Psychology</u>, 1997, <u>106</u>, 203-212.

128.  Gur RC, Ragland JD, Mozley LH, Mozley PD, Smith R, Alavi A, Bilker W, Gur RE.
      Lateralized changes in regional cerebral blood flow during performance of verbal and facial
      recognition tasks: Correlations with performance and"Effort". <u>Brain and Cognition</u>, 1997,
      <u>33</u>, 388-414.

129.  Mozley PD, Sadek AM, Alavi A, Gur RC, Muenz LR, Bunow BJ, Kim H-J, Stecker M,
      Jolles P, Newberg A.  Effects of aging on the cerebral distribution of [Tc-99m] HMPAO in
      healthy humans. <u>European Journal of Nuclear Medicine</u>, 1997, <u>24</u>, 754-761.

130.  Censits DM, Ragland JD, Gur RC, Gur RE. Neuropsychological evidence supporting a
      neurodevelopmental model of schizophrenia: A longitudinal study. <u>Schizophrenia Research</u>,
      1997, <u>24</u>, 289-298.

131.  Moberg PJ, Doty RL, Turetsky BI, Arnold SE, Mahr RN, Gur RC, Bilker W, Gur RE
      Olfactory Identification deficits in schizophrenia correlation with duration of illness.
      <u>American Journal of Psychiatry</u>, 1997, <u>154</u>, 1016-1018.

132.  Coleman AR, Moberg PJ, Ragland JD, Gur RC. Comparison of the Halstead-Reitan and
      infrared light beam finger tappers. <u>Assessment</u>, 1997, <u>4</u>, 277-286.

133. Glahn DC, Gur RC, Ragland JD, Censits DM, Gur RE. Reliability, performance
      characteristics, construct validity, and an initial clinical application of a visual object
      learning test (VOLT). <u>Neuropsychology</u>, 1997, <u>11</u>, 602-612.

134. Gur RC, Ragland JD, Gur RE. Cognitive Changes in Schizophrenia: A Critical Look .
      <u>International Review of Psychiatry</u>, 1997, <u>9</u>, 449-457.

135. Schneider F, Grodd W, Weiss U, Klose U, Mayer KR, Nagele T, Gur RC. Functional MRI
      reveals left amygdala activation during emotion. <u>Psychiatry Research:Neuroimaging
      Section</u>, 1997, <u>76</u>, 75-82.

136.  Kohler C, Gur RC, Swanson CL, Petty R, Gur RE.  Depression in schizophrenia: I.
      Association with neuropsychological deficits. <u>Biological Psychiatry</u>, 1998, <u>43</u>, 165-172.

137. Gur RE, Cowell P, Turetsky BI, Gallacher F, Cannon T, Bilker W, Gur RC. A followup
      MRI study of schizophrenia: Relationship of neuroanatomic changes with clinical and
      neurobehavioral measures. <u>Archives of General Psychiatry</u>, 1998, <u>55</u>, 145-152..

138. Kohler C, Swanson CL, Gur RC, Harper Mozley L, Gur RE. Depression In Schizophrenia:
      II. MRI and PET Findings. <u>Biological Psychiatry</u>, 1998, <u>43</u>, 173-180.

139. Ragland JD, Gur RC, Glahn DC, Censits DM, Smith RJ, Lazarev MG, Alavi A, Gur RE.
      Frontotemporal cerebral blood flow change during executive and declarative memory tasks

in schizophrenia: a positron emission tomography study. Neuropsychology, 1998, 12, 399-413.

140. Swanson CL, Gur RC, Bilker W, Petty RG, Gur RE. Premorbid educational attainment in schizophrenia: association with symptoms, functioning, and neurobehavioral measures. Biological Psychiatry, 1998, 44, 739-747.

141. Volkow ND, Gur RC, Wang GJ, Fowler JS, Moberg PJ, Ding YS, Hitzemann R, Smith G, Logan J. Association between decline of brain dopamine activity with age and cognitive and motor impairment in healthy individuals. American Journal of Psychiatry, 1998, 155, 344-349.

142. Erwin RJ, Turetsky B, Moberg P, Gur RC, Gur RE. P50 abnormalities in schizophrenia: relationship to clinical and neuropsychological indices of attention. Schizophrenia Research, 1998, 33, 157-167.

143. Gur RE, Maany V, Mozley D, Swanson C, Bilker W, Gur RC. Subcortical MRI Volumes in Neuroleptic-Naive and Treated Patients With Schizophrenia. American Journal of Psychiatry, 1998, 155, 1711-1717.

144. Moberg PJ, Doty RL, Turetsky BI, Arnold SE, Mahr RN, Gur RC, Bilker W, Gur RE. Deterioration of olfactory identification abilities in patients with schizophrenia. American Journal of Psychiatry, 1998, 155(10), 1463-1464.

145. Coleman AR, Norstrand JA, Moberg PJ, Kohler CG, Gur RC, Gur RE. MMPI-2 characteristics of adults diagnosed with Attention Deficit Disorder. International Journal of Neuroscience, 1998, 96, 161-175.

146. Volkow ND, Wang GJ, Fowler JS, Ding YS, Gur RC, Gatley JS, Logan J, Moberg PJ, Hitzemann, RJ, Smith G, Pappas N. Parallel Loss of Pre and Postsynaptic Dopamine Markers in Normal Aging. Annals of Neurology, 1998, 44, 143-147.

147. Cecil KM, Lenkinski RE, Gur RE, Gur, RC. Proton magnetic resonance spectroscopy in the frontal and temporal lobes of neuroleptic naive patients with schizophrenia. Neuropsychopharmacology, 1999, 20, 131-140.

148. Ragland JD, Gur RE, Klimas BC, McGrady N, Gur RC. Neuropsychological laterality indices of schizophrenia: Interactions with gender. Schizophrenia Bulletin, 1999, 25, 79-89.

149. Gur RC, Turetsky BI, Matsui M, Yan M, Bilker W, Hughett P, Gur RE. Sex differences in brain gray and white matter in healthy young adults. Journal of Neuroscience, 1999, 19, 4065-4072.

150. Moberg PJ, Agrin, RN, Gur RE, Gur RC, Turetsky BI, Doty RI. Olfactory dysfunction in schizophrenia: A qualitative and quantitative review. Neuropsychopharmacology, 1999, 21, 325-340.

151. Gur RE, Turetsky BI, Bilker WB, Gur RC. Reduced gray matter volume in schizophrenia. Archives of General Psychiatry, 1999, 56, 905-911.

152. Ragland JD, Coleman AR, Gur RC, Glahn DC, Gur RE. Sex differences in behavior relationships between verbal episodic memory and resting regional cerebral blood flow. Neuropsychologia, 2000, 38, 451-461.

153. Glahn DC, Cannon TD, Gur RE, Ragland JD, Gur RC.  Working memory constrains abstraction in schizophrenia. Biological Psychiatry, 2000, 47, 34-42.

154. Habel U, Gur RC, Mandal MK, Salloum JB, Gur RE, Schneider F.  Emotional processing in schizophrenia across cultures: standardized measure of discrimination and experience. Schizophrenia Research, 2000, 42, 57-66.

155. Mozley PD, Acton PD, Barraclough ED, Plossl K, Gur RC, Alavi A, Mathur A, Saffer J, Kung HF.  Effects of age on dopamine transporters in healthy humans.  Journal of Nuclear Medicine, 1999, 40, 1812-1817,

156.  McBride T, Arnold SE, Gur RC.  A comparative volumetric analysis of the prefrontal cortex in human and baboon MRI.  Brain, Behavior & Evolution, 1999, 54,159-166.

157. Volkow ND, Logan J, Fowler JS, Wang GJ, Gur RC, Wong C, Felder C, Gatley SJ, Ding YS, Hitzemann R, Papass N.  Association between age-related decline in brain dopamine activity and impairment in frontal and cingulate metabolism.  American Journal of Psychiatry, 2000, 157, 75-80.

158. Matsui M, Gur RC, Turetsky BI, Yan M, Gur RE.  The relation between tendency for psychopathology and reduced frontal brain volume in healthy people.  Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 2000, 13, 155-162.

159. Gur RC, Alsop D, Glahn D, Petty R, Swanson CL, Maldjian JA, Turetsky BI, Detre JA, Gee J, Gur RE.  An fMRI study of sex differences in regional activation to a verbal and a spatial task. Brain and Language, 2000, 74, 157-170.

160. Kohler CG, Bilker W, Hagendoorn M, Gur RE, Gur RC.  Emotion recognition deficit in schizophrenia: Association with symptomatology and cognition. Biological Psychiatry, 2000, 48, 127-136.

161. Ragland JD, Gur RC, Lazarev, MG, Smith RJ, Schroeder L, Raz J, Turetsky, BI, Alavi A, Gur RE. Hemispheric activation of anterior and inferior prefrontal cortex during verbal encoding and recognition. NeuroImage, 2000, 11, 624-633.

162. Gur RE, Cowell PE, Latshaw A, Turetsky BI, Gorssman RI, Arnold SE, Bilker WB, Gur RC.  Reduced dorsal and orbital prefrontal gray matter volumes in schizophrenia.  Archives of General Psychiatry, 2000, 57, 761-768.

163. Gur RE, Turetsky BI, Cowell PE, Finkelman C, Maany V, Grossman RI, Arnold SE, Bilker WB, Gur RC.  Temporolimbic volume reductions in schizophrenia.  Archives of General Psychiatry, 2000, 57, 769-775.

164.  Kohler CG, Ances BM, Coleman AR, Ragland JD, Lazarev M, Gur RC. Marchiafava-

Bignami disease: literature review and case report. <u>Neuropsychiatry, Neuropsychology, & Behavioral Neurology</u>. 2000, <u>13</u>, 67-76.

165. Matsuzawa J, Matsui M, Konishi T, Noguchi N, Gur RC, Bilker W, Miyawaki T. Age-related volumetric changes of brain gray and white matter in healthy infants and children. <u>Cerebral Cortex</u>. 2001, <u>11</u>, 335-342.

166. Kurtz, M.M., Moberg, P.J., Harper Mozley, L., Swanson, C.S., Gur, R. C., & Gur, R.E. Effectiveness of an attention and memory training program on neuropsychological deficits in schizophrenia. <u>Neurorehabilitation and Neural Repair</u>, 2001, <u>15</u>, 23-28.

167. Ragland JD, Gur RC, Raz J, Schroeder L, Smith RJ, Alavi A, Gur RE. Effect of schizophrenia on frontotemporal activity during word encoding and recognition: A PET cerebral blood flow study. <u>American Journal of Psychiatry</u>, 2001, <u>158</u>, 1114-1125.

168. Kurtz, M.M., Ragland, J.D., Bilker, W.B., Gur, R.C., & Gur R.E. Comparison of two forms of the Continuous Performance Test, with and without working memory demands, in healthy controls and patients with schizophrenia. <u>Schizophrenia Research</u>, 2001, <u>48</u>, 307-316.

169. Mozley LH, Gur RC, Mozley PD, & Gur RE. Striatal dopamine transporters and cognitive functioning in healthy men and women. <u>American Journal of Psychiatry</u>, 2001, <u>158</u>,1492-1499

170. Silver, H, Shlomo, N, Turner, T, Gur, RC. Perception of happy and sad facial expressions in chronic schizophrenia: Evidence for two evaluative systems. <u>Schizophrenia Research</u>, 2002, <u>55</u>, 171-177,

171. Gur RC, Ragland JD,Moberg PJ,Turner TH, Bilker WB, Kohler C, Siegel SJ, Gur RE. Computerized Neurocognitive Scanning: I. Methodology and validation in healthy people. <u>Neuropsychopharmacology</u>, 2001, <u>25</u>, 766-776.

172. Gur RC, Ragland JD, Moberg PJ, Bilker WB, Kohler C, Siegel SJ, Gur RE. Computerized Neurocognitive Scanning II: The Profile of Schizophrenia. <u>Neuropsychopharmacology</u>, 2001, <u>25</u>, 777-788,

173. Hill SK, Ragland JD, Gur RC, Gur RE. Neuropsychological differences among empirically derived clinical subtypes of schizophrenia. <u>Neuropsychology</u>, 2001, <u>15</u>, 492-501.

174. Moelter ST, Hill SK, Ragland JD, Lunardelli A, Gur, RC, Gur RE, Moberg PJ. Controlled and automatic processing during animal word list generation in schizophrenia. <u>Neuropsychology</u>, 2001, <u>15</u>, 502-509.

175. Kurtz MM, Moberg PJ, Gur RC, Gur RE. Approaches to cognitive remediation of neuropsychological deficits in schizophrenia: a review and meta-analysis. <u>Neuropsychology Review</u>. 2001, <u>11</u>,197-210.

176. Gur RC, Gunning-Dixon FM, Turetsky BI, Bilker WB, Gur RE. Brain Region and sex differences in age association with brain volume: A quantitative MRI study of healthy

Ruben C. Gur, Ph.D.                                                                      Page   21

young adults. Am J Geriatric Psychiatry, 2002, 10,72-80.

177. Ragland JD, Turetsky BI, Gur RC, Gunning-Dixon F, Turner T, Schroeder L, Chan R, Gur RE. Working memory for complex figures: an fMRI comparison of letter and fractal n-back tasks. Neuropsychology, 2002, 16, 370-379.

178. Langleben DD, Schroeder L, Maldjian JA, Gur RC, McDonald S, Ragland JD, O'Brien CP, Childress AR. Brain activity during simulated deception: An event-related functional magnetic resonance study. NeuroImage, 2002, 15, 727-732.

179. Gur RC, Sara R, Hagendoorn M, Maron O, Hughett P, Turner T, Bajcsy R, Gur RE. A method for obtaining 3-dimensional facial expressions and its standardization for use in neurocognitive studies. Journal of Neuroscience Methods, 2002, 115, 137-143.

180. Gur RC, Schroeder L, Turner T, McGrath C, Chan RM, Turetsky BI, Alsop D, Maldjian J, Gur RE. Brain activation during facial emotion processing. NeuroImage, 2002, 16, 651-662.

181. Gur RC, Gunning-Dixon F, Bilker WB, Gur RE. Sex Differences in temporo-limbic and frontal brain volumes of healthy adults. Cerebral Cortex, 2002, 12, 998-1003.

182. Gur RE, Gur RC. Gender differences in aging: Cognition, emotions and neuroimaging studies. Dialogues in Clinical Neuroscience. 2002, 4,197-207.

183. Goldstein RZ, Volkow ND, Chang L, Wang GJ, Fowler JS, Depue RA, Gur RC. The orbitofrontal cortex in methamphetamine addiction: Involvement in fear. NeuroReport, 2002, 13, 2253-2257.

184. Hill SK, Ragland JD, Gur RC, Gur RE. Neuropsychological profiles delineate distinct profiles of schizophrenia, an interaction between memory and executive function, and uneven distributions of clinical subtypes. Journal of Clinical and Experimental Neuropsychology. 2002, 24, 765-780.

185. Turetsky BI, Moberg PJ, Mozley LH, Moelter ST, Agrin R, Gur RC, Gur RE. Memory-delineated subtypes of schizophrenia: Relationship to clinical, neuroanatomical and physiological measures. Neuropsychology, 2002, 16, 481-490.

186. Gur RE, McGrath C, Chan RM, Schroeder L, Turner T, Turetsky BI, Kohler C, Alsop D, Maldjian J, Ragland JD, Gur RC. An fMRI study of facial emotion processing in schizophrenia. Am Journal of Psychiatry, 2002, 159, 1992-1999.

187. Rosen AC, Gur RC. Ethical considerations for neuropsychologists as functional magnetic imagers. Brain and Cognition. 2002, 50, 469-481.

188. Gunning-Dixon FM, Gur RC, Perkins AC, Schroeder L, Turner T, Turetsky BI, Chan RM, Loughead JW, Alsop DC, Maldjian J, Gur RE. Age-related differences in brain activation during emotional face processing. Neurobiology of Aging. 2003, 24, 285-95.

189. Kryspin-Exner I, Gur RC, Hoheisel B, Klein M, Six N.  Neurobehavioral Probes: Adaptierung und Erweiterung von Verfahren zur computergestützen neuropsychologischen Diagnostik. Verhaltenstherapie und Verhaltensmedizin, 2003, 24, 27-51.

190. Kohler CG, Turner TT, Bilker WB, Brensinger C, Siegel SJ, Kanes, SJ, Gur RE, Gur RC.  Facial emotion recognition in schizophrenia: Intensity effects and error pattern.  American Journal of Psychiatry, 2003, 160, 1768-1774.

191. Silver H, Feldman P, Bilker WB, Gur RC.  Working memory deficit as a core neuropsychological dysfunction in schizophrenia. American Journal of Psychiatry, 2003, 160, 1809-1816.

192. Indersmitten T, Gur RC. Emotion processing in chimeric faces: hemispheric asymmetries in expression and recognition of emotions. The Journal of Neuroscience. 2003, 23, 3820-3825.

193. Bilker WB, Brensinger C, Kurtz MM, Kohler C, Gur RC, Siegel SJ, Gur RE. Development of an abbreviated schizophrenia quality of life scale using a new method. Neuropsychopharmacology. 2003, 28, 773-777.

194. Windischberger C, Barth M, Lamm C, Schroeder L, Bauer H, Gur RC, Moser E. Fuzzy cluster analysis of high-field functional MRI data. Artificial Intelligence in Medicine. 2003, 29, 203-223.

195. Ragland JD, Moelter ST, McGrath C, Hill SK, Gur RE, Bilker WB, Siegel SJ, Gur RC.  Levels-of-processing effect on word recognition in schizophrenia.  Biological Psychiatry. 2003, 54, 1154-1161.

196. Dubb A, Gur RC, Avants B, Gee J.  Characterization of sexual dimorphism in the human corpus callosum. Neuroimage. 2003 20:512-519.

197. Gelber EI, Kohler CG, Bilker WB, Gur RC, Brensinger C, Siegel SJ, Gur RE. Symptom and demographic profiles in first-episode schizophrenia. Schizophrenia Research. 2004, 67, 185-194.

198. Kurtz MM, Ragland JD, Moberg PJ, Gur RC: The Penn Conditional Exclusion Test: A New Measure of Executive-function with Alternate Forms for Repeat Administration. Archives of Clinical Neuropsychology. 2004, 19, 191-201.

199. Kohler CG, Turner TH, Gur RE, Gur RC. Recognition of facial emotions in neuropsychiatric disorders. CNS Spectrum. 2004, 9, 267-274.

200. Elliott MA, Gualtieri EE, Hulvershorn J, Ragland JD, Gur R.  The effects of geometric distortion correction on motion realignment in fMRI.  Academic Radiology. 2004, 11, 1005-1010.

201. Kurtz MM, Moberg PJ, Gur RC, Gur RE.  Results from randomized, controlled trials of the effects of cognitive remediation on neurocognitive deficits in patients with schizophrenia. Psychol Med. 2004, 34, 569-570.

202. Lowery N, Ragland JD, Gur RC, Gur RE, Moberg PJ.  Normative data for the symbol

Ruben C. Gur, Ph.D.                                                                            Page      23

cancellation test in young healthy adults. <u>Applied Neuropsychology</u>. 2004, <u>11</u>, 218-221.

202. Kohler CG,  Turner T, Stolar NM,  Bilker WB, Brensinger CM, Gur RE, Gur RC.
Differences in Facial Expressions of Four Universal Emotions.  <u>Psychiatry Research</u>, 2004,
<u>128</u>, 235-244.

203. Gur RE, Kohler CG, Turetsky BI, Siegel SJ, Kanes SJ, Bilker WB, Brennan AR, Gur RC.  A
sexually dimorphic ratio of orbitofrontal to amygdala volume is altered in schizophrenia.
<u>Biological Psychiatry</u>, 2004, <u>55</u>, 512-517.

204. Keefe RSE, Seidman LJ, Christensen BK, Hamer RM, Sharma T, Sitskoorn MM, Lewine RRJ,
Yurgelun-Todd DA, Gur RC, Tohen M, Tollefson GD, Sanger TM, Lieberman JA. Comparative
effect of atypical and conventional antipsychotic drugs on neurocognition in first-episode
psychosis: A randomized double-blind trial of olanzapine versus haloperidol.  <u>American Journal
of Psychiatry</u>, 2004, <u>161</u>, 985-995.

205. Ragland JD, Gur RC, Valdez J, Turetsky BI, Elliott M, Kohler CG, Siegel SJ, Kanes SJ, Gur
RE. Event-related fMRI of frontotemporal activity during word encoding and recognition in
schizophrenia. <u>American Journal of Psychiatry</u>, 2004, <u>161</u>,1004-1015.

206. Irani F, Dankert M, Brensinger C, Bilker WB, Nair SR, Kohler CG, Kanes SJ, Turetsky BI,
Moberg PJ, Ragland JD, Gur RC, Gur RE, Siegel SJ.  Patient attitudes towards surgically-
implantable, long-term delivery of psychiatric medicine, <u>Neuropsychopharmacology</u>. 2004, <u>29</u>,
960-968.

207. Sachs G, Steger-Wuchse D, Kryspin-Exner I, Gur RC, Katschnig H.  Facial recognition deficits
and cognition in schizophrenia. <u>Schizophrenia Research</u>. 2004, <u>68</u>, 27-35.

208. Weiser M, Reichenberg A, Rabinowitz J,  Knobler HY, Lubin G,  Yazvitzky R,  Nahon D,
Gur RC, Davidson M.  Cognitive performance of male adolescents is lower than controls across
psychiatric disorders: A population-based study. <u>Acta Psychiatrica Scandinavica</u>. 2004, <u>110</u>,
471-475.

209. Bilker WB, Brensinger C, Gur RC. A two factor ANOVA-like test for correlated correlations:
CORANOVA. <u>Multivariate Behavioral Research.</u> 2004, <u>39</u>, 565-594.

210. Verma R, Davatzikos C, Loughead J, Indersmitten T, Hu R, Kohler CG, Gur RE, Gur RC.
Quantification of facial expressions using high dimensional shape transformations. <u>Journal of
Neuroscience Methods</u>. 2005, <u>141</u>, 61-73.

211. Goldstein RZ, Alia-Klein N, Leskovjan AC, Fowler JS, Wang G,  Gur RC, Hitzemann R,
Volkow ND.  Anger and depression in cocaine addiction: Association with the orbitofrontal
cortex.  <u>Psychiatry Research: Neuroimaging</u>.  2005, <u>138</u>, 13– 22.

212. Dubb A, Xie Z, Gur RC, Gur RE, Gee J.  Characterization of brain plasticity in schizophrenia
using template deformation.  <u>Acad Radiology</u>,.2005, <u>12</u>, 3-9.

213. Nucifora PG, Verma R, Melhem ER, Gur RE, Gur RC.  Leftward asymmetry in relative fiber
density of the arcuate fasciculus.  <u>Neuroreport</u>, 2005, <u>16</u>, 791-794.

214. Yushkevich P, Dubb A, Xie Z, Gur RE, Gur RC, Gee J.  Regional structural characterization of the brain of schizophrenia patients.  Acad Radiol., 2005, 12,1250-1261.

215. Calkins ME, Gur RC, Ragland JD, Gur RE.  Face recognition memory deficits and visual object memory performance in patients with schizophrenia and their relatives.  Am J Psychiatry. 2005,162,1963-1966.

216. Ragland JD, Gur RC, Valdez JN, Loughead J, Elliott M, Kohler CG, Kanes SJ, Siegel SJ, Moelter ST, Gur RE.  Levels-of-processing effect on frontotemporal function in schizophrenia during word encoding and  recognition. American Journal of Psychiatry. 2005, 162, 1840-1848.

217. Kurtz MM, Moberg PJ, Ragland JD, Gur RC, Gur RE.  Symptoms versus neurocognitive test performance as predictors of psychosocial status in schizophrenia.  Schizophrenia Bulletin. 2005, 31,167-174.

218. Gur RC.  Brain maturation and its relevance to understanding criminal culpability of juveniles. Current Psychiatry Reports. 2005, 7, 292-296.

219. Moelter ST, Hill SK, Hughett P, Gur RC, Gur RE, Ragland JD.  Organization of semantic category exemplars in schizophrenia.  Schizophr Res. 2005, 15, 209-217.

220. Platek SM, Loughead JW, Gur RC, Busch S, Ruparel K, Phend N, Panyavin IS,  Langleben DD.  Neural substrates for functionally discriminating self-face from personally familiar faces, Human Brain Mapping. 2005 Jul 20; [Epub ahead of print]

221. Williams LM, Grieve SM, Whitford TJ, Clark RC, Gur RC, Goldberg E, Flor-Hentry P, Peduto AS, Gordon E.  Neural synchrony and grey matter variations in human males and females:  An integration of 40hz gamma synchrony and neuroimaging measures.  Journal of Integrative Neuroscience, 2005, 4, 77-93.

222. Davatzikos C, Shen D, Gur RC, Wu X, Liu D, Fan Y, Hughett P, Turetsky BI, Gur RE. Whole brain morphometric study of schizophrenia reveals a spatially complex set of focal abnormalities.  Archives of General Psychiatry, 2005, 62, 1218-1227.

223. Langleben DD, Loughead JW, Bilker WB, Ruparel K, Childress AR, Busch S, Gur RC.  Telling truth from lie in individual subjects with fast event-related fMRI.  Human Brain Mapping, 2005, 26, 262-272.

224. Davatzikos C, Ruparel K, Fan Y, Shen DG, Acharyya M, Loughead JW, Gur RC, Langleben DD,. Classifying spatial patterns of brain activity using machine learning methods: application to lie detection.  NeuroImage. 2005, 15, 663-668.

225. Schneider F, Gur RC, Koch K, Backes V, Amunts K, Shah NJ, Bilker W, Gur RE, Habel U. Impairment in the specificity of emotion processing in schizophrenia.  American Journal of Psychiatry. 2006, 163, 442-447.

226. Siegel SJ, Irani F, Brensinger CM, Kohler CG, Bilker WB, Ragland JD, Kanes SJ, Gur, RC, Gur RE.  Prognostic variables at intake and long-term level of function in schizophrenia.

Ruben C. Gur, Ph.D.                                              Page      25

American Journal of Psychiatry, 2006, <u>163</u>, 1-9.

227. Ragland JD, McCarthy E, Bilker WB, Brensinger CM, Valdez J,  Kohler C, Gur RE,  Gur RC.  Levels-of-processing effect on internal source monitoring in schizophrenia. <u>Psychological Medicine</u>. 2006, <u>36</u>, 641-648.

228. Gur RE, Kohler CG, Ragland JD, Siegel SJ, Lesko K, Bilker WB, Gur RC.  Flat affect in schizophrenia: Relation to emotion processing and neurocognitive measures.  <u>Schizophrenia Bulletin</u>, 2006, <u>32</u>, 279-287.

229. Silver H, Goodman C, Bilker W, Gur RC, Isakov V, Knoll G, Feldman P.  Impaired error monitoring contributes to face recognition deficit in schizophrenia patients.  <u>Schizophrenia Reseach</u>. 2006, <u>85</u>, 151-161.

230. Dickinson D, Ragland JD, Calkins ME, Gold JM, Gur RC.  A comparison of cognitive structure in schizophrenia patients and healthy controls using confirmatory factor analysis.  <u>Schizophrenia Reseach</u>. 2006, <u>85</u>, 20-29.

231. Irani F, Platek SM, Panyavin IS, Calkins ME, Kohler C, Siegel SJ, Schachter M, Gur RE, Gur RC.  Self-face recognition and theory of mind in patients with schizophrenia and first-degree relatives.  <u>Schizophrenia Reseach</u>. 2006, <u>88</u>, 151-160.

232. Sanders RD, Joo YH, Almasy L, Wood J, Keshavan MS, Pogue-Geile MF, Gur RC, Gur RE, Nimgaonkar VL.  Are neurologic examination abnormalities heritable? A preliminary study.  <u>Schizophrenia Reseach</u>. 2006, <u>86</u>, 172-180.

233. Moberg PJ, Arnold SE, Doty RL, Gur RE, Balderston CC, Roalf DR, Gur RC, Kohler CG, Kanes SJ, Seigel SJ, Turetsky BI. Olfactory functioning in schizophrenia: Relationship to clinical, neuropsychological, and  volumetric MRI measures. <u>Journal of Clinical and Experimental Neuropsychology</u>, 2006, <u>28</u>, 1444-1461.

234. Ragland JD, Valdez JN, Loughead J, Gur RC, Gur RE.  Functional magnetic resonance imaging of internal source monitoring in schizophrenia: Recognition with and without recollection.  <u>Schizophrenia Research</u>. 2006, Jun 27; [Epub ahead of print]

235. Moser E, Derntl B, Robinson S, Fink B, Gur RC, Grammer K.     Related Articles, Links Amygdala activation at 3T in response to human and avatar facial expressions of emotions.  <u>J Neurosci Methods</u>. 2006 Nov 24; [Epub ahead of print]

236. Gur RC, Turetsky BI, Loughead J, Waxman J, Snyder W, Ragland JD, Elliot M, Bilker WB, Arnold SE, Gur RE.  Hemodynamic responses in neural circuitries for detection of visual target and novelty: An event-related fMRI study. <u>Hum Brain Mapp</u>. 2006 Nov 28; [Epub ahead of print]

237. Weiss EM, Kohler CG, Nolan KA, Czobor P, Volavka J, Platt MM , Brensinger C, Loughead J, Delazer M, Gur RE,  Gur RC. The Relationship between history of violent and criminal behavior and recognition of facial expression of emotions in men with schizophrenia and schizoaffective disorder.  <u>Journal of Aggressive Behavior</u>, in press.

238. Wolf DH, Gur RC, Valdez JN, Loughead J, Elliott MA, Gur RE, Ragland JD. Alterations of fronto-temporal connectivity during word encoding in schizophrenia. <u>American Journal of Psychiatry</u>, in press.

239. Fan Y, Shen D, Gur RC, Gur RE, Davatzikos C.  COMPARE:  Classification of morphological patterns using adaptive regional elements.  <u>IEEE Transactions on Medical Imaging</u>, in press.

240. Gur RE, Calkins M, Gur RC, Horan W, Nuechterlein K, Seidman L, Stone W.  The Consortium on the genetics of schizophrenia (COGS): Neurocognitive Endophenotypes.  <u>Schizophrenia Bulletin</u>, in press.

241. Gur RE, Nimgaonkar VL, Almasy L, Calkins ME, Ragland JD, Pogue-Guile MF, Kanes SJ, Blangero J, Gur RC.  Neurocognitive Endophenotypes in a Multiplex Multigenerational Family Study of Schizophrenia, <u>American Journal of Psychiatry</u>, in press.


<u>Contributions to peer-reviewed clinical research publications, participation cited but not by authorship:</u>
                          None.

<u>Research Publications, non-peer reviewed:</u>         None.

<u>Abstracts:</u>  (Excluding abstracts subsequently published as full-length papers; Past 3 years only)

1.   Gur RE, Almasy L, Nimgaonkar V, Gur RC, Turetsky BI.  Endophenotypic measures in disorders of complex behavior. Society of Biological Psychiatry, Philadelphia, Pennsylvania, 2002.

2.   Kurtz M, Moberg PJ, Gur RC, Gur RE. Remediation of Wisconsin Card Sorting Test performance in patients with schizophrenia: A Meta-analysis. The International Neuropsychological Society, Toronto, Canada, 2002.

3.   Siegel SJ, Winey Pierre J, Liang Y, Irani F, Maxwell C, Salama R, Weightman BD, Kirshner M, Pollock B, Lewis D, Gur RC, Gur RE. Title: Surgically implantable antipsychotic medication: release kinetics in animals and patient attitudes towards long-term delivery devices. American College of Neuropsychopharmacology, San Juan, Puerto Rico, 2002.

4.   Calkins ME, Gur RC, Ragland JD, Gur RE. Face recognition memory deficits in schizophrenia patients and their relatives: Comparison with visual object memory performance. International Congress on Schizophrenia Research, Colorado Springs, Colorado, 2003.

5.   Gur RE, Turetsky BI, Ragland JD, Gur RC. Habituation of the hemodynamic response during novelty detection in schizophrenia. International Congress on Schizophrenia Research, Colorado Springs, Colorado, 2003.

6.   Kurtz M, Moberg PJ, Ragland JD, Gur RC, Gur RE. Symptoms versus neurocognitive test performance as predictors of psychosocial status in schizophrenia: A 1- and 4-year

prospective study. International Congress on Schizophrenia Research, Colorado Springs, Colorado, 2003.

7.  Lowery N, Ragland JD, Indersmitten T, Gur RE, Gur RC. The contribution of controlled aspects of semantic processing to verbal memory encoding and semantic fluency deficits in schizophrenia. International Congress on Schizophrenia Research, Colorado Springs, Colorado, 2003.

8.  Kurtz M, Ragland JD, Moberg PJ, Gur RC.  The Penn Conditional Exclusion Test: A New Measure of Executive Function With Alternative Forms for Repeat Administration. 31st Annual International Neuropsychological Society Conference, Honolulu, Hawaii, 2003.

9.  Ragland JD, Gur RC, Valdez J, Gur RE. Effect of schizophrenia on frontotemporal activity during word encoding and recognition: An event- related fMRI study. International Congress on Schizophrenia Research, Colorado Springs, Colorado, 2003.

10. Calkins ME, Moberg PJ, Gur RC, Gur RE, Turetsky BI. Memory-delineated subtypes of schizophrenia: Performance in biological relatives. Society of Biological Psychiatry Annual Meeting, New York, New York, 2004.

11. Gur RC, Verma R, Davatzikos C, Gur RE. Using DTI to test hypotheses on sex differences in brain organization. New York Academy of Sciences Diffusion Tensor Imaging Workshop. New York, New York, August, 2004.

12. Gur RE, Almasy L, Nimgaonkar V, Pogue-Geile M, Ragland JD, Blangero J, Gur RC. Pleiotropic genetic effects in multiplex multigenerational families with schizophrenia on endophenotypic measures of memory and emotion processing. Society for Neuroscience, San Diego, California, 2004.

13. Gur RC, Verma R, Loughead J, Davatzikos C, Kohler C, Gur RE. Face processing as a tool for probing the neurobiology of affect: Methods and initial results. 43rd Annual Meeting of the American College of Neuropsychopharmacology, San Juan, Puerto Rico, 2004.

14. Irani F, Dankert M, Brensinger C, Bilker WB, Nair NR, Kohler CG,  Kanes SJ, Turetsky BI, Moberg PJ, Ragland JD, Gur RC, Gur RE, Siegel SJ.  Patient attitudes towards surgically-implantable, long-term delivery of psychiatric medicine.  American Psychiatric Association annual meeting New York, New York, 2004.

15. Moelter ST, Ragland JD, Friedman K, Moberg PJ, Gur RC, Gur RE, Turetsky BI. Does animal fluency reveal cognitive and neuroanatomical heterogeneity in schizophrenia? 33rd annual meeting of the International Neuropsychological Society, St.Louis, Missouri, 2004.

16. Ragland JD, Valdez J, Gur RC, Elliott M, Gur RE. Effect of schizophrenia on fMRI activity during shallow and deep word encoding. Human Brain Mapping, Budapest, Hungary, 2004.

17. Ragland JD, Valdez J, Loughead J, Gur RC, Elliot M, Gur RE. Diffuse cortical and sub-cortical over-activation during source monitoring in schizophrenia. 43rd Annual Meeting of the American College of Neuropsychopharmacology, San Juan, Puerto Rico, 2004.

18. Ragland JD, McCarthy E, Valdez J, Brensinger C, Bilker WB, Gur RC, Gur RE. Levels-of-processing effect on source monitoring in schizophrenia. 43rd Annual Meeting of the American College of Neuropsychopharmacology, San Juan, Puerto Rico, 2004.

19. Moelter ST, Kohler C, Ragland JD, Gur RC. Progression of Neuropsychological Deficits in a Case of Marchiafava-Bignami Disease. International Neuropsychological Society, Baltimore, Maryland, 2004.

20. Stewart CA, Cerhan J, Ragland JD, Gur RC, Smith G.  Correlates Between Traditional and Computerized Neuropsychological Testing in Hepatic Encephalopathy. The Liver Meeting, Boston, Massachusetts, 2004.

21. Gur RC, Davatzikos C, Shen D, Xiaoyng W, Fan Y, Hughett P, Turetsky BI, Gur RE. Whole-brain deformation based morphometry MRI study of schizophrenia. International Congress on Schizophrenia Research, Savannah, Georgia, 2005.

22. Gur RE, Calkins ME, Ragland JD, Richard J, Gur RC.  Neurocognitive measures in genetic studies of schizophrenia. International Congress on Schizophrenia Research, Savannah, Georgia, 2005.

23. Gur RE, Laura Almasy L, Kohler C, Gur RC. Emotion processing as an endophenotypic measure in family studies of schizophrenia. World Congress of Biological Psychiatry, Vienna, Austria, 2005.

24. Ragland JD, Moelter ST, Valdez J, Gur RC, Gur RE. Controlled versus automatic semantic retrieval in schizophrenia: A compressed image acquisition overt word production fMRI study. International Congress on Schizopohrenia Research, Savannah, Georgia, 2005.

Editorials, Reviews, Chapters, including participation in committee reports:

1. Gur RE, Gur RC.  Correlates of conjugate lateral eye movement behavior in humans.  In S. Harnad et al (eds.), Lateralization in the nervous system. New York:  Academic Press, 1976.

2. Gur RE, Levy J, Gur RC.  Clinical studies of brain organization and behavior.  In A. Frazer, A. Winokur (eds.), Biological basis of psychiatric disorders.  New York:  Spectrum, 1977.

3. Sackeim HA, Gur RC.  Self-confrontations, self-deception and  consciousness.  In G.E. Schwartz, D. Shapiro (eds.), Consciousness and self-regulation: advances in research.  New York:  Plenum Press, 1978.

4. Gur RC.  Imagery, absorption and the tendency toward  "mind exploration" as correlates of hypnotic susceptibility in males and females. In F.H. Frankel, H.S. Zamansky (eds.), Hypnosis at its bicentennial:  selected papers. New York:  Plenum, 1978.

5. Gur RC, Gur RE.  Handedness and individual differences in hemispheric activation.  In J. Herron (ed.), The Neuropsychology of left-handedness. New York:  Academic Press, 1979.

Ruben C. Gur, Ph.D.                                                        Page    29

6.  Levy J, Gur RC.  Individual differences in psychoneurologicalorganization.  In J. Herron (ed.), <u>The neuropsychology of left-handedness</u>.  New York:  Academic Press, 1979.

7.  Sackeim HA, Gur RC.  Facial symmetry, perceiver biases and the communication of emotion. In J.T. Cacioppo, R.E. Petty (eds.), <u>Social Psychophysiology</u>.  New York:  Guilford, 1983.

8.  Gur RC.  Measurement and imaging of regional brain function:  Implications for neuropsychiatry.  In P. Flor-Henry, J. Gruzelier (eds.), <u>Laterality and psychopathology</u>. Amsterdam: Elsevier, 1983.

9.  Reivich M, Gur RC.  Sensory and psychological effects on local glucose metabolism in humans.  In M. Reivich (ed.), <u>Positron emission tomography</u>. New York: Liss, 1985.

10.  Gur RC, Gur RE, Sussman NM, Selzer M.  Positron emission tomography in epilepsy.  In M. Reivich (ed.), <u>Positron emission tomography</u>. New York: Liss, 1985.

11.  Gur RC.  Measurement of regional brain physiology in humans:  early applications in behavioral neurology.  In M-M. Mesulam (ed.), <u>Principles of behavioral neurology</u>. Philadelphia: F.A. Davis, 1985.

12.  Alavi A, Chawluk JB, Hurtig HI, Dann RW, Saykin AJ, Gur RC, Reivich M. Determination of regional cerebral function and structure in normal aging and dementia with positron emission tomography (PET), magnetic resonance imaging (MRI) and x-ray computed tomography (XCT). In H. Hafner, G. Moschel, N. Sartorius (eds.), <u>Mental health in the elderly</u>. Heidelberg: Springer-Verlag, 1985.

13.  Gur RC, Gur RE.  Hemispheric specialization and regional cerebral blood flow.  In A. Glass (ed.), <u>Individual differences in hemispheric specialization</u>. New York: Plenum Publications, 1987.

14.  Gur RC.  Imaging the activity of the human brain. <u>National Forum</u>, 1987, <u>67</u>, 13-16.

15.  Gur RC. Integration of multifaceted data on regional brain function: from metabolic images to behavioral images. In R. Takahashi, P. Flor-Henry, J. Gruzelier, S. Niwa (eds.), <u>Cerebral dynamics, laterality and psychopathology</u>. Amsterdam: Elsevier, 1987.

16.  Gur RC.  Atlas of brain imaging: The 133-Xenon inhalation technique. <u>Masters in Psychiatry</u>, 1987.

17.  Gur RC, Gur RE, Saykin AJ. The neuropsychological study of schizophrenia. In C.A. Tamminga, S.C. Schulz (eds.), <u>Advances in Neuropsychiatry and Psychopharmacology</u>, Vol 1. <u>Schizophrenia Research</u>. New York: Raven Press, 1991, pp.153-162.

18.  Gur RC, Gur RE.  The use of neuroimaging techniques in brain injury. In J. Dywan, R. Kaplan (eds.), <u>Neuropsychology and the Law</u>.  New York:Springer-Verlag, 1991.

19.  Gur RC, Gur RE.  The impact of neuroimaging on human neuropsychology. In R.G. Lister, H.J. Weingartner (eds.), <u>Perspectives on Cognitive Neuroscience</u>. Oxford University Press, 1991, <u>23</u>, 417-435.

20. Gur RC, Gur RE. Laterality in schizophrenia: PET studies. In N.D. Volkow (ed), <u>Positron Emission Tomography in Schizophrenia</u>,1991, <u>3</u>, 47-58.

21. Gur RC, Saykin AJ, Gur RE.  Neuropsychological assessment in psychiatric research and practice.  In S.B. Guze, J. Helzer (eds), <u>Psychiatry</u>, 1991, <u>72</u>, 1-16.

22. Gur RC, Gur RE.  Neurobehavioral and neuroimaging data in the medical-legal context.  In H.V. Hall, R.J. Sbordone (eds.), <u>Disorders of Executive Functions: Civil</u> and Criminal Law <u>Applications</u>, 1993, <u>4</u>, 107-122.

23. Gur RC.  Neuropsychological methods for evaluating regional brain dysfunction.  In A. Wilner (ed.), <u>Cerebral Damage Before and After Cardiac Surgery</u>.  England: Kluwer, 1993, <u>8</u>, 101-111.

24. Gur RC, Gur RE, Saykin AJ.  Behavioral Imaging:  The Neuropsychological Assessment.  In K. Maurer (ed.), <u>Imaging of the Brain in Psychiatry and Related Fields</u>.  New York: Springer-Verlag, 1993, 351-361.

25. Gur RC, Saykin AJ, Gur RE.  Brain function in schizophrenia: application of neurobehavioral studies.  In N.C. Andreasen (ed.), <u>Schizophrenia:  From Mind to Molecule</u>, 1994, <u>5</u>, 93-104.

26. Gur RC, Gur RE. Methods for the study of brain-behavior relationships. In A. Frazer, P.B. Molinoff, A. Winokur (eds.), <u>Biological Bases Of Brain Function and Disease</u>. Raven Press. 1994, <u>15</u>, 261-279.

27. Gur RC, Gur RE. The potential of physiological neuroimaging for the study of schizotypy: experiences from applications to schizophrenia. In A. Raine, T. Lencz, S.A. Mednick (eds.), <u>Schizotypal Personality</u>. Cambridge University Press, 1995, <u>17</u>, 406-425.

30. Gur RC, Gutierrez JM, Holdnack JA, Mahr RN. Neurobehavioral probes as applied in physiologic neuroimaging studies: Methodologic considerations. In E.D. Bigler (ed.), <u>Handbook of Human Brain Function: Neuroimaging</u>. New York: Plenum Press, 1996, <u>10</u>, 199-214.

31. Gur RC, Moberg PJ, Gur RE. Aging and cognitive functioning. In R. Lavizzo-Mourey, M. Forciea (eds.), <u>Geriatric Secrets</u>, 1996, <u>26</u>, 126-129. 3rd Edition in press.

32. Gur RE, Gur RC.  Blood flow and metabolism in schizophrenia. In R. Mathew (ed.), <u>Cerebral Blood Flow in Neuropsychiatric Disorders</u>. Great Neck, NY:  PMA Publishing Corp., in press.

33. Gur RE, Gur RC. Schizophrenia: Brain Structure and Function. In H.I. Kaplan, B.J. Sadock (eds.), <u>Comprehensive Textbook of Psychiatry/VII</u>, Philadelphia: Lippincott Williams & Wilkins, 2000.

34. Gur RC, Cowell P, Gur RE. Gender Differences in Neuropsychological Testing. To appear in L.J. Dickstein, B.L. Kennedy (eds.), <u>Gender Differences in the Brain: Linking Biology to</u>

Ruben C. Gur, Ph.D.                                                          Page    31

Psychiatry. New York:Guilford Publications, Inc.

35. Gur, R.C., Moelter, S.T., Ragland, JD. "Learning and memory in schizophrenia". In, Sharma, T., & Harvey, P. (Eds.), Cognition in Schizophrenia. Oxford University Press: Oxford, G.B., 1999.

36. Gur RC, Gur RE. Neuroimaging applications in the elderly. American Journal of Geriatric Psychiatry, 2002, 10, 5-11.

37. Gutierrez, JM and Gur, RC. A computerized forced-choice method for detection of malingering. in: CR Reynolds (Editor) Detection of During Head Injury Litigation (Critical Issues in Neuropsychology). New York: Planum 1998.

COMMENTARIES:

1. Gur RC. Measuring hypnotic susceptibility: A guest editorial. American Journal of Clinical Hypnosis, 1979, 21, No. 2 and 3, (October 1978/January 1979).  (Two issues devoted to the psychometrics  of hypnotizability, edited by RC Gur).

2. Gur RE, Gur RC.  A note on Levick and Voneida:  Eye movements in schizophrenics vs. normal subjects.  Archives of General Psychiatry, 1979, 36, 493-494.

3. Sackeim HA, Gur RC.  Asymmetry in facial expression. Science, 1980, 209, 834-836.

4. Sackeim HS, Gur RC.  Voice recognition and the ontological status of self-deception. Journal of Personality and Social Psychology, 1985, 48, 1365-1368.

5. Gur RE, Skolnick BE, Gur RC.  Gruzelier's "reconsideration" considered. (Response to J. Gruzelier's reconsideration of Gur et al [1983] conclusions). Archives of General Psychiatry, 1985, 42, 633.

6. Saykin AJ, Gur RC.  A review of Neuropsychological Assessment of Neuropsychiatric Disorders. In I. Grant, K.M. Adams (eds.), New York, Oxford University Press, 1986.

7. Gur RC.  Do we have a research method for studying self reports? A review of A. Giorgi (ed.), Phenomenology and psychological research. Contemporary Psychology: A Journal of Reviews, 1987, 32, 547-548.

8.  Nasrallah HA, Mitchell AJ, Gur RE, Gur RC, Turetsky BI, Cannon TD, Mozley PD.  Brain and CSF Volume Differences in Schizophrenic Subtypes. American Journal of Psychiatry, 1995, 152, 817-818.

9.  Gur RC, Gur RE. Hypofrontality in schizophrenia: RIP. The Lancet, 1995, 345, 1383-1384.

10.  Lenkinsky RE & Gur RC. MRS: A novel tool for studying brain function. Contemporary Psychology: A Journal of Reviews, 1997, 42, 351-352.

11.  Moberg, P.J., Doty, R.L., Turetsky, B.I., Arnold, S.E., Mahr, R.N., Gur, R.C., Bilker, W., & Gur, R.E. . Olfactory identification abilities deteriorate in patients with schizophrenia, even for those with relatively recent onset [letter; reply]. American Journal of Psychiatry, 1998,

Ruben C. Gur, Ph.D.                                                                    Page     32

155, 1463-1464.

12. Gur RC &.McBride, T.  Toward a unitary description of neuropsychological functions: a
review of Handbook of Clinical and Experimental Neuropsychology Edited by Gianfranco
Denes and Luigi Pizzamiglio.  Contemporary Psychology, 2000, 45, 682-683.

## BOOKS:

Gur RE, Andreasen NA, Asarnow R, Gur RC, Jones P, Kendler K, Matcheri K, Lieberman J,
McCarley R, Murray R, Rapoport J, Tamminga C, Tsuang M, Walker E, Weinberger D.
Commission on Schizophrenia. In D.L. Evans, E. Foa, R.E. Gur, H. Hendrin, C. O'Brien, M.
Seligman, B.T. Walsh, (Eds), Treating and Preventing Adolescent Mental Health Disorders:
What We Know and What We Don't Know. New York: Oxford University Press, The
Annenberg Foundation Trust at Sunnylands, and the Annenberg Public Policy Center of the
University of Pennsylvania, 2005.

## PATENT:

Gur RC, Gur RE, Trivedi SS. "Behavioral Imaging:  Topographic Display of
Neuropsychological Data, U.S. Patent No. 4862359.

# EXHIBIT B

## LIST OF MATERIALS PROVIDED BY COUNSEL

## **EXHIBIT B**

Bound volume with:

  1.  Herald Democrat News Articles from trial

  2.  A. David Axelrad, M.D.'s 1/12/05 report

  3.  Edward Gripon, M.D.'s 2/13/05 report

  4.  James Harrison, M.D.'s 4/15/04 report.

  5.  Cactus McGirk, M.D.'s 4/7/04 report

  6.  Brent O'Bannon, M.D.'s 8/3/99 report

  7.  Peter Oropeza, M.D.'s 1/20/05 report

  8.  Victor Scarano, M.D.'s 1/5/05 report

  9.  Appellant's 9/29/06 Brief

  10.  Appellee's Brief

Dr. B. Thomas Gray 's July 22, 2004 Report.

Dr. Peter Oropeza's Report on Evaluations of 4/27/04 and 4/28/04.

Dr.  Brent O'Bannon's August 3, 1999 Report.

CD with certain Andre Thomas documents used at trial, including medical records of Andre Thomas, maternal aunt Teresa Baker, father Danny Thomas, brother Brian Thomas and half-brother Eric Ross.

Trial Testimony of Victor Scarano, M.D. (2/21/05 and 3/2/05).

Trial Testimony of A. David Axelrad, M.D. (3/1/05).

Trial Testimony of James Harrison, M.D.(12/14/04, 3/1/05, and 3/2/05).

Trial Testimony of Cactus McGirk, M.D.(3/2/05).

Trial Testimony of Edward Gripon, M.D. (3/3/05).

Trial Testimony of Peter Oropeza, M.D. (12/14/04 and 3/11/05).

Trial Testimony of Brent O'Bannon, M.D. (3/9/05).

Transcripts of Andre Thomas' statements of 3/29/04 and 3/30/04.

Three CDs containing Andre Thomas' interviews of March 29, 2004 and March 30, 2004 (two versions).

Three notebooks containing comprehensive information and mental health medical records for Andre Thomas from 2004 to 2005, itemized as follows:

Notebook 1

Tab 1:    General descriptions of Andre's mental state in 2004-2005, by various acquaintances, relatives and  friends.  Includes statements and notes of interviews of "EBG," Cliff Adams, Ricky Bell, Paul Boren, Don Bowling, Eric Clark, Isaiah Gibbs interview and Grand Jury testimony, (includes court and criminal history data for Gibbs), Liza Goldsmith, Carmen Hays (two interviews on 3/27/04 and 5/19/04), Bryant Hughes (interview on 3/27/04 and description of interview on 2/10/05), Floyd Patterson interview on 10/14/04, F. Patterson's criminal records and Grand Jury Testimony of Floyd Patterson, Grand Jury testimony of Eric Ross, interview with Rose Soto, outline for interview with Rose Soto, Soto's interview with handwritten notes, Rose Soto's letter to Andre Thomas dated 3/31/04, interview of Danny Thomas and of Rochelle Thomas, Grand Jury testimony of Rochelle Thomas, interviews of Kim Young and of Zach Young.

Tab 2:    Medical records from Mental Health Mental Retardation (MHMR) Services of Texoma dated 3/5/04 (two pages) and 3/8/04; 3/5/04 Application for Emergency Apprehension and Detention by Jennifer Loyless.

Tab 3:  Various records regarding Andre Thomas on March 26, 2004: 3/26/04 Application for Emergency Apprehension and Detention by William Bowen, M.D. of Texoma Medical Center with related documentation and medical records from 3/26/04, Grand Jury Testimony of Texoma Medical Center medical personnel: William Bowen, M.D., Marilyn Jones, Darlene McFadden, Sherrie St. Cyr, Amelda Turner, and Shirley Whitley.

Tab 4:    Various records regarding Andre Thomas on March 27, 2004: Grayson County Jail Intake Record, City of Sherman Ambulance Record and statement of Emergency Medical Team members, Grand Jury testimony of R.J. Willcott, M.D., typed notes regarding above statements, and Grand Jury testimony of Natalie Sims.

Notebook 2:

Tab 5:    Voluminous and comprehensive medical records regarding Andre Thomas on March 27, 2004 from Wilson N. Jones Medical Center, 3/26/04 Warrant for Apprehension and Transportation of A. Thomas signed by Magistrate, Grand Jury testimony of Derek Damon and Paula Clements.

Tab 6:    Various records describing Andre Thomas at the Grayson County Jail leading up to the 4/2/04 eye incident, including: 3/29/04 medical information report, Nurses' Notes and Doctors' Notes, Inmate Observation Sheet, transcribed interview of Natalie Sims. statement of Natalie Sims of 4/5/04.

Notebook 3:

Tab 7:        Various records regarding Andre Thomas from March 29, 2004 up to the July 27, 2004 Competency Hearing: Wilson N. Jones Medical Center records, statements of various personnel at Grayson County Jail regarding 4/2/04 eye incident, lengthy typed memo regarding eye incident by Sgt. M. Stephens, records from MHMR Services of Texoma from April 2004, 4/15/04 report of C. Robin McGirk, M.D., evaluation for competency to stand trial (undated), medical information reports and doctors' and nurses' notes from various dates, 5/5/04 and 6/22/04 reports by Dr. McGirk, voluminous records regarding A. Thomas' admission to North Texas State Hospital in Vernon (NTSH) from June 2004.

Comprehensive set of records from Texas Department of Public Safety regarding Andre Thomas

Complete set of records from University of Texas - Medical Branch (prison) records regarding Andre Thomas.

Medical records for 2004 for Andre Thomas from Grayson County Jail, along with additional jail staff notes, clinic staff notes from 3/30/04 on, jail assessment, and Grayson Memo re Eye Incident.

Affidavit of Amy Ingle.

Affidavit of Kevin Ross.

Affidavit of Konta Johnson.

Affidavit of Rickey Bell.

Affidavit of Teresa Baker.

Affidavit of Todd Johnson.

Affidavit of Ronald Brinson.

Affidavit of Chris Bennett.

Affidavit of Christopher Smith.

Affidavit of Clifton Eaton.

Affidavit of Doris Gonzalez.

Affidavit of Eric Ross.

Affidavit of McCloud Luper.

Affidavit of Roscoe Johnson.

Affidavit of Walter D. Johnson.

Affidavit of Wanda Banks.

Affidavit of Pam Borens.

Affidavit of Alice Harris.

Affidavit of Denise Wade.

Affidavit of Jonathan Lipman, M.D.

Affidavit of Kate Allen (6/14/07 draft)

Social History for Andre Thomas

Complete set of records received on June 4, 2007 from Mental Health Mental Retardation Services of Texoma regarding Andre Thomas.

Comprehensive set of records from North Texas State Hospital – Vernon regarding Andre Thomas.

Certain medical records regarding Brian Thomas showing his prescribed medications in March 2004.

Drug Chronology of medications for Andre Thomas.

4

# Exhibit 15

## Affidavit of R.J. Hagood

COUNTY OF GRAYSON      )
                              )   ss:   AFFIDAVIT OF RJ HAGOOD

STATE OF TEXAS         )

     **RJ HAGOOD,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.    My name is RJ Hagood.  I am a resident of Grayson County, Texas.  I am over 18 years of age and am otherwise competent to give this affidavit.  No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.    I am an attorney in the State of Texas and have been licensed since 1973.

3.    I was one of the court-appointed defense attorneys for Andre Thomas in the capital murder case of Leyha Marie Hughes.  I was appointed on March 30, 2004.  I was lead counsel; Bobbie Peterson was appointed as second chair co-counsel in this case at about the same time I was.

4.    Of the defense team, I was largely responsible for communicating with Andre in the jail.  I first met with Andre at or near the time I was first appointed to represent him.

5.    Ms. Peterson was responsible for the guilt-innocence phase of the trial, except for the experts, and I was responsible for the punishment phase.  I took the lead with regards to the experts.

6.    At the time I was appointed on Andre's case, I was also working on other cases in state and federal court. I continued to take state and federal appointments except during the time of the actual trial.

7.    I have chronic pancreatitis, and have had for several years, including during Andre's trial.  On one day I was in a lot of pain and either Bobbie handled it that day or the Judge let us go early.

8.    I discussed the plea deal offered by the State with Andre and his aunt, Doris Gonzalez.  Andre stated that "if they kill me I will go to the other side and see my son."

9.    We did not seek a pretrial hearing on competency.  Our focus was on the insanity issue.  If I talked to any of the doctors at Vernon State Hospital it was only briefly.

10.   We should have filed an objection to the competency report and should have urged a new competency hearing.  When the State rested its case and I was asked whether the defense wanted to raise an incompetency issue in the middle of the trial and I said no I do not have any new evidence regarding competency.

11.     The motion to suppress the interviews with Andre from March 29 and 30, 2004 was conducted by Ms. Peterson.  We did not discuss or consider using the interviews as evidence of Andre's mental illness.

12.     I did not consider bringing up diminished capacity as a defense during the trial even though I may have been provided with a memorandum regarding diminished capacity in Texas.  I just do not remember.

13.     Before trial, I sought assistance from others experienced in capital case voir dire.  Nona Dodson, a jury consultant, was working on the case pro bono but left before voir dire was completed.

14.     At the beginning of the venire on January 10, 2005, there were a number of African-Americans in the first three rows in the East Court Room of the Grayson County Courthouse.  There were also some other minorities and unsavory characters in the front.

15.     The State then requested a jury shuffle.  After the shuffle, there were only two African-Americans among the first 100 potential jurors.  We did not object to the jury shuffle, seek to put it on the record, or request a shuffle of our own.

16.     My failure to ask few, if any, follow up questions of the members of the jury who had indicated on their jury questionnaires that they were opposed to interracial marriage was not intentional; I simply didn't do it.

17.     Prior to and during the trial, I had multiple meetings with Mr. Ashmore and sometimes with Judge Fry and Mr. Ashmore.  Ms. Peterson was not required to attend these meetings.

18.     My physical file for this case was limited, in that I kept my personal notes and relied on Ms. Peterson to maintain the rest of the file.  Discovery was sent to me by the State.  I believe my office usually made it available to Ms. Peterson promptly but we may have miscommunicated regarding such issues from time to time.

19.     I did not object to Mr. Ashmore's opening statement or the instruction from the Court to the venire regarding voluntary intoxication not being a defense to a crime because I did not realize that it was defective.

20.     I hired Shelli Schade to be the mitigation expert on the case.

21.     I only met with Ms. Schade twice on my own.  The first time was for about 30 minutes when I gave her a synopsis of the case.  The second time was over lunch, when we talked generally, but not in any specifics about Andre's case.  I have worked with a mitigation expert before, so I knew what Ms. Schade was supposed to do.

22.     I was disappointed with the work Ms. Schade produced.  Ms. Schade made a madness timeline that had errors in it, and she did some preliminary work on getting a toxicologist, she did not meet the standards of what I expected from a mitigation investigator or



expert.  It could have been mine and Ms. Peterson's fault for not giving her enough direction.

23.     Ms. Schade wanted to pursue Rochelle Thomas and Brian Thomas, Andre's brother, as part of the mitigation case, but I decided that it was not worth pursuing Ms. Thomas.  Ms. Schade and Ms. Peterson wanted Brian to testify, but I did not think that would be a good idea.  We did not ask Ms. Schade to do a family history.

24.     We did not send anybody to talk to Ms. Thomas' family in Muskogee.

25.     Ms. Thomas, Andre's mother, did not testify because I did not know what she would say, and because shortly before trial she disappeared.  We did not know where to find her, and out attempts to have her subpoenaed were unsuccessful.

26.     Because the experts retained by the defense and the state for the guilt/innocence phase were my responsibility, I did the questioning of them.

27.     I did not do an independent investigation of the experts.  I did not know that Dr. Oropeza had worked with Dr. Scarano to attempt to facilitate changes in the statutes on insanity and competency favoring a more stringent law regarding psychosis caused by drugs.  I did not know that Dr. Oropeza had failed his psychological testing exam the year before he examined Andre.

28.     I retained Dr. Edward Gripon as an expert and asked him to opine as to whether Andre was sane or insane at the time of the crime.  I did not request Dr. Gripon to conduct any specific testing.

29.     We did not retain a separate pharmacology expert on Coricidin to show that there was no factual basis for substance-induced psychosis and to rebut the testimony of Dr. Scarano.  Instead, we thought we could rely on Dr. Gripon for this issue although that is not his area of expertise.  I did not ask Dr. Gripon to cover this matter at the time of his initial retention.  Nonetheless, I asked him a few questions about this topic during his examination but not in the level of detail that I might have gone into with a pharmacologist had we retained one.

30.     Ms. Schade told me that she had received a recommendation that we call a pharmacologist.  We did not retain Mr. Cohen, nor did I ever remember talking to him, although I did talk to several potential witnesses regarding this issue, as we thought Dr. Gripon could cover this topic to the degree necessary.

31.     I was never aware of nor looked into the possible significance of Dr. Shannon Miller, a DXM expert, even though he was the fourth name listed on the State's expert witness list.  Had I known what Dr. Miller's opinions were in this case, I would have certainly followed up with him. The State never revealed to me who Dr. Miller was or what his opinions were on the matters at issue.



32. Ms. Peterson brought in Kate Allen and Larry Fitzgerald. I do not know when our defense team first contacted them to participate in the punishment phase. I do know that they were both last minute additions.

33. We did not call Mr. Fitzgerald as an expert witness because I felt that Judge Fry was doubtful about Mr. Fitzgerald's expertise.

34. We did not consider or seek to have neuropsychological testing conducted on Andre, and were unaware if he had any organic brain dysfunctions. The presence of such dysfunctions would have been enormously helpful, as it would have strongly countered the state's contention that Andre's actions were the result of drug induced psychosis, and their direct and indirect accusations that he was "faking it" and just "out to get attention."

35. I did not know who Royce Smithey was prior to him being called by the State as a rebuttal witness. Given his testimony, I probably should have requested a gatekeeping hearing and tried to exclude his testimony.

36. The jury deliberated for a very short period of time at both the guilt-innocence and the punishment phase.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_____
Signature

_____R. J. HAGOOD_____
Printed Name

COUNTY OF GRAYSON, STATE OF TEXAS
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 13th day of
_June_, 2007.

_____
Notary Public's Signature

My commission expires:

MONICA BOATNER
Notary Public, State of Texas
My Commission Expires
11-18-2008

4

# Exhibit 16

## Affidavit of Alice Harris

COUNTY OF MUSKOGEE )

) ss:   **AFFIDAVIT OF ALICE HARRIS**

STATE OF OKLAHOMA )

 

      **ALICE ROSS HARRIS,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Alice Ross Harris. I am a resident of Muskogee County, Oklahoma. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am the half-sister of Andre Thomas' mother, Rochelle Ross.

3. Our mother, Vivian Joan, had nine children by five men. She had her first child, Ron, by one man, then Kevin by another man. Then my mother married Johnny Ross. My mother had Pam, Greg and Rochelle by him. They split up, and my mother had me with another man, and then three more children with a married man named Roscoe Johnson. After they broke up, my mother married Walter Martin.

4. Walter was a mean drunk and he often physically attacked my mother. We kids would try to break up the fights, but my mother would tell us to stay out of it. There was nothing we could do to protect our mother.

5. One time Walter and my brother Gregory were in a fight. Walter stabbed Gregory. My mother told us not to help him.

6. One night my mother and Walter were drunk and in a fight. Walter ended up shooting Gregory, and later he died. Before Gregory died, he told me that Walter had the gun pointed at my mother's head, and so Gregory pulled it down to his stomach and that's when the gun went off. Gregory told me he was tired of being beat and stabbed and hurt by Walter. Gregory was seventeen when he died.

7. My son Kevin got into some trouble a few years ago and had to go to prison for a few years. Rochelle was forced to testify against him. He has always had serious mental problems. When he was younger they said he had ADD.

8. Rochelle believes that she has special powers to see into the future and to talk to people who have died. She also believes that Andre has a gift because he can hear God.

9. When Andre was little he locked himself inside an empty refrigerator. Eventually Rochelle realized he was missing. When she finally found him, his eyes were bugging out.

10. Rochelle has always been very headstrong and set in her ways.  Rochelle does what Rochelle wants to do.  After she graduated from Muskogee High School, she went up to Parsons, Kansas to stay with her grandmother.  One day she saw a train passing.  She just threw her shoes up on the train and headed back to Muskogee.

11. Rochelle married Dan Thomas, who was a friend of Walter, my mother's husband at the time.  Rochelle had a hard time with Dan.  He ran around with women on her.  His people were into witchcraft and he also practiced it.  Dan was also known to do some strange things that Rochelle thought was witchcraft.  One time God told Rochelle to go home early from church.  She walked into the house while Dan was cooking and found him urinating in the stew he was making for everybody.

12. When Dan and Rochelle separated, Dan caused problems for her concerning their children.  When they split up, James was about four years old.  Around that time, he backed up against the stove door and burned his legs.  Dan called CPS.  They took James away from Rochelle and put him in foster care.  From that time on Rochelle was never the same.  Before this happened, Rochelle would cook dinner and was sort of domestic.  After they took James away she stopped cooking.  After they went to court over the custody of James, the court decided Rochelle didn't burn James intentionally and they gave him back to Rochelle.  Still, she was never the same after that.  My mother would say Rochelle had a nervous breakdown at that point.

13. Rochelle's oldest son, Eric, helped raise his younger brothers, and after he left home his younger brother Danny took on some of that responsibility.  After Danny left, the younger boys were on their own.  There was never really a father figure for Andre and the others.

14. Rochelle told me that one time their trailer was infested with roaches so they set off chemical bombs to get rid of them.  Instead of using just one or two, they used six or eight, which was way too many.  As soon as the bombs stopped spraying, Rochelle, Andre and some of his brothers went right back into the trailer.  Even though their eyes were burning and they had trouble breathing, they stayed in the trailer and went to sleep with the chemicals still in the air.  Later I wondered if this had a bad affect on Andre's mind.

15. For a few summers, Rochelle's boys all came to stay with me in Muskogee.  It was a more stable environment for them.

16. Before the murders, there was definitely something mentally wrong with Andre.  By the time of Eric's wedding, he didn't make a lot of sense.  I was very concerned.  He seemed to be losing his mind.

17. There is no doubt in my mind that Andre deteriorated mentally before the crime.  I was available at the time of trial and would have told his lawyers and court

appointed doctors about his mental illness.  Unfortunately no one ever contacted me about this.  Of course I also would have testified for Andre if I had been asked.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

*Alice Ross Harris*
Signature

*Alice Ross Harris*
Printed Name

COUNTY OF MUSKOGEE, STATE OF OKLAHOMA
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 3rd day of
May , 2007.

*Chuck White*
Notary Public's Signature
My commission expires:

# Exhibit 17

# Affidavit of James Harrison

COUNTY OF GRAYSON   )
                           ) ss:     **AFFIDAVIT DR. JAMES R. HARRISON**

STATE OF TEXAS       )

       **JAMES R. HARRISON, Ph.D.**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.      My name is James Ray Harrison. I am a resident of Sherman, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future. This affidavit is based on my personal knowledge.

2.      A true and correct copy of my *curriculum vitae* is attached to this affidavit as Exhibit A. I have a bachelor's degree in psychology from the University of Texas-Dallas, a master's degree in experimental psychology (the branch of psychology focused on behavioral research) from the University of North Texas, and a doctorate in clinical psychology from the University of North Texas. Additionally, I did an internship at the University of Arkansas in child and adolescent clinical psychology.

3.      I also did a year-long fellowship at the University of Texas Health Science Center in Dallas. The fellowship involved working at the Parkland Hospital psychiatric emergency room where I was responsible for treating psychiatric patients. The fellowship also included one year working half-time in an intake unit at Terrell State Hospital, which involved an initial psychological evaluation and preparing an initial treatment plan for acute and severely ill psychiatric patients. The patients in this unit were primarily psychotic or severely depressed, with a high proportion of patients with Schizophrenia.

4.      Prior to beginning my private practice, I worked at the Mental Health & Mental Retardation (MHMR) center in Sherman, Texas doing evaluations of people with psychological disorders as they initially entered the MHMR system. I saw numerous individuals with Schizophrenia while I was at MHMR.

5.      I returned to Terrell State Hospital after leaving MHMR for one additional year of employment as a psychologist. My duties during this second stint at Terrell State Hospital were the same as those described in paragraph 3 above.

6.      Additionally, I served as the chief psychologist at Wilson N. Jones Memorial Medical Center's inpatient psychiatric unit during the first year of that unit's existence. I continued to see numerous patients with Schizophrenia while I was at Wilson N. Jones hospital.

7.      I have been in private practice as a clinical psychologist since 1987. I have continued to consult at Wilson N. Jones hospital and several other local hospitals and psychiatric inpatient units. I also run a private psychological clinic, where I evaluate children and adults with a wide variety of psychological disorders, including psychosis and Schizophrenia.

8.     I also perform neuropsychological testing.  Neuropsychology is the study and assessment of brain related behavior.  My neuropsychological testing is aimed at evaluating cognitive functioning in relation to neurological disorders.

9.     In addition to the degrees listed above, I have the equivalent credit hours for a masters degree in psychopharmacology from a program provided by Texas A&M University and the Texas Psychological Association.  Psychopharmacology is the branch of pharmacology that deals with the study of the actions, effects, and development of psychoactive drugs.

10.     In all of my clinical positions, I evaluated numerous patients for substance abuse problems.  Additionally, I was a consultant for over three years at House of Hope, a residential drug treatment facility, working with that organization's substance abusing populations.  A number of my current patients present with co-occurring substance abuse problems and psychological disorders.  Additionally, I did consultations at the substance abuse unit at Terrell State Hospital during my fellowship there.

11.     During the week of March 29, 2004, I was appointed by the District Court of the 15th Judicial District, Grayson County, Texas to perform a competency evaluation of Andre Thomas for use by the Court in determining whether Thomas was legally competent to stand trial in the cause styled: *State of Texas v. Andre Thomas*, Case No. 051483.  I had done several such competency evaluations before my appointment in the *Thomas* case and have continued to perform competency evaluations since.

12.     I evaluated Andre Thomas and prepared a report dated April 15, 2004 in which I concluded that Thomas was not competent to stand trial in the above matter.  A true and correct copy of that report is attached to this affidavit as Exhibit B.

13.     My evaluation of Mr. Thomas involved four clinical interviews of Mr. Thomas.  I interviewed and observed Mr. Thomas on April 5, 2004 for 1 hour, on April 7, 2004 for 1 and ½ hours, on April 12, 2004 for 1 hour, and on April 14, 2004 for 45 minutes.  Thus, my first interview with Thomas occurred 9 days after the murders in this case occurred.

14.     In addition to my interviews of Mr. Thomas, I performed interviews of the Defendant's attorney, R. J. Hagood, the assigned prosecutor, Kerye Ashmore, the Grayson County Jail Chief Nurse, Natalie Sims, and Mr. Thomas' father, Danny Thomas.  I also reviewed both a videotape and an audiotape interview of Andre Thomas by Sherman Police Department Detective, Mike Ditto.  I did not receive transcripts of these recordings at the time.  I also reviewed Grayson County Jail medical records for Mr. Thomas and the interview notes of jail psychologist, Dr. Robin McGirk.

15.     My findings from my competency evaluation are set forth in detail in Exhibit B.  In summary, I concluded that Mr. Thomas was suffering from Schizophreniform disorder.  Schizophreniform disorder is the clinical diagnosis for a person who, although suffering all the symptoms of Schizophrenia, has not been known to suffer from such symptoms for more than 6 months.

16.   The facts supporting my conclusion that Thomas is schizophrenic are set forth in detail in Exhibit B.  The key facts that supported this conclusion follow:

    a.   Mr. Thomas pulled out his own right eye with his bare hands on April 2, 2004, six days after the murders.  Mr. Thomas did this after making two previous unsuccessful attempts at removing his eye.  This self-mutilation was in response to Thomas' focus on the Bible verse "If thy right eye offend thee, pluck it out" (Matthew 5:29).  Thomas believed this was the only way he could avoid burning in hell.  During treatment for this injury, Thomas noted that he didn't understand "why people didn't die."  The enucleation occurred at a time when Thomas was not under the influence of any substance.  This type of self-mutilation was part of a severe psychotic episode, and his symptoms are common in patients with paranoid Schizophrenia.  The severity of this act, and his inability to recognize the gravity of his actions, is consistent with a schizophrenic patient who has progressed beyond the nascent stages of the disorder, and has been suffering symptoms for several months.

    b.   Mr. Thomas exhibited extreme religiosity, a complex and grandiose delusional system that he believed was real, auditory hallucinations, fast and pressured speech, flight of ideas, periodic incoherence, paranoid thoughts and delusions.  These symptoms are prototypical of psychosis caused by Schizophrenia.

    c.   Mr. Thomas' symptoms were not reactive; i.e., they did not change in response to outside stimulus but were a product of Mr. Thomas' internal delusional reality.  Thomas often was responding to auditory hallucinations or other delusions rather than his surroundings.

    d.   Thomas' delusions were highly detailed and consistent with Schizophrenia.  Thomas believed that his wife Laura *was* Jezebel, the wife of the Devil, and that his son ▮▮▮▮ was the child of Satan or the antichrist.  Thomas believed that Dr. McGirk had told him to observe events that McGirk would need to know, and therefore he refused to sleep and constantly and intently observed the activities outside his holding cell.  Mr. Thomas expressed believing that he could not die or be killed.  Thomas also believed in delusions regarding the symbols on the dollar bill, including specific delusions about the pyramids on the dollar bill and a war or conflict related to those symbols.  Thomas made several references to time travel and its relation to repeating and reliving events.  As part of his delusions regarding time travel, Thomas expressed that he believed his wife and child were not actually dead, because he could travel back in time and bring them back to life.

    e.   Mr. Thomas' brother was clinically diagnosed with Bi-polar Disorder or Schizophrenia and a number of other individuals in Thomas' family have histories of substance abuse, violent behavior, and mental illness.

    f.    Mr. Thomas' affect generally did not match his speech, which is a common symptom of Schizophrenia and psychosis. Mr. Thomas' affect was usually flat and did not comport to the typical emotions someone would be expected to exhibit when describing the type of murders at issue in this cause.

17.    Based on my evaluations of Mr. Thomas in April 2004, including my personal observations of him and my review of his other symptoms reported by his father, Dr. McGirk, Nurse Nancy Sims, and the audio and video tapes of his interrogations immediately after the murders, I believe that he did not know his conduct was wrong at the time of the murders. Thomas' violent acts associated with the murders were part of a psychotic break due to his Schizophrenia. His extreme religious delusions caused him to believe that his wife and the two children were evil, biblical villains that Thomas had to kill to prevent a cataclysmic result. Thomas' descriptions of the crime and his motivations show that he honestly believed in this delusional system, thought his conduct was right, and did not believe he was killing people at all at the time of the murders. His schizophrenic symptoms created an distorted view of reality in which he actually believed he needed to kill demons in order to save himself, his family, and the world.

18.    I am confident that Mr. Thomas did not know whether his actions were wrong at the time of the murders, as his symptoms were consistent with someone who had been psychotic for some time before he was detained on March 27. His extreme act of enucleating his eyeball evidenced a progressive form of psychosis that likely had been affecting his decision making for many weeks. Thomas followed a prototypical pattern for the development of paranoid Schizophrenia , which typically develops in young adult men between the ages of 16 and 24. After the onset of symptoms, many schizophrenic patients experience psychotic breaks that manifest in bizarre and unrealistic beliefs, sometimes culminating in extreme violent outbursts like the murders in this cause and Mr. Thomas' enucleation of his eye.

19.    Defense counsel contacted me to ask me to testify for the defendant after the trial on the merits in this case had already begun.

20.    After being subpoenaed by the defense, R.J. Hagood never contacted me and I never spoke with him. I did have two meetings with Bobbie Peterson before I testified at trial. My first meeting with Ms. Peterson was in mid February and lasted for approximately one to one and a half hours. My second meeting with her was on February 27, 2005 and lasted for approximately one hour. For a short time during the second meeting, Dr. McGirk joined Ms. Peterson and I for a discussion of the case.

21.    During my first phone call and during my first meeting with Ms. Peterson, I explained to her that I believed it would not be appropriate for me to testify to my opinion that Thomas was insane at the time of the murders. This is because I believed that after being appointed by the Court to determine Thomas' competency to stand trial, I was limited to testifying to my competency opinion and to my observations of Mr. Thomas. Ms. Peterson did not dispute my assumption and appeared to accept my position. She did not attempt to explain whether I would be allowed to provide additional opinions at trial, though I had been appointed by the court to evaluate competency.

22.     If I knew I was allowed to provide an opinion about whether Mr. Thomas knew his conduct was wrong at the time of the murders, I would have been willing to render an opinion on that subject at trial.  On the basis of my competency evaluation, I would have testified that Mr. Thomas did not know his conduct was wrong at the time of the murders. More specifically I would have testified that his paranoid schizophrenic symptoms, particularly his delusions and hallucinations, prevented him from knowing whether any of his specific actions related to the murders were wrong.

23.     Additionally, if I had known I was allowed to perform an in-depth analysis of Mr. Thomas' case for the purpose of rendering an expert opinion regarding whether he knew his conduct was wrong at the time of the crime, I would have been willing to do so. However, defense counsel never informed me that I could perform such an evaluation nor did they give me the opportunity to do so.

24.     Ms. Peterson provided me with a number of documents for my review.  I was provided with reports prepared by Dr. Oropeza, Dr. Axelrod, Dr. Scarano and Dr. Gripon, along with a toxicology report I discussed in my trial testimony.  I was not given any guidance by Ms. Peterson as to what I should use these reports for, or how they would come in to play during my trial testimony.  Rather, Ms. Peterson just asked that I be familiar with these reports for my testimony.  She did not explain whether she would use the reports as exhibits with me, or what particular aspects of the reports I should be familiar with.

25.     Ms. Peterson and I talked about the possibility that I would testify regarding the psychopharmacological effects of DXM use, the typical time it takes for DXM to be metabolized, and whether I believed that Thomas' psychosis was influenced by DXM use.  My opinion was that DXM use had no bearing on Mr. Thomas' psychosis at the time of the murders.  However, because I had not done a full analysis of this issue, and because I have not actually obtained a masters degree or any other advanced degree in psychopharmacology, I specifically recommended to Ms. Peterson that the defense retain a psychopharmacologist to do an independent evaluation of Mr. Thomas and provide an opinion regarding the State's substance-induced psychosis theory.  Ms. Peterson did not retain a separate psychopharmacologist as I suggested.  She told me that there was not enough time to retain a separate expert, and wanting to help, I then agreed to testify regarding this subject.

26.     I was never able to perform a complete psychopharmacological analysis of Mr. Thomas, nor did defense counsel ever ask me or enable me to do so.  While I was asked to and did perform a literature search regarding the effects of DXM after I was subpoenaed to testify by the defense, and though I determined that DXM was highly unlikely to be the cause of Mr. Thomas' psychosis, I was never given the opportunity to perform a full review of Mr. Thomas' medical records, or a new evaluation of Thomas himself.  If I had been allowed to review medical records and perform another examination of Thomas, I would have been able to present a much more complete analysis regarding this issue.

27.     Defense counsel did not provide me with any of the following documents:

        a.     medical records from Mr. Thomas' stay at Vernon Hospital;

5

b. medical records predating Mr. Thomas' arrest;

c. medical records from the Grayson County jail facility generated after my competency evaluation;

d. factual statements, affidavits, testimony, or testimony summaries of any witnesses;

e. copies of Dr. Black's or Dr. Gray's competency evaluations; or

f. any other documents, with the exception of the documents listed in paragraph 24 above.

28. Ms. Peterson and I did not spend much time preparing for my specific testimony. Ms. Peterson told me I would be testifying about my competency evaluation, the fact that it was unlikely DXM contributed to Mr. Thomas' psychosis, and my factual observations. My testimony on the DXM issue was to be based on the scholarly literature search I performed after my first meeting with Ms. Peterson.

29. Defense counsel never asked me to, nor did I ever perform an evaluation or analysis of Mr. Thomas' case with a view specifically to providing an opinion of whether he was legally insane—i.e. whether he knew his conduct was wrong at the time of the crime.

30. At no time was I asked by the defense to or did I perform a specific evaluation of whether Mr. Thomas malingered on any psychiatric or psychological assessment he completed. I did not expect to be questioned regarding the concept of malingering at trial, because I had no prior indication from Ms. Peterson that she would be covering that subject with me. Therefore, I did not prepare to cover that subject. I do not have any special expertise in assessing malingering, although it is a standard part of my practice of psychology.

31. Nonetheless, my opinion was Thomas was not malingering because his behaviors were consistent with the clinical diagnosis of Schizophrenia. His behaviors were observed in multiple settings by multiple observers, often without his knowledge, and these observations confirmed the clinical diagnosis. Additionally, his self-mutilation is particularly unusual for someone who is malingering. Further, my evaluation of Mr. Thomas occurred 9 days after the murders, when he was not on medication. Thus, my early evaluation is a reliable indicator that Mr. Thomas was not malingering. Later evaluations by other professionals were performed when Mr. Thomas was medicated with psychotropic drugs, and therefore are not as reliable in indicating whether Mr. Thomas was malingering.

32. I would have been able to provide much more complete testimony and comprehensive opinions if I had been provided with all of Mr. Thomas' medical records, factual testimony from other witnesses such as Mr. Thomas' family, and further psychological testing results.

33. I have now had the opportunity to review the materials listed in Exhibit C.

6

34.　　If I had been presented with the information listed in Exhibit B, the strength of my opinion that Mr. Thomas was legally insane would have been bolstered. These additional materials confirm my belief that Mr. Thomas could not determine whether his conduct related to the murders was wrong. These materials also would have strengthened my testimony that Mr. Thomas' psychosis at the time of the murders was not caused by any substance, whether marijuana, wet marijuana, alcohol, Coricidin, or any combination of those drugs.

35.　　During my meetings with Ms. Peterson, I learned that she was angry with R.J. Hagood. She told me that Mr. Hagood had not been spending an adequate amount of time preparing for the case. She also mentioned that he was not assisting her sufficiently. She also intimated that Mr. Hagood failed to ask obvious questions of certain expert witnesses that would have been beneficial to Mr. Thomas' case, even when she had specifically provided those questions to him.

36.　　I was surprised that Ms. Peterson did not elicit all of my specific observations and impressions relating to Mr. Thomas' symptoms at trial, even though those specific observations were described in my competency report. Schizophrenia is a disorder with readily identifiable symptoms, and I observed many of those symptoms in Mr. Thomas. But Ms. Peterson did not have me testify regarding all of those symptoms.

37.　　For example, Ms. Peterson did not have me describe on the record the extent of Mr. Thomas' delusional systems. This may be because in our short preparatory meetings, we did not have time to go over the details of his delusions completely. Mr. Thomas had the type of delusions that I judged could not have been the product of malingering. His delusions were excessively ego-centric, placing himself at the center of elaborate plots that he honestly believed required him to take drastic actions. Further, Mr. Thomas plainly evidenced his genuine belief in his delusional systems by pulling out his own eye. Thomas' religiosity appeared to incorporate his auditory hallucinations, his paranoid and fearful interpretations of scripture—particularly the book of Revelations—and his noticeable tendency to experience a rapid flight of ideas. Mr. Thomas' delusions regarding government prosecution and the symbols on currency evidenced extreme paranoia, obsessive thinking, and grandiose fanaticism. Thomas plainly believed that he was acting righteously by killing "demons" and pulling out his eye. His specific delusions demonstrated that he did not know his actions were wrong.

38.     Additionally, Ms. Peterson did not ask me to describe fully how Mr. Thomas could seem
        calm and reasonable at some times to casual observers, but still suffer from symptoms
        that robbed him of the ability to understand the reality and propriety of his conduct. If
        allowed to present testimony fully on this subject, I would have explained that Thomas'
        seemingly calm demeanor and ability to describe events fully was commonly seen in
        psychotic patients who are legally insane; and that insane people can act in a goal
        directed manner, it is just that their goals are part of a psychotic belief system. Though
        Thomas often appeared calm and sometimes had normal responses to stimuli, the
        meaning he ascribes to his own actions and the actions of others is defined by his
        delusional system. For example, when Bryant Hughes waved to him on the day of the
        murders, Thomas believed that Mr. Hughes was giving his blessing for Thomas to
        dispense with the demons he imagined his wife and children to be. Additionally, Thomas
        genuinely believed he was immortal after he survived his self-inflicted knife wound.
        Only after Thomas was on medication for several weeks did he begin to realize that his
        wife and children had been killed. And even after he made that realization, he believed
        that they were not actually dead because he could travel back in time and live with them.
        These types of delusions prevented Mr. Thomas from being able to understand
        wrongfulness of his actions.

39.     Ms. Peterson also did not fully illicit my beliefs regarding whether someone in Mr.
        Thomas' mental state could sometimes distinguish conduct to be wrong, but at other
        times, such as the time of the crime, be unable to do so. Ms. Peterson prompted the
        following exchange during my trial testimony:

        Q.      Is the knowledge of wrongness or wrongdoing, is that inconsistent
                with suffering from a psychosis or mental illness?

        A.      No.

        Q.      And why not?

        A.      You've got to be careful about what that person's definition of
                wrong is. But they do make judgments about right and wrong,
                whether it's consistent with what we all would normally think is – is
                different for each person. But they do make judgments. In this case
                – well let me back off that. He was struck a lot with, you know, am I
                forgiven by God and those kind of issues. So those things were in
                his head.

R.R. Vol. 34, P. 210:22-211:9.

After eliciting this testimony, Ms. Peterson left the issue entirely.  If allowed to continue, I would have testified that Mr. Thomas and other persons suffering from paranoid Schizophrenia and related psychosis often can distinguish whether their conduct is wrong in some circumstances, but their distinctions in this regard are driven primarily by delusional systems.  In circumstances where their distinctions are driven by delusions, these individuals simply cannot distinguish whether their conduct is, in reality, proper.  Mr. Thomas plainly was suffering from psychosis at the time of the murders.  He believed he was on a religious mission to eliminate demons.  He therefore believed that his actions were righteous in his own delusional reality.  And because he was not cognitively aware of reality, he could not determine whether his actions were proper in reality.

40.     In sum, in my opinion, had I been asked at trial, I would have testified Mr. Thomas was legally insane.

**FURTHER AFFIANT SAYETH NAUGHT.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_James R Harrison PhD_
Signature

_James R Harrison PhD_
Printed Name

**STATE OF TEXAS**
**COUNTY OF GRAYSON**

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 14 day of June , 2007.

_Deborah Stanley_
Notary Public's Signature
My commission expires:

DEBORAH STANLEY
MY COMMISSION EXPIRES
July 2, 2007

9

# EXHIBIT A

## CURRICULUM VITAE

*James R. Harrison, Ph.D.*
*Clinical Psychologist*

### Address

James R. Harrison, Ph.D., P.A.
Center for Psychological Development
402 West Lamar Street, Suite 102
Sherman, Texas 75090

### Educational Experience

University of North Texas, Denton, Texas.  Department of Psychology, Program in Clinical Psychology (Accredited:  American Psychological Association).  *Doctor of Philosophy in Psychology.*  August 1985.

Southwest Medical School, University of Texas Health Science Center, Dallas, Texas.  UTHSC/Terrell State Hospital Consortium.  *Fellowship in Clinical Psychology,* Neuropsychology and Geriatric Psychology.  (Accredited: American Psychological Association).  August 1984 to September 1985.

University of Arkansas for Medical Science, Little Rock, Arkansas.  *Internship in Child Clinical Psychology* (Accredited:  American Psychological Association).  August 1983 to September 1984.  Child Psychology.

University of North Texas, Denton, Texas.  Department of Psychology, Program in Psychology, *Master of Science in Experimental Psychology.*  August 1985.

University of Texas at Dallas, Richardson, Texas.  School of Human Development.  *Bachelor of Arts in Psychology.* August 1980.

University of California, Irvine, California.  Program in Social Ecology.  September 1976 to August 1979.

### Work Experience

Clinical Psychologist, Director, Center for Psychological Development, Sherman, Texas, October 1990 to present. Practice includes evaluation and treatment of children, adolescents, and adults.  Specialty in neuropsychological evaluation and psychological trauma.  Co-director of SARAH program for treatment of sexual abuse survivors, 1991-1997.  Director, Batterer's Intervention and Prevention Program, 2003-present.

Psychologist in independent practice, Sherman, Texas.  July 1987 to October 1990.

Chief Psychologist, Wilson N. Jones Memorial Hospital, Mental Health Services, Sherman, Texas.  July 1987 to July 1988.

Clinical Psychologist II, Terrell State Hospital, Terrell, Texas.  March 1986 to July 1987.

Staff Psychologist, Mental Health Mental Retardation Services of Texoma, Grayson Mental Health Center, Sherman, Texas.  September 1985 to March 1986.  Coordinator of Sexual Abuse Treatment Program.

Psychology Fellow, University of Texas Health Science Center, Southwestern Medical School, Dallas, Texas. September 1984 to August 1985.

Psychology Intern, University of Arkansas for Medical Sciences, Child Study Center, Little Rock, Arkansas. September 1983 to August 1984.  Coordinator of Psychological Services, Child Abuse Clinic, Arkansas Children's Hospital.

Consultant, Suspected Child Abuse and Neglect (SCAN), Pulaski County, Arkansas.  January 1984 to August 1984.

Graduate Fellow, Dallas County Schools, Dallas, Texas.  September 1982 to August 1983.

Graduate Assistant, North Texas State University, Denton, Texas.  September 1980 to August 1983.

Childcare Supervisor, Children's Medical Center, Psychiatric Inpatient Unit, Dallas, Texas.  May 1978 to September 1982.

Research Assistant, University of California at Irvine, School of Social Ecology, Irvine, California.  September 1975 to September 1977.

### Publications

Social Hypervigilance in Abused Children.  Doctoral Dissertation.  North Texas State University, Denton, Texas. May 1984.

Structural Aspects of Loevinger's Model of Ego Development.  Master's Thesis.  North Texas State University, Denton, Texas.  December 1983.

### Hospital Staff Appointments

Wilson N. Jones Medical Center, Sherman, Texas
Community Specialty Hospital, Sherman, Texas

### Professional Affiliations

American Psychological Association
Texas Psychological Association
Southwest Psychological Association
Texoma Area Psychological Association
National Academy of Neuropsychology

### Other Affiliations

Board Member, Past-President, Children's Advocacy Center of Grayson County

### References

Provided upon request.

### Personal Information

| | |
|---|---|
| Birthdate: | January 11, 1956 |
| Birthplace: | China Lake, California |
| Spouse: | Dr. Karen Nelson, Professor, Austin College, Sherman, Texas. |
| Children: | Three adult children |

ii

# EXHIBIT B

AT003163

*Exhibit /*

TRACKING NO. 164871

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 15TH JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| ANDRE LEE THOMAS | § | GRAYSON COUNTY, TEXAS |

## COMPETENCY TO STAND TRIAL EVALUATION

### REPORT OF DISINTERESTED MENTAL HEALTH EXPERT

Comes now the assigned Psychologist, James R. Harrison, Ph.D. heretofore appointed to make the psychological study in the above styled matter. The court has ordered a psychiatric examination to evaluate the Defendant's competency to stand trial.

| | |
|---|---|
| Name of Defendant: | Andre Lee Thomas |
| Date of Birth: | ████████ |
| Age: | 21 years |
| Ethnicity: | African-American |
| Gender: | Male |
| Date of Report: | April 15, 2004 |

<u>Referral Information:</u> Andre Thomas is a 21 year old African-American male who is being held in the Grayson County Jail on one count of Capital Murder for the death of his wife, Laura Christine Thomas.

<u>Procedures:</u> Mr. Thomas was interviewed and observed on April 5th 2004 for 1 hour, April 7th for 1½ hours, on April 12th for 1 hour, and on April 14th for 45 minutes. Collateral interviews were conducted with the Defendant's attorney, R.J. Hagood, the assigned prosecutor, Kerye Ashmore, the Grayson County Jail Chief Nurse, Natalie Sims, and Mr. Thomas' father, Danny Thomas. In addition, both a videotaped and an audiotaped interview of the Defendant by Sherman Police Department Detective, Mike Ditto, were reviewed. Records of the medical staff at the Grayson County Jail were also reviewed, along with the interview notes of the jail Psychologist, Dr. Robin McGirk.

Prior to each interview with the Defendant and the one with his father, Danny Thomas, each was informed about the nature and purpose of this evaluation, as well as limits of confidentiality, including the fact that a report would be sent to the court. An indication of understanding of this review was obtained at each instance.

3179                                                                     02118

AT003164

Andre Thomas                                                     15th Judicial District Court, Grayson County Texas
Tracking No. 164871                                                    Competency to Stand Trial Evaluation

**Relevant History:** The following information was provided by the Defendant and his father, Danny Thomas; both of whom are considered poor historians. Mr. Thomas has resided alone at the Crossroads Trailer Park in Sherman, Texas. His father assisted him in finding these accommodations. He was married but separated from his wife, Laura, who is the victim of the murder with which he is charged. Mr. Thomas was unemployed at the time of his arrest.

Mr. Thomas is the youngest of 5 sons born to his parents, who separated when he was 3-4 years old. He was born in Muskogee, Oklahoma, but raised in the Grayson County area with his mother, with almost daily contact with his father. His father indicates that he had a good childhood, with a loving relationship with both parents. He was described as an obedient and loving child, who had good relationships with his brothers and peers. No traumas, tragedies, or abuse are reported as occurring in childhood.

Mr. Thomas attended school through the 9th grade, and later completed his GED. He has obtained no additional education or training, but was reportedly considering enlisting in the United States Navy. Mr. Thomas has a previous arrest for stabbing his brother, Brian, about one year ago, but was no-billed by the grand jury, reportedly due to his actions being in self defense. He provides unspecific references to juvenile offenses, but no other arrests or legal entanglements during adulthood.

His work history includes a position in the Maintenance Department for the City of Sherman, where he worked for 3 years. He was terminated for an undetermined reason, with his father speculating that it was due to a lost driver's license. Mr. Thomas indicates that he was tired of "dealing with the bodies" at the cemetery. According to his father, Mr. Thomas is reported to have gone "downhill in his mental state" after the termination, because he "didn't know what to do, he wanted to be a career man." Mr. Thomas reports short periods of employment since his termination about 1 year ago, that appear limited to dishwashing jobs in local restaurants.

Mr. Thomas reportedly lived with Laura Thomas from when he was 16 years old, was married to her since he was 18 years old, and has been separated for over 1 year. They had one child ████, aged 5, who was murdered at the same time as his mother. Mr. Thomas indicates that he spent time regularly with his son, and states that he "loves him and misses him." No other serious relationships are reported, although he discusses recently having been involved with a transsexual named Carmen.

Medical history was unremarkable, until the recent crime with which Mr. Thomas has been charged. No serious illnesses are indicated, with no history of illness, injury, or surgeries. He has no reported Physician. However, Mr. Thomas sustained self-inflicted stab wounds to the chest on 3/27/04 which required surgical repair of unspecified internal damage. Additionally, on 4/2/04, Mr. Thomas pulled out his right eye, with subsequent emergency medical treatment. Both wounds are presently healing.

Mr. Thomas reports regular abuse of alcohol, marijuana, and Coricidin for a duration that **3180**nclear, but likely more than the last 6 months. Coricidin is an over the counter 0 2 1 ! 9

ii

AT003165

Andre Thomas                                                    15th Judicial District Court, Grayson County Texas
Tracking No. 164871                                            Competency to Stand Trial Evaluation

medication that contains the substance, dextromethorphan (DXM), which is in class of drugs known as dissociative anesthetics.  At sufficiently high doses, this substance can have powerful psychedelic effects.

Mr. Thomas acknowledges in interviews with jail personnel that he has had "many suicide attempts, too many to count," with attempts at age 10 and 15 years by cutting his wrists. On intake at the jail, he reports hearing no voices or having current suicidal thinking.  He is observed to be preoccupied and confused; apathetic and hopeless.

His father report that he has had ongoing mental health problems for at least the last year.  His father indicates that he told his son that "you ain't thinking right.  You go get some help."  While unable to provide clear specifics, his father reports that he "didn't pay his bills right," and "he wasn't normally like himself."  Mr. Thomas reportedly talked excessively about God and the Bible, particularly Revelations and the "last days."  His father encouraged him to focus on Genesis, counseling him that Revelations was too confusing unless you begin reading at the beginning.  Mr. Thomas reportedly dwelled on the Bible and borrowed his father's Bible so often that his father dedicated a new Bible to him and presented it as a gift.  However, a couple of days later, Mr. Thomas reportedly "burned that Bible."  His father states, "Nothing makes sense, what he'd do." and he was "always running, going from here to there."

Mr. Thomas reports no formal psychiatric treatment, but reportedly has had at least four evaluations for psychiatric complaints.  Two evaluations were performed by MHMR staff at the Grayson County Jail.  His father reports that he also sought help from MHMR prior to that time.  Both Mr. Thomas and his father report that he sought help for his mental problems from the Wilson N. Jones Emergency Room within the week prior to the alleged murder but he was reportedly refused care.  He also reportedly sought help from the Texoma Medical Center Emergency Room two days before the murder, with Mr. Thomas stating that he "ended up walking out – I didn't see any point," in apparent reference to not believing he would receive help.

Jail records indicate that the MHMR evaluations were referrals for emotional distress after the incident when he stabbed his brother.  The evaluations appear intended to assess his suicidality, and he reported past suicidal ideation and attempts during the initial evaluation (1-28-03), and was found to be restless, with pressured speech, and agreed to a suicide contract.  Otherwise, his functioning was within normal limits, although he apparently had green hair.  The second evaluation (2-11-03) found him to be anxious with some driven speech and a past history of impulsiveness.  Checks every fifteen minutes were recommended due to violent thoughts.

Family history is significant for a likely psychotic disorder in Mr. Thomas' brother, who is treated by MHMR; a possible psychotic disorder in his mother, who is reportedly "crazy" and "obsessed with the Bible."  Additional family history includes substance abuse and violent behaviors.

**3181**                                                                                       02120

AT003166

Andre Thomas                                                    15th Judicial District Court, Grayson County Texas
Tracking No. 164871                                                   Competency to Stand Trial Evaluation

Course of Incarceration: Current records from the Grayson County Jail medical staff
and the jail Psychologist, Dr. C. Robin McGirk reveal that, during his incarceration, Mr.
Thomas has displayed behaviors consistent with psychosis, including paranoid and
grandiose delusions, ideas of reference, religiosity, flight of ideas, periodic incoherence,
the possibility of auditory hallucinations, and delusional self-mutilation.  Records over 17
days of incarceration generally document a docile and passive attitude, and cooperation
with jail personnel, but his stay was also marked by episodes of agitation, delusions, and
apparent remorse.

Mr. Thomas was unmedicated and under a suicide watch for the first 5 or 6 days of
incarceration, during which he had periods of agitation, yelling, and pacing, typically
followed by apologetic behavior.  Jail documentation states that Mr. Thomas was
described by the jail Psychologist as "floridly psychotic" in the initial days of his
incarceration.  Recommendations for pharmacological treatment were refused by both the
Defendant and his attorney.

On the first day of his incarceration, Mr. Thomas asked to see the Chief Nurse, Natalie
Sims, and stated that he was sorry.  Upon inquiry, he stated, "I cut their hearts out.  After I
stabbed them, I cut their hearts out.  I didn't mean to hurt anybody.  Please, Miss Natalie,
as God as my witness, I didn't mean it."  At another point, he asserted that he must have
a "mission" in the jail, as his way of explaining his second jail stay.  He had a period in
which he intently observed the activities outside his holding cell, refusing to sleep, and
attributing his action to a delusion that Dr. McGirk, the jail Psychologist, had directed him
to watch for events that Dr. McGirk would need to know.

In an initial interview on his 2nd day of incarceration by Dr. McGirk, Mr. Thomas related
the details of his actions in killing his wife, son, and stepchild, and his thinking at the time.
He was able to elaborate on thoughts prior to the murder, including his belief that his son
was the Antichrist, and that his son's birthday (1999) had religious significance when
viewed upside down.  He noted that he had smoking marijuana ("a blunt") afterward and
emphasized that this had no bearing on the events.  His speech was calm.

In second and third interviews in the following days, Dr. McGirk documents that Mr.
Thomas displayed "rapid pressured speech" and "significant agitation."  "He stood up and
offered himself to be attacked by the staff present, emphasizing that he would offer no
resistance."  His thoughts showed signs of tangentiality, and focused on the confusion he
had been experiencing.  He displayed "excellent verbal facility," "suggesting a high level
of intelligence."  He did not seem to be evasive in his actions, although he didn't always
respond directly to inquiry.  While his thoughts were seen as well organized, they were
irrational and included "overly elaborate interpretations of the behaviors of others."  He
admitted to stabbing himself, with Mr. Thomas believing that he "could not die or be
killed."  However, he "expressed no further desire to injure himself" and made no signs of
further suicidal thoughts or plans.

Dr. McGirk describes Mr. Thomas' conversation as primarily involving delusional content.
These delusions included the greater meaning of signs and symbols on the dollar bill, and

3182                                                                                        02121

iv

AT003167

Andre Thomas                                    15th Judicial District Court, Grayson County Texas
Tracking No. 164871                                          Competency to Stand Trial Evaluation

references to time travel and its relation to repeating and reliving events. Mr. Thomas
discussed that the government had been monitoring his activities and stated, "They know
everything about me." He reported cameras behind his eyelids and that others knew his
thoughts. He referred to the whole society as "God" and noted their impact on his life
without his knowledge.

Dr. McGirk reports that Mr. Thomas spoke about "Deja-vu" and being able to see his wife,
"as if she were alive and the experience of her death had been an illusionary or imaginary
event, resulting from other thoughts being injected into his mind through the experiments
in which he believed the government been involved." It appeared to Dr. McGirk that Mr.
Thomas believed he had destroyed the Devil rather than the lives of his family. Mr.
Thomas is also reported to discuss a woman named Carmen, who he believed may be a
"She-Devil" who influenced him to do things which "destroyed [his] life."

Dr. McGirk indicates that Mr. Thomas described events in an "egocentric fashion,
perceiving himself as the object of study by others," "as well as pondering the extent to
which he had been targeted by evil forces. His belief that he had been given instructions
by Dr. McGirk to observe events outside of his cell, suggested to Dr. McGirk the
possibility of illusions or hallucinations. Mr. Thomas' mood was seen as variable from
"euthymic to irritable", with his affect assessed as "inappropriate to content, ranging from
being rather matter of fact and flat to excited." His labile emotions suggested the potential
for violent behavior. Dr. McGirk assessed Mr. Thomas' attention, memory, and judgment
as adequate, but they were compromised by paranoid delusions, ideas of reference,
religiosity, and psychosis. He displayed a tendency to "extend [abstractions] to a level
which produces fantastic and unbelievable areas of relationship for which there is no
realistic support."

Dr. McGirk provided a provisional diagnosis of Paranoid Schizophrenia, with an acute
exacerbation of symptoms. The possibility of a substance induced psychotic reaction is
also suggested.

On his 5th day of incarceration, Mr. Thomas plucked his right eye from its socket. He had
made at least two previous attempts at this, reportedly in response to his having read the
Bible verse, "If thy right eye offend thee, pluck it out" (Matthew 5:29). He stated that, "The
Bible says that if your right eye offends thee, you are to pluck it out, so I did." He stated it
was the only way he could avoid "burning in hell." During medical treatment for his injury,
Mr. Thomas stated that he didn't know "why people didn't die."

Mr. Thomas was treated at the local hospital, where he was given an antipsychotic
medication. During the hospital visit, he frequently asked if he could go see his wife to
"ask her to forgive me." He stated, "My kids forgive me but she won't and I love her and I
need her to forgive me." Upon return to the jail, he placed in four-point restraints to
prevent further self mutilation, and started on an antipsychotic medication after this
incident; with an initial 20 mg. of Geodon, twice daily, which is a standard starting dose.

3183                                                                          02122

v

AT003168

Andre Thomas                                    15th Judicial District Court, Grayson County Texas
Tracking No. 164871                                  Competency to Stand Trial Evaluation

This medication typically takes several weeks (two to six) to titrate to a maximum dosage
of 160 mg per day in divided doses. Mr. Thomas appears to have responded quickly to
the medicine, in terms of his level of agitation, but he continued to show delusional
thinking and disorganization in his thought processes.

Medical reports in subsequent days indicate that he repeatedly called out for his wife, and
he reported dreaming about "Lucifer, the bearer of light." At one point, he displayed
pressured speech, and "remained delusional." He was reported to state that he did kill his
wife, son, and ███; and that ███ wasn't "[his] kid, but I loved her like my own." He
stated he had believed that his son was "the antichrist," and that he "know[s] what [he] did
was wrong."

His order for Geodon was increased to 40mg BID in the evening of April 7th. He observed
behavior in the cell was subdued, calm, and cooperative, with a brief period of smiling and
somewhat inappropriate laughter, with Mr. Thomas joking, "I've got to get another eye."
At another time, he was observed talking to someone, despite being alone in his cell. He
spent a lot of his time sleeping.

On April 13th, Mr. Thomas was observed by medical staff to shake violently all over his
body, as if having a seizure. Upon hearing his name called by staff, he slowly began to
calm, and the medical staff present described his state as a more like a full body sob. He
was provided oxygen, and when he began to speak, he stated; "I want my life back" two
or three times. He then stated, "I want to die," immediately followed by, "I don't want to
die."

**Current Mental Status:** Mr. Thomas is a 21 year old African-American male who was
seen both lying on a jail cot in 4 point restraints or restrained upright in a restraint chair.
Two officers were posted at the door of the cell, consistent with the ordered protocol.

He was dressed in orange jail coveralls, somewhat disheveled, with his right eye
bandaged and a bandage on a healing knife wound evident in his half opened shirt. He is
relatively clean. He is tall and thin and appears consistent with his stated age. His motor
activity cannot be fully evaluated due to his restraints, but he is ambulatory and evidences
no signs of dysfunction in the limited activities he is allowed. He is surprisingly tolerant
and passive in regard to his restraints, not complaining about their restrictions until the
fourth interview on April 14th. Activity level is generally low, with intact attention for
conversation.

Mr. Thomas presents as cooperative, with a subdued friendliness, but generally a serious
tone. He appears sincere and forthright in his statements, often showing a level of
apparent honesty about himself, without self consciousness or attempts to manage the
image he presents to others. He overtly questions the need to distort or hide events
related to the alleged crime, seemingly more focused on judgment of God rather than
implications regarding the legal system. He is alert and fully oriented. His speech has
been articulate without signs of a language disorder or impairment. However, the rate of
speech has been generally quite pressured, but varied across and within the four

3184

021 23

AT003169

interviews.  He can speak in a soft quiet tone, or escalate rapidly as if to keep up with his thoughts.

His communication has typically shown two patterns.  He can be detailed, sequential, and coherent in his descriptions of actual events or actions.  However, when conceptualizing or discussing the meaning of events, he can show increased psychomotor speed and driven expression of delusional beliefs.  His mood is generally euthymic, but his affect is labile in response to internal events, with a restricted range of available emotion, and very little humor or excitement.

His thinking is clearly impaired by an ongoing psychotic process, with evidence of both grandiose and paranoid delusions (outlined below), strong ideas of reference, some loose associations outside of his firm delusional system, tangentiality, and derailment.  It is not difficult to quickly move him from seemingly coherent descriptions of events to bizarre explanations of his motives and clearly delusional beliefs about the context of his actions.  His thinking was adequately organized with concrete tasks, and the core of his delusional system is remarkable consistent.  However, when confused, threatened, or emotionally conflicted, he attempts to resolve this by elaborating on his delusions further (outlined below).

Cognitively, Mr. Thomas displays grossly intact memory for immediate, recent, and remote events.  He is able to recognize jail personnel from his previous incarceration, recall generally that he has spoken to his lawyer or jail Psychologist, and recall the topic of this examination from one day to the next.  He provides details regarding his life circumstances, consistent with that of his father, although not always without interruption from a driven preoccupation with his delusions.  His attention is adequate for a one to one conversation in a noisy jail cell, but he is quite distractible on formal attention screening (Digit Span forward = 5, backward = 3).  Vocabulary, easy recall of scripture, and his reasoning give the impression of average to above average intellect.

Mr. Thomas demonstrates an impressive capacity to reflect upon his own perspective and those of others simultaneously; which is both an advantage and a detriment to him, in that he also tends to overinterpret these observations and incorporate them into his psychotic process.  His fund of knowledge and social judgment regarding hypothetical situations is intact.  Mr. Thomas' level of insight is impaired.  Although variable and improving across the four interviews, he moves from being completely captured by his belief system, to being confused and uncertain, to accepting his thinking was altered but having no understanding of the cause.  While he attributes some of his thinking at the time of the crime to his use of Coricidin, he has no explanation about the persistence of his symptoms after disuse.

The core of the delusional system expressed by Mr. Thomas has been generally consistent across his interviews with the Sherman Police Department investigator, the jail Psychologist, and the present examiner.  In addition, his confusion over the course of his incarceration led to an incorporation of others into his belief system.  They include: 02124

**3185**

AT003170

- A belief that Mr. Thomas attributes to have arisen in response to watching a videotape provided by his wife's boyfriend, Bryant. He describes a secret organization, somehow associated with pyramids in New York, and involving secret mantras. The organization's intent is to arise and to enslave people and rule them. This is somehow associated with a secret "God plan," but sometimes is associated with the Devil.

- On the basis of small signs, Mr. Thomas somehow decided that his wife was Jezebel, his son was the Antichrist, and that his stepdaughter was also involved in this organization. He believed that his wife's boyfriend, Bryant, was under Jezebel's control. He decided that he had to kill them to prevent this organization from arising, believing he was acting on behalf of God to save the world from this event.

- While he describes his actions in regard to the murder in gruesome detail, this has been without strong emotion, in part due to his underlying belief that he wasn't killing his family, but was killing what he came to believe was the representative of the Devil or the Devil himself. This included a belief that the method of killing them (e.g., 3 knives so as to not cross contaminate their blood) was necessary to insure the destruction of the beings in his family's bodies.

- While not clear about his stabbing of himself, he came to believe that his not dying meant he was incapable of dying.

- That his female friend, Carman, was also associated with the Devil and had influenced him to his detriment.

- That his experience of déjà vu means that he can time travel and that these events are not permanent.

- That Dr. McGirk had directed him to observe the activities of the jail so he could provide needed information to Dr. McGirk. That Dr. McGirk led him to the knowledge that the government was watching him since he was a child.

- That his lawyer, R.J. Hagood is the "Devil's advocate", and Mr. Thomas may be the Devil.

- That his wife and child are not dead, and his eye is not plucked out, because this is déjà vu and he can go back where his life was before and start over.

At the time of the last interview with Mr. Thomas, he was receiving Geodon 60 mg in the morning, which was a decrease from 40 mg, twice daily. Mr. Thomas was lethargic, tremulous and shaky in his movements, and was apathetic. His state appeared to be a combination of the effects of medication and increasing grief regarding the loss of his wife and child. His voice was more quiet than usual, and he was monotone. Attempts at  02125

**3186**

Page 8 of 12

AT003171

formal testing of cognitive skills increased his agitation, and he evidenced decreased attentional skills, despite relatively greater quiet in his cell.

His thinking was coherent for mundane topics and he was able to provide historical information in response to inquiry. He showed increasing awareness of the impairment in his past thinking, but remains confused about possible causes. However, he continues to fall into disorganized thinking quite easily, this time asserting that Dr. McGirk had told him he was supposed to save the world. While he was confused as to why he was chosen, he could not be dissuaded of this belief. He reports that he has been talking to God continuously, and that he thinks "everybody is going to heaven." He is preoccupied by the deaths of his wife and son. He openly weeps, and appeared to have periods where he fully realized the permanence of their deaths. This is clearly traumatic for him. However, when he became overwhelmed by this, he briefly reverted back to his previous delusion about time travel and restarting his life. His mood was clearly depressed, but unstable in that any pressure led him to become more agitated. Affect was mood congruent, flat, and restricted in range.

<u>Diagnosis:</u> Mr. Thomas displays the characteristic symptoms of Schizophrenia, Paranoid Type; with grandiose and paranoid delusions, possible auditory hallucinations, disorganized speech, and disorganized behavior. He has shown social and occupational dysfunction, and has been unable to adequately support himself and maintain employment. However, it is not clear that he these symptoms have been present for over 6 months, and this appears to be his first psychotic episode. Because of this, a diagnosis of Schizophreniform Disorder is more appropriate at this time. However, he has a strong family history of psychotic disorders, and the probability of Schizophrenia is considered high.

Additionally, there is the possibility that Mr. Thomas' current psychotic symptoms are related to his abuse of Coricidin. He reports that he had been using this substance in large quantities in the days and weeks prior to his crime. This is a drug of abuse due to its ingredient, dextromethorphan, which is considered a psychotomimetic, causing psychotic like symptoms. It is possible that Mr. Thomas' propensity toward psychosis was exacerbated by the use of this drug. In high doses, psychotic symptoms and strong dissociative experiences are common.

| DSM-IV TR | Axis I | 295.40 | Schizophreniform Disorder |
| | | Rule out | Substance Induced Psychotic Disorder |
| | Axis II | | No Diagnosis |
| | Axis III | | status post: thoracic surgery for knife wound, wound repair upon removal of right eye |
| | Axis IV | | recent injuries, incarceration, legal problems, death of close relatives |
| | Axis V | | GAF: 12 – danger of hurting self or others, behavior is considerably influenced by delusions |

02126

**3187**

AT003172

Andre Thomas                                                                    15th Judicial District Court, Grayson County Texas
Tracking No. 164871                                                             Competency to Stand Trial Evaluation

**Current Competency Assessment:** Mr. Thomas was able to identify the charge against
him as Murder and that he might be sentenced to death or life in prison. He was less
aware of mitigating factors that might reduce the length of his sentence.

Mr. Thomas appears capable of providing a plausibly accurate description of his
experience in a sequential, detailed manner, and to provide a clear description of his state
of mind, thoughts, and emotions at the time. While he demonstrated this capacity in
taped police interviews and through most of the present evaluation, his most recent
interview showed decrements in this capacity due to his depression and medication
effects. His capacity to relate these facts to his attorney, however, is not consistently
present. During those periods when he is preoccupied with delusional material, these
thoughts intrude and tend to hijack the conversation. While with gentle questioning, he is
able to maintain a sequential train of thought, under pressure of firm questioning or
internal conflict, Mr. Thomas tends to become less organized and his responses more
self involved and off topic.

Mr. Thomas' capacity for reasoned choice of legal strategies and options is currently
limited. When asked the options regarding defending himself, he vacillates between
leaving his fate to God, and a fatalistic approach of letting the judge decide. While he
acknowledges that there will be a trial, he has been unable to think of a hypothetical or
actual strategy that might mitigate against a finding of guilt or the maximum sentence. He
is resistant to any efforts by his attorney to put his circumstances into a sympathetic light,
and continues to show some distrust of attorneys as a profession and their connection to
the Devil. He has yet been unable to see an insanity plea as even a hypothetical option
to consider. While Mr. Thomas clearly has the intellectual capacity for such reasoning,
his delusional beliefs continue to have some hold on his unwillingness to trust an
attorney.

Mr. Thomas can clearly identify the general roles of the Judge ("He decides or runs the
courtroom"), prosecuting attorney ("He tries to prove I killed my wife and Andre and send
me to jail."), jury ("They decide if I die."), and his defense attorney ("He defends me."). He
is able to describe the general process, including presenting witnesses, facts, and
arguments. He understands the adversarial nature of the courtroom, stating a clear
understanding that the prosecutor will be presenting evidence about his commission of
the crime.

However, it is his defense that he does not fully understand. He sees the role of his
attorney as presenting "only part of the truth," which he connects with evil. He has yet to
fully realize that others might not acknowledge that his actions were not righteous or well
motivated. While he shows a capacity for perspective taking, he has yet to fully give up
the delusion that he acted consistent with God's will. He still struggles with the gravity of
his alleged actions, vacillating between deep regret and delusional denial. This prevents
him from seeing that others might view him as heinous and that his interests might be
served by presenting a defense that better explains his actions.

**3188**                                                                                    02127

x

AT003173

Andre Thomas                                          15th Judicial District Court, Grayson County Texas
Tracking No. 164871                                         Competency to Stand Trial Evaluation

Mr. Thomas' current state is quite fragile, despite improvement from medication. He has
been in isolation, protected from serious questioning, and the stress of more than one
person with which to cope. Even in these circumstances, he responds to stress with
reversion to delusional material and agitation. It is likely that in an open courtroom, with
intense testimony and a high level of stimulation, that Mr. Thomas will be unable to
maintain a quiet decorum appropriate for the courtroom. His agitation and intolerance of
stress may very well lead him to wish to leave the courtroom or become active and
display verbal outbursts, particularly if his delusions are activated.
Mr. Thomas is currently unable to testify on his own behalf in a coherent manner. While
he has demonstrated a capacity to present information about the crime in a detailed and
sequential manner, this is the limit of his capacity. The stress of both direct and cross
examination will overwhelm his current ability to cope. Intrusive delusional material will
certainly emerge. In addition, it is only now that Mr. Thomas appears to be fully facing the
implications of his alleged crime and the permanence of his wife, son, and stepdaughter's
death. At this time, he is unlikely to answer questions regarding this without either
excessive grief or active avoidance. His ability to conform his responses to those
appropriate to the courtroom will be overridden by his immediate emotional distress.

Summary and Recommendations: Mr. Thomas has a severe mental illness and is
currently actively psychotic, with some improvement shown after introduction of
antipsychotic medication. Mr. Thomas understands the charges and highest levels of
punishment that he now faces. He can disclose to his attorney relevant facts, events, and
states of mind, but not on a consistent basis or in a consistently helpful form due to
intrusive delusional thinking. He cannot yet engage in a reasoned process of choosing
legal strategies or options. He appears to understand the adversarial process and roles
of members of the court, with the exception of accepting a legitimate role for his defense
attorney due to ongoing delusions. He is unlikely to be able to exhibit consistently
appropriate courtroom behavior. Finally, Mr. Thomas is unlikely to be able to tolerate
testifying on his own behalf, without exacerbating his current condition, or a disruption in
his ability to answer questions appropriately.

Due to the above findings, it is this evaluator's opinion that Mr. Thomas is Incompetent
to Stand Trial.

It is recommended that Mr. Thomas be transferred to an appropriate treatment setting for
his mental disorder and that he also be provided specific training designed to help him
become competent to function in the courtroom. It is this examiner's opinion that Mr.
Thomas will likely become competent to stand trial in the future, with ongoing
pharmacological and psychological interventions. While a firm prediction is impossible,
the time frame for becoming competent is estimated to be between 4 and 12 weeks. He
is much less likely to achieve competency without medication management by a
Psychiatrist and if he remains in his current setting in restraints.

It is important to note that the examiner recognizes that a judge or jury decides trial
competency; as such, opinions expressed in this report should be considered as advisory
only.

3189                                                                          02128

AT003174

Andre Thomas
Tracking No. 164871

15th Judicial District Court, Grayson County Texas
Competency to Stand Trial Evaluation

*James R. Harrison, PhD*

James R. Harrison, Ph.D.
Clinical Psychologist
Texas License 23242

Submitted:  April 15, 2004

**3190**

02129

Page 12 of 12

xii

# EXHIBIT C

1.      Competency Letter dated July 27, 2004 from Dr. Joseph Black, M.D. to Judge Fry.

2.      Findings and Recommendations of Dr. B. Thomas Gray regarding competency dated July 22, 2004.

3.      Transcript of A. Thomas interview by Detective Mike Ditto dated March 29, 2004.

4.      Transcript of A. Thomas interview by Detective Mike Ditto dated March 30, 2004.

5.      Confidential Neuropsychological Evaluation Test Scores and Summary Results dated June 2, 2007 regarding the neuropsychological examination of A. Thomas on May 21-23, 2007, by Myla H. Young, Ph.D., ABPN.

6.      Medical records from A. Thomas's stay at the Vernon Campus at the North Texas State Hospital from June 23, 2004 to August 9, 2004.

# Exhibit 18
## Affidavit of Amy Ingle

COUNTY OF GRAYSON                )
                                                      ) ss:          **AFFIDAVIT OF AMY INGLE**
STATE OF TEXAS                      )


      **AMY INGLE,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Amy Ingle. I am a resident of Grayson County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I first met Andre Thomas in 1998. I began spending an extensive amount of time with him and the Thomas family in either July or August of 2003 at which time I became good friends with him. At the time, I was involved in a physically abusive relationship with Andre's paternal cousin, Floyd Patterson. Andre protected me from Floyd by allowing me to stay at his residence. I was not allowed to return to my parents' home because they had disowned me after I had dated Floyd, a black man. My family also had problems with the fact that I was even friends with Andre, since he too is black.

3. Another time I saw Andre in 2003 when I was over at Danny Thomas' trailer. Floyd brought me there to meet his family. Everyone was outside talking and Andre walked out of his trailer wearing camouflage clothing. He walked straight through the party without talking to anyone and went to the stores behind Danny's house. I asked who he was and several people said, "Oh that's just crazy Andre." Soon after, he walked back through the party, again without speaking to anyone. Andre was always very different. People would hang out and talk around him, but Andre did not really participate in the conversations. He was an outcast, even in his own family.

4. On many occasions, Andre would come to wherever I was and just pop up out of nowhere. I would say "Hi" to him and he would ask me, "How did you find me?" I tried to tell him that he had found me, but he did not listen.

5. Andre worked for the City of Sherman in the city's cemetery, digging graves and keeping the grounds. He would tell me that he could not get the smell of the cemetery and of digging graves off of him. He said he did not enjoy his work because of this problem. I never smelled this so-called "cemetery smell."

6. Andre was very polite. Since late 2003, however, he became more weird with each passing month. Everyone talked about him having problems, but no one helped him. Andre was always dyeing his hair odd colors – orange, green, red, and other strange colors. I asked him why he did this, and he said he just liked it that way. He also wore strange clothes, like army clothing.

7.  After Andre lost his job in late January 2004, he started acting more and more strange.  He really went haywire.  Since Andre lost his job and did not have any money, Andre and I and some of his friends used to play dice at Andre's trailer and bet money on the game.  Once, Andre won a $100 bill and immediately placed it in an ashtray and lit it on fire, while yelling "Money is the root of all evil!"  He burnt up the entire $100 bill, despite being broke.

8.  Shortly after I met Andre, I met Rochelle Thomas, Andre's mother.  She acts very crazy and hypocritical.  For example, I met Rochelle many times and she often preached the Bible and talked in a manner I found just plain crazy.  I believe Rochelle Thomas messed with Andre's head.  Often Rochelle would call and talk crazy to Andre about the Bible.  Once, in early February 2004, I was at Andre's father's trailer and Andre called Rochelle.  While Andre was talking to his mother, he grabbed a huge Bible that Danny Thomas had in his trailer and began flipping through the pages very quickly.  He started talking really fast, reading the passages out loud that he and Rochelle had talked about.  He would start preaching in a way that I found to be crazy.

9.  Once, in 2003, Rochelle told me that Danny Thomas used to have a drinking problem.  Rochelle said Danny was in the Vietnam War and he has flashbacks, like he is still in Vietnam.  Rochelle said when Andre and his brothers were kids, Danny would get drunk and have a flashback to the war.  He would grab his gun, yell "Kill!" and then shoot off the gun.  Once, Danny did this and shot off his gun in the house; he shot the gun into the upstairs, right next to where Andre and his brothers were sleeping.  Rochelle said she tried to calm him down by boiling water on the stove for Danny to take a bath.  Danny spilled the boiling water all over him and burned himself badly.  Rochelle said she was praying that God would make Danny stop shooting the gun and that the boiling water being spilled on him was just his karma getting him.  Rochelle told Amy that Danny used to drink all the time when the boys were little.

10. On or about the beginning of February 2004, Andre Thomas told me, "I have demons in me and I really need some holy water."  Andre then took me to St. Mary's Catholic Church in Sherman.  I stayed in the car and Andre went in.  When he came out of the church, his head was dripping wet.  I asked him why his head was wet.  Andre told me that he asked if he could take some holy water with him, and the people at the church said no, so he dipped his hands and his whole head in it.

11. Immediately after the holy water incident described above in paragraph 10, Andre took me to a cemetery in Sherman.  He walked me to a huge mausoleum.  I asked him if we were going to go in, and he said no, he was scared of it.  He asked me to read the words printed on it.  I read them to him.  Andre kept nodding his head when I was reading.  Andre asked me if I knew what the words meant.  I told him I did not.  Andre kept telling me, "Amy, you get it!"  He was talking about the words I had just read that were written on the mausoleum.  I said, "No, Andre, I don't get it.  Get what?"  Andre kept saying, "No, you get it, Amy, you get it!"  He kept saying it over and over; he really believed I knew what it meant.  He seemed to think there was some secret meaning to the statement on the mausoleum, and that I, too, understood this meaning.  In reality, I had no idea what he was talking about.

2

12. While we were at the cemetery that day, Andre told me he thought I was an angel. He did not use "angel" in the way that a normal person calls someone who is kind. I understood him to be using "angel" as in an angel who actually came from heaven and was not human.

13. Andre had lots of strange theories about life and other things. Andre did not talk very much, so the things he said stuck out because he was not talkative and because they were crazy. During March 2004, he often told me about these theories, but they never made any sense to me. They were crazy. Andre would sometimes take long walks and would come back and be in a completely different mind state. He sometimes would walk off and say he had to go to the library to do research on his theories. Andre was always telling me, "The dollar bill contains the meaning of life." He would always stare at dollar bills and tell me, "I figured it out! I figured it out!" Andre insisted that it was something in the eyes of the man on the dollar bill. Andre told me, "Everyone has a purpose. I wonder what mine is." I tried to listen to Andre's theories but they never made any sense.

14. In March 2004, Andre told me that everyone he knew was a character in a video game he was playing. I asked Andre which character I was, and he could not tell me, but he did tell me I was definitely in the video game.

15. In March 2004, Andre thought someone stole his coat from him. He insisted that Rose Soto, his girlfriend at that time, had stolen his coat and was using it to do some voodoo on him. He could not explain to me what the voodoo was but he knew that was why Rose had stolen his coat. In actuality, one of his cousins had taken the coat to wear during the colder weather.

16. Sometime in March 2004, before the crimes, I went over to Andre's trailer because he told me he would install my stereo in my car for me. When I got there, Andre had duct tape over his mouth. I asked if he could put in my radio and he nodded. He would not remove the duct tape from his mouth to speak, and instead just gestured or nodded to communicate with me the entire time I was at his trailer. He put the radio in my car for me and wore the duct tape on his mouth the whole time. He wore the duct tape on his mouth for three days.

17. One day, during these three days that Andre was wearing the duct tape over his mouth, I went over to his trailer and Andre was cutting words and letters out of the Bible and making them into sentences. He also had a notebook where he wrote a bunch of stuff. The writing in the notebook was going in all different directions on the page. The words and sentences did not make any sense.

18. Andre wanted his family to accept him for who he was, but he felt that his father did not accept him because he was different. From around February 1, 2004, to the time of the crimes, people would avoid Andre because he was always talking about his weird theories about the dollar bill containing the answers to the meaning of life, demons, and other strange things that did not make sense to me.

19. I spent time with Andre after he returned from the Texoma Behavioral Health Center. He was nervous that he had told them "too much" about his theories. I asked him what he had said but he could not tell me; he just kept repeating that he had said "too much." He still was not

making sense to me. Immediately after leaving me, Andre took off walking by himself. He looked very scared.

20. After the crimes, when I visited Andre in jail, he would talk to me about demons. He would see demons. Once during this time, he wrote me a letter telling me that the reason that he killed his son was because his son had a demon in him and Andre had to kill him to get rid of the demon. I believe that Andre truly believed this.

21. I have also known James Thomas, Andre's brother, since around the time I met Andre. With James, it is really iffy what he is going to be like; he will be one person one moment and a different person the next. James just flips out in a second.

22. I also met Andre's brother, Brian Thomas in 2003. Brian always acted like he had nothing up in the head; totally crazy behavior. Several people that I know in the community of Sherman, Texas think that Brian is totally crazy. Andre told me that Brian used to beat him up all the time throughout his childhood and teenage years.

23. Since I met Andre, I always thought he was different. It seemed to me like he was fighting something mental for a long time. He did not talk very much and it seemed like he was just trying to keep his problems under wraps. It seemed like Andre was always trying really hard to contain his issues inside him.

24. I testified for the defense at Andre's trial after contacting Ms. Bobbie Peterson and telling her I wanted to testify for him. No one from the defense team had contacted me prior to my phone call to Ms. Peterson.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Amy Ingle_
Signature

_Amy Ingle_
Printed Name

COUNTY OF GRAYSON
STATE OF TEXAS

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _11_ day of _April_, 2007.

_____
Notary Public's Signature
My commission expires: 12-18-2010

KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

4

# Exhibit 19

## Affidavit of Konta Johnson

COUNTY OF MUSCOGEE )

                          ) ss:    **AFFIDAVIT OF KONTA JOHNSON**

STATE OF GEORGIA )

    **KONTA JOHNSON**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Konta Johnson. I am a resident of Columbus, Georgia. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am Andre Thomas's aunt. Danny Thomas, his father, is my half-brother. Danny and I have the same mother, Emma Thomas, but different fathers.

3. I left the Sherman, Texas area after I graduated from high school in order to make a fresh start for myself. My father told me that in order to make something of myself, it would be best to get far away from that area. I took his advice and joined the military in order to leave home. It was important for me to do this, because so many members of the family had mental problems and drug and alcohol addictions. I needed to separate myself from this. Leaving home was a good decision for me; I now have a successful nursing career and family in Georgia.

4. Nevertheless, I returned to the Sherman area from time to time to help out when my relatives were ill or needed my assistance. I would also return home for big family events. On these occasions, I would see Andre and his brothers, as well as many other family members.

5. I began to suspect that Andre had some form of mental illness when he was a teenager. He had several behaviors that indicated to me that something was not right with his head. I suspected the same thing about many of his brothers, particularly Brian Thomas and James Thomas. I also suspected that Danny Ross suffered from some sort of depression. I think this is due to the mental illness that runs on both sides of Andre's family.

6. I returned home during the month before the crime for my sister Angel's funeral. I was very close to Angel, as she helped raise me. My mother would have to sneak out of the house in order to work to support her many children. When she would be away, Angel would take care of me. Andre was also very close to his Aunt Angel.

7. At Angel's funeral, Andre approached me and asked how I was doing. I told him that I was doing okay and inquired as to how he was doing. He told me that he wasn't doing well at all and that he had been back and forth to the doctor's. I asked him what was wrong, and he pointed to his head and said he was having a lot of problems with his thoughts and stuff.

8. I kept up with the media coverage of the crime and trial. At the time, I was taking psychology classes in nursing school and took some newspaper clippings to my psychology class. I talked with my psychology professor about Andre and she believed he had a serious mental illness based on what I told her and the newspaper accounts of Andre. We even

discussed Andre's case in class as a real-life example of mental illness and its effects.  I thought it was important that the truth come out about how Andre was mentally ill, so I called one of the television stations in the Sherman area to tell them about Andre's mental problems.

9.  I think a lot of Andre's problems also stem from his mother, Rochelle Ross.  Since the time that my brother Danny married her, I have suspected that she has had mental problems.  She acts erratic and never stays long in one place.  She also has had sexual relationships with many different men; I have often thought that Andre and his brothers could all have different fathers, even though she was married to my brother during the time the majority of them were conceived.  I also think Rochelle had a problem with alcohol and/or drugs.  I believe she took a number of drugs, both psychiatric and street drugs, during Andre's childhood.  Also, she was not around a lot of the time to properly raise her sons.

10. No one from Andre's defense team ever contacted me before or during trial.  Had someone from his team contacted me, I would have told them the information contained in this affidavit and testified to it at trial.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_____
Signature

_____
Printed Name

COUNTY OF MUSCOGEE
STATE OF GEORGIA

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 31st day of _____ 2007.

_____
Notary Public's Signature
My commission expires:

2

# Exhibit 20

# Affidavit of Roscoe Johnson

| | |
|---|---|
| COUNTY OF SAN DIEGO | ) |
| | ) ss:   **AFFIDAVIT OF ROSCOE JOHNSON** |
| STATE OF CALIFORNIA | ) |

**ROSCOE JOHNSON,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.  My name is Roscoe Johnson. I am a resident of San Diego County, California. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.  I am the half-brother and youngest brother of Rochelle Ross, the mother of Andre Thomas.

3.  When I was in around third or fourth grade, my mother Vivian Joanne, married Walter Martin. Sometimes Walter would get drunk and beat on my mother. All of us kids tried to keep Walter away from my mother when he got violent, but I was the poster boy for trying to stop him from hurting her.

4.  I am an alcoholic but I have never been drunk on the job.

5.  My sister Rochelle started going with Danny ~~Ross~~ Thomas when I was still living at home. Danny was mentally off. He would get a weird look on his face and he would talk to himself and curse himself. He was always talking under the mouth. His sister, Angel, was strange, too. They were the spitting image of each other and she seemed crazy, too.

6.  Walter Martin shot and killed my brother, Greg, when Walter was fighting with my mother.

7.  No one contacted me at the time of Andre's trial to help or testify. If anyone from his defense team had contacted me, I would have been willing to discuss the matters contained in this statement and to testify on Andre's behalf.


_____
Signature

_Roscoe Johnson_
Printed Name

COUNTY OF SAN DIEGO, STATE OF CALIFORNIA
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _14th_ day of
_May_ 2007.

_____
_Anntonika Marie Harrison_
Notary Public's Signature
My commission expires: _12/9/07_


ANNTONIKA MARIE HARRISON
Commission # 1455132
Notary Public - California
San Diego County
My Comm. Expires Dec 9, 2007

# Exhibit 21

## Affidavit of Todd Johnson

COUNTY OF MUSCOGEE )
                   ) ss:   **AFFIDAVIT OF TODD JOHNSON**
STATE OF GEORGIA   )

    **TODD JOHNSON,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.   My name is Todd Johnson. I am a resident of Columbus, Georgia. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.   My wife, Konta Johnson, is Andre Thomas's aunt. I have known Andre since 1985, when I married Konta. Andre was about two years old.

3.   I served in the military for over twenty years. During this time, one of my jobs was with the military police. I also served as an investigator for the military prosecutors. During both of these jobs, I came into contact with mentally ill individuals, as well as substance abusers. Sometimes, when a new recruit would join, I would have to send him to get a psychological evaluation, based on my thoughts that he might have mental problems. I learned how to spot mental problems fairly easily after spending time around these individuals.

4.   I have thought Andre had some sort of chemical imbalance or mental illness for years. The older he got, the more pronounced these problems became. I recognized Andre's signs and symptoms as mental illness based on my experience dealing with mentally ill individuals during my time in the military. I did not view his problems as those caused by drugs; his symptoms were much more in line with those of people suffering from mental problems.

5.   I have also thought that the majority of Andre's brothers – James, Brian, and Danny – also had some sort of mental problem. Each of them exhibited strange and unusual behaviors and they also seemed depressed.

6.   On one occasion, when I was in Sherman, Texas for one of my wife's family events, it was raining heavily. Everyone but Andre ran for shelter or used an umbrella, but Andre just stood there staring off into space in the pouring rain. He seemed out of it, like he was a million miles away.

7.   I have also experienced or observed several incidents of racism in the Sherman, Texas area. I believe that the racial problems are worse in that area than they are in Georgia. For example, at a local Sherman gas station, I observed white families being able to pump gas and pay afterwards, but black families being told they had to pay before they pumped the gas. I have also seen the way white people in Sherman treat black people, especially the older generations. For example, some white people in Sherman will not talk to or socialize with black people and act afraid of them. I have also observed interracial couples treated poorly in the area. This is in contrast to my experiences in the military, where minorities are treated in a more equal fashion, and interracial couples are more accepted.

8.   No one from Andre's defense team ever contacted me before or during trial.  Had someone from his team contacted me, I would have told them the information contained in this affidavit and testified to it at trial.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_____
Signature

_____
Printed Name

TODD E. JOHNSON

COUNTY OF MUSCOGEE
STATE OF GEORGIA

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _31st_ day of _May_, 2007.

_____
Notary Public's Signature
My commission expires:  5-27-08

2

# Exhibit 22

# Affidavit of Walter Johnson

COUNTY OF KERN                 )

                                ) ss: **AFFIDAVIT OF WALTER D. JOHNSON**

STATE OF CALIFORNIA          )

**WALTER D. JOHNSON,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Walter Johnson. I am a resident of Kern County, California. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I am seventy-two years old. I am the half-brother of Andre Thomas' maternal grandmother, Vivian Joanne Ross. I call her Joanne. She is the mother of Rochelle Ross, Andre's mother. When my father, Walter Johnson Sr., married my mother, Alice Pugh, they each had five children already. Joanne was my mother's fourth child. My parents had me first, and then my younger brother Earl. I am the only one still living of my mother's seven children. Eventually my mother left my father because he committed adultery.

3. Joanne was my closest sibling. We were buddies. She was four years older than me. When Joanne was just fourteen, she had her first baby, Ron. She still lived at home with my parents. After Ron, Joanne had another son, Kevin, from another man. Then, Joanne married Johnny Ross and had three kids. One of those kids was Rochelle, Andre's mother. Joanne eventually had four more kids, but did not marry their fathers.

4. Joanne had a problem with alcohol from a pretty young age. When she got drunk, Joanne would change and became mean. When I was about sixteen I remember Joanne being drunk and saying very abusive, bad things to our mother. When Joanne was in her drunken state she was mean to everybody.

5. After Joanne and Johnny Ross split up, she was married to Walter Martin. Walter was a mean drunk and abusive to Joanne. He would beat her. Sometimes when Joanne was drunk, she would pick a fight with Walter. He would have to defend himself against her and he would beat her then, too.

6. Joanne struggled to make ends meet but most of the time she was not able to. There were times when there was no electricity in her house for her kids. It was hard because none of the men she was with, including the five fathers of her nine children, were dependable. Sometimes I would give her money to help her out.

7. There have been a lot of violent incidents in my family. Our brother, Earl, was shot and killed by his wife. Joanne's second husband, Walter Martin, shot and killed Joanne's son, Gregory. After this happened, another one of Joanne's sons,

Kevin, tried to kill Walter Martin. Kevin killed his wife's ex-husband when he broke into their home, but he was not prosecuted.

8. For about twenty years, until 1994, I drove an airport shuttle bus between Bakersfield and Los Angeles. A year after I left my job, my fifth wife and I split up. For the next twelve years I traveled and lived all over the place, in at least five different states. I have settled back in Bakersfield for the last year.

9. During the last four years I lived with Rochelle for two periods of time. The first time was for a few weeks around 2002, before Andre was arrested for murder. I was moving around quite a bit. Rochelle convinced me to stay with her for a while. At that time she was living with a guy named McCloud. She also rented an apartment for her sons to live in. Andre did not like to live with his brothers because they were always getting into trouble so he stayed with Rochelle at McCloud's.

10. Rochelle never warned me that her son, Brian, was mentally ill. One night when I was staying with them, Brian suddenly got very upset for no reason and started to yell at me to get my stuff out of the house. I was afraid he was going to hurt me physically. I pushed him out of my room and slept with my door locked. Rochelle calmed Brian down. She said he got out of hand when he did not take his medication. Brian was seriously mentally ill. Sometimes he would be watching television and all of a sudden he would change from being quiet to being very upset, for no reason at all.

11. When I moved out of Rochelle's house in 2002, I left my van parked at her house with a lot of my stuff in it. I went to California for a little while. Rochelle called me and said someone wanted to buy the van, and said I should send the title to her. I sent it, and the next thing I knew they had thrown all my stuff away and had sold the van. I really needed that van. All of a sudden I had nothing.

12. The second time Rochelle and I lived together was after Andre was arrested for the murders. Rochelle and her youngest son, █, came to stay with me where I was living at the time in Coffeeville, Kansas, for about six months. Rochelle did not give █ any guidance or a sense of how a person is supposed to act. It's not a wonder that all her boys have had problems dealing with other people and had trouble with the law. The boys didn't have male role models and during our short time together I tried to have some positive influence on █. He liked me and we had a bond. It made Rochelle mad if I told █ to behave, and she was jealous of the bond I developed with him.

13. As always, Rochelle eventually moved on. All this moving around is very hard on █. Rochelle did the same thing with her other sons, including Andre. I know this had a bad affect on them because they never stayed anywhere long enough to get settled in school, make friends or just be stable.

14. Rochelle did not know how to keep a proper home. She never kept track of possessions. One of the times after I lived with her, I left her with some nice things when I moved out, like a nice television and some furniture. When she left that apartment she just left all of that stuff there. She just didn't care. It was just time to move on.

15. No one contacted me at the time of Andre's trial to help or testify. If anyone from his defense team had contacted me, I would have been very willing to discuss the matters contained in this statement and to testify on Andre's behalf.

X _Walter D Johnson_
Signature

_WAlteR D JOhnson_
Printed Name

COUNTY OF KERN, STATE OF CALIFORNIA
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _12th_ day of
_May_, 2007.

_Antoinette M. Mangrum_
Notary Public's Signature
My commission expires:

ANTOINETTE M. MANGRUM
COMM. #1464680
NOTARY PUBLIC • CALIFORNIA
KERN COUNTY
My Comm. Exp. Feb 19, 2008

# Exhibit 23

# Affidavit of Jonathan Lipman

COUNTY OF UNICOI      )
                            ) ss.     **AFFIDAVIT OF DR. JONATHAN LIPMAN**

STATE OF TENNESSEE   )

        **DR. JONATHAN LIPMAN**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

**1.**     I am a neuropharmacologist, having a doctoral degree (University of Wales, 1979) and postgraduate training in this field, which deals with the understanding of the effects of drugs on nerve, brain and behavior. A copy of my *curriculum vita* is appended as **Attachment № 1** to this affidavit.

**2.**     I am Board Certified in neuropharmacology by the American Board of Forensic Examiners, the American Board of Forensic Medicine and other professional certification bodies, as described in my *curriculum vita*.

**3.**     I have practiced in the fields of consulting, pharmaceutical, research and forensic neuropharmacology since 1979, and have consulted with state, federal and military courts both civil and criminal, in the United States, including the courts of Texas.

**4.**     I was available to consult with the attorneys representing Andre Thomas following his arrest in 2004 and subsequently, and was, in fact, consulting with attorneys in Texas in this time period.

**5.**     Through Mr. Cliff Anderson of the law firm of Dorsey and Whitney LLP - which firm is associated with state appointed habeas counsel, attorney Don Bailey of Sherman, Texas, representing Petitioner Andre Thomas - I am asked to opine on possible forensic neuropharmacological issues that could have been relevant to the criminal defense of Andre Thomas resulting from his killing of his wife and two children, one of which was also his son, on the morning of the 27th of March, 2004. I am particularly asked to address forensic neuropharmacological and toxicological issues that were overlooked, omitted or inadequately addressed by Mr. Thomas' defense team.

**6.**     I have not personally interviewed or evaluated Mr. Thomas, but have relied on extensive records together with the results of assessments and examinations performed upon him since his trial, as described in **Attachment № 2** to this affidavit. Should additional information be later made available to me for review, I reserve the right to modify or change the opinions expressed herein based on such additional information.

**8.**     According to my review of the records: at the trial of Mr. Thomas the State and defense stipulated to the laboratory toxicology findings regarding Mr. Thomas' blood and urine assays and the State argued that Mr. Thomas was voluntarily intoxicated on a combination of marijuana, alcohol and /or Coricidin at the time of the offense. My review of the record reveals that the State particularly focused on the effects of Coricidin's component drug dextromethorphan (DXM). The State further argued that the psychosis he suffered at the time of the offense was caused by this intoxication.

9.      It is undisputed, as described by State experts David Axelrad and Victor Scarano who testified during the guilt/innocence stage of the trial, that Mr. Thomas was indeed suffering psychosis at the time of the offense, and it is also clear from the records reviewed that this psychosis did not abate or diminish in the weeks and months following his arrest up to and through the time of his trial and it is clear also that this psychotic mental illness continued to require very large doses of antipsychotic medications to control. Thus the quality and persistence of the psychotic disorder from which he suffered was known to Mr. Thomas' attorneys at the time of trial.

10.     Pharmacokinetics is the study of the movement and change in concentration of drugs through the different tissues and compartments of the body. Pharmacodynamics is the study of the effects of drugs, as their concentrations change pharmacokinetically. Having regard to the known pharmacokinetics of the ingredients of the component drugs in the Coricidin compound; chlorpheniramine and dextromethorphan, and the known and pharmacodynamic time-course and intensity of these drugs' effects, the qualitative features of the intoxication typically produced, and the toxicological studies performed on his blood and urine following his arrest, I conclude, to a reasonable degree of neuropharmacological certainty, that there was and is no affirmative forensic toxicological support for the view that Mr. Thomas was intoxicated by alcohol, marijuana or Coricidin's ingredients at the time of the offenses. No laboratory forensic toxicology measures found him to be intoxicated on alcohol and the assay performed for marijuana metabolites (cannabinols) was in urine rather than blood, reflecting past presence rather than current influence. Cannabinols are concentrated by the body in the urine such that, for instance in a regular user who discontinues the drug, urine levels remain measurably high, declining at about 15 ng/ml per day, for several weeks after the blood level has fallen below the range of detection and below the concentration necessary to exert pharmacodynamic effects on the brain. In forensic toxicological terms: a urine cannabinoid concentration cannot be used to infer an intoxicating blood level of the drug.

11.     The only assay for DXM that was performed concluded that it was present at a concentration below the sensitivity of the assay to quantitate. Had I, or any pharmacologist, been consulted by Mr. Thomas's attorneys, it would have been explained to them that under accepted forensic toxicological guidelines, the only correct conclusion to be drawn from the toxicology studies for DXM was that DXM was not detected above the cut-off level of the test. A 'trace' quantity is impossible interpret in pharmacokinetic terms without some measure of quantitation, since small variations in concentration can have large consequences in back-calculation (interpolation) to a blood concentration at an earlier time.

12.     Essential to interpolation, and determining how the individual handles the drug's metabolites (which in dextromethorphan's case are themselves active drugs, with properties, like the parent drug, that alter the user's mental state) is the necessity of

Affidavit of Dr. Jonathan Lipman

understanding the metabolic state of the individual with regard to that drug. In the case of dextromethorphan, which assumed particular importance as an issue in Mr. Thomas' case, the drug is metabolized by a genetically controlled enzyme system with great inter-individual variation in efficacy. Had I, or any pharmacologist, been consulted by defense in this matter I would have recommended that a dextromethorphan metabolism study be conducted to assess the status of Mr. Thomas' drug metabolizing enzymes, principally Cytochrome $P_{450}$ 2D6 (also known as CYP 2D6). Although ample opportunity was available for such a study, and the procedure is routine, simple, cheap and non-invasive, no attempt was made to perform this essential procedure as far as I can tell from the record.

13.     Because no dextromethorphan metabolism study was performed, and because it was therefore unknown as to whether Mr. Thomas was a fast or slow (also called 'poor') metabolizer of the drug, counsel for the State was able to lead toxicologist Eduardo Padilla into testimony that in my opinion mis-stated the significance of the toxicology findings in Mr. Thomas' case. Specifically: Mr. Padilla testified that 90% of 'the population' are fast metabolizers of DXM and 10% are slow, and the state was able to draw the seeming inference that because of it's rarity in 'the population' Mr. Thomas was not a slow metabolizer, which led to the seeming inference that the dose Mr. Thomas took days before would have to have been large. This chain of inference and the facts on which it is based are false and misstate the statistical meaning of population incidence. Whether Mr. Thomas is or is not a slow or fast metabolizer is entirely independent of the incidence rate in 'the population'. Even so: the 'percentage' of a population that is of slow metabolizer status varies with the particular population studied. Thus: among so-called 'white' races, 10% of Swiss are slow metabolizers, but only 1.5% of Turkish and 8.9% of British and 7.7% of American 'whites' are slow metabolizers. Among Negro ethnicities the Nigerian slow metabolizer incidence varies between zero and 8.1, among Ghanians it is 6% and among Ethiopans (in the north of the African continent) it is 1.8%. Nineteen percent (19%) of Negroes from the south of the African continent are slow metabolizers. Very few Asians are slow metabolizers, the highest incidence being among the Indian ethnicities with a rate up to 4.8%

Had I, or any pharmacologist, consulted with the defense in preparation for witness examination, or been asked to testify, these facts could have been explained to Mr. Thomas' attorneys and discussed on direct and cross-examination. As described above, however, the knowledge of whether Mr. Thomas was a fast or slow metabolizer was amenable to measurement and there was no need to resort in this case to misleading speculation which allowed a cascade of nested and misleading inferences to be drawn.

14.     Having reviewed all information available from witnesses to his behavior under the influence of alcohol, marijuana and Coricidin following his taking the drug on 3-4 March 2004, 17 March 2004 and 25 Mar 2004, Mr. Thomas appears to have experienced the typical deliriant and emetic (vomiting) effects of Coricidin, which effects pharmacologically are due principally to its dextromethorphan ingredient. The drug

Affidavit of Dr. Jonathan Lipman

produces different and more deranging effects on chronic use than it does on acute use, the latter (just three uses, one or two weeks apart) being alleged as Mr. Thomas' lifetime exposure. Acute use is deliriant and dissociative in nature, behaviorally producing ataxia, nystagmus, slurring of the voice and euphoria. Such psychotomimetic effects as are produced by acute use are transient, lasting hours, and do not follow the persistent and exacerbating time-course of months and years reported in Mr. Thomas' case.

**15.**     In my opinion the behaviors exhibited by Thomas before, during, and after 27 March 2004, do not resemble the known psychotoxicity of dextromethorphan.  Rather, as described in the examination information I have been provided from Dr. Myla Young provided to me, and as amply supported by the record and witness statements that I have reviewed regarding his behavior,  both prior to and following Mr. Thomas' alleged exposure to dextromethorphan, he was demonstrating the signs of a paranoid psychotic mental illness with delusional, hyper-religious and affectively unstable features – a condition that Texas State Hospital staff at Vernon recorded as: *"...symptoms of schizophrenia beginning at age eighteen or nineteen."* To these healthcare workers Mr. Thomas' father, Danny Thomas, reported that his son had suffered ongoing mental health problems *"for at least the past year,"* and he described Andre Thomas's hyper-religious preoccupations in this context. Other witnesses describe his behavior as progressively more bizarre in the year before the offenses: reporting that he believed he was infested by *'demons,'* that while unemployed and impoverished he set fire to a $100 bill and 'preaching' in a way that others found to be *'crazy'* and nonsensical. Mental health worker's notes at the TSH Vernon hospital likewise clarify the relationship of alcohol use to the symptoms Mr. Thomas experienced: *"...alcohol seemed to decrease his fear of 'people listening to my thoughts' ... that he experiences voices whether he is drinking or not, but 'alcohol makes them less frightening.'* Several witnesses, whose statements I have reviewed, recalled – months before he was exposed to Coricidin - Mr. Thomas insisting that he was living and re-living portions of his life over and over again, in a state that he (in neuroscience terms, improperly) described as 'déjà vu.' From my review of the different reports of Mr. Thomas' use of this phrase and the context in which he used it, it seems clear that he was not referring to the subjective illusion of having experienced something before, but of actually in truth re-living these times [possibly a delusion of warped time, see: Aziz VM & Warner NJ (2005) Capgras syndrome of time, *Psychopathology* 38(1):49-52 and see also: Arehart-Treichel (2004) Déjà vu experiences linked to brain region, Psychiatric News 39(22)p25]. Thus: when Mr. Thomas visited the home of family friend McCloud Luper for the first time in 2002 or 2003 (where Mr. Luper, as he describes in his affidavit, was sitting on his porch with his friend Otis); Mr. Thomas insisted that he had visited before when Luper and Otis had been sitting talking on the porch. Mr. Thomas said to Mr. Luper that he had done this, and had previously lived that day *'over and over,'* and Mr. Luper was unable to disabuse him of this erroneous conviction. After the offenses, when Mr. Thomas was incarcerated, he described the same 'warped time' déjà vu explanation in his evaluation by Dr. Harrison: when explaining that his wife and child were not dead, and his eye was not plucked out, because *'this is déjà vu and he can go back to where his life was before and start over."*

Affidavit of Dr. Jonathan Lipman

Mr. Thomas' friend Amy Ingle described Mr. Thomas' conviction that she was – literally and not figuratively – an *'angel,'* a supernatural being [another example of Capgras syndrome, a psychotic symptom of delusional misidentification]. Those who knew Mr. Thomas the longest have reported that his thoughts and behavior became noticeably aberrant at an earlier age, which is characteristic of endogenous psychoses. His childhood friend Chris Bennett recalled and attested to Mr. Thomas in earlier years, in an agitated state of bizarre intensity, communing with 'demons' that only he could see or hear. Those who spent time with him more recently prior to the offense reported increased intensity of the symptoms that would later be recognized as psychotic. Amy Ingle described how, in March of 2004, Mr. Thomas claimed that the images on the dollar bill *"contained the meaning of life."* Specifically: *"..the meaning... had something to do with the eyes of the image of the man on the dollar bill"*. In this month also he inexplicably wore duct-tape over his mouth for three days, while continuing to socially interact, but refusing to speak, something that Mr. Thomas' father told Vernon Hospital workers his son had also done three months before the offense, months before his first exposure to Coricidin. About the time of his first exposure to Coricidin, on or about 5 March 2004, Mr. Thomas attempted suicide by drug overdose (taking his brother's medication) and following six days of drug-free incarceration, long after his blood showed no quantifiable dextromethorphan, he plucked out his own eye, explaining to the jail officers that it *"was God's will"* and later, to mental health workers, that he believed that *"everyone would get out of hell if he plucked his eye out."* This act, like the others described above was conducted in a continuing context of a deranged hyper-religious, psychotic, thought process - a derangement with which Mr. Thomas continues to be afflicted and for which he has continuously required antipsychotic drug treatment.

16.    Thus, several witnesses and family members attested to the essential psychotic features, delusional elements, thought derangements and perceptual distortions and hallucinations characteristic of Mr. Thomas' mental illness prior to his Coricidin exposure, and described these as being qualitatively and substantively similar in nature and content, though earlier of lesser intensity, to the elements later both relevant to his account of the offense and as assessed by mental health workers in the months and years following this offense. He continued to suffer from this psychosis through incarceration and trial and based on current information continues to suffer this mental disorder more than three years since the offense, and continues to require antipsychotic treatment for this.

17.    The psychotic condition which afflicted Mr. Thomas prior to, during and following the offense, and which continues to the present day, is not in my opinion a result of his having taken marijuana or alcohol, or Coricidin on three occasions in March 2004. The thought content of his psychosis, the nature and quality and content of his psychotic thinking as revealed in his confessions to police and my review of the crime scene photography, the command intrusive thoughts, without insight, that he reported and

Affidavit of Dr. Jonathan Lipman

the delusional nature of reality he experienced, and most particularly the evolution and persistence of these, characterized neuropsychologically in brain functional terms by current objective and projective testing performed by Dr. Myla Young, are quite distinctly different from the known quality, time course, content and intensity of intoxication typical of these drugs, and this would have been known to any pharmacologist consulted in 2004.

A search of the National Library of Medicine library files indicates that fifty-eight peer-reviewed scientific articles on the subject of dextromethorphan toxicity had been published up to the date of the trial, several of these specifically on the subject of Coricidin toxicity. [See, for instance: Kirages TJ, Sule HP, Mycyk MB. (**2003**) Severe manifestations of coricidin intoxication. *Am J Emerg Med*. 2003 Oct;21(6):473-5. and see also: Nevin J.(**2004**) Drug abuse update: dextromethorphan. *Emerg Med Serv*. Feb;33(2):34, 36. and see also: Boyer EW. (**2004**) Dextromethorphan abuse. *Pediatr Emerg Care*. Dec;20(12):858-63. ; and see also: Price LH & Lebel J (**2000**) Dextromethorphan-induced psychosis, *Am. J. Psychiatry* 157:304 and see also: Iaboni RP & Aronowitz JS (**1995**) Dextromethorphan abuse in a dually diagnosed patient. *J. Nerv Ment. Dis*. 183(5):341-2]. A number of web-sites describe the symptoms of dextromethorphan toxicity, including that of the U.S. government's National Highway Traffic Administration (listing research publications up to 1999, see: http://www.nhtsa.dot.gov/PEOPLE/injury/research/job185drugs/dextromethorphan.htm ) and Dr Shannon Miller's http://www.forensicaddictions.com/ which references the publication: Miller SC (2005) Dextromethorphan psychosis, dependence and physical withdrawal. *Addict Biol*. 2005 Dec;10(4):325-7

**18.**    From a neuropharmacological perspective, from a review of his treatment history, the drugs with which he has been treated and the effects these have had on his illness - both those that helped alleviate his symptoms and those that did not – I conclude, to a reasonable degree of neuropharmacological certainty. that Mr. Thomas appears to suffer from an endogenous schizophreniform psychotic illness. Such illnesses typically emerge in the patient's early 20's after a period of prodromal deterioration and increasing decompensation, as in the case of Mr. Thomas. Such illness is partly genetic in etiology, being more common in the first degree relatives of psychotic patients, and in this regard I note that Mr. Thomas' brother Brian Thomas has been diagnosed with schizophrenia, and was known to have been so diagnosed before Mr. Thomas came to the court's attention.

**19.**    Mr. Thomas came to the attention of mental health care workers on at least two occasions in the weeks prior to the offense, and on both occasions his mental illness was recognized and on both occasions an *Application for Emergency Apprehension and Detention* was prepared by healthcare workers and signed by a magistrate in order to restrain him against his will from leaving the hospital. Records reviewed indicate healthcare workers appreciation of his being a danger to both himself and others. On both occasions Mr. Thomas was allowed to walk away from the facility without being

detained, and no attempt was made by police or healthcare workers to retrieve him despite issuance of the *Orders*.


20.     Recent neuropharmacological research on treatment strategies for the endogenous psychotic illnesses – research that was available in 2004 – has found that active pre-emptive - neuropharmacological and psychotherapeutic interventions in the earliest stages of the illness can greatly improve the outcome, course and even the development of the illness.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.


Signature

Dr Jonathan Lipman.

Printed Name


COUNTY OF UNICOI          )
                          )          SS
STATE OF TENNESSEE        )


SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 14th day of June, 2007.

Notary Public's Signature

My commission expires: 3/29/2011

*SHERRY J. BAILEY*
*STATE OF TENNESSEE*
*NOTARY PUBLIC*
*UNICOI COUNTY*


Affidavit of Dr. Jonathan Lipman

## Attachment № 1: curriculum vita

*CURRICULUM VITA*

**Jun 2007 TN**

**JONATHAN JOSEPH LIPMAN, Ph.D., MIBiol., FACN**

ADDRESS: **Neuroscience Consulting, Inc.[  http://www.neuroscienceconsulting.com/ ]**
150 Hawkridge Road, Unicoi, TN 37692, USA

TELEPHONE:                        (423) 743-5300 [Unicoi, TN, office]
                                          (423) 743-0901 [Unicoi, TN, Fax]

DATE AND PLACE                   March 22, 1952
OF BIRTH:                             Leeds, England  (Naturalized USA)

MARITAL STATUS:                 Single

EDUCATION

  High School                  Allerton Grange School, Leeds, England
                                      General Certificates of Education, June 1970

  Undergraduate:            Kitson College of Science, Leeds, England
                                      Advanced Level Certificates of Education, June 1972

  Graduate:                    The Hatfield Polytechnic, Hertfordshire, England
                                      B.Sc. (Honours) Applied Biology 1972 -, 1976

  Postgraduate:              The University of Wales Institute of Science and
                                      Technology (UWIST), Cardiff, Wales
                                      Ph.D. (Neuropharmacology)
                                      September 1976 - December 1979

### REGISTRATION / CERTIFICATION:

Board Certification:  In Pain Management: Diplomate of the American Academy of Pain Management

Board Certification: Fellow and Diplomate, American Board of Medical Psychotherapists &
Psychodiagnosticians

Board Certification: In nutrition, Certification Board for Nutrition Specialists [recertified July 2001]

Board Certification:  Diplomate of the American Board of Forensic Examiners

Board Certification:  Diplomate of the American Board of Forensic Medicine

Board Certification: American Board of Psychological Specialties: Psychopharmacology board

Board Certification: American Board of Psychological Specialties: Substance Abuse board

Board Certification: Senior Disability Analyst and Diplomate of the American Board of Disability Analysts

Registered Biomedical Scientist  (Health Professions Council), England #BS17189

Certified Medical Hypnotherapist - National Board for Hypnotherapy and Hypnotic Anesthesiology

Certified Clinical Hypnotherapist - American Council of Hypnotist Examiners

Registered: National Registry of Board Certified Pain Practitioners (in Neuropharmacology)

US National Provider Identifier: 1003981218

**SOCIETY MEMBERSHIPS (CURRENT*):**
1978    International Narcotics Research Conference, Member
1979*   Institute of Biology (U.K.), Member, Chartered Biologist
1980*   American Assoc. for the Advancement of Science, Member
1981    National Society for Medical Research, Member
1981*   Society for Neuroscience, Member
1981*   International Brain Research Organization, Member
1984    Institute for the Advancement of Health, Member
1984    New York Academy of Sciences, Member
1985    International Society for Toxinology, Member
1986    American Institute of Chemistry, Member
1987*   International Association for the Study of Pain, Member
1987*   American College of Nutrition, Fellow (recertified 2003)
1994*   American College of Forensic Examiners, Fellow & Diplomate
1996*   American Board of Forensic Medicine, Diplomate
1997*   American Board of Psychological Specialties, Diplomate

**PROFESSIONAL EXPERIENCE:**

|  |  |
|---|---|
| 5/74 - 10/75 | Institute of Neurology<br>Department of Neurosurgical Studies, National Hospital for Nervous Diseases, Queen Square, London, England |
| 9/76 - 1/80 | Research Associate and Instructor<br>The Welsh School of Pharmacy, The University of Wales Institute of Science and Technology, Cardiff, Wales |
| 2/80 - 9/83 | Research Associate<br>Departments of Anesthesiology and Biochemistry and U.T. Pain Clinic, University of Tennessee Center for Health Sciences, Memphis, Tennessee |
| 9/83 - 7/93 | Research Instructor<br>Department of Surgery, Vanderbilt University School of Medicine, Nashville, Tennessee |
| 9/84 - 6/88 | Research Instructor<br>Department of Medicine, Vanderbilt University School of Medicine, Nashville, Tennessee |

| | |
|---|---|
| 6/88 - 7/93 | Research Assistant Professor<br>Departments of Medicine and Psychology (adjunct), Vanderbilt University School of Medicine, Nashville, Tennessee |
| 7/93 - 3/94 | Group Leader, Pharmacology<br>Molecular Geriatrics Corp.101 Carriage Point, Suite 970 Lake Bluff, IL 60044 |
| 10/94 -Present | Senior Vice President, R & D,<br>Medical Toolworks, Inc. Northwestern University / Evanston Research Park, 820 Davis Street, Suite 131, Evanston, IL 60201 |
| 1/97-Present | President and CEO<br>Neuroscience Toolworks Inc. Northwestern University / Evanston Research Park, 820 Davis Street, Suite 131, Evanston, IL 60201 |
| 9/01 – Present | Associate Clinical Professor of Psychiatry and Behavioral Science, Quillen College of Medicine, East Tennessee State University, Johnson City, Tennessee. |

## CONSULTANTSHIPS/PROFESSIONAL AFFILIATION HISTORY (CURRENT*):

| | |
|---|---|
| *Consultant: | American Academy of Pain Management<br>Pain Clinic Accreditation/Site Visit Team |
| *Board Member: | Executive Board of Scientific and Technical Advisers (1997/98, 98/99, 00/03 Terms of Office). American Board of Forensic Examiners, Springfield, Missouri. Chair Emeritus of the Executive Board of Scientific and Technical Advisers (2002-4 term), ABFE board member 2005-2007 |
| *Director | Toxicology Section, American College of Forensic Examiners |
| Consultant: | U.S. Department of Health & Human Services, Public Health Service, National Institute on Drug Abuse |
| Consultant: | In analgesic drugs; to Boehringer Ingleheim Sohn, Ingleheim-am-Rhine, West Germany. |
| Investigator: | Cathinone (KHAT) project; to the World Health Organization, Pharmacology Department, Vienna, Austria. |
| Research Collaborator | Consultant to the Program in Kidney Disease, School of Medicine, UCLA, Los Angeles, California. |

| | |
|---|---|
| Research Collaborator | Division of Nuclear Medicine, Brookhaven National Laboratory, Upton, Long Island, New York. [I.D.: L 5106] |
| Lecturer | on Alcohol and Drugs, National Defender Investigator Association Southeast Regional Conference. |
| Principal Investigator: | Dietary Modification of Uremic Encephalopathy (Center in Nutrition Research Unit/NIH / VUMC) |
| Principal Investigator: | Aluminum Toxicity in Uremia (Center in Molecular Toxicology/NIH/VUMC. |
| Preceptor: | Diabetes Research and Training Center, Vanderbilt University Medical School, Nashville, Tennessee. |
| Chief Investigator: | Vanderbilt University Clinical Research Center; Heatbeam Dolorimetry for Assessment of Pain.(GCRC Project #357). |
| Investigator: | Research Service in Brain Research Veterans' Administration Hospital Nashville, Tennessee. |
| Reviewer: | NIH / National Center for Complementary and Alternative Medicine (2003 and 2004). |

**PATENTS:**

Heatbeam Dolorimeter for Pain and Sensory Evaluation, US 5,941,833, Issued Aug 24, 1999
Improved Heatbeam Dolorimeter US 6,248,079 issued June 19, 2001
Comprehensive pain assessment systems and methods, US20020052562, May 2, 2002

**CONTINUING EDUCATION (selected):**

Refresher Course on Pain Management, IASP, Hamburg, Germany, August 1987
American College of Nutrition, New Orleans, 1987
American Academy of Forensic Sciences, New Orleans, February 1992
Clinical & Advanced Clinical EEG. American EEG Society, Washington, DC, Sept. 1995
Forensic Issues in Pain Management, Rehabilitation Institute of Chicago, October 1995
Advances in Clinical Nutrition, American College of Nutrition, New York, Sept. 1997
American College of Forensic Examiners, National Academy, San Diego, December 1996; San
    Diego, Dec. 1997; Naples, FL Oct.1998;  New York, NY, Oct-Nov, 1999;  Las Vegas NV,
    Oct 2000;  Scottsdale AZ Oct 2003.
Amer. Acad. Clinical. Neuropsychology Workshop, Northwestern University, Oct 2000
American College of Forensic Examiners, continuing education (annual) 2003–2005

**PEER-REVIEWED RESEARCH GRANT HISTORY:**

| | |
|---|---|
| 1986-1987 | Dietary Modification of Uremic Encephalopathy FROM: Vanderbilt University Center in Nutrition Research Unit - NIH |
| 1987-1988 | A Rodent Model of Aluminum Encephalopathy FROM:  Biomedical Research Support Grant - NIH |

| | |
|---|---|
| 1987-1988 | The Effect of Aluminum On Regional Cerebral Glucose Incorporation Research Training Grant:  Recipient Stephan Tolchard, Bristol Polytechnic (UK) PI/Research Director:  J.J. Lipman, Ph.D. |
| 1987-1990 | Studies on the Modulation of Uremic Encephalopathy FROM:  Dialysis Clinics Incorporated |
| 1987-1988 | Aluminum Neurotoxicity in Uremia FROM:  Vanderbilt University Center in Molecular Toxicology - NIH |
| 1987-1990 | Autotomy, Neuroma and Central Pain Models FROM:  Veteran's Administration, Nashville, TN VAMC, PI:  B. Blumenkopf, MD (Co-I:  J.J. Lipman, Ph.D., 10% effort) |
| 1988-1989 | The Effect of Dietary Modification on the Quantitative Electro - encephalogram and Development of Uremia in Juvenile and Adult Rats.  Research Training Grant:  Recipient Deborah L. White, Bristol Polytechnic, UK (Awarded the 1989 Young Investigator Award of the American College of Nutrition) |
| 1995-1999 | A Computerized Heatbeam Dolorimeter [PHASE I and II]  FROM:  US Public Health Service/NIH (SBIR), National Institute for Neurological Diseases and Stroke. P.I. J.J.Lipman PhD |
| 2000-2004 | Heatbeam Dolorimeter Commercialization, State of Illinois, Department of Commerce and Community Affairs, PI J.J. Lipman PhD |
| 2001-2004 | Computerized Pain Assessment Tool (ComPAT) Research and Development contract from the SBIR / NIH / NINDS – Phase I and II. P.I.: J.J.Lipman PhD |

## PUBLICATIONS:

1.   **Basic Drug Research**

A.   **Peer Reviewed Journals / Publications**

**Lipman JJ** and Spencer PSJ.  Clonidine and opiate withdrawal.  Lancet 11:521, 1978.

**Lipman JJ** and Spencer PSJ.  Further evidence for a central site of action for the antinociceptive effect of clonidine-like drugs.  Neuropharmacology 18:731-733, 1979.

**Lipman JJ** and Spencer PSJ.  An examination of tolerance to the antinociceptive effects Of clonidine, morphine and their combination in the mouse tail immersion test.  In:  Way EL (ed.). Endogenous and Exogenous Opiate Agonists and Antagonists.  London:  Pergamon Press, pp. 197-200, 1979.

**Lipman JJ** and Spencer PSJ.  A new rapid technique for intracerebroventricular administration of agents in the conscious mouse.  Journal of Pharmacological Methods 4:327-333, 1980.

**Lipman JJ** and Spencer PSJ.  A comparison of muscarinic cholinergic involvement in the antinociceptive effects of morphine and clonidine in the mouse. <u>European Journal of Pharmacology 64</u>:249-258, 1980.

**Lipman JJ**, Miller BE, Karkera S, Winfield RC, North WC and Byrne WL.  Morphine tolerance is associated with elevated levels of an uncharacterized endorphin (peak B) in mouse brain with no change in 3H-dihydromorphine binding. <u>Life Sciences 33(1)</u>:373-376, 1983.

**Lipman JJ**, Tolchard S.  Separate and Combined Effects of Morphine and Amphetamine on the Quantitative Electroencephalogram and Regional Cerebral Glucose Uptake in a Rat Model., <u>Neuropsychobiology</u> 23:89-98, 1990.

B.   **Book Chapters**

**Lipman JJ**, <u>Neurotoxic Actions on Mammalian Nerve Impulse Conduction</u>: Chapter 37 <u>In</u> Colowick and Kaplan's Methods in Enzymology.  Vol. 165, Microbial Toxins.  Harshman, S. (ed.) Academic Press, New York, pp. 254-269, 1988.

C.   **Abstracts Presented at Meetings**

Blumenkopf B and **Lipman JJ**.  Autotomy I:  Evidence supporting its being a behavioral response to nociceptive afference.  American Association of Neurological Surgeons,  5/1990, Nashville, TN.

2.   **Human Pain and Addiction States**

A.   **Journal Articles**

Mays KS, Schnapp M, North WC, **Lipman JJ** and Yodlowski E. Morphine peripheral perineural injection in chronic pain syndromes.  <u>In</u>: Rizzi R (ed).  Proceedings of the International Postgraduate Course in Pain Therapy.  Italian Ministry of Health (publishers), 1981.

**Lipman JJ**, Miller BE, Mays KS, North WC, Karkera S and Byrne WL.  CSF endorphin levels in chronic pain patients and in patients before and after a placebo pain relief.  In: *Advances in Endogenous and Exogenous Opioids.  Kodansha Press, Japan, pp.315-317, 1983.*

Mays KS, **Lipman JJ** and Schnapp M.  Local analgesia without anesthesia using peripheral perineural morphine injections.  <u>Anesthesia and Analgesia  66</u>:*417-420, 1987.*

**Lipman JJ**, Blumenkopf B.  Comparison of Subjective and Objective Analgesic Effects of Intravenous and Intrathecal Morphine in Chronic Pain patients by Heat Beam Dolorimetry. <u>*Pain 39*</u>:*249-256, 1989.*

**Lipman JJ**, Miller BE, Mays KS, Miller MN, North WC and Byrne, WL.  Peak "B" Endorphin Concentration in Cerebrospinal Fluid:  Reduced in Chronic Pain Patients and Increased During the Placebo Response. _Psychopharmacology 109 (1)_ 112-116, 1990.

**Lipman JJ**, Blumenkopf B, Lawrence PL.  Normal and Radiculopathic Cutaneous Pain Tolerance Levels Evaluated By Heat-Beam Dolorimetry. _J. Neurosurgery_  _72:883-888, 1990._

**Lipman JJ**, Blumenkopf B, Parris WCV:  Chronic Pain Assessment Using Heat-Beam Dolorimetry.  _Pain_  _30:59-67, 1987_

Miller BE, **Lipman JJ**, Byrne WL:  Partial Characterization of a Novel Endogenous Opioid in Human Cerebrospinal Fluid.  _Life Sciences_ 41: 2535-2545, 1987.

Blumenkopf B and **Lipman JJ**.  Studies in Autotomy: Its pathophysiology and usefulness as a model of chronic pain. _Pain 45(2):203-211, 1991._

**Lipman, JJ**, Objective Scientific Study of Hypnotic Analgesia on Experimental Pain.  _Adventures in Education._  _11(3) 1-5, 1995._

B.   **Book Chapters**

**Lipman JJ**.  _Pain Measurement In:_  Contemporary Issues in Pain Management.  Parris, WCV (ed.) KLUWER Pubs., 1991.

C.   **Abstracts Presented at Meetings**

Miller BE, Byrne WL, Noel M, Ungar AL, Mays K, North WC and **Lipman JJ**. Levels of cerebrospinal fluid endorphin are elevated in placebo responding chronic pain patients.  Society for Neuroscience (abstract), 1980.

Mays KS, Schnapp M, **Lipman JJ** and North WC.  Pain relief after peripheral perineural injection of morphine. _Pain 10, Suppl. 120, 1981._

Miller BE, **Lipman JJ**, Karkera S, Winfield R., Byrne WL, Mays KS and North WC.  Partial purification and characterization of a novel human endorphin from human CSF.  Society for Neuroscience (abstract), 1981.

**Lipman JJ**, Hudson JS, Karkera S and Winfield R. CSF ndorphin changes during transcutaneous  electrical nerve stimulation (TENS) for relief of causalgia-like pain:  Report of a case.  Memphis Neuroscience Society (abstract), 1981.

**Lipman JJ**, Parris WCV, and Blumenkopf B:  Heat Beam Dolorimetry in the Assessment of Chronic Pain.  Proceedings of the 6th Annual Meeting of the American Pain Society, Washington, D.C., (abstract), 1986.

Byrne WL, **Lipman JJ**, Miller BE, Mays KS and North WC.  Pain and the placebo response:  Involvement of CSF endorphins.  Federation Proceedings, (abstract), 1985.

**Lipman JJ** and Blumenkopf B:  Pain Assessment Using Heat Beam Dolorimetry In Neurosurgical Patients. <u>Proc Soc Neurol Surg</u> (abstract), 1986.

**Lipman JJ** and Blumenkopf B.  No Evidence for a Segmental Local Analgesic Effect Due to Intrathecal Morphine Sulphate.  Intraspinal Narcotic Special Interest Group Meeting, Hawaii, April 1990.

**Lipman JJ** and Blumenkopf B.  Thermal pain tolerance dolorimetry for evaluation of the pain and sensory deficits of radiculopathy.  American Association of Neurological Surgeons, May 1990, Nashville, TN.

Blumenkopf B and **Lipman JJ** Hyperalgesia of peripheral nerve injury (PNI) evaluated by Heat Beam Dolorimetry. American Association of Neurological Surgeons, February 1989, Cancun, Mexico

Blumenkopf B, **Lipman JJ**.  Objective Assessment of the Nociceptive Sensibility and Deficits Associated with Radiculopathy Using the Heat Beam Dolorimeter.  Fifth World Congress on Pain, Hamburg, West Germany, August 20, 1987. <u>Pain</u>, (Suppl. 4), 1987, S10.4

**Lipman JJ**, Blumenkopf B, Parris WC.  Chronic Pain Assessment Using Heat Beam Dolorimetry.  Fifth World Congress on Pain, Hamburg, West Germany, August 2-7, 1987. <u>Pain</u>, (Suppl. 4), 1987, S353.

**Lipman JJ**, Recent Developments in Chronic Pain Assessment Using Heatbeam Dolorimetry, American College of Forensic Examiners / American Board of Psychological Specialties Annual Training, New York, October 1999

Miller BE, Miller MN, Schacht T, Kauffmann C &  **Lipman JJ** (1999) Depressed Patients Report More Subjective Pain and Have a Higher Objective Pain Tolerance Than Normal Controls. Soc. Neurosci Annual Meeting, Miami, Abstract 839.3

**D.**     **Invited Lectures**

<u>The Principles of Chronic Pain Management</u>, Symposium, faculty and lecturer. Vanderbilt  University Medical Center, September 1991.

<u>Biopsychology of Pain</u> – Psychiatry postgraduate didactic lectures, Quillen College of Medicine, Johnson City, Tennessee (2005, 2006, 2007)

<u>ADHD/ADD treatment with stimulants</u>, Pediatric Grand Rounds, East Tennessee State University (with Stern P and Thigpen J) 14 June 2006

3.   **Encephalopathy - Dementia**

A.   **Journal Articles**

Wehr CJ, **Lipman JJ**, Hammon JW Jr, Bender HW JR and Merrill WH.  The effect of arterial carbon dioxide tension on cerebral blood flow and electroencephalogram during cardiopulmonary bypass. <u>Surgical Forum</u> <u>35</u>:252-254, 1984.

Wehr CJ, **Lipman JJ**, Hammon JW Jr, Bender HW Jr and Merrill WH.  Effect of carbon dioxide tension and hypothermia on cerebral blood flow and the electrocorticogram during cardiopulmonary bypass. <u>Surgical Forum</u> XXXVI:240-242, 1985.

Teschan PE, **Lipman JJ**, Lawrence P, DeBoer D: Encephalopathic Toxicity:  An Experimental Model of Uremic and Solute-specific Dialysis. (Proceedings), ISAO Symposium on Uremic Toxins; S. Ringoir, (ed.), (Plenum Pubs.) Ghent, Belgium, 1987.

**Lipman JJ**, Brill AB, Som P, Jones KW, Colowick S, Cholewa J:  Studies of Aluminum in Rat Brain. <u>Biological Trace elements Research Vol 13</u>, pp. 44-53, 1987.

**Lipman JJ**, Colowick SP, Lawrence PL, Abumrad NN: Aluminum induced encephalopathy in the rat. <u>Life Sciences</u> 42(<u>8</u>):863-875 (1988).

**Lipman JJ**, White DL, Lawrence P, Teschan PE. Juvenile Hypocalcemia provokes Persistent Electroencephalographic Change in Renally Compromised Rats <u>J Am Coll Nutrition</u>, <u>7(6)</u>: 453-460, 1988.

Teschan PE, **Lipman JJ**, Lawrence PE, and DeBoer D. Solutes vs Symptoms in Uremia.  <u>Int'l Artificial Organs</u> <u>11 (4)</u>:232-234, 1988.

**Lipman JJ**, Lawrence PL, DeBoer DK, Shoemaker MO and Teschan PE: Role of dialysable solutes in the mediation of Uremic Encephalopathy <u>Kidney</u> <u>International</u>  37(3):892-900 (1990)

B.   **Book Chapters**

Lipman JJ, <u>The Electroencephalogram as a Tool for Assaying Neurotoxicity</u> Chapter 38 <u>In</u> Colowick and Kaplan's Methods in Enzymology, Vol. 165, Microbial Toxins.  Harshman, S. (ed.), Academic Press, New York, p. 276-277, 1988.

**C.**    **Abstracts Presented at Meetings**

Jazarevic S, **Lipman JJ,** Abumrad NN: Inactivation of opioid receptors by collagenase: Relevance to studies on glucose homeostasis. Second AnnualVanderbilt University Research Forum (1984)

Wehr CJ, Gerhardt E, DeBoer DK and **Lipman JJ:** Quantitative Electrocorticographic Effects Attendant on Cardiopulmonary Bypass (CPB) in the Dog: Correlation With Regional Cerebral Blood Flow and pCO2. Second Annual Vanderbilt University Research Forum (1984)

**Lipman JJ,** Lawrence PL, Teschan PS:  Dialysate Solute Relations in Rat Uremic Neurotoxicity.  X[th] International Congress of Nephrology (abstract), London, 1987.

**Lipman JJ,** Colowick SP, Lawrence PL, Abumrad NN: Aluminum Induced Encephalopathy in the Rat. Xth International Congress of Nephrology (abstract), London, 1987.

Teschan P, **Lipman JJ,** Lawrence PL, DeBoer D, White D, Sulser, D: Quantitative Solute-Symptom Relationships in renal Failure and Solute-Specific Dialysis. <u>American Society of Nephrology</u>,  Washington, D.C., 1987.

**Lipman JJ,** Lawrence PL, Teschan PE:  Dialysate Solute Relations in Rat Uremic Neurotoxicity. Xth International Congress of Nephrology, 1987(abstract).

DeBoer D, **Lipman JJ,** Lawrence PL, Teschan PE: Automated EEG Monitoring System for Quantification of Uremic Encephalopathy in a rodent Model. Am.Assoc. Med. Instr., 1985.

**Lipman JJ,** White DL, Tolchard S, Lawrence PL:  The Effect of Elevated Dietary Phosphate on Uremic Progression and the Electroencephalogram in Renally Compromised Rats.  Journal of the American College of Nutrition, Vol. 7, No. 5, October, 1988.

**Lipman JJ,** Lawrence PL, Sulser D, White DL, Tochard S, Teschan PE:  Uremia Produces Dialysis- Reversible Depression of Geniculate but not Superior Collicular or Cortical 2-Deoxy-D-Glucose Uptake.  Society for Neuroscience  Abstracts, Vol. 14, November, 1988.

**Lipman JJ,** Lawrence PL, DeBoer DK, Shoemaker MO, Sulser D, Tolchard S, Teschan PE:  The Role of Dialyzable Solutes in the Mediation of Uremic Encephalopathy in the Rat Indexed by Electroencephalography and Regional Cerebral Glucose Uptake.  American Society of Nephrology, 21st Annual Meeting, December, 1988.

Nishijima F, Ikoma M, **Lipman JJ,** Teschan P, Fogo A, Ichikawa I:  Effect of Dialytic Intervention on the Function and Morphology of Glomeruli in Rats at an Early Stage of Progressive Renal Disease. American Society of Nephrology, 21st Annual Meeting, Dec.1988.

Lipman JJ, Tolchard S.  Comparison of the Effects of Central and Peripheral Aluminum Administration on Regional 2-Deoxy-D-Glucose Incorporation In The Rat Brain.  Life Sciences 45:1977-1987, 1989.

Teschan PE, Lipman JJ, Lawrence P, DeBoer D: Encephalopathic Toxicity:  An Experimental Model of Uremic and Solute-Specific Dialysis (Proceedings) ISAO Symposium on Uremic Toxins; S. Ringoir, (ed.), (Plenum Pubs.) Ghent, Belgium, 1987.

White DL, Lipman JJ, Lawrence PL, Teschan PE. Dietary Hypocalcemia Provokes Transient Uremia and Persistent Electroencephalogram Changes in Renally Compromised Juvenile Rats.  J Am Coll Nutrition, Vol. 6(5), 441, 1987.

4.       **Forensic Pharmacology**

ABSTRACTS, LECTURES  AND PRESENTATIONS AT MEETINGS (selected):

The future of the Insanity Defense:  The Best of the Worst Defense - Genetic and Other Biological Causes of Criminal Behavior, delivered at:  The John Dice Annual Criminal Defense Seminar, Peabody Hotel, Memphis, TN, October 10-11, 1987.

The Effects of Drugs and Alcohol on Brain and Behavior, delivered at: Experts on Experts, Annual Joint Meeting of The National Defender Investigator Association/    Tennessee Association of Criminal Defense Lawyers, May 20-21, 1988.

Pitfalls in Urinalysis Methodology for Controlled Drugs, delivered at: Tennessee Board of Nursing, Nashville, Tennessee, March 3, 1990.

Forensic Aspects of the Effects of Drugs on the Brain and Behavior, delivered at: National Defender Investigator Association, Annual Meeting, Atlanta, GA, November 7-8, 1990.

Airlie Conference Faculty.  Lecturer on Behavioral Psychopharmacology (plenary session) and Convenor of Evidentiary and Litigation Workshop, Airlie, Virginia, August 1-4, 1991.

Capital Litigation and Investigation Seminar, faculty, Lecturing on Mental Health Issues, Nashville, Tennessee, January 23-25, 1992.

Faculty, New York State Defender Association in-service training -effects of drugs on the brain and behavior - Conference on drug and alcohol addiction, March 1993.

Lecturer on Forensic Neuropharmacology (for Prof. Karl Dean),Vanderbilt University Law School, March 1993

Faculty and lecturer in forensic neuropharmacology: Arkansas Trial Lawyers Annual
   Meeting, continuing legal education training seminar, May 1995, Eureka
   Springs, Arkansas.


Lecturer: Drug Abuse, Drug Effects and the Law - Chemical Dependency
   and Chemical Abuse, Missouri State Public Defender System Annual
   Training Seminar, September 1997

Moderator: American Board of Psychological Specialties Abstract Presentations,
   Chronic Pain, Personality Attributes, Disability Evaluation, Iatrogenic Illness,
   New York, Oct 1999

Faculty: Relationship of Exposure to Toxic Substances and Intoxicants and Psychological
   Disorders. Texas Criminal Defense Lawyer's Association, Capital, Mental Health
   and Habeas seminar, Dallas Texas, April 2006

Faculty Presenter: Pediatric Grand Rounds, Quillen College of Medicine, East Tennessee
   State University, *"ADHD/ADD treatment with stimulants – what are the effects on the
   normal brain?"* 14 June 2006

Faculty: Biopsychology of pain, Psychiatry Resident Didactics, Quillen College of
   Medicine, East Tennesee State University, 2005, 2006, 2007


**PUBLICATIONS:**


McMullin MM. Selavka CM, Wheeler MT Werrell PL, Karbiwnyk CM and **Lipman JJ**,
   Forensic hair testing for haloperidol: A tale of two cases. *Proceedings of
   the American Academy of Forensic Sciences*, December 1993

**Lipman JJ,**         Multiple Homicides Occurring During A Time Of Abnormally Low
            Drug Concentration In The Hair Of A Treated Paranoid Schizophrenic,
            *Forensic Examiner*, 14-15,  *March-April 1996.*

**Lipman JJ,**         Recent Forensic Pharmacological Developments in Drug Abuse: The
            growth and problems of speedballing   *Forensic Examiner 6 (7-8) 9-13,
            1997*

**Lipman JJ,**         Psychopharmacology and the Disability Analyst. Chapter 2 <u>in</u> Anchor K
            and Felicetti T (eds) *Disability Analysis in Practice* ,Kendall Hunt (pubs)
            1999

**Lipman JJ** and Murphy PJ, Idiosyncratic psychotoxic effect of codeine in a criminal
            defendant suffering Gilbert's Syndrome , *Forensic Examiner, Nov-Dec
            1998*

**Lipman JJ**         Chronic Pain Assessment Using Heatbeam Dolorimetry, Proceedings of
            the American College of Forensic Examiners/ American Board of
            Psychological  Specialties, Oct/Nov 1999. *Forensic Examiner 9(1&2), 34*

Lipman JJ     Personality Drug Abuse and Murder: A pilot Study, *Forensic Examiner* 10 (1 & 2) 20-26 (2001)

Lipman, JJ     Psychometric Profiles of Violent Offenders with Histories of Psychostimulant Psychosis: A Pilot Study, *International Journal of Forensic Psychology*, 1(2) 82-93(2004)

**Testifying forensic consultant and expert witness** in State, Military and Federal courts of Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky Louisiana, Massachusetts, Mississippi, Missouri, Montana, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Vermont, Virginia, and Washington, in forensic pharmacological matters and the effects of psychoactive drugs on human behavior.

## Attachment № 2:
### Information relied upon from the case record and other sources

1. Defendant (hereafter 'AT') interview by police 29 Mar 2004
2. Defendant interview 30 March 2004
3. Testimony of Alan D. AXELRAD MD, 1 Mar 05
4. Testimony of Victor Scarano MD, 21 Feb 05
5. Testimony of Victor Scarano MD, 2 Mar 05
6. Dr. Edward GRIPON's trial testimony 2 Mar 05
7. Texas Department of Public Safety records [Bates DPS0001 through DPS 0408]
8. Three Volumes entitled 'Mental Health Documents' (AT000670 et seq), containing (a) Mental Health and Mental Retardation (MHMR) records, (b) police reports and other descriptions of defendant, (c) Wilson N. Jones Hospital records, (d) Transcripts of interviews of defendant with law enforcement.
9. Crime scene video DVD and digital still photography
10. Video DVD of defendant interviews
11. Affidavit of Amy Ingle (AT's friend)
12. Affidavit of K Ross (AT's step-uncle)
13. Affidavit of Konta Johnson (AT's aunt).
14. Affidavit of Rickey Bell (AT's supervisor)
15. Affidavit of Teresa Baker (AT's paternal aunt)
16. Affidavit of Todd Johnson (husband of Konta, AT's aunt)
17. Affidavit of Ronald Brinson (Elder brother of AT's mother Rochelle)
18. Affidavit of Chris Bennett (childhood friend of AT)
19. Affidavit of Christopher Smith (childhood friend of AT)
20. Affidavit of Clifton Eaton (Pastor of church)
21. Affidavit of Doris Gonzalez (AT's paternal aunt)
22. Affidavit of Eric Ross (AT's oldest brother)
23. Affidavit of McCloud Luper (Family friend)
24. Affidavit of R Johnson (half brother of AT's mother)
25. Affidavit of Walter Johnson (half brother of AT's maternal grandmother)
26. Affidavit of Wanda Banks (head of church youth academy)
27. Report of Thomas GRAY PhD, 22 Jul 04
28. Testimony of toxicologist Eduardo PADILLA, 17 Feb 06
29. MHMR Services of Texoma records (pp26, Bates MHMR0001 et seq)
30. Dr. HARRISON's testimony 1 Mar 05, 2 Mar 05 and 14 Dec 04
31. Affidavit of Pam Ross Borens (sister of Andre Thomas' mother)
32. Alice Ross Harris (half-sister of Andre Thomas' mother)
33. Affidavit of Denise Wade (half-sister of Andre Thomas' mother)
34. MHMR Services of Texoma, Texas, records (MHMR0001-0025)
35. Grayson County Jail medication records (pp9)
36. Jail clinic staff notes (pp10)
37. Defendant's agreement to stipulation Ex 93
38. Texas Dept of Public Safety report on blood and urine assays (Bates 18925 et seq)
39. Medical record of Brian Thomas (Andre Thomas' brother, Bates 6310-6314)
40. North Texas State Hosp (Vernon) – record Vol 1 (pp99)
41. North Texas State Hosp (Vernon) – record Vol 2 (pp102)
42. North Texas State Hosp (Vernon) – record Vol 3 (pp100)
43. North Texas State Hosp (Vernon) – record Vol 4 (pp101)
44. North Texas State Hosp (Vernon) – record Vol 5 (pp100)
44. North Texas State Hosp (Vernon) – record Vol 6 (pp100)
45. North Texas State Hosp (Vernon) – record Vol 7 (pp100)
46. North Texas State Hosp (Vernon) – record Vol 8 (pp100)
47. North Texas State Hosp (Vernon) – record Vol 9 (pp126)
48. Information regarding examination by Myla Young PhD
49. Chronology of Mr. Thomas' drug prescriptions from Mar 2004 to May 2007

# Exhibit 24

## Affidavit of McLoud Luper

COUNTY OF GRAYSON               )
                               ) ss:    **AFFIDAVIT OF MCCLOUD LUPER**
STATE OF TEXAS                 )


     **MCCLOUD LUPER,** being first duly sworn, appeared before the undersigned authority
duly designated to administer oaths and states as follows:

1.  My name is McCloud Luper. I am a resident of Grayson County, Texas. I am over 18
years of age and am otherwise competent to give this affidavit. No promises or agreements
have been made to me in exchange for this statement, and I do not expect any in the future.

2.  I have known Andre Thomas since he was a very young boy. I met him through his
parents, Rochelle and Danny Thomas. Andre was a good, sweet kid when he was growing up.
After Rochelle and Danny split up, I dated Rochelle. Andre was a teenager during the time I
was dating his mother. Andre told me that he considered me his stepfather on multiple
occasions. I fulfilled the stepfather role for Andre by trying to provide him with advice and
listening to his concerns and problems. I informed him, however, that I could not tell him what
to do; I told him that was Danny and Rochelle's role. However, Andre told me that he thought
I cared for him more than his own father and mother did.

3.  I believe that Andre's mother Rochelle is the root of many of Andre's problems. I think she
messed with his head. Once, a preacher who was Danny Thomas's uncle, told me that
Rochelle messed Andre up when it came to the Bible. I also believed this to be true. Rochelle
yelled at Andre about the Bible on several occasions. They would get in fights about what the
Bible meant. I did not think that the way either of them thought about the Bible made much
sense.

4.  After I broke up with Rochelle, she started acting crazy and started stalking me. On one
occasion, she came over to my house and ripped all my flowers and plants out of my flower
beds. She also broke my lights on my porch. It was very destructive and upsetting. I had to
get a protective order taken out against her. The protective order was granted by the court
based on Rochelle's behavior. Attached to this affidavit is a true and correct copy of the
protective order I obtained against Rochelle Thomas on or about November 1, 2005 in the
336th District Court of Grayson County, Texas.

5.  On one occasion in 2002 or early 2003, after Rochelle and I had broken up, Andre came
over to my house. A friend of mine and I were sitting on my front porch, talking. Andre
walked up to us and told me that he was living the same days over and over again. He stated,
"I've been here before just like this, I've walked up just like this and you were sitting here
talking to Otis." I told Andre, "that can't be," but Andre kept insisting that he had lived that
day before, "over and over." My friend and I looked at each other, knowing this wasn't true. I
told Andre that he had not been to my house before and that we had not had the same
conversation before. Andre told me that he was experiencing the same events over and over.
He was acting very bizarre and talking in circles. He then told me that his mother had ran off

and asked me for help finding her. I told him that I had no idea where Rochelle was and he started crying and acting frantic. He said that his father would not help him. He kept begging me to help him. I was not sure what help he wanted, but I thought he needed some mental health care because he was not right in the head.

6. I had not seen Andre for quite a while prior to the events described in paragraph 5. That was the only time I had seen Andre act crazy like that. Before that, he always seemed like a normal, good kid.

7. I got married to another woman after Rochelle and I broke up, and this made Rochelle very *M.L* angry. On one occasion, ~~she came over to my house~~ *my wife and I saw Rochelle* with her son Eric Ross. ~~Rochelle~~ *I told Rochelle I had called the police to talk to us about Rochelle having "regsed my wife's house.* assaulted my wife, and when my wife started to fight back, Eric got involved and got into a physical altercation with my wife. After this, several members of the community went to talk to Eric about how he could not fight his mother's battles, as she was not "right" and he did not need to get caught up in her craziness.

8. I think both Andre and Rochelle have something wrong with them mentally. I think whatever was wrong with Andre, Rochelle made it worse. Several other people in the community have talked to me about how Rochelle is crazy and a bad person.

9. No one from Andre's defense team contacted me prior or during trial.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.


*McCloud Luper*
Signature

*McCLOUD, LUPER*
Printed Name

COUNTY OF GRAYSON
STATE OF TEXAS

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 10th day of May, 2007.


Notary Public's Signature
My commission expires: 12-18-2010


KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

2

NO. 05-1698-336

| | | |
|---|---|---|
| McCLOUD LUPER | § | IN THE 336TH JUDICIAL DISTRICT |
| | § | |
| VS. | § | COURT OF |
| | § | |
| ROCHELLE THOMAS | § | GRAYSON COUNTY, TEXAS |

## *PROTECTIVE ORDER*

Be it remembered that on the ___1___ day of ___hov.___, 2005, the Court heard

the application of McCloud Luper, Applicant, for a protective order.

*APPEARANCES*

Applicant, McCLOUD LUPER, appeared in person and by and through his attorney of

record, JIM DUNN, and announced ready.

Respondent, ROCHELLE THOMAS, appeared in person and announced ready.

*JURISDICTION*

The Court, after examining the record and hearing the evidence and argument of counsel,

finds that all necessary prerequisites of the law have been legally satisfied and that this Court has

jurisdiction over the parties and the subject matter of this case.

*FINDINGS*

The Court finds that Applicant and Respondent previously resided together as a family for

approximately two years prior to there last separation approximately two years ago.

The Court finds that family violence has occurred and that family violence is likely to

occur in the future.  The Court finds that Respondent, ROCHELLE THOMAS, has committed

family violence.  The Court finds that the following protective orders are for the safety and

welfare and in the best interest of Applicant and his wife, SARAH LUPER and are necessary for

the prevention of family violence.

## *ORDER*

IT IS ORDERED that Respondent, ROCHELLE THOMAS, is:

A.   prohibited from committing family violence, as defined by Section 71.004 of the Texas Family Code.

B.   prohibited from communicating directly with McCLOUD LUPER and his wife, SARAH ANN LUPER, in a threatening or harassing manner.

C.   prohibited from committing a threat through any person to McCLOUD LUPER or his wife, SARAH ANN LUPER.

D.   prohibited from going to or near the residences or places of employment or business of McCLOUD LUPER and SARAH ANN LUPER, and specifically from going to or near 910 E. Thomas St., Sherman, Texas, and 1219 Bledsoe, Sherman, Texas, as well as the employment of SARAH ANN LUPER at Texoma Health Care.

E.   prohibited from engaging in conduct directed specifically toward McCLOUD LUPER and SARAH ANN LUPER, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass McCLOUD LUPER and SARAH ANN LUPER.

## *ORDER FORWARDED*

A copy of this order, along with the information provided by Applicant's attorney that is required under Section 411.042(b)(6) of the Texas Government Code, shall be forwarded by the Clerk of this Court to the Chief of Police of the City of Sherman, Texas, and the Sheriff of Grayson County, Texas.

## *EFFECTIVE*

This order shall continue in full force and effect until November 1, 2007.

## *WARNINGS*

**A PERSON WHO VIOLATES THIS ORDER MAY BE PUNISHED FOR CONTEMPT OF COURT BY A FINE OF AS MUCH AS $500 OR BY CONFINEMENT IN JAIL FOR AS LONG AS SIX MONTHS, OR BOTH.**

Social Security No.:     _____

Driver's License No.:     _____

Current Address:          Willow Garden Apartments, Sherman, Grayson County, Texas

Cyndi Mathis Spencer, District Clerk
200 South Crockett, Suite 120-A
Sherman, Texas  75090

NOTICE OF APPLICATION FOR PROTECTIVE ORDER

THE STATE OF TEXAS:

NOTICE TO RESPONDENT: An application for a protective order has been filed in the
court stated in this notice, alleging that you have committed family violence.  You may
employ an attorney to defend yourself against this allegation.  You or your attorney may,
but are not required to, file a written answer to the application.  Any answer must be filed
before the hearing on the application.  If you receive this notice within 48 hours before
the time set for the hearing, you may request the court to reschedule the hearing not later
than 14 days after the date set for the hearing.  If you do not attend the hearing, a default
judgment may be taken and a protective order may be issued against you.

TO:  Rochelle Thomas
     Willow Garden Apartments
     Sherman, Texas

        WHEREAS, Mccloud Luper did on the 6th day of October,
2005, filed in the 336th District Court of Grayson County, Texas, an Application for
Protective Order in Cause Number 05-1698-336, wherein Mccloud Luper is Applicant
and Rochelle Thomas is Respondent.
        AND WHEREAS, the Honorable Judge of the said Court has entered the
following order, to-wit:  (SEE PAPERS ATTACHED HERETO AND MADE A PART HEREOF).
        The said Application for Protective Order will be heard by the said Court at the
Grayson County Justice Center, Sherman, Texas, on the _3/__ DAY
OF __Oct____,2005 AT _9:00_ , _Am_, and you are therefore to appear at
the time and place as stated above.
        GIVEN UNDER MY HAND AND SEAL of said Court, at office, in the City of
Sherman, Grayson County, Texas, this the 6th day of October, 2005

                                    Cyndi Mathis Spencer, District Clerk
                                    Grayson County, Texas

By: _Lisa Wilson_____ Deputy
                        ************
        Came to hand on the _18_ day of ___Oct___, 20_05_ at _3:44_
o'clock _P_.m., and executed on the _19_ day of _Oct_  20_05_, at _3:40_
o'clock _P_.m., by delivering to the within named party, in person, a true copy of this
Notice.                                J. KEITH GARY
                                       Sheriff Grayson County
        Fees: _____                200 S. Crockett
                                    _____
                                    Sheriff, Grayson County, Texas

By: _G L Estes_____ deputy

**GARY ESTES**

D.  Prohibited, on the basis of good cause shown, from communicating in any manner with McCLOUD LUPER and SARAH ANN LUPER except through Respondent's attorney;

E.  Prohibited from going to or near the residences or places of employment or business of McCLOUD LUPER and wife, SARAH ANN LUPER;

F.  Prohibited from engaging in conduct directed specifically toward McCLOUD LUPER and wife, SARAH ANN LUPER, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass McCLOUD LUPER and/or SARAH ANN LUPER.

These Temporary Ex Parte Protective Orders shall be effective immediately and binding on Respondent and shall continue in full force and effect for twenty days from the date the order is signed unless terminated sooner by order of this Court.

The requirement of a bond is waived.

IT IS FURTHER ORDERED that the Clerk of this Court shall issue notice to Respondent, ROCHELLE THOMAS, to appear, and said Respondent is ORDERED to appear in person, before this Court in the Grayson County Justice Center, 200 South Crockett, Sherman, Texas, on the 3/ day of _Oct_, _____, 2005 at _9:00_ o'clock _a_.m. The purpose of this hearing is to determine whether the Court should issue its Protective Order:

1.  Prohibiting Respondent from committing family violence.

2.  Prohibiting Respondent from communicating directly with McCLOUD LUPER and his wife, SARAH ANN LUPER, in a threatening or harassing manner, from communicating a threat through any person to McCLOUD LUPER and SARAH ANN LUPER, and, on a finding of good cause, from communicating in any manner with McCLOUD LUPER and SARAH ANN LUPER except through Respondent's attorney or a person appointed by the Court.

3.  Prohibited from going to or near the residences or places of employment or business of McCLOUD LUPER and wife, SARAH ANN LUPER;

4.  Prohibited from engaging in conduct directed specifically toward McCLOUD LUPER and wife, SARAH ANN LUPER, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass McCLOUD LUPER and/or SARAH ANN LUPER.

This hearing is also to determine whether the Court should assess reasonable attorney's fees against Respondent, ROCHELLE THOMAS, to be awarded to JIM DUNN, attorney for Applicant.

### *WARNING*

A PERSON WHO VIOLATES THIS ORDER MAY BE PUNISHED FOR CONTEMPT OF COURT BY A FINE OF AS MUCH AS $500 OR BY CONFINEMENT IN JAIL FOR AS LONG AS SIX MONTHS, OR BOTH.

NO PERSON, INCLUDING A PERSON WHO IS PROTECTED BY THIS ORDER, MAY GIVE PERMISSION TO ANYONE TO IGNORE OR VIOLATE ANY PROVISION OF THIS ORDER.  DURING THE TIME IN WHICH THIS ORDER IS VALID, EVERY PROVISION OF THIS ORDER IS IN FULL FORCE AND EFFECT UNLESS A COURT CHANGES THE ORDER.

IT IS UNLAWFUL FOR ANY PERSON WHO IS SUBJECT TO A PROTECTIVE ORDER TO POSSESS A FIREARM OF AMMUNITION.

SIGNED on ____Oct 17____, 2005 at 2:48 o'clock p .m.

_____
JUDGE PRESIDING

**INFORMATION FOR LAW ENFORCEMENT OFFICERS:**

Information about Respondent to Aid Law Enforcement Officers:

Name:        ROCHELLE THOMAS

Sex:         Female

Race:        BLACK

Address:     Willow Garden Apartments, #6, Sherman, Grayson County, Texas
             or 803 N. Montgomery, Sherman, Grayson County, Texas

FILED FOR RECORD
2005 OCT 18  PM 2: 44
BY
CYNTHIA _____
DISTRICT CLERK
GRAYSON COUNTY



NO. 05-1698-336

| McCLOUD LUPER | § | IN THE 336 JUDICIAL DISTRICT |
| | § | |
| VS. | § | COURT OF |
| | § | |
| ROCHELLE THOMAS | § | GRAYSON COUNTY, TEXAS |

## APPLICATION FOR A PROTECTIVE ORDER

*1.   DISCOVERY LEVEL*

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

*2.   PARTIES*

This Application for a Protective Order is brought by McCLOUD LUPER, Applicant, who is a resident of Sherman, Grayson County, Texas. Respondent is ROCHELLE THOMAS, who resides at Willow Garden Apartments, #6, in Sherman, Texas.

*3.   SERVICE*

Process should be served upon Respondent, ROCHELLE THOMAS, at Willow Garden Apartments, #6, in Sherman, Texas, or she may be served at 803 N. Throckmorton, Sherman, Texas.

*4.   RELATIONSHIP OF PARTIES*

Applicant is the former boyfriend of Respondent, ROCHELLE THOMAS. Applicant and Respondent lived together, off and on, over a period of approximately 2 years prior to their last separation. Applicant and Respondent never married or attempted to marry under the laws of the State of Texas or of any other state or nation.

*5.   GROUNDS FOR PROTECTIVE ORDER*

Respondent, ROCHELLE THOMAS, has engaged in conduct that constitutes family violence under provisions of the Texas Family Code.

APPLICATION FOR PROTECTIVE ORDER-LUPER- PAGE 1

Respondent committed acts that were intended by Respondent to result in physical harm, bodily injury and assault, or were threats that reasonably placed your Applicant, McCLOUD LUPER, and his wife, SARAH ANN LUPER, in fear of imminent physical harm, bodily injury, and assault. Respondent's acts therefore constitute family violence. Additionally, Respondent's conduct was reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass your applicant and SARAH ANN LUPER.

Good cause exists for prohibiting Respondent from communicating with your Applicant and his said wife except through Respondent's attorney or a person appointed by the Court, as requested below.

6. *REQUEST FOR PROTECTIVE ORDER*

Applicant requests the Court, after notice and hearing, to issue its Protective Order;

A.   Prohibiting Respondent from committing family violence.

B.   Prohibiting Respondent from communicating directly with McCLOUD LUPER and his wife, SARAH ANN LUPER, in a threatening or harassing manner, from communicating a threat through any person to the said McCLOUD LUPER and wife, SARAH ANN LUPER and, on a finding of good cause, from communicating in any manner with McCLOUD LUPER and SARAH ANN LUPER except through Respondent's attorney or a person appointed by the Court.

C.   Prohibiting Respondent from going to or near the residences or places of employment or business of McCLOUD LUPER and his wife, SARAH ANN LUPER. Applicant requests the Court to specifically prohibit Respondent from going to or near 910 E. Thomas, Sherman, Texas; 1219 Bledsoe, Sherman, Texas; and Texoma Health Center, where SARAH ANN LUPER is employed. Applicant further requests the Court to require Respondent to maintain a distance of at least 300 yards from the above specified locations.

Respondent further requests the Court to prohibit Respondent from engaging in conduct directed specifically toward McCLOUD LUPER and wife, SARAH ANN LUPER, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the said McCLOUD LUPER and SARAH ANN LUPER.

7.     *REQUEST FOR TEMPORARY EX PARTE ORDER*

Before the filing of this Application, Respondent has engaged in conduct that constitutes

family violence.  The acts of family violence by Respondent against Applicant includes the

damaging of the motor vehicle of your Applicant by slashing of his tires; pulling down outside

light fixtures at Applicant's residence; harassing and threatening harm to Applicant's wife; egging

property of your Applicant; and harassment and threats directly to Applicant by Respondent.

There is an immediate need for the Protective Order requested in this Application.

Based upon the conduct of Respondent as alleged, Applicant reasonably fears that there is

a clear and present danger of family violence, which will cause Applicant immediate and

irreparable injury, loss, and damage, for which Applicant has no adequate remedy at law.

Applicant therefore request the Court, immediately and without hearing, to issue a

temporary ex parte order for the protection of Applicant and his wife, SARAH ANN LUPER, as

follows:

      A.     Prohibiting Respondent from committing family violence.

      B.     Prohibiting Respondent from communicating directly with McCLOUD LUPER and his wife, SARAH ANN LUPER, in a threatening or harassing manner, from communicating a threat through any person to the said McCLOUD LUPER and wife, SARAH ANN LUPER and, on a finding of good cause, from communicating in any manner with McCLOUD LUPER and SARAH ANN LUPER except through Respondent's attorney or a person appointed by the Court.

      C.     Prohibiting Respondent from going to or near the residences or places of employment or business of McCLOUD LUPER and his wife, SARAH ANN LUPER.  Applicant requests the Court to specifically prohibit Respondent from going to or near 910 E. Thomas, Sherman, Texas; 1219 Bledsoe, Sherman, Texas; and Texoma Health Center, where SARAH ANN LUPER is employed. Applicant further requests the Court to require Respondent to maintain a distance of at least 300 yards from the above specified locations.

Respondent further requests the Court to prohibit Respondent from engaging in conduct

directed specifically toward McCLOUD LUPER and wife, SARAH ANN LUPER, that is

reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the said McCLOUD

LUPER and SARAH ANN LUPER.

APPLICATION FOR PROTECTIVE ORDER-LUPER- PAGE 3

Applicant requests the Court to dispense with the necessity of a bond.

8.    *BEST INTEREST*

The Protective Order requested is in the best interest of the family, household, or member of the family or household.

9.    *ATTORNEY'S FEES AND COSTS*

The Court should assess against ROCHELLE THOMAS, a reasonable attorney's fees as compensation for JIM DUNN, attorney for Applicant, and judgment should be rendered in favor of the attorney and against Respondent, ROCHELLE THOMAS.

Applicant requests that Respondent be ordered to pay reasonable attorney's fees, the $16 protective order fee, the cost of service of the protective order, the costs of court, and all other fees, charges, or expenses incurred in connection with the protective order before the sixtieth day after the date the order is rendered.

10.   *PRAYER*

Applicant prays that notice of this Application for Protective Order issue as required by law and that the Court enter its protective order as requested in this Application.

Applicant further prays that this Court immediately issue a temporary protective order, ex parte, in conformity with the allegations stated above, prohibiting Respondent from the acts set forth herein above until a hearing can be held.

Applicant prays that a hearing be held no later than the fourteenth day after this Application is filed; that, after notice and hearing, the Court grant the relief requested above; and that the Court dispense with the necessity of a bond.

Applicant prays for attorney's fees, costs, charges, and expenses.

Applicant prays for general relief.

Respectfully submitted,

_____

JIM DUNN
STATE BAR NO. 06245000
108 South Crockett
P.O. Box 1182
Sherman, Texas 75091
Phone: (903)893-5535
Fax:    (903)813-4630

Attorney for Applicant

### *AFFIDAVIT IN SUPPORT OF EX PARTE RELIEF*

I, McCloud Luper, am the Applicant in the above Application for Protective Order.   The

facts and circumstances alleged are true to the best of my knowledge and belief.

_____
McCLOUD LUPER

SIGNED under oath before me on this the 5 day of October, 2005.

_____
Notary Public, State of Texas

APPLICATION FOR PROTECTIVE ORDER-LUPER- PAGE 6

# Exhibit 25

## Affidavit of Robin McGirk

COUNTY OF GRAYSON          )
                          ) ss:  **AFFIDAVIT OF C. ROBIN MCGIRK, Ph.D.**
STATE OF TEXAS            )

Appeared before the undersigned authority duly designated to administer oaths, C. Robin McGirk states on oath:

1. My name is C. Robin McGirk.  I am a resident of Grayson County, Texas.  I am over 18 years of age and am otherwise competent to give this affidavit.  No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I received my degree in psychology in 1984.  I have been in private practice as a clinical psychologist since 1988.  I have had a number of contracts with public institutions including the Department of Human Services and the Grayson County Jail.  I perform assessments and evaluations at the jail, and I work with inmates who require special assistance.

3. The Grayson County Jail contacted me on March 30, 2004, to evaluate Andre Thomas, and my first contact with Andre was that same day.  For the purposes of my evaluation, I also met with Andre on March 31 and April 5.  Following the completion of my initial written evaluation, I met with Andre a number of other times prior to his trial that began in January 2005.

4. During my first conversation with Andre, he initially spoke in a relatively controlled manner, but then he quickly slipped into a delusional monologue.  He said that for some time he had thought that his son was the anti-Christ, based on the fact that his son was born in 1999, and if you turn that year upside down, the last three digits are 666, which has religious significance.  Andre also mentioned that he thought he had killed the Devil and the anti-Christ, not his wife and son.

5. The symptoms Andre displayed included describing things in a delusional manner; nonsensical speech; ascribing special meanings to items, such as symbols in dollar bills; talking about demons; general confusion; and his belief that he was being influenced by outside forces.

6. In my opinion, these symptoms were not at all reactive.  There was no surrounding stimuli provoking them; they were not a product of the environment.

7. Based on my interviews with Andre and based on his symptoms, I diagnosed him as suffering from paranoid schizophrenia.  Andre was clearly disturbed.  I have treated a number of schizophrenic patients at the state hospital, but Andre's case was the worst I have ever seen.

8. I ruled out substance-induced psychosis in Andre's case.  In my experience, in such cases, the psychotic symptoms resolve themselves in a few days, or sometimes in less

time such as a few hours, after the individual has metabolized the alcohol or drugs and is no longer consuming such substances. With Andre, his symptoms did not get better after a lengthy period of sobriety, and in fact worsened. In my second contact with Andre, on March 31, he engaged in rapid, pressured speech, and at one point stood up and invited the staff who were present to attack him. After my second contact, Andre's condition deteriorated to the point that he pulled his own eye out. Following this incident, I met with him for the third time on April 5. During this third contact, Andre was in restraints, and his speech was again rapid and pressured, and he continued to talk about his delusional thought processes.

9. It is not possible to just suddenly develop schizophrenia with the severity of the symptoms that Andre displayed at the time I first met him. The onset of schizophrenia is usually a slower, more evolutionary process. The stage that Andre was at the first time I saw him could not have immediately developed right after his crimes. Andre had to have been experiencing schizophrenic symptoms for some time prior to the date of the crime to reach the stage of psychosis he had achieved by the time I started seeing him.

10. In my opinion, at the time of the murders, Andre did not know that his conduct was wrong. He thought that what he was doing was necessary to correct evil that was embodied in his wife and in the children. Andre's religious delusions and his description of the crime demonstrate that he did not think he was killing people at the time. Instead, he thought that he was killing manifestations of the Devil. In my opinion, Andre's delusions were the product of schizophrenia because the symptoms I observed, such as his elaborate delusions, his belief that the government was watching him, and his belief that others could reach his own thoughts, are consistent with schizophrenia.

11. If Andre's attorneys would have asked me to testify about my opinion regarding Andre's sanity at the time of the crime, I would have testified that Andre was not sane at the time of the murders.

12. Two days prior to my testimony at trial, Kerye Ashmore called me and asked if I was going to give an opinion on sanity at the time of the crime. I explained to him that I did not know because the defense attorneys had not discussed that with me. I never proposed to the defense attorneys that I could give an opinion on sanity, and they never discussed the topic with me.

13. At the time I was called to testify, the prosecution informed the judge that I was not going to give an opinion on Andre's sanity at the time of the crime. When the defense attorneys did not say anything, I was very surprised. I thought that the other testimony and the evidence would be enough to prove that Andre was insane.

14. The defense attorneys never provided me with copies of Andre's March 29 and 30 interviews with the police. I have since been provided with transcripts of these interviews, and I have reviewed them. These interviews confirm my opinion that Andre did not know his conduct was wrong at the time of the crimes. Just as he did with me, Andre explained to the police that he thought his wife was Jezebel, his son was the anti-

Christ, and that his wife's daughter was evil and "in it with them." Andre also explained that God told him to kill them. Throughout the interviews, Andre repeatedly states that he doesn't understand what is going on, and he experiences déjà vu. Andre's delusions and confusion during the interviews are consistent with my diagnosis of schizophrenia.

15. If I had been given copies of the March 29 and 30 interviews, I would have testified at trial that these interviews confirm my opinion that Andre did not know at the time of the crimes that his conduct was wrong.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.


_C Robin McGuirk_
**Signature**

_Cactus Robin McG. RK_
**Printed Name**


**STATE OF TEXAS**
**COUNTY OF GRAYSON**

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _11th_ day of _June_, 2007.


_Darlene Jurkich_
**Notary Public's Signature**
**My commission expires:** _06-14-08_

# Exhibit 26

## Affidavit of Floyd Patterson

COUNTY OF FANNIN                    )

STATE OF TEXAS                     )

                          )   **AFFIDAVIT OF FLOYD PATTERSON**

**FLOYD PATTERSON**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.   My name is Floyd Patterson. I am a resident of Fannin County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future. This affidavit is based on my personal knowledge.

2.   Andre Thomas is my paternal cousin. My mother, Teresa Baker, and his father, Danny Thomas, are siblings.

3.   I have known Andre Thomas and the rest of his family since I was a young child. When we were younger, Andre, his brothers and I often spent most our time together.

4.   Danny Thomas was a bad alcoholic when we were younger; he was drunk all the time. He used to mess with us and flip out his knife, and say "I'm going to cut ~~your little eyes out.~~" *off your weiner"* *FP*

5.   Andre and his brothers had it rough when we were growing up. They never had enough room in their houses. I used to sleep over all the time and I always had to sleep on the floor with Andre and his brothers because there were not enough beds. Andre and his brothers grew up eating potatoes. I remember only eating potatoes most of the time I stayed with Andre's family.

6.   Andre's brother, Brian, is mental. ~~James also has some serious mental problems.~~ *FP*

7.   At no time prior to or during the trial did any attorney, investigator, or attorney's representative working for Andre speak to me. I would have been happy to speak with me, had they contacted me. I would have told them and been happy to testify to the above facts.

8.   *Kerye Ashmore, Joe Brown + Mitzi from the DA's office all talked to me about 5 times before trial.* *FP*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Floyd Patterson Jr._
Signature

_Floyd Patterson JR._
Printed Name

STATE OF TEXAS
COUNTY OF FANNIN

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this _12TH_ day of _JUNE_, 2007.

_Dan W. Essary  Dan W. Essary_
Notary Public's Signature
My commission expires: _06-28-2010_

Dan W. Essary
Notary Public, State of Texas
My Commission Expires
06/28 2010
Notary without Bond

# Exhibit 27

## Affidavit of Bobbie Peterson

COUNTY OF GRAYSON )

) ss:  **AFFIDAVIT OF BOBBIE PETERSON**

STATE OF TEXAS )

    **BOBBIE PETERSON,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

    1.  My name is Bobbie Peterson.  I am a resident of Grayson County, Texas.  I am over 18 years of age and am otherwise competent to give this affidavit.  No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

    2.  I am an attorney in the State of Texas and have been licensed since November 2, 1990.  I practice and have my law office in Sherman, Grayson County, Texas.  Prior to opening my own law office, I was a prosecutor for Grayson County and Dallas County.

    3.  On March 31, 2004, I was appointed as second chair to represent Andre Thomas in his capital murder case.  At that time, as it also does today, my practice primarily consisted of criminal defense and family law cases.

    4.  Andre's case was my first death penalty case, either as a prosecutor or a defense attorney.  Prior to Andre's case, I had one or two felony criminal cases involving an insanity defense; neither case was capital.

    5.  R.J. Hagood was the lead attorney on Andre's case.  As such, I viewed Mr. Hagood as being in charge of the case, and as the person who would make assignments and provide guidance and direction.  I also looked to Mr. Hagood for guidance and direction because he had previously tried capital murder cases and I had not.

    6.  Initially, Mr. Hagood assigned me to work on portions of the guilt-innocence phase of the trial.  He retained responsibility for preparing and presenting expert testimony during the guilt-innocence and punishment phases of the trial.  My understanding was that Mr. Hagood was handling the mitigation portion of the case.

    7.  We did not contact many of Andre's family members.  The family would not cooperate with me or tell me where Rochelle was.  Mr. Hagood did not talk to family members that I am aware of, nor did he direct Shelli Schade, the mitigation specialist, to do so.

    8.  I talked to Rochelle once about getting Andre to accept the plea but she said it was "in God's hands" and would not recommend Andre accept the plea.  Rochelle was also mad at Andre for killing her grandson.

    9.  Because the agreement from the start was that Mr. Hagood was handling experts, I spent very little time early on in the case on expert issues.



10.   I had tried to get the CV's for Drs. Oropeza, Scarano and Axelrod but did not receive them because I was told Mr. Hagood was getting them. That said to me that expert preparation was in his camp, and that he would be handling investigation in preparation for same, and pursuit of any 702 hearings at trial.

11.   R.J. called two of the State's experts - Drs. Scarano and Axelrod - as part of our case in an effort to prove Andre was insane. He did not discuss this action with me, and I don't know why he did it.

12.   Mr. Hagood never informed me that he had received, before the beginning of the trial on the merits, a memo regarding the diminished capacity defense.

13.   Initially, the motion to suppress Andre's confession was Mr. Hagood's responsibility. However, a few days before it was set for a hearing, RJ said I could handle it, so I scrambled to prepare for it.

14.   I was new at capital voir dire, but tried to learn the specialized skills involved. About a week before voir dire began, we sought help from some capital voir dire specialists who came up to Sherman to help Mr. Hagood and me prepare for voir dire. We were provided a voir dire outline to use and follow during voir dire.

15.   Our venire at trial had only twelve African-Americans in it. Before the start of voir dire, and off the record over the noon hour on January 10, 2005, the State requested a jury shuffle in both courtrooms. (The jurors for our case were seated in two courtrooms the first day due to the large number of venire members). I do not specifically remember the events surrounding the shuffle.

16.   Prior to the shuffle, I did note that there were minorities present in the first three rows of the venire, although I do not remember specifically how many. After the shuffle, the minorities were in the back, and there were no African-Americans in the first three rows.

17.   We did not challenge the jury shuffle based upon equal protection grounds, object in any other way, or request our own shuffle. I do not know why we did not challenge the state's shuffle, request our own jury shuffle, or why we failed to insist that the State's shuffle request be on the record.

18.   Only two African-Americans were questioned during voir dire, and they were in seat Nos. 70 and 78. Neither one was selected to be a juror. The only African-American venire member the parties questioned was ▮▮▮▮▮▮ who – following the shuffle – was in seat #70. The only other African American venire member reached for questioning, ▮▮▮▮▮▮ in seat #78, was excused by agreement based on medical reasons. The remaining ten African-American venire members were all removed beyond the 100th seat after the shuffle, effectively removing them from the jury selection process since only 102 venire members were ultimately questioned.

19.   Voir dire in this case was a nightmare.



2

20.   No African-American served on Andre's jury.  All members of Andre's jury were white.

21.   Following the jury shuffle, I created a seating chart of the potential jurors.  On the chart, I indicated the race of some of the jurors, as well as whether the juror was struck by the defense ("D"), challenged for cause ("C"), struck by the state ("S"), or accepted as a juror.  A copy of that chart is attached to this affidavit.

22.   After voir dire and before the trial, I went to Judge Fry and asked for a continuance because I felt we needed more time to prepare.  I did not discuss my decision to talk to the Judge with RJ.  Judge Fry gave us one extra week to get ready.

23.   The issue of Andre's competency to stand trial was addressed initially by Mr. Hagood.  I never talked to the doctors at Vernon State Hospital regarding competency, and I do not know whether or not Mr. Hagood did.

24.   Mr. Hagood did not raise an incompetency claim after the State rested its case.  I do not know why we did not challenge competency then or much earlier.  In retrospect, I believe that we were so caught up in the insanity issue we did not think about it.

25.   During the guilt-innocence phase, Mr. Hagood put on one defense expert, Dr. Gripon.  Mr. Hagood was responsible for the direct examination of Dr. Gripon.  I asked Mr. Hagood numerous times to permit me to question Dr. Gripon, but he said no.

26.   Dr. Gripon's testimony was not as effective as I thought it could have been during direct examination so I asked my assistant, Leah Eastep, to sit down over lunch with Mr. Hagood and Dr. Gripon to cover the re-direct.  I was meeting with other witnesses.  It is my understanding that Dr. Gripon provided questions that needed to be asked by Mr. Hagood in order to cover issues that had been the subject of cross.  When we returned to the courtroom, Mr. Hagood did not ask any of the questions, which stunned the rest of the defense team and Dr. Gripon.

27.   When the experts were questioned or cross-examined, I wanted to assist, but Mr. Hagood took that role and did not allow me to interact with the experts or challenge them.

28.   We did not consider a *Daubert* gatekeeping hearing to attempt to exclude the state from presenting the testimony of Royce Smithey.  I think this was in part because we were having trouble getting Larry Fitzgerald qualified as an expert, and we needed someone through whom we could get in the videotape portraying maximum security prison conditions.  The state agreed we could get that in through Mr. Smithey, and we did not put on Mr. Fitzgerald.

29.   Late in the trial, Mr. Hagood asked me who we had for the punishment phase.  I was completely taken aback because my understanding was that Mr. Hagood was responsible for the mitigation and punishment phase.  At that point, I realized that we were not prepared for the punishment phase.



3

30.   The guilty verdict came back on Monday, March 7, 2005, and the punishment phase started that same day, giving us only two days from closing arguments on Friday, March 4, 2005, to work up a punishment case.

31.   I worked up to 20 hours a day over the Saturday-Sunday, March 5-6, 2005, break between guilt-innocence and punishment to try to put together a punishment case, although I had never done a mitigation case and was not sure what I was supposed to put together. It did not seem to me that Mr. Hagood's mitigation specialist, Shelli Schade, had been given much guidance by Mr. Hagood. She seemed very unsure, too, regarding how to prepare a mitigation case when I asked her for help. She did not investigate or talk to any of Andre's extended family because we did not know who they were.

32.   Even though I was not in charge of mitigation, I located and talked to the majority of the punishment witnesses. I ended up doing the questioning of twenty-one of the twenty-seven witnesses who testified during the punishment phase.

33.   The jury deliberated for a very short period of time in both the guilt-innocence phase and the punishment phase – I would say that they deliberated for less than an hour, both times.

34.   Mr. Hagood and the prosecutor, Kerry Ashmore, had a good relationship and went to lunch and dinner together during the trial.

35.   When the State produced discovery to the defense, they sent it to Mr. Hagood's office in Denison, not to me. After receiving incomplete copies of the discovery, I insisted that all discovery be sent to my office.

36.   I am now aware that Mr. Hagood has chronic pancreatitis. At the time of trial, I only knew that several months before he began working on Andre's case, Mr. Hagood was very ill with an unknown illness in a hospital in Oklahoma. At times during the trial, Mr. Hagood told me he was in a lot of pain. He would sometimes have to leave the courtroom suddenly. I believe that Andre's defense was severely hampered by Mr. Hagood's illness and my inexperience.

37.   I did not visit Andre very many times because Mr. Hagood said he was going to see him.

38.   Andre was pretty much unresponsive, disinterested, and unhelpful in his own defense during the trial and could not assist in any meaningful way with his defense. He was heavily medicated during trial. During the trial, Andre lived on candy, which we provided.

39.   I do not think we ever considered doing neuro-psychological or physical testing of Andre to better assess the status of his mental health. It just did not occur to us to do so.

40.   Dr. Kate Allen, a mitigation expert we put on during punishment, drove up the night before she testified, and I talked to her on the phone while she drove up to prepare. We then met at 6:00a.m. the next morning at my office to continue working on the case.



4

41.   I did everything I knew to do in this case, but believe more should have been done.  Between Mr. Hagood's illness, my inexperience in death penalty cases and the consequent lack of preparation, Mr. Thomas did not receive an effective defense.  He is an extremely mentally ill individual, and does not belong on death row.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_____
Signature

_____
Printed Name

COUNTY OF GRAYSON, STATE OF TEXAS
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 13th day of June , 2007.

_____
Notary Public's Signature
My commission expires: 02-09-2010

HELEN R. JEFFCOATS
Notary Public
STATE OF TEXAS
My Comm. Exp. Feb. 9, 2010

5

# Exhibit 28

## Affidavit of Eric Ross

COUNTY OF GRAYSON                )
                                )                   Affidavit of ERIC ROSS
STATE OF TEXAS                   )


Appeared before the undersigned authority duly designated to administer oaths, Eric Ross states
on oath:

1. My name is Eric Ross.  I am a resident of Grayson County, TX.  I am over 18 years of
   age and am otherwise competent to give this affidavit.  No promises or agreements have
   been made to me in exchange for this statement, and I do not expect any in the future.

2. I am Andre Thomas's oldest brother.

3. I think Andre has psychological problems.  I first thought this in approximately 2002.

4. Andre used to talk to me about how God told him to do things.  Once, in approximately
   February 2004, Andre told me that God told him to walk all night along the railroad
   tracks.

5. Andre sometimes would be awake for up to three days at a time in the year or two
   preceding the crime.

6. I testified in Andre's case, but I was never sure if it was for the prosecution or the
   defense.


I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge and abilities.


_____
Signature


ERIC M. ROSS
_____
Printed Name


STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 23rd day of
_____, 2007.


KRISTI M COUVILLON WISE
Notary Public, State of Texas
My Commission Expires
December 18, 2010

Notary Public's Signature
My commission expires: 12-18-2010

# Exhibit 29

# Affidavit of Kevin Ross

COUNTY OF DALLAS             )

                                         ) ss:   **AFFIDAVIT OF KEVIN ROSS**

STATE OF TEXAS                )

**KEVIN ROSS,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.  My name is Kevin Ross. I am a resident of Dallas County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.  Andre Thomas' mother, Rochelle Ross, is my half-sister.

3.  My mother, Vivian Joan, had nine children by five different men. She gave birth to her first son, Ron Brinson, when she was fourteen years old. I was born five years later. I never knew my father and do not know his name. I do not have any full siblings. When I was four years old, my mother married Johnny Ross. They had three children. Their first was Pam, who was born when I was five. One year later, Greg was born, and then the next year, Rochelle was born. My mother and Johnny Ross broke up. About two years later my mother had Alice, with another man. Then a year later, my mother and her boyfriend, Roscoe Johnson, who was a married man, had my sister Denise. Within the next four years my mother and Roscoe had two more children, Margie and Roscoe, Jr.

4.  My brother Ron lived with his father's family much of the year, so most of the time I was the oldest male, and father figure, living in our home. I started working when I was eleven years old. I bought my own clothes and anything else I needed.

5.  When I was seventeen I joined the Air Force and left home. My mother married Walter Johnson around this time. Walter was very violent, and I escaped having to be around him. He was a mean drunk. He drank excessively and fought violently with my mother and with my brother Greg. One time he hit my mother in the eye so hard that her eye was never the same. My mother drank alcohol, but when Walter was abusive she would drink more, so she could cope. She always had a lot of men around.

6.  Ron and I had left my mother's house, but the rest of my brothers and sisters had to live with Walter. He terrorized my sisters and they were very afraid of him. I always suspected he physically and sexually molested my sisters. My mother and Walter would have big fights, and he would leave and go to Colbert,

Oklahoma, where he was from. I always heard he messed around with a lot of women when he would go on these trips away from my mother. I even heard about him messing around with a woman right in Muskogee.

7.  When my mother married Walter they moved to Summit, Oklahoma, a small community just southwest of Muskogee. My mother's father lived there. The house they moved to was falling apart and patched together. There was a half-working well for water, and no facilities inside. Sometimes food was scarce. It was a bad home environment for my younger siblings.

8.  During one of Walter's fights with my mother, he killed my younger brother Greg. Greg was seventeen years old. Walter was charged with manslaughter, but somehow he got off. I was in the service in Thailand at the time. I flew home for the funeral.

9.  Not long after Walter killed Greg, I got out of the service. My first day home I was drinking with my brothers in the back yard. My mother and Walter were next door. My mother came up to me, crying, and said that Walter had just told her that he "planted" one of her sons, and he was going to "plant another one." He meant he was going to kill me. Then Walter started to pick on me. One of my friends who was with me at the time had his father's pistol. I took the pistol and shot Walter in the stomach. He was not hurt very badly. My mother fell down on Walter, because she did not want me to shoot him again and kill him. She said it was not worth me going to jail. I turned myself in for shooting Walter. I had to spend only a couple of nights in jail, I think because everyone, including the sheriff, knew that Walter had gotten away with killing Greg.

10. Walter's people practiced witchcraft. Walter's mother was what they called a "two-headed" woman. This meant she used potions and spells. Walter may have used witchcraft on my mother to keep her from leaving him.

11. My family may have generational curses. There was mental illness in my mother's family. Most of my mother's children are alcoholics and have depression. I started drinking at age fifteen, and became a heroin addict after I got out of the service. I suffered from depression after being in the Air Force. My older brother, Ron, has been an alcoholic and has suffered from depression his whole life. My sister Pam suffers from depression. My brother Greg sniffed gas and glue from the time he was ten years old. He drank alcohol and smoked marijuana from an early age, and always had mental problems. Rochelle drank alcohol and suffered from depression. She lost a kidney in her twenties. Denise has always been depressed. Denise's first husband molested their daughter, Gerica, so Denise divorced him. Roscoe Jr., started drinking heavily when he went into the Navy. He has used meth and alcohol and is still an alcoholic. Our youngest sister, Margie, has always suffered a great deal from depression.

12. Roscoe Jr. and his wife knew karate and used it on each other. He threw a flip on his wife. His wife divorced him a few years ago.

13. Rochelle failed either the fifth or sixth grade. Alice was the smart one and Rochelle made Alice do all of her schoolwork. Rochelle always got Alice in trouble. Rochelle's hair would never grow. She was obsessed with her hair. She even slept in an Afro wig.

14. When Rochelle has visited my church in recent years, she has acted inappropriately. She loses her self-control in church. She is not aware of how other people around her are acting, or how different her behavior is from others. She tries too hard to fit in. She sings too loud and shouts to the preacher when everyone else is quietly listening.

15. Rochelle was a very irresponsible mother. When all the rest of Rochelle's siblings and I had children, it made us grow up. Having children changed us into more mature people. Of all my siblings, Rochelle was the only one who raised her own kids sometimes without electricity, in very poor living conditions. She moved her children constantly, and this was very hard for them. Rochelle gave her sons no guidance or discipline. She neglected them and often did not know where they were. Her decisions never made much sense. She would move to a new place and try to get welfare. Even though she needed the money, if they asked her too many questions she would just leave. She would rather give up the welfare money than have someone ask her questions. She is extremely paranoid. One time I went to visit Rochelle, but she lived so deep in the country that someone she knew had to take me where she was living because there is no way I could have found it.

16. Rochelle's decisions to move did not take into consideration what was best for her kids. Her oldest son, Eric, was forced to help his younger brothers cope with the constant moving and Rochelle's lack of stability.

17. Like our mother, Rochelle is never without a man. Rochelle's children saw her with many men. Rochelle has got to have someone around who she has sex with. If she wakes up and she does not have someone, she goes out to find another man. She tends to find men who are like her, who have got to have sex. My mother said Rochelle was oversexed.

18. One time Rochelle was staying in an apartment I had fixed up but that I had moved out of. She told our mother to come over, that she had gotten a couple of guys for them to party with. I went to the apartment unexpectedly. When I got there I discovered Rochelle and my mother with these two guys. I got very angry, because the guy who was partying with my mother and potentially going to have sex with her was a classmate of mine from high school.

19. When I got home from the Air Force, I spent some time in Muskogee. I had developed an addiction to heroin and tried to quit three or four times. I decided to drive to Denver with my brother Ron to start a new life. Ron wrote a hot check for a condo where we lived for several weeks. Ron crashed our car and ended up in jail. I did not know what to do. I found a staple gun and tried to sell it to make a little money. I sold it to a man for thirteen dollars. This man was a Christian. Soon after this, in 1974, I accepted the Lord. Eventually I graduated from Oral Roberts University in Tulsa. I am very happily married to my wife, Cathy. We have a son and a daughter.

20. Andre's father, Danny Thomas, and his brother, Danny Ross, told me that before the murders, Andre walked around for two weeks with duct tape over his mouth. Even before he used the duct tape, he told them he was afraid to talk because he might say something evil. Everyone in the family knew there was something wrong with his mind. Andre thinks he hears God's voice, but he is really very mentally ill.

21. When Andre was arrested, I went to Sherman to try to help. After Andre removed his own eye because of something he read in the Bible, Rochelle did not want me, or anyone, praying with him. She thought he might hurt himself again.

22. Some time after Laura's death, her father talked to me. He was very compassionate and told me that they knew Andre needed mental help, and that he should have been helped long before this happened.

23. None of Andre's lawyers contacted me about his case. If they had asked, I would have been more than willing to tell them what I know, testify for Andre, or give information to the doctors who examined him.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Kevin Ross_
Signature

_Kevin Ross_
Printed Name

COUNTY OF DALLAS, STATE OF TEXAS
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 29th day of
_May_, 2007.

_Rachel Cloud Rogers_
Notary Public's Signature
My commission expires: 9/9/2010

RACHEL CLOUD ROGERS
Notary Public, State of Texas
My Commission Expires
September 19, 2010

# Exhibit 30

## Affidavit of Shelli Shade

COUNTY OF DALLAS        )
                               ) ss: **AFFIDAVIT OF SHELLI SCHADE**

STATE OF TEXAS            )

     **SHELLI SCHADE**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

     1. My name is Shelli Schade. I am a resident of Dallas County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

     2. I was the Mitigation Specialist for Andre Thomas' trial. It was my first capital murder trial. Prior to Andre's case, I had only worked on capital murder appeals. R.J. Hagood called me in September 2004 to ask me to work up mitigation for Andre's case.

     3. During the entire course of the case, I met with R.J. individually only two times to discuss my role. Our first meeting, on September 17, 2004, lasted only thirty minutes. R.J. gave me a brief oral synopsis of the case. It was apparent that R.J. did not understand mitigation. He told me to "just work on the case." I did not know what he meant. The second time we met was for lunch. Our conversation was mostly social and about the legal profession and was mostly unrelated to Andre's case. I started working on this case with little knowledge of what I should do.

     4. I met co-counsel Bobbie Peterson and paralegal Leah Eastep on December 14, 2004, three months after I met R.J. We had all gone to a pretrial hearing and we ended up at Bobbie's office afterward. I complained to Leah that R.J. was not responsive to my needs. Bobbie and Leah told me right then if I needed anything I could come to them for help from that point on. After that, I rarely had discussions with R.J. about Andre's case, even though R.J. was supposed to be providing me guidance and direction.

     5. I did not observe R.J. preparing for trial on his own, and only occasionally did I see him work with Bobbie or the rest of the defense team in preparing for trial. He did not seem concerned because I think he thought Bobbie would take care of everything. He was lead counsel, but most of the burden was put on Bobbie, Leah and me to try to figure out what to do. Bobbie also had no capital experience, so I felt like we were in way over our heads.

     6. Bobbie was forced to direct me, although this should have been R.J.'s responsibility. Bobbie did not know what a mitigation specialist was supposed to do, so she could not help me to the best of her abilities. Bobbie told me that R.J. did not tell her what I would need to do.

     7. During the regular workday, I know that Bobbie listened to tapes about the trial and read discovery in between seeing her other clients.

     8. After the first two meetings I had with him, the only contact I had with R.J. was when he would show up at Bobbie's office and I would give him a verbal progress report.

9. The only time R.J. asked me to do a specific task was when he asked me to highlight psychiatric evaluations for him and give him a synopsis. My understanding was that R.J. wanted me to highlight whatever would help or hurt the case. We did not discuss strategy regarding the evaluations at all, so I really did not know what he wanted or why.

10. R.J. never asked me for my input on experts, not even on mitigation experts. He never talked to me about Andre's symptoms of mental illness.

11. My own efforts to prepare a social history of Andre's life were thwarted by R.J.'s lack of attention, direction and preparation. I received no supervision from R.J. regarding records collection. I did request a minimal number of records on Andre and his brother Brian. I requested records from Muskogee Regional Medical Center (but no records were provided), jail records, Vernon State Hospital records, school and county mental health records for Andre, and mental health records for Brian. I did not request records on any other family members. Any other records we had, including any other medical or psychological records, were obtained through the state in discovery or subpoena, and not through independent defense efforts.

12. Andre's ability to assist counsel and to assist me was severely limited. He always had mittens on and was in a glass cell, on display twenty-four hours a day. He was extremely depressed. He was very childlike, quiet and sad, and it was not easy to start a conversation with him. He did not understand what we needed and could not identify or help locate witnesses. I now know Andre was on a maximum dose of drugs before and during his trial.

13. I spent most of my time reviewing records obtained by the State and preparing a timeline of Andre's life. The timeline of Andre's life was based on information I obtained almost entirely from Andre and discovery we received from the State. I was not able to interview Andre's family sufficiently to do an adequate background investigation. I met four people in Andre's family. I met Andre's father, Danny, two times, and his aunt Doris and his brother Brian. I also went to another one of Andre's brother's place of employment to speak to him, and I was able to talk to him briefly. I tried to talk to Andre's mother, Rochelle, but she avoided me and would not cooperate. I asked the jail to let me know when Rochelle visited Andre so that I might catch her, but they never notified me.

14. Andre's aunt, Doris, brought Andre's brother Brian to Bobbie's office. Brian would play with an Etch-A-Sketch for hours. He would not put it down until someone promised to take him to McDonald's. Doris wanted us to see how mentally ill Brian was, so that we could have some idea of how very sick Andre was, as well. It seemed like the family did not realize the extent of Andre's illness because Brian acted so crazy all the time, and he overshadowed Andre. Doris said Brian was diagnosed as schizophrenic. I thought Rochelle and Brian could provide the main mitigation in this case. It was my impression R.J. did not believe it was worth pursuing Rochelle or Brian. Because R.J. was in charge of mitigation and it was his decision, I let that go.

15. Gene Omundson, who seemed to be Bobbie's regular private investigator and seemed to have been assigned to work on Andre's case, occasionally came by Bobbie's

office to help Bates stamp and organize papers. As far as I know, he received no direction from R.J.

16. There were times when I wondered if R.J. was loyal to Andre's case. My appointment to the case was *ex parte*, yet the first time R.J. ran into the prosecutor, Kerye Ashmore, and I was with him, he introduced me in a jovial tone, "Meet my new mitigation specialist!" Almost every day of trial R.J. would take his breaks with Mr. Ashmore. R.J. and Mr. Ashmore would tell raunchy jokes. One night after court, Mr. Ashmore went with Andre's team to Bobbie's office. They fixed him a cocktail, and he hung out with R.J. and the rest of Andre's team. This seemed very strange to me.

17. I heard they were giving Andre a high dose of a new drug, a psychotropic. I could tell he was drugged because he had such a flat affect, he was child-like and soft-spoken, and did not make a lot of eye contact. Andre had been maintained on the drug for months.

18. I was present for only one meeting when we discussed the state's very long list of witnesses. We brainstormed about it, and I am uncertain whether any further steps were taken. As far as I know, the defense team did not contact any witnesses they anticipated the state would call.

19. Before, during and after trial, I felt that we had not been able to effectively represent Andre. I knew that someday we would be telling the facts of how Andre did not have adequate representation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

*Shelli S. Schade*
_____
Signature

Shelli S. Schade
_____
Printed Name

COUNTY OF DALLAS, STATE OF TEXAS
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this ___13___ day of
__June__, 2007.

_____
Notary Public's Signature
My commission expires: 6|12|10


RICHARD W. SWANNER
Notary Public, State of Texas
My Commission Expires 06-12-10

# Exhibit 31

## Affidavit of
## Christopher Smith

COUNTY OF GRAYSON         )

                                  )     Affidavit of CHRISTOPHER SMITH

STATE OF TEXAS              )

**CHRISTOPHER SMITH,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Christopher Smith. I am a resident of Grayson County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I first met Andre Thomas in 1995 when we were in the seventh grade. I saw him regularly from 1995 to 1997, but then we lost touch. I saw him again one time in the summer of 2002, and one time in 2004 on Andre's 21st birthday, which was in March.

3. When I knew Andre in 1995, 1996 and 1997, he regularly spoke to me about God. He often talked about Judgment Day and the Apocalypse.

4. During the time I knew Andre, he was not violent.

5. Before Andre's trial, I was contacted by the prosecution and spoke to them about Andre. I testified for the prosecution during Andre's trial. As I understood it, the two points that the prosecution wanted me to testify to, and about which I did testify, were my conclusions that Andre was an alcoholic and that Andre was obsessed with Laura Thomas.

6. The reason I thought Andre was an alcoholic was because when I saw in him 2002, and again in 2004, he was drinking beer on both occasions. I did not see him regularly, though, during those years. Also, my conclusion that he was obsessed with Laura came mostly from conversations we had in 1995, 1996 and 1997. I did not speak to him regularly in later years.

7. After the prosecution asked me about my opinions and observations of Andre at trial, Mr. Hagood (Andre's attorney) did not ask me any questions.

8. At no time prior to or during the trial did any attorney, investigator, or attorney's representative working for Andre speak to me.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Chris Smith_

Signature

_Chris Smith_

Printed Name

STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 22nd day of
May, 2007.

Notary Public's Signature
My commission expires: 12-18-2010





# Exhibit 32

## Affidavit of
## Donovan "Danny" Thomas

COUNTY OF GRAYSON     )
                             ) ss:     **AFFIDAVIT OF DONOVAN "DANNY" THOMAS**

STATE OF TEXAS        )

      **DONOVAN "DANNY THOMAS**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.      My name is Donovan "Danny" Thomas. I am a resident of Sherman, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future. This affidavit is based on my personal knowledge.

2.      I was born on November 1, 1948. I am originally from Denison, Texas but have spent most of my life in and around Sherman Texas.

3.      In April 1969 I was drafted into the military and was stationed in Germany. It was a bad time to be in the military, there was a lot of racial problems. It was a hard time. I started drinking a lot in the military.

4.      I have been arrested on numerous occasions for possession of illegal substances, resisting arrest, and for Driving Under the Influence of alcohol. A true and accurate list of my arrests is attached to this affidavit as Exhibit A. I have also attended drug treatment as a result of a probation revocation motion.

5.      I am Andre Thomas' father. I married Rochelle Thomas (then Rochelle Ross), Andre's mother, in 1975. We had five children including Andre Thomas. We separated in 1985 and divorced in 2005. Even since we separated, Rochelle and I still see each other often because of our kids which, in addition to Andre, include his brothers, Eric Ross, Danny Ross, Brian Thomas, and James Thomas. When I see Rochelle she is coming through town. She never stays anywhere very long.

6.      Between the time Andre was 3 and the time he was about 10, Rochelle would leave her home for months at a time and take the kids, including Andre, with her. She did this on many occasions until she finally settled the family in the Sherman, Texas area. I began having more contact with the children after Andre was 10.

7.      Rochelle constantly battled her own mental problems. When Andre was growing up, Rochelle regularly told him that she should have aborted him. This lead to his first suicide attempt that I am aware of. She continued expressing this to him beginning from the time he was about 13. She told Andre that he would always be the baby but when ████ was born he was no longer the baby. These incidents greatly distressed Andre. He asked me about this repeatedly throughout many years and it clearly upset him that his mother wished that he had not been born to the point he attempted suicide.

8.      Andre's first suicide attempt that I observed was after Rochelle told him that she wished she had aborted him. I believe this occurred when Andre was around 13. Andre came over to my house and was crying and told me about Rochelle telling him she wished she

had aborted him instead of letting him be born. He went to my sink and got a butcher knife and began sawing on his wrist. I told him "hell if you want to kill yourself go out on the freeway and jump in front of a 18 wheeler." He continued to cry and saw on his arm so I knew he was serious. So, I told him he needed to "make long cuts down his arm so it would split open" if he really wanted to kill himself. He left and began walking across the field still crying. He was walking like an old man.

9.    Rochelle's mental illness also surfaced in her conduct in front of the children and me. Rochelle often walked around in front of Andre and his brothers with no shirt on or completely naked. This happened repeatedly, starting when the boys were very young and continuing for several years. The boys were forced to ask their mother to put on clothes, and she usually refused to do so. Rochelle and I often disagreed about this behavior, walking around naked in front of the boys, and once I was taken to the Mental Health & Mental Retardation ("MHMR") hospital to talk about it. Rochelle's behavior did not change.

10.   Rochelle also regularly expressed that God was talking to her. Andre was offered a plea bargain in his case but refused to take it because his mother, Rochelle, told Andre that "God said not to take the plea because [Andre] would walk out of the courtroom a free man." I believe Andre should have taken the plea. My sister, Doris Gonzalez, and I tried to convince Andre to take the plea but he refused and stated that his mama had told him not to because God said he would walk out a free man. Andre seemed to believe that if his mama told him God said something, it was the complete truth.

11.   Rochelle Thomas had sexual relations with a very large number of men while were we married and after we were separated. She was not selective when choosing sexual partners, and would bring them home while our children were there. She still has sex with a lot of men.

12.   I am not aware of Andre being abused as a small child but I was not around when Andre was little. Rochelle was responsible for his early years and she had mental problems.

13.   I believe that Rochelle's conduct and behavior influenced the children in a detrimental way. For example, our son, James Thomas has never been right in the head. James receives a disability check from the government because his mental illness prevents him from holding a job. I do not know what happened to Andre and his brothers when they were little but I know all three, Andre, James and Brian, have shown mental illness signs as they grew up.

14.   Additionally, our son Brian has been extremely introverted throughout his life. Although our other sons would play together when they were little, Brian would not play with them and would remain on his own. I believe Brian is antisocial because of his mother's behavior. Brian has been diagnosed as schizophrenic.

15.   In the three months before Andre was arrested, I noticed a complete change in his behavior. He began becoming highly preoccupied with the Bible, especially with the Book of Revelation and with the ideas of good and evil, the end of the world, and heaven

that are described in that part of the Bible. Andre began asking lots of odd questions about these biblical subjects that did not make sense. He began being confused all of the time, for no apparent reason. During this time I often told him that he needed to try to control himself, because he was acting strangely, but nothing changed.

16. In the three months prior to his arrest, Andre also began compulsively working on his car, even in the middle of the night when it was dark outside. He was always trying to fix the car, but it was not apparent that the car was broken. He also expressed a number of times that he was in a circle that he needed to break out of.

17. Andre's conduct changed long before he met Carmen, his girlfriend. I first noted Andre changing after he married Laura. He continued to demonstrate increased signs of odd behavior throughout the years. In the months leading up to Laura and the children's death, Andre would walk around with duct tape on his mouth and be talking non-sense when his mouth was not taped. I did not know what was wrong with him.

18. I was subpoenaed by the prosecution to testify in Andre's case, but I did not want to testify for the prosecution. On multiple occasions, I informed Ms. Bobbie Peterson, one of Andre's defense attorneys, that I wanted to testify in support of, not against, Andre. Ms. Peterson told me that Joe Brown, the prosecutor, was already going to call me and ask me the questions. She made it sound like nothing could be done, and I was going to have to testify for the prosecution. I talked with Ms. Peterson at her office about this several times. But despite my requests, she never came to my home to meet with me to talk about Andre's case or to help me prepare to testify even though it as the prosecution that subpoenaed me to be a witness at Andre's trial. In fact, no member of Andre's defense team even attempted to talk with me before I initiated contact with Ms. Peterson myself.

19. Because I had not discussed my testimony with Andre's lawyers, I did not have any idea what types of questions either the prosecution or the defense would ask me at trial. I was never informed what the purpose of my testimony at trial would be, and I felt tricked by some of the prosecutor's questions that I was not prepared for by Andre's defense team.

20. I had no contact with the lawyers prior to trial. No one ever came out to talk about Andre's upbringing or what I had seen of Andre's mental illness.

21. R.J. Hagood never talked to me except one day when I saw him in court. I never saw Mr. Hagood prior to the trial. I was extremely disappointed in the way I saw Mr. Hagood represent my son. He did not seem to be interested in trying to help Andre or take any interest in Andre's fate.

FURTHER AFFIANT SAYS NOTHING.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Danny Thomas_        _Danny Thomas Jr._
Signature

_Danny Thomas_
Printed Name

STATE OF TEXAS
COUNTY OF GRAYSON

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 8th ___ day of _June_, 2007.

_Monica Boatner_
Notary Public's Signature
My commission expires:

MONICA BOATNER
Notary Public, State of Texas
My Commission Expires
11-18-2008

**Exhibit A**

| DATE | ARREST/CRIMINAL CONDUCT DESCRIPTION | [SOURCE/**** REMOVE THIS COLUMN BEFORE FILING***] |
|---|---|---|
| 8/20/1973 | Danny Thomas arrested for Possession of Marijuana. | DPS records (AT 005648) |
| 12/15/1974 | Danny Thomas arrested for DUI. | DPS records (AT 005648-005649) |
| 4/4/1973 | Danny Thomas arrested for DUI. | DPS records (AT 005649) |
| 3/13/1977 | Danny Thomas arrested for DUI. | DPS records (AT 005650) |
| 11/1/1982 | Danny Thomas arrested for DUI. | DPS records (AT 005651-005652) |
| 4/25/1984 | Danny Thomas arrested for resisting officer/resisting arrest. | DPS records (AT 005652) |
| 1986 | Danny Thomas committed to Wichita Falls hospital for alcoholism by court order after he got in a fight while drinking. | Grand Jury testimony, Danny Thomas (AT 005683) |