# Exhibit 33

## Affidavit of Jan Vogelsang

NO. _____

| | | |
|---|---|---|
| *EX PARTE* | § | IN THE 15th JUDICIAL |
| | § | DISTRICT COURT OF |
| ANDRE THOMAS | § | GRAYSON COUNTY, |
| TEXAS | | |

## DECLARATION OF JANET VOGELSANG

JANET VOGELSANG, MSW, BCD, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1. My name is Janet Vogelsang. I am a resident of Greenville, South Carolina. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2. I have a masters degree in social work from the University of South Carolina (1980) and a bachelors in psychology from Pepperdine University (1977). I am licensed by the State of South Carolina Board of Social Work Examiners and I am board certified by the American Board of Examiners in Clinical Social Work. I have a private practice in Greenville, South Carolina where I diagnose and treat mental, emotional, and behavioral disorders. I also conduct biopsychosocial assessments for family and criminal courts and have done so for the past 27 years. I have been qualified as a clinical social work expert in numerous states and have testified as to my opinions based on the biopsychosocial assessments I have conducted in capital cases.

3. The biopsychosocial assessment is a broad and comprehensive professional social work tool that encompasses clinical interviews, review of records, consultation with other professionals and experts, literature and research review, visits to home and community when necessary and the preparation of visual aids to assist the court. It is conducted in order to bring some reasonable understanding as to how an individual has come to his current situation. Information obtained from the assessment is used to give testimony regarding family systems and intergenerational patterns, family dynamics, and other areas such as substance abuse, family violence, trauma, mental illness, etc., and how these dynamics impacted the defendant during his development in life. Clinical social workers work in a multidisciplinary approach in order to factor into their assessments the observations of other professionals.

1

4.   I was asked by current counsel for Andre Thomas to discuss the impact on mental illness of family dynamics and health. This area of social study is called "family cohesion." Cohesion is the ability to "stick together," to be supportive, and to provide a platform under the feet of profoundly ill persons. It is a part of what is done when conducting a biopsychosocial assessment.

5.   In preparation for writing this affidavit, I reviewed the social history prepared by Andre Thomas' habeas defense team, which incorporated and reflected interviews with scores of friends and family members, as well as their review of thousands of pages of documents. I also reviewed the relevant body of literature.

6.   Andre Thomas is a twenty-four year old, mentally ill, African American male. Throughout his life, Andre was completely deprived of the cohesive family environment that would have provided crucial support for someone with his mental illness.

7.   Ethnicity and social status are important in understanding the dynamics of a family with mentally ill members, particularly African-American families with mentally ill members, as observed by Guarnaccia and Parra. (Community Mental Health Journal, Vol. 32, No. 3, June 1996, Ethnicity, Social Status, and Families' Experiences of Caring for a Mentally Ill Family Member, *Peter J. Guarnaccia, Ph.D.Pilar Parra, Ph.D*)

8.   Lefley (1987) reports that minority families view and cope with a mentally ill relative differently than European-American families. Existing research indicates that pathways into treatment are affected by the interpretations the family members place upon the patient's symptoms (Rogler, et al. 1989; Rogler & Cortes 1993). However, few studies have explored processes of symptom interpretation and illness definition among minority families, whose cultural construction of mental illness often deviates quite radically from those of the majority and of professionals. (Jenkins, J. 1988.  Conceptions of Schizophrenia as a Problem of Nerves: A cross-cultural comparison of Mexican-Americans and Anglo-Americans. *Social Science and Medicine* 26: 1233-1234.; Guarnaccia, P.J et al. 1992. Si Dios Quiere: Hispanic families' experiences of caring for a seriously mentally ill family member. *Culture, Medicine and Psychiatry 16*. Community Mental Health Journal, *supra.)*

9.   Evidence of Guarnaccia's and Parra's observations is found in Andre Thomas' family.  For instance, Rochelle Thomas (Andre's mother), and later her children Andre and Brian were born into a family that believed their delusions were "gifts" that made them special – thus interpreting their mental illness as superior powers.  For instance, Andre's and Rochelle's family believed that they had a "special gift" because "God talks to them" and gives them "visions." *See*

2

Denise Wade Affidavit, para. 5; 6; Alice Ross Harris Affidavit, para. 8. Thus, instead of seeking treatment for these delusions, the family believed they – and the behaviors they engendered - were entitled to deference. See Pam Borens Affidavit, para. 9-10.

10. The line between cultural beliefs and mental illness is a very delicate one. Cultural beliefs must be taken into consideration when determining the presence of a mental disorder and the impact of that disorder within the family. In Andre's family, mental illness was so common and accepted that patently bizarre behavior was tolerated, misunderstood, and ignored, to the detriment of Andre's ability to fortify his efforts to control his prodromal (the early phases that mark the beginning of the full onset of a mental illness) symptoms and delusional system.

11. Andre's parents' (Rochelle and Danny Thomas) own symptoms of mental illness, hypersexuality, impaired reasoning, perceptual disorders, self-medication with drugs and alcohol, and hyperreligiosity further precluded them from being able to intervene in their sons' social deterioration and religious delusions. Of course, having two sons (Andre and Brian) diagnosed with schizophrenia speaks to the genetic loading for psychosis in Andre's family.

12. Schizophrenia is frequently conceptualized in the context of severe psychotic symptoms, but the only symptom that DSM-IV requires of all cases is a deterioration (or failure to achieve adequate levels) of social functioning. This social deterioration isolates, stigmatizes, and impairs all aspects of the patient's existence. As many as two-thirds of people with schizophrenia are unable to fulfill basic social roles, such as spouse, parent, and worker, even when psychotic symptoms are in remission. Fewer than one-third work regularly, and the majority are underemployed (based on premorbid functioning) even when they can work. Only a small percentage of persons with schizophrenia marry, and marriages often end in divorce. Most patients have significant impairments in social relationships, and they often are socially isolated. When they do interact with others, they often have difficulty maintaining appropriate conversations, expressing their needs and feelings, achieving social goals, or developing close relationships. People with schizophrenia have increased medical morbidity and early mortality, and it has been hypothesized that an important factor in their poor medical status is difficulty effectively relating to health care providers.(Bellack et al; *Assessment of Community Functioning in People With Schizophrenia and Other Severe Mental Illnesses: A White Paper Based on an NIMH-Sponsored Workshop*, Schizophrenia Bulletin Advance Access published Aug. 24, 2006, page 1).

13. Family support can be the only safety net or reality check a person beset with delusions may have. Andre's family support was a facade, with huge holes created by the family's own paranoia, delusions, and neglect. Andre became increasingly psychotic, moving in the years leading up to the crime from the

3

prodromal phase into the active phase of his psychosis. In response, his family only isolated him further. See Amy Ingle Affidavit, para. 2-3, 18.

14. I have no doubt that further review of Andre Thomas' case and the development of his mental illness would further underscore and detail the findings outlined above. I also have no doubt that any competent clinical social worker conducting a comprehensive biopsychosocial assessment could have presented a formidable portrait of Andre's life and his family, which would have directly and strongly supported the severe, genetically mediated mental illness corroborated by current neuropsychological testing.

I declare under penalty of perjury under the laws of the State of South Carolina and the United States of America that the foregoing is true and correct. Executed this _17_ day of _June_, 2007 in Greenville, South Carolina.

_Janet Vogelsang, M/SW, BCD_
Signature

4

# Exhibit 34

## Affidavit of Denise Ross Wade

COUNTY OF MUSKOGEE )
                                            ) ss:   **AFFIDAVIT OF DENISE WADE**
STATE OF OKLAHOMA )

    **DENISE WADE,** being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.  My name is Denise Wade.  I am a resident of Muskogee County, Oklahoma.  I am over 18 years of age and am otherwise competent to give this affidavit.  No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.  I am a half-sister of Rochelle Ross, Andre Thomas' mother.  My mother was Vivian Joan Edwards Ross and my father was Roscoe Johnson.

3.  I am a resource specialist for the Department of Human Services.  I work as an advocate for children in foster care.

4.  There is a history of mental illness in Andre's background.  My mother, Andre's grandmother, used to tell me to be careful about how close I stepped to the line of mental illness, because you could fall over into the madness.  I have battled depression, which became severe after my mother died in 1997.  My mother's father, Papa John, had a sister who was found in her yard one day, buck naked, watering the lawn.  Another sister of Papa John had a grandson in Oklahoma City who videotaped his own suicide.  I have contemplated suicide, and I take anti-depression medication.

5.  Vivian, Rochelle and Andre all have a special gift, a special relationship with God.  God talks to them in dreams and by giving them visions.  It must be very difficult for Andre to handle his gift since he is mentally ill.

6.  Since my mother believed that Rochelle had the gift of hearing God, she was not as strict with her as she was with the rest of us.  Rochelle was allowed to run wild.  She had a strong will.  She was the only child who would fight with our mother.  Rochelle would sometimes bite her.

7.  Rochelle was obsessed with her hair, even when she was a young teenager.  She always wore a wig.

8.  In November 1969, my mother married her second husband, Walter Martin.  They both abused alcohol.  Every weekend they drank from Friday afternoon all the way through Sunday.  They would scream, curse and fight between one another and towards us.

9.  One night in December of 1971, my mother and Walter had gone to a local juke joint.  My brother Gregory was in the car with them.  When they got home, Walter pulled a shotgun on my mother and said he was going to kill her.  Gregory jumped in front of mother.  Walter shot and killed Gregory.  Walter did not go to prison because they said it was an accident.  Rochelle was very close to Gregory and was devastated when he died.

10. When Rochelle graduated from Muskogee High School, she went to Parsons, Missouri, where her father was from and lived.  She lived like she always had, with no responsibility or

commitment.  She met an Iranian student at the junior college in Parsons.  He is the father of her oldest son Eric.

11. Our sister Pam wanted to adopt Eric, with Rochelle's permission, but then Rochelle changed her mind.  Much later, when Rochelle got pregnant with her youngest son, ██, she contacted me and told me she did not want to have the baby.  She asked me if my husband and I would adopt the baby when he was born.  We said yes.  When the baby came she changed her mind.  I worry very much about ██ because he is being raised in such an unstable environment.

12. I sometimes say Rochelle has dated 'The whole United Nations.'

13. Rochelle married Danny Thomas, who was a friend of Walter, my mother's husband.  Danny was an alcoholic and there was a lot of domestic violence in his relationship with Rochelle.

14. Danny always talked fast, and a whole lot.  He always seemed like there was something not right about him.  He had a tremor - an involuntary thing going on with his head.  He may have had mild mental retardation.

15. For the first few years of her motherhood, Rochelle was sometimes domestic, but often wild.  She would even hitchhike when she was pregnant.  When she and Danny first broke up, the boys were pretty small.  Shortly after they split up, James got burned on a stove.  Danny tried to use this against Rochelle by calling CPS, and James was put into foster care.  Rochelle eventually got James back, but after that she was never the same.  After that, she was never there as a mother and could not provide for the boys.  Since Eric and Danny Ross were the oldest, they were forced to take care of the younger boys.  Rochelle did not guide or teach the boys properly.  She would let them be out all hours of the night and did not even know or seem to care where they were.

16. In the early nineties, Rochelle and the children sort of disappeared from the family.  Of course this was hard on all of us who cared about Rochelle and her kids.  Something bad happened between Rochelle and our mother.  Rochelle would disappear with her boys for several years at a time.  No one in the family knew where they were.  When my husband and I would drive from Muskogee down to Dallas to see my sister Margie and brother Kevin, we would stop in Sherman where we thought Rochelle was living to try to find her.  The only way we knew how to find her was to go see Eric and Danny at work at Popeye's.  If they were not working that day there was no way to find Rochelle.

17. Rochelle raised her sons telling them that their aunts and uncles were rich and that they looked down on the boys.  This was not true.  We had more stable environments for our children than she did, but we still loved her children and did not look down on them.  Recently, Andre's brother James wrote to me and asked if it was true that Rochelle's boys were considered the black sheep and that everyone else thought they were better than Rochelle and her sons.  I wish all of Rochelle's boys could know that no one ever meant to smite them, that they were loved.  It was only because Rochelle would not stay in one place that we were not able to help raise those boys.

18. Andre was never quite right.  When he was very little, he was not up to par with the other children in the family who were his same age.  He did not hit the milestones the way they did.  He did not talk very much.  He did not play with the other kids very easily and had trouble fitting in.  At the same time, he was also always respectful, throughout his childhood.  Brian was not right, either.  He was diagnosed with schizophrenia.

19. There is a lot of mental illness in the family, especially in Rochelle's kids.  Andre and his brothers Brian and James all show signs of something being really wrong with their minds.  In 1998, Rochelle sent Brian to stay with me in Muskogee because she was worried that some people in Sherman were out to get him.  At that time Brian told me that he was schizophrenic and was supposed to be taking medication.

20. Andre was very close to my mother, his grandmother.  It was like she was the only one he had ever been able to really talk to, and he lost that very important support when she died.  He had a big downfall after she died.  He was thirteen years old.  He was trying to cope because his mama was not there for him and his grandma had died.

21. Rochelle told me that Andre had been acting strange for quite some time before the murders.  She said he would often talk to himself and have conversations with people who were not there.  She said that one time he put duct tape over his mouth because God told him not to say the things that were coming out of his mouth.  When he couldn't see his son ███ anymore, he lost all hope.  Andre is very, very sick.

22. Rochelle still has a very hard time staying in one place.  If she is involved in a confrontation she disappears.

23. Andre's lawyers never contacted me.  If they had, I would have provided this information to them, and to the doctors who examined Andre.  I would have been available to testify for him had they asked me to.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

*Denise Wade*
Signature

*Denise Wade*
Printed Name

COUNTY OF MUSKOGEE, STATE OF OKLAHOMA
SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 4th day of June, 2007

*Chu T. White*
Notary Public's Signature
My commission expires: 06-23-07

# Exhibit 35

## Affidavit of Myla Young

COUNTY OF **CONTRA COSTA** )

STATE OF CALIFORNIA ) ss.   **AFFIDAVIT OF MYLA H. YOUNG, PH.D., ABPN**

**DR. MYLA H. YOUNG**, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.    I am a Board Certified clinical psychologist licensed to practice in the State of California with a specialty in neuropsychology and neuropsychological assessments.  I am certified with the American Board of Professional Neuropsychology (ABPN) in Neuropsychology.  I am a member in good standing of the ABPN; the American Psychological Association (APA) and its subspecialty divisions in Clinical Neuropsychology and Forensic Psychology; the California Psychological Association (CPA); the National Academy Neuropsychology (NAN); the International Neuropsychological Society (INS); and the Society of Personality Assessment (SPA).

2.  I currently have a private practice that includes conducting neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients.  I also conduct neuropsychological evaluations of children, adolescents, and adults.  I am an instructor of continuing education courses in Neuropsychology at University of California-Berkeley and at Alliant International University.

3.    I was the primary investigator for a long-range research project (1997 – 2005) evaluating neuropsychological and psychological functioning of inmates in the California Department of Corrections who have required mental health treatment during the course of their incarceration.  Using data obtained from this research project, I have been the primary presenter at multiple professional seminars, and have been the primary author of several peer-reviewed and published manuscripts.

4.  I hold a doctorate in Clinical Psychology from Alliant International University in San Francisco, California (formerly California School of Professional Psychology in Berkeley, California).  I received my Masters Degree in Experimental Psychology from

1

Towson State University in Baltimore, Maryland in 1977.  I earned my Bachelor of Arts Degree in 1975 with a major in psychology from the University of Guam.

5.     From 1984 to 1985, I completed a Pre-Doctoral Internship at Garfield Geropsychiatric Hospital in Oakland, California.  During this internship, I performed neuropsychological and psychological evaluations of geriatric patients who were hospitalized for medical, neurological, and/or psychiatric disorders.

6.     I completed a Pre-Doctoral Internship at McAuley Neuropsychiatric Institute of St. Mary's Hospital in San Francisco, California, from 1985 to 1987.  While at St. Mary's I conducted neuropsychological and psychological evaluations of children, adolescents, and adults who were hospitalized for psychiatric treatment, and provided treatment to these same individuals.  I also conducted neuropsychological evaluations of adults who were hospitalized for medical treatment or who were recovering from neurological and other medical disorders.

7.     In 1989, I completed a Post-Doctoral Fellowship in Neuropsychology at the University of California, San Francisco/San Francisco General Hospital.  During this time I conducted neuropsychological and psychological evaluations of patients hospitalized for medical, neurological, and psychiatric disorders; conducted neuropsychological and psychological evaluations of children and adolescents being evaluated at the Child and Adolescent Sexual Abuse Resource Center (CASARC); and participated in research that evaluated the neuropsychological, neurophysiological (Evoked Potential), and psychological functioning of HIV positive and negative men and women.

8.     From 1989 to 2005, I was employed by the California Department of Mental Health at the Correctional Medical Facility-Vacaville, California.  In this employment, from 1990 to 1995, I served as a staff psychologist, providing neuropsychological and personality assessments of inmates who had been admitted for acute and sub-acute psychiatric treatment while confined by the California Department of Corrections.

2

During this period, I also participated on an Interdisciplinary Treatment Team and served as the Clinical Coordinator responsible for the development, implementation, and evaluation of a Behavioral Milieu Treatment Program. Based on learning theory constructs of positive and negative reinforcement, while avoiding the use of punishment, this program provided a systematic way of decreasing dangerous and unwanted behaviors while increasing safe and wanted behaviors of offenders who had been psychiatrically hospitalized while in prison. From 1995 to 2000, I served as a Program Consultant for Psychology and, from 2000 to 2005, I served as a Senior Supervising Psychologist in this Behavioral Milieu Treatment Program. As described above, I was the Principal Investigator for research, program evaluation, and treatment outcome measurement. I also developed, accomplished accreditation of, and served as Director for an American Psychological Association Accredited Psychology Intern Training Program; provided seminars in neuropsychological assessment, and provided individual and group supervision to Psychology Pre-Doctoral Interns and Post-Doctoral Fellows.

9.      From January 1990 to the present, I have served on the Adjunct Faculty at Alliant International University/California School of Professional Psychology in Berkeley/Alameda where I have instructed a course on Neuropsychological Assessment, and have instructed several other courses in the past. I was the Dissertation Chairperson for several doctoral dissertations including: Neuropsychological Assessment of Psychotic and Non-psychotic Inmates; Neuropsychological Description of Children in Psychiatric Day Treatment; Neuropsychological and Psychological Functioning of HIV/AIDS Affected Children; Self-Mutilation in Psychiatrically Hospitalized Inmates; and Rorschach and MMPI-2 Investigation of Psychopathy in Prison Inmates. I have been a Dissertation Committee Person on multiple doctoral dissertations in several other areas of investigation. From 2003 to the present, I have presented continuing education courses in neuropsychology and neuropsychological evaluation of criminal offenders at University of California, Berkeley.

3

10.    I am the primary author of several peer-reviewed publications including: Neuropsychological Functioning of Prison Inmates; Risk Factors for Community Violence; Risk Factors for Assault in Prison and in Prison Psychiatric Treatment; and Risk Factors for Self Harm in Prison Psychiatric Treatment.  I am the secondary author of several peer reviewed publications including: Managing Violence in Prison Supermax Facilities; Previously Unrecognized Cognitive and Psychological Disorders in Patients with Chronic Neck Pain; Relationships between Neuropsychological and Immune Variables in HIV Positive Asymptomatic Men.  Several manuscripts are currently in peer review, including: Psychopathy in Prison Inmates; The Sexual Offender in Prison Psychiatric Treatment; and A Comparison of Rape and Molest Offenders in Prison Psychiatric Treatment.

11.    I have been the principal presenter at several professional conferences including: Asilomar Forensic Mental Health Conference; Patton State Hospital Forensic Mental Health Conference; California Psychological Association; American Correctional Mental Health Services Association; Behavioral Health Institute Conference; and the International Organization of Psychophysiology.

12.    I have been qualified as an expert witness in state and federal criminal courts in California, Nevada, and Washington and in state civil courts in California.  My Curriculum Vitae is attached to this affidavit as Exhibit A.

13.    I have been asked by counsel for Andre Lee Thomas to perform neuropsychological and psychological evaluation, to determine the presence and severity of any brain dysfunction, to determine the presence and severity of any psychiatric disorder, and—if brain dysfunction and/or psychiatric disorder exist—to render an opinion whether such brain dysfunction and/or psychiatric disorder would have prevented Andre Thomas's ability to know that the March 27, 2004 murder of his wife (Laura), son ( █████ ) and █████ half-sister ( ███ ) was wrong.

4

Evaluation of Andre Thomas:

14.     I saw Andre Thomas for 22 hours of neuropsychological and psychological evaluation over the course of three days – May 21, 2007, May 22, 2007 and May 23, 2007.  This evaluation was conducted in a confidential contact evaluation facility at Texas Department of Corrections - Polunsky Unit, Livingston, Texas.  He was not restrained during the evaluation, and the evaluation was uninterrupted.   Andre Thomas was cooperative with the evaluation, and attempted all tests that were requested of him.  All indications are that he expended substantial effort to complete each test that was administered.   I assessed his intellectual functioning, his neuropsychological functioning, and his psychological functioning.   Exhibit B sets forth the tests that I administered to Andre Thomas.   His performance on neuropsychological testing is summarized in this affidavit text.   Exhibit C provides further description of his test performance.

15.     The instruments used in the neuropsychological evaluation were designed to identify and measure cognitive and neuropsychiatric deficits caused by brain dysfunction, and to provide an indication of the thinking and behavioral consequences of disrupted brain function.   The comprehensive assessments that were administered measured various aspects of brain functioning, including intelligence, sensory-perceptual, motor, attention and concentration, verbal and visual memory, secondary language, visual-perceptual-motor, and executive functioning, including the ability to think, reason, problem-solve and anticipate consequences, all of which are involved in considering and deliberating, planning, self-monitoring, inhibition of impulse and mental flexibility.

Effort and Cooperation with Testing:

16.     Validity mechanisms imbedded in the testing materials revealed no evidence of malingering or exaggeration of neuropsychological dysfunction.   Andre

5

Thomas's effort on, and cooperation with neuropsychological testing were additionally independently assessed using the 15 Item Test, the Test of Malingering Memory (TOMM), and the Forced Choice Subtest of the California Verbal Learning Test (CVLT-II Forced Choice).  These tests were specifically developed to detect malingering and/or lack of effort on neuropsychological testing.  The tests have the appearance of being quite difficult (for example, sequentially look at pictures of 50 different everyday objects, and then be able to "pick" the item previously seen from one of two choices) but, in reality, were successfully completed by patients who have known severe brain damage caused by brain trauma, brain surgery, or severely deteriorating neurological diseases such as Alzheimer's Disease.  Individuals who are purposefully attempting to fake or malinger their performance and/or individuals who are not putting forth appropriate effort to complete neuropsychological testing perform poorly on these tests which were successfully completed by patients who are severely brain impaired.  Each of these tests was used to assess the degree and quality of effort being put forth by Andre Thomas.  The 15 Item Test has demonstrated usefulness in evaluating the individual's effort and cooperation with testing (Lee & Martin, 1992).  Research has demonstrated that the TOMM is a reliable and valid test to identify attempted faking on neuropsychological testing (Rees, Tombaugh, Gansler & Moczynski, 1998).  Research has also demonstrated that the CVLT-II Forced Choice Subtest is effective in detecting attempts to malinger neuropsychological test performance with 93 percent accuracy classifying individuals who are attempting to fake neuropsychological testing performance (Millis, Putnam, Adams, & Ricker, 1995).   Andre Thomas's performance on all of these measures indicated that he was cooperating fully with this evaluation, was not making any effort to feign his performance, and that information in this evaluation can be relied upon as a valid assessment of Andre Thomas's functioning.

17.   The validity of testing data, as well as conclusions established from testing data, is further confirmed by observations of Andre Thomas during testing.   Andre

Thomas attempted every task that was requested of him and worked consistently throughout the time allotted.   Although instructions for completion of several tests had to repeated more than once, and although instructions for  some tests (Paced Auditory Serial Addition Test) had to be provided initially in the standardized format, followed by alternate ways of assuring his understanding (Pantomime, Written Instruction, Written Example) he was able to complete standardized administration of all tests. Neuropsychological testing was consistently presented at the beginning of each session, and interviews were completed towards the end of sessions.  Although all testing data is valid, Andre demonstrated several actions that required me to stop his conversation, redirect him, and/or require that he "take a break" (stand up, walk around the testing room, leave the room briefly for food and/or drink).

18.    Even though at the time of evaluation Andre was prescribed (and confirmed that he was in fact taking medications as prescribed) antipsychotic (Navane), antidepressant (Trazodone), and medication for possible side effects of antipsychotic medication (Cogentin) his speech was episodically tangential, at times he appeared to be responding to internal stimuli, and at times he expressed frankly delusional—primarily religious--beliefs (personal communications to him from God; possession of his family by devils and demons; antichrist; Jezebel; hidden meanings in bible passages (Revelations); Armageddon being imminent and his needing to "save" the world; the "Illuminatis's" intent to dominate the world, have secret satellites, torture people, and are somehow related to the masons; and multiple instances of events that are totally normative but had special meanings to him; his children described as "cute and fuzzy" meaning that they were secret agents of the "illuminatis";  audiotapes that told him of possession of his family by the devil; radio programs that had secret codes; sermons that were specifically directed to him telling him of possessions of the devil; etc.).  This type of reasoning, known as ideas of reference, is a known symptom of schizophrenia, and is

7

the schizophrenic patient's interpretation of casual and meaningless incidents as having a particular and special—often bizarre—meaning for the schizophrenic patient.

19.     One of many examples of ideas of reference that Andre Thomas described was of walking by a church and the sign outside the church read, "Now that you have seen the movie, read the book."  Andre interpreted this sign as being placed there for the sole purpose of communicating a message from God to him, and that the message was God telling him that "my life like the movie (Passion of Christ).  I gotta read to find out what happens next.  Maybe there something I missed.  I figured it out later on when I came to my senses a couple of days later that they talking about me.  Gotta get home. Gotta find out what happen to me next..."  Andre Thomas further concluded…"it just hit me you didn't kill the antichrist.  You killed your own son.  It was right the thing.  What God told me to do."  In his mind, Andre Thomas concluded that the sign had special meaning for him and that meaning was that God was telling him to cut the hearts out of his wife and children in order to "save them from being possessed by the devil."

20.     In addition to ideas of reference, throughout the evaluation, Andre Thomas's affect was consistently flat and unchanging, with Andre Thomas demonstrating the same emotion when he was providing the definition of the word "bed" or  describing being possessed by the devil and Armageddon.  Flat affect, like ideas of reference, is a known symptom of schizophrenia, as well as other severe neurological disorders.  A patient who experiences flat affect, for example, may describe the death of a parent with the same emotion as describing what he ate for breakfast.  Flat affect may also be noted when a schizophrenic patient discusses ideas that, to anyone other than himself, would be considered illogical, bizarre, and unbelievable.

21.     It is important to note that this psychotic thinking was reported to me by Andre Thomas on May 21, 2007, when he had been incarcerated for three years, was not taking any drugs, including alcohol, marijuana and/or Coricidin, and was taking prescribed antipsychotic and antidepressant medication.

8

22.    <u>Understanding of Brain Functioning:</u>

23.    Several ways of understanding the evolutionary (phylogenetic) development of the brain are accepted in the neurosciences and assist in understanding the relationship between brain structure and functioning. One such developmental understanding was proposed by Yakovlev and is supported by contemporary neuroscientists (Bear, Connors & Paradiso, 2001). Yakovlev describes brain structure as organized in three separate, but related systems, with three primary connective systems, each brain system being increasingly mature. Brain maturity is measured by the complexity of dendrite branching and the degree of myelination of brain cells, referred to as neurons. Neurons have three primary structures, the body, the axon, and the dendrites. The body of the neuron is the largest part of the cell and contains the cell nucleus. The axon is a "tail like" structure that extends from the body of the neuron and serves as a track on which information moves across the neuron. Dendrites are "branches" that extend from the axon and serve as "tracts" on which information is carried from one neuron to the next neuron. The more dendrites that are identified, the more mature the brain structure. Myelin is a white "covering" or "insulation" that goes over the axon of the neuron. Like an electrical cord has a coating around the wire to insure the transmission of the electrical current, the neuron has myelin around the axon, insuring the rapid and efficient transport of information within the brain. The greater the amount of myelin around the cell's axon, the greater the maturity of the brain cell, and consequently the greater the maturity of the brain.

24.    There is a primitive nuclear core of the brain, the allocortex, which is composed of short, unmyelinated neurons that are diffusely organized, which predominantly includes the twelve cranial nerves (olfactory, optic, facial, etc.) and the reticular activating system. The reticular activating system is a diffuse neural structure located in the brainstem which functions to provide arousal of the forebrain, serves as a "filter" allowing the individual to attend to information that is relevant while ignoring all

of that information that is irrelevant.  The reticular activating system also functions to maintain consciousness, metabolism, respiration, and circulation, and serves to regulate sleep.  The middle system, the Neocortex, is composed of partially myelinated, organized cell groups (neurons), predominantly includes the hypothalamus, thalamus, pituitary, and limbic loop (Papez Circuit) and serves primary functions of motivation, memory, arousal, and emotion.   The outer layer, the mesocortex, is composed of well myelinated (insulated) and organized cell groups, predominantly includes the sensory and motor cortex, corpus callosum, and cerebrum (occipital, parietal, temporal, frontal lobes). Orbitofrontal and hippocampal paralimbic and subcortical limbic connections provide a "flow" of information throughout the brain.  Guided by this understanding of brain functioning that is accepted within the neuropsychological community, neuropsychological tests were selected and administered to Andre Thomas.

Intellectual Functioning:

25.     Andre Thomas's intellectual functioning (IQ) was evaluated using the Wechsler Adult Intelligence Test (WAIS-III) and the less culturally impacted Test of Nonverbal Intelligence (TONI-3)  (Brown, Sherbenou and Johnsen, 1997).  The WAIS-III is the most frequently used test of intelligence, has demonstrated reliability and validity, and is generally accepted in the neuropsychology community.  The WAIS-III consists of eleven subtests designed to evaluate a patient's general intellectual functioning.  Six of these subtests are designed to assess the patient's verbal functioning, while the remaining five subtests assess the patient's performance on non-verbal visual-spatial and constructional skills.  Upon completion, the six verbal tests are scored to determine the subject's verbal intelligence quotient (VIQ), while the five performance subtests are scored to determine the subject's performance intelligence quotient (PIQ).  A full-scale intelligence quotient or Full Scale IQ (FIQ) is determined from these two quotients.

10

26.     In addition to the WAIS-III, Andre Thomas's intellectual functioning was also evaluated using the Test of Nonverbal Intelligence (TONI-3).   Like the WAIS III, the TONI 3 is a standardized test of intelligence which has demonstrated reliability and validity and is generally accepted in the Neuropsychology community.   The TONI 3, however, is a measure of intelligence which does not require the individual to use verbal language.   There is historical knowledge that there are groups of individuals who, for various reasons (language impairments caused by brain injury and/or disease, English as a second language, differences in cultural and social experiences, ethnic/racial minority status, socio-economic status, etc.) perform lower on the WAIS-III, but who—nonetheless—are equally "intelligent" as individuals who do not have these individual characteristics (Brown, Sherbenou and Johnsen, 1997).   The TONI 3 is a test which "undoes" this potential test bias by testing the individual without requiring language, provides test instructions through pantomime rather than language instruction, and provides a measure of the individual's process of thinking—or "intelligence."   Andre Thomas is a black man.   His intellectual function, therefore, was also evaluated using the TONI 3.

27.     Andre Thomas's performance on the WAIS-III test demonstrates overall intellectual functioning in the Average Range.   His Full Scale IQ is 97, placing him in the 42nd percentile.   His performance on the TONI 3 also was in the Average Range, with an Intellectual Quotient (IQ) of 102, placing him in the 55th percentile.

28.     Andre   Thomas   demonstrates   essentially   equal   abilities   for   verbal comprehension and for thinking in visual images.   His Verbal IQ is in the Average Range (VIQ is 109 - 95 percent Confidence = 103 – 114).   His Performance IQ also is in Average Range  (PIQ is 95  - 95 percent Confidence = 93 – 101).

29.     Although Andre Thomas's overall intellectual functioning is in the Average Range, his performance on WAIS-III Indexes that predominantly measure his ability to actively process new information is significantly lower.   Andre Thomas's

11

Working Memory Index (WM = 84) and Processing Speed (PS = 86) are in the Low Average Range (WM = 84), and significantly lower than his verbal comprehension and/or processing speed.  Significantly lower performance on measures of the ability to actively process new information indicates concern for dysfunction of Neocortical (Hypothalamus, Hippocampus/Pituitary, Limbic System, Basal Ganglia) and Mesocortical (frontal, temporal, parietal) brain cortexes.

Neuropsychological Functioning

30.    Andre Thomas's neuropsychological functioning was evaluated using a series of tests selected to evaluate his sensory, motor, attention, memory, language, visual-perceptual-organization, and executive functioning.    Two separate neuropsychological protocols were administered to Andre Thomas.  The first protocol includes a series of neuropsychological tests specifically selected to evaluate systematically his brain functioning and that represent currently available neuropsychological tests that have significant sensitivity and specificity in identifying brain function and dysfunction.  The second protocol includes those neuropsychological tests that were widely used and generally accepted in the neuropsychological community at the time of the offenses (i.e. March 2004) for which Andre Thomas was found guilty and were available at the time of his trial for these offenses (February 2005).  Andre Thomas's neuropsychological functioning was as follows:

Sensory functioning:

31.    Andre Thomas's sensory functioning was evaluated using the Smell Identification Test (SIT), the Halstead-Reitan Sensory Perceptual Examination (SPE) and the Luria-Nebraska Neuropsychological Battery (LNNB) Tactile Subscale.  He made 5 errors on the Smell Identification Test (SIT) with olfaction at the 22nd percentile, and the lowest range of normosia.  The SIT is, as the title indicates, a test of the individual's

ability to identify common objects (rose, gasoline, pine, etc) by smell.  Impaired olfactory sensitivity has been demonstrated to identify numerous neurological disorders (lesions or tumors  in the cerebral cortex, parkinsonism, alcohol dementia, Alzheimer's disease, cystic fibrosis, multiple sclerosis) (Doty, Frye and Agrawal, 1989).  Impaired olfactory sensitivity is also demonstrated by individuals who are schizophrenic and particularly sensitive to the temporal and frontal cortex impairment associated with schizophrenia (Mober et al, 2006).

32.    On the sensory perception test (SPE) Andre Thomas did not make errors on the SPE primary visual, auditory and tactile sensory tasks.  He, however, made significant bilateral errors on SPE tertiary sensory task  (Finger Tip Number Writing Errors = 13).  On the LNNB Tactile Scale Andre Thomas's overall functioning is below the critical level.  Item analysis, however, reveals impaired tactile pressure, impaired tactile sensitivity, and impaired two-point discrimination, all signs of brain damage.

Motor Functioning:

33.    Andre Thomas's motor functioning was evaluated using the LNNB Motor Scale and the Finger Tapping Test.  Although his overall performance on the LNNB Motor Scale is below the critical level, he consistently demonstrates bilateral motor impairment on tasks that require complex sequential motor movements, alternative motor movement and motor inhibition.   On the Finger Tapping Test Andre Thomas demonstrates mild (dominant hand) and moderate (non-dominant hand) impairment.

34.    Sensory and motor impairments indicate primary dysfunction in the most basic brain regions of the allocortex.  Sensory and motor pathways are initiated in the brain's cranial nerves, with complex pathways leading through the thalamus and into the motor and sensory strips of the posterior frontal cortex and anterior parietal cortex. Impaired allocortex (cranial nerve), neocortex (thalamus) and isocortex (sensory strip, motor strip, orbitofrontal frontal cortex) brain structures are implicated for Andre

Thomas.  In addition to primary neurological disease, impaired sensory and motor functioning are significantly associated with a wide range of neurological, psychiatric and neuro-developmental disorders including, but not limited to, schizophrenia, chronic childhood neglect, and traumatic brain injury.

<u>Attention and concentration:</u>

35.     Andre Thomas's attention and concentration were evaluated using the Conners' Continuous Performance Test (CPT) and the Paced Auditory Serial Addition Test (PASAT).  On the CPT Andre Thomas demonstrates both inattention and impulsivity.  His ability to withhold his motor movement when the task requires inhibition (commissions) and alternately generate his motor movement when the task changes and requires responding (detectability) are both significantly impaired.

36.     On the PASAT Andre Thomas's abilities are severely impaired.  This test requires complex sustained attention and manipulation of information and Andre Thomas's ability to complete this task is consistently impaired, with impairment greater than three (3) standard deviations below that of individuals who do not experience brain damage.

37.     Attention and concentration are primarily mediated by the allocortex (Reticular Activating System) and isocortex (frontal cortex) brain systems and are experienced in a wide range of psychiatric, neurological disorders and neuro-developmental disorders.

<u>Memory and Learning:</u>

38.     Andre Thomas's memory and learning were evaluated using the Wechsler Memory Scale (WMS-III), California Verbal Learning Test (CVLT II),  memory trials of the Rey Complex Figure Test (Rey) and memory trials of the Tactual Performance Test (TPT).  His performance on all of these measures is remarkably impaired.

14

39.     The Wechsler Memory Scale (WMS-III) is a comprehensive test of memory and learning that evaluates the individual's ability to process, learn and recall information that is presented both verbally and visually, as well as the individual's ability to recall information immediately after presentation, with a delay, and with recognition cues.  Andre Thomas's memory and learning on five (5) of seven (7) primary indexes of the WMS-III is significantly impaired (Auditory Immediate, Visual Immediate, Immediate Memory, Visual Delayed, and General Memory), with impairment severity ranging from Borderline to Low Average.   His performance on subtests of immediate and delayed recall of facial recognition and person recognition and delayed recall of his ability to learn verbal pairs was mild-moderately impaired.

40.     The CVLT II is a measure of the individual's ability to learn, recall, and use information that is presented verbally.  CVLT II test trials evaluate immediate memory, learning from repetition, learning when different information interferes with the originally learned information, memory after a brief time (60 seconds), memory after an extended time (30 minutes), and the ability to recognize information that was previously presented.  As previously described, the CVLT II also has a specific validity subtest that evaluates the individual's cooperation with and effort on testing and detects malingering or exaggeration of difficulties.   The CVLT II validity index (Forced Choice) demonstrated that Andre Thomas was cooperating and not attempting to exaggerate or feign his performance.   His performance on all verbal memory tasks on this test significantly impaired, with impairment ranging from mild to moderate.

41.     Rey Complex Figure memory trials evaluate the individual's ability to recall a complex visual figure after a brief delay (Immediate Recall) , a long delay (Delayed Recall), and to look at and recognize individual pieces of the figure after a delay (Recognition).   Andre's ability to complete this test was consistently severely impaired, with his ability below or equal to the first percentile (Immediate Recall T = $\leq$

20, ≤ 1st %ile; Delayed Recall T = ≤ 20, ≤ 1st %ile; Recognition Recall T = ≤ 20, ≤ 1st %ile)).

42.     The Tactual Performance Test (TPT) Memory and Location trials are tests of the individual's incidental memory.  Incidental memory is a form of learning that does not require direct effort, does not require education or social experience, and does not require language.   Incidental memory is a measure of overall brain integrity and particularly the brain's ability to communicate information between the right and left brain hemispheres, and therefore a more "pure" measure of the brain's ability to process and remember information.   Andre's ability to complete these tests was consistently significantly impaired, with impairment ranging from mild to moderate (TPT Memory  T = 36, mild impairment; TPT-Location T = 30 (moderate to severe impairment).

43.     Memory is an extraordinarily complex function that is basic to all functioning, requires normal functioning of all brain regions (allocortex, neocortex and isocortex) and requires normal communication across the right and left brain hemispheres, and requires normal communication among all brain regions through connection pathways (orbitofrontal, subcortical and hippocampal) for the individual to function adequately.  For memory to be intact, each individual brain region (primarily reticular activating system, pituitary, hippocampus, thalamus, and frontal cortex) must be able to complete its function and each individual brain region must be able to communicate information from one to another through brain pathways (frontal cortex to posterior brain cortex; frontal cortex to subcortical brain; frontal cortex through and around the limbic system (Papez Circuit)), and across both brain hemispheres across the corpus callosum.  Memory impairment has been demonstrated to be associated with an extremely wide range of psychiatric, neurological and neuro-developmental disorders and signals brain damage.   Andre Thomas's pervasive memory impairment signals a damaged brain.  The severity of memory impairment demonstrated by Andre Thomas signals serious psychiatric, neurological and/or neuro-developmental disorder(s).

16

**Language:**

44.     Andre Thomas's secondary language functioning was evaluated using the Wechsler Individual Assessment Test (WIAT-II) Word Reading, Reading Comprehension, Numerical Operations and Math Reasoning.   Education transcripts indicate that Andre Thomas attended school through 8th grade and that he obtained a General Education Degree (GED).  For research purposes obtaining a GED is considered to be equivalent to having completed 10th grade.  Andre Thomas's reading is more accomplished than his formal educational experience (Word Reading >12th grade equivalent; Reading comprehension 11th grade equivalent).   His mathematical achievement, however, is significantly lower than his educational accomplishment, and is significantly lower than his reading accomplishment (Numerical Computation = 5th grade equivalent; Math Reasoning = 6th grade equivalent).   Over learned secondary language functioning in general, and reading ability specifically, is well-known to be robust in the face of many severe neurological disorders, even in developing dementias. Mathematical ability, however, requires the ability to actively process new information, and is vulnerable to deterioration in many psychiatric and neurological disorders.  Andre Thomas's preserved ability for reading, combined with significantly lower ability for mathematics, suggests acute brain dysfunction.

**Visual Perceptual Motor:**

45.     Andre Thomas's visual-perceptual-motor functioning was evaluated using the Rey Complex Figure Copy Trial, Benton Visual Form Discrimination and Benton Judgment of Line Orientation.  Andre Thomas's ability for simple form discrimination was in the normal range (Benton Form Discrimination).  He, however, demonstrates borderline impairment in his ability to complete the more complex Benton Judgment of Line task and  mild-moderate impairment in his ability to copy the Rey Complex Figure.

Visual perceptual motor abilities are predominantly mediated by isocortex structures (Motor Strip, Occipital, Parietal brain cortexes) and connections among these brain structures. Andre Thomas's ability within the normal range for form discrimination and mildly impaired ability for judgment of line indicates relative sparing of these posterior brain structures for Andre Thomas. The Rey Complex Figure is a far more complex task than the Benton tasks and requires a combination of abilities including motor coordination, visual-perception, and organization. Greater frontal cortex involvement, therefore, is required in order to complete the Rey Complex Figure. Andre Thomas's performance on the Rey Complex Figure was mild-moderately impaired indicating that when he is required to use frontal cortex abilities for organization of visual-perceptual information, his abilities are more compromised

46. Executive Functioning: Executive functioning is an umbrella term which describes a wide range of abilities to integrate and access information in a manner necessary to think, reason, problem solve, anticipate consequences of actions, and change actions based on information received from the environment. Central to this process is the ability to simultaneously access and respond in a thinking way to external stimuli that communicates how an individual's functioning and behaviors are viewed by the world around him or her. Executive functioning is also the ability to inhibit responding, monitor responding, maintain impulse control, shift thinking, and organize both thinking and actions. It refers to the ability to evaluate a spectrum of possible alternatives, select an appropriate response based on the simultaneous assessment of multiple pieces of information, and respond to relevant information while ignoring information which is not relevant or necessary to understanding the situation. Executive functioning is also the higher-order ability needed for impulse control, self-regulation, social functioning, goal-directed behavior, insight and foresight. Executive functioning is predominantly mediated by the isocortex frontal cortex, is impaired in multiple neurological disorders, and is predominantly impaired in psychiatric disorders—particularly in schizophrenia.

18

47.     The frontal cortex comprises the largest area of the human brain, making up 20% of the entire brain's cortex.   The frontal cortex is divided into four regions: motor, medial, dorsolateral and orbitofrontal.   Each of these regions mediates   different aspects of executive functioning.



48.     The motor region primarily regulates repeated finger movement and finger sequencing.   The medial region primarily regulates the ability to monitor actions, changing actions depending on the demands of the situation or task.   The dorsolateral region primarily regulates memory and learning, specifically the ability to organize new information so that information can be remembered.   The orbitofrontal region primarily regulates planning, anticipating consequences of actions, self control and impulse control, appropriate social responses, and olfaction.   The frontal cortex also receives significant input  from  dopaminergic  cells,  the  primary  neurotransmitter  associated  with Schizophrenia.

49.     Although Andre Thomas was able to successfully complete some tests of executive functioning, his ability to complete many tests of executive functioning was impaired, with his impairment ranging from mild to severe.   As previously described, Andre Thomas's ability to carry out motor tests which required complex sequential motor movements, alternating motor movement and motor inhibition was consistently impaired.

19

His ability to use his hands and fingers to rapidly depress a lever was bilaterally severely impaired, implicating impairment in the motor region of the frontal cortex.  Also as previously described, Andre Thomas made five errors on the Smell Identification Test. Andre Thomas's ability to organize information so that he was able to remember that information was complete was significantly impaired.  Andre Thomas's ability to plan ahead in order to successfully follow a written line with a pencil was significantly impaired (Trailmaking Motor Test).  His ability to plan ahead, anticipate the next correct response, flexibly switch his thinking to shift from number to letter  was significantly impaired (Trailmaking sequencing and shifting errors).  His ability to inhibit an over-learned response was consistently impaired (Color Word color, word, inhibition, inhibition Switching; inhibition errors).   And Andre Thomas's ability to organize his thinking, plan ahead, categorize information into meaningful groups and flexibly switch his thinking was also significantly impaired.  The base of impaired executive functioning is the reticular formation, the brain region that controls neural processing (gating.)  These executive functioning abilities are predominantly impaired in several neurological disorders, and are particularly impaired in psychiatric disorders (Schizophrenia).

50.     Andre Thomas's abilities for facial recognition were evaluated using the Benton Facial Recognition Test and his abilities for facial emotional recognition were evaluated using the Comprehensive Affect Testing System (CATS).   His facial recognition was in the borderline impaired range.  His ability to recognize facial emotion, however, was persistently significantly and severely impaired.   Facial emotional recognition is predominantly mediated by Isocortical structures, particularly frontal, temporal, limbic and connections among these brain regions—those frontal cortex structures that allow the individual to understand social cues and to respond to emotional situations in ways that are consistent with the situation—happy, sad, angry, disgusted. Facial emotional recognition is also impaired in multiple neurological and psychiatric disorders, particularly in Schizophrenia.  These tests specifically measure the ability to

think, reason, organize, problem solve, simultaneously consider information, anticipate the consequences of decisions and/or actions, change thinking and actions based on information being received from the environment, terminate thoughts and/or actions that are not correct and switch to a different action that is correct, and regain thought process after interruption.  The tests administered have demonstrated reliability and validity in a nationally representative sample of "normal" subjects, have been validated with groups of individuals who experience various neurological/medical disorders (Korsakoff's Disease, Frontal Lobe Lesion, Chronic Alcoholism, Multiple Sclerosis, Temporal Lobe Epilepsy, Fetal Alcohol Syndrome, Alzheimer's Disease, Huntington's Disease, etc.) that predominantly present frontal lobe pathology, and accurately discriminate individuals who experience these neurological disorders from those who do not experience neurological disorders.

51.    This pattern of impairment on executive functioning tests that predominantly evaluate inhibition and cognitive flexibility, but performance in the normal range on other tests of executive functioning, suggests that the primary brain dysfunction for Andre Thomas lies in the deeper brain regions, subsequently affecting the transfer of information via Orbitofrontal, Hippocampal, and Subcortical brain connections.  This indicates proneness to mental inflexibility, to be stimulus bound and unable to flexibly shift his thinking in response to information that he was provided.  This performance across tests of executive functioning indicates mesocortical (prefrontal) and brain connective (orbitofrontal, hippocampal) dysfunction.

Halstead-Reitan Neuropsychological Battery (HRNB)

52.    The HRNB is a comprehensive standardized neuropsychological testing battery that was developed in 1950.  It has been widely used by neuropsychologists since at least the early 1980's and continues to be researched, developed, and utilized by neuropsychologists.  It is a comprehensive neuropsychological battery that evaluates

21

sensory, motor, attention, memory, language, psychomotor, and executive functioning, and that provides a measure of the individual's overall neuropsychological functioning (Impairment Index).  The HRNB has demonstrated accuracy in determining the presence or absence of brain damage, with 82.3 percent accurate classification of brain damaged patients (Kane, Goldstein, Parson, and Moses (1987).   The Halstead-Reitan Neuropsychological Battery includes the following tests—some of which have previously been described and all of which were administered to Andre Thomas: Sensory (Sensory Perceptual Examination); Motor (Name Writing, Finger Tapping Test); Attention (Trail Making Test Part A, Seashore Rhythm Test, Speech Sounds Perception Test); Memory (Tactual Performance Test Memory Trial, Tactual Performance Test Location Trial); Language (Aphasia Test); Psychomotor (Tactual Performance Test Total Time); and Executive Functioning (Trail Making Test Part B, Category Test).

53.    Three standardized normative scales are currently available:  Halstead-Reitan Neuopsychological Deficit Scale (1985); Comprehensive Norms for an Expanded Halstead-Reitan Battery (1991); Revised Comprehensive Norms for an Expanded Halstead-Reitan Battery: Demographically Adjusted Neuropsychological Norms for African-American and Caucasian Adults (2006).  The offense for which Andre Thomas was found guilty occurred in March 2004.  His performance on the HRNB was scored using the normative standards available at that time, as well as using the currently available normative standards adjusted standards to accommodate possible racial/ethnic differences.

54.    Applying the 1985 normative standards, Andre Thomas's performance indicates significant brain dysfunction.  The Impairment Index is a summary value based on seven of the Halstead-Reitan tests that have been shown to be very sensitive to impaired brain functions.     Andre Thomas's Impairment Index indicated Severe Impairment (NDS Score = 3).  His sensory-motor abilities were severely impaired (Finger Tip Number Writing = 3; Finger Tapping Dominant = 3; Finger Tapping Non-

22

Dominant = 3); attention and concentration ranged in impairment from borderline impairment (Speech Perception = 1; Trail Making A = 1) to mild-moderate (Seashore Rhythm = 2); incidental memory ranged from borderline to severe (Tactual Performance Test Memory = 1; Location = 3); his visual perceptual ability was mild-moderately impaired (Tactual Performance Test Total Time = 2); concept formation, reasoning and logical analysis moderate to severe impairment (Trail Making B = 3; Category Test = 2).

55.     Using the 1991 age and education adjusted normative standards, Andre Thomas's performance also indicates significant brain dysfunction, with Andre Thomas demonstrating significant impairment on ten (10) of thirteen (13) brain functioning measures.

56.     Using the 2006 age, education, and race adjusted normative standards, Andre Thomas's performance continues to indicate significant brain dysfunction on seven (7) of thirteen (13) brain functioning measures.  Appendix C provides specific details of Andre Thomas's performance on each of these normative standards.

57.     Irrespective of normative standards applied, Andre Thomas's performance on neuropsychological testing describes an individual who—despite overall intellectual ability in the High Average Range—also experiences significant brain dysfunction that is diffuse, affects all brain regions (allocortex, neocortex, isocortex) and all brain connection systems (orbito-frontal, frontal-subcortical, hippocampal) and that is like that demonstrated in several neurological, psychiatric and neurodevelopmental disorders. Andre Thomas's neuropsychological testing is significantly like that of individuals who experience Schizophrenia and for whom that vulnerable brain structure has been further compromised by additional brain insult on top of an already vulnerable brain.

Psychological Functioning

58.     Andre Thomas's psychological functioning was empirically evaluated using the Rorschach Test.  All Rorschach measures of validity and cooperation indicate

that Andre Thomas's responses to the Rorschach Test are valid, that he was putting forth sufficient effort to assure validity, and that information concluded from this empirical test is an accurate description of Andre Thomas's psychological functioning.

59.     Andre Thomas's Rorschach protocol is exceedingly complex and provides a complex description of his psychological functioning.  Andre Thomas's Rorschach protocol is like that of individuals who experience a severe psychotic disorder, most likely Schizophrenia Paranoid Type (Perceptual Thinking Index (PTI) = 5; Hypervigilence Index (HVI = Positive).  The PTI is an update of the original Rorschach Schizophrenia Index (SCZI) research that demonstrates 80% accuracy in correctly identifying individuals who experience schizophrenia.  The SCZI correctly identifies individuals who, at the time of testing, are not demonstrating psychotic symptoms but who develop psychotic symptoms within 2-3 years post testing (O'Connell, et al, 1989). Research also demonstrates that the SCZI is significantly associated with biological (Coleman et al, 1997; Edel et al, 1997) and neurophysicological (Perry et al, 1990) indicators of schizophrenia.  As demonstrated through the significantly elevated Rorschach PTI and HVI, Andre Thomas's Rorschach responses indicate severe perceptual distortion, illogical and bizarre psychotic thinking, delusional thinking and paranoid ideation.

60.     As is not uncommon in patients who experience severe Schizophrenia, Andre Thomas's Rorschach protocol also is like that of individuals who experience a severe mood disorder (DEPI = 5) with concerning similarity to the Rorscahch protocols of individuals who have at least one near-lethal suicide attempt (Fowler et al, 2001).

61.     It is noteworthy that although Andre Thomas's Rorschach protocol is like that of individuals who experience major mental disorders, his responses are not like those of individuals who experience a severe personality disorder or who are Psychopathic.

24

62.     Andre Thomas's performance on neuropsychological testing demonstrates diffuse brain dysfunction that is like that of individuals who experience severe chronic Schizophrenia (Bilder, et al, 2000; Moberg et al, 2006; Shaw, et al, 2004; Turetscy, et al, 2002; Zakzanis and Heinrah, 1999).     Affidavits and Grand Jury Testimony of family members and acquaintances are consistent with conclusions established from neuropsychological testing and confirm that one etiology of Thomas's brain dysfunction is chronic Schizophrenia.

63.     Schizophrenia would explain the brain dysfunction that Andre Thomas demonstrates through neuropsychological testing.  Andre Thompson's brain dysfunction, however, is greater than would be accounted for by Schizophrenia alone.  Information that is known about Andre Thomas's childhood development indicates that Andre Thomas's brain dysfunction was made more severe by circumstances of his childhood development.

Childhood History

64.     In her Grand Jury Testimony, Andre's mother (Rochelle) Thomas denied childhood neglect or abuse of Andre or his siblings.  Despite her claims, information that is known about Andre's childhood, however, confirms that his childhood development was characterized by neglect, persistent emotional stress, and perhaps abuse.

65.     Several affidavits of people who knew his family during Andre's developmental years describe an impoverished and emotionally stressful and deprived environment.  Danny Thomas, Andre's father, did not, for the most part, live in the home.  He had extensive alcohol problems for which he eventually received alcohol treatment.  Although his mother (Rochelle Thomas) worked much of the time, the family was periodically dependant on welfare for subsistence.

66.     Andre Thomas's mother is described as having multiple problems.  Her half-brother, Kevin Ross, stated in his affidavit that "Rochelle was a very irresponsible

mother. Rochelle gave her sons no guidance or discipline. She neglected them and often did not know where they were."

67.     In his affidavit, Eric Ross (Andre's older brother) stated that even before he was an adolescent he thought of himself as a "father figure" to Andre and the younger siblings. He stated that it was necessary for him to assume multiple responsibilities that are typically assumed by an adult. He stated that it was his responsibility to get the younger siblings up in the morning, oversee their homework, and prepare food for them. Statements from other relatives confirmed this.

68.     While Eric Ross assumed a primary role in caring for Andre, childhood friend Christopher Bennett stated in his affidavit that the two middle brothers, Brian Thomas, who was subsequently diagnosed as Schizophrenic, and James Thomas were often cruel to Andre and frequently assaulted him.

69.     Amy Ingle (Andre's friend) stated in her affidavit that she believed Andre's mother (Rochelle Thomas) to be "very crazy and hypocritical." She added his mother "often preached the Bible and talked in a manner" she found just plain crazy. McCloud Luper who lived with Rochelle for a period of time described her extreme reactions when their relationship ended. He described Rochelle "stalking him" and stated she smashed the lights on the front porch of his home and destroyed his garden by pulling up the flowers. McCloud Luper also said that he eventually had to get "a court issued protective order against her."

70.     Andre's mother did not testify at his trial. She did, however, testify at a Grand Jury Hearing. When asked about Andre's childhood she acknowledged that she recalled limited details of Andre's childhood. She was not able to tell the Grand Jury when Andre started school, what elementary school(s) he attended, or the names of any of his elementary school teachers. She was not able to describe Andre's childhood friends, indicating that Andre "had a bunch of friends" and she could only remember one

by name.  She did, however, describe multiple residential moves throughout Andre's childhood.

71.     Rochelle Thomas also denied abuse of Andre or his siblings.  She testified that she did not physically abuse any of the children.  While Rochelle Thomas denied that neglect and/or abuse occurred in the home, Child Protective Services (CPS) reports portray a somewhat different picture.  CPS intervention is documented on three separate occasions.  The first, in 1986, was when Andre's older brother James burned his leg on a hot stove.  This resulted in James being temporarily removed from the home and placed in foster care.  The second CPS intervention was 10 years later, in 1996 (Andre would have been about 13 years old), for medical neglect of James.  During the previous month, James had been hospitalized for 10 days with liver and kidney problems.  The investigator who came to the house found James to be swollen and suffering from severe itching because his skin was raw.  The investigator reported that James wanted help but was afraid of his mother.  The last CPS intervention was in 1999 because of unhealthy living conditions.  The family was living in a house with no utilities, and Rochelle was getting water from a city hydrant.

72.     In an interview, Andre reported one incidence of severe physical abuse by his mother.  He reports that when he was in the fifth or sixth grade of school he "accidentally" took a paring knife to school.  The knife was found in his school backpack, and Andre was sent home.  Andre reports that when he got home his mother asked him why he had taken the knife to school, and he provided an explanation of how it was an "accident."  He reports that his mother accused him of lying "and she just kept whooping me until I told her what she wanted to hear."  Andre describes that "she beat me for four (4) hours."  A switch, extension cord, and paddle were used in the discipline.

73.     There is a wealth of research documenting the neurobiological, neuron-structural and neuropsychological consequence of persistent emotional stress on the child's developing brain (Ito, et al, 1993; Teicher, Anderson and Polcari, 2002; Teicher et

27

al, 2000; Teicher et al, 1997; Teicher, Glod, Surrey and Swett, 1993; Teicher et al, 2004). Although much of this research has focused on brain dysfunction caused by physical and/or sexual abuse, there is increasing recognition that neglect and persistent emotional stress has the same consequence on the child's developing brain as physical and/or sexual abuse, and also results in neurobiological, neurostructural, and neuropsychologial abnormalities.   The effects of childhood maltreatment and resulting emotional stress are of such consequence that Van der Kolk (2006) has proposed that current psychiatric diagnoses (Diagnostic and Statistical Manual-DSM-IV) are not sufficiently inclusive to include this biological consequence.   He proposes a separate diagnosis, Developmental Trauma Disorder, which includes multiple and/or chronic exposure to one or more forms of childhood maltreatment be included in the next revision of this manual.

74.   There is substantial information to indicate that Rochelle Thomas, herself, was emotionally unstable, that her lifestyle, and consequently the lifestyle she provided for Andre was unstable, and that she may have also suffered from mental illness and drug abuse.   In his affidavit, Kevin Ross (half brother) revealed that Rochelle's biological father (Johnny Ross) "acted irrationally and did bizarre things" and he described Rochelle as "extremely paranoid"   In her affidavit, Rochelle's aunt (Konta Johnson) expressed the opinion "I think a lot of Andre's problems stem from his mother...I have suspected that she had mental problems."   She further expressed her opinion that Rochelle used several street and psychiatric drugs, and "she was not around a lot of the time to properly raise her sons."   And Rochelle's half sister (Alice Ross Harris) indicated in her affidavit "Rochelle lives in her own world.   She does not always stop to think what is for her or anyone around her.   Rochelle often blows up for no rational reason."   Alice also indicated that Rochelle "believes she has special powers...to talk to people who have died..."   A picture of Rochelle's long-standing emotional instability is further indicated in the affidavit of a pastor of a church (Clifton Eaton) that Rochelle attended.

28

75.     Abnormal development of the neocortex (primarily frontal and temporal cortexes) has been identified as one of the neurostructural consequences of childhood maltreatment and persistent emotional stress (Teicher, et al, 2003).     Research documenting these neurological consequences, however, has been conducted using samples of individuals who have a history of childhood maltreatment and persistent emotional stress, but do not also have severe psychiatric disorder that—in itself—is caused by compromised brain development.

76.     As previously discussed, brain abnormalities of schizophrenia are well documented.  Although the entire brain is affected, brain abnormalities of schizophrenia are predominantly associated with temporal and frontal brain structures, as well as connections from and to these brain structures from other brain regions (Heinrich, 2005; Ragland, et al, 1998; Woodruff et al, 1997).     Brain abnormalities of childhood maltreatment and persistent emotional stress are also well documented.  Although the entire developing brain is affected by persistent emotional stress during childhood, temporal and frontal brain structures are the most significantly affected.    What is not known, however, is the impact of childhood maltreatment and persistent emotional stress on the already abnormal developing schizophrenic brain.  It is, however, scientifically reasonable to conclude that the cumulative effect of schizophrenia, combined with persistent emotional stress, would have even greater consequence on the child's developing brain.  This conclusion is also reasonably supported by research that documents the cumulative effect of a second closed head injury on top of a prior closed head injury and the cumulative effect of head injury on a brain that is vulnerable to dementia (DeFord, et al, 2004;  Willmot, et al, 2004).

Signs of Schizophrenia in Andre Thomas

77.     It is well established that the acute onset of schizophrenia is preceded by prodromal signs.  It is not uncommon for prodromal symptoms to be identifiable years prior to the acute onset of schizophrenia, even in childhood.  Recent research has focused

29

on identifying and organizing early symptoms so as to inform the development of early clinical intervention programs.    A recent article identified specific factors or "dimensions" of early signs of childhood and adolescent signs of schizophrenia. These are emotional dysphoria and "odd" perceptual and cognitive content; impaired functioning at home and school; suspiciousness and impaired concentration; and irritability or aggression  (Norman, Scholten, Malla and Ballageer, 2005; Hodgins, Maughan, Murray, Rutter and Taylor, 2007).   Another study identified a triad of childhood symptoms.    This triad of symptoms included speech and/or motor developmental problems; social, emotional, or behavioral problems; and "psychotic-like" experiences (Laurens, et al, 2007).

78.    There is substantial evidence that Andre Thomas's mental illness has its roots in his childhood and that he was already showing signs of the prodromal phase of Schizophrenia when he was nine to ten years old.  The onset of psychotic illness this early in life is consistent with genetically-mediated psychotic disorders like Schizophrenia.   The affidavit of Andre Thomas's mother's half sister, Denise Wade, includes a description of Andre as a child: "Andre was never quite right.  When he was very little, he was not up to par with the other children in the family who were his own age. He did not hit the milestones that they did. He did not talk very much. He did not play with the other kids very easily and had trouble fitting in." Affidavits, Grand Jury, and Trial Testimony of Andre's older half-brother Eric Ross state that when Andre was a child he told Eric that God spoke to him.   Andre's friend Amy Ingle stated that she learned from family members and others that Andre had always been thought of as "different," considered to be "an outcast even in his own family," and people commented "Oh, that's just crazy Andre."   Another friend, Christopher Bennett, also stated in his affidavit that he recalled Andre expressing illogical beliefs when he was as young as nine to ten years old that Andre believed himself to be a real life character from a video game and that Andre experienced auditory hallucinations.  Christopher Bennett also stated that

Andre was frequently teased by peers when he was observed openly responding to internal stimuli and that Andre would say strange things that made their friends uncomfortable.

### Descriptions from Andre Thomas's childhood and adolescence

79.     Several individuals have also described psychotic functioning consistent with prodromal deterioration for Andre during adolescence.  Andre's paternal aunt Konta Johnson stated "I began to suspect that Andre had some form of mental illness when he was a teenager…that something was not right with his head."  Several individuals have also described psychotic symptoms for Andre through adolescence and into adulthood.  School records indicate that in the early years of his education, Andre Thomas did extremely well.  As he got older, and particularly as he reached adolescence, his grades fell dramatically, and he quit going to school in the 9th grade.

80.     Andre's symptoms of Schizophrenia continued into adulthood and his supervisor at the city cemetery where Andre was employed stated "from the time that I started working with Andre in 2002 I thought that he was mentally ill."  He described Andre as lying down in graves after they were dug but before the caskets were placed inside them because he "wanted to see what it would be like to be in a grave."  Andre's friend Amy Ingle described an incident when Andre won a $100 bill and "he immediately placed it in an ashtray and lit it on fire while yelling 'money is the root of all evil.'"

### Course of Andre Thomas's Psychotic Decompensation

81.     Andre's father described Andre as "not himself" during the months leading up to the offenses.  He describes him as confused, asking "odd stupid questions," and being obsessed about religion-"that's all he talked about…on several occasions I said 'you are losing your mind'."  His aunt Doris Gonzalez described Andre several weeks prior to the offenses as "very distraught, crying a lot" and she described an incident when Andre came "…out of the bathroom unable to stop crying and (telling her) "the voices

won't stop."  During this time Andre was also described by several witnesses as talking about visual and auditory hallucinations of God and demons.   As noted above, he was described by these same witnesses as putting duct tape over his mouth on several occasions because not talking was a "test from God."  Andre is described as cutting words out of a bible and making them into sentences that "did not make sense."

82.     Andre Thomas continued to demonstrate idiosyncratic actions that progressively developed into a bizarre and psychotic delusional system.  He is described as unable to sleep, reflecting disruption of the reticular activation system, becoming increasingly preoccupied with religious ideation including conspiracies, secret sects, and impending catastrophe (Armageddon).  He expressed the belief that he and certain other people were not human, but angels from heaven, all with a divine purpose.  He believed that the pyramid on the dollar bill was symbolic of a malevolent clandestine organization and that the eye in the pyramid was "the eye of God."  Amy Ingle testified that two months before the murders Andre Thomas asked her to take him to the church because he felt demons were trying to possess him.  He went into a church and when he came out she described him as "dripping wet" with holy water, which Andre had used to soak his head.

83.     One month before these offenses a neighbor's son took Andre Thomas to the mental health center where he told staff that life was too much and he wanted to die. Reportedly, the staff told him to go to the emergency room, which he did not do. Subsequently, an order for involuntary psychiatric treatment was obtained ordering his apprehension and detention, however no action was taken in this regard.

84.     Following the offenses, and Andre Thomas's subsequent arrest and incarceration in the Grayson County Jail, an evaluation by C. Robin McGirk Ph.D. (4/05/04) concluded that Andre Thomas continued to be confused and tangential, exhibited pressured speech, agitation, and inappropriate affect, and that he was not competent to stand trial.   Thereafter, further clinical evaluations were ordered to determine Andre's competency to stand trial.  A competency evaluation by James R.

32

Harrison, Ph.D. (4/15/04) appointed by the Court also described delusional thinking such as Andre Thomas's belief that his wife and her children were not dead.  He determined him to be incompetent to stand trial.  A competency evaluation by the state's expert Peter Oropeza, Psy.D. described Andre Thomas as mumbling to himself, delusional, paranoid, and also concluded that he was incompetent to stand trial.  Andre Thomas was transferred from jail to North Texas State Hospital for restoration to competency.

85.     Andre Thomas was hospitalized in this Competency Restoration program for approximately six weeks (6/23/04 thru 8/9/04).  He was maintained on antipsychotic medication throughout the hospitalization.  Psychological testing by (B. Thomas Gray, Ph.D on or about 7/22/04 indicated that Andre Thomas's responses to Structured Interview of Reported Symptoms (SIRS) and the Evaluation of Competency to Stand Trial-Revised (ECST-R) were "atypical…he appears to have exaggerated the symptoms that he has experienced and it is uncertain the degree to which he is currently experiencing symptoms of psychosis."  However, this same evaluator, in this same report, added the caveat "…this is not to say that he is not experiencing psychiatric symptoms…"and "It is important that he take prescribed [antipsychotic] medications as ordered." Physician note (Dr. Black, 7/23/04) documented "Patient states hallucinations are decreasing with medications."  When he was discharged, he was prescribed the antipsychotic medication Geodon and the mood stabilizer Depakote.

86.     Medication records from March 2004 thru June 2006 were available for review.   These records indicate that Andre Thomas continues to be prescribed both typical and atypical antipsychotic medications (Geodone, Haldol, Thorazine, Navane), and antidepressant medications (Zoloft, Prozac, Trazadone).   At the time of this evaluation Andre Thomas was prescribed and was taking antipsychotic (Navane), antidepressant (Trazodone), and benzotropine (Cogentin).   During this evaluation, although he was not floridly psychotic as previously described, psychotic delusional

ideations persisted and were readily elicited or spontaneously emerged throughout the evaluation.

Substance Use:

87.     Andre Thomas reports a history of alcohol and marijuana use beginning when he was ten years old and continuing until his incarceration.   He described continuing use of alcohol but episodic use of marijuana (when was age 12-14 and age 19 and older until incarceration).   He described one incidence of cocaine use when he was 16 years old, and use of Coricidin on three separate occasions during March 2004.   He did not report using any other substance.   He identifies alcohol and marijuana as the substances most used.

88.     This report of drug use is generally consistent with what Andre told other interviewers as well as the other records available to me with the exception of Dr. Gray's report (7/23/04) that stated that in addition to the aforementioned drugs, Andre also reported using LSD one time.

89.     Christopher Bennett (childhood friend) described not only Andre's psychotic symptoms as a child, but their occurrence in relation to substance use: "… sometimes Andre and I (and friends) would drink or smoke marijuana.   I had the opportunity to observe Andre when he was drunk, when he was high, and when he was sober.   Andre's encounters and conversations with the demons happened both when he was high (or drunk) and when he was sober." Bennett Affidavit 5/25/07.

90.     Andre's reports of his use of drugs in the weeks leading up to the offense indicates that he had been using alcohol on a daily basis and marijuana in the form of "blunts" on an everyday or every other day basis.   Andre's use of the over-the-counter cold and cough medicine Coricidin was a primary issue in the legal proceedings against him.   Coricidin has known recreational use for the effects produced by its main ingredient dextromethorphan.   When taken in high doses this drug produces euphoria and sensory

34

and perceptual changes that typically last about 6-10 hours depending on the tolerance of the user.  Effects may be enhanced or become less predictable when used in conjunction with other mind altering substances.

91.     He used Coricidin three times, all in March, 2004.  The record is sketchy on exactly how much Coricidin Thomas took each time.  The first time was on or about March 3-4, when he took some number of pills (possibly 4-8) along with marijuana and alcohol (malt liquor).  The second time was March 17, and he ingested about 4-8 pills, also while using marijuana and alcohol.  The last time was the evening of March 25, when it is reported he took possibly 8-10 pills, again along with marijuana and alcohol. Andre told Dr. Gripon that the effects had long worn off before the offenses.  He stated that he used no drugs at all the day before the offense on Friday 3/27/04 although there is some contradictory evidence.

92.     Lab results from blood drawn at Wilson N. Jones Hospital at 10:00 AM on 3/27/04 (probably less than 3 hours after the offenses) revealed a "less than therapeutic amount, basically an immeasurable amount of DXM (dextormethorphan) in the blood." The amount of blood drawn was insufficient to test for marijuana.

93.     The use of dextromethorphan (in Coricidin) was a primary issue in the legal proceeding against Andre Thomas.  Mental health evaluations were conducted, first to determine competency to stand trial, and subsequently to address the issue of insanity. Drs. McGirk, Harrison, and Oropeza all agreed on the issue of competency (finding him incompetent to stand trial).  With regard to the sanity issue, the opinions of the experts differed.  The State's experts Drs. Axelrod, Oropeza, and Scarano determined him to be sane and the defense's expert Dr. Edward Gripon found him insane at the time of the offense.  The primary issue in the differing opinions involved Andre Thomas's alleged abuse of dextromethorphan (main ingredient of Coricidin), and persistent use of marijuana and alcohol, resulting in a Substance Induced Psychotic Disorder.  This was the primary diagnosis of the State's experts, as well as the discharge diagnosis at NTSH

(which also added malingering).  The defense's expert Dr. Gripon, along with Grayson County jail psychiatrist C. Robin McGirk and Dr. Harrison, appointed by the Court to assess competency, made diagnoses of Paranoid Schizophrenia or its variants (i.e., Schizophreniform Disorder).   All experts also gave some diagnosis of substance abuse/dependence as well.  One of the experts stated that all of the bizarre, psychotic behavior so evidenced in the testimony and records was within the context of substance use.

94.    In his affidavit, Dr. Jonathan Lipman, an expert in the field of understanding the effects of drugs on the brain and behavior, differs markedly with Drs. Axelrod, Oropeza and Scarano.   He states that the effects of dextromethorphan (Coricidin) are "distinctly different from the known quality, time course, content and intensity of intoxication typical of these drugs, and this (knowledge) would have been known by any pharmacologist consulted in 2004.

Determination of Insanity:

95.    Texas Penal Code 8.01(a) Insanity states:  It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

96.    There is a wealth of information that documents that Andre Thomas experienced psychotic symptoms long before these current offenses, starting in childhood, and continuing through adolescence and adulthood.  It is significant that his brother, Brian Thomas, suffers from Schizophrenia.   The probability of developing schizophrenia in a sibling of a schizophrenic individual is six times greater than the probability for the general population.  A childhood friend stated that when Andre was nine years old he talked about being a character in a video game, and it was his friend's conclusion that Andre was not fantasizing, but was unable to distinguish between himself and the imaginary video character.  This same friend stated that when Andre was nine or

ten years old he began talking about demons that spoke to him and told him to do things. He would talk to back to the demons in front of other children who made fun of him. "Andre often spoke of the Seven Deadly Sins and the way he talked about them sometimes frightened me."   Andre's behavior became "more strange every year." (Christopher Bennett Affidavit, 5/25/07).

97.    Andre's bizarre thinking continued into adolescence.  An adult friend stated that when Andre was a teenager he said that he was living the same day over and over again.   Reference to this déjà vu experience was made again many years later, on the day of the offenses when Andre said that he had killed Laura and the children before, and been living the day over and over again (Police Interview, Carmen Hayes 4/27/04).

98.    Several other individuals who knew Andre as he was growing up described a persistent pattern of Andre becoming increasingly "strange."  Affidavits of aunts and uncles describe him as "having something not right with his head," and "different" than the other kids.

99.    When Andre was 16 years old, and on juvenile probation for unauthorized use of motor vehicle and consuming alcohol as a minor, his juvenile probation officer referred him for a psychological evaluation.  Andre told the evaluator that he was hearing voices telling him he is going to die.  One of the assessment instruments given (Carlson Psychological Survey) revealed disturbed personality characteristics in irrationality, poor judgment, disorganization of thinking, perceptual distortions, and feelings of unreality and anxiety.  The evaluator diagnosed Andre as Psychotic Disorder NOS at that time.

100.    As an adult, Andre's bizarre thinking and actions continue to be described. His work supervisor, Ricky Bell stated "From the time I started working with Andre in 2002, I knew he was mentally ill." Also, "Andre frequently talked about the Bible but he always had strange and negative interpretations of the Scriptures...which did not make sense to me... or his coworkers."  Amy Ingle described an incident when Andre told her

that the inscriptions on a mausoleum in the cemetery where he worked were a special message to him.

101.    Months before the offenses, several individuals described a continuing pattern of psychotic decompensation in Andre.  He is described as being obsessed about religion and "all he wanted to talk about was Revelations."  There were periodic incidents over a period of time where Andre placed duct tape over his mouth because "God told him not to talk...as a test."  He is described as cutting words and letters out of the Bible and making sentences that made no sense (Amy Ingle Affidavit 4/11/07).  A friend (Billy Hester) stated that about two years before the offenses, Andre told him that God had spoken to him.  This friend also stated that three or four months before the offenses, Andre was reading the Bible and taking things out of context.  (Psychological Evaluation, P. Oropeza, PsyD, 1/20/05)

102.    There are also multiple incidences of ideas of reference, where a common event would occur and Andre would interpret it as a "sign" or message to him and him alone.  He began believing that the end of the world was coming and began looking for signs from the devil, and messages from God.  When given a bag of clothing that was too large for him, Andre conclude that the large clothing was a "sign from God" that he was to cut the hearts from his wife and her children and the clothing was so that he could more easily put the hearts in the large pockets.  He perceived others pronouncing his girlfriend's name Carmen as Car-Man and concluded that their pronunciation meant that she was a male rather than a female.  He broke up with her because of this perception.

103.    There is convincing evidence that days before the murders Andre's decompensation deteriorated further.  At around midnight on March 25, prior to the murders,  Andre stabbed himself in the chest in order to "open the gates of Heaven."  He was taken to the Emergency Room by his mother the next morning and medical personnel determined that he required involuntary psychiatric hospitalization.  Andre walked away from the hospital before he could be hospitalized.

38

104.    Based on all information that is known to me, it is my opinion that Andre has experienced recurrent psychotic symptoms since childhood, before his use of any amounts of drugs or alcohol.   Andre experienced recurrent psychosis before these offenses, continued to experience psychosis after these offenses, and continues to experience psychosis to this date, and in the absence of any drugs and/or alcohol.

105.    Andre Thomas became increasingly absorbed in an ever expanding delusional system that included both grandiose and paranoid thinking.  He believed that his girlfriend was actually a man, as evidenced by her name Carmen, which he thought people pronounced as "car man" to ridicule him.  He believed that he was "chosen" to save the world from domination by the "Illuminati" whose goal was to enslave people and rule the world.  He believed that he was a "fallen angel" who could "open the gates of Heaven" by killing himself by stabbing himself in the heart.

106.    Thursday, March 25th, two days before the murders of his wife and her children, Andre Thomas stabbed himself in the chest in an attempt "to go to Heaven and fly with the angels."  The wound was not medically serious, but Andre did not understand why he did not die.  He concluded that he was "immortal."  The following morning Andre's mother took him to the Texoma Medical Center (TMC) where he was evaluated by an emergency room physician Dr. Bowen and a psychiatric social worker Sherrie St. Cyr.  Andre told them he stabbed himself because he was trying "to cross over into Heaven," that he had been trying to cross over into Heaven since he was ten years old, and that he was not sure if he "was real and other people were not real or if it is the other way around."  Dr. Bowen described him as "very psychotic."  Dr. Bowen and Ms. St. Cyr determined that Andre needed psychiatric hospitalization and initiated an application for an emergency involuntary hospitalization.  Andre walked out of the hospital before documents could be finalized to detain him involuntarily.

107.    Andre's friend, Carmen Hayes, stated that after Andre returned from TMC he slept for 3 to 4 hours, and left after that.  Andre's actions in the time between mid-

afternoon and his arrival at his wife's apartment about 7:00 p.m. appear to include time with friends, including Isaiah Gibbs. There is testimony about the smoking of some marijuana by Thomas but the record is sketchy regarding to what extent. [See Gibbs at 143-149]

108.    At approximately 7:00 p.m., Andre Thomas went to his wife's apartment where Andre and her boyfriend Bryant Hughes listened to religious audio tapes. Andre Thomas concluded that there were conspiracies all around him and that the "Illuminati" were tracking him with secret satellites and sending messages in "code." At this time, Andre came to believe that God wanted him to kill his wife Laura who was Jezebel, his son ███████ who was the anti-Christ, and his wife's daughter ███████ somehow was evil too. He believed that God had chosen him and that by killing them, he could save the world. He believed that Bryant was his ally in this divine mission. While they were listening to the tape Andre noticed Bryant wrapping an extension cord and believed that this meant Bryant wanted to strangle Laura and the children, but that he, Andre, had to make the first move—he "would lead and others would follow." Andre Thomas considered killing his wife and her children that night, and went into their kitchen to find a knife, but decided that it was not the "right time." Bryant drove Andre home at approximately 10:00 p.m. The record is sketchy as to what may have transpired between then and when Andre awoke the next morning about 6:00 a.m. At that time, Andre reported that he heard a voice whom he thought to be God, telling him that he needed to stab and kill his wife and the children using three different knifes so as to not "cross contaminate" their blood and "allow the demons inside them to live." He woke his mother telling her that God told him "to walk." He left his trailer and walked to Laura's apartment. On the way, Andre saw Bryant driving past on his way to work, and Bryant waved to Andre. Andre believed that this was a signal that he was doing the right thing by killing his wife and the children.

109.    Police reports and court documents indicate that on March 27, 2004, Andre Thomas stabbed and killed his wife, Laura Boren, his 4 year old son ███████ and Laura's 13-month old daughter, Leyh███████ by stabbing them, cutting their hearts out of their bodies and putting the hearts in his clothing pocket.  With Laura, he actually was unsuccessful in removing her heart and instead cut out a portion of a lung, believing it was her heart.  He then stabbed himself in the chest, believing that killing himself by stabbing himself in the heart would assure the death of the "demons" that had inhabited his wife and the children.  Andre's efforts to kill himself, however, were unsuccessful, and he concluded that he must therefore be "immortal."

110.    Andre Thomas exited his wife's residence and walked home.  On the way, he saw a church sign saying "You've seen the movie, now read the book."  He determined that this was a message to him that he had done the "right thing."  He went home, changed his clothing and placed the hearts in a paper bag.  He then walked to his father's house with the intention of telephoning his wife—whom he had just killed. Unable to remember her phone number, he telephoned her parents.  There was no answer and Andre left the following message on the phone recorder:  "I need y'alls help, something bad is happening to me and it keeps happening and I don't know what's going on.  I need some help.  I think I'm in hell...I need help.  Somebody needs to come and help me.  I need help bad.  I'm desperate.  I'm afraid to go to sleep."

111.    Andre Thomas then walked back to his trailer where his girlfriend Carmen Hayes and friend Isaiah Gibbs were waiting for him.  He told them he had just killed his wife, ███████ and ████ .  When Isaiah Gibbs expressed disbelief, Andre Thomas told him to look in the bag where he had put their hearts telling them "God wanted me to do it."  Hayes ultimately helped Thomas get to the police station to turn himself in.  Once there, Andre insisted on going in alone.

112.    When Andre Thomas arrived at the Sherman Police Department, he told police what he had done.  Paramedics were called to treat his chest wounds, and Andre

41

Thomas was transported to the hospital where he underwent surgery.   He was subsequently incarcerated in Grayson County Jail.

Events after arrest and prior to trial

113.    Five days after the killings, jail records indicate that Andre Thomas continued to experience hallucinations and delusional beliefs that the killing of his wife and children were "divinely inspired," that he believed that God wanted him to cut the hearts out of his wife and children and that "what he did was right."   In response to command hallucinations and delusional ideation related to the Biblical passage paraphrased "if the eye offends thee, pluck it out," on Friday, April 2, 2004, Andre gouged his right eye out with his fingers.

114.    There is substantial evidence that Andre experienced psychotic symptoms before the deaths of his wife and her children, and there is convincing evidence that Andre continues to experience psychotic symptoms.   Days after his incarceration, using his fingers, Andre gouged out his eye.   He was found incompetent to stand trial by three different mental health evaluators.   When he was placed in a Restoration to Competency Treatment Program, he was prescribed powerful antipsychotic and antidepressant medications.   His response to medication was positive and Andre was returned to jail. Andre continues to be prescribed antipsychotic and antidepressant medications. Although controlled with medication, Andre continues to experience psychosis.

42

115.   Andre is now three years post conviction.   He has been in custody or incarcerated since March 27, 2004.   He has been consistently maintained on psychiatric medications.   Although drugs and alcohol are obtainable in prison, there is no evidence that Andre has used drugs and/or alcohol since his incarceration.

116.   Andre continues to express bizarre delusions.   He describes these bizarre delusions without any change in affect and seemingly without any awareness that what he is saying may be unusual.   Andre's performance across multiple neuropsychological tests of brain functioning are impaired and the pattern of his impairment is consistent with the brain impairment known to be experienced in schizophrenia.   Andre's responses to tests of psychological functioning demonstrate gross distortion of reality; illogical and bizarre thinking; delusional thinking; paranoid hypervigilence; and significant depression.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

_Myla D. Young, PhD_
Signature
_Myla H. Young, Ph.D_
Printed Name

COUNTY OF _Contra Costa_
STATE OF CALIFORNIA

SUBSCRIBED and SWORN before me in the jurisdiction aforesaid, this 14th day of June, 2007.

_Alana M. Carrasco_
Notary Public's Signature

My commission expires: _04/16/2009_

ALANA M. CARRASCO
COMM. #1569777
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA COUNTY
My Comm. Expires April 16, 2009

43

<u>EXHIBIT A</u>

**MYLA H. YOUNG, Ph.D., ABPN**

Diplomate - American Board of Professional Neuropsychology
PSY 11916

RESUME

*Office:*                          *Mailing:*
1475 North Broadway # 335          1630 North Main Street #357
Walnut Creek, CA 94596             Walnut Creek, CA 94596

(925) 952-4350
925  945-8991 (FAX)
<u>mylayoung@sbcglobal.net</u>

**LICENSE-Psychology**

California       August, 1990        PSY 11916

**CERTIFICATION**

Board Certification in Neuropsychology - American Board of
    Professional Neuropsychology (ABPN)

Certification in Hare Psychopathy Checklist-#99-20
    Robert Hare, Ph.D.

**EDUCATION**

Ph.D.           Alliant International University
                (Formerly California School of Professional
                Psychology)
                    San Francisco, California
                    Doctor of Philosophy/Clinical Psychology
                    January, 1988

M.A.            Towson State University
                    Baltimore, Maryland
                    Master of Arts/Experimental Psychology
                    June, 1977

B.A.            University of Guam
                    Agana, Guam
                    Bachelor of Arts/Psychology
                    June, 1975

1

## EXHIBIT A

**POST-DOCTORAL FELLOWSHIP**

    University of California/San Francisco General Hospital
       San Francisco, California

          January 1988 – January 1990

**PRE-DOCTORAL INTERNSHIPS**

McAuley Neuropsychiatric Institute of St. Mary's Hospital
       San Francisco, California

          July 1985 - July 1987

Garfield Geropsychiatric Hospital
       Oakland, California

          October 1984 - July 1985

**PROFESSIONAL WORK EXPERIENCE - Current**

| | |
|---|---|
| Private<br>Practice | Neuropsychological Assessment<br>   Child, Adolescent and Adult<br>     Forensic, Medical, Psychiatric, Medico-<br>      Legal, Educational |

          March 1992 - Present

| | |
|---|---|
| Continuing<br>Education<br>Faculty | Alliant International University<br>Neuropsychological Evaluation of Criminal<br>    Offenders |

          2000 - Present

| | |
|---|---|
| Continuing<br>Education<br>Faculty | University of California-Berkeley<br>Neuropsychological Evaluation of Criminal<br> Offenders<br>Introduction to Neuropsychological<br>  Assessment |

          2005 - Present

**EXHIBIT A**

**PROFESSIONAL WORK EXPERIENCE - Prior**

| | |
|---|---|
| Senior<br>Supervising<br>Psychologist | California Department of Mental Health<br>Correctional Medical Facility<br>Vacaville, California |

Psychology Consultant to Executive Director,
  Medical Director and Program Directors
Principal Investigator for Research Project
Program Evaluation, Program Development,
  Treatment Outcome Measurement
Director-American Psychological Association
  (APA) Psychology Intern Training Program
Director-Psychology Fellowship Training
  Program
Standards of Practice/Quality Assurance
  -Psychology Service
Staff Selection/Evaluation - Psychology
  Service
Clinical Supervision and Consultation -
  Psychology Service

Staff Psychologist - January 1990 - June 1995
Program Consultant - June 1995 - January 2000
Senior Psychologist - January 2000 - July 2005

| | |
|---|---|
| Adjunct<br>Faculty | Alliant University - Berkeley/Alameda<br>Instructor: Neuropsychological Assessment<br>Cognitive Bases of Behavior |

Dissertation Chairperson:
        -Neuropsychological Assessment of
          Psychotic and Non-Psychotic
          Inmate/Patients
        -Neuropsychiatric Description of
          Children in Day Treatment
        -HIV/AIDS-Affected Children:  A
          Study Utilizing the Rorschach To
          Identify Depression
        -Self Mutilation:  Analysis of
          a Psychiatric Forensic
          Population
          -Relationships of Rorschach and
            MMPI2 to the PCL-R among
            Mentally Ill Felons

3

## EXHIBIT A

Dissertation Committee:
-Development of Special
Aggression Content Scales for
Rorschach Test Administration
within a Prison Population
-Neuropsychological and Cognitive
Correlates of Academic
Achievement in a Child
Psychiatric Sample
-Emotional Descriptors of
Adolescents Who Have
Committed Homicide
-Rorschach Responses/Piagetian
Cognitive Development in Eight
to Twelve Year Old Children
-Understanding Malingering:
Theory and Treatment

1990 - 2005

| | |
|---|---|
| Training, Assessment, Consultation | Oaks Children's Center San Francisco, California Training and Supervision of Pre-Doctoral Psychology Intern Seminars in Neuropsychological and Personality Assessment of Children 1992 - 1995 |
| Training, Assessment, Consultation | McAuley Institute of St. Mary's Hospital San Francisco, California Training and Supervision of Pre/Post-Doctoral Psychology Interns/Fellows Seminars in Neuropsychological Assessment Of Children, Adolescents, Adults  1992 - 1995 |
| Research Training | University of California-San Francisco NIDA Research Grant:  Longitudinal Study of HIV Related Cognitive Impairment in Groups of Gay Men and IV Drug Users  1990 |

4

## EXHIBIT A

| | |
|---|---|
| Child &<br>Family<br>Counselor | Florida United Methodist Children's Home<br> Enterprise, Florida<br>Child & Family Counselor at a Residential<br> Treatment Facility for Children/Adolescents<br>Individual and Group Counseling<br>Parent Education<br>Court Liaison<br>Consultation to Residential Group Home<br>Consultation to Children in Foster Care |

1978 - 1980

| | |
|---|---|
| Adjunct<br>Faculty | University of Central Florida<br>Valencia Community College<br>Seminole Community College<br>Lake-Sumter Community College<br> Orlando, Florida<br>   General Psychology<br>   Developmental Psychology<br>   Child & Adolescent Psychology<br>   Research Methods<br>   Learning Theory and Animal Behavioral<br>    Training Laboratory |

1980 - 1984

**RESEARCH EXPERIENCE**

| | |
|---|---|
| Principal<br>Investigator | California Department of Mental Health<br> Correctional Medical Facility-Vacaville<br> Prospective description of demographic,<br>neuropsychological and emotional<br>functioning in psychiatrically hospitalized<br>males |

1994 - 2005 (Project Completed)

| | |
|---|---|
| Principal<br>Investigator | California Department of Mental Health<br> Correctional Medical Facility-Vacaville<br>  Multimethod description of inmates<br>   referred for psychiatric treatment from<br>   Pelican Bay State Prison |

1994 - 1997 (Project Completed)

5

## EXHIBIT A

| | |
|---|---|
| Principal Investigator | California Department of Mental Health Correctional Medical Facility-Vacaville Development and Evaluation of a Behavioral Milieu Program in a Forensic Psychiatric Treatment Program |

1990 - 1993 (Project Completed)

| | |
|---|---|
| Participant | Spine Institute of San Francisco - Medtronic Spinal Cord Stimulator Project Principal Investigator: J. Schofferman, M.D. |

1996 - 1998 (Project Completed)

| | |
|---|---|
| Post Doctoral Research Assistant | University of California-San Francisco Psychiatric Aspects of AIDS Dementia in Gay Men and IV Drug Abusers Principal Investigators: Alicia Boccellari, Ph.D. J. Dilley, M.D. |

1988 - 1990 (Project Completed)

| | |
|---|---|
| Post Doctoral Research Assistant | McAuley Neuropsychiatric Institute of St. Mary's Hospital Longitudinal Study of Infant Attachment Principal Investigators: H. Massey, M.D. J. Afterman, M.D. |

1988 -1990 (Project Completed)

| | |
|---|---|
| Doctoral Dissertation | Neuropsychological and Piagetian Cognitive Development: A comparison of children's responses to the Luria-Nebraska Neuropsychological Battery-Children's Revision, Piagetian Tasks, and the WISC-R |
| Master's Thesis | Piagetian Moral Development: A comparison of children's responses to Piagetian Moral Intentionally stories presented in both verbal and videotaped versions |
| Graduate Research Assistant | Towson State University Piagetian Cognitive Development Behavioral Treatment |

6

## EXHIBIT A

**PROFESSIONAL PRESENTATIONS**

Contra Costa Department of Defense Seminar Martinez,
California.  *When juvenile offenders become adult
offenders:  A prospective look* (July, 2006)

California Psychological Association Conference San Jose,
California. *The sexual offender in prison psychiatric
treatment: A multimethod description* (April, 2003)

Forensic Mental Health Association of California Conference
Asilomar, California. *The sexual offender in prison
psychiatric treatment: A multimethod description*
(March, 2003)

International Organization of Psychophysiology Montreal,
Canada  *Profiles of Violent Mentally Ill Incarcerated
Males: Neuropsychology and Psychophysiology* (August,
2002)

California Psychological Association Conference Pasadena,
California *Research in Prison Psychiatric Treatment*
(May, 2002)

American Correctional Health Services Association
Conference Costa Mesa, California *Profiles in Violence*
(September, 2001)

Forensic Mental Health Association of California Conference
Asilomar, California *Profiles in Violence* (March,
2001)

Behavioral Health Institute Conference – Los Angeles, CA.
*Latinos is Forensic Psychiatric Treatment* (September,
2000)

Forensic Social Work Conference – Palm Springs, California
*The Violent Psychopath in Treatment* (May, 2000)

Forensic Mental Health Association of California Conference
Asilomar, California *Danger to Self and Danger to
Others:  A description of Inmates Who Harm Themselves
or Harm Others* (March, 2000)

California Psychological Association Conference, San Jose,
California
*Neuropsychological and Psychological Evaluations in
A Forensic Psychiatric Setting* (March, 2000)

## EXHIBIT A

Forensic Mental Health Association of California Conference
     Asilomar, California  *The Violent Psychopath in*
     *Psychiatric Treatment* (March, 1999)

Patton State Hospital Mental Health Conference, Patton,
  California *The Violent Psychopath in Psychiatric*
  *Treatment* (September, 1999)

Patton State Hospital Mental Health Conference, Patton,
    California *Psychopathy in a Forensic Psychiatric*
    *Population*(September, 1998)

Forensic Mental Health Association of California Conference
     Asilomar, California *A Multimethod Approach to*
    *Understanding Psychopathy* (March, 1998)

Patton State Hospital Mental Health Conference, Patton,
  California *Violence in the Community and Assaut in*
  *Prison:  A Multimethod Approach*(September, 1997)

Forensic Mental Health Association of California Conference
     Asilomar, California *Patterns of Violence:*
    *Demographic, neurocognitive, diagnostic, and emotional*
    *descriptions of inmates with high and low violence*
    *histories.* (April, 1997)

California Department of Corrections-Pelican Bay-Pelican
    Bay, California *Description of Inmate/Patient*
    *Populations Demographic, Cognitive,*
    *Neuropsychological, and Psychological Correlates with*
    *Violence* (July, 1996)

California Department of Corrections-Preston School for
    Boys - Ione, California *Demographic, Cognitive,*
    *Neuropsychological, and Psychological Correlates with*
    *Age of Offense* (July, 1996)

California Department of Corrections-Director's Cabinet
    Meeting - Sacramento, California *Description of*
    *Inmate/Patient Population* (July, 1996)

California Department of Corrections-Northern Regional
    Warden's Meeting - Folsom State Prison *Description of*
    *Inmate/Patient Population* (July, 1996)

## EXHIBIT A

California Department of Corrections-Warden's Meeting - CMF
        Vacaville, California *Description of Inmate/Patient
        Population* (June, 1996)

Patton State Hospital Forensic Mental Health Conference.
        *Development of a Forensic Psychiatric Treatment
        Program Based on Empirical Description of the
        Population* (October, 1995)

Patton State Hospital Forensic Mental Health Conference.
        *Opening Address - The Changing Face of Forensic Mental
        Health:  The Challenge Described* (October, 1994)

**PUBLICATIONS**

Young, M. H., Justice, J., & Erdberg, P. (2007). *The
        Rorschach Test in a prison population.* (Manuscript in
        press).

Young, M. H., Justice, J., & Erdberg P. (2007).  *The sex
        offender in prison psychiatric treatment.* (Manuscript
        in review).

Young, M. H., Justice J., & Erdberg, P. (2007). *A
        comparison of rape and molest offenders in prison
        psychiatric treatment.* (Manuscript in review).

Schofferman, J. & Young, M. H.  (2007).  *Previously
        unrecognized cognitive and psychological disorders in
        patients with chronic neck pain due to whiplash and
        other forms of cervical trauma.* Pain Medicine,
        (Manuscript in revision).

Young, M. H., Justice, J., & Erdberg, P. (2006).  Risk of
        harm:  Inmates who harm themselves while in prison
        psychiatric treatment.  *Journal of Forensic Sciences,
        51*(1), 154-162.

Young, M. H., & Justice, J. (2003). Risk Factors for
        assault while in Prison Psychiatric Treatment. *Journal
        of Forensic Sciences, 49*(1), 141-149.

Justice, J. & Young, M. H. (2002).  *Managing violence in a
        Supermax facility:  A discussion of research findings
        and their application to reducing violence in supermax*

9

## EXHIBIT A

*institutions and beyond.* In D. Neal (ed.) Supermax Prisons (pp. 99 – 118). Lanham, MD. American Correctional Association.

Young, M. H., Siemsen, R., & Roman, T. (2000). Neuro-psychological and personality assessment in a forensic psychiatric setting. *California Psychological Association Convention Abstracts.*

Young, M.H., Justice, J., & Erdberg, P. (2000). A multi-method description of psychopathy among forensic psychiatric inmates. In C. Gacono(Ed.) *The Clinical Forensic Assessment of Psychopathy: A Practitioner's Guide* (pp. 313-332). Mahwah, New Jersey, Erlbaum.

Young, M.H., Justice, J., & Erdberg, P. (1999). Risk factors for violence among incarcerated male psychiatric patients: A multimethod approach. *Assessment, 6,* 243-258.

Young, M. H. & Justice, J. (1997). Neuropsychological functioning of inmates referred for psychiatric treatment. *Archives of Clinical Neuropsychology, 13,* 303 – 318.

Dilley, J., Boccellari, A., Davis, A., Young, M., & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *IV International Conference on AIDS. Montreal, Canada.*

Dilley, J., Boccellari, A., Davis, A., Young, M. & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *Abstract and oral presentation. American Psychiatric Association, May 11, 1989. San Francisco, CA.*

Young, M.H. (1977). Visual Modality as a Preferred Mode presentation for Piagetian Moral Intentionally. *Monographs of Lida Lee Tall Learning Research Center.* Towson State University

10

## EXHIBIT A

**PROFESSIONAL AWARDS**

| | |
|---|---|
| University of Guam | Graduation - Magna Cum Laude<br>June, 1975 |
| Towson State University | Graduation - Magna Cum Laude<br>June, 1978 |
| California School of Professional Psychology | Superior Accomplishment Award<br>Dissertation<br>June, 1988 |
| State of California | Superior Accomplishment Award |
| Department of Mental Health Correctional Medical Facility | Exceptional Job Performance<br>April, 1993 |
| State of California Department of Mental Health Correctional Medical | Superior Accomplishment Award<br>Exceptional Job Performance<br>April, 1995 |
| State of California Award Department of Mental Health Correctional Medical Facility | Outstanding Accomplishment<br>Exceptional Job Performance<br>September, 1999 |

**PROFESSIONAL ASSOCIATIONS**

-American Board of Professional Neuropsychology (ABPN)
-American Psychological Association (APA)
    Division 40:  Clinical Neuropsychology
    Division 42:  Forensic Psychology
-California Psychological Association (CPA)
-National Academy of Neuropsychology (NAN)
-International Neuropsychological Society (INS)
-Society for Personality Assessment (SPA)

*February 2007*

11

## EXHIBIT B

### Tests Administered

Attitude Towards Evaluation
  15 Item Test
  Test of Malingering Memory

Intellectual Functioning
  Wechsler Adult Intelligence Scale (WAIS III)
  Test of Non-Verbal Intelligence (TONI 3)

Academic Functioning
  Wechsler Individual Achievement Test (WIAT II)
    Word Reading
    Reading Comprehension
    Numerical Operations
    Math Reasoning

Neuropsychological Functioning
  Sensory
    Sensory Perception Examination
    Smell Identification Test
    Luria-Nebraska Neruopsychological Battery – Tactile Scale (LNNB)

  Motor
    Luria-Nebraska Neuropsychological Battery – Motor Scale (LNNB)
    Finger Tapping Test

  Attention and Concentration
    Conners' Continuous Performance Test (CPT)
    Paced Auditory Serial Attention Test (PASAT)

  Memory and Learning
    California Verbal Learning Test (CVLT II)
      Trial Learning
      Interference Learning
      Short Delay-Free
      Short Delay-Cued
      Long Delay-Free
      Long Delay-Cued
      Recognition
      Forced Choice

Wechsler Memory Scale (WMS III)
        Logical Memory I
        Logical Memory II
        Logical Memory Recognition
        Faces I
        Faces II
        Verbal Paired Associates I
        Verbal Paired Associates II
        Verbal Paired Associates Recognition
        Family Pictures I
        Family Pictures II
        Visual Reproduction Copy
        Visual Reproduction I
        Visual Reproduction II

Rey Complex Figure Test
        Immediate Recall
        Delayed Recall
        Recognition

Psychomotor
        Rey Complex Figure Test Copy Trial
        Benton Visual Form Discrimination
        Benton Judgment of Line Orientation
        Benton Facial Recognition Test

Executive Functioning
        Executive Functioning Test
            Trail Making Tests
            Verbal Fluency Tests
            Design Fluency Tests
            Color-Word Interference Tests
            Sorting Tests
            Twenty Questions
            Word Context Test
            Tower Test

Wisconsin Card Sorting Test

Comprehensive Affect Testing System (CATS)

Halstead-Reitan Neuropsychological Battery
    Name Writing
    Sensory Perceptual Examination
        Bilateral Simultaneous Sensory Stimulation
        Tactile Finger Recognition
        Finger Tip Number Writing
    Finger Tapping Test
    Trail Making Test
        Trail Making A
        Trail Making B
    Seashore Rhythm Test
    Speech Sounds Perception Test
    Tactual Performance Test
        Total Time
        Memory
        Location
    Category Test

Rorschach Test

## EXHIBIT C

## Neuropsychology Test Data

**Attitude towards Evaluation**

| Test | Score | Qualitative Description |
|---|---|---|
| 15 Item Test | 15/15 | Not Malingering |
| Test of Malingering Memory (TOMM) | 44/50 | Not Malingering |
| CVLT II Forced Choice | 100% | Not Malingering |

**Wechsler Adult Scale of Intelligence (WAIS III)**

| Scale | Sum of SS | IQ | 95% Confidence | %ile | Qualitative Description |
|---|---|---|---|---|---|
| Verbal | 58 | 97 | 92-102 | 42 | Average |
| Performance | 47 | 95 | 89-102 | 37 | Average |
| Full Scale | 105 | 97 | 93-101 | 42 | Average |

| Index | Sum of SS | Index Score | 95% Confidence | %ile |
|---|---|---|---|---|
| Verbal Comprehension | 35 | 109 | 103-114 | 73 |
| Perceptual Organization | 30 | 99 | 92-106 | 47 |
| Working Memory | 22 | 84 | 78-92 | 14 |
| Processing Speed | 15 | 86 | 79-97 | 18 |

| Verbal Subtests | Raw Score | Age SS | %ile |
|---|---|---|---|
| Vocabulary | 40 | 11 | 63 |
| Similarities | 24 | 11 | 63 |
| Arithmetic | 9 | 7 | 16 |
| Digit Span | 13 | 7 | 16 |
| Information | 20 | 13 | 84 |
| Comprehension | 16 | 9 | 37 |
| Letter-Number | 9 | 8 | 25 |
|  |  |  |  |

| Performance Subtests | Raw Score | Age SS | %ile |
|---|---|---|---|
| Picture Completion | 19 | 8 | 25 |

| Digit Symbol | 62 | 7 | 16 |
| Block Design | 43 | 10 | 50 |
| Matrix Reasoning | 20 | 12 | 75 |
| Picture Arrangement | 15 | 10 | 50 |
| Symbol Search | 29 | 8 | 25 |

**Wechsler Individual Achievement Test (WIAT-II)**

| Subtest | Standard Score | %ile | Age Equivalent | Grade Equivalent |
|---|---|---|---|---|
| | | | | |
| **Reading** | | | | |
| Word Reading | 101 | 53 | | |
| Comprehension | 96 | 59 | | |
| Pseudoword | | | | |
| **Mathematics** | | | | |
| Numerical Operations | 71 | 3 | | 9 |
| Math Reasoning | 71 | 3 | | 9 |
| Composite | 142 | 3 | | 9 |

**Test of Non-Verbal Intelligence (TONI III)**

| Raw Score | Quotient | %ile | Qualitative Description |
|---|---|---|---|
| | | | |
| 32 | 102 | 55th | Average |

**Smell Identification Test**

| Errors | Raw Score | %ile | Qualitative Description |
|---|---|---|---|
| | | | |
| 5 | 35 | 22 | Normosia |

**Luria-Nebraska Neuropsychological Battery**

| Scale | Raw Score | T Score | Qualitative Description |
|-------|-----------|---------|------------------------|
| Motor | 6 | 46 | |
| Sensory | 17 | 47 | |

Critical level = 62.39

**Conners' Continuous Performance Test (CPT)**

**Inattention**

| Measure | T Score | Qualitative Description |
|---------|---------|------------------------|
| Omissions | 46.88 | OK |
| Commissions | 71.44 | Inattention |
| Hit RT | 29.47 | OK |
| Hit RT Std. Error | 39.37 | OK |
| Variability | 35.42 | OK |
| Detectability | 62.20 | Inattention |
| Hit RT ISI Change | 52.62 | OK |
| Hit SE ISI Change | 45.63 | OK |

**Impulsivity**

| Measure | T Score | Qualitative Description |
|---------|---------|------------------------|
| Commissions | 71.44 | Impulsive |
| Hit RT | 29.47 | Fast |
| Perseverations | 57.28 | OK |

**Vigilance**

| Measure | T Score | Qualitative Description |
|---------|---------|------------------------|
| Hit RT Block Change | 53.90 | OK |
| Hit SE Block Change | 53.49 | OK |

**Paced Auditory Serial Addition Test (PASAT)[1]**

3

| Trial | Raw Score | Age & IQ Adjusted Mean[2] | Age & IQ Adjusted S/D | Qualitative Description |
|---|---|---|---|---|
|  |  |  |  |  |
| Trail 1 | 10 | 42.0 | 5.5 |  |
| Trial 2 | 9 | 37.6 | 1.9 |  |
| Trial 3 | 10 | 32.5 | 7.5 |  |
| Trial 4 | 12 | 26.1 | 7.0 |  |
| Total | 41 | 138.2 |  |  |

[1] Gronwal Version

[2] Strauss, E., Sherman, E., & Spreen, O. (2006) (Age 16-29; IQ 90-99)

**California Verbal Learning Test (CVLT-II)**

| Subtest | Raw Score | Standard Score | Qualitative Description |
|---|---|---|---|
|  |  |  |  |
| Trial 1 | 6 | -0.5 | Mild Impairment |
| Trail 5 | 9 | -1.5 | Mild-Moderate Impairment |
| Trial B | 4 | -1.5 | Mild-Moderate Impairment |
| Short Delay-Free | 9.0 | -0.5 | Mild Impairment |

| Subtest | Raw Score | Standard Score | Qualitative Description |
|---|---|---|---|
|  |  |  |  |
| Short Delay-Cued | 9.0 | -1 | Mild Impairment |
| Long Delay-Free | 9.0 | -1 | Mild Impairment |
| Long Delay-Cued | 9.0 | -1 | Mild Impairment |
| Recognition | 13 | -1.5 | Mild-Moderate Impairment |
|  |  |  |  |
| Forced Choice | 100 |  | Not Malingering |

**Wechsler Memory Scale (WMS-III)**

4

| Index | Sum of SS | Index Score | 95% Conf Interval | %ile | Qualitative Description |
|---|---|---|---|---|---|
| *Primary Indexes* | | | | | |
| Auditory Immediate | 14 | 83 | 77-91 | 13 | Low Average |
| Visual Immediate | 15 | 84 | 77-97 | 14 | Low Average |
| Immediate Memory | 29 | 80 | 74-90 | 9 | Low Average |
| Auditory Delayed | 17 | 92 | 84-102 | 30 | Average |
| Visual Delayed | 11 | 72 | 67-87 | 3 | Borderline |
| Auditory Recog. Delayed | 9 | 95 | 85-107 | 37 | Average |
| General Memory | 37 | 82 | 76-92 | 12 | Low Average |

| *Primary Subtest Scores* | Raw Scores | Age SS |
|---|---|---|
| | | |
| Logical Memory I-Recall | 34 | 8 |
| Faces I - Recognition | 35 | 8 |
| Verbal Paired Assoc I - Recall | 10 | 6 |
| Family Pictures I - Recall | 39 | 7 |
| | | |
| Logical Memory II - Recall | 22 | 9 |
| Faces II - Recognition | 31 | 6 |
| Verbal Paired Assoc II - Recall | 4 | 8 |
| Family Pictures II - Recall | 30 | 5 |
| Auditory Recognition - Delayed | 49 | 9 |

**Rey Complex Figure Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Copy | 32 | | 2.5 | Mild-Moderate Impairment |
| Immediate Recall | 7 | <20 | <1 | Severe Impairment |
| Delayed Recall | 5 | <20 | <1 | Severe Impairment |
| Recognition | 17- | <20 | <1 | Severe Impairment |
| Time to Copy | 210" | | >16 | Within Normal Range |
| Recognition True Positive | 7 | | 2.5 | Mild-Moderate Impairment |
| Recognition False Positive | 2 | | 2.5 | Mild-Moderate Impairment |
| Recognition True Negative | 10 | | 2.5 | Mild-Moderate Impairment |
| Recognition False Negative | 5 | | 2.5 | Mild-Moderate Impairment |

5

**Benton Laboratory of Neuropsychology[1]**

| Test | Patient Correct | Control Mean | Control Median | Control Range | Qualitative Description |
|------|-----------------|--------------|----------------|---------------|-------------------------|
| Visual Form Discrimination | 29 | 30.8 | 31.0 | 28-32 | Within Normal Range |
| Judgment of Line Orientation | 20 | 25.6 | | | Borderline (9%) |
| Facial Recognition | 39 | | | | Borderline |

[1]Benton Laboratory Norms

**Executive Functioning Test (EFT)**

| Measure | Raw Score | Scaled Score | Qualitative Description |
|---------|-----------|--------------|-------------------------|
| **Trail Making Tests** | | | |
| Visual Scanning | 22 | 9 | Within Normal Range |
| Number Sequencing | 22 | 12 | Within Normal Range |
| Letter Sequencing | 34 | 9 | Within Normal Range |
| Number-Letter Sequencing | 86 | 8 | Within Normal Range |
| Motor Speed | 46 | 7 | Mild Impairment |
| **Verbal Fluency Tests** | | | |
| Letter Fluency | 56 | 16 | Within Normal Range |
| Category Fluency | 38 | 10 | Within Normal Range |
| Category Switching | 12 | 8 | Within Normal Range |
| Category Switching Accuracy | 6 | 4 | Moderate Impairment |
| **Design Fluency** | | | |
| Filled | 9 | 9 | Within Normal Range |
| Empty | 11 | 10 | Within Normal Range |
| Switching | 6 | 8 | Within Normal Range |
| **Color-Word Interference** | | | |
| Color | 34 | 7 | Mild Impairment |
| Word | 32 | 4 | Moderate Impairment |
| Inhibition | 81 | 2 | Severe Impairment |
| Inhibition-Switching | 74 | 6 | Mild Impairment |

6

| Sorting Test | | | |
|---|---|---|---|
| Confirmed Sorts | 6 | 5 | Moderate Impairment |
| Description | 20 | 5 | Moderate Impairment |
| Recognition | 7 | 11 | Within Normal Range |
| **Twenty Questions** | | | |
| Abstraction | 19 | 7 | Mild Impairment |
| Questions Asked | 42 | 5 | Moderate Impairment |
| Achievement | 12 | 7 | Mild Impairment |
| **Tower Test** | | | |
| Achievement | 15 | 9 | Within Normal Range |
| Rule Violations | 1 | 36 | Within Normal Range |

**Wisconsin Card Sorting Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Total Correct | 49 | | | |
| Total Errors | 15 | 51 | 55% | Within Normal Range |
| Perseverative Responses | 11 | 48 | 42% | Within Normal Range |
| Persevertive Errors | 9 | 49 | 45% | Within Normal Range |
| Nonperseverative Errors | 6 | 51 | 53% | Within Normal Range |
| Conceptual Level | 43 | 49 | 47% | Within Normal Range |
| Categories Completed | 3 | | >16% | Within Normal Range |
| Trials to Complete | 13 | | 11-16% | Mild Impairment |
| Failure to Maintain Set | 1 | | | |
| Learning to Learn | -5.98 | | >16% | Within Normal Range |

**Comprehensive Affect Testing System (CATS)**

| Quotient/Scale/Subtest | Raw Score | Standard Score | Qualitative Description |
|---|---|---|---|
| Affect Recognition Quotient (ARQ) | 37 | -2.8 | Moderate-Severe Impairment |
| Prosody Recognition Quotient (PRQ) | 19 | -4.6 | Severe Impairment |
| Emotion Recognition Quotient (ERQ) | 83 | -4.3 | Severe Impairment |
| Simple Facial | 16 | -2.2 | Moderate Impairment |

7

| Facial Matching | 21 | -0.1 | Mild Impairment |
| Prosody Discrimination | 14 | -2.7 | Moderate-Severe Impairment |
| Prosody Identification | 22 | -3.1 | Severe Impairment |
| Lexical Scale | 10 | -0.4 | Normal |
| | | | |
| Identify Discrimination | 12 | 0.5 | Low Normal |
| Affect Discrimination | 12 | 0.7 | Mild Impairment |
| Nonemotional Prosody Discrimination | 3 | -7.5 | Severe Impairment |
| Emotional Prosody | 5 | -100 | Severe Impairment |
| Name Affect | 4 | -0.4 | Normal |
| Identify Emotional Prosody | 8 | -1.4 | Mild-Moderate Impairment |
| Match Affect | 5 | -4.2 | Severe Impairment |
| Select Affect | 0 | -9.2 | Severe Impairment |
| Conflicting Prosody/Meaning (Prosody) | 6 | -5.4 | Severe Impairment |
| Conflicting Prosody/Meaning (Meaning) | 10 | -0.4 | Normal |
| Match Emotional Prosody/Meaning | 8 | -1 | Mild Impairment |
| Match Emotion Face/Prosody | 9 | -2.4 | Moderate Impairment |
| Faces | 16 | -1.1 | Mild Impairment |
| | | | |
| Happy Emotion | | -11.4 | Severe Impairment |
| Surprised | | -2.7 | Severe Impairment |
| Fearful | | 0.6 | Normal |
| Sad | | -4.5 | Severe Impairment |
| Angry | | -2 | Moderate Impairment |
| Disgusted | | -0.1 | |

**Halstead-Reitan Neuropsychological Battery**

| Measure | Raw Score | Scaled Score | Education 6-8 T Score[1] | Education 9-11 T Score[1] | Black 7 – 8 T Score[2] |
|---|---|---|---|---|---|
| Category | 53 error | 8 | 46 | 43 | 43 |
| Trails A | 31" | 9 | 47 | 46 | 47 |
| Trails B | 128" | 6 | 33 | 34 | 35 |
| TPT Total | 16' 47" | 8 | 41 | 39 | 42 |
| TPT Memory | 7 | 9 | 45 | 36 | 47 |
| TPT Location | 1 | 6 | 32 | 30 | 28 |
| Seashore | 22 correct | 6 | 38 | 36 | 36 |
| Speech Sound | 6 error | 7 | 43 | 39 | 40 |
| FTT-Dom | 37.9 | 6 | 31 | 29 | 32 |
| FTT-Non | 33.1 | 5 | 29 | 28 | 27 |
| TPT Dom | 4'55" | 10 | 47 | 47 | 50 |
| TPT Non | 7'12" | 7 | 33 | 39 | 38 |
| TPT Both | 4'21" | 7 | 38 | 35 | 34 |

[1] Heaton, R., Grant, I., and Matthews, C. (1991)

[2] Heaton, R., Walden, M., Taylor, M., and Grant, I.  (2006)


**Luria-Nebraska Neuropsychological Battery**

**Motor and Sensory Subscales – Items Impaired**


| Motor Scale | | |
|---|---|---|
| Item Number | Performance | Rating |
| | | |
| 1 – Thumb-finger sequential touch –Right Hand | 6 | 1 |

9

| 2 -                                 - Left Hand | 6 | 1 |
|---|---|---|
| 3 – Alternating clench/extension – Right Hand | 10/1 error | 1 |
| 4 -                                 – Left Hand | 11 | 1 |
| 19 – Point to your left eye with your right hand | Incorrect | 2 |
| 20 – Touch your right ear with your left hand | Incorrect | 2 |
| 21 – Alternating Finger /Fist | 5 accurate * | 2 |
| 22 – Tap Right Hand 2x/ Left Hand 1x | 4 **simultaneous | 0 |
| 23 – Tap Left Hand 2x/ Right Hand 1x | 7 simultaneous | 1 |
| 49 – Red/Green Squeeze | 2 errors | 2 |
| 50 – Knock 1x Raise Right Hand/ Knock 2 Left Hand | *** | 0 |
| 51 – Knock Hard/Knock Gently | 3 errors | 2 |
| | | |
| Tactile | | |
| #64 – Finger Recognition – Eraser | 1 right error | 1 |
| #66 – Point/Head of Pin | 2 right errors | 2 |
| # 70 – 2 point discrimination – Right Hand | 10mm required | 1 |
| #71 –                            Left Hand | >10 mm " | 2 |
| | | |

* Item #21 – 5 Errors – R/L Fists…R/L Extension without alternating

** Item #22 – 4 Errors – Simultaneous taps rather than right/left alternating

*** Item #50 – Testing Limits – When repeat 4 x OK; When repeat 10 x – 7 errors

## EXHIBIT D

## Materials Made Available For Review And Consideration

**Expert Witness Reports/Other Reports**
A. David Axelrad
Brent O'Bannon
B. Thomas Gray
Edward B. Gripon
James R. Harrison (Competency)
C. Robin McGirk
Peter Oropeza (Competency)
Peter Oropeza
Victor Scarano

**Affidavits**
Teresa Baker
Wanda Banks
Rickey Bell
Christopher Bennett
Pam Ross Borens
Ronnie Brinson
Reverend Clifton Eaton,
Doris Gonzalez
Edward Gripon
Alice Harris
Amy Ingle
Konta Johnson
Roscoe Johnson
Todd Johnson
Walter Johnson
Jonathan Lipman
McCloud Luper
Floyd Patterson
Eric Ross
Kevin Carl Ross
Christopher Smith
Danny Thomas
Denise Ross Wade

**Grand Jury Testimony**
Sonya Mongtomery
Rochelle Thomas
Shriley Whitley

**Trial Testimony**
Kate Allen
A. David Axelrad

William Bennie
Paul Boren
William Bowen
Mike Burkhart
Cindy Carr
Kyunogho Scott Choi
Sherrie St. Cyr
Cheryl Deganais
Isaiah Gibbs
Doris Gonzalez
Cathy Gray
Edward Gripon
James Harrison
Carmen Hayes
Bryant Hughes
Jennifer Loyless
Chuck Maudlin
Lueva McCarthy
C. Robin McGirk
Chris Mullins
Brent O'Bannon
Peter Oropeza
Edward Padilla
Dan Rios
Danny Ross
Victor Scarano
Natalie Sims
Sheila Sportswood
Danny Thomas
Amelda Turner
R.V. Wilcott

**Interviews**
Isaiah Gibbs
Carmen Hayes
Bryant Hughes
Andre Thomas (videotaped interview with transcript)
Andre Thomas (audiotaped interview with transcript)
Rochelle Thomas

**Clinical Records**
CD Rom of Andre Thomas/Family Medical Records
Chronology of Thomas medications
DPS Records
Grayson Co Jail Medical Records
MHMR Records

2

North Texas State Hospital Records
Polunsky Unit Records
UTMB Prison Records
Wilson N. Jones Medical Center – Medical Records

**Other Records / Documents**
State Trial Exhibit 86
State Trial Exhibit 93
Crime Scene police photos
Select excerpts of Texas Penal Code

<u>**EXHIBIT E**</u>

**References**

Bilder, R., Goldman, R., Robinson, D., Reiter, G., Bell, L., Bates, J., Pappadopulos, E., Willson, D., Alvir, J., Woerner, M., Geisler, S., Kanes, J., & Lieberman, A.  (2000).  Neuropsychology of first-episode schizophrenia:  Initial characterization and clinical correlates. *American Journal of Psychiatry, 154*(4), 549-559.

DeFord, a. M., Wilson, M.S., Rice, A. C., Clausen, T., Rice, L. K., Barabnva, A., Bullock, R., & Hamm, R. J. (2004).  *Repeated mild brain injuries result in cognitive impairment in B6C3F1 mice.*  National Library of Medicine, PubMed.

Doty, R. (1995). *The smell identification test.*  Haddon Heights NJ:Sensonics.

Heinrichs, W. (2005).  The primacy of cognition in schizophrenia. *American Psychologist, 60*(3), 229-242.

Lee, G., Loring, D., & Martin, R. (1992).  Rey 15 Item Visual Memory Test for the detection of malingering. *Psychological Assessment, 4*(1), 43-46.

Lorens, K., Hodgins, S., Maughan, B., Murray, R., Rutter, M., & Taylor, E. (2007).  Community screening for psychotic-like experiences and other putative antecedents of schizophrenia in children aged 9-12 years. *Schizophrenia Research, 90*, 130-146.

Millis, S. R., Adams, K. M. & Ricker, J. H. (1995).  The California verbal learning test in Detection of incomplete effort in neuropsychological evaluations. *Psychological Assessment, 7*(4), 463-471.

Moberg,  P., Arnold, S., Doty, R., Gur, R.E , Balderston, C., Roalf, D., Gur, R. C., Kohler, C., Kanes, S., Siegel, S., & Turetsky, B.  (2006).  Olfactory functioning in schizophrenia:  Relationship to clinical, neuropsychological, and volumetric MRI measures. *Journal of Clinical and Experimental Neuropsychology, 28*:1444-1461.

Norman, R., Scholten, D., Malla, A., & Ballageer, T. (2005).  Early signs in

## EXHIBIT E

schizophrenia spectrum disorders. *Journal of Nervous and Mental Disease, 193*(1), 17-23.

Ragland, J., Gur, R., Glahn, D., Censits, D.,  Smith, R., Lazarev, M., Alavi, A., & Gur, R.
Frontotemporal cerebral blood flow change during executive and declarative memory
tasks in schizophrenia:  A positron emission tomography study. *Neuropsychology, 12*(3),
399-413.

Rees, L., Gansler, D., Mozynski, P., & Tombaugh, T. (1998).  Five validation
experiments of the Test of Memory Malingering. *Psychological Assessment, 10*(1), 10-20.

Shaw, P., Radbourne, L., Polkey, B., & David, A. (2004).  The impact of early and late
damage to the human amygdala on 'theory of mind' reasoning. *Brain, 127*(7), 1535-1548.

Teicher, M. H., Anderson, S., Polcari, A. (2002).  Developmental neurobiology of
childhood stress and trauma. *Clinical Psychiatry, 25*:397-426.

Teicher, M. H., Andersen, S. L., Dumont, N. L., Ito, Y., Glod, C. A., Vaituzis, C., &
Geidd, J. N. (2000).  Childhood neglect attenuates development of the corpus callosum.
*Social Neuroscience, 26*:549.

Teicher, M. H., Ito, Y., Glod, C. A. Andersen, S. L., Dumont, N., Ackerman, E. (1997).
Preliminary evidence for abnormal cortical development in physically and sexually
abused children using EEG coherence and MRI. *New York Academy of Science, 821*,
160-175.

Teicher, M., H.,  Glod, C. A., Surrey, J., & Swett, C. (1993).  Early childhood abuse and
limbic system ratings in adult psychiatric outpatients. *Journal of Neuropsychiatry
Neuroscience, 5*(3), 301-306.

Tombaugh, T.(1997).  The test of memory malingering:  Normataive data from

# Exhibit 36

## "It's Just Cough Medicine - Think Again!"

**From the Tennessee Association of Alcohol, Drug & Other Addiction Services**

**Found on Shannon C. Miller's Website**

 **TAADAS**    Tennessee Association of Alcohol, Drug & other Addiction
Services

| The Association | The Clearinghouse | Book & Gift Shop | Substance Abuse News |

| Home | Publications | Newsletter | Fact Sheets | Videos | Links |

# "It's Just Cough Medicine" – Think Again!

There is an emerging trend happening in homes across Tennessee, right under parents' noses. Recently, there have been news reports of overdoses and theft of this drug across the state as well as nationwide. The Tennessee REDLINE has been receiving calls and inquiries about it for nearly 3 years from various areas of the state. What is it? What is this drug? It is the abuse of over-the-counter cough suppressants. Dextromethorphan or DXM is a semisynthetic narcotic related to opium and found in many over-the-counter cough suppressants in the United States and most countries. DXM is contained in any drug whose name includes "DM" or "Tuss." The drug comes in various forms. Most common are cough suppressants in caplet or liquid form, including Corcidin, Robitussin, Vicks Formula 44, Drixoral, and several generic brands. (A caution: Not all medicines under these brands contain the drug since most brands put out several formulations. Look on the label for "DM," "Tuss," or "Maximum Strength.")

Less publicized and more easily obtained than the more well-known club-drug ecstasy, DXM's legal status and familiarity may lure some kids into taking it, despite the dangers it poses of addiction, injury, and death. "It's not an ugly drug. It's much less intimidating than snorting a powder or injecting a strange substance," said William Bobo, M.D., a psychiatrist who, along with Shannon Miller, M.D., is conducting an exhaustive review of the scientific literature on DXM.

Anyone, including minors, can buy these medicines at a local convenience mart or drugstore. And since the Food and Drug Administration (FDA) approves DXM for sale in over-the-counter medicines, those seeking a high, and especially teens, may assume it's "safe." "It's a very familiar substance, in short," said Bobo, and thus "it is felt to be benign by abusers." This underestimation of the drug's dangers and abuse potential is not limited to abusers, explained Miller. "Many clinicians simply aren't asking these questions—and certainly when they are faced with someone using it, they tend to minimize it."

DXM is related to opiates in its make-up, and it produces mind-altering highs. Misuse of the drug creates both depressant and mild hallucinogenic effects. It also acts as a dissociative anesthetic, similar to PCP and ketamine.

***Sought-after effects include:***

- Hallucinations

- Heightened perceptual awareness

- Lethargy

- Perceptual distortion

- Dissociation

- Euphoria

- Mania-like symptoms such as thoughts racing

**Adverse effects are many:**

- Confusion

- Impaired judgment and mental performance

- Blurred vision

- Slurred speech

- Loss of coordination

- Rigid motor tone and involuntary muscle movement

- Tremor

- Dizziness

- Nausea, abdominal pain, vomiting, vomiting of blood

- Dysphoria (sadness)

- Paranoia

- Headache

- Decreased ability to regulate body temperature

- Excessive sweating

- Reduced sweating and increased body temperatures, or hot flashes

- Irregular heartbeat

- High blood pressure

- Numbness of fingers or toes

- Redness of face

- Loss of consciousness

- Dry mouth and loss of body fluid

- Dry itchy skin and occasional patches of flaky skin

Emergency rooms increasingly report DXM overdoses and DXM-related crises. In spite of these serious potential adverse effects of DXM, the dangerous behavior it induces, and the ingredients ingested along with DXM-containing cough medicines, abusers keep returning because of the drug's legal status and easy access.

Its use is becoming more prevalent in dance clubs and at dance events called "raves," where it is sometimes used as an alternative for the more well-known drug ecstasy. Adolescent youth easily can obtain the drug because stores sell it over the counter, with no prescription required. Its street names include:

- DXM

- robo

- skittles

- Vitamin D

- dex

- tussin

## WHAT CAN WE DO??

The most important thing for everyone is simply to be aware that the problem exists. Parents should look for signs of abuse such as a child bringing home his or her own box, or an unexplained dwindling of the family's stock. Doctors can look for signs of abuse and send patients to treatment providers. Treatment providers need to be aware of the special considerations associated with the drug's availability. And abusers should know that the drug is dangerous and has addictive properties.

For further information or if you or someone you know needs help for a problem with DXM or any other drug, Call the Tennessee REDLINE at 1.800.889.9789 for free confidential referrals to services in your area. For more information about over-the-counter or any alcohol or other drug abuse, please call Tennessee Association of Alcohol and Drug Abuse Services (TAADAS) at 615.780.5901 or visit www.health.org/newsroom/rep/170.htm. The Tennessee REDLINE is a program of TAADAS and is funded by the Tennessee Department of Health. Sources: Tennessee REDLINE & NCADI Reporter.

The Association | The Clearinghouse | Book & Gift Shop | Substance Abuse

# Exhibit 37

## Excerpt From Carmen Hayes' Diary

AT011184

# A DAY LIKE NO OTHER

march 27

this morning, andre went to
laura's house & killed her,
████ & ████. laura was pregnant.
he confessed to isaiah & i- we
were here most of the day doing
questioning... i'm so shaken...
and in disbelief. wendy
said that they think ~~they had~~
andre had someone help...
they have a white guy in custody
that tried to run from the cops.
"they" say that it was the most
gruesome scene they've ever seen.
i want to be mad at him, but
i can't be because i know he
didn't realize what he was doing—
he didn't believe anything was
real...
everyone's blaming this on me...
because of the cori- but andre
was all the way down... i know
cause i was all the way down
& i took mine later than he did.
andre's mom was trying to kick
me out... so was the landlord.--
kushnir said that there's a chance
he could still come here to live.
he's going to talk to his parents &
see. who knows.
andre almost didn't make it n4687

**11294**

AT011314

thru surgery - he stabbed himself
twice in the chest.. god, i feel
responsible...
   i felt like isaiah was coming
onto me today at the police
station. oh well.
ashley hugged me today when
i went to work to tell them
i'd be in in the morning...
everyone wanted to know the
details fucked up motherfuckers...
they asked me if i had seen
anything. ashley told me he
"still loved me". MAN! after
everything ive been through
today, he made my heart jump -
WHY?
   everything here is creepy to me
now.
   i could have been next. THAT's
the thing that scares me the most.

3-28 :   SCARED ooo

   the whole family is after me
now... they got me out of the
house at 8:30 AM. cause they
"didn't want me to get hurt."
   i partially believe his mom -

11295

04688

AT011315

# Exhibit 38

## Curriculum Vita of
## Peter P. Oropeza, Psy.D.

**Peter P. Oropeza, Psy.D.**
Clinical and Forensic Psychologist
TX License # 3-2020
P.O. Box 1481 • Grapevine, TX 76099 • (940) 631-3927

### EDUCATION

**Forest Institute of Professional Psychology (Full APA Accreditation)**-Springfield, MO
  Psy.D., Clinical Psychology, Proficiency in Neuropsychology, October 2000
  M.A., Clinical Psychology, October 1998
  Dissertation: The Effectiveness of the Wide Range Achievement Test-3 and the National
  Adult Reading Test-Revised as Estimates of Premorbid Intelligence

**Angelo State University**- San Angelo, TX
  B.S., Major in Psychology, Minor in Sociology, August 1996

### PROFESSIONAL EXPERIENCE

**Lead Psychologist, North Texas State Hospital**-Vernon, TX                    08/01-Present
  . Promoted from a staff position to lead psychologist after less than one year of service.
  • Forensic evaluations of Competency to Stand Trial, Mental Status at the Time of Offense, and
    malingering issues. Clinical evaluations of personality and cognitive functioning. Consult with
    multidisciplinary team members and other psychologists on issues of cognitive performance and
    differential diagnosis. Supervise psychology staff and trainees as well as provide didactic training
    to direct care staff. Presented to hospital administration on the issue of risk assessment.

**Staff Psychologist, Federal Correctional Institution**-Ft. Dix, NJ            09/00-07/01
  • Performed psychological assessments to include initial clinical screenings, crisis management,
    and suicide assessments. Assisted with interviewing applicants for various types of employment.
    Consulted with administration, medical department, and officers on issues of inmate violence in
    the workplace as well as fitness for special housing. Performed individual and group therapy.

**Psychology Intern, Florida State Hospital**-Chattahoochee, FL                 09/99-08/00
  • (Full APA Accreditation). Performed cognitive screening assessments, clinical and
    forensic evaluations, and risk/suicide assessments. Other duties included assisting a
    community forensic evaluator, performing long/brief-term therapy, and working with a
    team of professionals as well as consulting with other disciplines.

### ADDITIONAL GRADUATE TRAINING EXPERIENCE

**Psychological Trainee/Supervisor, Forest Human Services Center-Outpatient Clinic**
  Springfield, MO                                                              03/98-06/99
  • Provided individual, marital, and family psychotherapy as well as conducted
    comprehensive psychological assessments; performed weekly intake and diagnostic
    interviews with in-vivo supervision. Provided individual supervision to first year
    psychological trainees; responsible for weekly case supervision with supervisees;
    supervised weekly intake groups and diagnostic interviews as well as being responsible
    for crisis management in the clinic for designated times.

**Psychological Trainee, Neuropsychological Associates of Southwest Missouri, P.C.**
Springfield, MO                                                                                                    03/99-06/99
- Assisted with clinical interviews, administered and scored neuropsychological assessments to include measures of intellect, achievement, cognition, personality, and memory.

**Psychological Trainee, Springfield Psychological Associates Inc.**
Springfield, MO                                                                                                    05/98-09/98
- Administered and scored comprehensive psychological assessments involving clinical and forensic matters and also assisted with clinical interviews.

**Co-facilitator, The Parenting Place**
Springfield, MO                                                                                                    05/98-07/98
- Co-facilitated a parenting skills group offered to individuals referred through the Division of Family Services, the court system, or self-referred.  The classes covered a variety of materials, but focused on behavioral principles and developmental stages.

**Psychological Trainee, Reaching Out to Rural Ozarks (RORO)**
Southwest MO                                                                                                      09/97-05/98
- Provided child, individual, and family therapy to clients in rural areas who were referred through school districts or local churches.  Treatment involved play therapy and brief-therapy utilizing a cognitive-behavioral approach.  Also performed evaluations with children to assist teachers and the family to better deal with problems that were exhibited.

**OTHER EXPERIENCE**
**Instructor, Drury University**                                                                               06/99-08/99
Springfield, MO
- Taught a sophomore level course in social psychology during a summer term.

**Graduate Assistant, Forest Institute of Professional Psychology**                      09/97-12/97
- Assisted in the objective laboratory class that focused on administering, scoring, interpreting, and report writing for intelligence assessment instruments.

**PUBLICATIONS/PRESENTATIONS**
James, M.T., Oropeza, P.P., Gray, B.T., & Gacono, C.B. (2002).  Use of the Rorschach in forensic settings for treatment planning and monitoring. *International Journal of Offender Therapy and Comparative Criminology*, 46, 294-307.

Ethical and methodological considerations for dangerousness risk assessment in a maximum-security psychiatric hospital. Presentation at the National Association of State Mental Health Program Directors (NASMHPD) Forensic Division. 2002 Annual Meeting in Seattle, WA.

# Exhibit 39

## Curriculum Vita of

## Shannon C. Miller, M.D., FASAM, FAPA, CMRO

# SHANNON C. MILLER, M.D., FASAM, FAPA, CMRO

### POINTS OF CONTACT

*BEST POINT OF CONTACT:*
937-245-0711 (cell)

Dual Diagnosis and Opioid Substitution Services
7 East
**VA Medical Center**
3200 Vine St.
Cincinnati, OH  45220
513-861-3100, x4870
or (888) 267-7873, x4870
shannon.miller@va.gov

**Lieutenant Colonel, USAFR**
Research Physician
**United States Air Force Research Lab**
AFRL/HEP
Biosciences and Protection Division
Wright-Patterson Air Force Base, OH 45433

**Forensic Addiction and Psychiatric Services, L.L.C.**
P.O. Box 211
Dayton, OH 45409
937-299-9204 (office)
smiller@forensicaddictions.com
www.forensicaddictions.com

## BIOGRAPHY

**Dr Shannon Miller** is a board-certified psychiatrist with additional certifications in Addiction Medicine and Drug Testing.  He is a native of Ohio and was awarded United States Air Force (USAF) scholarships in physics and pre-medicine for undergraduate training, and later a HPSP scholarship for medical school.  He completed residency in psychiatry at Wright Patterson USAF Medical Center/Wright State University in Dayton, Ohio prior to being assigned to Andrews Air Force Base in Washington, DC.  While there, he quickly rose in rank and position to Chief Administrative and Clinical Officer of the Department of Defense's (DoD) Tri-Service Addiction Recovery Center.  As Chief, he was given his first medal for vastly overhauling its service design; reducing cost per episode of care by $39,000 per patient, translating several cutting-edge research ideas into practice (earning one of few USAF Best Practice Awards from the Inspector General), and establishing his addiction line as DoD's #1 worldwide referral choice.

Hand-picked by the DoD as the Lead Agent/Author for the Veterans Affairs-DoD Practice Guidelines for Substance Use Disorders, Dr Miller has been active in a wide range of topics relating to addictions and has approximately 30 publications.  He exited the USAF in 2004 after 12 years of service and has since been sought out for his expertise on issues relating to addiction.  A national source on cough medicine addiction, he has been interviewed on *Dateline* (NBC).  He has co-chaired the American Society of Addiction Medicine (ASAM) Review Course and was selected by ASAM as one of 4 co-editors for their flagship textbook: *Principles of Addiction Medicine*.  He is one of the youngest of 400 physicians selected nationally as "Fellow" of ASAM and Co-Chaired the 2005 State of the Art Course in Addiction Medicine in Washington DC – ASAM's prestigious and most advanced scientific course, featuring Directors of NIDA, NIAAA, and a Nobel Laureate.  Dr Miller has been selected as a "Fellow" of the American Psychiatric Association.  He serves as Co-Editor of the *Journal of Addiction Medicine*, the official journal of the world's largest addiction medicine society; with a subscribership of over 3,000 physicians – the largest reader base of any journal relating to addiction medicine.

Throughout his career, Dr Miller has received numerous awards in teaching, leadership and clinical excellence; including the Humanism in Medicine Award (American Medical Association).  A prior USAF Residency Training Director, Dr Miller has continued his federal service with the Department of Veteran's Affairs.  He also serves as Associate Professor in Clinical Psychiatry at the University of Cincinnati where he is Co-Director of the Addiction Psychiatry Fellowship, Associate Director for Education in the Addiction Sciences Division, and Design Consultant for the Lindner Center of Hope – specializing in translational research and state-of-the-art clinical practice.  Dr Miller also serves as a reserve Lieutenant Colonel (research physician) at the USAF Research Lab.  His specific interests are the neurobiology of risk and protective factors as they relate to addiction and obesity, brain imaging, and combat post traumatic stress disorder; particularly Operation Iraqi Freedom.  He has earned grant funding in brain imaging research.  Dr Miller maintains a private practice in forensics, having been retained in about 30 cases, worldwide.

## EDUCATION

Air Command and Staff College
Air University, United States Air Force
1999-2000

Residency Training in Psychiatry
Wright Patterson Regional USAF Medical Center /Wright State University (Integrated)
Wright Patterson Air Force Base (AFB), Ohio
1992 - 1996

M.D., The Ohio State University College of Medicine
Columbus, Ohio
1988 - 1992

B.S., Otterbein College
Westerville, Ohio
Major: Life Sciences
Minor: Chemistry
**Summa Cum Laude/Valedictorian**
1984 - 1988

High School Diploma
Ohio
**Summa Cum Laude/Valedictorian**
**Varsity Athletics Letter Club Inductee**
1980 – 1984

## FACULTY APPOINTMENTS

**Associate Professor of Clinical Psychiatry** (Affiliated)
**Co-Director, Addiction Psychiatry Fellowship**
**Associate Director for Education in the Addiction Sciences Division**
College of Medicine
University of Cincinnati (UC)
October 2006 - present

**Associate Professor of Psychiatry**
Boonshoft School of Medicine
Wright State University (WSU)
April 2005 - present

**Associate Residency Training Director**, USAF, General Psychiatry
Wright State University School of Medicine
June 2002 – July 2004

Assistant Professor in Psychiatry
Wright State University School of Medicine
July 2001 – July 2004

Assistant Residency Training Director, General Psychiatry
Wright State University School of Medicine
July 2001 – June 2002

**Associate Residency Training Director**

National Capital Area (NCA) Military Psychiatry Residency Training Program
Uniformed Services University School of Medicine
Washington, DC
Sept 1997 - May 2001
**Assistant Professor in Psychiatry**
1996 - 2001

## MEDICAL STAFF APPOINTMENTS

**Design Leader,** Addiction Services
Lindner Center of HOPE Hospital
Mason, OH
October 2006 – present

Staff Psychiatrist
**Dual Diagnosis** Services
**Opioid Substitution** Services
**Ambulatory Detoxification** Services
Veterans Affairs Medical Center
Cincinnati, OH
October 2006 – present

**Lieutenant Colonel, USAF Reserves**
**Research Physician**
Biosciences and Protection Division
Human Effectiveness Directorate
United States Air Force Research Lab
Wright Patterson Air Force Base, Ohio
June, 2006 – present

**Consulting Forensic Addiction Psychiatrist**
Forensic Addiction and Psychiatric Services, L.L.C.
Dayton, OH
August 2004 - present

**Medical Director,**
Dual Diagnosis Rehabilitation Services
**Medical Director,**
Polysubstance Rehabilitation Services
Veterans Affairs Medical Center
Dayton, OH
October 2004 – October 2006

**Private practice of general adult psychiatry**
Dayton, OH
September 2004 – September 2006

**Medical Review Officer**
Wright Patterson Air Force Base, Ohio
July 2003 – June 2004

Acting Chief, Psychiatry
Wright Patterson Medical Center
Wright Patterson AFB, Ohio
Jan 2003 – Aug 2003; Jan 2004 – May 2004

Shannon C. Miller, M.D., FASAM, FAPA, CMRO     1/9/2007

**Medical Director, Alcohol & Drug Abuse Prevention & Treatment** (ADAPT)
Wright Patterson Medical Center
Wright Patterson AFB, Ohio
July 2001 – June 2004

Staff Psychiatrist
Advanced Therapeutic Services
Dayton, Ohio
Nov 2002 – May 2004

Staff Psychiatrist
Dayton Human Rehabilitation Center/**Correctional Medical Services**
Aug 2001 – Sept 2002 (facility closed)

**Chief, TriService Addiction Recovery Center**
➢   **Chief administrative & clinical officer (25 staff – USAF, civilian, USN)**
•   ASAM Levels of care 2.5 & 2.1 (Partial Hospitalization, Intensive Outpatient)
•   ASAM Levels of care 0.5 & 1.0 (ADAPT/Outreach, Outpatient Treatment Services)
•   Intake & Managed Care Authorization Services
•   **Family Recovery** Services
•   **Nicotine Addiction** Services
•   **Dual Disorder** Services
•   **Gambling Addiction** and **Sexual Addiction** Services
Malcolm Grow USAF Medical Center (MGMC)
Andrews Air Force Base, Maryland
May 1999 – June 2001

Staff Psychiatrist
The Family Health Center **(Pretrial and probationary mental health services)**
Hyattsville, Maryland
Oct 2000 – June 2001

Staff Psychiatrist
Ethos Foundation, Inc. **(Pretrial and probationary mental health services)**
College Park, Maryland
July 1998 – Sept 2000 (facility closed)

**Clinical Director, Inpatient Addiction Services (Detoxification & Dual Diagnosis/High Acuity)**
TriService Addiction Recovery Center
Andrews Air Force Base, Maryland
Aug 1997 -- May 1999

Attending Physician
Tri-Service Addiction Recovery Center
Andrews Air Force Base, Maryland
July 1996 – June 2001

## CREDENTIALS

**Fellow, American Psychiatric Association** (FAPA)
**Fellow, American Society of Addiction Medicine** (FASAM)
**Certification in Psychiatry,** American Board of Psychiatry and Neurology
**Certification in Addiction Medicine,** American Society of Addiction Medicine
**Certification in Drug Testing,** Medical Review Officer Certification Council
**SAMHSA/CSAT-authorized prescriber, Buprenorphine;** opiate detoxification, maintenance

Shannon C. Miller, M.D., FASAM, FAPA, CMRO      1/9/2007

Diplomate, National Board of Medical Examiners
Licensed, State of Ohio Medical Board: Dec 22, 1993 -- present

## ACADEMIC HONORS and AWARDS

### Military

- **Meritorious Service Medal (with oak leaf cluster),** USAF, July 1996 – June 2001
- **Meritorious Service Medal,** July 2001 – June 2004
- Air Force Outstanding Unit Award (with 2 oak leaf clusters)
- National Defense Service Medal (with bronze star)
- Air Force Longevity Service Award (with 1 oak leaf cluster)
- Expert Marksman Medal, Small Arms (earned twice)
- Air Force Training Ribbon

### Staff Physician

- **Resident's Faculty Recognition Award,** given 1 of 2 awards to faculty, by psychiatry residents, "In recognition of valued guidance and inspiration," WSU (2004)
- **Chair's Faculty Recognition Award,** "exemplary contributions to the Dep't of Psychiatry," WSU (2003)
- **Golden Apple Award,** single departmental award given for **"teaching excellence,"** WSU Psychiatry Residency Training Program (2003)
- **Janssen Pharmaceutica/Emory University "Future Leaders in Psychiatry"**
  - 1 of 87 Psychiatry faculty selected nationally to attend an educational and mentoring experience with the nation's leaders in psychiatry, 2002 January, Miami, Florida.
- Showcased by ASAM in a feature article for contributions to addiction medicine.  ASAM News, Jan 2002.
- **"Definitely Promote/My #1 Below the Promotion Zone physician." Given at both 1 and 2 years below the promotion zone/BTZ for Lt Colonel.** Given by Medical Group Commander/Brigadier General  (2000 & 2001)
- **Teacher of the Year Award** (PGYII), NCA Military Psychiatry Residency Program (2001)
- VHA- DoD Substance Use Disorder Practice Guidelines selected by Veterans Health Administration (VHA) and Department of Defense (DoD) as single pick/best practice model for illustrating to future practice guidelines authors how to properly apply evidence based principles.
- **"2001 Humanism in Medicine Award."** Sponsored by the **Organization of Student Representatives of the Assoc. of American Medical Colleges,** together with the **American Medical Association and** Pfizer, Inc.
  - Nominated and selected by 600+ medical students from all 4 classes at the Uniformed Services University (USU). This award recognizes faculty physicians at USU worldwide who "demonstrate not only superior technical competence and a drive to further their profession, but also embodied mentorship, displaying an active interest in the professional development of both students and colleagues and reinforcing professionalism through interactions with students and patients." (May 2001)
- **Selected as one of 20 national finalists** (among 180 applicants) for 10 positions for a 3-year fellowship program **"Developing Leadership in Preventing Substance Abuse," The Robert Wood Johnson Foundation** (May 2001)
- USAF Nominee to sit on National Council of Drug Abuse
- **USAF nomination by the Psychiatry Consultant to the USAF Surgeon General for the "Porter Award."** This award is given to the DoD psychiatrist who has contributed most to the mission of military medicine over the past year. (March 2001)
- Our restructuring of Addiction Services at Andrews AFB was **one of less than 10 Quality Improvement projects selected by the Department of Defense Office of Health Affairs, TriCare Management Activity (DoD/TMA)** as DoD examples to the Institute of Medicine (IOM) of QI initiatives that have progressed and shown results in improving care for beneficiaries.  (March 2000)
- Awarded **USAF Inspector General/Health Services Inspection "Best Practice Award."**  Concept and design of a Structured Living Environment recognized throughout USAF Medical Service for

enabling relocation of various inpatient services (IV drug therapy, aeromedical care, substance detoxification and rehabilitation, etc) to far more cost-effective outpatient care.  (Oct 2000)
- **PGYII Teacher of the Year Award** (PGII), NCA Military Psychiatry Residency Program (1997)

<u>Residency</u>

- **Most Outstanding Resident Award**
- **Ranked in the top 1 -2% of Psychiatry residents nationwide on Psychiatry Resident In-Training Examinations (PRITE)**
- **National Laughlin Fellow Nominee**
- *Letter of Appreciation,* Wright Patterson Medical Center
- *Letter of Exemplary Performance,* Wright Patterson Medical Center

<u>Medical School</u>

- **Dean's Letter of Commendation:  Neurosciences and Neuroanatomy**
- **Dean's Letter of Commendation:**  Gross Anatomy and Embryology
- **Dean's Letter of Commendation:**  Pediatrics Clinical Rotation
- **Dean's Letter of Commendation:**  OB-Gyn Clinical Rotation
- **Dean's Letter of Honors:**  Internal Medicine Clinical Rotation

<u>Undergraduate</u>

- Dean's List, every term
- Freshman scholastic honorary
- Science and math honorary
- Pre-med honorary
- Teleiotes (Mortar Board)
- Torch and Key- scholastic honorary
- **American Legion ROTC Scholar Award**
- Air Force ROTC Honors Ribbon- every year
- Air Force ROTC Physical Fitness Ribbon- every year
- **Air Force ROTC Scholarship** awarded in **Physics** (4 year)
- **Air Force ROTC Scholarship** awarded in **Pre-Health Professions** (3 year)
- Air Force ROTC Honor Flight Ribbon
- **Otterbein Presidential Scholarship**
- **Otterbein Life Sciences Departmental Scholarship**
- **Otterbein General Scholarship**
- **Local Rotary Club Scholarship**

## PROFESSIONAL SOCIETY MEMBERSHIPS

American Academy of Forensic Sciences, Associate Member (elected)
American Psychiatric Association
     Society of Uniformed Psychiatrists
American Society of Addiction Medicine
     Ohio Society of Addiction Medicine
Society for Neuroscience, Ohio Miami Valley Chapter
Ohio State Medical Association

## TEACHING

Shannon C. Miller, M.D., FASAM, FAPA, CMRO     1/9/2007

Training Rotations, Graduate Medical Education

- Addiction Psychiatry (MSIV selective), 1 month, WSU, 2005-6
- Addiction Psychiatry (PGY1), 1 month, WSU/WPAFB Psychiatry Residency, 2005-6
- Adult Psychiatry Clinic (PGY3), 1 year, WSU/WPAFB Psychiatry Residency, 2001-4
- Consultation & Liaison Psychiatry (PGY2), 1 month, WSU/WPAFB Psychiatry Residency, 2001-2
- Geriatric Psychiatry in Primary Care (PGY4), 1 month, WSU/WPAFB Psychiatry Residency, 2001-2
- Addiction Medicine (PGY2), 1month, DeWitt Army Med. Center Family Practice Residency, 1996-2001
- Addiction Psychiatry (PGY2), 1-2 months, NCA Military Psychiatry Residency, 1996-2001

Lectures, Graduate Medical Education

- *Dissociatives, Hallucinogens, Inhalants, & Steroids*. Clinical Case Conference series. 2006. Given to UC 3rd-Year Medical Students
- Neurobiology Series: *Reward & Addiction Circuitry*. 2 lectures. 2006. Given to WSU PGY3 Psychiatry Residents
- *Child and Adolescent Substance Abuse*. Dec 2004. Given to WSU Child & Adolescent Psychiatry Fellows.
- *Addiction Psychiatry*. 9 lectures. Feb-Mar 2004-6. Given to WSU PGY1 Psychiatry residents
- *The management of sedative-hypnotic, opioid withdrawal syndromes.* Given to Wright Patterson Medical Center Emergency Medicine Department. 22 Jan 2004.
- *The diagnosis and practical neurobiology of addiction.* Given to Wright Patterson Medical Center Dental Department. 2004.
- *The DoD GME Selection Board: how to navigate your career successfully.* Given to WP USAF Psychiatry Residents. 2004.
- *Street drugs.* Given to WSU 2nd year medical student class. 2003 October.
- *Neurobiology of addiction disorders, Motivational enhancement therapy and stages of change, Drug testing, Hallucinogens & dissociative anesthetics* Given to WSU PGY I and PGYIV psychiatry residents. 2002-2003.
- *Pharmacotherapy, patient panel.* Given at NCA US Navy Intern Annual Addictions Conference, Washington, DC. 1996-2001.
- *USAF mental health services.* Given to DOD Triservice Medical Law Consultant Course, Washington, DC. 1998-1999.
- **Co-Course Director**, Basic Psychiatry, NCA Psychiatry Residency Didactics. 1997-1998.
- *Addiction disorders(3 varying topics).* Given to NCA psychiatry PGY2's. 1999-2000.
- *Psychotic disorders (3 varying lectures).* Given to NCA psychiatry PGY2's. 1999.
- *Anxiety disorders(5 varying lectures).* Given to NCA psychiatry PGY2's. 1999.
- *Neurobiology of psychotic disorders (3 varying lectures).* Given to NCA psychiatry PGY2's. 1997.
- *Pharmacokinetics and pharmacodynamics.* Given to NCA psychiatry PGY2's. 1997-2000.
- Small Groups Leader (MSII), Uniformed Services University (1996-1998)
- *Introduction to the medical work-up of patients.* Given to NCA psychiatry PGY2's. 1996.
- *Neurobiology of anxiety disorders (3 lecture series).* Given to NCA psychiatry PGY2's. 1996-1997.
- Small Groups leader (MSII), WSU, Behavioral Science program. 1995-6.
- *Clerkship responsibilities, Biological therapies for mental disorders, Psychotherapies: basic theoretical principles and techniques, Child and adolescent psychiatry, Somatoform and factitious disorders.* Given to MSIII, WSU Clerkship rotation lectures.

## PUBLICATIONS & FORMAL PRESENTATIONS

### PRINTED SCHOLARSHIP

Shannon C. Miller, M.D., FASAM, FAPA, CMRO    1/9/2007

**Co-Editor, Journal of Addiction Medicine.**  Official journal of the American Society of Addiction Medicine.  March 2006 – present.  Library of Congress ISSN: 1932-0620.
- **Official journal of the world's largest addiction medicine society**
- Subscribership of over 3,000 – **largest reader base of any journal relating to addiction medicine.**
- **Senior Editor:  George Koob, PhD**

## Books

(in press) Ries RK, Fiellin D, Miller SC, Saitz R, **editors.  Principles of Addiction Medicine. 4th ed.** Chevy Chase, Maryland: The American Society of Addiction Medicine, Inc.; 2008, April: **> 1600 pages, > 100 chapters, > 200 authors.**

Wilford B, Miller SC, Salsitz E, editors.  ASAM Review Course in Addiction Medicine: Study Guide. Chevy Chase, Maryland: The American Society of Addiction Medicine, Inc.; 2004 November. (CD-ROM)

Wilford B, Miller SC, Salsitz E, editors.  ASAM Review Course in Addiction Medicine: Study Guide. Chevy Chase, Maryland: The American Society of Addiction Medicine, Inc.; 2002 September.

## Articles (Peer Reviewed)

(accepted) Miller SC, Schulz P, Wunsch M, Salsitz E.  Language and Addiction. **Journal of Addiction Medicine** 2007 Spring: TBA.

(accepted) Miller SC, Wunsch MJ. Welcome letter from the editors. **Journal of Addiction Medicine** 2007 Spring: TBA.

Miller SC.  Language and Addiction. **American Journal of Psychiatry** 2006 Nov; 163(11):2015.

Miller SC.  Dextromethorphan psychosis, dependence, and physical withdrawal. **Addiction Biology** 2005 Dec; 10(4):325-7.

Miller SC.  Treatment of dextromethorphan dependence with naltrexone. **Addictive Disorders and Their Treatment.** 2005 Dec; 4(4):145-8.

Miller SC.  Psychiatric effects of ephedra: addiction. **American Journal of Psychiatry** 2005 Nov; 162(11):2198.

Sumitra L, Miller SC.  Pathologic gambling disorder. **Postgraduate Medicine** 2005 July; 118(1):31-37. Available at  http://www.postgradmed.com/issues/2005/07_05/sumitra.htm

Bobo WV, Miller SC, Martin BD.  The abuse liability of dextromethorphan among adolescents: a review. **Journal of Child and Adolescent Substance Abuse** 2005 Summer;14(4):55-75.

Miller SC.  *Coricidin ® HBP Cough and Cold* Addiction. **Journal of the American Academy of Child and Adolescent Psychiatry** 2005 June; 44(6):509-510.

Miller SC. Ephedra and FDA. **Psychiatric News** 2004 April 2;39(7):66,76.

Miller SC.  Safety concerns regarding ephedrine-type alkaloid-containing dietary supplements. **Military Medicine** 2004 February;169(2):87-93.  **{first article}**

Miller SC, Waite C.  Ephedrine-type alkaloid-containing dietary supplements and substance dependence. **Psychosomatics** 2003 November - December;44(6):508-511.

Bobo WV, Miller SC.  Ketamine as a preferred substance of abuse.  **American Journal on Addictions** 2002 Fall;11(4):332-4.

Miller SC. Self Assessment in Psychiatry: Substance dependence - review questions. **Hospital Physician** 2002 July:29-30.

Bobo WV, Miller SC, Smith CJ.  Possible physiologic dependence on dextromethorphan. **Western Journal of Medicine** 2002 May;Vol 176(5).  (Available from Dr Miller)

Bobo WV, Miller SC.  Complicated dual diagnosis: a case for physician involvement in addictions treatment.  **International Journal of Psychiatry and Medicine** 2001; 31:233-5.

Miller SC.  Doxycycline-induced lithium toxicity.  **Journal of Clinical Psychopharmacology** 1997 Feb; 17(1):54-5.

Miller SC.  Methylphenidate for clozapine sedation.  **American Journal of Psychiatry** 1996 Sept; 153:9:1231-2.

## Articles (Invited)

Miller SC. Nicotine Use Disorders. In: Psychiatry board review manual. **Hospital Physician** 2004 May;8(2):1-11.

Miller SC. Raves and Club Drugs. In: Psychiatry board review manual. **Hospital Physician** 2002 Feb;7(1):1-12.

Miller SC, Brown, J. Alcohol use disorders. In: Psychiatry board review manual. **Hospital Physician** 2002 May;6(2):2-12.

## Articles (Non Peer Reviewed)

Salsitz EA, Miller SC. Perspectives: the language of addiction.  American Society of Addiction Medicine News. 2002 November/December;17(6):13.

Muller C, Lauber S, Miller S, LeBegue B.  September is national alcohol and drug addiction recovery month. Skywrighter 2002 Sept.

Lauber S, Miller S, LeBegue B.  Being a responsible drinker. Skywrighter 2001 Dec 14.

Bobo WV, Miller SC, Jackson J.  DM (Dextromethorphan): a store-bought dissociative?  American Society of Addiction Medicine News.  2001 July-August;16(4):5.

## Chapters in Books

Bobo WV, Miller SC, Jackson J. Dextromethorphan as a drug of abuse. In: Graham  AW, Schultz TK, Ries RK, Mayo-Smith M, editors.  **Principles of Addiction Medicine**.  3rd ed.  Chevy Chase, Maryland: The American Society of Addiction Medicine, Inc.; 2003: 154-5.

Nasrallah HA, Smeltzer DJ, Miller SC.  Psychotic disorders. In: Silver JM, Yudofsky SC and Hales RE, editors.  **Neuropsychiatry of traumatic brain injury**. Washington, DC: American Psychiatric Press; 1995. p. 251-84.

## Papers Published in Full in Official Proceedings

None

## Book Reviews

None

## Abstracts

Miller SC.  The neurobiology of dextromethorphan addiction.  Neuroplasticity in Health and Disease: Strategies for Recovery.  **3rd annual Cincinnati Translational Neuroscience Symposium.**  Cincinnati, OH.  2005 March 11-12.

## Technical Reports

Caraballo P, Flynn J, Goodman F, Miller SC, Rosenberg J, Willenbring M, et al, editors/authors.  **Clinical Practice Guideline for the Management of Opioid Therapy for Chronic Pain.**  Veterans Health Administration and Department of Defense, 2003 March.  Available online @ **http://www.oqp.med.va.gov/cpg/cot/ot_base.htm**

Provided significant input to re-publishing of Air Force Instruction 48-123: Medical Examinations and Standards.  Jan 2002.

Kivlahan D, McNicholas LF, Willenbring M (Lead Editors/Authors for the Department of Veterans Affairs); Miller SC (**Lead Editor, Author for the Department of Defense**); Susskind O (facilitator).  **Clinical Practice Guideline for the Management of Substance Use Disorders in the Primary Care Setting**.  Veterans Health Administration and Department of Defense, 2001 April.  Available online @ http://www.cs.amedd.army.mil/qmo/substance%20abuse/substance.htm and in print.

Campise R, Miller SC, Bradley EC, Morrow CW, Green DD, Roberts D.  Concept of operations for mental health facilities in a deployed setting.  Air Force Medical Service, USAF.  1999 October 1.

## Unpublished Studies

(closed, not to be published) As a resident, involved as an investigator at WPAFB Medical Center in a study of Complex Post-Traumatic Stress Disorder in perpetrators of domestic violence at WPAFB.  The study was designed to determine if perpetrators of domestic violence have higher rates of Complex PTSD than matched, non-patient controls.

# PRESENTATIONS

## International

Miller SC.  Hallucinogens, Dissociatives (including dextromethorphan), Steroids, and Inhalants.  Given at **Review Course in Addiction Medicine.**  American Society of Addiction Medicine. Toronto, Ontario, Canada. Sheraton Centre. 2004 November 5.

## National

Miller SC.  Hallucinogens, Dissociatives, Steroids, and Inhalants.  Given at **Review Course in Addiction Medicine.**  American Society of Addiction Medicine. Chicago, Ill. 2006 October 28.

Miller SC. Brain Research and Combatant Effectiveness: New Opportunities for the Department of Defense. **United States Air Force Research Lab.** WPAFB, Dayton, Ohio and Brooks Air Force Base, Texas (live, via video-teleconferencing). 2006 Jan 4.

Miller SC, Kennedy N (Moderators, Case Presentation, Panel Discussants).  Terror, Trauma, and Addiction.  Given at **State of the Art in Addiction Medicine**.  American Society of Addiction Medicine.  Washington, DC.  Hyatt Regency Capitol Hill.  2003 November 1.

Miller SC, Salsitz E, Payte T. Clinical case panel discussion.  Given at **Review Course in Addiction Medicine**. American Society of Addiction Medicine. Chicago, Illinois. Westin O'Hare. 2002 October 25.

Miller SC, Salsitz E, Weirs C. What to expect of the certification exam.  Given at **Review Course in Addiction Medicine.** American Society of Addiction Medicine. Chicago, Illinois. Westin O'Hare. 2002 October 25.

Miller SC, Salsitz E, Weirs C, Haynes T. A report on credentialing: the status of certification and ABMS recognition of Addiction Medicine. Given at **Review Course in Addiction Medicine**. American Society of Addiction Medicine. Chicago, Illinois. Westin O'Hare. 2002 October 26.

Miller SC.  Practice Guidelines for Substance Use Disorders (poster presentation).  **Future Leaders in Psychiatry**.  Emory University School of Medicine/Janssen Pharmaceutica.  Miami Beach, Florida.  2002 April 13.

Kivlahan D, McNicholas LF, Miller SC, Suchinsky R, Willenbring M.  Evidence-based treatment for substance use disorders.  **Nationally televised live/interactive broadcast.**  St Louis (MO): Departments of Veterans Health Affairs and Department of Defense; 2001 Oct 31.

Bobo WV, Miller SC.  The abuse liability of dextromethorphan.  Noon conference.  **Substance Abuse and Mental Health Services Administration (SAMHSA).**  Washington, DC. 2001 May 1.

Miller SC: Date rape drugs: review and update.  **Department of Defense/ MCIO sex crimes and family violence conference**.  Andrews Air Force Base, Maryland.  2000 August 29.

## Grand Rounds

Miller SC:  Alcohol Use Disorders, Brain Addiction Circuitry, and Pharmacotherapies.  Grand rounds (psychiatry).  **University of Texas at San Antonio** (UTSA) and broadcasted live to San Antonio State Hospital, the Regional Academic Health Center (Harlington, TX), the **School of Aerospace Medicine** (Brooks Air Force Base), Brooke Army Medical Center, and **Wilford Hall USAF Medical Center**.  San Antonio, Texas. 2006 Jan 24.

Miller SC.  Raves and club drugs.  Grand rounds (psychiatry). Wright State University School of Medicine.  Dayton, Ohio. 2001 December 11.

Miller SC.  Drug-facilitated sexual assault.  Grand rounds (psychiatry). Wright State University School of Medicine.  Dayton, Ohio.  2001 August 21.

Miller SC:  Raves and club drugs.  Grand rounds (family practice).  Malcolm Grow USAF Medical Center.  Andrews Air Force Base, Maryland.  2001 June.

Bobo WV, Miller SC.  The abuse liability of dextromethorphan.  Grand rounds (psychiatry).  **Walter Reed Army Medical Center**.  Washington, DC.  2001 April 11.

Miller SC.  Drug-facilitated sexual assault.  Grand rounds (family practice).  Malcolm Grow USAF Medical Center.  Andrews Air Force Base, Maryland.  2000 September 22.

Miller SC:  Drug-facilitated sexual assault.  Grand rounds (psychiatry).  **Wilford Hall USAF Medical Center & University of Texas at San Antonio**, Lackland Air Force Base/San Antonio, Texas.  2000 August 22.

Miller SC.  Primary care screening and assessment of addiction disorders.  Grand rounds (family practice).  Malcolm Grow USAF Medical Center.  Andrews Air Force Base, Maryland.  2000 April 4.

Miller SC.  Alcoholism.  Grand rounds (internal medicine).  Malcolm Grow USAF Medical Center.  Andrews Air Force Base, Maryland.  1999 February 5.

Miller SC.  Chronic effects of alcohol on human cognition.  Grand rounds (psychiatry).  **Walter Reed Army Medical Center**.  Washington, DC.  1998 May 20.

Miller SC.  Methylphenidate for clozaril sedation (poster presentation).  Grand rounds (psychiatry).  Wright State University School of Medicine.  Dayton, Ohio.  1995 May 2.

Miller SC.  Doxycycline induced lithium toxicity (poster presentation).  Grand rounds (psychiatry).  Wright State University School of Medicine.  Dayton, Ohio.  1995 May 2.

## Local

Miller SC. Bridging Research and Clinical Practice: Advancing Treatment for Alcohol dependence. Vivitrol® (Naltrexone extended release/injectable suspension). Columbia Tusculum, OH. 2006 Oct 24.

Miller SC. Bridging Research and Clinical Practice: Advancing Treatment for Alcohol dependence. Vivitrol® (Naltrexone extended release/injectable suspension). Columbus VA Outpatient Clinics, OH. 2006 Sept 26.

Miller, SC.  Acamprosate/Campral®. Dayton, OH. 2006 Aug 31.

Miller SC. Bridging Research and Clinical Practice: Advancing Treatment for Alcohol dependence. Vivitrol® (Naltrexone extended release/injectable suspension). Outpatient Addiction Clinic, Worthington, OH. 2006 Aug 2.

Miller SC. Bridging Research and Clinical Practice: Advancing Treatment for Alcohol dependence. Vivitrol® (Naltrexone extended release/injectable suspension). Addiction Services, Dayton VA Medical Center, OH. 2006 July 13.

Miller, SC. Alcohol Use Disorders. Oakwood (Dayton), Ohio. 2005 Dec.

Miller, SC.  Alcohol Use Disorders.  Norwood (Cincinnati), Ohio. 2005 July.

Miller SC, Young N.  Morbidity and Mortality Rounds: a case of alcohol dependence.  Departmental presentation. Wright Patterson USAF Medical Center.  Wright Patterson Air Force Base, Ohio.  2003 Apr.

Weaver J, Miller SC.  Pharmacotherapies for Pathological Gambling Disorder.  Departmental presentation, Psychiatry.  Wright State University School of Medicine.  2003 March 12.

Miller SC.  Military Mental Health Issues.  Military Unique Curriculum. Wright Patterson Medical Center. 2003 June 12.

Miller SC.  Nuts and Bolts of Detoxification Management in the ICU, MSU. Wright Patterson USAF Medical Center.  Wright Patterson Air Force Base, Ohio.  2002 Dec.

Miller SC. Detoxification. Departmental conference (mental health). Wright Patterson USAF Medical Center. Wright Patterson Air Force Base, Ohio. 2002 May 3.

Miller SC. Deployment: What it's like, how to cope, & what to bring. Departmental conference (mental health). Wright Patterson USAF Medical Center. Wright Patterson Air Force Base, Ohio. 2002 April 4.

Miller SC. Drug-facilitated sexual assault. Departmental conference (mental health). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 2000 October 12.

Miller SC. Rohypnol: date rape drug of the 90's. Departmental Conference (addictions). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 2000 February.

Miller SC. Intensive Addiction Services and cost analysis. Departmental offsite. Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 2000 January.

Miller SC. Treatment planning. Departmental conference (mental health). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 1999 December.

Miller SC. Closure of inpatient addictions unit: a quality improvement & business case analysis. JCAHO Presentation/Hospital Conference. Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 1999 October.

Miller SC. Neurobiology of addiction disorders. Departmental conference (mental health). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 1999 May.

Miller SC. Outpatient detoxification. Departmental conference (mental health). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 1999 March.

Miller SC. Chronic effects of alcohol on human cognition. Departmental conference (mental health). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 1998 January.

Miller SC. The development and use of the university of Toronto's narcotic withdrawal assessment tool: CINA. Departmental conference (mental health). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 1996 September.

Miller SC. Substance abuse group therapy -- traditional and interpersonal models. Departmental conference (mental health). Malcolm Grow USAF Medical Center. Andrews Air Force Base, Maryland. 1996 August.

## GRANTS AND CONTRACTS

Submitted: Circadian and thermoregulatory mechanisms of cocaine-induced reward in cocaine-addicted humans. 3/1/07 - 2/28/09. Role: Co-Investigator. Funding: National Institutes of Health (NIH) - National Institute on Drug Abuse (NIDA), R21, $TBA.

**Awarded:** (Brain-imaging study using Magnetic Resonance Imaging/MRI modalities to study risk factors for the onset of nicotine addiction). 5/07 – 5/09. Role: **Principal Investigator**. Funding: University of Cincinnati College of Medicine. **$6,500.** Scored: top third group of 54 applications.

**Awarded:** (Brain-imaging study using Magnetic Resonance Imaging/MRI modalities to study risk factors for the onset of nicotine addiction). 5/06 – 5/08. Role: **Principal Investigator**. Funding: Boonshoft School of Medicine. **$7,100**.

**Scored**, 1st attempt (220): (A study using Positron Emission Tomography/PET to evaluate the pathophysiology of cocaine addiction). Applied 2003. Role: Co-Principal Investigator. Funding: **National Institute on Drug Abuse, Cutting Edge Basic Research Award/CEBRA**, $252,000

## Speaker/Consultant

Cephalon Pharmaceuticals, Inc. (Speaker)
Forest Pharmaceuticals, Inc. (Speaker)
Reckitt Benckiser, Inc. (Speaker)

## REVIEWER FOR PEER-REVIEWED JOURNALS

**Journal of Addiction Medicine:** American Society of Addiction Medicine
**American Journal on Addictions:** American Academy of Addiction Psychiatry
**Psychosomatics:** American Psychiatric Publishing, Inc.; American Psychiatric Association

## REVIEWER FOR CONTINUING MEDICAL EDUCATION CURRICULA

The Professional Television Network, Content Review Board for Physicians
International Doctors in Alcoholics Anonymous (1.5 day conference)

## INTERVIEWS

Williams, Natasha. Returning troops, PTSD, and Addiction. WHIO-TV Channel &. CBS. Dayton, OH. Aired 11 November 2005.

Mitchell, Kim. Dextromethorphan Addiction. Daily Times. Salisbury, MD. 2005.

Magnus E. Bad Medicine. **Dateline, NBC News**. **Aired nationally** March 26, 2004.

Burcham L. Convenience store high: how ordinary cough medicine is being abused for its mind-altering effects. [The NCADI Information Reporter, **The US Department for Health and Human Services and the Substance Abuse and Mental Health Service's National Clearinghouse for Alcohol and Drug Information website**]. June 12, 2001. Available at:http://www.health.org/newsroom/rep/170.aspx. Accessed December 2, 2004.

## QUOTATIONS IN

Whitacre, Diana. (**Ephedra** Dietary Supplements). **University of California at Las Angeles (UCLA) Daily Bruin**. Las Angeles, CA. 2006 November 8.

West, William F. Attorney: **Date-rape** drug test negative in **lacrosse case**. **Durham Herald Sun**. Raleigh-Durham, NC. 2006 Aug 30.

Magnus E. Bad Medicine. Dateline, NBC News. Re-Aired nationally on Cover to Cover, **CNBC**, January 19, 2005.

Magnus E. Bad Medicine. [Dateline, **NBC News website**]. March 27, 2004. Available at: http://msnbc.msn.com/id/4608341/. Accessed Dec 2, 2004.

Language makes a difference. **Addiction Treatment Forum** Spring 2003; 12(2):8.

"It's just cough medicine" – think again. [TAADAS (Tennessee Association of Alcohol and Drug Abuse Services) website]. Available at: http://www.taadas.org/factsheets/DXM.htm. Accessed Dec 2, 2004.

## FORENSIC ADDICTION MEDICINE CONSULTATIONS

**CIVILIAN COURTS** – Since 2004, consulted for multiple cases in:

- Europe (Germany)
- *Alabama*
- Arizona
- California
- *Florida*
- Hawaii
- Illinois
- *Indiana*

- Kentucky
- New York
- Maryland
- Massachusetts
- *Missouri*
- North Carolina
- *Nevada*

- *Ohio*
- Oklahoma
- *Pennsylvania*
- *South Carolina*
- *Texas*
- Virginia
- Washington, DC

**Issues have involved:**

- addiction (cause of)
- assault
- *bipolar disorder*
- *buprenorphine*
- *cognitive effects of alcohol, methamphetamine*
- competency
- *class-action suit*
- *death penalty*
- *disability*
- *disorderly conduct*
- *drug testing*
- ephedra products
- *failure to control vehicle*
- *gambling addiction*

- hair testing
- *homicide (triple)*
- *intoxication*
- life-expectancy (impact of addiction on)
- *mail fraud*
- *malpractice*
- *methadone maintenance*
- *motor vehicle accident*
- *operating vehicle while intoxicated*

- pain (chronic)
- *parental rights*
- physician impairment
- *police brutality*
- pornography
- *prescription medication abuse/addiction*
- *public intoxication*
- *rehabilitation*
- *robbery*
- sexual addiction
- *suicide*
- tolerance
- *vehicular homicide*
- withdrawal
- *wrongful death*

**... as well as a wide array of drugs of abuse:**

- alcohol
- *cannabis*
- *cocaine/crack*

- *cough medicine*
- *dextromethorphan*
- GHB
- *Heroin/opiates/ narcotics*

- *methamphetamine*
- nicotine
- oxycontin

Retained by Prosecution, Defense, and Plaintiff in multiple cases (italicized above), including federal.

**MILITARY COURTS** - Between 1999 - 2002, consulted for multiple cases in:

- Europe (Germany)
- California
- Colorado
- District of Columbia
- Florida

- Georgia
- Illinois
- Maryland
- New Jersey

- New Mexico
- Oklahoma
- Multiple others

**Issues have involved:**

- amnesia

- blackouts

- creating a disturbance

Shannon C. Miller, M.D., FASAM, FAPA, CMRO     1/9/2007

- date rape drugs
- pain – chronic
- public intoxication
- rape
- toxicology
- violence

- frontal-lobe
- larceny
- murder
- public nudity
- sexual assault

**... as well as a wide array of drugs of abuse:**
- alcohol
- amphetamine
- cannabis
- cocaine
- ecstasy (MDMA)
- gambling addiction
- heroin
- ketamine
- lysergic acid (LSD)
- methamphetamine
- psilocybin

**Consulted by Prosecution, Defense, and Office of Special Investigations (OSI) in 17+ cases, including VIP's, flag officers, and Chief Master Sergeants**

## SERVICE AND ACADEMIC OUTREACH

### Staff Psychiatrist

- Member, Graduate Medical Education/CME Committee, American Society of Addiction Medicine
- Forensic services volunteered to the VA (defense): Pickering vs US.
- Member, Physician Compensation Panel, Veterans Affairs Medical Center, Dayton, OH, March 2006 - present
- Led efforts to bring new addiction medications to the Dayton VA: Campral/Acamprosate, Suboxone/Buprenorphine, Vivitrol/Naltrexone IM
- SATP re-alignment committee, Dayton VA
- Nursing issues/orders committee, Dayton VA
- **Co-Chair, American Society of Addiction Medicine "State of the Art" Conference.** Washington DC. 2005.
    - 3-day conference for over 350 attendees provided an important link between **cutting-edge scientific research** and clinical practice. It directly involved the institute directors for the **National Institute on Drug Abuse (NIDA), the National Institute on Alcohol Abuse and Alcoholism (NIAAA), the Substance Abuse and Mental Health Services Administration (SAMHSA), the Center for Substance Abuse Prevention (CSAP),** and other agencies. The course showcased the **most recent findings in addiction research, with the nation's leading addiction researchers and NIH directors as speakers; including a Nobel Laureate.**
- Psychobiology Committee, Department of Psychiatry, Boonshoft School of Medicine, WSU
- Selection Committee for Department Chair, Psychiatry, Dayton VAMC
- **Editorial Panel and Reviewer,** Principles of Addiction Medicine. 3rd ed. Chevy Chase, Maryland: The American Society of Addiction Medicine, Inc.; 2003
- **Co-Chair, American Society of Addiction Medicine "Review Course in Addiction Medicine."** Chicago. 2002, again in 2004.
    - 3-day conference that **trained 440 physicians** in the principles and practice of addiction medicine. Delivered services under budget (under $155,000 set limit) and on time. **Recruited and facilitated international caliber faculty;** including the Director of the National Institute of Drug Abuse and selected faculty from distinguished addiction medicine institutions (Betty Ford Center, Johns Hopkins, Haight Ashbury Free Clinics, Georgetown, etc.). International level audience/attendance from Saudi Arabia, Australia, Great Britain, Hong Kong, Canada, India, etc. Exit surveys revealed 98.5% of attendees felt conference met stated objectives and also enhanced professional skills/effectiveness.
- Professional Education Committee, WPAFB (2001-2004)
- Process Action Team Member, CHCS Consultation and Referral System. Wright Patterson Medical Center. July 01 – Oct 01.
- **Internal Planning Committee, American Society of Addiction Medicine "State of the Art Conference," Washington DC. 2001, 2003.**
- Team Chief, Mental Health Augmentation Team (July 00 - June 01)
- **Practice Guidelines Committee, The American Society of Addiction Medicine (ASAM) (Aug 2000-July 01)**

- **DoD Super Champion (top representative for Army, Navy, Coast Guard, and Air Force)**, VA-DoD Substance Abuse Disorders Practice Guidelines Mar 2000 - June 2004
- Medical Review Officer and Cross Functional Oversight Committee Representative for Malcolm Grow USAF Medical Center (1996-2001)
- Co-Founder, National Capital Area Military Psychiatry Residency PGY III Training Year experience at Malcolm Grow USAF Medical Center Outpatient Mental Health Clinic (Jan 2000)
- **Curriculum Committee, The American Society of Addiction Medicine (ASAM)** (1999- 2001)
- **Vice President, Society of Uniformed Psychiatrists, District Branch of The American Psychiatric Association** (1999- 2000)
- MGMC Action Workout Team (reducing ER admission Times)
- Company Grade Officer of the Quarter Selection Board (Dec 98)
- National Capital Consortium Search Committee for Forensic Psychiatry Program Director (Oct 98)
- **Conceptualized, developed, marketed and deployed the first ever NCA "At Home" call experience for psychiatry residents-** expanded manning, improved morale
- Policy Committee, NCA Military Psychiatry Residency Program (1997-2001)
- PGYII Committee, NCA Military Psychiatry Residency Program (1997-2001)
- Professional Education Committee Member, MGMC (1997-2001)

## Residency

### (PGYIV)
- Voting Member, Dayton Area Graduate Medical Education Consortium
- Voting Member, WSU School of Medicine Residency Education Committee
- Voting Member, WSU School of Medicine **Institutional Review Board**
- Member, Dept of Psychiatry Medical Student Task Force Committee
- Volunteer, Medical Student Psychiatry Interest Group
- Participant, WPAFB Residency Review Committee

### (PGY III)
- Member, Medical Student Task Force Committee
  - Goal was to increase medical student interest in psychiatry; that year, WSU was officially recognized by the American Psychiatric Association as having 2-3 times the national average of medical students enter psychiatry residency training
- Participant, first "Managed Care Retreat" held at WPAFB to begin the process of bringing WPAFB psychiatric services in line with managed care guidelines

### (PGY II)
- One of two residents in the department who served on work groups which began the process of restructuring the department after new Chair and leadership installed.
- Volunteer, American Psychiatric Association Depression Screening Program

### (PGY I)
- None

## Medical School

- Member, Curriculum Evaluation Committee
- Military Student Interest Group
- Contributing editor of the *Toad Manual* (orientation book for new medical students)
- College of Medicine Tour Guide

## Undergraduate

- College Senator
- Member, Campus Programming Board
- Science Fair Judge

Shannon C. Miller, M.D., FASAM, FAPA, CMRO     1/9/2007

- College Freshman Orientation Assistant
- Dormitory Resident Assistant (85-86)

## OTHER LEADERSHIP & EXTRACURRICULAR ACTIVITIES

### Staff Psychiatrist

- Records Custodian, DoD Graduate Medical Education Selection Board, Psychiatry. 2003.
- **Deployed (status-post Sept. 11th terrorist attacks), Operation Enduring Freedom, 2002.**
- **TriService Addiction Recovery Center**: In 2 years, reduced the cost for rehabilitation services from $42,000/patient to $3,100/patient; reduced costs by $1.134 million/year.  Doubled and broadened referrals, resulting in the **first ever proven cost effective hospital service** at Malcolm Grow USAF Medical Center (Debits {salaries + operations costs + facility maintenance} - Credits {billing valuations} resulted in as much as $18,000 "profit" per month).
- Founded Intensive Outpatient Addiction Services (IOS) at MGMC (June 99)
- Co-Founded Patient Work Program at MGMC (Oct 99)
- Created TriSARC Treatment Plan document which strikes unique balance between JCAHO requirements and clinical usefulness - -adopted Flight-wide as benchmark
- **USAF Mental Health Rapid Response Global Mobility Team** (Sole psychiatrist to serve on **USAF'S Pilot Team**, product praised by the Surgeon General, USAF)
- Board of Directors, (local) Homeowners Association, Inc. (1999-2000)
- Secretary, homeowner's association Architectural Review Board (96-98)
- **Inpatient Working group leader** tasked with reorganizing the inpatient addiction services. Outlined a **paradigm shift in how the Air Force could provide treatment for addiction disorders** (originated the following quality improvements:  **variable length of stays** reducing bed days and costs by over 50%, created **individualized treatment services** to better suit dual-disorders, pioneered smoking cessation programming in parallel with other addiction rehabilitation, originated the concept of utilizing **outcome measurement tools).**

### Residency

**(PGYIV)**
- Volunteer, WSU Student To Student Program
  - Gave user-friendly presentations to the public on selected topics in psychiatry and mental health; this included facilitating several group discussions between 46 local fourth graders on the topic of depression and suicide; several children had recently committed suicide in the same school system

**(PGY III)**
- Elected Social Chair
- *Neighborhood Pride Award* recipient (recognized by city & mayor)

**(PGY II)**
- Elected Class Representative

**(PGY I)**
- Volunteer, Mentor Program, 2 medical students

### Medical School

- **Advisor,** Fraternity, Otterbein College

### Undergraduate

- Fraternity
  - **President** (1987-1988)

Shannon C. Miller, M.D., FASAM, FAPA, CMRO     1/9/2007

- o **Rush Chair for two consecutive terms** (1985-1986, 1986-1987)
- o Interfraternity Council Representative (1984-1985)
- o *Fraternity Active of the Year -* two consecutive years (1987, 1988)
- o *Pledge of the Year* (1984)
- o *Scholastic Achievement Award*
- o Intramural football, basketball, softball, and Greek Olympics
- o *Run for Life* (charity benefit)-- Prizes Director
- o *Walk for Life* (charity benefit)-- Co-founder, Prizes Director
- Greek honorary
  - o Secretary, Treasurer
- **Senior Advisor,** Freshman Scholastic Honorary
- **President,** Freshman Scholastic Honorary
- Vice-President, Math and Science Honorary
- Air Force ROTC, The Ohio State University: Chief, Community Relations
- Nursing Assistant/Orderly, Nursing Home, (87-88)

## **PERSONAL**

<u>Hobbies</u>
Gardening
Sightseeing
Spending time with the family

Shannon C. Miller, M.D., FASAM, FAPA, CMRO      1/9/2007

# Exhibit 40

## Interview of Carmen Hayes

### Interview of Carmen Hayes

**Officer 2:** _____, could you state your full name?

**Carmen:** Carmen Lee Hayes.

**Officer2:** Okay. What is your date of birth?

**Carmen:** ██████. •

**Officer2:** Okay. And as you are aware, I'm here in order _____ an incident that involved Andre. Correct?

**Carmen:** Yes.

**Officer2:** Okay. Could you tell me, start from this morning...earlier you told me Andre got up.

**Carmen:** I heard the door...the door shut and now that I'm thinking about it, it was probably about 6:30 in the morning and I almost stopped him, but I didn't. 'Cause I was tired and I didn't see where he was going.

**Officer2:** And when you're saying him, who are you referring to?

**Carmen:** Andre.

**Officer2:** Andre...?

**Carmen:** Thomas.

**Officer2:** Thomas. Okay. And you live with him, correct?

**Carmen:** Yes.

**Officer2:** And how long have you been living with him?

**Carmen:** I've been staying her for about 2 weeks, but I technically moved in on Tuesday.

**Officer2:** Okay. Um, now then tell me what happened after that.

**Carmen:** Um, I went back to sleep and Isaiah gives...knocked on the door and was like, Andre, Andre, and he opened the door. And I thought Andre was there, 'cause I had heard the door open and close a couple of times, so I thought he may have come back. And Isaiah was like, Carmen where's Andre at. And I said I don't know, I haven't seen him; he's not in his room? And he said no. And then I said what's up. And he's like nothing, I just came over to see what you guys were doing, and I wanted to know if

04109

AT010744

you wanted to smoke with me, and I said no, I don't want to smoke, and we went in the front room 'cause he was gonna smoke. And we were only there about 5 minutes and then Andre came in...I was standing at the sink 'cause I went to get a drink of water, and I saw..I only got a partial view of Andre..but I could pretty much see he didn't have anything in his hands. I didn't say anything to him because we weren't really on good terms at the time. And Isaiah was like, Andre? And he said, yeah. And he goes, you want to smoke with me, and he said no _____ ya'll. And he was breathing real heavy and I saw he had a little bit of blood on his chest.

**Officer2:**  Okay, what was he wearing?

**Carmen:**  He was wearing a blue camouflage shirt and camouflage pants, green, you know, _____, and ah, Isaiah sat back down and I was like what's wrong, what, you know, and he said, you guys the police are getting ready to come here. I said Andre what's you do? He was breathing real heavy, and I said...I said what did you do? And he goes, _____ ████████ and ███ and I said, are you kidding and he said no. Do you want to go look in the bag, and he was like screaming at me. And I was like, no. I don't...I don't want to look in the bag.

**Officer2:**  Do you know what bag he was talking about?

**Carmen:**  No. No. I never saw a bag. And I looked afterwards and didn't see one.

**Officer2:**  Okay. What else did he say?

**Carmen:**  And I said, why did you do that? And he said I thought she was Jezebel. And I've done this before. I said, what do you mean? And he said I'm reliving today. I killed ████ and Laura and ███ before; I done this before and the sick part is I don't go to jail. I was like, Andre you're talking crazy. You need to get some help. And he took his shirt off and showed me that he had stabbed himself in his chest twice. And I was like, why did you do that? And he was like, because I should be dead. I don't know, I should be dead, and he went over to the sink and he pulled out the butcher knife and he said, see I stuck it this far in me and showed me. And from what I could see, it still had the blood on it. And I went into my room and I still had my pajamas on at that time, but I was changing into my work clothes, and I was like, I'm not gonna...I don't even want to be in the same house as you, you're scaring me. I'm gettin out of here. And was like, Carmen, you don't understand. I just don't know what to do. I was like...I came back out after I had changed, and I said you should turn yourself in. And he was like, yeah, I know. I know, I'm going to turn myself in, and he was like, will you go with me. And I said I have to work at eleven. And he said, well, I need you to go with me. And I said, if we can find a ride there, then I'll go with you. And we went to go to Brandon's house, his cousin's house. I don't know his last name.

**Officer2:**  Where does he live?

04110

AT010745

**Carmen:** He lives just right around the corner.

**Officer2:** In this trailer park?

**Carmen:** Yes.

**Officer2:** Okay. Do you know the number?

**Carmen:** No. I don't, but he's right by the landlord's house. And we went over to Brandon's house and his car wasn't there, so we knocked on the door anyway. And we said is there somebody we can....Isaiah met us over there. Isaiah left with us...

**Officer2:** Does Isaiah live with you all?

**Carmen:** No. Just...I just met him the other day and he had been coming over just to say hi and stuff. He's friends with Andre and....

**Officer2:** And it's Isaiah Thomas?

**Carmen:** No. I think...I think he said his last name was Gibbs.

**Officer2:** Isaiah Gibbs?

**Carmen:** Yes. And his first name is Benjamin, but he goes by Isaiah. His middle name is Isaiah. But he was like well, I'm going to Brandon's and he walked out and then I hugged Andre, and I was just like, honey I know you're not right. I know you're not right and you wouldn't do this if you were in the right frame of mind; and he said, I know. And then I said okay, well, let's go over to Brandon's house and see if he can give us a ride. And the car wasn't there; and so I knocked on the door and he was like, hey what's going on? And I was like...Brandon had just woken un so we didn't tell him what was going on or anything. I said is there somebody that can give us a ride somewhere. And he said no. He said can I get a cigarette from you and I gave him a cigarette; and then Isaiah was leaving...he was walking away and...I don't know if he went inside Brandon's house or not. But I said, okay, what...do you think your dad would give us a ride? And he said, maybe. So we started walking over there and I changed my mind and I said well lets go to Rachel, I know Rachel will help us. And we went over to Rachel's house and I knocked on the door and I said hey, we have an emergency, can you get us to the police station? And she said yeah, I've gotta pay a ticket down there anyway. And I gave her $5.00 for gas. And then she drove us down there. I didn't tell her what happened. But Andre was just sitting all quiet in the back seat and we just made small talk while we were going there. And then we got to the police station and I let Andre out...because they have a two-door car, so I let him out and I hugged him and he said I love you and I said I love you too. It's like, I know you're scared, and he said I've been locked up before, I'm not scared. I said, well, I'm scared for you _____ and he said okay. Then

AT010746

he turned himself in.  We did...I didn't even watch him go in.  But as soon as we closed the door, she said, he's in trouble isn't he?  I said yeah.  She said, with his mom?  And I said, no with his wife.  And she said what do you mean?  And I said, he killed his wife and ██████ and ████.  And she started crying.  She was like, I love Andre, I love ████ (the little boy), she loves ████.  And she went in to pay her ticket and we were talking about going up and seeing him and seeing if we could see him.  She paid her ticket and then we went up to the second floor and I had to go to the bathroom, so we went to the bathroom then we heard them talking...I guess in questioning or something.

Officer2:   Earlier you _____ that he thought the lady was who?

Carmen:     Jezebel.  From the Bible.

Officer2:   And he was referring to the Bible on that?

Carmen:     Yes.

Officer2:   Okay.  Earlier you told me that ah, Andre's been acting in a certain ways for the last couple days.  Can you tell me about that?

Carmen:     Um, just he's like a fanatic almost.  Like with the Bible and he keeps reading Revelations and he's very removed from himself lately.  And he stopped talking for 24 hours just, just, I guess, because he thought he was the devil, and if he stopped talking everything would be alright with the world.  He just thought he was the key to everything being alright.

Officer2:   Okay.  Is there anything else that you may be forgetting?

Carmen:     When Rachel and I came back here, we were looking for the bag.  'Cause he told me...

Officer2:   Where did you all look at?

Carmen:     We looked under the trailer and we went inside and looked in the closet, just a quick look around to see if he had put anything anywhere.

Officer2:   Did ya'll find anything?

Carmen:     No.  No.

Officer2:   And did ya'll remove anything from the house?

Carmen?     No.

Officer2:   What about the knife that he showed you?  Where is it at?

n4112

AT010747

Carmen:      It should be in the sink.

Officer2:    Okay.  Did you all touch it?

Carmen:      No.  I didn't touch it.   I don't know if Isaiah touched...

Officer2:    Can you describe it for me?

Carmen:      It was a butcher knife...

Officer2:    What....

Carmen:      ..._____ that long with the handle.

Officer2:    What color was the handle?

Carmen:      I'm pretty sure it was black.

Officer2:    Okay.  Does Isaiah live around here?

Carmen:      I don't know. _____.

Officer2:    Okay.  Is there anything else?

Carmen:      Um, not that I remember.

Officer2:    Did Isaiah hear Andre say that he killed somebody?

Carmen:      Yes.

Officer2:    Okay.  This_____concluded at approximately 12:25 hours same date.

**10723**

04113

AT010748

# Exhibit 41

## Power Point Presentation, "Insanity Defense"

# Insanity Defense

It is an affirmative defense to prosecution in a case that, at the time of the conduct charged, the actor, as a result of a severe mental disease or defect, did not know that his conduct was wrong.

# Voluntary Intoxication

Voluntary intoxication does not constitute a defense to the commission of a crime.

"Intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

# Special Issues

1.     Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

2.     Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

# Insanity Defense

It is an affirmative defense to prosecution in a case that, at the time of the conduct charged, the actor, as a result of a severe mental disease or defect, did not know that his conduct was wrong.

Persons are presumed sane.

Defendant bears the burden of proof.  The State bears no burden to prove the defendant was sane.

Defendant must prove insanity.

# Insanity Defense

"It is an affirmative defense to prosecution in a case that, at the time of the conduct charged, the actor, as a result of a severe mental disease or defect, did not know that his conduct was wrong."

Focus is on a defendant's condition at the time of the crime.

Competency To Stand Trial - Different than Insanity!

- focus is on a defendant's condition at time of trial.

# Insanity Defense

It is an affirmative defense to prosecution in a case that, at the time of the conduct charged, the actor, as a result of a severe mental disease or defect, did not know that his conduct was wrong.

Defendant can have severe mental illness and not be legally insane.

Mental disease or defect must be to such a degree that the defendant did not know his conduct was wrong.

Where there is evidence of drugs or alcohol, insanity defense is considered with intoxication instructions.

# Voluntary Intoxication

Voluntary intoxication does not constitute a defense to the commission of a crime.

Insanity caused by intoxication does not constitute a defense to the commission of a crime.

# Voluntary Intoxication

Insanity caused by the aggravation of a pre-existing mental condition by alcohol or drugs is not a defense to a crime

"Intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

# Special Issues

1.    Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

YES

2.    Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

NO

= Death Sentence

# Special Issues

1.     Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

NO

2.     Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

= LIFE SENTENCE

# Special Issues

1.    Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

YES

2.    Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

YES

= LIFE SENTENCE

# Special Issues

1.  Do you find from the evidence beyond a reasonable doubt that there is a *PROBABILITY* that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

State does not have to prove certainty of future "acts of violence" - only that such acts are PROBABLE

State does not have to prove defendant would probably commit murder - only "acts of violence"

A person who is a continuing threat to a prison population can be "a continuing threat to society"

# Special Issues

1.     Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

A "Yes" answer can be based solely on the facts of the crime, even if a person has never committed a previous crime

# Special Issues

2.     Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a *sufficient mitigating circumstance or circumstances* to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Mitigating Evidence  =

Evidence that a juror might regard as reducing the defendant's moral blameworthiness

State has no burden of proof on this issue

# Exhibit 42

**Correspondence and Documentation Regarding Dr. Oropeza's Failure to Pass Oral Exam**



**TEXAS STATE BOARD OF EXAMINERS OF PSYCHOLOGISTS**
333 Guadalupe, Ste. 2-450
Austin, TX 78701
(512) 305-7700

PETER P OROPEZA PSYD                                    July 29, 2002
2001 ARTHUR ST.
WICHITA FALLS, TX  76309

Re: Oral Examination

Dear  PETER OROPEZA:

The Texas State Board of Examiners of Psychologists is sorry to inform
you that you did not pass the oral exam offered to you on July 13, 2002.

Application Rule 463.18 states that applicants who fail the oral exam
for the first or second time may take it again at any future testing
date by submitting a completed application and the required $320 fee
payable to the Texas State Board of Examiners of Psychologists. If this
was your third time to take the examination it will be necessary for you
to wait a calendar year to retake the exam. The exams are offered in
January and July each year. The deadline for the January exam is
December 1. The deadline for the July exam is June 1.

Enclosed are copies of the Failed Candidate Scoring Sheets from the
examiners for your review. Also for your convenience, enclosed is an
application for the Oral Examination.

Sincerely,

Sherry L. Lee
Executive Director

Enclosure

**ORAL EXAMINATION**
**CANDIDATE'S SCORE SHEET**
**SAMPLE #4**

I.   NAME OF CANDIDATE _Peter Oropeza_   DATE _7-13-02_
                        PLEASE PRINT

II.  ORAL EXAMINER #1 _Maria C Cruz PLD_ _McPargara_   PASS/FAIL
                      PRINTED NAME/SIGNATURE              (CIRCLE ONE)

     ORAL EXAMINER #2 _____   PASS/FAIL
                      PRINTED NAME/SIGNATURE              (CIRCLE ONE)

          **INFORMATION BELOW THIS LINE IS FOR STAFF ONLY**

_____

III. CANDIDATE NOTIFICATION:

     A.   TIME DISMISSED: _3:25_____

     B.   RE-EXAM (SAME DAY)_____   TIME OF SECOND EXAM_____
                           YES/NO

          By accepting the opportunity to retake the examination
          today, I understand that examiners are expected to be as
          objective as possible in their examination;  however, my
          examiners know that I received a split decision on my
          first examination.


          _____        _____
          Candidate's Signature                    Date

     C.   CANDIDATE WAIVER FOR RE-EXAM:

          I choose to waive the right to retake the exam at this
          time and will reapply at a future exam period.   I
          understand that I will be required to pay the Oral
          Examination fee to retake the examination at that time.


          _____        _____
          Candidate's Signature                    Date


OTHER COMMENTS_____

_____

_____

OECSS - 6/95

26

# Texas State Board of Examiners of Psychologists
## Failed Candidate Feedback Form

Candidate Name: _Peter Oropeza_          Date: _7-13-00_

Examiner: _Maria C. Cruz PhD_   _(signature)_
(Print)                          (Signature)

This feedback is being provided to help the candidate improve his or her performance on any subsequent re-examination. The oral examiner will **indicate areas of weakness in the candidate's** performance. Please check appropriate areas. Do **not** provide any written comments. (Areas of relative strength and areas where the candidate met minimal entry-level standards will **not** be identified.)

| | | |
|---|---|---|
| ✓ | 1. | IDENTIFIES PROBLEM |
| ✓ | 2. | IDENTIFIES AND OBTAINS INFORMATION/PSYCHOMETRICS |
| ✓ | 3. | DEVELOPS AND PROCESSES THE IMPLEMENTATION OF A PLAN OF ACTION AND/OR INTERVENTION |
| | 4. | HANDLES CRISIS SITUATIONS |
| ✓ | 5. | ATTENDS TO CULTURAL AND OTHER RELEVANT DIFFERENCES |
| | 6. | HAS AWARENESS OF PROFESSIONAL LIMITATIONS |
| | 7. | APPLICATION OF PROFESSIONAL STANDARDS |
| ✓ | 8. | APPLICATION OF LAWS |
| ✓ | 9. | APPLICATION OF ETHICS |
| | 10. | HAS AWARENESS OF PERSONAL LIMITATIONS AND IS FREE FROM DYSFUNCTIONAL CHARACTERISTICS |

OEFCC - 5/99, 8/01

# Texas State Board of Examiners of Psychologists
## Failed Candidate Feedback Form

Candidate Name: _____   Date: _____

Examiner: _____   _____
　　　　　　　　　　(Print)　　　　　　　　　　　　(Signature)

This feedback is being provided to help the candidate improve his or her performance on any subsequent re-examination. The oral examiner will **indicate areas of weakness** in the candidate's performance. Please check appropriate areas. Do **not** provide any written comments. (Areas of relative strength and areas where the candidate met minimal entry-level standards will **not** be identified.)

| | | |
|---|---|---|
| _____ | 1. | **IDENTIFIES PROBLEM** |
| ✓ | 2. | **IDENTIFIES AND OBTAINS INFORMATION/PSYCHOMETRICS** |
| ✓ | 3. | **DEVELOPS AND PROCESSES THE IMPLEMENTATION OF A PLAN OF ACTION AND/OR INTERVENTION** |
| ✓ | 4. | **HANDLES CRISIS SITUATIONS** |
| ✓ | 5. | **ATTENDS TO CULTURAL AND OTHER RELEVANT DIFFERENCES** |
| _____ | 6. | **HAS AWARENESS OF PROFESSIONAL LIMITATIONS** |
| ✓ | 7. | **APPLICATION OF PROFESSIONAL STANDARDS** |
| ✓ | 8. | **APPLICATION OF LAWS** |
| _____ | 9. | **APPLICATION OF ETHICS** |
| _____ | 10. | **HAS AWARENESS OF PERSONAL LIMITATIONS AND IS FREE FROM DYSFUNCTIONAL CHARACTERISTICS** |

OEFCC - 5/99, 8/01

2001 Arthur St.
Wichita Falls, TX 76309
Work: (940) 552-9901 ext. 4548
Home: (940) 322-5268

T.S.B.E.P.

2002 AUG 12  PM 1: 21

August 7, 2002

Sherry L. Lee
Executive Director
Texas State Board of Examiners of Psychologists
333 Guadalupe, Ste. 2-450
Austin, TX 78701

Dear Ms. Lee:

I have recently received and reviewed the results from the oral examination that occurred on July 13, 2002 and wish to express my concerns.   I have spoken with Mr. McCraig and Mr. Creath and they were helpful in providing me information about my rights if I believe there has been a procedural error.  Based on my recollection of the process of the examination, I am of the respectful opinion that I received verbal as well as nonverbal feedback from one of the examiners that indicated satisfactory responses.  This is the primary reason that I believe a review of the recorded examination appears warranted; therefore, I am requesting this review be conducted.

I am unclear as to the rationale for scoring that took place during the oral examination. The provided scoring sheet seems vague in that it lacked additional information about how my answers failed to meet passing requirements versus a marginal, weak or unacceptable response.  My preparation for the exam included mock orals with licensed colleagues who provided suggestions that I incorporated into the formal exam.  The stated feedback received during the examination in addition to my preparation leave me perplexed with the ultimate result of not having passed the exam.  In order to prepare adequately for the next exam as well as to ensure that I successfully display my clinical knowledge and abilities, additional information about this past exam would be crucial. Lastly, given the need to retake the oral examination despite the outcome of a review, I am requesting different evaluators.

Thank you in advance for hearing my concerns about such an important process.

Respectfully,

Peter Oropeza, Psy.D.

# TEXAS STATE BOARD OF EXAMINERS OF PSYCHOLOGISTS

**EXECUTIVE DIRECTOR**
Sherry L. Lee



MEMBERS OF THE BOARD

Brian H. Stagner, Ph.D.
Chair
College Station

Pauline A. Clansy, Ed.D
Vice-Chair
Houston

Catherine Bernell Estrada
Dallas

Arthur E. Hernandez, Ph.D.
San Antonio

Michael D. Nogueira
Fredericksburg

Ruben Rendon, Jr., M.S.
Dallas

M. David Rudd, Ph.D.
Waco

Stephanie Sokolosky, M.P.S.
Wichita Falls

Jess Ann Thomason
Midland

November 12, 2002

Peter Oropeza, Psy.D.
2001 Arthur Street
Wichita Falls, TX 76309

RE:   Appeal of Oral Examination

Dear Dr. Oropeza:

At its meeting on November 7-8, 2002, the Texas State Board of Examiners of Psychologists considered your appeal of your Oral Examination administered on July 13, 2002. After review by the Oral Examination Committee, no procedural errors were found in the course of your Oral Exam. Therefore, it was the determination of the Board to deny your appeal.

In order for you to sit for the January 10-11, 2003 Oral Examination, it will be necessary for the agency to have received your examination fee no later than December 2, 2002. An Oral Examination Application form is enclosed for your use.

Thank you for your inquiry.

Sincerely,

Sherry L. Lee
Executive Director

SL:bc

Enclosure

333 Guadalupe, Suite 2-450, Austin, Texas 78701
(Administration) 512-305-7700; (Investigations) 512-305-7709; (TDD) 1-800-735-2989; (Fax) 512-305-7701
http://www.sbep.state.tx.us

The Texas State Board of Examiners of Psychologists does not discriminate
on the basis of race, color, national origin, sex, religion, age or disability in employment or the provision of services, programs or activities.

# Exhibit 43

**Email to Larry Phillips from
Victor Scarano, M.D., J.D.**



**LARRY PHILLIPS - FW: Insanity Defense**

From:
To:          "Larry Phillips@house.state.tx.us" <Larry Phillips@house.state.tx.us>
Date:        3/12/2003 9:57 AM
Subject:     FW: Insanity Defense
CC:

Rep. Phillips & Anne: Here are Dr. Scarano's thoughts on the question I posed yesterday. His position is similar to mine [to change "know" to "appreciate," and to have a limited volitional prong - limited to severe psychosis]. The advantage of Victor's language - as opposed to my earlier drafts - is that he doesn't list specific diagnoses.

Brian

-----Original Message-----
From: Victor R. Scarano, M.D., J.D. [mailto:vscarano@bcm.tmc.edu]
Sent: Tuesday, March 11, 2003 5:08 PM
To:
Subject: Insanity Defense

Dear Brian,

Thanks for the email regarding Representative Phillips' filing of an insanity defense related bill. I do have reservations about a psychiatrist's ability to assess the determination as to whether or not a defendant because of a mental disease or defect was incapable of conduct, his/her behavior in accordance with the law. It would provide some level of comfort in my ability to do so if amount of conduct level, and to be more exact, if someone, for psychosomatic, determined that of his/her conduct was wrong. I believe that organic mental disorders would be a category for psychiatrists and psychologists since, in my view, it would be the difficult to say he/she (what/makes them) psychotic. In addition, this would be a very important provider for the attorney and his/her client, at the time he/she and/or, if the responsible action of the mental control disorder would be used effectively in the punishment phase of the trial by the prosecuting attorney to enhance punishment between that defendant is extremely dangerous since he cannot control his violent impulses.

So, in my view, if we are to add a volitional test, I would like to see its use narrowed to those individuals who at the time of the offense were so psychotic that they were unable to conform their behavior to the requirements of the law - BUT, those same individuals would lack substantial capacity to appreciate that wrongfulness of his/her conduct. In those cases the cognitive and volitional prongs work hand in hand (so to speak). I certainly agree with you and Representative Phillips that the volitional test should be reserved eliminating personality disorders, impulse control disorders, intoxicated use of intoxicants OR confining it to those individuals who are acting under the influence of psychosis.

Here is a suggestion:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of severe mental disease of defect
> he/she lacked substantial capacity to appreciate the criminality
> of his/her conduct or due to a severe psychotic episode was unable

file://C:\Documents%20and%20Settings\t4160a1\Local%20Settings\Temp\GW}00001.H...   3/12/2003



to conform his/her conduct to the requirements of the law.

Those cases [illegible] with a severe personality disorder such as borderline personality can become so disorganized that at times and under special circumstances they can suffer a severe psychotic episode. If the psychotic brief for at least 1 day but [illegible] than 1 month an Axis I diagnosis of Brief Psychotic Disorder can be made.

I'd be happy to work with you on this in regards to the wording. If you believe it would be most beneficial helpful. Dear, I'm looking at this from the point of view of a mental health professional whose job it is to assist the jury in understanding the [illegible] whole mental state at the time of the criminal event. I am looking at how it would be able to be helpful rather than confusing.

Yours,

Steve B. Sorsano, M.D., J.D.
[illegible] Psychiatric Services
Director, Outpatient & Forensic Psychiatry Program
Department of Psychiatry and Behavioral Sciences
Baylor College of Medicine
6560 Fannin Street, Suite 832
Houston, Texas 77030
(713)798-3044; (713)798-2465 fax

# Exhibit 44

## Application for Emergency Detention

Emergency Apprehension and Detention

No. _____

THE STATE OF TEXAS
FOR THE BEST INTEREST )(
AND PROTECTION OF )(
)(

ALT _____

#596983

COPY

## APPLICATION FOR EMERGENCY APPREHENSION AND DETENTION

On the _5_ day of _March_, 20_04_, before the undersigned authority, personally appeared _Jennifer Layless_, an adult person, who made Application for the Emergency Apprehension and Detention of _Andre L. Thomas_

The Applicant, after first being duly sworn stated:

"My name is _Jennifer Layless_, and I am an adult person with personal knowledge of the facts stated herein. I am fully competent to execute this affidavit application.

I have reason to believe and do believe that the above named person evidences mental illness for the following reasons: _suicidal ideation_ _+ high agitation; Family hx of mental illness_

I have reason to believe and do believe that the above named person evidences a substantial risk of serious harm to self or others which risk of harm is more specifically described as (NOTE: This harm may be demonstrated either by the person's behavior or by evidence of severe emotional distress and deterioration in mental condition to the extent that the person cannot remain at liberty.

_He presented as highly agitated + anxious. He stated he recently tried to overdose on pills. He stated today that he would shoot himself if asked staff to kill him. He stated "Life is too much for me to handle."_

COPY

I have reason to believe and do believe that the above risk of harm is imminent unless the said person is immediately restrained. My beliefs are based upon specific recent behavior, overt acts, attempts, or threats or by evidence of severe emotional distress and deterioration in mental condition more specifically described as:

_He stated "I want to die right now" and talked about shooting himself in the head or getting hit by a car. He stated he is "losing it."_

**3115**

00534

AT003097

and do believe that the necessary restraint cannot be
accomplished without emergency detention because: _He was given a chance to_

_go voluntarily with a friend & has not arrived at the ER per WJT-ER._

I am/am not related to the said person. Specify nature of relationship

_MH-MR - Triage_

Any further relevant information, if any, is attached.

_(signature)_ JPC
AFFIANT/APPLICANT

STATE OF TEXAS                )(

COUNTY OF _Grayson_           )(

BEFORE ME, the undersigned authority on this date personally appeared

_Jennifer Layless_ , known to me to be the person subscribed below,
who after being duly sworn, under oath does swear and depose that the foregoing
Application has been read and that all facts stated therein are true and correct.

_(signature)_
APPLICANT

SUBSCRIBED and SWORN BEFORE ME this _5th_ day of _March_

20___, to certify which witness my hand and seal of office.

_Tanya L. Brown_
NOTARY PUBLIC in and for the
State of Texas

My Commission expires: _5-31-05_



TANYA L. BROWN
Notary Public, State of Texas
My Commission Exp. 5-31-2005

3116

00535

AT003098



**WARRANT FOR IMMEDIATE APPREHENSION AND TRANSPORTATION**
(Section 28, Texas Mental Health Code)

TO ANY PEACE OFFICER OF GRAYSON COUNTY, TEXAS, GREETINGS:

WHEREAS, an application in writing and under oath has been filed with me by _Jennifer Layless_ charging that _Andre Thomas_ of Grayson County, Texas, evidences mental illness, and alleging that the person evidences a substantial risk of serious harm to self or others; that the risk of harm is imminent unless the person is immediately restrained; and that the necessary restraint cannot be accomplished without emergency detention and

WHEREAS, this Magistrate finds that there is reasonable cause to believe such allegations, and that said person meets all four criteria for detention in Subsection (a) of Section 27 of the Texas Mental Health Code;

THESE ARE, THEREFORE, to command you to immediately apprehend the said _Andre Thomas_ and have (him)her transported to the _WUI-FR ) TMC-BHC_ for a preliminary examination in accordance with the provisions of Subsection © of Section 26 of the Texas Mental Health Code.

IT IS FURTHER ORDERED that copies of the Application for Warrant and this Warrant shall be immediately transmitted to said Facility.

HEREIN FAIL NOT but of this Writ make due return to the County Judge, showing how you have executed the same.

GIVEN UNDER MY HAND AND SEAL OF OFFICE,

This ___5th___ day of ___March___, 200_7_.

_____
Magistrate

**OFFICER'S RETURN**

Came to hand the _____ day of _____ 20___ of _____, 20___, by apprehending and transporting the above named person to the above named Facility.

By: _____

SECTION 30, TEXAS MENTAL HEALTH CODE, REQUIRES THAT THE OFFICER ADVISE EACH PERSON APPREHENDED, WITH OR WITHOUT WARRANT, OF THE FOLLOWING RIGHTS:

_____ The right to be advised of the location of detention, the reasons for his detention, and the fact that his detention could result in a longer period of involuntary commitment;

_____ The right to contact an attorney of his own choosing with a reasonable opportunity to contact that attorney;

_____ The right to be transported back to the location of apprehension or his palace of residence in the state or other suitable place if not committed for emergency detention, unless he is arrested or objects to the return;

_____ The right to be released if the head of the facility determines that the four criteria for emergency detention set out in Subsection (a) of Section 27 of this code no longer apply; and

_____ The right to be advised that communications to a mental health professional may be used in proceedings for further detention.

The word suitable controls this section, and for non residents of the County, transportation back to the place of apprehension should be sufficient unless circumstances dictate a more appropriate place within this County.

00536

AT003099

# Exhibit 45

## MHMR Services of Texoma

## Admission Information

## Address History

Type: (CUR-Current)   BIL-Billing   PER-Permanent   MAL-Mailing   INC-Incomplete

Street Address ▓▓▓▓▓

City ▓▓▓▓   State _TX_   Zip ▓▓▓

Phone Number _N/A_   Phone Type (Home)   Office   Cellular   Pager   Other

Living Arrangement  (1)Family/Relatives   2 Group Quarters   3 Alone in own Dwelling   4 Homeless   5 Medical Facility

6 Correctional Facility   7 Other Institutional

## Significant Others

Type: (EMG-Emergency)   O-Other

Relationship   Attorney   Aunt/Uncle   Case Manager   Child   Child-in-law   Cousin   Executor   Foster Parent

Friend   Grandparent   Guardian   Legal Representative   Niece/Nephew   Other Relation   (Parent)

Parent-in-law   Self   Sibling   Sibling-in-law   Sponsor   Spouse/Poss LP   Step Child

Step Parent   Step Sibling   This Component   Trustee   Unknown

Name _Dan Thomas_

Street Address _____

City _____   State ___   Zip ___

Phone Number ▓▓▓▓▓   Phone Type (Home)   Office   Cellular   Pager   Other

## Name Aliases

_N/A_

Type: _____   Preferred   Alias   Legal   Maiden   Other

First Name _____

Middle Name _____

Last Name _____

00528

| Staff ID | Program | Service | Begin Time | End Time | Duration | Setting | Appt. | Rec. Code | Mode | Crisis |
|---|---|---|---|---|---|---|---|---|---|---|
| 765 | 11 | 101A | 11am | 12:15p | 1hr.15min. | 1 | 2 | 1 | (F) P O | (Y) N |

Note: Cl. presented as a walk in & reportedly told the front desk he would throw him't in front of a bus if he couldn't talk to someone now. He presented as restless & highly agitated. He made loose associations & often didn't answer Q's directly. He stat we've been here before & the same shit happened." He stated "Life is too much for me to ha want to die right now." He stated if he had a gun he would shoot himself he asking Tri age would shoot him. He stated the only drugs in his system was marijuana & 90 his psychotropic meds which he quit recently. Yesterday wife may have ... the graveyard & quit recently. Yesterday wife may have him. "I hear the sound of my own voice". He stated he needed help & was willing to go to the ER on to BHC if they accept him. Triage spoke w/ his friend Zach who agreed to get him there. He w... that if he went there in 20 minutes an ED would be completed & he voiced understanding ... Nal ... later he was still not at any ER so an ED was completed.

_____, LP AT003094

# Contact Information

Case Number 596983

**Initial Contact**   **Admit**   Update

Contact Date: 3-5-04   Time 11am

| First Name: Andre | Middle Name: L. | Last Name: Thomas | Suffix | Sex M. | Birth Date | Estimat |

20 yrs old

Immediate danger to self?  ● Yes   O No   O Unknown
Immediate danger to others?  ● Yes   O No   O Unknown

First Contact Staff _Chril_
Program (RU) of Contact _11_

## Presenting Problem
(1=MH)   2=MR   3=ALC   (4=Drug)   5=ECI   6=Related Condition

Contact Type                        Contact With:
Phone   (Face-to-Face)   Other    Self   Informant   Other

First Name _____ Last Name _____   Callers Phone Number   Alternate Phone Number
(    )   -          (    )   -

Street _____
Zip _____   City _____   State _____

### History of Risk
Suicide   O Yes   ● No   ⊙ Unknown          Homicide   O Yes   O No   ⊙ Unknown
Violence   ⊕ Yes   O No   O Unknown          Psychosis   O Yes   O No   ⊙ Unknown

## Admission Information

Social Security # ▓▓▓▓▓▓▓          (1) Voluntary   2 Involuntary

MR Participant Group _____          Care ID _____

Marital Status   1 Married   2 Widowed   3 Divorced   (4) Separated   5 Never Married   6 Unknown

Group   A Asian   (B) Black   C Cuban   H Hispanic   I American Indian   P Puerto Rican
W White   O Other

**COPY**

Guardianship Status   1 Minor   2 Minor w/Conservator   3 Adult w/Guardian of Estate/Person
4 Adult w/Guardian of Estate   5 Adult w/Guardian of Person   6 Adult w/Limited Guardian
7 Adult w/Temporary Guardian   (8) Adult w/No Guardian   9 Adult w/Conservator

Level of Education:   No HS Diploma   (HS Equivalent)   HS Diploma   Assoc. Degree   BA of Arts
BA of Science   Masters Degree   Doctorate   Vocational

Last Year Completed: _9th_

Education Status:   (Still) Not in School   PT - Part-Time   FT - Full Time   O In Special Education?

**ENTERED**   00527

Religion _N/A_

Assign to Responsible Staff _____

Primary Language _English_          _____   AT003095

The records of Mental Health Mental Retardation Services of Texoma are confidential and for your use only. They are to be used only for the purpose for which they are requested. They are not to be released to the client or to any other person or agency.

CONFIDENTIAL

*Old paper work destroyed*

## Individual Service

## MHMR Services of Texoma

| Client Name/Case Number | | MEDICAID ID | Date | Begin | End | Duration |
|---|---|---|---|---|---|---|
| Thomas, Andre L. 00596983 | | | 03/08/2004 | 10:51 AM | 11:20 AM | 00.29 |

| Staff ID | Name | Provider | Allow Multiple Focus Providers |
|---|---|---|---|
| 0765 | Loyless, Jennifer M. | | No |

| Program ID | Program Description | Setting | Appointment Code |
|---|---|---|---|
| 0011 | MH Adult Assessment | Office | Non-Scheduled |

| Service Code | Service Description | Crisis | Mode |
|---|---|---|---|
| 101A | MH Screening | No | Phone |

| Recipient Code | Collateral Type |
|---|---|
| Other Collateral | Other Collateral |

| Recipient Clarification | Location |
|---|---|
| | None |

| Diagnosis Code | Description |
|---|---|
| | No diagnosis on record |

## Outcomes

## Progress Note

————03/08/2004————
————Subjective————
Reportedly Mr. Thomas never arrived at TMC-BHC.  Triage contacted the jail, local ER's, and the police station.  All stated they were unaware of Mr. Thomas arrival.  The police department stated they had no knowledge.  They were encouraged to find out some info and call back.  They did and stated they were unable to locate him but will continue to look.

Jennifer Loyless, LPC

3114

COPY

00529

Provider's Signature: _____   Date: 3-8-04

AT003096

# Exhibit 46

## Application for Emergency Detention

FORM VIII-28 – Application for Emergency Apprehension and Detention (By any adult)
TEX. HEALTH & SAFETY CODE ANN. §§573.011-.012

**COPY**

NO. MH204-21

| IN THE MATTER OF | X | IN THE JUSTICE COURT |
| A.-U. | X | PCT. _2_ , PLACE _1_ |
| | X | Grayson COUNTY, TEXAS |

## APPLICATION FOR EMERGENCY APPREHENSION AND DETENTION

Date 3-26-04

Dr. William Bowen
Name of Affiant

Street Address: 1000 Memorial   Phone: 416-4184   (Home)

City, State, ZIP Denison TX 75020                (Office)

Name of Person for whom apprehension and detention are sought:
Andre Thomas

Address ██████████ ███████ ██████ ████

Physical Description:
Sex _m_ Age _21_ Height _____ Weight _____ lbs.
Hair (color & length) _black_   Eye Color _brown_
Other Identifying Information _African American_

Relationship of Affiant to Person who is to be detained (check one):
___Stranger ___Spouse _ Neighbor ___Friend ___Former Spouse ___Adult Child

_✓_Other (please specify) ER Physician

I have reason to believe and do believe that Andre Thomas (name of person to be detained) is mentally ill and that unless the person is immediately restrained there is an imminent substantial risk of harm to the person or others, said risk of harm being (describe and specify the harm that probably will occur)
Andre has expressed suicidal ideation to several staff in the ER

01064

AT007731

my beliefs are based on the following specific recent behavior, overt acts, attempts or threats:

*He cut on his chest with a knife this morning.*

_____
Affiant

Sworn to and Subscribed before me, this 24th day of *March*, 2004.

_____
JUSTICE OF THE PEACE,
PCT. 2, PLACE 1,
Grayson COUNTY, TEXAS

7734

01065

AT007732

WARRANT FOR IMMEDIATE APPREHENSION AND TRANSPORTATION
(Section 28, Texas Mental Health Code)

TO ANY PEACE OFFICER OF GRAYSON COUNTY, TEXAS, GREETINGS:

WHEREAS, an application in writing and under oath has been filed with
me by DR. William Bowen SR. charging that ANDRE Thomas
of Grayson County, Texas, evidences mental illness, and alleging that the
person evidences a substantial risk of serious harm to self or others;
that the risk of harm is imminent unless the person is immediately
restrained; and that the necessary restraint cannot be accomplished
without emergency detention and

WHEREAS, this Magistrate finds that there is reasonable cause to
believe such allegations, and that said person meets all four criteria
for detention in Subsection (a) of Section 27 of the Texas Mental Health
Code;

THESE ARE, THERFORE, to command you to immediately apprehend the said
ANDRE Thomas and have him/her transported to the
TMC Behavioral Health for a preliminary examination in
accordance with the provisions of Subsection (c) of Section 26 of the
Texas Mental Health Code.

IT IS FURTHER ORDERED that copies of the Application for Warrant and
this Warrant shall be immediately transmitted to said Facility.

HEREIN FAIL NOT but of this Writ make due return to the County Judge,
showing how you have executed the same.

GIVEN UNDER MY HAND AND SEAL OF OFFICE. This 26th day of March,
2004.

_James E. Harr_
Magistrate

OFFICER'S RETURN

Came to hand the _____ day of _____, 19____, and executed
the _____ day of _____, 19____, by apprehending and transporting
the above named person to the above named Facility.

By: _____

SECTION 30, TEXAS MENTAL HEALTH CODE, REQUIRES THAT THE OFFICER ADVISES
EACH PERSON APPREHENDED, WITH OR WITHOUT WARRANT, OF THE FOLLOWING RIGHTS:
1. The right to be advised of the location of detention, the reasons for
his detention, and the fact that his detention could result in a longer
period of involuntary commitment;
2. The right to contact an attorney of his own choosing with a reasonable
opportunity to contact that attorney;
3.** The right to be transported back to the location of apprehension or
to his place of residence in the state or other suitable place if not
admitted for emergency detention, unless he is arrested or objects to the
return;
4. The right to be released if the head of the facility determines that
the four criteria for emergency detention set out in Subsection (a) of
Section 27 of this code no longer apply; and
5. The right to be advised that communications to a mental health
professional may be used in proceedings for further detention.

**The word suitable controls this section, and for non-residents of
County, transportation back to the place of apprehension should be
sufficient unless circumstances dictate a more appropriate place within
this County.

01066

7735

AT007733

# Exhibit 47

## Blood and Urine Analysis

Texoma Medical Center
Mon Mar 29, 2004 08:46
Outpatient Summary Report-CHEMISTRY

```
Pat Name:          THOMAS,ANDRE L                          Page:  1
Unit #/Acct #:     0000295550/T0002597188
Loc:               E/R 03/26/04
Phys-Service:      BOWEN,WILLIAM - EMERGENCY SERVICE
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
Test Name: DRUG SCREEN WITH TCA          Spec: Urine
Collected: 03/26/04 0753                 In at: 03/26/04 0810
Ordering Phys: BOWEN,WILLIAM             Out at: 03/26/04 0902
```

| Result Name | Outside | Within | Reference Range | Units |
|---|---|---|---|---|
| Amphetamine | Neg | | Negative | |
| Methamphetamine | Neg | | Negative | |
| Barbituate Screen | Neg | | Negative | |
| Benzodiazepine Screen | Neg | | Negative | |
| Cocaine Screen | Neg | | Negative | |
| Opiate Screen | Neg | | Negative | |
| Phencyclidine Screen | Neg | | Negative | |
| Cannabinoids | POSITIVE | | Negative | |
| Tricyclic Antidepressa | Neg | | Negative | |
| Drug Screen Comment | | | This test provides only a screening analytical test result.  A more specific alternate chemical method must be ordered to obtain a confirmed analytical result. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
Test Name: ETHANOL LEVEL                 Spec: Blood
Collected: 03/26/04 0820                 In at: 03/26/04 0827
Ordering Phys: BOWEN,WILLIAM             Out at: 03/26/04 0857
```

| Result Name | Outside | Within | Reference Range | Units |
|---|---|---|---|---|
| Alcohol, Ethyl | | <0.3 | <10 mg/dl Normal >100 mg/dl toxic | mg/dl |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
Test Name: COMPREHENSIVE METABOLIC PANEL  Spec: Blood
Collected: 03/26/04 0820                 In at: 03/26/04 0827
Ordering Phys: BOWEN,WILLIAM             Out at: 03/26/04 0858
```

| Result Name | Outside | Within | Reference Range | Units |
|---|---|---|---|---|
| Glucose | | 107. | 65-110 | mg/dL |
| Urea Nitrogen | 6. L | | 7-21 | mg/dL |
| Creatinine | | 1.1 | 0.5-1.4 | mg/dL |
| Sodium | | 142. | 137-145 | mmol/L |
| Potassium | 3.5 L | | 3.6-5.0 | mmol/L |
| Chloride | | 102. | 98-107 | mmol/L |
| Calcium | | 10.0 | 8.4-10.2 | mg/dL |
| Bili Total | | .8 | 0.2-1.3 | mg/dL |

(Continued on next page)

```
                                         THOMAS,ANDRE L
                                         0000295550/T0002597188
Dr. Joe Barns                            E/R 03/26/04
                                         (M-▮▮▮▮▮▮)
Outpatient Summary Report-CHEMISTRY      Dr. BOWEN,WILLIAM
```

```
                        Texoma Medical Center
                       Mon Mar 29, 2004 08:46
                 Outpatient Summary Report-CHEMISTRY
Pat Name:            THOMAS,ANDRE L                          Page:  2
Unit #/Acct #:       0000295550/T0002597188
Loc:                 E/R 03/26/04
Phys-Service:        BOWEN,WILLIAM - EMERGENCY SERVICE
```

*********************************************************************
Test Name: COMPREHENSIVE METABOLIC PANEL    Spec: Blood
Collected: 03/26/04 0820                    In at: 03/26/04 0827
Ordering Phys: BOWEN,WILLIAM                Out at: 03/26/04 0858

| Result Name | Outside | Within | Reference Range | Units |
|-------------|---------|--------|-----------------|-------|

(Continued from previous page)

| Result Name | Outside | Within | Reference Range | Units |
|-------------|---------|--------|-----------------|-------|
| Prot Total | | 8.3 | 6.0-8.3 | gm/dL |
| Albumin | | 4.8 | 3.5-5.0 | gm/dL |
| Alk Phos | | 78. | 38-126 | U/L |
| AST - SGOT | | 33. | 5-40 | U/L |
| Carbon Dioxide | | 27. | 22-31 | mmol/L |
| ALT - SGPT | | 26. | 7-56 | U/L |

*********************************************************************
Test Name: THYROID PROFILE (T3-T4-T7)      Spec: Blood
Collected: 03/26/04 0820                    In at: 03/26/04 0827
Ordering Phys: BOWEN,WILLIAM                Out at: 03/26/04 0912

| Result Name | Outside | Within | Reference Range | Units |
|-------------|---------|--------|-----------------|-------|
| T3 Uptake | 37.57 H | | 26-37 | % Uptake |
| T4 | | 9.97 | 4.7-11.5 | ug/dl |
| T7-FTI | 11.9 H | | 4.8-11.3 | |

*********************************************************************

```
Dr. Joe Barns                              THOMAS,ANDRE L
                                           0000295550/T0002597188
Outpatient Summary Report-CHEMISTRY        E/R 03/26/04
                                           (M-████████)
                                           Dr. BOWEN,WILLIAM
```

AT024539

```
                        Texoma Medical Center
                        Mon Mar 29, 2004 08:46
                 Outpatient Summary Report-HEMATOLOGY

Pat Name:          THOMAS,ANDRE L                        Page:  3
Unit #/Acct #:     0000295550/T0002597188
Loc:               E/R 03/26/04
Phys-Service:      BOWEN,WILLIAM - EMERGENCY SERVICE

*****************************************************************
Test Name: CBC                        Spec: Blood
Collected: 03/26/04 0820              In at: 03/26/04 0827
Ordering Phys: BOWEN,WILLIAM          Out at: 03/26/04 1112
```

| Result Name | Outside | Within | Reference Range | Units |
|---|---|---|---|---|
| WBC | | 8.3 | 4.0-10.0 | x 10^3ul |
| RBC | | 4.94 | 4.3-5.7 | x 10^6ul |
| Hgb | | 15.7 | 14-18 | gm/dl |
| Hct | | 44.7 | 42-52 | % |
| MCV | | 90.6 | 80-94 | fl |
| MCH | 31.8 H | | 27-31 | pg |
| MCHC | | 35.1 | 33-37 | gm/dl |
| RDW-CV | 10.7 L | | 11.5-14.5 | % |
| PLT | | 377 | 130-450 | x 10^3ul |
| MPV | | 8.2 | 7.4-10.4 | fl |
| Neutrophil % | 78.0 H | | 42-75 | % |
| Lymphocyte % | 13.7 L | | 20.5-51.1 | % |
| Monocyte % | | 7.4 | 1.7-9.3 | % |
| Eosinophil % | | 0.1 | 0-7 | % |
| Basophil % | | 0.8 | 0-2 | % |
| Neutrophil | | 6.5 | 1.5-6.5 | x 10^3ul |
| Lymphocyte | | 1.1 | 1.0-4.0 | x 10^3ul |
| Monocyte | | 0.6 | 0-1 | x 10^3ul |
| Eosinophil | | 0.0 | 0-0.7 | x 10^3ul |
| Basophil | | 0.1 | 0-0.2 | x 10^3ul |
| Segs | 81 H | | 50-70 | % |
| Lymphs | 8 L | | 20-40 | % |
| Aty Lymphs | | 2 | | % |
| Monos | 8 H | | 1-6 | % |
| Basos | | 1 | 0-1 | % |
| Plt Est | | Normal | Normal | |
| RBC Morph | #1 | | Normal | |

```
#1 RBC Morph: RBC morphology appears normal.
*****************************************************************




                                   THOMAS,ANDRE L
                                   0000295550/T0002597188
                                   E/R 03/26/04
Dr. Joe Barns                      (M-██████████)
                                   Dr. BOWEN,WILLIAM
Outpatient Summary Report-HEMATOLOGY
```

```
                        Texoma Medical Center
                      Mon Mar 29, 2004 08:46
                 Outpatient Summary Report-HEMATOLOGY

Pat Name:         THOMAS,ANDRE L                          Page:  4
Unit #/Acct #:    0000295550/T0002597188
Loc:              E/R 03/26/04
Phys-Service:     BOWEN,WILLIAM - EMERGENCY SERVICE

*******************************************************************
Test Name: URINALYSIS                     Spec: Urine
Collected: 03/26/04 0753                  In at: 03/26/04 0810
Ordering Phys: BOWEN,WILLIAM              Out at: 03/26/04 0853

   Result Name        Outside    Within       Reference Range  Units
------------------------------------------------------------------
Color                         |Yellow
Character                     | Hazy
Spec Gravity                  |1.015            1.001-1.035
pH                     30     | 8.5                  5-9 pH Units
Protein                30     |                      Neg mg/dL
Glucose                       |NEGATIVE          Negative mg/dL
Ketone              NEGATIVE  |                      Neg mg/dL
Blood, Occult       SMALL     |                      Neg
Urobilinogen                  |1.0               0.1-1.0 E.U./dL
Nitrates            NEGATIVE  |                      Neg
Leucocytes-Urine    NEGATIVE  |                      Neg
Microscopic Exam              |Test ordered, if culture desired, all
                              |clean catch samples will be held in lab
                              |until 10-00 am of following day for add on
                              |orders please call lab.
Ictotest               #1                        NEGATIVE mg/dL

#1 Ictotest: Negative(Confirmatory test for Bilirubin)
*******************************************************************
Test Name: URINALYSIS-AUTO W/MICRO        Spec: Urine
Collected: 03/26/04 0753                  In at: 03/26/04 0821
Ordering Phys: BOWEN,WILLIAM              Out at: 03/26/04 0853

   Result Name        Outside    Within       Reference Range  Units
------------------------------------------------------------------
Epiths                        |3-5                 0-25 /LPF
Mucus                Small    |               NEG-SMALL /LPF
Casts                         |Negative      0-2 HYALINE /LPF
WBCs                 5-10 H   |                      0-2 /HPF
RBCs                 3-5 H    |                      0-2 /HPF
Bacteria             Few      |                 NEGATIVE /HPF
Crystals                      |Negative                  /LPF
*******************************************************************
```

```
                              THOMAS,ANDRE L
                              0000295550/T0002597188
                              E/R 03/26/04
Dr. Joe Barns                 (M-▮▮▮▮▮▮▮)

Outpatient Summary Report-HEMATOLOGY      Dr. BOWEN,WILLIAM
```

AT024541

```
                         Texoma Medical Center
                         Mon Mar 29, 2004 08:46
                    Outpatient Summary Report-REFERENCE LAB

Pat Name:          THOMAS,ANDRE L                        Page:  5
Unit #/Acct #:     0000295550/T0002597188
Loc:               E/R 03/26/04
Phys-Service:      BOWEN,WILLIAM - EMERGENCY SERVICE

**************************************************************************
Test Name: RPR SEROLOGY                    Spec: Blood
Collected: 03/26/04 0820                     In at: 03/26/04 0827
Ordering Phys: BOWEN,WILLIAM                 Out at: 03/26/04 1401

     Result Name          Outside    Within        Reference Range  Units
    ---------------------------------------------------------------------
RPR                      |Nonreactive |             Non-reactive Titer
**************************************************************************

                    End of Report - 03/29/04 08:46
```

```
                                    THOMAS,ANDRE L
                                    0000295550/T0002597188
Dr. Joe Barns                       E/R 03/26/04
                                    (M-███████)
Outpatient Summary Report-REFERENCE LAB    Dr. BOWEN,WILLIAM
```

AT024542

# Exhibit 48

# Physician's Certificate of Medical Examination for Mental Illness

FOR THE BEST INTEREST
AND PROTECTION OF _____

IN THE COUNTY COURT
OF
_____ COUNTY, TEXAS

PHYSICIAN'S CERTIFICATE OF MEDICAL EXAMINATION FOR MENTAL ILLNESS

I, the undersigned, a person licensed to practice medicine in the State of Texas, or a person
employed by an agency of the United States having license to practice medicine in any State of the
United States, do hereby certify, to-wit:

1. That my name and address is _____ and my address is _____

2. That on the 26 day of March 20 0Y, at the following location: _____
_____, I evaluated and examined _____
hereinafter called Patient.

3. The Patient, whose address is [redacted] has been under my care of the
following, if any, period of time: _____

4. A brief diagnosis of the physical and mental condition of the Patient is: _____
_____

5. An accurate description of the mental health treatment, if any, given by me or
administered under my direction is as follows: _____

6. That I am of the opinion that the Patient is mentally ill, and that as a result of that illness
the Patient is ( X ) likely to cause serious harm to self or others, or (    ) both self and
others, or ( X ) will, if not treated, continue to suffer severe and abnormal mental, emotional
or physical distress and will continue to experience deterioration of his ability to function
independently and is unable to make a rational and informed decision as to whether or not to
submit to treatment and the detailed basis for this opinion is as follows: _____
_____

7. (NOTE: COMPLETE THIS ITEM ONLY IF THIS CERTIFICATE IS TO BE
ORDERED IN SUPPORT OF A MOTION FOR AN OPC.)

That I am further of the opinion that the Patient presents a substantial risk of serious harm
to self or others if not immediately restrained, the detailed basis for this opinion being:
_____
_____

8. (NOTE: COMPLETE THIS ITEM ONLY IF THIS CERTIFICATE IS TO BE
OFFERED IN SUPPORT OF COURT ORDERED EXTENDED MENTAL HEALTH
SERVICES OR A RENEWAL OF SAME.)

That I am additionally of the opinion that the Patient's condition, as set out in Item 6 above,
is expected to continue for more than 90 days, the detailed basis for this opinion
being: _____
_____

_____
Examining Physician

SWORN TO AND SUBSCRIBED BEFORE ME, this the _____ day of _____, 20 _____

_____
NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

PRINTED NAME OF NOTARY: _____
MY COMMISSION EXPIRES: _____

00445

3164