# Exhibit 49

## TMC Behavioral Health Center Admission Screening Form



**TMC BEHAVIORAL**
**HEALTH CENTER**
TEXOMA HEALTHCARE SYSTEM

## TMC – BEHAVIORAL HEALTH CENTER
### ADMISSION SCREENING FORM

Date: 3-26-04

Start Time: _____

POTENTIAL CLIENT NAME: Andres Thomas

AGE: 21
DOB: ████████

How Arrived: Seen in ~~ES~~ TMC ER   Accompanied By: Ø

Referred By: _____   Referral Source Phone: _____

PRESENTING PROBLEM (include precipitating events): pt states he cut on his chest this AM trying to "cross over into heaven"; pt. psychotic – thinks something like Holodeck on Star Trek is happening to him; "I don't know if I volunteered for this or if I was forced to" – referring to his life; no drugs, 3-4 drs beers/week

RISK FACTORS (Circle ALL that apply):   (Suicidal) / Homicidal / Violent Behavior / Non-compliant w/Meds / Needs Detox / Grossly Impaired due to Psychosis / Other: SPECIFY _____

LEGAL STATUS:   [ ] Voluntary   [✓] Involuntary/DESCRIBE ED

Current & Previous PSYCHIATRIC/CD ISSUES: psychosis

Current & Previous PSYCHIATRIC & CD TREATMENT: no treatment

Related FAMILY HISTORY of Psychiatric/CD Illness: unknown

Current MEDICAL DIAGNOSIS & CONCERNS: none

Current MEDICATIONS (Include Prescribing MD & when last taken): none

SUPPORT SYSTEM (Include Current Living Arrangements): lives alone
Family/Significant Other Contact NAME Dan Thomas   PHONE # ████████

What is/are potential Client/Family REQUESTING? pt requesting to go home

3041

Page 1 of 2

TMC - Behavioral Health Center
**MENTAL STATUS ASSESSMENT**

Potential CLIENT NAME: *Andre Thomas*

**Level of Consciousness:** [✓] Alert   [ ] Drowsy   [ ] Lethargic   [ ] Unresponsive
**Oriented to:** [-] Time   [✓] Place   [ ] Person   [✓] Situation
**Mood/** [ ] Apathetic   [ ] Angry   [ ] Depressed   [ ] Tearful   [ ] Sad
**Affect:** [✓] Anxious   [ ] Irritable   [ ] Quiet   [ ] Fearful   [ ] Indecisive
　　[ ] Appropriate   [ ] Labile   [✓] Agitated   [ ] Inappropriate   [ ]
**Communication:** [ ] Normal   [✓] Rapid   [ ] Coherent   [ ] Incoherent
　　[ ] Reluctant   [✓] Relevant   [ ] Irrelevant   [✓] Flight of Ideas
　　[ ] Easily Distracted   [ ] Loose Associations   [ ]
**Socialization:** [ ] Friendly   [✓] Cooperative   [ ] Withdrawn   [ ] Manipulative
　　[ ] Family   [ ]
**General Appearance:** [ ] Neat   [ ] Unclean   [ ] Well Groomed
　　[✓] Disheveled   [ ] Bizarre Dress   [ ]
**Eye Contact:** [ ] Good   [✓] Fair   [ ] Poor   [ ] Intermittent
**Attention Span:** [✓] Good   [ ] Fair   [ ] Poor   [ ]
**Concentration:** [✓] Good   [ ] Fair   [ ] Poor   [ ]
**Judgment:** [ ] Good   [ ] Fair   [✓] Poor   [ ]
**Memory/Recall:** Immediate - [✓] Good   [ ] Fair   [ ] Poor
　　Recent - [✓] Good   [ ] Fair   [ ] Poor
　　Remote - [✓] Good   [ ] Fair   [ ] Poor
**Psycho-Motor Activity:** [ ] Agitated   [ ] Hyperactive   [ ] Hypoactive
**Feelings Reported:** [✓] Hopeless   [ ] Helpless   [ ] Worthless   [ ] Guilt   [✓] Shame
**Energy Level:** [✓] Normal   [ ] Fatigued   [ ] Tired   [ ] Restless   [ ] Hyper
**Appetite/Weight:** [✓] No Change   [ ] Increased Appetite   [ ] Weight Gain
　　[ ] Decreased Appetite   [ ] Weight Loss
DESCRIBE _____
**Sleep Pattern:** [✓] No Problem   [ ] Insomnia   [ ] Hypersomnia
DESCRIBE _____
**Psychotic Symptoms:** [✓] Delusions/DESCRIBE *not sure if people are real, he may be the only real one*
　　[ ] Hallucinations/DESCRIBE _____
　　[ ] Other/DESCRIBE *religious preoccupation*
**Danger To:** [ ] NA   [✓] Self   [✓] Suicidal   [ ] Self Mutilates   [ ] Sets Fires
　　[ ] Others   [ ] Homicidal   [ ] Destroys Property   [ ]
Describe PLAN *cut self*
Specify MEANS & if ACCESSIBLE _____
Describe HISTORY of PRIOR ATTEMPTS *slit wrists @ age 10*

**DIAGNOSTIC IMPRESSIONS:** Axis I *¥ Psychosis*
　　Axis II *deferred*
　　Axis III *none*
　　Axis IV *unknown*
　　Axis V *15*
**RECOMMENDATIONS:** *pt meets criteria for inpt admission on ED*
**DISPOSITION/Provisional TX Plan:** *pt accepted for services of hh*
CLINICIAN SIGNATURE: *Sherrie St Cyr, LMSW*   End Time: _____

3042

Page 2 of 2

TMC BEHAVIORAL HEALTH CENTER
ADMISSION SCREENING FORM

(NOT PART of MEDICAL RECORD)

**ADMISSION NOTIFICATION**

*Gleason on call*

CLIENT NAME: _Andre Thomas_

Client's CURRENT PSYCHIATRIST:   [✓] None   [ ] Dr. _____
PSYCHIATRIST _Dan_ _____ Notified at _900_ Time on _3-26-04_ Date

_____ **MEDICARE COVERAGE;**                PRIMARY [ ]   SECONDARY [ ]
Copy of Medicare Card Attached:   [ ] Yes   [ ] No
Medicare # _____ - _____ - _____
____ Medicare: Part A   ____ Medicare: Part B   ____ Medicare: Part A & B

_____ **MEDICAID COVERAGE** (Oklahoma Medicaid NOT Accepted);
Copy of Medicaid Card Attached:   [ ] Yes   [ ] No
                    Texas Medicaid # _____

_____ Is this a work-related/WORKMAN's COMP injury or condition?   [ ] Yes   [ ] No

_____ **INSURANCE COVERAGE;**
Copy of Insurance Card(s) Attached:        [ ] Yes        [ ] No

*\*\*\*\* Pre-certification MUST be completed at time of screening for ALL insurance
providers and on ALL program admissions\*\*\*\**
(Primary)_____ Insurance: Company Name _____

Insured/Subscriber's Name: _____
Patient's Relationship to Insured:   [ ] Self;  [ ] Spouse;  [ ] Mother;  [ ] Father
Insured/Subscriber's SS Number: _____
Phone # _____ Spoke to _____

Date Called; _____ Time: _____ # Days Cert'd: _____ Auth # _____

(Secondary)_____ Insurance: Company Name_____

Insured/Subscriber's Name: _____
Patient's Relationship to Insured:   [ ] Self;  [ ] Spouse;  [ ] Mother;  [ ] Father
Insured/Subscriber's SS Number: _____
Phone # _____ Spoke to_____

Date Called: _____ Time: _____ # Days Cert'd: _____ Auth # _____

✓  **PRIVATE PAY;**
Will need to consult with a TMC Financial Counselor for PAYMENT PLAN arrangements.

_____ MHMR Funded/County: _____ per: _____
                                        (MHMR Contact NAME)

CLINICIAN SIGNATURE: _Sherrie St. Cyr, LMSW_ _____ DATE: _3-26-04_

**TMC BEHAVIORAL
HEALTH CENTER**
TEXOMA HEALTHCARE SYSTEM

00444

*White Original & Yellow Carbon to BHC  CM/UR*              Form # 602-143c(Rev.10/18/01)

AT003026

# Exhibit 50

## Clinical Lab Reports for Blood Samples

## (Taken 3/27/04 from A. Thomas)

CLAB REPORT #30

```
                        WILSON N. JONES MEMORIAL HOSPITAL          HEMA    PAGE:     1
                          500 N. HIGHLAND SHERMAN, TEXAS          PRINTED DATE/TIME
                          CLINICAL LABORATORY REPORT              03/27/2004 12:05

ACCOUNT NUMBER: 0016152365      MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L                        LOCATION: ER    ROOM #:
D.O.B.: ███████    AGE:   21  SEX: M    DOCTOR: ER - PHYSICIANS
-----------------------------------------------------------------------------
COLLECTED: 03/27/200410:15     BY: RW                    ACCESSION NO: 4087-GL4942
  RECEIVED: 03/27/200411:55
ACCESSION COMMENT: X:ER 2
-----------------------------------------------------------------------------
        PROCEDURE NAME            RESULT      REFERENCE RANGE     UNITS        TECH
-----------------------------------------------------------------------------

        TYPE & XM 1               DONE                                       TONIS
```

1745            LAST PAGE OF REPORT

000055

42

AT001705

CLAB REPORT #30

WILSON N. JONES MEMORIAL HOSPITAL           CHEM   PAGE:     1
500 N. HIGHLAND SHERMAN, TEXAS               PRINTED DATE/TIME
CLINICAL LABORATORY REPORT                   03/27/2004 11:42

ACCOUNT NUMBER: 0016152365    MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L                         LOCATION: ER    ROOM #:
D.O.B.: ████████    AGE:   21  SEX: M    DOCTOR: ER - PHYSICIANS
-------------------------------------------------------------------------------
COLLECTED: 03/27/200410:15    BY: RW                 ACCESSION NO: 4087-GL4915
RECEIVED: 03/27/200410:17
ACCESSION COMMENT: ER 2; ER 2; .; .; .; .; .; .; .; .; .
-------------------------------------------------------------------------------

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| CKMB | 0.6 | 0.0-3.6 | NG/ML | SARAHM |
| TROPONIN-I* | 0.34 | 0.00-0.40 | NG/ML | SARAHM |
| ACETAMINOPHEN | 0 L | 10-30 | UG/ML | SARAHM |
| ALCOHOL (ETOH) | 2 | 0-79 | MG/DL | SARAHM |
| SALICYLATE | 1.5 L | 2.8-20.0 | MG/DL | SARAHM |
| TSH | 0.69 | 0.34-4.82 | uIU/mL | SARAHM |
| BASIC METABOLIC PNL | | | | |
| SODIUM | 140 | 136-145 | MEQ/L | SARAHM |
| POTASSIUM | 3.4 L | 3.5-5.1 | MEQ/L | SARAHM |
| CHLORIDE | 102 | 98-107 | MEQ/L | SARAHM |
| BICARBONATE | 26 | 23-29 | MMOL/L | SARAHM |
| ANION GAP | 15 | 10-20 | | SARAHM |
| GLUCOSE | 89 | 70-110 | MG/DL | SARAHM |
| BUN | 9 | 5-21 | MG/DL | SARAHM |
| CREATININE | 1.1 | 0.8-1.3 | MG/DL | SARAHM |
| BUN/CREAT RATIO | 8.2 | | | SARAHM |
| CALCIUM | 9.1 | 8.1-10.5 | MG/DL | SARAHM |
| ADJUSTED CALCIUM | 8.9 | 8.0-10.5 | MG/DL | SARAHM |
| ALBUMIN | 4.2 | 3.4-5.0 | G/DL | SARAHM |

ATTENTION METHODOLOGY AND REFERENCE RANGES CHANGED 8/4/98 12:00 NOON.
REFERENCE RANGES FOR CKMB
0 - 3.6 NG/ML Non Cardiac patient.
3.6 - 5.0 NG/ML Patient's with history of Myocardial Ischemia & Angina.
   >5.0 NG/ML Compatible with Myocardial Damage.

TROPI RERAN TROPI & ACTMN TO VERIFY RESULTS/SMC-- FAX ORGINAL RESULTS TO ER @ 1130/SMC

ATTENTION METHODOLOGY CHANGED 8/4/98 12:00 NOON.......
REFERENCE RANGES FOR TROPONIN-I
0 - 0.4 NG/ML  Non Cardiac Patient.
0.4 - 1.5 NG/ML Gray Zone, SUGGEST REPEAT AT 2 HRS.
  > 1.5 NG/ML Compatible with Myocardial Damage OR Unstable Angina.

ATTENTION METHODOLOGY AND REFERENCE RANGES CHANGED 8/4/98 12:00 NOON.

ADJUSTED CALCIUM is invalid if the ALBUMIN is greater than 4.0 mg/dl.

1746          LAST PAGE OF REPORT

AT001706

CLAB REPORT #30

<table>
<tr><td></td><td>WILSON N. JONES MEMORIAL HOSPITAL<br>500 N. HIGHLAND SHERMAN, TEXAS<br>CLINICAL LABORATORY REPORT</td><td>HEMA    PAGE:    1<br>PRINTED DATE/TIME<br>03/27/2004 11:52</td></tr>
</table>

ACCOUNT NUMBER: 0016151680    MEDICAL RECORD #: 0000021153
PATIENT NAME: REYNOLDS, EDGAR L                              LOCATION: SI      ROOM #: 007
D.O.B.: 04/19/1924   AGE:   79  SEX: M     DOCTOR: WATSON, NATHAN ADAMS

--------------------------------------------------------------------------------
COLLECTED: 03/26/200423:54      BY: JAC                      ACCESSION NO: 4086-GL4777
RECEIVED: 03/26/200423:54
ACCESSION COMMENT: X:RM2 THAN OR KEEP 4 UNITTS AHEA
--------------------------------------------------------------------------------

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| TYPE & XM2 | DONE | | | TONIB |

1747          LAST PAGE OF REPORT

000060

AT001707

CLAB REPORT #30

```
                         WILSON N. JONES MEMORIAL HOSPITAL           CHEM   PAGE:   1
                            500 N. HIGHLAND SHERMAN, TEXAS           PRINTED DATE/TIME
                            CLINICAL LABORATORY REPORT               03/27/2004 11:08
ACCOUNT NUMBER: 0016152365     MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L                       LOCATION: ER       ROOM #:
D.O.B.: ████████   AGE:   21  SEX: M    DOCTOR: ER - PHYSICIANS
----------------------------------------------------------------------------------
COLLECTED: 03/27/200410:34   BY: ER                ACCESSION NO: 4087-GL4917
 RECEIVED: 03/27/200410:34
ACCESSION COMMENT: . Urine Type:C
----------------------------------------------------------------------------------
```

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| DRUG OF ABUSE SCREEN | | | | |
| PHENCYCLIDINE | NEGATIVE | NEG | | SARAHM |
| BENZODIAZEPINES | NEGATIVE | NEG | | SARAHM |
| COCAINE | NEGATIVE | NEG | | SARAHM |
| TETRAHYDROCANNABINOL | POSITIVE C | NEG | | SARAHM |
| OPIATES | NEGATIVE | NEG | | SARAHM |
| BARBITURATES | NEGATIVE | NEG | | SARAHM |
| AMPHETAMINES | NEGATIVE | NEG | | SARAHM |

1748                    LAST PAGE OF REPORT

000061

AT001708

CLAB REPORT #30

```
                    WILSON N. JONES MEMORIAL HOSPITAL          HEMA    PAGE:    1
                     500 N. HIGHLAND SHERMAN, TEXAS            PRINTED DATE/TIME
                       CLINICAL LABORATORY REPORT              03/27/2004 11:11
```

ACCOUNT NUMBER: 0016152365      MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L                        LOCATION: ER      ROOM #:
D.O.B.: ▮▮▮▮▮▮▮   AGE:   21   SEX: M     DOCTOR: ER - PHYSICIANS
--------------------------------------------------------------------------------
COLLECTED: 03/27/200410:15      BY: RW              ACCESSION NO: 4087-GL4915
 RECEIVED: 03/27/200410:17
ACCESSION COMMENT: ER 2; ER 2; .; .; .; .; .; .; .; .; .
--------------------------------------------------------------------------------
        PROCEDURE NAME              RESULT        REFERENCE RANGE     UNITS      TECH
--------------------------------------------------------------------------------
     TYPE/RH/SCREEN
        BLOOD TYPE                    A                                        TONIE
        RH                        POSITIVE                                     TONIE
        INDIRECT COOMBS           NEGATIVE                                     TONIE
```

1749

LAST PAGE OF REPORT

000062

AT001709

CLAB REPORT #30

```
                    WILSON N. JONES MEMORIAL HOSPITAL          HEMA    PAGE:    1
                    500 N. HIGHLAND SHERMAN, TEXAS             PRINTED DATE/TIME
                    CLINICAL LABORATORY REPORT                 03/27/2004 10:48

ACCOUNT NUMBER: 0016152365    MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L                        LOCATION: ER      ROOM #:
D.O.B.: ▓▓▓▓▓▓  AGE:   21  SEX: M      DOCTOR: ER - PHYSICIANS
```
--------------------------------------------------------------------------------
```
COLLECTED: 03/27/200410:15    BY: RW
  RECEIVED: 03/27/200410:17                           ACCESSION NO: 4067-GL4915
ACCESSION COMMENT: ER 2; ER 2; .; .; .; .; .; .; .; .; .
```
--------------------------------------------------------------------------------

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| CBC | | | | |
| WBC | 9.20 | 4.10-10.00 | x10E3/uL | PEGGYT |
| RBC | 4.26 | 3.80-5.80 | x10E6/uL | PEGGYT |
| HGB | 13.5 | 12.0-17.2 | G/DL | PEGGYT |
| HCT | 40.5 | 39.0-52.0 | % | PEGGYT |
| MCV | 95.2 | 84.0-98.0 | FL | PEGGYT |
| MCH | 31.7 | 26.0-33.0 | PG | PEGGYT |
| MCHC | 33.3 | 32.0-37.0 | G/DL | PEGGYT |
| PLT | 312 | 150-400 | x10E3/uL | PEGGYT |
| MPV | 8.2 L | 8.8-12.0 | FL | PEGGYT |
| RDW-CV | 11.2 L | 11.5-14.5 | % | PEGGYT |
| NEUT% | 80.5 H | 48.0-80.0 | % | PEGGYT |
| LYMPH% | 11.0 L | 15.0-40.0 | % | PEGGYT |
| MONO% | 7.5 | 0.0-14.0 | % | PEGGYT |
| EOS% | 0.1 | 0.0-7.0 | % | PEGGYT |
| BASO% | 0.8 | 0.0-2.0 | % | PEGGYT |
| NEUT# | 7.4 H | 1.1-5.7 | x10E3/uL | PEGGYT |
| LYMPH# | 1.0 | 0.6-2.4 | x10E3/uL | PEGGYT |
| MONO# | 0.7 | 0.0-3.0 | x10E3/uL | PEGGYT |
| EOS# | 0.0 | 0.0-0.7 | x10E3/uL | PEGGYT |
| BASO# | 0.1 | 0.0-0.2 | x10E3/uL | PEGGYT |
| SEG | 83 H | 42-75 | % | PEGGYT |
| BANDS | 0 | 0-5 | % | PEGGYT |
| LYMPHOCYTES | 13 L | 30-50 | % | PEGGYT |
| MONOCYTES | 4 | 0-9 | % | PEGGYT |
| EOSINOPHILS | 0 | 0-6 | % | PEGGYT |
| BASOPHILS | 0 | 0-2 | % | PEGGYT |

1750

LAST PAGE OF REPORT

000063

AT001710

CLAB REPORT #30

```
                        WILSON N. JONES MEMORIAL HOSPITAL        UA/FL   PAGE:    1
                          500 N. HIGHLAND SHERMAN, TEXAS         PRINTED DATE/TIME
                          CLINICAL LABORATORY REPORT             03/27/2004 10:47

ACCOUNT NUMBER: 0016152365     MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L                            LOCATION: ER      ROOM #:
D.O.B.: ▮▮▮▮▮▮▮   AGE:  21  SEX: M     DOCTOR: ER - PHYSICIANS
-------------------------------------------------------------------------------
COLLECTED: 03/27/200410:34    BY: ER
 RECEIVED: 03/27/200410:34                               ACCESSION NO: 4087-GL4916
ACCESSION COMMENT: . Urine Type:C
-------------------------------------------------------------------------------
```

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| URINALYSIS | | | | |
| COLOR, URINE | YELLOW | | | VERONI |
| APPEARANCE-UA | HAZY A | | | VERONI |
| URINE GLUCOSE | NEGATIVE | | MG/DL | VERONI |
| URINE BILIRUBIN | NEGATIVE (1) | | | VERONI |
| URINE KETONES | 15 A | | MG/DL | VERONI |
| SPECIFIC GRAVITY | 1.032 H (2) | 1.003-1.030 | | VERONI |
| URINE BLOOD | MODERATE A | | | VERONI |
| URINE PH | 6.0 | 4.5-8.0 | | VERONI |
| URINE PROTEIN | 100 A | | MG/DL | VERONI |
| UROBILINOGEN | 2.0 A | 0 - 2 | E.U./DL | VERONI |
| URINE NITRITES | NEGATIVE | | | VERONI |
| LEU. ESTERASE | NEGATIVE | | | VERONI |
| URINE WBC'S | 2 - 4 | 0 - 5 | /HPF | VERONI |
| URINE RBC'S | 10 - 25 A | 0 - 3 | /HPF | VERONI |
| URINE EPI-CELL | 10 - 25 A | | /HPF | VERONI |
| URINE BACTERIA | NONE SEEN | | | VERONI |
| URINE MUCUS | MODERATE A | | | VERONI |

1  ICTOTEST FOR BILIRUBIN PERFORMED

2  MANUAL SPECIFICI GRAVITY PERFORMED (REFRACTOMETER)

**1751**

LAST PAGE OF REPORT

000064

AT001711

CLAB REPORT #30

WILSON N. JONES MEMORIAL HOSPITAL                    HEMA    PAGE:    1
500 N. HIGHLAND SHERMAN, TEXAS                  . PRINTED DATE/TIME
CLINICAL LABORATORY REPORT                        03/27/2004 10:47

ACCOUNT NUMBER: 0016152365     MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L                        LOCATION: ER      ROOM #:
D.O.B.: [redacted]   AGE:   21  SEX: M     DOCTOR: ER - PHYSICIANS

COLLECTED: 03/27/200410:15     BY: RW                    ACCESSION NO.: 4087-GL4915
RECEIVED: 03/27/200410:17
ACCESSION COMMENT: ER 2; ER 2; .; .; .; .; .; .; .; .; .; -
------------------------------------------------------------------------

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| CBC | | | | |
| WBC | PENDING | 4.10-10.00 | x10E3/uL | |
| RBC | PENDING | 3.80-5.80 | x10E6/uL | |
| HGB | PENDING | 12.0-17.2 | G/DL | |
| HCT | PENDING | 39.0-52.0 | % | |
| MCV | PENDING | 84.0-98.0 | FL | |
| MCH | PENDING | 26.0-33.0 | PG | |
| MCHC | PENDING | 32.0-37.0 | G/DL | |
| PLT | PENDING | 150-400 | x10E3/uL | |
| MPV | PENDING | 8.8-12.0 | FL | |
| RDW-CV | PENDING | 11.5-14.5 | % | |
| NEUT% | PENDING | 48.0-80.0 | % | |
| LYMPH% | PENDING | 15.0-40.0 | % | |
| MONO% | PENDING | 0.0-14.0 | % | |
| EOS% | PENDING | 0.0-7.0 | % | |
| BASO% | PENDING | 0.0-2.0 | % | |
| NEUT# | PENDING | 1.1-5.7 | x10E3/uL | |
| LYMPH# | PENDING | 0.6-2.4 | x10E3/uL | |
| MONO# | PENDING | 0.0-3.0 | x10E3/uL | |
| EOS# | PENDING | 0.0-0.7 | x10E3/uL | |
| BASO# | PENDING | 0.0-0.2 | x10E3/uL | |
| SEG | PENDING | 42-75 | % | |
| BANDS | PENDING | 0-5 | % | |
| LYMPHOCYTES | PENDING | 30-50 | % | |
| MONOCYTES | PENDING | 0-9 | % | |
| EOSINOPHILS | PENDING | 0-6 | % | |
| BASOPHILS | PENDING | 0-2 | % | |
| | | | | |
| PTT | 29.6 | 23.5-39.0 | SEC | VERONI |
| PROTIME | | | | |
| PROTIME | 13.6 H | 11.1-13.4 | SEC | VERONI |
| PT INR | 1.31 | | | VERONI |

PLEASE NOTE!!!  The nomal PTT control average = 30.5 seconds.
PLEASE NOTE!!!  The reference range for the PTT has shifted upward, this is due to the
implementation of new instrumentation. 8/18/99.

**1752**

LAST PAGE OF REPORT

000065

AT001712

```
* DEMAND PRINT REQUEST * 0016152365-107
                                                  Page 1

Transaction ID: 0016152365-107  NO-INFO ALEXANDER,JASON        Room: 010
Collection Date/Time: 03/28/04 04:10am   Physician:
  Citation Result:
Accession No: 4088GL5013
Ordered    : JDS1  03/27/2004  15:35
Collected  : LINE  03/28/2004  04:10
Received   : BURLEI03/28/2004  04:18
Draw Comment: WITH DIFF
NAME                  RESULT           UNITS        RANGE
------------------------------------------------------------------
SODIUM               133      L       MEQ/L        136-    145
POTASSIUM            3.9              MEQ/L         3.5-    5.1
CHLORIDE            103              MEQ/L          98-    107
BICARBONATE          25              MMOL/L         23-    29
ANION GAP             9      L                      10-     20
GLUCOSE             113      H    MG/DL             70-    110
                    CONTINUED on Next Page
```

1753

000066

AT001713

* DEMAND PRINT REQUEST * 0016152365-107

Page 2

Transaction ID: 0016152365-107  NO-INFO ALEXANDER,JASON          Room: 010
Collection Date/Time: 03/28/04 04:10am   Physician:
Citation Result:

| | | | | | |
|---|---|---|---|---|---|
| BUN | 5 | | MG/DL | 5- | 21 |
| CREATININE | 0.8 | | MG/DL | 0.8- | 1.3 |
| BUN/CREAT RATIO | 6.3 | | | - | |
| CALCIUM | 8.3 | | MG/DL | 8.1- | 10.5 |
| ALBUMIN | 3.1 | L | G/DL | 3.4- | 5.0 |

RESULTS VERIFIED BY REPEAT ANALYSIS ON SAME SAMPLE

| | | | | | |
|---|---|---|---|---|---|
| ADJUSTED CALCIUM | 9.2 | | MG/DL | 8.0- | 10.5 |

ADJUSTED CALCIUM is invalid if the ALBUMIN is greater than 4.0 mg/dl.

1754

000067

CLAB REPORT 116

WILSON N. JONES MEMORIAL HOSPITAL     LOCATION:   SI     RM#:   004     PATIENT:     THOMAS, ANDRE N
500 N. HIGHLAND SHERMAN, TX           ADMITTED: 03/27/04          ACC#: 0016152365   MR#: 0000032561
LABORATORY CUMULATIVE REPORT          DR. WILCOTT, ROBERT         DOB:                 AGE:  21 SEX: M
DIAGNOSIS:                                                   - MR#   DISCHARGED DATE -

====================================================================================================

    PROCEDURE NAME   REFERENCE RANGE  UNITS   03/27/04 10:15   03/27/04 10:34   03/27/04 11:50
    ----------------4087-GL4915------------4087-GL4917-------------4087-GL4939-------------

                                               CHEMISTRY

CHEMISTRY

| PROCEDURE NAME | REFERENCE RANGE | UNITS | 03/27/04 10:15 | | 03/27/04 10:34 | 03/27/04 11:50 |
|---|---|---|---|---|---|---|
| SODIUM | 136-145 | MEQ/L | 140 | | | |
| POTASSIUM | 3.5-5.1 | MEQ/L | 3.4 L | | | |
| CHLORIDE | 98-107 | MEQ/L | 102 | | | |
| BICARBONATE | 23-29 | MMOL/L | 26 | | | |
| ANION GAP | 10-20 | | 15 | | | |
| GLUCOSE | 70-110 | MG/DL | 89 | | | |
| BUN | 5-21 | MG/DL | 9 | | | |
| CREATININE | 0.8-1.3 | MG/DL | 1.1 | | | |
| BUN/CREAT RATIO | | | 8.2 | | | |
| CALCIUM | 8.2-10.5 | MG/DL | 9.3 | | | |
| ADJUSTED CALCIUM | 8.0-10.5 | MG/DL | 8.5 | | | |
| ALBUMIN | 3.4-5.0 | G/DL | 4.2 | | | |
| CPK | 0-232 | U/L | | | 246 H | |
| CKMB | 0.0-3.6 | NG/ML | 0.6 | | 0.9 | |
| TROPONIN-I* | 0.00-0.40 | NG/ML | 0.34 | | 0.32 | |
| ACETAMINOPHEN | 10-30 | ug/ml | 0 L | | | |
| ALCOHOL (ETOH) | 0-79 | MG/DL | 2 | | | |
| SALICYLATE | 2.8-20.0 | MG/DL | 1.5 L | | | |
| TSH | 0.34-4.82 | uIU/mL | 0.69 | | | |
| PHENCYCLIDINE | NEG | | | NEGATIVE | | |
| BENZODIAZEPINES | NEG | | | NEGATIVE | | |
| COCAINE | NEG | | | NEGATIVE | | |
| TETRAHYDROCANNAB | NEG | | | POSITIVE C | | |
| OPIATES | NEG | | | NEGATIVE | | |
| BARBITURATES | NEG | | | NEGATIVE | | |
| AMPHETAMINES | NEG | | | NEGATIVE | | |

ACCESSION:      COMMENT:
4087-GL4915     ER 2; ER 2; .; .; .; .; .; .; .; .; .
4087-GL4917     . Urine Type:C
4087-GL4939     ER2; ER2; ER2


ACCESSION:      PROCEDURE:              COMMENT:
4087-GL4915     ADJUSTED CALCIUM        ADJUSTED CALCIUM is invalid if the ALBUMIN is greater than 4.0 mg/dl.

4087-GL4915     CKMB                    ATTENTION METHODOLOGY AND REFERENCE RANGES CHANGED 8/4/98 12:00 NOON.
                                        REFERENCE RANGES FOR CKMB
                                        0 - 3.6 NG/ML Non Cardiac patient.
                                        3.6 - 5.0 NG/ML Patient's with history of Myocardial Ischemia & Angina.
                                        >5.0 NG/ML Compatible with Myocardial Damage.

4087-GL4915     TROPONIN-I*             RERAN TROPI & ACTMN TO VERIFY RESULTS/SMC-- FAX ORGINAL RESULTS TO ER @ 1130/SMC

4087-GL4915     TROPONIN-I*             ATTENTION METHODOLOGY CHANGED 8/4/98 12:00 NOON.......
====================================================================================================
C.B. SIMPSON, PATHOLOGIST/MEDICAL DIRECTOR                                          CHART REPORT

PATIENT:    THOMAS, ANDRE N           ACC#: 0016152365   MR#: 0000032561   LOC:   SI   -004    PRINTED: 03/27/04 13:42
            1755                                         CONTINUED ON NEXT PAGE              PAGE:  CHEM    1-1

                                                                                       000068

AT001715

```
WILSON N.  JONES MEMORIAL HOSPITAL      LOCATION:SI    RM#: ˉ 004      PATIENT: THOMAS, ANDRE N
500 N. HIGHLAND SHERMAN, TX             ADMITTED: 03/27/2004    ACC#:          MR#:0000032561
LABORATORY CUMULATIVE REPORT            DR. WILCOTT, ROBERT      DOB:          AGE:  21  SEX: M
DIAGNOSIS:                                    0016152365    ˄ MR#   DISCHARGED DATE ˄
```

---

```
ACCESSION:        PROCEDURE:                 COMMENT:
4087-GL4915       TROPONIN-I*                REFERENCE RANGES FOR TROPONIN-I
                                              0  - 0.4 NG/ML  Non Cardiac Patient.
                                              0.4 - 1.5 NG/ML Gray Zone, SUGGEST REPEAT AT 2 HRS.
                                               > 1.5 NG/ML Compatible with Myocardial Damage OR Unstable Angina.

4087-GL4915       TSH                        ATTENTION METHODOLOGY AND REFERENCE RANGES CHANGED 8/4/98 12:00 NOON.

4087-GL4917       DRUG OF ABUSE SCREEN
```

---

```
C.B. SIMPSON, PATHOLOGIST/MEDICAL DIRECTOR                                    CHART REPORT

PATIENT: THOMAS, ANDRE N           ACC#: 0016152365   MR#: 0000032561   LOC: SI    - 004   PRINTED: 03/27/2004 13:41
                                                                                     PAGE:  CHEM      1-2
```

## 1756

CONTINUED ON NEXT PAGE

000069

AT001716

CLAB REPORT #16

```
WILSON N. JONES MEMORIAL HOSPITAL        LOCATION:  SI      RM#:  010      PATIENT:    NO-INFO ALEXANDER, JASON
500 N. HIGHLAND SHERMAN, TX              ADMITTED: 03/27/04                ACC#: 0016152365   MR#: 0000032561
LABORATORY CUMULATIVE REPORT            DR. WILCOTT, ROBERT               DOB:              AGE:   21 SEX: M
DIAGNOSIS: PENETRATING TRAUMA TO CX,POSS. TO HEART          = MR#   DISCHARGED DATE =
```

| PROCEDURE NAME | REFERENCE RANGE | UNITS | 03/27/04 10:15 | 03/27/04 10:15 | 03/27/04 14:55 | 03/27/04 23:58 | 03/28/04 04:10 |
|---|---|---|---|---|---|---|---|
| | | | 4087-GL4915 | 4087-GL4942 | 4087-GL5002 | 4087-GL5083 | 4088-GL5013 |

HEME/COAG/SERO

**HEMATOLOGY**

| PROCEDURE NAME | REFERENCE RANGE | UNITS | | | | | |
|---|---|---|---|---|---|---|---|
| WBC | 4.10-10.00 | x10E3/uL | 9.20 | | | | 7.76 |
| RBC | 3.80-5.80 | x10E6/uL | 4.26 | | | | 4.09 |
| HGB | 12.0-17.2 | G/DL | 13.5 | | 13.4 | 13.3 | 12.6 |
| HCT | 39.0-52.0 | % | 40.6 | | 38.9 L | 38.1 L | 38.5 L |
| MCV | 84.0-98.0 | FL | 95.2 | | | | 94.1 |
| MCH | 26.0-33.0 | PG | 31.7 | | | | 30.9 |
| MCHC | 32.0-37.0 | G/DL | 33.3 | | | | 32.8 |
| PLT | 150-400 | x10E3/uL | 312 | | | | 223 |
| MPV | 8.8-12.0 | FL | 8.2 L | | | | 8.6 L |
| RDW-CV | 11.5-14.5 | % | 11.2 L | | | | 11.1 L |
| NEUT% | 48.0-80.0 | % | 80.5 H | | | | 70.8 |
| LYMPH% | 15.0-40.0 | % | 11.0 L | | | | 18.8 |
| MONO% | 0.0-14.0 | % | 7.5 | | | | 12.5 |
| EOS% | 0.0-7.0 | % | 0.1 | | | | 0.3 |
| BASO% | 0.0-2.0 | % | 0.8 | | | | 0.6 |
| NEUT# | 1.1-5.7 | x10E3/uL | 7.4 H | | | | 5.5 |
| LYMPH# | 0.6-2.4 | x10E3/uL | 1.0 | | | | 1.2 |
| MONO# | 0.0-3.0 | x10E3/uL | 0.7 | | | | 1.0 |
| EOS# | 0.0-0.7 | x10E3/uL | 0.0 | | | | 0.0 |
| BASO# | 0.0-0.2 | x10E3/uL | 0.1 | | | | 0.1 |

**DIFF/MORPH/OTHER**

| PROCEDURE NAME | REFERENCE RANGE | UNITS | | | | | |
|---|---|---|---|---|---|---|---|
| SEG | 42-75 | % | 83 H | | | | 75 |
| BANDS | 0-5 | % | 0 | | | | 0 |
| LYMPHOCYTES | 30-50 | % | 13 L | | | | 21 L |
| MONOCYTES | 0-9 | % | 4 | | | | 4 |
| EOSINOPHILS | 0-6 | % | 0 | | | | 0 |
| BASOPHILS | 0-2 | % | 0 | | | | 0 |

**COAGULATION**

| PROCEDURE NAME | REFERENCE RANGE | UNITS | | | | | |
|---|---|---|---|---|---|---|---|
| PROTIME | 11.1-13.4 | SEC | 13.6 H | | | | |
| PT INR | | | 1.31 | | | | |
| PTT | 23.5-39.0 | SEC | 29.6 | | | | |

**SEROLOGY**

| PROCEDURE NAME | REFERENCE RANGE | UNITS | | | | | |
|---|---|---|---|---|---|---|---|
| BLOOD TYPE | | | A | | | | |
| RH | | | POSITIVE | | | | |
| INDIRECT COOMBS | | | NEGATIVE | | | | |

(1 )  RESULTS VERIFIED BY REPEAT ANALYSIS ON SAME SAMPLE

| CCESSION: | COMMENT: |
|---|---|
| 087-GL4915 | ER 2; ER 2; .; .; .; .; .; .; .; . |
| 087-GL4942 | X:ER 2 |
| 087-GL5002 | IN PACU |
| 088-GL5013 | WITH DIFF |

B. SIMPSON, PATHOLOGIST/MEDICAL DIRECTOR                                    CHART REPORT

```
TIENT:  NO-INFO ALEXANDER, JASON .      ACC#: 0016152365   MR#: 0000032561   LOC:    SI    -010      PRINTED: 03/28/04 05:29
                                                           CONTINUED ON NEXT PAGE                     PAGE: HEMA    1-1
```

1757

000070

AT001717

```
WILSON N. JONES MEMORIAL HOSPITAL          LOCATION:SI    RM#: ˉ 010         PATIENT: NO-INFO ALEXANDER, JASON
500 N. HIGHLAND SHERMAN, TX                ADMITTED: 03/27/2004              ACC#:              MR#:0000032561
LABORATORY CUMULATIVE REPORT               DR. WILCOTT, ROBERT               DOB:               AGE:  21  SEX: M
DIAGNOSIS:                                          0016152365    = MR#   DISCHARGED DATE =
```

| PROCEDURE NAME | REFERENCE RANGE | UNITS | 03/27/04 10:15 | 03/27/04 10:15 | 03/27/04 14:55 | 03/27/04 23:58 | 03/28/04 04:10 |
|---|---|---|---|---|---|---|---|
| | | | 4087-GL4915 | 4087-GL4942 | 4087-GL5002 | 4087-GL5083 | 4088-GL5013 |
| TYPE & XM 1 | | | | DONE | | | |

```
ACCESSION:      COMMENT:
4087-GL4942     X:ER 2


ACCESSION:      PROCEDURE:          COMMENT:
4088-GL5013     CBC                 NO PLATELET CLUMPS SEEN, PEGGYT.
```

```
C.B. SIMPSON, PATHOLOGIST/MEDICAL DIRECTOR                              CHART REPORT

PATIENT: NO-INFO ALEXANDER, JASON    ACC#: 0016152365    MR#: 0000032561    LOC: SI    - 010    PRINTED: 03/28/2004 05:35
                                                                                    PAGE:  EEMA        1-2
```

**1758**                    LAST PAGE OF REPORT                    000071

AT001718

MEDICAL CENTER
CLINICAL LABORATORY
Current Date/Time  03/27/04 23:59  Software  System V2.0

Specimen ID  123
Name NO INFO
Pat ID SI- 10
DOB
Dr
Param 1  Limits 1

Mar 27 2004 23:58
Operator ID    000
Sequence #    2208
Open Sampler

Sex
Col
Cmt

WBC 9.06 K/uL

NEU 6.82  75.2 %N

LYM 1.15  12.7 %L

MONO .939  10.4 %M

EOS .010  .113 %E

BASO .145  1.60 %B

RBC 4.10 M/uL

HGB 13.3 g/dL

HCT 38.1 %

MCV 93.0 fL

MCH 32.4 pg

CHC 34.8 g/dL

RDW 10.9 %

PLT 224. K/uL

MPV 8.06 fL



| MANUAL DIFFERENTIAL | | RBC MORPHOLOGY | |
|---|---|---|---|
| NEU | META | NORMAL | MICRO |
| BAND | MYELO | PLYCHROM | MACRO |
| LYMPH | PRO | HYPCHROM | ANISO |
| MONO | BLAST | POIK | BASOSTIP |
| EOSIN | VAR LYM | TARGET | |
| BASO | NUXGRAN | SPHERO | NRBC |
| COMMENT: | | | |
| DIFF BY | | DATE | |

000072

AT001719

CLAB REPORT #30

**WILSON N. JONES MEMORIAL HOSPITAL**                     HEMA   PAGE:   1
500 N. HIGHLAND SHERMAN, TEXAS                          PRINTED DATE/TIME
CLINICAL LABORATORY REPORT                              03/27/2004 15:00

ACCOUNT NUMBER: 0016152365     MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE N                          LOCATION: SI      ROOM #: 004
D.O.B.: ███████    AGE:   21   SEX: M    DOCTOR: WILCOTT, ROBERT

COLLECTED: 03/27/200414:55      BY: LINE                    ACCESSION NO: 4087-GL5002
RECEIVED: 03/27/200414:55
ACCESSION COMMENT: IN PACU

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| HGB & HCT | | | | |
| HGB | 13.4 | 12.0-17.2 | G/DL | TAYLOR |
| HCT | 38.9 L | 39.0-52.0 | % | TAYLOR |

LAST PAGE OF REPORT

1780                                                                          000073

AT001720

```
WILSON N. JONES MEMORIAL HOSPITAL        LOCATION:SI    RM#:  004       PATIENT: THOMAS, ANDRE N
500 N. HIGHLAND SHERMAN, TX.             ADMITTED: 03/27/2004           ACC#:              MR#:0000032561
LABORATORY CUMULATIVE REPORT             DR. WILCOTT, ROBERT            DOB:               AGE:  21  SEX: M
DIAGNOSIS:                                          0016152365        - MR#  DISCHARGED DATE -
```

```
PROCEDURE NAME   REFERENCE RANGE  UNITS   03/27/04 10:34
------------------------------------------4087-GL4916------------------------------------------
```

URINE/FLUIDS

| URINALYSIS | | | | | | | |
|---|---|---|---|---|---|---|---|
| COLOR, URINE | | | YELLOW | | | | |
| APPEARANCE-UA | | | HAZY A | | | | |
| URINE GLUCOSE | | MG/DL | NEGATIVE | | | | |
| URINE BILIRUBIN | | | NEGATIVE | (1) | | | |
| URINE KETONES | | MG/DL | 15 A | | | | |
| SPECIFIC GRAVITY | 1.005-1.030 | | 1.032 H | (2) | | | |
| URINE BLOOD | | | MODERATE A | | | | |
| URINE PH | 4.5-8.0 | | 6.0 | | | | |
| URINE PROTEIN | | MG/DL | 100 A | | | | |
| UROBILINOGEN | 0 - 2 | E.U./DL | 2.0 A | | | | |
| URINE NITRITES | | | NEGATIVE | | | | |
| LEU. ESTERASE | | | NEGATIVE | | | | |
| MICROSCOPIC/OTHER | | | | | | | |
| URINE WBC'S | 0 - 5 | /HPF | 2 - 4 | | | | |
| URINE RBC'S | 0 - 3 | /HPF | 10 - 25 A | | | | |
| URINE EPI-CELL | | /HPF | 10 - 25 A | | | | |
| URINE BACTERIA | | | NONE SEEN | | | | |
| URINE MUCUS | | | MODERATE A | | | | |

(1)  ICTOTEST FOR BILIRUBIN PERFORMED
(2)  MANUAL SPECIFIC GRAVITY PERFORMED (REFRACTOMETER)

ACCESSION:     COMMENT:
4087-GL4916     . Urine Type:C

```
--------------------------------------------------------------------------------------
C.B. SIMPSON, PATHOLOGIST/MEDICAL DIRECTOR                                CHART REPORT

PATIENT:  THOMAS, ANDRE N          ACC#: 0016152365   MR#: 0000032561   LOC: SI   - 004   PRINTED: 03/27/2004 13:41
                                                                                          PAGE:  UA/FL      1-1
         1761
                                        LAST PAGE OF REPORT
```

000074

AT001721

# Exhibit 51

## Interview in Sherman PD with Carmen Hayes



1

INTERVIEW IN THE SHERMAN POLICE DEPARTMENT

WITH CARMEN HAYS

BY THE INTERVIEWER

TAKEN ON MARCH 27, 2004

ORIGINAL

5336

04519

2

1   March 27, 2004.

2                      (Proceedings take place at the Sherman

3   Police Department.)

4                      Carmen Hays,

5   hereinafter answered the questions propounded to him:

6                      DIRECT EXAMINATION

7   BY SHERMAN POLICE DETECTIVE:

8        Q.    Your name is Carmen.  But after that what is

9   your last name?

10       A.    Hays.

11       Q.    Hays?

12       A.    H-a-y-s.

13       Q.    What is your date of birth?

14       A.    ████.

15       Q.    Of course, you know the reason we are here is

16  what you told us about this incident with Andre.  Okay?

17  Can you start with let's say, you know, the stab wounds

18  and stuff like that themselves.  Start there.  Okay?

19       A.    This was actually Wednesday.  It started about

20  about twenty-four hours and then that was prior to the

21  stabbing.  But Thursday when I got off of work, like we

22  would get trashed and whatever so we got some cough

23  medicine.  And we got in the car.  We went home.  We went

24  home.

25  **5337** Q.    You went home?

04320

3

1        A.    We got the cough medicine.

2        Q.    For?

3        A.    To trip over.  Because, but and so and I don't

4   think --- I don't think he was drunk when we went over

5   there at Laura's, but we went over there, he was ---   He

6   started taking pills and we were talking to the kids.

7        Q.    What kind of pills?

8        A.    Coricidin Cough and Cold.  You trip off of it.

9   And at Fairview Park he would stop and throw up.  We went

10  back to the park.  He went to sleep.  He got there.

11  Laura could tell something was wrong with him.

12              It was so intense when he started

13  tripping, he had to lay down on the ground.  And she was

14  like, "What is wrong with you?  This is sad.  You come

15  over here all puffed up wanting to see your son."  He was

16  like, nothing could stop him, but she did not piss him

17  off to the point that I thought this would happen.

18       Q.    This was Thursday?

19       A.    Yes.   Then Thursday night we were sitting there

20  and listening to music and just hanging out at his house.

21  After we got back from there and we were just hanging out

22  and everything was cool.  Then he was like, "I love you,

23  Carmen.  I love you."  Then he stabbed himself.  I didn't

24  realize that was what he had done.

25  5338    Q.    Where were you all laying down?

04521

4

1    A.    We were laying down on the bed.  And I was

2   like, "What just happened?"  Because I was tripping out.

3   He was like, "Nothing happened.  Just lay there."  Two

4   minutes later he turned over and I saw the wound on his

5   chest and the blood and all and I said, "What did you

6   do?"

7              He was like, "I stabbed myself."  I was

8   like, "Why did you do that?"  I started flipping out.

9   And he was really scaring me and so I went and told his

10  mom.  She was like, "What are you guys on?"  I said,

11  "Cough medicine."  We had been drinking.  I didn't drink

12  no more.  She was like, "You guys are just playing with

13  your lives and everything."  I was like, "I know.  We

14  will never do it again, never.  I will never do it

15  again."

16              And I went to sleep, you know, because he

17  was like I am all right.  I am not coughing up blood or

18  anything.  I said, "You need to go to the hospital or

19  something."  I tried to get him to stand up.  He could

20  not stand up and he just lay there.

21              I fell asleep in about twenty or thirty

22  minutes.  He woke me up and told me he was going to the

23  hospital.  His mom was taking him to the hospital.  He

24  got back about ten o'clock that morning and he was okay.

25  I mean that was why he broke up with me.  And I was like

**5339**

5

1  all right, whatever. And I mean I think he cared about

2  me. I knew he had stuff wrong with him.

3            We were doing our own thing that day. I

4  was off work on Friday. I was with his mother. As a

5  matter of fact, I was back in the middle bedroom and I

6  went to sleep about 8:30. And I woke up and I had been

7  asleep and his mom came in the room getting laundry and

8  stuff. I don't know what time that was. But I heard

9  Andre coming in at 6:30.

10     Q.  This morning?

11     A.  Yes.

12     Q.  Did you say anything to Andre this morning?

13     A.  I don't think so.

14     Q.  But did you say anything as he was leaving

15  then?

16     A.  I don't think so.

17     Q.  What time did he come back that you know of?

18     A.  Well, I heard the door open and close twice. I

19  was up at 6:30, but he did not come back until a little

20  bit before nine o'clock.

21     Q.  How do you know?

22     A.  What happened. He went to show us the butcher

23  knife and that is when my alarm went off.

24     Q.  Tell me about that.

25     A.  He came in. I just had a partial view of him.

**5340**                                 04323

1  I didn't see if he had anything in his hand.  I could not

2  see.

3      Q.    What was he wearing?

4      A.    He was wearing a blue T-shirt and a pair of

5  green BBUs.  I had come.  I had turned around and was

6  sitting on the couch where I did not want to talk to him.

7  But I was like, Andre, and he was like, you know, I am

8  not, I was trying to tell the story.

9      Q.    What did Andre say?

10     A.    This is when he said the police will come.

11 They are coming for me.  I said, "What did you do?"  That

12 is when I noticed the blood on his shirt.  I was like,

13 "Andre, what did you do?"  He said, "I stabbed Laura and

14 I ripped her heart out."  I said, "Are you playing

15 around?"  He was like, "No."  Do you want to see the bag?

16 He pointed toward the kitchen.  I thought he had put it

17 outside, you know.

18     Q.    That was the first time you saw him.  So was it

19 possible he was in there earlier when you were in bed?

20     A.    Yes.

21     Q.    But he pointed towards the kitchen and he asked

22 you if you wanted to see the bag?

23     A.    Yes.  "Do you want to look in the bag?"  I

24 said, "No.  Why would I want to see that?"  At that time

25 we crossed each other in the living room.  He was going

**5341**

44524

7

1   around to the, actually he took his shirt off when we

2   first started talking and he said, "Look at this."  I was

3   like, "I don't believe you stabbed yourself."  Then he

4   went out and we crossed and I went to the bedroom.  I was

5   getting my work clothes on.  I was like, "I don't want to

6   be in the house with you."  He was like, "Put your like

7   this" or whatever he said.  But you know, he was I

8   thought I used that one.  He had his hand on the line.

9   It looked like there was blood.

10              He said, "I put it in twice.  I wanted to

11   be sure."  "I don't want to look at that."  You know,

12   that is when I went to the bedroom and got changed.  I

13   don't know if Isiah and Andre were talking or whatever.

14   But when I came out of the bedroom, Andre was sitting at

15   the bar and I was like why did you do that?  ~~Why did you~~

16   ~~do that? I thought she was Jezebel.~~  I was like,

17   "Andre, you need help."  I was sitting on the couch.  I

18   said, "You need help."  I was like, "Are you going to

19   turn yourself in?"  "Yes, I will turn myself in."

20              Then he said, Isiah was listening.  "You

21   know, I will help you."  He said, "I will go with you.

22   We will get a ride."  He said, "Okay."  I went back in and

23   changed my shirt and put my socks and shoes on and I came

24   out and he was hugging Andre.  Andre was leaning on his

25   chest.  We went around.  Isiah grabbed me, but I guess he

**5342**

8

1   heard we were going to turn him in.

2              We went through the apartment and turned

3   around.  He had not talked to Ray yet.  We got to tell

4   her what was going on or anything.  "Can you give us a

5   ride to the police station?"  She was like, "Well, you

6   know, Jason has a car, his brother."  I said, "Okay.

7   Because they would tell us.  He said, "Maybe."  So we

8   started walking over there.  I changed my mind and we

9   will, you know, we went for help.  And I did not tell him

10  anything in the car.

11      Q.   What did you tell her?

12      A.   I said we needed a ride to the police station.

13  She said, "Okay."  We drove there because they talked on

14  the way.

15      Q.   Where did you sit in the car?

16      A.   Huh?

17      Q.   Where did you sit in the car?

18      A.   I sat in the front seat.  Andre was in the

19  back.

20      Q.   Behind you?

21      A.   Yes.  And when he got to the police station,

22  Andre did not want to talk with us.  He walked out.  He

23  wanted to go in by himself.  So I let him out to go in

24  and he told me.  He said he would write me.  I said,

25  okay.  Then he pulled out and she was, "Probably he will

**5343**

04326

AT005339

1   never get out."  She started crying and she said, I will

2   help Andre.  Went there and he said, "I love you."

3                    And we came up here.  Then I went to the

4   bathroom because I was like I have to go to the bathroom.

5   We heard Andre talking and all I heard was he was

6   screaming.  I was like I can't listen to this.  I can't,

7   you know.  I left.  I went back to the trailer and

8   looked.  He said there was something about the bag.  You

9   know, so we looked around the house and around the

10  outside and underneath the trailer and I went in his

11  room.  I didn't want to find anything, you know.  So we

12  looked.  We just went in his bedroom and looked in the

13  bathroom.  When I saw Andre ---

14       Q.   Did you turn the water on anywhere?

15       A.   No.

16       Q.   Earlier you said something about he thought it

17  was somebody.

18       A.   Jezebel.

19       Q.   Jezebel?

20       A.   From the Bible.

21       Q.   That is what he was referring to was the Bible?

22       A.   Yes.

23       Q.   Was there anything else that you could think of

24  about what happeneded on this morning or anything that

25  you know of?

**5344**                                                    04527

1      A.    No.

2      Q.    So what happened?

3      A.    No?

4      Q.    Did Andre tell you that you saw somebody on his

5   way over here?

6      A.    Yes.  Brad.  He was with her.

7      Q.    When?

8      A.    When he was walking to their house.

9      Q.    When he was walking to their house?

10     A.    Yes.  And Brian waved at her or had some hand

11   motion.

12     Q.    Did Brian go into Andre's daddy's house?  Is

13   that what he told you?

14     A.    Yes.  He went in Rochelle's house.  She said,

15   "Why did you even go over there?"  He said, "Well, you

16   know, I wanted to ask Laura to forgive me for everything

17   that I had done."  I was like, "Did you know what you

18   were doing."  He said, "No."  He said, "Well, you know,

19   today I am re-living today because he had deja view or

20   something back in the house.  He said he killed Laura and

21   ██████  before.

22     Q.    That is what he thought about?

23     A.    No.  That is what he had done it before in his

24   mind, yes.  I believe that he thought that, you know,

25   because when you have deja view, he had deja view for a

5345

11

1    week, you know, from what I understand.

2         Q.    Is there anything else?

3         A.    No.

4                    (End of the transcription of the hearing.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **5346**                                    14329

1  THE STATE OF TEXAS

2  COUNTY OF GRAYSON

3             I, Janet M. Kamras, Official Court

4  Reporter in and for the 15th Judicial District Court of

5  Grayson, State of Texas, do hereby certify that the above

6  and foregoing contains a true and correct transcription

7  of all portions of evidence and other proceedings

8  requested by the parties to be included in the Reporter's

9  Record, in the above-styled and numbered cause, all of

10 which occurred in open court or in chambers and were

11 reported by me.

12             I further certify that this Reporter's

13 Record of the proceedings truly and correctly reflects

14 the exhibits, if any, admitted by the respective parties.

15             I further certify that the total cost for

16 the preparation of this Reporter's Record is $36.00 and

17 will be paid by Grayson County Commissioners.

18             WITNESS MY OFFICIAL hand this the 21sth

19 day of March, 2004 .

20  _____

21  JANET M. KAMRAS, Texas CSR#1129
    Expiration Date:  12-31-2004
22  Official Court Reporter
    200 S. Crockett
23  Sherman, Texas  75090

24             903-813-4315

    **5347**
25                                            04530


JANET M. KAMRAS
CERTIFIED SHORTHAND REPORTER                    AT005343

# Exhibit 52

## Sherman PD Incident Report

Complete

INCIDENT REPORT

Date Printed:
Oct 14 2004

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

---

Incident # 0402024                Case #                Document #

---



Victim:
THOMAS, LAURA CHRISTINE (DECEAS UNEMPLOYED    AGE:  20  SEX: F
                                              RACE: W
                                              DOB:
                                              DL#:
                                              SS#:
                (DECEASED)                    AGE:   4  SEX: M
                                              RACE: B
                                              DOB:
                                              DL#:
                                              SS#:
                (DECEASED)                    AGE:   1  SEX: F
                                              RACE: B
                                              DOB:
                                              DL#:
                                              SS#:

Witness:
MAYO, JOHN BRUNSON                            AGE:  29  SEX: M
                                              RACE: W
                                              DOB:
                                              DL#:
                                              SS#:
BOREN, PAUL EDWARD                            AGE:  45  SEX: M
                                              RACE: W
                                              DOB:
                                              DL#:
                                              SS#:
FLYNN, NICOLE BRANDY                          AGE:  19  SEX: F
                                              RACE: W
                                              DOB:
                                              DL#:
                                              SS#:
                                              AGE:  17  SEX: F
                                              RACE: W
                                              DOB:
                                              DL#:
                                              SS#:
JOHNSON, RAQUEL          HOUSEWIFE            AGE:  30  SEX: F
                                              RACE: W
                                              DOB:
                                              DL#:
                                              SS#:
HAYES, CARMON            WAITRESS             AGE:      SEX: F
                         SONIC                RACE: W
                         PARKWAY              DOB:
                                              DL#:
                                              SS#:

10554

03945

AT010581

Date Printed:              INCIDENT REPORT
Oct 14 2004

SHERMAN POLICE DEPARTMENT
317 S TRAVIS



RILES, WILLIE             REPAIRMAN              AGE:  69   SEX: M
                        KELLY SQUARE           RACE: B
                                                  DOB:
                                                  DL#:
                                                  SS#:

HUGHES, BRYANT LEE      LABOR                 AGE:  31   SEX: M
                        CON AGRA             RACE: B
                                                DOB:
                                              DL#:
                                              SS#:

                        STUDENT              AGE:  16   SEX: M
                        SISD-SHERMAN HIGH AEP   RACE: B
                                              DOB:
                        SHERMAN TEXAS        DL#:
                                              SS#:

Arrestee:
THOMAS, ANDRE LEE                            AGE:  21   SEX: M
                                                RACE: B
                                                DOB:
                                                DL#:
                                                SS#:

Other:
RAMSEY, LISA MARIE      MANAGER             AGE:  33   SEX: F
                        BURGER KING          RACE: W
                        1213 N TRAVIS       DOB:
                        SHERMAN, TX         DL#:
                        903-868-1820        SS#:

COLE, CRYSTAL MAY STANLEY                  AGE:  22   SEX: F
                        BURGER KING          RACE: W
                                              DOB:
                        SHERMAN, TX         DL#:
                                              SS#:

JONES, JEREMY DEWAYNE (P)    LABORER             AGE:  26   SEX: M
                        BURGER KING          RACE: B
                        1213 N TRAVIS       DOB:
                        SHERMAN, TEXAS      DL#:
                        903-868-1820        SS#:

ROBBINS, ANNETTE J      ASST MANAGER         AGE:  46   SEX: F
                        BURGER KING          RACE: B
                                              DOB:
                                               DL#:
                        868-1820            SS#:

TAYLOR, SAMUEL JAMES     BURGER KING          AGE:  40   SEX: M
                                               RACE: B
                        SHERMAN TX          DOB:
                                              DL#:
                                              SS#:

HUGHES, STEPHANIE                           AGE:  36   SEX: F
                                                RACE: B
                                                DOB:
                                                DL#:
                                                SS#:

**10555**



Date Printed:                INCIDENT REPORT
Oct 14 2004

               SHERMAN POLICE DEPARTMENT
                    317 S TRAVIS

HUGHES, BOBBIE JEAN        DISABLED             AGE:  60  SEX: F
                                            RACE: B
                                          DOB:
                                          DL#:
                                          SS#:

ENGLAND, JENNIFER DARE     CASHIER             AGE:  25  SEX: F
                         WALMART             RACE: W
                                          DOB:
                         DENISON, TX        DL#:
                                            SS#:

----------------------------------------------------------------------
Offense : CAPITAL MURDER          UCR Code : 01A
Date    : 03/27/04              Time : 07:22M-
Location : 1200 W TAYLOR #340
Weapon  :                       Dept Code: C
M / O   : SUSPECT FORCED FRONT DOOR/STABBED VICTIMS
----------------------------------------------------------------------

| Vehicle Owner's Name | License# | Yr | Color | Model | Make | Style | I |
|----------------------|----------|----|-------|-------|------|-------|---|
| RAQUEL JOHNSON | F93WXB | 91 | TAN | ACCORD | HONDA | 2D | |

----------------------------------------------------------------------

| Init/Currnt Status | Description | Serial # | Value |
|--------------------|-------------|----------|-------|
| EVIDENCE | 2 CONSENT TO SEARCHS | | |
| 0402024 | | | |
| EVIDENCE | 16 PHOTO DISKS | | |
| 0402024 | | | |
| EVIDENCE | VOLUNTARY WRITTEN STATEMENT | | |
| 0402024 | | | |
| EVIDENCE | 14 AUDIO TAPES | | |
| 0402024 | | | |
| EVIDENCE | 8MM VIDEO TAPE | | |
| 0402024 | | | |
| EVIDENCE | SEXUAL ASSAULT KIT | | |
| 0402024 EXH 1 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | RIGHT HAND NAILS FROM VICTIM | LAURA THOMAS | |
| 0402024 EXH 2 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | LEFT HAND NAILS FROM VICTIM | LAURA THOMAS | |
| 0402024 EXH 3 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | HAIR FROM LAURA THOMAS | | |
| 0402024 EXH 4 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | FINGERNAIL FROM LEFT HAND | | |
| 0402024 EXH 5 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | BLOOD STANDARD | FROM | |
| 0402024 EXH 6 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | FINGERNAIL CLIPPINGS | | |
| 0402024 EXH 7 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | BLOODY WATER SWABS | | |
| 0402024 EXH 8 | -RL- | RL RANGER BENNIE | |
| EVIDENCE | FTA CARD (BLOOD) | | |
| 0402024 EXH 9 | -RL- | RL RANGER BENNIE | |

10556

03047

AT010583

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                          SHERMAN POLICE DEPARTMENT
                               317 S TRAVIS

EVIDENCE                 HAIR STANDARD
    0402024        EXH 10                 -RL-            RL RANGER BENNIE
EVIDENCE                 HAIR
    0402024        EXH 11                 -RL-            RL RANGER BENNIE
EVIDENCE                 BLOOD STANDARD                   FROM LAURA THOMAS
    0402024        EXH 12                 -RL-            RL RANGER BENNIE
EVIDENCE                 KNIFE
    0402024        EXH 13                 -RL-            RL RANGER BENNIE
EVIDENCE                 KNIFE
    0402024        EXH 14                 -RL-            RL RANGER BENNIE
EVIDENCE                 FILET KNIFE W/BLOOD
    0402024        EXH 15                 -RL-            RL RANGER BENNIE
EVIDENCE                 WALMART BAG                      FROM SUSP HOUSE
    0402024        EXH 16                 -RL-            RL RANGER BENNIE
EVIDENCE                 BLOOD SWABS & CONTROL
    0402024        EXH 17                 -RL-            RL RANGER BENNIE
EVIDENCE                 KNIFE
    0402024        EXH 18                 -RL-            RL RANGER BENNIE
EVIDENCE                 DEAD BOLT SET FROM FT DOOR
    0402024        EXH 19                 -RL-            RL RANGER BENNIE
EVIDENCE                 ROLL OF GRAY DUCT TAPE
    0402024        EXH 20                 -RL-            RL RANGER BENNIE
EVIDENCE                 DOOR KNOB SET FROM FT DOOR
    0402024        EXH 21                 -RL-            RL RANGER BENNIE
EVIDENCE                 SUSPECTS CAMO PANTS
    0402024        EXH 22                 -RL-            RL RANGER BENNIE
EVIDENCE                 SUSPECTS BRIEFS
    0402024        EXH 23                 -RL-            RL RANGER BENNIE
EVIDENCE                 SUSPECTS LEFT SOCK
    0402024        EXH 24                 -RL-            RL RANGER BENNIE
EVIDENCE                 SUSPECTS RIGHT SOCK
    0402024        EXH 25                 -RL-            RL RANGER BENNIE
EVIDENCE                 VISOR
    0402024        EXH 26                 -RL-            RL RANGER BENNIE
EVIDENCE                 SUSPECT'S SHOES
    0402024        EXH 27                 -RL-            RL RANGER BENNIE
EVIDENCE                 PAIR OF SHOES
    0402024        EXH 28                 -RL-            RL RANGER BENNIE
EVIDENCE                 WATER FROM BATHROOM SINK TRAP
    0402024        EXH 29                 -RL-            RL RANGER BENNIE
EVIDENCE                 WATER FROM KITCHEN SINK TRAP
    0402024        EXH 30                 -RL-            RL RANGER BENNIE
EVIDENCE                 DRAIN PIPE
    0402024        EXH 31                 -RL-            RL RANGER BENNIE
EVIDENCE                 DRAIN PIPE
    0402024        EXH 32                 -RL-            RL RANGER BENNIE
EVIDENCE                 SANE KIT ON ANDRE THOMAS
    0402024        EXH 33                 -RL-            RL RANGER BENNIE
EVIDENCE                 BLOOD AND URINE SAMPLE
    0402024        EXH 34                 -RL-            RL RANGER BENNIE


                          **10557**

03348
AT010584

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS

EVIDENCE                  PIECE OF LUNG                    FROM WALMART SACK
  0402024        EXH 35                    -RL-            RL RANGER BENNIE
EVIDENCE                  SECTION OF LUNG                  FROM ████████
  0402024        EXH 36                    -RL-            RL RANGER BENNIE
EVIDENCE                  PIECE OF HEART                   POSS FROM ████████
  0402024        EXH 37                    -RL-            RL RANGER BENNIE
EVIDENCE                  PIECE OF HEART                   POSS FROM ██   ████
  0402024        EXH 38                    -RL-            RL RANGER BENNIE
EVIDENCE                  WASHCLOTH
  0402024        EXH 39                    -RL-            RL RANGER BENNIE
EVIDENCE                  2 WASHCLOTHES & SOCK
  0402024        EXH 40                    -RL-            RL RANGER BENNIE
EVIDENCE                  SHIRT SUSPECT WEARING
  0402024        EXH 41                    -RL-            RL RANGER BENNIE
EVIDENCE                  BLOODY SHIRT
  0402024        EXH 42                    -RL-            RL RANGER BENNIE
EVIDENCE                  BLOODY SHIRT
  0402024        EXH 43                    -RL-            RL RANGER BENNIE
EVIDENCE                  OVERALLS
  0402024        EXH 44                    -RL-            RL RANGER BENNIE
EVIDENCE                  SHOES
  0402024                                                 SEE SECT 22 FOR MORE PRO
------------------------------------------------------------------------

Offense Narrative:  03/27/04  1024  Dawsey  132  164
Comp. is the State of Texas

On 03/27/2004 at approximately 0723 hours, I was in the briefing room at
the Sherman Police Department when Sgt. Mullins received a call from
dispatch in regards to a possible triple homicide located at 1200 W. Taylor
apt. #340.  Sgt. Mullins directed myself, Officer Miller and Officer
Ferguson to the scene and we arrived at the location at approximately 0725
hours.  I arrived with Sgt. Mullins at the location and we went immediately
to the apartment, which was 340.  Upon walking up to the front door of the
apartment, I observed that the door was not completely closed and appeared
to have been forced open and the door frame appeared to be cracked.  Sgt.
Mullins pushed open the door and announced that we were the Sherman Police
Department and we made entry into the apartment to check for victims and or
suspect in what is known as a protective sweep.  Upon entering the
apartment, I observed a white female lying on her back near the breakfast
area at the front of the hallway. The white female, later identified as a
Laura Christen Thomas, was nude with a large open chest wound in her chest
area.  I maintained my position there covering the kitchen area and
hallway as Sgt. Mullins checked the back bedrooms of the apartment.

Sgt. Mullins notified me that the back area of the apartment was clear
and that two other victims were located in the bedrooms off of the
hallway.  Upon completing the protective sweep, myself and Sgt. Mullins
exited the apartment and secured the area with crime scene tape to
ensure that no one disturbed the crime scene area.  After securing the
area with crime scene tape, I began a crime scene log at the direction

**10558**

03349

AT010585

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS

of Sgt. Mullins on a piece of notebook paper.  After receiving an official
crime scene log, the information was transferred from the notebook paper
to the actual crime scene log.

I was relieved from my duties of keeping up with the crime scene log by
reserve Officer Tony Leone at approx. 0959 hrs.

The notebook paper, which I had originally started the crime scene log
on, was turned over to Officer Leone to be tagged with the official
crime scene log.

While I was conducting the integrity of the crime scene by keeping up
with the crime scene log, Officer Ferguson began canvassing the near
by apartments and speaking with residents obtaining their names and
phone numbers.  Paul Bornan, who was the reporting party and the father
of victim Laura Thomas, was still at the apartment complex and spoke
with Officer Miller.

   <<< Segment 2 >>>

Follow-Up Narrative: 03/07/04 0955 Guedea 145 164

On 03/27/04 at 0724 hrs, I Officer F. Guedea 145, was dispatched
to 1200 W. Taylor apt. #340 in building number ten.  Myself, Sgt.
Mullins, Officer Ferguson, and Officer Dawsey arrived at about 0726
hrs.

We went up the stairs, and approached apartment #340.  Officer
Ferguson was already inside as well as Sgt. Mullins.  I did not
observe where Officer Dawsey was, however, I did step into the
doorway and observed a white female subject lying on the floor,
nude, and had large amounts of blood that appeared to be coming
from the chest and upper torso area.

Sgt. Mullins and the other officers had already cleared the apartment.
Sgt. Mullins then had the officers step out from the doorway, close
the door partially, and immediately started to cordon off the crime
scene area.  Sgt. Mullins gave us the area that he wanted cordoned off.
Officer Dawsey had already cordoned off some of the area, and I also
cordoned off several areas behind the apartment building number ten as
well as in the front lower level of the apartment.

Other Officers started arriving on the scene as well as investigators,
whom myself and Officer Ferguson then started interviewing people in the
immediate building and buildings surrounding the crime scene.  I went
to building number four and interviewed the residents, which were at
home.

I first started at apartment #124 and made contact with Roberta Kay Gray
w/f who stated that she had heard nothing at all, or anything unusual.
I spoke with her at 0818 hrs.

**10559**                                              03350

                                                        AT010586

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                          SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS


I then went to apartment #224, and made contact with a couple Melvin
Cecil Bowen b/m who stated that he had been asleep all night and heard
nothing.  I then spoke with his girlfriend Danielle Minor w/f who stated
that she was up at about 0400 hrs. this morning, however, she heard
nothing unusual in the apartment building across from her.

I then knocked on apartment #123 at 0827 hrs. and made contact with
Sandra Stewart w/f who stated that she had heard nothing at all and
stated that she lives there with her brother David Stewart.

At 0829 hrs. I knocked on door #121 and made contact with Allen
Valentine w/m.  Allen stated that he sees large volumes of traffic
going into the apartment #340 at all hours of the day.  Allen stated
that there is always a black male subject there who appeared to live
there, but would be in and out quite often.  He stated that he did
see a white female there who had a couple of small children, but he
stated he believes that there was drug activity taking place in that
residence.

I was not able to make contact with the residents in apartment #222,
or #122.

I relayed this information to the Sgt. on scene, Sgt. Blankenship.

I was busy back and forth after I interviewed people in apartment #4,
stopping various residents who were leaving through the crime scene
and identifying them as they went out.  The investigators and Texas
Ranger continued their investigation at the scene, and shortly afterwards
at about 0950 hrs. traffic was able to move through the complex
around the immediate crime scene that was still cordoned off in
front of the apartment.

   <<< Segment 3 >>>

Follow-Up Narrative: 03/07/04 1415 Guedea 145   164

On 03/27/04 at 1055 hrs, I Officer F. Guedea 145, arrived at
500 N. Highland.  I arrived here to stand by with Officer Marc
Miller #114 who was watching the suspect Andre Thomas B/M.
Thomas was handcuffed to a hospital bed and was being monitored
by medical staff who were coming in and out of the treatment
room.  The Doctor in charge of treating Thomas at this time
was Dr. Scott Choi.

The nursing staff then told myself and Officer Miller that
Thomas was going to have to get a CT done, at which time they
did take him to the X-Ray examining area as myself and Officer
Miller followed.  After the CT staff viewed the images, they
stated that there appeared to be no deep penetration from the
.tab wounds that were self-inflicted by Thomas.

**10560**                                              03351

AT010587

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS


Shortly after that Thomas was transported back to the examination
room in the ER.  It was within a few minutes that the nursing staff
started to call the Doctor in the room and started working what
appeared to be frantically on Thomas.  Shortly afterwards a physician
from Texoma Medical Surgeon, who was a heart specialist named Dr.
Wilcott, arrived at the ER.  It was later learned that Thomas
apparently may have caused a hole to an area in his heart and the
nursing staff further stated that he was losing blood, and at one
point one nurse said she had to give him blood.

Soon after that Thomas was prepped for surgery and he was then
rushed upstairs to the operating room.  Myself and Officer Miller
did dress in the proper sterile attire and escorted Thomas into the
operating room where we stood back as the Doctors worked on him.
Dr. Wilcott then opened Thomas' chest cavity up, and examined the
inside around the heart and stated that there was some bleeding,
however, I do not know the area that was bleeding.

Afterwards I was called by Sgt. Mullins to exit the operating room
and clear the hospital due to the full call load that we had at this
time.  I did clear the hospital room.  Officer Miller remained with
Thomas who was sedated at this time, and Officer MIller related to
me that it would take Thomas six weeks to recover, however, he would
be able to go home after about four days.

As I was exiting the ER, I was stopped by a nurse who was also tending
to Thomas.  The nurses name was Loava Mcarthy, she is a RN in the
ER.  Loava related to me at 1527 hrs. that when Thomas first came in
she asked how did he receive the stab wounds, and he responded to her
that he did them himself.  She asked him why he stabbed himself, and
he stated he wanted to die.  She said that she again asked him why
do you want to die, and Thomas told her because I stabbed three people.

   <<< Segment 4 >>>

Follow-up narrative:  Capital Murder  03/07/04 0722  Sgt. Mullins 130

On 03/07/04 at approx. 0722 hrs. I was in the briefing room conducting
the 0700 briefing.  Present in the briefing room were Officer Guedea,
Officer Dawsey, Officer Miller, and Officer Ferguson.  At approx. 0722
hrs. the briefing room phone rang, and I answered it.  Dispatcher
Marinda Womack #107 advised me that she had just received a call of a
possible triple homicide.  Womack stated that the homicide occurred
at the Arrow Wood apartments 1200 W. Taylor #340.

I turned to Officer Dawsey and Officer Miller and told them to start
towards Arrow Wood apartments code three.  I then told the other
officers to respond also.  Dispatcher Womack told me that Paul Boren
had gone to that location and found his daughter, Laura, and two
grandchildren stabbed.  Boren told Dispatcher Womack he believed all

**10561**

03352

AT010588

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS

three were dead because they were blue.

As I was leaving the station I went to Dispatch and advised Dispatcher
Womack to send EMS, but tell them to stage if they arrived before
officers.  I then went out the back door of the Sherman Police Dept.
and responded to the scene in unit #295.  I ran code three with lights
and sirens to the scene.

I was the first officer to arrive on the scene at approx. 0725 hrs.
When I arrived on scene there was a white female standing across from
building ten.  I asked her where apartment #340 was, she pointed towards
building ten and stated it's the top one.  She then stated, "He left,
no one is up there".  I took this to mean that Paul Boren had left.

I pulled into the parking area in front of building ten.  Officer
Dawsey arrived shortly after I did.  I approached the apartment up
the stairs.  As I was moving up the stairs, I noticed that the door
jamb was broken and that the door was standing open.  I drew my
department issued handgun, and stopped at the top of the stairs to
allow Officer Dawsey to catch up.  I then told him that we were going
to conduct a protective sweep of the residence to see if any victims
or suspects were inside.

When I got to the threshold of the door I shouted in a loud clear
voice "Sherman Police Department".  I then moved into the living room
of the apartment and immediately noticed a white female lying on the
ground.  The white female had a large gaping chest wound, and blood
on her upper torso.  The white female was pale and appeared dead.

As I visually cleared the room, I moved past the deceased female and
looked into the kitchen.  I then shouted again "Sherman Police Department"
and stepped past the deceased female to move down the hall.  In the
two bedrooms that were down the hall, I did not observe any suspects.

In the bedroom that was on the northeast corner of the apartment I
observed two small children with knife wounds to the chest.  One of
the children, who appeared to be approx. age four, was lying in a
toddler bed against the north wall.  There was a large open wound in
the child's chest and blood on the wall.  A toddler was lying in the
floor with a large wound in her chest.  There was a large amount of
blood in the crib, and it appeared that the suspect had began the
assault in the crib and then removed the child and placed her in the
floor.  Both children were pale and appeared deceased.

I then moved back down the hallway to where Officer Dawsey was.  I
told Officer Dawsey what I had seen and told him to move back out of
the apartment.  We then moved out of the apartment.  As I was leaving
the apartment Officer Ferguson and Officer Guedea were arriving.  I
told them to start putting up crime scene tape and protecting the area.

**10562**

0335.3

AT010589

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                 317 S TRAVIS

While I was enroute, I had notified Dispatch to call Lieutenant Fair.
I called Dispatch after the protective sweep, and told Dispatcher
Womack to contact Sgt. Blankenship and on-call CID.

I then told Officer Dawsey to begin a crime scene log and log everyone
that entered the area at the base of the stairs.  Officer Dawsey entered
me into the log and himself.  I noticed that Sherman Paramedics were
now on scene.  I called to the Lieutenant and motioned him over.  I
told the Lieutenant that the bodies appeared to be deceased, but that
I would like to take a Paramedic into the crime scene to double check.
I then escorted one Paramedic into the crime scene and allowed him to
check for signs of life in all three victims.  The Paramedic found no
signs of life and we immediately left the apartment.

I directed officers to cordon off a wide crime scene around the base
of building ten, and begin controlling the area as people were entering
and leaving the parking lot.  I did this to preserve any evidence that
may be further out of the crime scene.

I then spoke to Lieutenant Fair on the phone again and told him a brief
synopsis of what I had found.  Officer Ferguson began to canvas the
building getting names and apartment numbers of the residents who had
been at home throughout the night.  Officer Guedea strung crime scene
tape, and then began to canvas one of the other buildings nearby.

I then stood by near the base of the stairs waiting for Lieutenant Fair
and CID to arrive.

During my protective sweep of the apartment and the second time I entered
with Paramedics, I noticed that the kitchen light was on.  The living
room light was not.  In the hallway there was no light on, and in the
parent's bedroom no light was on.  In the children's room the light was
on and a small 13 inch TV was playing cartoons.  The window to the
children's room appeared to be slightly open.  I observed blood in the
crib and blood on the north wall.

When Sgt. Blankenship and Lieutenant O'Toole arrived, I briefed them
on what I had done up until this point.  We then walked to the base
of the flight of stairs that leads to apartment #340.  We noticed blood
evidence on the hand rail.  We then walked to the entry of the apartment
and Lieutenant O'Toole and Sgt. Blankenship observed the deceased adult
female.  We then went back down stairs and Sgt. Blankenship advised that
we would obtain a search warrant before continuing.

I stood by the base of the stairs and directed the patrol units.  Officer
Dawsey continued to maintain the crime log.  Officer Dawsey maintained the
crime log until he was relieved by reserve officer Tony Leone.

I remained on scene until approx. 1337 hrs. at which time Lieutenant
Fair advised that patrol was released from the scene.

<<< Segment 5 >>>                                              03354
                     **10563**

                                                                    AT010590

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS

Follow-Up Narrative: 03/27/04 1054 Mauldin 040 164

On 03/27/04 I was contacted at home by Dispatch and was advised that
there had been a triple homicide and that they needed me to come to
the station to work.

I arrived to the back door of the Sherman Police Dept. at 0936 hrs.
and stepped into the hallway. As I stepped into the hallway, Dispatcher
Marinda Womack stepped out of Dispatch into the hall and stated the
suspect Andre Thomas is in the lobby.

I proceeded to the lobby of the Sherman Police Dept. where I observed
a black male subject I later identified as Andre Thomas on the Dispatch
phone. I took Mr. Thomas off the phone, placed him on the south wall of
the lobby, and frisked the subject for weapons. As I was frisking the
subject for weapons, the suspect made the comment "Will I be forgiven?".
I advised Andre Thomas that I knew nothing about the case that I had
just arrived at the station. At that point Detective Brice Smith #115
entered the lobby and approached suspect Thomas and handcuffed him behind
his back. I later double-locked the handcuffs.

At that point Thomas advised Detective Smith #115 that he was hurt.
Thomas showed Detective Smith injuries to his chest that he stated
were stab wounds. At that point Detective Smith #115 requested Dispatch
to send an ambulance to the back of the Sherman Police Dept. I then
escorted suspect Andre Thomas to the book in room and handcuffed him
to the bench.

Shortly after that Paramedics arrived and began to attend to suspect
Thomas. At that point I un-handcuffed Thomas and removed his shirt.
I then turned to Detective Brice Smith #115 and requested a paper
bag to place the shirt in. Detective Smith returned with several
paper bags and I placed the shirt into one of the bags and handed it
to Detective Smith #115, and advised him that if I was going to keep
up with the suspect he would need to take charge of that bag of evidence.

Sherman Paramedics attended to Thomas and placed a bandage on his chest.
Subsequent to that it was decided by Paramedics that the suspect needed
to be transported to the hospital. At that time the suspect was placed
in the ambulance behind the Police Dept. and Paramedics attended to him
for several minutes while I waiting outside the back door of the
ambulance. Once the Paramedics advised that they were ready to transport
the suspect, I rode in the back of the ambulance to the hospital with
the suspect.

When we arrived at the hospital, hospital personnel directed us to
emergency room number two. Once we entered ER #2, hospital personnel
began to attend to suspect Thomas' injuries. I advised hospital
personnel that if all possible we needed to remove his clothing without
cutting it. At that point I approached suspect Thomas and removed

**10564**                                          03355

AT010591

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS

his shoes.  I took charge of those shoes at 0953 hrs. and placed them
in a brown paper evidence bag.  At that point hospital personnel
requested that I remove the handcuffs from suspect Thomas, and I did
so.

Hospital personnel removed suspect Thomas' camo pants at 0954 hrs.
and I took charge of them at that time and placed them into a brown
paper evidence bag.  At 0956 hrs. hospital personnel removed
suspect's briefs and I took charge of them at 0956 hrs. and placed
them into a brown paper evidence bag.  Hospital personnel removed
suspect's left sock at 0956 hrs., and I took charge of that sock at
that time and placed it into a brown paper evidence bag.  Hospital
personnel then removed suspect's right sock at 0956 hrs. and I placed
it into a brown paper evidence bag.  At 0957 hrs. hospital personnel
removed the bandage that had been applied by the Sherman Paramedics,
and I took charge of that bandage at 0957 hrs. and placed it into a
brown paper evidence bag.  As I took each of these items I wrote down
what was in the bag, the time it was recovered, they were taken in ER
#2, and my name Mauldin #040.

Later at the Sherman Police Dept. I tagged each of these items with
Sherman Police Dept. evidence tags.

Officer Marc Miller #114 was also in the ER while I was recovering
these items.  Shortly after bagging each of these items, Detective
Sgt. Blankenship #036 arrived.  At that point Detective Sgt. Blankenship
#036 assigned Officer Marc Miller #114 to watch the suspect in ER #2.
Detective Sgt. Blankenship #036 then transported me to the Sherman Police
Dept.  All during that time I had possession of the items taken as
evidence.

Once I had reached the Sherman Police Dept. and had tagged each of
the items, I made this follow-up report.  At 1117 hrs. I contacted
Sgt. Blankenship #036 and asked him if he wanted me to place those
items directly into the evidence lockers.  Sgt. Blankenship #036
advised me to place those items in the evidence lockers at the Sherman
Police Dept.  Those items were placed in the evidence locker at the
Sherman Police Dept., and I placed a lock on the door.

    <<< Segment 6 >>>

Follow-Up Narrative: 03/27/04 1230 Mauldin 040 164

On 03/27/04 at 1145 hrs. I, Mauldin 040, was dispatched to the east
control road of U.S. 75 and the south control road of U.S. 82 in
reference to burn clothing at the side of the road.  Dispatch advised
that the victim's father, Paul Boren, had called and stated that he
was traveling on the highway when he saw what appeared to be shirt
and jeans that had been burned laying on the side of the roadway near
the total service station.

**10565**                                              03356

AT010592

Date Printed:                       INCIDENT REPORT
Oct 14 2004

                            SHERMAN POLICE DEPARTMENT
                                   317 S TRAVIS

I arrived at that location at 1151 hrs. and saw what appeared to be
rolled up burned clothing next to the traffic island at the corner of
the south control road of U.S. 82 and the east control road of U.S. 75.

I called Dispatch and had them advise Sgt. Blankenship #036 of what
I had located.  Sgt. Blankenship #036 came to my location and decided
that the items did need to photographed and collected as possible
evidence in this case.

I photographed the evidence and the scene where they were located at
1210 hrs. on 03/27/04.  I did not unroll the bundle of clothing, but
it appeared to be a dark blue pair of jeans and possibly a blue plaid
shirt and a grey t-shirt.  Also near the clothing was a burn mark on
the traffic island.  At the burn mark was what appeared to be a brake
master cylinder cover.

All of these items were photographed, and all of the items were collected
as evidence at 1213 hrs. on 03/27/04.  Sgt. Blankenship #036 had a
white plastic bag that we attempted to place the items in.  When we
placed the items in the white bag, it split down the side.  I took
charge of the items at that time and placed them in my unit and
transported them to the Sherman Police Dept.

Once I arrived at the Sherman Police Dept., I placed the white bag
and contents into a brown paper evidence bag.  I tagged it as evidence,
and placed it into an evidence locker at the Sherman Police Dept.

   <<< Segment 7 >>>

Follow-Up Narrative: 03/27/04 1815 Miller 114 164

I, Officer Miller, was on duty for the Sherman Police Dept. as a
patrol officer on report date.  Sherman Police Dept. advised by
telephone of a possible triple homicide at 0725 hrs.  Myself along
with Officer Ferguson, Dawsey, Guedea were verbally dispatched by
Sgt. Mullins to 1200 W. Taylor apartment #340 to check for injured
parties.

I arrived on scene behind Sgt. Mullins, Ferguson, Dawsey, and Guedea
at 0737 hrs.  Upon my approach on foot to apartment #340, I approached
the threshold of the unsecured door and observed officers exiting the
apartment.  Officers advised of numerous deceased persons located
inside apartment.  Other officers began placing crime scene tape around
the perimeter of the parking lot, sidewalk, and apartment entrance.

Sgt. Mullins requested this officer identify caller who was found to
be the father and grandfather of the victims.  I spoke to a white male
identified by Texas drivers license as Paul Edward Boren.

accompanied Mr. Boren to the Sherman Fire Dept. ambulance.  Moments
later was advised to escort the Sherman Fire Dept. with Mr. Boren and

03357

**10566**

AT010593

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                           SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS

his spouse to the Wilson N Jones ER family facility.

At approx. 1055 hrs. I was advised by Sherman Police Dispatch that suspect
had been placed in custody and was enroute to the WNJ ER for self-
inflicted stab wound to the chest.

The family members of the victims were contained in the north end family
center with suspect entering the ER by ambulance personnel and officer
Chuck Mauldin #040 of the Sherman Police Dept.

The suspect was identified as Andre Thomas and was placed in room two.
Numerous ER medical personnel were present with an identification list
made of all parties entering the ER #2.  This list was taken as evidence,
later tagged and placed in the evidence locker room at the Sherman Police
Dept. by this officer.

I, Officer Miller, assisted Officer Mauldin in collecting the evidence
placing suspect's clothing separately in paper sacks to be tagged by
Officer Mauldin.

I was advised at approx. 1200 hrs. that suspect was bleeding internally
from the self-inflicted stab wounds and would be placed into emergency
surgery.

Suspect Thomas entered emergency surgery at approx. 1227 hrs. and was
accompanied by this officer who was scrubbed and sterilized by hospital
personnel and provided proper clothing for the operation room.

At approx. 1430 hrs. suspect was recovering from surgery which was
conducted by R.J. Wilcott medical Doctor from Texoma Medical Center.
Suspect Thomas was subsequently moved to surgical intensive care unit
room ten, upon where I was released from guarding suspect by Officer
Guedea at approx. 1741 hrs.

Digital photographs were taken of observed self-inflicted injuries of
suspect while in room two of the ER.  The digital photographs were taken
as evidence later tagged, and placed in the evidence locker room of the
Sherman Police Dept. by this officer.

   <<< Segment 8 >>>

Follow-Up Narrative: Capital Murder, 03/27/04  1800  Ferguson  168  164

On Saturday 03/27/04 at 0724 hrs. I was dispatched to 1200 W. Taylor
apartment #340 in reference to triple homicide.

At 0726 hrs. myself, along with Sgt. Mullins, and Officer Dawsey
arrived at Arrow Wood apartments.  Sgt. Mullins, Officer Dawsey,
and myself proceeded to apartment #340.  As I was climbing the
stairs, I observed the door to the apartment had damage to the
interfacing as if it had been kicked in.  Sgt. Mullins and Officer

**10567**

0335

AT010594

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                           SHERMAN POLICE DEPARTMENT
                               317 S TRAVIS

Dawsey made entry into the apartment and immediately began doing a
protective sweep.

Sgt. Mullins began going through the entry approx. 15 feet to the
hall which runs West.  At that time he turned West to travel down
the hall.  Officer Dawsey took a post at the beginning of the hallway.
I took post at the entryway to the front door.

I observed a white unidentified body laying almost parallel to the
entry to the hall.  I observed the body to be white in color near
pale and did not appear to be alive.  I observed a large hole in the
chest area of the subject.

Sgt. Mullins exited the hallway and we backed out of the apartment.
Officer Dawsey, Officer Guedea, and myself began hanging protective
barrier tape around the perimeter of apartment building number ten.
I placed a protective barrier from the stair rail to my patrol unit
around my patrol unit to around the Sergeant's unit and back to the
rail on the south side.  I also ran a protective tape barrier around
the downstairs portion of building number ten to prevent anyone from
disturbing evidence.

After hanging the protective barrier, Sgt. Mullins instructed me to
begin a canvas of building number ten as well as the building just
outh of building ten.

The first person I identified lives in apartment #140 (two apts. below
the crime scene) Rene Morales.  Morales stated she had been home all
day on 03/26/04 and went to bed at approx. 1930 hrs.  Morales stated
that at approx. 0100 hrs. she had gotten out of bed to take medicine
and then went back to bed.  Morales stated she did not hear any
commotion or any unnatural noises.

The second apartment I identified was #139 with occupant Perry Rolston.
Mr. Rolston stated that he had gone to bed at approx. 2100 hrs. on
03/26/04.  Rolston advised he had not heard anything out of the ordinary.

I then identified the occupants of apartment #239.  Brandy Nicole Cooley,
and Wash Mckee.  Ms Cooley stated she had been home all day on 03/26/04
and Mckee stated he had come to the apartment at approx. 1930 hrs.
Cooley and mckee stated they had went to bed at approx. 0230 hrs. on
03/27/04.  Cooley and Mckee stated they heard no unusual noises.

I then identified the occupants in apartment #339.  (Apt. on same level
in building ten on the north side).  The occupants were identified as
Ellis Renard Cotton and Mittie Mae Cotton.  Speaking with Mr. Cotton
he stated he was home most of the day on 03/26/04 and had went to bed
at approx. 0000 to 0030 hrs.  Ms cotton stated she worked at Nexis
health care from 2200 hrs. on 03/26/04 until 0600 hrs. on 03/27/04.
r. Cotton stated he had gotten up to go pick his wife up from work

**10568**                                              03359

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                          SHERMAN POLICE DEPARTMENT
                               317 S TRAVIS

at approx. 0545 hrs.  When he exited the apartment he observed a large
white vehicle resembling a caprice speed out of the parking lot at a
high rate of speed.

I then identified the occupants in apartment #241, Janece Rene Everett
and her son Alex Everett.  Mrs. Everett stated she had gotten home at
approx. 2200 hrs. on 03/26/04 and had gone to bed at approx. 0100 hrs.
on 03/27/04.  Mrs. Everett had questioned, while we were identifying her,
and I informed her we were investigating a triple homicide that occurred
at apartment #340.  At that time Mrs. Everett informed me her son worked
with the victim at Kentucky Fried Chicken.  Mrs. Everett went and woke
her son up, and when he came into the living room I asked Alex Everett
if Laura had been at work the previous evening, and he stated no.

I attempted to make contact with the occupants in apartment #341 and
#142 with no success.

I made contact with occupants in apartment #242.  The occupant was
identified as Waverly Burkins.  Mr. Burkins stated he had been home
all day on 03/26/04 and went to bed before 2200 hrs.  Burkins stated
he woke up at approx. 0430 hrs. on 03/27/04.  Burkins stated he heard
no unusual noises or voices or commotion.  Mr. Burkins resides with
his son Robert Kennedy.  Burkins advised me that his son had gotten home
at approx. 1615 hrs. on 03/26/04 and had gone to bed at approx. 2200
urs. on the same evening.

I identified the occupants in apartment #342 Thurman Wright Jr.
Nicole Brandy Flynn, and Melanie Danielle Flynn.  Wright advised me
that he had come home at approx. 2230 hrs. on 03/26/04 and that
they had stayed up almost all night until 0400 hrs. on 03/27/04
attempting to fix his computer.  Wright stated they heard no unusual
noises or voices or commotion outside their apartment.

At that time I concluded the canvas of apartment building ten and
the apartment building just south of ten.

I was posted up at the south crime scene tape at 0913 hrs. Janece
Everett driving Texas F82VJP exited the parking lot.  She had been
previously identified in the building canvas.  At approx. 0916 hrs.
Thurman Wright returned to his apartment.

At 0930 hrs. I was informed by Lieutenant O'Toole that I was clear
to leave the crime scene, and Sgt. Blankenship asked me to attempt
to locate the suspect Andre Thomas.  Detective Michael Young that
Andre Thomas was possibly at Crossroad Mobile home park.  While
en route to that location, I was informed by Sgt. Blankenship that
Andre Thomas possibly had turned himself in to the station.  I
proceeded on to 2424 Texoma Parkway lot #15.

hen I arrived I made contact with Danny Thomas, Andre Thomas' father.

                          **10569**                              03960

                                                          AT010596

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                         SHERMAN POLICE DEPARTMENT
                              317 S TRAVIS

I asked if he was the owner and occupant of the trailer at lot #15,
and he stated yes. I asked Danny Thomas if there was anybody located
in the trailer, and he stated no. I contacted Sgt. Blankenship and
informed him I had made contact with Danny Thomas at lot #15. He
asked me if I could obtain consent to search for the property that
there was a possible weapon located at the residence.

My in car camera system was recording video, but was unable to record
audio, therefore, I took my micro cassette tape recording device and
put it in my shirt pocket to record my conversation with Danny Thomas.
I approached Danny and informed him that we are looking for an item and
asked for consent to search his trailer. Danny Thomas gave me consent.

Detective Young arrived at my location and provided me with a written
consent to search form. I read the written consent to search form to
Danny Thomas, filled it out, and he signed it. After the consent to
search form was filled out and signed, Detective Young and myself made
entry into the trailer. Danny Thomas had informed me earlier that
his son had been at the trailer twice that morning and made phone calls
both times. The second time he had arrived at the trailer he used the
phone he had went into the bathroom area of the trailer. Detective
Young went to this area and began photographing.

Danny Thomas had informed me earlier that Andre Thomas had actually
occupied a trailer in Crossroad Mobil home park not too far from his.
Thomas pointed to a trailer across the drive within a hundred yards.
At that time I informed Detective Young that I would go to that location
and stand by.

At approx. 1020 hrs. I arrived at lot #100, Andre Thomas' trailer, and
maintained the integrity of the trailer. At approx. 1030 hrs. a white
female, later identified as Carmen Hayes, arrived at the trailer telling
me that lot #100 was her residence. She informed she lived with Andre
Thomas. I asked her if she was aware of what was going on, and she stated
she had taken Andre to the police station to turn himself in. I asked
her if she was informed on what was going on, and she stated that Andre
had confessed to murdering his wife and two children. At that time I
asked Ms Hayes to go through the entire story about what had occurred.

Ms Hayes told me at approx. 0830 hrs. on 03/27/04 Isaiah Gibbs had
come over to her residence to see Andre, but when he stuck his head
into the door Hayes informed him Andre was not there. She stated a
short time later Andre came home and he seemed to be in a daze, he
turned to the right and Isaiah said hey man what's up and Andre
turned back to the left entering into the living room area of the
mobil home and stated he had just killed Laura, ███████, and ███████.
Carmen stated that she believed he was kidding and Andre replied
what do you want to do look in the bag. Hayes stated Andre began
talking that Laura was Jezabel from the Bible and this had to
happen.

**10570**

03961

AT010597

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                          SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS

Hayes stated Andre had stabbed himself and he took off his shirt
to show them.  Ms Hayes asked Andre if he was going to turn himself
in, and he said yes.  By the time they attempted to find a ride at
Brandon Patterson's house, but the car was gone so they proceeded to
Raquel's house where she agreed to give them a ride to the police
station.

After hearing what Ms Hayes had to say I gave her a voluntary
statement not under arrest form and asked her if she would sit
down and fill the document out, and she stated yes.  At that time
Ms Hayes sat down and gave a written statement.  I informed
investigator Young and Sgt. Blankenship what Ms Hayes had relayed
to me.  Sgt. Blankenship informed me investigator Smith was in
process of obtaining a search warrant for lot #100.  At 1050 hrs.
Carmen Hayes completed her voluntary statement containing the
following;

This morning at about 0830 hrs. Isaiah Gibbs came into the apartment
to look for Andre, he found me.  We started talking and about five
minutes later Andre came home he was upset and breathing heavily.
He said to us that the police were coming soon.  I asked him what he
did, and he said I killed Laura, ███████, and ███████.  I asked him if he
was kidding and said what do you want to look in the bag, I said no
why do you think I want to see that.  He sat down at the bar and I
asked him why, he said that he thought Laura was Jezabel and he has
had this happen before.  He thinks he relives days and weeks.  I tried
to calm him down, he took his shirt off and showed us that he had
stabbed himself twice in the chest.  He was freaking out because he
should have been dead and he wasn't.  I asked him what he was going
to do, and he said he did not know.  I told him he should turn himself
in and he agreed.  He wanted me to go with him and I told him I to work
at 1100, but if we could find a ride there I would go.  We went to
Brandon's, his cousin, and asked him if he could give us a ride.
His girlfriend was gone with the car, so I asked him if he wanted to
go to Raquel's.  I gave her gas money and she took us to the police
station so he could turn himself in.  (End of statement by Ms Hayes).

CONTINUED ON NEXT SEGMENT

   <<< Segment 9 >>>

continuation from segment 8......

At approx. 1040 hrs. Raquel Johnson arrived at lot #100.  As she
approached Ms Hayes stated this was the individual that they rode
with up to the police station.  As she got out of the car, I asked
Ms Johnson if she had given Andre and Carmen a ride to the police
station and she stated yes.  I asked Ms Johnson if she would agree
to a consent to search to her vehicle, and she stated yes.  I read
consent to search to Ms Johnson and had her sign for a 1991 Honda

                          **10571**                        03962

AT010598

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

accord bearing Texas tag F93WXB.  After reading the consent to search
form to Ms Johnson, she signed the consent to search form.

I asked Ms Johnson where Andre Thomas was sitting on the way to the
police station.  She informed me he was sitting in the back right
passenger seat.  When I opened the passenger side of the vehicle, I
lifted up the seat and began searching the back portion.  There was
a child safety seat sitting in the rear left seat.  I was unable to
locate any evidence.  At approx. 1100 hrs. Raquel Johnson was released.

At approx. 1315 hrs. investigator Smith arrived at our location with
the search warrant for lot #100.  Investigator Smith and Investigator
Young made entry into the residence to conduct their search.  I stayed
with Ms Hayes, and spoke with her more about the events between her
and Andre Thomas

On Wednesday 03/24/04 Andre Thomas stopped speaking at approx.
1330 hrs. on Thursday 03/25/04 Ms Hayes informed me Andre had
walked her to work at approx. 1100 hrs.  At approx. 1615 hrs. Andre
arrived back at Sonic driving his mother's car.  Ms Hayes stated she
got off at approx. 1700 hrs. and they went to the drug store and bought
two boxes of cough and cold medicine.  At that time in the parking lot
both Ms Hayes and Andre Thomas took ten pills each in attempt to get
intoxicated from the medicine.  They went back to lot #100 at Crossroad
obile home park and then proceeded to Bob's to cash Ms Hayes' check
and to buy alcohol.  At approx. 2330 hrs. Ms Hayes stated Andre stabbed
himself with a small knife and threw it under the desk in his bedroom.
Because of taking the pills and drinking the alcohol, Ms Hayes said
she was unaware of Andre stabbing himself.  At approx. 0600 hrs.
Andre's mother transported him to Wilson N Jones where he was treated
for the stab wound.  On Friday 03/26/04 Ms Hayes stated Andre returned
home from the hospital at approx. 1000 hrs. and broke up with her.
During the day on Friday Ms Hayes stated she and Andre did their own
thing and she had went to bed at approx. 2030 hrs.  Ms Hayes stated
that at approx. 0600 hrs. she woke up to the front door of the residence
opening and closing, she was unaware of whether Andre was coming or
going.  At approx. 0815 hrs. to 0830 hrs. she woke up when Isaiah Gibbs
arrived then she stated at approx. 0830 hrs. to 0900 hrs. Andre arrived
back home, and had confessed to murdering his wife and children.
Ms Hayes informed me during the confession, Andre had mentioned that
he had seen Bryant as he was going to the apartment to perform the
murder.

At approx. 1500 hrs. Isaiah Gibbs arrived at lot #100 and I asked him
if he would come speak with me.  As he was approaching me he asked
if it was true and I stated yes.  I asked if he could recall the
events that transpired this morning, and he stated yes.  Isaiah
informed me that at approx. 0900 hrs. he arrived at Andre's residence
to speak with him, and Andre was not home.  A short time later Andre
had came home through the front door crying.  Isaiah asked him what

10572

03963

AT010599

Date Printed:                       INCIDENT REPORT
Oct 14 2004
                             SHERMAN POLICE DEPARTMENT
                                    317 S TRAVIS

was wrong and Andre stated he had killed Laura and the kids.  He stated
that he had stabbed and cut their hearts out.  Isaiah asked him if he
was kidding and he stated if you think I'm kidding go look in the bags
as he pointed towards the kitchen area.  Andre then showed Isaiah the
wounds on his chest from him stabbing himself with a butcher knife.
Isaiah stated he had seen a wound on his chest from the previous night,
but it appeared to be much larger and deeper than before.  Isaiah stated
he tried to comfort Andre when he decided to turn himself in.  Isaiah
stated he, Andre, and Ms Hayes went to Brandon Patterson's residence
to attempt to find a ride and he fell asleep.

After receiving this statement from Isaiah Gibbs at the scene, I asked
him if he would come to the police station and give a more detailed
statement and he stated yes.  I asked Ms Hayes if she would do the
same thing and she said yes.

At approx. 1530 hrs. Investigator Young and Investigator Smith left
lot #100 to proceed back to police station transporting Gibbs and
Hayes.  I stayed at lot #100 until it could be secured by the manager
of the mobile home park.  At 1550 hrs. the trailer was secured with
a pad lock, and I proceeded to the police station.  Investigator
Young and myself performed an interview with Ms Hayes and Mr. Gibbs.
The information consisted of information already detailed in this
report.

After the conclusion of the taped interviews, I tagged the micro
cassette tape which I used in recording the conversation between
myself and Danny Thomas, myself and Ms Hayes.  I tagged the written
statement in which Ms Hayes wrote.  I tagged the consent to search
form Ms Johnson had signed and the consent to search form Mr. Thomas
had signed, and tagged the video tape from my patrol unit.  I dropped
all of the items in the evidence locker at the Sherman Police Dept.

   <<< Segment 10 >>>

FOLLOW UP NARRATIVE: CAPTIAL MURDER  03/29/04  1020 HRS  ROBINSON 147

ON SATURDAY, 3/27/04, AT APPROX. 0800 HOURS I RECEIVED A PHONE CALL
FROM DISPATCHER WOMACK.  WOMACK INFORMED ME THAT A 19 YEAR OLD
FEMALE AND TWO CHILDREN HAD BEEN MURDERED AT THE ARROWWOOD
APARTMENTS.  I WAS TOLD TO RESPOND TO THE SHERMAN POLICE DEPARTMENT.
I ARRIVED AT THE POLICE DEPARTMENT AT APPROX. 0840 HOURS.

WHEN I ARRIVED, I CALLED SGT BLANKENSHIP ON HIS CELL PHONE.  SGT
BLANKENSHIP TOLD ME THAT DET BRICE SMITH AND DET LARRY BELL WERE
ON THEIR WAY TO THE SHERMAN POLICE DEPARTMENT AND MIGHT NEED
SOME HELP.

DET SMITH AND DET BELL ARRIVED WITH POSSIBLE SUSPECT BRYANT HUGHES.
DET BELL SPOKE WITH HUGHES.  I HEARD HUGHES SAID THAT HE HAD SPENT
THE NIGHT WITH LAURA THOMAS AND HAD LEFT LATE FOR WORK THAT

                  **10573**                                03964

                                                        AT010600

Date Printed:                INCIDENT REPORT
Oct 14 2004

                          SHERMAN POLICE DEPARTMENT
                               317 S TRAVIS

MORNING.  I WENT TO DET BRICE AND TOLD HIM WHAT I HAD HEARD
HUGES SAY.  WHILE IN DET SMITH'S OFFICE, DET SMITH ASKED ME
TO GO TO BURGER KING, WHERE HUGHES WHITE BONNEVILLE WAS PARKED,
AND WATCH IT WHILE HE GOT A WARRANT TO SEARCH IT.  I WENT TO
BURGER KING AT APPROX. 0930 HOURS.

WHILE AT BURGER KING, I RECIEVED A PHONE CALL FROM DISPATCHER
WOMACK.  SHE SAID THAT ANDRE THOMAS HAD TURNED HIMSELF IN
AND DET SMITH WAS WITH HIM.  DET SMITH TOLD ME TO STAY AT
BURGER KING AND WATCH THE VEHICLE.

AT APPROX. 1030 HOURS DET BELL ARRIVED WITH HUGES.  DET BELL
HAD ME SIGN A CONSENT TO SEARCH FORM AS A WITNESS.  BEFORE
SEARCHING HUGHES VEHICLE, DET SMITH BROUGHT DET BELL A SEARCH
WARRANT FOR THE VEHICLE.  DET BELL TOOK PHOTOGRAPHS AND
SEARCHED THE VEHICLE.  WHILE DET BELL WAS SEARCHING HUGHES
VEHICLE, I SAT WITH HUGHES.

HUGHES WAS VISIBLY UPSET.  HE KEPT REPEATING, "THEY CAN'T BE
DEAD."  HE SAID HE AND LAURA THOMAS HAD BEEN TOGETHER FOR ABOUT
3 YEARS.  THE ONE YEAR OLD VICTIM WAS HIS CHILD WITH THOMAS.
HUGHES KEPT BLAMING HIMSELF FOR THIS INCIDENT BECAUSE HE WAS
NOT SURE IF HE HAD LOCKED THE APARTMENT DOOR WHEN HE LEFT FOR
WORK.  HE SAW ANDRE THOMAS WALKING TOWARDS THE APARTMENT COMPLEX,
AND ANDRE WAIVED AT HIM.  HE SAID HE SHOULD HAVE TURNED AROUND,
BUT HE WAS ALREADY LATE FOR WORK.  HE STATED HE NEVER IMAGINED
ANDRE DOING SOMETHING LIKE THIS (KILLING THE VICITMS).

I LEFT BURGER KING AROUND 1100 HOURS.

AT THE SHREMAN POLICE DEPARTMENT, I SPOKE WITH DET SMITH.  DET
SMITH ASKED ME TO TYPE UP A SEARCH WARRANT FOR HUMAN PROPERTIES.
I TYPED UP THE SEARCH WARRANT AND AN ARREST AFFIDAVIT FOR DET
SMITH.

AT APPROX. 1600 HOURS I WAS ASKED TO EXECUTE THE SEARCH WARRANT
FOR PHYSICAL PROPERTIES ON THOMAS.  I COMPLETED THE SEARCH
WARRANT FOR PHYSICAL HUMAN PROPERTIES.  DET SMITH COMPLETED
THE AFFIDAVIT FOR ARREST WARRANT.  I TOOK THE WARRANTS TO JUDGE
FRY AT HIS HOME.  JUDGE FRY SIGNED THE WARRANTS AT APPROX. 1730
HOURS.

I WENT TO WILSON N. JONES SURGICAL ICU WHERE THOMAS WAS LOCATED.
OFFICER GUEDEA AND SGT BLANKENSHIP WERE WITH THOMAS.  I HAD A
NURSE OBTAIN A SANE KIT FOR THE COLLECTION OF THE EVIDENCE.  SGT
BLANKENSHIP COLLECTED THE PUBIC AND HEAD HAIR FROM THOMAS.  I
COLLECTED THE SALIVA SWABS, FINGERNAIL SCRAPINGS, AND THE
PULSE OXIMETER FROM THOMAS' RIGHT "POINTER" FINGER.  THERE WAS
WHAT APPEARED TO BE BLOOD ON THE FINGERNAILS OF THOMAS' RIGHT
HAND.  I USED STERILE WATER TO WET A SWAB AND SWABBED THE FINGER-

**10574**

03965

AT010601

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                           SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS

NAILS ON THOMAS RIGHT HAND.  THE PULSE OXIMETER, WHICH WAS ON
THOMAS' FINGER ALSO HAD BLOOD ON IT.  THE EVIDENCE WAS PLACED
INTO THE SANE KIT.

I WENT TO THE LAB TO COLLECT THE BLOOD AND URINE SAMPLES THAT
THAT THE HOSPITAL HAD COLLECTED FROM THOMAS.  THE LAB PUT THE
SAMPES IN AN ORANGE BIOHAZARD BAG.  WHEN I WENT BACK TO THOMAS'
ROOM, THE NURSE TOLD ME THAT SHE HAD TAKEN THE PULSE OXIMETER
OFF OF THOMAS' LEFT FINGER.  I PUT THE ITEM IN THE SANE KIT.

A COPY OF THE SEARCH WARRANT RETURN WAS LEFT WITH THOMAS AT
THE HOSPITAL.

THE SANE KIT WAS SEALED AND TAGGED AS EVIDENCE. IT WAS LOCKED
IN THE REFRIGERATOR ON THE SECOND FLOOR OF THE SHERMAN POLICE
DEPARTMENT.  THE BLOOD AND URINE SAMPLES WERE KEPT IN THE
BIOHAZARD BAG AND TAGGED.  THE BAG WAS ALSO LOCKED IN THE
REFRIGERATOR AT THE SHERMAN POLICE DEPARTMENT.

ON MONDAY, 3/29/04, AT APPROX. 0900 HOURS I HAD JUDGE FRY SIGN
THE RETURN FOR THE PHYSICAL HUMAN PROPERTY.  THE ORIGINAL WAS
LEFT WITH JUDGE FRY.

I WENT TO THE COUNTY ATTORENY'S OFFICE AND OBTAINED A TRACKING
NUMBER FOR THE ARREST WARRANT.  THE TRACKING NUMBER WAS 164871.

   <<< Segment 11 >>>

FOLLOW-UP NARRATIVE:  CAPITAL MURDER 03/27/04 1630 HRS  DITTFURTH 024

On 03/27/04 at approx. 0900 hrs I was contacted by Lt. Bob Fair, the
Critical Accident Investigation Team commander.  Lt. Fair requested members
of CAIT to respond to the Arrow Wood Apartments to forensically map the
scene of the capital murder.  I contacted Officers Mark Wood and Brad
Gibson to respond with me.

Officers Wood, Gibson and I arrived at approx. 1056 hrs.  After being
briefed by Lt. Fair, we set up the Electronic Total Station (Sokkia Set6F)
and the SDR 31 outside the apartment building and began forensically
mapping the outside area requested by the investigators.

At approx. 1320 hrs we moved inside the apartment to map the interior.
Interior evidence/reference points were mapped according to investigators.
Sgt. Charley Smith, also a member of CAIT arrived at approx. 1400 hrs and
assisted in mapping the scene when Officer Wood left at 1500 hrs.  We
completed mapping the scene at approx. 1600 hrs.

The data from the SDR31 will be downloaded into Mapscenes software to
complete the diagram of the crime scene.

   <<< Segment 12 >>>

**10575**

03966

AT010602

Date Printed:              INCIDENT REPORT
Oct 14 2004

SHERMAN POLICE DEPARTMENT
317 S TRAVIS


FOLLOW-UP NARRATIVE: 03/28/04 2330 HRS  DITTFURTH 024

On 03/28/04 at approx. 2303 hrs I was contacted by Paul Boren, father of
deceased Laura Thomas.  Mr. Boren advised his daughter ███████████ had
information that may be relevant to the investigation.  I then spoke with
████████████████ advised she was contacted by ████████████ who had
been contacted by another friend (unidentified) who told ████████ that Andre
Thomas had gone by Kim Young's apartment (Diamond Place 102G) and spoke
with a male named ████ (ULN).  ████████ advised that ████████ told her
allegedly told Andre that he would help "do it" or give him (Andre) a ride.
███████ provided ████████ phone # as ███████████ and Kim Young's phone
number as ████████.

The Borens were advised the information would be passed on to investigators
working the case.

   <<< Segment 13 >>>

FOLLOW-UP NARRATIVE:  CAPITAL MURDER  03/29/04 0600  CAVER 156  095

ON MONDAY, MARCH 29, 2004 AT 0600 HOURS, I OFFICER TOM CAVER 156
ARRIVED AT THE WILSON N JONES HOSPITAL SICU LOCATED AT 500 NORTH
HIGHLAND TO RELIVE OFFICER STEVE NORTHINGTON 159.  MY DUTIES ON
THIS DATE WERE TO STAND BY AND GUARD ANDRE LEE THOMAS.  I KNEW
THOMAS TO BE IN OUR CUSTODY AS A SUSPECT IN THE MARCH 27, 2004,
TRIPLE HOMICIDE IN SHERMAN TEXAS.  I ALSO HAD KNOWLEDGE THAT
THOMAS WAS BEING EVALUATED BY WILSON N JONES MEDICAL STAFF DUE
TO SELF-INFLICTED WOUNDS, WHICH HE SUSTAINED SHORTLY AFTER THE
TRIPLE HOMICIDE OCCURRED.

ON THIS DATE, AT APPROX. 1000 HOURS, THOMAS WAS MOVED FROM SICU
ROOM #10 TO ROOM #285, LOCATED IN TWO SOUTH OF THE WILSON N JONES
HOSPITAL.

WHILE IN ROOM #285, AT APPROX. 1130 HOURS, SHERMAN POLICE DEPT.
CID SUPERVISOR SGT. BRAD BLANKENSHIP 036 ARRIVED TO SPEAK WITH
ANDRE THOMAS.  SGT. BLANKENSHIP IDENTIFIED HIMSELF TO THOMAS AND
THOMAS ACKNOWLEDGED HIM.  SGT. BLANKENSHIP ASKED THOMAS IF HE
WAS WILLING TO SPEAK TO HIM ABOUT THE EVENTS THAT HAD TAKEN PLACE
IN REFERENCE TO THE TRIPLE HOMICIDE.  THOMAS TOLD SGT. BLANKENSHIP
AND MYSELF THAT HE WAS READY TO SPEAK ABOUT THE INCIDENT.  NEARLY
IMMEDIATELY AFTER THOMAS ADVISED US THAT HE WANTED TO SPEAK, HE
ASKED IF HE WAS GOING TO HAVE A LAWYER WITH HIM.  EVERYONE PAUSED
FOR A FEW SECONDS, AT WHICH TIME (APPROX. 1135 HOURS), THOMAS
SAID THAT HE THOUGHT HE SHOULD PROBABLY HAVE A LAWYER PRESENT.
AT THAT POINT, SGT. BLANKENSHIP ADVISED THOMAS THAT SINCE IT
APPEARED HE WAS REQUESTING A LAWYER, THAT WE WERE NOT GOING TO
BE ABLE TO TALK TO HIM ABOUT THIS INCIDENT.

ABOUT THIS SAME TIME, MEDICAL STAFF ENTERED THE ROOM AND
EVALUATED THOMAS' SURGERY INCISIONS AND WOUNDS.

03967

AT010603

Date Printed:               INCIDENT REPORT
Oct 14 2004
                        SHERMAN POLICE DEPARTMENT
                              317 S TRAVIS


MEDICAL STAFF ADVISED THAT THEY WOULD BE PREPARING THE
DISCHARGE PAPERS.  THEY ADVISED THAT THOMAS WOULD BE FIT FOR
CONFINEMENT AS SOON AS THE DISCHARGE PAPERS WERE COMPLETED.


SGT. BLANKENSHIP AND MYSELF THEN WALKED JUST OUTSIDE ROOM #285.
WE SPOKE BRIEFLY AND SGT. BLANKENSHIP BEGAN WALKING DOWN THE
HALL TO LEAVE.  I WALKED BACK INTO ROOM #285 AND IMMEDIATELY
THOMAS ADVISED ME THAT HE HAD CHANGED HIS MIND AND HE DID WISH
TO SPEAK TO SGT. BLANKENSHIP.  THOMAS STATED THAT HE DID NOT
THINK HE NEEDED A LAWYER AND HE ADVISED THAT HE BELIEVED HE
COULD REPRESENT HIMSELF.  I THEN QUICKLY WENT DOWN THE HALL
AND STOPPED AT THE FIRST HALL ON MY LEFT.  FROM THERE, I
CALLED FOR SGT. BLANKENSHIP TO STOP.  I ADVISED SGT. BLANK-
ENSHIP THAT AS SOON AS I WALKED BACK INTO THE ROOM AND WITH-
OUT ME SAYING ANYTHING, THOMAS STATED HE WANTED TO TALK ABOUT
WHAT HAD HAPPENED.  SGT. BLANKENSHIP THEN WENT BACK INTO THE
ROOM #285 AND SPOKE TO THOMAS BRIEFLY.  HE THEN LEFT WITHOUT
ASKING THOMAS ANY QUESTIONS.


AT APPROX. 1200 HOURS, SHERMAN POLICE RESERVE OFFICER TONY
LEONE #441 ARRIVED IN ROOM #285 TO ASSIST.


ONCE I RECEIVED THE DISCHARGE PAPERS, I CONTACTED SHERMAN
POLICE DEPT. COMMUNICATIONS AND REQUESTED A TRANSPORT UNIT.
 T THAT TIME, LT. BOB FAIR 006 ADVISED THAT SGT. BLANKENSHIP
ۄOULD BE RESPONDING TO MY LOCATION TO TRANSPORT.  I REQUESTED
AN ORANGE JUMP SUIT BE BROUGHT SO THAT THOMAS WOULD HAVE SOME-
THING TO WEAR.  I WAS ADVISED THAT INVESTIGATOR BRICE SMITH 115
WOULD BE PICKING UP AN ORANGE JUMP SUIT FROM THE GRAYSON COUNTY
JAIL AND BRINGING IT TO OUR LOCATION.


UPON THEIR ARRIVAL, THOMAS WAS DRESSED OUT AND PLACED IN HAND-
CUFFS, WHICH WERE DOUBLE LOCKED IN THE FRONT OF HIS BODY.  THOMAS
WAS THEN PLACED IN A WHEELCHAIR.  I THEN ATTACHED A SECOND SET
OF HANDCUFFS AROUND THE CENTER OF THE HANDCUFFS HE WAS WEARING
AND THEN TO A METAL BAR ON THE WHEELCHAIR.  AT THAT TIME, THE
FOLLOWING OFFICERS ESCORTED THOMAS TO THE MAIN LOBBY ENTRANCE
LOCATED ON THE WEST SIDE OF WILSON N JONES HOSPITAL:


1)   LT. TERRY O'TOOLE
2)   SGT. BRAD BLANKENSHIP
3)   INV. MIKE DITTO
4)   INV. BRICE SMITH
5)   OFFICER TOM CAVER
6)   OFFICER TONY LEONE


THOMAS WAS THEN PLACED IN THE RIGHT FRONT SEAT OF SGT. BLANKEN-
SHIP'S UNMARKED CID CAR, WHERE HE WAS SECURED BY A SEATBELT.
I OCCUPIED THE RIGHT REAR SEAT OF THAT VEHICLE WHILE SGT. BLANK-
ᴺNSHIP DROVE.  THOMAS WAS THEN TRANSPORTED TO THE SHERMAN POLICE


**10577**                                              03968

AT010604

Date Printed:                          INCIDENT REPORT
Oct 14 2004

                              SHERMAN POLICE DEPARTMENT
                                   317 S TRAVIS


DEPT. SO THAT INVESTIGATORS COULD INTERVIEW HIM.

I STOOD BY AT THE SHERMAN POLICE DEPT. UNTIL INVESTIGATORS WERE
DONE SPEAKING TO THOMAS.  INVESTIGATORS THEN ADVISED ME THAT
THOMAS WAS READY TO BE TRANSPORTED TO THE GRAYSON COUNTY JAIL.
I THEN PLACED THOMAS BACK INTO THE WHEELCHAIR AND AGAIN I
ATTACHED A SECOND SET OF HANDCUFFS AROUND THE CENTER OF THE
HANDCUFFS HE WAS WEARING AND THEN TO A METAL BAR ON THE WHEEL-
CHAIR.

THOMAS WAS THEN ESCORTED THROUGH THE BACK ENTRANCE OF THE SHERMAN
POLICE DEPT. AND INTO THE RIGHT REAR SEAT OF A WAITING PATROL
UNIT.   I THEN ESCORTED THOMAS TO THE GRAYSON COUNTY JAIL VIA
UNIT #233.   THERE HE WAS BOOKED IN ON AN OUTSTANDING CAPITAL
MURDER WARRANT #164871, WHICH I HAD IN-HAND.   THOMAS WAS
RELEASED TO GRAYSON COUNTY JAIL PERSONNEL.

   <<< Segment 14 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 03/30/04, 1435, DITTO (021)

On 03/27/04, I received a call from Dispatch (Womack) at approximately 0735
hrs. She advised that there had been a triple homicide at the Arrow Wood
Apartments #340.

When I checked in service, Sgt. Blankenship called and requested that I go
to the P.D. and pick up equipment that might be needed at the scene. I went
to the P.D. first and picked up some equipment and then responded to the
scene. Sgt. Blankenship also advised me that the victims were a mother and
her two small children.

Upon my arrival I was met by Lt. O'Toole, Sgt. Blankenship, and Sgt.
Mullins. I was briefed on what they knew at that time, which was that they
had received a call from Laura's father reporting the offense. Officers had
responded to the scene and confirmmed that all the victims were deceased.

Det. Brice Smith and Det. Larry Bell arrived on scene and were advised to
go to Burger King and attempt to locate Witness (B Hughes). Det. Smith was
also to prepare an affidavit for search warrant and then obtain a search
warrant to allow us to enter the scene and conduct a crime scene search.

Texas Ranger W.A. (Tony) Bennie had been notifed and arrived a short time
later. We photographed what appears to be blood stains on the handrail on
the stairs, leading to apartment #340. We then used cotton tipped swabs to
collect samples of the blood from the handrail.

I photographed a blood drop at the top of the stairs, just outside the door
of apartment #340.

I then walked the grassy area behind the apartment building, searching for
evidence that might have been dropped by the Suspect, but did not locate

                              **10578**

                                                    03969
                                                                    AT010605

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

any. There were tire tracks in the grass, but they appeared to have been
made some time in the past. It appeared that vehicles had gone in and out
of this area repeatedly, and possibly were made by workmen in the area.

Det. Steve Dean arrived on scene with a video camera. I requested that he
video tape the license numbers and descriptions of all the vehicles parked
in the area of the crime scene. As he did that, Det. Trisler and Officer
Ferguson followed Det. Dean and checked the area under and around the cars
for possible evidence, but did not find any.

During this time period we were advised that Suspect (Thomas) had come to
the P.D. and confessed that he committed this offense. He was arrested and
transported to Wilson N. Jones Hospital for treatment of reported
self-inflicted stab wounds.

Det. Smith arrived with a search warrant that allowed us to search Victim's
apartment. Ranger Bennie and I entered the apartment first and walked
through the scene to assess the scene. We found Laura Thomas laying on the
floor in front of the entrance to the hallway. She was on her back with her
head to the West and feet to the East. She was nude, and was laying with
her arms spread apart. There was a large wound near her left breast, and a
large amount of blood under and around her. The two children were found in
the bedroom at the far end of the hall. ████████ was laying in a Toddler
bed on his back. He was clad in blue jogging pants and socks. There was a
arge wound in his chest. There was also what appeared to be a lung laying
on the mattress just above his head.

████████████ was found on the floor near ████████ bed. She was also laying on
her back, and was clad in blue sweat pants and socks. There was a large
wound in her chest. The baby bed where ████████ had presumably been sleeping
was against the West wall. There was a large amount of blood in the bed,
indicating that the attack on her had begun there. Her attacker had removed
her body from the bed and placed it on the floor where she was found.

We also located spots of blood in the kitchen near the sink and counter.
There was a drop of blood on the floor and smaller ones on the edge of the
counter, on a knife block, and on the wall behind the counter.

There was a roll of gray duct tape laying on a chair just inside the front
door of the apartment. We also located a man's viser laying on a chair near
the body. This viser had what appeared to be a small spot of blood on the
bill.

Det. Dean video taped the scene as I escorted him through it. Ranger Bennie
and I then took still photographs of the scene. Ranger Bennie used a 35mm
and I used a digital camera. The disks from the video camera were tagged
and placed into evidence.

Ranger Bennie and I took blood samples (using cotton tipped swabs) from the
various places in the crime scene. Blood samples were placed into small

**10579**

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                 317 S TRAVIS

manilla envelopes, all of which were placed into a paper sack, tagged, and
placed into an evidence locker after we cleared from the scene.

Judge Middents was called to the scene and I escorted him into the
apartment. He pronounced the victims dead at 1144, 1146, and 1148 hrs. and
ordered autopsies on all three.

Waldo Funeral Home was summoned to the scene to transport the bodies to
Dallas for autopsies. The lung found in ███████████ bed was placed into
paper sacks and sent with the bodies to the M.E.'s office.

CAIT Officers (Dittfurth, Smith, Gibson, & Wood) were then brought into the
apartment. They completed the forensic mapping of the scene.

Ranger Bennie, Det. Dean, and I cut out the section of bloody carpet where
Laura Thomas had been laying. We also cut out the section of bloody carpet
from where ███████ had been laying. We wrapped these pieces in paper
sacks and tagged them as evidence.

Other items that were removed from the apartment at the request of County
Attorney Joe Brown were a framed family photo. This photo shows the three
victims, Witness (B Hughes) and his other children.
We also collected a framed child's bedtime prayer from the bedroom wall
above where both children slept.

All of the items of evidence collected from the apartment were placed in my
car and transported to the P.D. where they were tagged and placed in
evidence lockers.

On 03/28/04 Ranger Bennie and I met at the P.D. at 0600 hrs. We gathered
the body organs recovered from Suspect's (A Thomas) residence and placed
the bag into an ice chest. We then traveled to the Southwest Institute of
Forensic Science (SWIFS), arriving there at approximately 0740 hrs. The
autopsies began at approximately 0800 hrs. Dr. Pinckard conducted the
autopsy on ███████████. He determined that the left lung and heart were
both missing from ███████ body.

Dr. Spotswood conducted the autopsy of ███████████ She discovered that
the heart was missing from her body.

Dr. Young conducted the autopsy of Laura Thomas. He discovered that the
upper lobe of her left lung was missing.

We received samples of the hearts and lungs that had been submitted, as
well as FTA cards (blood standard), hair standards from each victim,
fingernail standards, clothing from ███████ and ███████, and the breastplate
from each body. The breastplates were sealed in plastic with formalin,
which is a preservative. It may be necessary to submit these to a lab for
comparison of the marks on the bone with the knives recovered from
suspect's residence.

**10580**                                                    03971

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                              SHERMAN POLICE DEPARTMENT
                                     317 S TRAVIS


All of the items received from SWIFS were brought to the P.D. and tagged as
evidence.

  <<< Segment 15 >>>

(Continued from above segment)

On 03/29/04, I received a call from Sgt. Blankenship, who advised that
Suspect was being released from the hospital, and had agreed to speak to me
about this offense. Sgt. Blankenship advised for me to meet him at the P.D.
at 1300 hrs.

When Sgt. Blankenship and Officer Caver arrived at the P.D. with the
Suspect, he (Suspect) was in a wheel chair. He was escorted to the
Interview Room on the second floor. He was able to walk into the room and
sit in a chair. I entered the room a short time later and introduced myself
to him. I then advised him of his rights and he agreed to waive his rights
and talk to me. During the interview Suspect confessed that he killed all
three of the Victims. He claimed that God told him to kill them, but also
said that he knew that it was wrong. He seemed reluctant to discuss
removing the body organs. The entire interview will be transcribed and
included in the case file. The interview was terminated when Suspect said
that he did not want to talk about it anymore because he was tired. I gave
 im my business card and told him that if he decided that he wanted to talk
 o me later, he could have one of the Jailers call me. (See transcription)

On 03/30/04 Ranger Bennie and I went to the Property & Evidence Division of
the Sherman Police Department. There we sorted evidence collected in this
case and decided what needed to be taken to the DPS Lab in Austin, Texas.

As we finished sorting through the evidence, I was advised by Dispatch that
Natalie Sims had called and advised that Suspect was requesting to talk to
me. I advised Dispatcher Jo Shaw to mark the recording of this call so that
it could be copied for evidence.

Ranger Bennie and I then went to the Grayson County Jail, where we spoke
first with Natalie Sims, who is a Nurse at the jail. I took a tape recorded
statement from her, in which she related that Suspect had asked her to
call me and advise that he wanted to talk to me. In this statement Sims
related that in her professional opinion Suspect was alert, knew where he
was, and was able to carry on a conversation. Sims removed Suspect from the
holding cell and had him sit in a wheel chair. She took him to her office,
and Ranger Bennie and I accompanied them. Once inside the office I
activated my audio tape recorder. Sims asked if she should stay or go, and
I told her that it was up to Suspect. He advised that he wanted her to stay
and she did. I advised Suspect of his rights and he said that he understood
them and agreed to waive those rights. I asked him to tell us about what
had happened on Saturday morning, and he began to relate the sequence of
 vents. Suspect related that he had walked to Laura's apartment that
 orning. He said that he was walking on McGee street when he saw Witness (B

**10581**
                                                                    03972

                                                                  AT010608

Date Printed:           INCIDENT REPORT
Oct 14 2004

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

Hughes) driving his car to work. Suspect said that Witness (B Hughes)
raised his hand up in what he (Suspect) took to be a motion for him to go
on to the apartment. (Hughes had told an Investigator that when he saw
Suspect, he waved at him, and Suspect threw his hands up in the air)
Suspect related that when he saw Witness (B Hughes) make the motion with
his hand, he threw his hands up in the air, and then continued walking.
Suspect claims that as he reached the apartment complex he saw a woman
outside, and felt compelled to speak to her, but did not do so. He said
that he went to Laura's apartment, knocked on the door, and then shouldered
it open. He told us that he had taken a roll of duct tape in case he needed
to tie someone up, but didn't need it. He told us that he took three
knives, so as not to cross-contaminate the blood.

Suspect related that when he broke into the apartment he saw Laura run down
the hall toward him. He said that he stabbed her in the heart and she fell
down and was bleeding. He said that she said, "No" when he stabbed her. He
then told us that he cut her heart out, and went down the hall to the kid's
room. He told us how he stabbed his son (████) first and that he woke up
and said, "No" while he was holding him down. Suspect told us that he cut
his son's heart out and then turned to the little girl.

He first told us that he pulled her out of her bed and put her on the floor
where he stabbed her. I questioned him about this, and he corrected himself
and related that he had stabbed her while she was laying in the baby bed,
but then pulled her out of the bed and laid her on the floor so that he
could cut her heart out too.

Suspect went on to tell us that he put the hearts into the pockets of his
overalls, took the knives and left. He also said that the alarm on the door
as well as the alarm clocks were going off when he left. He told us that he
left the roll of duct tape there.

Suspect related that he was walking past the church across from Fairview
School when he heard the first sirens. He went on to tell us the
approximate route he took going back to his residence. When he got there he
told Karman Hayes what he had done. A short time later they came to the
P.D. and he turned himself in. (See transcription)

On 03/31/04 Ranger Bennie picked up the items of evidence that we wanted
analyzed, and drove to the DPS Lab in Austin, Texas.

On this date Det. Bell sent an email message relating that Officer Hapiuk
had called to tell him that two students in Dillingham AEP had come to him
with the information that Suspect had been saying that if he could not have
Laura, no one could. Det. Bell and I went to Dillingham AEP this afternoon
in an attempt to contact these subjects, but learned that neither one had
come to the AEP class today. I will attempt to contact them tomorrow.

  <<< Segment 16 >>>

OLLOW UP NARRATIVE: CAPITAL MURDER, 04/02/04, 0655, DITTO (021)

**10582**                              03973

AT010609

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                          SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS


On 04/01/04 Ranger Bennie and I went to 812 E. Brockett in an attempt to
locate ███████████. We spoke with an elderly B/M who advised that ██████
did not live there, but lived on the corner of Maxey and College. We then
went to 822 N. Maxey and knocked on the door, but got no answer. I left my
business card with a note requesting that ██████ call me.
██████ called later and advised that he would be at the house across the
street from 822 N. Maxey at 1430 hrs. and I could meet him there at that
time.

We then went to 2700 S. Travis #221, in an attempt to locate ████████
██████. After getting no response at the door, we spoke with the apartment
Manager, who advised that ████████ had not lived there since April of
2003. She did not have a forwarding address.

At 1430 hrs. Sgt. Blankenship and I went to the house across from 822 N.
Maxey, where we found ████████ sitting on the front porch. I asked him
about what he had told Officer Hapiuk, and he denied telling him that Andre
had ever said anything about Laura. He claimed that ████████ was the one
who said that she heard it. I asked him to repeat her name as I was not
sure that I had understood it correctly, and he said that it was
██████, but that her real name was ████████. He also gave us directions to
her house on College street. We then drove to the house he described, and
observed a B/F sitting on the front porch. As we got out of the car she
jumped up and ran into the house, emerging a moment later with a cordless
telephone, which she had apparently just answered. I was close enough to
hear her say, "They just got here. What do they want?" She listened for a
moment and then hung up. I introduced myself and Sgt. Blankenship and asked
if that was ██████ she had been speaking with. She confirmmed that it was,
and asked what we wanted. I asked her what ██████ had told her and she
indicated that he did not tell her. I then told her what ██████ said and
she denied that Andre had ever told her anything like that. She claimed
that it was just everyone talking as a group and someone, maybe ████████,
had made the statement that Andre had said that if he couldn't have Laura
then no one could.

After we left the house on College street, we called Det. Bell and asked
him to check with the school and find out what address they had for
████████. He called back a few minutes later and gave us the
address of 909-B W. Laurel. We then drove to that address and knocked on
the door, but got no response. I left my business card with a note
requesting that ████████ call me.

After my return to the P.D. I received a call from a female who said that
she was a sister to ████████ and had found my business card. She
advised that ██████ did not live there but lived at 906 W. Birge.

I then called Officer Ward who was working off-duty security at the
Dillingham AEP, and asked him to call me when the 1600 hrs AEP class
arrived and advise if ████████ was there or not. In the meantime Lt.

                                                              03974

        **10583**
                                                         AT010610

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                          SHERMAN POLICE DEPARTMENT
                               317 S TRAVIS


O'Toole and I drove toward 906 W. Birge. Before we got there Officer Ward
called and advised that ███████ was in the AEP class. We drove to the old
Dillingham school on Loy Lake rd. where we met Officer Ward. He brought
████████ out into the hallway to meet with us. After introducing ourselves
to him, I asked him about Andre. ███████ gave a tape recorded statement
in which he advised that he had known Andre Thomas for the past five years,
and that they had been close friends. When asked about hearing him say that
if he couldn't have Laura then no one could, he admitted that he had heard
Andre say that, but it had been about four years ago. We questioned him
as to why he could remember that so clearly, but was not clear about why
Andre would have said it. ███████ would not or could not give us a clear
answer to that question, and could not recall other things in the much more
recent past than that. He also claims that he had not spoken to Andre in
the past year. The audio tape from this interview was taken to the P.D.
where I tagged it and placed it into an evidence locker.


   <<< Segment 17 >>>

FOLLOW UP, CAPITAL MURDER, 03-30-04, 1045, BELL, 092


SHORTLY BEFORE 0800 ON 03-27-04 I WAS CONTACTED BY SHERMAN POLICE
DEPARTMENT DISPATCH AND ADVISE TO RESPOND TO THE ARROWWOOD APARTMENTS IN
REGARDS TO A TRIPLE HOMICIDE AT THE LOCATION. I WAS ALSO ADVISED THAT THE
INCIDENT HAD OCCURRED IN APT. #340.

UPON ARRIVING AT THE SCENE I MEET WITH CID SGT. BLAKENSHIP AND BRIEFED BY
HIM AS TO WHAT WAS KNOWN AT THAT TIME. SHORTLY THERE AFTER SGT. BLAKENSHIP
INSTRUCTED DET. BRICE SMITH AND MYSELF TO GO TO BURGER KING AND MAKE
CONTACT WITH A BRYANT HUGHES AND SEE IF HE WOULD GO TO THE POLICE
DEPARTMENT WITH US SO THAT WE COULD TALK TO HIM ABOUT WHAT HAD HAPPENED.
HUGHES WAS REPORT TO US AS BEING THE CURRENT BOYFRIEND OF THE ADULT VICTIM
AND THE FATHER OF ONE OF THE JUVENILE VICTIMS.

UPON ARRIVAL AT BURGER KING SMITH AND MYSELF MADE CONTACT WITH HUGHES. WHEN
WE MADE CONTACT WITH HUGHES HE IMMEDIATELY BEGAN ASKING US IT EVERYTHING
WASOK IF WE INFORMED HUGHES THAT WE HAD A FEW QUESTIONS TO ASK HIM AND THAT
WE WOULD TELL HIM WHY WE WERE THERE AS SOON AS POSSIBLE. HUGHES AGREED TO G
TO THE STATION WITH US. [WE HAD ALREADY GOTTEN THE MANAGER'S APPROVAL FOR
HUGHES TO LEAVE IF HE WANTED TO]. AT THIS TIME HUGHES AGREED TO GO WITH US
AND HE GOT HIS MANAGER'S APPROVAL AND HE WENT TO THE STATION.

WHILE EN ROUTE TO THE STATION HUGHES ASKED US AGAIN IF EVERYTHING WAS OK AN
WE TOLD HIM THAT WE WOULD TALK WITH HIM WHEN WE GOT TO THE STATION. .ONCE AT
THE STATION I BEGAN TO TALK TO HUGHES IN THE INTERVIEW ROOM WHILE SMITH
LEFT TO DO OTHER PAPERWORK.

I THEN BEGAN TO TALK TO HUGHES. HE GAVE ME HIS NAME AND SAID THAT HE STAYS
WITH HIS MOTHER AT 802 MARTIN. I THEN ASKED HUGHES WHERE HE HAD STAYED LAST
NIGHT [THIS WOULD HAVE BEEN 03-26-04]. HUGHES THAT HE STAYED LAST NIGHT AT
'IS GIRLFRIEND LAURA THOMAS. HUGHES THEN ASKED WHAT THIS WAS A ABOUT. I
.OLD HUGHES TO WAIT JUST A MINUTE.

03975

AT010611

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

I THEN ASKED HUGHES WHAT TIME HE HAD TO BE TO WORK AND HUGHES SAID 5
O'CLOCK AND HE WANTED TO KNOW WHERE THIS WAS GOING. HE RELATED THAT HE DID
NOT KNOW WHAT TIME HE GOT TO WORK. HE SAID THAT HE THINKS IT WAS ABOUT
FIFTEEN UNTIL SEVEN WHEN HE GOT TO WORK.

I THEN ASKED HUGHES ABOUT A CONCERN HE HAD WHEN HE WENT TO WORK. HUGHES
THEN ASKED WHERE LAURA WAS. HUGHES SAID THAT HE WAS WORRIED. HUGHES SAID
THAT WHEN HE WAS ON HIS HIS WAY TO WORK HE SAW ANDRE [LAURA'S HUSBAND]
WALKING DOWN THE STREET TOWARDS THEIR APARTMENT. HUGHES SAID THAT HE FIRST
SAW ANDRE AT THE CORNER OF LOCKHART AND MCGEE AND THIS IS WHERE LUARA'S
PARENT'S LIVE. HUGHES ASKED AGAIN WHAT THIS WAS ABOUT.

I THEN ASKED HUGHES IF HE DROVE THIS WAY TO WORK AND HE SAID THAT YES IT
WAS. HUGES SAID THAT HE DROPPED ANDRE OFF AT HIS HOUSE AT ABOUT TEN O'CLOCK
THE NIGHT BEFORE. I THEN ASKED HUGHES IF THEY WERE FRIENDS AND HUGHES SAID
THAT THEY ARE NOT FRIENDS BUT THAT THEY ARE NOT ENEMIES. HUGHES SAID THAT
THEY SHARE A BABIES MOMMA. HUGHES SAID THAT HE HAS A CHILD BY LAURA AS DOES
ANDRE.

I THEN ASKED HUGHES WHICH WAY ANDRE WAS WALKING AND HUGHES SAID TOWARDS HIS
APARTMENT AND THAT WAS WHY HE CALLED LAURA'S DAD TO GO CHECK ON HER. HE
RELATED THAT ANDRE WAS WALKING WEST BOUND ON MCGEE [WHICH WOULD BE TOWARD
THE ARROWHEAD APARTMENTS]. HUGHES SAID THAT HE TOLD LAURA'S FATHER THAT HE
AS TRYING TO CALL LAURA AND THAT HE WANTED HIM TO GO CHECK BECAUSE HE HAD
SEEN ANDRE WALKING IN THE DIRECTION THAT HIS APARTMENT WAS IN.

HUGHES ADDED THAT HE WAS PRETTY SURE THAT ANDRE HAD HEARD HIM SAY THAT HE
HAD TO GO TO WORK AT 5 O'CLOCK IN THE MORNING WHEN ANDRE WAS AT HIS
APARTMENT THE NIGHT BEFORE. HUGHES SAID THAT ANDRE HAD COME BY THE
APARTMENT TO SEE HIS SON. HUGHES SAID THAT ANDRE WAS AT HIS APARTMENT
FROM ABOUT 8PM UNTIL ABOUT 10PM. HUGHES SAID THAT HE WAS IN ANOTHER ROOM
MOST OF THE TIME THAT ANDRE WAS THERE. [HUGHES RELATED LATER THAT HE WAS
TRYING TO GIVE ANDRE A LITTLE PRIVACY WHILE HE VISITED WITH HIS SON]. ONCE
AGAIN HUGHES ASKED IF HE [ANDRE] DID ANYTHING TO HER [LAURA]. I ASKED
HUGHES TO WAIT A SECOND.

I THEN ASKED HUGHES WHAT THE TONE OF THE CONSVERATION WAS BETWEEN LAURA AND
ANDRE AND HE SAID THAT THEY WERE BOTH QUIET. HUGHES SAID THAT WHEN HE GOT
TO WORK HE CLOCKED IN AND TRIED TO CATCH UP A LITTLE BECAUSE HE WAS OVER AN
HOUR LATE. HUGHES SAID THAT HE THEN STARTED TO WORRY ABOUT LAURA AGAIN
BECAUSE HE HAD SEEN ANDRE WALKING IN THE DIRECTION OF HIS APARTMENT AND
THAT HE COULD HAVE GOTTEN TO THE APARTMENT BY NOW. HUGHES RELATED THAT WAS
WHEN HE TRIED TO CALL THE APARTMENT AND THEN HE CALLED HER DAD.

I THEN ASKED HUGHES IF LAURA'S DAD HAD CALLED HIM BACK OR IF HE TRIED TO
CALL LUARA'S DAD BACK AND HE SAID NO. HUGHES SAID THAT HE FIGURED THAT
LAURA'S DAD HAD TAKEN CARE OF EVERYTHING. HUGHES THEN SAID THAT HE COULD
NOT ANSWER ANYMORE QUESTIONS WITHOUT KNOWING WHAT WAS GOING ON.

03976

AT010612

Date Printed:          INCIDENT REPORT
Oct 14 2004

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

I THEN ASKED HUGHES WHAT THE CHILDREN'S NAMES WHERE AND HUGHES TOLD ME
███████ AND ████. AT THIS TIME I TOLD HUGHES THAT THE PEOPLE AT THE APARTMENT
WERE DEAD. HUGHES THEN WENT HYSTERICAL WHEN I TOLD HIM THIS. HUGHES ACCUSED
ME OF LYING TO HIM AND WENT ON SAYING THAT IT WAS TRUE. AFTER A WHILE I WAS
ABLE TO CALM HUGHES DOWN AND WE TALKED SOME MORE.

HUGHES THEN ASKED WHERE ANDRE WAS AND I INFORMED  HUGHES THAT WE DID NOT
KNOW AT THE TIME. HUGHES THEN SAID THAT HE AND ANDRE EVEN LISTENED TO
CHURCH ON THE RADIO LAST NIGHT. HUGHES THEN ASKED ABOUT PAUL [LAURA'S
DAD]. I TOLD HUGHES HE WAS A THE HOSPITAL WITH OTHER FAMILY MEMEMBERS.

AT THIS TIME HUGHES JUST HELD ON TO HIS CHEST AND WAS QUIET FOR A SHORT
TIME. HUGHES THEN SAID THAT HE DID NOT WANT TO GO BACK TO WORK AND THAT HE
WANTED TO GO TO HIS MOTHER'S HOUSE.

HUGHES WAS IN A STATE OF DISBELIEF AT THIS TIME. I THEN ASKED HUGHES WHEN
HE LEFT THE APARTMENT IF EVERYONE WAS ASLEEP AND HE SAID YES. HE SAID THE
THE APARTMENT WAS A TWO BEDROOM AND THAT THE CHILDREN SLEEP IN ONE ROOM
TOGETHER. HUGHES THEN BECAME TO SAY THAT HE WONDERED IF HE LEFT THE DOOR
UNLOCKED WHEN IF LEFT BECAUSE HE WAS IN SUCH A HURRY.

I ASKED HUGHES IF HE HAD OVERSLEPT AND HE SAID YES AND THAT HE HAS BEEN
LATE TO WORK IN THE PAST. HUGHES THEN ASKED IF EVERYONE WAS DEAD AND I
AGAIN TOLD HIM THAT THEY WERE ALL DEAD. HUGHES THEN SAID "THAT BASTARD".
 GAIN AT THIS TIME HUGHES SAID THAT "HE DID IT HE DID IT" REFERRING TO
ANDRE]. I THEN ASKED HUGHES WHY WOULD HE SAY THAT ANDRE DID IT. HUGHES SAID
THAT HE HAD COME OVER LAST NIGHT AND ANDRE WAS TALKING ABOUT KILLING
HIMSELF A COUPLE OF DAYS AGO.

I THEN ASKED HUGHES WHY ANDRE WOULD TRY TO KILL HIMSELF. HUGHES RELATED
THAT ANDRE THOUGHT THAT HE WAS A FALLEN ANGEL AND THAT HE HAS TO OPEN THE
GATES TO HELL. HUGHES THEN SAID THAT HE HAD A FEELING THAT ANDRE WAS GOING
TO KILL SOMEBODY. I ASKED HUGHES WHAT GAVE HIM THE FEELING. HE SAID THAT HE
JUST HAD A FEELING.

HUGHES GOT VERY UPSET AGAIN. I LET HIM CALM DOWN BY HIMSELF. I THEN ASKED
HUGHES HOW HE LEFT THE APARTMENT COMPLEX WHEN HE WENT TO WORK. HUGHES SAID
THAT HE LEFT OUT ON TAYLOR AND TURNED ON TAYLOR AND TURNED RIGHT ONTO
WHARTON AND LEFT ON MCGEE AND HE SAW ANDRE IN THE GRASS OF PAUL'S HOUSE. HE
THEN SAID THAT HE KNEW ANDRE HAD HEARD HIM SAY THAT HE WAS GOING TO WORK.
HE SAID THAT HE WONDERED WHAT ANDRE WAS DOING OUT THAT EARLY.

I THEN ASKED HUGHES IF ANDRE OR ANYONE ELSE HAS EVER THREATEN HIM OR LAURA.
HUGHES SAID THAT HE [ANDRE] NEVER THREATENED HIM OR LAURA BUT THAT LAURA
SAID THAT HE WAS CRAZY ALL THE TIME. I THEN ASKED IF ANYONE ELSE HAD EVER
THREATENED LAURA AND HUGHES REPEATEDLY SAID THAT HE KNEW "HE DID IT"
REFERRING TO ANDRE. I ASKED HUGHES IF LAURA WAS HAVING PROBLEMS WITH ANYONE
ELSE AND HE SAID NO JUST ANDRE.

UGHES THEN SPOKE OF HOW ANDRE CAME TO THE APARTMENT ON THRUSDAY NIGHT AND

03977

AT010613

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                         SHERMAN POLICE DEPARTMENT
                              317 S TRAVIS

HE WAS DRUNK AND THAT HE CUSSED HIM OUT FOR BEING DRUNK WHEN HE CAME OVER
TO SEE HIS SON. HE SAID LAURA TOLD HIM THAT ANDRE HAD TAKEN SOME PILLS.
HUGHES SAID THAT HE NEEDED TO GO AND BE AROUND FAMILY. HE SAID THAT HE
LOVED THAT GIRL [LAURA] MORE THAN ANY OTHER GIRL THAT HE HAD EVER MET.

HUGHES WENT ON TO EXPRESS HOW HE COULD NOT BELIEVE THAT THEY WERE DEAD AND
HOW "HE" [ANDRE] HAD KILLED THEM. I TOLD HUGHES THAT "SOMEONE" HAD KILLED
THEM. HUGHES KEPT SAYING THAT HE [ANDRE] DID IT. HUGHES THEN ASKED IF THE
DOOR WAS KICKED IN OR DID HE LOCK IT. I INFORMED HUGHES THAT I COULD NOT
TELL HIM ABOUT THOSE THINGS. HUGHES THEN ASKED TO SEE HIS MOMMA, PAUL OR
SOMEONE.

DET. SMITH CAME INTO THE ROOM AND CALMED HUGHES DOWN. HUGHES THEN ASKED
SMITH IF ALL THREE WERE REALLY DEAD. HUGHES SAID THAT HE JUST KNEW ANDRE
DID IT. SMITH ASKED HUGHES TO HELP US.

I THEN ASKED HUGHES ABOUT TAKING ANDRE HOME. HUGHES RELATED THAT HE WENT BY
SHAWN WILLIAMS' HOUSE AND LEFT ABOUT 10:50PM AFTER HE TOOK ANDRE HOME.
HUGHES THAN GAVE ME THE GENERAL LOCATION OF WILLIAMS' HOUSE ON WELLS.

HUGHES SAID THAT HE GOT BACK TO THE APARTMENT AT ABOUT 1100PM. HE SAID THAT
EVERYONE WAS ASLEEP AND THAT HE WENT TO BED. HUGHES RELATED THAT HE GOT UP
LATE AND LAURA MADE A COMMENT ABOUT BEING LATE AND HE LEFT AND SAW ANDRE IN
THE AREA AND HE CALLED LAURA'S DAD.

I AGAIN ASKED HUGHES IF LAURA HAD BEEN HAVING PROBLEMS WITH ANYONE ELSE OR
WERE THEY HAVING PROBLEMS. HUGHES REPLIED BY SAYING THAT LAURA WAS THE
"LOVE OF HIS LIFE". HUGHES SAID THAT HE HAD KNOWN LAURA ABOUT THREE YEARS
WHEN SHE MET HER AT CHURCHES CHICKEN WHERE SHE WORKED. HUGHES SAID THAT
LAURA WAS MARRIED TO ANDRE WHEN HE MET HER AND THAT THEY ARE STILL MARRIED.
HUGHES SAID THAT HE WAS MARRIED TO JENNIFER AT THIS TIME. HUGHES SAID THAT
HE AND LAURA STARTED OUT AS FRIENDS BUT THAT THEY FELL IN LOVE AND THAT
LAURA LEFT ANDRE AND HE LEFT HIS WIFE JENNIFER AND THAT THAT STARTED TO
LIVE TOGETHER. HUGHES RELATED THAT HE WAS STAYING BETWEEN LAURA'S, JENNIFER
AND HIS MOTHER'S.

HUGHES ADDED THAT WHEN LAURA BECAME PREGNANT LAURA MADE HIM CHOSE AND AT
THAT TIME ABOUT TWO YEARS AGO HE DECIDED TO BE WITH LAURA. HUGHES THEN
BECAME CONCERNED ABOUT WHETHER OR NOT HE HAD LOCKED THE DOOR. I EXPLAINED T
HUGHES THAT I DID NOT HAVE ANY OF THE DETAILS.

HUGHES WENT ON TO SAID THAT HE KNEW ANDRE DID IT BECAUSE IN HIS HEAD ANDRE
PROBABLY FIGURED THAT SINCE HE HAD TAKEN LAURA AWAY FROM HIM AND HIS SON
THAT ANDRE WOULD CONSIDER THIS A PAYBACK. HUGHES SAID THAT ANDRE WAS CRAZY.
I ASKED HUGHES IF ANDRE SHOWED HIM ANY RESENTMENT AND HUGHES STATED THAT HE
WAS BIGGER THAN ANDRE AND THAT ANDRE WAS AFRAID OF HIM.

CONTINUED IN SEG # 17

  <<< Segment 18 >>>

                         **10587**                          03978


                                                          AT010614

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS


CONTINUED FROM SEG #17

HUGHES SAID THAT ANDRE USED TO COME OVER WHEN HE WAS NOT THERE AND TRY TO
GET LAURA TO LEAVE WITH HIM. HUGHES SAID THAT HE WOULD NOT ALLOW THIS.
HUGHES SAID THAT WHEN ANDRE CAME OVER HE WOULD STAY IN ANOTHER ROOM UNLESS
LAURA WANTED HIM TO STAY IN THE ROOM WITH HER. HUGHES SAID THAT LAURA WAS
SCARED OF ANDRE BECAUSE HE WAS UNSTABLE.

I THEN ASKED HUGHES ABOUT ANDRE TRYING TO COME OVER WHEN HE WAS GONE AND
WHAT LAURA WOULD DO. HUGHES WAS SILENT FOR A WHILE. HUGHES THEN ASKED IF HE
COULD GO TO THE APARTMENT. I TOLD HIM NO THAT IT WAS A CRIME SCENE. HUGHES
THEN EXPRESSED CONCERN ABOUT PAUL [LAURA'S DAD] FINDING THE BODIES.

HUGHES SAID THAT HIS BOSS LISA [RAMSEY] KNEW ANDRE AND THAT HE HAD TALKED
TO HER ABOUT THE THOMAS FAMILY. HUGHES WAS SILENT FOR A WHILE.

I ASKED HIM ABOUT THE CAR HE WAS IN THIS MORNING AND HE RELATED THAT THE
CAR WAS THEIRS [HIS AND LAURA'S]. AT THIS TIME DET. SMITH TOOK ME FROM THE
ROOM AND INFORMED ME THAT THOMAS HAD JUST CAME INTO THE LOBBY AND TOLD
DISPATCH THAT HE HAD KILLED THE PEOPLE AT THE APARTMENT. AT THIS TIME SMITH
AND MYSELF TALKED ABOUT THE NEED TO KEEP HUGHES IN THE INTERVIEW ROOM AS
LONG AS WE COULD WHILE THOMAS WAS THERE.

I THEN REENTERED THE ROOM AND ASKED HUGHES WHO THE CAR WAS REGISTERED THAT
E DROVE TO WORK. WHEN WE HAD LEFT BURGER KING WITH HUGHES HE HAD ALREADY
POINTED OUT A WHITE PONTIAC BONNEVILLE AS BEING HIS CAR. HUGHES SAID THAT
THE CAR BELONGED TO HIM. I THEN ASKED HUGHES IF HE WANTED TO SMOKE. HUGHES
THEN SAID THAT HE NEEDED SOMEONE TO LEAN ON AND THAT HE NEEDED TO GO TO
CHURCH. I ASSURED HUGHES THAT AS SOON AS POSSIBLE WE WOULD GET HIM WITH THE
PEOPLE HE NEEDED TO BE WITH.

HUGHES THEN MADE STATEMENTS THAT HE COULD NOT BELIEVE WHAT HAD HAPPENED. HE
ASKED IF ALL THE BABIES WERE DEAD. HE SAID THAT HE WOULD STAKE HIS LIFE ON
IT THAT ANDRE DID IT. HUGHES SAID THAT HE SAID THAT BECAUSE HIS PASSED
HISTORY OF STABBING HIS BROTHER BRIAN AND THAT HE TRIED TO KILL HIMSELF.
HUGHES SAID THAT ANDRE HAD SHOWN HIM A GASH IN HIS CHEST AND HAD TOLD HIM
THIS WAS FROM WHERE HE HAD TRIED TO STAB HIMSELF. HUGHES SAID THAT ANDRE
HAD SHOWN HIM THAT LAST NIGHT [WHICH WOULD HAVE BEEN FRIDAY NIGHT] AT HIS
APARTMENT. HUGHES SAID THAT THE WOUND LOOKED FRESH MAYBE A TWO DAYS OLD BUT
THAT IT WAS NOT BLEEDING. HUGHES SAID THAT HE DID NOT ASK ANDRE WHY HE
TRIED TO KILL HIMSELF.

AT THIS TIME I ASKED HUGHES IF HE KILLED THOSE THREE PEOPLE AND HE ANSWERED
WITH A DEFIANTE "I DID NOT I LOVE THEM WITH ALL MY HEART". HUGHES THEN
SAID THAT THEY WERE IN INTENSIVE CARE IN THE HOSPITAL. I TOLD HUGHES THAT
THEY WERE NOT AT THE HOSPITAL. HUGHES ASKED ABOUT LAURA'S FAMILY AND I TOLD
HIM FROM WHAT I UNDERSTOOD THE FAMILY WAS AT THE HOSPITAL BECAUSE OF THE
ELDERLY PEOPLE WHO WERE BEING NOTIFIED.

 TOLD HUGHES THAT WE NEEDED HIM AT THE STATION AND HUGHES SAID THAT HE WAS

                                                                    03979

                                                                    AT010615

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                             SHERMAN POLICE DEPARTMENT
                                   317 S TRAVIS

GOING TO HURT HIM [REFERRING TO ANDRE]. I TOLD HUGHES THAT WE DID NOT NEED
HIM RUNNING AROUND LOOKING FOR SOMEONE WHEN WE DID NOT KNOW FOR SURE WHO
COMMITTED THE OFFENSE. HUGHES AGAIN SAID THAT ANDRE DID. IT.

HUGHES RELATED THAT THE APARTMENT WAS LAURA'S. HUGHES AGAIN STATED THAT HE
DID NOT BELIEVE THAT SHE WAS DEAD AND THAT THE BABIES WERE NOT DEAD. HUGHES
ASKED AGAIN IF THEY WERE DEAD AND MAYBE HANGING ON TO LIFE. HUGHES ASKED IF
WE WERE SURE AND I ASSURED HIM THAT THEY WERE DEAD.

HUGHES THEN SAID THAT HE WAS WEARING ALL BLACK. I ASKED HIM WHO HE WAS
TALKING ABOUT AND HE SAID ANDRE. HUGHES ADDED THAT HE [ANDRE] WAS WEARING
BLACK OVERALLS, BLACK SHIRT AND BLACK SHOES WHICH IS UNUSUAL FOR ANDRE
BECAUSE HE LIKES TO WEAR BRIGHT COLORS. HUGHES ONCE AGAIN SAID THAT ANDRE
WAS WEARING ALL BLACK.

HUGHES THEN ADDED THAT WHEN HE SAW ANDRE THAT ANDRE ALSO SAW HIM AND THAT
ANDRE THREW HIS HANDS INTO THE AIR AS IF TO TO "HEY BRYANT WHATS UP".
HUGHES STATED THIS WAS AS HE WAS DRIVING BY CLOSE TO PAUL'S [BOREN] HOUSE.
HUGHES RELATED THAT WHEN HE DID CALL PAUL'S HOUSE HE ASKED PAUL IF HE HAD
SEEN ANDRE BECAUSE HE HAD SEEN BY THEIR HOUSE. HUGHES SAID THAT PAUL SAID
THAT HE HAD NOT SEEN ANDRE. HUGHES SAID THAT HE TOLD PAUL THAT HE HAD SEEN
ANDRE BY THEIR HOUSE AND IT LOOKED LIKE HE WAS GOING TOWARD HIS APARTMENT.
HUGHES SAID THAT PAUL SAID THAT HE WOULD GO RIGHT OVER THERE.

HUGHES SAID THAT ANDRE WOULD GO BY PAUL'S HOUSE ALL THE TIME. HUGHES SAID
THAT EVEN LAURA'S PARENTS WERE WORRIED ABOUT LAURA'S SAFETY. HUGHES SAID
THAT HE WAS GOING EAST ON MCGEE TOWARDS TRAVIS STREET WHEN HE HAD SEEN
ANDRE WALKING WESTBOUND BY PAUL'S HOUSE.

HUGHES SAID THAT WHEN HE GOT TO WORK HE CALLED SEVERAL TIMES AND THAT HE
ONLY GOT THE ANSWERING MACHINE. HE SAID THAT LAURA WAS A SOUND SLEEPER.
HUGHES SAID THAT HE HAD A FEELING THAT SOMETHING WAS GOING TO HAPPEN.
HUGHES AGAIN ASKED FOR HIS FAMILY. I ASKED HUGHES TO STAY WITH US A LITTLE
LONGER.

I THEN ASKED HUGHE IF HE AND LAURA WERE HAVING ANY PROBLEMS WITH ANYONE
ELSE OF IF SHE HAD EVERY BEEN THREATENED BY ANYONE ELSE. HUGHES SAID THAT
THE ONLY OTHER PERSON SHE HAD HAD TROUBLE WITH WAS A GUY NAMED JOSH. THIS
OFFICER IS FAMILIAR WITH JOSH. HUGHES IS SPEAKING OF JOSH LEHRMAN. LEHRMAN
AND LAURA USED TO LIVE TOGETHER. AT THIS TIME LEHRMAN IS IN JAIL FOR
ANOTHER OFFENSE. HUGHES SAID THAT LEHRMAN TRIED TO CUT UP SOME OTHER GIRL.
HUGHES THEN MADE THE COMMENT THAT ANDRE WAS TRYING TO WIN LAURA BACK.

I AGAIN ASKED HUGHES IF HE COULD THINK OF ANYONE ELSE WHO MIGHT WANT TO
HARM HIM OR LAURA. HUGHES SAID THAT HE COULD THINK OF NO ONE. I ASKED HUGHE
IF ANY ONE WAS MAD AT HIM AND HE SAID NO.

HUGHES THEN STATED THAT HE ALMOST HAD HIS KIDS OVER THERE. HUGHES STATED
THAT THESE WERE THE CHILDREN HE HAD WITH HIS EX-WIFE JENNIFER. HE SAID
THAT HE HAD TWO CHILDREN WITH JENNIFER AND ONE ADOPTED CHILD. HE SAID THAT

                    **10589**                              03930

                                                        AT010616

Date Printed:                           INCIDENT REPORT
Oct 14 2004

                              SHERMAN POLICE DEPARTMENT
                                    317 S TRAVIS


JENNIFER WANTED HIM TO TAKE THE KIDS ON FRIDAY NIGHT BUT HE HAD SAID NO
BECAUSE HE DID NOT WANT LAURA TO HAVE ALL THE KIDS.

HUGHES SAID THAT ANDRE HAS BEEN TRYING TO GET LAURA ALONE BY TALKING TO HER
PARENTS THAT HE WAS TRYING TO COME OVER WHEN HE WAS NOT AT HOME. HUGHES
SAID THAT HE NEVER HAD ANY PROBLEMS WITH ANDRE AND THAT HE TRIED TO GIVE
ANDRE TIME WITH HIS KIDS.

HUGHES SAID THAT WHEN ANDRE CAME OVER TO SEE "          HE NEVER REALLY
DID SEE HIM. HUGHES SAID THAT ANDRE WOULD SPEND THE WHOLE TIME TALKING TO
LAURA AND THAT HE WAS STILL HUNG UP ON HER. I ASKED HUGHES IF LAURA HAD
EVER EXPRESSED ANY CONCERNS ABOUT ANY ONE. HUGHES SAID THAT LAURA HAD SAID
THAT SHE DID NOT WANT TO BE ALONE WITH ANDRE. HUGHES WENT ON TO SAY THAT
LAURA HAD TOLD ANDRE THAT HE COULD NOT SEE           ALONE ANYMORE. I
ASKED HUGHES TO EXPLAIN. HUGHES RELATED THAT WAS BECAUSE THEY HAD A FEELING
THAT ANDRE WAS "MESSING AROUND" WITH HIS SON. HUGHES SAID THAT WHEN THEY
TOLD ANDRE THAT HE COULD NOT SEE HIS SON ALONE ANYMORE HE TOOK IT PRETTY
HARD. HUGHES WENT ON TO SAY THAT LAURA TOLD ANDRE THAT HE COULD ONLY COME
OVER AND SEE HIS SON WHEN BRYANT WAS AT HOME.

I THEN ASKED BRYANT IF HE COULD THINK OF ANYONE ELSE HE OR LAURA HAD HAD
PROBLEMS WITH. BRYANT THEN SAID THAT HE COULD NOT BELIEVE THAT SHE WAS
DEAD. I THEN TOLD HUGHES WE DO NOT KNOW WHO DID IT AND THAT WE WERE STILL
INVESTIGATING.

I AKSED HUGHES IF HE STILL WANTED TO GO OUT AND SMOKE AND HE RELATED THAT H
DID. AT THIS TIME I TOOK HUGHES OUTSIDE TO SMOKE.

AS HUGHES STOOD OUT BACK OF THE STATION SMOKING HE KEPT ASKING IF ALL HIS
FAMILY WAS REALLY ALL DEAD. HE WAS TOLD AGAIN THAT THEY WERE. WHILE OUT
BACK OF THE STATION CID SGT. BLANKENSHIP CAME UP TI TALK TO ME ABOUT WHAT
HUGHES HAD SAID. AFTER BRIEFING HIM ON THAT HE ASKED ME TO TAKE HUGHES BACK
TO BURGER KING TO SEE IF HE WOULD GIVE CONSENT TO THE SEARCHING OF HIS CAR.

WHILE TAKING HUGHES BACK TO BURGER KING I EXPLAINED TO HIM WHY WE WANTED TO
SEARCH HIS VEHICLE. HUGHES RELATED THAT HE UNDERSTOOD COMPLETELY AND HE DID
NOT HAVE ANYTHING TO HIDE. ONCE AT BURGER KING [1213 N TRAVIS] HUGHES READ
OVER A SIGNED A CONSENT TO SEARCH FORM. WHILE I SEARCHED THE VEHICLE HUGHES
SAT IN MY CID UNIT WITH DETECTIVE ROBINSON.

UPON SEARCHING HUGHES VEHICLE A 1996 WHITE PONTIAC BONNEVILLE 4 DOOR WITH
TEXAS TAG #ZGK-22C I FOUND NOTHING OUT OF THE ORDINARY. I FOUND NOTHING OF
EVIDENCURY VALUE TO THE CASE THAT WAS BEING WORKED.

AFTER THE SEARCH OF HUGHES VEHICLE I MADE CONTACT WITH SGT. BLANKENSHIP AND
INFORMED HIM OF THE RESULTS OF THE SEARCH. AT THIS TIME HE ASKED IF I HAD
ANYTHING ELSE TO ASK HUGHES ABOUT. WHEN I INFORMED SGT. BLANKENSHIP I DID
NOT BASED WHAT ALL I KNEW ABOUT THE INCIDENT SGT. BLANKENSHIP SAID THAT
HUGHES COULD LEAVE.


                    **10590**                                    03981


                                                                 AT010617

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                              SHERMAN POLICE DEPARTMENT
                                    317 S TRAVIS


AT THIS TIME I INFORMED HUGHES THAT UNLESS HE HAD ANY QUESTIONS HE COULD
GO TO THE PLACES THAT HE NEEDED TO GO. HE ASKED IF HE COULD GO BY THE
APARTMENT AND I TOLD HIM THAT HE COULD NOT GO THERE BECAUSE IT WAS A CRIME
SCENE. HE THEN ASKED IF WE HAD FOUND ANDRE AND I TOLD HUGHES AT THIS TIME
ALL I KNEW WAS THAT ANDRE WAS IN CUSTODY.

HUGHES WOULD NOT ALLOW ME TO DRIVE HIM TO WHEREVER HE WAS GOING TO GO. AS I
LEFT THE PARKING LOT ONE OF HIS CO-WORKERS CAME OUT AND WAS SPEAKING WITH
HIM WHEN I FINALLY DROVE OFF OF THE LOT.


CONTINUED IN SEG #18

  <<< Segment 19 >>>

CONTINUED FROM SEG #18

I THEN RETURNED TO THE CRIME SCENE AND MEET WITH SGT. BLANKENSHIP. AT THIS
I WAS ASSIGNED TO LOCATE AND CHECK ON BRYANT HUGHES EX-WIFE AND CHILDREN. I
WAS ABLE TO MAKE CONTACT WITH JENNIFER ENGLAND HUGHES PARENTS AND CONFIRM
THAT EVERYONE WAS OK. THEY HAD CUSTODY OF JENNIFER'S THREE CHILDREN AT THIS
TIME. THE ALSO TOLD ME THAT JENNIFER WAS A WORK AT THE WAL MART STORE IN
DENISON.

 NCE AT WALMART I SPOKE WITH JENNIFER. I TOLD HER THAT I NEEDED TO ASK HER
 OME QUESTIONS FIRST AND I WOULD TELL HER WHY I WAS THERE WHEN I WAS DONE.
I BEGAN BY TELLING ME THAT BRYANT WAS HER EX-HUSBAND AND THAT THEY HAVE TWO
CHILDREN TOGETHER. SHE ALSO TOLD ME THAT BRYANT LIVES WITH LAURA THOMAS IN
THE APARTMENTS AT 1200 W TAYLOR #340. JENNIFER RELATED THAT BRYANT AND
LAURA HAVE ONE CHILD TOGETHER AND HER NAME IS ████. SHE ALSO SAID THAT
THERE WAS ANOTHER CHILD AT THE HOUSE NAMED ████ AND THAT LAURA IS
CURRENTLY SEPARATED FROM LAURA BUT THAT THEY ARE STILL MARRIED. SHE RELATED
THAT SHE HAS ONLY MET ANDRE THOMAS [ADULT] ONCE VERY BRIEFLY.

I THEN ASKED JENNIFER WHEN THE LAST TIME SHE HAD SPOKEN WITH BRYANT. SHE
SAID THAT IT WAS ABOUT 6PM YESTERDAY [03-26-04]. SHE TOLD ME THEY HAD
TALKED ABOUT WHEN HE WAS GOING TO PICK UP HER TWO CHILDREN. JENNIFER SAID
THAT THE CHILDREN DID NOT GO TO BRYANT'S LAST NIGHT BECAUSE HE HAD TOLD HER
THAT HE WOULD PICK THEM UP AT 2PM [03-27-04] WHEN HE GOT OFF WORK.

I THEN ASKED JENNIFER IF BRYANT HAD EVER MENTIONED ANYTHING ABOUT WHO HE
MAY HAVE BEEN HAVING PROBLEMS WITH. SHE RELATED THAT BRYANT NEVER SAID
ANYTHING ABOUT ANY PROBLEMS. SHE DID SAY THAT THE LITTLE BOY ████ HAD WENT
TO BE WITH HIS DAD AND FOR SOME REASON THE LITTLE BOY HAD SLEPT IN THE SAME
BED WITH HIS DAD AND HIS DAD'S BOYFRIEND. SHE SAID THAT MOST OF HER
CONSVERATIONS WITH BRYANT WERE ABOUT HER KIDS.

I THEN ASKED JENNIFER HOW HER AND HUGHES BROKE UP. JENNIFER RELATED THAT
HUGHES WAS HAVING AN AFFAIR WITH HER [LAURA] AND THAT SHE HAD GOTTEN
 REGNANT. JENNIFER RELATED THAT SHE DOES NOT HAVE MUCH KNOWLEDGE ABOUT
 UGHE'S PERSONAL LIFE AFTER THEY DIVORCED. I ONCE AGAIN ASKED HER IF HUGHES

**10591**

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

HAD EVER MENTIONED ANYTHING ABOUT EVER HAVING ANY PROBLEMS WITH ANYONE AND
SHE SAID NO THAT HE HAD NOT.

AT THIS TIME I CONCLUDED THE INTERVIEW WITH JENNIFER. I NOW INFORMED HER
ABOUT THE INCIDENT THAT HAD OCCURRED AT HUGHES APARTMENT BY ONLY TELLING HE
THAT LAURA AND THE TWO CHILDREN HAD BEEN KILLED. AT THIS TIME JENNIFER
BECAME HYSTERICAL AND STARTED CRYING. WHILE SHE WAS DOING THAT SHE MADE THE
COMMENT THAT HER KIDS WERE SUPPOSED TO HAVE BEEN AT THE APARTMENT THAT
NIGHT BUT THAT HUGHES WOULD NOT COME GET THE KIDS UNTIL THE NEXT DAY.

AT THIS TIME I DROVE JENNIFER TO HER PARENTS LOCATION. WHILE DRIVING THERE
JENNIFER TOLD ME [I RECORDED THIS] THAT ANDRE [THOMAS] WAS TRYING TO GET
BACK WITH JENNIFER. SHE ADDED THAT HUGHES HAD TOLD HER THAT HE KNEW THAT
WAS NOT GOING TO HAPPEN. SHE RELATED THAT LAURA WAS HAPPY WITH BRYANT
[HUGHES] AND THAT LAURA HAD TOLD HER ANDRE THOMAS DID NOT MAKE HER HAPPY.

I ASKED JENNIFER IF HUGHES HAD EVER SAID ANYTHING ABOUT HOW LAURA FELT
ABOUT GETTING BACK WITH THOMAS. JENNIFER RELATED THAT WHEN SHE HAD FIRST
FOUND OUT THAT BRYANT AND LAURA WERE SEEING EACH OTHER SHE TALKED TO LAURA
AND THAT LAURA HAD TOLD HER SHE [LAURA] WOULD NOT TAKE HIM BACK BECAUSE
ANDRE WAS VIOLENT AND THAT HE WOULD YELL AT HER ALL THE TIME. JENNIFER
RELATED THAT LAURA NEVER MENTIONED ANYTHING ABOUT ANDRE BEING PHYSICAL WITH
HER.

N 03-29-04 I WENT TO BURGER KING AND SPOKE WITH ANNETTE ROBBINS. SHE IS
ONE OF THE MANAGERS AT THE SHERMAN BURGER KING. SHE RELATED THAT SHE WAS AT
THE STORE ON SATURDAY [03-27-04] MAKING BIRTHDAY SIGNS. SHE RELATED THAT
SHE WAS NOT SCHEDULED TO WORK. SHE RELATED THAT SHE HAD GOTTEN THER ABOUT
620AM. SHE SAID THAT SHE ANSWERED THE PHONE AND THAT IT WAS BRYANT [HUGHES]
TELLING HER THAT HE HAD OVERSLEPT AND THAT HE WOULD BE THERE IN A MINUTE.
ROBBINS WENT ON TO SAY THAT ABOUT 15 TO 20 MINUTES LATER BRYANT GOT TO
WORK AND HE CLOCKED IN IN.

ROBBINS SAID THAT BRYANT ASKED LISA [SHIFT MANAGER] IF HE COULD USE THE
PHONE. ROBBINS SAID THAT SHE GUESSED THAT HUGHES HAD CALLED HOME BECAUSE HE
WAS TALKING TO SOMEONE BUT SHE SAID THAT SHE DID NOT NO WHO IT WAS AND THAT
SHE COULD NOT HEAR WHAT HE WAS SAYING. SHE SAID THAT BRYANT TALKED ON THE
PHONE FOR AWHILE. SHE GUESSED THAT IT MAY HAVE BEEN TEN MINUTES OR SO. SHE
SAID THAT HUGHES WAS TO HAVE OPENED WITH LISA.

ROBBINS SAID THAT HUGHES HELPED OUT SOME BEFORE HE USED THE PHONE. ROBBINS
SAID THE ONLY PHONE IS IN THE OFFICE. SHE RELATED THAT SHE ONLY KNEW OF ONE
PHONE CALL THAT HUGHES MADE BUT SHE ALSO ADDED THAT SHE WAS IN AND OUT OF
THE OFFICE SO HE COULD HAVE MADE MORE. ROBBINS SAID THAT SHE LEFT ABOUT
715AM. ROBBINS SAID THAT HUGHES ONLY ASKED LISA IF HE COULD USE THE PHONE
FOR A MINUTE AND THAT HE WAS ON IT FOR AWHILE. SHE SAID THAT HE WAS ON THE
PHONE FOR MAYBE TEN MINUTES AND THAT LISA SCOLDED  HIM FOR BEING ON THE
PHONE FOR SO LONG.

OBBINS SAID THAT HUGHES USUALLY DOES NOT WORK THAT EARLY SHIFT. ROBBINS

10592

03983

AT010619

Date Printed:              INCIDENT REPORT
Oct 14 2004
                        SHERMAN POLICE DEPARTMENT
                              317 S TRAVIS


SAID THAT HUGHES HAS WORKED THERE ABOUT TWO MONTHS.

I THEN SPOKE WITH CRYSTAL COLE WHO WAS AT WORK AT BURGER KING. SHE RELATED
THAT SHE WAS TO HAVE BEEN AT WORK AT 600AM ON 03-27-04 BUT THAT SHE WAS A
FEW MINUTES LATE. SHE RELATED THAT HUGHES WAS TO HAVE ALREADY BEEN THERE
BUT THAT HE WAS LATE ALSO AND THAT HE WAS NOT THERE WHEN SHE GOT THERE. SHE
RELATED THAT SHE DOES NOT KNOW WHEN HUGHES GOT TO WORK BECAUSE SHE WAS
BUSY. COLE RELATED THAT SHE DID SEE HIM LATER WORKING.

I THEN ASKED COLE IF HUGHES MADE ANY PHONE CALLS AND SHE SAID THAT SHE DID
NOT KNOW. SHE RELATED THAT HUGHES IS USUALLY ALREADY THERE WHEN SHE GETS
THERE. SHE SAID THAT HE SEEMED NORMAL ON SATURDAY MORNING. SHE RELATED THAT
HUGHES DID NOT TALK TO HER ABOUT HIS PERSONAL LIFE MUCH BUT SEE RELATED
THAT WHENEVER HUGHES DID SPECK ABOUT THEM HE HAD A LOT OF FEELING IN HIS
VOICE. COLE SAID THAT HE TALKED ABOUT HIS KIDS ALL THE TIME.

COLE SAID THAT HUGHES DID NOT TALK WITH HER ABOUT HIS PERSONAL LIFE. SHE
SAID THAT HUGHES HAS BEEN THERE ABOUT TWO MONTHS. SHE ADDED THAT SHE WAS
OUTSIDE WHEN ALL THE COPS AND AMBULANCES WENT BY AND THAT WHEN SHE WENT
INSIDE SHE MADE A COMMENT ABOUT ALL COPS. SHE SAID THAT SHE HAD MADE THIS
COMMENT NEAR HUGHES AND THAT HUGHES THEN SAID THAT HE WONDERED WHAT WAS
GOING ON AND THAT IT SOUNDED LIKE THERE WAS QUIT A FEW OF THEM. SHE SAID
THAT THE NEXT THING SHE KNEW HUGHES WAS GONE.

I THEN SPOKE TO LISA RAMSEY [SHE IS THE MANAGER OF BURGER KING]. SHE
RELATED THAT HUGHES HAS WORKED THERE ABOUT ABOUT A MONTH. SHE RELATED THAT
HUGHES WAS SCHEDULED TO BE AT WORK AT 530AM ON 03-27-04. RAMSEY SAID THAT
HUGHES CALLED HER AT WORK AND TOLD HER THAT HE HAD OVERSLEPT AND SHE
RELATED THAT HUGHES GOT TO WORK AT ABOUT A QUARTER TO SEVEN. RAMSEY SAID
THAT HUGHES HAD CALLED HER AND THAT HE WAS THERE FOR WORK ABOUT FIVE
MINUTES LATER.

RAMSEY SAID THAT HUGHES WAS IN GOOD MOOD WHEN HE GOT TO WORK AND THAT THEY
TALKED FOR A FEW MINUTES ABOUT THEIR FAMILY AND KIDS. RAMSEY ALSO SAID
HUGHES TOLD HER ABOUT SEEING ANDRE OUT BY HIS APARTMENTS AND THAT HUGHES
SAID THAT HE WAS WORRIED BECAUSE ANDRE HAD BEEN TALKING ABOUT KILLING
HIS SELF AND HOW GOD HAD TOLD HIM TO KILL HIMSELF. RAMSEY SAID THAT SHE
TOLD HUGHES THAT HE SOUNDED LIKE HE WAS CRAZY AND THAT MAYBE HE SHOULD CALL
THE POLICE BECAUSE HE MIGHT DO SOMETHING TO THE FAMILY IF HE IS TALKING
LIKE THAT.

RAMSEY THEN SAID THAT HUGHES THEN GOT ON THE PHONE BUT THAT SHE DID NOT
KNOW WHO HE WAS TALKING TO. SHE SAID THAT WHEN HE GOT OFF OF THE PHONE HE
WAS HAPPY AND HUGHES WAS TALKING ABOUT GETTING MARRIED AND THAT TALKED
ABOUT THEIR DAUGHTERS.

RAMSEY SAID THAT HUGHES HAD SAID THAT HE HAD SEEN ANDRE OUTSIDE THE
APARTMENTS BUT THAT HE WAS LATE FOR WORK AND THAT HE WAS IN A HURRY. RAMSEY
RELATED THAT THIS IS THE FIRST TIME THAT HUGHES WAS SCHEDULED TO COME IN
THAT EARLY IN A LONG TIME. RAMSEY SAID THAT SHE WAS UNSURE WHETHER ANDRE

**10593**

03984

AT010620

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS


WAS IN A CAR OF IF HUGHES MEANT THAT HE SAW HIM WALKING BUT THAT ANDRE WAS
GOING TOWARDS THE APARTMENTS. SHE SAID THAT HUGHES WAS CONCERNED.

I THEN ASKED RAMSEY IF HUGHES HAD SAID WHEN ANDRE HAD TALKED ABOUT KILLING
HIMSELF AND SHE SAID THAT HE HAD NOT. I THEN ASKED RAMSEY IF HUGHES HAD
MENTION ANYTHING IN THE PAST ABOUT ANDRE'S BEHAVIOR. RAMSEY SAID NO. RAMSEY
RELATED THAT SHE KNOWS OF ANDRE BECAUSE SHE LIVES IN THE SAME TRAILER PARK
AS ANDRE AND HIS FATHER.

RAMSEY SAID THAT HUGHES HAD TALKED SATURDAY MORNING ABOUT HIS STEP SON AND
THAT HE WAS CONCERNED ABOUT SENDING HIM WITH HIS FATHER BECAUSE HIS FATHER
HAD BEEN TALKING CRAZY. RAMSEY SAID THAT SATURDAY MORNING WAS THE ONLY TIME
THAT HUGHES SHOWED CONCERN ABOUT ANDRE. SHE SAID THAT HUGHES HAD SAID THAT
ANDRE THOUGHT HE WAS A FALLEN ANGEL. RAMSEY SAID THAT HUGHES TALKED OF
GETTING MARRIED.

I ASKED RAMSEY ABOUT HUGHES USING THE PHONE THAT DAY. SHE SAID THAT SHE
THOUGHT HUGHES USED THE PHONE MAYBE TWICE BUT THAT SHE DID NOT WATCH HIM SO
SHE DOES NOT KNOW HOW MANY CALLS HE MIGHT HAVE MADE. SHE SAID THAT HUGHES
WAS IN THE OFFICE MAYBE FIVE OR TEN MINUTES. SHE SAID THAT HE WAS HAVING A
CONSVERATION WITH SOME ONE BUT THAT SHE COULD NOT HEAR HIM.

RAMSEY SAID THAT HUGHES HAD SAID THAT HE WAS WORRIED ABOUT ANDRE BEING IN
THE AREA OF HIS APARTMENT BUT HUGHES WENT BACK TO WORK AND THAT HE WAS
USY BECAUSE HE HAD BEEN LATE.

RAMSEY ADDED TO HER STATEMENT THAT SHE HAD ASKED HUGHES ABOUT IF HE WAS
CONCERNED ABOUT ANDRE HARMING HIS FAMILY AND HUGHES SAID THAT ANDRE ONLY
TALKED ABOUT HARMING HIMSELF.

RAMSEY DID PROVIDE ME WITH A PHOTO COPY OF THE TIME SHEETS FOR THAT DAY
WHICH SHOWED HUGHES CLOCKING IN FOR WORK AT 647AM ON 03-27-04.

I THEN SPOKE WITH JEREMY JONES WHO ALSO WORKS AT BURGER KING. HE RELATED
HUGHES WAS SCHEDULED TO WORK AT 530AM ON 03-27-04 AND THAT HE KNOWS HE WAS
LATE. JONES SAID THAT HE WAS NOT SCHEDULED TO WORK AT 800AM THAT DAY.

I ASKED JONES IF HUGHES HAD EVER SPOKEN WITH HUGHES ABOUT ANY PROBLEMS HE
MIGHT HAVE BEEN HAVING WITH ANYONE. JONES SAID THAT HUGHS NEVER TALKED TO
HIM ABOUT ANY PROBLEMS. JONES SAID THAT HUGHES TALKED ABOUT GETTING MARRIED
TO THAT GIRL [LAURA]. JONES SAID THAT HUGHES HAS BEEN WORKING AT BURGER
KING FOR ABOUT A MONTH OR SO. JONES SAID THAT ON SATURDAY MORNING HE AND
HUGHES WERE UNLOADING A TRUCK WHEN THE POLICE CAME TO TALK TO HUGHES. JONES
SAID THAT HUGHES TALKED ABOUT HIS KIDS AND GETTING MARRIED. JONES ALSO
SAID THAT HUGHES HAS BEEN LATE TO WORK BEFORE.

I THEN SPOKE TO SAMUEL TAYLOR WHO ALSO WORKS AT BURHER KING. HE RELATED
THAT HE CAME INTO WORK ON SATURDAY [03-27-04] AT 800AM. TAYLOR SAID THAT HE
HAD HEARD HUGHES [WHO WAS ALREADY AT WORK] TALKING ABOUT SOME GUY WALKING
OWARDS HIS HOUSE. TAYLOR SAID THAT HUGHES HAD TOLD HIM THAT HE HAD THOUGHT


**10594**                                                    0 3985

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS


ABOUT TURNING AROUND AND GOING HOME BUT THAT HE WAS ALREADY LATE FOR WORK.
TAYLOR SAID THAT HUGHES HAD SAID SOMETHING ABOUT SOMEONE NAMED "DRE
THOMAS".

TAYLOR SAID THAT HUGHES HAS BEEN THERE ABOUT A MONTH OR TWO. TAYLOR SAID
THAT HUGHES DID NOT TALK TO HIM ABOUT HIS PERSONAL LIFE. TAYLOR SAID THAT
SATURDAY WAS THE FIRST TIME THAT HUGHES HAD EVER MENTIONED THOMAS NAME.

CONTINUED IN SEGMENT #19

  <<< Segment 20 >>>

CONTINUED FROM SEG #19

ON 03-29-04 I SPOKE WITH STEPHANIE HUGHES ASHLEY. SHE IS BRYANT HUGHES
BROTHER. ASHLEY RELATED THAT BRYANT STARTED A RELATIONSHIP WITH LAURA
[THOMAS] ABOUT TWO YEARS AGO. ASHLEY SAID THAT SHE AND LAURA WERE CLOSE.
ASHLEY SAID THAT PRIOR TO SATURDAY MORNING SHE HAD LAST SHE HAD TALKED TO
BRYANT WAS THURSDAY. SHE SAID THAT SHE HAD TALKED TO BRYANT ABOUT HER
DAUGHTER AND SHE WAS CHECKING TO SEE IF BRYANT AND LAURA COULD LOOK AFTER
████████ SO HER MOM AND DAD COULD HAVE A BREAK. ASHLEY SAID THERE WAS TO HAVE
BEEN A PICNIC INCLUDING ALL KIDS. ASHLEY  SAID THAT IS WAS TO BE HER
DAUGHTER, LAURA'S AND BRYAN'S CHILDREN AND BRYANTS CHILDREN FROM HIS FIRST
WIFE. ASHLEY SAID THAT SHE DID NOT GET BACK UNTIL LATE FROM THE APPOINTMENT
ND THAT BRYANT HAD TO BE TO WORK EARLY ON SATURDAY SO NONE OF THE CHILDREN
GOT TO SPEND FRIDAY NIGHT [03-26-04] AT BRYANT AND LAURA'S APARTMENT.

ASHLEY SAID THAT THE LAST TIME PRIOR TO SATURDAY MORNING SHE HAD LAST
TALKED TO LAURA ON FRIDAY AT ABOUT ABOUT 830PM. SHE RELATED THAT SHE HAD
TALKED TO LAURA ABOUT HER DAUGHTER WANTING TO GO TO THE APARTMENT BUT THAT
THEY WERE TIRED AND THAT CHILD COULD NOT GO. ASHLEY SAID THAT THE TALKED TO
LAURA EVERYDAY. ASHLEY SAID THAT BRYANT WAS ALWAYS TALKING ABOUT LAURA BEIN
HIS SOUL MATE. SHE SAID THAT LAURA WAS ALWAYS TALKING ABOUT BRYANT. ASHLEY
SAID THAT EVERYONE NEW THAT BRYANT HAD TO GO TO WORK EARLY ON SATURDAY
[03-27-04].

I THEN ASKED ASHLEY IF LAURA HAD EVER EXPRESSED ANY CONCERNS ABOUT ANYONE.
ASHLEY SAID THAT THE ONLY PERSON THAT LAURA EVER EXPRESS AND CONCERNS ABOUT
WAS ████████ DAD [REFERRING TO ANDRE THOMAS]. ASHLEY RELATED THAT LAURA
[ASHLEY THEN HESITATED] AND SAID MAYBE I SHOULDN'T SAY THIS] HAD SAID THAT
LAURA WAS CONCERNED ABOUT ANDRE BEING AROUND HER AND THE CHILDREN BECAUSE
ANDRE WAS JEALOUS BECAUSE SHE [LAURA] HAD MOVED ON. ASHLEY WENT ON TO STATE
THAT LAURA HAD TOLD HER THAT ANDRE WAS UPSET BECAUSE HE THOUGHT HE WAS
LOSING HIS SON BECAUSE ████████ WAS CALLING BRYANT DADDY AND THAT HE
HAD STARTED CALLING ANDRE [HIS FATHER] BY THE NAME ANDRE.

ASHLEY SAID THAT SHE ONLY MET ANDRE THOMAS BRIEFLY A TIME OR TWO. ASHLEY
SPOKE OF HOW LAURA WAS CONCERNED ABOUT ████████ ACTING OUT AND THAT
████████ WOULD COME HOME [FROM HIS FATHERS] AND ACT OUT AND TALK ABOUT.
SHLEY SAID THAT LAURA WAS CONCERNED ABOUT ████████ AND THAT SOMEONE
IGHT BE TOUCHING ████ ████ ASHLEY SAID THAT LAURA AND BRYANT THAT

                                                              03986

                    **10595**

                                                              AT010622

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

THEY TALKED TO ANDRE ABOUT IT. ASHLEY SAID THAT ███████████ TALKED ABOUT
HOW HE SLEPT IN THE BED WITH HIS DADDY AND HIS DADDY'S BOYFRIEND AND THAT
████████ WAS TALKING ABOUT HIS PENIS. ASHLEY  SAID THAT SHE AND LAURA
WERE FOLDING CLOTHES ONE DAY WHEN THEY FOUND OUT THAT ████████ HAD BEEN
TALKING TO HER DAUGHTER ABOUT A PENIS.

ASHLEY SAID THAT LAURA HAD TOLD HER THAT THEY [HER AND BRYANT] HAD TOLD
ANDRE THAT HE COULD NOT COME BY THE APARTMENT ANYMORE UNLESS BRYANT WAS
HOME. ASHLEY SAID THAT LAURA HAD BECOME UNEASY ABOUT ANDRE MAKING COMMENTS
LIKE "WHAT WOULD YOU DO IF I TOOK HIM FROM YOU?" [REFERRING TO
████████ AND MAYBE WE COULD WORK ON IT GETTING BACK TOGETHER OUR
RELATIONSHIP. ASHLEY SAID THAT LAURA TOLD HER THAT SHE TOLD ANDRE THAT SHE
HAD A LIFE AND THAT HE NEEDED TO GET ON WITH HIS LIFE. ASHLEY SAID THAT
WHEN SHE TOLD ANDRE THIS HE ASKED HER THAT IF SHE DID NOT HAVE THE KIDS
WOULD SHE COME BACK. ASHLEY SAID THAT LAURA TOLD HER SHE TOLD ANDRE NO.

ASHLEY SAID SHE WAS AT BRYANT'S AND LAURA'S WHEN LAURA TOLD BRYANT THAT SHE
DID NOT WANT TO LET ANDRE IN THE APARTMENT ANYMORE UNLESS HE WAS THERE.
ASHLEY SAID THAT AT THIS TIME BRYANT SAID THAT IF SHE [LAURA] DID NOT WANT
TO TELL HIM THAT THEY WOULD TELL HIM TOGETHER. ASHLEY SAID THAT THIS WAS A
COUPLE OF MONTHS AGO OR SO.

ASHLEY SAID THAT ABOUT A COUPLE OF WEEKS OR SO AGO IT GOT SERIOUS BECAUSE
SHE WAS AT LAURA'S APARTMENT AND ANDRE HAD CALLED AND WANTED TO COME OVER
 ECAUSE HE WAS AT SOMEONE'S APARTMENT IN THE COMPLEX AND LAURA TOLD HIM NO.
I THEN ASKED ASHLEY WHAT HAPPENED AFTER THEY PLACED THESE CONDITIONS ABOUT
HIM NOT COMING OVER UNLESS BRYANT WAS HOME. ASHLEY SAID THAT SHE KNEW OF
ANOTHER TIME WHEN ANDRE WAS AT THE APARTMENTS WITH HIS MOTHER OR
GRANDMOTHER AND WANTED TO COME OVER. ASHLEY SAID THAT LAURA CALLED BRYANT
AND ASKED HIM IF IT WAS OK AND ANDRE WAS ALLOWED IN.

I ASKED ASHLEY IF SHE NEW WHAT BRYANT WOULD DO WHEN ANDRE CAME OVER TO
SEE HIS CHILD. SHE RELATED THAT BRYANT DID NOT HAVE A PROBLEM WITH ANDRE
COMING OVER AND VISITING AS LONG AS HE WAS THERE.

ASHLEY ADDED TO HER STATEMENT THAT BRYANT HAD TOLD HER THAT HE HAD TAKEN
ANDRE SR. HOME FRIDAY NIGHT. ASHLEY ALSO SAID THAT BRYANT HAD TOLD HER THAT
HE HAD MENTIONED THAT HE HAD TO GO TO WORK EARLY. ASHLEY SAID THAT LAURA
HAD CALLED OVER TO HER HOUSE ON FRIDAY EVENING LOOKING FOR HER KEYS TO THE
APARTMENT BECAUSE SHE COULD NOT FIND HER KEYS.

I THEN SPOKE TO BOBBIE HUGHES AND SHE RELATED THAT THE LAST TIME SHE HAD
SPOKEN TO LAURA WAS FRIDAY EVENING. BOBBIE SAID THAT SHE HAD TAKEN LAURA
HOME EARLIER AND THAT ON THE WAY HOME LAURA WAS LOOKING FOR HER PURSE.
BOBBIE SAID THAT LATER IN THE EVENING LAURA CALLED BACK AND SAID THAT SHE
HAD FOUND THE PURSE BUT THAT SHE COULD NOT FIND THE KEYS.

BOBBIE SAID THAT ON SATURDAY [03-27-04] SHE KNEW BRYANT HAD TO BE TO WORK
AT 5 IN THE MORNING. BOBBIE SAID THAT SHE DID NOT KNOW WHAT TIME LAURA HAD
 O BE TO WORK SO WHEN SHE GOT UP ON SATURDAY MORNING BOBBIE RELATED THAT

03987

**10596**

AT010623

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                           SHERMAN POLICE DEPARTMENT
                                 317 S TRAVIS

SHE STARTED CALLING LAURA TO SHE WHAT TIME SHE WAS GOING TO WORK AND TO
TELL HER TO DROP THE GRANDCHILDREN OFF WITH HER.

BOBBIE RELATED THAT SHE WOKE UP AT SEVEN AM ON SATURDAY AND WENT AND GOT A
CUP OF COFFEE AND THEN STARTED TO CALL OVER TO THE APARTMENT TO TALK TO
LAURA. BOBBIE THEN TALKED ABOUT OTHER CALLS SHE HAD MADE LATER. I WAS
FINALLY ABLE TO DIRECT BOBBIE BACK TO THE THE SUBJECT ABOUT HER MAKING THE
CALLS TO THE APARTMENT. BOBBIE SAID THAT SHE MADE BACK TO BACK CALLS TRYING
TO GET LAURA ON THE PHONE.

BOBBIE DID ADD TO HER STATEMENT THAT SHE HAD CALLED BURGER KING AND BRYANT
HAD TOLD HER THAT HE COULD NOT GET A HOLD OF LAURA AND THAT HE WAS GOING TO
CALL HER DAD AND HAVE HIM CHECK. BOBBIE SAID THAT BRYANT HAD SAID THAT HE
HAD PAST THAT "BOY" ON HER WAY TO WORK.

I THEN SPOKE TO CARMEN HAYS. SHE IS ANDRE'S GIRLFRIEND AND LIVES WITH THEM
AT THE TRAILER. I ASKED CARMEN ABOUT FRIDAY NIGHT AND SHE SAID THAT SHE
WENT TO BED ABOUT 830PM AND THAT SHE SAID THAT SHE DOES NOT KNOW IF ANDRE
CAME HOME THAT NIGHT OR NOT. SHE SAID THAT ANDRES MOTHER HAD SPENT THAT
NIGHT AT THE TRAILER AND SHE THINKS THAT SHE CAME IN AROUND TEN PM BECAUSE
SHE GETS OFF WORK AT 10PM.

CARMEN WENT ON TO TALK ABOUT HEARING SOMEONE COME IN AND OUT AT ABOUT 638A
BUT SHE DID NOT KNOW WHO IT WAS. SHE SAID THAT SHE HAD LOOKED AT THE CLOCK
AND SAID THAT THIS WAS TO EARLY FOR HER SO SHE WENT BACK TO SLEEP. CARMEN
SAID THAT SHE WOKE UP AT ABOUT 830A AND SOMEONE WAS KNOCKING AT THE DOOR.
SHE SAID THAT SHE THOUGHT THAT ANDRE WOULD GET THE DOOR. CARMEN SAID THAT
SHE THEN HEARD ISAIAH CALL ANDRE'S NAME AND THEN OPEN HER DOOR. CARMEN SAID
THAT SHE AND ISAIAH WENT INTO THE LIVING SO ISAIAH COULD SMOKE AND THAT
ISAIAH ASKED WHERE ANDRE WAS AND CARMEN SAID THAT SHE TOLD HIM THAT SHE HAD
NOT SEEN ANDRE ALL MORNING. SHE SAID THAT SHE TOLD ISAIAH SHE DID NOT EVEN
KNOW IF ANDRE HAD COME HOME LAST NIGHT. CARMEN SAID THAT THE FIRST TIME
THAT SHE HAD SEEN ANDRE THAT DAY WAS ABOUT 900AM. CARMEN RELATED THAT SHE
HAD ALREADY TOLD THE POLICE WHAT HAD HAPPENED AFTER THAT.

CARMEN SAID THAT ANDRE AND SHE BROKE UP EARLIER BECAUSE HIS BROTHER JAMES
HAD TOLD HIM THAT SHE WAS A GUY AND THAT HE WAS BELIEVING IT. CARMEN SAID
THAT SHE AND ANDRE THEN GOT BACK TOGETHER BECAUSE SHE THOUGHT THAT SHE COUL
HELP HIM WITH HIS MENTAL PROBLEMS AND HIS THOUGHTS OF SUICIDE BECAUSE SHE
HAD BEEN THERE BEFORE.

CARMEN SAID THAT ON THRUSDAY NIGHT SHE AND ANDRE WERE "TRIPPING" ON
CORISEDANT [COLD MEDICINE PILLS] AND ALCOHOL. CARMEN SAID THAT AT THIS TIME
ANDRE STABBED HIMSELF [THIS WAS ABOUT 1100PM] AND SHE TOLD HIS MOTHER BUT
THAT HE DID NOT WANT TO GO TO THE HOSPITAL AT THIS TIME. CARMEN SAID THAT
ANDRE'S MOTHER TOOK HIM TO THE HOSPITAL AT ABOUT 630AM AND THAT WHEN HE
RETURNED FROM THE HOSPITAL ABOUT 1000AM HE TOOK HER TO THE BACK BEDROOM AND
TOLD HER THAT HE JUST WANTED TO BE FRIENDS.

CARMEN SAID THAT ANDRE SAID THAT HE DID NOT LOVE HE LIKE HE SHOULD. SHE ALS

**10597**                                              03988

                                                     AT010624

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                          SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS


SAID THAT ANDRE SAID THAT IF THEY HAD BEEN MEANT TO BE TOGETHER HE WOULD
HAVE MET HER BEFORE LAURA. CARMEN SAID THAT SHE STAYED AROUND THE HOUSE AND
ANDRE LEFT THE HOUSE FOR THE DAY AND THAT SHE WENT TO BED ABOUT 830PM.

CARMEN THEN TOLD ME ABOUT HOW AFTER THEY HAD TAKEN THE COLD AND COUGH
MEDICINE AND THE ALCOHOL THEY HAD WENT TO LAURA'S HOUSE AND THAT ANDRE WAS
STARTING TO TRIP ON THE MEDICINE. CARMEN SAID THAT WHEN THEY GOT TO THE
APART MART LAURA, BRYANT AND THE KIDS WERE THERE. CARMEN SAID THAT ANDRE WAS
TRYING TO VISIT WITH ████████     ████ BUT THAT ████████     ████ COULD TELL
SOMETHING WAS WRONG WITH ANDRE AND THAT HE WOULD HAVE NOTHING TO DO WITH
HIM. CARMEN SAID THAT LAURA WAS "PISSED OFF" AND THAT SHE TOLD ANDRE THAT
IF HE WANTED TO SEE HIS SON THE NEST TIME HE CAME OVER "HE HAD BETTER SOBER
HIS ASS UP".

CARMEN THEN SAID THAT THEY WERE ABOUT TO LEAVE AND THAT WAS WHEN LAURA
BROUGHT HIS "40 oZ" TO HIM AND THIS IS WHEN LAURA HAD TOLD HIM TO SOBER UP.
CARMEN SAID THAT ANDRE THOUGHT THAT HE HAD SAW GOD WHEN HE WAS DRUNK ONE
NIGHT AND THAT ANDRE THOUGHT THAT IF HE WASN'T WITH LAURA HE WOULD NOT MAKE
ANYTHING OUT OF HIS LIFE. I ASKED CARMEN WHAT ANDRE THOUGHT ABOUT BRYANT
AND SHE SAID THAT SHE DID NOT THINK THAT ANDRE THOUGHT BAD OF BRYANT
BECAUSE HE HAD SAID THAT LAURA WAS GOING TO DO WHAT SHE WANTED TO.

I ASKED CARMEN IF ANDRE HAD EVER TALKED ABOUT HURTING ANYONE IN PARTICULAR
BRYANT, LAURA OR THE KIDS. CARMEN IMMEDIATELY SAID "NEVER THE KIDS". LAURA
AID IN PASSING HE TALKED ABOUT LAURA AND THAT ANDRE SAID TO HER "THAT HE
DOES NOT KNOW WHY SHE DOES THE THINGS THAT SHE DOES, IT JUST MAKES ME WANT
TO HURT HER SOMETIMES".


CONTINUED IN SEG 20

  <<< Segment 21 >>>

CONTINUED FROM SEG #20

ON 03-30-04 I SPOKE WITH PAUL BOREN. I ASKED PAUL ABOUT THE CALL FROM
BRYANT. BOREN SAID THAT THE CALLER ID SAID THAT IT WAS 709AM [03-27-04].
PAUL SAID THAT BRYANT HAD ASKED IF ANDRE THOMAS WAS AT HIS HOUSE BECAUSE HE
HAD SEEN ANDRE WALKING BY THE HOUSE [BOREN HOUSE]. I ASKED BOREN IF IT WAS
UNUSUAL FOR ANDRE TO DROP BY THE HOUSE. BOREN SAID NO THAT IT WAS NOT BUT
THAT IT WOULD BE A FIRST FOR ANDRE TO STOP BY THAT EARLY. BOERN SAID THAT
BRYANT HAD TOLD HIM THAT HE WAS ON HIS WAY TO WORK AND THAT HE WAS LATE.

BOREN WENT ON TO SAY THAT BRYANT WAS WORRIED ABOUT LAURA BECAUSE ANDRE HAD
TO THEIR APARTMENT RECENTLY AND THAT ANDRE HAD SHOWN HIM HIS CHEST WHERE HE
[ANDRE ] AHD TRIED TO COMMIT SUICIDE. BOREN SAID THAT BRYANT TOLD HIM THAT
HE WAS WORRIED ABOUT LAURA AND THAT HE [ANDRE] MIGHT BE HEADED TOWARDS
LAURA'S. BOREN SAID THAT BRYANT HAD TOLD HIM THAT HE HAD BEEN TRYING TO
CALL LAURA AND COULD NOT GET AHOLD OF HER. BORE SAID THAT BRYANT WANTED HIM
⊃ GO CHECK ON LAURA. BOREN SAID THAT HE THEN LEFT TO CHECK ON LAURA.

**10598**                                              03989

                                                      AT010625

Date Printed:                     INCIDENT REPORT
Oct 14 2004
                              SHERMAN POLICE DEPARTMENT
                                    317 S TRAVIS

BOREN SAID THAT WHEN HE GOT TO THE APARTMENT HE COULD TELL THAT THE DOOR
WAS BROKEN INTO. AT THIS TIME I TOLD BOREN I WOULD NOT HAVE HIM GO INTO
THAT PART OF THE INCIDENT.

I THEN ASKED BOREN IF BRYANT HAD EVER EXPRESSED ANY CONCERNS TO HIM ABOUT
ANDRE OTHER THAN THAT MORNING ON THE PHONE. BOREN SAID THAT THEY WERE ALL
CONCERNED ABOUT ANDRE AND EVERYTHING. BOREN SAID THAT ANDRE HAS BEEN GOING
THROUGH THINGS AND THAT HE WOULD GET BETTER.

I ASKED BOREN WHAT THEY WERE CONCERNED ABOUT IN REGARDS TO ANDRE. BOREN
SAID THAT ANDRE SEEMED TO BE DISTRAUGHT AND THAT THEY WOULD TALK. BOREN
SAID THAT THEY TALKED ABOUT ANDRE TEARING UP MONEY AND ANDRE WAS SAYING
THAT HE HAD THE ANSWER THAT IT WAS IF EVERYONE LOVED EVERYTHING WOULD BE
PERFECT. BOREN SAID THAT THEY MINISTERED TO ANDRE.

BOREN SAID THAT WHEN HE CAME BACK TO THE HOUSE FOR SHOES THERE WAS MESSAGE
ON THE PHONE FROM DANNY THOMAS ANDRE'S DAD AND THAT IT WAS FROM ANDRE.
BOREN RELATED THAT THE MESSAGE HAS ALREADY BEEN RECORDED BY ANOTHER
OFFICER.

I THEN ASKED BOREN ABOUT THE CALL HE HAD MADE TO 911 WHERE HE HAD SAID THAT
ANDRE HAD DID IT. I ASKED BOREN WHAT HE HAD MEANT WHEN HE HAD SAID THAT.
BOREN SAID HE FELT THAT HE WOULD NOT DO ANYTHING LIKE THIS BUT THAT IN THE
BACK OF THEIR MIND THEY KNEW THAT HE WAS CAPABLE OF DOING SOMETHING LIKE
THIS. BOREN SAID THAT LAURA'S GREATEST FEAR WAS THAT SOMETHING LIKE THIS
WAS GOING TO HAPPEN. BOREN RELATED THAT LAURA EXPRESSED THIS TO HIM SEVERAL
TIMES.

I ASKED BOREN IF LAURA OR BRYANT HAD EVER EXPRESSED ANY CONCERNS ABOUT
ANYONE ELSE IN THEIR LIVE. HE SAID THAT THEY WORRIED ABOUT ANDRES BROTHERS.
BOREN SAID THAT AS FAR AS HE KNEW THERE WERE NO PROBLEMS THAT HE KNEW OF
WHEN IT CAME TO ANDRE VISITING HIS SON. BOREN DID SAY THAT BRYANT AND LAURA
DID EXPRESS CONCERN ABOUT JOSH [LEHRMAN] BUT THAT HE WAS IN PRISON.

BOREN RELATED THAT LAURA EXPRESSED CONCERNS ABOUT HER FEARS IN REGARDS TO
ANDRE. BOREN SAID THAT THERE WERE NO PROBLEMS BETWEEN BRYANT AND ANDRE THAT
HE KEWN OF OR ANY PROBLEMS BETWEEN BRYANT AND LAURA THAT HE KNEW OF.

   <<< Segment 22 >>>

FOLLOW UP, CAPITAL MURDER, 04-01-04, 1730, BELL, 092

I MADE CONTACT WITH ANNETTE ROBBINS THIS DATE. AS SHE IS ONE OF THE
MANAGERS FOR THE BURGER KING I ASKED HER HOW FAR IN ADVANCE WERE THE WORK
SCHEDULES MADE OUT FOR THE EMPLOYEES. SHE RELATED THAT THE SCHEDULES ARE
MADE OUT ONE WEEK IN ADVANCE. SHE ALSO RELATED THAT AS FAR AS SHE KNEW
BRYANT HUGHES SCHEDULE WAS NOT CHANGED FROM THE TIME THAT IT WAS POSTED
UNTIL HE WORKED IT.

I THEN MADE CONTACT WITH ELLIS COTTON AND SPOKE WITH HIM ABOUT THE CAR HE
AD SEEN LEAVING THE COMPLEX ON THE MORNING OF THE INCIDENT. COTTON'S

                                                                    03990

**10599**

AT010626

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                             SHERMAN POLICE DEPARTMENT
                                   317 S TRAVIS

APARTMENT IS IN THE SAME BUILDING AS THE VICTIMS. COTTON'S APARTMENT DOOR
IN ON THE NORTH SIDE OF THE BUILDING AND THE VICTIM'S APARTMENT DOOR IS ON
THE SOUTH SIDE OF THE BUILDING. THERE ARE SEPARATE STAIRS TO THE DOORS OF
THESE APARTMENTS. THERE IS A COMMON WALL BETWEEN THE TWO APARTMENTS.

COTTON RELATED IN A RECORDED STATEMENT THAT HE HAD GOT UP ABOUT 545AM
BECAUSE HE HAD TO PICK HIS MOTHER UP FROM WORK. COTTON RELATED THAT AS HE
WALKED DOWN THE STAIRS TO GO TO HIS CAR THE CAR LEFT THE PARKING LOT REAL
FAST. HE SAID THAT THE CAR "BURNED OUT" REAL FAST LIKE IT WAS IN A HURRY.
COTTON SAID THAT THE CAR WAS SITTING OUT RIGHT IN FRONT OF HIS APARTMENT.
WHEN ASKED COTTON SAID THAT HE COULD NOT TELL WHO WAS IN THE CAR NOR COULD
HE TELL HOW MANY PEOPLE WERE IN THE CAR. HE COULD GIVE NO DESCRIPTION OF
ANY KIND AS TO WHO MIGHT HAVE BEEN IN THE CAR.

COTTON SAID AT FIRST GLANCE HE THOUGHT THE CAR WAS THAT OF HIS COUSIN'S.
COTTON SAID THAT HIS COUSIN LIVES TO THE WEST OF HIM IN THE SAME COMPLEX.
COTTON SAID THAT HE THEN REALIZED THAT THE CAR DID NOT HAVE TINTED WINDOWS
AS HIS COUSIN'S CAR DOES. COTTON SAID THAT HE THEN THOUGHT THAT WHOEVER WAS
IN THE CAR MIGHT HAVE BEEN MESSING WITH HIS CAR OR OTHER CARS.

COTTON SAID THAT HIS COUSIN HAS A WHITE CAPRICE CLASSIC AND THAT WAS WHITE.
HE SAID THAT THE WAS CAR LONG AND ROUND AND THAT IT REMINDS HIM OF THE OLDE
COP CARS THAT HAVE THE ROUNDED FRONT. I THEN ASKED COTTON IF HE KNEW THE
DIFFERENCE BETWEEN A CAPRICE CLASSIC AND AN LTD [COTTON SAID THAT THE LTD
IS SQUARE] OR A GRAND PRIX OR A BONNEVILLE OR THE BIG OLDSMOBILES. COTTON
SAID THAT HE KNEW THE DIFFERENCES.

COTTON SAID THAT HE GOT BACK ABOUT 620AM AND WENT BACK TO SLEEP AND THAT HE
DID NOT HEAR OR SEE ANYTHING AFTER THAT.

I THEN TOOK COTTON TO THE PARKING LOT OF THE COMPLEX AND I HAD HIM LOOK FOR
THE TYPE CAR THAT HE HAD SEEN ON THE MORNING OF THE INCIDENT. SITTING IN
FRONT OF THE NEXT BUILDING SOUTH OF COTTON'S BUILDING WAS A WHITE CHEVY
CAPRICE CLASSIC. COTTON SAID THAT THIS WAS THE EXACT SAME TYPE CAR AS THE
ONE HE HAD SEEN IN FRONT OF HIS BUILDING AND THAT LEFT THE PARKING LOT AT A
HIGH RATE OF SPEED ON THE MORNING OF THE INCIDENT.

I RAN THE TEXAS TAG [K28BCZ] ON THE VEHICLE THAT COTTON SAID WAS THE SAME
TYPE AND IT CAME BACK TO A 1992 CHEVROLET 4 DR. [THIS VEHICLE WAS A WHITE 4
DR CHEVY CAPRICE CLASSIC]. COTTON RELATED THAT HE HAD NOT NOTICED THAT CAR
IN THE COMPLEX BEFORE THE INCIDENT NOR HAS HE NOTICED IT IN THE PARKING LOT
SINCE THE INCIDENT.

I THEN MADE CONTACT WITH STACY PERKINS. SHE LIVES AT 1515 E WELLS. THIS
LIVES AT THE RESIDENCE THAT HUGHES STATED THAT HE WENT BY TO SEE
WILLIAMS AT AFTER HE HAD DROPPED ANDRE THOMAS OFF AT HIS TRAILER. PERKINS
RELATED THAT WILLIAMS MOVED OUT OF TGHE RESIDENCE ABOUT TWO OR THREE MONTHS
AGO AND THAT SHE HAS NOT HEARD FROM HIM SINCE. SHE RELATED THAT WILLIAMS
OWES HER SOME CHILD SUPPORT. SHE SAID THAT SHE DOES NOT KNOW WHERE WILLIAMS
IS AT THIS TIME.

03991

**10600**

AT010627

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                           SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS


PERKINS SAID THAT HUGHES CAME OVER TO HER HOUSE AT ABOUT 930PM/1000PM ON
FRIDAY NIGHT [03-26-04] LOOKING FOR WILLIAMS. PERKINS RELATED THAT HUGHES
HAD NOT BEEN TO HER HOUSE FOR AWHILE SO HE DID NOT KNOW THAT WILLIAMS HAD
MOVED OUT. PERKINS SAID THAT WILLIAMS TALKED TO HER FOR A WHILE. PERKINS
SAID THAT HUGHES TOLD HER THAT HE AND LAURA WERE PLANNING ON GETTING
MARRIED. SHE SAID THAT HUGHES WAS CONCERNED ABOUT THE TIME BECAUSE HE SAID
THAT HE WAS ON PROBATION AND HAD TO BE HOME BEFORE ELEVEN. PERKINS SAID
THAT SHE DOES NOT HAVE A PHONE SO SHE COULD NOT EVEN HAVE CALLED LOOKING
FOR WILLIAMS AND THAT AT THIS TIME SHE DOES NOT EVEN KNOW WHERE WILLIAMS IS
AT.

I CHECKED WITH THE ADULT PROBATION OFFICE IN SHERMAN AND BRYANT HUGHES IS
ON INTENSIVE SUPERVISION PROBATION AND ONE OF THE REQUIREMENTS OF THIS
TYPE PROBATION IS THAT HE BE AT HOME BY 1100PM NIGHTLY.

THE CASSETTE TAPE I RECORDED COTTON AND PERKIN'S STATEMENTS WILL BE PLACED
INTO EVIDENCE.

    <<< Segment 23 >>>

FOLLOW-UP NARRATIVE:   CAPITAL MURDER, 04/06/04 0900, KSMITH 048

THIS IS A CONTINUATION OF THE LIST OF PROPERTY IN THE PROPERTY SECTION OF
THIS OFFENSE REPORT.

| PROPERTY # | DESCRIPTION OF PROPERTY | LOCATION |
|---|---|---|
| 51 | CLOTHING FROM ██████████ | H |
| 52 | BREAST PLATE FROM ████████ | H |
| 53 | BREAST PLATE FROM ██████ | H |
| 54 | CHEST PLATE | H |
| 55 | NOTES ON NOTEPAD | H |
| 56 | BIBLE | H |
| 57 | BIBLE | H |
| 58 | CLOTHES FROM ██████ | H |
| 59 | FRAMED CHILDS PRAYER | H |
| 60 | FRAMED FAMILY PHOTO | H |
| 61 | WRITINGS | H |
| 62 | BANDAGE | H |
| 63 | SHOES | H |
| 64 | BURNED CLOTHING & CYLINDER COVER | H |
| 65 | SECTION OF CARPET | H |
| 66 | SECTION OF CARPET UNDER LAURA | H |
| 67 | COPY OF 911 CALL | H |
| 68 | 4 VIDEO TAPES | H |
| 69 | BIBLE | H |
| 70 | CHILD SUPPORT ORDER | H |
| 71 | BROWN WALLET | H |
| 72 | CRIME SCENE LOG | H |
| 73 | 3 RECEIPTS FOR EVIDENCE FORMS/SWIFS | H |
| 74 | STATEMENTS FROM PARAMEDICS | H |

**10601**

03992

AT010628

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                          SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS

75        FAMILY NAME LIST                           H
76        ER MEDICAL PERSONNEL LIST                  H
77        PAPERS                                     H
78        CONSENT TO SEARCH                          H
79        2 TYPED STATEMENTS FROM DISPATCH           H
80        COPY OF AFFIDAVIT FOR SEARCH WARRANT,      H
              WARRANT & RETURN
81        COPY OF BURGER KING TIME SHEETS            H
82        COPIES OF VIDEO & AUDIO TAPE               H
83        PHOTOGRAPHS                                H
84        6 AUDIO TAPES                              H
85        PAYROLL INFO ON SUSPECT                    H
86        AUDIO TAPE OF J.B. MAYO                    H
87        AUDIO TAPE OF WILLIE RILES                 H
88        AUDIO TAPE OF PAUL BOREN                   H
89        COPY OF PHONE CALL                         H
90        AUDIO TAPE INTERVIEW                       H
              WITH ROCHELLE THOMAS

     <<< Segment 24 >>>

FOLLOW-UP NARRATIVE:  CAPITAL MURDER, 04/06/04 0905, KSMITH 048

I RECEIVED THE AUTOPSY REPORTS FROM THE SOUTHWESTERN INSTITUTE OF FORENSIC
SCIENCES IN DALLAS, TEXAS ON VICTIM'S LAURA CHRISTINE THOMAS,
█████, AND ████████████. THE AUTOPSY REPORTS SHOW THE CAUSE OF DEATH
ON ALL THREE VICTIM'S IS:  MULTIPLE SHARP FORCE INJURIES OF THE CHEST.
THE AUTOPSY REPORT WAS PLACED INTO THE FILE CABINET IN RECORDS WITH A COPY
SENT TO DETECTIVE DITTO #021.

     <<< Segment 25 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 04/07/04, 1045, DITTO (021)

On 04/06/04, I went to Logan's Roadhouse (restaurant) and spoke with Julie
Murphy, who is the General Manager. She advised that he was hired as a
Dishwasher, and had last worked on 03/23/04. She gave a statement in which
she related that until the day he did not report for work as scheduled, he
had been a good employee, and had told her that he intended to be the best
Dishwasher that she had ever had. She knew of no problems at work or in his
personal life.

I was advised to call Larry Caylor of the Austin College Police in
reference to this case. Upon speaking with him, he advised that a woman who
is employed at the Credit Union there told him that her daughter, Summer
Sherman, has known Suspect (Thomas) since high school, and worked with him
at Logan's Roadhouse. This woman went on to relate to Caylor that Summer
had told her about a big disturbance caused by Suspect (Thomas) on the day
before the murders. I obtained a cell phone number from Caylor for Summer
Sherman, and called it. I left a message on her voice mail requesting that
she call me back. I also called her home telephone number and left a
message on the answering machine asking her to call me. As of this writing

Date Printed:              INCIDENT REPORT
Oct 14 2004
                      SHERMAN POLICE DEPARTMENT
                           317 S TRAVIS

she has not returned my calls.

On this date I went to 120 W. Texas, which is the listed address for Summer
Sherman. I knocked on the door and rang the doorbell, but got no answer. I
left my business card with a note, requesting that she call me, on the
front door.

I then drove to Logan's Roadhouse, where I found that Julie Murphy was not
at work today. I did speak to Alan Byrd, who identified himself as the
Kitchen Manager. He gave a statement relating that he had met Suspect
(Thomas) when he interviewed him for employment. Mr. Byrd related that he
did not know of any problems with Suspect (Thomas) and had not seen or
heard of any problems or abnormalities since learning of the murders. He
also advised that Suspect (Thomas) had been a good employee.

I obtained the names of two other dishwashers who worked closely with
Suspect (Thomas). They are J.B. Mayo and Sam White, neither of whom are
scheduled to work today. Both should be at work on 03/28/04, and I will
attempt to interview them then.
I also asked about Summer Sherman, and was advised that she is not
scheduled to work today, but is scheduled to work at 1600 hrs. on 04/08/04.

I received FAX copies of payroll information for Suspect (Thomas) from Alan
Byrd.

The audio tape from Alan Byrd and the payroll records for Suspect (Thomas)
were taken to the P.D. tagged as evidence and placed into an evidence
locker.

    <<< Segment 26 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 04/07/04, 1515, DITTO (021)

A copy of this report was submitted to the County Attorney on this date. I
signed it in in the 15th District Court book. The report itself was handed
to Sandy, who is Kerye Ashmore's secretary.

    <<< Segment 27 >>>

04/07/04: SEGMENT 12 APPROVED BY SGT BROOKS 098.

    <<< Segment 28 >>>

04-01-04 Blankenship, 036.
    I had been called at home by dispatch concerning a triple homicide. I
told dispatch to call Lt O'Toole (033) and I would respond to the scene. On
my arrival at the Arrowwood Apts on Taylor Street I met Sgt Mullins (130)
    Mullins briefed me that there were three people inside the apt he
pointed out that had been murdered. When Lt O'Toole arrived Mullins,
O'Toole and I approached the apt and I noticed a bloody handprint on the
stair rail, which I pointed out for them to avoid. We entered the front
room through the front door which appeared to have been kicked open. In the
front room near the entrance to a hallway lay an adult female who was

                           **10603**                              03994

                                                              AT010630

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                           SHERMAN POLICE DEPARTMENT
                                 317 S TRAVIS

completely nude. She had a large open wound between her left breast and the
center of her chest. She appeared obviously dead (I had been told that SFD
personnel had determined death on all three vicitms prior to entry). At
this point we look around for a minute and I remarked that we should leave
rather than continue and chance disturbing any evidence.

I then assisted Lt O'Toole with assigning investigators to different
chores and requested that Texas Ranger Tony Bennie be called.

Officer Ditto (021) and Bennie were to work the primary crime scene at
nad in the apt.

Officers Robinson (147), Bell (092), and Smith (115) were to locate the
man who lived with the adult victim; Bryant Hughes.

When it was learned that the adult victim's estranged husband was
believed to be at his house in Crossroads MHP I sent officer Ferguson (168)
to that location to determine if the man was there and I would follow. This
man was Andre Thomas.

As I started to that location I was called and learned that Thomas had
been arrested at the SPD lobby by Smith. Thomas had turned himself in and
confessed to this crime.

I went to the home of Thomas and waited there with Ferguson and Young
(161) until Smith brought a search warrant. I then supervised the search
and evidence collection at that location. At one point I brought Smith a
plier from my unit to take the kitchem sink trap due to the knives believed
to be involved found in this sink and partly washed off. Smith was unable
to get the trap loose and I worked on it briefly until it was loose enough
for him to take off. While I was doing this I observed Young reach into the
kitchen trash and pick up a plastic bag and look inside it. He related that
he had found what we were looking for.

When I got up from the sink trap area I look inside this bag and
observed what appeared to be three pieces of some internal organs. I placed
the sack back inside the trash container and told Smith to photograph prior
to collection.

Note this section is out of order:

Prior to the search of the suspect home I had returned to the primary
scene at the apt of the victim. I spoke to officers involved in the scene
search and learned that the original belief we had that some internal
organs had been removed from the victims was being confirmed after a closer
viewing. Also, by this time the suspect had told dispatch that he had cut
out their hearts. Karmen Hayes (suspects live in girlfriend) had told
Ferguson the same type information. I reentered the crime scene at the apt
of the vicitm, wearing shoe coverings and gloves. No one else was present
at this time. I viewed the bodies of all three victims and observed large
holes in their chests consistent with what I was being told about the
suspect cut out their hearts.

When I viewed the evidence found by Young in the suspects home kitchen
trash I believed it consisted with the wounds I observed at the crime scene
of the apt.

I assisted Robinson with collection of human properties evidence form
the suspect in SICU room 10 in the presence of a nurse and officer Guedea
'145). I arranged for very tight security by patrol officers and warned the

**10604**                                                      03995

Date Printed:                     INCIDENT REPORT
Oct 14 2004
                              SHERMAN POLICE DEPARTMENT
                                   317 S TRAVIS

hospital supervisor of possible threats to the suspect and further suicide
attempts.
    Throughout the day I kept Lt O'Toole briefed on progress at the suspects
home and I made several trips between the SPD, WNJ, the apt of the victim
and the home of the suspect.
    I collected no evidence and took no statements from anyone. My duties
were supervisory in nature as i coordinated and directed officers under my
command and other Patrol division officers for different tasks.

    On Monday (03-29-04) I met officer Caver (156) at room 285 at WNJ where
he was guarding the suspect. I introduced myself to the susepct who was
sitting in bed and had bandages from his surgery on his chest. I asked him
if he would be willing to talk to police about what happened Saturday
morning. He said he wanted to talk to police. I told him it would take
awhile to set up the interview and I would be back.
    As I approached the door of the room the suspect asked me if he wasn't
supposed to get a lawyer first. I was there to assess the suspects ability
to make a statement at the time. I told him if he wanted to talk to police
I would set it up. He said he wanted a lawyer before he spoke to police
about the incident. I told him that he had said the magic words and police
would be unable to discuss the matter with him until he obtained a lawyer.
    I went to the hall with Caver and carefully instructed him to ask the
suspect no questions, but to note anything the suspect said of his own
will. I then started out of the hall area. Caver called me back and I
returned to the room. I had gotten almost to the elevators.
    The suspect told me he had decided to talk to police without a lawyer. I
told him I was unsure if that would work at this point and I would call to
find out where we stood now. I went to a waiting area across from the
elevators and called the county attorneys office. When I got through to Joe
Brown he referred me to Ashmore. I called Ashmore and related the incident
to him. My question to Ashmore was could we now take a statment from the
susepct without a lawyer for the suspect. Ashmore told me to take the
statement by first Mirandizing the suspect and then clarifying the issue of
the suspects statements to me and that the suspect had voluntarily
restarted the process by initiating contact with police.
    During this time frame the hospital was releasing the suspect from
treatment. I notified Lt O'Toole and we made arrangments for transportation
to SPD and an interview with the suspect. After a conversation with Ditto
about my conversation with Ashmore Ditto began that interview as I
observed. This interview was videotaped.
    I observed the suspect relate that he had committed the offense. At some
point the suspect made a remark that he was too tired to continue talking
at that time. I instructed Ditto to give the suspect a business card and to
tell him to call Ditto if he desired to talk again. Suspect was then taken
by Caver to the back lot of the SPD and loaded into a marked unit for
transportation.

   <<< Segment 29 >>>

follow up narrative:  Capital Murder  03-27-04  0800 hrs  Young 161

**10605**

03996

AT010632

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                            SHERMAN POLICE DEPARTMENT
                                  317 S TRAVIS

On this date at approximately 0800 hrs I was contacted by the on duty
communications operator and advised that I needed to respond to 1200 W.
Taylor in reference to a triple homicide.

Upon my arrival at the crime scene I made contact with Sgt. Blankenship and
was instructed to respond to Wilson N Jones to meet with Officer Miller who
is standing by with the family.  I was to obtain a statement from the
subject who found and reported the incident.  This subject was going to be
Paul Boren the victim's father.

Upon my arrival I did make contact with Officer Miller who was with the
family and Mr. Boren.  I was able to obtain a recorded interview from
Boren who related that he was the subject who found and called the incident
in to the police.  Boren received a phone call around 0709 Hrs from a
subject he knows as Bryant Hughes.  Boren knows Hughes from Hughes living
and having a child with Boren's daughter.  Hughes asked Boren if he would
go and check on Laura and the kids, because Hughes saw Andre Thomas walking
around in the area of the apartments and he can not reach Laura on the
phone.  When Hughes made this call he was at Burger King where he works.

Boren then left his residence and went to his daughter's apartment which is
located at 1200 W. Taylor #340.  Upon his arrival he found that the front
door had been forced open.  He then entered the apartment and found his
daughter Laura laying in the floor with blood all over her.  Boren could
ell his daughter was deceased and he started yelling for the kids.  Boren
then proceeded through the apartment to the bedrooms.  When he reached the
kids bedroom he found both of them deceased with blood all over them.

Boren then backed out of the apartment and was going to go find a pay
phone.  When he reached the parking lot he could not find a pay phone but
did find some one in the parking lot and was able to use their phone to
call the police.

Boren related that he never touched his daughter or the kids but he could
tell they were already deceased when he arrived.

I then contacted Sgt. Blankenship and advised him of what I was informed of
by Boren.  I was instructed to seize Boren's shoes as possible evidence.

After obtained Boren's shoes he asked that I escort him to his residence to
obtain more shoes.  I did take him to his residence to obtain some more
shoes.

Upon our arrival we went inside once inside Boren was going to check his
answering machine and give me the exact time he received the phone call
from Bryant this morning.  Boren noticed he had some more messages.  Boren
then checked the caller ID and noticed somebody had called from Danny
Thomas's residence.  Boren knew this to be Andre's father residence.  This
call came in at approximately 0842 Hrs according to the caller ID.

**10606**                                                        03997

AT010633

Date Printed:               INCIDENT REPORT
Oct 14 2004
                        SHERMAN POLICE DEPARTMENT
                             317 S TRAVIS

Boren then played the messages on his machine so I could record the
messages.  The answering machine related that the message was left on
Monday but the message was actually left on Saturday 27, 2004.  This
message was left by Andre Thomas.  In this message he was saying something
terrible is happening to him and he was afraid to go to the police,
for someone to come and help, that he was going to be at home.
Boren was able to tell me that Andre's father lived at 2424 Texoma parkway
but did not know which lot.  Boren said that Andre also live in the trailer
park at that location just to the North of his father residence in a White
trailer on the corner.

I was able to get an address from the on duty communications operator for
Danny Thomas and it was 2424 Texoma Parkway lot #15.  Andre did not show an
address in this trailer park in house computer.  I then contacted
Sgt Blankenship and informed him of this information.
I then took Boren back to the hospital where Officer Miller was located.

Upon my arrival officer Miller advised me that Andre had turned himself in
at the police station.  A few minutes later Sgt. Blankenship arrived and
advised me that I needed to respond to 2424 Texoma parkway and met with
Officer Ferguson in reference to Danny Thomas giving consent to search his
residence.

Upon my arrival at this location I met with Officer Ferguson who filled out
a consent to search form for 2424 Texoma Pkwy. #15 and it was signed by
Danny Thomas giving myself and Officer Ferguson consent to search his
residence.

Danny Thomas did tell me that Andre was at his residence this morning and
used his telephone.  While using the telephone Andre went into the
restroom.  After coming out of the restroom Andre hung up the phone and
left.  Danny said Andre did not say much and acted like he did not want to
talk.  Danny did confirm that the phone number on Boren's caller ID was
his number.

Prior to entering this residence I photographed the outside of the trailer.
Upon entering the residence I photographed the inside showing the area to
be searched.   I did search this residence and nothing relating to this
incident was discovered.

During this search it was found that Andre's trailer was at lot #100.

Officer Ferguson went to that location and stood by while Det. Smith
obtained a search warrant.

After I completed the search on Danny's residence I responded to Officer
Ferguson's location.  Upon my arrival I made contact with officer Ferguson
who was in the process of talking with two female subjects.  Ferguson
informed my that the subject with the dyed pink hair was going to be
ndre's roommate, Carmon Hayes, and the other subject was going to be Raque

                        **10607**                              03998

                                                            AT010634

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                          SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS

Johnson who gave Hayes and Andre a ride to the police station.  Ferguson
was also in the process of getting consent to search Johnson's vehicle
for evidence.

I photographed the vehicle bearing Texas registration F93WXB which was
Johnson's vehicle.  The vehicle was then searched and no evidence was
obtained, according to Johnson Andre rode in the back seat on the way to
the police department.

While waiting on Det. Smith to arrive with the Search Warrant I obtained a
detailed recorded statement from Carmon Hayes who Andre confessed to.  In
Hayes's statement she related that this morning some time approx 0630 hrs
she heard the door shut to the trailer house.  Carmon then went to sleep
and the next thing she noticed was when Isaih Gibbs knocking on the door.
Isaih was looking for Andre and Andre was not at home.

Isaih and Carmon went into the living room.  About 5 minutes later Andre
walked into the trailer and Carmon was in the kitchen when Andre walked
into the trailer.  During this time Carmon noticed Andre was breathing
heavily and had blood on his shirt.  Andre was wearing blue camouflage
shirt and green BDU paints.

Andre then told Carmon and Isaih that the police were going to be coming.
Andre then told Carmon that he stabbed Laura, ████████ and ████.  Carmon
hought Andre was not telling the truth and Andre wanted to know if she
wanted to look in the bag.  During this time Andre was pointing into the
kitchen.  Carmon did not see the bag and did not go look for the bag.

Andre told Carmon that he killed Laura, ████████ and ████ and that this
was not the first time he killed them.  Andre told Carmon that Laura was
Jezebel, referring to the Bible.  Andre then took his shirt off and
showed Carmon he stabbed his self in the chest.  Andre started telling
he should be dead.

The Stab wound was to his chest.  Andre then went over to the
kitchen sink and grabbed a butcher knife and was showing Carmon how far he
stuck the knife into his chest.  Carmon Said the knife still had blood on
it.

Carmon then went back to her bedroom and changed clothes so she could leave
the house because she did not want to be in the same house as Andre.  After
changing clothes Carmon went back in where Andre was and told him he needed
to turn himself into the police.  Andre agreed.  Andre asked Carmon to go
with him to the police department.

They then walked to Brandon Patterson's house with is in this same trailer
park Lot #92.  When they arrived Brandon did not have a car to give them a
ride.  Isaih also walked to Brandon's house.  While at Brandon's house they
did not tell him why the needed a ride.  Since Brandon did not have a
ehicle they just left.

**10608**

03999

AT010635

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

Carmon and Andre then walked to Raquel Johnson residence located in the
trailer park at lot #13.  They told Johnson that they had an emergency and
needed to go to the Sherman Police station.  Johnson did give Andre and
Carman a ride to the police station.

Upon arrival at the police station Andre was let out at the front door and
Carmon and Johnson went and parked the car.  During this is when Carmon
told Johnson what Andre had done.

After leaving the police station Johnson and Carmon went back to the
trailer park.  They went back to Carmon's and Andre's residence.  Carmon an
Johnson looked for the bag that Andre had been talking about but did not
find it.  They looked under the trailer and in Andre's closet.

During this time I also made contact with Andre's Father Danny Thomas and
obtained a statement from him in reference to Andre.  Danny related that
Andre has been confused the last couple of weeks.  According to
Danny, Andre supported himself and took care of himself by working
various jobs.  Danny did say Andre had been acting strange by putting
Duct tape over his mouth so he could not talk.

Upon Det. Smith's arrival I assisted him in processing and photographing
the crime scene.  I also assisted in the gathering of the evidence found
inside of the trailer.  For further details of this search see the follow
up by Det. Smith.

   <<< Segment 30 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 04/08/04, 0705, DITTO (021)

On 04/07/04, I was advised by County Attorney's Office that this case would
be presented to the Grand Jury on 08/15/04. I then spoke with Joe Brown and
Kerye Ashmore via telephone. Brown advised that he needed me to obtain a
list of all medical personell who had contact with Suspect (Thomas) on
03/26/04 and on 03/27/04, at Texoma Medical Center and Wilson N. Jones
Hospital respectively.

Brown also sent a FAX copies of:

Memo from Judge James E. Harris J.P. Pct. #2 dated 04/06/04, and addressed
to "Joe/Lauri".
Application for Emergency Apprehension and Detention of Suspect (Thomas),
which was dated 03/26/04.
Order for Immediate Apprehension and Transportation.

I went to Texoma Medical Center and learned that the following people had
personal contact with Suspect (Thomas):

William Bowen-M.D.
Shirley Whitley-R.N.

**10609**                                                    04000

AT010636

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                             SHERMAN POLICE DEPARTMENT
                                   317 S TRAVIS

Arnelda Turner-R.N.
Sandra Anderson-Lab

Suspect's (Thomas) chart was signed by Marilan Jones R.N. but she advised
that she had no personal contact with him.

On 04/08/04 I obtained a list from Wilson N. Jones Hospital of medical
personell who had contact with Suspect (Thomas) on 03/27/04. They are as
follows:

Rusty Wendt-Phlebotomist
Peggy Thedford-Med Tech (Lab)
Charles McDade-CT Tech.
Mike Burkhart-Echo Tech
R.J. Wilcott-M.D. (TMC)
Connie Quintane-R.N.
Loava McCarthy-R.N.
Scott Choi-M.D.
Richard Frazier-M.D.
Sonia Montgomery-R.N.
Lane Grisham-R.N.
Gino Pinalto-R.N.
Derek Damon-R.N.
Sheryl Dagenais-R.N.
onnie Ertel-R.N.
Grant Krahl-R.N.

Subpoenas were prepared and served on the following persons from these
lists:

Texoma Medical Center
William Bowen-M.D.
Arnelda Turner-R.N.
Shirley Whitley-R.N. (Subpoena served to Sandra Jones-Risk Manager for
TMC. as Whitley is on vacation)

Wilson N. Jones
Scott Choi-M.D.
Loava McCarthy-R.N
Connie Quintana-R.N.
Mike Burkhart-R.N.
All subpoenas served to Tracey Masson-Risk Manager for WNJ.

   <<< Segment 31 >>>

04/12/04 SEG. 5 & 6 APPROVED SGT. SMITH 082

   <<< Segment 32 >>>

OLLOW UP NARRATIVE: CAPITAL MURDER, 04/13/04, 1430, DITTO (021)

On this date I went to Logan's Roadhouse where I spoke with J.B. Mayo, who

**10610**                                                    04001

AT010637

Date Printed:                   INCIDENT REPORT
Oct 14 2004

                           SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS


is a Dishwasher there. He gave a statement in which he related that he knew
Suspect (Thomas) from the day they were both hired by Logan's. Mayo also
related that his first impression of Suspect (Thomas) was that he was a
"bad ass". I asked what he meant by that and Mayo advised that he meant
that Suspect (Thomas) was cocky, and was bragging that he was the best dish
washer there. Mayo related that after the first meeting, that Suspect was
not as cocky and seemed to be a normal person. He related that Suspect
(Thomas) mentioned his 21st birthday and how he went out drinking that
night. This statement was audio recorded. The tape was taken to the P.D.
and tagged as evidence.

Prior to leaving Logan's I spoke with Sam White, who had also reportedly
worked with Suspect (Thomas). However, White claims that he only met
Suspect (Thomas) a couple of times and did not recognize his picture on the
television news. He also claims that he cannot recall ever having a
conversation with Suspect (Thomas). No statement was taken from White.


    <<< Segment 33 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 04/15/04, 1435, DITTO (021)

On this date I spoke with County Attorney Joe Brown, who suggested that I
talk with Willie Riles, at Kelly Square, as he may have some information
about this case.

I contacted Mr. Riles at Kelly Square and took a tape recorded statement
from him. He advised that he first met Andre Thomas was when Thomas was
working in the restaurant. Riles related that Thomas would come and talk to
him frequently. During the course of their conversations about Laura
Thomas, Andre Thomas told him that when she left him "it just ripped his
heart out". Riles said that he knew that Thomas needed help back then, and
told him so. I asked what he meant by that and he said that any man who
would dye his hair a different color every week had something wrong with
him. I asked him if Thomas had done anything else to make him believe that
he needed some type of help and he said that he had not. The tape of this
interview was taken to the P.D. and tagged as evidence.


    <<< Segment 34 >>>

FOLLOW-UP NARRATIVE: CAPITAL MURDER, 04/16/04  0103  HAPIUK  170  062

ON 03/29/04 I WAS WORKING OFF DUTY SECURITY JOB FOR SHERMAN INDEPENDENT
SCHOOL DISTRICT AT 2201 N. LOY LAKE, AEP.  AT APPROXIMATELY 1800 HRS
THE STUDENTS TOOK A BREAK AND WATCHED THE 6 O'CLOCK EVENING NEWS ON
CHANNEL 12.

DURING THE NEWS BROADCAST A STORY ABOUT MR. THOMAS WAS RAN.  DURING THE
STORY, THE TEACHER MADE A STATEMENT ABOUT HOW MR. THOMAS MUST HAVE BEEN
ON DRUGS TO DO SUCH A THING.

AFTER THE COMMENT WAS MADE ████████████, A STUDENT OF AEP RELATED THAT
HE HAD HEARD FROM AN UNKNOWN SOURCE THAT MR. THOMAS HAD TAKEN SOME PILLS

**10611**

04002

AT010638

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

BEFORE COMMITTING THE CRIME.  BOTH ▮▮▮▮▮▮ AND ▮▮▮▮▮▮ MADE
A COMMENT ABOUT HOW THEY WERE BOTH RELATED TO MR. THOMAS.

I ASKED HOW THEY ANSWERED BY SAYING COUSINS. ▮▮▮▮▮ THEN RELATED
THAT A WHILE BACK HE HEARD MR. THOMAS SAY THAT "IF HE COULDN'T HAVE HER
NO ONE COULD". ▮▮▮▮▮▮ SAID MR. THOMAS WAS TALKING ABOUT THE
VICTIM.  NOT KNOWING WHAT TO DO WITH THIS INFORMATION I CALLED DETECTIVE
BELL THE NEXT CHANCE I HAD AND TOLD HIM ABOUT WHAT I HAD HEARD.

ON 03/31/04 I WAS AGAIN WORKING THE SAME OFF DUTY JOB.  DETECTIVE BELL
AND DETECTIVE DITTO CAME TO MY LOCATION TO SPEAK TO ▮▮▮▮▮ AND
▮▮▮▮▮ HOWEVER I INFORMED THEM THAT NEITHER OF THE TWO HAD
SHOWN UP FOR SCHOOL THAT DAY.

   <<< Segment 35 >>>

04/22/04: SEGMENT 34 APPROVED BY SGT BROOKS 098.

   <<< Segment 36 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 04/30/04, 1520, DITTO (021)

On 04/29/04 I was asked by County Attorney Joe Brown to serve subpoenas on
Danny Thomas and Rochelle Thomas, who are the parents of Andre Thomas.

On 04/30/04 I located Danny Thomas at 2424 Texoma Parkway #15, and served
the subpoena to him. The copy of the subpoena was returned to the County
Attorney's office.

Danny Thomas advised that he thought that Rochelle Thomas might be living
at Willow Garden Apartments (now Eastside Gardens) and was possibly in apt.
#15. He also advised that she was at work today at the Mullican Care Center
nursing home in Savoy, Texas, and would get off work at 1500 hrs. I drove
to Savoy and went to the nursing home. I was advised that she does work
there, but she had gotten off at 1300 hrs. today. I arrived at
approximataly 1315 hrs. The address the nursing home had for Rochelle was
803 N. Throckmorton, but one of the employees there advised that Rochelle
had mentioned that she was living at the Claymar apartments on Travis
street.

I returned to Sherman and went to the Eastside Gardens apartments. I went
to apartment #15 but got no anwser when I knocked. I went to the Manager's
office but there was a "Closed" sign on the door.

I then went to the Claymar on Travis apartments and spoke with the manager.
She advised that she did not know the name of Rochelle Thomas, but that
there were some African Americans living in apartment "H". She advised that
all of the other tenants were Hispanics. I went to apartment "H" and
knocked on the door but got no answer.

then went to 803 N. Throckmorton and the front door was standing open. I
knocked on the door several times but still got no answer.

   <<< Segment 37 >>>
**10612**

04003

AT010639

Date Printed:
Oct 14 2004

INCIDENT REPORT

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

FOLLOW UP NARRATIVE: CAPITAL MURDER, 05/05/04, 1250, DITTO (021)

On 05/04/04, I called Mullican Care Center and was advised that it was
Rochelle Thomas' day off, but she would be back to work on 05/05/04, at
0500 hrs.

On 05/05/04, Ranger Bennie and I drove to Mullican Care Center. We were
allowed to use a vacant patient room to speak with Rochelle Thomas. Upon
her arrival in this room we introduced ourselves and I activated an audio
cassette recorder. During the interview with Rochelle, she related that she
had been at Suspect's trailer on the morning of the murder. She went on to
tell us that Suspect had woke her up at 0600 hrs. to tell her that God had
told him to go for a walk. She advised that he did not tell her where he
was going to walk, nor did she notice how he was dressed, or if he was
carrying anything.

Rochelle advised that Suspect had been acting strangely since the first of
the year. When I asked her what she meant by that, she told us that he had
placed gray tape over his mouth, saying that God had told him not to talk.
She also advised that a day or two before the murders he had stabbed
himself with a knife. Rochelle advised that she had taken him to Texoma
Medical Center, but did not stay to learn if he was going to be admitted or
not. She claimed that she stayed for a while, and when Suspect did not come
back out she assumed that he was going to be admitted and left.

I served Rochelle with the Grand Jury Subpoena, and explained when she was
to be there. She told me that she could not make it because of work. I
explained that her work would understand that she had to be there if
subpoenaed. She advised that if she had to go to jail she would, but she
would not obey the instructions of the subpoena.

   <<< Segment 38 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 05/06/04, 0715, DITTO (021)

Pending supervisory approval this case file will be forwarded to the County
Attorney.

   <<< Segment 39 >>>

05-10-04 Approved. Blankenship, 036.

   <<< Segment 40 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 05/13/04, 1040, DITTO (021)

On 05/12/04, I was contacted by Delia at the County Attorney's Office, who
requested that I serve a Grand Jury Subpoena on Carman Hayes.

 1 05/13/04, I attempted to locate Hayes at the Crisis Center and was
_ advised that she had left there on the first of May. I then went to her
last known place of employment and was advised that she had moved to
Virginia. **10613**

04004

AT010640

Date Printed:                    INCIDENT REPORT
Oct 14 2004
                          SHERMAN POLICE DEPARTMENT
                                317 S TRAVIS


I returned the subpoena to the County Attorney's Office and gave them the
information on Hayes' location.

   <<< Segment 41 >>>

FOLLOW-UP NARRATIVE:  CAPTIAL MURDER, 06/15/04 1250, KSMITH 048

I RECEIVED THE AUTOPSY REPORT FROM THE MEDICAL EXAMINER'S OFFICE IN DALLAS,
TEXAS ON VICTIM ███████████        THE AUTOPSY REPORT WAS PLACED INTO THE
FILE CABINET IN RECORDS WITH A COPY SENT TO DETECTIVE DITTO #021.

   <<< Segment 42 >>>

FOLLOW-UP NARRATIVE:  CAPITAL MURDER, 06/22/04 1145, KSMITH 048

I RECEIVED THE AUTOPSY REPORT FROM THE MEDICAL EXAMINER'S OFFICE IN DALLAS,
TEXAS ON VICTIM'S LAURA CHRISTINE THOMAS AND ███████████.  THE AUTOPSY
REPORT WAS PLACED INTO THE FILE CABINET IN RECORDS WITH A COPY SENT TO
DETECTIVE DITTO #021.

   <<< Segment 43 >>>

FOLLOW UP NARRATIVE: CAPITAL MURDER, 06/23/04, 1510, DITTO (021)

On this date I submitted the case file, along with copies of 4 video tapes
and 6 audio tapes, to the County Attorney. The case file is complete with
the exception of lab reports from DPS which have not been returned. As most
of these are DNA tests it may take some time yet.

   <<< Segment 44 >>>

Follow-up narrative: March 29, 2004 @ 0801 hours, Smith 115

On Saturday, March 27, 2004, I was contacted at my residence at about 0745
hours and advised of this offense. I responded to the scene where I met
with Sgt. Blankenship, Lt. Otoole, Detective Bell, and Detective Ditto. I
was told that three victims had been confirmed deceased in apartment 340.
I was advised that a boyfriend to the the adult victim was Bryant Hughes
and that he was working at Burger King. I was told Hughes was probably the
last person known to officers to have seen the victims alive. I was given
the assignment of locating Hughes and bringing him to the PD.

Detective Bell agreed to assist me in locating Hughes and we went to the
PD, got into one vehicle, and drove to Burger King. At Burger King, I asked
to speak to the manager and a white female came out to speak to us stating
she was the manager. I identified ourselves and relayed to her that we were
needing to speak to Hughes and that we were going to ask him to come with
us to the PD. I asked her if Hughes was late getting to work today and she
told me that he was and that he did not arrive until about 0745 hours. She
went back behind the counter and shortly afterward a black male identifying
himself as Hughes came out from the behind the counter.

I spoke to Hughes and told him that something bad had happened and asked

10614                                                                    0400

                                                                      AT010641

Date Printed:                 INCIDENT REPORT
Oct 14 2004
                          SHERMAN POLICE DEPARTMENT
                              317 S TRAVIS

him to come with us to the PD so that we could speak to him. Hughes asked
us if everything was OK and at one point asked "Did someone die?". We did
not discuss anything with Hughes until arriving at the PD. As we were
walking through the parking lot to my car, I asked Hughes if he had a car
that he drove to work. Hughes said he did and he pointed out a white
Pontiac Bonneville saying it wa the car he drove. The car was parked on the
south side of the Burger King building. We then drove Hughes to the PD.

At the PD, I set up the CID interview room to record and Bell took Hughes
into the interview room. I did not attend the interview as I had been
directed to obtain a search warrant for the victims residence and I went
to my office to start the warrant. About halfway through the warrant, I
heard yelling coming from the interview room and I went there and learned
that Hughes had just been told of the deaths. Hughes was distraught,
yelling, unbelieving, and pacing the floor. Hughes said that Andre Thomas
had committed the crime. I then went back to my office.

While typing the warrant, Dispatcher Womack came upstairs and yelled fo
the Sgt. down the hallway. I asked her to not yell due to the interview and
she told me that Andre Thomas was in the lobby of the PD and had confessed
to the murders. I immediately went downstairs and to the front lobby. Upon
my arrival, Officer Mauldin was patting down Thomas for weapons. I
immediately handcuffed Thomas and observed blood on the front of his shirt.
I asked him if he was hurt and he said he was. I asked dispatch to send an
mbulance.

Thomas was taken to the book-in room to await the ambulance. I spoke to
Dispatcher Carr who was the one that Thomas had confessed to over the
phone. Carr told me Thomas told her he had killed his wife at Arrowwood and
that he had cut her heart out. Carr had asked Thomas where the weapon was
and he told her it was at his trailer at Crossroads.

Paramedics had arrived and were treating Thomas. They stated that Thomas
had stabbed himself the previous night and it looked like he had reopened
the same wound. They stated he needed to go to the hospital. I asked
Mauldin to remain with Thomas and obtain his clothing at the hospital.
Prior to Thomas being transported, his camo style shirt was removed and I
took possession of it. It was later placed into evidence. This shirt had
blood on the front of it.

I left and went back to typing the warrant. In a short period of time I
heard Hughes again and I went back to the interview room. This time I
spoke to Hughes and relayed to him how important it was for him to tell us
what had occurred so that we could catch the person responsible. Hughes
calmed down for a moment and agreed to help. I then left and went back to
my office. The interview and its details will be documented in Bells
follow-up.

I prepared a search warrant for apartment #340 at Arrowwood. I had called
jt. Blankenship and told him that Hughes vehicle was at his work and it

04006

10615

AT010642

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                           SHERMAN POLICE DEPARTMENT
                                 317 S TRAVIS

was decided to also obtain a warrant for his car. I prepared that warrant
also. I then made contact with Judge Fry, 15th District Court, and met with
him. Fry issued the warrants. I then went to Arrowwood Apts and gave the
search warrant to Detective Ditto. I maintained the search warrant for the
vehicle. I had called Detective Robinson, who was at the PD, and she had
made arrangements to watch Hughes vehicle until which time as we could
execute the warrant on it.

I learned that Officers had determined that Thomas was living at Crossroads
Mobile Home Park at lot #100 and that Thomas had been at the residence just
prior to coming to the PD. I was instructed to obtain a search warrant for
Thomas residence. I prepared the warrant affidavit and met with Judge Fry
again. He issued the warrant for Thomas residence.

By this time, the interview with Hughes was completed and Hughes was
driven back to Burger King. I went to Burger King and met with Detective
Bell and Robinson. I gave the search warrant for Hughes vehicle to Bell
and he executed the warrant. I then took the search warrant for Thomas
residence and went to Crossroads. Detective Young and Officer Ferguson
were securing the trailer until my arrival.

When I arrived, I asked Det Young to assist me in searching the trailer.
I photographed the trailer from the outside and then checked the front door
finding it unlocked. Carmen Hays, another resident of the trailer, was
outside speaking to Ferguson prior to us entering the trailer and she had
told us no one was inside. We entered through the front door, north door,
and made entry into the trailer finding no one inside. We then started
the search and labeling the various points of evidence located.

The trailer had two bedrooms and one bathroom. The north door opened into a
hallway and immediately to the west of the hallway was the living room and
then the kitchen. Traveling east down the hallway was the bedrooms which
were separated by a bathroom. There appeared to be no electricity in the
residence as the lights and refrigerator were not working.

We first processed the kitchen and living room for evidence and found
several items of evidence. There were three knives found in the kitchen
sink. There also appeared to be bloody water in the sink as if the knives
had been in the sink after the water was turned on. A blue plastic sack
was located in the trash in the kitchen. The sack appeared to contain
body parts. These items were photographed.

We next processed the living room area. We then moved onto the hall and the
bathroom. In the bathroom I observed what appeared to be a drop of blood
in the sink. I photographed the blood drop. I observed that the bath
tub had water spots in it and was wet. I saw a washcloth sitting on the
side of the tub that appeared as a pink color possibly from blood. I also
observed two other washclothes and a sock in the bottom of the tub. All of
these items were photographed.

04007

**10616**

AT010643

Date Printed:                    INCIDENT REPORT
Oct 14 2004

                          SHERMAN POLICE DEPARTMENT
                               317 S TRAVIS

We then went to the east bedroom. Hays had told us that this was Thomas'
bedroom. We located some bloody overalls on the floor in front of a dresser
that was along the west wall. We also located a white shirt that had a spot
of blood on it. The shirt was located under the overalls and the blood spot
appeared to be a transfer spot from the overalls.

We located a black handled knife that appeared to have blood on the blade.
The knife was sitting on some boxes in the northeast corner of the bedroom.
I located several photographs on a desk that was along the east wall. Also
on the desk was a brown wallet that had the social security card of Thomas
in it. We located several writings on the desk. All of these items were
photographed.

We located a child support order with the victims and suspects name on it.
This was found inside the top desk drawer. Another pad with writing was
located on the floor between the desk and the bed. Sheets and blankets
were thrown on the bed and I started sorting them and located a blue shirt
that had blood on it. There were also several pairs of shoes sitting on the
floor in the bedroom. None appeared to have visible blood on them. All
of these items were photographed.

Sgt. Blankenship arrived at the scene and relayed to us that Thomas was
reported to have been quoting some bible stories or text in an attempt to
explain the crime. He asked if we located any bibles in the house and I
recalled seeing three of them during the search. Due to this new
information we went back and collected the three bibles. A bible was
located on the bed in the east bedroom, one on a couch in the living room,
and one on the desk in the east bedroom. The one on the desk had numerous
pages torn from it. These items were photographed. We then searched the
middle bedroom and found no items of evidence in it. This was reportedly
the bedroom that Hays stayed in.

We then started the collection of the various evidence that had been
located. Young packaged the evidence and labeled each item. We decided
to collect the drain trap water from the kitchen and bathroom sink as
it appeared that someone had washed and there might be forensic evidence
available. We also took the drain pipes.

The following is a list of the evidence markers used and what each number
represented.

#1 - kitchen sink with three knives in it and bloody water spots
#2 - blood drop in bathroom sink
#3 - water spots in bathtub indicating recent water
#4 - overalls with blood in east bedroom
#5 - white shirt with blood in east bedroom
#6 - knife with blood in east bedroom
#7 - photographs on desk in east bedroom
#8 - brown wallet with Thomas' social security card on desk in east bedroom
 9 - writings on top of desk in east bedroom

                    **10617**                                    04008


                                                              AT010644

Date Printed:                     INCIDENT REPORT
Oct 14 2004

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

#10 - child support order from desk drawer in east bedroom
#11 - writings on notepad on floor in east bedroom
#12 - bloody shirt found on bed in east bedroom
#13 - pinkish colored washcloth sitting on side of bathtub
#14 - two washclothes and a sock in the bottom of the bathtub
#15 - kitchen sink drain
#16 - body parts in sack from trashcan in kitchen
#17 - bathroom sink drain
#18 - bible in living room on sofa
#19 - bible on bed in east bedroom
#20 - bible on desk in east bedroom
#21 - shoes on floor in east bedroom

All of these items were secured and taken to the PD where they were filed
in evidence.

   <<< Segment 45 >>>

Follow-up narrative: March 31, 2004 @ 1620 hours, Smith 115

I was advised by Sgt. Blankenship that information had been received from
█████████     victims sister, that she had heard from other persons that a
15 year old named "███" had possibly agreed to give Andre Thomas a ride to
the victims apartment or had agreed to assist in the homicide. I was told
that "███" was living with a male named Kim Young at Diamond Place Apts.
#G102.

Detective Atherton and myself went to that apartment on 3-30-03 at about
0830 hours and could get no one to answer the door. I checked with
management at the complex and learned that Young did live in the apartment.
I left a business card on the front door. At about 1400 hours on 3-30-03,
Kim Young came to the PD to speak to me. I met with him and obtained a
recorded statement from him.

Young relayed that he has known Andre Thomas for about two months. Young
said Thomas had some problems and at times Young said Thomas would talk to
his hand and ask Young if he could hear voices. Young said that Thomas had
mentioned killing Laura on at least three occasions but Young said he
always thought that Thomas was kidding and not serious.

Young relayed that Thomas had told him that he wanted to kill himself and
he had asked Young if it was worth it. Young said that he believes Thomas
wanted to kill Laura because he was jealous of her life and success and
because she had left him. Young said that Thomas exact words were "I want
to kill that bitch!"

Young also said that Thomas had asked him where to stab himself with a
knife and where the vital organs were inside the body. Young said he told
him. Young said that Thomas had asked them to stab him and that Thomas was
wanting to commit suicide. Young said that Thomas never asked them ███ or
him) to participate in the murder. ███ is Youngs son. Young said that he

**10618**                                                          04009

AT010645

Date Printed:          INCIDENT REPORT
Oct 14 2004

SHERMAN POLICE DEPARTMENT
317 S TRAVIS

would bring ▓▓▓ to the PD to speak to me.

Young left and shortly afterward he returned with ▓▓▓ ▓▓▓ (w/m ▓▓▓▓. I spoke to ▓▓▓ and he gave a recorded statement. That statement is on side two of the same cassette that Youngs statement is on.

▓▓▓ said that he has known Thomas for about a month. ▓▓▓ said that he has given Thomas a ride before and that Thomas told him that Laura was trying to restrict him from seeing the baby (▓▓▓▓▓ said that Thomas told him that he "could just kill the bitch" as a solution. said a week ago that Thomas tried to get treatment at MHMR and WNJ but that he was not able to.

▓▓▓ said that Thomas never told him how he wanted to kill Laura but he said that he mentioned it twice. ▓▓▓ said that Thomas had mentioned killing Laura twice. ▓▓▓ said that Thomas never asked him to help murder Laura. He said that Thomas had asked him to stab him.

From this information it appears that Thomas had asked both Kim and ▓▓▓ Young to stab him (Thomas) and that he did not solicit help in killing anyone else.

  <<< Segment 46 >>>

Follow Up Narrative:  3/27/04  Capital Murder  Stephen Dean - 166

On 3/27/04 I, Inv. Stephen Dean, was notified by Sherman PD dispatch that there had been a triple homicide at 1200 W. Taylor #340  and was asked to respond to that location.

I was then contacted by Lt. O'Toole and asked to bring a video camera to the scene.

Upon my arrival Det. Mike Ditto and Lt. O'Toole requested that I video tape the vehicles in the parking lot and record license plate numbers.

I video taped the parking lot area as well as the bystanders that were gathering outside the crime scene area.

I then occampanied Det. Ditto and Ranger Bennie into the apartment to video tape the crime scene.

I turned the 8mm tape over to Det. Ditto to be placed into evidence.

I then remained in the crime scene to assist Det. Ditto and Ranger Bennie with the investigation.

-------------------------------------------------------------------------
Officer 1: DAWSEY, BRUCE - 132      Officer 2: DITTO, MIKE - 021
Disposition Code : AC

**10619**

04010

# Exhibit 53

# Voluntary Written Statement of Carmen Hayes

0402024

**VOLUNTARY STATEMENT**
**(NOT UNDER ARREST)**

PAGE NO. 1 OF 1 PAG

I, CARMEN HAYS _____, am not under arrest for, nor am I being detained for any crimi

offenses concerning the events I am about to make known to _OFC. RICHARD FERGUSON #168_
Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following infor
mation of my own free will, for whatever purposes it may serve.

Ph._____

I am 22 years of age, D.O.B. ██ ██ and I live at ████████████████

this morning at about 8:30 AM, Isaiah gibbs came into the apt to look for andre, he found me, we started talking, and about 5 minutes later, andre came home, he was upset and disheveled, breathing heavy. he said to us that the police were coming soon. i asked him what he did, & he said, "i killed laura, ████ and ████." i asked him if he was kidding, & he said, "what, do you want to look in the bag?" i said, "no, why do you think i want to see that?!?" he sat down at the bar and i asked him why. he said that he thought laura was jezebel (from the Bible), and he has had "this happen before" (he thinks he relives days and weeks). i tried to calm him down. he took his shirt off and showed us that he had stabbed himself twice in the chest. he was freaking out because he should have been dead, and he wasn't. i asked him what he was going to do. he said he didn't know... i told him he should turn himself in, and he agreed. he wanted me to go with him, and i told him that i had to work at 11, but if we could find a ride there, i would go. we went to brandon's (his cousin) and asked him if he could give us a ride. ~~the~~ CLH his girlfriend was gone w/ the car, so i asked him if he wanted to go to raquel's. i gave her gas money and she took us to the police station ~~is~~ CLH so he could turn himself in.

have read each page of this statement consisting of _____ page(s), each of which bears my signature, and corrections, i
ny, bear my initials, and I certify that the facts contained herein are true and correct.

lated at 1050 HRS _____ this 27TH day of MARCH, 2004

WITNESS: Rick Ferguson 168

Signature of person giving voluntary statement

COPY

ITNESS: _____

**DPS 0402**

DPS0402