# Exhibit 54

## Recorded Statement of Carmen Hayes

*Audi?*

## Recorded Statement of Carmen Hayes

Bell:   This is a recorded statement from Carmen Hayes in regard to incident number 0402024. 3/29/04 at 10:02 hours.  Cameron can you give me your name and date of birth?

Hayes: Carmen Hayes.

Bell:   Carmen, I'm sorry.

Hayes: ███.

Bell:   What I wanted to ask you about is Friday night, you said you went to bed about 8:30?

Hayes: Yes.

Bell:   And who was there at the trailer when you went to bed?

Hayes: No one.

Bell:   Okay.  Do you know what time Andre came home or if he even came home.

Hayes: No, I don't.  I heard his mom come in about 10:00, I knew she got off work at that time.

Bell:   _____?

Hayes: Yes.

Bell:   She lives there too?

Hayes: She was staying there because they had gas at his house and she didn't have gas at her house in Denison so she could heat up the trailer.

Bell:   Okay.  So you know his mom came in about 10:00?

Hayes: Yeah.  And I heard her step over me, and...

Bell:   How do you know it was about ten?

Hayes: Well, I assumed because I knew what time she got home.

Bell:   Okay.

**10707**

04098

Hayes: So, I'm sorry.

Bell: That's okay. So the next morning, who all was at the trailer when you got up?

Hayes: I woke up and...well, I had heard somebody coming in and out; I heard the door open and close twice and I looked at my clock and it was like 6:38 I think it said. And then...

Bell: Do you know who that was?

Hayes: I assumed it was Andre.

Bell: But you don't know for sure?

Hayes: No.

Bell: Okay.

Hayes: But I was like this is too early for me, so I went back to sleep and then at about, I would say about 8:20 or so, I woke up and I was just sitting up smoking a cigarette, looking over my journal and I heard a knock at the door and I didn't answer it because I thought Andre was in the house and I thought he would answer it. And I heard Isaiah Gibbs say, Andre, Drey. And then I heard him come in and then he opened my bedroom door.

Bell: Who did?

Hayes: Isaiah. And he was like hey you want to come smoke with me, and I was like no not really, but I'll sit here with you. And he was like okay and we went in the living room.

Bell: You and Isaiah?

Hayes: Yeah. And he said do you know where Andre is. And I said no, I haven't seen him all morning. And I went to bed at 8:30, I don't know if he was even here last night or anything.

Bell: So when was the first time Saturday morning you saw Andre?

Hayes: A little before nine.

Bell: And that's when ya'll started looking for...that's when you told the other detectives what happened from then on?

Hayes: Yes.

Bell: About him, you know, doing the _____ things he did. You already told them that part?

**10708**

04009

AT010734

Hayes: Yes.

Bell:   You know, you told me a little earlier in the week that you broke up with him and he broke up with you.  Can you tell me about that again?

Hayes: He had been going out and telling...his brother James had put the idea in his head that I used to be a guy and that I had had a sex change, I mean, it's not true, whether it matters or not.  But Andre was so messed up in his head that he really started to believe it, and....

Bell:   You said messed up in his head.  What do you mean?

Hayes: He lets what people say and what they believe get to him.

Bell:   Okay.

Hayes: So by James thinking that, because of the way that I dress and the way, you know, that I wear like collars around my neck and he thought I was trying to hide my Adam's apple, you know.  So, Andre started to look at it and started to believe what he was saying.

Bell:   _____.

Hayes: And that night he had told me that he went and told some people that he thought I was a guy and he was carrying the picture around saying this is what I used to look like when I was a boy.  And I said, screw this.  You know, we went over to his house and I was just sitting there...we were sitting there in silence for at least half an hour and then I left and I came back I would say about 2 hours later and I broke up with him.

Bell:   What night was this?

Hayes: I don't even....

Bell:   Like toward the first of the week, middle or end of the week?  Monday, Tuesday, Tuesday, Wednesday, Wednesday,....

Hayes: You know it was on Wednesday, but I'm not sure how many weeks.  I think it was 2 ½, 3 weeks ago.

Bell:   But then ya'll got back together for what ever reason?

Hayes: Yeah.  I mean, it was, I just...it sounds so bad, but I just care about him so much, and I thought I could help him with his mental situation and suicide attempt because I had been there before myself and I thought I could help him out with it.

Bell:   So, you told me a few minutes ago that a little bit later on you broke up again?

**10710**

04100

AT010735

Hayes: Well, we broke up that first time and I broke up with him.  And then the day before all this happened with Laura...

Bell:   That would have been Thursday?

Hayes: ...Ah, no Friday morning.  Friday morning he came home from the hospital....

Bell:   Well, what happened Thursday night.  You told me about something happened Thursday night.

Hayes: Thursday night we were tripping on Coricidin.

Bell:   Which is....

Hayes: Cough and cold medicine.

Bell:   And what happened while you were tripping on this?

Hayes: He stabbed himself.

Bell:   Where at?

Hayes: On the left side of his chest.  And I think the doctor said he missed it by like...he missed his lung by like an inch or less.

Bell:   So this was Thursday night you was tripping on this cough syrup, he stabbed himself?

Hayes: Yeah.

Bell:   And what happened the rest of Thursday night?

Hayes: That was at 11:30 at night, and I was freaking out and I went and told him mom and his mom said you guys are playing with your lives and I was like its bad, I'm stopping I'm not doing it anymore, it's awful.  And she said, well it's too late now, something's already happened, you know.  And she...I tried to make Andre stand up because that's what she wanted, she wanted him to come in the living room where she was sleeping.  And I couldn't get him up and he was hurting real bad, he told me.  And I just didn't know what to do, I said, you know, I want to take you to the hospital and he was like, no, no, just lay here, just lay here.  So we just laid there and then at 6:30 he...I...

Bell:   6:30?

Hayes: In the morning.

Bell:   Friday morning?

10721

04101

AT010736

Hayes: Friday morning, yeah.

Bell:   What happened then?

Hayes: He woke me up and he said, Carmen, My mom's taking me to the hospital.  Apparently, they had talked all night or something, from what I understand.  And so at about..I gather it was about 10:00 he came home...

Bell:   From the hospital?

Hayes: From the hospital.

Bell:   You didn't go with them?

Hayes: No.  And he came home from the hospital and I went to go hug him and he was kinda standoffish, and I was just like, okay something's wrong.  And he took me in the back room and he said, look, lets just be friends, and I went why.  And he said because I don't love you like I thought I did, and I said but we care about each other enough _____, right. And he was like, you know, I figure if were meant to be then I would have met you before Laura..

Bell:   _____ Andre was saying if he had met you before he met Laura it would have meant to be or something like that?

Hayes: Yeah.

Bell:   So what happened the rest of Friday?

Hayes: He went somewhere...I know it was my day off, so I was just kinda moping around the house.  I went out and walked around a little bit and moved all my stuff from his bedroom into the front bedroom and then I went to sleep at 8:30 Friday night.

Bell:   Uh...

Hayes: But prior to the...on Thursday, Thursday night right after we had taken the medicine we had gone over to Laura's and ▊▊▊▊ house.

Bell:   Together?

Hayes: Yes.

Bell:   What happened then?

Hayes: He was starting to trip.

04102

10-12

AT010737

Bell:   As in what?

Hayes:  On the medicine.  Like he...it takes an hour for the pill to kick in, so he had taken them and we had gone...we had gone home, we took them in the parking lot of Wal...of not Wal-Mart, I'm sorry, Kroger and then...I'm sorry.  I'm trying to gather my thoughts.  We had bought them in the parking lot of Kroger after we got my paycheck cashed and we bought alcohol and stuff and went to Kroger and bought the pills and then...

Bell:   So you were mixing the pills and alcohol Thursday night?

Hayes:  Yes.

Bell:   Did you end up going over to Laura and Bryant's apartment?

Hayes:  Before we'd even started drinking we'd gone over to Laura's.

Bell:   Okay.

Hayes:  But we'd just bought it and it was at home.

Bell:   You hadn't used any of it yet?

Hayes:  No.

Bell:   What happened Thursday night when you got over there?>

Hayes:  Ah,....

Bell:   Who all was there when you got there at ......

Hayes:  Laura and Laura and ████████ were there.  As far as I know Bryant wasn't there.  Oh, I'm sorry, he was in the bathroom or taking a shower or something.  And I assume ████ was there too.

Bell:   Okay.  So what'd ya'll do while you were there?

Hayes:  We just sat there and Andre was trying to visit with ████████ and...but ████████ could tell something was wrong with his dad, so didn't really want to be around him and he would just come and Laura was getting ready to leave to go somewhere, so we had to kinda had to cut it short and she was understandably pissed off and she said next time you want to come for your son you better sober your ass up.

Bell:   Okay.  Did she place any other kind of conditions on him for coming by and seeing the child?

**10713**

AT010738

Hayes: No.

Bell: No?

Hayes: No. Not that I heard. But, I mean, I was with him the whole time that he

_____

Bell: What happened next after she said that?

Hayes: That was in the car. Like we were leaving.

Bell: So, she came down?

Hayes: Yeah. And he had forgotten his Forty upstairs, so she brought it down and she said I don't think you need this, but next time you decide to come by, try to sober your ass up if you want to see your son.

Bell: Then you all left?

Hayes: Yeah. He threw up in the parking lot. And then we left.

Bell: Alright. Then you went back to the trailer and started doing the drinking and the......

Hayes: _____. You know, he didn't, I think he maybe had a sip or two of my Smirnoff, but he didn't drink the Forty at all. He had drink the Forty the next morning after the hospital.

Bell: Did he talk much about the relationship between him and Laura?

Hayes: Um...

Bell: I know you told me earlier that he...he basically was hoping that they could get back together.

Hayes: Yeah, but....

Bell: Had he ever propositioned her with that, that you know of?

Hayes: I don't know, but he...

Bell: Go ahead.

Hayes: ...a while ago he thought he saw God. And he was drunk and he was in his brother's apartment or something, that's all he told me. And he was just laying back and a bright light came over him and told him that he and Laura were meant to be and if he wasn't with

Laura then he wouldn't make anything out of himself his whole life.

Bell:   Okay. Did he ever say anything about his relationship with Bryant? You know how he felt about Bryant being in the picture?

Hayes: He wasn't really...as far as I know he didn't have much animosity towards Bryant because Laura was going to do what she was going to do anyway, and Bryant didn't really...you know...

Bell:   Did Bryant make it...had Bryant ever brought Andre home before? Or do you know?

Hayes: I'd never seen them together. I had met Bryant one time, I mean, when my roommates were going over there to buy weed from him. And that was the only time I ever met him.

Bell:   Over to the apartment? He was _____ over the apartment?

Hayes: Yeah. And Laura wasn't there and I met ███ that time. That was the only time I'd met ███.

Bell:   So, in your opinion, Andre didn't have any...didn't hold any hard feelings against anybody, or somebody or....

Hayes: I believe he did against Laura because when Andre was in jail Laura slept with his brother, cousin and his best friend.

Bell:   When he was in jail...?

Hayes: After stabbing his brother _____.

Bell:   And he...how did he find out about _____?

Hayes: Um, I think his cousin Floyd told him. Or some, you know,...

Bell:   Somebody.

Hayes: Somebody. You know, somebody knows something and he found out.

Bell:   Did Andre ever talk about harming anybody in regards to Laura or the kids or wife or.....?

Hayes: Oh, never the kids, never the kids. Laura, he talked in passing about it, but you know, people kid a lot about that stuff, you know what I mean, like man I'm gonna kill you, you know.

Bell:   Did he make some comments like that maybe? Or...

04105

AT010740

Hayes: Nothing that rash.

Bell:   Well, what did he say though?

Hayes: He was just like, man I just don't know...I don't know why she does the things she does,
       it makes me want to hurt her sometimes.  Something like that, you know.  But I mean, I
       can't quote anything.  I don't want to....

Bell:   Okay.  Can you think of anything else?

Hayes: Um.  No.  I'm just scared about my current position, you know, with the family...I mean,
       not the family putting threats, but just genes specifically and his mom has said to me, you
       know, we want you out of the trailer because we're afraid you're gonna get hurt, cause
       my whole family's coming down here today.  You know, so...

Bell:   Does that conclude your statement today.

Hayes: Yes.

Bell:   Okay. That concludes the statement from Carmen at 16:15.

10716

04106

AT010741

# Exhibit 55

## Grayson County Jail

## Clinic Staff Notes

### (Defendant's Exhibit 3)

# CLINIC STAFF NOTES

**INMATE NAME:** Thomas Arthur          **SO#:** _____          **DATE:** 3, 30, 04

**SUBJECT:** "I am the 13th warrior on the dollar bill" — "I am the chosen one to free us from evil; tell me what I have to do to be ready" — "My wife + kids aren't dead, their hearts have been freed from evil" — "this is deja vu from all reality"

**OBJECTIVE:** I/M delusional in thinking. I/M histo gestures wildly, voice increase in pitch and tone. Approximately 15 minutes later, the I/M layed on his bunk with his eyes closed, breathing evenly and slowly.

**ASSESSMENT:**

**PLAN:** Per Dr Bell, offer Zyprexa 10 mg po — To Dr Bell NSims I/M refused med — Dr Bell aware that I/M feels he does not need medication. Per Dr Bell, continue to offer med & cont to have Dr McGirk see I/M when possible. If I/M continue to refuse medication, contact the I/M Atty for permission to medicate — To Dr Bell NSims

**STAFF SIGNATURE:** To Dr Bell, NSims L

**PHYSICIAN SIGNATURE:** _____ MD

DEFENDANT'S EXHIBIT 3

00470

TR002379

# Exhibit 56

**Time sheet submitted by R.J. Hagood for services rendered for the period 3/31/2004 to 5/11/2004 in State of Texas v. Andre Lee Thomas**

| Jurisdiction | 2. County: | 3. Cause Number | Offense | 4. Proceeding |
|---|---|---|---|---|
| ☐ District ☑ County | Grayson | 51483 | Capital Murder | ☐ Trial-Jury ☐ Trial-Court |
| County Court at Law Court # 15th | | | | ☐ Plea-Open ☐ Plea-Bargain |
| | | | | ☐ Other |

In the case of: State of Texas v Andre Lee Thomas

Case Level: ☑ Felony ☐ Misdemeanor ☐ Juvenile ☐ Appeal ☑ Capital case

☐ Revocation - Felony ☐ Revocation-Misdemeanor ☐ No Charges filed ☐ Other

| Attorney (Full Name) R. J. HAGOOD, JR. | 9. Attorney Address (Include Law Firm Name if Applicable) LAW OFFICE OF R. J. HAGOOD | 10. Telephone (903) 465-0501 |
|---|---|---|
| 8a. State Bar Number 08698500 | 8b. Tax ID Number 75-2695779 | 2301 S. EISENHOWER PARKWAY DENISON, TEXAS 75020-7722 | 11. Fax (903) 465-4400 |

| 2. Flat Fee - Court Appointed Services | | 12a. Total Flat Fee $ |
|---|---|---|

| 3. | In Court Services | Hours | Dates | 13a. Total In Court Compensation |
|---|---|---|---|---|
| | See detail on reverse side of form | | See detail on reverse side of form | |
| | Rate per Hour = | Total Hours | | $ |

| 14. | Out of Court Services | Hours | Dates | 14a. Total Out of Court Compensation |
|---|---|---|---|---|
| | See detail on reverse side of form | | 03/31/04, 04/01/04 04/02/04 See detail on reverse side of form 4/26-28/04 04/03/04 4/05/04 04/06/04 4/29/04 5/11/04 04/07/04, 04/08/04, 4/9/04 4/30/04 5/7/04 | |
| | Rate per Hour = | Total hours 43.70 | 4/12/04, 4/13/04, 4/14/04, 4/21/04 5/3/04 4/16/04, 4/17/04, 4/20/04 4/20/04 | |

| 15. | Investigator | Amount $ | 15a. Total Investigator Expenses |
|---|---|---|---|
| 16. | Expert Witness | Amount $ | 16a. Total Expert Witness Expenses $ |
| 17. | Other Litigation Expenses | Amount $ | 17a. Total Other Litigation Expenses $ |

18. Time Period of Service Rendered:   From 03/31/04 Date   to 05/11/04 Date

POSTED

| 19. Additional Comments | 20. Total Compensation and Expenses Claimed $ |
|---|---|

21. Attorney Certification - I, the undersigned attorney, certify that the above information is true and correct and in accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel.

☐ Final Payment ☑ Partial Payment

Signature _____   Date 5/21/04

| 22. SIGNATURE OF PRESIDING JUDGE: | Amount Approved 3059.00 |
|---|---|
| Reason(s) for denial or variation. | |

APPROVED
COURT ADMINISTRATOR'S OFFICE
DATE 6-14-04 BY RR

AUDITED AS TO EXTENSIONS TOTAL AMOUNT CLAIMED J. RICK COLLARD COUNTY AUDITOR

Adopted 10/23/02 – Task Force on Indigent Defense

DefBill000458

I HAVE DEVOTED THE FOLLOWING TIME RENDERING THE FOLLOWING SERVICES ON THE FOLLOWING DATES REPRESENTING THE ABOVE MENTIONED DEFENDANT IN THE ABOVE MENTIONED CAUSE BY APPOINTMENT OF THE COURT.

| DATE | TIME SPENT | TYPE OF SERVICE |
|---|---|---|
| 03/31/04 | 1.00 | Conference w/ client |
| 03/31/04 | .75 | Conferred w/ CA |
| 03/31/04 | .50 | Conferred w/ Gerald Dempster |
| 03/31/04 | .50 | Conferred w/ Client's parents |
| 03/31/04 | .50 | Conferring w/ jail nurse |
| 03/31/04 | .75 | Conferred w/ Judge Meg & CA |
| 04/01/04 | .25 | Conference w/ Gerald Dempster |
| 04/01/04 | .50 | Conferred w/ Dr. McDaniel |
| 04/02/04 | .50 | Conferred w/ jail Dr./nurse |
| 04/02/04 | .60 | Conference w/ Channel 12 |
| 04/02/04 | .25 | Conferred w/ Client's parents |
| 04/02/04 | .75 | Prepared Motion for competency examination |
| 04/03/04 | .50 | Conferred w/ jail nurse |
| 04/03/04 | 2.25 | Conferred w/ A |
| 04/03/04 | .50 | Conferred w/ client |
| 04/05/04 | .30 | Conferred w/ jail nurse & Reviewed records |
| 04/05/04 | .20 | Conferred w/ Dr. Bell |
| 04/05/04 | .20 | Conferred w/ Client's former counsel |
| 04/05/04 | .25 | Defined parameters for Dr. Harrison |
| 04/05/04 | .40 | Conferred w/ Dr. Harrison |
| 04/05/04 | 1.5 | Read & reviewed complaint |
| 04/05/04 | .25 | Conferred w/ Client's parents |
| 04/05/04 | .60 | Competency hearing Judge & CA |
| 04/05/04 | .50 | Interviewed w/ Channel 12 |
| 04/06/04 | .75 | Conferred w/ Client's father |
| 04/06/04 | .25 | Conferred w/ Dallas associated press |
| 04/07/04 | .40 | Conferred w/ Judge & CA |
| 04/07/04 | 1.00 | Read & reviewed Texas Defender Service Materials |
| 04/07/04 | .25 | Conferred w/ Psychologist |
| 04/07/04 | .20 | Conferred w/ Channel 12 |
| 04/08/04 | .35 | Conferred w/ Client's parents |
| 04/08/04 | .20 | Conferred w/ Client's sister-in-law |
| 04/12/04 | .75 | Conferring w/ jail nurse |
| 04/12/04 | .25 | Conferred w/ Channel 12 |
| 04/12/04 | .20 | Conferred w/ Dr. Rogers |
| 04/12/04 | .20 | Conference & arranged for examination Dr. Rogers |
| 04/12/04 | .75 | Conferred with Harrison |
| 04/12/04 | .25 | Conference w/ Dr. Rogers |
| 04/13/04 | .25 | Conferred w/ Texas Defender Service |
| 04/13/04 | .50 | Conferred w/ Gerald Dempster |
| 04/13/04 | .20 | Conferred w/ Channel 12 |
| 04/13/04 | .25 | Conference w/ Dr. Rogers |
| 04/14/04 | .40 | Conferred w/ person director re: omnibus fund |
| 04/14/04 | .20 | Conferred w/ jail doctor |
| 04/14/04 | .20 | Conferred w/ client's parents |
| 04/14/04 | 1.00 | Conferred w/ reviewed report from Dr. Harrison |
| 04/15/04 | .30 | Conferred w/ Channel 12 |
| 04/15/04 | .35 | Conferred w/ Dr. Harrison |
| 04/15/04 | .25 | Conferred w/ Client's father |
| 04/15/04 | 1.25 | Prepared Motion for appointment of Motion |
| 04/16/04 | .20 | Conferred w/ mitigation specialist |
| 04/16/04 | .20 | Conferred w/ Gerald Dempster |
| 04/18/04 | .30 | Conferred w/ expert witness |
| 04/20/04 | .20 | Interviewed potential mitigation specialist |
| 04/21/04 | .15 | Consent to Client's parents |
| 04/26/04 | .20 | Conferred w/ Colleague re: from state |
| 04/26/04 | .15 | Return phone call from state expert |
| 04/26/04 | 1.75 | Phone call to state expert |
| 04/26/04 | .20 | Conferred w/ state expert & CA |
| 04/26/04 | 2.50 | Reviewed doctor report for Judge |
| 04/27/04 | .30 | Research |
| 04/27/04 | .30 | Conferred w/ CA |
| 04/28/04 | 1.80 | Research w/ Dr. Rogers |
| 04/28/04 | 5.50 | Traveled to & from conference w/ Dr. Rogers |
| 04/28/04 | 1.75 | Interviewed mentally of Client |
| 04/30/04 | .25 | Conferred w/ Dr. Harrison |
| 04/30/04 | .50 | Conferred w/ district clerk |
| 05/07/04 | .30 | Conferred w/ co-counsel |
| 05/07/04 | 5.50 | Interviewed w/ Dr. & co-counsel & client |
| 05/07/04 | .60 | Conference w/ psychologist |
| 05/TOTAL | .75 | Conferred w/ potential expert witness |

43.70

DefBill000459

# Exhibit 57

## Psychological Interview Report of Andre Thomas by C. Robin McGirk, Ph.D.

ive Psychological Services

C. Robin McGirk, Ph.D.
Licensed Psychologist

## Psychological Interview

Name:                        Andre Thomas

Age:                         21

Date of Evaluation:          March 30, March 31, and April 5, 2004

Techniques Used:             Clinical Interview

Source of Referral:          Ms. Natalie Sims, Chief Nurse
                             Grayson County Jail

**General Observations:**
The interview was conducted with two deputies present as well as nursing staff. Although notes are usally taken using a word processor, the conditions did not make this practice feasible and content was reconstructed after the interviews had been conducted. This report is based upon three separate contacts of approximately one hour duration with additional contact time with the Chief Nurse Ms. Natalie Sims and other staff for purposes of case consultation and review.

**History and Relevant Observations:**
At the outset of the interview, he asked if it would be possible to speak with this psychologist without the presence of two officers in order to obtain a higher degree of privacy. He was informed that this would not be possible, although efforts were made using body language to close off the space within which communications occurred, as he was encouraged to speak in a lowered voice to create a greater sense of rapport and confidence. This technique appeared to prove effective as the interview continued unhampered by such initial concerns.

During this initial interview he related some of events leading up to events for which he is currently in jail describing how he had stabbed his wife ripped open her chest taken out her heart and held it in his hand while it was still beating he emphasized that he was thinking "what the fuck am I doing?!" during the episode. He querried about what would be likely to happen to him now, specifically asking about whether or not he would get the death penalty. He reviewed having previously been involved with the juvenile probation department, but did not recall at the time having ever been psychologically evaluated previously. When asked whether he had thoughts of killing his wife and children prior to the actual event, he responded "Fuck

AT002013

*yes* and began to elaborate on thoughts which he had for some time that his son was the anti-Christ, stating that "His birth date was 1999" which turned upside down had religious significance that led him to consider that possibility.  He did not indicate that he had been on any medications or received any formal mental health services in the past.  He did describe having "smoked a blunt" around the time of the stabbings but indicated that this occurred "after" those events, emphasizing that doing so had no bearing on his actions.  When asked about the use of illicit drugs, he stated that he had primarily used marijuana in the past, but made no mention at the time of whether or not it had been combined with other substances.  Results of Toxicology tests were not available to determine the extent to which illicit drug use may have contributed to the mental condition noted.

His attorney was advised of the need for medication and the concomitant consideration of whether to pursue such treatment prior to the actual performance of the examination by court ordered personnel. He advised that these plans be delayed until the examination had been performed.

Mental Status Examination:

Appearance, Behavior, and Speech:
He is a slender attractive black male who appeared calm and controled during the initial interview but exhibited rapid pressured speech during the second contact as well as significant agitation which was present throughout the bulk of the time spent.  At one point, for example, he stood up and offered himself to be attacked by staff present, emphasizing that he would offer no resistance.  During the third interview, he was in restraints and was considerably calmer than had been the case prior to that, although speech continued to be rapid and pressured, particularly when delusional processes were stimulated by pertinent questions essential to the underlying rationale on which they were based.

Thought Process:
He showed signs of tangentiality, frequently pursuing various aspects of each aspect of the discussion relating to the confusion he had been experiencing in his life.  Thoughts were expressed using excellent verbal facility and suggesting a high level of intelligence.  He showed no apparent signs of evasiveness during the interviews, but did show occasional signs of talking around issues with addressing them as directly as would have been desired or ideal.  Thoughts were generally well organized although irrationally designed and related to overly elaborate interpretations of the behaviors of others.  For example, he described in detail some of the behavioral mannerisms and expressions of Carmen at one point, noting that she (or he) also seemed to exhibit a tone which indicated sarcasm and the rejection of religious beliefs on her part, which led to his conclusion that she was evil and attempting to influence

in the same direction.

**Thought Content:**
Although he readily admitted to stabbing himself and after doing so believing that he "could not die or be killed", he expressed no further desire to injure himself and made no further mention of thoughts which could be characterized as suicidal in design.

Delusional content comprised the majority of conversational exchange that occurred, with elaborate descriptions using the signs and symbols on the back of a dollar bill as an opportunity to illustrate matters of importance to him, with references to "time travel" as it relates to the opportunity to repeatedly reproduce and repeat events. In this regard, he referenced how he was reliving events for which others had more recall or awareness than did he, stating that "I don't know why we're having this conversation again, because we've had it before". Within this vein, he also discussed how the government had been involved in monitoring his activities and how "they know everything about me", adding at one point that there were cameras behind his eyelids and indicating that his own thoughts were known to others. In this regard, he described the "whole of society" as "God" and emphasized how they would be making decisions that would impact his life without his knowledge of how the process would unfold. He frequently spoke about experiencing "De ja vu" as evidence of the repetitious and recurrent nature of events which he has undergone. During the second interview, he spoke about being able to see his wife, as if she were alive and the experience of her death had been an illusionary or imaginary event resulting from other thoughts being injected into his mind through the experiments in which he believed the government to have been involved. Although it was unclear at the time, it appeared that he believed he had destroyed the Devil rather than the lives of his family.

He described having become involved with a woman named Carmen who he believes may be a "She-Devil", elaborating that other friends had referred to her as a "he" because of some apparently masculine features. Andre described how he had begun to wonder,and now moreso than ever, if Carmen had actually been a male who had undergone a sex change. He offered numerous bits of supportive information to this effect in spite of having reportedly seen a photograph of Carmen kissing with a former boyfriend who he believed to be her former identity i.e. Michael. He detailed having had sexual contact with her on several occasions, believed she influenced him to do things which "destroyed my life". In this regard, it is important to note that such descriptions lead to an hypothesis of sexual identity difficulties which may be of relevance insofar as pursuing treatment, as well as obtaining a better understanding of processes leading up to the killings he reports. All in all, he described events in an egocentric fashion, perceiving himself as the object of study by others i.e. the government or world at large, as well as pondering the extent to which he may have

2059

00461

been targeted by evil forces e.g. the "She-Devil named Carmen".

**Perceptual Abnormalities:**
It was noted in the review of notes that he reported to medical
staff that he had been instructed by this psychologist to remain
awake in order to fully aware and observe everything going on
outside his cell.  Since such instructions had not been given,
it is unclear whether this report constitutes a distortion of
actual communications which may be classified as illusory,
hallucinatory, or delusional.

**Mood and Affect:**
Mood varied from euthymic to agitated and irritable, while
affect was inappropriate to content, ranging from being rather
"matter of fact" and flat to excited, with the latter occurring
and becoming most prominent during periods in which he was
engaged in attempting to rationally grasp events which have
taken place and the processes which drove his own behavior.
To this extent lability was present and the potential for violent
behavior appeared to be present.

**Sensorium and Cognition:**
He was able to correctly report his birth date, knew his name
and where he was being held at the time of the initial interview.

**Attention and Concentration:**
He was able to attend to the conversational process and respond
to various questions posed  more effectively during the first
and third encounters than during the second exchange.  His
concentration appeared to be reasonably good although his focus
was primarily rooted in his problems and interests of the moment
rather than pursuing matters presented which were outside this
range.

In order to obtain and maintain rapport the decision was made
to avoid formal assessment techniques typically employed for
the assessment of these functions i.e. serial calculations and
digit recall tasks

**Memory:**
This individual demonstrated what appeared to be a reliable
reproduction of descriptions of past events and interactions
with others, although the accuracy of such reports was grossly
influence by paranoid delusional processes present.
Insofar as remote recall is concerned, he was able to recall
past involvement with the juvenile department and the
relationship and problems which he had experienced with his
wife, as he seemed to describe some events in a consistent
fashion over time.

**Insight and Judgment:**
His ability to exercise rationality in the decision-making
process appears to be markedly influenced by the presence of

2060

0046

Apr 07 04 07:47a      903-893-5344      DR ROBIN MCGIRK PHD      C ROBIN MCGIRK PHD      p.4

AT002016

paranoid delusions, ideas of reference, religiosity, and other
signs of psychosis which prevent the emergence of such functions,
thereby compromising these abilities.

**Abstract Reasoning Ability:**
Formal assessment of these functions was not attempted in order
to preserve rapport, although he appears able to understand
abstractions and extend them to a level which produces fantastic
and unbelieveable areas of relationships for which there is
no realistic support.

**Summary, Conclusions, and Recommendations:**
This 21 year old male appears to have been developing psychotic
symptomology over a span of time which predates his involvement
in activities for which he is currently incarcerated.  Although
no contact with the family has been made, it will be important
for whomever performs a court order assessment to do so to
determine the extent to which he has been aware of the
encroachment of symptoms and subsequently attempted to seek
out treatment in arriving at a more accurate diagnostic
conclusion.  He appears to have responded well to medication
in use i.e. Geodon, although it is interesting to note that
improvements reportedly began to occur within 15 minutes of
its administration, suggesting the possibility of placebo effect,
the likelihood of which would be supported by the presence of
delusional processes present since he had been provided with
suggestions of such benefit.

Although, this medication is not typically used until other
antipsychotic medications have been used first, his response
suggests that continued use is advisable.  Most individuals
require two weeks to respond to its administration so that
increased dosage beyond 20 milligrams twice daily is generally
considered acceptable, with increases in that dosage gradually
to 80 milligrams twice daily.  In addition, the injectable form
is usually intended for intial use, with replacement by oral
forms of the medication after the first several days of
administration.

This individual is in need of psychiatric treatment which can
best be offered through a facility designed to offer such
specialized services, with the eventual hope of achieving the
level of competency needed to stand trial.

Diagnostic Impression

Axis I     Provisional-     Paranoid Schizophrenia
                            acute exacerbation of symptoms

           R/O              Substance Induced Psychotic
                            Reaction


Axis II                     Deferred

AT002017

Axis III                              See Physician's Report

Axis IV                               Stressors—Unknown

Axis V                                GAF-Past year—Unknown
                                      GAF-Present-25


*C. Robin McGirk, Ph.D.*

C. Robin McGirk, Ph.D.
License No. 3018
Health Service Provider Certification No. 34593

2002

00461

AT002018

# Exhibit 58

**Time sheet submitted by Bobbie Peterson for services rendered for the period 4/5/2004 to 12/4/2004 in State of Texas v. Andre Thomas**

| 1. Jurisdiction | 2. County: | | | | |
|---|---|---|---|---|---|
| [X] District    [ ] County | Grayson | 051858 | Capital murder | [ ] Trial-Jury | [ ] Trial-Court |
| [ ] County Court at Law | | 051483 | Capital murder | [ ] Plea-Open | [ ] Plea-Bargain |
| Court # 15th | | | | [X] Other | |

**5. In the case of:** State of Texas v *Andre Thomas*

**6. Case Level**
[ ] Felony   [ ] Misdemeanor   [ ] Juvenile   [ ] Appeal   [X] Capital case
[ ] Revocation - Felony   [ ] Revocation-Misdemeanor   [ ] No Charges filed   [ ] Other

COPY

| 7. Attorney (Full Name) *Bobbie J. Peterson* | | 9. Attorney Address (Include Law Firm Name if Applicable) *120 S. Crockett Sherman Tx 75090* | 10. Telephone *903-870-1007* |
|---|---|---|---|
| 8a. State Bar Number *02112205* | 8b. Tax ID Number *75-2781550* | | 11. Fax *903-870-1446* |

| 12. Flat Fee – Court Appointed Services | 12a. Total Flat Fee $ |
|---|---|

| 13. | In Court Services | Hours | Dates | 13a. Total In Court Compensation |
|---|---|---|---|---|
| | See detail on reverse side of form | | See detail on reverse side of form | |
| | Rate per Hour = | Total Hours | | $ |

| 14. | Out of Court Services | Hours | Dates | 14a. Total Out of Court Compensation |
|---|---|---|---|---|
| | See detail on reverse side of form | | See detail on reverse side of form | |
| | Rate per Hour= | Total hours *73* | | $ |

| 15. | Investigator | | Amount | 15a. Total Investigator Expenses $ |
|---|---|---|---|---|

| 16. | Expert Witness | | Amount | 16a. Total Expert Witness Expenses $ |
|---|---|---|---|---|

| 17. | Other Litigation Expenses | | Amount | 17a. Total Other Litigation Expenses $ |
|---|---|---|---|---|

POSTED

**18. Time Period of Service Rendered:** From *4-5-04* (Date) to *12-4-04* (Date)

| 19. Additional Comments | 20. Total Compensation and Expenses Claimed $ |
|---|---|

**21. Attorney Certification – I, the undersigned attorney, certify that the above information is true and correct and in accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel.**

[ ] Final Payment   [X] Partial Payment    Signature: *Bobbie J. Peter*    Date: *12-9-04*

**22. SIGNATURE OF PRESIDING JUDGE:**

Amount Approved: *5870.*

Reason(s) for denial or variation.

APPROVED
COURT ADMINISTRATOR'S OFFICE
DATE *12-16-04* BY *DVR*

Adopted 10/23/02 – Task Force on Indigent Defense

DefBill000621

I HAVE DEVOTED THE FOLLOWING TIME RENDERING THE FOLLOWING SERVICES ON THE
FOLLOWING DATES REPRESENTING THE ABOVE MENTIONED DEFENDANT IN THE ABOVE
MENTIONED CAUSE BY APPOINTMENT OF THE COURT.

| DATE | TIME SPENT | TYPE OF SERVICE |
|------|------------|-----------------|
| *See Attached Exhibit "A"* | | |

**TOTAL** 73

DefBill000622

Time Sheet          The State of Texas vs. Andre Thomas

| Date | Hours | Description |
|---|---|---|
| 04/05/04 | .5 | Conference with Client |
| 04/06/04 | .2 | TC to Gene Omundson |
| 04/26/04 | .5 | Hearing |
| 04/26/04 | .5 | Conference |
| 04/27/04 | .5 | Conference with GCAO |
| 05/03/04 | .3 | Conf. with RJ |
| 05/07/04 | 1.5 | Conf. with client and state's expert |
| 05/11/04 | .5 | Conf. with Expert |
| 08/11/04 | .5 | Conf. with Gene |
| 08/11/04 | .5 | Conf. with RJ |
| 08/11/04 | .2 | R&R Fax |
| 08/11/04 | .2 | TC Investigator |
| 08/12/04 | .2 | TC Investigator |
| 08/12/04 | .2 | TC Investigator |
| 08/13/04 | .4 | O/V Investigator |
| 08/13/04 | 1.0 | Arraignment and Conference with Family |
| 08/13/04 | .2 | TC Expert |
| 08/13/04 | .2 | O/V Investigator |
| 08/13/04 | .2 | letter |
| 08/16/04 | .3 | TC Investigator |
| 08/06/04 | .3 | TC Investigator |
| 08/16/04 | .2 | TC Investigator |
| 08/17/04 | 2.2 | TC Investigator |
| 08/17/04 | .2 | Research |
| 08/18/04 | 1.2 | Conference with Expert |
| 08/18/04 | 2.0 | Research |
| 08/18/04 | .4 | TC Investigator |
| 08/18/04 | .3 | TC Witnesses |
| 08/18/04 | .2 | TC Investigator |
| 08/18/04 | .2 | TC Investigator |
| 08/26/04 | .2 | TC Investigator |
| 08/27/04 | 1.0 | TC Investigator x 3 |
| 08/27/04 | .5 | Conf with Expert |
| 09/15/04 | 2.0 | Review Discovery |
| 09/23/04 | 1.0 | Conf. With co-counsel |
| 09/29/04 | .2 | TC Investigator |
| 10/07/04 | 5.2 | Review Discovery |
| 10/11/04 | .2 | Conf. With Investigator |
| 10/26/04 | .3 | Conf. With co-counsel |
| 10/28/04 | .4 | TC with co-ounsel |
| 11/02/04 | 3.3 | Research |
| 11/03/04 | 2.4 | Research |
| 11/04/04 | 3.0 | Review Discovery |

DefBill000623

| | | |
|---|---|---|
| 11/11/04 | .2 | TC Investigator |
| 11/12/04 | .4 | TC Investigator |
| 11/10/04 | 4.5 | File Organization |
| 11/11/04 | 3.3 | Research |
| 11/16/04 | .2 | TC Investigator |
| 11/18/04 | 2.3 | Case Management conference |
| 11/24/04 | 1.4 | Conf. With co-counsel |
| 11/24/04 | .2 | Conference with GCAO |
| 11/11/04 | 1.0 | Conference with co-counsel |
| 11/18/04 | 1.0 | Case Management Conference |
| 11/22/04 | .2 | TC with co-counsel |
| 11/22//04 | .3 | Case Management Conference |
| 11/23/04 | .2 | O/V with Mitch |
| 11/28/04 | 1.0 | Research |
| 11/29/04 | 4.0 | Review Discovery |
| 11/30/04 | 3.0 | Review Discovery |
| 12/01/04 | 5.0 | Review Discovery |
| 12/01/04 | .3 | TC with co-counsel |
| 12/02/04 | 4.0 | Review Discovery |
| 12/03/04 | 2.0 | Conference with client |
| 12/04/04 | 3.0 | Review Discovery |

TOTAL     73 hours

DefBill000624

# Exhibit 59

## Laboratory Information Sheet regarding analysis of knives


Crime Laboratory Service
Serology/DNA

## LABORATORY INFORMATION SHEET

Case Number: L-320483                          Evidence Received: 3/31/04

Date: 4/13/04                                   Analyst: RS

Received large brown box, sealed, initialled. Contains several items, among them are:

Item 13: knife from kitchen sink at 2424 Texoma Pkwy #100

- large brown bag, sealed, initialled, contains black-hand knife w/ ~8" long serrated blade.
- dark staining on blade → Stain A. PHT pos; portion collected using one swab → F(K1)
- orange-colored staining on blade → Stain B: PHT pos → portion collected (very hard to rub off of blade) → F(K1)
- red staining on handle → Stain C: PHT pos → collected → F(K1)



Stain C

Stain A          Stain B

Stains A-D:
- PHT pos → each swabbed & collected → test results not RS 10/5/04 placed on item

Stain D: PHT pos on other side of knife



Stain C & D RS

- L#/date/initials not placed on item → L#/date/initials subsequently placed on item on 10/5/04 (when opened by WH for print analysis) RS
- No hairs detected

DPS 0208

DPS0208



Crime Laboratory Service
Serology/DNA

## LABORATORY INFORMATION SHEET

Case Number: L-320483

Date: 4/13/04

Evidence Received: 2/3/04

Analyst: RS

<u>Item #14</u>: Knife from kitchen sink at 2424 Texoma Pkwy #100

- large brown paper bag, sealed/initialled, contains black-handled knife w/ ~8" steel blade, wider than Item 13

- no hairs detected

- red stains on blade: PHT neg (x1)

     - <u>Stain A</u>: on groove of handle & blade; PHT pos → collected portion using (1) swab

     - <u>Stain B</u>: PHT pos → collected using (1) swab → F(x1)

     - <u>Stain C</u>: roundish stain, PHT pos → collected using (1) swab → F(x1)

[knife diagram with labels: stain A, stain B, stain C]

stain A-D:
- PHT pos,
  collected using
  one swab for
  each stain → F

- <u>Stain D</u>: PHT pos on other side → collected 2 areas using (1) swab → F(x1)

[knife handle diagram with labels: stain D PHT pos, PHT neg]

- Lift/date/initial's placed on handle

DPS 0209



**Crime Laboratory Service**
**Serology/DNA**

## LABORATORY INFORMATION SHEET

Case Number: L-320483

Evidence Received: 3/31/04

Date: 4/13/04

Analyst: RS

Item 15: knife (filet) from NE corner of east bedroom
medium-p.b. brown paper bag, sealed, initialled, contains black-handled
skinny blade knife, blade ~5 1/4" long, serrated w/red stains
on it on (1) side.
- stain PHT pos (x1) → swabbed w/ (1) swab → F(x1)
        → Stain A

→ misshapen end of hand
Stain A - PHT pos; collected scoring using one swab → F

- L#/date/initials placed on item's handle
- no hairs detected

Item 18: knife
- medium brown paper bag, sealed, initialled, contains black-hand-
L#/date/init. led "Revere" brand knife, blade ~4.5" long, no hairs detected
loued on - orangish stain on one side of blade → PHT pos → collected using
handle    (1) swab → F(x1) → Stain A

→ crack in handle
one side
Stain A - PHT pos

stains A+B:
PHT pos →
ollected using
ne swab for
ach
                                        other side

stain B - PHT pos

stain B: red stain on other side of blade along groove → PHT pos →

DPS 0210

# Exhibit 60

# Competency to Stand Trial Evaluation; Report of Disinterested Mental Health Expert by James R. Harrison, Ph.D.

TRACKING NO. 164871

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 15TH JUDICIAL |
| VS. | § § § | DISTRICT COURT OF |
| ANDRE LEE THOMAS | § § | GRAYSON COUNTY, TEXAS |

## COMPETENCY TO STAND TRIAL EVALUATION

### REPORT OF DISINTERESTED MENTAL HEALTH EXPERT

Comes now the assigned Psychologist, James R. Harrison, Ph.D. heretofore appointed to make the psychological study in the above styled matter.  The court has ordered a psychiatric examination to evaluate the Defendant's competency to stand trial.

Name of Defendant:   Andre Lee Thomas
Date of Birth:   ████████
Age:   21 years
Ethnicity:   African-American
Gender:   Male
Date of Report:   April 15, 2004

**Referral Information**:  Andre Thomas is a 21 year old African-American male who is being held in the Grayson County Jail on one count of Capital Murder for the death of his wife, Laura Christine Thomas.

**Procedures**:  Mr. Thomas was interviewed and observed on April 5th 2004 for 1 hour, April 7th for 1½ hours, on April 12th for 1 hour, and on April 14th for 45 minutes.  Collateral interviews were conducted with the Defendant's attorney, R.J. Hagood, the assigned prosecutor, Kerye Ashmore, the Grayson County Jail Chief Nurse, Natalie Sims, and Mr. Thomas' father, Danny Thomas.  In addition, both a videotaped and an audiotaped interview of the Defendant by Sherman Police Department Detective, Mike Ditto, were reviewed.  Records of the medical staff at the Grayson County Jail were also reviewed, along with the interview notes of the jail Psychologist, Dr. Robin McGirk.

Prior to each interview with the Defendant and the one with his father, Danny Thomas, each was informed about the nature and purpose of this evaluation, as well as limits of confidentiality, including the fact that a report would be sent to the court.  An indication of understanding of this review was obtained at each instance.

**18344**

02069

**Relevant History:** The following information was provided by the Defendant and his father, Danny Thomas; both of whom are considered poor historians. Mr. Thomas has resided alone at the Crossroads Trailer Park in Sherman, Texas. His father assisted him in finding these accommodations. He was married but separated from his wife, Laura, who is the victim of the murder with which he is charged. Mr. Thomas was unemployed at the time of his arrest.

Mr. Thomas is the youngest of 5 sons born to his parents, who separated when he was 3-4 years old. He was born in Muskogee, Oklahoma, but raised in the Grayson County area with his mother, with almost daily contact with his father. His father indicates that he had a good childhood, with a loving relationship with both parents. He was described as an obedient and loving child, who had good relationships with his brothers and peers. No traumas, tragedies, or abuse are reported as occurring in childhood.

Mr. Thomas attended school through the 9th grade, and later completed his GED. He has obtained no additional education or training, but was reportedly considering enlisting in the United States Navy. Mr. Thomas has a previous arrest for stabbing his brother, Brian, about one year ago, but was no-billed by the grand jury, reportedly due to his actions being in self defense. He provides unspecific references to juvenile offenses, but no other arrests or legal entanglements during adulthood.

His work history includes a position in the Maintenance Department for the City of Sherman, where he worked for 3 years. He was terminated for an undetermined reason, with his father speculating that it was due to a lost driver's license. Mr. Thomas indicates that he was tired of "dealing with the bodies" at the cemetery. According to his father, Mr. Thomas is reported to have gone "downhill in his mental state" after the termination, because he "didn't know what to do, he wanted to be a career man." Mr. Thomas reports short periods of employment since his termination about 1 year ago, that appear limited to dishwashing jobs in local restaurants.

Mr. Thomas reportedly lived with Laura Thomas from when he was 16 years old, was married to her since he was 18 years old, and has been separated for over 1 year. They had one child, ███, aged 5, who was murdered at the same time as his mother. Mr. Thomas indicates that he spent time regularly with his son, and states that he "loves him and misses him." No other serious relationships are reported, although he discusses recently having been involved with a transsexual named Carmen.

Medical history was unremarkable, until the recent crime with which Mr. Thomas has been charged. No serious illnesses are indicated, with no history of illness, injury, or surgeries. He has no reported Physician. However, Mr. Thomas sustained self-inflicted stab wounds to the chest on 3/27/04 which required surgical repair of unspecified internal damage. Additionally, on 4/2/04, Mr. Thomas pulled out his right eye, with subsequent emergency medical treatment. Both wounds are presently healing.

Mr. Thomas reports regular abuse of alcohol, marijuana, and Coricidin for a duration that is unclear, but likely more than the last 6 months. Coricidin is an over the counter

**18345**

02070

AT018376

medication that contains the substance, dextromethorphan (DXM), which is in class of drugs known as dissociative anesthetics. At sufficiently high doses, this substance can have powerful psychedelic effects.

Mr. Thomas acknowledges in interviews with jail personnel that he has had "many suicide attempts, too many to count," with attempts at age 10 and 15 years by cutting his wrists. On intake at the jail, he reports hearing no voices or having current suicidal thinking. He is observed to be preoccupied and confused; apathetic and hopeless.

His father report that he has had ongoing mental health problems for at least the last year. His father indicates that he told his son that "you ain't thinking right. You go get some help." While unable to provide clear specifics, his father reports that he "didn't pay his bills right," and "he wasn't normally like himself." Mr. Thomas reportedly talked excessively about God and the Bible, particularly Revelations and the "last days." His father encouraged him to focus on Genesis, counseling him that Revelations was too confusing unless you begin reading at the beginning. Mr. Thomas reportedly dwelled on the Bible and borrowed his father's Bible so often that his father dedicated a new Bible to him and presented it as a gift. However, a couple of days later, Mr. Thomas reportedly "burned that Bible." His father states, "Nothing makes sense, what he'd do." and he was "always running, going from here to there."

Mr. Thomas reports no formal psychiatric treatment, but reportedly has had at least four evaluations for psychiatric complaints. Two evaluations were performed by MHMR staff at the Grayson County Jail. His father reports that he also sought help from MHMR prior to that time. Both Mr. Thomas and his father report that he sought help for his mental problems from the Wilson N. Jones Emergency Room within the week prior to the alleged murder but he was reportedly refused care. He also reportedly sought help from the Texoma Medical Center Emergency Room two days before the murder, with Mr. Thomas stating that he "ended up walking out – I didn't see any point," in apparent reference to not believing he would receive help.

Jail records indicate that the MHMR evaluations were referrals for emotional distress after the incident when he stabbed his brother. The evaluations appear intended to assess his suicidality, and he reported past suicidal ideation and attempts during the initial evaluation (1-28-03), and was found to be restless, with pressured speech, and agreed to a suicide contract. Otherwise, his functioning was within normal limits, although he apparently had green hair. The second evaluation (2-11-03) found him to be anxious with some driven speech and a past history of impulsiveness. Checks every fifteen minutes were recommended due to violent thoughts.

Family history is significant for a likely psychotic disorder in Mr. Thomas' brother, who is treated by MHMR; a possible psychotic disorder in his mother, who is reportedly "crazy" and "obsessed with the Bible." Additional family history includes substance abuse and violent behaviors.

**18346**

02071

AT018377

Andre Thomas
Tracking No. 164871

15th Judicial District Court, Grayson County Texas
Competency to Stand Trial Evaluation

**Course of Incarceration:**  Current records from the Grayson County Jail medical staff and the jail Psychologist, Dr. C. Robin McGirk reveal that, during his incarceration, Mr. Thomas has displayed behaviors consistent with psychosis, including paranoid and grandiose delusions, ideas of reference, religiosity, flight of ideas, periodic incoherence, the possibility of auditory hallucinations, and delusional self-mutilation.  Records over 17 days of incarceration generally document a docile and passive attitude, and cooperation with jail personnel, but his stay was also marked by episodes of agitation, delusions, and apparent remorse.

Mr. Thomas was unmedicated and under a suicide watch for the first 5 or 6 days of incarceration, during which he had periods of agitation, yelling, and pacing, typically followed by apologetic behavior.  Jail documentation states that Mr. Thomas was described by the jail Psychologist as "floridly psychotic" in the initial days of his incarceration.  Recommendations for pharmacological treatment were refused by both the Defendant and his attorney.

On the first day of his incarceration, Mr. Thomas asked to see the Chief Nurse, Natalie Sims, and stated that he was sorry.  Upon inquiry, he stated, "I cut their hearts out.  After I stabbed them, I cut their hearts out.  I didn't mean to hurt anybody.  Please, Miss Natalie, as God as my witness, I didn't mean it."  At another point, he asserted that he must have a "mission" in the jail, as his way of explaining his second jail stay.  He had a period in which he intently observed the activities outside his holding cell, refusing to sleep, and attributing his action to a delusion that Dr. McGirk, the jail Psychologist, had directed him to watch for events that Dr. McGirk would need to know.

In an initial interview on his 2nd day of incarceration by Dr. McGirk, Mr. Thomas related the details of his actions in killing his wife, son, and stepchild, and his thinking at the time.  He was able to elaborate on thoughts prior to the murder, including his belief that his son was the Antichrist, and that his son's birthday (1999) had religious significance when viewed upside down.  He noted that he had smoking marijuana ("a blunt") afterward and emphasized that this had no bearing on the events.  His speech was calm.

In second and third interviews in the following days, Dr. McGirk documents that Mr. Thomas displayed "rapid pressured speech" and "significant agitation."  "He stood up and offered himself to be attacked by the staff present; emphasizing that he would offer no resistance."  His thoughts showed signs of tangentiality, and focused on the confusion he had been experiencing.  He displayed "excellent verbal facility," "suggesting a high level of intelligence."  He did not seem to be evasive in his actions, although he didn't always respond directly to inquiry.  While his thoughts were seen as well organized, they were irrational and included "overly elaborate interpretations of the behaviors of others."  He admitted to stabbing himself, with Mr. Thomas believing that he "could not die or be killed."  However, he "expressed no further desire to injure himself" and made no signs of further suicidal thoughts or plans.

Dr. McGirk describes Mr. Thomas' conversation as primarily involving delusional content.  These delusions included the greater meaning of signs and symbols on the dollar bill, and

**18347**

02072

AT018378

references to time travel and its relation to repeating and reliving events. Mr. Thomas discussed that the government had been monitoring his activities and stated, "They know everything about me." He reported cameras behind his eyelids and that others knew his thoughts. He referred to the whole society as "God" and noted their impact on his life without his knowledge.

Dr. McGirk reports that Mr. Thomas spoke about "Deja vu" and being able to see his wife, "as if she were alive and the experience of her death had been an illusionary or imaginary event; resulting from other thoughts being injected into his mind through the experiments in which he believed the government been involved." It appeared to Dr. McGirk that Mr. Thomas believed he had destroyed the Devil rather than the lives of his family. Mr. Thomas is also reported to discuss a woman named Carmen, who he believed may be a "She-Devil" who influenced him to do things which "destroyed [his] life."

Dr. McGirk indicates that Mr. Thomas described events in an "egocentric fashion, perceiving himself as the object of study by others," "as well as pondering the extent to which he had been targeted by evil forces. His belief that he had been given instructions by Dr. McGirk to observe events outside of his cell, suggested to Dr. McGirk the possibility of illusions or hallucinations. Mr. Thomas' mood was seen as variable from "euthymic to irritable", with his affect assessed as "inappropriate to content, ranging from being rather matter of fact and flat to excited." His labile emotions suggested the potential for violent behavior. Dr. McGirk assessed Mr. Thomas' attention, memory, and judgment as adequate, but they were compromised by paranoid delusions, ideas of reference, religiosity, and psychosis. He displayed a tendency to "extend [abstractions] to a level which produces fantastic and unbelievable areas of relationship for which there is no realistic support."

Dr. McGirk provided a provisional diagnosis of Paranoid Schizophrenia, with an acute exacerbation of symptoms. The possibility of a substance induced psychotic reaction is also suggested.

On his 5th day of incarceration, Mr. Thomas plucked his right eye from its socket. He had made at least two previous attempts at this, reportedly in response to his having read the Bible verse, "*If thy right eye offend thee, pluck it out*" (Matthew 5:29). He stated that, "The Bible says that if your right eye offends thee, you are to pluck it out, so I did." He stated it was the only way he could avoid "burning in hell." During medical treatment for his injury, Mr. Thomas stated that he didn't know "why people didn't die."

Mr. Thomas was treated at the local hospital, where he was given an antipsychotic medication. During the hospital visit, he frequently asked if he could go see his wife to "ask her to forgive me." He stated, "My kids forgive me but she won't and I love her and I need her to forgive me." Upon return to the jail, he placed in four-point restraints to prevent further self mutilation, and started on an antipsychotic medication after this incident; with an initial 20 mg. of Geodon, twice daily, which is a standard starting dose.

DISTRICT COURT
OF GRAYSON COUNTY, TEXAS

02073

**18348**

AT018379

This medication typically takes several weeks (two to six) to titrate to a maximum dosage of 160 mg per day in divided doses. Mr. Thomas appears to have responded quickly to the medicine, in terms of his level of agitation, but he continued to show delusional thinking and disorganization in his thought processes.

Medical reports in subsequent days indicate that he repeatedly called out for his wife, and he reported dreaming about "Lucifer, the bearer of light." At one point, he displayed pressured speech, and "remained delusional." He was reported to state that he did kill his wife, son, and ▇▇; and that ▇▇ wasn't "[his] kid, but I loved her like my own." He stated he had believed that his son was "the antichrist," and that he "know[s] what [he] did was wrong."

His order for Geodon was increased to 40mg BID in the evening of April 7th. He observed behavior in the cell was subdued, calm, and cooperative, with a brief period of smiling and somewhat inappropriate laughter, with Mr. Thomas joking, "I've got to get another eye." At another time, he was observed talking to someone, despite being alone in his cell. He spent a lot of his time sleeping.

On April 13th, Mr. Thomas was observed by medical staff to shake violently all over his body, as if having a seizure. Upon hearing his name called by staff, he slowly began to calm, and the medical staff present described his state as a more like a full body sob. He was provided oxygen, and when he began to speak, he stated, "I want my life back" two or three times. He then stated, "I want to die," immediately followed by, "I don't want to die."

**Current Mental Status:** Mr. Thomas is a 21 year old African-American male who was seen both lying on a jail cot in 4 point restraints or restrained upright in a restraint chair. Two officers were posted at the door of the cell, consistent with the ordered protocol.

He was dressed in orange jail coveralls, somewhat disheveled, with his right eye bandaged and a bandage on a healing knife wound evident in his half opened shirt. He is relatively clean. He is tall and thin and appears consistent with his stated age. His motor activity cannot be fully evaluated due to his restraints, but he is ambulatory and evidences no signs of dysfunction in the limited activities he is allowed. He is surprisingly tolerant and passive in regard to his restraints, not complaining about their restrictions until the fourth interview on April 14th. Activity level is generally low, with intact attention for conversation.

Mr. Thomas presents as cooperative, with a subdued friendliness, but generally a serious tone. He appears sincere and forthright in his statements, often showing a level of apparent honesty about himself, without self consciousness or attempts to manage the image he presents to others. He overtly questions the need to distort or hide events related to the alleged crime, seemingly more focused on judgment of God rather than implications regarding the legal system. He is alert and fully oriented. His speech has been articulate without signs of a language disorder or impairment. However, the rate of speech has been generally quite pressured, but varied across and within the four

**18349**

02074

AT018380

interviews. He can speak in a soft quiet tone, or escalate rapidly as if to keep up with his thoughts.

His communication has typically shown two patterns. He can be detailed, sequential, and coherent in his descriptions of actual events or actions. However, when conceptualizing or discussing the meaning of events, he can show increased psychomotor speed and driven expression of delusional beliefs. His mood is generally euthymic, but his affect is labile in response to internal events, with a restricted range of available emotion, and very little humor or excitement.

His thinking is clearly impaired by an ongoing psychotic process, with evidence of both grandiose and paranoid delusions (outlined below), strong ideas of reference, some loose associations outside of his firm delusional system, tangentiality, and derailment. It is not difficult to quickly move him from seemingly coherent descriptions of events to bizarre explanations of his motives and clearly delusional beliefs about the context of his actions. His thinking was adequately organized with concrete tasks, and the core of his delusional system is remarkable consistent. However, when confused, threatened, or emotionally conflicted, he attempts to resolve this by elaborating on his delusions further (outlined below).

Cognitively, Mr. Thomas displays grossly intact memory for immediate, recent, and remote events. He is able to recognize jail personnel from his previous incarceration, recall generally that he has spoken to his lawyer or jail Psychologist, and recall the topic of this examination from one day to the next. He provides details regarding his life circumstances, consistent with that of his father, although not always without interruption from a driven preoccupation with his delusions. His attention is adequate for a one to one conversation in a noisy jail cell, but he is quite distractible on formal attention screening (Digit Span forward = 5, backward = 3). Vocabulary, easy recall of scripture, and his reasoning give the impression of average to above average intellect.

Mr. Thomas demonstrates an impressive capacity to reflect upon his own perspective and those of others simultaneously; which is both an advantage and a detriment to him, in that he also tends to overinterpret these observations and incorporate them into his psychotic process. His fund of knowledge and social judgment regarding hypothetical situations is intact. Mr. Thomas' level of insight is impaired. Although variable and improving across the four interviews, he moves from being completely captured by his belief system, to being confused and uncertain, to accepting his thinking was altered but having no understanding of the cause. While he attributes some of his thinking at the time of the crime to his use of Coricidin, he has no explanation about the persistence of his symptoms after disuse.

The core of the delusional system expressed by Mr. Thomas has been generally consistent across his interviews with the Sherman Police Department investigator, the jail Psychologist, and the present examiner. In addition, his confusion over the course of his incarceration led to an incorporation of others into his belief system. They include:

**18350**                                                            02075

AT018381

Andre Thomas
Tracking No. 164871

15th Judicial District Court, Grayson County Texas
Competency to Stand Trial Evaluation

- A belief that Mr. Thomas attributes to have arisen in response to watching a videotape provided by his wife's boyfriend, Bryant.  He describes a secret organization, somehow associated with pyramids in New York, and involving secret mantras.  The organization's intent is to arise and to enslave people and rule them.  This is somehow associated with a secret "God plan," but sometimes is associated with the Devil.

- On the basis of small signs, Mr. Thomas somehow decided that his wife was Jezebel, his son was the Antichrist, and that his stepdaughter was also involved in this organization.  He believed that his wife's boyfriend, Bryant, was under Jezebel's control.  He decided that he had to kill them to prevent this organization from arising, believing he was acting on behalf of God to save the world from this event.

- While he describes his actions in regard to the murder in gruesome detail, this has been without strong emotion, in part due to his underlying belief that he wasn't killing his family, but was killing what he came to believe was the representative of the Devil or the Devil himself.  This included a belief that the method of killing them (e.g., 3 knives so as to not cross contaminate their blood) was necessary to insure the destruction of the beings in his family's bodies.

- While not clear about his stabbing of himself, he came to believe that his not dying meant he was incapable of dying.

- That his female friend, Carman, was also associated with the Devil and had influenced him to his detriment.

- That his experience of déjà vu means that he can time travel and that these events are not permanent.

- That Dr. McGirk had directed him to observe the activities of the jail so he could provide needed information to Dr. McGirk.  That Dr. McGirk led him to the knowledge that the government was watching him since he was a child.

- That his lawyer, R.J. Hagood is the "Devil's advocate", and Mr. Thomas may be the Devil.

- That his wife and child are not dead, and his eye is not plucked out, because this is déjà vu and he can go back where his life was before and start over.

At the time of the last interview with Mr. Thomas, he was receiving Geodon 60 mg in the morning, which was a decrease from 40 mg, twice daily.  Mr. Thomas was lethargic, tremulous and shaky in his movements, and was apathetic.  His state appeared to be a combination of the effects of medication and increasing grief regarding the loss of his wife and child.  His voice was more quiet than usual, and he was monotone.  Attempts at

02076

AT018382

formal testing of cognitive skills increased his agitation, and he evidenced decreased attentional skills, despite relatively greater quiet in his cell.

His thinking was coherent for mundane topics and he was able to provide historical information in response to inquiry. He showed increasing awareness of the impairment in his past thinking, but remains confused about possible causes. However, he continues to fall into disorganized thinking quite easily, this time asserting that Dr. McGirk had told him he was supposed to save the world. While he was confused as to why he was chosen, he could not be dissuaded of this belief. He reports that he has been talking to God continuously, and that he thinks "everybody is going to heaven." He is preoccupied by the deaths of his wife and son. He openly weeps, and appeared to have periods where he fully realized the permanence of their deaths. This is clearly traumatic for him. However, when he became overwhelmed by this, he briefly reverted back to his previous delusion about time travel and restarting his life. His mood was clearly depressed, but unstable in that any pressure led him to become more agitated. Affect was mood congruent, flat, and restricted in range.

Diagnosis: Mr. Thomas displays the characteristic symptoms of Schizophrenia, Paranoid Type; with grandiose and paranoid delusions, possible auditory hallucinations, disorganized speech, and disorganized behavior. He has shown social and occupational dysfunction, and has been unable to adequately support himself and maintain employment. However, it is not clear that he these symptoms have been present for over 6 months, and this appears to be his first psychotic episode. Because of this, a diagnosis of Schizophreniform Disorder is more appropriate at this time. However, he has a strong family history of psychotic disorders, and the probability of Schizophrenia is considered high.

Additionally, there is the possibility that Mr. Thomas' current psychotic symptoms are related to his abuse of Coricidin. He reports that he had been using this substance in large quantities in the days and weeks prior to his crime. This is a drug of abuse due to its ingredient, dextromethorphan, which is considered a psychotomimetic, causing psychotic like symptoms. It is possible that Mr. Thomas' propensity toward psychosis was exacerbated by the use of this drug. In high doses, psychotic symptoms and strong dissociative experiences are common.

| DSM-IV TR | Axis I | 295.40 | Schizophreniform Disorder |
| | | Rule out | Substance Induced Psychotic Disorder |
| | Axis II | | No Diagnosis |
| | Axis III | | status post: thoracic surgery for knife wound, wound repair upon removal of right eye |
| | Axis IV | | recent injuries, incarceration, legal problems, death of close relatives |
| | Axis V | | GAF: 12 – danger of hurting self or others, behavior is considerably influenced by delusions |

**18352**

92077

DISTRICT COURT
OF GRAYSON COUNTY, TEXAS
CERTIFIED COPY

AT018383

**Current Competency Assessment**: Mr. Thomas was able to identify the charge against him as Murder and that he might be sentenced to death or life in prison. He was less aware of mitigating factors that might reduce the length of his sentence.

Mr. Thomas appears capable of providing a plausibly accurate description of his experience in a sequential, detailed manner, and to provide a clear description of his state of mind, thoughts, and emotions at the time. While he demonstrated this capacity in taped police interviews and through most of the present evaluation, his most recent interview showed decrements in this capacity due to his depression and medication effects. His capacity to relate these facts to his attorney, however, is not consistently present. During those periods when he is preoccupied with delusional material, these thoughts intrude and tend to hijack the conversation. While with gentle questioning, he is able to maintain a sequential train of thought, under pressure of firm questioning or internal conflict, Mr. Thomas tends to become less organized and his responses more self involved and off topic.

Mr. Thomas' capacity for reasoned choice of legal strategies and options is currently limited. When asked the options regarding defending himself, he vacillates between leaving his fate to God, and a fatalistic approach of letting the judge decide. While he acknowledges that there will be a trial, he has been unable to think of a hypothetical or actual strategy that might mitigate against a finding of guilt or the maximum sentence. He is resistant to any efforts by his attorney to put his circumstances into a sympathetic light, and continues to show some distrust of attorneys as a profession and their connection to the Devil. He has yet been unable to see an insanity plea as even a hypothetical option to consider. While Mr. Thomas clearly has the intellectual capacity for such reasoning, his delusional beliefs continue to have some hold on his unwillingness to trust an attorney.

Mr. Thomas can clearly identify the general roles of the Judge ("He decides or runs the courtroom"), prosecuting attorney ("He tries to prove I killed my wife and ▆▆▆ and send me to jail."), jury ("They decide if I die."), and his defense attorney ("He defends me."). He is able to describe the general process; including presenting witnesses, facts, and arguments. He understands the adversarial nature of the courtroom, stating a clear understanding that the prosecutor will be presenting evidence about his commission of the crime.

However, it is his defense that he does not fully understand. He sees the role of his attorney as presenting "only part of the truth," which he connects with evil. He has yet to fully realize that others might not acknowledge that his actions were not righteous or well motivated. While he shows a capacity for perspective taking, he has yet to fully give up the delusion that he acted consistent with God's will. He still struggles with the gravity of his alleged actions, vacillating between deep regret and delusional denial. This prevents him from seeing that others might view him as heinous and that his interests might be served by presenting a defense that better explains his actions.

**18353**

92078

AT018384

Mr. Thomas' current state is quite fragile, despite improvement from medication. He has been in isolation, protected from serious questioning, and the stress of more than one person with which to cope. Even in these circumstances, he responds to stress with reversion to delusional material and agitation. It is likely that in an open courtroom, with intense testimony and a high level of stimulation, that Mr. Thomas will be unable to maintain a quiet decorum appropriate for the courtroom. His agitation and intolerance of stress may very well lead him to wish to leave the courtroom or become active and display verbal outbursts, particularly if his delusions are activated.

Mr. Thomas is currently unable to testify on his own behalf in a coherent manner. While he has demonstrated a capacity to present information about the crime in a detailed and sequential manner, this is the limit of his capacity. The stress of both direct and cross examination will overwhelm his current ability to cope. Intrusive delusional material will certainly emerge. In addition, it is only now that Mr. Thomas appears to be fully facing the implications of his alleged crime and the permanence of his wife, son, and stepdaughter's death. At this time, he is unlikely to answer questions regarding this without either excessive grief or active avoidance. His ability to conform his responses to those appropriate to the courtroom will be overridden by his immediate emotional distress.

<u>Summary and Recommendations</u>: Mr. Thomas has a severe mental illness and is currently actively psychotic, with some improvement shown after introduction of antipsychotic medication. Mr. Thomas understands the charges and highest levels of punishment that he now faces. He can disclose to his attorney relevant facts, events, and states of mind, but not on a consistent basis or in a consistently helpful form due to intrusive delusional thinking. He cannot yet engage in a reasoned process of choosing legal strategies or options. He appears to understand the adversarial process and roles of members of the court, with the exception of accepting a legitimate role for his defense attorney due to ongoing delusions. He is unlikely to be able to exhibit consistently appropriate courtroom behavior. Finally, Mr. Thomas is unlikely to be able to tolerate testifying on his own behalf, without exacerbating his current condition, or a disruption in his ability to answer questions appropriately.

Due to the above findings, it is this evaluator's opinion that Mr. Thomas is **Incompetent to Stand Trial**.

It is recommended that Mr. Thomas be transferred to an appropriate treatment setting for his mental disorder and that he also be provided specific training designed to help him become competent to function in the courtroom. It is this examiner's opinion that Mr. Thomas will likely become competent to stand trial in the future, with ongoing pharmacological and psychological interventions. While a firm prediction is impossible, the time frame for becoming competent is estimated to be between 4 and 12 weeks. He is much less likely to achieve competency without medication management by a Psychiatrist and if he remains in his current setting in restraints.

It is important to note that the examiner recognizes that a judge or jury decides trial competency; as such, opinions expressed in this report should be considered as advisory only.

**18354**

92079

AT018385

Andre Thomas
Tracking No. 164871

15th Judicial District Court, Grayson County Texas
Competency to Stand Trial Evaluation

*James R Harrison PhD*

James R. Harrison, Ph.D.
Clinical Psychologist
Texas License 23242

Submitted:  April 15, 2004

A CERTIFIED COPY
ATTEST: 4-18-04
CYNDI MATHIS SPENCER, DIST. CLERK
GRAYSON COUNTY, TEXAS
BY: _____ DEPUTY
Jane Ceylon

**18355**

02030

AT018386

# Exhibit 61

## Grand Jury testimony of Dr. Kyungho Scott Choi

1

1    REPORTER'S RECORD

2

3

4    -------------------------------------

5    GRAND JURY TESTIMONY

6    -------------------------------------

7

8

9

10

11

12

13

14

15

16

17

18        On the 15th day of April, 2004, the

19   following proceedings came on to be heard before Joe

20   Brown, the Grayson County Attorney, presiding over the

21   Grand Jury proceedings, held in Sherman, Grayson County,

22   Texas.

23        Proceedings reported by Case Catalyst

24   machine shorthand.

ORIGINAL

25

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00308

AT007061

64

```
 1   beyond that.
 2                   GRAND JURY MEMBER:  But nothing else came
 3   out?
 4                   DR. BOWEN:  No, ma'am.
 5                   MR. BROWN:  Okay.  I know your time is
 6   valuable.  We appreciate you being here.
 7                   (Dr. Bowen exited the courtroom.  Dr. Choi
 8   entered the courtroom.)
 9                   KYUNGHO SCOTT CHOI, M.D.
10   having been sworn, testified upon his oath as follows:
11                   DIRECT EXAMINATION
12   BY MR. BROWN:
13       Q.   This is the Grayson County Grand Jury.  Would
14   you introduce yourself to us, please, sir?
15       A.   My name is Kyungho Scott Choi.  I am a medical
16   doctor.  I work at the emergency room.  I work at Wilson
17   N. Jones Medical Center in the emergency room.
18       Q.   Would you spell your first name?
19       A.   It is K-y-u-n-g-h-o C-h-o-i.
20       Q.   Do you go by Scott?
21       A.   That is my middle name.
22       Q.   That is easier.  I will go by Scott.  Okay.
23   Dr. Choi. My name is Joe Brown.  I am the Grayson County
24   Attorney.  We just met outside in the hall; is that
25   right?
```

1072

65

1      A.   Yes.

2      Q.   And the Grayson County Grand Jury is looking at

3 investigating criminal charges against an Andre Thomas.

4 Do you understand that?

5      A.   Yes.

6      Q.   Have you given a deposition before, I assume?

7      A.   No.

8      Q.   No deposition?

9      A.   In a case like this?

10     Q.   Not in a criminal case, but have you given your

11 testimony to a court reporter before?

12     A.   No.

13     Q.   Wow.  Lucky.  Very lucky.  All right.  Well,

14 she will write down everything that we say and so, if you

15 would, help me by answering yes or no or out loud because

16 she can't take down a shake of the head or a nod.

17     A.   Sure.  No problem.

18     Q.   I provided to you what I have marked as exhibit

19 two.  There are 167 pages, I believe.  Is that accurate?

20     A.   Yes.

21     Q.   And I will represent to you those are the

22 records from Wilson N. Jones Medical Center, if you need

23 to refer to those.  Okay?

24     A.   Yes.

25     Q.   Would you tell us your background a little bit

1073

66

1  and things on your resume and your qualifications and

2  certification and things of that nature?

3     A.  Well, I came to American when I was fifteen.  I

4  went to school.  I went to medical school.

5     Q.  Where did you go?

6     A.  I went Saint George University for Medicine in

7  Grenada.

8     Q.  You went where?

9     A.  Saint George.

10     Q.  In Grenada?

11     A.  Yes.  For the first two years and I did really

12  well and I transferred into the University of American

13  Dentistry of New Jersey.

14     Q.  You went to dentist school?

15     A.  No.  It is the University system for medicine

16  and dentistry.

17     Q.  Okay.

18     A.  But it was the University for Medicine and

19  Dentistry of New Jersey.  At the university they have one

20  dental school and two medical schools and a pharmacy

21  school also.  So I went to medical school.

22     Q.  Okay.

23     A.  Around four years graduated from there then I

24  went on to Emergency Room Medicine Residency program at

25  North Shore University Hospital at Manhattan in New York

1074

67

1   City

2        Q.    Okay.

3        A.    I finished that.

4        Q.    So you finished your residency at New York and

5   then what?

6        A.    I finished that and I came to Greenville, Texas

7   and I practiced for one year in the ER and then I moved

8   over to Wilson N. Jones Medical Center.

9        Q.    How long have you been at Wilson N. Jones?

10       A.    I started on May the first of last year so it

11  is almost one year.

12       Q.    Almost one year.  Okay.  As far as speciality

13  as an emergency room physician?

14       A.    Yes.

15       Q.    Do you have any certifications or any other

16  things that you want us to know?

17       A.    Well, I am currently past the first part of my

18  Boards, the American Board of Emergency Medicine.  The

19  second part is the oral exam which should be taken in

20  October of this year.  I have a certificate of American

21  Pharmacological for Emergency Cardiac Trauma Life Support

22  and American College Life Support and I just did the

23  Pediatric Emergency Medicine.

24       Q.    Were you on duty at Wilson N. Jones Hospital on

25  March the twenty-seventh of 2004?

1075

63

1       A.    I saw this patient.  I don't exactly remember
2   what date that was.

3       Q.    Let see if we could find your ---  This was
4   from notes.  This is it.

5       A.    March the twenty-seventh of 2004.

6       Q.    Let me find the ER record.  Is that it?

7       A.    There you go.

8       Q.    On the initial emergency room record, start on
9   page twenty-one?

10      A.    Yes.

11      Q.    If you would, tell us and walk us through your
12  contact.  When did you first contact Andre Thomas?

13      A.    When the emergency medical crew brought in the
14  patient.  When the ER crew brought the patient into room
15  two of our emergency department.  That is the first time
16  I saw the patient.

17      Q.    Describe what you saw?

18      A.    He came in with a handcuff on both wrists.  I
19  see that on the chest he had two superficial lacerations
20  and blood oozing out.  The gauze was half on there.

21      Q.    The gauze?

22      A.    Yes.

23      Q.    And so you saw two superficial wounds?

24      A.    Yes.

25      Q.    Is that all the wounds there were?  Just two?

69

1      A.   Yes.

2      Q.   What did you do when you saw that?

3      A.   Well, when I saw that, immediate I knew that

4   was the location of the heart.  So before that, the

5   emergency medical room crew called us in and they said

6   they are bringing in a patient with a stab wound to the

7   chest.

8      Q.   Did you know anything about the circumstances

9   of the stab wounds?

10      A.   No.  So I prepared for emergency, you know,

11   possibly operation to save his heart or lungs or

12   anything.  We prepared for that five or ten minutes.

13   They rushed in.  I saw the patient.  At that time he was

14   alert and awake and oriented and he was moving and

15   everything.

16      Q.   Did he say anything?

17      A.   No.  He just said, "Oh, it hurt."  You know.  So

18   I asked him, "Where do you have pain?"  He pointed to the

19   chest.  I asked him did you have any other wounds on the

20   rest of your body?  He said, "No."

21      Q.   Okay.

22      A.   So I quickly, you know, we go through this

23   routine.  I looked for the airway, neck, chest, lungs

24   quickly in like one minute to make sure all the immediate

25   life threatening wounds are not there.  So the only thing

107

1  that I found is he had a laceration here.   That was not

2  like shooting blood.   It was a little oozing out so I

3  thought it was superficial, but because it was a stab

4  wound, you can never be sure if it went down or they cut

5  the lung or it cut the heart or a vessel or who knows.

6  So I prepared.   I got quick IV line in took a chest X-ray

7  to make sure there was no puncture wound and I called the

8  general surgeon and chest surgeon.

9          Q.    So when you come in, the first thing you say to

10  him or he says to you is you ask him if he has any other

11  wounds?

12          A.    Yes.

13          Q.    And he said, "No"?

14          A.    Yes.

15          Q.    Is he making eye contact with you?

16          A.    Yes.

17          Q.    Is he responding appropriately?

18          A.    Definitely.

19          Q.    And then what is the next conversation that you

20  had with him?

21          A.    Then we asked simple questions, trauma

22  questions.   The first thing I asked him was his allergies

23  to medications.

24          Q.    Okay.

25 1078  A.    Did he have any allergies to be given

71

1   medications so we know what to expect.  He did not have
2   any allergies to any drugs.

3                And then I asked him his medical
4   condition, his past medical history and did he have any
5   medical problems and he said no.  And any surgeries
6   previously, no.  I asked him the last one was if you have
7   to operate you worry about anesthesia so you have to know
8   if they had anything to eat or drink.  And then what
9   happened.

10       Q.    You asked him when his last meal was?

11       A.    Yes.

12       Q.    What was his response to you?

13       A.    That actually I don't remember.

14       Q.    Were his responses to those questions
15   appropriate?

16       A.    Yes.  He answered clearly and correctly and,
17   you know, we made eye contact.

18       Q.    Did you get any impression he was not
19   understanding what you were saying?

20       A.    No.

21       Q.    What else did he say?

22       A.    The event, I asked him, you know, what
23   happened?  Who did this to you?  He told me that he did
24   it to himself.  So then I asked because that is kind of
25   unusual.  So I said, did he try to kill yourself?  And he

72

1    told me yes.  I asked him why and he did not answer that

2    to me.

3         Q.   He did not answer that?

4         A.   No.  He just refused to answer.

5         Q.   Do you remember did he make any reference to

6    anyone else outside of the emergency room or anything

7    about any other friends or family members?

8         A.   No.  I mean at that point I still did not know

9    why the patient, you know, would do that because no one

10   told me anything.

11        Q.   You did not know about the murders?

12        A.   No, I didn't know.  All I knew this was, the

13   police were there and usually more than the usual number

14   of police.  But I have no idea.  I asked him, "Do you

15   have any psychiatric problems?"

16             He goes, "Well, people told me, you know,

17   I may have problems."  But I said, "Did any doctor ever

18   tell you that?"  He said, "No."  "Were you ever

19   recommended to see a doctor?"  "No."  "Did you ever try

20   to commit suicide before?"  "No."  "Are you bipolar?"

21   "No."  So to me there was I thought something happened

22   that prompted him to injure himself.  But he did not

23   convey to me that he had any history, past history of a

24   psychiatric problem.

25        Q.   Do you remember him making a comment that he

1080

AT001048

73

1    does not deserve to live?

2        A.   No, he did not say.

3        Q.   Did you ever remember him ever saying anything

4    about stabbing anybody else?

5        A.   No.

6        Q.   So the last we left the subject, you asked him

7    about his allergies and about prior psychiatric treatment

8    and what other conversation did you have?

9        A.   Well, that was it.  It seemed like any minute

10   he would have blood accumulating in the sack that wrapped

11   around the heart.  At any minute the patient can crash.

12            There was a quick history and I got it and

13   I was on the phone with the other doctors begging them to

14   come down.  I kept on checking on his vital signs, you

15   know, making sure the appropriate treatment was getting

16   done.  I had to make sure everything was ready just in

17   case I needed to operate on him right then.  It was all

18   ready and set to go.

19       Q.   Did he make any other statements that you

20   remember?

21       A.   No.

22       Q.   When did you find out that he was a suspect of

23   a crime?

24       A.   After there was an X-ray done and we gave IV

25   fluids and I spoke with the general surgeon and I took

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00380

AT001049

74

1   him down and then after that, I took, you know, the

2   information and I started writing on his chart and I

3   don't know at what point, but I heard that he was

4   involved in a triple murder case.

5       Q.   And involved as a suspect or you heard that he

6   was involved?

7       A.   I was told he was involved as a suspect.

8       Q.   Had you already completed your treatment of him

9   when you heard that?

10      A.   Yes.  I mean, the treatment was ongoing

11  basically.

12      Q.   It was before he went to the OR?

13      A.   Yes.  I mean, basically in a case like that,

14  the patient can get worse any minute so I knew the

15  documentation was very important for an emergency.

16           My usual pattern when a patient like that

17  comes in, I would see him quickly and whatever emergency

18  treatment needs to be done, I would do it.  I made the

19  important phone call.  I make sure the patient is stable

20  and then I quickly write on my chart and I go back and I

21  assess him again and I come back and I made my impression

22  and I write it down on the chart and then keep forcing my

23  concerns for the physicians to come to ER right away.  I

24  keep on pushing them.  It is constant evaluation.  So I

25  ran in there several times looking to check his vital

75

1  signs and checking on him.

2      Q.    And did you ever hear him say anything else

3  other than what you have told us?  Was there anything

4  that you heard him say or any other conversation?

5      A.    No.

6      Q.    Did he ever exhibit any type of psychosis to

7  you?

8      A.    No.

9      Q.    Did everything he do seem appropriate in his

10 behavior?

11     A.    Yes.  Because when we actually rolled him to

12 look at his back and make sure there were no knife wounds

13 that could be anywhere and he was like, "Oh, it hurts.

14 It hurts."

15            It was not like someone who is on LSD or

16 some kind of a drug that don't feel any pain or like a

17 chronically depressed patient just staring somewhere

18 else, you know.  To me he looked like a perfectly normal

19 guy, you know.

20     Q.    Let me ask you some specific questions.  Would

21 you describe him as alert?

22     A.    Yes.

23     Q.    Would he be oriented as to time, place and

24 person and situation?

25     A.    That is correct.

1083

76

1    Q.    How would you describe his mood?

2    A.    His mood.  His mood.

3    Q.    Mood and affect?

4    A.    I will say appropriate for the situation.  He

5    was worried.  It looked like he was worried about his

6    injuries and I guess a little bit sad.

7    Q.    But appropriate for the situation?

8    A.    Yes, I would think so.

9    Q.    And how was his level of communication?

10   A.    I mean normal.

11   Q.    Was he cooperative?

12   A.    Yes.

13   Q.    How was his eye contact?

14   A.    Normal.

15   Q.    How was his attention span?

16   A.    Normal.

17   Q.    How was his concentration?

18   A.    Normal.

19   Q.    His judgement from what you could tell?

20   A.    Well, I didn't test for that.

21   Q.    Okay.

22   A.    Because I mean that is something that you

23   others would do.

24   Q.    What about his recall and his memory?

25   A.    I didn't ask him about specific events.  The

1084

77

1    only recall was what happened to you.  So if that was

2    recall, that is recall.

3          Q.    He was able to appropriately describe what had

4    happened to him?

5          A.    Yes.

6          Q.    How you was his energy level?

7          A.    What do you mean by that?

8          Q.    His level of activity.  I guess that is like

9    his mood or affect?

10         A.    Normal to me.

11         Q.    Did he ever make any religious statements to

12   you?  Did you ever hear him say anything?

13         A.    No.

14         Q.    Did he ever make any comments about his family

15   or the stabbings that he had done to other people?

16         A.    No.

17         Q.    Did he make any references to his children or

18   to his children being in heaven or anything like that?

19         A.    No.

20         Q.    Did he tell you any kind of prior suicidal

21   attempt?

22         A.    I asked him that.

23         Q.    He denied that?

24         A.    He denied it, yes.

25         Q.    All right.  Let me see in these records what

1085

1   part of these would have been your records.   If you can

2   help me by referring by the page number.

3        A.   Page number twenty-one if you look at the right

4   side and those are the orders that I had written.   It is

5   right at the bottom.

6        Q.   Under physician orders?

7        A.   Yes.   Those are my handwriting.

8        Q.   And what briefly tell us what they are.

9        A.   It means nothing by mouth because he is going

10  to surgery.   LR on the left hand.   I just wrote 500 CCs

11  of it.   Again, there are quantities for IV fluids done

12  and the face mask oxygen, done.   Then cardiac enzyme, CT

13  cardiac enzyme.

14       Q.   Would you have made any other notes in the

15  medical records?

16       A.   On page twenty-four that is my record.

17       Q.   The whole thing?

18       A.   Yes.

19       Q.   Did you fill out everything on that page?

20       A.   That is right.   On the left side is the

21  history.

22       Q.   Is page twenty-five your record?

23       A.   Yes.

24       Q.   Did you fill out everything on that page?

25       A.   That is right.

1086

79

1          Q.   Is there anything else that you would have
2   filled out?

3          A.   Twenty-seven is condition.  All right.

4          Q.   What is page twenty-nine?

5          A.   This is the chest surgeon who came to do the
6   operation on him.  He came down and he saw him and then
7   he admitted the patient and he took him to the OR.

8          Q.   So would you think there would be any other
9   records that would be yours in here?

10         A.   No.

11              MR. BROWN:  Are there any questions from
12   the grand jury?

13              GRAND JURY MEMBER:  When you saw the
14   trauma, did you do a blood test for drugs or anything or
15   did you order that to be done under those circumstances?

16              DR. CHOI:  Yes.  I would do that.

17              GRAND JURY MEMBER:  Was one ordered?

18              DR. CHOI:  Yes.  I think there was one
19   made and it was all negative.

20         Q.   (By Mr. Brown)  I thought there was Cannabis.

21         A.   Alcohol was negative.

22         Q.   What was negative?

23         A.   Alcohol was negative.  Page twenty-five is my
24   documentation on the right hand side where the pictures
25   are.  It says CT cardiac enzyme for heart attack.  It was

1087

80

1    negative.  Alcohol was zero.  Aspirin, normal.  Thyroid

2    stimulating hormone, that was normal.  The CVV was

3    normal.  The urine test for infection was normal.

4    Coagulation was normal.  His blood type was RH positive.

5    Urine drug screen.  It was positive for THC.  That means

6    marijuana.  All others were negative.

7         Q.   So he had marijuana in his system?

8         A.   Yes.  By marijuana, usually if you take it

9    today, you would be positive like for several weeks so.

10             GRAND JURY MEMBER:  Would it be unusual

11   for an individual to come in and be depressed and have

12   scattering of information when asked, and then the

13   following day be coherent and be responsive in a normal

14   manner?

15             DR. CHOI:  Would it be unusual?

16             GRAND JURY MEMBER:  Yes.

17             DR. CHOI:  Well, that I don't know.

18             MR. BROWN:  That is beyond your medical

19   experience?

20             DR. CHOI:  Yes.

21             GRAND JURY MEMBER:  The wound when you saw

22   it, did that look like a stab wound?

23             DR. CHOI:  Yes.

24             GRAND JURY MEMBER:  Did you see two stab

25   wounds?

10

81

1        DR. CHOI:   Yes.

2              GRAND JURY MEMBER:   This wound that you

3   saw was not superficial?   This wound, how severe was this

4   stab wound?

5              DR. CHOI:   Well, it looked like

6   superficial.   It was short, you know, and the blood was

7   just a tiny bit of blood oozing out.   It was not a

8   constant flow.   Also, the patient was not exhibiting a

9   lot of pain or having any difficulty breathing.   It

10  fortunately was not high.   So the emergency room crew

11  when they see the patient, they say it is superficial

12  wound to the chest.

13              When I evaluate patients, I kind of grade

14  it but because the location was right next to the heart,

15  it could be very superficial.   The heart is not touching

16  the ribs right next to it.   So even less than one depth

17  can cause primary injury which happened in this case.

18              GRAND JURY MEMBER:   I have a question.

19  Were there any other family members of his present that

20  you observed?

21              DR. CHOI:   No.

22      Q.   (By Mr. Brown)   Was there anything else that

23  you think is important with regards to his mental

24  condition or his status at that point?

25      A.   My impression is that I also communicated with

1089

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00388

AT001057

82

1    the other nurses. We actually sat down and we said what

2    happened to this guy.  But, you know, my impression was

3    the guy looks normal.  He did not appear to me psychotic

4    or depressed.  You know, my impression was that he got

5    into a fight or something and then some stabbing.  That

6    was my impression.  But when I saw him and I asked him

7    some questions.

8                    GRAND JURY MEMBER:  On a scale from one to

9    ten, if you look at stab wounds, where would you put this

10   wound, I mean, as far as somebody taking a knife and

11   stabbing?  Do you understand?

12                   DR. CHOI:  Ten would be the worst and one

13   not the worst?

14                   GRAND JURY MEMBER:  Yes.  I mean, as far

15   as the effect, I understand.  But if somebody is going to

16   stab somebody like if I have a sharp knife, I am sure it

17   could be a lot more damage.

18                   DR. CHOI:  To me there was, of course,

19   this was not a medical person.  He does not know about

20   the anatomy that well.  To me there was, I don't think he

21   actually meant to kill himself.

22                   GRAND JURY MEMBER:  That is what I

23   thought.

24                   DR. CHOI:  I just thought he wanted to

25   make a gesture.  I would call it a suicidal gesture and

1090

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00309

AT001058

83

1    not an attempt.

2        Q.   (By Mr. Brown)  Did he express remorse at all

3    for either stabbing himself or stabbing anybody else?

4        A.   You know, after I initially saw him and treated

5    him, I came out and thought to myself and I quickly

6    discussed it with the nurse and then I heard he was

7    involved.  I kind of did not go into it deeply, you know,

8    because I knew this was going to be a medical case so I

9    only asked him pertinent medical questions.

10            GRAND JURY MEMBER:  Did you ever have any

11   chance to look at the other little wound there.  It was

12   just like the day before.

13       A.   Yes.

14       Q.   He was supposed to be in the hospital because

15   he tried to stab himself before.

16       A.   Okay.

17       Q.   You obviously saw that wound.  That was a

18   lesser wound than the wound, than this one; is that

19   correct?

20       A.   My recollection was I didn't treat the wound.

21   He had another wound in the chest?

22       Q.   No.  There were two wounds.  You said you saw

23   two wounds to the chest?

24       A.   Yes.  There were two wounds.

25   **1091**  Q.   Do you know if both of them were recent as in

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00390

AT001059

84

they just happened?

A.   Yes.  He told me that he did it.

Q.   Do you know if he could have done it the day before?

GRAND JURY MEMBER:  The night before he had done one.

A.   You know, I really can't tell you.  It mean it looked to me, it looked fresh to me.

Q.   Was there anything else on his, mental state that you think is important that we need to know?

A.   I thought his mental state was as normal as me.

Q.   Okay.

GRAND JURY MEMBER:  In your opinion do you think he really meant to do as much damage as he did? Was he just trying to just maybe ---

DR. CHOI:  You know, if you asked him with his criminal pathology, you know, actually stabbing yourself to the chest and causing injury is fairly difficult because you have the ribs.  But even if you really meant to hit hard, if you put it like this way and you can't go in-between.  If you put it this way with a big knife, it won't go in unless you cut the rib and you go through to the heart.

If you have a small steak knife and you 109d it like this and with a relatively hard force, I

1   will go in.   But you can not looking at your chest just

2   blunting hitting it, you may hit the rib because you

3   slide off and you hit the muscle and you go in a little

4   bit.   That is a possibility.

5              If you really meant to do it, if you did

6   it and then you did not cause that much damage, I would

7   stab myself in my belly.   So for him to do like that, you

8   know, this is a personal opinion and my impression.   It

9   is not an expert's opinion.   My impression is that it was

10  a suicide gesture.

11     Q.   A suicide gesture as opposed to an attempt?

12     A.   That is right.

13          MR. BROWN:   Questions?   We know you are

14  busy and we thank you for your time.

15          (Dr. Choi exited the courtroom.   Mr. Ed

16  Fursh came into the grand jury room.)

17          Ed Fursh,

18  having been sworn, testified upon his oath as follows:

19          DIRECT EXAMINATION

20  BY MR. BROWN:

21     Q.   This is the Grayson County Grand Jury.   Would

22  you introduce yourself, please, sir?

23     A.   My name is Ed Fursh.   I am a licensed

24  professional counselor.   I am a licensed marriage and

25  family therapist.   My first interaction with Andre was

1093

# Exhibit 62

# Grand Jury Testimony of Paula Clements

1

REPORTER'S RECORD

------------------------------------------------

GRAND JURY TESTIMONY

------------------------------------------------

On the 22nd day of April, 2004, the following proceedings came on to be heard in the above entitled and numbered cause before the Honorable James R. Fry, Judge Presiding, held in Sherman, Grayson County, Texas.

Proceedings reported by Case Catalyst machine shorthand.

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

AT006921

70

1      A.   No.

2                  GRAND JURY MEMBER:   Are there two exits in

3  the area?

4                  MRS. MCFADDEN:   Ma'am?

5                  GRAND JURY MEMBER:   Are there two exits in

6  the area?

7                  MRS. MCFADDEN:   Yes.   There are just two.

8      Q.   (By Mr. Brown)   Did you ever see after he went

9  back in for treatment?

10     A.   No.

11                 MR. BROWN:   Thank you very much.   You are

12  free to go.

13                 (Mrs. McFadden exited the grand jury room.

14                 MR. BROWN:   Let's take five minutes.

15                 (Recess.   After the recess, grand jury

16  room.)

17                 PAULA CLEMENTS,

18  having been sworn, testified upon her oath as follows:

19                 DIRECT EXAMINATION

20  BY MR. BROWN:

21     Q.   Would you introduce yourself to us, please,

22  ma'am?

23     A.   Paula Clements.

24     Q.   Paula, this is the Grayson County Grand Jury.

25  I am Joe Brown.   We have not met before today; is that

71

1    right?

2        A.    That is true.

3        Q.    Do you understand the grand jury is

4    investigating three charges of capital murder against

5    Andre Thomas?

6        A.    Yes.

7        Q.    This lady is writing down everything we say so

8    you could help me out.  Have you ever had to give your

9    testimony before a court reporter before?

10       A.    This is my first.

11       Q.    Good.  She is writing everything down.  So if

12   you could answer with a yes or a no as opposed to a shake

13   of the head or a uh-huh or huh-huh.  Okay?

14       A.    Okay.

15       Q.    That isn't hard to do.  Some of the people are

16   hard of hearing in here so if you would keep your voice

17   up and help us out?

18       A.    I could do that.

19       Q.    Tell us your background and medical background

20   and lead us up professionally up to March the

21   twenty-seventh of 2004.

22       A.    I graduated from nursing school in 1996.  I

23   worked at Ocona General Hospital for five years after

24   that.

25       Q.    In what capacity?

1  A.   I worked in cardio rehab.

2  Q.   As a RN?

3  A.   Yes.  I came to Wilson N. Jones.  I have been

4  employed there four years.  I worked in cardiac rehab

5  there up until seven months ago when I transferred to the

6  ER.

7  Q.   I have in front of you what I have marked as

8  exhibit two and that is what I will represent are the

9  medical records from Wilson N. Jones.  I have the pages

10  numbered.

11  A.   Okay.

12  Q.   If you would refer to that and help me out with

13  the records if you would refer to them by page numbers?

14  A.   Yes.

15  Q.   And point out what you are talking about so

16  that if somebody is reading it, they will understand it.

17  A.   Okay.

18  Q.   Were you on duty on March the twenty-seventh of

19  2004?

20  A.   Yes.

21  Q.   When is your shift?

22  A.   6:30 to 7:00.

23  Q.   6:30 AM?

24  A.   Yes.  By the time I got there.  It is supposed

25  to be 7:00 and I get there early.

AT006992

73

1      Q.    Did you have an opportunity to come in contact

2  with Andre Thomas that morning?

3      A.    Yes.

4      Q.    My goal is and you are here this morning and I

5  want to ask you as specifically as detailed as you can

6  remember it, all the communications that you had with him

7  and everything that you observed and walk us through it

8  step by step so when we leave here, we will have

9  established the things that you saw or what he said or

10  you said and any type of contact that you had with him.

11  Okay?

12      A.    Okay.

13      Q.    Tell me what your first contact with him was.

14      A.    My first contact was as soon as he walked

15  through the back doors in the ER, I went in and I helped

16  triage him which is basically getting a background of why

17  he is there, what happened.   There were a lot of nurses

18  working on him.

19            I was the one writing everything down.   I

20  was asking him some questions.   The questions entailed

21  his name, his date of birth, any drug allergies and the

22  specifics about why he was there.   He answered these

23  questions appropriately when I asked him.

24            When I asked him what kind of injuries he

25  had, he told me he had stab wounds.   That was

**6999**

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00240

AT006993

74

1    specifically what he said.

2    Q.    When you asked him this, was he on the gurney?

3    A.    Yes.  The ambulance had already transferred him

4    from their gurney and he was in a full spinal package and

5    they had already transferred him from their gurney over

6    to our gurney.

7    Q.    Is there a page in the records that should

8    reflect the questions that you were asking him?

9    A.    It should be this page right here.

10    Q.    Is that page twenty-one?

11    A.    Yes.

12    Q.    Tell us what part of that page that you were

13    responsible for filling out.

14    A.    I was responsible for the chief complaint up

15    here where it says stab wound to chest, where it says

16    three stab wounds.

17    Q.    It looks like two different writings.

18    A.    They were two different writings simply because

19    as I had only been down there for seven months, someone

20    has to come behind me and help me triage.  That is all.

21    That is why there are two different writings there.

22    Q.    Which is your writing?

23    A.    This right here.

24    Q.    The part that says three stab wounds?

25    A.    Uh-huh.  Two one-inch and one one-inch, no

75

1    active bleeding.  Patient states he wanted to kill

2    himself.

3        Q.    So you have a clipboard or something and you

4    are walking and he goes through there and you are asking

5    him which questions?

6        A.    I asked him his name, his date of birth, and

7    then basically I am looking at him to see what kind of

8    injuries he has got.  I am looking at him to see if he is

9    breathing normally.  Does he have an airway?  Who brought

10   him in?  Vital signs?  His weight, his height, and

11   allergies.

12       Q.    Tell me about asking him about allergies.

13       A.    I asked him if he had any drug allergies and he

14   told me no at first and then he said, "I am allergic to

15   some allergy medicine."  So we start asking him what type

16   and then finally he told us he was allergic to Claritin.

17       Q.    Is that one that you suggested or did he just

18   pull that up?

19       A.    He actually---  I said, "There are several."  I

20   said, "Can you be more specific?"  Then I asked him if it

21   was Allegra or any of those?  He said, "No.  It started

22   with a C."

23       Q.    Did he volunteer Claritin?

24       A.    I said, "There are several that start with a C.

25   Is it Claritin or anything?"  He said, "I can't remember

2001

76

1      right now."   Then about five minutes later he said, "I do

2      remember.   It is Claritin, I think."   I asked him was it

3      Claritin and he said, "Yes."

4           Q.   There is a box for last tetanus.   Do you

5      remember what he said about his last tetanus?

6           A.   He said that he could not remember, but it had

7      been more than five years.

8           Q.   There is a box about immunizations.   Do you

9      remember what he said about immunizations?

10          A.   He said he did not know.

11          Q.   What is the next box there?

12          A.   Pregnant and he was not pregnant.

13               GRAND JURY MEMBER:   In this day and time.

14          A.   I was not with him very long.

15          Q.   And you listed his weight and his height as

16     five ten and 145?

17          A.   Uh-huh.

18          Q.   How did you get that information?

19          A.   I just asked him.   I said, "How tall are you?"

20     He told me.   I asked him his weight and he told me it was

21     145.   I said, "Is that a guess or are you pretty sure on

22     that?"   He said, "I am pretty sure it is around 145."

23          Q.   Did that look consistent with his size?

24          A.   Yes, it did.   He was not a very big man.   I

25     remember that much.

00243

AT006996

77

1        Q.    The history and screening, did you do that?

2        A.    Yes.

3        Q.    Tell me what you asked him.

4        A.    We go down and ask any heart problems?  No.

5   Any diabetes?  No.  Any stroke?  No.  We go down that

6   list and ask everything and if there is something

7   significant, then we put a check mark by it.

8        Q.    When you are asking him these questions, how is

9   he responding to you?

10       A.    He answered appropriately but he never really

11  made eye contact with me.

12       Q.    What was he doing with his eyes?

13       A.    He was mostly looking around at everybody

14  working on him.  I mean he was looking at the person

15  putting the blood pressure cuffs on him.  People were

16  looking at his wound.  They were trying to start another

17  IV on him.

18       Q.    Did he make any inappropriate comments or

19  things that seemed delusional?

20       A.    No.

21       Q.    Did he say anything off the wall or strange to

22  you?

23       A.    No, sir.

24       Q.    Did he talk about what had happened before he

25  got there?

7003

78

1      A.    Not a word.

2      Q.    Did he ever say anything about his family?

3      A.    Nothing.

4      Q.    Did he say anything was bothering him?  Did he

5  talk to you talk about anything?

6      A.    Only he was hurting.

7      Q.    Describe that to us.

8      A.    Basically he said, "My chest, it hurts."

9  Occasionally he would put his hand up there.  As I said,

10  this was basically the only contact that I had with him

11  was filling out this form and then I helped put a Foley

12  catheter in him.

13      Q.    Did he say anything or make any comments about

14  that?

15      A.    He wasn't very happy about it.  He was yelling

16  and screaming saying, "I don't want you to do that."

17      Q.    Describe as specifically as you can what he was

18  saying.

19      A.    He was saying, "I don't want this done."  I

20  said, "Well, sir, you have to have it done."

21      Q.    What did you do to cause him to make that

22  statement?  Did you tell him what would happen?

23      A.    Yes.  I told him that we would put a Foley

24  catheter in his bladder for his urine.

25      Q.    None of these people know what a Foley catheter

7004

79

1  is:

2       A.   I told him ---

3       Q.   Not for us, but did you explain it to him?

4       A.   Yes, I told him it would be a tube that went in

5  to his penis and we blow up a little balloon which was in

6  there so we could drain the urine from his bladder

7  because if he had to go to surgery, he had to have a

8  Foley catheter put in.

9       Q.   When you told him that, what was his reaction?

10      A.   Nothing.  He did not say anything after that.

11      Q.   When you told him that you would have to put a

12  tube into his penis, did he have any reaction to that?

13      A.   Once we explained to him why we were doing it,

14  then he did not say anything after that.

15      Q.   When did he say he did not want that done and

16  all of the reactions?

17      A.   When we first told him that we were going to do

18  it.  He said he did not want to have it done until we

19  explained to him why we would do it.

20      Q.   When he said he did not want it done, how was

21  he acting when he said he did not want it to be done?

22      A.   He just said, "I don't want it done."  He kind

23  of stuck his hands down to his private area.  I said,

24  "Sir, you have to have it done."  He was like, "I don't

25  want it done."  So about the time that I started to

7005

80

1    explain to him why he had to have it done, then he moved

2    his hands and he got quiet.

3        Q.    He allowed you to do it?

4        A.    He allowed us to do it.  He was screaming when

5    we put it in but I don't know of too many people who

6    don't.

7        Q.    It is painful?

8        A.    It is painful.

9        Q.    What other contact did you have with him?  Have

10   we touched on everything, on every conversation that you

11   had with him?

12       A.    Yes.  I went back in and I think I helped a

13   nurse maybe thirty minutes later.  I hung a bag of IV

14   fluid on him, an extra bag of IV fluid.  I was probably

15   in there for maybe a total of maybe three minutes to do

16   that.

17       Q.    Did you hear him say anything?

18       A.    I asked him if he was doing okay and he said,

19   "Yes."  I hung the fluid and I left.

20       Q.    What other part of the records would you have

21   filled out?

22       A.    Page twenty-two.

23       Q.    Tell us what that is.

24       A.    This is just a general sheet when they come in.

25   This is our nurse's notes.  Here is the initial assess

81

1    which says he was presented to the ER by EMS.  He had

2    three stab wounds to the right side, two-inch.  He had

3    two two-inch and one one-inch mid-nippleline.  He was

4    alert and oriented.  He was very alert and oriented.

5         Q.   What do you mean by that?

6         A.   Alert and oriented?

7         Q.   Yes.

8         A.   It means he knew his name.  He knew where he

9    was at.  He knew why he was there.  Which means he knew

10   he had stabbed himself in the chest.  He was very

11   appropriate when we asked him questions.  He knew where

12   he was.

13             GRAND JURY MEMBER:   Did he know he was at

14   Wilson N. Jones?

15             MRS. CLEMENTS:  We asked him.  We said,

16   "Do you know which hospital you are at?"  He said,

17   "Wilson N. Jones."  We said, "Where is Wilson N. Jones?"

18   He said, "Sherman."  He knew where he was.

19        Q.   I want to know everything specific like that.

20   I want to know in his conversation everything that he

21   said that was specific.

22        A.   Here is the Foley, you know, I was talking

23   about inserting the Foley.  From there on, I didn't have

24   any other contact with him.

25        Q.   Did you see him after the surgery at all?

7007

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00248

AT007001

82

1      A.   No, sir.

2      Q.   All right.   Can you remember any other contact

3  that you had with him or can you think of any other thing

4  that he said?

5      A.   No, sir.   My contact with him was minimal.

6      Q.   Did he ever make any religious statements?

7      A.   No, sir.

8      Q.   Did he ever make any statements that I would

9  call psychotic that indicated that he was not in touch

10  with reality?

11      A.   No, sir.

12      Q.   He never mentioned anything about any person

13  outside of that room or his family?

14      A.   I never heard him say anything about his

15  family.

16      Q.   Did you know at the time what it turned out

17  that he had done?

18      A.   Uh-huh.

19      Q.   You knew that he was a suspect and you were

20  treating him?

21      A.   Yes.

22      Q.   How did you learn that?

23      A.   There were officers there and I didn't know it

24  until after I saw him and I came back out because I gave

25  him his tetanus shot which we have to give if they are

7008

83

1    not sure when their last tetanus shot was.

2         Q.    Do you remember anything about giving him the

3    tetanus shot or any discussion about it or any

4    conversation?

5         A.    He had to sign a consent for us to do it.

6         Q.    Did you have him sign that?

7         A.    Uh-huh.

8         Q.    Yes?

9         A.    Yes.

10        Q.    Did you go over the terms of that consent with

11   him?

12        A.    The only thing that we tell him is that he has

13   to sign a consent to have a tetanus because a lot of

14   people have a reaction to tetanus.  I can't really

15   remember if we had him sign that or if we did a verbal

16   order?

17        Q.    Is this it?

18        A.    Yes, I did.

19        Q.    This is on page 157?

20        A.    Yes, sir.  I think we did a verbal.  We asked

21   him and he consented.  Verbal order.

22        Q.    Describe how that was done with him.

23        A.    We told him, Mr. Thomas, we will have to give

24   you a Tetanus because you have a stab wound to your

25   chest.  Since you said it has been more than five years

7003

84

1   since you had one, you have to have a Tetanus.  Do you

2   agree to that?  He said, "yes."

3        Q.   Did he seem to understand what a tetanus was?

4        A.   He seemed to understand.  I told him we had to

5   give it in his right or left arm and I gave him a choice

6   and which arm he would like it in?

7        Q.   How did he express his answer?

8        A.   He raised his hand a little bit.  I asked him

9   which arm do you want it in.  He said, "I don't care."  I

10  said, "No.  You have to tell me."  He raised his hand.  I

11  said, "Do you want it in the hand that you raised."  He

12  said, "Yes."

13       Q.   Were you there when he signed a consent for

14  anesthesia?

15       A.   No.  I think Loava was taking care of him that

16  day.

17       Q.   Do you remember any other contact with him or

18  anything else that you participated in?

19       A.   No.  That would be it.

20            MR. BROWN:  Are there any questions from

21  the grand jury?  Okay.  We appreciate you being here.

22            GRAND JURY MEMBER:  Obviously, a lot is

23  going on.  With as many people as you come in that are

24  hurt and obviously, all of their emotions are escalated.

25  But on a scale from one to ten, was he normal for the

7010

JANET M. KAMRAS                          00251
REGISTERED PROFESSIONAL REPORTER

AT007004

85

1   situation as far as being hurt in answering questions?

2                   MRS. CLEMENTS: I think he was very normal

3   in that situation.  He probably acted more appropriate

4   than some of our patients do at times.  So he was very

5   appropriate.

6                   MR. BROWN:  Any there any questions?

7   Thank you, ma'am.

8                   (Mrs. Clements exited the grand jury room.

9   Mr. Wendt came into the grand jury room.)

10                  RUSTY WENDT,

11  having been sworn in, testified upon his oath as follows:

12                  DIRECT EXAMINATION

13  BY MR. BROWN:

14      Q.    Rusty, this is the Grayson County Grand Jury.

15  I am Joe Brown, the County Attorney and we have not

16  spoken before today, have we?

17      A.    No.

18      Q.    Would you give us your full name, please?

19      A.    Russell Hill Wendt.

20      Q.    How are you employed?

21      A.    I am a phlebotomist, RN at Wilson N. Jones.

22      Q.    Have you ever had to give your testimony before

23  a court reporter before?

24      A.    No, sir.

25      Q.    She is writing down everything that you say so

# Exhibit 63

## Mass Spectral Data Screen Worksheet

# MASS SPECTRAL DATA SCREEN WORKSHEET

SEARCH REPORT LIBRARY

LAB CASE # L- 320483

SCREEN _____ ✓_____

SCREEN DATE _____ 5/6/04 _____

TMS _____

AAFS _____

ANALYST _____ EP _____

NIST _____

GBI _____

## NON-REPORTED COMPOUNDS

| IONS | DRUG | DETECTED? |
|------|------|-----------|
| 86 | SKF ISTD | |
| 207, 242 | MEDAZEPAM ISTD | ✓ |
| 386 | CHOLESTEROL | |
| 149, 167 | PHTHALATE | |
| 109, 194 | CAFFEINE | |
| 84, 162 | NICOTINE | |
| 98, 176 | COTININE | |

## ADDITIONAL SPECIFIC SCREENING
### (LIST COMPOUND AND IONS)

⊕ Chlorpheniramine (203, 205)
Indications of Dextromethorphan (150, 271)

Neg Clonazepam, Temazepam, Midazolam, Oxazepam, Chlordiazepoxide, and Desalkylflurazepam

## REPORTED DRUGS
### (SUPPORTED BY SPECTRA)

| IONS | DRUG |
|------|------|
| 144, 114 | MEPROBAMATE |
| 158, 245 | CARISOPRODOL |
| 182, 303 | COCAINE |
| 71, 247 | PETHIDINE |
| 200, 242 | PHENCYCLIDINE |
| 58, 73 | DIPHENHYDRAMINE |
| 72, 165 | METHADONE |
| 110, 217 | PENTAZOCINE |
| 193, 236 | CARBAMAZEPINE |
| 180, 252 | PHENYTOIN |
| 58, 208 | PROPOXYPHENE |
| 44, 220 | NORPROPOXYPHENE |
| 44, 234 | NORPROPOX ( AMIDE) |
| 58, 202, 215 | TRICYCLICS |
| 242,299 | HYDROCODONE |
| 44, 58 | AMINES |
| 205,176 | TRAZODONE |
| 58,263 | TRAMADOL |
| 235,307 | ZOLPIDEM |

MARK + OR - ON THE "DETECTED?" LINE IF A
SPECIFIC ION PLOT WAS PERFORMED
(A BLANK LINE INDICATES NO PLOT MADE)

DPS 0160

DPS0160

DPS CRIME LABORATORY -TOXICOLOGY

Name: L-320483 BLOOD
Misc:
Data File: BNH53.D Injected At: 6 May 2004 9:55

Sample Ions

Blank Ions

Printed: Thu May 06 13:53:56 2004



Library Searched : H:\SCREEN.L
Quality          : 47
ID               : CHLORPHENIRAMINE

5/6/04

EP   L-320483



DPS 0162

DPS0162

```
File       : C:\HPCHEM\1\DATA\BP395.D
Operator   : EP
Acquired   : 23 Apr 2004   9:56    using AcqMethod MBBNHF
Instrument :    TOX_B
Sample Name: CHLORPHENIRAMINE/CARBAMAZEPINE STD
Misc Info  :
Vial Number: 100
```





DPS 0163

DPS0163

DPS CRIME LABORATORY -TOXICOLOGY

Name: L-320483 BLOOD
Misc:
EP
Data File: BNH53.D Injected At: 6 May 2004 9:55

Sample Ions

Blank Ions

Printed: Thu May 06 13:57:56 2004



Library Searched : H:\SCREEN.L
Quality          : 45
ID               : DEXTROMETHORPHAN

EP  L-320483

5/6/04



# Exhibit 64

## Reporting Toxicology (Drug) Analysis

# REPORTING TOXICOLOGY (DRUG) ANALYSIS

## L- 320483

**DRUG SIGNATURE(S):** EP,DAN          **OTHERS WHO WORKED ON CASE:** EJP

**SAMPLE_FROM** THOMAS, ANDRE

**DISPOSITION NOTE:**
Retain                                    **COPY TO:**

| BLOOD DRUGS: | CHLORPHENIRAMINE | DETECTED (NO QUANTITATION PERFORMED) |
|---|---|---|
| URINE DRUGS: | 9-CARBOXY-THC (A MARIHUANA METABOLITE) | DETECTED |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**SPECIAL NOTE:**

SEND BLOOD/URINE EMIT NOTE

NOT TESTING FOR:   THC IN BLOOD

**NON BAC & UAC ALCOHOL ANALYSIS:**

| | | |
|---|---|---|
| BLOOD EMIT SCREEN: | 1 | URINE CONFIRMATIONS:   1 |
| BLOOD  SCREENS (GCMS,ETC): | 2 | OTHER TISSUE  DRUGS DETECTED: |
| BLOOD  CONFIRMATIONS & QUANTS: | 4 | CONTROLLED SUBSTANCE EXAMS: |
| URINE  EMIT SCREEN: | 1 | TOXIC SUBSTANCE EXAMS: |

LOGOUT DATE 6/4/04

HANDWRITTEN INITIALS:

DPS 0137

DPS0137

# Exhibit 65

# Evaluation for Competency to Stand Trial by Peter Oropeza, Psy.D.

# Evaluation for Competency to Stand Trial

**Name:** Andre Lee Thomas

**DOB:** ███████

**Race:** Black

**Age:** 21

**Court:** 15th Judical District Court of Grayson County

**Track #:** 164871

**REFERRAL REASON:** On April 26, 2004, the defendant's attorneys, R.J. Hagood and Bobbie Peterson and assistant county attorney, Kerye Ashmore, agreed that the defendant maybe examined by the State's expert witness, Peter Oropeza, Psy.D., for the purpose of determining competency. The Honorable Judge James R. Fry of the 15th Judicial District Court of Grayson County, Texas, therefore ordered the defendant to submit to an examination for the purposes of determining competency.

Competency to stand trial is defined in regard to whether the defendant has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding and whether the defendant has a rational as well as factual understanding of the proceedings against him.

**PROCEDURES FOR EXAMINATION:**
1. Clinical interview on April 26, 2004 for approximately one hour.
2. Attempted clinical interview on April 28, 2004.
3. Clinical interview on May 7, 2004 for 1-1/2 hours in the morning and again in the afternoon for approximately 50-minutes.
4. Additionally, collateral information was gathered via interviews with the defendant's attorney, R.J. Hagood, the assigned prosecutor, Kerye Ashmore, the chief jail nurse of the Grayson County Jail, Natalie Sims, as well as jail nurse Don Campbell. Information was also obtained from Captain Kelly Stevens, jail administrator.
5. Other documents reviewed included a previous evaluation for competency to stand trial submitted by James R. Harrison, Ph.D., Clinical Psychologist, dated April 15, 2004, psychological interview by C. Robin McGirk, Ph.D., Licensed Psychologist, dated March 30, 2004, March 31, 2004, and April 9, 2004 and April 15, 2004.
6. Also reviewed were jail nurse notes, hospital records, and the incident report.

The defendant was examined on each occasion at the Grayson County Jail. Prior to each meeting he was informed of the purpose for the evaluation and was told that information he reported could be used in future proceedings against him. He was also informed that a report would be submitted to the State's attorney. He verbally acknowledged his understanding of this

DISTRICT COURT OF GRAYSON COUNTY, TEXAS
CERTIFIED COPY

**18357**

02032

information and consented to each interview, with the exception of April 28, 2004. It should further be noted that the defendant's attorney, R.J. Hagood, was a party to the evaluation on April 28, 2004 and on each contact on May 7, 2004.

RELEVANT BACKGROUND INFORMATION:  Information regarding Mr. Thomas' personal history was mostly obtained during the interview on April 26, 2004.  Additional information was obtained via Dr. Harrison's report, as he was able to obtain collateral information from Mr. Andre Thomas's father, Danny Thomas.  Dr. Harrison noted that both individuals were considered poor historians; nevertheless, the reader is referred to Dr. Harrison's report in addition to the information that will be covered in this section.  Likewise, Mr. Thomas was considered an unreliable historian during the interviews for this examination.

Mr. Thomas reported that he was born in Muskogee, Oklahoma and that he was reared in the Grayson County area since preschool.  His parents separated when he was very young, but he reported that he maintained contact with both of his parents during his childhood years.  Mr. Thomas reported that he is the youngest of four sons, and does not have any sisters.  When asked about a family history of mental illness, he reported one of his brothers is "supposed to be paranoid schizophrenia," and is apparently taking medications to address this illness.  Mr. Thomas reported that his family lives in the Sherman area and that he had maintained contact with them prior to his arrest.

Educationally, Mr. Thomas completed the 8th grade and discontinued school in the 9th grade because he had a son.  He reportedly earned his GED soon after he left school.  His grades were "okay" and he denied having learning problems or ever repeating a grade.  He denied ever having disciplinary problems throughout his grade school years.

After discontinuing school, Mr. Thomas reportedly washed dishes at Red Lobster for about a year in 1998, but discontinued because he was tired of management.  He washed dishes again at Denny's in 1999.  He reported that he worked for the City of Sherman in the department of ground maintenance for a period of three years, somewhere between the year 2000 and early 2004.  According to Dr. Harrison's report, Mr. Thomas indicated sustaining short periods of employment since being terminated from the City of Sherman approximately one year from April 2004.  Dr. Harrison noted that Mr. Thomas's father speculated that the reason for the termination was due to Mr. Thomas having lost his driver's license.

Regarding use of substances, Mr. Thomas reported abusing marijuana, alcohol, and Coricidin.  He did not specify the exact amount he was ingesting; however, he indicated that he progressively began to use more marijuana prior to his arrest, at least one-half ounce per week.  He described Coricidin as an over-the-counter high blood pressure medicine that many people in the community were abusing in order to obtain a high.  This substance contains the ingredient dextromethorphan (DXM), which apparently can have psychedelic effects if taken in high dosages.  Mr. Thomas referenced getting a high as being the reason he was abusing this substance.  More information will be provided about his reported use when discussing his living situation prior to his arrest.

Regarding relationship history, he reported being married to Laura Thomas since the age of 18 years old, and that the two of them separated in July of last year.  He stated, "I wish we could have stayed together."  He reported one of the reasons they separated was due to his learning that ___ had sexual relations with his brother and cousin; on the other hand he stated that he was unsure if this was truly the case.  At this point in the interview, Mr. Thomas repeated on a couple of occasions that he missed her.  Laura Thomas is the victim for which Mr. Thomas is alleged to

DISTRICT COURT
OF GRAYSON COUNTY, TEXAS
CERTIFIED COPY

18358

NAME: Andre Lee Thomas                                                      Page 3
Track #: 164871

have murdered. The relationship between the Thomas' produced one child, ███, who was also
murdered on the evening that his mother was killed.

Mr. Thomas denied a significant medical history upon inquiry; however, records indicate that he
produced a self-inflicted stab wound to the chest on March 27, 2004 that produced internal
damage, requiring surgical repair. Moreover, Mr. Thomas pulled out his right eye on April 4,
2004, and this also required emergency medical treatment. At the time of the interview, he wore
bandages and a black patch over his right eye and a noticeable scar was on his chest.

Regarding previous mental health treatment, Mr. Thomas denied ever having received inpatient
hospital treatment for mental reasons; however, he noted that about a month before the charge he
allegedly committed, he attempted to speak with someone and rambled something about having
approximately 20-minutes to go to the hospital. His statement was unclear.
On examination of Dr. Harrison's report, Mr. Thomas had reportedly been evaluated for
psychiatric complaints on at least four occasions, two were performed by MHMR staff at
Grayson County Jail last year, one from the Texoma Medical Center emergency room two days
prior to the murder, and one other contact with MHMR at the Wilson N. Jones emergency room
approximately one week prior to the alleged murder.

When asked about the number of times he had been arrested, he stated, "can't even count." He
denied ever having received time in the Texas Department Corrections or having received
probation. He noted a few incidences in which he was arrested as a juvenile. Mr. Thomas had
been in jail in early 2003 in which he was arrested for stabbing his brother, but was later released
because this was noted to be in self-defense. Dr. Harrison's report noted him to have received
contact with MHMR on two occasions when he was in jail, both of which were in an attempt to
assess possible suicidal ideation. On January 28, 2003 he was noted to be restless with pressured
speech, but agreed to a suicide contract. A second evaluation on February 11, 2003 noted him to
be anxious, with driven speech as well as having an impulsive history; therefore, 15-minute
checks were recommended due to violent thoughts.

Prior to Mr. Thomas's incarceration, he was reportedly living at the Crossroads Trailer Park. He
stated that he lived mostly by himself for the past year at this residence, and that a friend of his,
Clifford, would stay with him at times for the past five or six months. More recently,
approximately one to two months prior to the arrest, he reported living with a woman named
Carmen. Mr. Thomas had been noted in previous evaluations as being unsure as to whether
Carmen was a man or a woman, or a transsexual. When questioned about this during the
interview on April 26, 2004, he noted that at this point he was probably sure that Carmen was a
woman. Mr. Thomas also stated that Carmen introduced him to Coricidin and that the two of
them ingested several pills on a daily basis to obtain a high, up to ten pills at a time. He described
the effects of using this drug as "it brings perspective to the whole world, reality breakthrough
drug." He also stated that Coricidin "shouldn't be legal." He mixed this with alcohol and
marijuana as well.

COLLATERAL INFORMATION: Shortly following his arrest, jail medical staff had concerns
regarding Mr. Thomas' mental state. C. Robin McGirk, Ph.D., evaluated Mr. Thomas on several
occasions and basically noted paranoid and grandiose ideations, tangential speech, and bizarre
content in his thoughts (see Dr. McGirk's report for additional details.). Mood was further
described to range from normal to agitated and irritable. Dr. McGirk's initial diagnostic
impression was a provisional diagnosis of Paranoid Schizophrenia with a Rule Out of Substance
Induced Psychotic Reaction.

**18359**                                                            02084

NAME: Andre Lee Thomas                                           Page 4
Track #: 164871

Nurses Natalie Sims and Don Campbell have also noted Mr. Thomas to be soft spoken and
becoming more tangential with rapid speech the longer he engaged in conversation. This was
particularly evident prior to taking Geodon on April 3, 2004. The medication was added
subsequent to an incident a day prior, in which Mr. Thomas took his hand to his right eye and
dislodged his eyeball from his socket. He had been observed reading the bible just prior to this
incident. On April 26, 2004, Nurse Sims informed me that he was interacting much better and
that the medications had seemed to help stabilize his behavior. On April 27th, 2004, he was
observed placing his hands near his left eye and was again restrained to prevent further harm to
himself. Nurse Campbell informed me on May 7th, 2004 that just a couple days prior Mr. Thomas
was observed in his cell to be tearful for approximately one minute and within five minutes
thereafter was laughing. On May 10th Nurse Campbell phoned and informed me that Mr. Thomas
was refusing to drink and eat, requiring transportation to the hospital for possible dehydration.
He had refused his medications the past two dosage times (current regimen Geodon 160 mg, po,
hs and Depakote 500 mg, po).

James R. Harrison, Ph.D. evaluated Mr. Thomas on four separate occasions between April 5 and
14, 2004, and noted grandiose and paranoid delusions, possible auditory hallucinations, and
disorganized speech and behavior. Dr. Harrison provided a diagnosis of Schizophreniform
Disorder with a Rule out of Substance Induced Psychotic Disorder due to Mr. Thomas recent
history of abusing Coricidin. Dr. Harrison further stated an opinion that Mr. Thomas' mental
state and symptoms of a mental illness precluded him from being able to rationally communicate
with his attorney and he should therefore be considered not competent to stand trial.

CURRENT CLINICAL PRESENTATION: Mr. Thomas presented to the interview as a 21-
year old black male. He was observed in his cell lying in 4-point restraints on a jail cot with two
officers watching him. The reason for these restraints was due to Mr. Thomas's self-inflicted
injuries. Throughout the different evaluations, jail officers were within visual contact with the
door to the interview room slightly ajar.

A more detailed description of his presentation will follow; however, in summary Mr. Thomas'
did not appear similarly on the different days he was evaluated. Prior to the first interview, I
observed him in his cell mumbling to himself. He ranged from verbally responsive, to
uncooperative, to writing his answers, laughing awkwardly and drawing, to appearing solemn.
His ability to concentrate and attend to the conversation tended to fluctuate as well, with his best
showing being on the first interview. No formal psychological testing was done, nor was
screening measures of cognition completed; however, he was able to approximate the day and
time of the month, understood the purpose of the evaluations, and knew that he was in the
Grayson County Jail in Sherman, Tx. His use of vocabulary was fair to good, and seemed to be at
least of average intelligence. Also, he denied thoughts or intent of self-harm on at least a couple
of occasions.

*Interview on April 26, 2004:* Mr. Thomas displayed slight growing of his beard and he had
indicated not having shaved for the past month. He wore white bandages covered by a black
patch over his right eye. He hands and ankles were cuffed. The interview took place in a
separate room so he was allowed to sit in a chair while restrained in cuffs. He presented as an
average in height, slender, almost frail individual who generally avoided eye contact or would put
his head down on the table. As noted previously, he had a noticeable vertical scar on his chest
and generally sat stooped in his chair without much purposeful movement during the interview.
When asked about his physical presentation, he reported that he felt tired, but denied feeling sick.
He was superficially cooperative in that he answered questions posed to him, but at times
mumbled his words and required repeating. The rate of his speech was slow, and he spoke softly;

**18360**

DISTRICT CO... OF GRAYSON COUNTY, TEXAS   CERTIFIED COPY

02035

AT018391

NAME: Andre Lee Thomas                                                Page 5
Track #: 164871

however, he was generally responsive to questions posed, and answered coherently and logically. His affect was constricted and dysphoric, and when asked his current emotional state, he stated "feeling okay, keeping my eyes on God."

*Attempted interview April 28, 2004:* I attempted a follow-up interview, and R.J. Hagood, defense attorney, was also present. Jail staff escorted Mr. Thomas to an interview room where Mr. Hagood and I were seated awaiting his entry. Mr. Thomas sat in his chair and immediately indicated to Mr. Hagood that he did not wish to talk with us. Mr. Hagood informed Mr. Thomas of the purpose of the evaluation; however, Mr. Thomas refused to participate, and stood up and exited the interview room and was escorted by officers back to his cell.

Mr. Hagood reapproached Mr. Thomas in his cell attempting to persuade him to participate in the interview. Mr. Thomas continued to indicate that he did not wish to speak and made reference that talking would get him in trouble. It was interesting to note that a couple of days following, approximately April 30, 2004, Mr. Thomas indicated to his other attorney, Bobbie Peterson, that he apologized and wished to participate in an interview.

*Morning Interview, May 7, 2004 :* On the morning of May 7, 2004, I interviewed Mr. Thomas for approximately 1-1/2 hours in a separate interview room in the presence of R. J. Hagood. He had limited eye contact, and generally sat stooped in his chair. The rate of his speech was slow and hesitant, and he mumbled his words, at times requiring repeating to understand. He informed me "last time, because I didn't know what to say, yes I felt uncomfortable" regarding the reason for not wanting to participate in the April 28th evaluation. He stated there to be no difference in his feelings about meeting today; however, approximately 20 or 30 minutes into the interview, he became virtually verbally non-responsive, and would occasionally nod to close-ended questions, or provide brief responses.

Interestingly, Mr. Thomas requested a pen and paper about a half-hour into the interview on the morning of May the 7th so that he could write answers rather than speak. He identified his mouth getting him in trouble as the reason for not wanting to speak. His attorney indicated this to be the first instance this behavior was demonstrated, and jail staff had also not seen this type of behavior. Mr. Thomas' request was granted and he wrote his answers to questions for the rest of the evaluation; though, he spoke on a couple of occasions in short sentences.

When asked questions regarding his mental state, he denied experiencing perceptual disturbances such as auditory or visual hallucinations as well as bizarre thinking; however, he indicated thinking jailers were laughing at him and that his voice would get him in trouble. He also noted believing, for the past two-three months, that other people were out to get him. When asked if he felt other people could place thoughts in his head he wrote that aliens could possibly "mind control" or use "telepathy." He was unable to explain what he meant by aliens, but pointed to his attorney and me as alien, then stated that anyone who is not black could be alien, and then later stated "we are all alien to each other." He was vague about mind control and stated, "may be they have so many mediums to work in." He also stated that he was very fearful for his freedom.

Feelings of depression were noted, as Mr. Thomas indicated that he felt sad because of "everything that has happened to me," and feeling that "people [are] laughing at me." He identified "girls that I've done wrong, mean things I've said to people," getting into a fight with his brother, and missing his wife and son as other reasons for feeling depressed.

*Afternoon Interviews, May 7th, 2004:* Mr. Thomas was seen on this afternoon on a couple of occasions, for approximately one-half hour, followed by about a ten minute break, and then again

**18361**

DISTRICT COURT, OF GRAYSON COUNTY, TEXAS
CERTIFIED COPY

02086

NAME: Andre Lee Thomas                                                    Page 6
Track #: 164871

for approximately twenty minutes. His attorney, R.J. Hagood, was again present for these interviews. During the first meeting, Mr. Thomas began by drawing a female picture with wings and made physical gestures of being beat up by this person, whom he identified as his girlfriend, because "I talk way too much." His writings about this girlfriend were difficult to follow and he rambled a bit about being in trouble, feeling stressed, and having dreams about different girls. He was vague.

Affect was broad and labile, and he physically moved back and forth in his chair with many hand and arm gestures. He smiled and laughed inappropriately, and it was difficult to ascertain if he understood that his behavior, writings, and drawings were bizarre and psychotic in nature, versus an attempt to press an agenda and appear mentally ill. Considering the seriousness of his legal situation, and the inconsistent nature of his appearance (laughing, drawing a female figure, vaguely referencing aliens and mind control, and feeling that people were laughing at him) during this segment of the evaluation, the issue of feigning or exaggerating symptoms of a mental illness was a notable concern. On the other hand, his writings involved a theme of biblical references and being called the devil as well as reflected a disjointed sentence structure that was nearly impossible to comprehend. When I told him that other people would have difficulty believing the nature of him being in trouble by an unnamed girlfriend with wings, he wrote, "I would agree."

Following a break, the evaluation continued for another twenty minutes. During this meeting, Mr. Thomas demonstrated limited eye contact, had labored, heavy breathing, and wrote comments reflecting being stressed, his mouth getting him trouble, and "there's no telling how much I've broken her heart already." He went on to write, "If I ever said I loved her than she knows I'm going to come out shining like the sun." He appeared emotional and possibly distraught, and when asked about his current emotional state, he wrote feeling "like the sorriest son of a bitch." At the end of this meeting he wrote "I believe her name is Maranda," directing this to the drawing about a girl with wings who was to beat him up if he kept speaking. The interview was discontinued due to him appearing to become possibly becoming erratic in his behavior (e.g. heavy breathing, softly thumping his hands on the wall, not laughing or smiling).

Mr. Thomas was then escorted back to his jail cell, and officers noted him to be thumping his forehead against the wall and not replying to directives to stop this behavior. I observed him to be hunched over and swaying his head and back, as if possibly becoming tearful. Due to concern of him harming himself once again, he was placed in four point restraints.

CURRENT COMPETENCY ASSESSMENT: Mr. Thomas' mental state was assessed for this evaluation in order to render an opinion regarding his ability to stand trial. The following areas are considered.

*1. Rationally understand the charges and the potential consequences of pending criminal proceedings.* On the morning of May 7th, 2004, Mr. Thomas demonstrated a verbal understanding that he knew his charge to be three counts of Capital Murder. He reported, "I could get the death penalty or I could spend the rest of my life in prison." Overall, he is considered to have a rational understanding in this area.

*2. Disclose to counsel pertinent facts, events, and states of mind.* Mr. Thomas demonstrated some ability to relate important information about his history as well as his past mental states of mind. On 04/26/04, he engaged in a conversation for nearly an hour, and no significant disturbance in thought processes or bizarre ideation was noted. Indeed, when asked about the reason he plucked his right eye out he stated, "I misinterpreted the bible." On subsequent interviews, Mr. Thomas demonstrated difficulty in relaying his thoughts even though he was able

**18362**

02087

DISTRICT COURT
OF GRAYSON COUNTY, TEXAS
CERTIFIED COPY

NAME: Andre Lee Thomas                                                    Page 7
Track #: 164871

to write down accurate responses to questions about the role of the jury, judge, and defense
attorney. He either chose not to or was unable to engage in a conversation, opting instead to write
down his responses. His written notations were difficult to follow at times and his emotional
state wavered among distressed to irritable to laughing. There remains the possibility that his
wavering presentation was a volitional attempt to not readily cooperate; however, given the
totality of his presentation during the time he has spent in his jail cell and observations made by
other professionals, it is reasonable to conclude that there is presently disturbance of thought.

3. *Engage in reasoned choice of legal strategies and options.* Mr. Thomas wrote down accurate
replies to questions about different pleas he may enter in court. He understood guilty "is when
the prove I did it" and "not guilty is when they can't prove I did it." He defined no contest as
"neither guilty nor innocent," and not guilty by reason of insanity as "it means I was crazy at the
time of the murders." The question in this area is the degree to which Mr. Thomas is able to
reasonably choose legal strategies and assist his attorney. At this point, Mr. Thomas' emotional
stability remains a concern, and his ability to focus and engage in a coherent conversation about
his legal situation appears compromised.

4. *Understand the adversarial nature of criminal proceedings.* As mentioned previously, Mr.
Thomas understood the roles of the judge (compared this to a referee), the jury ("people who
come together to make a decision on me the person being charged whether I'm guilty or not."),
and the defense attorney ("to plead my case"). He described the role of the prosecutor as "argue
with exalibur, Excalibur, double edge sword of truth," which made little sense and he did not
provide further explanation when questioned. Mr. Thomas displays a rudimentary and factual
understanding of the criminal proceedings being adversarial in nature.

5. *Exhibit appropriate behavior.* This area remains questionable. Mr. Thomas has plucked his
own eyeball out, attempted to stab himself in his chest just prior to being arrested, and has
behaved awkwardly across different evaluations. He vacillated in his presentation and began
writing his responses and also drew a picture of a female with wings whom he said would beat
him up if he continued to talk. He was vague at times and difficult to follow in his speech.
Again, some of this behavior may have been a volitional attempt to control the interview and
press an agenda and simply not cooperate. On the other hand, given the seriousness of his self-
harm behavior as well as bizarre presentation, his ability to demonstrate appropriate behavior
appears limited at present.

6. *Testify.* Again, this area remains questionable based upon the same explanation provided
above. His speech is difficult to follow at times and he also makes non-sensical remarks.

SUMMARY AND RECOMMENDATIONS: Mr. Thomas does not appear to be a person with
Mental Retardation. His use of vocabulary and history suggests that he is of average intelligence.

Regarding mental illness, there is information to suggest that he has had mood symptoms in the
past and has expressed suicidal ideation dating back to early 2003. Further complicating his
current presentation is his recent heavy ingestion of Coricidin, which he explains taking this in
combination with marijuana and alcohol. Other evaluators have provided a diagnosis along the
Schizophrenic spectrum along with a rule out of a substance induced psychotic disorder. My
opinion is similar. Additional information regarding his previous mental functioning and
subsequent deterioration following ingestion of substances will be helpful in clarifying his current
condition. Moreover, there is previous legal involvement, and if he is pressing an agenda by
exaggerating symptoms, then there may be underlying character issues.

02088

**18363**

NAME: Andre Lee Thomas                                        Page 8
Track #: 164871

Altogether, present symptoms include disorganized speech, erratic and bizarre behavior, mood problems and depression, possible continued delusional ideation (e.g. aliens, picture of winged girlfriend who may beat him up, thoughts that jailers are laughing at him), and possible auditory hallucinations. These symptoms appear to be of enough severity so as to impair his ability to converse for lengthy periods in a manner that is comprehensible. Nursing staff note that his behavior has improved since the addition of psychiatric medications; however, he has shown digression in his presentation once again. Interestingly, Mr. Thomas indicated feeling that he is currently competent and able to stand trial; however, I am of the opinion that at present he appears Incompetent to Stand Trial, based on his current mental state.

I recommend that he be transferred to a secure inpatient facility in order to receive more intensive psychiatric treatment and ongoing evaluation. Mr. Thomas has benefited from psychiatric medications thus far, and it is likely in a more therapeutic environment he will improve and attain competency in the near future. Moreover, if Mr. Thomas is presently feigning or exaggerating symptoms in order to delay proceedings, then the professional staff at such a facility can offer a more detailed explanation given their training and ability to monitor his behavior continuously. If his current condition is the result of ingesting substances, then his symptoms may remit soon, particularly with continued intensive interventions.

This evaluation was ordered to render an opinion regarding competency to stand trial, and I recognize that in offering opinions the ultimate decision is decided by a judge and/or jury.

Peter Oropeza, Psy.D.
Licensed Psychologist

A CERTIFIED COPY
ATTEST: 6-18-09
CYNDI MATHIS SPENCER, DIST. CLERK
GRAYSON COUNTY, TEXAS
BY: _____ DEPUTY
    Jana Caylor

18364                                        02039

AT018395

# Exhibit 66

# Admission Evaluation Report for North Texas State Hospital, Vernon Campus

BM
F07164

06-23-04

PROGRAM:   SPRUCE

BHIS: 196949

To be completed initially upon admission or denial.  Updates are to be done as pertinent new information is gathered and as necessary, including to justify change of Axis I or Axis II diagnoses.
#Expanded assessment from items 4c/d/e/f on attached BPRS 3-1.2
*Expanded assessment from items 4g/h/I on attached MMSE 3-1.1

| FORMAT | 4. | MENTAL STATUS | 5. | STRENGTHS & LIABILITIES. |
|---|---|---|---|---|

**FORMAT**
1. CHIEF COMPLAINT
2. HX. OF PRESENT ILLNESS
3. PAST HISTORY

a. Psychiatric/Substance Abuse
b. Medical
c. Family psychiatric history
d. Current medications/allergies
e. Social/Legal Status

**4. MENTAL STATUS**
a. Appearance/behavior/level of consciousness
b. Speech/communication
#c. Affect
#d. Mood
#e. Thought Process
#f. Thought Content (include suicidal/homicidal, thoughts, delusions, hallucinations)
*g. Orientation
*h. Memory (immediate, recent/ remote)
i. Cognition/concentration
j. Intellectual functioning/abstraction
k. Insight and Judgement

**5. STRENGTHS & LIABILITIES.**

**6. PRESUMPTIVE DIAGNOSES**
AXIS I
AXIS II
AXIS III

7. FORMULATION/ RECOMMENDATIONS
8. DISPOSITION
9. SIGNATURE, DATE & TIME

---

EVALUATION TYPE:   Admission/Screening   X        Update

IDENTIFICATION:   Age   21        Sex   M        Race   B        Marital Status _____

SEEKING:        Voluntary        Emergency Detention        Court Commitment   X

HAS THIS PATIENT BEEN SCREENED RECOMMENDING ADMISSION BY:        A Community Center?
A Hospital Outpatient Program?
A Private Physician?

---

DATE OF EVALUATION: 06-23-04

DATE OF DICTATION: 06-23-04 @ 1335

INFORMANTS:  The patient appeared to be a poor historian.

Sources of information for this report include the patient's own statements, my clinical observations, the clinical observations of other staff members and limited collateral records.  The collateral records available for this evaluation include but are not limited to copies of the listed informants.

1. ~~Preliminary Social Assessment from the Admissions Department of North Texas State Hospital-Vernon Maximum Security Unit.~~
2. Sherman Police Department incident report for incident #0402024.
3. True Bill of Indictment for Cause #51483.
4. Competency to Stand Trial evaluation report by James R. Harrison, Ph.D., dated 04-15-04.
5. Evaluation of Competency to Stand Trial report by Peter Oropeza, Psy.D., dated 04-26-04.
6. Transcript of Hearing about Competency for Trial Court Cause #51483, in the 15th District Court of Grayson County, Texas, on 06-16-04.
7. Amended Order of Criminal Commitment Because of Incompetency for Cause #50391.
8. North Texas State Hospital - Vernon Maximum Security Unit questionnaire (undated).
9. Amended Order of Criminal Commitment Because of Incompetency for Cause #51483, which indicates that Mr. Thomas has been found Incompetent to Stand Trial for another charge of Capital Murder.

This evaluation was conducted without the aid of FBI records, other prior medical records, or other police reports.

MEDICATIONS:  The North Texas State Hospital - Vernon Maximum Security Unit questionnaire indicated that at the time of his transport to this facility the patient had been prescribed the following medications:

1. Geodon 160 mg po qhs
2. Depakote 500 mg po qAM
3. Ibuprofen 600 mg po q 4-6 hrs prn

01727

REVISED 8/96        8390

MHRS 3-1
(blank)

**Dated:** 06-23-04

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

BM

06-23-04                                                 F07164
PROGRAM:   SPRUCE
BHIS: 196949

In response to the question "Does inmate refuse medicine, and if so, how often?", the response on the questionnaire was "to two weeks."

CHIEF COMPLAINT: This 21 year old, widowed black male from Sherman, Texas, was admitted to North Texas State Hospital - Vernon Maximum Security Unit on 06-23-04, pursuant to Article 46B.073of the Code of Criminal Procedure after having been found incompetent to stand trial for charge of Capital Murder, out of the 15th District Court of Grayson County, Texas.

The patient was committed to this facility for the specific purpose of treatment toward the goal of gaining competency to stand trial.

The patient's primary language is English, and an interpreter was not needed.

I informed the patient of the purpose of this evaluation, of the purpose of this hospitalization, of the limited degree of confidentiality at this facility, of a report being prepared for the court, his attorney and the prosecuting attorney, and of the possibility that I may be required to testify at a hearing. The patient indicated that he understood my explanations.

The patient was interviewed in the presence of security staff.

When the patient was asked what events brought him to this facility, he responded, "They're trying to dope me up."

HISTORY OF PRESENT ILLNESS: The Sherman Police Department incident report for incident #0402024 provided the following information:

   **"Offense Narrative: 03-27-04, 10:24, Dawsey 132 164:**

   "On 03-27-04 at approximately 0723 hours, I was in the briefing room at the Sherman Police Department when Sgt. Mullins received a call from dispatch in regards to a possible triple homicide located at 1200 West Taylor, Apt. #340. Sgt. Mullins directed myself, Officer Miller and Officer Ferguson to the scene. We arrived at the location at approximately 0725 hours. I arrived with Sgt. Mullins at the location. We went immediately to the apartment, which was #340. Upon walking up to the front door of the apartment, I observed that the door was not completely closed and appeared to have been forced open and the door frame appeared to be cracked. Sgt. Mullins pushed open the door and announced that we were the Sherman Police Department. We made entry into the apartment to check for victims and/or suspect in what is known as a protective sweep. Upon entering the apartment I observed a white female lying on her back near the breakfast area at the front of the hallway. The white female, later identified as Laura Christen Thomas, was nude with a large open chest wound in her chest area. I maintained my position there covering the kitchen area and hallway and Sgt. Mullins checked the back bedrooms of the apartment.

   "Sgt. Mullins notified me that the back area of the apartment was clear and that two other victims were located in the bedrooms off of the hallway. Upon completing the protective sweep, myself and Sgt. Mullins exited the apartment and secured the area with crime scene tape to ensure that no one disturbed the crime scene area. After securing the area with crime scene tape, I began a crime scene log at the direction of Sgt. Mullins, on a piece of notebook paper. After receiving an official crime scene log, the information was transferred from notebook paper to the actual crime scene log.

01728

D: 06-23-04/JB    T: 06-25-04/ce Steno
R: 06-24-04 @ 7:05 AM by mail

Signature, Date, and Time   Joseph Black, M.D.
                            Chief Psychiatrist, Comp. Prog.

**8391**       Core Form: ☐ Yes   ☐ No          Continuation of MHRS  3-1

AT008390

Dated: _____06-23-04_____                                          BM

To be completed whenever a standard MHRS form does not provide     06-23-04          F07164
adequate space for the required data.                              PROGRAM:   SPRUCE
                                                                   BHIS: 196949

"I was relieved from my duties of keeping up with the crime scene log by Reserve Officer Tony Leone at approximately 0959 hours.

"The notebook on which I had originally started the crime scene log was turned over to Officer Log to be tagged with the official crime scene log.

"While I was conducting the integrity of the crime scene by keeping up with the crime scene log, Officer Ferguson began canvassing the nearby apartments and speaking with residents, obtaining their names and phone numbers. Paul Bornan, who was the reporting party and the father of victim Laura Thomas, was still at the apartment complex and spoke with Officer Miller."

Also included in the report was the following information by Officer F. Guedea, #145:

"On 03-27-04 at 0724 hours, I, Officer F. Guedea, #145, was dispatched to 1200 W. Taylor, apt. 340 in building #10. Myself, Sgt. Mullins, Officer Ferguson, and Officer Dawsey arrived at about 0726 hours.

"We went upstairs and approached apartment #340. Officer Ferguson was already inside, as well as Sgt. Mullins. I did not observe where Officer Dawsey was; however, I did step into the doorway and observed a white female subject lying on the floor nude and had large amounts of blood that appeared to be coming from the chest and upper torso area.

"Sgt. Mullins and the other officers had already cleared the apartment. Sgt. Mullins then had officers step out from the doorway, closed the door partially, and immediately started to cordon off the crime scene area. Sgt. Mullins gave us the area that he wanted cordoned off. Officer Dawsey had already cordoned off some of the area and I also cordoned off several areas behind the apartment building #10 as well as in the front lower level of the apartment.

"Other officers started arriving on the scene, as well as investigators. Myself and Officer Ferguson then started interviewing in the immediate building and buildings surrounding the crime scene. I went to building #4 and interviewed the residents which were at home.

"I first started at apartment #124 and made contact with Roberta K. Gray, WF, who stated that she had heard nothing at all, or anything unusual. I spoke with her at 0810 hours.

"I then went to apartment #224 and made contact with a couple, Melvin Cecil Bowen, BM, who stated that he had been asleep all night and heard nothing. I then spoke with his girlfriend, Danielle Minor, WF, who stated that she was up at about 0400 hours this morning; however, she heard nothing unusual in the apartment building across from her.

"I then knocked on apartment 123 at 0827 hours and made contact with Sandra Stewart, WF, who stated she had heard nothing at all, and stated she lives there with her brother, David Stewart.

"At 0829 hours I knocked on door 121 and made contact with Allen Valentine, WM. Allen stated that he sees large volumes of traffic going into the apartment #340 at all hours of the day. He stated that there is always a black male subject there, who appeared to live there but would be in and out quite often. He stated he did see a white female there who had a couple of small children, but he believes that there was drug activity taking place in that residence."

01729

D: 06-23-04/JB     T: 06-25-04/cc Steno          Signature, Date, and Time   Joseph Black, M.D.
R: 06-24-04 @ 7:05 AM by mail                                                Chief Psychiatrist, Comp. Prog.

Page 3 of 9                    8392              Core Form: ☐ Yes  ☐ No      Continuation of MHRS   3-1

**Dated:** _06-23-04_

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

BM

06-23-04                    F07164

PROGRAM:   SPRUCE

BHIS: 196949

Officer Guedea also had the following narrative:

"On 03-27-04 at 10:55 hours, I, Officer F. Guedea, 145, arrived at 500 N. Highland.  I arrived here to stand by with Officer Mark Miller, #114, who was watching the suspect, Andre Thomas, BM. Thomas was handcuffed to a hospital bed and was being monitored by medical staff who were coming in and out of the treatment room.  The doctor in charge of treating Thomas at this time was Dr. Scott Choi.

"Nursing staff then told myself and Officer Miller that Thomas was going to have to get a CT done, at which time they did take him to the x-ray examining area as myself and Officer Miller followed.  After the CT staff viewed the images, they stated that there appeared to be no deep penetration from the stab wounds that were self-inflicted by Thomas.

"Shortly after that, Thomas was transported back to the examination room in the ER.  It was within a few minutes that the nursing staff started to call the doctor into the room and started working what appeared to be frantically on Thomas.  Shortly after, a physician from Texoma Medical Surgery, who was a heart specialist named Dr. Wilcott, arrived at the ER.  It was later learned that Thomas apparently may have caused a hole area in his heart and that the nursing staff stated he was losing blood.  At one point one nurse said she had to give him blood.

"Soon after that, Thomas was prepped for surgery and he was then rushed upstairs to the operating room.  Myself and Officer Miller did dress in the proper sterile attire and escorted Thomas into the operating room where we stood by as doctors worked on him.  Dr. Wilcott then opened Thomas' chest cavity up and examined the inside around the heart, and stated that there was some bleeding. However, I do not know the area that was bleeding.

"Afterwards, I was called by Sgt. Mullins to exit the operating room and clear the hospital due to the full call that we had at this time.  I did clear the hospital room.  Officer Miller remained with Thomas, who was sedated at this time and Officer Miller related to me that it would take Thomas six weeks to recover; however, he would be able to go home after about four days.

"As I was exiting the emergency room I was stopped by a nursing who was also attending Thomas. The nurse's name was Loava McCarthy.  She is an RN in the ER.  Loava related to me at 1527 hours that when Thomas first came in she asked how did he receive the stab wounds and he responded to her that he did them himself.  She asked him why he stabbed himself and he stated that he wanted to die.  She again asked him 'Why do you want to die' and Thomas told her 'Because I stabbed three people.'"

The True Bill of Indictment for Cause #51483 indicated that Andre Lee Thomas was indicted for having done the following:

"Count One:  Intentionally or knowingly cause the death of an individual, namely Laura Christen Thomas, by stabbing or cutting her with a knife and did then and there intentionally or knowingly cause the death of another individual, namely ████████████ by stabbing or cutting him with a knife and both murders were committed during the same criminal transaction.

01730

D: 06-23-04/JB     T: 06-25-04/ce Steno
R: 06-24-04 @ 7:05 AM by mail

Signature, Date, and Time   Joseph Black, M.D.
                            Chief Psychiatrist, Comp. Prog.

8393 Core Form:  ☐ Yes   ☐ No        Continuation of MHRS   _3-1_

AT008392

Dated: _06-23-04_                                                                          BM

06-23-04                                                                                   F07164

To be completed whenever a standard MHRS form does not provide      PROGRAM:   SPRUCE
adequate space for the required data.                              BHIS: 196949

"County Two:  Intentionally or knowingly cause the death of an individual, namely ████████ but cutting or stabbing him with a knife and that the said ████████ was then and there an individual younger than six years of age."

The competency to stand trial evaluation report by James R. Harrison, Ph.D., dated 04-15-04, indicated that Dr. Harrison had interviewed and observed the defendant on 04-05-04, 04-07-04, 04-12-04, and 04-14-04.  Dr. Harrison indicated that he also had interview's with the defendant's attorney, R.J. Haygood; the assigned prosecutor, Kerry Ashmore; the Grayson County Chief Nurse, Natalie Sims; and the defendant's father, Danny Thomas.  Dr. Harris also indicated that he reviewed the records of the Medical Staff at Grayson County Jail, including the interview notes of the jail psychologist, Dr. Ruben McGirk.  Dr. Harris reviewed the day-by-day notes of Mr. Thomas' incarceration, including the patient reporting that he had cameras behind his eyelids and that others knew his thoughts.  Dr. Harris indicated that on the fifth day of incarceration, Mr. Thomas plucked his right eye from the socket after reading the Bible verse Matthew 5:29.  Dr. Harris indicated that previous recommendations for pharmacological treatment had been refused by both the defendant and his attorney.  Dr. Harris indicated that after the defendant had enucleated his right eye, he was given jail antipsychotic medications in the form of Geodon, with doses up to 160 mg per day.  Dr. Harris reported, "Mr. Thomas appeared to have responded quickly to the medicine in terms of his level of agitation but he continues to show delusional thinking and disorganization in his thought processes."

Dr. Harris reported that the defendant's thinking was impaired by psychotic process, with evidences of both grandiose and paranoid delusions, strong ideas of reference, and loose associations, tangentiality and derailment.  Dr. Harris recommended that Mr. Thomas be found incompetent to stand trial.  Dr. Harris diagnosed Mr. Thomas' condition as Schizophreniform Disorder; Rule Out Substance Induced Psychotic Disorder.

The evaluation for competency to stand trial by Peter Oropeza, Psy.D., indicated that Dr. Oropeza evaluated the defendant on 04-26-04, 04-28-04, and 05-07-04.  Dr. Oropeza indicated that on the last day the inconsistent nature of his appearance and behavior, that the issue of finding or exaggerating symptoms of a mental illness was of "notable concern."  Dr. Oropeza reported that the defendant appeared to have a rational understanding of the charges and the potential consequences, but that he had difficulty expressing his thoughts.  Dr. Oropeza recommended that he be considered to be incompetent to stand trial, but thought that he could be evaluated for possible feigning or exaggerating symptoms at an inpatient facility.

The Transcript of the Hearing About Competency for Cause #51484 in the 15th District Court of Grayson County, Texas, on 06-16-04, indicated that the reports of Dr. Harrison and Dr. Oropeza were submitted into evidence.

The Amended Order of Criminal Commitment because of Incompetency for Cause #50391 in the 15th District Court of Grayson County, Texas, indicated that Mr. Thomas was found incompetent to stand trial and was committed to North Texas State Hospital - Vernon Maximum Security Unit for a period not to exceed 120 days for the purpose of restoration of competency to stand trial.

The Amended Order of Criminal Commitment Because of Incompetency for Cause #51483, indicates that Mr. Thomas has been found Incompetent to Stand Trial for another charge of Capital Murder.

When the patient was asked what events brought him to this facility, he responded, "They're trying to dope me up."  The patient appeared to be lethargic or sedated.  He stated that he had difficulty keeping his left eye open.  He stated that he wanted to go to sleep.  He frequently lowered his head and spoke in a low voice that was difficult to understand.  He continued to lower his head and talk in inaudible volumes even after repeated requests for him to raise his head and to talk louder.

01731

D: 06-23-04/JB   T: 06-25-04/ce Steno          Signature, Date, and Time   Joseph Black, M.D.
R: 06-24-04 @ 7:05 AM by mail                                              Chief Psychiatrist, Comp. Prog.

AT008393

**Continuation Form**

Dated:  06-23-04

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

06-23-04                                                          ‡BM

PROGRAM:     SPRUCE                                    F07164

BHIS: 196949

He stated that he had no desire to harm himself or to remove his left eye. He denied having a desire to harm others. He reported that he had "bad dreams of scorpions and tarantulas trying to eat me but I will not let them." He denied auditory and visual hallucinations at this time. He answered most questions with "I don't know". He then stated, "I've already told them" and then refused to provide further information.

PAST PSYCHIATRIC HISTORY:

FAMILY PSYCHIATRIC HISTORY:  Unknown.

NONPSYCHIATRIC MEDICAL HISTORY:  When asked if the patient had medical problems, he responded, "I don't know"; however, I think that we can check and see that the patient had a self-inflicted stab wound of the chest 03-27-04, which required a thoracotomy and surgical repair. He had also had another stab wound of the chest a day or two earlier, which apparently did not penetrate the chest cavity.

He also enucleated his right eye on 04-02-04 and surgical repair of the injury was accomplished.

SUBSTANCE ABUSE HISTORY:  The patient refused to provide information. The information provided by Dr. Harris and Dr. Oropeza indicated that the patient had substantially abused alcohol and marijuana and over-the-counter medications such as Coricidin.  Statements in the police report indicate that prior to the events for which the patient was arrested, he had taken large quantities of over-the-counter cold medicine, possibly Coricidin, and used alcohol in significant quantities.

SOCIAL/LEGAL STATUS:  The records of Dr. Harris and Dr. Oropeza indicated that the patient's father reported that he had been raised in a loving home and that he had done well early in life.  The report indicated that he attended school through the ninth grade and then dropped out but later got a GED.  The information reported that he worked for three years for the City of Sherman maintenance department but was fired about one year ago and has had only spotty employment since that time.

The patient's father reported that Andre Thomas had lived with Laura Thomas from age 16 years until he married her at age 18 years.  They apparently had one child, ▮▮▮▮▮, who was about five years old, who was murdered at the same time as his mother.

Statements from involved individuals in the police report indicated that the patient was living with another woman at the time of the events for which he was arrested.

The patient admitted that he had had multiple arrests as a juvenile, but he refused to provide further information.

The patient is presently committed to North Texas State Hospital - Vernon Maximum Security Unit pursuant to Article 46B.073 of the Code of Criminal Procedure after having been found incompetent to stand trial for the charge of Capital Murder, out of the 15th District Court of Grayson County, Texas.

HISTORY OF SUICIDAL IDEATION/ATTEMPT:  Dr. Harris's report indicated that either the patient or his father reported that he had had many suicide attempts as a child or adolescent and had cut his wrist at age 10 and age 15.

MENTAL STATUS:  The patient appeared to be a short, slender, 21 year old, black male, dressed in an orange jail jumpsuit.  His right eyelid remained closed and his left eyelid was frequently closed during the interview.  The patient frequently lowered his head and talked in essentially inaudible tones, even after multiple requests to raise his head and to talk louder.  The rate of his speech was within normal limits.  His hair was cut short and he had a few days growth of

D: 06-23-04/JB      T: 06-25-04/ce Steno
R: 06-24-04 @ 7:05 AM by mail

**8395**

Page 6 of 9                          Core Form:  ☐ Yes  ☐ No

Signature, Date, and Time   Joseph Black, M.D.
                            Chief Psychiatrist, Comp. Prog.

Continuation of MHRS   3-1
                        01732

AT008394

**Continuation Form**

**Dated:** 06-23-04 _____

THOMAS, ANDRE                                          BM

06-23-04                                                F07164

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

PROGRAM:    SPRUCE

BHIS: 196949

beard and mustache. He also had a midline thorachotomy scar as well as two stab wounds to the left of midline, all of which appeared to be well healed. His gait appeared to be normal as he entered and exited the interview. The patient was essentially uncooperative with the interview and after providing information, he finally stated, "I've already told them" and refused to provide additional information. He was oriented to name and place, but refused to cooperate with evaluations of orientation to date and legal situation. His thought processes appeared to be organized and goal directed. Although his recent history included indications of delusional thought processes, he gave no evidences of such at the time of this interview, but then he refused to disclose much information. He was uncooperative with evaluation of such things as hallucinatory behavior, his level of intellectual functioning, his memory, his abstract thinking, and his judgment and insight. However, his vocabulary suggested that his level of intellectual functioning was probably in the average or low average range. He denied suicidal or homicidal ideation. He denied wanting to enucleate his left eye. His judgment appeared to be poor. His insight appeared to be limited.

STRENGTHS AND LIABILITIES: The patient's strengths appear to include intelligence, physical health, verbal skills.

The patient's liabilities appear to include unhealthy coping style, criminal record, substance abuse history, and poor work history.

PRESUMPTIVE DIAGNOSES

Axis I:      Substance-Induced Psychosis With Delusions  292.11
             Substance-Induced Psychosis With Hallucinations  292.12
             Polysubstance Dependence  304.80
Axis II:     No Diagnosis  V71.09
Axis III:    Status-Post Enucleation of Right Eye
             Status-Post Surgical Repair of Injury Associated With Enucleation of Right Eye
             Status-Post Stab Wounds of Chest
             Status-Post Thorachotomy for Self-Inflicted Stab Wounds of Chest
             High Risk Medications  V58.69
Axis IV:     Psychosocial and Environmental Stressors:
             **Problems with Primary Support Group**
             **Problems Related to the Social Environment**
             Educational Problems
             **Occupational Problems**
             **Problems Related to Interaction with the Legal System/Crime**
Axis V:      Global Assessment of Functioning
             1.  **Psychiatric/Psychological Impairment Subscale** – 30 – As evidenced by recent history of delusional thought processes, irritable and labile affect, impaired judgment and insight.
             2.  **Social Skills Subscale** – 30 – As evidenced by grossly inappropriate behaviors with virtually little understanding of feelings and needs of others or how to share with others.
             3.  **Violence Subscale** – 10 – As evidenced by history of charges for multiple homicides.
             4.  **Activities of Daily Living – Occupational Skills Subscale** – 30 – No job and apparent inability to independently maintain a home.
             5.  **Substance Abuse Subscale** – 20 – Functioning is extremely impaired by frequent use of drugs such as alcohol, marijuana, and others when not in a controlled environment.
             6.  **Medical Impairment** – 70 – Mild medical problems which may cause some difficulty in social or occupational functioning, including his need to take prescription medications on a daily basis and his need for periodic medical follow-up.
             7.  **Ancillary Problems** – 10 – As evidenced by charges for Violence.

01733

D: 06-23-04/JB    T: 06-25-04/ce Steno
R: 06-24-04 @ 7:05 AM by mail

8396

Page 7 of 9

Signature, Date, and Time  Joseph Black, M.D.
Chief Psychiatrist, Comp. Prog.

Core Form:  ☐ Yes    ☐ No          Continuation of MHRS  3-1

AT008395

**Continuation Form**

**Dated:** 06-23-04

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

THOMAS, ANDRE          BM

06-23-04          F07164

PROGRAM:   SPRUCE
BHIS: 196949

---

Global Assessment of Functioning-Equivalent = (Subscales #1 + #2 + #3 + #4) ÷ 4 = 25
Highest GAF in past year = Unknown

<u>FORMULATION AND RECOMMENDATIONS:</u>  This 21 year old, widowed, black male from Sherman, Texas, was admitted to North Texas State Hospital - Vernon Maximum Security Unit on 06-23-04, pursuant to Article 46B.073 of the Code of Criminal Procedure, after having been found incompetent to stand trial for the charge of Capital Murder, out of the 15th District Court of Grayson County, Texas.

At the present time there is no indication of biologic or genetic predisposition to mental illness or chemical dependency. However, the patient's history of polysubstance dependence has certainly increased his vulnerability to presentation of mental disorder.  In fact, the temporal relationship of his use of alcohol and drugs would raise the likelihood of his mental disorder being that of substance-induced psychosis with delusions and substance-induced psychosis with hallucinations.

The patient may have grown up in a somewhat dysfunctional family in that the history suggests that the parents did not live together, although the patient did have frequent access to both father and mother.  His dropping out of the ninth grade suggests that the patient may have had some difficulties at that time.  I would wonder if he did not become actively involved in his polysubstance dependence at that time, resulting in his lack of motivation and lack of involvement in academic activities.  The patient's poor work history also suggests that he may have been having continued difficulties with chemical dependency or mental disorders.

The incident report by the Sherman Police Department includes statements of individuals who apparently were unaware of Mr. Thomas having a mental disorder prior to the events which led to his arrest.  The woman with whom he was living at the time of the index event indicated that she and the defendant had engaged in abusing over-the-counter medications and alcohol on the day or evening prior to the event for which the patient was arrested.

<u>INITIAL TREATMENT PLAN:</u>  At the present time, the patient's current problems appear to be in the following areas:

1.  **Psychiatric/Psychological Impairment Subscale – 30 –** As evidenced by recent history of delusional thought processes, irritable and labile affect, impaired judgment and insight.
2.  **Social Skills Subscale – 30 –** As evidenced by grossly inappropriate behaviors with virtually little understanding of feelings and needs of others or how to share with others.
3.  ~~Violence Subscale – 10 – As evidenced by history of charges for multiple homicides.~~
4.  **Activities of Daily Living – Occupational Skills Subscale – 30 –** No job and apparent inability to independently maintain a home.
5.  **Substance Abuse Subscale – 20 –** Functioning is extremely impaired by frequent use of drugs such as alcohol, marijuana, and others when not in a controlled environment.
6.  **Medical Impairment – 70 –** Mild medical problems which may cause some difficulty in social or occupational functioning, including his need to take prescription medications on a daily basis and his need for periodic medical follow-up.
7.  **Ancillary Problems – 10 –** As evidenced by charges for Violence.

Since the patient expressed a negative toward medications, a First Level Clinical Review has been requested for potential treatment of the patient with antipsychotics, mood stabilizers, and anxiolytics as appropriate.

Since the patient has already been taking Depakote or has been prescribed Depakote, a Depakote protocol was requested and serum Valproate requested.  A question of whether the patient is really actually sedated or whether he is feigning sedation to avoid interaction with the staff is unclear.  However, the patient will be observed for such.

01734

---

D: 06-23-04/JB     T: 06-25-04/ce Steno
R: 06-24-04 @ 7:05 AM by mail

Signature, Date, and Time   Joseph Black, M.D.
                            Chief Psychiatrist, Comp. Prog.

Page 8 of 9          **8397**   Core Form:  ☐ Yes   ☐ No          Continuation of MHRS   3-1

AT008396

**Continuation Form**

Dated: 06-23-04

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

THOMAS, ANDRE                    050

████                             BM

06-23-04                         F07164

PROGRAM:    SPRUCE

BHIS: 196949

---

The patient has been admitted to the therapeutic milieu of the Competency Program.  He shall be enrolled in the on-unit groups, including Coping Skills, Stress and Anger Management, and Competency Education and training groups.

Since the patient has a history of self-mutilation and since the deputies who transported him here reported that he continued to attempt to injure his face, he has been placed in mitten restraints for prevention of self-mutilation.  His fingernails were also noticeably dangerously long and an order was issued to trim them to an appropriate length per program rules and the need for safety.

The Treatment Team shall work with the patient towards the goal of his gaining competency to stand trial.

<u>DISPOSITION:</u> Upon demonstrating competency to stand trial the patient shall be discharged to his committing court.

---

01735

D: 06-23-04/JB    T: 06-25-04/ce Steno
R: 06-24-04 @ 7:05 AM by mail

Signature, Date, and Time   Joseph Black, M.D.
                            Chief Psychiatrist, Comp. Prog.

Page 9 of 9       **8398**       Core Form: ☐ Yes  ☐ No        Continuation of MHRS   3-1

AT008397

# Exhibit 67

## Physician's Orders from North Texas State Hospital, Vernon Campus

# PHYSICIAN'S ORDERS
Use ball point pen only.

656   BHIS #:196949
Episode:2
THOMAS, Andre

BM   F07164
06-23-04

**Please draw a line through and initial orders not needed.**

| Date & Time | Admission Screening | Clinical Indication |
|---|---|---|
| 06/23/04 i ○ ○ 5 | 1. Admit to: Spruce unit | Per Unit MD/Pgm. Dir. |
| | 2. Physical examination (within 24 hours) | To assess physical status |
| | 3. Dental examination (within 30 days) | To assess dental problems |
| | 4. Mantoux test within 24 hours of admission (read in 72 hours) - if positive, please do chest x-ray | Unless contraindicated |
| | 5. Td (tetanus diptheria-adult) 1/2 cc IM. | If none in 10 years |
| | 6. Pap smear         Wet Prep         GC | For female patients to rule out infection or malignancy |
| | 7. Baseline EKG  done 6-23-04 | On patients 45 yrs. or older or who are on psychoactive medications. |
| | 8. Provisional diagnosis: Substance-Induced Psychotic Disorder, Delusions 292.11  Substance-Induced Psychosis c Hallucinations 292.12  Other substance Dependence 304.80  Adjourned EKG Richard MD 06/23/04 | |
| | 9. Allergies  Claritan → rash | |
| | 10. Diet  Regular | |
| | 11. Vital Signs  TID X 3days, then if WNL, routinely | |
| | 12. Ht. 67"      Wt. 141 # | |
| | 13. Lab screens: CBC, Chem 12, RPR, UA (stat), serum, preg (for females) | To assess physical status |
| | 14. Special Precautions: Category I Precautions to attempt to prevent self-harm  First Rivol Clinical Security to prevent c antipsychotic used - ckd high  Mittens on hands to prevent self-mutilation  #Hazmrd. Seen | |
| | 15. Medications: Depakote protocol - Serum Valproate in a.m.  16. Thin finger rolls, any - to attempt to prevent self-mutilation | |

8374   Joseph Black MD
Physician's Signature

01711

01-2000

Noted C ABolt at nurse # 6/23/04 @ 1723

MHRS 2-1.20

White-To Chart/Yellow-To Pharmacy/Pink-To Lab

AT008373

# Exhibit 68

## Record Index for Andre Thomas at North Texas State Hospital, Vernon Campus

**RECORD INDEX**

CASE #  F 07164

Admission #  1   UNIT  Spruce

NAME  
THOMAS, Andre

BHIS #:196949  
Episode:2

**Middle**

06-23-04

THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM RECORDS WHOSE CONFIDENTIALITY IS PROTECTED BY FEDERAL LAW. FEDERAL REGULATIONS (42 ... PART 2) PROHIBIT YOU FROM MAKING ANY FURTHER ... OSURE OF ... OF THE SPECIFIC WRITTEN ... OF THE ... ONS. OR AS OTHER ... E PERMITTED. BY SU ... NERAL AUTHORIZATION FOR THE R ... ATION ... IS NOT SUFFICI ...

## IDENTIFICATION
1-1  Movement Log  ✓  
1-1.11  Medical Record Movement Log  ✓  
1-2  Demographic Data Sheet  ✓  

## PHYSICIAN'S ORDERS
2-0.10  Physician's Order Contra to R/S  ✓  
2-1.1  Physician's Orders  ✓  
2-1.5  Physician's Discharge Order/Note  ✓  
2-1.10  Physician's Order R/S  _____  
2-1.12  Physician's Order Day Pass  _____  
2-1.15  Physician's Order AFP Elms  _____  
2-1.16  Physician's Order AFP Cedars  _____  
2-1.17  Physician's Order AFP Oaks  _____  
2-1.18  Physician's Order Med Restraint  _____  
2-1.19  Physician's Order Med Protect Dev  _____  
2-1.20  Physician's Order/Admission  _____  

## INTAKES/ASSESSMENTS
3-1  Psychiatric Evaluation  ✓ ✓  
3-1.10  Psychiatric Evaluation/Admission  _____  
3-1.15  Risk Factors Dangerous Screening  _____  
3-1.2  BPRS  ✓  
3-1.4  Mental Status Admission/Update  ✓  
3-2.1  Initial Nursing Assessment  ✓  
3-2.10  Pain Assessment  _____  
3-2.11  Wound Care Assessment  _____  
3-2.12  Pressure Sore Risk Assessment  _____  
3-2.13  Nutrition Screening  _____  
3-3  Medical History/ROS  ✓  
3-3.11  Medical History/ROS  ✓  
3-4  Physical Examination  ✓  
3-4.11  Physical Examination  ✓  
3-5B  Boy's Growth and Development  _____  
3-5G  Girls Growth and Development  _____  
3-6  AIMS  ✓  
3-7  Social Assessment  ✓  
3-8  Rehabilitation Assessment  ✓  
3-9  Dental Record  ✓  
3-10  Dental Progress  ✓  
3-11  Optometry Consultation  _____  
3-12  Psychological/Psychosocial Assess  _____  
3-12  Substance Abuse  _____  
3-12  Other Specialized Assessments  ✓  
3-12.1  Med Refusal-First Step  ✓  
3-16  Nutrition Assessment  ✓  
3-17  Specialized Assessment  _____  
3-17.11  Fall Risk Assessment  _____  

## TREATMENT PLANNING
4-1  Working Diagnosis  ✓  
4-2  Multidisciplinary Case Conference  ✓  
4-4.1  Treatment Plan Review  ✓  
4-3  Multidisciplinary Treatment Plan  _____  
4-3.11  Initial Treatment Plan  ✓  
4-3.12  Overall Rehabilitation Goal  _____  
4-3.13  Treatment Plan  _____  
4-3.14  Health Maintenance Goal  _____  
4-3.15  Dangerous Management Plan  _____  
4-4.9  Elopement Risk Assessment  _____  
4-4.20  Relapse/Recidivism Prevention Plan  _____  
4-4.21  Health Promotion/Med Education  _____  
4-5  Program Participation Record  _____  
4-6  Community Support Plan  _____  
4-7  Referral Instructions  _____  
4-7.11  Nursing Dx/Furlough Summary  ✓ ✓  
4-8  Discharge/Furlough Summary  ✓  
4-10  Aftercare Log  _____  

## PROGRESS RECORDS
5-2  Progress Notes  ✓ ✓  
5-2.1  Clinical Inpatient Record  ✓  
5-2.11  Restraint/Seclusion Progress Notes  _____  

## DIAGNOSTIC STUDIES
6-1  Laboratory Reports  ✓  
6-3  Radiology Request Reports  ✓  
6-4  EKG Request /Report  ✓  
6-5  EEG Request/Report  _____  
6-6  Immunization Record  _____  
6-6.10  TDH Vaccines for Children Program  _____  
6-6.11  Screening Questionnaire  _____  

## TREATMENT/OBSERVATION RECORDS
7-1  Signature Key  ✓  
7-2  Medication-Treatment-Special Diet  ✓  
7-3  Routine Vitals/Medical Observ  ✓ ✓  
7-4.10  R/S Inventory of Possessions  _____  
7-5  Total Intake/Output Record  _____  
7-6  Seizure Record  _____  
7-7A  Diabetic Record  _____  
7-8  Menstrual Record  _____  
7-11  Suicide Precautions Checklist  _____  
7-11.10  Medical Protective/Support Devices  _____  
7-11.11  Medical Protect/Supportive Devices  ✓  
7-11.12  Suicidal Precautions Checklist  _____  

## PRIOR SUMMARIES
8-1  Info From Other Agencies (Active)  ✓  
8-2  Info From Other Agencies (Prior)  ✓  

Date of Adm  6/23/04   Date of Disch  8/9/04   LOS  47 days   Initials  KB

Medical Records  
Revised 04/03  
NTSH #315

8370

01707

# Exhibit 69

## Clinical Note from Michelle Moore at North Texas State Hospital, Vernon Campus

Run Date: 09/13/2004                                           Page: 1

**North Texas State Hospital**
**Wichita Falls/Vernon, TX**

ÚÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄ
³Patient Name: THOMAS,ANDRE LEE(196949)      ³Episode #:    2      ³
³Admit Date:  06/23/2004          ³Discharge Date: 08/09/2004 ³
³Written By:  MOORE MICHELLE R         ³On:    06/24/2004 ³
³Note Type:  Case Coordinator       ³Note Time:    09:03 AM   ³
ÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÙ

Notes Field:
    Treatment Team met with patient this a.m. to discuss report of patient not
    sleeping through the night. Patient stated he was hearing the voice of a voice
    telling him a girl was going to burn in a fire in a car accident. He stated
    these voices are in his head, he hears voices of a God that if he does not shut
    up he would burn in hell, and demons were laughing at him. The patient was soft
    spoken, held head down and did not make eye contact. Patient agreed to begin
    antipsychotic of Zyprexa. Will continue to meet with him regularly or as
    needed. Will have initial staffing tomorrow.

**8549**

01886

AT008546

# Exhibit 70

**Findings and Recommendations from B. Thomas Gray, Ph.D. at North Texas State Hospital, Vernon Campus**

| Referral/Consultation Report | THOMAS, ANDRE | 656 |
|---|---|---|
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | ██████ | BM |
| | 06-23-04 | F07164 |
| | PROGRAM:   SPRUCE | |

TO:  Consultant and/or Service:  Psychological Services

REQUEST:  Reason for Requested Consultation:   Competency Assessment Required by Court

Physician:  Joseph Black, M.D.                          Requested Date:  07-16-04

CONSULTANT:  FINDINGS AND RECOMMENDATIONS:

Name:  Andre Thomas          DOB: ██████                Race:  African-American

Sex:  Male                    Hospital #: F07164              Cause #:  50391

Committing Court:.  15ᵗʰ JDC, Grayson Co.                Report Date: 07-22-04

REASON FOR ADMISSION/ASSESSMENT: Andre Lee Thomas is a 21 year old African-American male, admitted to the Maximum Security Unit of North Texas State Hospital - Vernon Campus under provisions of Article 46B.073 of the Texas Code of Criminal Procedure.  He has felony charges pending after being found incompetent to stand trial.

Mr. Thomas was interviewed by the undersigned on 07-22-04, for approximately three hours over the course of two sessions separated by lunch, to assess competency to stand trial. Three psychological tests were administered during this time: the Structured Interview for reported symptoms (SIRS), the Test of Memory Malingering (TOMM), and the Evaluation of Competency to Stand Trial – Revised (ECST-R). In addition to the interviews, his medical record and relevant preadmission documents were reviewed, and ward staff and members of his treatment team were consulted. Prior to each session he was informed of the nature and purpose of this evaluation; of the limits of confidentiality; of the fact that a report would be sent to the court, to his defense attorney, and to the District Attorney; and that I might be called to testify. He indicated understanding of this information, and repeated back crucial portions.

RELEVANT BACKGROUND AND HISTORY:  The following is a brief summary of available information concerning this patient. The interested reader is referred to the full medical record for additional details, if desired.

Mr. Thomas is the youngest of four brothers born to a family that was disrupted by the separation of his parents when was four. They apparently never legally divorced, although he reportedly has two half brothers as well. Records indicate that his father abused alcohol in the past, and that one of his full brothers has a history of substance abuse and mental illness. It is also possible that his mother has had psychiatric difficulties. There were no known problems at birth, and he apparently met developmental milestones in a timely fashion. There is one report that he was accidentally kicked in the head by his father when he was quite young, although there is no further information concerning this alleged injury. He stated that he made minimally passing grades in school, but also that he was in Gifted and Talented classes. (He did not know in which Gifted and Talented classes he was placed). He dropped out in the 9ᵗʰ grade, but later went on to earn the GED. He reported that he left school to support his girlfriend and their newborn son. He initially worked at a fast food restaurant, and then for three

B. Thomas Gray, Ph.D.
Signature, Date, and Time

Core Form:  [ ] Yes    [ ] No

MHRS 3-17

02139

| Continuation Form | THOMAS, ANDRE | 656 |
|---|---|---|
| Dated:   07-23-04 | ▆▆▆▆▆ | BM |
|  | 06-23-04 | F07164 |
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | PROGRAM:    SPRUCE |  |

years for the City of Sherman. He was apparently fired from the latter position approximately a year before the instant offense, and held sporadic employment in unskilled jobs during that year. He began living with the mother of his child when he was 16 years old, and they were married when he was 18. They separated approximately a year later, in 2001, allegedly due to her infidelities with one of his brothers and with a cousin. At the time of the instant offense, he was living with another individual, whom he refers to as his girlfriend, although his father raised questions concerning this individual's gender. His mother may have been living with him at that time of his arrest, as well.

Mr. Thomas reported that he began using alcohol at the age of 10, although described his use as "occasional." He also reported having used marijuana, and that he tried LSD and cocaine one time each. He did not mention using Coricidin, an over-the-counter cold remedy containing dextromethorphan, as an intoxicant. When asked directly, however, he acknowledged that, "It just brings everything in perspective to you, that's all." He denied any knowledge of the effects of the drug if combined with alcohol. Other reports suggest he was more heavily involved in substance use, and among other consequences, this has been implicated in his employment difficulties over the year prior to his arrest.

Mr. Thomas has repeatedly stated that he has made several suicide attempts, beginning as early as age 10, when he reportedly cut his wrist. He made another serious attempt to cut his wrist when he was 15, but apparently neither of these wounds was of sufficient severity to require extensive medical care or to prompt psychiatric treatment. According to his father, Mr. Thomas began wearing duct tape on his mouth approximately three months prior to the instant offense, and his speech was heavily dominated by religious topics. Records from the local MHMR indicate a warrant for emergency detention was issued in early March of this year, as he had made suicidal statements. It is unclear whether he was ever actually detained, or if any other steps were taken. It has also been reported that he sought help in a hospital emergency room within a week of the instant offense, but was allegedly refused treatment. This may have been related to a self-inflicted stab wound to the chest two days before his arrest that left only superficial injuries. On the day of his arrest, however, he inflicted a much more serious stab wound to his chest, requiring emergency surgery and a few days of hospitalization.

Shortly after he was incarcerated, Mr. Thomas was seen by C. Robin McGirk, Ph.D., the jail psychologist. Dr. McGirk documented a variety of seemingly psychotic behaviors and statements, and tentatively assigned a diagnosis of Schizophrenia, Paranoid Type; he also raised the possibility of a substance-induced psychosis, however. On the fifth day of incarceration, apparently in response to the Biblical verse, "If thy right eye offend thee, pluck it out" (Matthew 5:29), Mr. Thomas removed his right eyeball and attempted to swallow it, as reported by alert jail staff. He had been prescribed Geodon, an antipsychotic, and Depakote, a mood stabilizer, although it appears that he may not have actually consented to take these medications until after he had removed his eye. He reportedly became less agitated after he began consistently taking these drugs, although his thinking continued to be disorganized and predominated by delusional content.

Not surprisingly, issues of competency arose while Mr. Thomas was incarcerated. He was therefore evaluated by James R. Harrison, Ph.D. on 04-05-04, 04-07-04, 04-12-04, and 04-14-04; he was later seen by Peter Oropeza, Psy.D., on 04-26-04 and 05-07-04 (an attempt on 04-28-04 was refused by Mr. Thomas. Dr. Harrison noted grandiose and paranoid delusions, a tendency to leap from topic to topic, and evidenced suggesting Mr. Thomas was hearing voices. This, together with indications of a family history of thought disorders led him to conclude that Schizophreniform Disorder was the most appropriate diagnosis, although he did not totally dismiss the possibility of a Substance-Induced Psychotic Disorder. He recommended that the deficits were of sufficient severity as to render Mr. Thomas incompetent to stand trial.

Dr. Oropeza found a number of odd and bizarre behaviors, and raised the possibility that at least some of this may have been feigned or exaggerated. He concluded Mr. Thomas understood his charges as well as the adversarial nature of the

02140

| D: -07-23-04/BTG  T: 07-26-04/ce (Steno)  C: 07-27-04 | Signature, Date, and Time | B. Thomas Gray, Ph.D. |
|---|---|---|
| R: 07-23-04 @ 3:45 PM by hand | Core Form: ☐ Yes   ☐ No | Clinical Psychologist III |
| Page 2 of 6 |  | Continuation of MHRS   3-17 |

MHRS-cf AT002025

| Continuation Form | THOMAS, ANDRE | 656 |
|---|---|---|
| Dated:  07-23-04 | ████ | BM |
| | 06-23-04 | F07164 |
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | PROGRAM:   SPRUCE | |

proceedings against him, and that he had some ability to consult with his attorney and to make reasoned choices. Dr. Oropeza suggested Mr. Thomas' abilities were somewhat compromised in terms of relating to his attorney, however, and had serious questions as to his ability to exhibit appropriate behavior and to testify. He therefore recommended Mr. Thomas as incompetent to stand trial. The court concurred with the two experts, and Mr. Thomas was transferred to this facility.

COURSE OF HOSPITALIZATION: Mr. Thomas was seen at the time of admission by Joseph Black, M.D., his attending psychiatrist. Dr. Black found him to be lethargic, and noted he spoke in such a low tone of voice as to render many of his answers inaudible. He also replied to a number of questions with "I don't know." Dr. Black concluded he was being uncooperative with most of the evaluation, and was unable to establish ongoing delusional ideation; he also found no evidence of auditory or visual hallucinations. Mr. Thomas had been receiving Geodon, an antipsychotic, and Depakote, a mood-stabilizing agent, while incarcerated, although the extent of his compliance with these medications is unclear. The Geodon was discontinued and replaced by Zyprexa, another antipsychotic. Depakote was discontinued in early July due to the absence of any evidence of mood instability.

In addition to medications, Mr. Thomas has been enrolled in standard psychosocial educational programming, including a class designed to improve his trial competence. He has attended regularly, although his participation has been quite limited. Although he has been generally compliant with unit rules and procedures, Mr. Thomas has been on special observation status, continually monitored by staff due to fears that he might attempt to remove his remaining eye. He attained a passing score on an informal written competency test, and was therefore referred for full evaluation.

CURRENT CLINICAL OBSERVATIONS: Andre Lee Thomas is a tall, slender, African-American male who appears younger than his stated age of 21 years. At several points during the interview sessions he appeared lethargic, although he consistently responded to questions promptly and reasonably appropriately. His appearance was distinctive for the patch over his enucleated right eye, and the bulky padded mittens he wore that were designed to prevent him from causing further harm to himself. He was dressed in casual clothing for the interview sessions, with adequate hygiene and grooming. Gait and posture were reasonably normal, although he showed some tendency to shuffle. Other physical movements were within normal limits. He spoke only when prompted to do so, offering virtually nothing spontaneously, and his speech was slow and very soft. He was nevertheless articulate and could be readily understood, although I had to ask him to repeat himself on a number of occasions. When asked how he was feeling, he replied, "Tired" and stated his sleep was "kinda troubled...'cause I don't know what's gonna happen to me." He described his appetite as "pretty strong." He complained of long-term depressive symptoms, including very low energy and reduced sex drive. He initially denied ever having sought any sort of mental health care; however, he later said he had gone to MHMR, "but the lady there tried to trick me so I went away." He reported "three or four" serious attempts to harm himself as documented above. The first of these occurred when he was incarcerated in a juvenile facility. He complained of hearing voices, which he stated had been going on "for a long time." He also reported having the ability to "put a word inside people's hearts, make 'em change what they're thinking," and went on to say that others tried to plant ideas in his mind, "but I don't let 'em." In evaluating these reports, results of psychological testing that was conducted must be considered. Specifically, the Atypical Presentation scales on the ECST-R, as well as his responses on the SIRS, strongly indicated gross exaggeration of his psychotic symptoms. This is not to say necessarily that he is not experiencing psychotic symptoms such as auditory hallucinations, nor should this be taken to mean that he has not experienced such symptoms in the past. However, these test results strongly indicate that he has been exaggerating any symptoms that he may be experiencing at present.

Mr. Thomas was oriented to person, place, and situation. He misstated the month (he stated June, when in fact it was July), and missed the date by one day. He displayed some possible impairment of memory, as well as attention and concentration. He presented a subjective complaint of memory problems, and was consequently administered the TOMM. His

2070

00141

| | Signature, Date, and Time | B. Thomas Gray, Ph.D. |
|---|---|---|
| D: -07-23-04/BTG  T: 07-26-04/ce (Steno)  C: 07-27-04 | | Clinical Psychologist III |
| R: 07-23-04 @ 3:45 PM by hand | Core Form: ☐ Yes   ☐ No | Continuation of MHRS    3-17 |
| Page 3 of 6 | | |

MHRS AT002026

| Continuation Form | THOMAS, ANDRE | 656 |
|---|---|---|
| Dated:  07-23-04 | ███████ | BM |
| | 06-23-04 | F07164 |
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | PROGRAM:   SPRUCE | |

performance on that test strongly suggested that he was exaggerating his memory deficits. Use of language suggested intellectual functioning in the Average range. His responses when asked to interpret proverbs suggested perhaps some degree of impairment, as did his responses when asked to provide solutions to everyday problems as a measure of judgment. However, this must be interpreted in light of the exaggeration of his psychotic symptoms, as described above. His level of insight appeared to be fair to adequate.

UPDATED DIAGNOSES:  (Per Joseph Black, M.D., attending psychiatrist)
Axis I:    Substance-Induced Psychosis With Delusions  292.11
           Substance-Induced Psychosis With Hallucinations  292.12
           Polysubstance Dependence  304.80
           Malingering  V65.2
Axis II:   No Diagnosis  V71.09
Axis III:  Status-Post Enucleation of Right Eye
           Status-Post Surgical Repair of Injury Associated With Enucleation of Right Eye
           Status-Post Stab Wounds of Chest
           Status-Post Thoracotomy for Self-Inflicted Stab Wounds of Chest
           High Risk Medications  V58.69
Axis IV: Psychosocial and Environmental Stressors:
           Problems with Primary Support Group
           Problems Related to the Social Environment
           Educational Problems
           Occupational Problems
           Problems Related to Interaction with the Legal System/Crime
Axis V:  Global Assessment of Functioning
    1.  Psychiatric/Psychological Impairment Subscale – 60 – Moderate symptoms as evidenced by improved cognitive functioning. Evaluation of psychotic symptoms is obscured by malingering symptoms of mental illness, which may be motivated by a desire to avoid prosecution.
    2.  Social Skills Subscale – 70 – Some difficulty with social skills as evidenced by insensitivity to the feelings and needs of others.
    3.  Violence Subscale – 50 – Serious problems with potential for self-harm.
    4.  Activities of Daily Living – Occupational Skills Subscale – 60 – Moderate problems as evidenced by little history of educational or occupational attainment.
    5.  Substance Abuse Subscale – 20 – Functioning is extremely impaired by frequent use of drugs such as alcohol, marijuana, and others when not in a controlled environment.
    6.  Medical Impairment – 70 – Mild medical problems which may cause some difficulty in social or occupational functioning, including his need to take prescription medications on a daily basis and his need for periodic medical follow-up.
    7.  Ancillary Problems – 10 –  As evidenced by having been found incompetent to stand trial.

    Global Assessment of Functioning-Equivalent = (Subscales #1 + #2 + #3 + #4) ÷ 4 = 60
    Highest GAF in past year = Unknown

CURRENT COMPETENCY ASSESSMENT: The current competency assessment was conducted in accordance with provisions of Article 46B of the Texas Code of Criminal Procedure, which identifies six specific areas to be addressed:

02142

| | Signature, Date, and Time | B. Thomas Gray, Ph.D. |
|---|---|---|
| D: -07-23-04/BTG  T: 07-26-04/ce (Steno) C: 07-27-04 | | Clinical Psychologist III |
| R: 07-23-04 @ 3:45 PM by hand   Core Form:  [ ] Yes   [ ] No | | Continuation of MHRS   3-17 |
| Page 4 of 6 | | |

MHRS-cAT002027

| | |
|---|---|
| Continuation Form | THOMAS, ANDRE                    656 |
| Dated:   07-23-04 | ███████                          BM |
|  | 06-23-04                         F07164 |
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | PROGRAM:   SPRUCE |

1. <u>Capacity to Understand the Charges and Potential Consequences of Pending Criminal Proceedings:</u> Mr. Thomas has consistently been able to accurately name the charges he faces, and has periodically indicated his awareness that this is a serious matter of felony status. During our interview, he effectively denied any understanding of the possible consequences that he might face, although he has given indications to other clinicians that he is aware of a range of penalties to which he might be subjected if convicted.

2. <u>Capacity to Disclose Pertinent Facts, Events, and States of Mind to Counsel:</u> He identified his attorney by name, and although he stated, "I don't know if he's really trying to help me or not," he subsequently revealed that his equivocal view was "because I hardly ever see him." Thus, one might conclude that his faith in his attorney representing his best interest might well be increased if and when he has greater contact. Importantly, Mr. Thomas was able to provide a consistent account of facts, events, and states of mind to various authorities within the first several weeks after the instant offense, suggesting that should he chose to do so, he would be able to convey information to his attorney as well.

3. <u>Capacity to Engage in a Reasoned Choice of Legal Strategies and Options:</u> His responses to questioning in this area were vague and tended to suggest a lack of understanding of basic legal strategies and choices. However, on an informal written competency test administered on 07-09-04, he revealed considerably better understanding of such information than he was willing to reveal during our interview. Furthermore, his approach of grossly exaggerating the symptoms of memory deficits and psychosis that he appears to have adopted during this evaluation can be interpreted as a distinct strategy, one which he has apparently chosen to pursue.

4. <u>Capacity to Understand the Adversarial Nature of the Legal Process:</u> Although he was somewhat vague in his responses during our interview, Mr. Thomas nevertheless conveyed a reasonable understanding of the roles played by various key courtroom personnel. This included the fact that the prosecutor and the defense attorney occupy opposing roles in the proceedings. His responses on the informal written competency test administered on 07-09-04 confirmed his understanding of the adversarial nature of the proceedings.

5. <u>Capacity to Exhibit Appropriate Courtroom Behavior:</u> He indicated an awareness of proper dress for the courtroom, and knew that while in court he was "supposed to sit still, pay attention." He initially suggested that he would speak directly to the judge if faced with a situation in which others were lying about him, even though he knew that he was "not supposed to...but I will if somebody lies." With further questioning and minimal prompting, however, he revealed not only his understanding that it would be more appropriate to use his attorney as a conduit by which to communicate with the court. He was aware that he could face additional consequences if he were to violate appropriate standards of courtroom decorum.

6. <u>Capacity to Testify:</u> Mr. Thomas has exhibited a number of characteristics that might suggest difficulties in this area, including his very low tone of voice, his tendency to mumble, and his vague and virtually non-responsive answers to many questions. However, it should be kept in mind that he was able to provide a consistent accounting of events concerning the circumstances surrounding his arrest in discussions with several different authorities during the first several weeks following the event. In addition, according to the evaluation done by Peter Oropeza, Psy.D., he was able to convey information without undue influence of emotion, and without requiring extensive redirection. Furthermore, during our interview sessions, he was able to carry out a strategy directed toward a specific goal (i.e., exaggerate psychiatric symptoms), which would greatly enhance his ability to testify appropriately.

02143

| | | |
|---|---|---|
| D: -07-23-04/BTG   T: 07-26-04/ce (Steno)   C: 07-27-04 | Signature, Date, and Time | B. Thomas Gray, Ph.D. |
| R: 07-23-04 @ 3:45 PM by hand      Core Form:  ☐ Yes   ☐ No | | Clinical Psychologist III |
| Page 5 of 6 | | Continuation of MHRS   3-17 |

AT002028

| | |
|---|---|
| **Continuation Form** | THOMAS, ANDRE                          656 |
| Dated:  07-23-04 | ████                                    BM |
| | 06-23-04                                 F07164 |
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | PROGRAM:   SPRUCE |

<u>SUMMARY AND RECOMMENDATIONS:</u> It is my clinical opinion, with a reasonable degree of scientific certainty, that Andre Lee Thomas currently meets criteria to be considered Competent to Stand Trial. This is based on information obtained from the interview reported here, from available records, and from treatment team members and other direct care staff on the unit. Mr. Thomas has been treated for symptoms of a serious mental illness, and is currently stabilized in a therapeutic environment involving use of psychoactive medications. He is not mentally retarded. He does, however, appear to have exaggerated the symptoms that he has experienced, and it is uncertain the degree to which he is currently experiencing symptoms of psychosis. It is important that he receive ongoing psychiatric care, that he take prescribed medications as ordered, and that he abstain from alcohol and all illicit drugs, including improper use of over-the-counter medications. Failure to follow these recommendations could result in deterioration of his condition and a return to trial incompetency.

Mr. Thomas has been diagnosed with Malingering. He has clearly exaggerated symptoms that he might be experiencing, and may have even fabricated some symptoms of psychosis. It is possible that he may engage in gestures or behaviors, including possibly those involving self-harm, in a bid to appear more seriously mentally ill than he is, and to avoid the consequences of the current charges he faces. Because Mr. Thomas is exaggerating psychiatric symptoms, it has been difficult to determine which symptoms are actually present, and the severity of any symptoms he may be genuinely experiencing. Nonetheless, it must be kept in mind that a true mental disorder can and often does co-exist in someone who is diagnosed with Malingering.

This report addresses issues of competency only, and is not a dangerousness risk assessment. If the court deems it appropriate, a qualified professional should be contacted to perform such a risk assessment.

It should be recognized that decisions concerning trial competency are made by a judge and/or jury, and not by mental health professionals. Consequently, opinions stated in the context of this report are offered as advisory only.

*This report may be protected by Fed. Reg. 42CFR(2).*

02141

**2073**

| | |
|---|---|
| Signature, Date, and Time | B. Thomas Gray, Ph.D. |
| | Clinical Psychologist III |
| D: -07-23-04/BTG  T: 07-26-04/ce (Steno)  C: 07-27-04 | Continuation of MHRS   3-17 |
| R: 07-23-04 @ 3:45 PM by hand          Core Form:  ☐ Yes  ☐ No | |
| Page 6 of 6 | |

MHRS  AT002029



Texas Department of Mental Health and Mental Retardation    Karen F. Hale, M.S.S.A., *Commissioner*

*North Texas State Hospital-Vernon Campus  P.O. Box 2231  Vernon, TX  76385-2231  (940 )552-9901*
*North Texas State Hospital-Wichita Falls Campus  P. O. Box 300  Wichita Falls, TX  76307-0300  (940) 692-1220*
James E. Smith, A.C.S.W., L.M.S.W.-A.C.P., *Superintendent*

July 27, 2004

Honorable Judge James R. Fry
15th Judicial District Court
  of Grayson County
200 S. Crockett St
Sherman, Texas 75090

<table>
<tr><td>Re:</td><td>Andre Lee Thomas</td></tr>
<tr><td>Case No:</td><td>F07164</td></tr>
<tr><td>Cause No:</td><td>51483</td></tr>
<tr><td>Admission Date:</td><td>06-23-04</td></tr>
<tr><td>Commitment Date:</td><td>06-17-04</td></tr>
</table>

Honorable Judge Fry:

This report is submitted concerning the above named defendant who is charged with a criminal offense and was admitted to North Texas State Hospital upon a jury finding of incompetence to stand trial. This evaluation was for the purpose of determining the defendant's competency to stand trial and not for purposes of mitigating circumstances, guilt, innocence, sanity or future dangerousness.

After a period of observation and treatment, the defendant has been evaluated and competency determined. It is my opinion that the defendant is COMPETENT to stand trial.

The Sheriff of your County is required by law to present this facility a bench warrant for release and provide transportation for the defendant to your Court for appropriate disposition within 14 days of receipt of this letter. This action is requested in compliance with Article 46B.082 Code of Criminal Procedure.

We appreciate the opportunity to be of service to your Court and appreciate your prompt consideration and attention to this matter.

Respectfully submitted,
FOR THE SUPERINTENDENT

*Joseph Black, M.D.*

Joseph L. Black, M. D.
Certified by the American Board of Psychiatry and Neurology, Inc.
  in Psychiatry and with Special Qualifications in Forensic Psychiatry
Chief Psychiatrist, Competency Program
North Texas State Hospital-Vernon Campus

Enclosure: Competency Evaluation

cc:    District Attorney
       Defense Attorney
       District Clerk
       Sheriff

Sworn to and subscribed before me
this the 27th day of July, 2004

Jerry N. Witt

*Jerry N. Witt*

Notary Public in and for the
State of Texas
Commission expires 08/08/05

JERRY N. WITT
COMMISSION EXPIRES
August 8, 2005

02145

2074

NORTH TEXAS STATE HOSPITAL    PATIENT PROPERTY INVENTORY   4431
VERNON CAMPUS

Unit _____ Spruce _____          Date  6-23-04
Patient's Name _Thomas, Andre_          Case No. _FD 7164_

**PROPERTY ARRIVING** ____ X__ With Admission _____ By Visitor _____ Other

**MONIES SENT TO CASHIER** Cashier Accepting Monies _Cail Brum_

Currency ___n/a___ Check# _032168_ Amount $ _10.55_ Issue Date _6/23/04_

Check Issued by _Grayson County Jail Inmate Trust Fund_

Check Endorsed by Patient ___ / __ Yes _____ No   (Reason) _____

**CONTRABAND ITEMS RETAINED IN PROPERTY ROOM** Property Clerk _____

n/A

**PROPERTY TO NURSES STATION**

Driver's License# __n/A__ State _n/A_ Social Security Card __n/A__

CreditCards _____ n/A

Medication: Amount and Name _____ n/A

Other _____

**PROPERTY TO UNIT**

__ Shirts __ Shoes __ Coats __ Pants _2_ Socks __ Bras __ Belts __ Dresses __ Sweaters __ Shorts __ Skirts
__ Undershirts __ Undershorts __ Thermal Underwear __ Pajamas __ Gowns __ Misc.Toiletries _✓_ MiscPapers

(2) stamped envelopes / (3) color pictures /

(1) orange jail suit

**CLOTHING RECEIVED FROM VOLUNTEER SERVICES** ___ Shoes ___ Socks ___ Coat ___ Hospital Scrub

_Mary Clear_ _Swm_                    _____
Security                              Unit Staff Accepting Property

_____                                            02060
Security                              Law Enforcement Officer / Visitor

**2075**

AT002031

4431

# NORTH TEXAS STATE HOSPITAL   PATIENT PROPERTY INVENTORY
## VERNON CAMPUS

Unit _Spruce III_                                    Date _6-30-09_

Patient's Name _THOMAS, Andre_                  Case No. _FG 7164_

**PROPERTY ARRIVING** _____ With Admission   _✓_ By Visitor _____ Other

**MONIES SENT TO CASHIER**  Cashier Accepting Monies _____

Currency _____ Check# _____ Amount _____ Issue Date _____

Check Issued by _____

Check Endorsed by Patient _____ Yes _____ No   (Reason) _____

**CONTRABAND ITEMS RETAINED IN PROPERTY ROOM**  Property Clerk _____

_____

_____

_____

**PROPERTY TO NURSES STATION**

Driver's License# _____ State _____ Social Security Card _____

CreditCards _____

Medication: Amount and Name _____

Other _____

_____

_____

**PROPERTY TO UNIT**

___Shirts___Shoes___Coats___Pants___Socks___Bras___Belts___Dresses___Sweaters___Shorts___Skirts

___Undershorts___Undershirts___Thermal Underwear___Pajamas___Gowns___Misc.Toiletries___MiscPapers

_1 - calling card_

_____

_____

_____

_____

_____

_____

_____

_____

**CLOTHING RECEIVED FROM VOLUNTEER SERVICES** ___Shoes___Socks___Coat___Hospital Scrub

_Susan Thornhill_                          _Michelle Moore, CW I_

Security                                   Unit Staff Accepting Property

_Michael Brake_                            _Rosi Caballero_

Security                                   Law Enforcement Officer / Visitor

2076                                        02061

AT002032

# THE STATE OF TEXAS

TO THE HONORABLE ___Kieth Garry_____SHERIFF OF GRAYSON COUNTY, TEXAS
GREETING:

On this the ___30___ day of ___July_____ A.D. 20_04_, it appearing to the Court

that there is now pending on the docket of this Court, a certain case entitled the State of Texas vs.

___Andre Lee Thomas_____ being our cause No. _051858_____, wherein said

defendant____ is charged with the offense of ___Capital Murder_____, and

WHEREAS, said case has been set down for trial on the ___11___ day of ___Oct_____

A.D. 20_04_; and

WHEREAS, it further appearing to the Court, from application filed herein by the District Attorney,

that ___Andrea Lee Thomas_____ is now confined in ___North Texas State Hopital_

at ___Vernon, Texas_____, and that therefore a necessity exists for the issuance of a

Bench Warrant for said ___Andre Lee Thomas_____ to appear before

this Court as a _____Defendant_____.

THEREFORE, it is ordered by the Court that the application of the District Attorney for the issuance

of a Bench Warrant for the said ___Andre Lee Thomas_____ be, and is hereby granted, and

THEREFORE, you the said ___Keith Garry_____ Sheriff of Grayson County, Texas,

are hereby directed to call upon the proper authorities of ___North Texas State Hospital___

_____at ___Vernon____, Texas, for permission to take the body of said

_Andre Lee Thomas_____, and to safely convey him to the County Jail

of Grayson County, Texas at Sherman, Texas, to answer the State of Texas as a _Defendant_____,

and that you safely keep him in said jail until further orders of this Court are made and entered.

Due return make of this writ on or before _Aug. 9th_____20_04_ showing

how you have executed the same.

Given under my official hand and seal of said Court at Sherman, Texas, this the ___30_____

day of ___July_____A.D.20_04_.

Judge _____ Judicial District Court

Grayson County, Texas

2077

02138

AT002033

# Exhibit 71

## Physician Discharge Order from North Texas State Hospital, Vernon Campus

Report Date: 09/13/2004                                    Page 1 of 4

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN DISCHARGE ORDER Inquiry

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ▮▮▮▮▮▮▮                  Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 08/06/2004

*GENERAL INFORMATION*
   Assessment Date:    07/28/2004

   Assessment Time:    10:12 AM

   Draft/Final:    Final

   Assessing Clinician:    BLACK,JOSEPH L (000035)

   Client Date of Birth:    ▮▮▮▮▮▮▮

   Client SS#:    ▮▮▮▮▮▮▮

   Primary Language:    ENGLISH

*NOTE*
   Commitment Status:    RESTORATION NOT TO EXCEED 120 DAYS

   Discharge Diagnosis:
      Axis I:
      Substance-Induced Psychosis With Delusions 292.11
      Substance-Induced Psychosis With Hallucinations 292.12
      Polysubstance Dependence 304.80
      Malingering V65.2
      Axis II:
      No Diagnosis V71.09
      Axis III:
      Status-Post Enucleation of Right Eye
      Status-Post Surgical Repair of Injury Associated With Enucleation of
      Right Eye Status-Post Stab Wounds of Chest
      Status-Post Thoracotomy for self-inflicted Stab Wounds of Chest
      High Risk Medications V58.69
      Axis IV:
      Psychosocial and Environmental Stressors:
      Problems with Primary Support Group
      Problems Related to the Social Environment
      Educational Problems
      Occupational Problems
      Problems Related to Interaction with the Legal System/Crime
      Axis V:
      Global Assessment of Functioning
      1.Psychiatric/Psychological Impairment Subscale 60 Moderate symptoms as
      evidenced by improved cognitive functioning. Evaluation of psychotic

8386

01723

AT008385

Report Date: 09/13/2004                                    Page 2 of 4

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN DISCHARGE ORDER Inquiry

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ███████                 Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 08/06/2004

symptoms is obscured by malingering symptoms of mental illness, which may
be motivated by a desire to avoid prosecution.
2.Social Skills Subscale 70 Some difficulty with social skills as
evidenced by insensitivity to the feelings and needs of others.
3.Violence Subscale 50 Serious problems with potential for self-harm.
4.Activities of Daily Living Occupational Skills Subscale 60 Moderate
problems as evidenced by little history of educational or occupational
attainment. 5.Substance Abuse Subscale 20 Functioning is extremely
impaired by frequent use of drugs such as alcohol, marijuana, and others
when not in a controlled environment.
6.Medical Impairment 70 Mild medical problems which may cause some
difficulty in social or occupational functioning, including his need to
take prescription medications on a daily basis and his need for periodic
medical follow-up. 7.Ancillary Problems 10 As evidenced by having been
found incompetent to stand trial.

Admission GAF: 25

Discharge GAF: 60

Discharge Medications:
Discharging with 14 day supply of:
1.Zyprexa 40 mg po q 1800 hr
2.Cleanses right eye orbit with cotton ball soaked in NS qid, then 4
drops of artificial tears to right eye orbit area qid

Also sending 1 eye patch at discharge.

Condition at Discharge:   Improved

Child/Adolescent Patient Discharged To:
This adult male is discharging to the care and custody of the Grayson
County Sheriff's Department to return to the 15th Judicial District Court
of Grayson County, Texas at 200 S. Crockett Street, Sherman, Texas 75090,
903-813-4303, for disposition of the charges pending of Capital Murder.

Comments:
Andre is returning to the committing court with our recommendation he is
competent to stand trial. He has demonstrated all areas of trial
competency. He has been on a Category I, one to one, observation for
prevention of self harm throughout his stay with mittens ordered to be
worn on both hands. Patient only allowed to remove mittens to bathe with
staff observing and only one removed to eat meals or bathroom needs. The

**8387**

01724

AT008386

Report Date: 09/13/2004                                    Page 3 of 4

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN DISCHARGE ORDER Inquiry

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ▓▓▓▓▓▓▓                  Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 08/06/2004

        patient had reportedly plucked out his right eye during incarcation at
        the Grayson County Jail. He has been cooperative with staff. Due to the
        special precaution, the patient has not been enrolled in groups off the
        unit. He has attended on unit groups with little input. He was able to
        pass a written competency test without difficulty. He has not displayed
        bizarre or unusual behaviors. Andre has made hyper-religious statments
        throughout his stay. The patient is currently stable on the prescribed
        psychotropic medications and has been compliant. The patient has support
        from his father, Danny Thomas. The extent, however unclear. Andre has had
        several visitors consisting of friends from Sherman, his mother, and
        brother, James.

    Allergies:   Yes

    Allergy Comments:
        Claritan

    Diet:
        Diet: Regular

        Weight:159

    Activity Level:   Ad Lib

FOLLOW UP

    Coordination with MHA:   Yes

    Medical Follow Up Needs:
        Aims testing q 3 months due: 9-23-04. Routine lab work since patient is
        maintained on psychoactive meds to include SMA-20 and CBC.
        Olanzapine Protocol: Cholesterol, Triglycerides, SGPT at 3 months due:
        10-25-04, at 6 months due: 1-25-04, then every 6 months due: 7-26-05. FBS
        q 3 months due 10-25-04, 1-25-05. Notify physician if symptoms of
        hyperphagia, polydipsia or polyuria develop. Weigh monthly and notify
        physician if weight 10% or more over baseline. Discontinue protocol on
        any of above medications when medication has been discontinued.
        LFTS due: 8-16-04.
        May use eye patch, will send one at discharge.
        County was notified that patient will need mitts when discharged due to
        self harm.

    Other Follow Up Needs:

**8388**

01725

AT008387

Report Date: 09/13/2004                                    Page 4 of 4

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN DISCHARGE ORDER Inquiry

CLIENT NAME: THOMAS,ANDRE LEE            Episode Start Date: 06/23/2004
CLIENT ID: 000196949                     Episode End Date: 08/09/2004
DATE OF BIRTH: ███████                   Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                        Data Entry Date: 08/06/2004

    Aftercare services will be provided by the Grayson County Mental Health
    Center at 101 E. Jones, Sherman, Texas 75090, 903-893-0175, with Cynthia
    Fulbright at 903-893-0175 being the aftercare coordinator. She has been
    notified of the patient's pending discharge and informed a copy of
    discharge information will be faxed to her upon completion.

    INTERVENTIONS/OBJECTIVES:
    1. Contact with jail liasion to ensure competency status.
    2. Contact with jail liasion and MHA to ensure medication compliance.
    3. Referral to case manager for substance abuse counseling.
    4. Referral to case manager to address suicidal/homicidal ideation.
    5. Referral to case manager to assist in applying for SSI/SSDI.
    6. Referral to case manager for assistance in living needs.
    7. Referral to case manager for assistance in seeking employment.
    8. Referral to case manager to teach more effective coping skills.
    9. Referral to case manager to ascertain the amount of familial support.
    10. Contact with court appointed attorney of record:
    R.J.Hagood, 2301 S. Austin Hwy, 75 South, Denison, Texas 75020,
    903-465-0501
    11. Contact with father, Danny Thomas of 2424 Texoma Parkway, Crossroads
    Apt. #15, Sherman, Texas 75090, 903-813-4040.

Destination at Discharge:    Jail/Other Correctional Facility

Disposition of Private Medications:    Return All

Medications Returned:
    Any medication received with patient at admissions will be returned with
    the patient at discharge.

TIMA Algorithm:    BD-M/MX

Stage at Discharge:    1


Signature_____
Date_____


8389                                                    01726

AT008388

# Exhibit 72

## Defendant's Disclosure of Exert Witnesses

NO. 051483

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 15th JUDICIAL DISTRICT |
| | § | |
| ANDRE THOMAS | § | GRAYSON COUNTY, TEXAS |

### Defendant's Disclosure of Expert Witnesses

Defendant, Andre Thomas, hereby discloses to the Grayson County Attorney's Office the following expert witnesses that may testify for the defense in the above referenced cause of action.

Dr. Edward Gripon
Beaumont, Texas

Dr. Jaye Crowder
Dallas, Texas

Dr. Richard Rogers
Denton, Texas

Shelli Schada – Mitigation Specialist
Mesquite, Texas

Dr. William Bowen
Sherman, Texas

Dr. Robin McGirk
Sherman, Texas

Dr. James Harrison
Sherman, Texas

Dr. Montford
Midland, Texas

Dr. Backer
Midland, Texas

Toxicologist –Name to be provided
New Orleans, LA

Respectfully Submitted:

Law Offices of Bobbie J. Peterson
120 S. Crockett
Sherman, Texas  75090
Tel. (903) 870-1007
Fax. (903) 870-1446

By: _Bobbie J. Peter_

760

AT000737

**Certificate of Service**

This is to certify that on the 20th day of December, 2004, a true and correct copy of the foregoing document was hand delivered to J. Kerye Ashmore, Assistant Grayson County Attorney, at 200 S. Crockett, Sherman, Texas.

Bobbie J. Peterson

761