# Exhibit 130

**Various Wilson N Jones Medical Records for Andre Thomas's multiple self-inflicted stab wounds to heart**

cc: LYLE L. BROWN, M.D., FAX # 9039570269
    R.J. WILCOTT, MD, FAX # 9039570269

## WILSON N. JONES MEDICAL CENTER
### Sherman, Texas

ADMITTED:    03/27/2004
DISCHARGED:  03/29/2004

ADMITTING DIAGNOSIS:
1.  Multiple stab wounds to chest.
2.  Traumatic pericardial effusion with cardiac tamponade.
3.  Left pneumothorax.
4.  Intercostal artery hemorrhage.
5.  Self inflicted stab wounds to chest.
6.  Police custody.

DISCHARGE DIAGNOSIS:
1.  Sternotomy with ligation of intercostal artery and release of tamponade.
2.  Left chest tube.

HISTORY OF PRESENT ILLNESS AND HOSPITAL COURSE:  The patient is a 21-year-old black male, admitted to the emergency room at Wilson N. Jones Medical Center with self inflicted stab wounds to the chest, occurring about 8:00 on the day of admission.  The patient is a suspect in a homicide and denies recent drug usage, has mild shortness of breath with decreased oxygen saturations.  Computerized tomography scan done in the emergency room showed a left pneumothorax, small.  Echocardiogram revealed a small pericardial effusion with decreased septal wall motion. The patient had an episode of hypotension which resolved with fluid boluses.  Hemoglobin and hematocrit was 13 and 40.  Positive cannabis. Potassium 3.5.  The patient was referred to Dr. Wilcott for release of pericardial tamponade, exploration of wound.  On March 27, 2004, the patient underwent sternotomy with ligation of intercostal artery and release of tamponade with left chest tube.  The patient tolerated the procedure well and was transferred to the intensive care unit with stable vital signs.  On the first postoperative day, the patient was sitting in the chair at the bedside.  Temperature was 97 degrees, blood pressure 108/61, in sinus tachycardia at 128 beats per minute.  Chest wound was okay.  Chest tube had minimal drainage and no air leak.  Jackson-Pratt mediastinal drain had 210 cc in 24 hours.  Potassium 3.9, hemoglobin and hematocrit 12.6 and 38.5.  Good urine output.  The patient was tolerating p.o.  Chest x-ray had positive air bubble in stomach.  Wound had slightly serous drainage from stab wounds.  On March 29, 2004, the patient had stable vital signs and normal sinus rhythm.  Chest x-ray was clear. Chest tube had minimal drainage and no air leak.  Jackson-Pratt drain had minimal.  The wound was clean.  Chest tube and mediastinal tube were removed.  The incision is healing without erythema, drainage or swelling. No shortness of breath.  No complaints of discomfort.  The patient is ready for discharge.

DISCHARGE PLANNING:  Patient is discharged to police custody.  Return to

REPORT: DISCHARGE SUMMARY                                    000017
1551
NAME: THOMAS, ANDRE                    MR#: 32561      RM#: 282

AT001516

Page 2

clinic on April 13, 2004, at 9:00 a.m. for Dr. Lyle Brown. The patient is encouraged to walk daily, use incentive spirometry with deep breathing and coughing. Wash incisions daily with mild soap and water. Band-aids to chest tube sites. May reapply p.r.n.

DISCHARGE MEDICATIONS: Prescription for Motrin 200 mg 2 tablets p.o. q. 6 hours p.r.n. pain.

R.J. WILCOTT, MD

MW/RJW/MDQ80
D:03/29/2004 12:06
T:03/30/2004 13:31
JOB#:193873

1550

REPORT: DISCHARGE SUMMARY

NAME: THOMAS, ANDRE                    MR#: 32561      RM#:

000015

AT001517

cc: KAMAL RATHOD, M.D., FAX # 9038936501
    R.J. WILCOTT, MD, FAX # 9039570269

## WILSON N. JONES MEDICAL CENTER
### Sherman, Texas

DATE:  03/27/2004

CHIEF COMPLAINT:   The patient has a stab wound to the left chest, possibly self-inflicted.

HISTORY OF PRESENT ILLNESS: The patient is a 21-year-old male, who was brought in by ambulance to the emergency room, in the company of the Sherman Police Department, after a self-inflicted stab wound to the chest, according to the officers. This happened about three hours prior to this dictation at 0800 hours. It is now 1200 hours.

The patient was seen in the emergency room and was worked up by the emergency room physician, as seen in the emergency room record. His workup included a chest x-ray, CT scans and echocardiograms. Initially, the patient was stable, however, he did have hypotensive episodes with decreasing respiratory function and he required 100% oxygenation. A CT scan did show a pneumothorax and an echocardiogram showed a decreased wall motion of the ventricular septum with a small pericardial effusion. The patient experienced some blood loss from the stab wound and chest wall. The patient denies any other pertinent history.

PAST MEDICAL HISTORY:  Negative for major illnesses or surgeries.

PAST SURGICAL HISTORY:  Negative.

FAMILY HISTORY:  Nonpertinent to this admission.

SOCIAL HISTORY:  The patient admits to marijuana use.

PHYSICAL EXAMINATION:

GENERAL:   The patient is awake and in acute distress. He is having some shortness of breath, tachycardia and tachypnea. He is oriented and expresses good cognitive function.

VITAL SIGNS: Blood pressure 120 systolic, with brief hypotension which was corrected with a fluid bolus.

HEENT:  Pupils equal, round and reactive to light.

NECK:  Supple.  Clear of any injury.

CHEST: Breath sounds bilaterally were slightly decreased on the left. Anterior chest wall has three 1.5 to 2 cm lacerations in the inferior mammary area on the left, just below the nipple line.

**1553**

REPORT: HISTORY & PHYSICAL

NAME: THOMAS, ANDRE                    MR#: 32561      RM#: 000019

AT001518

Page 2

HEART:  Sounds are not muffled.  Regular rate and rhythm.

ABDOMEN:  Soft.  Good bowel sounds.

BACK:  No sign of injury.

EXTREMITIES:  Clear.

NEUROLOGIC:  Grossly intact.

IMPRESSION:
1.  Stab wound, left chest, possible intracardiac, intrathoracic injury.
2.  Pneumothorax on CT scan.

PLAN:    Surgery for repair and sternotomy with evaluation of the abdomen
at that time.


                                        R.J. WILCOTT, MD

RJW/MDQ80
D:03/27/2004 12:35
T:03/27/2004 13:23
JOB#:193530


**1554**


REPORT: HISTORY & PHYSICAL

NAME: THOMAS, ANDRE              MR#: 32561      RM#:    000020

# WNJ MEDICAL CENTER
## Emergency Department Record

**Rm#** 2
Time to Rm: 093
☐ Direct to ER exam rm
☐ Assist Gown/Clothes

THOMAS, ANDRE MO-MED
03/27/04 M 03/17/93 21

Date 3-27-04   Triage Time 0950   Level ①  2  3

Patient Name: Thomas Andre   DOB: [redacted]   21

**CHIEF COMPLAINT** ☐ Work Related/Company
☐ Industrial Pref. Reviewed

Self inflicted

Onset of Symptoms/MOI:
Stab wound to chest, 3 stabs
wound in chest 2 inch + 1 in
no active bleeding
Pt states wanted to kill himself.
SPD medic + police on scene to PD

Triage Interventions: ☐ Ice Bag ☐ Splint ☐ Circulation check ☐ O2 ☐ Monitor

Last Tetanus / Immunizations / Pregnant Yes ☐ No ☐  Ht: 5'10  Wt: 145
ALLERGIES: ☒ NKDA   Claritin
CURRENT MEDICATIONS: ☐ NONE  ☐ SEE MED LIST ATTACHED

HISTORY/SCREENING ☐ None Significant

**AIRWAY** ☒ Patent ☐ Other
**BREATHING** ☒ Normal ☐ Labored ☐ Audible Wheeze ☐ Other
**CIRCULATION** Skin: Color
**NEURO** ☒ Alert

PHYSICIANS ORDERS

NURSE SIGNATURE: 1555

MD SIGNATURE: Kyungho S. Choi, MD

000021

AT001520

```
PH Live Data Acct              P H A R M A C Y      PPHX901  Page 1 of 1
Sherman TX                     Patient Profile      Printed: 03-28-04 22:2
=============================================================================
              Nurse Station : SI Surgical Intensive Care Unit

    Patient Name : NO-INFO ALEXANDER,JASON        Number : 0016152365
    Room         : 010
    Diagnosis    : PENETRATING TRAUMA TO CX,POSS. TO HEART
    Allergies    : CLARITIN

=============================================================================
                    * * *  Active Drug Orders  * * *
                          ------------------

  Start Medication                                Dose      Rt Sched    Doses

  03/27 DARVOCET N 100 (PROPOXYPHENE NAP W/APAP)  1-2 TAB   PO Q4-6H PRN   6
        TAB

  03/27 PHENERGAN AMP* (PROMETHAZINE) 25MG/ML AMP 12.5-25 MG IV Q6H PRN    1
        1 ML

  03/28 REGLAN (METOCLOPRAMIDE) 10MG TAB          1 TAB     PO QID         3

  03/28 MS PCA (MORPHINE SULFATE) 1MG/ML INJ 30   30 ML     IV PRN         1
        ML

  03/28 KETOROLAC (TORADOL) 10MG TAB              1 TAB     PO Q6H         4

 ----------------------------------------------------------------------------
                     * * *  Active IV Orders  * * *
                          ----------------

  Start Medication                              Flow/Dose   Rt Sched    Doses
```

1563

000025

AT001528

| Doc. every 20 minutes | Recovery | Preop | Time |
|---|---|---|---|
| POST ANESTHESIA | SCORE | | |

**Respiration:**

2 = Able to breathe & cough freely
1 = Asleep-adequate airway
0 = Dyspnea-limited breathing-apneic

**Circulation:**

2 = BP + 20% of Preanesthetic level
1 = BP + 20-50% of Preanesthetic level
0 = BP + 50% of Preanesthetic level

| | | NA | |
| | | NA | |
| | | NA | |

**Consciousness:**

2 = Fully awake
1 = Arousable on calling
0 = Non-responsive

**Color:**

2 = Pink
1 = Pale,dusky,blotchy,other
0 = Cyanotic

**Activity:**

2 = Move four extremities on command
1 = Move two extremities on command
0 = Move zero extremities on command

INITIALS

SIGNATURE _____ / / ____ MDA, CRNA, RN
                                                  DATE

## POSTOPERATIVE ASSESSMENT

| | | | | |
|---|---|---|---|---|
| | PACU/DSU  BL~  DATE 3/27/4  TIME: 1430  SIGNATURE | | | |
| | B/P 144/00  168/00  PHYSIOLOGICALLY STABLE  ☑ YES  ☐ NO  RESPONSIVE  ☑ YES  ☐ NO | | | |
| A | P  105 | | | |
| N | R  20 | O₂ 10'an Facemask - Mae -VSS | | |
| E | O2 Sat  100 | Resp Adequate  Drowsy | | |
| S | Complications/Comments | | | |
| T | | | | |
| H | DISCHARGED TO | ☐ DSU | FLOOR ☐ | |
| E | MDA SIGNATURE | | | |
| S | POST OP VISIT | DATE | TIME: | DATE/TIME |
| I | | PHYSIOLOGICALLY STABLE | | ☐ YES  ☐ NO |
| A | COMMENTS | | | |
| | | | | |
| | | | | |
| | MDA SIGNATURE: | | DATE/TIME: 3/27/14 | |

1731

000044

CLAB REPORT #30

WILSON N. JONES MEMORIAL HOSPITAL
500 N. HIGHLAND SHERMAN, TEXAS
CLINICAL LABORATORY REPORT

CHEM   PAGE:   3
PRINTED DATE/TIME
03/27/2004 11:08

ACCOUNT NUMBER: 0016152365        MEDICAL RECORD #: 0000032561
PATIENT NAME: THOMAS, ANDRE L
D.O.B.: ▓▓▓▓▓   AGE:   21  SEX: M        LOCATION: ER        ROOM #:
                                 DOCTOR: ER - PHYSICIANS
---------------------------------------------------------------
COLLECTED: 03/27/200410:34    BY: ER
 RECEIVED: 03/27/200410:34                    ACCESSION NO: 4087-GL4917
ACCESSION COMMENT: . Urine Type:C
---------------------------------------------------------------

| PROCEDURE NAME | RESULT | REFERENCE RANGE | UNITS | TECH |
|---|---|---|---|---|
| DRUG OF ABUSE SCREEN | | | | |
| PHENCYCLIDINE | NEGATIVE | NEG | | SARAHM |
| BENZODIAZEPINES | NEGATIVE | NEG | | SARAHM |
| COCAINE | NEGATIVE | NEG | | SARAHM |
| TETRAHYDROCANNABINOL | POSITIVE C | NEG | | SARAHM |
| OPIATES | NEGATIVE | NEG | | SARAHM |
| BARBITURATES | NEGATIVE | NEG | | SARAHM |
| AMPHETAMINES | NEGATIVE | NEG | | SARAHM |

1855

LAST PAGE OF REPORT

000061

AT001810

# Exhibit 131

## Grand Jury testimony of Grant Krahl

1    family or anything outside of the hospital treatment?

2        A.    No, sir.

3                MR. BROWN:  Questions?  Okay.  We

4    appreciate you coming.  You are free to go.

5                (Mr. Wendt exited the grand jury room.

6    Mr. Krahl entered the grand jury room.

7                GRANT KRAHL,

8    having been sworn, testified upon his oath as follows:

9                DIRECT EXAMINATION

10   BY MR. BROWN:

11       Q.    Would you introduce yourself to the grand jury?

12       A.    My name is Grant Krahl.  I am an ICU nurse at

13   Wilson N. Jones.

14       Q.    I am Joe Brown, the Grayson County Attorney.

15   This is the Grayson County grand jury.  Do you understand

16   they are investigating the capital murder charges against

17   Andre Thomas.

18       A.    Uh-huh.

19       Q.    Yes?

20       A.    Yes.

21       Q.    Have you ever given your testimony in front of

22   a court reporter before?

23       A.    No.  I have never done this before.

24       Q.    This lady right here is writing down everything

25   that you say.  And so you could help me by answering out

1050

93

1    loud, with a yes or no, as opposed to a uh-huh or

2    huh-huh.

3        A.    Okay.

4        Q.    She can't write those things down.  I have in

5    front of you what I have marked as exhibit number two

6    which I will represent to you is the medical records from

7    Wilson N. Jones on Mr. Thomas.  They are numbered in the

8    bottom right side and if you will refer to them for the

9    record, would you help me point out what you are talking

10   about and what page you are talking about.  So when we go

11   back, we will know what you were referring to.

12       A.    All right.

13       Q.    If I prompt you to say yes or no, I am not

14   trying to be rude.  I am trying to make sure that it

15   shows up on the record.  Okay?

16       A.    Okay.

17       Q.    Tell us your background, your training and your

18   experience and kind of lead us up in the life of Grant

19   Krahl until March the twenty-seventh of 2004.

20       A.    I am forty-six years old.  How much do you want

21   to know?

22       Q.    Well, speak in broad terms.

23       A.    Well, I became a nurse five years ago.  I went

24   straight into ICU.  I worked for Baylor for a year and

25   then I came to Wilson N. Jones.  I have been there for

1051

AT001019

1    almost four years.  I have been in ICU the whole time

2    I went to school at North Central College in Gainesville

3    and I live in Gainesville.  What else do you want?

4         Q.   That is good.  So you worked there for five

5    years in the ICU the whole time.  Are you a RN?

6         A.   Yes, I am a RN.  I have worked at Wilson N.

7    Jones for almost four years and one year at Baylor.

8         Q.   Were you on duty on March the twenty-seventh of

9    2004?

10        A.   As far as I know.

11        Q.   Do you have the memory of treating Andre

12   Thomas?

13        A.   Yes.

14        Q.   And what was your shift that day?

15        A.   Seven PM to 7:30 or so the next morning.

16        Q.   So it was pretty early in your shift?

17        A.   Yeah.  I had him the whole shift from 7:00 PM.

18   Actually I got report from 7:00 to 7:30 and I had him

19   before that.

20        Q.   My goal by the time that you leave here is in

21   talking in broad terms.  I need to know every contact

22   that you had with him and every conversation that you had

23   with him and every description of all of your contact

24   with him.

25   **1052** A.   I will try my best.

JANET M. KAMRAS                    00261
REGISTERED PROFESSIONAL REPORTER

AT001020

95

Q.   You have your records in front of you if you
need them.

A.   Okay.

Q.   Tell us how you first made contact with him.

A.   I got report.  I came in and I did my
assessment.

Q.   Where was he in his treatment?

A.   He was in bed number ten.

Q.   He had already been brought in and had been
treated?

A.   Yes.  I had been brought in, I believe,
sometime that afternoon.  I would have to look again.
Maybe three or four or five o'clock to the ICU in bed ten
from the OR.

Q.   Did you see him in the ER when he initially
came in?

A.   No.  He was already in the ICU when I got
there.

Q.   So he had been to the ER and he had gone to
surgery and he was out of surgery and he was in recovery
and ICU?

A.   He went through recovery and then to ICU.

Q.   You don't see him until after he comes to ICU?

A.   Right.

Q.   It was later in the afternoon?

1053

96

1      A.    Yes.

2      Q.    On that day?

3      A.    Yes.

4      Q.    Can you refer to that and tell us what your

5  encounter was with him the first time?

6      A.    I did my assessment which is basically look at

7  all of their systems and their neuro and their cardiac

8  and all of that.

9      Q.    How do you record that?

10     A.    Well, it is in my nurse's notes.  I guess they

11  are in here somewhere.  I could find them.

12     Q.    I am sure they are.

13     A.    Let me find them then  and then we can go from

14  there, I guess.

15     Q.    It looks like they are page 148.

16     A.    That is it.

17     Q.    Where would your first note be?

18     A.    We have a flow sheet also.  These are my

19  written notes right here.

20     Q.    Okay.  What page is that?

21     A.    That would be 148, 149 and you also have a flow

22  sheet where you check off certain things as being

23  whatever it is they say.

24     Q.    Is that this one?

25     **105**  A.    Yes, that is part of it.

97

1    Q.    That is 144?

2    A.    Yes.  This is where I picked him up at 7:30.

3    Q.    You are referring to page 145?

4    A.    Yes. 145.  And there is 146 and 147 and some

5    other pages also maybe.  Yes.  143, 142, and 141.  This

6    is all of mine here.

7    Q.    Okay.  Why don't you give us an overview first

8    of those twelve hours of his demeanor and your experience

9    with him.

10   A.    I came in and assessed him.  I assessed him at

11   twenty minutes after 8:00.  I got report.  Apparently, I

12   got there a little bit late that day.  I came in and I

13   assessed him.  Basically I believe I assessed his

14   drainage.  I believe he had a chest tube.  I know he had

15   a JP drain.  He had a chest tube and a JP drain.

16         I basically assessed the drainage which I

17   had down here as being bloody drainage and checked his

18   vital signs, his rhythm on the monitor and his blood

19   pressure and all of that which, you know ---

20   Q.    Talk to me about your verbal communication with

21   him.

22   A.    Well, I asked him, you know, if he was hurting

23   and which I do that with all of my patients every time I

24   come in.  I assess that after they had surgery.  I would

25   have to look to see.  I need his MAR and that is not

1055

86

1  here.

2      Q.   You have it.

3      A.   Let me look.  Okay.  So he was hurting and

4  complaining of incisional pain and I don't have the MAR

5  in front of me so I don't know what I gave him.

6      Q.   I mainly want to concentrate on what it is that

7  he said and what you said.

8      A.   Well, as far as at that point, he responded

9  appropriately to my questions as far as whether he was

10  hurting.  You know, he followed commands because we ask

11  them if they can squeeze our hand and  move their feet

12  and all of that.  I looked, you know, and checked his

13  pupils and which I recorded on page 142, pupils.

14           His upper extremities, his lower

15  extremities.  His upper extremities were all normal.  It

16  was not normal because he was in pain and he could not

17  get up and go walk.  But usually if they, you know, if

18  they are out of surgery and they are in pain, we don't

19  put normal power because like I said, they can't get up

20  and walk.  But overcome their distance means they could

21  lift off the bed and they can squeeze your hand and move

22  their toes and all of that.

23      Q.   So he was following commands?

24      A.   Yes.  He was communicating with me.  He could

25  answer all of the questions.  I asked him if the room was

AT001024

1   hot or cold or okay, and he said it was all right.

2      Q.   I am looking at page 142.   There is an area for

3   assess verbal response.   There are some blank places

4   where you could have checked as to disoriented and

5   confused?

6      A.   Right.

7      Q.   None of them were checked.

8      A.   He was oriented and his speech was clear.

9   Quite often, if I have a confused patient, they will say

10  words that you cannot understand.   They will make sounds

11  or they will say words that are inappropriate for the

12  situation.   That is what those boxes are for.

13     Q.   There is a box for inappropriate words and that

14  is not the case?

15     A.   Right.

16     Q.   At any of your time with him did he say

17  anything inappropriate?

18     A.   The only time I don't know if you would call it

19  inappropriate.   I think I got it later on in the evening.

20  But I will see where it was it.   This was at 11:30.   Of

21  course, he had been reading the Bible, the book of

22  Revelation for, oh, it probably had been thirty minutes

23  or so, maybe a little bit longer.

24          And I asked him if he needed me to turn

25  the light on because there was a light on in the back,

AT001025

100

1    toward the back of the room.  There was enough light to

2    see but not real clear.  He said, no, he did not need any

3    more light to read.

4                    As the evening went by, he started reading

5    faster and faster.  His heart rate got up to 170 and 180

6    and it starts there on page 149.  Anyway, I tried to get

7    him to relax and he continued reading.

8         Q.   What do you mean by relax?

9         A.   Well, you could tell that he was reading faster

10   and faster and like I said, his heart rate was going up

11   and I didn't want him to ---  Whenever your vital signs

12   start elevating and you have just been operated on, you

13   have a good chance to you could start bleeding.  And I

14   didn't want that to happen so I was trying to get him to

15   calm down.

16                    Earlier, let me see, at 22:50 it says,

17   patient claiming incisional pain and with breathing and

18   nausea and vital signs ---  That is when his heart rate

19   was 150.  Let me see where is that at.  Yes.  This is the

20   bottom of page 148.

21        Q.   Would you read that?

22        A.   There is a risk of tamponade.  Tamponade is

23   when you have bleeding around the heart and the heart is

24   in a fixed area and if you have a lot of bleeding in

25   there the heart has trouble beating and it has shallow

AT001026

1  or muffled tones.  That is what you look for.

2                      In fact, that is what was wrong with him

3  when he came to the ER.  He had tamponade.  They had to

4  go in there and vacate that blood.  He had a JP drain in

5  there to keep that blood drained out so it would not

6  happen again.  That is something that you monitor for.

7                      If for some reason the JP drain clots off,

8  then he could possibly go into tamponade again.  That is

9  something that we watch for and keep it patent to where

10  it won't do that.

11      Q.   On the top of page 139 can you describe that?

12      A.   This is 23:30.  The patient's heart rate is 170

13  and 180, regular sinus tac.  That just means that it was

14  a regular rhythm which it was too fast but it wasn't like

15  an afib.

16      Q.   Go on.

17      A.   Okay.  The patient is reading the book of

18  Revelation at a rapid pace.  The patient is encouraged to

19  relax.  But he refuses and continues with this behavior.

20                      On page 125, patient now resting

21  comfortably with eyes closed.  Heart rate is 130.  Star

22  agent as ordered.  And 23:58 H and H is 13.  The other

23  base line is the H and H before that and you can see how

24  much.  It had dropped quite a bit and you know that he

25  bled out quite a bit.  These numbers are stable.

1059

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00268

AT001027

102

1      Q.    Were there any more problem with the reading or

2  unusual behavior?

3      A.    Not after that.

4            GRAND JURY MEMBER:  Did he say anything to

5  you about what he was reading in Revelation or why he was

6  reading Revelation?

7      A.    No.  He did not say anything as to why.  He was

8  just reading it.

9      Q.    Did he say anything unusual or out of the

10  ordinary?

11      A.    Really he did not.  You know, I didn't feel it

12  was my place to ask him questions about what happened so

13  I didn't.  He did not volunteer any information.

14  Basically I asked him questions about the nature of his

15  condition.  And other than that really, other than

16  reading like I said, The Book of Revelation.

17            GRAND JURY MEMBER:  How do you know that

18  is the book he was reading?

19            MR. KRAHL:  Because I am a Christian.  I

20  know the Bible real well.

21      Q.    Was he reading out loud?

22      A.    Yes, he was reading out loud.

23      Q.    Was he?

24      A.    Yes.

25            GRAND JURY MEMBER:  Where did the Bible

1060

AT001028

1  come from?  The hospital room?

2       MR. KRAHL:  Yeah, there is a Bible in each

3  room.  I believe the officer gave it to him.

4       GRAND JURY MEMBER:  Was the officer there

5  the whole time?

6       MR. KRAHL:  Yes.  In fact, I have in my

7  notes that he was there somewhere.  Jennifer Bentley was

8  there at that time.  Ryan and I can't pronounce his name.

9  He came there at 24:00.

10      Q.    (By Mr. Brown)  And in all of these assessments

11 that you were doing, you asked him lots of questions

12 about his medical condition and how he was feeling and

13 that type of thing?

14      A.    Right.

15      Q.    Was he communicating appropriate with you?

16      A.    Yes.  He answered every question appropriately.

17      Q.    Did he have any problems understanding or any

18 problems in expressing himself?

19      A.    No problems.  He had the JP drain and he had a

20 Foley and he had chest tubes.  When I have a confused

21 patient, I have to worry about him pulling his tubes out.

22 His hands were untied.  I was not concerned because of

23 his demeanor whether he would pull anything out because

24 he was very calm at the time.  Except for when he was

25 reading the book, when he was reading the Bible.  Other

AT001029

1   than that he was very subdued and he did not really say

2   a whole lot.

3       Q.   Can you tell from your records what medication

4   was he under?

5       A.   I need the MAR.  Maybe it is back here.  I am

6   pretty sure I gave him Darvocet.  Here is one.  He was

7   on ---

8       Q.   Tell us what page you are on.

9       A.   This is on page 110.  He got a dose of Toradol

10  at 21:00.  We generally try to give them regularly

11  scheduled doses of Toradol.  That is more for their pain

12  control on day two, three, four and out.  I know this was

13  day one and we get them started on it.

14          This is a regular dose whereas the other

15  ones are PRN or as needed.

16      Q.   When was your assessment done?

17      A.   Right at 8:20.  It would have been forty

18  minutes before that.

19      Q.   So as far as you could tell, he did not have

20  any pain medication before the Toradol?

21      A.   Well, I would have to look.  I gave him some

22  Darvocet at 20:30 which was shortly after I talked to him

23  because he said he was in pain.  That is a PO med and it

24  takes a little while to kick in as opposed to the IV.

25          At 21:08 I gave him four milligrams of

1062

AT001030

105

1   morphine.  Apparently, the Darvocet had not kicked in

2   soon enough and he was still hurting.  At 21:55 I gave

3   him twenty milligrams of Morphine.

4        Q.   Was this after your assessment of him?

5        A.   Yes.

6        Q.   It was after you had asked him some more

7   questions?

8        A.   Right.  At 22:55 I gave him Phenergan.  That

9   was right when he was reading, you know, the Bible so

10  fast and I was afraid --- He was complaining that he was

11  nauseous and that is why I gave him the Phenergan.  I

12  didn't want him to start heaving and rip his sutures

13  open.

14            So he got pain medicine through the night.

15  He never actually went to sleep, you know.  He was awake

16  the whole time.  I mean, earlier, as far as, from the

17  time that I assessed him until he was reading at a rapid

18  pace, he was awake that whole time.  I believe 23:45

19  patient now resting comfortably with his eyes closed.

20       Q.   Was the rest of the night uneventful?

21       A.   Well, you know, off and on he would complain

22  that he was hurting like at two o'clock the patient

23  complained of incisional pain a eight over ten.  That

24  means on a scale of one to ten with one being not at all

25  and ten being unbearable how badly he was hurting, give

**1063**

AT001031

106

1    me a number.  So that is what the eight over ten means.

2    He was not nauseous at two o'clock.

3              I gave him some --- Let me see what I

4    gave him.

5        Q.    That is okay.  Let's stay on his demeanor and

6    his behavior.  Was there anything else that night that

7    seemed that he was acting in any way out of the ordinary?

8        A.    The only thing that was out of the ordinary was

9    his reading, the rapid reading of the book.  And I asked

10   him to stop reading so fast because he was getting his

11   vital signs all out of whack and that is about the only

12   thing unusual the whole night.  Other than that, he

13   answered questions and he did everything that I asked him

14   to do.

15       Q.    Did he ever say anything about his family or

16   anybody outside of the hospital?

17       A.    No.

18       Q.    He did not make any reference to his wife or to

19   his kids or the murder or anything like that?

20       A.    No.  I know the nurse and I don't know if she

21   has been in here yet.  But the nurse that had him before

22   me, he said some things to her and I can't recall what

23   they were exactly.  But it was some things of that

24   nature.

25   106  Q.    Who was the nurse?

AT001032

107

1        A.   Sheryl Dodgnia.  She had him like from four

2   o'clock until when I had him.  She only had him like

3   three hours.

4              GRAND JURY MEMBER:  When he was reading,

5   was he reading out loud?

6              MR. KRAHL:  Yes.

7              GRAND JURY MEMBER:  Did he show any

8   heightened anxiety?  You know, I can read fast too.  I

9   don't feel like I am preaching to myself or to others.

10             MR. KRAHL:  Uh-huh.

11             GRAND JURY MEMBER:  I don't sound like I

12  am angry or I am looking for ---  Give me just his

13  personal.  When he was reading, was he laughing or was he

14  reading with emotion or was he reading rapidly with

15  determination or with self-evaluation?  Do you

16  understand?

17             MR. KRAHL:  I will just say reading

18  rapidly with emotion.  You could tell he was anxious

19  because his heart rate would not have went from 114 to

20  180.  I guess anxious and reading with emotion would be

21  what I would say.

22        Q.   Did you treat him other than that night?  Did

23  you see him the next day?

24        A.   No.  I didn't see him again after that.

25        Q.   Only this one night?

1065

AT001033

1    A.    Yes.

2            GRAND JURY MEMBER:  How long did he read

3    like that aloud?

4            MR. KRAHL:  I am guessing for about an

5    hour because, you know, I didn't have a problem with him

6    reading until his heart rate got up so high.

7            GRAND JURY MEMBER:  Did she say reading

8    aloud?

9            MR. KRAHL:  Yes.  He as reading aloud.  As

10   far as how long, I would estimate for about an hour.  I

11   am not for sure.  I would have to look at my notes.  Like

12   I said, the longer it got, the more anxious he got and

13   the higher his heart rate got.

14           GRAND JURY MEMBER:  Did you ask him to

15   stop?

16           MR. KRAHL:  Yes, I did.

17   Q.    (By Mr. Brown)  Is there anything else that you

18   think we need to know or that stands out in your mind

19   about your treatment of him?

20   A.    Not especially.  Like I said, he answered the

21   questions appropriately.  And other than the reading

22   episode, he was quite normal all night.   He was very

23   calm the whole night and then he was very anxious during

24   the reading of the Revelation.  There was really no

25   in-between that.  So it was either one or the other.  He

1066

AT001034

1  did not volunteer any information that I did not ask him.

2         GRAND JURY MEMBER:   Do you think that for

3  a twenty-one year old man, did you feel like he was just

4  a kid?  He was twenty-one years old?  I mean, did you

5  consider him looking and acting like an adult or did you

6  see him as a ---  He had no feelings one way or the

7  other?

8         MR. KRAHL:  It is kind of hard to tell

9  just from the time I had with him because I just asked

10 him about his medical condition and he would answer the

11 questions that I asked.  So I would as an adult because

12 all I treat are adults and he did not really act any

13 different than anybody else that I treat.

14         Like I say, he was not trying to pull his

15 tubes out and he was not trying to get out of bed and all

16 of that.  For one thing, he was concerned about the

17 amount of blood that was coming out of his JP drain.  I

18 recall telling him that was normal and he needed to

19 evacuate the blood out.

20    Q.   (By Mr. Brown)  How did he express that?

21    A.   Well, you know, the JP drain was right here and

22 I had to empty it about every thirty minutes to an hour.

23 He saw it there and I can't remember exactly what he

24 said.  I just know that he expressed concern over the

25 amount of blood and it was dark blood that was coming out

1067

110

1    and he asked if that was normal or not and I said, yes,

2    for what happened to you, it is normal.

3         Q.    Did he make a comment about the color of it?

4    About it being dark?

5         A.    Let me see.  It was probably about the amount

6    because after I had emptied it two or three times, you

7    know, he made a comment about the amount of blood that I

8    had to empty out.  I guess maybe he thought he was

9    bleeding to death.  Like I say, I can't remember exactly

10   what he said, but I remember responding to that concern.

11        Q.    Were there any other situations like that where

12   he expressed concern about his treatment or anything that

13   showed his understanding of what was happening to him?

14        A.    Well, when I DCed his Foley.

15        Q.    Does that mean discontinued?

16        A.    Yes, discontinued.  The Foley goes up into your

17   bladder and you blow up a balloon to hold it up in there

18   so it won't come out.  It will come out if you pull it

19   hard enough.

20              Anyway, when I took that out, I think it

21   was 6:00 or 6:30.  Which most people get real anxious

22   when you are getting ready to do that.  You could tell

23   and I explained the procedure to him and the best thing

24   to do is to explain it and then to just get it over with.

25   You could tell he was really anxious because I was about

1068

00277

AT001036

111

1   to pull the Foley out.

2       Q.   How did he express his being anxious?

3       A.   Basically just not verbally.  I would say I

4   guess I have seen that look a lot of times.  People kind

5   of have that look of shock on their faces that, you now,

6   what is fixing to happen to me and then in just a moment

7   it is over with.  It is no big deal taking it out.  It is

8   a lot bigger deal to put it in.  I think he was like, and

9   then it is over.  It is kind of like that.  That is

10  pretty typical of anybody when you DC their foley because

11  they knew what it was like going in and it was sometimes

12  painful.  And they think coming out that it would be

13  painful too, but in most cases it is not and it is over

14  with in an instant.  It was just kind of like shock,

15  anxiety and then all of a sudden, relief.

16      Q.   Would you tell me about him?

17      A.   Basically, he was just looking and kind of

18  staying back like this and his eyes were real big and you

19  know, what are you fixing to do and although he knew.

20  That was basically it.  He was not saying anything.  That

21  is what it was.  I said something like, that wasn't too

22  bad, was it?  And he said, no.

23      Q.   You know, were there any other statements that

24  indicated he was aware of what was going on?

25      A.   Well, we wouldn't have taken the Foley out if

**1069**

112

1   we did not think he was capable of taking care of his

2   elimination needs on his own.  As far as what happened

3   from this point forward, I don't know.

4             But if we think that a patient is confused

5   or unable to understand or take care of their own needs,

6   we leave the Foley in.  So we took it out and the next

7   morning that is what the doctor had ordered.

8        Q.   Is anything else that you think we need to

9   know?

10       A.   Let me see.  You know, other than he did not do

11  random things like a lot of confused patients do.  You

12  know, just out of the blue, they might pull their Foley

13  out or pull their JP drain out or say something that is

14  inappropriate.  He did not do that the whole night.

15       Q.   So you felt like he knew what was going on?

16       A.   Yes, I felt like he knew what was going on.  I

17  did.  I never had to clarify when I asked him a question

18  what he was telling me.  I understood what he was telling

19  me when I asked him a question.

20       Q.   He never made any references to strange things?

21       A.   No.  But the Book of Revelation is written in

22  apocalyptic literature and it has a lot of symbolism.

23       Q.   But other than reading it, he did not talk

24  about it?

25       A.   No, he did not talk about it.  He just read it

**1070**

JANET M. KAMRAS

AT001038

113

1    is all he did.

2             MR. BROWN:  Thank you very much.  You are

3    free to go.

4             (Mr. Krahl exited the grand jury room.

5    Mrs. Ford entered the grand jury room.)

6                  Peggy Thedford,

7    having been sworn, testified upon her oath as follows:

8                  DIRECT EXAMINATION

9    BY MR. BROWN:

10        Q.    Ma'am, would you introduce yourself to us?

11        A.    My name is Peggy Thedford.

12        Q.    Mrs. Thedford, this is the Grayson County Grand

13   Jury.  I am Joe Brown.  We met outside before this;

14   right?

15        A.    Yes.

16        Q.    I have not talked to you before today?

17        A.    No.

18        Q.    Can you tell us what you do for a living?

19        A.    I work at Wilson N. Jones laboratory.  I am a

20   medical technologist.

21        Q.    What does that involve?

22        A.    It involves drawing blood and running lab

23   tests.  I am a supervisor.

24        Q.    How long have you done that?

25        A.    I have been there for about fifteen years.

**1071**

AT001039

64

1   beyond that.

2            GRAND JURY MEMBER:  But nothing else came

3   out?

4            DR. BOWEN:  No, ma'am.

5            MR. BROWN:  Okay.  I know your time is

6   valuable.  We appreciate you being here.

7            (Dr. Bowen exited the courtroom.  Dr. Choi

8   entered the courtroom.)

9            KYUNGHO SCOTT CHOI, M.D.

10  having been sworn, testified upon his oath as follows:

11           DIRECT EXAMINATION

12  BY MR. BROWN:

13      Q.   This is the Grayson County Grand Jury.  Would

14  you introduce yourself to us, please, sir?

15      A.   My name is Kyungho Scott Choi.  I am a medical

16  doctor.  I work at the emergency room.  I work at Wilson

17  N. Jones Medical Center in the emergency room.

18      Q.   Would you spell your first name?

19      A.   It is K-y-u-n-g-h-o C-h-o-i.

20      Q.   Do you go by Scott?

21      A.   That is my middle name.

22      Q.   That is easier.  I will go by Scott.  Okay.

23  Dr. Choi. My name is Joe Brown.  I am the Grayson County

24  Attorney.  We just met outside in the hall; is that

25  right?

1072

1      A.     Yes.

2      Q.     And the Grayson County Grand Jury is looking at

3  investigating criminal charges against an Andre Thomas.

4  Do you understand that?

5      A.     Yes.

6      Q.     Have you given a deposition before, I assume?

7      A.     No.

8      Q.     No deposition?

9      A.     In a case like this?

10     Q.     Not in a criminal case, but have you given your

11  testimony to a court reporter before?

12     A.     No.

13     Q.     Wow.  Lucky.  Very lucky.  All right.  Well,

14  she will write down everything that we say and so, if you

15  would, help me by answering yes or no or out loud because

16  she can't take down a shake of the head or a nod.

17     A.     Sure.  No problem.

18     Q.     I provided to you what I have marked as exhibit

19  two.  There are 167 pages, I believe.  Is that accurate?

20     A.     Yes.

21     Q.     And I will represent to you those are the

22  records from Wilson N. Jones Medical Center, if you need

23  to refer to those.  Okay?

24     A.     Yes.

25     Q.     Would you tell us your background a little bit

1  and things on your resume and your qualifications and

2  certification and things of that nature?

3      A.   Well, I came to American when I was fifteen.  I

4  went to school.  I went to medical school.

5      Q.   Where did you go?

6      A.   I went Saint George University for Medicine in

7  Grenada.

8      Q.   You went where?

9      A.   Saint George.

10     Q.   In Grenada?

11     A.   Yes.  For the first two years and I did really

12  well and I transferred into the University of American

13  Dentistry of New Jersey.

14     Q.   You went to dentist school?

15     A.   No.  It is the University system for medicine

16  and dentistry.

17     Q.   Okay.

18     A.   But it was the University for Medicine and

19  Dentistry of New Jersey.  At the university they have one

20  dental school and two medical schools and a pharmacy

21  school also.  So I went to medical school.

22     Q.   Okay.

23     A.   Around four years graduated from there then I

24  went on to Emergency Room Medicine Residency program at

25  North Shore University Hospital at Manhattan in New York

1074

1    City

2        Q.    Okay.

3        A.    I finished that.

4        Q.    So you finished your residency at New York and

5    then what?

6        A.    I finished that and I came to Greenville, Texas

7    and I practiced for one year in the ER and then I moved

8    over to Wilson N. Jones Medical Center.

9        Q.    How long have you been at Wilson N. Jones?

10        A.    I started on May the first of last year so it

11    is almost one year.

12        Q.    Almost one year.  Okay.  As far as speciality

13    as an emergency room physician?

14        A.    Yes.

15        Q.    Do you have any certifications or any other

16    things that you want us to know?

17        A.    Well, I am currently past the first part of my

18    Boards, the American Board of Emergency Medicine.  The

19    second part is the oral exam which should be taken in

20    October of this year.  I have a certificate of American

21    Pharmacological for Emergency Cardiac Trauma Life Support

22    and American College Life Support and I just did the

23    Pediatric Emergency Medicine.

24        Q.    Were you on duty at Wilson N. Jones Hospital on

25    March the twenty-seventh of 2004?

1075

AT001043

68

1       A.   I saw this patient.   I don't exactly remember
2  what date that was.

3       Q.   Let see if we could find your ---   This was
4  from notes.   This is it.

5       A.   March the twenty-seventh of 2004.

6       Q.   Let me find the ER record.   Is that it?

7       A.   There you go.

8       Q.   On the initial emergency room record, start on
9  page twenty-one?

10       A.   Yes.

11       Q.   If you would, tell us and walk us through your
12  contact.   When did you first contact Andre Thomas?

13       A.   When the emergency medical crew brought in the
14  patient.   When the ER crew brought the patient into room
15  two of our emergency department.   That is the first time
16  I saw the patient.

17       Q.   Describe what you saw?

18       A.   He came in with a handcuff on both wrists.   I
19  see that on the chest he had two superficial lacerations
20  and blood oozing out.   The gauze was half on there.

21       Q.   The gauze?

22       A.   Yes.

23       Q.   And so you saw two superficial wounds?

24       A.   Yes.

25       Q.   Is that all the wounds there were?   Just two?

1076

69

1      A.    Yes.

2      Q.    What did you do when you saw that?

3      A.    Well, when I saw that, immediate I knew that

4  was the location of the heart.   So before that, the

5  emergency medical room crew called us in and they said

6  they are bringing in a patient with a stab wound to the

7  chest.

8      Q.    Did you know anything about the circumstances

9  of the stab wounds?

10     A.    No.   So I prepared for emergency, you know,

11 possibly operation to save his heart or lungs or

12 anything.   We prepared for that five or ten minutes.

13 They rushed in.   I saw the patient.   At that time he was

14 alert and awake and oriented and he was moving and

15 everything.

16     Q.    Did he say anything?

17     A.    No.   He just said, "Oh, it hurt."   You know.   So

18 I asked him, "Where do you have pain?"   He pointed to the

19 chest.   I asked him did you have any other wounds on the

20 rest of your body?   He said, "No."

21     Q.    Okay.

22     A.    So I quickly, you know, we go through this

23 routine.   I looked for the airway, neck, chest, lungs

24 quickly in like one minute to make sure all the immediate

25 life threatening wounds are not there.   So the only thing

1077

1  that I found is he had a laceration here.   That was not

2  like shooting blood.   It was a little oozing out so I

3  thought it was superficial, but because it was a stab

4  wound, you can never be sure if it went down or they cut

5  the lung or it cut the heart or a vessel or who knows.

6  So I prepared.   I got quick IV line in took a chest X-ray

7  to make sure there was no puncture wound and I called the

8  general surgeon and chest surgeon.

9       Q.    So when you come in, the first thing you say to

10  him or he says to you is you ask him if he has any other

11  wounds?

12       A.    Yes.

13       Q.    And he said, "No"?

14       A.    Yes.

15       Q.    Is he making eye contact with you?

16       A.    Yes.

17       Q.    Is he responding appropriately?

18       A.    Definitely.

19       Q.    And then what is the next conversation that you

20  had with him?

21       A.    Then we asked simple questions, trauma

22  questions.   The first thing I asked him was his allergies

23  to medications.

24       Q.    Okay.

25       A.    Did he have any allergies to be given

AT001046

71

1   medications so we know what to expect.   He did not have

2   any allergies to any drugs.

3             And then I asked him his medical

4   condition, his past medical history and did he have any

5   medical problems and he said no.   And any surgeries

6   previously, no.   I asked him the last one was if you have

7   to operate you worry about anesthesia so you have to know

8   if they had anything to eat or drink.   And then what

9   happened.

10       Q.   You asked him when his last meal was?

11       A.   Yes.

12       Q.   What was his response to you?

13       A.   That actually I don't remember.

14       Q.   Were his responses to those questions

15   appropriate?

16       A.   Yes.   He answered clearly and correctly and,

17   you know, we made eye contact.

18       Q.   Did you get any impression he was not

19   understanding what you were saying?

20       A.   No.

21       Q.   What else did he say?

22       A.   The event, I asked him, you know, what

23   happened?  Who did this to you?  He told me that he did

24   it to himself.   So then I asked because that is kind of

25   unusual.   So I said, did he try to kill yourself?  And he

1  told me, yes. I asked him why and he did not answer that

2  to me.

3      Q.   He did not answer that?

4      A.   No.  He just refused to answer.

5      Q.   Do you remember did he make any reference to

6  anyone else outside of the emergency room or anything

7  about any other friends or family members?

8      A.   No.  I mean at that point I still did not know

9  why the patient, you know, would do that because no one

10  told me anything.

11     Q.   You did not know about the murders?

12     A.   No, I didn't know.  All I knew this was, the

13  police were there and usually more than the usual number

14  of police.  But I have no idea.  I asked him, "Do you

15  have any psychiatric problems?"

16          He goes, "Well, people told me, you know,

17  I may have problems."  But I said, "Did any doctor ever

18  tell you that?"  He said, "No."  "Were you ever

19  recommended to see a doctor?"  "No."  "Did you ever try

20  to commit suicide before?"  "No."  "Are you bipolar?"

21  "No."  So to me there was I thought something happened

22  that prompted him to injure himself.  But he did not

23  convey to me that he had any history, past history of a

24  psychiatric problem.

25     Q.   Do you remember him making a comment that he

AT001048

1   does not deserve to live?

2        A.   No, he did not say.

3        Q.   Did you ever remember him ever saying anything

4   about stabbing anybody else?

5        A.   No.

6        Q.   So the last we left the subject, you asked him

7   about his allergies and about prior psychiatric treatment

8   and what other conversation did you have?

9        A.   Well, that was it.  It seemed like any minute

10   he would have blood accumulating in the sack that wrapped

11   around the heart.  At any minute the patient can crash.

12              There was a quick history and I got it and

13   I was on the phone with the other doctors begging them to

14   come down.  I kept on checking on his vital signs, you

15   know, making sure the appropriate treatment was getting

16   done.  I had to make sure everything was ready just in

17   case I needed to operate on him right then.  It was all

18   ready and set to go.

19        Q.   Did he make any other statements that you

20   remember?

21        A.   No.

22        Q.   When did you find out that he was a suspect of

23   a crime?

24        A.   After there was an X-ray done and we gave IV

25   fluids and I spoke with the general surgeon and I took

AT001049

74

1   him down and then after that, I took, you know, the

2   information and I started writing on his chart and I

3   don't know at what point, but I heard that he was

4   involved in a triple murder case.

5        Q.   And involved as a suspect or you heard that he

6   was involved?

7        A.   I was told he was involved as a suspect.

8        Q.   Had you already completed your treatment of him

9   when you heard that?

10        A.   Yes.  I mean, the treatment was ongoing

11   basically.

12        Q.   It was before he went to the OR?

13        A.   Yes.  I mean, basically in a case like that,

14   the patient can get worse any minute so I knew the

15   documentation was very important for an emergency.

16             My usual pattern when a patient like that

17   comes in, I would see him quickly and whatever emergency

18   treatment needs to be done, I would do it.  I made the

19   important phone call.  I make sure the patient is stable

20   and then I quickly write on my chart and I go back and I

21   assess him again and I come back and I made my impression

22   and I write it down on the chart and then keep forcing my

23   concerns for the physicians to come to ER right away.  I

24   keep on pushing them.  It is constant evaluation.  So I

25   ran in there several times looking to check his vital

4082

AT001050

1   signs and checking on him.

2      Q.   And did you ever hear him say anything else

3   other than what you have told us?  Was there anything

4   that you heard him say or any other conversation?

5      A.   No.

6      Q.   Did he ever exhibit any type of psychosis to

7   you?

8      A.   No.

9      Q.   Did everything he do seem appropriate in his

10  behavior?

11     A.   Yes.  Because when we actually rolled him to

12  look at his back and make sure there were no knife wounds

13  that could be anywhere and he was like, "Oh, it hurts.

14  It hurts."

15           It was not like someone who is on LSD or

16  some kind of a drug that don't feel any pain or like a

17  chronically depressed patient just staring somewhere

18  else, you know.  To me he looked like a perfectly normal

19  guy, you know.

20     Q.   Let me ask you some specific questions.  Would

21  you describe him as alert?

22     A.   Yes.

23     Q.   Would he be oriented as to time, place and

24  person and situation?

25     A.   That is correct.

1083

76

1    Q.   How would you describe his mood?

2    A.   His mood.  His mood.

3    Q.   Mood and affect?

4    A.   I will say appropriate for the situation.  He

5   was worried.  It looked like he was worried about his

6   injuries and I guess a little bit sad.

7    Q.   But appropriate for the situation?

8    A.   Yes, I would think so.

9    Q.   And how was his level of communication?

10   A.   I mean normal.

11   Q.   Was he cooperative?

12   A.   Yes.

13   Q.   How was his eye contact?

14   A.   Normal.

15   Q.   How was his attention span?

16   A.   Normal.

17   Q.   How was his concentration?

18   A.   Normal.

19   Q.   His judgement from what you could tell?

20   A.   Well, I didn't test for that.

21   Q.   Okay.

22   A.   Because I mean that is something that you

23   others would do.

24   Q.   What about his recall and his memory?

25   A.   I didn't ask him about specific events.  The

1084

AT001052

77

1    only recall was what happened to you.  So if that was

2    recall, that is recall.

3         Q.   He was able to appropriately describe what had

4    happened to him?

5         A.   Yes.

6         Q.   How you was his energy level?

7         A.   What do you mean by that?

8         Q.   His level of activity.  I guess that is like

9    his mood or affect?

10        A.   Normal to me.

11        Q.   Did he ever make any religious statements to

12   you?  Did you ever hear him say anything?

13        A.   No.

14        Q.   Did he ever make any comments about his family

15   or the stabbings that he had done to other people?

16        A.   No.

17        Q.   Did he make any references to his children or

18   to his children being in heaven or anything like that?

19        A.   No.

20        Q.   Did he tell you any kind of prior suicidal

21   attempt?

22        A.   I asked him that.

23        Q.   He denied that?

24        A.   He denied it, yes.

25        Q.   All right.  Let me see in these records what

1085

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00384

AT001053

78

1  part of these would have been your records.  If you can

2  help me by referring by the page number.

3       A.    Page number twenty-one if you look at the right

4  side and those are the orders that I had written.  It is

5  right at the bottom.

6       Q.    Under physician orders?

7       A.    Yes.  Those are my handwriting.

8       Q.    And what briefly tell us what they are.

9       A.    It means nothing by mouth because he is going

10  to surgery.  LR on the left hand.  I just wrote 500 CCs

11  of it.  Again, there are quantities for IV fluids done

12  and the face mask oxygen, done.  Then cardiac enzyme, CT

13  cardiac enzyme.

14       Q.    Would you have made any other notes in the

15  medical records?

16       A.    On page twenty-four that is my record.

17       Q.    The whole thing?

18       A.    Yes.

19       Q.    Did you fill out everything on that page?

20       A.    That is right.  On the left side is the

21  history.

22       Q.    Is page twenty-five your record?

23       A.    Yes.

24       Q.    Did you fill out everything on that page?

25       A.    That is right.

1086

79

1          Q.   Is there anything else that you would have

2    filled out?

3          A.   Twenty-seven is condition.  All right.

4          Q.   What is page twenty-nine?

5          A.   This is the chest surgeon who came to do the

6    operation on him.  He came down and he saw him and then

7    he admitted the patient and he took him to the OR.

8          Q.   So would you think there would be any other

9    records that would be yours in here?

10         A.   No.

11              MR. BROWN:  Are there any questions from

12   the grand jury?

13              GRAND JURY MEMBER:  When you saw the

14   trauma, did you do a blood test for drugs or anything or

15   did you order that to be done under those circumstances?

16              DR. CHOI:  Yes.  I would do that.

17              GRAND JURY MEMBER:  Was one ordered?

18              DR. CHOI:  Yes.  I think there was one

19   made and it was all negative.

20         Q.   (By Mr. Brown)  I thought there was Cannabis.

21         A.   Alcohol was negative.

22         Q.   What was negative?

23         A.   Alcohol was negative.  Page twenty-five is my

24   documentation on the right hand side where the pictures

25   are.  It says CT cardiac enzyme for heart attack.  It was

1087

80

1    negative.  Alcohol was zero.  Aspirin, normal.  Thyroid

2    stimulating hormone, that was normal.  The CVV was

3    normal.  The urine test for infection was normal.

4    Coagulation was normal.  His blood type was RH positive.

5    Urine drug screen.  It was positive for THC.  That means

6    marijuana.  All others were negative.

7        Q.    So he had marijuana in his system?

8        A.    Yes.  By marijuana, usually if you take it

9    today, you would be positive like for several weeks so.

10              GRAND JURY MEMBER:  Would it be unusual

11   for an individual to come in and be depressed and have

12   scattering of information when asked, and then the

13   following day be coherent and be responsive in a normal

14   manner?

15              DR. CHOI:  Would it be unusual?

16              GRAND JURY MEMBER:  Yes.

17              DR. CHOI:  Well, that I don't know.

18              MR. BROWN:  That is beyond your medical

19   experience?

20              DR. CHOI:  Yes.

21              GRAND JURY MEMBER:  The wound when you saw

22   it, did that look like a stab wound?

23              DR. CHOI:  Yes.

24              GRAND JURY MEMBER:  Did you see two stab

25   wounds?

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

00397

AT001056

1              DR. CHOI:   Yes.

2              GRAND JURY MEMBER:   This wound that you

3    saw was not superficial?   This wound, how severe was this

4    stab wound?

5              DR. CHOI:   Well, it looked like

6    superficial.   It was short, you know, and the blood was

7    just a tiny bit of blood oozing out.   It was not a

8    constant flow.   Also, the patient was not exhibiting a

9    lot of pain or having any difficulty breathing.   It

10   fortunately was not high.   So the emergency room crew

11   when they see the patient, they say it is superficial

12   wound to the chest.

13             When I evaluate patients, I kind of grade

14   it but because the location was right next to the heart,

15   it could be very superficial.   The heart is not touching

16   the ribs right next to it.   So even less than one depth

17   can cause primary injury which happened in this case.

18             GRAND JURY MEMBER:   I have a question.

19   Were there any other family members of his present that

20   you observed?

21             DR. CHOI:   No.

22        Q.   (By Mr. Brown)  Was there anything else that

23   you think is important with regards to his mental

24   condition or his status at that point?

25        A.   My impression is that I also communicated with

**1089**

82

1   the other nurses. We actually sat down and we said what

2   happened to this guy. But, you know, my impression was

3   the guy looks normal. He did not appear to me psychotic

4   or depressed. You know, my impression was that he got

5   into a fight or something and then some stabbing. That

6   was my impression. But when I saw him and I asked him

7   some questions.

8           GRAND JURY MEMBER: On a scale from one to

9   ten, if you look at stab wounds, where would you put this

10  wound, I mean, as far as somebody taking a knife and

11  stabbing? Do you understand?

12          DR. CHOI: Ten would be the worst and one

13  not the worst?

14          GRAND JURY MEMBER: Yes. I mean, as far

15  as the effect, I understand. But if somebody is going to

16  stab somebody like if I have a sharp knife, I am sure it

17  could be a lot more damage.

18          DR. CHOI: To me there was, of course,

19  this was not a medical person. He does not know about

20  the anatomy that well. To me there was, I don't think he

21  actually meant to kill himself.

22          GRAND JURY MEMBER: That is what I

23  thought.

24          DR. CHOI: I just thought he wanted to

25  make a gesture. I would call it a suicidal gesture and

AT001058

1  not an attempt.

2      Q.  (By Mr. Brown)  Did he express remorse at all

3  for either stabbing himself or stabbing anybody else?

4      A.  You know, after I initially saw him and treated

5  him, I came out and thought to myself and I quickly

6  discussed it with the nurse and then I heard he was

7  involved.  I kind of did not go into it deeply, you know,

8  because I knew this was going to be a medical case so I

9  only asked him pertinent medical questions.

10          GRAND JURY MEMBER:  Did you ever have any

11  chance to look at the other little wound there.  It was

12  just like the day before.

13      A.  Yes.

14      Q.  He was supposed to be in the hospital because

15  he tried to stab himself before.

16      A.  Okay.

17      Q.  You obviously saw that wound.  That was a

18  lesser wound than the wound, than this one; is that

19  correct?

20      A.  My recollection was I didn't treat the wound.

21  He had another wound in the chest?

22      Q.  No.  There were two wounds.  You said you saw

23  two wounds to the chest?

24      A.  Yes.  There were two wounds.

25  **1091**  Q.  Do you know if both of them were recent as in

1   they just happened?

2        A.    Yes.   He told me that he did it.

3        Q.    Do you know if he could have done it the day

4   before?

5             GRAND JURY MEMBER:   The night before he

6   had done one.

7        A.    You know, I really can't tell you.   It mean it

8   looked to me, it looked fresh to me.

9        Q.    Was there anything else on his, mental state

10  that you think is important that we need to know?

11       A.    I thought his mental state was as normal as me.

12       Q.    Okay.

13            GRAND JURY MEMBER:   In your opinion do you

14  think he really meant to do as much damage as he did?

15  Was he just trying to just maybe ---

16            DR. CHOI:   You know, if you asked him with

17  his criminal pathology, you know, actually stabbing

18  yourself to the chest and causing injury is fairly

19  difficult because you have the ribs.   But even if you

20  really meant to hit hard, if you put it like this way and

21  you can't go in-between.   If you put it this way with a

22  big knife, it won't go in unless you cut the rib and you

23  go through to the heart.

24            If you have a small steak knife and you

25  hold it like this and with a relatively hard force, I

1   will go in.  But you can not looking at your chest just

2   blunting hitting it, you may hit the rib because you

3   slide off and you hit the muscle and you go in a little

4   bit.  That is a possibility.

5                    If you really meant to do it, if you did

6   it and then you did not cause that much damage, I would

7   stab myself in my belly.  So for him to do like that, you

8   know, this is a personal opinion and my impression.  It

9   is not an expert's opinion.  My impression is that it was

10  a suicide gesture.

11       Q.    A suicide gesture as opposed to an attempt?

12       A.    That is right.

13                    MR. BROWN:   Questions?  We know you are

14  busy and we thank you for your time.

15                    (Dr. Choi exited the courtroom.  Mr. Ed

16  Fursh came into the grand jury room.)

17                    Ed Fursh,

18  having been sworn, testified upon his oath as follows:

19                    DIRECT EXAMINATION

20  BY MR. BROWN:

21       Q.    This is the Grayson County Grand Jury.  Would

22  you introduce yourself, please, sir?

23       A.    My name is Ed Fursh.  I am a licensed

24  professional counselor.  I am a licensed marriage and

25  family therapist.  My first interaction with Andre was

**1093**

1    May 6, 2004.

2                    (Grand jury room.)

3                    R. J. Wilcott,

4    having been sworn, testified upon his oath as follows:

5                    DIRECT EXAMINATION

6    BY MR. BROWN:

7        Q.    Good morning.

8        A.    Good morning.

9        Q.    Would you introduce yourself, please, sir?

10       A.    My name is R. J. Wilcott.

11       Q.    Dr. Wilcott; is that correct?

12       A.    That is right.

13       Q.    Tell us how you are employed?

14       A.    I am self-employed as a Texoma cardio-vascular

15   surgeon and cardio-vascular surgeon.

16       Q.    This is the Grayson County grand jury.  I am

17   Joe Brown, the Grayson County Attorney.  We just met

18   outside the chambers; is that right?

19       A.    That's correct.

20       Q.    Have you had to give a deposition or testimony

21   to a court reporter before?

22       A.    Yes, I have.

23       Q.    She is writing everything down and you could

24   help me and you have been through it before, but she will

25   be taking everything down, so be sure to say yes or no

AT001062

1    and something out loud and answer.  Some people have a

2    hard time with that.

3        A.    Okay.

4        Q.    Dr. Wilcott, the grand jury is investigating a

5    capital murder charge, three capital murder charges

6    against Andre Thomas.  Do you understand that?

7        A.    I do.

8        Q.    Have you had an occasion to treat Andre Thomas?

9        A.    I did.

10       Q.    Before we get started, could you briefly run

11   through your educational background and experience as a

12   cardio-vascular surgeon?

13       A.    Undergraduate school was the University of

14   Texas at Arlington; graduate school was the University of

15   Texas at Arlington.  I went to medical school at the

16   University of Texas at Houston.  Then general surgery

17   training at Case Western Reserve, University of Ohio,

18   Mount View Hospital and cardio-vascular training at the

19   University of Medicine and Dentistry at New Jersey.

20            I have been in practice since 1983.  My

21   major practice is cardio-vascular surgery.

22       Q.    You have been doing that ever since 1983?

23       A.    Well, cardio-vascular surgeon since 1988.

24       Q.    And how long have you been at Wilson N. Jones,

25   working out at Wilson N. Jones?

1      A.    Well, I started taking calls at Wilson N. Jones

2   in October of this past year.  I was with Texoma Medical

3   Center before then for three years.  Prior to that I was

4   at Lubbock at the Methodist Hospital for ten years.

5      Q.    Dr. Wilcott, I will represent to you in this

6   case, a large issue in it will be the mental competency

7   or the sanity of Andre Thomas.  In your practice have

8   you, obviously that is not your speciality, but in your

9   practice, have you handled cases where the patient's

10  mental status or mental sanity is at issue in a case?

11     A.    Yes, I have.

12     Q.    How often would you say that you have a case

13  where the mental status of a person is in question?

14     A.    It is not very frequent especially, I mean, it

15  does not lend itself to encountering that in patients.

16     Q.    If you do, it is likely through the emergency

17  room?

18     A.    That's correct.

19     Q.    So a couple of years or a couple of months.

20  What would you say you had a concern or that entered into

21  the treatment of your consideration or treatment of the

22  patient?

23     A.    If we discount organic brain problems and then

24  Alzheimer's disease and things like that, probably two or

25  three times a year.

1096

1     Q.    All right.  Tell us, if you will, the first

2   contact you had with Andre Thomas?  And for the record, I

3   have provided to you what have I marked as exhibit number

4   two.  I will represent to you that is the medical records

5   from Wilson N. Jones.  Have you had a chance to look over

6   those records briefly before we started?

7      A.    Briefly.

8      Q.    For about five minutes before you came in here

9   today?

10     A.    That's correct.

11     Q.    Do they appear to contain your records of

12   treatment that you gave to Andre Thomas?

13     A.    They seem to.

14     Q.    I have them marked on the bottom right hand

15   corner with page numbers.  If you would help us in the

16   record by referring to the document and identify what

17   page number you are talking about?

18     A.    I will do that.

19     Q.    Tell us how you first came in contact with

20   Andre Thomas?

21     A.    I was called to the emergency room by the

22   emergency room physician on the day of his injury, the

23   twenty-seventh of March to evaluate Mr. Thomas because of

24   a stab wound, multiple stab wounds to the chest.

25     Q.    Did you know the circumstances of him being in

1087

1  the hospital other than that?

2      A.   I did not until I arrived at the emergency room

3  and one of the officers informed me of some of the

4  circumstances, but that was after my initial evaluation.

5      Q.   We will get to that.  When you were called, you

6  were at your home?

7      A.   Through my answering service.  I have a pager.

8      Q.   But you were not at the hospital.  You were at

9  home or doing personal business?

10     A.   That's correct.

11     Q.   And so you come up to the hospital on Saturday

12  morning; right?

13     A.   That's correct.

14     Q.   Who was the first person you talked to?

15     A.   The emergency room doctor that had called me.

16     Q.   Doctor Choi?  Do you know?

17     A.   Yes.

18     Q.   Then what did he tell you?  What was your

19  understanding when you first were making contact with Mr.

20  Thomas?

21     A.   Well, the emergency room doctor informed me

22  that the patient had multiple stab wounds, self-inflicted

23  is what he said.  And that there had been difficulty in

24  reaching one of the other trauma surgeons which was fine

25  because I am a chest surgeon.  I would have taken care of

8

1   this anyway.  But the patient, apparently, had

2   self-inflicted wounds to the left chest.  Some of the

3   X-rays had been done on the CAT scan which is the mode of

4   evaluating of chest injury.

5              And he invited me to look at those studies

6   and I did that.  We then went to the patient's room and

7   he introduced me to the patient.

8       Q.    Tell me what you saw when you went into the

9   patient's room?

10      A.    The patient was on a gurney.  There were

11  monitors and IVs connected and the officer was at the

12  door.  I did notice that the patient had restraints on

13  his left arm connected at the time to the bed rail.

14      Q.    His right arm was not restrained?

15      A.    I cannot remember that.  I did notice the left

16  arm.

17      Q.    Describe the demeanor of the patient?

18      A.    He was not excited.  He did not appear to be in

19  much distress and fairly calm.

20      Q.    What did you do at that point?

21      A.    I performed the primary exam which started at

22  the head and examined the entire body from the head to

23  the toe, front and back.

24      Q.    Did you have any conversations or interact with

25  the patient?

1099                                        00541

AT001067

1      A.   I did.  I asked him his name and introduced

2    myself and he told me his name.  He did ask me if he

3    could see his mother at that time.  I told him that was

4    not something that would be up to me.  It would be up to

5    the officers involved.  And he said, okay.

6      Q.   And I want to get as exact as we can everything

7    that he said.  The first thing that you say as you are

8    examining him, you introduce yourself and you tell him

9    who you are.  Does he say anything in response to that?

10     A.   Well, he asked me to see his mother.

11     Q.   The first thing was can I see my mother?

12     A.   Yes.

13     Q.   Did he say it just like that?  Can I see my

14   mother?

15     A.   Yes.  "Can I see my mother?"

16     Q.   Okay.  What did you say and what was the

17   conversation that you had?

18     A.   After the exam I asked him how these wounds

19   occurred and he told me that he had stabbed himself with

20   a knife and I asked him when did this happen and he told

21   me.

22     Q.   What did he tell you?

23     A.   He said that he had stabbed himself twice on

24   two different occasions.  Once was the day before, I

25   believe, and once that morning.  And I asked him what

AT001068

1   kind of knife did he use?  He said, "Two different

2   knives.  One was a steak knife and one was a butcher

3   knife."

4        Q.   So he appeared to have recall as to at least

5   the day before?

6        A.   That's correct.

7        Q.   What was the conversation from there?

8        A.   I told him that the indications were that he

9   had significant injury to the chest in that he probably

10  needed an operation to repair it.  He once again asked if

11  he could see his mom and I gave him the same response

12  that I had initially.

13       Q.   Which was that it was not up to you?

14       A.   That's correct.

15       Q.   Tell me about telling him that he would need

16  surgery.  Did he respond to that or did he seem to

17  recognize what you were saying would happen?

18       A.   He did.  I went into details about what the

19  surgery would be and he asked appropriate questions.

20       Q.   And detail those as specifically as you can,

21  what it was that he said and what it was that you said?

22       A.   I told him that it appeared there had been

23  bleeding around his heart and it restricted his heart

24  muscle from functioning properly and that we would need

25  to perform an operation similar to open heart surgery

110

AT001069

1    where we go through the breast bone and open the heart

2    sack and take out the blood and repair the injury.

3           This operation would probably take a

4    couple of hours and he would likely be in the hospital at

5    least three days.  He did ask me what was his chances of

6    getting through this and I told him it would be good.

7    Q.  How did he say that?

8    A.  He just asked me if he would make it.

9    Q.  Would I make it?

10   A.  Yes.

11   Q.  Was other questions did he ask?

12   A.  I don't recall really.

13   Q.  Do you remember him saying something to the

14   effect of are you going to split me open?  Are they going

15   to split me open or something to that effect?

16   A.  He did say something like that.  Most people do

17   and so, yes.

18   Q.  How did he say that?

19   A.  I can't recall specifically how he said it, but

20   it was a similar question.

21   Q.  Was there anything else that he asked about the

22   operation or to this point that we have not covered what

23   he said?

24   A.  Not really.  He did not go into any details

25   surrounding the circumstances other than what I asked him

**1102**

1  specifically.

2      Q.   Did you ask him why he had those stab wounds in

3  his chest?  Why he had stabbed himself?

4      A.   No, I did not.  The reason that I didn't was

5  generally I don't want to know those issues when I

6  encounter a patient.

7      Q.   Why not?  So you don't have to end up in front

8  of the grand jury?

9      A.   Well, no.  I think my job is to take care of

10  the situation and, you know, the circumstances

11  surrounding this should not enter into what I need to do

12  for him.  So unless it is something that would allow me

13  some information that would help me take care of his

14  injuries, then I really don't want to know those things.

15      Q.   At this point, you don't know anything about

16  the circumstances of what he has allegedly done?

17      A.   The initial evaluation that is true.

18      Q.   Up to the point that we talked about where you

19  told him what would happen and he asked for his mom and

20  he expressed some concerns about making it?

21      A.   That is probably true.  I did leave out looking

22  at some other test results and on the way back in, I

23  talked to an officer and he told me more about what had

24  happened which was more than I wanted to know, but he did

25  tell me.  And I had to go back in because the patient

1103

1    became somewhat unstable.

2        Q.    So we have talked about all the conversations

3    that you had with him before you left out to look at the

4    tests?

5        A.    I believe so.

6        Q.    Then the next time you go back in there was

7    because a change in the condition had occurred?

8        A.    That is correct.

9        Q.    Tell us about that.

10       A.    His blood pressure started to drop and then his

11   heart rate so we administered fluid and ordered blood.

12   And of course, it is fairly urgent that get to the

13   operating room and the anesthesiologist had spoken with

14   him over the phone.  He responded.  We got the patient to

15   the operating room.

16       Q.    Did you have any more conversations with him

17   before the surgery?

18       A.    No, not really.  He did not have much to say

19   after that.

20       Q.    So just to make it clear what you remember the

21   total conversations with him were, it was you introducing

22   yourself to him and him asking for his mother and you

23   explaining the operation and him making a comment of to

24   the effect of, you would have to split me open and am I

25   going to make it.  Was there anything else that I missed?

A.   He asked about his mom twice.

Q.   He asked about his mother after you told him about the surgery?

A.   That's correct.

Q.   What impression did you get when he was asking for his mom?

A.   Well, he was not anxious about it.  I think he gave me the impression that she was someone that could help him maybe and that he had not been able to see her and he wanted to see her before the operation.

Q.   Did you get the impression he was more worried about himself or scared of the operation and he wanted his mom or worried about what his mom might worry about him or he just wanted the comfort level of having his mom?

A.   It seemed more of a comfort level.  He did not seem afraid of the operation.  He was a lot more calm than I would have expected from a person that young and was told they needed a major operation on the heart.

Q.   Are you trained or are you able to recognize the signs of intoxication or substance, either alcohol or another substance?

A.   I would not say that I could.  It might be something quite gross and I could tell you that it was abnormal for the patient to express himself in a certain

had Benzodiazepine
in system
cd have
caused
ee P17

1   way or for his pupils to react in a certain way.

2       Q.   Did you examine his pupils?

3       A.   Yes, I did.

4       Q.   What was the result of that exam?

5       A.   He reacted.  I didn't see anything that would

6   indicate he had other substances that would have been at

7   an intoxication level that would effect the pupils at

8   least.  They are quite reactive.

9       Q.   Let me go through some items, mental status

10  items and get your comments on what he exhibited in your

11  evaluation with him?  His level consciousness when you

12  were speaking to him?

13      A.   He was alert.

14      Q.   Alert?

15      A.   Yes.

16      Q.   Was he oriented to time and place and person

17  and situation?

18      A.   He was.

19      Q.   All four as far as you could tell?

20      A.   As far as I could tell.  I asked.

21      Q.   How did you do that?

22      A.   I asked him who you are, where are you?

23      Q.   What did he respond when you asked him who you

24  are?

25      A.   He introduced himself as Andre Thomas and I

1105

AT001074

1    asked him where he was and he said he was at Wilson N.

2    Jones Hospital.  And I asked him what was the date?  He

3    told me Saturday.

4        Q.    He knew it was Saturday?

5        A.    Yes, he did.

6        Q.    Did you ask him anything else or those kind of

7    diagnostic questions?

8        A.    No, I didn't go into any further detail because

9    the problem was more of a mechanical problem than a

10   mental problem I felt.

11       Q.    Why did you feel that?  Did you get a concern

12   about mental status at all during that conversation?

13       A.    Not really.  He was calm.  Like I mentioned

14   before, he was a little unusual for a guy that age to be

15   so calm about things, but he was.  But he answered all

16   the questions appropriately.

17       Q.    Were you able to tell whether that calmness

18   could have been the result of substance abuse?

19       A.    I would not be able to say.  I don't know.

20   Now, I do believe that the paper work indicated there was

21   some substance in his blood.  I don't recall

22   specifically.  I would have to look at it in here to see.

23       Q.    Would your test at the hospital, the blood

24   test, be able to detect the term for Valium,

25   Benzodiazepine, could you have detected that in the test

1107

AT001075

1    that you run at the hospital?

2        A.   Well, the emergency could detect that, yes.

3        Q.   Would it be standard blood work-up?  Would it

4    have detected Benzodiazepine?

5        A.   I am not sure if they can.  But in a blood test

6    in the serum level, you could detect it, yes.

7        Q.   If I represent to you that his blood that was

8    taken that morning as tested by the Department of Public

9    Safety showed a level of Benzodiazepine, would that be

10   consistent with explaining the effect that it had on him

11   that day?

12       A.   Well, Benzodiazepine is noted for being an

13   anti-anxiety drug.  And of course, this would normally be

14   an anxious situation and, in fact, he was so calm, it

15   could be the effect of that, yes.

16       Q.   Could you look through there and see if you

17   could find the lab work to see if they would have tested

18   for that?

19       A.   Okay.

20       Q.   You looked through and we are looking at page

21   sixty-one and the results from the blood test at the

22   hospital show a negative result for Benzodiazepine.

23       A.   That's correct.

24       Q.   So if blood taken that morning and tested at

25   the Department of Public Safety lab shows Benzodiazepine,

1  do we have any way to know how that could happen, whether

2  it be a ---

3      A.   Well, this is a urine test.  This is a blood

4  test.  A pathologist would have to answer that question

5  for you.

6      Q.   Okay.

7      A.   But this is urine not blood.

8      Q.   And do you know anything about the drug,

9  Coricidin?

10     A.   Not much.  It is a cold remedy.

11     Q.   Do you know it to be abused by people at times?

12     A.   I don't know that to be a fact.

13     Q.   Do you know the effects of the abuse of

14  Coricidin?

15     A.   No, I don't.

16     Q.   I was going through.  In there anything else

17  remarkable with regards to the blood test besides

18  positive for Cannabis or THC?

19     A.   Well, that was the only positive that we have

20  here and the alcohol test here.  It is within the range.

21     Q.   Does it show any alcohol intake?

22     A.   It is on page fifty-nine.

23     Q.   It says result two with a reference zero to

24  seventy-nine.  What does that mean?

25     A.   That is a good question.  I don't know.

1    Q.    So we don't whether that two indicates that

2    there was some alcohol but not enough to be intoxicated

3    or whether that two would be consistent with somebody who

4    had no alcohol at all.  We don't know that?

5    A.    No.  Unless you know the reference range of the

6    mean at a particular lab, it is hard to say.

7    Q.    Is there anything else with regard to the blood

8    sugars or anything else that was remarkable at all on

9    page fifty-nine?

10    A.    No.  It looks like the potassium was a little

11    low, which could account for some of the arrythmia of the

12    irregular heart heat.   But otherwise, the blood test

13    looked benign.

14    Q.    Go back to the mental status assessment here.

15    What was his level of communication or the effectiveness

16    of his communication?

17    A.    I think his communication was cogent.  He

18    answered specific questions in a very clear manner.

19    Q.    How was his eye contact?

20    A.    He would look at me frequently, but he did not

21    hold eye contact well.

22    Q.    Do you think it was appropriate for the

23    situation?

24    A.    To tell you the truth, it did not quite seem

25    normal because of instead of talking with me, he would

AT001078

20

1    look at me for a moment and then kind of look away.  I

2    just thought maybe he was worried or something.  But he

3    did not hold eye contact very well.

4         Q.   Did he ever exhibit any signs of psychosis to

5    you?

6         A.   None that I could detect, no.

7         Q.   How was his attention span?

8         A.   It was good.  Other than asking about his

9    mother, he held a conversation in the direction that it

10   should go.

11        Q.   How was his concentration level?

12        A.   I thought it was appropriate.

13        Q.   His memory and recall?

14        A.   Well, other than asking who, what, where and

15   that kind of thing, I can't tell you about the recall of

16   events.  But he knew where he was and what day it was and

17   he recalled my name when I walked back in.

18        Q.   He called you by name when you walked back in?

19        A.   Yes, he did.

20        Q.   You say he recalled having stabbed himself the

21   day before; correct?

22        A.   That is what he said.

23        Q.   Did he tell any specifics about that or any

24   more about that?

25        A.   No.

**1111**

1      Q.    Just that he stabbed himself the day before?

2      A.    Yes.

3      Q.    How was his energy level?

4      A.    Well, he was restrained and he was laying on

5  the gurney so he was not moving around very much.  When

6  we asked him to turn so I could look at his posterior

7  aspect, his back, he did that for us with some

8  assistance.

9      Q.    Did he ever mention any religious items or did

10  he make any religious comments?

11      A.    Not to me.

12      Q.    Did he ever indicate any sign of depression?

13      A.    I didn't notice any, no.

14      Q.    Was there anything else that stands out in your

15  mind understanding what it is he is charged with now and

16  realizing that sanity is an issue in this case?  Is there

17  anything that stands out in your mind that you think the

18  grand jury should know about?

19      A.    I didn't get any impression that sanity was an

20  issue when I went in to see him initially.  When I heard

21  that he had self-inflicted wounds, of course, I always

22  think that is not normal that a person would do something

23  to himself, but he did not impress me as being insane.

24      Q.    Did he ever mention anything about his wife or

25  his kids or anybody other than his mother?

112

1    A.    No, he did not.

2    Q.    He never mentioned anything about circumstances

3 of the crime?

4    A.    No, he did not, not to me.

5              MR. BROWN:   Questions?

6              GRAND JURY MEMBER:   You have seen probably

7 a lot of stab wounds and cuts and so forth.  But did this

8 seem to you like he was trying to harm himself or there

9 is a certain spot you probably would believe it or not

10 believe it, but did it seem like it was serious in that

11 extent?

12             DR. WILCOTT:   Yes, sir.  These were

13 serious wounds and they were directed in the heart area.

14 And that I felt it was a serious intention.

15    Q.    (By Mr. Brown)  How deep was the main stab

16 wound that caused the problems?

17    A.    It went through the chest wall and it lacerated

18 one of the arteries that lines the chest wall and it

19 lacerated the sack over the heart.  It is called the

20 precardium.  There was only one millimeter distance

21 between the pericardium and the heart itself.  So it is a

22 deep wound.

23    Q.    So are you saying an inch to an inch and a

24 half?

25    A.    No.  It was about that big.

1113

AT001081

1    Q.   You have indicated about an inch and a half to

2 an inch and three-quarters?

3    A.   Something like that.

4    Q.   He missed a rib.  He went through the rib?

5    A.   He went in-between the ribs.  The artery that

6 was transected lies under the rib so it was the anterior

7 aspect of one rib.

8    Q.   Do you know how he did the stabbing, whether he

9 was pushing or he leaned up against something that comes

10 into play?

11    A.   I didn't ask him.  I could not determine that

12 there from the position.  There was three or actually

13 four different wounds there.  Most of them were very

14 small and one that was larger and longer wound and that

15 appeared to be the one that gave him some trouble.  So

16 the timing of which stabbing came when I can't tell you.

17 But I would surmise that the one that did the injury was

18 the one that we encountered in the emergency room as the

19 cause of the bleeding.

20    Q.   The most recent one?

21    A.   The most recent one.

22       MR. BROWN:  Do you have any questions?

23       GRAND JURY MEMBER:  Yes.  I didn't hear

24 him about if the pupil was dilated or not dilated.

25       DR. WILCOTT:  They were reactive.  They

**1114**

JANET M. KAMRAS
REGISTERED PROFESSIONAL REPORTER

AT001082

1   were not dilated.

2        Q.   Did they react appropriately to the light?

3        A.   That is correct.  Light and distance.

4             GRAND JURY MEMBER:   There are times that

5   you leave people, you know, say you are watching that

6   person and you get a feeling they will do something, you

7   know.  Even if you are in the emergency room.  And from

8   anything in his demeanor did you get the feeling that

9   after the surgery or whatever, knowing that, obviously he

10  has a self-inflicted wound and thinking they better keep

11  an eye on him because he could do this again.

12            DR. WILCOTT:  Well, I would feel that way

13  from any one that had a self-inflicted wound.  And what I

14  failed to mention is I did work several summers at the

15  Terrell State Hospital in Terrell, Texas and so I had a

16  lot of experience in dealing with folks who had psychosis

17  and are insane.  Some were violent and some were not.

18            What I did learn is it is impossible to in

19  a brief encounter really project what a person would do.

20  You can after listening to what they have done in the

21  past surmise that they may do it again, especially in

22  suicide issues.  So precautions would be taken in a

23  person like that.

24       Q.   Tell me about your experience at Terrell State

25  Hospital.  Tell me what you did and how long you did it

1115

AT001083

1  and what all it involved.

2      A.   The Terrell State Hospital was during college

3  and I was a ward attendant.

4      Q.   A ward attendant?

5      A.   Yes.  At that time Terrell State Hospital was a

6  large institution and the wards were open wards.  I

7  worked in two different areas.  One was geriatric and one

8  was a locked ward.

9      Q.   Locked?

10     A.   Yes.

11     Q.   The locked ward meaning the highest risk

12 patients?

13     A.   That's correct.  And my job was to in a usual

14 day to care for the patients and the ones that were good

15 enough to go out, we would take them out.  We would have

16 to restrain the other patients.  We at that time did

17 participate in electro-shock therapy for patients who had

18 depression or other forms of psychosis.

19     Q.   You did that for how long?

20     A.   Two years.  Two summers.

21     Q.   During undergraduate?

22     A.   Yes.

23          GRAND JURY MEMBER:  In summary, you said

24 that his blood level blood work did show the presence of

25 have THC and alcohol?

**1116**

AT001084

1   A.   Well, the alcohol level that is ---  It looks

2   like there is a level there, but I am not sure what that

3   means in relative terms.

4            GRAND JURY MEMBER:  You can't perceive for

5   sure?

6            DR. WILCOTT:  That is correct.  That is in

7   his urine.

8            GRAND JURY MEMBER:  At the moment you saw

9   him, did it ever go through your mind that this man was a

10  danger to himself or to others?  Did you sense that being

11  around him?  Did you feel like?

12           DR. WILCOTT:  I didn't get a sense of

13  foreboding.  I felt comfortable going in and out and

14  talking to him.  I didn't feel that he was going to bolt

15  from the emergency room at any time.  He was very calm,

16  as I mentioned before.  He did not have the malicious,

17  calculating calm about him as you notice with some people

18  in situations that subsequently I became aware of.

19           GRAND JURY MEMBER:  Did you feel he had a

20  desire to live?

21           DR. WILCOTT:  I believe so.  He consented

22  to the surgery and when I explained the surgery and why

23  we needed to do it, he felt that was what he wanted to

24  do.

25      Q.   (By Mr. Brown)  What if he said no?

AT001085

1          A.    If he had said no, then without any other power

2    of attorney or someone interceding from the legal system

3    saying that is what is required, then no is no.

4          Q.    He would have died right there on the table?

5          A.    Most likely.   He had already showed signs of

6    decompensating.   The blood pressure drop and the change

7    of his heart rate and rhythm which prompted the more

8    urgent approach to the operating room.

9               When we got there, we did notice there was

10   a significant amount of blood around the heart and the

11   heart sack was tense which means that he was in a

12   tamponade state.   Tamponade is when the pressure inside

13   the heart sack compresses the heart such that it cannot

14   pump the blood around the body like it should.

15               MR. BROWN:   We thank you very much for

16   your time.

17               (Dr. Wilcott exited the grand jury room.)

18               Richard Frazier, M.D.

19   having been sworn, testified upon his oath as follows:

20               DIRECT EXAMINATION

21   BY MR. BROWN:

22          Q.    Would you introduce yourself to us, please?

23          A.    My name is Richard Frazier.   I am an

24   anesthesiologist for Wilson N. Jones.

25          Q.    I am Joe Brown of the Grayson County Attorney.

1113

AT001086

1    that you run at the hospital?

2        A.   Well, the emergency could detect that, yes.

3        Q.   Would it be standard blood work-up?  Would it

4    have detected Benzodiazepine?

5        A.   I am not sure if they can.  But in a blood test

6    in the serum level, you could detect it, yes.

7        Q.   If I represent to you that his blood that was

8    taken that morning as tested by the Department of Public

9    Safety showed a level of ~~Benzodiazepine~~ would that be

10   consistent with explaining the effect that it had on him

11   that day?

12       A.   Well, Benzodiazepine is noted for being an

13   anti-anxiety drug.  And of course, this would normally be

14   an anxious situation and, in fact, he was so calm, it

15   could be the effect of that, yes.

16       Q.   Could you look through there and see if you

17   could find the lab work to see if they would have tested

18   for that?

19       A.   Okay.

20       Q.   You looked through and we are looking at page

21   sixty-one and the results from the blood test at the

22   hospital show a negative result for Benzodiazepine.

23       A.   That's correct.

24       Q.   So if blood taken that morning and tested at

25   the Department of Public Safety lab shows Benzodiazepine,

1119

1  do we have any way to know how that could happen, whether

2  it be a ---

3      A.   Well, this is a urine test.  This is a blood

4  test.  A pathologist would have to answer that question

5  for you.

6      Q.   Okay.

7      A.   But this is urine not blood.

8      Q.   And do you know anything about the drug,

9  Coricidin?

10     A.   Not much.  It is a cold remedy.

11     Q.   Do you know it to be abused by people at times?

12     A.   I don't know that to be a fact.

13     Q.   Do you know the effects of the abuse of

14  Coricidin?

15     A.   No, I don't.

16     Q.   I was going through.  In there anything else

17  remarkable with regards to the blood test besides

18  positive for Cannabis or THC?

19     A.   Well, that was the only positive that we have

20  here and the alcohol test here.  It is within the range.

21     Q.   Does it show any alcohol intake?

22     A.   It is on page fifty-nine.

23     Q.   It says result two with a reference zero to

24  seventy-nine.  What does that mean?

25     A.   That is a good question.  I don't know.

**1120**

AT001088

1    Q.   So we don't whether that two indicates that

2    there was some alcohol but not enough to be intoxicated

3    or whether that two would be consistent with somebody who

4    had no alcohol at all.  We don't know that?

5    A.   No.  Unless you know the reference range of the

6    mean at a particular lab, it is hard to say.

7    Q.   Is there anything else with regard to the blood

8    sugars or anything else that was remarkable at all on

9    page fifty-nine?

10   A.   No.  It looks like the potassium was a little

11   low, which could account for some of the arrythmia of the

12   irregular heart beat.   But otherwise, the blood test

13   looked benign.

14   Q.   Go back to the mental status assessment here.

15   What was his level of communication or the effectiveness

16   of his communication?

17   A.   I think his communication was cogent.  He

18   answered specific questions in a very clear manner.

19   Q.   How was his eye contact?

20   A.   He ~~would look at me frequently, but he~~ did not

21   hold eye contact well.

22   Q.   ~~Do you think was appropriate for the~~

23   ~~situation?~~

24   A.   ~~To tell you the truth, it did not quite seem~~

25   ~~normal because of instead of talking with me, he would~~

1121                                              00555

AT001089

1   look at me for a moment and then kind of look away. I

2   just thought maybe he was worried or something. But he

3   did not hold eye contact very well.

4        Q.   Did he ever exhibit any signs of psychosis to

5   you?

6        A.   None that I could detect, no.

7        Q.   How was his attention span?

8        A.   It was good.  Other than asking about his

9   mother, he held a conversation in the direction that it

10  should go.

11       Q.   How was his concentration level?

12       A.   I thought it was appropriate.

13       Q.   His memory and recall?

14       A.   Well, other than asking who, what, where and

15  that kind of thing, I can't tell you about the recall of

16  events.  But he knew where he was and what day it was and

17  he recalled my name when I walked back in.

18       Q.   He called you by name when you walked back in?

19       A.   Yes, he did.

20       Q.   You say he recalled having stabbed himself the

21  day before; correct?

22       A.   That is what he said.

23       Q.   Did he tell any specifics about that or any

24  more about that?

25       A.   No.

**112**

00536

AT001090

1  Q.  Just that he stabbed himself the day before?

2  A.  Yes.

3  Q.  How was his energy level?

4  A.  Well, he was restrained and he was laying on

5  the gurney so he was not moving around very much.  When

6  we asked him to turn so I could look at his posterior

7  aspect, his back, he did that for us with some

8  assistance.

9  Q.  Did he ever mention any religious items or did

10  he make any religious comments?

11  A.  Not to me.

12  Q.  Did he ever indicate any sign of depression?

13  A.  I didn't notice any, no.

14  Q.  Was there anything else that stands out in your

15  mind understanding what it is he is charged with now and

16  realizing that sanity is an issue in this case?  Is there

17  anything that stands out in your mind that you think the

18  grand jury should know about?

19  A.  I didn't get any impression that sanity was an

20  issue when I went in to see him initially.  When I heard

21  that he had self-inflicted wounds, of course, I always

22  think that is not normal that a person would do something

23  to himself, but he did not impress me as being insane.

24  Q.  Did he ever mention anything about his wife or

25  his kids or anybody other than his mother?

32

1   A.   No, he did not.

2   Q.   He never mentioned anything about circumstances

3   of the crime?

4   A.   No, he did not, not to me.

5       MR. BROWN:  Questions?

6       GRAND JURY MEMBER:  You have seen probably

7   a lot of stab wounds and cuts and so forth.  But did this

8   seem to you like he was trying to harm himself or there

9   is a certain spot you probably would believe it or not

10  believe it, but did it seem like it was serious in that

11  extent?

12      DR. WILCOTT:  Yes, sir.  These were

13  serious wounds and they were all located in one, over one area.

14  And that I felt it was a serious question.

15  Q.   (By Mr. Brown)  How deep was the main stab

16  wound that caused the problems?

17  A.   It went through the chest wall and it lacerated

18  one of the arteries that lines the chest wall and it

19  lacerated the sack over the heart.  It is called the

20  precardium.  There was only one millimeter distance

21  between the pericardium and the heart muscle.  So it is a

22  deep wound.

23  Q.   So are you saying an inch to an inch and a

24  half?

25  **1124** A.   No.  It was about that big.

AT001092

1   were not dilated.

2       Q.   Did they react appropriately to the light?

3       A.   That is correct.  Light and distance.

4           GRAND JURY MEMBER:   There are times that

5   you leave people, you know, say you are watching that

6   person and you get a feeling they will do something, you

7   know.  Even if you are in the emergency room.  And from

8   anything in his demeanor did you get the feeling that

9   after the surgery or whatever, knowing that, obviously he

10  has a self-inflicted wound and thinking they better keep

11  an eye on him because he could do this again.

12          DR. WILCOTT:  Well, I would feel that way

13  from any one that had a self-inflicted wound.  And what I

14  failed to mention is I did work several summers at the

15  Terrell State Hospital in Terrell, Texas and so I had a

16  lot of experience in dealing with folks who had psychosis

17  and are insane.  Some were violent and some were not.

18          What I did learn is it is impossible to in

19  a brief encounter really project what a person would do.

20  You can after listening to what they have done in the

21  past surmise that they may do it again, especially in

22  suicide issues.  So precautions would be taken in a

23  person like that.

24      Q.   Tell me about your experience at Terrell State

25  Hospital.  Tell me what you did and how long you did it

**1125**

2

1  and what all it involved.

2      A.   The Terrell State Hospital was during college

3  and I was a ward attendant.

4      Q.   A ward attendant?

5      A.   Yes.  At that time Terrell State Hospital was a

6  large institution and the wards were open wards.  I

7  worked in two different areas.  One was geriatric and one

8  was a locked ward.

9      Q.   Locked?

10      A.   Yes.

11      Q.   The locked ward meaning the highest risk

12  patients?

13      A.   That's correct.  And my job was to in a usual

14  day to care for the patients and the ones that were good

15  enough to go out, we would take them out.  We would have

16  to restrain the other patients.  We at that time did

17  participate in electro-shock therapy for patients who had

18  depression or other forms of psychosis.

19      Q.   You did that for how long?

20      A.   Two years.  Two summers.

21      Q.   During undergraduate?

22      A.   Yes.

23          GRAND JURY MEMBER:  In summary, you said

24  that his blood level blood work did show the presence of

25  have THC and alcohol?

1126

AT001094

# Exhibit 132

## Written statement of Cindy Carr

0402024

Date:  03-27-2004

On Saturday, 03-27-2004, at approximately 0933 hours, a B/M in blue camouflage shirt was standing at the Dispatch Information window.  I asked the B/M to pick up the white phone.  B/M picked up the white phone, I asked him if I could help him and he said that he was here to turn himself in because he had murdered his wife.  I asked him where and he said at her apartment at Arrow Wood.  I then asked the B/M what his name was and he stated "Andre Thomas" and that he needed help.  As I was listening to him, I was motioning for my partner, Marinda Womack, so that I could let her know that the suspect was in the lobby.  Marinda did notice me and ran upstairs to Det Brice Smith and informed him that Andre Thomas was in the front lobby.  Mr Thomas stated that he had gone to wife's apartment and kicked in the door and then stabbed his wife and ripped her heart out, then he got his son and stabbed him and ripped his heart out and then he got his stepdaughter and did the same to her. After telling me this he kept saying that he needed help. I asked Mr Thomas if he had gotten mad and he said he did not know what had happened. I told Mr Thomas that he was going to get help.  I asked Mr Thomas where the knife was that he had used because at that time I saw Officer Chuck Mauldin going into the front lobby and I wanted to make sure the Subject did not have the knife on him due to officer safety.  Mr  Thomas said that the knife was at his trailer at Crossroads.  At that time, Officer Mauldin came into the lobby and Mr Thomas hung up the phone.

*#m*

After first making Contact with Mr Thomas,
I did Stay on the phone with him the Whole time
until Officer Mauldin came into the lobby.
CC #m

4501

00919

AT004480

# Exhibit 133

**Written statement of C. Daniel Nixon EMT-P**

March 27, 2004

At 0934 M3 responded to a medical emergency at the Sherman Police Department. Upon our arrival SPD officer advised me that they had a subject with a stab wound and they would like to have him evaluated. I found a male subject in the book in room accompanied by SPD officers the male stated that his name was Andre Thomas and that he was 21 years old. I ask Mr. Thomas what was going on and he lowered the collar of his shirt and showed me what appeared to be multiple lacerations on the left side of his chest. I had Mr. Thomas to remove his shirt, which was given to the SPD officer in the room. I ask Mr. Thomas what had happened and he stated that he had stabbed himself. After further examination it was determined that the patient would need transport to WNJ south campus Emergency Department for further evaluation of his wounds. I ask Mr. Thomas what he had stabbed him self with and he stated a knife, I ask how big was the knife and he drew a line on the bench that looked to be roughly 8-10 in long. I then ask Mr. Thomas how deep he thought the knife went in and he held his fingers apart to indicate the depth and I ask him if that was about 6 in. he agreed. Mr. Thomas began to answer my questions by saying " I just don't know what's going on" " I just don't understand" and "I just wanted to die to pay for my sins".

C. Daniel Nixon  EMT-P

3-27-04

**4504**

00922

AT004483

# Exhibit 134

## Written statement of Marinda Womack

On 03/27/04 at approx 0721 hrs I received a 911 call from 1200 W Taylor. Comp identified himself as Paul Boren. He stated that he needed to report that his daughter had been murdered and that he needed to call his wife. I asked complainant what had happened and he stated that the door of the apartment had been kicked in and that his daughter and her 2 children where dead. I asked if he had checked for a pulse and he stated no, they had been stabbed in the chest by Andre Thomas and they were blue. I asked complainant how old his daughter was and the age of the children. He stated his daughter was 19 and the children were 4 & 1. Comp asked if he needed to check for a pulse, I advised him to not go back into apartment but to wait for PD & EMS. Comp advised that he needed to call his wife and I advised him to wait until officers were on scene.

At this time I hung up with complainant and started placing call screen in CAD for EMS & PD and notified on duty Sgt of call holding.

At approx. 0930 a B/M came into the lobby and walked up to the dispatch window. Cindy told him to pick up the white phone. I noticed Cindy waving at me and when I turned around she mouthed that Andre Thomas was in lobby. I ran upstairs to try to locate an investigator. At the top of the stairs I meet Det. Brice Smith and told him that the suspect was in the lobby. I then came back down stairs and Officer Chuck Mauldin was walking in the back door and I also told him that the suspect was in the lobby. He asked if anyone was with him and I stated no. Officer Mauldin stepped into lobby and Det. Smith stepped into lobby and took suspect into custody. At this time Det. Smith asked for an ambulance to come to the station to check out suspect.

Marinda Womack #107

3-27-04

10127                                                          03497

# Exhibit 135

## Grayson County Jail Doctors Observation Notes

DOCTORS NOTES

| DATE: | INMATES NAME: | SO# | MED# |
|-------|---------------|-----|------|

_[illegible handwritten lines]_ ... me that she would call Dr. Caruso

1755  I/m standing up in front of cell door, ... looking ... Eyes open, _[illegible]_ ...

4/1 1600  Obs. I/m sitting on end of his bunk watching people walk back and forth near H3.

1730  I/m lying on back, head to the glass, with hands under head. His eyes were open and he appeared to be staring at the ceiling.

1900  I/m again sitting on end of bunk watching people pass by.

2000  w/ Sgt Solis, Cpl Engler and Officer Cotton, went in to H3 to Δ dressings for I/m Thomas. Major wound and both drain incisions clean, dry, and appeared to be healing nicely. Cleaned area w/ H₂O₂ and applied band-aids to the drain incisions. In passing I asked I/m Thomas how he was doing and he replied that he was very tired. I told him that after a brief breathing treatment (which he agreed to w/o a problem) he could go to sleep. At this he told me that he wasn't sure Dr McGirk wanted him to go to sleep. When I asked why not. I/m Thomas told me that Dr McGirk had told him to carefully observe everything he could see from his cell. He further stated that he was afraid if he slept he would miss something that Dr McGirk

**4782**

AT004757

## DOCTORS NOTES

| DATE: | INMATES NAME: | SO# | MED# |
|-------|---------------|-----|------|

**4/1/04** — would need to know. I told I/m Thomas that I felt that Dr McGirk would want him to sleep when he was tired so that fatigue would not cause him to miss his "observations". I/m Thomas seemed to consider this idea for a few moments and then then said "are you sure?". I told him I was almost positive, but I would confirm w/ Dr McGirk as soon as possible. Until then I told him to tell anyone who asked that his sleeping was OK'ed by medical. ●D. Campbell EMT-B

**2200** — I/m lying on bunk w/ head to window. (R) arm across his chest. He appeared to be asleep.

**0130** — I/m lying on his back. Appears to be asleep. CSW

**0315** — continues to sleep. CSW

**0445** — has turned on R. side. still asleep.

**0830** — I/m lying supine appears to be sleeping — woods.

**0915** — I/m standing in front of cell door leads in the air yelling "what are you going to do". I/m coming to pace in front of cell door.

**1030** — I/m sitting on console pencil in the dark in the position of asleep I/m if he was going to do his I/s tracy he stood up and stood up Children

**1125** — I/m sitting on console if called I/m out and he stood up if I covered him I was just sitting on swim (repeat

**4783**                    00507

AT004758

# Exhibit 136

## Written statement of Natalie Sims, LVN

*pg 'g ⁔ ②*

April 5, 2004

Statement of:   NATALIE SIMS, LVN

My name is Natalie Sims.  I am a Licensed Vocational Nurse employed by Grayson
Emergency Specialists.  My direct employer is Dr. WAYNE BELL, physician-owner of
Grayson Emergency Specialists.  My usual tour of duty is Monday through Friday, 0800
hours until 1600 hours.  My work hours and workdays vary frequently.  I am on-call for
emergency situations 24 hours daily.

Inmate ANDRE LEE THOMAS, SO # 62890, is an inmate in the Grayson County Jail.
Inmate Thomas has been incarcerated in this facility since 03/29/2004.  Inmate Thomas
has been charged with Capital Murder.  ·

Since Inmate Thomas' incarceration, I have been able to medically deal with Inmate
Thomas in most situations, i.e., Inmate Thomas will generally follow my directions in
instances where he refuses to follow the directions of others.  I have successfully dealt
with Inmate Thomas on his previous incarcerations in this facility.

On Monday, 03/29/2004, Inmate Thomas asked me to contact the Sherman Police Officer
whose name was imprinted on a business card.  The Officer's name was Mike Ditto.
Without prompting, the inmate began to tell me the particulars of his case.  I immediately
stopped the inmate and advised him I would contact Officer Ditto.  This was done within
one minute of the inmate's request.  Once Officer Ditto and Ranger Tony Bennie arrived,
the inmate refused to speak with them unless I was present.  With the permission of both
law enforcement officials and the permission of the inmate, I was present during the
statement given by Inmate Thomas to the officers regarding his crime.  Prior to the
interview, I had the inmate state his name, the date, the month, the name of the President,
his location and my name to ensure orientation to person, place and time.  The inmate
successfully completed this task.

At the conclusion of the Officers' interview, I advised both my staff and the Grayson
County Jail Administrator that this inmate was at a high risk for harm to self or others.
The inmate had been placed on, and remained on, a constant check system to help ensure
both inmate and officer safety.  This nursing order was written remain in effect until
further notice.

I had requested Dr. C. ROBIN MCGIRK, subcontract psychologist, to see the inmate on
at least 2 occasions since his incarceration.  This request was honored by Dr. McGirk,
who stated to me that the inmate was "floridly psychotic" and that the inmate's condition
probably would not get better unless medications were given.  Both Dr. McGirk and Dr.
Bell agreed on this matter.  I offered the inmate medications each time as ordered.

On 04/02/2004, I again offered the inmate medication; again the inmate refused.  I
contacted the inmate's attorney, R.J. HAGOOD, and asked for permission to medicate his
client as I felt the inmate was not rational enough to speak for himself.  Attorney Hagood
advised me to NOT medicate his client until a court ordered mental evaluation was done,
as medications could alter the test.  The inmate was not medicated.

On 04/02/2004 at approximately 1930 hours, I was off duty and at another person's
residence.  Present was CAPT. KELLI STEPHENS.  Capt. Stephens received a cell
phone call at that time.  She advised me that Inmate Thomas had plucked his eye from the
socket and I was to report to the jail immediately.  I arrived at the jail in less than one

( **369**

pg 2 g 3

minute. I went to Inmate Thomas' assigned cell, Holding 3, and observed Inmate Thomas' uniform to be very bloody. Blood on the floor in front of Thomas was fresh, bright red and in a non-uniform pattern. Thomas was sitting at the door of Holding 3, leaning forward, with gauze and an ice pack to the area of the his right eye. Inmate Thomas held the ice pack with his right hand. Present was DON CAMPBELL, EMT-B. Campbell advised me that the inmate had gouged out his own eye and that the eye had been placed in a Styrofoam cup with normal saline. I sat Thomas upright and asked him what happened. Thomas stated, "The Bible says that if your right eye offends thee, you are to pluck it out so I did". I asked Thomas to show me how he had performed the act. Thomas put the first 3 fingers of his left hand together, overlapping the fingers, and said "like that". Dried blood was present on the left hand and under the left nails. No tissue was noted under the nails.

The inmate's eye bandage was removed and revealed gross swelling of both right eyelids. Tissue was slightly protruding from the eye slit. Using gloved, sterile technique, the eyelids were separated and blood tissue was present. The eye was re-bandaged and ice pack reapplied. The inmate continually stated that the pain in the eye socket was unbearable. No medication was given pending treatment at Wilson Jones Emergency Room. The inmate asked me several times "why". I asked Thomas what he was referring to and he stated that he didn't know "why people didn't die"; why he himself "didn't die"; that the Bible "told" him to "poke out my eye"; and for me to "please help" him. I remained by the inmate's side until EMS arrived. I do not know the time that EMS arrived at the facility.

Once EMS assumed care of Inmate Thomas, I observed the Styrofoam cup contents. Contents of the cup revealed one human eyeball with visceral tissue intact. The iris was brown, and matched the color of the inmate's remaining intact left eye. The cup was given to EMS personnel, who wrapped the eyeball in gauze and placed it in an emptied, sterile IV bag. EMS personnel affixed the socket patching done by Campbell by wrapping Kerlix Kling around the inmate's head.

EMS personnel transported Inmate Thomas to Wilson Jones Emergency Room. Accompanying Thomas were SGT. JESUS SOLIZ and C/O ROBERT LANG. Both Officers rode in the ambulance with the inmate. I do not know what transpired during the transport. Sometime during my arrival inside the jail, Capt. Stephens had arrived outside the jail and met me there as the ambulance was preparing Thomas for transport. Present with her was LT. TOM WORSHAM. Capt. Stephens drove me to Wilson Jones Emergency Room in her County-assigned vehicle; Lt. Worsham drove a County-assigned vehicle to Wilson Jones. Worsham, Stephens and I met the ambulance at Wilson Jones Emergency Room.

Once inside the hospital, a man introducing himself as DR. TRIECHLER assumed care of Thomas. Dr. Triechler elected to medicate Thomas for his mental trouble, using Geodon 20 mg. IM and Morphine Sulfate 4 mg IV. Triechler telephonically contacted DR. ROBERT BURLINGAME, an eye specialist, who stated to have Thomas in his office Monday, 04/05/2004. Triechler also telephonically contacted DR. MYRNA TUCKER, psychiatrist, for psychotropic medication orders. The inmate was given TobraDex eye ointment, IV solutions, pain medications and psychotropic medications in the Emergency Room. The inmate's eye socket was re-patched and head re-wrapped for further protection of the socket. Lab values were drawn with the inmate's permission. I

370

do not know what Lab values Dr. Triechler ordered.  INVESTIGATOR MIKE
STEPHENS arrived at the Emergency Room.  At Investigator Stephens' direction, I
showed him the inmate's eyeball and photographs were taken by Investigator Stephens.
The inmate was released from the hospital with orders.  Per Capt. Stephens the inmate
was ordered to remain restrained at all times for his own safety.  Once back at the jail, the
inmate was again housed in Holding 3.  A backboard with spider straps and leather
restraints was fashioned for inmate sleeping.  A restraint chair was present for non-
sleeping time frames.  The inmate was drowsy and requested to sleep.  This request was
honored.  At one point, Inmate Thomas raised his head and asked me "Did I pull my eye
out for nothing?" and I replied in the affirmative.  Inmate Thomas asked me if the
medication would help him and I told him that it would; that it would clear his thinking.
The inmate agreed to continue to receive the medications offered. The inmate frequently
asked if he go see his wife to "ask her to forgive me"…."My kids forgive me but she
won't and I love her and I need her to forgive me".  After calming the inmate, I left his
cell.  Approximately 15 minutes later, I again went to check on Inmate Thomas and
found Investigator Stephens and Investigator DICK ROGERS in the inmate's cell.  They
were discussing the medical incident of the eye enucleation with Thomas.  I heard
Thomas agree that he had performed the act upon himself, that no one was in the cell
with him and that no one in the jail had forced him to do the act.  The inmate's speech
was soft and low, and he occasionally answered by nodding or shaking his head rather
than by verbal means.  After the interview concluded and my staff was briefed, I left the
facility.
I have been back numerous times since the incident of 04/02/2004 to personally check on
the condition of Inmate Thomas.  Inmate Thomas' thinking processes are somewhat
clearer.  His eye socket remains wrapped and treated per orders.  An indwelling urinary
catheter has been placed per the orders of Dr. Bell.  Dr. Bell is scheduled to see the
inmate today, as is Dr. McGirk.  The inmate will be taken to see Dr. Burlingame as
ordered.
I spoke with the inmate's attorney, RJ Hagood on Saturday, 04/03/2004 to advise him of
the situation.  The attorney was aware of the incident.  I do not know how the attorney
was made aware of the incident.  Also, Capt. Stephens contacted me and asked me to
speak to Mr. DAN THOMAS, Inmate Thomas' father to alert him to the situation.  This
was done as well.  Mr. Thomas stated he had "heard what had happened" and wanted "to
know why nobody called me".  I advised Mr. Thomas that Inmate Thomas' attorney was
informed of what the situation was, what medications were being given and the current
treatment for Inmate Thomas.  Mr. Thomas was also given my usual work schedule and
told he could contact me at any time at the jail for assistance.
This statement is being recalled to the best of my ability and is true and correct to the best
of my recollection.  End of statement----Natalie Sims, LVN

371

# Exhibit 137

# Written statement of William F. Engler

Date 2 April 2004 ———— Page No. 1

STATEMENT OF: William F. Engler

Grayson County Jail

≈ 1929

As I Entered Bookin From The Laundry, I observed Cpl Braziel, + Sgt Soliz Approach The Hold 3 Door. I saw Thomas, Andre Leaning on The Door. Sgt Soliz called For The Hold 3 Door. As The Door opened Nurse Don Campbell Entered Hold 3 As Thomas went Down To His Knees I then Saw Blood stream From His Face and His Eyeball in His Right Hand. Nurse Don Gave Thomas 4x4 Gauze And Instructed Him To Hold it over His Eye. Thomas Keep Repeating That He Did Not Want To Go To Hell, Dispatch Was Called To Call An Ambulance. I went out into The Old Lobby And Cleared The Lobby The went To The North Parking Lot To Escort in The Ambulance Crew. I lead them into The Jail To Bookin. I waited as they Loaded Thomas onto The Gurney, And Lead them Back out To The Parking Lot.

374

# Exhibit 138

# Written statement of Joe Medlin

Date  4-2-04                 Page No.  1

STATEMENT OF:   Joe Medlin #114
                134 Sunrise Rd
                Denism Texas


At approx 7:30 Pm I (medlin) Heard a noise and turned away from the fingerprint machine to see Inmate Thomas (who was Housed in Holding unit #3) walk up to The Glass door, I Noticed He Had Blood on His Hand & Blood running down his face. He cried out and mumbled something I didn't understand. The door was opened and He fell to the floor in the Entry way. As soon as the door opened we (officers medlin, Cpl. Brazil, Sgt. Soliz, Cpl Englen, Lang & Nurse Don) were there to assist. I was told by Cpl. Brazil to go to the Kitchen & get a cup of water with some Ice and Nurse Don said to Get a glove with Ice in it. as soon as I obtained the Ice in th glove I took it out I Then went back and got the water & Ice, at this time first aid was being given to the inmate by Nurse Don. During the inital incident the Ambulance was called. After giving the water to Cpl Brazil I removed my self from the area & waited for the Ems to arrive. I met them with Cpl. Englen at the Inside Slider & directed Them To the Inmate.

AT000363

Date 4-2-04 _____ Page No. 2

STATEMENT OF: Joe Medlin

(Cont)

_____

During this time I did overhear the inmate quoting scripter from the bible. It was in referance to plucking one's eye out to be saved from going to hell.

When the Ems crew came in & began tending to the Inmate (thomas) I returned to my regular duties

J. ___ . #114

373

AT000364

# Exhibit 139

# Written statement of Don Campbell, EMT-B

APRIL
Date ~~Aper~~ 2, 2004                    Page No. 1 of 4

STATEMENT OF: Don Campbell, EMT-B
G.E.S. (Jail Medical)
Sherman, Tx

At approximately 1925 hours this date I was in the Book-In area of the Grayson County Jail completing medical histories on new inmates. I was seated behind the book-in counter directly across from Holding Cell #3. I heard and felt Deputy Corporal Roger Braziel pass quickly behind me and saw him turn in the direction of Holding Cell #3, followed closely by Correction Officer Sergeant Jesus Soliy. Sgt. Soliy was calling loudly for someone to open the electric door to Holding Cell #3 (H3). I raised from my chair to see more and I observed I/M Andre Thomas on his knees slumped against the left side (as I viewed it) door frame. The I/M's head was bowed and his right hand was over his right eye. He hand, face, the front of his jail uniform, and an area of the floor near his knees was covered with a dark red substance I interpreted to be blood. I immediately reached under the desk where a first aid "jump" kit is stored, grabbed the bandage box and placed it on the counter. I then turned and went

**4785**

Date April 2, 2004    Page No. 2 of 4

STATEMENT OF: Don Campbell, EMT-B
G.E.S. (Jail Medical)
Sherman, TX

to the fingerprint area (about six steps) for protective gloves. I pulled the gloves on, grabbed a package of 4 in. x 4 in. gauze pads out of the box on the counter and entered H3. I positioned myself behind I/M Thomas and told him who I was. I placed several of the 4x4 gauze pads in his left hand and told him to put the compress over his injured eye. He complied and stated that he hurt badly and asked if I could give him something to make the pain go away. While gloving up prior to entering the cell I had told Sgt. Solis to call the Sherman Fire Department Ambulance and I told I/M Thomas that help was on the way. Dep. Cpl. Braziel had sent Correction Officer Medlin to the kitchen for a cup of water and ice to preserve the I/M's right eyeball, which had been recovered from the I/M's right hand. I called after CO Medlin to bring me an ice pack made from an extra large protective glove. I also called by radio for my partner, EMT-B Roberta Mayo, to bring me a

**4786**

AT004761

Date April 2, 2004 _____ Page No. 3 of 4

STATEMENT OF: Don Campbell, EMT-B
G.E.S. (Jail Medical)
Sherman, TX

bottle of Normal Saline to place the avulsed eye in. During this time I also asked Dep. Cpl. Brazzel to contact my superviser, Natalie SIMS, LVN, and advise her of the situation. Also during this time I continued to talk to I/M Thomas and reassure him that help was on the way. I/m Thomas stated to me that he believed a bible verse had directed him to remove his right eye to avoid "burning in hell." He repeated this statement several times. When the ice pack arrived I placed a fresh pad of gauze 4x4's on it and directed him to place the fresh gauze over the wound, which he did. About this time LVN Sims arrived and helped me move I/m THOMAS to a position sitting with his head leaning back against his bed frame. At about 1935 to 1937 the ambulance crew from Sherman FD arrived in the book-in area. Nurse Sims remained with I/m Thomas while I met the Paramedics in front of holding cell #1 and advised them of the situation. At this time the Paramedics packaged I/m Thomas

4787

Date April 2, 2004    Page No. 4 of 4

STATEMENT OF:  Don Campbell, EMT-B
G.E.S. (Jail Medical)
Sherman, TX

for transport to Wilson N. Jones Hospital- Nurse Sims,
Lt. Tom Worsham, Sgt. J. Solis, CO R. Long accompanied
I/m Thomas.  To the best of my knowledge and
recollection, this statement is a true record of
my participation in the events surrounding the
eye injury to I/m Andre Thomas on this date.
Don Campbell EMT-B   4/2/04

**4788**

AT004763

# Exhibit 140

## Wilson N. Jones Medical Records regarding the enucleation of Andre Thomas's right eye

**WNJ** Wilson N. Jones
MEDICAL CENTER

## REGISTRATION RECORD

| PATIENT ACCOUNT NO. | PAT TYPE | SOURCE | PRE. | | | | | | PRIOR ADMIT DATE | ROOM |
|---|---|---|---|---|---|---|---|---|---|---|
| 0016176778 | ER | 7 | | | | | | | 03/27/04 | 3250 |

| FC | ADMIT DATE / TIME | BIRTHDATE | AGE | SEX | MAR. | RACE | TYPE | RELIG. | ADMITTING PHYSICIAN / CODE | NEWS |
|---|---|---|---|---|---|---|---|---|---|---|
| N | 04/02/04 19:58 | | 21 | M | S | B | | CHR | | |

PATIENT NAME AND ADDRESS
THOMAS, ANDRE NO-INFO
2424 TEXOMA PKWY
SHERMAN, TX 75090

SSN/PHONE/COUNTY
903 868-4657
GRAYSON

PT. EMP NAME AND ADDRESS
UNEMPLOYED

WORK PHONE

GUARANTOR NAME AND ADDRESS
CENTER, GRAYSON JUSTICE
200 S CROCKETT-2ND FLOOR
SHERMAN, TX 75090

SSN/PHONE/REL

GUAR. EMP NAME AND ADDRESS
ATTN:CO COURT @ LAW

WORK PHONE

SPOUSE PARENT NAME AND ADDRESS

SSN/PHN SPOUSE PARENTS EMPLOYMENT NAME

EMERGENCY CONTACT NAME AND ADDRESS
ROCHELLE THOMAS
800 E HWY 1417 #2
SHERMAN, TX 75090

PHONE/REL
903 868-4657

FAMILY PHYSICIAN

RESISTANT ORGANISM

OTHER

PRIOR HOSP NO.

INS. NAME  GROUP NAME

CERT. NO. / GROUP NO.

SUB. NAME  INS. ADDRESS
0016152035

ADMITTING COMPLAINT

COMMENTS

ATTENDING PHYSICIAN

EMERGENCY PHYSICIAN

DISCHARGE DATE & TIME

### Insurance Assignment
I authorize payment directly to Wilson N. Jones Medical Center and physician(s) which accept this assignment of hospital and medical benefits otherwise payable to me. I understand that I will be responsible for any balance. I understand that I may receive a bill from the following: Pathologists, Radiologists, Emergency Physician, Anesthesiologists, EEG, ECG, or EKG interpreters, surgeons, or consultants.

### Medicare/Medicaid Assignment - Important Message From Medicare - Important Message From Champus
I certify that the information given to me in applying for payment under Title XVIII or XIX of the Social Security Act is correct and I request that said payment of authorized benefits be made in my behalf. If Medicare, I have received AN IMPORTANT MESSAGE FROM MEDICARE - if Champus I have received AN IMPORTANT MESSAGE FROM CHAMPUS.

### Release of Information
I authorize the hospital to release such medical information as necessary when requested by insurance companies, worker's compensation carrier, the patient's or responsible party's employer, representatives of government agencies, or the other entities, medical facility physician for continuing care or other entities as may be necessary.

### Valuables
I understand that the hospital is not responsible for damage, theft, or loss of my personal property. I have been informed that items such as necessary eyeglasses, dentures, jewelry and other valuables should be sent home or deposited with the hospital for safekeeping. I understand that lost and found articles not claimed in sixty (60) days will be disposed of.

PATIENT SIGNATURE   Unable to Sign

DATE   4-2-04

WITNESS, CLERK

SIGNING FOR PATIENT   1857

DATE

MEDICAL RECORDS

RELATIONSHIP TO PATIENT   000001

02

**Wilson N. Jones Medical Center**
**EMERGENCY PHYSICIAN RECORD**
Eye Problems (3-4)

THOMAS, ANDRE NO-INFO
04/02/04 M C3/17/83 21

32561

TIME SEEN: ___ ROOM: 2 ✓ EMS Arrival

HISTORIAN: patient — spouse / paramedics

HX / EXAM LIMITED BY: ___

**HPI** chief complaints: ___ eye pain

duration / occurred: ___

current and associated symptoms:
- ✓ pain / burning / itching
- photophobia
- redness / matting / eyelid swelling
- foreign body sensation
- ✓ decreased / blurred vision
- diplopia

location: ✓ RIGHT EYE ___ LEFT EYE

severity: __ mild __ moderate ✓ severe

apparent injury? __ no ✓ yes __ possibly

How? (context): foreign body / direct trauma ___
__ chemical exposure ___
__ washed eye(s) at scene with ___
__ welding arc exposure / tanning booth ___
__ contact lenses soft / hard / extended wear
__ started after exposure to contact cleansing fluid

Where? __ home __ work __ school County Jail
Other injuries? __ neck __ head __ back __ other:

**ROS** __ fever __ sore throat __ cough

**PAST HISTORY** __ negative __ prior eye injury __ glaucoma
__ diabetes __ wears contact lenses ___

Meds- __ none / __ see nurses note ___

Allergies- __ NKDA / __ see nurses note ___

FORM# - GRAY - 02 8/00

**1858**

---

☐ Nurses note reviewed ☐ Tetanus immun. current ☐ Vital signs reviewed

**PHYSICAL EXAM** __ Alert __ Lethargic

Distress __ NAD __ mild __ moderate __ severe
☐ Examined with Slit Lamp (R/L)

**Visual Acuity** __ NOTED (see nursing assessment)

**Eyelids**
__ nml inspection
__ everted for exam (R/L)
- __ see diagram
- __ foreign body under eyelid (R/L)
- __ edema (R/L)
- __ erythema (R/L)
- __ stye (R/L)

**Conjunctivae and Sclerae**
__ nml inspection
- __ see diagram
- __ injected (R/L)
- __ exudate (R/L)
- __ foreign material R__
- __ subconjunctival hemorrhage R__
- __ scleral icterus

**Corneas**
__ nml inspection
__ examined w/ fluorescein (R/L)
- __ see diagram
- __ foreign body (R/L)
- __ abrasion (R/L)
- __ fluorescein dye uptake (R/L)

**EOM's**
__ intact
- __ palsy

**Pupils**
__ PERRL
__ normal accommodation
- __ irregular pupillary shape (R/L)
- __ abnormal pupillary size
  ( unequal / miotic / mydriatic ;
  R- __ mm L- __ mm

**Anterior Chambers**
__ normal inspection
- __ see diagram
- __ hyphema (R/L)
- __ cell / flare (R/L)
- __ narrow angle (R/L)

**Posterior Segments**
__ normal funduscopic (R/L)
- __ papilledema (R/L)
- __ AV nicking (R/L) grade 1 2 3 4
- __ exudate (R/L)
- __ hemorrhage(s) (R/L)
- __ retinal detachment
- __ abnormally large optic cup R__

000002

AT001813

**PROCEDURES and PROGRESS:** _325 6'_

**RIGHT EYE:**

_Enucleated_

A=abrasion
D=dye uptake (fluorescein)
FB=foreign body
SCH=subconjunctival hem.

**LEFT EYE:**

A=abrasion
D=dye uptake (fluorescein)
FB=foreign body
SCH=subconjunctival hem.

---

local anesthesia:  ☐ Alcaine Drops _____

foreign body removal:
☐ with cotton-tipped swab   ☐ with needle / burr drill
☐ with irrigation   ☐ _____
☐ Morgan lens
☐ cornea curettaged with corneal burr after removal of
   foreign body, because of residual material

Remaining material after foreign body removal?
   NO   DEBRIS   RUST-RING

irrigation:   R / L  eye(s) irrigated with _____ cc nm: saline / LR

other: _____

intraocular pressure:  RIGHT EYE- _____ mm
                       LEFT EYE- _____ mm

---

| | |
|---|---|
| **HEAD / ENT** | ___ tenderness / swelling ___ |
| ___ nml inspection | ___ TM erythema / dullness ( R / L ) ___ |
| ___ pharynx nml | ___ pharyngeal erythema / tonsillar exudate ___ |
| **NECK / BACK** | ___ tenderness ___ |
| ___ nml inspection | ___ swelling / ecchymosis ___ |
| ___ painless ROM | |
| ___ thyroid nml | |
| **RESPIRATORY** | ___ wheezing ___ |
| ___ no distress | ___ rales ___ |
| ___ lungs clear | |
| **ABDOMEN** | ___ tenderness / guarding ___ |
| ___ non-tender | |
| ___ no organomegaly | |
| **NEURO / PSYCH** | ___ disoriented to person / place / time ___ |
| ___ oriented x 3 | ___ depressed affect ___ |
| ___ mood / affect nml | ___ motor / sensory loss ___ |
| ___ neuro intact | |

**XRAYS**  ☐ Interp. by me   ☐ Reviewed by me   ☐ Disc'd w/radiologist

**Facial Series   Water's View**
___ nml / NAD       ___ soft-tissue swelling ___
___ no fracture     ___ max. sinus opacification / air-fluid level ___
___ soft tissues nml  ___ fracture ___
___ sinuses nml

**Other** ☐ See separate report

---

✓ referred to / discussed with Dr. _____
will see patient in   office / ED / hospital  in ____ days
Rx given _____

**CLINICAL IMPRESSION:**

| | |
|---|---|
| Acute Eye Pain | R / L EYE |
| Decreased Vision | R / L EYE |
| Corneal Abrasion | R / L EYE |
| Corneal Ulcer | R / L EYE |
| Foreign Body | R / L EYE |
| removed  resolved | |
| w/ residual material | |

| | |
|---|---|
| Acute Iritis | R / L EYE |
| Glaucoma acute | R / L EYE |
| Conjunctivitis | R / L EYE |
| chemical / allergic / infectious | |
| Corneal Injury From- | |
| Contact Lens | R / L EYE |
| Ultraviolet Keratitis | R / L EYE |

**DISPOSITION-** ☐ home  ☐ admitted  ☐ transferred _To ISU_
**CONDITION-** ☐ unchanged  ☐ improved  ☐ stable

PA

BRENT TREICHLER MD          MD / DO

Eye - 02          1359          000003

AT001814

☐ Direct to ER exam rm
☐ Assist Gown/Clothes

32561

Date 4-2-04 Triage Time 2000 Level (1) 2 3

Patient Name Amaru Thomas ▮▮▮▮ Age 21

| Last Tetanus | Immunizations | Pregnant Yes ___ No ___ | Ht: 5'11" | Wt: 165 |
| ☒ 5 yrs | ☐ UTD | Grav ___ Para ___ AB ___ | | |
| ☒ 5 yrs | ☐ Needs | LMP ___ | | |

CHIEF COMPLAINT ☐ Work Related/Company ____
Rt leg pain ☐ Industrial Pref. Reviewed

Onset of Symptoms/MOI
"Shot by self" "Rt Ward of
God" Thru Gun Co.

ALLERGIES
☒ NKDA

CURRENT MEDICATIONS: ☒ NONE   ☐ SEE MED LIST ATTACHED

HISTORY/SCREENING ☒ None Significant:  ☒ Growth Development: WNL
☐ Heart          ☐ Hypertension      ☒ Alcohol/Drug      ☐ Infectious Disease
☐ Diabetes       ☐ Seizures          ☐ Psychiatric       ☐ TB  ☐ MRSA
☐ Stroke/CVA     ☐ Pulmonary         ☐ Asthma            ☐ Abuse/Neglect
☐ Hearing/Speech Impairment          ☐ Language Barrier  ☒ Smoker PPD ___
☐ Chronic Pain Where? ___

Triage Interventions ☐ Ice Bag ☐ Splint ☐ Circulation check ☐ O2 ☐ Monitor

| AIRWAY | BREATHING | CIRCULATION | NEURO |
| ☒ Patent | ☒ Normal | Skin: Color: | ☒ Alert |
| ☐ Other | ☐ Labored | ☒ Dry ☐ Pink-Brown | ☒ Calm |
| | ☐ Audible | ☐ Moist ☐ Cyanotic | ☐ Confused |
| Visual Acuity | Wheeze | Cap Refill ☐ Pale | ☐ Coherent |
| ☐ Vision Corrected | ☐ Other | ☐ < 3 sec ☐ Jaundice | ☐ Anxious |
| ☐ Yes | | ☐ > 3 sec ☐ Other | ☐ Hostile |
| | | | ☐ Other |

PHYSICIANS ORDERS           ☐ See Attached
LABS
☐ CBC                        ☐ EKG
☐ GLUCOSE
☐ BASIC MET PANEL            X-RAYS
☐ COMP MET PANEL             ☐ CXR
☐ MAGNESIUM                  ☐ PORTABLE
☐ CPK                        ☐ ABD SERIES
☐ CKMB                       ☐ PORTABLE
☐ TROPONIN                   ☐ C-SPINE
☐ PT (INR) ☐ PTT             ☐ LS-SPINE
☐ ABG                        ☐ CT SCAN ☐ HEAD ☐ ABD
☐ AMYLASE                    ☐ OTHER
☐ LIPASE                     ☐ WITH CONTRAST ☐ WITHOUT
☐ UCG (URINE)                ☐ ULTRASOUND
☐ HCG QUANTITATIVE
☐ GEN-PROBE
☐ UA      ☐ CATH             INITIATE STANDING ORDERS
☐ CULTURE                    ☐ PED. FEVER PROTOCOL
☐ WET PREP                   ☐ CHEST PAIN
☐ MONITOR:               ☐ SUSPECTED STROKE
☐ B/P                    ☐ ASTHMA
☐ CARDIAC                ☐ LOW ABD PAIN-FEMALE
☐ PULSE OXIMETRY         ☐ MINOR TRAUMA
☐ I/O                    ☐ EYE-CHEMICAL
☐ O2 ___ LPM
☐ SALINE LOCK  ☐ IV OF: ___

| MOA: ☐ Walk ☒ EMS ☐ Carried ☐ W/C | PREHOSPITAL |
| Brought by: Police | ☐ O2 |
| ☐ Mobility assist Vehicle to W/C ☐ Interpreter Used | ☐ Splint ☐ Meds |
| Nurse's Signature: ___ | ☐ See EMS Sheet |

Pvt. MD: Bill Myers ☐ On Call: ___
Emergency Physician ___ Notified ___ Arrived ___

VITAL SIGNS PAIN: LOCATION R thigh INTENSITY ___
ONSET ___ ALLEVIATING/AGGRAVATING Factors ___

| Time | B/P | Pulse | Resp | Temp | O2 sat Rm air | O2 | GCS |
| 2011 | 102/65 | 75 | 18 | 97.4 | 99% | | 15 |
| | | | | | (8) | | |

CLASS 3 NURSES NOTES ☐ SEE PAGE 2 ☐ SEE NEURO FLOW

☐ Seizure/Fall Precautions/Siderails Up/Risk to Fall noted
☐ Lab Draw by ED staff ☐ Glucometer done @ ___ Results ___

ADDITIONAL ORDERS:
(handwritten orders, illegible)

NURSE SIGNATURE: ___

MD SIGNATURE: ___
☐ TEMPLATE          ☐ NO TEMPLATE          ☐ DICTATION

DISPOSITION CONDITION: ☐ SAME ☐ WORSE ☒ IMPROVED ☐ EXPIRED ACCOMPANIED BY HCSD
DISCHARGE: ☐ HOME ☐ AMA ☐ ELOPEMENT ☐ OTHER Jail  MODE: ☐ WALKED ☐ W/C ☐ CARRIED ☐ EMS
Instructions: ☐ Verbal ☐ Written DC Instructions received, understood and pt. agrees to follow
☐ ADMIT  Room # ___ With: ☐ Oxygen ☐ Monitor  Report to: ___ ☐ By Phone ☐ By Fax
☐ TRANSFER to: ___ Transported by: ___ Report to: ___ MOT done: ☐ Yes ☐ No
Pain at Discharge: Intensity (0-10) 11
DISCHARGED BY ___ DATE: 4-2-04 DISCHARGE TIME: 2320
Form = ED-046 Rev. (10/2003)

VALUABLES ☐ Retained by Pt.
☐ Given to Security (see list)
☐ Given to: ___
Indicate items Pt. has with them:
☐ Glasses  ☐ Dentures
☐ Hearing aids ☐ Meds
☐ Wallet/purse ☐ Jewelry
☐ Clothing  ☐ Cash/checks



AT001815

**WNJ** Wilson N. Jones
MEDICAL CENTER

EMERGENCY DEPARTMENT NURSING RECORD
CONTINUATION SHEET

DATE: 4-2-04   PAGE #: 2

| TIME | B/P | P | R | T | MEDICATIONS & INFUSIONS | NURSES NOTES |
|---|---|---|---|---|---|---|
| | | | | | | Pt. arrived via EMS from Grayson Co |
| | | | | | | Correctional facility. O/C in |
| | | | | | | Osgine his Clery. Oppart 30 |
| | | | | | | minutes PTA. Pt. (?) exam |
| | | | | | | EMS TKO. Pt. states he was |
| | | | | | | "instructed by God" use to |
| | | | | | | Onera. Bend to O₂ sat |
| | | | | | | and accessed ℞ EKG on |
| | | | | | | monitor. Warm blanket. Given |
| | | | | | | Eldevil. V.O. Dr. Trekle for |
| | | | | | | 20mg IM. |
| 2005 | | | | | | Given 20mg (?) Deltoid. Pt. treated. |
| 2013 | | | | | | Morphine 4mg SIVP flushed. |
| 2018 | | | | | | Anvementia 8mg SIVP flushed |
| 2020 | | | | | | Atized 16m IVPB |
| 2045 | 93 | 52 | 86 | 14 | | Dr. Trekler speaking ℅ pt. ref. |
| 2055 | | | | | | Pt. gave consent for blood draw. witnessed |
| | | | | | | by Dr. Trekler, G.Bruton, N.Wilson |
| | | | | | | G.Kruse |
| 2140 | 97 | 52 | 86 | 18 | | Dr. Trekler to examine eye sects. Clean |
| | | | | | | Tramamin- Neutrial |
| 2150 | 103 | 54 | 89 | 14 | | to eye pads wrapped ℅ Contacol |
| 2220 | | | | | | pt. c/o pain. Dr. Trekler noted. |
| | | | | | | V.O. Morphine 4mg IVP Dr. Trekle |
| | | | | | | G.Bruton RN. |
| 2225 | | | | | | Morphine 4mg SIVP flushed |
| 2230 | | | | | | D/C'd IV ℅ Cathter intact. |
| 2245 | | | | | | Dr. Trekle to Matris Susan Grayson |
| 2250 | | | | | | to Shil Nurse Sims LVN. G.Bruton |
| 2305 | 118 | 56 | 84 | 16 | | Dr. Trekle to speak ℅ pt. Reviewed |
| | | | | | | D/C home/quit ℅ D/C instructions and |
| | | | | | | prescription given to N.Sims LVN. |
| | | | | | | pt. ambulated to GCSD van ℅ |
| | | | | | | deffice. G.Kruse |

1961

000005

AT001816

# WILSON N. JONES MEDICAL CENTER
## 500 North Highland
## Sherman, Texas 75092

| | | |
|---|---|---|
| **Case #:** W04-1885 | **SCode:** | **Physician:** Treichler |
| **Name:** Thomas, Andre | | |
| **Age:** 21   **Loc:** | **Room:** | **Operation Date:** 4-2-04 |
| **MR #:** 0000032561 | **Hosp #:** 0016176778 | **Received Date:** 4-5-04 |

**History:** Patient gouged own eye out
**Preoperative Diagnosis:**
**Postoperative Diagnosis:**

**Gross Description(s):**
Labeled: right eye. There is an intact, 2.2 x 2.0 x 2.5 cm eye. The iris is blue and 1.2 cm in diameter. The sclera has a few brown patches, the largest of which is 0.3 cm in greatest dimension. There are attached small muscle segments, and posteriorly is an attached, 2.2 cm long, 0.5 cm in diameter portion of optic nerve. A microscopic exam is not performed.

EGM:cm 4-6-04 10:14 AM

**Diagnosis(es):**
Eye, right (history of traumatic removal by patient)
EGM:cm 4-6-04 10:15 AM  CPT:88300

Page 1 of 1
Printed   4/6/2004 10:16 AM

Edgar G. McKee, MD                                      **Pathologist**

———— Pathology Consult ————

PATIENT  CHART COPY

000006

AT001817



| Test Name | | Results | Units | Reference Range | Site |
|---|---|---|---|---|---|
| 8475 | HEPATITIS B SURFACE ANTIBODY (QUANT) | <6 | MIU/ML | | IG |

ACCORDING TO CURRENT CDC GUIDELINES,
VALUES GREATER THAN OR EQUAL TO 10 MIU/ML
INDICATE IMMUNITY.

COMMENTS:      ER

Performing Laboratory Site Legend...

        IG
        QUEST DIAGNOSTICS-IRVING
        4770 REGENT BLVD.
        IRVING, TX  75063

### *** END OF REPORT ***

**1863**

000007

Legend  ↑ High  ↓ Low  ✱ Abnormal  C Corrected  I Incomplete  P Preliminary

AT001818

**Complete Report**

| THOMAS, ANDRE N. | | 04/02/2004 | 10:58pm | 04/03/2004 | 04/05/2004 |
|---|---|---|---|---|---|
| Patient Name | | Date Drawn | Time Drawn | Date Received | Date of Report |
| **M** [redacted] **21** | WILSON JONES HOSPITAL | | | 40937853 | 44532 |
| Sex  D.O.B.  Age | 500 NORTH HIGHLAND | | | Hospital/ID # | Account Number |
| 0000032561 | SHERMAN, TX 75092 | | | | IF506323C |
| Patient I.D. | | | | SS # | Specimen Number |
| ER, PHYSICIANS | | | | | |
| Ordering Physician | REQ#: B09188  021070A | | ER | | |
| Patient Home#  Patient Work# | | | Comments | | |

| Test Name | Results | Units | Reference Range | Site |
|---|---|---|---|---|
| 8472  HEPATITIS C ANTIBODY | NON-REACTIVE | | NON-REACTIVE | IG |

A NON-REACTIVE TEST RESULT DOES NOT EXCLUDE THE
POSSIBILITY OF HCV INFECTION SINCE THE TIME FOR
SEROCONVERSION IS VARIABLE.

COMMENTS:      ER

Performing Laboratory Site Legend...

    IG
    QUEST DIAGNOSTICS-IRVING
    4770 REGENT BLVD.
    IRVING, TX  75063

### *** END OF REPORT ***

1864

000003

Printed on 04/05/2004 at 15:38:33 Site# B09188
AutoPrint                        Wilson N Jones Hospital
CCLink Version# 3.4 [August 29 2002 15:28:38]

AT001819

**WNJ**

Wilson N. Jones Medical Center
500 N. Highland

| Patient Information | Treating Provider | Discharge Summary |
|---|---|---|
| Thomas, Andre | Brent Treichler M.D. 500 N. Highland Phone: 903-870-4121 | Date: 4/2/04  Time: 10:30:09 PM **Chart Copy** |

**1) Your Discharge Instructions:**

CUSTOM # (English)
NARCOTIC MEDICATION #Document 548 (English)

**2) Your Prescriptions:**

Geodon Oral Capsule 20 Milligram 1 CAPSULE TWICE DAILY # 20 CAPSULES (0 Refills)
Vicoprofen Oral Tablet 7.5/200 Milligram 1 TABLET EVERY 6 HOURS AS NEEDED # 20 TABLETS (0 Refills)
TobraDex Ophthalmic Ointment 0.1-0.3 % FILL RIGHT EYE SOCKET WITH OINTMENT QID  # 1 TUBE(S) (3 Refills)

**3) You should Follow Up with:**

| Follow Up Physician: | Follow Up Information |
|---|---|
| Robert Burlingame, MD 1303 N. Travis Sherman, TX Phone: 892-3282 Fax | On 04/2/2004 this patient was treated in the Emergency Department of Wilson N. Jones Medical Center at 500 N. Highland for EYE INJURY, CUSTOM.  The patient was asked to follow up 2 Days. ADDITIONAL NOTES. Follow up in Dr. Burlingame on Monday afternoon. |

I understand that the emergency care which I received is not intended to be complete and definitive medical care and treatment.  I acknowledge that I have been instructed to contact the above physician immediately for continued and complete medical diagnosis, care and treatment.  EKG's, X-rays, and lab studies will be reviewed by appropriate specialists and I will be notified of significant discrepancies.  I also understand that my signature authorizes this Medical Center to release all or any part of my medical record (including, if applicable, information pertaining to AIDS and/or HIV testing, mental health records, and drug and/or alcohol treatment) to the referred physician listed above.

Witnessed by N Sims LVN

*I have read and understand the above, received a copy of applicable instruction sheets, and will arrange for follow up care.*

Pt. Unable to sign due to condtn

| Signature | Patient/Parent/Guardian | Date/Time | Signature | Instructed by | Date/Time |
|---|---|---|---|---|---|

**CONFIDENTIAL INFORMATION:** The information contained in this fax is confidential.  If you have received this fax in error, please notify the sender at once and destroy this document.

Powered by ScriptRx, Inc.                                                            http://www.ScriptRx.com

1865                                                                                        000009

AT001820

| WNJ | Patient Information | Treating Provider | Discharge Instructions |
|---|---|---|---|
| **Wilson N. Jones Medical Center**<br>500 N. Highland | Thomas, Andre<br><br>Phone: | Brent Treichler M.D.<br>500 N. Highland<br><br>Phone: 903-870-4121 | Date: 4/2/04  Time: 10:30:07 PM<br><br>**Chart Copy** |

Page: 1 of 2

## Patient Discharge Instructions

Last Update: 03/01/2002

You have enucleated(removed) your right eye.  Put the eye ointment into your right eye socket 4x's per day.  Take a pain pill 45minutes prior to doing this.  Take your Geodon shot every 12 hours. Return immediately to the ER for increasing pain, fever, purulent discharge.

## Patient Discharge Instructions

Document: 548        Last Update: 09/20/2002

### NARCOTIC MEDICATIONS

You have been prescribed narcotic. Narcotic medicines are used to relieve pain. Some examples of narcotic medicines include the following:

- Codeine (Tylenol #2, #3 - cough syrup)
- Propoxyphene (Darvocet, Darvon)
- Hydrocodone (Vicodin)
- Oxycodone (Percocet, Percodan)

This drug may cause drowsiness. Therefore, be sure to take it only as directed.

How To Take This Medication:

1. If this medicine makes your stomach upset, take it with food.
2. Pain medicine should be taken only if needed at the times prescribed. If you are not having pain, do not take the medicine  unless you are advised to do so by your doctor.
3. Narcotic medicines can be habit forming; therefore, take this medicine only as directed. Do not take more of it, do not take it more often and do not take it for a longer period of time than directed.

What You Should Watch Out For:
Possible Side Effects:

- If you have dizziness, or drowsiness, take a smaller dose, breaking a pill in half or take it less often.
- If you develop constipation, drink lots of liquids; use small doses of a mild laxative like Milk of Magnesia as needed and add fiber to your diet.
- If you have difficulty passing urine, stop taking the medicine and contact your doctor.

Possible Allergic Reactions: Rash, itching, swelling, trouble breathing or swallowing. You should contact your doctor or return to this facility immediately.
Medical Conditions: Before you begin to take this medicine, be sure your doctor knows if you have any of the following conditions:

- Prostate enlargement.
- Pregnancy or breast-feeding.

Possible Drug Interactions: This drug may cause increased side effects when taken with alcohol, muscle relaxant, sedative, tricyclic antidepressants, MAO-inhibitor or another pain medicine. Make sure your doctor knows what other medicines you are taking.

Note These Warnings:

- Do not drive, ride a bicycle, operate dangerous equipment, climb a ladder or do any other activity where you must concentrate and might be injured for at least 12 hours after taking this medicine until you know how it will affect you.
- Prolonged use of this medicine can be habit forming and may lead to addiction.
- Tell your doctor what other medicines you are taking.
- Do not drink any alcohol while taking this medicine.

Stop taking this medication and call your doctor or return to this facility right away if you notice any of these problems:

- Hives or itching.
- Confusion, dizziness, or lightheadedness.
- Hallucinations.
- Blurry vision.
- Slow breathing, slow heartbeat, or severe weakness.
- Nausea or vomiting.
- Stomach pain or chest pain.
- Anything else that worries you.

## Discharge Instructions Special Notes

Powered by ScriptRx, Inc.        **1866**

000010        http://www.ScriptRx.com

AT001821

**WNJ**

Wilson N. Jones Medical Center
500 N. Highland

| Patient Information | Treating Provider | Discharge Instructions |
|---|---|---|
| Thomas, Andre<br><br>Phone: | Brent Treichler M.D.<br>500 N. Highland<br><br>Phone: 903-870-4121 | Date: 4/2/04  Time: 10:30:06 PM<br><br>**Chart Copy**<br><br>Page:  2 of 2 |

**Discharge Instructions Special Notes**

000011

AT001822



1868

000012

AT001823

Wilson N. Jones Medical Center
ED EMS / Inter Facility Transfer Communication Record

THOMAS, ANDRE NO ___
04/02/04  M 03/17/83

**☐ Ambulance Transfer Communication**

Stab
Wound
reported

Date 4-2-04 Time 1941 Ambulance Service SFD 4
Age 21 (Male) Female    Private Physician ___
**Chief Complaint:**
☐CPR in Progress  ☐Major Trauma  ☐Possible Stroke  ☐ Chest Pain / AMI
☐Other Pulled eye out -in dressing. bleeding controlled
**Vital Signs**
B/P 114/76 Pulse 74 Resp 18 Sats 100 ☐Rm Air ☐ O2 @ ___ GCS ___
PMH ___  Allergies ___

**EMS Treatment:**
☐ Oxygen ___ L via ☐ N/C  ☐ NRB  ☐ Intubation
☐ IV Fluid_  ☐ Saline Lock
☐ Monitor  ☐ 12 Lead EKG ___
☐ Stabilization (circle all that apply)
    FSP   C-Collar   Backboard   KED   Extremity splint___
**Medical Control Orders / Comments**
___

ED Room Assignment ___ ETA 5
**Pre-Hospital Activation (if applicable)**
☐Level I (88) Trauma Activation  ☐Level II (44) Trauma Activation  ☐Stroke Team
☐ Cath Lab Notified  ☐ No pre-hospital activation required

**☐ Interfacility Transfer Documentation**

Date ___ Time ___ Hospital ___
Transferring Physician ___
Patient Name ___ Age ___ Male / Female
**Chief Complaint:**
___

**Vital Signs**
B/P ___ Pulse ___ Resp ___ Sats ___ ☐ Rm Air ☐ O2 @ ___ GCS ___
Accepted ☐ Yes
House Supervisor ___ Contacted by ___ Time ___
Mode of Transport ___ ETA ___
Accepted ☐ No (if no, place completed form in the ED Director mailbox)
Reason for denial ___

Physician Signature ___ Date ___

Form # ED-011 (Rev 6/03)

**1869**

000013

- 0016176778
0016176778

PHYSICIA
THOMAS, ANDRE NO-INFO
03/17/83    2

### Wilson N. Jones Medical Center
ED EMS / Inter Facility Transfer Communication Record

## ☐ **Ambulance Transfer Communication**

Date_____ Time_____ Ambulance Service_____
Age_____ (Male / Female)   Private Physician_____
**Chief Complaint:**
☐ CPR in Progress   ☐ Major Trauma   ☐ Possible Stroke   ☐ Chest Pain / AMI
☒ Other ____eye ball____

**Vital Signs**
B/P_____ Pulse_____ Resp_____ Sats_____   ☐ Rm Air
PMH _____   Allergies_____   ☐ O2 @____ GCS_____
_____   _____
_____   _____

**EMS Treatment:**
☐ Oxygen_____ L via ☐ N/C ☐ NRB ☐ Intubation
☐ IV Fluid_ ☐ Saline Lock
☐ Monitor ☐ 12 Lead EKG_____
☐ Stabilization (circle all that apply)
FSP    C-Collar    Backboard    KED    Extremity splint_____
**Medical Control Orders / Comments**
_____
_____

ED Room Assignment_____ ETA____
**Pre-Hospital Activation (if applicable)**
☐ Level I (88) Trauma Activation   ☐ Level II (44) Trauma Activation   ☐ Stroke Team
☐ Cath Lab Notified   ☐ No pre-hospital activation required

## ☐ **Interfacility Transfer Documentation**

Date_____ Time_____ Hospital_____
Transferring Physician_____
Patient Name _____
**Chief Complaint:**   Age_____ Male / Female
_____

**Vital Signs**
B/P_____ Pulse_____ Resp_____ Sats_____   ☐ Rm Air
**Accepted** ☐ Yes   ☐ O2 @____ GCS_____
House Supervisor_____ Contacted by_____
Mode of Transport_____ ETA_____ Time____
**Accepted** ☐ No (if no, place completed form in the ED Director mailbox)
Reason for denial
_____
_____

Physician Signature_____ Date_____

Form # ED-011 (Rev 6/03)
**1870**

000014

AT001825



**WNJ** Wilson N. Jones
MEDICAL CENTER

## Acknowledgement of Receipt of Notice of Privacy Practices

I have received a copy of the Notice of Privacy Practices.  I may keep this copy and may request a new copy in the future.  I understand that if I have Internet access I can view and print a copy from www.wnj.org.

Patient's name (please print) _Andre Thomas_

Patient or guardian's signature _____ Date _4-2-05_

Guardian's Name (please print) _____

Wilson N. Jones Medical Center made the following good faith efforts to obtain the above-referenced individual's written acknowledgement of receipt of the Notice of Privacy Practices:

[Identify the efforts that were made to obtain the individual's written acknowledgement, including the reasons (if known) why the written acknowledgement was not obtained.]

_unable to sign_

Form # AD-041 (3/2003)

1871

000015

AT001826

Wilson N. Jones Medical Center

**GENERAL CONSENT FORM**

THOMAS,ANDRE NO-INFO
PHYSICIA
04/02/04 M 03/17/83   2

1. I hereby request admission to this facility and authorize my attending physician, and any and all other attending physicians and surgeons, including radiologists, emergency physicians, pathologists, and anesthesiologists to order or administer any treatments, procedures, tests, examinations or other services of a routine or medical or surgical nature, or to order any hospital services which he/she may deem necessary or advisable in the diagnosis and treatment of my health or physical condition.

2. I understand that the physicians, surgeons, and/or physician assistants who may treat my condition are not employees of this hospital, but are independent physicians who have been selected by my agents or me. I understand that these physicians are independent physicians engaged in the private practice of medicine who are authorized to use the facilities of Wilson N. Jones Medical Center while treating me for my medical condition. The physician may be one selected by me, my agents, or the physician consulting with my attending physician, performing tests ordered by attending physician, such as radiologist, anesthesiologist, cardiologist, or other specialist. I also understand that the emergency room physicians and physician assistants are also not employees of Wilson N. Jones Medical Center, but are private physicians or physician assistants who are treating me until my own physician has time to arrive or until my agents select an attending physician. This Medical Center is not responsible for recommending my treating physicians and I have not relied upon a hospital representative in selecting my independent physician.

3. I authorize Wilson N. Jones Medical Center, its employees and agents to perform nursing care, diagnostic procedures and medical treatment requested by my attending physician and his/her assistant. I understand this may include, but is not limited to diagnostic x-ray procedures, venipunctures for laboratory, intravenous procedures and clinical photographs, videotapes, or film for substantiation or clarification. All prints, negatives, or film will be considered part of the confidential record and will be treated as confidential information related to the diagnosis, treatment, or prognosis of patient. I further authorize the hospital to release my medical records to entities that utilize this information for peer review, quality management, trend and outcome studies or other educational or research purposes. In addition, I authorize Wilson N. Jones Medical Center to transmit electronically or via facsimile any medical data pertaining to my care.

4. I understand that this Medical Center serves as a clinical training site for a number of accredited health professions students including, but not limited to, programs in Nursing, Paramedic, and Medical Technologist training. These are under the direct supervision of a qualified, licensed instructor or certified professional. During the course of my stay, these students may participate in my care.

5. I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as to the result of treatments or examinations in the Medical Center.

6. I hereby acknowledge that I have been provided materials about my rights as a patient and my rights to execute Advance Directives. I understand that I am not required to have an Advance Directive in order to receive medical treatment at this health care facility. Advance Directive data will not be available for outpatient services or procedures.

---

**I HAVE READ AND FULLY UNDERSTAND THE ABOVE**

---

**PATIENT CONFIDENTIALITY DESIGNATION**

☑ I wish to be registered as a standard confidentiality patient.

☑ I wish to register as a strictest confidentiality patient. My presence will not be acknowledged other than my caregivers and those with a need-to-know. I will not receive mail, flowers, visitors or calls.

---

4-1-04                    Implied
DATE/TIME        PATIENT'S SIGNATURE                          PATIENT REPRESENTATIVE'S SIGNATURE

WITNESS                   REASON PATIENT UNABLE TO SIGN              RELATIONSHIP TO PATIENT

**TELEPHONE CONSENT**

| Telephone Consent for emergency treatment | Phone # ( ) | Party issuing consent | Relationship | Date & Time |
|---|---|---|---|---|
| Consent Witness: | | Consent Witness: | | |
| Comments: | | | | |

Form #BO-037 (Rev 02/03)

1872

000016

AT001827

# Exhibit 141

## Report by C. Robin McGirk, Ph.D. regarding Andre Thomas

# Comprehensive Psychological Services

C. Robin McGirk, Ph.D.
Licensed Psychologist

Andre Thomas
April 15, 2004

Delusional content of discussion duirng this contact was quite similar to that observed on previous dates with mention of recurring nature of events which he was observing, while emphasizing that he was attempting to pay close attention to everything that was going on in order to be able to "pass whatever kind of test this is", adding that he thought he had already done enough but would continue to monitor events so that he could fulfill whatever great pupose was intended for him. He was encouraged to consider the importance of much needed rest, however, so that if he does intend to "stand guard duty", that he will be refreshed enough to benefit more thoroughly from the things that he does notice and was re-instructed on some of the meditation techniques which he may be able to use to retard the rush of ideas which appear to present from observing the flow of his speech as well as his own report.

He was observed to be showing signs of tremor in his arms and legs which was intermittent during the course of the interview, and when this was discussed with nursing personnel (Mr. Don Campbell)) information was provided that Andre had been observed to have what appeared to be seiure activity on at least one occasion and that efforts had been made to instruct him with breathing techniques which may be able to halt such activity. The likelihood of such activity being due to the side-effects of Geodon, with the need to monitor for such symptoms recurring at a higher frequency and intensity was discussed. Depending upon the outcome over the next few days, it may be necessary to stop the use of the medication and shift treatment in some other direction.

Also offered for discussion is the issue of allowing him the opportunity for exercise e.g. outside at some nearby park, which certainly appears to be useful for offsetting some of the effects of the ongoing use of restraints. Mr. Don Campbell was informed that such a recommendatin has my support, assuming of course, that security needs can adequately be met while providing this activity for Andre.

10256

03647

AT010276

# Exhibit 142

## Letter from James R. Harrison, Ph.D. to Natalie Simms, RN regarding Andre Thomas



**CENTER FOR
PSYCHOLOGICAL
DEVELOPMENT**

402 West Lamar, Suite 102, Sherman, Texas 75090  (903) 868-2961

April 27, 2004

*Copy to Capt
Stephens 4/27/04 @
1535 hrs-*

Natalie Sims, RN
Chief Nurse
Grayson County Jail
Sherman, Texas 75090

Re:  Andre Thomas

Dear Natalie,

In response to your question regarding use of restraints on Andre Thomas, it is my opinion that the restraints were unfortunately necessary for his own protection when Mr. Thomas was actively delusional. However, he has responded well to the antipsychotic medication, he has been demonstrably calmer and his delusions more short lived. Since it will be more difficult for him to recover from his psychotic episode while in four point restraints, and the danger of self-mutilation is directly related to his delusions, I would now recommend that you strongly consider removing the restraints for increasing longer periods of time.

In doing this, I would also recommend that your medical staff and jail Psychologist monitor Mr. Thomas condition regularly throughout the day for the possible return of either delusions or agitation. Restraints would be appropriate again if those symptoms return. In addition, Mr. Thomas appeared to be increasingly depressed as the full realization of his acts and his situation have become clearer to him as the psychotic episode lifts. When out of restraints, I would suggest that he remain on suicide watch, until such time as the jail Psychologist determine that he is no longer at risk.

As always, please review these recommendations with Drs. Bell and McGirk for any concerns or differing opinions they may have.

Sincerely,

James R Harrison PhD

James R. Harrison, Ph.D.
Clinical Psychologist

cc:  Judge Fry, 15th Judicial District Court of Grayson County

03658

10267

AT010287

# Exhibit 143

**Grayson County Jail Medical Division Incident Report regarding Andre Thomas; Inmate Incident Histories**

# Grayson County Jail
## Medical Division

# INCIDENT REPORT

**Date:** 04/28/04

**Inmate:** THOMAS, Andre

**GCSO #:** 62890

**Medical Staff:** D. Campbell, EMT-B

At approximately 2210 on 04/27/04, I/M THOMAS asked me if he could talk to Dr. McGIRK. I told him that Dr. McGirk was not available to us at night, but that I would pass the request to him as soon as possible. This seemed to satisfy Andre at the time.

At approximately 2350 Deputy Braziel called me to Holding 3. On arrival L was told that I/M THOMAS had wakened and seemed very agitated. Jail Staff then entered the cell and began to talk to the I/M and I was summoned. I was told (but did not witness) that I/M Thomas had been "poking" and "scratching" at his remaining (L) eye. Although he had done no damage, Jail Staff (Dep. Braziel, Sgt. Soliz and Sgt. Miller) was concerned that he might damage his remaining functional eye.

I talked briefly with I/M THOMAS, who would respond only with nods of the head. He answered Yes to the question "Did you have a bad dream?". He answered No to "Do you want to talk about it?". He answered Yes to "Was it about bad things in the past?". After each question he would fold into a near-fetal position for a moment or so. Each time I thought he was going to sleep, but within a minute or so he would open his eyes and straighten his body into a lying position. After a few minutes, I asked him if he wanted to go to sleep and he nodded No. I asked him if he was afraid the bad dreams would return and he nodded Yes. I explained to him that I did not have the power to make the bad dreams go away, but that while he was here I would take care of him as best I could. At that point I/M THOMAS did close his eyes and appeared to try to sleep. I left Holding 3 at approximately 0015 hours on the morning of 04/28/04

*Don Campbell EMT-B*

03869

1

10278

AT010298

```
--------------------------------------------------------------------------
Grayson Co. Sheriff's Office  L A W   E N F O R C E M E N T          29 APR 2
TSG, INC.                        Inmate Incident History          PAGE    1
--------------------------------------------------------------------------
```

il Id: 122448
Name: THOMAS, ANDRE LEE                                  Race: B  Sex: M   DOB: ███████
SO #: 62890        DL#: TX-13408901       SS#: ████████   Date Booked: 03/29/2004

```
Date...... Time... Location......................  Reported By...............
04/28/2004 11:45pm HOLD 3                           SGT. MILLER
Type: INFO (INFORMATION REPORT)
Victim:      ANDRE THOMAS
Witnesses:   CPL.BRAZIEL-NURSE DON CAMPBELL-OFC.WINTERS-CPL.LITTLE-CPL.MULKEY
Rpt Officer: 0677 (MILLER, DONNA)
Supervisor:  0677 (MILLER, DONNA)
Narrative:   ON 04-28-04 at 2345 hrs. WHEN I ARRIVED FOR DUTY, I NOTICED INMATE
```
THOMAS IN H3 WITH HIS ARM MOVING AROUND UNRESTRAINED.  HE WAS
TOUCHING HIS GOOD EYE AND THEN HE WOULD SCRATCH ON THE WALL AND
THE DIG AROUND ON HIS FACE AGAIN.  I ASKED CPL. BRAZIEL ABOUT THIS
AND HE STATED THAT MEDICAL HAD A MEMO REGARDING THE USE OF
RESTRAINTS ON THOMAS AT BOOKIN. CPL BRAZIEL STATED THOMAS HAD BEEN
ACTING REAL STRANGE FOR THE PAST HOUR AND WE BOTH DECIDED TO GO IN
AND CHECK ON HIM.  WHEN WE ENTERED HIS CELL WE SPOKE SOFTLY TO HIM
SO NOT TO STARTLE HIM.  HE WAS SHAKING VERY BADLY AND DID NOT SEEM
TO BE AWARE THAT WE WERE STANDING THERE.  HE HAD A VERY WILD
STARE, WAS SHAKING VERY HARD AND SEEMED NOT TO KNOW WHERE HE WAS
OR WHO WE WERE.  I ASKED IF HE WAS HURTING SOMEWHERE, IF HE FELT
BAD OR IF THERE WAS ANYTHING WE COULD DO FOR HIM.  NO ANSWER.  HE
CURLED UP IN A BALL AND WE CALLED FOR MEDICAL.  WHILE WAITING FOR
MEDICAL CPL. BRAZIEL ASKED HIM IF HE COULD READ THE LETTER HE GOT
THAT DAY TO SEE IF HE HAD RECEIVED BAD NEWS OR SOMETHING.  NURSE
DON CAMPBELL ARRIVED , SAT DOWN TO SPEAK WITH ANDRE AND I LEFT THE
CELL WITH OFC. DONOHOE AND OFC. CRANFILL IN ATTENDANCE. NURSE
CAMPBELL STAYED FOR AT LEAST 30 MINUTES TALKING WITH ANDRE AND BY
THIS TIME HE STATED HE HAD A BAD DREAM AND HIS SHAKING DID
SUBSIDE. NURSE CAMPBELL SPOKE WITH US AFTERWARDS AND I STATED TO
HIM THAT I FELT THOMAS SHOULD BE RESTRAINED FOR HIS OWN SAFETY
DURING THE NIGHT AND HE STATED THAT NO ONE SHOULD FAULT US FOR
THAT.  CPL. LITTLE AND CPL. MULKEY AT THIS TIME RESTRAINED INMATE
THOMAS AND HE WAS CALM AND ALERT AT THIS TIME AND VERY
CO-OPERATIVE. HE SLEPT THE REST OF THE NIGHT AND WAS FED BREAKFAST
AT 5:30 A.M. WITHOUT ANY PROBLEMS.  IT WAS PASSED ON TO DAY SHIFT
WHY HE WAS RETURNED TO RESTRAINTS. EOR.

*Sgt. Miller 125*

03670

16279

```
----------------------------------------------------------------------
Grayson Co. Sheriff's Office L A W   E N F O R C E M E N T        29 APR 2
TSG, INC.                      Inmate Incident History           PAGE    1
----------------------------------------------------------------------
```

Jail Id: 122448
Name: THOMAS, ANDRE LEE                          Race: B  Sex: M  DOB: ███████
SO #: 62890      DL#: TX-13408901     SS#: ███████  Date Booked: 03/29/2004

Date...... Time... Location..................    Reported By..................
04/27/2004 12:00am HOLDING 3                     C/O WINTERS
Type: INFO (INFORMATION REPORT)
Victim:
Witnesses:    SGT. MILLER; CPL.BRAZIEL; DON CAMPBELL; C/O CRANFILL
Rpt Officer: 9627 (WINTERS, LEIGH ANN)
Supervisor:  0677 (MILLER, DONNA)
Narrative:   I,OFFICER WINTERS, WAS WORKING FIRST FLOOR WHEN SGT. MILLER AND
             CPL. BRAZIEL WENT INTO HOLDING 3 TO CHECK ON INMATE ANDRE THOMAS.
             WHEN I STEPPED INTO HOLDING 3 MILLER AND BRAZIEL WERE ASKING
             THOMAS WHAT WAS WRONG. I SAW THOMAS JUST STARE AT THEM AND HIS
             WHOLE BODY WAS SHAKING HE WOULD NOT ANSWER THEM. CPL. BRAZIEL
             CALLED FOR MEDICAL DON CAMPBELL TO HOLDING 3 TO CHECK ON THOMAS.
             WHEN CAMPBELL ARRIVED I STEPPED OUT AND LEFT CAMPBELL AND TWO
             OTHER OFFICERS IN HOLDING 3.

03671

**10280**

```
rayson Co. Sheriff's Office  L A W   E N F O R C E M E N T        29 APR 2
SG, INC.                      Inmate Incident History             PAGE   1
----------------------------------------------------------------------------
```

Id: 122448                              Race: B   Sex: M   DOB: ███████
Name: THOMAS, ANDRE LEE      SS#: ████████      Date Booked: 03/29/2004
CO #: 62890      DL#: TX-13408901

```
Date...... Time... Location.............      Reported By..................
4/27/2004 12:00am HOLDING 3                    C/O WINTERS
Type: INFO (INFORMATION REPORT)
Victim:
Witnesses:      SGT. MILLER; CPL.BRAZIEL; DON CAMPBELL; C/O CRANFILL
Rpt Officer:    9627 (WINTERS, LEIGH ANN)
Supervisor:     0677 (MILLER, DONNA)
Narrative:      I,OFFICER WINTERS, WAS WORKING FIRST FLOOR WHEN SGT. MILLER AND
                CPL. BRAZIEL WENT INTO HOLDING 3 TO CHECK ON INMATE ANDRE THOMAS.
                WHEN I STEPPED INTO HOLDING 3 MILLER AND BRAZIEL WERE ASKING
                THOMAS WHAT WAS WRONG. I SAW THOMAS JUST STARE AT THEM AND HIS
                WHOLE BODY WAS SHAKING HE WOULD NOT ANSWER THEM. CPL. BRAZIEL
                CALLED FOR MEDICAL DON CAMPBELL TO HOLDING 3 TO CHECK ON THOMAS.
                WHEN CAMPBELL ARRIVED I STEPPED OUT AND LEFT CAMPBELL AND TWO
                OTHER OFFICERS IN HOLDING 3.
```

03672

**10281**

AT010301

```
--------------------------------------------------------------    29 APR 2
Grayson Co. Sheriff's Office L A W   E N F O R C E M E N T       PAGE    1
TSG, INC.                        Inmate Incident History    ------------------
-----
```

l Id: 122448
Name: THOMAS, ANDRE LEE
SO #: 62890         DL#: TX-13408901        SS#:            Race: B  Sex: M   DOB:
                                                           Date Booked: 03/29/2004

Date...... Time.... Location........                    Reported By.................
04/28/2004 12:05am HOLDING THREE                        SGT MILLER
Type: INFO (INFORMATION REPORT)
Victim:
Witnesses:         CPL MULKEY
Rpt Officer:  2775 (LITTLE, JOHN)
Supervisor:   0677 (MILLER, DONNA)
Narrative:    ON THE ABOVE DATE AND TIME, SGT MILLER TOLD ME AND CPL MULKEY THAT
              INMATE THOMAS NEEDED TO BE PUT BACK IN THE RESTRAINTS PER MEDICAL.
              CPL MULKEY AND ME WENT INTO THE CELL, PUT THE RESTRAINTS BACK ON
              INMATE THOMAS AND LEFT THE CELL. THIS WAS DONE WITHOUT INCIDENT.

03673

**10282**

AT010302

```
------------------------------------------------------------------
Grayson Co. Sheriff's Office L A W   E N F O R C E M E N T          29 APR 2
TSG, INC.                      Inmate Incident History              PAGE    1
------------------------------------------------------------------
```

Jail Id: 122448
Name: THOMAS, ANDRE LEE                     Race: B  Sex: M  DOB:
SO #: 62890        DL#: TX-13408901    SS#:             Date Booked: 03/29/2004

Date...... Time... Location...................... Reported By...............
04/28/2004 12:05am HOLDING 3                       SGT MILLER
Type: INFO (INFORMATION REPORT)
Victim:
Witnesses:  CPL LITTLE
Rpt Officer: 3238 (MULKEY, CHAD)
Supervisor: 0677 (MILLER, DONNA)
Narrative:   ON THE ABOVE DATE AND TIME, I, CPL CHAD MULKEY, WAS INSTRUCTED BY
             SGT MILLER THAT INMATE THOMAS NEEDED TO BE PLACED BACK IN THE
             RESTRAINTS PER MEDICAL STAFF. CPL LITTLE AND MYSELF ENTERED
             HOLDING 3 AND PUT INMATE THOMAS BACK IN THE RESTRAINTS WITHOUT
             INCIDENT. END OF REPORT.

------------------------------------------------------------------
```

10283                                              03674

AT010303

# Exhibit 144

## Medical Information Report by Natalie Sims, LVN regarding Andre Thomas

04-28-04
1733

Medical Information Report

Inmate:  Thomas, Andre
SO#:

I was made aware today that Inmate Thomas was back to having to be restrained for his own safety.  I was not made aware of the particulars of the situation that necessitated the restraint replacement.

I spoke with Inmate Thomas in his cell at 1645 hours.  Capt. Kelli Stephens and Sgt. Jesus Soliz accompanied me and stood outside the cell door of Holding 3, where Inmate Thomas remains housed.  When asked how he was feeling, I/M Thomas revealed that he felt "scared", wondered "what is wrong with me", "why do I feel different from everyone else", stated "I'm having bad dreams again, about the future in the matrix, I feel like everyone else is an angel that knows what normal is and I can't fly. I'm not sure I want to, but I don't like feeling like I do".  His speech remained soft and rhythmic during our conversation.  His body language, however, displayed what I interpreted as fear and anxiety, i.e., tremulous hands, mild generalized shuddering of the body, concern and some confusion in his eyes and facial expressions, tearful. I asked, and received, permission from Capt. Stephens to have Thomas' hand restraints removed while we conversed in his cell. The inmate revealed to me, without questioning, that he had had homosexual experiences "in the past, but I don't think like that anymore.  It was curiousness, I guess.  But I worry about all the people that do that; what the world is coming to.  Carman was supposed to be a woman, but I think she was a man.  There was only one woman I really wanted to get close to and that was Alexandra from Austin College.  She was an athlete that had a heart attack because they ran her too hard to the court.  My friend told me that she died and when I cut the grass at the cemetery I saw her grave, but I don't know how she could be dead because she gave me a ride one day after that." I reassured the inmate that his sexual orientation, crime and past were not the concerns that we were discussing; I reassured him that I was only concerned about him as a person and a patient. Inmate Thomas also asked why the Bible was contradictory, and stated that he was reading it "in his head". Thomas asked me if I felt different medications could help him, and I told him I didn't know, but that I would attempt to find someone who could.  I have made contact today with Dr. Gleason in regard to treating the inmate privately. Dr. Gleason has tentatively agreed to add Inmate Thomas to his caseload, but is to call in the "next few days" to make the agreement concrete.  Inmate Thomas agreed he would see Dr. Gleason.  He also stated to me that "that other psychologist came to see me today and I don't want to talk to him.  Every time I open my mouth I seem to get in trouble.  I just need to rest my mind". I attempted to have the inmate explain to me what he meant by his statements, but he seemed to withdraw at that point. I have knowledge that Dr. Orapazo was scheduled to see Inmate Thomas today.  I asked Thomas if he would be willing to see Dr. Orapazo again, perhaps next week, and

**18148**

03667

AT018180

Thomas agreed.  I told Inmate Thomas that should be need anything or start feeling any differently, to again contact medical staff or any person at booking.  He wearily shook his head in agreement and laid back down on his bed.  I left the cell at that time and advised Sgt. Soliz that I was through, and that Inmate Thomas wished to rest.  End of report--- Natalie Sims LVN

18149

03668

# Exhibit 145

## Chronological accounts from Braziel regarding Andre Thomas

## BRAZIEL

03/31/2004     10:00pm- While changing wound dressing, Tomas tells Braziel he believes he should stay in jail b/c every time he is released he keeps coming back; Thomas says, "I think this is where my mission is, that's why I keep coming back."

04/13/2004     10:25pm- Braziel enters Thomas' cell w/ Campbell and Engler due to Thomas having a seizure; Thomas states, "I want my life back" (2, 3 times), "I want to die" followed by "I don't want to die"; Thomas asks for restraints to be removed.

04/14/2004     9:00pm- Braziel enters Thomas' cell w/ Campbell and Cummins due to Thomas shaking, similar to that of the evening before.

04/27/2004     12:00am- Braziel, Miller and Winters enter Thomas' cell due to violent shaking; Thomas just "stared at them" when Miller and Braziel asked what was wrong; Braziel calls for Campbell; Winters left Braziel and Miller in cell w/ Thomas when Campbell arrived.

04/28/2004     11:45pm- When asked, Braziel told Miller that medical had memo regarding restraints on Thomas at book-in when Miller sees that Thomas is touching good eye and scratching wall w/ unrestrained hand; Braziel states to Miller that Thomas was acting real strange for past hour; Braziel and Miller enter Thomas' cell, asked Thomas if he felt bad; no answer, Thomas curled in fetal position; Braziel asked if he could read the letter Thomas received that day; Braziel and Miller call for medical; unknown as to the whereabouts of Braziel during Campbell's visit with Thomas.

05/01/2004     3:20pm- Thomas asks why people die, makes statements that officers are immortal and that they can see his wife, son and "daughter-in-law" but he cannot; Thomas states "I don't want to be in this program any longer. I don't want people studying me, I don't want to be in here in this program" and asks, "Why am I here?" Braziel states that he is here because he was "being charged w/ capital murder"; Thomas states "I'm normal, I could understand if I had wings why I would be here, but I'm normal."

05/01/2004     9:30pm- Braziel takes Thomas to shower after night meds; Braziel states he will notify medical to change chest bandage after shower.

05/15/2004     8:30pm- Reporting officer noted Thomas was cursing at a picture he was holding and said, "I know you are here so don't just sit in the picture and smile like that." Braziel enters Thomas' cell w/ another officer to administer night meds; Thomas said he didn't want to do this anymore, laughed and stated how GD mad he was; Braziel told Thomas he was going to restrain him until he calmed down; Thomas didn't resist.

05/15/2004     7:10pm- Braziel returns Thomas to the bed and removes transport belt after Thomas wearing transport belt, but not restrained, slid off the bed, got on the floor beside bed and screamed; Braziel put mittens back on Thomas.

**1265**

AT001231

# Exhibit 146

## Grayson County Jail Nurses Notes regarding Andre Thomas

THOMAS, ANDRE

**NURSES NOTES**
**DOCTORS NOTES**

pg ___ of ___

| DATE: | INMATES NAME: | SO# | MED# |
|---|---|---|---|

2330 and then lay down on his ® side as if sleeping.

6-10-04 SLEPT MOST OF NIGHT. DSG. Δ DONE ON SPIDER BITE

0645 + ABRASION ON L. LEG. ABRASION ALMOST HEALED +

SPIDER BITE IS IMPROVING. CSRₙ

0830 ㎝ covered up c̄ blanket sleeping supino ø

tremors noted. Woodson EN TP

1000 ㎝ lying on ® side appears to be sleeping, note

1120 Sitting ® in bed; partially restrained — Lunch meal

served + officers present. I/M alert + ᵗʰᵉⁿ jovial. Answer

correctly to questions q̄ person place, time + local. Denies

needing anything. — NSm L

1148 I/M back in full restraints p̄ meal. Ate approx 90%

of meal. Without provocation, I/M began screaming

"HOO-YAH" repeatedly, then abruptly stopped — I/M

denied any difficulty when asked — NSm L

1330 [illegible] ® [illegible] C Rooker

I/m was screaming several different things.

I/m would wise up and yell and then did

[illegible] going. CRooker

1445 I/m was crying on ® side c̄ eyes open. CRooker

6/10/04
1715 Andre was sitting in the restraint, with his

mittens on but not restrained to the chair.

Suddenly he sits straight upright and

shouts at the wall "Never ever will you let

that happen again — NEVER! You ain't nothin

but a fuck-up. (about a 1 minute pause) Why

are you trying to fuck me over, bitch? SC

4812

03761

AT004787

THOMAS, ANDRE                    DOCTORS NOTES                    Pg

| DATE: | INMATES NAME: | SO# | MED# |
|-------|---------------|-----|------|

**6/10/09**
**1720** "Damn! What's wrong with you? Don't be like that. Don't even try to talk to God."

**1728** "I think this is some fucked-up crap, man." "Ooh Rah! Mr. President, I'm going to whip some ass when I get out of here." He repeated this statement verbatim 3 times. DC

**1733** "There she is!" (repeated twice) followed by a long giggle. DC

**0645** SLEPT MOST OF NIGHT. DSG. A DONE ON L. LEG SPIDER BITE & ABRASION. BOTH CONTINUE TO HEAL WELL. CS LW

**0830** I/M lying S/NO. quiet and still appears to be sleeping                                "Dodson"

**0645** I/M lying on ⓛ side, resting quietly          RODD

**1305** I/M is _____

**1445** I/M is yelling "No! Hell NO!"               RODD

**1515** officers present, removing mittens to allow I/M to get up and out in chair. RODD

**1625** I/M sitting in chair, watching the activity around room.                  D Bell LVN-P

**1730** I/M ate all his supper tray except the cookies these, he saved "until later." Denies any needs at this time.                  D Bell LVN-P

**1915** I/M on rec court — mittens, restraints in place - walking around                  D Bell LVN-P

**2300** 2nd attempt to get I/M to take meds - unsuccessful I/M lying on side, awake                  D Bell LVN-P

1813

03762

AT004788

# Exhibit 147

## Grayson County Jail Nurses Notes regarding Andre Thomas

THOMAS, ANDRE

NURSES NOTES
DOCTORS NOTES

pg __ of __

| DATE: | INMATES NAME: | SO# | MED# |
|-------|---------------|-----|------|

**0030** SITTING UP ON BUNK Ē KNEES BENT & MITTENED

**6-22-04** HANDS UNDER KNEES, RUBBING MITTENS TOGETHER

VIGOROUSLY. WHEN ASKED WHAT HE WAS DOING

HE REPLIED: "I AM MAKING TWO CARS HAVE SEX." c̄

**0300** ASLEEP. CSRN. ————

**0630** HAD BEGUN TO SHOWER. BAND-AIDS REMOVED FROM

ALL WOUNDS. HAS SOCKS ON & UNIFORM LEGS

PULLED DOWN OVER SOCKS, SO RESTRAINTS SHOULD

NOT RUB DIRECTLY ON SKIN. CSRN ————

**0630** I/m lying supine on bed Ē ____ ____, I/m

appears to be sleeping ————

**0930** I/m lying on ℞ side speaking Ē Nurse Sims ____

**1100** I/m ____ ____ CROOOOO

**1405** ____ ____

____ ____

____ ____ ____ CROOOOOO

**1500** ____ ____ ____ CROOOOO

**6/22/04 1630** I/m sitting up looking around. Restraint mittens in

place. DC

**1800** Lying on Ⓛ side, apparently dozing. DC

**1840** Dr McGirk here for about a 40 min. interview. DC

**2000** Refused meds. DC

**2130** Lying on his Ⓛ side apparently asleep. DC

**0130** TOOK LATE DOSE OF PM MEDS. CSRN ————

**0400** ASLEEP. CSRN ————

**0622** LEFT FOR HOSPITAL IN VERNON. WENT c̄

2 OFFICERS. HAD MITTENS, HANDCUFFS, WAIST CHAIN,

& LEG SHACKLES ON. CSRN

**4815**

03771

AT004790

# Exhibit 148

## North Texas State Hospital, Vernon Campus, Spruce Unit Admission Demographic Sheet

DEMOGRAPHIC SHEET

ID#: _____ BHIS # 196949   Episode # 2
Unit Spruce              Code: 587      Case No.: F07164
       Admit Date 06/23/2004        Time    10:05    AM Black

Name: Last Thomas            First: Andre
Middle: Lee                  Maiden: _____
AKA: _____
Ethnicity: B   Sex:   M       Marital Status:    Sep
Birth date: ███████████       Age:     21
Birthplace: Muskogee, Oklahoma    Mother's Maiden name: _____
SSN ███████████              Physician Joseph Black, M.D.
Family Size _____          Psg     Tom Gray
STAFF  DATE: 06/25/2004      SW      Rick Inglish
LAST  AIMS  SCREEN: 06/23/2004   Case Mgr. Michelle Moore
Medicare # _____           RN      Sherry Hagerty

Address: 2424 Texoma Pkwy Lot # 100
City: Sherman                Phone: _____
State: TX          Zip: 75090    Code:    106
Resident County Grayson          Code:    106
Admission County Grayson

Commitment information
Com. Type              46B.073           Code _____
Com. Date 06/17/2004         Expiration Date   10/15/2004
Cause No 50391               Court #  15th JDC
   Offense Capital Murder- 0913

County of Comm. Grayson                  Code 106

Legal-Judge
Name: James R. Fry, Justice Center
Court: 15th JDC                  Code 19
Address 200 S. Crockett St.
City Sherman                 State Texas
Zip 75090                Phone 903-813-4303 fax: 813-4304

Primary Correspondent
Name Danny Thomas            Relationship Father
Street _____               Phone 903-813-4040
City Sherman            State Texas        Zip     75090

Secondary Correspondent
Name _____                 Relationship _____
Street _____               Phone _____
City _____            State _____   Zip _____

Health Care Provider
Name _____
Street _____
City _____            State _____   Zip _____
Phone _____

8372                                  01709

                                       1 OF 2

AT008371

# Exhibit 149

## North Texas State Hospital, Vernon Campus Orientation to Unit Inquiry

Report Date: 09/13/2004

THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM
RECORDS WHOSE CONFIDENTIALITY IS PROTECTED BY
FEDERAL LAW. FEDERAL REGULATIONS (42 ... PART 2)
PROHIBIT YOU FROM MAKING ANY FURT... ...CLOSURE
OF IT ... ... UT THE SPECIFIC WRITTEN ... ...T OF THE
PERS... ... PERTAINS, OR AS OTHE...SE PERMITTED
BY ... ...... ...ERAL AUTHORIZATION FOR
THE RELEASE ... .... ...
SUFFICIENT FOR THIS ... ...THER INFORMATION IS NOT

North Texas State Hospital
Wichita Falls/Vernon

ORIENTATION TO UNIT Inquiry

CLIENT NAME: THOMAS,ANDRE LEE
CLIENT ID: 000196949
DATE OF BIRTH: ████████
Episode Number: 2

Episode Start Date: 06/23/2004
Episode End Date: 08/09/2004
Data Entry By (Login): CIESIELSKI JOAN
Data Entry Date: 06/23/2004

*GENERAL INFORMATION*
Assessment Date:     06/23/2004

Assessment Time:     11:25 PM

Draft/Final:    Final

Staff Providing Orientation:    CIESIELSKI,JOAN F (001427)

Client DOB:    ████████

Client SS#:    ████████

Client's Unit:    COMPETENCY

Primary Language:    ENGLISH

Is the preferred language English:    Yes

*ORIENTATION*
The following orientation was performed:   Introduced to Staff, Introduced
to patients, Tour of Unit, Explanation of Unit Rules, Explanation of Unit
Program, Dangerous Review Board, Explanation of Ethics Committee,
Explanation of Client Rights (handbook), Explanation of Advanced Directive,
Check for Contraband Accomplished, Explanation of Personal Property Policy,
Belonging/luggage Checked, Competency

Rationale for any part of unit orientation not performed     :
NONE

Describe the patient's response to the orientation:
BLACK MALE 21 YRS OLD ADMITTED TO BLUE SUB,V/S TAKEN . PT APPEAR CALM, AND
RESPONDED TO THE STAFF. HE APPEAR NEAT BUT VOICE HE DID NOT TAKE ABATH
THIS A.M.
WHEN ASK ABOUT VOICE HE STATED"YES. THEY SAID PISS OFF. NOT TO YOU,BUT TO
ME. SOMETIMES I CAN READ PEOPLE THOUGHTS, AT LEAST I THINK I CAN . I
THINK ITS A BUNCH OF DEMONS. I DIDN"T DO THAT UNTIL I STARTED TAKING THE
MEDIENCE IN JAIL. I
SWEAR.OR MAYBE ITS MY OTHER PERSON. I KNOW I CAN READ PEOPLE MIND. SOME

AT008801

Report Date: 09/13/2004                                    Page 2 of 2

North Texas State Hospital
Wichita Falls/Vernon, TX

ORIENTATION TO UNIT Inquiry

CLIENT NAME: THOMAS,ANDRE LEE            Episode Start Date: 06/23/2004
CLIENT ID: 000196949                     Episode End Date: 08/09/2004
DATE OF BIRTH: ███████████               Data Entry By (Login): CIESIELSKI JOAN
Episode Number: 2                        Data Entry Date: 06/23/2004

TIMES THEY TELL ME TO DO THINGS. THATS WHEN I STABBED MYSEIF IN THE
CHEST." DRUGS, STATED "YES. DONT KNOW WHAT KIND." ALLERGIES,CLARTIN.
STATED THE REASON BEING HERE, "I DONNT KNOW WHY, I AS IN THE HOSPITAL
THEN THEY BOUGHT ME HERE."PT DID REQUEST A PATCH FOR HIS EYE. ANDHIS
NAILS WERE CLIPPED. HE SEVERAL SCARS, ONE MIDDLE OF CHEST AREA.

Signature_____Date_____

8802

02147

AT008802

# Exhibit 150

## North Texas State Hospital, Vernon Campus, Physician P. Note

Report Date: 09/13/2004                              Page 3 of 36

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN P. NOTE

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ███████                 Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 06/24/2004

### GENERAL INFORMATION

Assessment Date:   06/24/2004

Assessment Time:   08:27 AM

Draft/Final:   Final

Assessing Clinician:   BLACK,JOSEPH L (000035)

Local Case #:   656F07164

Primary Language:   ENGLISH

### MEDICATIONS

Medication Comments:
    Depakote 500 mg po BID pc (begun today)

### NOTE

Note:
    21 y/o BM admitted o6/23/04 did not sleep any last night. He stated that
    "the voices in my head keep me awake". He reported voices as being "voice
    of girl in the burning car" and "the voice of Allah". Patient continued
    to avoid eye contact and to talk in mostly inaudible volume.

### TIMA

Reason For Continued Hospitalization:   Medical Necessity

Psychiatric Hospital Services Medically Necessary Because:   Treatment Can
Improve Patient Condition

Barrier To Discharge:   Forensic Commitment

Algorithm:   Bipolar Disorder - Manic (BD-M)

TIMA Stage:   1

**8807**                                              92152

# Exhibit 151

## Clinical Note from Michelle Moore at North Texas State Hospital, Vernon Campus

Run Date: 09/13/2004

Page: 4

**North Texas State Hospital**
**Wichita Falls/Vernon, TX**

ÚÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄ
³Patient Name: THOMAS,ANDRE LEE(196949)      ³Episode #:    2        ³
³Admit Date:  06/23/2004           ³Discharge Date: 08/09/2004  ³
³Written By:  MOORE MICHELLE R        ³On:       06/30/2004  ³
³Note Type:  Case Coordinator         ³Note Time:    09:14 AM  ³
ÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÙ

Notes Field:
   Treatment team met with the patient this a.m. to discuss Category I special
   precuation for self harm. Patient stated that if God commanded him, he would
   inf fact extract his left eye. The patient currently wears mittens on both
   hands for the patient's safety, as well as will continue on this special
   precuation. The patient is able to clearly state his charges, and has an
   understanding of the consequencues of conviction. He stated he was confused as
   to why he was incarcerated when God told him to do what he did. He stated it
   did not seem fair for the President to order people to kill others in Iraq and
   not be held accountable. He has been cooperative with staff. He is able to
   carry on a logical, goal directed conversation. He is soft spoken and often
   holds his head down making it more difficult to hear him. He was not able to
   pass the factual portion of the written competency test, therefore will
   encourage him to study with material presented to him. We will meet with him
   again on Friday for weekly treatment team meeting.

**855?**

01889

AT008549

# Exhibit 152

## North Texas State Hospital, Vernon Campus, Physician P. Note

Report Date: 09/13/2004                                    Page 9 of 36

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN P. NOTE

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ███████████             Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 06/30/2004

## GENERAL INFORMATION

Assessment Date:   06/30/2004

Assessment Time:   08:15 AM

Draft/Final:   Final

Assessing Clinician:   BLACK,JOSEPH L (000035)

Local Case #:   656F07164

Primary Language:   ENGLISH

Is the Preferred Language English:   Yes

## MEDICATIONS

Medication Comments:
  Zyprexa 20 mg po q1800 hours

## NOTE

Note:
  Patient told staff that he didn't know why he was in jail because he "did them a
  favor by killing the demons". This a.m. patient said that he was in jail because
  "I killed three people". He then said that he didn't know why it was
  considered wrong "since I was doing the will of God".
  He said that he would enucleate his remaining left eye if he thought that it was
  God's will.

## TIMA

Reason For Continued Hospitalization:   Medical Necessity

Psychiatric Hospital Services Medically Necessary Because:   Treatment Can

8813

02158

AT008813

Case 4:09-cv-00644-JRG   Document 7-9   Filed 03/16/10   Page 160 of 170 PageID #: 1797

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN P. NOTE

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ███████                 Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 06/30/2004

   Improve Patient Condition

   Algorithm:  Bipolar Disorder - Manic (BD-M)

   TIMA Stage:  1

SUBJECTIVE FINDINGS (Patient Self-Report: 0=None, 10=Extreme)

   Symptom Severity:  6

   Side Effects:  0

   Side Effect Types:  None

   Appetite:  Fair

   Sleep:  Fair

OBJECTIVE FINDINGS (Physician Examination)

Clinical Rating Scales

   POS SX:  5

   NEG SX:  4

Core Symptoms (Scale: 0-10, 0=None, 10=Extreme)

   Mania:  0

   Depression:  0

   Positive SX or Psychosis:  5

   Negative SX or Psychosis:  4

Other Symptoms (Scale: 0-10; 0=none, 10=Extreme)

ASSESSMENT

0=None; 10=Extreme

   Overall Side Effect:  0

8814

02159

AT008814

Report Date: 09/13/2004                                    Page 11 of 36

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN P. NOTE

CLIENT NAME: THOMAS,ANDRE LEE              Episode Start Date: 06/23/2004
CLIENT ID: 000196949                       Episode End Date: 08/09/2004
DATE OF BIRTH: ███████                     Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                          Data Entry Date: 06/30/2004


Overall Functionality:   5

Overall Clinical Response:   3 - Partial

PLAN

Lab Work Needed:   Other

Specify Other Lab Work Needed:   Continue Depakote protocol

Deviation From Medication Algorithm Recommended:   No

Rationale for Changing Medication and/or Dose:   Insufficient Improvement

Change in Diagnosis:   No

Change in Algorithm:   No

Change in Stage:   No

Plan Comments:
   1. Increase Zyprexa to 30 mg po q1800h.
   2. Continue current groups.
   3. Continue Catagory I precautions and mitts in attempt to prevent
   self-harm.

AT008815

# Exhibit 153

## Clinical Note from Michelle Moore at North Texas State Hospital, Vernon Campus

North Texas State Hospital
Wichita Falls/Vernon, TX

ÚAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA
³Patient Name: THOMAS,ANDRE LEE(196949)       ³Episode #:    2        ³
³Admit Date:  06/23/2004              ³Discharge Date: 08/09/2004  ³
³Written By:  MOORE MICHELLE R        ³On:       07/01/2004  ³
³Note Type:   Case Coordinator        ³Note Time:    04:23 PM   ³
AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAAÙ

Notes Field:
    Andre had two school mates from Sherman come to visit on 06-30-04. Visitor list
to Security at that time. The patient continues on a Category I, 1:1, for
prevention of self-harm, therefore was escorted to Security by assigned MHW.
The patient signed consent for Rose Soto, and Julie Soto, the visitors. I also
went to Security to observe patient's behavior and interaction. Initially the
patient was goal directed, they laughed and reminisced about growing up. He
then began talking about character witness, "people who know what kind of
person I am", then stated he would rather be injected, than the electric chair.
He then stated "that shit is hot" and laughed. He stated "if they kill me, I
look at it like rapture", fuck that shit". The bible was mention shortly into
the visit, and the patient began talking about his son being a demon and that
is why the incident occured. Rose and Julie both emphasized to the patient,
that this was a sweet, innocent, little boy. The patient told the girls they
were in denial, that he knew his son was a demon at about age two due to his
son's behaviors. He stated that what happended to his wife, Laura, was a result
of what she put their son threw. He talked about her having affairs with his
brother and cousin. Also that he found cocaine on the table at her house as
their son was playing in the back room. He talked about Carmen, his girlfriend
for a short period of time. Andre told the visitors that Carmen had drew an
"illustration" of him pointing at the sky, then become very delusional talking
about the end of the world, and that he had mentioned to his brother, James,
that he did not understand the "illustration". He also spoke of another
"illustration" Carmen sketched days before the incident of him without his
right eye. Andre questioned "how did she know?" and that Carmen stated she
should have stopped him, because she knew it was going to happen. Aslo days
before the incident, Carmen told him specifically to look out, there is
something bad out to get him. He then stated "the war was already won, that is
why I had to do what I had to do". During the delusional part of the
conversation, the girls sat quietly in disbelief. Finally, they began talking
about his mother and other people they all knew. Andre turned to the MHW
assigned to the Cat 1 at the time and asked about being competent. I then
intervened to explain what the definition of competent was. One of the girls
asked, "if he is still delusional, can he become competent?" I explained that
yes he would, but as long as these delusions do not interfere with his ability
to stand trial. The patient signed consent allowing contact with Julie and Rose
Soto and placed in chart. At 1415, I asked Andre about the voices. He stated
that just before he came to my office he heard the voice of his wife, Laura,
and that she was angry with him. I asked him what about, and he stated "because
I killed her." We will meet with the patient in the morning for weekly review.

**8553**

# Exhibit 154

## North Texas State Hospital, Vernon Campus, Physician P. Note

Report Date: 09/13/2004                                    Page 12 of 36

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN P. NOTE

CLIENT NAME: THOMAS,ANDRE LEE            Episode Start Date: 06/23/2004
CLIENT ID: 000196949                     Episode End Date: 08/09/2004
DATE OF BIRTH: ██████████                Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                        Data Entry Date: 07/07/2004

### GENERAL INFORMATION

Assessment Date:   07/02/2004

Assessment Time:   10:10 AM

Draft/Final:   Final

Assessing Clinician:   BLACK,JOSEPH L (000035)

Local Case #:   656F07164

Primary Language:   ENGLISH

### MEDICATIONS

Medication Comments:
    Zyprexa 30 mg po q1800 hours
    Depakote 500 mg po bid pc

Serum Valproate of 06-24-04 was 21.0.

### NOTE

Note:
    The patient has been fairly cooperative with staff and unit rules. He
does not appear to be exhibiting mood symptoms or mood swings at this
time. The patient has continued on Category I precautions with mitts on
his hands in an attempt to prevent self-harm.

    The patient restated his belief that if he believed God told him to
enucleate his left eye, he would do so; however, he stated, "I don't
think God would tell me to do that."

    The patient stated that he had received the message from God by just his
having an understanding of what God wanted him to do in his mind. When he
was asked if he was a prophet of God, the patient stated, "I don't think

**8816**

02151

AT008816

Case 4:09-cv-00644-JRG   Document 7-9   Filed 03/16/10   Page 166 of 170 PageID #:  1803

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN P. NOTE

CLIENT NAME: THOMAS,ANDRE LEE                Episode Start Date: 06/23/2004
CLIENT ID: 000196949                         Episode End Date: 08/03/2004
DATE OF BIRTH: ███████                       Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                            Data Entry Date: 07/07/2004

so."

The patient was able to keep his head up better today than on previous
interviews. He was able to speak a little more plainly; however, he still
slipped back several times into ducking his head and talking in alow,
inaudible voice.

The staff reported the patient had a rash on his back. Examination of the
patient did reveal what appeared to be a maculopapular dark eruption over
his back; however, he did not have it on his chest or limbs.

He was agreeable with discontinuance of the Depakote.

### TIMA

Psychiatric Hospital Services Medically Necessary Because:   Treatment Can
Improve Patient Condition

Algorithm:   Bipolar Disorder - Manic (BD-M)

TIMA Stage:   2

SUBJECTIVE FINDINGS (Patient Self-Report: 0=None, 10=Extreme)

Symptom Severity:   6

Side Effects:   0

Side Effect Types:   None

Appetite:   Good

Sleep:   Good

OBJECTIVE FINDINGS (Physician Examination)

Clinical Rating Scales

POS SX:   5

8817

0216?

Report Date: 09/13/2004                           Page 14 of 36

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN F. NCTE

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ███████████             Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 07/07/2004

    NEG SX:   4

Core Symptoms (Scale: 0-10, 0=None, 10=Extreme)

    Mania:   0

    Depression:   0

    Positive SX or Psychosis:   5

    Negative SX or Psychosis:   4

Other Symptoms (Scale: 0-10; 0=none, 10=Extreme)

ASSESSMENT

0=None; 10=Extreme

    Overall Side Effect:   0

    Overall Functionality:   4

    Overall Clinical Response:   3 - Partial

PLAN

    Lab Work Needed:   Other

    Specify Other Lab Work Needed:   Zyprexa protocol

    Deviation From Medication Algorithm Recommended:   No

    Rationale for Changing Medication and/or Dose:   Insufficient Improvement

    Change in Diagnosis:   No

    Change in Algorithm:   No

    Change in Stage:   Yes

    Plan Comments:
        Return to Stage I after discontinuing the Depakote.

8818

02163

Report Date: 09/13/2004                           Page 15 of 36

North Texas State Hospital
Wichita Falls/Vernon, TX

PHYSICIAN P. NOTE

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ███████████             Data Entry By (Login): BLACK JOSEPH L
Episode Number: 2                      Data Entry Date: 07/07/2004

    1. Continue Zyprexa 30 mg po q1800h.
    2. Discontinue the Depakote.
    3. Continue on-unit groups.
    4. Continue Catagory I precautions and mitts on hands in attempt to
    prevent self-harm.

8819

02161

AT008819

# Exhibit 155

## Patient Daily Functioning Checklist Inquiry at North Texas State Hospital, Vernon Campus

Report Date: 09/13/2004                                    Page 56 of 253

North Texas State Hospital
Wichita Falls/Vernon, TX

PATIENT DAILY FUNCTIONING CHECKLIST Inqu

CLIENT NAME: THOMAS,ANDRE LEE          Episode Start Date: 06/23/2004
CLIENT ID: 000196949                   Episode End Date: 08/09/2004
DATE OF BIRTH: ███████████             Data Entry By (Login): BANNISTER LLOYD
Episode Number: 2                      Data Entry Date: 07/02/2004

*GENERAL INFORMATION*
   Assessment Date:    07/02/2004

   Assessment Time:    02:21 PM

   Draft/Final:    Final

   Assessing Clinician:    BANNISTER,LLOYD G (000700)

   Client DOB:   ███████████

   Client SS#:   ███████████

   Primary Language:   ENGLISH

   Is the preferred language English:   Yes

*LEVEL OF OBSERVATION/MONITORING*
   Precaution Type:   Self Abuse

   Level of Monitoring:   1:1 Arms Length

   Observation Comments:
      REMAINS ON A CATEGORY I 1:1 FOR THE PREVETION OF HARM TO SELF. HE HAS
      MADE NO ATTEMPTS TO HARM HIMSELF THIS SHIFT. HE IS QUIT AND STAYS TO
      HIMSELF. HE DID TELL STAFF THAT HE STILL HEARS VOCIES, BUT HE TRYS TO
      IGNORE THEM. HE ALSO SAID THAT HE DOES NOT ARGUE WITH THEM EITHER. HE DID
      TELL STAFF THAT DURING TREATMENT
      TEAM THAT THE DOCTOR ASKED HIM "IF GOD TOLD YOU TO HART YOURSELF WOULD
      YOU?" HE SAID THAT HE ANSWERED "YES". HE THEN SAID "THAT THE WAY THAT HE
      BELIVES IS THAT SINCE GOD IS A HIGHER POWER THAT HE WAS GOING TO LISTEN
      TO HIM." WELL CONTIUNE TO OBSERVE WITH 15 MIN. CHECKLIST ALREADY IN
      PROGRESS.

9062                                      02407