# Exhibit 166

**Letter from Peter Oropeza, Psy.D. to J. Keyre Ashmore attaching Psychological Evaluation: Mental State Surrounding the Time of Offense**

## Peter P. Oropeza, Psy.D.
### Consulting Psychologist
210 W. 6th Street, Suite 305 • Ft. Worth, TX 76102 • (817) 850-9911
TX License # 3-2020

---

January 20, 2005

J. Kerye Ashmore
Assistant County and District Attorney
200 S. Crockett, Ste. 116A
Sherman, Tx 75090-7167

**Re: State of Texas v. Andre Lee Thomas**

---

Dear Mr. Ashmore:

Attached is the psychological report detailing the full evaluation of the defendant, Mr. Andre Lee Thomas, which was conducted in late 2004 through the present date.  I am available to answer questions from you or Mr. Brown regarding this matter.

Again, thank you for allowing me to work on this case.

Sincerely,

Peter Oropeza, Psy.D.

17788

AT017823

# PSYCHOLOGICAL EVALUATION:
# MENTAL STATE SURROUNDING
# THE
# TIME OF OFFENSE

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE COURT AT LAW |
| | § | |
| VS. | § | OF |
| | § | |
| ANDRE LEE THOMAS | § | GRAYSON COUNTY, TEXAS |

**CAUSE NOS. 051483 & 051858**

Submitted on January 20, 2005

Peter Oropeza, Psy.D.
Consulting Psychologist
210 W. 6th Street, Suite 305
Ft. Worth, Texas 76102

**17789**

AT017824

# PSYCHOLOGICAL EVALUATION:
## MENTAL STATE SURROUNDING
### THE
### TIME OF OFFENSE

| THE STATE OF TEXAS | § | IN THE COURT AT LAW |
|---|---|---|
| VS. | § | OF |
| ANDRE LEE THOMAS | § | GRAYSON COUNTY, TEXAS |

**CAUSE NOS. 051483 & 051858**

## I. INTRODUCTION

**Referral Reason:** Mr. Andre Lee Thomas has been charged with three counts of Capital Murder for the deaths of his estranged wife, Laura Boren Thomas; his son, ▇▇▇▇; and Laura Boren Thomas' daughter, ▇▇▇ ▇▇▇▇. The defendant has entered a plea of Not Guilty by Reason of Insanity. The Grayson County District Attorney, Mr. Joseph D. Brown and Mr. J. Kerye Ashmore, Assistant County Attorney, request that I, Peter Oropeza, Psy.D., be a consulting expert for the purpose of performing a psychological evaluation of the defendant. The defendant's attorney, Mr. R.J. Hagood, Attorney at Law, was informed that I would be evaluating his client and was present during the evaluations.

This case is filed under the 15th Judicial District Court of Grayson County, Texas, presided by the Honorable Judge James R. Fry.

The primary purpose of this evaluation is to provide an objective opinion with regard to the following questions involving the defendant:

1. Was, at the time of the conduct charge, the defendant suffering from a mental disease or defect, and
2. did he not know that this conduct was wrong.

According to the Texas Penal Code, the term Mental Disease or Defect does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. The Texas law also specifically rejects voluntary intoxication as a defense.

17790

AT017825

**Procedures for Evaluation:**

*Direct Clinical Contact:*

Clinical interview on October 21, 2004, for approximately 3.5 hours.

Clinical interview and psychological testing on November 15, 2004, for
approximately 6 hours (one hour was observing Victor Scarano, M.D., a
consulting psychiatrist, conduct cognitive tests).

Mental Status Examination

Tests Administered

Personality Assessment Inventory

Beck's Hopelessness Scale

Beck's Depression Inventory-II

Miller Forensic Assessment of Symptoms Test (M-FAST)

Structured Interview of Symptoms (SIRS)

*Collateral Information:* Records, audio and video recorded tapes, and other documents
totaling approximately 4900 pages are indicated as below:

1. Twenty-six lined pages of words and drawings.
2. Thirty pages of writings with different handwriting.
3. Kim Young Interview, dated 03/30/04.
4. Demicus Kelsey Interview, dated 04/01/04.
5. Zack Young Interview, dated 03/30/04.
6. Competency to Stand Trial evaluation by James R. Harrison, Ph.D., dated 04/15/04.
7. Letter from Joseph L. Black, M.D., North Texas State Hospital, Vernon Campus,
   dated 07/27/04.
8. Referral/consultation report completed by B. Thomas Gray, Ph.D., dated 07/22/04.
9. Statement of Natalie Sims, dated 03/30/04.
10. Interview of Carmen Hayes, dated 05/19/04.
11. Recorded statement of Samuel Taylor, dated 03/29/04.
12. Audiotape from Paul Boren's 911 telephone call on 03/27/04.
13. Recorded statement of Jeremy Jones, dated 03/29/04.
14. Recorded statement of Bobbie Hughes, dated 03/29/04.
15. Paul Boren's answering machine recording on 03/27/04.
16. Audiotape of Bryant Hughes and Laura Thomas answering machine messages.
17. Dialogue between Officer Richard Ferguson and a Mr. Thomas, no date.
18. Interview of between an officer and a lady, no date.
19. Interview of Carmen Hayes, no date.
20. Interview of Danny Thomas, no date.
21. Interview of Danny Thomas, dated 03/27/04.
22. Interview of Paul Boren, no date.
23. Interview of Willie Riley, dated 04/15/04.
24. Interview of Julia Ann Murphy, dated 04/06/04.
25. Interview of John Bronson Mayo, dated 04/13/04.
26. Interview of Alan Byrd, no date.
27. Interview of Summer Sherman, dated 04/07/04.
28. Recorded statement of Ellis Cotton, dated 04/01/04.
29. Recorded statement of Stacy Perkins, dated 04/01/04.

**17791**

AT017826

Andre Lee Thomas                                              Psychological Evaluation:
Cause Nos. 051483 & 051858                          Mental State Surrounding the Offense

30. Interview of Jennifer England Hughes, dated 03/27/04.
31. Interview of Summer Sherman, dated 04/07/04.
32. Interview of Rochelle Thomas, dated 05/05/04.
33. Interview of Kim Young, dated 03/30/04.
34. Interview of Zach Young, dated 03/30/04.
35. Interview of Paul Boren, dated 03/27/04.
36. Recorded statement of Annette Robins, dated 03/29/04.
37. Recorded statement of Crystal Cole, dated 03/29/04.
38. Recorded statement of Lisa Ramsey, dated 03/29/04.
39. Recorded statement of Stephanie Ashley, dated 03/29/04.
40. Recorded statement of Paul Boren, dated 03/30/04.
50. Recorded statement of Carmen Hayes, dated 03/29/04.
51. Sherman Police Department Affidavit for Search Warrant, dated 03/27/04.
52. Application for Emergency Apprehension and Detention regarding Andre Thomas,
    dated 03/26/04.
53. Sherman Police Department Incident Report.
54. Texas Department of Public Safety, Texas Ranger Division, Report of Investigation.
55. Medical Examiner's Report — ███re█████████, date of examination 03/28/04.
56. Medical Examiner's Report ███████ie█████, date of examination 03/28/04.
57. Medical Examiner's Report — Laura Christine Thomas, date of examination 03/28/04.
58. Documents on Child Custody and Child Support.
59. Andre Thomas medical records — Wilson N. Jones Medical Center. 3/27 4/2
61. Incident Report — Laura Christine Boren Thomas.
62. Marriage Certificate, No. 185, Andre Lee Thomas and Laura Christine Boren, dated
    03/17/01.
63. Andre Lee Thomas medical records — TMC Behavioral Health Center, dated
    03/26/04.
64. Grayson County Sheriff's Office records regarding Andre Lee Thomas.
65. Andre Lee Thomas medical records — Grayson County Jail.
66. Sherman Police Department Incident Report and copies of photos of the crime scene.
67. Grand Jury Testimony, dated 04/15/04.
68. Grand Jury Testimony, dated 04/22/04.
69. Grand Jury Testimony, dated 05/06/04.
70. Grand Jury Testimony, dated 05/20/04.
71. Grand Jury Testimony, dated 06/10/04.
72. Hearing on competency, dated 06/16/04.
73. Personal history, Andre Lee Thomas, 2 pages.
74. Sherman Police Department Incident Report, dated 11/04/01.
75. Sherman Police Department Incident Report, dated 01/26/03.
76. Videotape interview of Carmen Hayes and Ben Gibbs.
77. Videotape interview of Andre Lee Thomas.
78. Videotape interview of Bryant Hughes.
79. Audiotape of the following materials:
    a. Paul Boren's 911 call.
    b. Bryant Hughes and Laura Thomas answering machine.
    c. Paul Boren interview.
    d. Paul Boren's answering machine.

17792

AT017827

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

    e.  Search of 224 Texoma Parkway, #15.
    f.  Summer Sherman.
    g.  Ellis Cotton and Stacy Perkins.
    h.  Demicus Kelsey.
    i.  Rochelle Thomas.
    j.  Natalie Sims.
    k.  Kim Young and Zack Young.
    l.  Telephone call with Carmen Hayes, dated 05/19/04.
    m.  Jennifer Hughes.
    n.  Annette Robins.
    o.  Crystal Cole.
    p.  Lisa Ramsey.
    q.  Jeremy Jones.
    r.  Samuel Taylor.
    s.  Stephanie Ashley.
    t.  Bobbie Hughes.
    u.  Carmen Hays.
    v.  Paul Boren.
80.  Sherman Police Department videotape of the crime scene.
81.  Videotape of Officer Ferguson and Andre Thomas, dated 03/27/04.
82.  Copies of crime scene photographs – 54 photos.
83.  Sherman Police Department reports regarding Andre Thomas, 1994 to 1997.
84.  Sherman Police Department reports regarding Laura C. Boren, 1998.
85.  Probation records regarding Laura C. Boren, 1998-1999.
86.  Records pertaining to Andre Thomas:
    a.  Birth
    b.  Immunizations
    c.  Academic
87.  Medical Records – North Texas State Hospital – Vernon Campus.
88.  Carmen Hays Diary – September 2003 to April 2004.
89.  Personal interview with Carmen Hayes on December 12, 2004.
90.  Personal interview with Natalie Sims on December 10, 2004.
91.  Observations from hearing December 13-15, 2004.

*[handwritten annotations in right margin:] Dr. Colk's Report? 3/5/04 MHMR - J. Layless? Expert reports? Tox/lab reports?*

*[handwritten note at item 89:] 1 of 3 days meeting w/ State*

**Identifying Information/Confidentiality Statement:**  Mr. Andre Lee Thomas, the defendant, is a 21-year-old, African American male, who was arrested on March 27, 2004, subsequent to turning himself in at the Grayson County Jail.  He presented to the jail with a self-inflicted stab wound that required surgical repair; therefore, he was transferred to the Wilson N. Jones Hospital where he stayed for two days.  He was released on March 29, 2004 and provided statements to investigator Mike Ditto regarding the crimes that occurred on the morning of March 27, 2004.  He is currently in the Grayson County Jail in Sherman, Texas.

Prior to the evaluation on October 21 and again on November 15, 2004, Mr. Thomas was informed of the purpose of the evaluation and that his attorney, Mr. R.J. Hagood would be present during the interviews.  I also explained to him my role as an evaluator and that I will be submitting a report to the District Attorney's office and that what he told me would not be confidential.  I also informed him that we would be doing a number of different tasks and that

**17793**      Page 4

AT017828

at any point he could terminate the interview. More specifically, per request from Mr. Kerye Ashmore, Assistant County and District Attorney of the Grayson County Attorney's Office, he was read the following notification:

> *I am a psychologist that has been hired by the Grayson County Attorney's Office to examine you in regard to the Capital Murder charges that you have against you.*
>   1. *You have the right to remain silent and not make any statement at all. Any statement you make may be used as evidence against you in court. What you tell me can be used against you at your trial, at either guilt/innocence phase of the trial or at the punishment phase or at any hearing. So what you tell me is not confidential;*
>   2. *You have the right to have your lawyer present to advise you before and during any questioning;*
>   3. *You have the right to end or terminate this interview at any time.*
>
> *Knowing that you have these rights, do you want to waive or give up these rights and talk to me?*

Subsequent to reviewing with Mr. Thomas this statement and the purpose of the evaluation, he appeared to understand and consented to the evaluation.

## II. CURRENT CLINICAL PRESENTATION

**Current Mental Status**
*From Interviews on October 21, 2004 and November 15, 2004:* The defendant was interviewed on two separate occasions. On October 21, 2004, he was interviewed in a separate room of the Grayson County Jail with his attorney, Mr. R.J. Hagood, observing and taking notes. A jail officer was outside the door. On November 15, he was interviewed in a separate office of the Grayson County Courthouse, and again, Mr. Hagood and an officer were present. Mr. Thomas wore standard orange jail garb, and presented with fairly good grooming and hygiene. He had some facial hair because he had not shaved in a while and he had not visited the barber recently. On each of the two meetings, the defendant was alert and responsive to questions as he correctly stated his name, date of birth, as well as the current date. He understood his surroundings as well as the purpose of the evaluation. He indicated he is a 21-year-old male, who stands at 5'11" and weighs approximately 180 lbs. He is of African-American decent and looks his stated age. His eye contact was appropriate and he was considered cooperative in answering questions. He indicated a scar on his chest and was also noted to have a patch over his right eye. He entered the evaluations in ankle and handcuffs as well as mittens over his hands, but these were taken off so that he could write and attend to tasks.

The defendant spoke in a soft voice with low volume, but his speech was normal in terms of productivity, rate, and clarity. He did not speak too fast or mix his words, and when necessary he was asked to speak up and he complied.

**17794**

AT017829

He expressed his thoughts coherently and logically. He was able to converse appropriately and in a goal-directed manner, and at no point did he speak off topic or ramble incessantly.

His facial expressions and general affect were constricted, but considered appropriate given the circumstances of the evaluation period. His mood was consistent, which he indicated has "been pretty depressed." He noted not feeling like getting out of bed and thinking of his own mortality. This was reasonable considering his very serious legal situation and his current jail status. The defendant described being preoccupied with certain thoughts of a depressive nature as well as thinking about his own death. When asked to explain about feeling depressed, he indicated "don't know what is going to happen to me, I just want to go home." He denied feeling anxious at present. He noted his sleep and appetite to be "alright."

When asked about current thought disturbance such as bizarre or persecutory beliefs/delusions, he denied currently thinking in this manner. Moreover, no such active odd, bizarre, grandiose, or uncommonly held beliefs/delusions were apparent during conversation.

Regarding experiencing perceptual disturbances or hallucinations, the defendant denied such problems at present. The last time he heard voices inside his head was toward the end of September and this came in the form of a loud man's voice indicating everything was going to be all right. He noted he usually heard these voices in the morning. No other perceptual disturbances have occurred since the end of September per his report, and he did not appear to be responding to internal stimuli during the evaluation.

Cognitively, the defendant was observed responding to questions Victor Scarano, M.D., a consulting psychiatrist, asked on the morning of November 15, 2004. Essentially, the defendant's general intellectual functioning appears consistent with testing conducted several years ago by a mental health professional, which indicated his level to fall in the upper part of the Average range (i.e. 112). At present, his cognitive functioning appears intact. Memory functioning for immediate, recent, and remote events all appeared intact; that is, he recalled personal information and facts about his history and responded well when asked to retain and recall three unrelated words after five to ten minutes. His attention and concentration levels were adequate, as he subtracted seven from one-hundred without problem, spelled a five letter word forward and backward without error, and repeated seven digits forward and four backward. Use of vocabulary, responses to questions of abstractions (proverbs), and general fund of knowledge were all consistent with his intellectual abilities.

His judgment and insight regarding his current situation were considered good. He understood that psychotropic medications assist with him not thinking about religion and death as much. He is currently taking Zyprexa, an antipsychotic medication, 40mg daily.

**Personality Testing:** Given the nature of the mental health issues involved in this case as well as in viewing previous psychological examinations as an adolescent and more recently when he was in the state hospital, testing was conducted to obtain additional information about the defendant's current mental functioning. Psychological testing is supplemental information and is interpreted in view of his history and symptoms he is reporting and has reported. On October 21, 2004, he was administered the Beck's Depression Inventory-Second Edition (BDI-II), which is a 21-item self-report instrument measuring the severity of

**17795**

AT017830

depression in adults and adolescents aged 13 years and older. His total score on this instrument placed him in the severe range. On the Beck Hopelessness Scale, a 20-item scale measuring the extent of negative attitude about the future, his total also placed him in the severe range.

On November 15, 2004, Mr. Thomas was administered the Personality Assessment Inventory (PAI). This test is a self-administered, objective inventory of adult personality designed to provide information on critical clinical variables. It has 344 items in which the examinee responds to each statement as it applies to him, by answering false, slightly-true, mainly-true, or very-true. As indicated by the validity scales, his PAI results are considered valid. His validity scores reflect he may be presenting an exaggerated or unfavorable impression, and this could also be an indication of a cry for help. Essentially, the defendant's PAI results indicate a marked elevation on the suicide index, with a score that exceeds two standard deviations above the mean for the clinical population. This suggests, particularly in combination of the BDI-II and BHS scores, that the defendant continues to hold suicidal ideation and thoughts. Results of the PAI that are clinically significant as compared to the clinical population, indicate that he endorses symptoms such as unusual perceptions and sensations, magical thinking, and confusion and difficulty in concentration or problems with thinking. It is important to note that the defendant also scored in the elevated range as compared to a clinical population on scales reflecting significant alcohol and drug problems.

As noted in the proceeding paragraph, there was indication the defendant may be exaggerating his symptoms; therefore, a screening test for malingering psychiatric symptoms was administered. On the Miller Forensic Assessment of Symptoms (MFAST) test his responses suggested he was malingering; consequently, the Structured Interview of Reporting Symptoms (SIRS) was administered to further assess this area. The defendant had moderately elevated scores on three scales, suggesting a significant likelihood of feigning or exaggerating symptoms. With this particular test, the defendant responded in a manner endorsing a high percentage or proportion of symptoms of a major mental illness, everyday problems, and symptoms that are not always associated with mental illness, and higher unexpected proportion of symptoms of an extreme severity.

At present, Mr. Thomas appears to be acknowledging symptoms of depression and an overall sense of hopelessness about his future. He also denies current problems in his thinking or that he is hearing voices; however, testing indicates the presence of drug and alcohol problems as well as active problems with his thinking, suggestive of a formal thought disorder. On the other hand, testing also indicates a likelihood of exaggerating symptoms.

## III. BACKGROUND HISTORY

Information regarding the defendant's personal history was obtained from essentially two sources. He was interviewed for a number of hours regarding aspects about his life and he appeared to be rather responsive in answering questions. Information was also obtained from a variety of other documents to include police reports, juvenile records, jail records, notes, letters he has written, hospital records, and grand jury statements from person's who know him. The following sections about his history will be divided into two sources of information, accounts from the defendant and information from collateral records.

**17796**

AT017831

Andre Lee Thomas                                                    Psychological Evaluation:
Cause Nos. 051483 & 051858                               Mental State Surrounding the Offense

**Family History:** The defendant was reportedly born in Muskogee, Oklahoma, and grew up in Sherman, Texas, when his parents moved there when he was two or three years old. He noted being primarily reared by his mother, with his father around some of the time. His parents never divorced; however, they separated when he was four or five years old. He denied fighting or physical aggression within the family during his child rearing years. The defendant is the fifth child of Danny and Rochelle Thomas. He has a brother Eric (26 or 27 years old), Danny (25 or 26 years old), Brian (24 years old), James (22 years old), and a younger half-brother from his mother, ████ (seven or eight years old). He reportedly grew up in a household where fighting or arguments were not an issue, but his father has reportedly used alcohol for years. The defendant noted being closest to his mother and his brother Danny, and having the most problems with his brother Brian. He also reported that his brother Brian has been diagnosed with Paranoid Schizophrenia. Other than his father drinking alcohol, he also noted that his brother James has smoked marijuana for a long period. Mr. Thomas denied having any adjustment problems growing up.

**Family History Per Collateral Information:** According to documents reviewed, information the defendant provided is considered consistent. Mr. Danny Thomas, father of the defendant, indicated multiple separations between he and his wife, in which Rochelle Thomas, the defendant's mother, would leave. Mr. Danny Thomas also noted receiving alcohol treatment for 18 days in Wichita Falls, Texas, in 1986.

*[handwritten left margin: self report]*

**Educational History:** Mr. Thomas reportedly attended Dillingham Elementary, Pines Junior High, and Sherman High School. He indicated his grades were good when he was young; however, he noted concentrating on drugs rather than his schoolwork and ultimately dropped out of school in the ninth grade when he had his son. He was reportedly 15 or 16 years old at the time. He noted taking courses at the Grayson County Community College in order to obtain his GED in 1999. He did not attend college, though he planned to study computer graphic design. He denied any learning problems and was not diagnosed as being hyperactive or having attention problems. He indicated attending alternative education programs in which he was separated from other students on two or three different occasions when he was 13 years old. He noted the reasons for attending this program was because he missed too many days of school. The reason he missed too many days of school was reportedly because he would stay up late, try and chase girls, or stayed at home and got high smoking weed with his friends. He denied involvement in fights or talking back to teachers. He was reportedly truant, or skipped school 10 to 15 times, beginning in the seventh grade. He was ultimately suspended on three or four different occasions for missing school days, but was never expelled, per his report. He noted he first started smoking marijuana in the seventh grade at the age of 13 and was held back that year in school.

**Educational History Per Collateral Information:** A review of academic records from junior high and high school indicate Mr. Thomas performed at lease between the average to the above average range in his classes and course work. He was not enrolled in special education classes; rather, notations dating to 1998 indicate he had potential to be in gifted and talented. Other notations from records indicate a rather intelligent individual who could do very well in school when he made effort. Records indicate numerous absences, at least

17797

*[handwritten: Rochelle fired ?]*

AT017832

Andre Lee Thomas                                    Psychological Evaluation:
Cause Nos. 051483 & 051858                 Mental State Surrounding the Offense

dating back to 1997 and continuing until 1999. His grades vacillated and ultimately declined, which is consistent with reports from the defendant. *self report* ✓

**Employment History:** The defendant first began working at the age of 15 with his brother at Popeye's. He was employed there for a couple of months but was ultimately fired for abusing Codeine with the manager on duty. He noted after using this substance he was feeling buzzed and went to the restroom and threw up. His next job was at Red Lobster when he was 16 years old and he was employed there for almost a year and worked there a couple months again in 1999, both times as a dishwasher. He noted becoming bored with this type of work and therefore discontinued. When he was 16 or 17 years old he worked at Lone Star Food Store for six months. He recalled being fired from this position for drinking alcohol while on the job. He worked at Denney's when he was 17 years old, again as a dishwasher, and was employed there for six months but left because the pay was too low.

He was next employed at Kelly's restaurant for a couple of months when he was 17 years old but discontinued because of problems with his marriage. He washed dishes at this restaurant as well. He also noted being a cook at Long John Silver's for a couple of months when he was 17 or 18 years old. He noted when he was 17 years old there was gap of employment for about six months and he received money through his wife Laura, who was working at Chick-fil-A at the time. At the age of 18, he began working in the grounds maintenance department for the City of Sherman. He noted the job with the City of Sherman was initially a seasonal job, but because his work performance was above average he was employed there all year around. He worked there for approximately three years and discontinued because he was ultimately fired for coming in late multiple times, as a result of his car not working well. He last worked at Logan's restaurant in March 2004. Altogether, he noted at least three firings, one for the use of Codeine, one for the use of alcohol, and another for being late too many times (he was increasingly smoking marijuana).

**Employment History Per Collateral Information:** Records available for review were less detailed than what the defendant provided, indicating the defendant appeared to be forthright in providing information about where he was employed and reasons for leaving.

*self report* ✓

**Drug Abuse History:** Mr. Thomas reported using various substances beginning at the age of 12 years old. He first started using alcohol with his brothers and friends when he was 12 in the form of MD 20-20, approximately four to five times per month. He indicated getting very drunk to the point of throwing up about one time per month.

He indicated when he was 13 years old he had smoked and drank and experienced at least three black-outs. When he was 16 years of age, he believed this was the worst period of drinking he ever had, acknowledging drinking at least one time per week to the point where he was throwing up and had a real quick temper. He would yell on a couple of occasions and "I would get real mad," but others could not readily notice he was upset. When he was 17 years of age, he indicated drinking two or three times per week and would drink he became sick at least once per week. In early 2004 he was not drinking as much but was drinking about a six-pack two times per week and would get drunk.

**17798**

Page 9

AT017833

Mr. Thomas also noted having a friend by the name of Scott Hamel he used to hang out with when he was 10 or 11 up till the age of 14. He began hanging out with his fried Scott once again sometime in 2003 and they would talk every day and they started smoking pot. At the age of 13, he began experimenting with marijuana on at least a couple of occasions. He noted becoming real high with his brother during Thanksgiving of 2001, but his wife became very upset and therefore he quit smoking. He began smoking once again in early 2003 when he was 19 years of age. He noted at that point he was smoking a "joint" every other day. At the beginning of 2004, the defendant reportedly began smoking "blunts," which is a method involving a cigar, and replacing tobacco with marijuana. He indicated smoking approximately two to three blunts a day or the equivalent of a quarter-ounce every three days. He denied lacing these blunts with any other types of drugs (e.g. adding other drugs). He acknowledged experimenting with cocaine by snorting it on one occasion when he was 17 or 18 years old. More recently, he used Coricidin on three occasions in March 2004. This drug has the ingredient Dextromethorphan, which in high doses can cause psychedelic effects. The defendant reported using this substance to obtain a high, or euphoric mental state.

*[handwritten left margin: 2003-2004 Intensive mj use]*

*[handwritten right margin: quantity matters]*

*[handwritten left margin: self report]*

**Drug Abuse History Per Collateral Information:** After reviewing the records, Mr. Thomas was generally forthright in providing his history of drug and alcohol abuse; though, testing in 1996 indicated a tendency to minimize use/abuse. A review of documentation from juvenile records indicated a history of alcohol and marijuana abuse.

**Marital and Relationship History:** Mr. Thomas reported beginning to date at around 10 years of age and had his first real relationship when he was about 12 years old. It was at this point he had his first sexual encounter and did not use protection at that time. He indicated his next major relationship was with Laura Boren. Ms. Laura Boren and he had met when he was 13 years old, she a year younger, and they were intimate from the beginning. She was subsequently pregnant at the age of 15 years old and he 16. He began living with her in April 1999, when he turned 17 years old. He and Ms. Boren had a child, ▮▮re▮, who was born on August 31, 1999. Mr. Thomas and Ms. Boren were married on March 17, 2001, which was his 18th birthday. He noted at the beginning of their marriage in 2001, the two of them would argue about once per week about petty things. He stated his wife would cry and he would in turn get mad, draw, or drink. He noted at other times they would separate or part rooms and eventually he would go over and try to console her.

The two of them eventually separated in July 2001 and she took their son ▮▮▮▮▮▮ and moved in with Josh Lehrman. After the separation, the defendant moved in with his brother Eric. The defendant noted from July to November that she continued to live with Mr. Lehrman until January 2002. At this point the defendant and his wife moved back together for about one month, but then in February 2002 he went to jail for approximately four months. He indicated believing his wife cheated on him with his brother James and his cousin Floyd Patterson. When he was in jail he was "heartbroken" upon hearing this news so much so that he was not mad. He recalled confronting his wife on this issue in June or July of 2002 and that she cried and said it was not true. He stated she began seeing Bryant Hughes in late 2001 and then again in July 2002. Mr. Thomas denied getting back together with his estranged wife and said he did not love her, "not after what she had done to me." He noted after July 2002 he and Ms. Thomas got along fine and he continued to see their son, ▮▮re▮.

**17799**

AT017834

The defendant reportedly started dating and "got over it in 2002 during jail." He noted having no resentment toward her, but "I think she harbored some on her part." He based this on his estranged wife finding reasons not to let his son; ▮▮▮▮▮▮go with him, but became better about allowing him to see his son once Ms. Thomas and Mr. Hughes were together. He stated his estranged wife never cursed or cussed about the situation but she would complain about the defendant not spending enough time with his son ▮▮▮▮▮▮.

**Marital and Relationship History Per Collateral Records:** A review of collateral information indicates Mr. Thomas was very social in that he would hang around with friends from an early age and also was involved in relationships with other girls during his adolescent years. He eventually married his long time girlfriend, Laura Thomas, on March 17, 2001. According to Paul Boren, Laura Boren Thomas' father, the defendant was living with them (Laura Boren's parents, Paul and Sherry Boren) at the time of the birth of ▮▮▮▮re ▮▮▮▮as▮. Mr. Boren indicated the defendant lived with them until they had an argument about an income tax issue. At this point Mr. Thomas moved in with his mother, and it appears that Laura and the baby moved in as well. Mr. Boren recalls Andre, Laura, and the baby lived with Andre's mother for approximately two to three weeks, at which point Laura moved back in with her parents and Andre moved in with his brother Danny. According to the records reviewed, Mr. Boren recalled Mr. Thomas would go with other young women and invite Laura along, but Laura wished to be a mother and did not go. Mr. Boren indicated eventually Laura tired of Mr. Thomas' behavior and had enough.

Records from acquaintances and people who knew Laura Boren, indicate Mr. Thomas continued to have feelings for her and had difficulty moving on in his own life. According to persons close with Mr. Thomas, such as Isaiah Gibbs a lifelong friend, Floyd Patterson, his cousin, Mr. Thomas always talked about Ms. Thomas and was of the opinion she had messed around. In 2001, Isaiah indicated the defendant believed that Laura and James (Mr. Thomas' brother) had an affair and the defendant and was crying and very angry. The defendant was also of the opinion Bryan (the defendant's brother) had slept with Laura. Floyd Patterson indicated the defendant believed Floyd and Laura had an affair and at one point the defendant had threatened him with his life. Floyd also noted the defendant referred to the relationship (Andre's and Laura's) as Romeo and Juliet, and more recently Andre had been upset about the situation in his life.

Kim Baird, a friend of Laura's since the age of 12, met Andre several years ago when Laura and Andre began dating. Ms. Baird indicated Mr. Thomas was jealous of Laura and recalled an incident in which Laura and Andre had been arguing and the defendant would take his anger by having sex with Laura. One of Andre's friends since the second grade, Billy Hester, noted the defendant referred to Romeo and Juliet when describing the relationship he had with Laura. Billy recalled several instances in which the defendant would bring up Laura and vacillated between being mad at her and the next minute not. Billy also recalled the defendant speaking of Laura having had sex with the defendant's brother. Another of Andre's friends, Christopher Smith, indicated the defendant discussed frequently Laura's being unfaithful and had been upset about the way she treated him, and the defendant appeared depressed. There was also an incident on August 1, 2001, in which Josh Lehrman, who was living with Laura at the time, reported to the police Laura was being held by the

**17800**

AT017835

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

defendant against her will.  Laura reported to the officer she wished to stay and talk the problems out with the defendant.

Mr. Ed Furst, a licensed marriage and family therapist, first came into contact with Andre in 1998 or 1999 as part of the alternative education placement program.  Mr. Furst, according to records, recalled Andre one or two years ago by way of Andre visiting Mr. Furst in his office.  Mr. Thomas had concerns about Laura regarding being angry and jealous that Laura was living with Bryant Hughes and had dated other men.  At that time, the defendant had informed a person by the name of Willy, a friend of the defendant, that Laura had "ripped my heart out."  Willy is a maintenance worker at Kelly's Square, where Mr. Furst has his office.

**Mental Health History:**  According to the defendant, he first had contact with a mental health professional, in particular a psychologist named Ed Furst, after seeing a vision of God.  He stated that he saw Mr. Furst, who had a clinic at Kelly Square in Sherman, Texas, because he wanted Mr. Furst to revert "me to where I could see this again."  He referred to a vision he saw from dream in June or July of 2002.  He noted drinking a lot of beer with his brother and a friend, became drunk, and had a hangover the next day.  At this point he drank another beer and was sitting in the living room, laid back and saw a light with God at the center telling him to get back with Laura.

He could not recall, but believed in February or early 2004, he had contact with MHMR.  He noted being angry because his life was not going the way it was supposed to go, and he felt like he could destroy the world.  He was also high.  He noted a MHMR person told him he had to go to a hospital within 20 minutes and his friend Zack took him there.  Once he was inside no one was there so he went home and figured the cops would pick him up.

He recalled going to a hospital in March 2004 once again, because he believed he was the devil and he needed to unlock heaven by stabbing himself in the heart with a knife.  He noted he was actually trying to kill himself because he was confused.  He walked out of the hospital because he became scared, believing he would be locked up for a long time.  He wished he stayed at the hospital.

**Mental Health History Per Collateral Information:**  The defendant's father indicated a suicide attempt by the defendant when he was 10 years old; however, there are no medical records substantiating this event.  It appears the first contact Mr. Thomas had with mental health professionals occurred in the summer of 1999.  Apparently at this point, Mr. Thomas was to be placed in the Alternative Learning Academy (ALA) and reported hearing voices as well as having suicidal ideation.

According to Rodney Hough, M.Ed., LPC, from a meeting with Mr. Thomas on 5/18/1999:
> "I met with Andre at the request of Mike Polk.  Andre has made a threat to kill himself.  Andre reports some mild symptoms of a depressive disorder, but not enough to be Major Depression.  Andre's threat of suicide is manipulative in that it is only if he has to go to ALA.  In one statement he reports he will kill himself and then he contradicts himself saying he wouldn't kill himself because he wants to be around in September when his child is born.  Andre signed a No Suicide Contract and stated he was sincere about what the

**17801**

AT017836

*contract said. I left a copy for him and a copy for JPD. Andre's mother should be encouraged to keep an eye on him to ensure his safety. Andre would probably benefit from counseling and maybe a medication evaluation. He reports he is willing to seek these services. His mother should be encouraged to call TYFS to schedule an intake period."*

He was seen on June 30, 1999, by Mr. Hough, who indicated on his note:

*"I met with Andre Thomas at the request of JDC. He had self-mutilated his left arm by scratching it with his fingernail. He reports this was a suicide attempt and states he will try to kill himself again if he has to go to the ALA. He reports he doesn't feel suicidal except when incarcerated or at the ALA. Andre also reported some audio and visual hallucinations. He reports the hallucinations is a movie character named Polix Troy. When questioned about this his answers were somewhat vague and lacked any real detail. He also reported this hallucination only appeared when he was detained at JDC then later said that it happened at home also.*

*Andre seems to be malingering in an attempt to avoid these 60 days at the ALA. His reported suicide attempt was a non-lethal attempt and his "hallucination" is not even original and also not very detailed. He also first reported he only had the hallucinations in the JDC then later reported he had it all the time.*

*I suggest he stay on high-suicide watch due to the statements and the possibility he might accidentally harm himself."*

On a note dated 7/7/1999, Mr. Hough indicated the defendant was in a better mood and did not report suicidal thoughts; however, "due to Andre's reported suicidal thoughts he should be kept on moderate-suicide watch," indicating that Mr. Hough still had some concern about self-harm given the recency of Mr. Thomas' comments.

On 7/20/1999, the defendant was seen by Brent O'Bannon, M.B.S., LPC, LCDC, ADCIII, for a mental health evaluation at the request of Mike Polk, for placement and treatment recommendations due to violation of juvenile probation while Mr. Thomas was at the Juvenile Detention Center. At the time Mr. Thomas was sixteen years and four months old. The evaluation included a clinical interview as well as psychological testing. Mr. Thomas admitted to repeating the seventh grade for excessive tardiness and had been absent from school for truancy and health reasons. Ms. Thomas indicated average grades and getting along with his teachers, as well as having a few close friends who are primarily on probation. Mr. Thomas also indicated his friends did drugs, drank alcohol, partied, and had group-sex, but that he only watched. Mr. Thomas admitted to feeling lonely, suspicious, inferior, unpopular, and different than others. He was worried about being accepted by God and not having friends at church. Mr. Thomas also admitted to a legal history and Theft since 1997, and also believed his Probation Officer, Mike Polk was against him and Mr. Thomas had a "defiant oppositional attitude toward possibly going to boot camp."

17802

AT017837

The report by Mr. O'Bannon also indicated significant drinking since the age of 10 and progressively more so since then. Mr. Thomas admitted to using alcohol to help him with his feelings and he had become intoxicated and sick from intoxication, as well as experienced strange hallucinatory experiences and feeling nervous after sobering up. Mr. Thomas also admitted to smoking marijuana three times and had not done so since he was 12 years old. The results from the Substance Abuse Subtle Screening Inventory for Adolescents (SASSI-A) indicated Mr. Thomas was chemically dependent on alcohol and was thought to be minimizing use of substances. Other testing indicated mild to low grade major depressive symptoms as well as the presence of disturbed personality characteristics and poor judgment, irrationality, disorganized thinking, and perceptual distortions as well as feelings of unreality. Mr. O'Bannon also noted testing indicated Mr. Thomas likely to be dependent and desperate for attention, but driving people away as a result of irrational and demanding behavior. Intellectual functioning, as measured by the Slosson Intelligence Test-Revised (SIT-R) resulted in a sore of 112, which placed Mr. Thomas in the upper limits of the average range. Final diagnoses, in this order, were Alcohol Dependence; Conduct Disorder, Adolescent Onset Type, Moderate; and Psychotic Disorder Not Otherwise Specified. There was no indication in this report of Mr. Thomas recently attempting suicide (at that time Mr. Thomas admitted to being somewhat depressed as well as hearing voices telling him he was going to die). Mr. O'Bannon also indicated Mr. Thomas held a "victim mentality."

Mr. Thomas also received contact with mental health professionals when he was in jail in 2002 and again in 2003. In January 2002, when Mr. Thomas was initially screened upon entrance to the Grayson County Jail, he admitted to previous attempts or threats of suicide and the interviewer also indicated Mr. Thomas seemed sad and apathetic, as well as spoke rapidly. It appears he was on suicide watch from April 3, 2002 through April 9, 2002. When he was placed in jail in 2003, he also expressed suicidal ideation and was seen by MHMR. On 1/26/03 Mr. Thomas denied previous MHMR services, but indicated he had attempted suicide with his fingernails sometime in 2002. Overall behavior observations appeared normal, but he was placed on 15-minute watches due to his history. On 1/28/03 a note by MHMR indicated he complained of increased stress and had also claimed suicidal ideation approximately three months previously (around the end of October 2002). The note continued that Mr. Thomas appeared well groomed with green hair, was alert, and exhibited pressured speech; though, thought processes were coherent. On a note from 2/11/03, MHMR indicated denial of suicidal ideation but he exhibited ideations of violence as well as anxious mood and affect. Hallucinations were denied and he expressed his thoughts coherently. Fifteen-minute checks were ordered due to recent violent thoughts. No pressured speech was noted. Mr. Thomas was not placed on any antipsychotic medications.

Information related to contact Mr. Thomas had with mental health professionals in early 2004 will be covered in the latter part of this report.

**Medical History:** The patient denied any major medical problems in the past or present.

**Medical History Per Collateral Information:** There is some indication of minor medical issues, but no significant medical concerns such as traumatic head injuries, seizure problems, or other developmental problems. He appears to have met all of his developmental

17803

AT017838

Andre Lee Thomas                                                    Psychological Evaluation:
Cause Nos. 051483 & 051858                           Mental State Surrounding the Offense

milestones on time such as walking and talking.  More recently, on March 27, 2004, he
required surgical operation for self-inflicted stab wounds to his chest.

**Legal History:**  Mr. Thomas indicated he has been arrested once or twice and then later
stated three times since 2001.  As a juvenile, he indicated being arrested five or six different
times and was placed on probation on two occasions and said he completed it.  In 1998, at the
age of 15 years old, he was placed in the Juvenile Detention Center for a period of six months
and was placed on suicide watch.  He indicated being depressed and thinking about suicide.
He also noted when he was 14 years old he was feeling depressed and thinking about suicide.
He noted the drinking he was doing at the time did not help, and also noted problems with
concentration and low appetite.

He noted in 2001, he beat up another guy for sleeping with his wife..  He also noted in early
2002, he was charged with assault of bodily injury and evading arrest with a motor vehicle;
two Class-A Misdemeanors, and he was in jail for approximately four months.  He noted the
last 10 days of his jail period he was placed on suicide watch.  He further indicated in March
2003 he was involved in a fight with his brother Brian, and felt in fear because his brother
Brian began punching him.  Mr. Thomas noted stabbing his brother three or four times in the
heat of the moment.  At this point he was charged with Aggravated Assault with a deadly
weapon, per his report, and spent five or six months in jail until the charges were dropped.
He noted when he was in jail he became depressed and thought about suicide as well and
ending his life by hanging.  He further noted thinking about his son and his wife, but did not
follow through with this suicide because "I figured everything was going to be alright."  He
thought about suicide for a couple of days.  When he was in JDC, he recalled about three
months into his time he became depressed and suicidal.  He noted attempting to injure
himself by cutting his wrist on two different occasions with a staple.  He was thinking about
jail, his son, and also about another relationship with a girl who was seeing another guy.

**Legal History Per Collateral Information:**  Mr. Thomas has an extensive history of arrests
and being placed on probation as an adolescent, and has had at least three arrests as an adult.
On December 9, 1993, he was indicated to have committed criminal mischief of over
$200.00, and then in 1994 he was arrested on at least three occasions for offenses ranging
from petty theft of over $20.00 to causing damage to property of over $750.00 but less than
$20,000.00.  He was eventually placed on probation in the juvenile court on or about October
26, 1994.  On April 4, 1995 he was again arrested for theft of over $20.00 of a bicycle.  On
February 4, 1996 he was arrested of theft of under $50.00 of a toy at a Tom Thumb store and
on June 24, 1996 he committed theft of money from a senior citizen.  On August 20, 1996, he
was arrested for violation of curfew.

He has at least three different charges for unauthorized use of a motor vehicle in 1997.  On
June 7, 1997 he was arrested for obtaining a vehicle of more than $1,500.00 but less than
$20, 000.00 and again on March 26, 1997 the defendant did then obtain a vehicle of more
that $1,500.00 from a different person.  On August 15, 1997, the defendant committed the
same act of the same value from a different person.  On July 7, 1997 Mr. Thomas was found
in violation of curfew and was indicated to have committed the offense of evading detention
or arrest.  On May 26, 1997, the defendant was arrested for committing the offense of
evading arrest with a motor vehicle when he fled from a Sherman police officer.  On

**17804**

AT017839

September 20, 1997 the defendant committed the offense of unauthorized use of a motor vehicle and was also arrested for minor in consumption of an alcoholic beverage.

Due to these offenses, Mr. Thomas was placed on probation and in 1998 was indicated to have failed to abide by the terms and conditions of his probation for failing to attend school on various dates in October, September, and November of 1998.  On July 26, 1999 another petition was filed due to failing to report to his Probation Officer as well as not attending the Alternative Learning Academy in June and July of 1999.  On October 27, 2000, he violated conditions of his probation for failing to report to his probation officer for September, October, November, and December of 1999, and January, March, April, May, and September of 2000.

In 2000, Mr. Thomas was arrested on a couple of occasions and again on November 4, 2001, Mr. Thomas caused bodily injury to Jermain Bean, and according to persons at the scene Mr. Thomas believed Jermain had been with Laura.  In January 2003, Mr. Thomas was arrested for committing the offense of aggravated assault of Bryan Thomas, his brother, after stabbing him with a knife; however, this charge was later dropped as Mr. Thomas' behavior was indicated to be in self-defense.  Mr. Thomas' last arrest was on March 27, 2004, which involved the offenses for which this evaluation has come to be.  There is indication in the records that Mr. Thomas' court cost and related fees were not paid, and when he became an adult the probation was eventually discontinued.

According to Mike Polk, who was Mr. Thomas' Probation Officer from 1996 through 1999, he believed Mr. Thomas initially could be able to turn his behavior around and complete probation; however, Mr. Thomas was not able to do so.

As mentioned previously in the report, Mr. Thomas appeared to have difficulties with the legal system beginning in adolescence and was unable to comply with conditions of his probation.  While he was in a juvenile in 1999, he indicated concerns with suicide and ultimately went through a mental health evaluation in July of 1999 with Mr. O'Bannon.  Reviewing several letters that Mr. Thomas wrote to Laura during that time, he appears to admit to behaving in a manner as to avoid further incarceration.

In letter from June 29, 1999, Mr. Thomas was having a difficult time with incarceration, stating, "I'm only a minute percent away from loosing my grip on reality. I don't want to die!"  He goes on to say
     *"seems just to get some help around here I have to prove I slit my wrist. I going to talk to my Court-appointed attorney here at 10:30, I don't think they realize how easy it would be to just do it. I think everyone is against in fact I know everyone's against me. Basically, I'm going to try and fight this."*

On a letter dated August 6, 1999, Mr. Thomas writes to Laura and indicates not wanting to be placed in boot camp.  He states "they're trying to get me in there faster than anyone else in here. You know I don't belong there. When I got back from the doctor's office I cried because I was furious thinking about how they're trying to separate me from my son for the first three months of his life."  He indicates later in the letter that his disposition will be up to

17805

AT017840

Andre Lee Thomas                                        Psychological Evaluation:
Cause Nos. 051483 & 051858                    Mental State Surrounding the Offense

the judge and that he was going to ask the judge for placement of his original terms of
probation. He goes on to state,

> "but it seems as though there's a conspiracy that Mike Polk has conjured up
> in this whole matter, even before we went to court the first time he spoke in
> terms of already sending me to boot camp as if he didn't even listen to what I
> had to say in court. You were there I've been screwed around during this
> whole matter. Mike's keeping me in here during this whole matter because he
> simply doesn't, and hasn't been trying to work with me. He hates me, and
> when you're P.O. doesn't like you you're screwed anyway."

In a letter dated August 9, 1999, Mr. Thomas stated, "That son of a _ _ _ _ Mike Polk is
really scheming on trying to send me to boot camp though. I really don't want to miss out on
the first three months of my son's life." Also within this context Mr. Thomas indicates
having a difficult time dealing with incarceration, as he later states at the end of the letter
"Man it's amazing what crazy thoughts can go through your head when you start being in
these four walls in your cell all alone."

In a letter postmarked August 20, 1999 to Laura Thomas, Mr. Andre Thomas indicates the
following:

> "by the time you read I shall definitely without a doubt be at your side
> laughing our heads off about how Mike Polk tried his hardest to send me off.
> I love you. Speaking in terms of future reference, I am sorry I worried you so
> much by the reports Mike, my Moma, and James had given you about my
> puzzling actions. But Laura you'll fully understand why I did this when I see
> you and explain because more than anything, I'm doing this as a promise I
> made to you and my son."

## IV. MENTAL STATE SURROUNDING THE TIME OF OFFENSE

**Prior Mental State:  January 2004 through March 26, 2004**
*Per Defendant's Report from Interview on 10-21-2004:*  During the interview on October 21,
2004, the defendant provided the following account of his mental state prior to March 27,
2004, he noted toward the beginning of February through March, he was going by Bryant
Hughes and Laura's apartment approximately one time per week, just long enough to pick up
his son ███re██. He noted at one point within this time span, he and Bryant were listening to
an audiotape known as the *ILLUMINATI*.  He noted this tape involved discussions about
angels and heaven and about what has happened in history as well as religion and it talked
about the devil a lot.

One time in February, Bryant, Laura, and the defendant were smoking "weed" and listening
to this tape. He related this tape to him studying the bible a lot, in particular Revelations.
Moreover, he was smoking "weed" a lot and was reading Revelations over and over, stating
"it was like poetry to me, I became really obsessed about it." In particular, he was reading
chapters 21, 22, and 23. He indicated in December 2003 or January 2004 he was dreaming
about the end of the world and about demons, and began looking for signs for the end of the
world as well as thinking he was the devil and getting messages from God telling him

AT017841

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

directions while driving, stating "it was minor things." He also indicated having thoughts of dejavu such that he was reliving the same days over and over again. In the midst of feeling he was the devil, he began to believe God wished for him to save the world. At one point he stated believing he was the devil when he was in jail in 2003, because he had withstood the light from the dream in 2002.

He noted a couple weeks before mid March 2004, he overdosed on his brother Brian's medications and was feeling bad about life, his job, and not being able to see his son, because Laura would not allow him. He noted this to be a suicide attempt by taking pills and drinking beer. He further noted beginning to feel as if the drugs made him feel like slow-motion and he began to hear a voice saying "he's gay," "let's kill him," and "do you know who Jezebel is?" He noted on this occasion he went to bed after hearing these voices. He noted at another point he was working on his car and began thinking about going to the hospital because he was hearing voices such as a conversation as well as someone say "your weak," and "nobody is going to believe you," referring to the voices. At the time he was thinking he was hearing voices as a result of smoking marijuana at a rate of approximately two to three blunts a day.

He indicated when he met Carmen Hayes he began to use Coricidin, which includes the ingredient dextromethorphan (an ingredient that can cause psychedelic effects if taken in high dosages). He reportedly used this substance to obtain a high, or a euphoric state. The first occasion was March 3 or 4 and he also drank two 40oz malt liquors plus smoked marijuana and believes he took about four pills. He indicated feeling as if the world revolved around him, he thought he was the devil (more so than other times, and he noted a difference from being high on that "stuff," and the high lasted a couple of hours. The second time he used Coricidin was on his birthday, March 17, 2004. He indicated throwing up after taking four to six pills, but he also drank one six-pack of Taquiza and a 40oz of malt liquor and was smoking. The third time he used this substance was March 25, 2004, and he threw up after taking eight to ten pills, drinking approximately a six-pack of Taquiza, two Smirnoff's, and smoking weed, per his report.

Mr. Thomas noted on March 25, 2004, after he tripped on Coricidin (dextromethorphan) with Carmen, he believed the world was revolving around him. On March 26, 2004, he noted going over to Bryant and Laura's house and asking Bryant to play the religious tape *ILLUMINATI*. He recalled Bryant and him talking about angels and demons and he believed ████████ was a demon because his son was attempting to get constant attention from the defendant. That night the defendant asked Bryant to give him a ride home and on the way to the defendant's house the defendant reportedly began believing angels in heaven had come up with a code of silence. The defendant mentioned asking Bryant about the code and Bryant said "you're loosing me Dre," which the defendant took to mean that Bryant was in trouble and the *Illuminati* was going to beat him up due to allowing the defendant to listen to those tapes. After being dropped off at his house, the defendant walked over to his dad's home and believes he began smoking with his brother Danny while they drove around the trailer park.

*Per Defendant's Report from Interview on 11-15-2004:* The defendant noted more detail with regard to his mental state prior to March 27. He indicated feeling more so that he was the devil and the center of the universe the first time he used Coricidin. His trip was reportedly better on the second occasion he used Coricidin (March 17, 2004) and he knew he

**17806**

AT017842

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

was doing the Coricidin to get high. The third time he used Coricidin (March 25, 2004) he noted taking eight pills plus drinking beer and feeling as if he could unlock heaven on earth by stabbing himself in the heart to death. This was the first occasion in which he felt he was immortal. He noted believing that evening that Carmen was a witch and she could make him hurt. He also believed she was speaking in code when she said it was approaching midnight and took this to mean the world was coming to an end. He noted not interpreting codes or receiving codes until meeting Carmen.

On the morning of March 26, 2004, he recalled going to the hospital to find out why he had not died. His mother reportedly took him and mentioned he would be locked away for a long time. He remembered becoming paranoid about being locked away so he got up and left out of the hospital and walked home. At this point he broke up with Carmen, as he stated it was because of the Coricidin and thinking may be Carmen was a guy. He noted not thinking Laura was a Jezebel at this point.

**During and After March 27, 2004, According to the Defendant**

*During and After the Incident, Per Defendant's Report from Interview on 10-21-2004:* The defendant indicated getting up around 6:45 or 7:00 a.m. on the morning of Saturday (03-27-2004) and walked through the hallway and heard someone say, whom he thought was God, "Use three different knifes, be sure not to cross-contaminate the blood, they may have worked a blood pact [the demons]." He noted at this point believing Laura was Jezebel, ▇▇re ▇the antichrist, and ▇▇a demon. After hearing this voice he entered the kitchen of his dwelling, picked up three knives, and heard his mom say, "what are you doing." The defendant believed this was code for everyone rising together and he thought Laura was going to make people the mark of the beast, 666. After picking up the three knives he also picked up duct tape out of his room. He started walking toward the apartment, started hearing voices and hearing a sermon about Jezebel and the Unix, and also started hearing a voice indicating to throw Jezebel down. At this point in the interview, Mr. Thomas indicated hearing from Leander Willowford a couple weeks prior for him to be aware because there was supposed to be a she-devil around making she-devil slaves. He also remembered hearing his mom saying a witch had power over sex and drugs and was supposed to die soon.

On his way over to the apartment he kept hearing "throw Jezebel down." He believed Laura's apartment was a big mirage, a big palace. He recalled walking down McGee Street and seeing Bryant driving and at this point the defendant raised up his hands and did not know where Mr. Hughes was going or doing, he stated, "I thought he was supposed to help me kill the demons." The defendant noted Bryant waiving his hand or his shoulder, and the defendant continued to walk to the apartment and continued to hear "throw her down." He stated on his way over to the apartment he recalled thinking it was now or never to save the world. He could not recall if he knocked or kicked the door first, but believed he kicked the door in. Ms. Thomas came running down the hall and the defendant said "you" and thought she was a witch, demon, or Jezebel. He noted she more or less ran into the blade and he recalled when she fell back on the floor the situation did not seem real. At this point he kneeled down and used the same butcher knife to cut open her chest and took her heart out and put it in his pocket. He believed she was a demon and he had to destroy the heart.

17807

AT017843

Then the defendant ran into his son's room. While his son was in bed sleeping, the defendant put his hand of his son's chest and his son said "no," and at this point the defendant stabbed him in the chest and took out his heart.

The defendant then went to ███████'s crib. ███████ was sleeping on her stomach and the defendant indicated turning her over and stabbed her in the heart, took her out of the crib and placed her on the floor, and then took out her heart.

The defendant recalled using different knifes and believed that he left all of the knives at the scene. He left the tape there and did not use it. He noted bringing along the tape because he intended to use it in case anyone tried to run.

Mr. Thomas indicated believing the kids were demons because the night before Mr. Bryant Hughes said demons come in all sizes.

After killing the two children, the defendant walked back into the room and heard Ms. Laura Thomas gurgling. He believed his mission was over and all he had to do was kill himself next. At this point he picked up the butcher knife and stabbed himself twice in the chest. He laid by her side and then got up and panicked, "because I wasn't bleeding fast enough." He stated he left the apartment, "because I thought it wasn't real." The defendant indicated walking home and on the way home passed by the Trinity Church and saw the sign "Now that you've seen the movie, read the book," and believed this was talking about his life and this was a game show. It was at this point he reportedly realized what he had actually done.

He then went to his house, took the hearts out of his pocket, put them into a Wal-mart bag, and placed them in a trash can in the house. He did not destroy the hearts because he heard a voice tell him not to.

He then walked over to his father's trailer and called Ms. Laura Thomas' parents and left a message saying he needed help. He went back to his house and saw Isaiah and Carmen there and at this point the defendant remembered crying and saying he had killed his son. The defendant, Isaiah, and Carmen then went to a friend's house, Brandon, in order to obtain a ride to the police station. The defendant recalled he and Carmen went to Raquel's (a next-door neighbor) and she gave them a ride to the police station, which is where he turned himself in. He stated his reasoning as, "I was thinking I had to turn myself in because of what I had done." The defendant recalled smoking marijuana following the incident.

*During and After the Incident, Per Defendant's Report From Interview on 11-15-2004:*
During the interview on November 15, 2004, the defendant indicated he woke up on the morning of March 27, 2004, at approximately 6:00 a.m. He recalled hearing a voice in his head indicating, "use three different knives be sure not to cross-contaminate the blood, the demons may have worked out a blood-contract." He thought this voice was God and he assumed he needed to die. He walked over to the apartment, which took about 20 to 25 minutes and he was hearing voices several times going through his head. He recalled taking the road alongside of Big Lots, taking the bridge over to Taylor and then from Taylor to McGee, which is where he saw Mr. Bryant Hughes. He stayed on McGee through the woods and then he arrived at the apartment. He recalled knocking on the door first and then he

17808

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

kicked in the door. He kept hearing voices the entire time he was walking. He recalled being in the apartment approximately 15 minutes. He remembered the alarm going off and a phone call from Mr. Paul Boren's answering machine saying "Laura pick up the phone." He remembered hearing the message right after he stabbed Laura. — *[handwritten: delusion]* *[handwritten: didn't even stabbed kids; himself; laid down]*

He recalled leaving the scene and thinking he was not bleeding fast enough and recalled the alarm going off. He noted after the incident in question he walked back to his trailer, took the hearts out of his pocket and put them in a Wal-mart bag because of the bleeding in his pocket from the hearts. He then recalled thinking about what he had done, "I started crying, freaking out." He changed his shirt because of the blood, he was not sure if he changed his pants. He walked back to his father's house in order to call Paul and Sherry Boren, because he was thinking about what he had done and he needed help. He left a message and recalled crying "pretty bad." *[handwritten: delusion; Q's in; overall pain; pocket not; third pocket; Not wearing "pants"]* *[handwritten: yet calls the Boren's & took Laura's #]*

He then walked over to his trailer, which is where he saw Isaiah and Carmen. He remembered telling Isaiah that he had to turn himself in because he was thinking what he had done was wrong, "because I just killed three people."

At this point the defendant was asked what he meant by thinking what he had done was wrong and the defendant indicated that when he was walking back to his apartment he passed the church and he felt as if he had to get the hearts out of his pocket. He had intended on cutting the hearts and burning them, but then he heard the voice "don't do that to those hearts," and he believed the voices came from God. He recalled hearing this voice when he got the hearts out and put them in the bag. When asked about cutting the hearts and burning them, he indicated he may have saw this on a movie one time and related this to a way of killing the demons.

*[handwritten left margin: doesn't; think; self diagnosis; effects; met with effects]*
When asked how he looked back upon the situation he stated "I don't know;" and then stated "sometimes I think it was the drugs but I had been doing that a long time; I think I was just living too fast." After he turned himself in he recalled telling the dispatcher he had just killed three people and shortly thereafter an officer came out. Mr. Thomas also noted experiencing dejavu in terms of feeling and thinking this episode had happened before.

**Prior Mental State, January 2004 through March 26, 2004, Per Collateral Records:**
There were several persons who came into contact with Mr. Andre Thomas who report notable changes in his behavior and overall demeanor one to three months prior to the date of the incident, March 27, 2004. Mr. Danny Thomas, Andre Thomas' father, indicated approximately two months prior to March 27, 2004, he had observed the defendant with duct tape over his mouth, he appeared more confused, had lost his job, and had difficulty supporting himself. Mr. Danny Thomas mentioned the defendant was hanging out with "dope people" and was involved in drugs. Mr. Danny Thomas also recalled the defendant saying something in late January 2004 about getting out of the circle and in February began reading the Bible. Ms. Rochelle Thomas, Andre Thomas' mother, indicated she moved back in with her son, the defendant, on February 23, 2004, and noticed a difference in his overall demeanor. She indicated he put tape over his mouth and was claiming God had told him not to talk. She further indicated he was acting strange. She observed him take approximately 15 or 16 pills of Coricidin on his birthday, March 17, 2004. She remembered him stabbing

17809

AT017845

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

himself on approximately March 25, 2004, and she drove him to the Texoma Medical Center
on the morning of March 26, 2004.  She recalled the defendant walking back from the
hospital and said the hospital had refused him because he did not have insurance.

Other friends close to Mr. Andre Thomas also noticed changes in his behavior.  Billy Hester
indicated approximately three or four months before the murder he noticed Mr. Thomas
reading the Bible and taking things out of context.  He also recalled the defendant saying God
had spoken to him a couple years ago, but never mentioned what the defendant believed he
heard.  Another one of the defendant's friends, Kim Young, had met the defendant two to
two and a half months prior to March 27, 2004.  Mr. Young stated, "Andre was in left field,
basically, all the time."  He noted behaviors such as Mr. Thomas talking to his hand and the
floor and also mentioned Mr. Thomas had said several times, referring to Ms. Thomas, "I
want to kill that bitch."  When he spoke about his wife he was upset.  Mr. Young recalled the
defendant mentioned something about stabbing himself or the use of a knife to kill someone.
Mr. Young further indicated recalling the defendant dating Carmen Hayes.  Zach Young,
Kim Young's son, had met the defendant through Kimberly Baird and had talked with the
defendant a few times.  Mr. Zach Young recalled he and the defendant going to the store and
the defendant mentioning something about Laura not allowing him to meet with his son
▮▮re▮▮, and further recalled the defendant saying, "I'll just kill that bitch."  Mr. Zach
Young also recalled the defendant asking something about using a knife for a quick death.
Mr. Zach Young was with the defendant when, on March 5, 2004, the defendant visited
MHMR and informed MHMR he was thinking of ending his life and indicated his wife had
just left him.  Mr. Zach Young accompanied Mr. Andre Thomas to the hospital; however,
Mr. Thomas did not check himself in.

Other persons who had contact with Mr. Thomas provided statements.  Floyd Patterson, the
defendant's cousin, indicated the defendant had been upset with him and had accused Floyd
of sleeping with Ms. Laura Thomas a couple years ago.  Mr. Patterson recalled the defendant
referring to Andre and Laura as Romeo and Juliet, and the defendant was upset about his (the
defendant's) situation in life.  Mr. Patterson recalled an incident in February 2004 when the
defendant became upset with James (the defendant's brother) about boxers and grabbed two
knives from the kitchen and threatened James.  Mr. Patterson separated the two brothers and
was able to take the knives out of the defendant's hand.  Mr. Patterson also recalled an
incident two weeks prior to March 27, 2004, in which Mr. Thomas approached him and
asked to speak with him regarding difficulties he (the defendant) was facing at that time.  Mr.
Patterson recalled Mr. Thomas making statements about the earth being flat.  He also had
heard from the defendant's brothers that the defendant had been placing tape over his mouth.
Otherwise, Mr. Patterson was able to hold a conversation with the defendant and did not
observe any other unusual behavior.

Mr. Paul Boren also noted the defendant, approximately three to six weeks before March 27,
2004, had complained about Ms. Laura Thomas regarding not being able to see Andre Jr.  At
some point within this period, Mr. Boren facilitated the defendant speaking with his
estranged wife and the defendant may have wanted to get back with her.  The defendant
appeared upset and questioned the reason Ms. Thomas was of the opinion he was gay.  Mr.
Boren also recalled one to two months before March 27, 2004 the defendant visited their
house and made comments that appeared illogical (e.g. talking about peace and love, the

17810

AT017846

world coming to an end, read Revelations very fast, and tore up money and later stuck this money in his pocket as well as talking about being a fallen angel and needing to get his wings back.). At that time Mr. Thomas admitted to smoking weed. During the same conversation the defendant also indicated knowing about things happening before they happen. The defendant had difficulty controlling the conversation, became upset, and the Boren's asked him to leave. About one week later, the defendant again arrived at the Boren's house and again continued to indicate feeling as if he was reliving experiences. Mr. Boren apparently told Mr. Thomas that he (Mr. Boren) would take the defendant to MHMR. After Mr. Thomas left, he indicated not needing to go to MHMR and was to begin work at Logan's.

During the videotape of Bryant Hughes, Mr. Hughes noted some concern about the defendant's mental state on March 26, 2004, and also Ms. Laura Thomas had concerns about Mr. Thomas regarding his behavior around ███ re██ from previous contacts. Mr. Hughes indicated he and the defendant had heard a tape about the *ILLUMINATI*. Mr. Hughes also noted concern because the defendant had admitted to stabbing himself on March 25, 2004.

*[handwritten: Duh!]*

Information in the records was also obtained from coworkers and managers at Logan's restaurant, which is the place Mr. Thomas was employed in March 2004. Those interviewed did not report any behavior reflective of an odd or bizarre nature or the presentation or demeanor by the defendant that would bring concern of mental illness. One of his coworkers, Summer Sherman, had gone to school with the defendant in junior high school and indicated seeing the defendant on March 23, 2004 at the restaurant talking to himself and cursing, as well as mentioning something about a Ferrari. Ms. Sherman did not think much of this behavior, saying this was common within the restaurant environment.

One of the persons who had a lot of contact with Mr. Thomas in February and March of 2004 was Carmen Hayes, the woman Mr. Thomas was dating. Ms. Hayes, in a phone interview with Mr. Kerye Ashmore, Assistant County and District Attorney of Grayson County, indicated knowing the defendant since February 10, 2004. She recalled the defendant seemed "cool" and he also believed Revelations was written for him. She recalled the two of them trying Coricidin, which contains Dextromethrophan, approximately a week after they met or three weeks prior to March 27, 2004. Ms. Hayes also recalled the defendant and her using Dextromethorphan on March 25, 2004, as well as drinking alcohol. The defendant threw up eventually. She recalled the defendant stabbing himself that evening and the next day the defendant's mother drove him to the hospital. He came back and informed Ms. Hayes he did not love her and wanted to be friends.

*[handwritten: NO. my!]*

*[handwritten: No one else says that]* Ms. Hayes has also reported the defendant smoked marijuana daily during the time she was acquainted with him at a rate of four to five blunts per day.

Ms. Hayes provided a statement on March 29, 2004, and at that time indicated the incident of the self-inflicted stab wound the defendant had given himself on March 25, 2004, and that the next day the defendant broke up with her. In her statement she indicated the defendant said he wanted to be friends and further stated, "and he was like, you know, I figure if were meant to be then I would have met you before Laura."

**17811**

Ms. Hayes also recalled visiting Ms. Laura Boren and Mr. Bryant Hughes' home on March 25, 2004, so the defendant could see his son Andre Jr.  This visit was after Carmen and the defendant had taken Coricidin and the defendant was quite intoxicated.  This was apparently obvious to Ms. Thomas, who was upset with the defendant for being visibly intoxicated.  Ms. Hayes also recalled the defendant indicating he had seen God when he was at his brother's apartment (possibly the same vision he had reported to Mr. Furst) and referred to this as hearing a voice telling the defendant "that he and Laura were meant to be and if he wasn't with Laura then he wouldn't make anything out of himself his whole life."  During this interview of March 29, 2004, Ms. Hayes made a statement indicating the defendant had hard feelings toward Ms. Laura Thomas because "I believe he did against Laura because when Andre was in jail Laura slept with his brother, cousin, and best friend."

According to Carmen Hayes' journal, she and the defendant began their relationship in February 2004 and became more involved on February 27, 2004.  Very early on in her journal she described Andre as talking about the Bible and at one point states, "Andre and I talk for hours and hours…he's cool, but really fucking off his rocker- thinking that being sober = going to another dimension. Whoa."  Her journal also indicated on March 5 she broke up with Andre because Andre "told everyone that I was a guy…sex change." Ms. Hayes also noted she "tripped" the night previous, March 3, 2004, which is consistent with the date Mr. Thomas reported first using Coricidin.  Ms. Hayes wrote she attempted to speak with Mr. Thomas but he spoke about God and she was unable to get a straight answer from him.  She stated, "he thinks we're soul mates! WTF?!?."  On her note of March 5, she indicated the defendant went to a mental ward and the defendant had 20 minutes to get there (the hospital) or the cops would be called.  The defendant apparently informed the person at this facility he had used Coricidin, as Ms. Hayes wrote in her journal for March 5, 2004, "THE RETARD TOLD HER ABOUT CORI!"

Ms. Hayes' note also stated, "Andre told me that I was the personification of God and he was the devil and everyone knew what he had done to me. What issues!"

She continued to write,

> "I think it would have been best if he had turned himself in, because I truly believe he's crazy…to an extent that I didn't know before he took the Cori. I told him he was never allowed to do it again. I feel bad for him, but I put my foot down and told him I wasn't going to be with him- this was better after he came up to Sonic yesterday and begged me to forgive him for what he had done in front of customers. WHAT THE FUCK?!? He's got issues…"

On another note dated March 22, 2004, from the journal, Ms. Hayes indicated the defendant had stopped talking and she was upset because he "DIDN'T EVEN TELL ME!" Prior to this on March 15, 2004, Ms. Hayes indicated her and the defendant were together constantly and the defendant is introducing her as his girlfriend.  On this note she wrote Mr. Thomas' 21st birthday was forthcoming and they were going to get "trashed." Ms. Hayes made no mention of using Coricidin on Mr. Thomas' birthday; however, Mr. Thomas recalled using Coricidin on his birthday for the second time.  She also noted at one point on March 16 they "smoked."

17812

AT017848

Andre Lee Thomas                                            Psychological Evaluation:
Cause Nos. 051483 & 051858                    Mental State Surrounding the Offense

On another note, dated March 25, 2004, Ms. Hayes indicated her and Andre "tripped. BIG MISTAKE." She mentioned "Cori" and the two of them went to visit ███re███and "Laura was so pissed that Andre was fucked up...he's so cute!" Carmen indicated in her note she had to drive the vehicle because "he was so trashed." She also mentioned Mr. Thomas stabbed himself and she wrote in her journal "he said he was trying to kill himself...and he said he was thinking about being an angel, getting his wings, and flying..." She also noted the defendant attempted to check himself into the mental ward and upon the defendant's return from the hospital he broke up with her. On the evening on March 26, 2004, at 8:34 p.m., Ms. Hayes wrote the following "still tripping a bit just took a shower Andre's at his dad's smoking with everyone I consider to be my friend...but whatever..."

Ms. Hayes journal entry from March 27, following the incidents in question, stated: "I want to be mad at him, but I can't be because I know he didn't realize what he was doing-he didn't believe anything was real...everyone's blaming this on me...because of the cori-but Andre was all the way down..i know cause I was all the way down & I took mine later than he did."

*Mental Health Records From March 2004:* MHMR services of Texoma indicate on a dated entry of 03/05/04, Mr. Thomas complained of suicidal ideation and appeared agitated and anxious. Mr. Thomas at that time reported recently trying to overdose on pills (consistent with his report during the interview). Mr. Thomas reportedly indicated to the mental health professional he would shoot himself and complained that life was difficult to handle. He also mentioned possibly throwing himself in front of a bus if no one spoke with him at that point. Loose associations in his speech were indicated and he had difficulty answering questions directly. The defendant stated at one point "we've been here before and the same shit happened." Mr. Thomas also noted his wife had left him and he hated the sound of his own voice. Personnel at MHMR informed Mr. Thomas he had 20 minutes to arrive at the hospital; however, he did not show up according to records, and the police were informed.

Mr. Thomas also had contact with the Texoma Medical Center on March 26, 2004, after having self-inflicted a knife to his chest the night prior. On 03/26/04 Mr. Thomas expressed suicidal thoughts and a recent attempt, and there were indications that he was hallucinating. Mr. Thomas complained of depression and he was considered by a social worker and physician to be psychotic and paranoid. Mr. Thomas indicated using marijuana and alcohol occasionally and his drug results from the morning of March 26, 2004, were positive for Canabinoids. Mr. Thomas had noted attempting to cut his chest to "cross over into heaven." Mr. Thomas had also mentioned information about the holodeck, was not sure if people were real, exhibited religious thinking and preoccupations, and admitted to having these problems all of his life. TMC-ER attempted to have Mr. Thomas voluntarily placed in the behavioral health center and later involuntarily placed; however, Mr. Thomas left the facility without informing anyone of his desire to leave.

**During and After March 27, 2004, According to Collateral Records**

Regarding collateral records, there were several persons that came into contact with Mr. Thomas on the morning of March 27, 2004 and throughout the next several days. As Mr. Thomas indicated, subsequent to the murders being committed that morning, he had contact with Isaiah Gibbs, Carmen Hayes, persons at the jail, and later persons at Wilson N. Jones

17813

AT017849

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

Hospital from March 27 through March 29, 2004.  There were also persons in the jail, including nurses who came into contact with Mr. Thomas March 29, 2004, and afterwards.

*Information from witnesses directly after the incidents*:  According to Carmen Hayes, Mr. Thomas arrived at the trailer and stated, "I killed Laura, ████, and ████."  Ms. Hayes asked the defendant the reason he did this and the defendant indicated, "She was Jezebel" and also stated, "I'm reliving today."  In Ms. Hayes' statement from 5/19/04, she indicated hearing a door open at approximately 6:38 a.m. and later on that morning she came into contact with Isaiah Gibbs, who had come over.  Isaiah Gibbs and Carmen Hayes smoked some marijuana at which point the defendant entered the door.  Ms. Hayes recalled Andre stating, "You guys, the police are coming for me," and she also stated, "He started, like, just hanging his head and I was like, you know…"  Mr. Thomas also said "they're going to be here at any minute," and when asked the reason "he stated he had killed the three of them and had also stabbed himself."  The defendant exhibited the chest wound he had self-inflicted and he stated, "Carmen I need your help."  At this point Mr. Thomas was standing up against the wall and Ms. Hayes asked him if he was going to turn himself in, he stated, "Yeah, I guess."

Ms. Hayes did not see any blood on his pants or body parts, but she did see blood on his shirt.  Ms. Hayes also recalled Isaiah, Andre, and herself, walking over to Andre's friend Brandon's house in order to get a ride to the police station.  When the defendant parted with Isaiah Gibbs he said that he would not see him for a long time.  No car was available so Andre and Carmen walked to Raquel's, a next-door neighbor, who drove the three of them to the police station.  Carmen is the one who asked for the ride and Mr. Thomas leaned up against the trailer, and on the way over to the police station sat in the back seat and had his Bible on hand.  Ms. Hayes did not mention he was reading the Bible.  Ms. Hayes remembered at the police station Mr. Thomas told her "I love you."  Ms. Hayes also recalled Mr. Thomas saying he went over to Ms. Laura Thomas' house to ask for her forgiveness and at some point that morning he also stated today was one of those days he was reliving.

Upon the defendant being placed at the police station to turn himself in, the dispatcher, Cindy Carr, indicated he approached the window and said he wanted to turn himself in because he had killed his wife.  He apparently answered questions appropriately and further indicated he went over to the apartments and kicked in a door, stabbed his wife and ripped out her heart and did the same with his son and her daughter.  He also stated the knife was at his trailer.  He indicated he needed help.  Ms. Carr noted the conversation with him took about five to six minutes.  Officer Chuck Malden was the first officer to have contact with the defendant.  The officer frisked the defendant and arrested him, and the defendant asked, "Will I be forgiven?"  Detective Bryce Smith also had contact with the defendant in the lobby of the police department and noted the defendant was mumbling something and the detective informed him not to say anything.  The defendant had blood on his shirt and indicated he had self-inflicted a wound to his chest by knife.

The defendant was subsequently transferred to the WNJ Hospital where he underwent surgery.  Nurses, doctors, and anesthesiologists all indicated Mr. Thomas was able to answer questions appropriately and no significant abnormalities in his mental state were noted; with the exception of one of the nurses noting at 11:30 on the evening of March 27, 2004 the patient was reading the book of Revelations at a rapid pace to the extent that his heart rate

*(handwritten margin note): Nothing about me! "want me"*

17814

AT017850

Andre Lee Thomas
Cause Nos. 051483 & 051858

Psychological Evaluation:
Mental State Surrounding the Offense

was elevated. At 11:50 on the same evening he was resting with his eyes closed. It appears he may have read the Bible for approximately one hour and was given sedatives to help him rest. An RN, Sheryl Dagenais, had contact with the defendant on March 27 and March 28, 2004. The defendant appeared groggy. In one of these contacts Ms. Dagenais stated to the defendant, "Well Andre, you have to admit what you did was very brutal. Why did you do that?" And he said, "Because my wife would not give me a divorce." Mr. Thomas had also indicated two previous encounters with mental health professionals, with the first being for depression in which he got scared and left and the second time was when he stabbed himself on 3/26/04, and he also was scared and left. No delusional ideation was indicated, and he did not appear to be rambling or thinking off topic with Ms. Dagenais.

*[handwritten margin note: same guy that had to get back together 3-6 wks before?]*

J.B. Blakenship, a Sergeant with the Grayson County Police Department, attempted to gather a statement from the defendant while he was in the hospital on March 29, 2004; however, when Sergeant Blakenship began reading the defendant his rights, the defendant indicated he did not wish to speak or provide a statement. Sergeant Blakenship attempted to take a statement from the defendant but the defendant questioned if he should have a lawyer present. At this point Sergeant Blakenship indicated to the defendant he had said the magic words and a statement could not be obtained at that time. Subsequent to this occurrence, the defendant indicated he wished to provide a statement and eventually this was orchestrated.

**Defendants Statements on March 29, 2004 and March 30, 2004:**
On March 29, 2004 Detective Ditto read Mr. Thomas his rights and Mr. Thomas acknowledged these rights and indicated he had understood his Miranda Rights earlier. At the beginning of this interview, Mr. Thomas said he was not sure what was happening to him and what was happening in the world, stating, "I don't understand any of this. I don't understand..." He acknowledged the reason he was in jail, as he stated, "Because I, uh, I killed my wife and my son and her um, her daughter," and he stated he did this "Because I thought it was the word of God. Because I thought that God wanted me to do it." Detective Ditto also obtained information regarding Mr. Thomas' work history, as well as his living situation. Mr. Thomas expressed on multiple occasions he was not sure what was going on and did not understand the current situation.

At one point Detective Ditto asked Mr. Thomas this question, "For instance, you knew it wasn't right to go out there and do what you did at the apartment; right?" Mr. Thomas answered "Right, but I felt like it was what God wanted me to do. That's what he told me to do." Mr. Thomas further stated God had told him to do this behavior and "I felt like he was, uh, he wanted me to use a different knife on each one of 'em and not to cross-contaminate their blood, um..." Mr. Thomas further stated he heard the voice from within him, "from within side of me." He further stated he felt like his wife was evil and was "Jezebel," his son was the antichrist, and his wife's daughter was evil. Mr. Thomas referenced reading in Revelations and spoke of the dollar bill having a pyramid on the back reflecting an evil eye.

*[handwritten margin note: What key? Not found anywhere!]*

Upon questioning the defendant indicated he had carried the knives with him in a bag. At this point Mr. Thomas stated he did not wish to talk about the morning of March 27 because, "I'm not proud of what I did," and further stated "I didn't want to do that regardless. I didn't want to do it." Mr. Thomas then stated he thought, "God wanted me to do it."

**17815**

AT017851

Andre Lee Thomas                                           Psychological Evaluation:
Cause Nos. 051483 & 051858                       Mental State Surrounding the Offense

The defendant, in response to whether his behavior was wrong stated, "I wasn't on my mind whether it was right or wrong. I don't like to talk about it because I cared about Laura. That was my friend. She's my friend. I didn't want to hurt her. What's happening?" The defendant acknowledged returning from Ms. Laura Thomas' apartment to his house where he met with Carmen Hayes and stated, "I told Carmen I was going to turn myself in." The defendant also stated, " I wanted to die for my sins." Mr. Thomas ended the interview, stating he did not wish to speak anymore.

Later that day, Mr. Thomas informed Jail Nurse Natalie Sims he wished to speak with Mr. Ditto again and therefore another interview was conducted on the morning of March 30, 2004. At the beginning of this interview, Mr. Ditto reread Miranda Rights to Mr. Thomas and Mr. Thomas provided information about the incident. Mr. Thomas indicated the evening prior to March 27, 2004, he had visited Mr. Bryant Hughes and Ms. Laura Thomas and had listened to tapes about a pyramid, secret mantra, enslaving people, a conspiracy, and a God clan, and that there was a pact "They were either all rise together or all fall together." Mr. Thomas further noted having dreams similar to this, and he had related it all and figured that "My wife was Jezebel and, uh, I had to kill her and my son was the antichrist and that uh, my little, uh, their little girl was involved with it also." Mr. Thomas also indicated on the morning of March 27, 2004, he went into Ms. Thomas' apartment and killed her, their son, and her daughter. He acknowledged bringing duct tape with him in case he needed to tie someone up, but this material was ultimately not needed.

After the murders he stated that he left,

*"I started panicking. I was like 'Oh shit,' and the alarms were going off and then I heard, I heard her dad's voice, on the answering machine and said, 'Laura, Laura, pick up the phone,' like that and he said...I think I heard him say 'Oh shit,' over the tape recorder, and, uh, you know, alarms were going off..." "So I tried to stab myself again and I was like, 'Damn' and it didn't hurt, after about the second time, it didn't even hurt..."*

The defendant acknowledged when he left the apartment he had blood on his overalls and pants and he began walking around Fair View Park and thought it strange that persons who were jogging did not notice him. He further stated, "I mean I must have looked crazy, you know, I had that wild ass look in my eye, man, and I crossed over to Fair View Park and I walked right by some people on the Fair View Park trail..." Mr. Thomas further stated when he walked past K-Mart he heard sirens that sounded like the fire department, ambulance, and police cars, and he eventually walked past the Trinity Baptist Church and he had on his mind to throw the hearts away "Something's telling me just throw 'em in the bushes and I's like nah, I'm not that heartless...I keep their hearts with me in my pocket and anyway...I went to the house and I went and I got a Wal-Mart sack and put the hearts into the Wal-Mart sack and put the hearts in the trash." Mr. Thomas indicated he changed clothes and got into his camouflage pants and camouflage shirt and went to his father's house and called Ms. Laura Thomas' parents and he (the defendant) did not believe what had happened. He went back to his house and saw Carmen and Isaiah and told them he had just killed his son and Ms. Thomas, and her daughter because, "That's what God wanted me to do." He also said he had stabbed himself.

*[handwritten margin note, left:]* Not even to lose Not ej Heard were just like alarms

*[handwritten margin note, right:]* If Laura also looked his wasn't to call her

17816

AT017852

On March 30, 2004, Mr. Thomas was able to speak about the incident in question as well as his thought process the night before and the day of the incident in terms of thinking of Revelations, the pyramid, the government being after him, and had decided the night before that he was going to kill them. He spoke of these beliefs or delusions in the past tense and was able to give a rather coherent story of his thinking and behavior.

Mr. Thomas acknowledged seeing a sign (at the Trinity Baptist Church) indicating "Now that you've seen the movie, read the book." When he was in the hospital on the evening of March 27, 2004 he was reading Revelations, chapters 7 and 22 and the nurse was checking his heartbeat and he took this to mean the nurse was trying to mess with him when he was reading and he "assaulted Chris with breaking the evil spell." The defendant indicated Ms. Laura Thomas had cheated on him because technically they were still married though they had been separated since January 27, 2001. Moreover, the defendant reported she had cheated on him with his brother and cousin, but he did not want to harm her "But I thought that's what God had called me to do," and "I'm obedient to God, regardless." When asked if he thought his behavior on Saturday morning was right or wrong, Mr. Thomas stated, "I don't know. I don't know...I don't know because I don't know where I am anymore." Mr. Thomas related he was not sure where his mind was. Mr. Thomas further stated, "I just want to say that I'm sorry for what I did."

*Comments from Natalie Sims, Grayson County Jail Chief Nurse and Nurse Notes:* Ms. Sims had significant contact with the defendant and had known him in previous years when the defendant was in jail. She had direct contact with the defendant on March 29, and has continued to provide care for him. She recalled on March 29 2004, he was soft spoken, appeared lethargic and sleepy which she related was probably a result of the Darvocex, a prescription pain pill, was oriented and understood his surroundings, denied hearing voices, and indicated suicidal history as well as feeling depressed and appearing hopeless and apathetic. Nurse Sims recalled on the evening of March 29, 2004, Mr. Thomas indicated a desire to speak with Detective Mike Ditto and on the morning of March 30, 2004, Ms. Sims was present during the statement the defendant provided to Mr. Ditto. Subsequent to the statement on March 30, Ms. Sims noted the defendant's behavior changed at approximately 4:00 or 5:00 p.m. that day and the defendant appeared to be talking in a nonsensical manner with apparent delusional ideation, increased pressure, and appeared to be calmer approximately 15 minutes later. Ms. Sims recalled the defendant asked to speak with Dr. McGirk without the presence of officers and he appeared to understand what was going on at that time. Ms. Sims also noted when the defendant was with Dr. McGirk he was less coherent, made comments he believed his son was the antichrist, his estranged wife was Jezebel, and he appeared to have increased religiosity in the content of his speech. Apart from talking about the religion he appeared calm and was redirectable.

On 3/31/04 Mr. Thomas had made a statement that he was a marine and that he was going to save man from evil. On March 31, 2004, at 12:37 p.m., the defendant was banging on the window and screaming and indicated he acted out because he did not want breathing treatment. Subsequent to this behavior, Dr. McGirk was contacted again for an evaluation regarding the defendant's treatment. Dr. McGirk saw the defendant at approximately 7:00 p.m., March 31. On April 1, no significant behavior was noticed, but on April 2, 7:25 p.m.

17817

the defendant removed his right eyeball after reading a certain verse in the Bible and later asked if he had done this behavior for nothing.

C. Robin McGirk, Ph.D., Psychological Evaluation from March 30, March 31, April 9, and April 15, 2004. Dr. McGirk, a licensed psychologist, noted the defendant was exhibiting paranoid and grandiose delusions, tangential speech, and bizarre content in his thoughts, as well as his mood ranged from normal to agitated and irritable. Dr. McGirk noted at the onset of the interview the defendant asked to speak with the psychologist without the officers present for a higher degree of privacy. Dr. McGirk noted the defendant asked whether or not he would get the death penalty and spoke about the events that occurred on March 27, and his belief that his son was the antichrist and other indications of religious significance. The defendant also admitted to having smoked a blunt after the time of the events. Early in this meeting the defendant asked specifically if he "would get the death penalty."

Regarding the defendant's expression of thought, Dr. McGirk stated, "Thoughts were generally well-organized although irrationally designed and related to overly elaborate interpretations of the behavior of others." Dr. McGirk further noted the defendant was better able to attend to the conversation on the first and third encounters than the second interview. Based on information available to Dr. McGirk at the time of the interview, a provisional diagnosis of Paranoid Schizophrenia with Acute Exacerbation of Symptoms was noted as well as a Rule Out of a Substance Induced Psychotic Reaction and a deferment on Axis II. On an April 9, 2004 note, Dr. McGirk noted a belief by the defendant that his wife and his children were still alive. During Dr. McGirk's contact with the defendant on April 15, 2004, the defendant was under the impression that he needed to pay close attention "to everything that was going on in order to be able to pass whatever kind of test this is," adding that he thought he had already done enough but would "continue to monitor events so that he could fulfill whatever great purpose was intended for him." As a result of Mr. Thomas' behavior and recommendations on behalf of Dr. McGirk, a physician eventually prescribed Mr. Thomas antipsychotic medications.

## V. MENTAL STATE SUBSEQUENT TO APRIL 15, 2004

As a result of Mr. Thomas' behavior in jail and questionable mental state with regard to his ability to relate to others rationally, the issue of Competency to Stand Trial was brought forth by Mr. Thomas' attorney, Mr. R.J. Hagood.

James R. Harrison, Ph.D., a licensed psychologist, performed a competency evaluation in which he interviewed Mr. Thomas on four occasions between April 5 and April 14, 2004. Dr. Harrison indicated presence of grandiose and paranoid delusions and possible auditory hallucinations. Dr. Harrison also indicated that at times Mr. Thomas was able to provide sequential and coherent descriptions of events and at other times had difficulty explaining himself due to increased psychomotor speed and driven expression of delusional beliefs.

Dr. Harrison was of the opinion that Mr. Thomas exhibited psychotic thought processes that included, in addition to the delusions, strong ideas of reference, some loose associations outside of these delusions and tangentiality as well as derailment in which Mr. Thomas would speak off topic. Dr. Harrison also indicated the beliefs that Mr. Thomas held were

17818

AT017854

delusional in nature in regard to the pyramid and enslaved people; thoughts about his estranged wife being Jezebel as well as their son being the antichrist and her daughter being involved; not believing that he was capable of dying; his girlfriend Carmen was associated with the devil; he was experiencing dejavu symptoms; and he was of the opinion that Dr. McGirk had given him an assignment to observe activities in the jail. Presumptive diagnosis included Schizophreniform Disorder and a Rule Out of Substance Induced Psychotic Disorder, based upon the information available to him at the time. Dr. Harrison was also of the opinion Mr. Thomas understood the adversarial process of court; however, he had difficulty engaging in reason choice of choosing legal strategies and options and therefore should be considered Incompetent to Stand Trial.

Peter P. Oropeza, Psy.D., licensed psychologist, also performed an evaluation to assess Mr. Thomas' competency to stand trial and did these evaluations between April 26, 2004 and May 7, 2004. Mr. Thomas exhibited symptoms that included disorganized speech, erratic and bizarre behavior, mood problems and depression, possible continued delusional ideation (e.g. aliens, picture of wing girlfriend who may beat him up, thoughts that jailers are laughing at him) and possible auditory hallucinations. Mr. Thomas had difficulties speaking in a manner that made sense in terms of working with his attorney or others, and complicating his situation was his recent ingestion of drugs as well as Coricidin. Based on information available and reviewed at that time, it was not clear if his presentation was a result of abuse of substances. There was also concern Mr. Thomas may have been pressing an agenda, and therefore, a recommendation was given he be considered incompetent to stand trial and he be transferred to an inpatient facility for treatment and ongoing evaluation.

While at North Texas State Hospital in Vernon, Mr. Thomas was treated by Joseph Black, MD, Chief Psychiatrist, Competency Program. Admission to this facility was on June 23, 2004, and Dr. Black wrote a letter indicating Mr. Thomas was competent to stand trial on July 27, 2004. On Dr. Black's indicated Mr. Thomas provided many "I don't know," responses and was not cooperative and there was no evidence of auditory or visual hallucinations at the time. Zyprexa, another antipsychotic was used for treatment. Diagnoses on discharge included substance induced psychosis with delusions and hallucinations, polysubstance dependence, and malingering, based on available information.

Dr. Thomas Gray, Ph.D., is a Clinical Psychologist on the competency program at NTSH-Vernon, and performed an evaluation of Mr. Thomas to assess his ability to stand trial on 7/22/04. Dr. Gray essentially indicated Mr. Thomas was competent to stand trial and that there was indication from testing, records, and observations by others while Mr. Thomas was at the hospital that he appeared to be exaggerating symptoms and it is difficult to ascertain the degree to which psychotic symptoms were present. On the other hand, he had been treated with an antipsychotic medication and had shown current stabilization within a therapeutic environment.

# VI. SUMMARY

The defendant, Mr. Andre Lee Thomas, is a 21-year-old, African-American male, is currently standing trial for the charge of Capital Murder in the deaths of Laura Thomas (his estranged

**17819**

AT017855

wife), his son ▮▮re▮, and ▮▮▮▮▮▮▮Ms. Thomas and Mr. Bryant Hughes' daughter). This event occurred on the morning of March 27, 2004.

Mr. Thomas grew up in a relatively poor socioeconomic environment in the Sherman, Texas area and was predominantly reared by his mother. He has five brothers in total, one of whom has reportedly been treated for a mental illness. Moreover, his father has abused alcohol for a number of years and at least one of his brothers has also smoked marijuana.

Mr. Thomas did well in academics when he was in grade school and there are several reports in his record that he is quite intelligent. He began to exhibit difficulty in school when he started drinking and using marijuana as well as experimenting with other drugs. He also began to have entanglements with the legal system on multiple occasions including curfew violations, truancy from school, criminal mischief and theft, and was eventually placed on probation. He had to repeat the seventh grade due to significant truancy. He did not accept responsibility on multiple occasions when arrested and did not complete conditions of his probation due to uncooperativeness. He was eventually on the verge of being placed in boot camp upon recommendation from his Probation Officer.

During the summer of 1999, the defendant was being considered for placement in boot camp and following a suicide gesture was evaluated by a couple of mental health counselors: Mr. Rodney Hough, M.Ed., L.P.C., and Mr. Brent O'Bannon, M.B.S., L.P.C. Mr. Hough was of the opinion the defendant was malingering and his suicide attempt was a manipulative effort to avoid further incarceration as mentioned in Section III of this report under Legal History. Subsequent to this evaluation, Mr. O'Bannon evaluated Mr. Thomas and provided a diagnosis of Alcohol Abuse, Conduct Disorder, and Psychotic Disorder Not Otherwise Specified, and noted the defendant held a victim mentality.

During his adolescent years, Mr. Thomas met and began dating Laura Boren and eventually she gave birth to ▮▮re▮ in 1999, and they married on March 17, 2001. Their marriage was quickly marked with discord and the two separated. They attempted to reengage their relationship in early 2002; however, Mr. Thomas was placed in jail for an assault to an individual he believed was having a relationship with his wife. While in jail, Mr. Thomas believed his wife had slept with his brother and cousin. According to persons who knew the defendant, he continued to talk about his wife with anger regarding the way he felt she treated him and had difficulty dealing with this over a number of years.

Eventually, Laura met Bryant Hughes and the two of them had a daughter, ▮▮▮▮▮▮▮. Mr. Thomas would occasionally go over to their residence to visit his son.

In 2002 and 2003, Mr. Thomas was placed in jail. Both times he made references to having suicidal ideation or having aggressive thoughts toward others and was therefore placed on suicide watch. In 2002, Mr. Thomas related that subsequent to having drunk a large amount of alcohol, he had a dream-like experience in which he saw a vision of God, ultimately believing he was to work things out with Laura.

Mr. Thomas has held a number of jobs usually washing dishes or working some kind of manual labor. Per his report, he has usually discontinued his job on his own accord;

17820

Andre Lee Thomas                                             Psychological Evaluation:
Cause Nos. 051483 & 051858                          Mental State Surrounding the Offense

however, he was fired on one occasion for being drunk on the job, on another occasion for
taking Codeine with the manager and becoming ill, and on another occasion for arriving late
to work multiple times. He was abusing marijuana daily toward the end of this last job. *Jan 2004*

Multiple observers, including his family and friends, have indicated Mr. Thomas began to
show a difference in his behavior sometime in January, and more prominently in February
and March 2004. Mr. Thomas himself noted he began heavily smoking marijuana in 2003
and daily at the beginning of January 2004 approximately two to three blunts (small cigars
without tobacco and filled with marijuana) or at least one-quarter ounce every other day. He
was also drinking alcohol. In February 2004, he met Carmen Hayes and began a relationship
with her. She reported the defendant smoking four to five blunts daily. Approximately
March 3 or March 4, 2004, Mr. Thomas was introduced to Coricidin. This substance
includes the ingredient dextromethorphan, and in high doses can have psychedelic effects,
according to the defendant. He took Coricidin for the purpose of obtaining a "high." On
March 5, subsequent to smoking marijuana, drinking alcohol, and using Coricidin, he
attempted to gain help from MHMR services and claimed his wife had just recently left him
and he was wishing to end his life. There is also indication from the records he placed a call
to Laura and asked for her to give their relationship another attempt.

At some point before March 2004, Ms. Laura Thomas became concerned about ▓▓▓▓▓'s
comments about sleeping in bed with his father and another male. Ms. Thomas and Mr.
Bryant Hughes concluded that the defendant could see his son if they (Ms. Thomas and Mr.
Hughes) were both present.

Mr. Thomas continued to smoke marijuana daily, drink alcohol frequently, and used
Coricidin for the second time on his birthday, March 17, 2004. Toward the end of February
and early March it was indicated that Mr. Thomas was placing tape over his mouth because
he believed God did not want him to talk. It is written in Carmen Hayes' journal that Mr.
Thomas made statements indicating he believed he was the devil and there is mention of the
word Jezebel. Mr. Thomas indicated in March he believed he heard voices, but not the
command auditory type, indicating he was not obeying these voices *per se*. He was reading
Revelations frequently in late January, February, and March 2004. The third time he used
Coricidin was on March 25, 2004, and later that night he stabbed himself in the chest.

The next morning, March 26, 2004, he was taken to the Texoma Medical Center by his
mother and records from TMC indicate Mr. Thomas was exhibiting delusions and was at risk
of harming himself and he was to be involuntarily admitted; however, he left the hospital
against medical advice, and walked home and claimed the hospital would not admit him
because he did not have medical insurance. Upon arrival back to his house, he broke up with
Carmen Hayes because he mentioned to her that if they were meant to be together he would
have met Ms. Hayes before he met Ms. Laura Thomas.

Notes from Ms. Hayes' diary on the evening of March 26, 2004 indicate she was coming
down from a high from the night before. There are also notes from that evening on March 26
that Mr. Thomas was smoking (presumably marijuana) at that time.

**17821**

AT017857

Also, Bryant Hughes and Andre Thomas agreed that on the evening of Friday, March 26, 2004, they were listening to an audiotape of a group of people called the *ILLUMANTI*. Mr. Thomas believed people were being enslaved. Mr. Thomas indicated on that evening he began to believe Ms. Laura Thomas was the Jezebel, his son was the antichrist (because he was diverting attention away from Andre listening to the tape), and Ms. Thomas' daughter, ████, was involved as well. Ms. Thomas indicated during this evaluation that he thought he was a fallen angel and that God wanted him to kill Ms. Thomas, ████, and ████, and assimilated this belief with information he had obtained from the Bible and Revelations as well as the audiotape of people being enslaved.

On the morning of March 27, 2004, Mr. Thomas carried knives and walked over to his estranged Laura's apartment, broke in the door, and killed Laura, ████, and ████ with three different knives (so that he would not "cross-contaminate the blood"). He then ripped their hearts out with intent to cut up and burn them as part of his plan as directed from God, per his report.

After the alarm went off in the apartment, Mr. Thomas indicates he was scared and also heard Mr. Paul Boren's message on the answering machine and left the apartment, after stabbing himself in the chest as well. Upon hearing sirens and walking in front of the Trinity church he began to realize what he had done, per his report. Upon arriving back to his trailer he changed into camouflage clothes and went to his father's house and placed a phone call to Paul Boren indicating a need for help. He met with Isaiah Gibbs and Carmen Hayes, and indicated to them the police were coming after him. He informed the two of them what he had done and was complaining of dejavu experiences. He also expressed a desire to turn himself in and upon doing so asked one of the officers if he was to be forgiven. On March 29 and March 30, 2004, Mr. Thomas provided a statement to officers after waiving his Miranda Rights and spoke about his thought processes with regard to the events that occurred on March 27, 2004. C. Robin McGirk, Ph.D., a licensed psychologist, met with the defendant between March 30, 2004 and April 15, 2004, noting the defendant plucked his eyeball from its socket on April 2, 2004, was exhibiting psychotic behavior, and required mental health treatment.

## VII.  CONCLUSIONS

As an older child and adolescent, Mr. Thomas exhibited behavior problems such as multiple entanglements with the law, truancy from school, abuse of drugs, and an unwillingness to abide by conditions of his probation. Prior to 2004, Mr. Thomas had not been formally treated for a psychiatric disorder, although, he had been noted to be malingering a suicide attempt and was diagnosed with Alcohol Dependence; Conduct Disorder, and Psychotic Disorder, Not Otherwise Specified. The occasions he had contact with mental health professionals before 2004 was during periods of incarceration, and at least one of these was viewed as an effort to avoid more penalties. There are indications from multiple sources that he was angry with Laura about the separation and had difficulty emotionally moving forward with his life.

Mr. Thomas admitted he has smoked marijuana daily for several months prior to March 27, 2004, and this was in the form of two to three blunts (small cigars filled with marijuana) a

**17822**

Andre Lee Thomas                                      Psychological Evaluation:
Cause Nos. 051483 & 051858                    Mental State Surrounding the Offense

day, and possibly four to five blunts per day.  He was also drinking alcohol as well as used
Coricidin on at least three occasions (approximately March 4, March 17, and March 25).  He
indicated the use of Coricidin was to obtain a "high," or a euphoric state.  His significant use
of substances appears to have at the very least contributed, and probably even caused,
deterioration in his mental state to the extent he was behaving in a different way from his
previous functioning in 2003, as well as at any other point in his life.  It is apparent that Mr.
Thomas has not been observed to show such significant deterioration without drugs.

Subsequent to ingestion of drugs he exhibited symptoms of a mental disorder.  In particular
he reportedly was responding to a falsely held belief system, or a delusion, beginning
sometime in late January or early February and continuing through March 2004.  These
indicators are as follows:

- He put tape over his mouth and attempted to go a day without speaking several times
  in February and March.
- He was observed reading the Bible more often and talked about religious themes at
  times for long periods.
- He sought assistance from MHMR on March 5, 2004, and again on the morning of
  March 26, 2004 went to the hospital after having stabbed himself in the chest.
- He claimed to be misperceiving messages and believing these were codes.
- He claimed dejavu experiences.
- He claimed to have heard voices.
- He reported believing his wife was Jezebel, their son was the antichrist, and her
  daughter was involved.
- He appeared to have deteriorated in jail to the extent he plucked his eyeball from its
  socket on April 2, 2004.

Moreover with regard to the dates of March 27, 2004, there are a number of indicators
reflecting his knowledge of the wrongfulness of his behavior, such as the following:

- Despite Mr. Thomas claiming his belief Mr. Bryant Hughes was in danger and Mr.
  Hughes knew of this *Illumaniti* conspiracy, the defendant never spoke about this with
  Mr. Hughes and went to his estranged wife's apartment without Mr. Hughes present.
  (If Mr. Hughes were in real danger then why not confront him the previous evening
  rather than allow him to sleep overnight under imminent danger?)
- He left the scene after hearing the apartment alarm as well as hearing Mr. Boren on
  the answering machine.
- He admits to beginning to understand what he had done several minutes afterward.
- He told others the police were coming after him.
- He aborts his original plan to cut and burn the hearts…claiming God tells him not to
  do so and he was not that cold blooded.
- He changed clothes.
- He turned himself in.
- He asked the police officer if he was to be forgiven.

As mentioned previously in the report, Mr. Thomas continues to endorse symptoms on
psychological testing of unusual perceptions, magical thinking, and difficulty with

**17823**

AT017859

concentrating.  Likewise, information from the interview, records, and psychological testing indicates alcohol and drug problems, as well as a tendency to over-endorse or to exaggerate symptoms.  There is also information from his history as an adolescent and adult he has a pervasive pattern of antisocial behavior and an unwillingness to accept responsibility.  Upon direct questioning during this evaluation, he denied psychotic symptoms at present and none were evident.

Diagnostic impressions, according to the Diagnostic and Statistical Manual IV-TR, are as follows:

Axis I:       History of Polysubstance Dependence _which substance_
              History of Substance Induced Psychosis with delusions and hallucinations
              Depressive Disorder Not Otherwise Specified
              Malingering — _do-it treat w/ max dosage of anti-psychotic Rx!_

Axis II:      Antisocial Personality Disorder

Conclusions from this evaluation are based on review of voluminous records, interviews with collateral sources, and information obtained via testing and report from the defendant.  In my professional opinion and with reasonable certainty, information obtained from this evaluation indicates that Mr. Andre Thomas exhibited psychotic symptoms during the month of March 2004 in the form of religious and grandiose delusions as well as bizarre behavior while voluntarily ingesting a heavy dose of marijuana and alcohol over several months, and using Coricidin to obtain a euphoric state.

In sum, symptoms the defendant reports and the bizarre behavior observed by others were not apparent independent of ingesting drugs.  Moreover, his actions and verbalizations indicate an understanding of the wrongfulness of his behavior on March 27, 2004.

RESPECTFULLY SUBMITTED,


Peter P. Oropeza, Psy.D
Licensed Psychologist


**17824**

AT017860

# Exhibit 167

**E-mail chain between Shelli Shade and John Niland regarding Larry Fitzgerald and Kate Allen**

**Vincent, Joni**

| | |
|---|---|
| **From:** | John Niland [jniland@texasdefender.org] |
| **Sent:** | Monday, February 07, 2005 3:13 PM |
| **To:** | Shelli Schade |
| **Subject:** | Re: Trial starting |

I will call Fitzgerald and I think Kate Allen would be good on the other issues.  I will contact her as well.

----- Original Message -----
From: Shelli Schade
To: John Niland
Sent: Monday, February 07, 2005 1:59 PM
Subject: Re: Trial starting

You are too kind...... Yes it was my 21st birthday again.

The mitigation issues that I will be presenting to Bobbie and RJ are:

-Institutional failure on Andre
-Abuse and neglect issues from family to Andre
-Absence of father/positive male role model
-Poverty
-Dysfunctional family systems
-Mental Illness

to name a few.. Bobbie said that Larry Fitzgerald may be able to help us (if we get to the penalty phase).

Thanks-
Shelli

Oh, by the way. Did you happen to read about the case I was originally asked to work on with Hugh Lucas and Paul Brauchle (James Singleton, killed his adopted parents with sword)? Apparently the trial started last Tuesday and ended Thursday with a guilty verdict. Short trial huh? It never ends......

----- Original Message -----
From: John Niland
To: Shelli Schade
Sent: Monday, February 07, 2005 1:38 PM
Subject: Re: Trial starting

I think that we might just keep notes and load up the state habeas lawyer with affidavits.  I would like to discuss with you who we need to explain the mitigation evidence.  What will be the mitigation issues?

Happy B-day--you look younger and younger all of the time in spite of new B-days.   How do you do that?

----- Original Message -----
From: Shelli Schade
To: John Niland
Sent: Monday, February 07, 2005 1:28 PM

5/14/2007

**Subject:** Re: Trial starting

John,

Sorry for the delay, yesterday was the big B-day so I decided to take the day off from the computer....

I totally respect your opinion and agree with your rationale. Whatever you think I should do, just let me know and I'll do it. I do know that Nona was very disappointed , not only with RJ but with the judge's behavior.

I can't believe the judge was "going" to start the trial on Valentine's Day... That would have been great huh?

Shelli

---- Original Message ----
**From:** John Niland
**To:** Shelli Schade
**Sent:** Sunday, February 06, 2005 12:39 PM
**Subject:** Re: Trial starting

Bobbie would be able to appreciate the impact of her presenting the affidavit, although I think it would be a real boost for her.  Bad practice does not happen in a vacuum and I am sure that all lawyers know of R.J.'s inabilities.

Certainly your affidavit would be helpful, however, the 1st question would be "What qualifications do you have to critique the efforts of a lawyer?"  Of course, it sounds his inadequacies are apparent to everyone and your mitigation experience has exposed you to a number of different lawyers.   >From that standpoint, your affidavit could be very valuable.

How about if I prepared an affidavit?  I could look at a transcript of his voir dire, set out what Carlos and I did in training and recite how he failed to do any of it.  Perhaps get one from Nona Dotson who I understand left in disgust.

I like R.J. very much, but itsounds like it is time for a "come to Jesus" discussion with him about this and future cases.

Let me know what you think.

John

---- Original Message ----
**From:** Shelli Schade
**To:** John Niland
**Sent:** Saturday, February 05, 2005 4:09 PM
**Subject:** Trial starting

John,,
All jurors are picked and the judge has said trial starts the 15th (yikes). Anyway, Bobbie talked with me about doing the affidavit on RJ and of course she feels that it would professional suicide for her. How do feel about me doing the affidavit.....

I'll be home most of the week preparing for trial-

Shelli

Forensic Social Work Consultants
Shelli S. Schade, CSMS, LMSW, DAPA
Certified Sentence Mitigation Specialist
P.O. Box 850069
Mesquite, Texas 75185-0069
(972) 288-8108
(214) 354-8145 cellular
(972) 692-6826 fax
shellischade@mindspring.com

# Exhibit 168

**E-mail chain between Kate Allen and Bobbie Peterson regarding testifying for trial**

Subj:   **RE: forensic fees and resume for Thomas case**
Date:   2/21/2005 12:38:12 P.M. Central Standard Time
From:   bobbie.peterson@4ladyjustice.com
To:     KAllen1818@aol.com

Hello Kate:

Thank you for the info.  Would you mind contacting Shelli Schade, our mitigation specialist?  She is
working on everything you will need.  Her cell number is 214-354-8145 and her email address is
shellischade@mindspring.com.  Unfortunately right now I am unable to specify either the 4th or the
7th.  I should have a better idea tomorrow.  I will let you know ASAP.  Thank you again for all of your
help.

Bobbie J. Peterson

-----Original Message-----
From: KAllen1818@aol.com [mailto:KAllen1818@aol.com]
Sent: Monday, February 21, 2005 12:26 PM
To: bobbie.peterson@4ladyjustice.com
Subject: forensic fees and resume for Thomas case

Bobbie:

I am enclosing via email attachment a copy of my forensic resume, a list of my specialties, and my fee
schedule.  I hope that is all you need.  As I understand it, I need to be ready to testify on either March
4th or 7th.  Please reconfirm these dates.  I will be in Harlingen and may need to fly in if I am going on
on the 4th.  I will drive if I am on on the 7th.

My biggest need, right now, is to review the mitigation study and relevant documents.  I really need to
know what the status of that is at this time.  Could you let me know?

Thanks,

Kate

Kate Allen, LCSW, Ph.D.
Forensic Consultant and Trainer
512-449-1100
512-787-9565

Monday, February 21, 2005 America Online: KAllen1818

KA000016

# Exhibit 169

**E-mail chain between John Niland and Bobbie Peterson regarding R.J. Hagood's failure to notify the State of the defense's intention to call Dr. Allen or Mr. Fitzgerald**

From: John Niland [jniland@texasdefender.org]
Sent: Tuesday, March 08, 2005 9:02 AM
To: Bobbie Peterson; 'Shelli Schade'
Subject: Re: Kate Allen, Larry Fitzgerald

Sorry about R.J.'s performance in this trial.  You have had much to make up
for—your job and his.  I am attaching a sample direct testimony you can use
with Larry.  Please pass on to R.J.  I just spoke to George Parnham.  He
thinks very highly of you as we all do.

John
—— Original Message -——
From: "Bobbie Peterson" <bobbie.peterson@4ladyjustice.com>
To: "'John Niland'" <jniland@texasdefender.org>; "'Shelli Schade'"
<shellischade@mindspring.com>
Sent: Monday, March 07, 2005 9:24 PM
Subject: RE: Kate Allen, Larry Fitzgerald


> Hi John:  I got the info you sent.  Thanks.  I found out at 5:00 today
> that RJ did not tell the state that we planned on calling Kate &
> Larry. The judge at pre-trial ordered both sides to provide names of
> any experts they intended to call.  I thought RJ had told Kerye &
> given them their names a couple of weeks ago.  He didn't & the state
> is raising hell.  I don't know if the judge will let us call them or
> not.  The only thing is that Kerye is trying to keep the record as
> clean as possible (from his standpoint!) & doesn't want to give us
> something that is blantly ineffective on its face, so I don't know.
> I'm not happy to say the least.
>
> Dr. Crowder pours us out, even after talking to him again tonight.  I
> told RJ to forget about calling him.  RJ thinks he "wants" to help us
> so we need to call him.  I don't care what he "wants" to do...his
> opinions hurt us, as much as their experts.
>
> If we get to call Larry, RJ will probably be questioning him & I will
> take Kate (more fact specific info).  Can you talk to Larry about
> "volunteering" as much info as possible on direct?!  Thanks for all
> your help, I'm tired & headed for the house. Bobbie
>
> ——Original Message——
> From: John Niland [mailto:jniland@texasdefender.org]
> Sent: Monday, March 07, 2005 11:56 AM
> To: shellischade@mindspring.com
> Cc: Bobbie Peterson; Bobbie Peterson
> Subject: Re: Kate Allen, Larry Fitzgerald
>
> Shelli:  Here is some case law that will support the testimony. Most
> of it is applicable to Kate's testimony, but should help with Larry's
> as well.
>
> John
> ----- Original Message -----
> From: <shellischade@mindspring.com>
> To: <jniland@texasdefender.org>
> Sent: Monday, March 07, 2005 10:50 AM

BP000399

> Subject: Kate Allen, Larry Fitzgerald
>
>
>> JOhn,
>>
>> DO you have any case law that we can use when the prosecution tries
>> to
>
>> object to both Kate and Larry? I'm sure at this point they smell
>> blood
> and
>> will stop at nothing to win.
>>
>> I have left word on Kates cell phone but didn't have her land line
> number
>> with me. We anticipate needing Kate Thursday and Larry Friday.
>>
>> I'm sure I will be having a nervous breakdown later this evening but
> will
>> be back in commission tomorrow and plan to be back here Wednesday
> night.
>>
>> Thanks for all you help and support-
>> Shelli
>>
>> Shelli Schade, LMSW, DAPA
>>
>
>

BP000400

# Exhibit 170

**E-mail from Shelli Schade to Leah and Bobbie Peterson regarding documents for the Thomas case**

**From:** Shelli Schade [shellischade@mindspring.com]
**Sent:** Wednesday, February 23, 2005 10:20 AM
**To:** Leah; Bobbie Peterson
**Subject:** Fw: documents for the Thomas case
I'll get this done asap. As usual, another delay in getting my crap done, sound familiar?

Shelli
----- Original Message -----
**From:** KAllen1818@aol.com
**To:** shellischade@mindspring.com
**Sent:** Wednesday, February 23, 2005 9:55 AM
**Subject:** Re: documents for the Thomas case

Shelli:

Thanks for getting back to me.  In general, I need the following documents, more or less in order of importance:

1)  your mitigation study (with notes is fine) (include any summaries of interviews, especially with mitigation witnesses)
2)  timeline (as soon as it's done or even what you have now, if it's substantial) [the more complete the timeline and the sooner I get it, the better I can learn the case--without it, I have to spend much more time (and $) in putting it together for myself]
3)  any and all psych and neuropsych evals over his lifetime, in all settings (these are especially important in Andre's case, of course)
4)  any foster care, RTCs, juvenile detention, drug/alcohol evals, probation/parole reports/evaluations
5)  medical records (especially birth-related and head-injury related, but any that would help in the case (neglect, abuse, etc)
6)  all school records
7)  any mental health, medical, CPS reports that are pertinent to Andre's bio and step parents
8)  all statements about the crime
9)  all crime reports, especially defendant's statements

The prosecutor may grill me on what I know as opposed to what the defendant told me (or told you) or what the mitigator might have said/written.  That is why I need your report and all back-up documents.  Also, I often can find things that slipped by other readers (the more the better).  And, in general, the more official documents I read, the better strategy I can develop.  But mostly, it is for a complete picture and to defend against cross.  That's why I need them ASAP.

Thanks for all your work on this case.  My address is 5576 Hartson, Kyle, TX 78640.  My home phone is:  512-449-1100 and my cell is 512-787-9565.

Will talk later.

Kate

**Kate Allen, LCSW, Ph.D.**
**Forensic Consultant and Trainer**
512-449-1100
512-787-9565

# Exhibit 171

# Andre Thomas Interview Transcript

### Interview of Andre Thomas
### 3/30/04

| | |
|---|---|
| Mike Ditto: | Detective Mike Ditto.   Sherman Police Department.   Investigating Case #0402024. This is Tuesday, March 30, 2004, at 9:01 a.m.  Present are myself, Texas Ranger Tony Bennie, Natalie Sims and, in just a moment, Andre Thomas. |
| Mike: | Andre, how you feeling this morning? |
| Andre Thomas | Okay. |
| Mike: | Feelin' a little better today than you were yesterday? |
| Andre: | Inaudible. |
| Mike: | I understand you want to talk to us again. |
| Andre: | Yeah. Uh… |
| Mike: | Hang on just a minute.  We gotta go through the thing about reading you your rights again.   Okay, you have the right to remain silent and not make any statement at all.   Any statements you make may be used against you at your trial.  Any statement you make may be used as evidence against you in court.  You have the right to have a lawyer present to advise you prior to and during any questioning.  If you're not able to hire a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning.  You have the right to terminate this interview at any time.  Do you understand each of these rights I've explained to you? |
| Andre: | Yes, sir. |
| Mike: | You do? |
| Andre: | Yes, sir. |
| Mike: | Okay.  Having these rights in mind, are you willing to talk to us now? |
| Andre: | Yeah. |
| Mike: | Okay. |
| Natalie Sims: | Do you want me to stay in here or do you want me to step out? |
| Mike: | That's up to him. |

**564**

Interview of Andre Thomas

| | |
|---|---|
| Natalie: | Okay. |
| Tony Bennie: | You want her to stay in? |
| Andre: | Inaudible |
| Tony: | Okay, Andre, I know it's kind of hard but we need you to speak up when you talk, okay? |
| Andre: | Okay. |
| Tony: | Alright. |
| Mike: | Like I said, I'm a little hard of hearing so it helps me if you kind of talk loud. |
| Andre: | Okay. Uhm, I was...the night that, uh,...before the...before I went over there and killed 'em, uh, I had been watching (inaudible) listening to some videotapes with this guy...well, her boyfriend, my wife's boyfriend...his name is Bryant Shaw and it was some tapes about, uh, about some kind of secret organization called the...uh...I don't know...it's like a secret (inaudible), uh, and it was talking about making this pyramid (inaudible) spear with, uh, pyramids that rotated on it, uh, in New York all the way around and it quoted secret mantras and it was talking about like enslaving people and he was talking about like, uh, I don't know, he was just, he made it like out to like...he...the tapes were talking about, uh, like these people that were going to like, rule over other people. You know, gonna enslave other people to be like (inaudible) separate class of people and made it out to be a conspiracy and, uh, I don't know...he was talking about some kind of secret God clan that, uh, they had made a pact in the beginning that, uh, they were either all rise together or all fall together and, that uh, they were supposed to come down here and kill all these people, uh, uh, like he's talking about like the beginning of creation, talking about, uh, these people, these angels the Nephalim that came down and they didn't, they didn't kill all of 'em and all this other stuff and I remember I had some dreams somewhat similar to it and I related it all and I figured that, uh, my wife was Jezebel and, uh, I had to kill her and my son was the Antichrist and that, uh, my little, uh, their little, their little, their little girl was involved with it also. And, the morning that I went to go kill 'em, uh, sh...I was walking down, uh, oh, uh, what's that street that runs on the side of Lockhart and Woods? |
| Unknown: | Inaudible. |
| Andre: | I was walking down McGee and I seen him and, uh, when I seen him I, I... |
| Mike: | Saw who? |

Andre:        I seen Bryant...

Mike:         Okay.

Andre:        ...driving in the Bonneville and he was coming out the other way like he was going toward Burger King. I seen his shirt and his hat. He had his uniform on. Anyway, he went like this, like he knew what I was fixing to go do, like that's what he wanted me to do. And, he was...I put my hands up like this and he was just like, like you know what you gotta go do and I had three knives in my pocket and I went...

Mike:         You had 'em in your pocket?

Andre:        (Inaudible) I went, uh, I went to, uh,...I climbed down the hill over there by our apartment complex and I went and, uh, busted, uh...I went up to the apartment complex and there was this lady...she walked out of the complex next to it. I thought it was kind of odd she didn't say anything to me and I felt, I felt compelled to say something to her, you know, like say good morning but I, I chose not to and, uh, to make it all seem normal I guess. And, uh, I walked upstairs and I grabbed the door handle and, uh, I knocked at first and then I grabbed it and busted it open with my shoulder and Laura came running out of the room. She, uh, I had already had a knife pulled and she said, "No." And, I grabbed her and I said, "You." That's all I said was, "You." And, uh, I stabbed her in the heart and, uh, she fell down and started bleeding on the floor and then, uh, I jabbed the knife into her chest again and I ripped open her chest and, uh, reached down inside of there and I ripped out her heart and then, uh, uh, I ran to the back room and, uh, uh, I ran in there...I think I stabbed my son next, uh, with the smaller knife, and he said, "No," but I pushed down on his chest to, to steady him so he wouldn't move and, uh, then, uh, I cut open his chest and I ripped out his heart and then, uh, then ████...she had...she had woken up and she looked up and I...I picked her up out of the crib and threw her on the floor...I didn't throw her on the floor...I, more or less, I had a really strong grip on her and I put her on the floor and I pulled out her heart, and I cut open her chest and ripped out her heart. And I stuffed their hearts in my pocket and then I started to stab myself in the chest...I stabbed myself three times and I was bleedin' and I was wonderin' how come I didn't fall down like she did. And, uh, cause as soon as I stabbed her she fell down. She started bleedin' right away and I noticed that when she was bleedin' she was still breathin', even after I ripped out her heart, which I thought was kind of strange. Uh, she was still breathin' and, uh, I could hear it, the blood gurgling up in her...in her throat and, uh, uh, uh...I put their hearts in my pocket and the knives...I got the knives...I left the duct tape there. I had brought some duct tape with me just in case, you know, I had brought it with me just in case one of 'em, uh...if I had to tie

566

somebody up but it never came down to that because of the way I done it.  So, uh, I, uh, left. Like I said, I started panicking.  I was like 'oh, shit,' and the alarms were going off and then I heard, I heard her dad's voice recorder come on the answering machine and said, "Laura, Laura, pick up the phone," like that and he said…I think I heard him say, "Oh, shit," over the tape recorder and, uh, you know, alarms were going off…the alarm, you know, to the apartment was going off so then, uh, I tried to stab myself again and I was like, 'damn' and it didn't hurt like, after about the second time, it didn't even hurt…it was just like I was jabbin' it…I was jabbin' these knives…I had three different knives…I had a butcher knife, I had a steak knife, and I had a, oh, uh, some different types of knives.  Anyway, I stabbed myself again and I was like, 'damn'.  I was like 'how fuckin' hard do I gotta go to get my heart, you know, how hard do I gotta go'.  And, uh, I stood up and I didn't feel weak at all or anything.  It was like I didn't feel anything and, uh, I went and I got out of the apartment, uh…and I started walkin' and, uh…the whole time though, like I say, the alarm's goin' off in the apartment and, uh, uh…anyway, like I say, I left and I got out of the apartment and had all this blood on my overalls, my Dickies overalls had all this blood on my pants…all this blood and, uh, I was walking…there was people jogging down Fairview and no one…I mean I thought it'd be kind odd, kind of strange anybody didn't notice that right off you know, you know the dark stain…you could tell it was blood even though my overalls were blue…it was like a dark brown…it was fresh and the way I was…I mean I must have looked crazy, you know, I had that wild ass look in my eye, man, and I crossed over to Fairview Park and I walked right by some people on the Fairview Park trail and, uh, they kept on walkin' and act like they didn't notice a thing and I cut through the park and then from there I went, uh, out the park through the exit over there by the bathrooms and then from that street I went over there to, uh, I remember the street I took. I took Woods to Hickory, Hickory to Shannon or, no, to Alexander, then Alexander to Shannon, and then Shannon to Lamberth and, uh, then I took Lamberth all the way to the house.  See, on Lamberth…on Lamberth I, uh, I, I cut across the highway over there…highway 75 over to the K-mart parking lot and, uh, uh, uh, uh, through the back of K-mart parking lot and I was walkin' and I heard…I heard…when I was over there by the park I heard the…I heard the sirens…I heard the fire department, I mean, I heard it…the fire truck and everything…ambulance, police cars…I heard 'em all just going there, you know.  I figured, you know, that they, you know, I figured somebody would of seen me come out of her apartment or heard me bustin' in and that they'd be on me in second but they didn't, they didn't ever catch up to me, uh…I walked, uh, uh…I walked to Dilling…I walked to Dillingham and the, uh, the Trinity Baptist Church over there…I looked on the sign and it said 'Now that you've seen the movie, read the book' and uh that kinda threw me off so I walked to the back of Dillingham and I had in mind to throw their hearts away…somethin's tellin' me just throw 'em in the bushes and I, I's like nah, I'm like nah (inaudible) I'm not that heartless (inaudible) I keep their hearts with me in my pocket and uh anyway…I went to the house and I went and I

567

Interview of Andre Thomas

got a Wal-Mart sack and I put the hearts into a Wal-Mart sack and put the hearts in the trash and then uh, uh, I went and I changed clothes. I got into my uh, uh, my camouflage pants and uh, my camouflage shirt, I think and uh I was still bleedin'...my chest was...well, my chest wasn't even bleedin' that bad it was just an open wound but it (inaudible) there was blood on my shirt (inaudible) and uh, uh, I went to my dad's house and I called Laura's parent's house to see if, uh, I could talk to 'em...nobody answered, the voice machine came on and I thought I left a message...I told 'em I said I was really confused and I didn't know what was going on and uh, needed some help and uh...I didn't believe what had happened...I guess I didn't believe what had happened...I thought I was gonna...I was gonna...cause I was lookin' for Laura's number. I was looking for Laura's number in my pocket in my wallet...I was gonna call her and uh, uh, I (inaudible) was gonna call her...I don't uh...then uh, I went to the...I think I went back to my house...I went back and forth between my dad's like a couple of times try to find a phone but I could never find a phone and, uh, uh. (inaudible – somebody's cell phone rang!!!). I went back...I went back to my house and uh, that's when I seen Carmen and uh, Isaiah...Isaiah was sittin' there rollin' a blunt and uh, Carmen she was just sittin' there and I told 'em what I'd done. I said I just...I just killed my son and Laura and her daughter like that and she was like 'why did you do that' and I said, uh, cause I thought that's what God wanted me to do. I, I don't know, I said uh, I thought's that what he wanted me to do and uh, she said, "Oh, my God," like that...she was like what's wrong with you and I was like I don't fuckin' know...I said, "You don't believe me and shit, you know what I'm sayin', (inaudible) I just stabbed myself in the heart three times and I didn't die...Y'all don't think that's just a little bit strange...Y'all don't think that's just a little bit fuckin' odd," you know, and I...I showed 'em my chest and I said, "What? You want me to do it again? I'll go stab myself again." And, she said, "No." She screamed, "No." And then Isaiah was like, uh...

SILENCE ON TAPE

Unknown:          Okay. Go ahead.

Andre:            Anyway, he said uh...he said uh, "You ever need any help," and then uh, I asked Carmen if she would come down to the police station and turn myself in with me and she said, "Yeah," and then I went over at Brandon's house uh...we walked around to Brandon's cause I wanted to see if Brandon would give me a ride and Isaiah, he walked in there and, uh, I guess I mentioned to 'em (inaudible) what happen to me and (inaudible) he said, "Come inside cause we brothers" and Brandon was like, "yeah. Come on in cousin," like that. I 'magine he told 'em, uh, then Carmen she walked around there to (Waukena) and them's house and she, she, she, uh, she said she had to be at work at 11:00 and I told 'em, I said uh, uh, I, I asked her I said, "Just go down there to the police station with me." So, (Waukena) she didn't say...Carmen

568

never told her why we was goin' to the police station and uh, we went to the police station and then that's when I walked in there and I told 'em over the phone that I had just done.

Mike:       Look...let me ask you a question.  What did...when did you first decide to do this?

Andre:      That night when I had talked to Bryant, when I had talked to him uh, I felt like everything was a conspiracy...I felt like everybody was listenin' to everything I was sayin'...everything.  I felt like the government was like after me uh...I felt like uh...I felt like they was listenin' to everything like it was like I was fixing (inaudible) end of the world type thing and that they were all like listenin' to what I was sayin' and watchin' every move that I made, every single one of 'em and I was like uh, it had gotten like...when I talked to, uh, Bryant, he put on these tapes...these tapes was just this guy was talkin' and he was talkin' about uh this...this plan like...I had been readin' Revelations a lot up until then and I started thinkin' about time and how time really doesn't exist, you know, and how (inaudible) keepin' up with events (inaudible) and I was like...so we could be livin' in a time when, you know, the wool's been pulled over our eyes (inaudible) like the Matrix and I was like 'well, that means we're slaves then...we're all slaves' (inaudible) and I was like 'there's no way' I was like (inaudible) everybody's mind (inaudible) not right and I was like uh, I had the diagram that uh, Carmen had drew on this yellow notepad with a pyramid and a evil eye...a pyramid on the back of a dollar bill and it had a door on it though and the door was open and inside was this man and he was layin' down like he was dead, I guess, I don't know, and she said that it was me and I was like 'so you mean to tell me I'm trapped in a damn pyramid' and she was like (inaudible) and I was like 'well, what the fuck...I didn't choose to be trapped in this pyramid'...I was like uh, somebody (inaudible) to let me out so I figured I was gonna let myself out.  I thought that like, uh, somehow, I played this role in ending all of this for everybody and that like I was chosen or somethin', I don't know.  Uh...

Mike:       What made you think you were chosen?

Andre:      Cause I...cause of the dreams that I've had...different dreams that I've had, uh, I had this dream that uh, I was an angel in this dream.  I didn't have wings, though, in the dream...but my hair was really really long and it was curly it was black, you know, really long and, uh, I was in this white robe and I was in this dwelling place, this long long, like, complex and it was like...I remember knowin' in the dream that it was worm wood and that it was made out of worm wood and it's like worms had eaten all the way through it...little bitty trail...like they just ate...eaten their way all the through this wood, you know, and, uh, I remember the next thing in this dream I was leanin' on the balcony and I was lookin' up at God, or where God should be, and I remember knowin' that God can hear people and I just remember shakin' my head and I

569

was just shakin' my head back and forth like that, back and forth, and, uh…I remember eventually I was in the sand and the sand was like sinkin' beneath me. I was on my knees and I was lookin' up at this huge wall of water. This water was like crashin' upon itself but it didn't fall on me. It didn't fall upon me. It was like (inaudible). It was just like (inaudible) water and, uh, crashin' down, uh…I remember knowin' that it was the wrath of God and I remember askin' God, "Please (inaudible) let it fall on me (inaudible) and I was like scared like, you know…I remember knowin' that I was standin' before God and, uh, I don't know…that dream associated with what had happened was like…in that dream, I was uh, uh, like a God I guess, I don't know…cause my body was perfect, everything was perfect, you know, like everything from the clothes I wore to the appearance of my body and so (inaudible)…

Tony:      Why do you think God's wrath was fallin' upon you?

Andre:     I didn't, I didn't….for my sins…I seen in this water…I could see my sins. I could see them. I could see them inside of it. It was like crashin' upon it. It was like fallin' down and swirling like, like a wall, you know, like a wall of water and like it was fallin' down the sides but then it was like curlin' back in under itself and I could see my sins inside of it. I could see a whole bunch of 'em.

Mike:      You see your sins?

Andre:     My sins…I mean, not things I had done, I'd be actually doin' 'em over again but it was like dark, this darkness, and I knew that they were my sins.

Mike:      So, what…what made you decide to kill them?

Andre:     Well, cause I thought that…the way he was talkin' to us, he said that these people…he said, uh, that Jezebel and…he said that these demons, Jezebel and all these people they could be humans, cuddly as can be and my son kept on tryin' to talk to me while I'm tryin' to listen to this tape and I thought…I was like…I was like "Hey", I was like, "I'm tryin' to get educated." He kept on sayin', he kept on sayin', uh, baby this is the word of God. He's tryin' to listen to he word of God and (inaudible) I just kept listening' and kept listening and I was like, I was like uh…I kept on tryin' to listen and the more I try to listen the harder he try to distract me and try to talk to me and I was like 'man, it's almost like he don't want me to get educated on the subject,' like, uh, maybe, maybe, you know, he was like…I figured, you know, he's the Antichrist or something maybe he's disguised his appearance or somethin', you know, uh, to look like, you know, a little 4-year-old boy to where I couldn't differentiate who it was. My wife, she…uh…she kept…she was like actin' nervous and the more I listened the more nervous she got so I figured she had to be Jezebel cause she was scared…she was like nervous and…uh….

570

Interview of Andre Thomas                                                          7

**Mike:**  Let me clear up something in my mind here...you said earlier that the alarms were going off in the apartment...is that like the burglar alarm thing your talking about or the alarm clocks?

**Andre:**  The alarm clock and the burglar alarm (inaudible) both of 'em.

**Mike:**  Okay. Alright. Uh...why didn't you just stay there?

**Andre:**  I don't know.

**Mike:**  Didn't want to get caught or...?

**Andre:**  I knew it was just a matter of time before I got...

**Unknown:**  Inaudible.

**Andre:**  I don't know, I knew it was only a matter of time, you know...Well, I knew, like...for instance when before I left the (inaudible) I knew that they could tell (inaudible) fingerprints (inaudible) take my prints and I was like, "Who cares, like...I don't know...uh...I knew I wasn't gonna make a run for it because I (inaudible) I ended up turnin' myself in so I didn't understand why, why I left...I don't know...maybe the siren I think is what it was...scared me...the more I heard 'em, you know, the further away from the...the faster I started walkin' tryin' to get away from the vicinity of where it happened.

**Mike:**  Where were you when you first heard the sirens?

**Andre:**  Uh...Over there...the parking lot across from, uh, Fairview School...the church parking lot...where I heard 'em...I heard the fire truck first then I heard the ambulance (inaudible) police car soon after that...I couldn't tell which one was which.

**Mike:**  Now, you carried all those knives back home with you, right?

**Andre:**  Uh-huh.

**Mike:**  Were those the ones that were in the sink?

**Andre:**  Inaudible.

**Mike:**  Did you stab yourself with one of the same knives you used over there at the apartment?

**Andre:**  Uh-huh. I stabbed myself with two of 'em I believe.

**Mike:**  Two of the knives?

571

Interview of Andre Thomas

8

Andre:      Yeah.

Tony:       Two of the same ones you used at the apartment?

Andre:      Inaudible.

Mike:       Why did you bring three different knives?

Andre:      I felt like...I don't know, I would cross contaminate blood or somethin'...maybe like they would come back to life and (inaudible) or somethin'...I don't know...maybe they had worked out some kind of spell between all the three of 'em and, uh, if, uh...

Mike:       Did you think what you were doing was wrong?

Andre:      No.  I thought I was doing the will of God.  That's what I thought.

Tony:       What do you think now?

Andre:      I don't think God would have me, uh, kill 'em (inaudible).  I don't think, uh...

Tony:       I'm sorry?

Andre:      I don't think God would have me kill (inaudible).  I don't think, uh...when I, when I was on my way home, I started thinkin' about Bryant...the way he looked at me and I started thinkin' about like...I was walkin' down the road and (inaudible) he knew what I was going to do.  Like he knew...

Tony:       Did y'all ever talk about it?

Andre:      No.  See...when I hopped in the car that night when he gave me a ride home, he said, uh, he said somethin' about us all risin' together and all fallin' together (inaudible) God's plan (inaudible) make a secret pact that if one of us (inaudible), that we would (inaudible) and I, I felt like that was, like, my responsibility to lead and everybody else was to follow.  So, uh...I asked him, cause I was in a paranoid state of mind cause of this conspiracy, like I said, that I had in my mind...uh...I had...I don't know...I felt like I had talked to 'em in code (inaudible) and I thought "Ah, man, like...man, she must be Jezebel, she must have some kind of wicked spell on his mind where he...she's like, when I'm not around, she's like maybe torturing 'em or beatin' 'em or somethin' and, uh, he can't tell me...he can't tell me what's, uh, like what's really goin' on, you know what I'm sayin', he can't tell me, you know, uh, can't just openly confirm, you know, yeah I still remember code of silence cause...see, I was gonna start...I was gonna do it that night...I

572

had it in my mind to do it...I went in the kitchen, in fact, and grabbed a knife...they only had like a little bitty knife like that in the kitchen sink so...

Mike:      That happened over there at Laura and Bryant's apartment?

Andre:     Yeah.

Mike:      So, the only reason you didn't do it that night is because you didn't have a big enough knife or what?

Andre:     No, that, not only that but,...I had...when I thought about it, I went back in there and I sat down on the couch...he had grabbed an extension cord and wrapped it around like he was getting' ready, like he was just gonna strangle one of 'em.  And then I was, that's how, I was interpreting it, I was like, uh...(inaudible) like 'he was gonna strangle 'em or somethin' with an extension cord.  (Inaudible) I was like...he looked like he was scared, like he couldn't, like he couldn't move unless I made the first move and then, uh, that's when I...When I was listening to the tapes though it made a bunch of sense...everything, I mean, this guy was a history buff...he was talkin' about like power bein' invented, you know, all this stuff and I seen presentations (inaudible), you know, over there at people's places and houses...this sphere with these triangles and, uh, (inaudible) dangerous (inaudible) like brainwashing people can't hear it because it's, I don't know, maybe it's at a higher pitch (inaudible)...it's a method of control...and it sounded like it made sense and all and I was like, our government (inaudible), you know, I remember that (inaudible) inside, you know, (inaudible) control your thoughts and everything that you do, make you a slave (inaudible) and I thought I was (inaudible)...I don't know, but somehow I thought she was Jezebel (inaudible) the devil.  I thought my son was the devil (inaudible)...I can't read everbody's mind (inaudible)...when I was walkin' home (inaudible), I was thinkin' about Bryant and the (inaudible)...when I, when I seen that sign (inaudible)

Mike:      Tape number 2.  Case Number 02...correction...0402024.  I'm Detective Mike Ditto.  Present are Texas Ranger Tony Bennie, uh, Natalie Sims, Grayson County Sheriff's Office, and Andre Thomas.  Go ahead Andre, you were talking about seeing the sign (inaudible).

Andre:     It said, uh, "now that you've seen the movie, read the book", and, uh, uh, I just remember interpreting the book as bein' the Bible so I went...when I, when I, when I got, when I got in the hospital later on that night, uh, I started readin' the Bible, I started readin' Revelations, Chapter 21 and 22, and I kept on havin' to start over cause this man-nurse came in to check my heartbeat and, uh, (inaudible) check my heartbeat and I was tryin' to finish readin' it and kept on interruptin' me and it strictly, it strictly says in this Revelation not to add or subtract to the words of the Bible so that means if I

573

cut myself off while I'm readin' it and say somthin' else then I'm addin' or subtractin' the Revelations and I knew that and he, he, he looked like he wanted me to mess up, like he wanted me to, you know, keep messin' up, you know what I'm sayin', he kept on 'let me check your heartbeat,' while I was readin' and I kept on readin', I kept on readin', I kept on readin' and he said, uh, "(Inaudible) let me check your heartbeat," (inaudible) while I was readin' and I just kept on readin' and he started like he's getting' angry, like maybe I's about to break some kind of evil spell or something.  (Inaudible)  And, uh, let me check your heartbeat.  So, finally, I got frustrated and I stopped and he had this look in his eye (inaudible) check my heartbeat and it was a like a clock.  I was like it was something about (inaudible) clock (inaudible) clock and I was readin' on the clock, like it's about to be 11 o'clock so I's supposed to finish that bottle at 11 o'clock and then he looked up at the computer screen (inaudible) like.  I think he got me to quit and he did (inaudible) like a smile came back over his face.  I interpreted it like she came back to life or somethin' and I was like 'man, this shit's crazy.'

**Mike:**          What were you going to do with the hearts?

**Andre:**         Well, I had a mind, when I first ripped 'em out...I had a mind to burn 'em, just destroy 'em.  But, as I...when I started walkin' home I didn't, I couldn't, I didn't want to touch 'em...(Inaudible) I reached up in my pocket and grabbed 'em and took 'em out and put 'em in a bag.  I didn't want to look at 'em any more.  I think I was (inaudible) cut 'em up (inaudible).

**Tony:**          Why would you think that Laura was Jezebel?

**Andre:**         She'd told me that she (inaudible)

**Mike:**          I can't hear you.  Could you speak up?

**Andre:**         When she was a little girl, I mean, when I first met her and me and her first started datin' she said (inaudible) she was a little girl she had this...she said she was at her dad's at nighttime, I mean, it was like dark in her room and she said she looked in the closet and she said (inaudible) the devil and said somethin' (inaudible) people like glowin' eyes and she said she was scared (inaudible)..Jezebel was like the female equivalent to the devil and I figured she was tryin' to lie to me (inaudible)...I don't know, I figured that, you know, she (inaudible), you know, she was (inaudible)  She, uh, she told me she, that she was scared.  I thought about the things that she had done, different things, to me, uh...

**Tony:**          What had she done to you?

574

Interview of Andre Thomas                                                                              11

| | |
|---|---|
| Andre: | Cheatin' off on me and stuff like that...me bein' married to her, she (inaudible) divorce and things like (inaudible). It says in the Bible that Jezebel lives in our hearts (inaudible). |
| Tony: | So, Laura was cheatin' on you? |
| Andre: | Yeah.  The divorce, I mean, technically, it's a technicality, we're still married.  Well, were...well, we were still married.  Sigh. |
| Tony: | How long...how long have y'all been separated? |
| Andre: | Since January 27th of 2001. |
| Tony: | Since January the 27th of 2001? |
| Andre: | Yeah. |
| Tony: | How'd that make you feel? |
| Andre: | I was okay with it.  I mean, the way she done it, I didn't think it was right.  She (inaudible) my brother (inaudible). I didn't think that was right.  She left...she left me at a time when I needed her most.  I didn't think that was right at all. (inaudible) |
| Tony: | That make you mad? |
| Andre: | Yeah, while I was in jail but, I mean... |
| Tony: | I'm sorry? |
| Andre: | Yeah, when I was in jail but, I mean, after I got out I had got over it.  I was like, you know, (inaudible).  She said she would but she wouldn't. |
| Tony: | She said she would but she wouldn't? |
| Andre: | Inaudible. |
| Tony: | Did you ever go over to the house with the papers? |
| Andre: | Yeah, I had got these papers from the library and I told her that, uh, I was gonna divorce her and that I needed her to be there.  The times I went down there (inaudible) I think twice she wasn't there so I think she was avoidin' it.  (Inaudible)  She didn't want to be divorced. |
| Tony: | So, (inaudible), you never had the opportunity to sit down with her with the papers in front of both of y'all? |

575

Interview of Andre Thomas

12

Andre:    The opportunity...the opportunity was always there but our lives were (inaudible) she was doin' somethin' I was doin' somethin'.

Tony:     When was the last time you talked to her about getting divorce papers signed?

Andre:    Oh, it was about 2 or 3 months before that...

Tony:     Two or three months when?

Andre:    Before, before all this took place. I had gotten the papers from the library. I took 'em and got a friend of mine to type 'em up and, uh, she, uh, she...

Tony:     Inaudible.

Andre:    I had gotten a friend of mine to type the papers up and, uh, I had talked to her about it on the phone and she told me that she (inaudible) divorce (inaudible), you know, (inaudible) ready to sign the papers, you know, (inaudible) she wouldn't be there. (Inaudible)

Tony:     Would you call before you went over to get her to sign the papers?

Andre:    (Inaudible) It wasn't...to me, it wasn't even so much an issue about signin' the papers. I wanted her to sign the papers cause I knew it still had to get done but after awhile, you know, you start livin' like, or I did anyway, I started livin' like I wasn't married to her at all no more, cause I felt like in God's eyes I (inaudible), you know. I thought that was just a piece of paper (inaudible). I felt like, uh, that our contract, was just a contract, that's all it was...was a piece of paper and no little boy. She already...she'd already shown me that she was gonna be with somebody else, you know, so I figured I'm gonna be with somebody else, too.

Tony:     So, you figured you was gonna be with someone else?

Andre:    Yeah.

Tony:     Why didn't you just do that? Why...

Andre:    I was. I was with Carmen. Carmen...Carmen...everybody was tellin' me Carmen was a guy. Everybody told me Carmen was a guy. She didn't have an Adam's apple, she didn't have a penis, she had breasts, there were no incision marks. I'm like what the hell is goin' on and like she's tellin' me that (inaudible) was CarMAN (inaudible) was CarMAN. I'm like her name is Carmen (inaudible) call her CarMAN. I was like why do you call her...why does everybody keep callin' her a guy? (Inaudible)

576

Interview of Andre Thomas

Mike:          Did Carmen know what you were gonna do before you did it?

Andre:         No.

Mike:          Did anybody know?

Andre:         No.

Mike:          So you hadn't discussed this with anybody or told anybody that you wanted to do that or were going to do that?

Andre:         Cause I felt like (inaudible).

Mike:          Okay.

Tony:          So, is, is, was killing Laura something that you needed to do to put all this behind you?  The cheating and the...

Andre:         It wasn't...it wasn't...I didn't...I just really didn't want to...I really didn't want to harm Laura.  I didn't want to harm nobody, but I thought that's what God had called me to do.  I was like that doesn't make, you know, it doesn't...I 'm obedient to God, regardless.

Mike:          Have you ever known of God to be vengeful or want people to hurt other people?

Andre:         In the Old Testament.

Mike:          So what made you think God wanted you to do this?

Andre:         Cause I...I don't know, it was just like everything I was interpreting...everything that like (inaudible) everything that was happening around me.

Tony:          You made reference to the Old Testament?  God was vengeful?  Okay.  In the New Testament, God doesn't operate that way anymore, does he?

Andre:         Nah.

Tony:          Cause through Jesus Christ, all we have to do is ask for forgiveness, right?  And, our sins are forgiven?

Andre:         Right.

Tony:          Okay.  So...

577

Interview of Andre Thomas                                                                          14

| Andre: | But see, the only thing I didn't understand about that was if that's case, then how come we still sin…how come we still sin daily?  If our sins are forgiven and how could one man (inaudible) I didn't understand how could one man die for the sins…I started questionin' my faith in that, in that I was like it doesn't make sense for us to keep on livin' and sinnin'.  And, uh, sinning daily if our sins are…if, if our…I don't understand how can one person in the history of the world die for the sins of the future, past, and present.  That didn't seem possible cause, if that was the case, then why are we still here, why are we, why are we still sinnin', how come we just didn't go straight to heaven?  (Inaudible) |
|---|---|
| Tony: | I think God put us…God put in us free will. |
| Andre: | Yes. Yes, that's what I don't understand. |
| Tony: | The freedom to make our own choices. |
| Andre: | That right there in itself…free will…the two words contradict themselves.  Free and will.  It's like you're free to do whatever you want to but then you have a will.  Will is to be either right or wrong.  But still, it's still contradictory (inaudible).  That's what didn't make sense to me. |
| Tony: | Okay.  God put in us, then, the freedom to make our own choices. |
| Andre: | Yeah. |
| Tony: | And that we know right and wrong, correct?  You agree with that? |
| Andre | Yeah. |
| Tony: | Do you know right and wrong? |
| Andre: | Yeah. |
| Tony: | Okay.  So, if God didn't instill us with the choice to make right and wrong or the freedom to make right and wrong choices, then we'd all be like robots, is that correct? |
| Andre: | Yeah. |
| Tony: | Okay. |
| Andre: | Inaudible |
| Tony: | Okay.  When the choice is right and wrong, uh, do you feel like the choice that you made on Saturday was wrong? |

Interview of Andre Thomas

15

| | |
|---|---|
| Andre: | I don't know.  I don't know.  (Inaudible) I don't, uh, I don't know because I don't know where I am anymore.  I don't know where I am anymore… |
| Mike: | When you say you don't know where you are, you mean you don't know where you physically are right now, or you don't know where you are in your mind? |
| Andre: | I don't know where I am in my mind (inaudible)… |
| Tony: | I mean, where are we right now? |
| Andre: | Well, it appears to me, it appears to my reality, my perspective, that yall seem to be real enough for me, I could reach out and touch y'all (inaudible) we're in Grayson County Jail but my mind is tellin' me that this is all like, false reality, (inaudible) real in a sense that… |
| Mike: | Well, let me assure you it's real…this, this is the Grayson County Jail. |
| Andre: | I know, I know.  I can…I can feel the incision in my chest.  I can feel, uh, I can feel everything I went through…uh…(inaudible) |
| Mike: | You know somebody named Zach?  Who is Zach? |
| Andre: | (Inaudible) |
| Mike: | Okay.  Zach is Kim Baird's (?) boyfriend?  What's Zach's last name, do you know? |
| Andre: | I don't even know. |
| Mike: | Does he live with her? |
| Andre: | Yeah. |
| Mike: | When's the last time you talked to Zach? |
| Andre: | It's been a couple of weeks, couple of months maybe. |
| Mike: | A couple of weeks or months? |
| Andre: | Yeah.  Nah, not months, a couple of weeks. |
| Mike: | Okay.  When was the last time you talked to Kim? |
| Andre: | Uh, 'bout the same…I talked to 'em together. |

Mike:       Why would people be tellin' us that Zach might've helped you do this?

Andre:      I don't know.  Zach didn't have anything to do with it.

Mike:       Zach didn't have anything to do with this?

Andre:      Nuh-uh.  In fact, Zach wasn't even there.  I did it by myself.

Mike:       Did they know you did it?

Andre:      Nuh-uh.  So far as I know, nobody know I did it til, you know, it came out in the paper or that day.

Mike:       Why would anybody...(inaudible) I wanted to ask you about it.

Andre:      Who'd you hear that from?

Mike:       Different people.  I didn't personally hear it.  Another investigator heard it and came told me and I...I don't know...I just wanted to ask you about it.

Andre:      Nah.  Zach didn't help me.  (Inaudible)

Mike:       So, did you...did you tell...we've covered this already but I want to make sure that we understand.  Did you tell anybody that you were gonna do this?

Andre:      No.

Mike:       Nobody?

Andre:      No.

Mike:       Okay.  And, and, uh, you said earlier and I want to make...I'm going back over this again cause I want to make sure that I don't put words in your mouth.  You said earlier that, that, you know, that God wouldn't tell you...I mean wouldn't...

Andre:      I feel like this about it...I don't know...previous to me actually doin' it...I don't know what was goin' on in the world but I felt like I did know.  I felt like I was...I felt like...I don't...my beginning in 1982...that's when I con...that's when I was made, you know, was in my mom.  I thought that maybe like the government, had like maybe kidnapped me...took me away from my mom and put me in this false reality, if you will, in order to make me a slave.  They was using me to make me a sl...to make a slave...like my soul may be a slave to...uh...the way the world is, you know, with money and everything because she was...I remember there was a point in my life I had

580

this vision I had seen God and, uh, in that moment all possible (inaudible) of knowledge was bestowed upon me.  It was the most beautiful thing that had ever happened to me.  At the same time, it had been like a curse it had happened to me because after you've seen God, you don't want to see anything else on this planet.  Don't want to see, don't want to be around anything else...anything...anything (inaudible) this body as I know it (inaudible) so anything else was just misery for me.

Tony:            But, you'd commented earlier that...that you know that God wouldn't tell you to kill someone.

Andre:          I don't...In the Old Testament he did.  In the Old Testament he told people...I mean, you know, he told the prophets.

Mike:           Do you believe in the New Testament?

Andre:          Yeah, but...yeah it's...yeah I do.

Mike:           So, under the New Testament, God wouldn't...wouldn't have you kill somebody would he?

Andre:          I don't know.

Mike:           Let me clear something up in my mind.  Out there at the scene, in her apartment, the little girl...you said she was in the baby bed, right?

Andre:          No audible response.

Mike:           Did you not stab her there in bed first and then pick her up?

Andre:          I stabbed her there first.

Tony:            Do what?

Andre:          I stabbed her in the bed first.

Mike:           Okay.

Andre:          And, then I put her on the floor.

Mike:           Alright.  You got anything else for him?

Tony:            Andre, you got anything else?

Andre:          Uh, uh, I just want to say that I'm sorry for what I did.  I want to talk to my mom and I want to talk to my dad.  I love 'em.  I don't know what's gonna

581

happen to me.  I don't know what is happening.  And, like, honest to God, honest to God (inaudible) it's not, it's not, I would say…I wouldn't go so far as to say it's driving me crazy but it's beyond that.  It's a little bit beyond that now.  It's like, uh, I don't know (inaudible) the world is, you know, I think the world (inaudible) is insane.  I think people shouldn't have to work and be salves to (inaudible).  I don't think that, uh,…I know this much, I know that, uh, I didn't die (inaudible) stabbed me in the heart.  I'm, I'm, I'm like, I'm so desperate, I'm so desperate that I wish somebody would like get a gun right now, just to test the limit, just to see and I would take it, just like shoot me dead in my heart, in my heart, and if I didn't die then I would know somethin' was really fucked up because he…they said when I went to the hospital that I stabbed myself and just barely missed my atrium.  I stabbed myself (three clapping noises)…·

Tony:        That's alright…

Mike:        Don't…

Andre:       …three different times in the same…I mean, one right here, one right here, and one right here.  That's three different places.  How the fuck do you miss your heart that many times?  I didn't miss.  There's no way I could fuckin' miss.  It doesn't seem…that…that's not even…that…that…that in itself is insane.  Me havin' to stab myself in the chest…that is insane.  The point is, is I keep getting led to that.  I was layin' in bed with Carmen when I did it.  And, that shit hurt.  It really hurt, man.  It really fuckin' hurt.  I'm sorry, I don't' mean to be cussin' but I'm just tryin' to get this out.  That shit hurt, you know.  And then, uh, I was like, man, I was like, I thought I was gonna die and somehow unlock heaven…maybe.  Man, that pain was like incredible and I could,…and then I took the motherfucker out and just a little bit of blood trickled out and that was it.  I was like 'Man, I just stabbed myself in the heart.  The rules go you stab yourself in the hear, you die.'  So what the…I was like 'what's goin' on…what the fuck is goin' on' and nobody would tell me.  Nobody…everybody's hush mouthed about it.  That's what's really pissin' me off is everybody, you know, nobody's like…they ain't gonna just go ahead and just go ahead and confirm it, you know what I'm sayin' motherfucker you're already dead.  I wish somebody'd tell me that, well, hell I could deal with that…motherfucker ain't tellin' me whether I'm alive or dead.

Mike:        You're alive.

Andre:       In what sense of the…what the fuck does that mean?  That's just a word.

Mike:        Well, you're still here amongst the rest of us that're living,  is all I can tell you.  Okay.  Well, Andre, we appreciate you talkin' to us.  It's, uh, 9:54 a.m., March 30, 2004.

582

Interview of Andre Thomas                                                                    19

Tony:          You know that if there's anything else you want to talk about, all you gotta do is let Natalie know and we'll come back over and talk, alright?

Mike:          We'll come over and talk to you any time you want to.  Okay?

Andre:         Okay.  What's gonna happen to me?

Mike:          Don't know.  Uh, we gotta present all this to the DA's office and go from there.  Our job is to investigate these things...uh, the DA's job is to go to court with it.

Andre:         See, the thing is...this is (inaudible) regardless, this is what I figured out.  I keep getting' (inaudible).  I know that words have power, that much I do know.  Uh, (inaudible) if that's what's happenin' then I'm gonna keep doin' this and I don't want to keep stabbin' myself in the fuckin' heart cause that shit hurts.

Mike:          Yeah.

Andre:         Cause, see, if I kept led to that conclusion...and I keep doin' that over...I don't have a choice, you see what I'm sayin'.  I don't have...I don't have a choice.

Tony:          What about your choice to keep killin' other people?

Andre:         That's just it...see, if, if, if, if this...if this keeps getting rewound and I keep goin' through that...that's what the fuck...that means I've already done it then and that, that...then there's no tellin' how many times.

Tony:          So, you think this is somethin' you'll continue to do?

Andre:         Hell, no, I (inaudible)...man, I don't want to kill nobody else...or hurt...I didn't want to hurt nobody...I don't want to hurt nobody.  You know what I want?  I want everybody to go to heaven.  That's what...everybody and I don't...I mean Jezebel, too.  Hell, I mean everybody.  That's what I want.  That's what I want, honest to God.  I...you know what?  Everybody can go to heaven, that would be the end, you know what I'm sayin'.  Nobody goes to hell because essentially what it all boils down to in our essence, in all of us, there's a capacity to love, whether it's of evil or of good, it's still love.  Now, it's a sickness of mind, somewhere in the psyche, whether you make choice of whether you decide to do good or evil.  That much we know.  I'm just sayin' that I think I got the cure for all the evil and that's love...that's just love, love...what the fuck's wrong with me...ain't nothin' wrong with that.  We got...we agree?

Unknown:       Inaudible.

583

Interview of Andre Thomas                                                                  20

Andre:      There's nothin' wrong with that.  (Inaudible)  If that's the case, then why does
            this keep happenin' to me?

Natalie:    Part of it, what I think Andre's tryin' to say, and correct me if I'm wrong.
            Andre's tried to kill himself several times, true?

Andre:      Yeah.

Natalie:    And, yet he never dies.  And, should be…I mean, (inaudible)

Mike:       Uh-huh.

Natalie:    And, uh, that's just what he's tryin' to express to you.  Am I correct in that?

Andre:      Yeah.  I mean, I, I wan…I really want to show you…you hadn't seen 'em.  I
            really want to show you…can I show you?  Please?  Can I show you these
            scars?  I mean I want you…

Tony:       No, I mean, I know they're there, Andre.

Andre:      How come I can't show you?  I just…I mean, I really, I want to take a double
            take at the same time.  I want y'all to be witness and I want to witness this
            shit, too.  Can we look at 'em?

Tony:       Go ahead.

Andre:      Man, I'm talkin' about a butcher knife.

Inaudible whispering

Tony:       Yeah.

Mike:       Yeah.

Andre:      I mean a…a…a…a butcher knife.  Whew.  Look…I mean that's, that's, that's
            about that big, man, and it's got a wood handle and you…you got the steak
            knife that's about that big and you've got the smaller knife that's about that
            big.  How…you know, it's three different times and those three different
            angles, you know, possible a million ways and I didn't die.  That's just seems
            just a little fucked up to me, man.  Just a little bit fucked up.

Tony:       Well, Andre, I'm sure there's a clear medical explanation for why it didn't
            happen.  I can't give it to you, but, uh, I bet you if you ask Natalie a little bit
            later on…

581

Interview of Andre Thomas                                                              21

Natalie:          (Talking over Tony) (Inaudible) I'll tell you later.

Tony:             ...she can explain that...she can explain it to you later.

Natalie:          Uhm, one thing I did want to ask (inaudible) on tape.  Okay.  Alright.  This is just about some information we got back yesterday.

Mike:             We'll go ahead and conclude the interview.  It's 9:59 a.m.

585

Interview of Andre Thomas

# Exhibit 172

## 03-15-04 Texas Uniform Health Status Update completed by Nurse Natalie Sims, R.N.

Scanned by DUNN, ALMA J in facility POLUNSKY (formerly TERRELL) on 03/22/2005 12:32

#11493

## TEXAS UNIFORM HEALTH STATUS UPDATE

I. NAME: **Thomas** **Andre** **L** DOB: ▇▇▇▇ AGE: **21**
Last        First        MI

RACE: **B** SEX: Male **X** Female ___

STATE ID# _____

COUNTY/TDCJ# **62890** WT: ___ HT: ___

**CURRENT/CHRONIC HEALTH PROBLEMS**

### A. Health Problems
- ___ 1. None
- ___ 2. Asthma
- ___ 3. Pregnancy
- ___ 4. Dental Priority
- ___ 5. Diabetes
- **X** 6. Drug Abuse
- ___ 7. Alcoholism
- ___ 8. Orthopedic Problems
- ___ 9. Cardiovascular/Heart Trouble
- **X** 10. Suicidal - Made threats + attempts in past
- ___ 11. Mental Retardation
- **X** 12. Mental Illness (Specify diagnosis) Paranoid Schizophrenic
- ___ 13. Recent Surgery
- ___ 14. Seizures
- ___ 15. Dialysis
- ___ 16. Hypertension
- ___ 17. CARE System  Y/N

*NOTE: When screening substance abuse facility clients, please contact the TDCJ-ID Health Services Liaison at (936)437-3589 for clients with any chronic disease symptoms deemed unstable.*

### B. Preventive Medicine
- **X** 1. Tuberculosis Status
  Skin Test:  Date Given: **3,9,05** Date Read: **3,11,05** Results: **-0-** ___mm*
  X-Ray:  Date: _/_/_  ___ Normal  ___ Abnormal  Anti-TB Treatment? No ___ Yes ___
- ___ 2. Hepatitis: A ___ B ___ C ___ Other:_____
- ___ 3. HIV Antibody:  Test Date: _/_/_  Results: Neg ___ Pos ___ CD4: ___ Date _/_/_
- ___ 4. Syphilis: Date: _/_/_  Type: ___ Treatment Completed: ___Yes ___No

*NOTE: If any treatment has been recommended, the X-Ray was abnormal, or skin test indicates infection please attach tuberculosis record.*

### C. Other Health Care Problems: Enucleated own eye 04/04 while in SHU - Seen @ NTSH - Vernon - Was d'c'd c mitts for safety of remaining eye - Mitts remain in use.

### III. SPECIAL NEEDS (Check all that apply)
#### A. Housing Restrictions
- ___ 1. None
- ___ 2. Skilled Nursing Facility
- ___ 3. Extended Care Facility
- ___ 4. Psychiatric Inpatient Facility
- ___ 5. Respiratory Isolation
- **X** 6. Other: Death Row

#### B. Transportation
- **X** 1. Routine  c mitts
- ___ 2. Crutches/Cane
- ___ 3. Ambulance
- ___ 4. Wheelchair/Wheelchair Van
- ___ 5. Prosthesis: _____

#### C. Pending Specialty Clinic Appointment
___ None  ___ Type  Psych

#### D. ALLERGIES  States CLARITAN
_____
_____
_____
NKA _____

## CURRENT PRESCRIBED MEDICATIONS  None ___

| Medication | Dosage | Frequency |
|---|---|---|
| Cleanse (R) eye socket c NS + gauze - | | Instill 4 gtts Natural Tears QID - Cover c patch |
| Zyprexa 20 mg @ hs - no stop date indicated - no med Δ since t'vd @ NTSH-Vernon- | | |

THIS FORM MUST ACCOMPANY ALL OFFENDERS TRANSFERRED TO/FROM ALL TEXAS CRIMINAL JUSTICE ENTITIES

Grayson County Jail
200 South Crockett
Sherman, TX 75090
(903) 813-4010 x2232

COMPLETED BY: _____ DATE: **3,15,04**
Signature/Title

PHONE NUMBER: _____ FACILITY: _____

**Exhibit 172**

TDCJ-HSA00128

# Exhibit 173

## 03-16-05 UTMB Intake Health Screening form

Scanned by DUNN, ALMA J in facility POLUNSKY (formerly TERRELL) on 03/22/2005 12:08

UNIVERSITY OF TEXAS MEDICAL BRA.
CORRECTIONAL MANAGED CARE
INTAKE HEALTH SCREENING

NAME: _Thomas Andre_        TDCJ#: _999493_

COUNTY: _Grayson_        DOB: ▂▂▂▂▂▂▂

ARE YOU OR HAVE YOU EVER BEEN TREATED FOR:

| | | |
|---|---|---|
| 1. Asthma | YES | NO |
| 2. Heart Trouble | YES | NO |
| 3. High Blood Pressure | YES | NO |
| 4. Diabetes | YES | NO |
| 5. Seizures | YES | NO |
| 6. Allergies | YES | NO |
| 7. Hepatitis | YES | NO |
| 8. STD's (venereal disease) | YES | NO |

| | | |
|---|---|---|
| 9. Problem Pregnancy | YES | NO |
| 10. Currently Pregnant | YES | NO |
| 11. Alcoholism | YES | NO |
| 12. Mental Illness | YES | NO |
| 13. Depression or suicide attempt | YES | NO |
| 14. Head Injury | YES | NO |
| 15. Drug Addiction | YES | NO |
| 16. HIV ~/AIDS | YES | NO |

IF YES TO ANY OF THE ABOVE, GIVE DATES & TREATMENT RECEIVED:
_Zyprexa for Paranoid Schizophrenic_

HAVE YOU EXPERIENCED ANY OF THE FOLLOWING: COUGH, WEAKNESS, WEIGHT LOSS, FEVERS, NIGHT SWEATS, LETHARGY OR LOSS OF APPETITE? ☒ YES ☐ NO
IF YES, WHEN? _1st Jail - except March 27, 2004_

ARE YOU CURRENTLY TAKING ANY PRESCRIBED MEDICATIONS? ☒ YES ☐ NO
IF YES, WHAT? _Zyprexa_

WHAT ILLEGAL DRUGS HAVE YOU USED? _Marijuana    Cocaine_
WHAT WAS THE MODE (S) OF USE? (SMOKING, INJECTION, INHALED, INGESTED) _Smoked    Snorted_
WHAT AMOUNTS & HOW OFTEN DID YOU USE DRUGS OR ALCOHOL? _Cocaine   at age 16_
_Marijuana   2 joints a day_
WHEN WAS THE LAST TIME YOU USED DRUGS OR ALCOHOL? _March 2004_
HAVE YOU EVER HAD WITHDRAWAL SYMPTOMS OR SEIZURES WHEN YOU STOPPED USING DRUGS OR ALCOHOL? ☐ YES ☒ NO

DO YOU HAVE ANY CURRENT MENTAL HEALTH, MEDICAL OR DENTAL COMPLAINTS? ☐ YES ☒ NO
IS YES, WHAT?

OBSERVATIONS: ☒ TREMOR ☐ SWEATING
CONDITION OF SKIN: ☐ CUTS ☐ BRUISES ☐ SORES ☐ OTHER
BODY & MOVEMENT: ☐ DEFORMITIES ☐ IMPAIRED MOTOR ACTIVITY ☐ OTHER

BEHAVIOR & MENTAL STATUS:

HYGIENE & APPEARANCE: ☒ CLEAN, NEAT ☐ DIRTY, SLOPPY ☐ OTHER

ORIENTATION (Ask questions and document response)
What is it today's date? _Mar 16 - 2005_
What time is it?
What place is this? _Livingston TX, Polunsky Unit_
SPEECH: ☐ LOUD ☒ SOFT ☐ MUMBLING ☐ OTHER
BEHAVIOR: ☐ LAUGHING ☐ CRYING ☐ CURSING ☐ QUIET
☐ OTHER:

THOUGHT CONTENT:
ARE YOU HAVING ANY CURRENT THOUGHTS ABOUT SUICIDE? ☐ YES ☒ NO
DO YOU SEE OR HEAR THINGS THAT OTHERS DON'T SEE OR HEAR? ☒ YES voices ☐ NO
DO YOU HAVE ANY SPECIAL POWERS OR ABILITIES? ☐ YES ☒ NO
DO YOU RECEIVE PERSONAL MESSAGES FROM THE TV OR RADIO? ☐ YES ☒ NO
DO YOU HAVE ANY PHOBIAS OR EXCESSIVE FEARS? ☐ YES ☒ NO

DISPOSITION:
ROUTINE REFERRAL TO: ☐ MEDICAL ☒ MENTAL HEALTH ☐ DENTAL ☐ CID   RELEASE TO GENERAL POPULATION: ☐ YES ☒ NO
IMMEDIATE REFERRAL TO: ☐ MEDICAL ☒ MENTAL HEALTH ☐ DENTAL ☐ CID

OFFENDER SIGNATURE: _Cindy Homer_        DATE: _3-16-05_
SCREENER SIGNATURE: _E. Donaldson LVN_        DATE/TIME: _3-16-05_

HSM-13 (ACA-Pilot Draft 1/2002)

**Exhibit 173**

TDCJ-HSA00126

# Exhibit 174

## 03-22-05 Intake Mental Health Screening

Scanned by DUNN, ALMA J in facility POLUNSKY (formerly TERRELL) on 03/22/2005 12:29

## INTAKE MENTAL HEALTH SCREENING

Name: Thomas, Andre    TDCJ# 999493    DOB: ▮    Age: 22    Sex: M

Place of Birth: Muskogee OK    Race: ( ) Caucasian

Prior TDCJ Incarceration:    Yes    No    (X) African-American
Prior Mental Health Treatment:    Yes    No    ( ) Hispanic
Prior Inpatient/Crisis Mgt.:    Yes    No    ( ) Other _____
Prior MROP:    Yes    No

| Yes | No | |
|---|---|---|
| ( ) | ( ) | 1. How are you feeling? _Taking as I comes_ |
| ( ) | (X) | 2. Have you ever had any kind of mental, emotional or nerve problem? _No_ |
| | | Did you get any kind of counseling? _No_ |
| | | What was it for? _____ |
| | | When & where was it? _____ |
| ( ) | (X) | 3. Have you ever taken medicine for mental, emotional or nerve problems? |
| on sheet | | What was the name of the medication? _Zyprexa 20mg_ |
| | | When did you take the medication? _this AM_ |
| | | What medicine are you taking currently? _Only this_ |
| ( ) | (X) | 4. Have you ever been admitted to a psychiatric hospital? _No_ |
| | | What was the name of the hospital? _____ |
| | | When were you a patient? _____ |
| | | What was the reason for hospitalization? _____ |
| (X) | ( ) | 5. Has anyone in your family been diagnosed with a mental or emotional problem? _yes_ |
| | | Whom and what type of problem? _Bro  P32-19_ |
| ( ) | (X) | 6. Have you ever had a head injury or seizure? _No_ |
| (X) | ( ) | 7. Have you ever tried to hurt yourself or commit suicide? _yes_ |
| | | How many times? _10 & 15_  Was medical attention required? _stitches_ |
| | | How?  ( ) Cut arm/wrist/throat   ( ) Hanging _knife cut was_ |
| | | ( ) Overdose _of superficial_  (X) Other _fingernail scratc_ |
| | | When? _____ |
| ( ) | (X) | 8. Have you ever hurt yourself on purpose when you were not trying to commit suicide? |
| | | How and when? _No_ |
| ( ) | (X) | 9. Are you thinking about hurting or killing yourself currently? _No_ |
| (X) | ( ) | 10. Do you ever see or hear things that other people do not see or hear? |
| | | Specify: _sometimes    12 or 13_ |

HSP-31 (Front)(Rev. 9/99)

_Paula & Troy  play jokes on_
_each other in my cell_
_— told me to steal cars_
_— told me to hurt people but I_
_wouldn't do it_
_didn't want to see people cry  JW_

Exhibit 174

TDCJ-HSA00635

Scanned by DUNN, ALMA J in facility POLUNSKY (formerly TERRELL) on 03/22/2005 12:30

→ sometimes when other people are around
ones black & ones
Willis 5' 7

— saw demons in Grayson Co jail fat & really
big ears
told dis about her

TDCJ-HSA00636

# Exhibit 175

# 03-24-05 Correctional Managed Care – Individualized Treatment Plan for Psychiatry Chronic Care – Initial Psychiatric Evaluation

**Individualized Treatment Plan for Psychiatry Chronic Care (Initial or Follow-up)**

**Patient Name:** THOMAS, ANDRE    **TDCJ#:** 999493    **Date:** 03/24/2005 13:55
**Facility:** POLUNSKY (formerly TERRELL)  **Date of Birth:** ███████  **Age:** 22 Years  **Race:** B  **Sex:** Male

| Patient Language: | Name of interpreter, if required: |
|---|---|

_____x_____   **INITIAL PSYCHIATRIC EVALUATION**
_____   **FOLLOW-UP PSYCHIIATRIC EVALUATION**

**Current Medications:**
**Allergies:**
**Most recent vitals from :** BP:  Wt.  Height  Pulse:  Resp.:  Temp:
**Current Lab Tests:**
**CASE SUMMARY:**(active dx)


**PSYCHIATRIC/MEDICAL/SOCIAL HISTORY:**
**22 y/o BM**

**Brown chart was not available for review.  Also, very limited mental health information currently in EMR.**


**SUBJECTIVE:**
        History of present illness:  Pt c/o "hear voices…keep talking to me."  During interview, pt seemed to be distracted and responding to the claimed voices.  Pt states "hear multiple voices…some like the president…say 'bash my head…that I'm gay'…Polix(?sp)…guardian angel."  Frequency – "just started when they got me off medications."  Duration – "in and out during the day."  Onset – "twelve years old…fell off my bike…I hear the voice…'I'll be alright'…Polix picked me up."

Pt also c/o depression.  Pt states "real depressed since I've been off my medication."  Pt did not appear depressed.  Pt came to unit without any Rx for an antidepressant, only for an antipsychotic.

No h/o mania.

Pt's medication did not follow him from last unit.  Pt states that he was taking Zyprexa.  Pt informed that it is a non-formulary medication.  Pt has not used any other psych medication, other than the Geodon.  Pt willing to try Navane.  Pt was educated about possible side effects from psychiatric medications.

Will continue to monitor.

        Psychiatric history:  Hospitalization at Vernon State Hosp x 1 ½ mos for mental evaluation for trial competency.  Dx – paranoid schizophrenia.  Rx – "geodon and zyprexa."  OP psych care onset at 21y/o at Bryson County Jail for "hearing voices."  Dx – paranoid schizophrenia      Rx – "Geodon"  Suicide hx- pt states "slit wrist…tried to hang…slit my wrist again."  Observation of L wrist reveals superficial scar.  Pt states that no emergency medical care was given for suicide attempts.

        Substance Use history:  polysubstance abuse since 13 y/o

        Social history:   9th grade edu.    GED.  Worked in grounds maintenance x 3 yrs
Prison - 1st time        Jail – 6x

        Medical history: Pt states that he ripped out his R eye secondary to the President (Bush) telling him "if I wanted to be one of the thirteen warriors…save the world."  Pt states that this happened in Byson County Jail on 4/2/04.

        Family psychiatric history: older brother – paranoid schizophrenia.


**OBJECTIVE:**
**R eyelid is in a fixed, closed position.  R eye seems to be missing (as pt claims).**

**Mental Status:**

| | | | |
|---|---|---|---|
| Oriented x | [x] | WNL | [ ] Other _____ |
| Appearance: | [x] | WNL | [ ] Other _____ |

**Exhibit 175**

TDCJ-HSA00630

CORRECTIONAL MANAGED CARE
OUTPATIENT MENTAL HEALTH SERVICES

**Individualized Treatment Plan for Psychiatry Chronic Care (Initial or Follow-up)**

**Patient Name:** THOMAS, ANDRE   **TDCJ#:** 999493   **Date:** 03/24/2005 13:55
**Facility:** POLUNSKY (formerly TERRELL)   **Date of Birth:** ▇▇▇▇   **Age:** 22 Years **Race:** B **Sex:** Male

| | | | | | |
|---|---|---|---|---|---|
| Speech: | x | WNL | | Other | |
| Mood: | x | Euthymic | | Other | Not depressed |
| Affect: | x | WNL | | Other | |
| Thought processes: | x | WNL | | Other | |
| Thought content: | | WNL | x | Other | Auditory hallucinations |
| Cognition: | x | WNL | | Other | |
| Suicidal/homicidal idea: | x | None | | Other | |
| Insight/judgment: | x | Intact | | Other | |

**COMPLIANCE:** n/a

**AIMS:**

Complete examination procedure outlined in the instructions before making rating.  Rate highest severity observed.  Movements occurring upon activation rate one less that those occurring spontaneously.
0=None        1=Minimal        2=Mild        3=Moderate        4=Severe

| | |
|---|---|
| 1.   Muscles of facial expression<br>e.g. movements of forehead, eyebrows, preorbital area, cheeks, include frowning, blinding, smiling, grimacing | 0 |
| 1.   Lips and perioral area<br>e.g.  puckering, pouting, smacking | 0 |
| 1.   Jaw<br>e.g.  biting, clenching, chewing, mouth opening, lateral movement | 0 |
| 1.   Tongue<br>Rate only increase in movement both in and out of mouth, not inability to sustain movement | 0 |
| 1.   Upper (arms, wrists, hands, fingers)<br>Include choreic movements (i.e., rapid, objectively purposeless, irregular, spontaneous); athetoid movements (i.e., slow, irregular, complex, serpentine).  DO NOT include tremor (i.e., repetitive, regular, rhythmic). | 0 |
| 1.   Lower (legs, knees, ankles, toes)<br>e.g. lateral knee movement, foot tapping, heel dropping, foot squirming, inversion & eversion of foot | 0 |
| 1.   Neck, shoulders, hips<br>e.g. rocking, twisting, squirming, pelvic gyrations | 0 |
| 8.   Severity of abnormal movements | 0 |
| 9.   Incapacitation due to abnormal movements | 0 |
| 10.  Patient's awareness of abnormal movements<br>Rate only patient's report:  No awareness=0  Aware, no distress=1  Aware, mild distress=2  Aware, moderate distress=3  Aware, severe distress=4 | 0 |
| 10.  Current problems with teeth &/or dentures?<br>No=1   Yes=2 | 0 |
| 10.  Does patient usually wear dentures?<br>No=1   Yes=2 | 0 |
| Total | 0 |

**ASSESSMENT:**

**Relevant Brief Psychiatric Rating Scale Items**
BRIEF PSYCHIATRIC RATING SCALE
Depression
1-Not Present
Sucidality
1-Not Present
Distractibility

CORRECTIONAL MANAGED CARE
OUTPATIENT MENTAL HEALTH SERVICES

**Individualized Treatment Plan for Psychiatry Chronic Care (Initial or Follow-up)**

**Patient Name:** THOMAS, ANDRE   **TDCJ#:** 999493   **Date:** 03/24/2005 13:55
**Facility:** POLUNSKY (formerly TERRELL)   **Date of Birth:** ▮▮▮▮▮▮   **Age:** 22 Years **Race:** B **Sex:** Male

    4-Mod-Responsive To Irrelevant Stimuli Much Of Time
Hallucinations
    4-Mod-Verbal, Visual, Other >3x Or Freq Non-Verbal, No Impair
Unusual Thought Content
    1-Not Present
Conceptual Disorganization
    1-Not Present
Mannerisms & Posturing
    1-Not Present
Bizarre Behavior
    1-Not Present
Suspiciousness
    1-Not Present
Self-Neglect
    1-Not Present
Blunted Affect
    1-Not Present
Disorientation
    1-Not Present
(Use BPRS decision tree and paste here)


**Diagnosis:**
Axis I:  h/o Paranoid Schizophrenia
Axis II:
Axis III:

**PLAN:  Request f/w records**

**Medication:**   Start Navane and Cogentin


**Started Meds:**
    BENZTROPINE MESYLATE 2MG TABS        52555067801        03/24/2005 14:48
        1 TABS ORAL(po) QPM
            Special Instructions:Equi=Cogentin. Non-Kop
       STOP DATE:                REFILLS: 5
    THIOTHIXENE 10MG CAPS        57866443803        03/24/2005 14:48
        1 CAPS ORAL(po) B QPM
       STOP DATE:                REFILLS: 5
Refer to:

Lab/EKG:     LFT     TSH     chem-10


**Procedures Ordered:**
    CHEMISTRY 10 PANEL (CHEM 10) {PSYLDMCD}:   schizophrenia, paranoid type
    THYROID STIMULATING HORMONE (TSH) {BFPSYLDMCD}:        schizophrenia, paranoid type
    LIVER PANEL (ALB,ALKPHOS,ALT,AST,BC,BILI T,TP) (LFP) {HVCNDBSZPSYLDMCD}:
schizophrenia, paranoid type
    MH OP ASSESSMENT/EVALUATION:  schizophrenia, paranoid type

CORRECTIONAL MANAGED CARE
OUTPATIENT MENTAL HEALTH SERVICES

**Individualized Treatment Plan for Psychiatry Chronic Care (Initial or Follow-up)**

**Patient Name:** THOMAS, ANDRE   **TDCJ#:** 999493   **Date:** 03/24/2005 13:55
**Facility:** POLUNSKY (formerly TERRELL)   **Date of Birth:** ▮▮▮▮▮▮   **Age:** 22 Years **Race:** B **Sex:** Male

HSM-18:  III:  Work Restrictions  # 19 __x_yes ___no   #20 _x__yes ___no
Other:

PULHES: ___ S-1AP ___ S-1AH ___ S-2BR ___S-2BT ___S-3NR _x__S-3NT ___S-4PT ___ S-4MR
ALERT CODE:

Follow-up appointment in - 1 mo – 4/26/05
Other recommendations:

**ORDERS/PROCEDURES:**

I have discussed with the patient the risks, benefits and alternatives to the treatment plan as specified above and he/she agrees to the recommended treatment(s).

_____x_____ Yes          _____ No          _____ N/A


 Electronically Signed by FONG, GEORGE G PA-C on 03/24/2005.
 Electronically Signed by WHITE, DONNA L BS on 03/24/2005.
 Electronically Signed by BEASLEY, MELVA J CCA on 03/25/2005.
 Electronically Signed by LIMSIACO, MARCIANO M.D. on 04/19/2005.
 ##And No Others##

TDCJ-HSA00633

# Exhibit 176

## 12-01-08 Correctional Managed Care – Mental Health Observation Note

**CORRECTIONAL MANAGED CARE**
**OUTPATIENT MENTAL HEALTH SERVICES**

MENTAL HEALTH OBSERVATION NOTE

Patient Name: THOMAS, ANDRE          TDCJ#:999493          Date:  12/01/2008 14:00
Facility:  POLUNSKY (formerly TERRELL)
Age:25  Race:  B  Sex:  Male

Patient Language: **ENGLISH     Name of interpreter, if required:**
**Most recent vitals from 11/29/2008:** BP: 116 / 72 (Sitting) ; Wt: ; Height: 69 In.; Pulse: 75 (Sitting) ; Resp: 12 / min; Temp:

**Allergies:** NO KNOWN ALLERGIES

Seen this date at (time):  08:00 and 13:30

S:      Reason for Admission: Threats of self-harm by hanging

        Length of stay: 48 hours

        Summary of stay: Pt. was resting on paper bags at first arrival.  He requested to be transferred to J4 for thinking he was God.  His suicide blanket had been restricted due to continued threats to hang himself.  He denied self-harm and was given a suicide blanket at that time to be assessed later in the day.
The pt. is alert, oriented by 4, denies thoughts or plans for self-harm at re-assessment.  He reported that he felt he was "going back in time" when he last carved words in his arm
 'ong with several superficial lacerations on the other forearm.  He had a recent disciplinary case for which he lost his Level 1 _.atus.  He stated that he is taking his medication as prescribed.  Mr. Fong, will be notified of the increase in MH symptoms.  He does not appear to be in need of in-patient care at this time.
        He returned from J4 (D &E) in August, 2008.

O:      Mental Status/ Behavioral Observations
        **Mental Status:**
        **Orientation:** x4
        **Behavior:** cooperative
        **Speech:** normal
        **Thought Process:** lucid, organized (no noticible delusions)
        **Thought Content:** appropriate (free of hallucinations)
        **Memory:** intact
        **Mood:** mixed
        **Affect:**  congruent
        **Impulse Control:** good
        **Insight & Judgment:** fair to poor
        **Suicidal/homicidal ideation:** denied

        MENTAL HEALTH SUICIDE RISK ASSESSMENT
            Subjective
                Reason For Referral
                    Offender Is At Possible Risk/Threatening Self-Injury
                Offender Report
                    Offender Denies Or Has No Current Plans For Suicide Or Self-Injury
            Objective
                History
                    Offender Has A Hx Of Self-Injurious Behavior W/In
    The Past 12 Mths Which Was

1 of 2

**Exhibit 176**                                                    TDCJ-HSA00256

**CORRECTIONAL MANAGED CARE**
**OUTPATIENT MENTAL HEALTH SERVICES**

<u>MENTAL HEALTH OBSERVATION NOTE</u>

Patient Name: THOMAS, ANDRE          TDCJ#:999493          Date:  12/01/2008 14:00
Facility:  POLUNSKY (formerly TERRELL)

Potentially Lethal
Long-Term Risk Factors Include (Check All That Apply)
Serious Mental Illness
History Of Self-Harm Command Hallucinations
Prior Self-Injuries And/Or Suicide Gestures
Lengthy Sentence
Crime That Involves Serious Injury Or Death Of A Loved One (Specify):
Acute Risk Factors Include (Check All That Apply)
Recent Or Pending Custody Change, Majory Disciplinary Or Escape Attempt
Assessment
Assessment Of Self-Report
Offender Denies Or Has No Current Plan For Suicide Or Self-Injury
Is Likely To Seek Help If S/He Changes His/Her Mind
Assessment Of Suicide Risk
Based Upon Available Data, It Is My Clinical Opinion That This Offender Is At
Low Imminent Risk For A Potentially Lethal Suicide Attempt

A:      Diagnostic Impression
Axis I: 295.7
Axis II: none

P:      ☐  Continue observation
        ☒  Return to housing area
            Follow-up appointment x __1____ days (no later than 72 hours after release)
            Refer to _____ for further evaluation &/or treatment

        ☐  Transfer to crisis management/diagnostic and evaluation

Pt. is discharged from psychological observation.  Security was notified (count room, and 10 back)

Procedures Ordered:
MH OP ASSESSMENT/EVALUATION:  mh death row patient, mental health cars 3, schizoaffective
disorder

Electronically Signed by ROY, JULIA L MA, SP on 12/01/2008.
##And No Others##

2 of 2

TDCJ-HSA00257

# Exhibit 177

## 12-08-08 Clinic Notes

c:\temp\114178150.tif printed by mivap. (Page 1 of 1)

Case 4:09-cv-00644-JRG Document 7-12 Filed 03/16/10 Page 90 of 140 PageID #: 2035

Scanned by SUTTON, KAREN B in facility POLUNSKY (formerly TERRELL) on 01/13/2009 07:58

# CLINIC NOTES

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## INSTITUTIONAL DIVISION

Name: Andrew Thomas
TDCJ No: 999493
Unit: Polunsky

### TREATMENT CONTINUES

| Date & Time | | Notes |
|---|---|---|
| 12-8-08 1800 | S – | Offender remains in psychological observation with no forced meds, no restraints, no property, no hot meals (Johnnies only), no clothes, no electrical outlets, no bed, no place to hang, no unsafe windows, no pens/paper clips or staples. Continues behavior or verbalization to warrant psychological observations as follows: |
| | O – | Pt. quiet. Took Johnnie, has already took his medication. |
| | A – | Self abusive or suicidal behavior occurring/not occurring consisting of: |
| | P – | Continue observation. |

Please sign each entry with status.
HSM-1 (Rev. 5/92)

**Exhibit 177**

TDCJ-HSA00156

# Exhibit 178

## 12-09-08 Brain scans



Exhibit 178



# Exhibit 179

## 12-10-08 Correctional Managed Care Clinic Notes – Mid Level Provider

**Correctional Managed Care**
**CLINIC NOTES - MID LEVEL PROVIDER**

**Patient Name:** THOMAS, ANDRE   **TDCJ#:** 999493   **Date:** 12/10/2008 13:44   **Facility:** JESTER IV

**Age:** 25 Years   **Race:** B   **Sex:** Male

**Most recent vitals from 12/10/2008:** BP: 125 / 66 (Sitting) ; Wt: 146 Lbs.; Height: 69 In.; Pulse: 77 (Sitting) ; Resp: 18 / min; Temp: 97.3 (Oral)

**Allergies:** NO KNOWN ALLERGIES

| Patient Language:   ENGLISH   Name of interpreter, if required: |
|---|

Today's Problem:

S: Pt has hx of removing right eye 2004. He has been blind in that eye since.
Yesterday, he removed the left eye and was seen in local ER.  He was released on Cipro and antibiotic eye drops

O: NAD.  Pt calm and aswering questions with "Sir, yes sir."
right eye- socket clean.  No infection.  No eyeball present
left eye- socket has fresh tissue- no signs of infection. No eyeball present

A:  Totally blind s/p self-inflicted eyeball removal

Plan is as follows:
    Motrin 600mg 1 po bid x 10 days- start today
    Tobramycin 0.3% opth solution 1 drop left eye qid x 10 days
    Eye patch replacement qd x 10 days
    Bactrim DS 1 po bid x 10 days- start today
    f/u 10 days
    Blindness- complete added to problem list.

Electronically Signed by EVANS, ALAN  PA-C on 12/10/2008.
Electronically Signed by ARTHUNGAL, ELCY  R.N. on 12/10/2008.
Electronically Signed by COPELAND, ALICE F CCA on 12/10/2008.
Electronically Signed by WEST, LAKEYA  CCA on 12/11/2008.
##And No Others##

1 of 1

**Exhibit 179**

TDCJ-HSA00102

# Exhibit 180

## 12-11-08 Emergency Record

Scanned by LITTON, TRACY B in facility POLUNSKY (formerly TERRELL) on 12/10/2008 09:26

# EMERGENCY RECORD

FACILITY: _TL_    ER NUMBER: _0813?_

| | | | |
|---|---|---|---|
| _Thomas_ | _Andre_ | __ | |
| Name | First Name | MI | |

Age: _25_  DOB _____ ☒Male ☐ Female

Date: _12-10-08_  Time: _0802_
☐Ambulatory ☒W/C  ☐Stretcher ☐Carried
Condition: ☒Stable ☐Guarded  ☐Serious ☐Critical
Allergies: ☒NKA  ☐_____

TDCJ#: _999493_

| Chief Complaint/Location/Onset: | TIME | TEMP | PULSE | RESP | B/P | OTH (O2 Sat. Carbo...) |
|---|---|---|---|---|---|---|
| _Self Mutilation_ | 0730 | 98 | 98 | 20 | 110/6? | 100% |

| Current Medications: | Dose | Freq | Last Dose | | |
|---|---|---|---|---|---|
| _Fluoxetine_ | _10mg_ | _i po. QAM_ | _given 0830_ _↗ dwa @ 12/9 @ ETMC_ | | |
| _Trazodone_ | _50mg_ | _iii po. qPm_ | _gave 0830_ | | |

NURSE ASSESSMENT: _0800 Recieve Report that patient is in 17 Ob Cell and will transfer to JJ bed. Spoke with Mr. Tracy and wants transferred will folds to J4. Observed patient upon wrapped in security blanket. States OK. Continu_
Triage Nurse Signature: _Jordan_

SIGNIFICANT MEDICAL HISTORY:

PHYSICAL:

PROVIDERS ORDERS: _@ Pru..._
Notified: ☒  Time: _0830_
(1) _Medically clears_ _Bp to J4 by Dr ..._
(2) _Give MS 15 g pc ?_ _to pain._
(3) _Transfer to J4 pc._
(4) _Report to Mr Bull...._

DIAGNOSIS/IMPRESSION: _Suicidal_

| Time | Medication/Solution | Dose /Rate | Site Route | Gauge | Amount Infused | Signature |
|---|---|---|---|---|---|---|
| _0830_ | _MS_ | _15 g_ | _i_ | | _gave_ | _Bird_ |

Disposition of Patient: ☐Cell ☐TDCJ Infirmary _____ ☒Other _J4_ facility
☐Local ER ☐Hospital Galveston
Condition on Discharge: ☐Improved ☒Stable  Date: _12/10/08_  Time _0830_
☐Deceased ☐Unstable
Type of Transfer: ☒Van ☐Local EMS ☐UTMB EMS
☐Other: _____
UR Notified: ☒N/A ☐Yes ☐No  Date: ____  Time: ____
Pre-Certification #: _____  UR Contact: _____
Follow-up: _pm unit route_

Provider Signature: _Thomas Sr_
Date: _12/1-08_  Time: _900_
RN/LVN Signature: _Bird sn_
Date: _12/10/08_  Time: _0830_

**Exhibit 180**

TDCJ-HSA00114

C:\temp\1250088Z1.tif printed 03/16/10

Scanned by SWAIM, KATHY L CCA in facility POLUNSKY (formerly TERRELL) on 12/09/2008 14:28

## EMERGENCY RECORD

**FACILITY:** TL                                   **ER NUMBER:** 0812B

| MODE OF ARRIVAL |
|---|

Name: Thomas     First Name: Andre     MI:

Date: 12-9-08     Time: 1250
☐ Ambulatory  ☒ W/C  ☐ Stretcher  ☐ Carried
Condition: ☒ Stable  ☐ Guarded  ☐ Serious  ☐ Critical
Allergies: ☒ NKA  ☐

Age: 25   DOB: ▓▓▓▓   ☒ Male  ☐ Female
TDCJ#: 999 493

**Chief Complaint/Location/Onset:**
1250 C/O to security that he had removed his eye and ate it. Cell #17 Psych Ob cell- patient seen lin on fl left side face down.

| | TIME | TEMP | PULSE | RESP | B/P | OTHER (O2 Sat, Cardiac Monitor, glucose, etc.) |
|---|---|---|---|---|---|---|
| | 12:50 | 98² | 70 | 20 | 111/73 | |

**Current Medications:** Dose / Freq / Last Dose

**NURSE ASSESSMENT:** 1255 Brought over by wheelchair ob cell #17 per patient who states "ate left eye ball". Blood noting on L eye orbit. Used sterile 4x4 - held to left eye. Opened to reveal dark empty socket - No drip 9 noted. To ER via Wheelchair.

Triage Nurse Signature: _Smith_

**SIGNIFICANT MEDICAL HISTORY:**

**PHYSICAL:**

**PROVIDERS ORDERS:**
Notified: ☒   Time: 1250
① Transfer to local ER to be evaluated -
② May give Tylenol #3 Ti, PO X1

**DIAGNOSIS/IMPRESSION:** Self enucleation of L eye
Death Row Patient

| Time | Medication/Solution | Dose/Rate | Site/Route | Gauge | Amount Infused | Signature |
|---|---|---|---|---|---|---|
| 1355 | Tylenol #3 | Ti | P.O. | | given by Ms | Johnson LVN |

**Disposition of Patient:** ☐ Cell  ☐ TDCJ Infirmary
☒ Local ER  ☐ Hospital Galveston  ☐ Other ____ facility
**Condition on Discharge:** ☒ Improved  ☒ Stable  ☐ Unstable  Date: 12/9/08  Time: 1400
☐ Deceased
**...e of Transfer:** ☒ Van  ☐ Local EMS  ☐ UTMB EMS  Time: 1350
☐ Other:
**UR Notified:** ☐ N/A  ☒ Yes  ☐ No  Date: 12/9/08
**Pre-Certification #:** ____  UR Contact: Ray

**Provider Signature:** _Johnson_   Date: 12/9/08  Time: 1400
**RN/LVN Signature:** _Johnson_   Date: 12/9/08  Time: 12:05

**Follow-up:** _____ M.H.

HSM-16 Front (8/01)

TDCJ-HSA00115

# Exhibit 181

## 12-11-08 Correctional Managed Care Mental Health Services – Mental Health Inpatient Crisis Management

CORRECTIONAL MANAGED CARE
MENTAL HEALTH SERVICES

MENTAL HEALTH  INPATIENT  CRISIS MANAGEMENT

Patient Name: THOMAS, ANDRE          TDCJ#:999493  Date:  12/11/2008 10:08   Facility:  JESTER IV
Age:25   Race: B  Sex: Male

| Patient Language: **ENGLISH**    Name of interpreter, if required: |

**Most recent vitals from 12/10/2008:** BP: 122 / 65 (Sitting) ; Wt: 135 Lbs.; Height: 69 In.; Pulse: 88 (Sitting) ; Resp: 18 / min;
Temp: 98.2 (Oral)

**Allergies:** NO KNOWN ALLERGIES
Active Problems: *

Cars:
    **Medical Cars 3 First Observed 03/30/2006 07:47AM**
    **Mental Health Cars 3 First Observed 12/01/2008 02:36PM**

Dental:
    **Dental Examination First Observed 04/17/2007 06:57AM**
    **Hard Tissue Disease First Observed 10/09/2007 08:48AM**

Mental Health:
    **Mh Death Row Patient First Observed 07/10/2007 06:53AM**

1h Other:
    **Behavioral Problems First Observed 03/24/2005 02:38PM**
    **Mental Status Exam First Observed 04/08/2005 05:01PM**
    **Mental Health Behavioral Observations First Observed 05/11/2005 06:00PM**
    **Mental Health Case Mgmt Problems And Trmt Objectives First Observed 04/07/2006 03:27PM**
    **Mental Health Suicide Risk Assessment First Observed 06/07/2006 04:27PM**

Nurse Protocol:
    **Np - Eye/ear/nose/throat Complaints First Observed 06/04/2008 07:52AM**
    **Np - Psychiatric Symptoms First Observed 07/14/2008 09:57PM**

Not Specified:
    **Brief Psychiatric Rating Scale First Observed 03/24/2005 02:49PM**
    **Misc Diagnosis First Observed 03/27/2005 07:46AM**
    **Hiv High Risk Screening Completed First Observed 03/27/2005 07:46AM**
    **Screening Exam For Suspected Condition First Observed 03/27/2005 07:47AM**
    **Respiratory System And Chest Symptoms Nec First Observed 01/05/2006 04:12PM**
    **Np - Chest Pain First Observed 03/07/2006 08:17AM**
    **Annual Ppd Skin Test First Observed 03/23/2006 03:40PM**
    **Observation- Cond Not Found First Observed 03/30/2006 07:47AM**
    **Np - Burns/wounds/bites First Observed 05/03/2006 09:31PM**
     **Pre-segregation/lock-up Physical Exam First Observed 06/07/2006 04:16PM**
    **Vision First Observed 11/21/2006 07:20AM**
    **Lipoma First Observed 04/27/2007 07:48AM**
    **Dental Cars 1 First Observed 10/09/2007 08:47AM**
    **Schizoaffective Disorder First Observed 02/26/2008 04:00PM**
    **Tb Class 0 (no Exposure Pulm. Tuberculosis) First Observed 04/29/2008 09:11AM**
    **Tetanus Toxoid Vaccination First Observed 04/29/2008 09:11AM**
    **Offender Returning From I/p Psych Facility First Observed 07/31/2008 05:22PM**

1 of 3

**Exhibit 181**

TDCJ-HSA00213

**CORRECTIONAL MANAGED CARE**
**MENTAL HEALTH SERVICES**

MENTAL HEALTH  INPATIENT  CRISIS MANAGEMENT

Patient Name: THOMAS, ANDRE        TDCJ#:999493  Date:  12/11/2008 10:08  Facility:  JESTER IV
Age:25  Race: B  Sex: Male

## Seen this date at (time):

**Initial Crisis Management:**

**Patient verbally consented to Crisis Management intervention for 3 working days.  The limits of confidentiality were explained.   Patient was informed of treatment plan, risks/ benefits, and alternatives to treatment.  Patient understands that participation is voluntary and may be discontinued at any time.**

CM Day: #1
UOA: Polunsky
Precipitant: Self- Injurious Gesture- Plucked out Left Eye and Ate It

S: "I ripped out my eye.  I didn't want to look at no other woman besides the one I am in love with.  I thought I was justified being with another man.  I feel she isn't dead because I keep seeing her.  I want out of this false reality.  I don't feel she has a right to- Everyone makes mistakes!"

O:

| | |
|---|---|
| Orientation: Ox2, person and situation | Behavior: Shaking |
| Mood/Affect: Agitated with congruent affect | Appearance: Bandage over left eye, skinny, impaired ADLs |
| Insight/Judgment: Limited | Speech: Clear with normal rate, rhythm, and volume |
| Thought Process: Illogical, irrational, not based on reality | S/H ideations: Denied thoughts of harm to self and others, contracted for safety |
| Thought Content: Delusions, paranoid | Hallucinations: auditory |

Offender Thomas was seen in the B1- Dayroom on 12/11/2008 by the Crisis Management Treatment Team.  The offender was referred after removing his left eye and consuming it; he previously removed his right eye.  The offender is incarcerated due to convictions of murder of his wife and children.  He reports that he does not believe his wife is dead and that his actions were actually a "false reality."  He is "sure" his wife is alive because she visits him daily.  The offender is prescribed psychotropic medications but claims he is not taking them consistently, as he believes the medications amplify his hallucinatory experiences.  The offender is paranoid, illogical, and delusions are present.  The offender is actively psychotic.  He was encouraged to take his psychotropic medication.  The offender responded, "I don't want to be here; I just want to go back to my wife."

A: H/O 295.70

2 of 3

TDCJ-HSA00214

**CORRECTIONAL MANAGED CARE
MENTAL HEALTH SERVICES**

MENTAL HEALTH  INPATIENT  CRISIS MANAGEMENT

Patient Name: THOMAS, ANDRE          TDCJ#:999493  Date:   12/11/2008 10:08   Facility:  JESTER IV
Age:25  Race: B  Sex:  Male
P: The clinician will follow the patient routinely for the duration of his CM to check his progress and for interventions
as appropriate.


Is CARS Current?  Yes   No



Procedures Ordered:
        MH IP ASSESSMENT/EVALUATION:   schizoaffective disorder

        Electronically Signed by SAMUELS, KIMBERLY C MA, SP on 12/11/2008.
        ##And No Others##

TDCJ-HSA00215

# Exhibit 182

**12-12-08 Correctional Managed Care Mental Health Service – Mental Health Inpatient Crisis Management Discharge Note**

**CORRECTIONAL MANAGED CARE**
**MENTAL HEALTH SERVICES**

<u>MENTAL HEALTH INPATIENT CRISIS MANAGEMENT DISCHARGE NOTE</u>

Patient Name: THOMAS, ANDRE      TDCJ#:999493  Date:  12/12/2008 12:55   Facility:  JESTER IV

Age:25   Race: B  Sex:  Male

| Patient Language:  ENGLISH    Name of interpreter, if required: |

**Most recent vitals from 12/10/2008:** BP: 122 / 65 (Sitting) ; Wt: 135 Lbs.; Height: 69 In.; Pulse: 88 (Sitting) ; Resp: 18 / min; Temp: 98.2 (Oral)

**Allergies:** NO KNOWN ALLERGIES
Active Problems: *

**Cars:**
> Medical Cars 3 First Observed 03/30/2006 07:47AM
> Mental Health Cars 3 First Observed 12/01/2008 02:36PM

**Dental:**
> Dental Examination First Observed 04/17/2007 06:57AM
> Hard Tissue Disease First Observed 10/09/2007 08:48AM

**Mental Health:**
> Mh Death Row Patient First Observed 07/10/2007 06:53AM

**1h Other:**
> Behavioral Problems First Observed 03/24/2005 02:38PM
> Mental Status Exam First Observed 04/08/2005 05:01PM
> Mental Health Behavioral Observations First Observed 05/11/2005 06:00PM
> Mental Health Case Mgmt Problems And Trmt Objectives First Observed 04/07/2006 03:27PM
> Mental Health Suicide Risk Assessment First Observed 06/07/2006 04:27PM

**Nurse Protocol:**
> Np - Eye/ear/nose/throat Complaints First Observed 06/04/2008 07:52AM
> Np - Psychiatric Symptoms First Observed 07/14/2008 09:57PM

**Not Specified:**
> Brief Psychiatric Rating Scale First Observed 03/24/2005 02:49PM
> Misc Diagnosis First Observed 03/27/2005 07:46AM
> Hiv High Risk Screening Completed First Observed 03/27/2005 07:46AM
> Screening Exam For Suspected Condition First Observed 03/27/2005 07:47AM
> Respiratory System And Chest Symptoms Nec First Observed 01/05/2006 04:12PM
> Np - Chest Pain First Observed 03/07/2006 08:17AM
> Annual Ppd Skin Test First Observed 03/23/2006 03:40PM
> Observation- Cond Not Found First Observed 03/30/2006 07:47AM
> Np - Burns/wounds/bites First Observed 05/03/2006 09:31PM
>  Pre-segregation/lock-up Physical Exam First Observed 06/07/2006 04:16PM
> Vision First Observed 11/21/2006 07:20AM
> Lipoma First Observed 04/27/2007 07:48AM
> Dental Cars 1 First Observed 10/09/2007 08:47AM
> Schizoaffective Disorder First Observed 02/26/2008 04:00PM
> Tb Class 0 (no Exposure Pulm. Tuberculosis) First Observed 04/29/2008 09:11AM
> Tetanus Toxoid Vaccination First Observed 04/29/2008 09:11AM
> Offender Returning From I/p Psych Facility First Observed 07/31/2008 05:22PM

**Exhibit 182**

TDCJ-HSA00211

CORRECTIONAL MANAGED CARE
MENTAL HEALTH SERVICES

MENTAL HEALTH INPATIENT CRISIS MANAGEMENT DISCHARGE NOTE

Patient Name: THOMAS, ANDRE       TDCJ#:999493  Date:  12/12/2008 12:55   Facility:  JESTER IV

## Seen this date at (time):  9:15am

S:
Reason for admission: Self- Injurious Gesture- Plucked out Left Eye and Ate It
Course of Treatment during Crisis Management: Following crisis intervention counseling, Offender Thomas continues to present with an impaired mental status.  The offender is actively psychotic and further stabilization and evaluation is need.  Offender Thomas expresses paranoid themes, poor reality testing, delusional and magical beliefs, and reports hallucinatory experiences.  The offender is unpredictable and quotes the Bible frequently to support his self- injurious and bizarre actions.  He has been compliant with his medication regime and has not been a behavioral management problem.  At this time, he denies suicidal and homicidal thoughts, but contradictorily states he wants to be with his deceased wife.  The writer has not removed the offender from the Crisis Management checklist over the weekend; he is to be checked on until seen by the D&E therapist.

O:

| | |
|---|---|
| Orientation: Ox2, person and situation | Behavior: Cooperative |
| Mood/Affect: Anxious with congruent affect | Appearance: Bandage over both eyes, skinny, impaired ADLs |
| Insight/Judgment: Limited | Speech: Clear with normal rate, rhythm, and volume |
| Thought Process: Illogical, irrational, not based on reality | S/H ideations: Denied thoughts of harm to self and others |
| Thought Content: Delusions, paranoid | Hallucinations: auditory |

A: Discharge Diagnosis
  Axis I:   295.70 Schizoaffective Disorder
  Axis II:   Deferred
  Axis III:   See medical file

P:  Diagnostic and Evaluation

Procedures Ordered:
  MH IP ASSESSMENT/EVALUATION:    schizoaffective disorder

  Electronically Signed by SAMUELS, KIMBERLY C MA, SP on 12/12/2008.
  ##And No Others##

2 of 2

TDCJ-HSA00212

# Exhibit 183

## 12-15-08 Correctional Managed Care – Inpatient Psychiatric Evaluation

CORRECTIONAL MANAGED CARE
MENTAL HEALTH SERVICES

Inpatient Psychiatric Evaluation

Patient Name: THOMAS, ANDRE     TDCJ#:999493  Date:  12/15/2008 15:08     Facility:  JESTER IV

Age:25  Race: B  Sex:  Male
**Current Medications:**  Thiothixene 10mg pOQPM
**Allergies:**  NO KNOWN ALLERGIES
**Most recent vitals from 12/10/2008:** BP: 122 / 65 (Sitting)  Wt. 135 Lbs. Height 69 In. Pulse: 88 (Sitting)  Resp.: 18 / min Temp: 98.2 (Oral)
**CASE SUMMARY**
**Problems:**

**Cars:**
    **Medical Cars 3 First Observed 03/30/2006 07:47AM**
    **Mental Health Cars 3 First Observed 12/01/2008 02:36PM**

**Dental:**
    **Dental Examination First Observed 04/17/2007 06:57AM**
    **Hard Tissue Disease First Observed 10/09/2007 08:48AM**

**Mental Health:**
    **Mh Death Row Patient First Observed 07/10/2007 06:53AM**

**Mh Other:**
    **Behavioral Problems First Observed 03/24/2005 02:38PM**
    **Mental Status Exam First Observed 04/08/2005 05:01PM**
    **Mental Health Behavioral Observations First Observed 05/11/2005 06:00PM**
    **Mental Health Case Mgmt Problems And Trmt Objectives First Observed 04/07/2006 03:27PM**
    **Mental Health Suicide Risk Assessment First Observed 06/07/2006 04:27PM**

**Nurse Protocol:**
    **Np - Eye/ear/nose/throat Complaints First Observed 06/04/2008 07:52AM**
    **Np - Psychiatric Symptoms First Observed 07/14/2008 09:57PM**

**Not Specified:**
    **Brief Psychiatric Rating Scale First Observed 03/24/2005 02:49PM**
    **Misc Diagnosis First Observed 03/27/2005 07:46AM**
    **Hiv High Risk Screening Completed First Observed 03/27/2005 07:46AM**
    **Screening Exam For Suspected Condition First Observed 03/27/2005 07:47AM**
    **Respiratory System And Chest Symptoms Nec First Observed 01/05/2006 04:12PM**
    **Np - Chest Pain First Observed 03/07/2006 08:17AM**
    **Annual Ppd Skin Test First Observed 03/23/2006 03:40PM**
    **Observation- Cond Not Found First Observed 03/30/2006 07:47AM**
    **Np - Burns/wounds/bites First Observed 05/03/2006 09:31PM**
    **Pre-segregation/lock-up Physical Exam First Observed 06/07/2006 04:16PM**
    **Vision First Observed 11/21/2006 07:20AM**
    **Lipoma First Observed 04/27/2007 07:48AM**

**Exhibit 183**

TDCJ-HSA00203

**CORRECTIONAL MANAGED CARE**
**MENTAL HEALTH SERVICES**

Inpatient Psychiatric Evaluation

Patient Name: THOMAS, ANDRE          TDCJ#:999493  Date:  12/15/2008 15:08      Facility:  JESTER IV

   **Dental Cars 1 First Observed 10/09/2007 08:47AM**
   **Schizoaffective Disorder First Observed 02/26/2008 04:00PM**
   **Tb Class 0 (no Exposure Pulm. Tuberculosis) First Observed 04/29/2008 09:11AM**
   **Tetanus Toxoid Vaccination First Observed 04/29/2008 09:11AM**
   **Offender Returning From I/p Psych Facility First Observed 07/31/2008 05:22PM**
   **Blindness, Complete First Observed 12/10/2008 02:49PM**

| Patient Language:  ENGLISH    Name of interpreter, if required: |
|---|

____x_ Patient seen
_____ Patient **not** seen

**Treatment Track:**

_____      Crisis Management
___x__   D&E
_____      Acute Care
_____      Chronic Care
_____      Partial Remission Psychotic
_____      Mood Disorder
_____      Impulsive Behavior
_____      Organic

Identifying Data:25 years old man with history of  schizoaffective disorder and blindness.

Reason for Admission:"Patient took is left eye out and ate it"

Chief Complaint:"I still hear voices"

History of present illness:this is a 24 years old man with a very serious psychiatric condition  due to which he he took both of his eyes out in the last 6-7 years.On 12-9-2008 he reportedly took his left eye out because"I was in love with my wife and I don't want to look at somebody".He was very disorganized and could not give an organized history.According to his chart this patient had taken his right eye out many years ago because of similar thinking pattern.He is very paranoid ,he thinks that "people are after him,there is a conspiracy by the government".He has delusions of grandeur"God has given me special powers""if I pull my eye I will be able to control electricity".He hears voices telling him to "curse God '.At this time  he denies any thoughts of suicide or self injurious behavior.He has a history of depressive and manic episodes in the past.During his manic episodes he was hyper,full of energy and had racing thoughts.He denied any psychotic symptoms during those episodes.He was hospitalized  for suicide attempt to D&E in july/2008.He currently denies any symptoms of depression,He has been hyperreligous and psychotic for a long time.
   Past psychiatric history:He was hospitalized at Vernon State hospital after he murdered his family.Since then he has been treated with Chlorpromazine 200mg/day,Haldol 5mg /Day,thiothiexene 20mg /Day ,trazadone, and prozac.His compliance has been poor and he has a history of changing his medication frequently.Before coming to the hospital he was talking Thiothiexene 10mg /day regularly,he has tried geodon and zyprexa in the free world.He has a history of attempting suicide at least 10 different times.
   Past medical history:

TDCJ-HSA00204

## CORRECTIONAL MANAGED CARE
## MENTAL HEALTH SERVICES

Inpatient Psychiatric Evaluation

Patient Name: THOMAS, ANDRE        TDCJ#:999493  Date:  12/15/2008 15:08     Facility:  JESTER IV

He denies any chronic medical problems.His chart indicates a questionable history of seizures and head trauma with  possible loss of consciousness.He is blind in both eyes.

Substance use:

He admits to using marijuana and alcohol before coming to the hospital.

Social History:He was married and had a son before he murdered them.He has two brothers who have a diagnosis of schizophrenia and Bipolar disorder.There is no history of sexual or physical abuse.

Pertinent Physical Findings

Vital signs  12/10/2008  BP  122 / 65 (Sitting)  P  88 (Sitting)  R  18 / min T  98.2 (Oral)

AIMS exam:

AIMS:

Complete examination procedure outlined in the instructions before making rating. Rate highest severity observed.
Movements occurring upon activation are rated one less than those occurring spontaneously.

0 = None 1 = Minimal         2 = Mild  3 = Moderate        4 = Severe .

| | |
|---|---|
| 1.  Muscles of facial expression e.g. forehead, eyebrows, periorbital area, cheeks, include frowning, blinding, smiling,  grimacing | 0 |
| 2.  Lips and perioral area e.g. puckering, pouting, smacking | 0 |
| 3.  Jaw e.g. biting, clenching, chewing, mouth opening, lateral movement | 0 |
| 4.  Tongue Rate only increase in movement both in and out of mouth, not inability to sustain movement | 0 |
| 5.  Upper (arms, wrists, hands, fingers) Include chronic movements (i.e. rapid objectively purposeless, irregular, spontaneous); athetoid movements (i.e. slow, irregular, complex, serpentine). DO NOT include tremor (i.e. repetitive, regular, rhythmic). | 0 |
| 6.  Lower (legs, knees, ankles, toes) e.g. lateral knee movement, foot tapping, heel dropping, foot squirming, inversion, and eversion of foot | 0 |
| 7.  Neck shoulders, hips e.g., rocking, twisting, squirming, pelvic gyrations | 0 |
| 8.  Severity of abnormal movements | 0 |
| 9.  Incapacitation due to abnormal movements | 0 |
| 10. Patient's awareness of abnormal movements Rate only patient's report:<br>      No awareness=0  Aware, no distress=1  Aware, mild distress=2  Aware, moderate distress=3  Aware,  severe distress=4 | 0 |
| 11. Current problems with teeth &/or dentures? No=0   Yes=1 | 0 |
| 12. Does patient usually wear dentures? No=0    Yes=1 | 0 |
| Total: | |

Lab/x-ray results:

| CHEMISTRY | 09/09/2008 11:34 | 09/05/2008 12:23 | 07/30/2008 07:12 | 07/28/2008 21:03 |
|---|---|---|---|---|
| ALT | 21 | | | 25 |
| ALBUMIN | | 3.8 | | 4.9 |
| ALK PHOS | | 58 | | 58 |
| BILI T | | 0.3 | | 0.5 |
| BILIRUBIN CONJU | | 0 | | |
| BILIRUBIN UNCON | | 0.5 | | |
| TOTAL PROTEIN | | 6.5 | | 7.7 |
| AST | | 19 | | 24 |
| HGBA1C | | | 5.2 | |
| POTASSIUM | | | | 4.8 |
| SODIUM | | | | 140 |
| ANION GAP | | | | 10 |
| BUN | | | | 13 |
| CALCIUM | | | | 9.5 |
| CHLORIDE | | | | 101 |

3 of 6

TDCJ-HSA00205

## CORRECTIONAL MANAGED CARE
## MENTAL HEALTH SERVICES

Inpatient Psychiatric Evaluation

Patient Name: THOMAS, ANDRE    TDCJ#:999493  Date:  12/15/2008 15:08    Facility:  JESTER IV

| | | | | |
|---|---|---|---|---|
| CHOL | | | | 131 |
| CO2 TOTAL | | | | 29 |
| CREATININE | | | | 1.09 |
| GLU | | | | 68 [L] |
| HDL | | | | 55 |
| HDL CHOL RATIO | | | | 2.4 |
| LDL | | | | 69 |
| TRIGLYCERIDES | | | | 37 |
| VLDL | | | | 7 |
| | | | | |
| HEMATOLOGY | 07/28/2008 20:17 | | | |
| WBC | 4.9 | | | |
| BASO ABS | 0.1 | | | |
| BASO% | 1.2 | | | |
| EOSINO ABS | 0.2 | | | |
| EOSINO% | 4.1 | | | |
| GRAN ABS | 2.2 | | | |
| GRAN% | 44.9 | | | |
| HCT | 46.4 | | | |
| HEMOGLOBIN | 15.5 | | | |
| LYMPH ABS | 2 | | | |
| LYMPH% | 40.4 | | | |
| MCHC | 33.4 | | | |
| MCV | 92.1 | | | |
| MEAN CORP HGB | 30.8 | | | |
| MEAN PLATELET V | 10.5 | | | |
| MONO ABS | 0.5 | | | |
| MONO% | 9.4 | | | |
| PLT | 325 | | | |
| RBC | 5.04 | | | |
| RDW | 12.5 | | | |
| | | | | |
| POINT OF CARE TESTS | 04/29/2008 09:16 | | | |
| PPD | 0 | | | |
| | | | | |
| RIA | 07/28/2008 20:30 | | | |
| TSH | 2.46 | | | |
| | | | | |
| SEROLOGY | 05/02/2008 15:39 | 05/02/2008 15:26 | 05/02/2008 15:17 | 05/02/2008 14:46 |
| HBsAb | NEGATIVE | | | |
| HBsAg | | NEGATIVE | | |
| HCV | | | NEGATIVE | |
| HIV | | | | NEGATIVE |
| RPR QL | | | | |
| | | | | |
| TDM/TOX | 09/06/2008 00:02 | 08/27/2008 22:45 | | |
| VALPROIC TIME | N/A [~] | N/A [~] | | |
| | | | | |
| TOXICOLOGY | 09/11/2008 00:40 | 09/06/2008 00:02 | 08/27/2008 22:45 | |
| VALPROIC A | 42 | 133 [H] | 116 [H] | |
| | | | | |
| URINALYSIS | 07/28/2008 22:41 | 07/28/2008 22:40 | | |
| BACTERIA | NEGATIVE | | | |
| EPITHELIAL CELL | 1 | | | |
| MUCOUS URINE | SLT [~] | | | |

4 of 6

**CORRECTIONAL MANAGED CARE
MENTAL HEALTH SERVICES**

Inpatient Psychiatric Evaluation

Patient Name: THOMAS, ANDRE       TDCJ#:999493  Date:  12/15/2008 15:08       Facility:  JESTER IV

| | |
|---|---|
| RBC UR | <1 |
| WBC URINE | 1 |
| APPEARANCE | SLCLDY [~] |
| COLOR | YELLOW |
| PH URINE | 8 |
| AMORPHOUS MAT U | MODERATE [~] |
| BILIRUBIN URINE | NEGATIVE |
| BLOOD URINE | TRACE [~] |
| GLUCOSE QUAL UR | NEGATIVE |
| KETONES URINE | NEGATIVE |
| LEUKOCYTE ESTER | NEGATIVE |
| NITRITE URINE | NEGATIVE |
| PROTEIN URINE | NEGATIVE |
| SPEC GRAVITY UR | 1.01 |
| UROBILINOGEN UR | 0.2 |

Physical/neurological exam:

Mental Status
    Oriented x _AAOx3___
    Appearance:restless,moving his legs,bandage on his eyes
    Behavior:cooperative
    Mood:anxious,intense and constricted affect.
    Speech:Pressured
    Thought processes:illogical,circumstantial
    Thought content:delusional
    Auditory hallucination
    Suicidal/homicidal ideations:denies
    Cognition:poor attention span
    Insight and judgment:poor

Summary of Findings:

DSM IV Diagnosis:
    Axis I:Schizoaffective Disorder,Bipolar Type
        R/O Temporal lobe epilepsy
    Axis II:Deffered
    Axis III:Bind in both eyes

Recommendations/Interventions:
    1.    Admit to:D%E
    2.    Nursing care/level of observation:
    3.    Vitals:
    4.    Laboratory:
    5.
    6.    Procedures Ordered:
    7.        EKG/ECG REQUEST/ORDER (CNDBBPBFSZPSYLEV2):   schizoaffective disorder
    8.        *CBC W/DIFF {DMCD PSYLBPSZDBHVCNESLDAHEPHP}: schizoaffective disorder
    9.        *COMPREHENSIVE METABOLIC PANEL (CMP)
            {PSYLAHEPSZDBHVCNBFAHEPESLDHP}:   schizoaffective disorder

5 of 6

TDCJ-HSA00207

**CORRECTIONAL MANAGED CARE**
**MENTAL HEALTH SERVICES**

Inpatient Psychiatric Evaluation

Patient Name: THOMAS, ANDRE        TDCJ#:999493  Date:  12/15/2008 15:08     Facility:  JESTER IV

10.        *CARBAMAZEPINE, SERUM {PSYLSZ}:        schizoaffective disorder
11.        *THYROID STIMULATING HORMONE [TSH]{CNBFPSYLDMCDTPBPDBLEV2}:
           schizoaffective
           disorder

12.
13.     Medications:Discontinue Thiothixene.
14.             Start Carbamazepine 200mg POBID x 30 days with 11 refills
15.             Haloperidol 10mg POBID x 30 days with 11 refills
16.             Benztropine 2mg POBID x 30 days with 11 refills
17.             work on suicide prevention,patient is at a very high risk for suicide and depression
18.             Consider getting EEG one patient is stable.
19.     Referrals:

Prognosis:


        Electronically Signed by RAFIQUE, JAMAL  M.D. on 12/15/2008.
        Electronically Signed by RENZETTI, MONICA  R.N. on 12/16/2008.
        Electronically Signed by BUTLER, EBONI T PsyD on 12/16/2008.
        ##And No Others##

TDCJ-HSA00208

# Exhibit 184

## 12-16-08 Correctional Managed Care -Inpatient Clinic Note (Psychologist / Psychotherapist)

**CORRECTIONAL MANAGED CARE**
**Mental Health Services**

**Inpatient Clinic Note (Psychologist/Psychotherapist)**

**Patient Name:** THOMAS, ANDRE      **TDCJ#:** 999493      **Date:**  12/16/2008 10:42      **Facility:**  JESTER IV
Age:25   Race: B  Sex: Male

| Patient Language: ENGLISH   Name of interpreter, if required: |
**Most recent vitals from 12/10/2008:** BP: 122 / 65 (Sitting) ; Wt: 135 Lbs.; Height: 69 In.; Pulse: 88 (Sitting) ; Resp: 18 / min;
Temp: 98.2 (Oral)

**Allergies:** NO KNOWN ALLERGIES

<u>Seen this date at (time):</u>  10:02

**Treatment Track:**

|        |                              |
|--------|------------------------------|
| _____  | Crisis Management            |
| _x___  | D&E                          |
| _____  | Acute Care                   |
| _____  | Chronic Care                 |
| _____  | Partial Remission Psychotic  |
| _____  | Mood Disorder                |
| _____  | Impulsive Behavior           |
| _____  | Organic                      |

Pt seen today for follow-up. "alright-I hear voices".

S: Pt is still housed on B-1-no amenities. Pt was eating his lunch. He came to his door and continued to eat his sandwich. Pt c/o voices, things being speeded-up and wanting his eyes back". Pt claims god is talking to him. He removed his eye because of Miranda-" I'm in love and I  should never look at another woman". Pt claims voices telling him about the secrets of the universe. Some responses  with religious overtones. He believes its 2010 because things are accelerated.  Encouraged medication compliance.  Pt verbally contracted for safety.

O: Ox 2, neat clean, mood-neutral with flat dull affect, thought process-goal directed, content- he denies si/hi. He claims  audio hallucinations voices talk to him along with god.  Pt is not presenting as delusional or paranoid today. He requested his eyes back" I ate one but the government has the has the other".  Pt insight/judgement both fair.

A  stable
P Continue D&E protocal. Pt has pending psychiatry

Electronically Signed by ROSS, VERONICA R MA, SP on 12/16/2008.
##And No Others##

**Exhibit 184**

# Exhibit 185

## 12-19-08 Correctional Managed Care – Inpatient Psychosocial Evaluation

# CORRECTIONAL MANAGED CARE
# MENTAL HEALTH SERVICES

## MENTAL HEALTH INPATIENT PSYCHOSOCIAL EVALUATION

Patient Name: THOMAS, ANDRE        TDCJ#:999493  Date:  12/19/2008 15:54  Facility:  JESTER IV

Age:25  Race: B  Sex:  Male

Patient Language:  ENGLISH    Name of interpreter, if required:

**Most recent vitals from 12/10/2008:** BP: 122 / 65 (Sitting) ; Wt: 135 Lbs.; Height: 69 In.; Pulse: 88 (Sitting) ; Resp: 18 / min;
Temp: 98.2 (Oral)

**Allergies:** NO KNOWN ALLERGIES
Active Problems: *

**Cars:**
> Medical Cars 3 First Observed 03/30/2006 07:47AM
> Mental Health Cars 3 First Observed 12/01/2008 02:36PM

**Dental:**
> Dental Examination First Observed 04/17/2007 06:57AM
> Hard Tissue Disease First Observed 10/09/2007 08:48AM

**Mental Health:**
> Mh Death Row Patient First Observed 07/10/2007 06:53AM

**Mh Other:**
> Behavioral Problems First Observed 03/24/2005 02:38PM
> Mental Status Exam First Observed 04/08/2005 05:01PM
> Mental Health Behavioral Observations First Observed 05/11/2005 06:00PM
> Mental Health Case Mgmt Problems And Trmt Objectives First Observed 04/07/2006 03:27PM
> Mental Health Suicide Risk Assessment First Observed 06/07/2006 04:27PM

**Nurse Protocol:**
> Np - Eye/ear/nose/throat Complaints First Observed 06/04/2008 07:52AM
> Np - Psychiatric Symptoms First Observed 07/14/2008 09:57AM

**Not Specified:**
> Brief Psychiatric Rating Scale First Observed 03/24/2005 02:49PM
> Misc Diagnosis First Observed 03/27/2005 07:46AM
> Hiv High Risk Screening Completed First Observed 03/27/2005 07:46AM
> Screening Exam For Suspected Condition First Observed 03/27/2005 07:47AM
> Respiratory System And Chest Symptoms Nec First Observed 01/05/2006 04:12PM
> Np - Chest Pain First Observed 03/07/2006 08:17AM
> Annual Ppd Skin Test First Observed 03/23/2006 03:40PM
> Observation- Cond Not Found First Observed 03/30/2006 07:47AM
> Np - Burns/wounds/bites First Observed 05/03/2006 09:31PM
> Pre-segregation/lock-up Physical Exam First Observed 06/07/2006 04:16PM
> Vision First Observed 11/21/2006 07:20AM
> Lipoma First Observed 04/27/2007 07:48AM
> Dental Cars 1 First Observed 10/09/2007 08:47AM
> Schizoaffective Disorder First Observed 02/26/2008 04:00PM
> Tb Class 0 (no Exposure Pulm. Tuberculosis) First Observed 04/29/2008 09:11AM
> Tetanus Toxoid Vaccination First Observed 04/29/2008 09:11AM

**Exhibit 185**

TDCJ-HSA00196

**CORRECTIONAL MANAGED CARE**
**MENTAL HEALTH SERVICES**

MENTAL HEALTH INPATIENT PSYCHOSOCIAL EVALUATION

Patient Name: THOMAS, ANDRE          TDCJ#:999493  Date:  12/19/2008 15:54  Facility:  JESTER IV
        **Offender Returning From I/p Psych Facility First Observed 07/31/2008 05:22PM**

* 

I.   Identifying information:
     Name   Thomas, Andre
     TDCJ #: 999493
     Sex:    Male
     Date of Birth: ███████
     Age:    25
     Ethnicity: African American
     DOA to JIV CM   12/11/08
     DOA to JIV D&E: 12/15/08

II.  Reason for referral/circumstances leading to admission:
     The patient was referred to Jester IV CM due to an act of self-harm and question of decompensation.  While in CM he
     exhibited as slow, religious references, and curled in blanket.  He was subsequently referred to Diagnostic and
     Evaluation (D&E) for further evaluation.
     This psychosocial evaluation was completed in accordance with MHS Policy and Procedure D-2.1. The purpose of this
     evaluation was to assess the patient's current mental functioning, DSM-IV diagnosis, and to make recommendations for
     further treatment as appropriate.  The patient was informed that this report would be placed in his mental health record,
     and he voluntarily gave his informed consent.
     Information for this evaluation was obtained via clinical interview, behavioral observations, the patient's TDCJ medical and
     mental health records, clinical staff, and security staff.

III. Chief complaint:
     The patient   was asked to summarize his chief complaint that would be the focus of clinical attention. He reported " I
     hear voices-its gods voice".

IV.  Mental health history:
     Patient Thomas has a  history of mental health treatment in the freeworld. He reports behavior problems at an early age.
     He feels he has ways had behavior problems. He has  history of mh treatment with MHMR Grayson County. He arrived in
     TDCJ from county jail with a history of treatment for Schizophrenia, Paranoid Type and treatment with Zyprexia. While in
     the county jail he removed his one of
     his eyes. Pt was referred to Vernon State Hospital while in the county jail.  He  first came to the attention of TDCJ mental
     health staff when he presented at his  UOA with  bizarre statements and an act of self-harm. He has a history of
     extensive substance abuse.  He  has a history  threats of suicidal attempts and self-
     mutilation.   He has been referred to JIV in the past.  This contact he  was referred to JIV due to an act of self-harm
     which he removed his remaining eye.    This is his second  referral to JIV CM and D&E in 2008.   His current  diagnosis is
     Schizophrenia, Paranoid Type and he currently   prescribed Haldol, Cogentin, and Tegretol  mental health medications.
     Pt was a poor historian therefore secondary sources were used to complete this report.

V.   Social history:
     The patient  is a native of the state of Oklahoma.   He was raised by his mother and  father until he was grade school.
     He reports good relationship with both parents. His mother relocated to Sherman, Texas. He reports continued contact
     with his father. He stated in one interview his father may have kicked him in the head as a child.      He denied any
     physical and  emotional abuse this contact. In past interview he reported he may have been inappropriately touch by an
     aunt.  He  states his family life was unstable due to his father being away from home . He denied any family history
     mental issues .  One uncle committed suicide.   He has no  family support.   He has 5 siblings. He  completed the 10th
     grade. He attended school until the 10th grade.  He dropped out due  lack of interest.  He  has  not completed a GED.
     During adolescence, he admitted to fighting, truancy,  and petty theft. He reported a history juvenile arrest .   The

2 of 4

**CORRECTIONAL MANAGED CARE
MENTAL HEALTH SERVICES**

MENTAL HEALTH INPATIENT PSYCHOSOCIAL EVALUATION

Patient Name: THOMAS, ANDRE        TDCJ#:999493  Date:  12/19/2008 15:54  Facility:  JESTER IV

patient is divorced and has fathered one child. Both mother, his child and step-child were the victims in his instant offense.   In terms of employment, he has worked  in a variety of jobs as a laborer. He longest employment was for 6 mos. He has no  history of being approved SSI disability benefits in the past.  He reported no history of  military service. He has a history of  a head  injury and  unconscious for several minutes due to fights with his siblings. He has a history of acts of self-harm including stabbings, hanging gestures and overdose on medications.    He has never been treated for seizure disorder. This is his 1rst      TDCJ incarceration. He  is serving  a Death penalty sentence  for Capital Murder which  began on  03/11/05.

VI.     Substance use history:
The patient admitted to a history of substance abuse starting at age 17yrs old. His
past history includes ETOH,   and  marijuana.  He say he used marijuana  daily until he was arrested.   He has no history of drug treatment.

VII.     Mental Status
Thomas is 69" in height and 135lbs  in weight. He was cooperative.   He was dressed standard paper gown. His attitude toward the interviewer was polite.   Rapport was adequately established and maintained.  Motor behavior was some anxious .   Eye contact was indirect .  Speech ranged from rhymic to spontaneous  . There was no  halting between responses.  Mood was dysphoric with dull restricted affect.    The patient reported that his   appetite was ok.  He reported sleep
disturbances.  He believes he sleeps 5-6 hrs per day.  Energy level was normal.  The patient denied any self-mutilating, suicidal, assaultive, or homicidal ideation without intent or plans.  The patient agreed to a verbal contract not to harm himself or others.  The patient was future-oriented.  Thought processes, as evidenced by speech, which was tangential disorganized and mildly incoherent .  Thought content consisted of topics relevant to interview situation and some irrelevant responses. He was focused on religious delusional responses  " I am experiencing  a message from god". He presents  as grandiose –god talks to me.He claims to be in the spiritual realm between this life and the spirit world." I am being told all the secrets of the universe".The spirits are revealing messages to him. Why? Because he has been choose to receive these messages. His message however appear to be "hurt yourself or kill yourself". He reported  a belief that things  have " speeded up" it could be 2010".  He minimized the significance of behavior which bought him to JIV. He state he would like his eyes back.  He  reports ruminative negative thoughts." I took my eyes out because I can no look upon another woman other than Miranda".    He reported  visual  hallucinations  of his girl friend.  He had a number of somatic complaints including pain in his face due to his incident.  He reported feeling like "the government had his eyes."  He appears to be somewhat casual  in his response. He does appear genuine in his lack of ability to articulate his symptoms. He was somewhat distracted however, he was easily redirected.    The patient was alert and oriented x 3 . He did not know the date .  He was able to sustain attention during the interview.   Depressive symptoms  were prominent. By the end of his   stay in D&E, his presentation had improved.

VIII.   Results of Psychometrics:
No indication for testing.

IX.Summary of findings:
The patient arrived from his  UOA due to  an act of self-harm.   He has been referred to in-patient treatment in the past for same or similar complaints. He has a history of  threats of self-harm in the freeworld. He has a history of extensive substance abuse. He denied any peer related stress. He has a  no serious chronic medical conditions. He had many somatic complaints and a few bizarre request.
He  verbally contracted for safety day one of D&E. While in D&E the patient did  not present as  manic. He  did present as psychotic and with   depressive symptoms .   He reports difficulty sleeping and decreased appetite and decrease social skills. The patient was   provided  psycho-tropic medications while here in D&E and these symptoms improved . He was  compliant with his medication . His psychotic symptoms which are delusional are secondary delusions which are relativity based  due to this upbringing and religious background did not improve. He continued  to talk about religion, god and his ex-girl friend.  He  is  currently

3 of 4

TDCJ-HSA00198

## CORRECTIONAL MANAGED CARE
## MENTAL HEALTH SERVICES

<u>MENTAL HEALTH INPATIENT PSYCHOSOCIAL EVALUATION</u>

Patient Name: THOMAS, ANDRE          TDCJ#:999493  Date:  12/19/2008 15:54  Facility:  JESTER IV
          not stable and maintaining functioning. He  is    in need of inpatient treatment at this time.   His diagnosis meets the
          criteria for Schizophrenia, Paranoid Type
     X.Axis I:  295.3 Schizophrenia, Paranoid Type
       Axis II:   301.7 ASPD
       Axis III:see medical
            Axis IV:Incarceration
            Axis V:Current GAF = 55
     XI.   Recommendations/Interventions: none.  if  his symptoms have not improved by day #7
          Follow Up: follow-up by outpatient mental health staff.  The patient is not an imminent danger to himself or others.  The
          outpatient setting is the least restrictive environment for treatment at this time.
     XII.   Prognosis:
          Guarded,  comorbid factors including chronic mental disorder, characterlogical deficts and a history of substance abuse.


        Electronically Signed by ROSS, VERONICA R MA, SP on 12/19/2008.
        Electronically Signed by BARRIENTOS, ROXSANDRA  CCA on 02/02/2009.
        ##And No Others##

TDCJ-HSA00199

# Exhibit 186

## 01-21-09 Correctional Managed Care – Individualized Treatment Plan for Psychiatry Chronic Care

CORRECTIONAL MANAGED CARE
INPATIENT MENTAL HEALTH SERVICES

**Individualized Treatment Plan for Psychiatry Chronic Care (Initial or Follow-up)**

**Patient Name:** THOMAS, ANDRE    **TDCJ#:** 999493   **Date:** 01/21/2009 07:25
**Facility:** JESTER IV   **Date of Birth:** ▮▮▮▮▮▮ **Age:** 25 Years  **Race:** B  **Sex:** Male
| Patient Language: ENGLISH   Name of interpreter, if required:
**Most recent vitals from 12/30/2008:** BP: 108 / 66 (Sitting) ; Wt: 139 Lbs.; Height: 69 In.; Pulse: 90 (Sitting) ; Resp: 18 / min;
Temp: 96.7 (Oral)

**Allergies:** NO KNOWN ALLERGIES

_____         **INITIAL PSYCHIATRIC EVALUATION**
___xxx_____     **FOLLOW-UP PSYCHIATRIC EVALUATION**

_xxx____  **Patient seen**
_____  **Patient _not_ seen**
                    **Reason not seen:**

**Current Medications:**
Carbamazepine 400-mg p.o. b.i.d.---38 out of 40
haloperidol 15-mg p.o. b.i.d.--- 24 out of 26
Benztropine 2-mg p.o. b.i.d.--- 65 out of 68
citalopram 20 milligram p.o. q.a.m.--6 out of 7

**Allergies:** NO KNOWN ALLERGIES
**Most recent vitals from 12/30/2008:** BP: 108 / 66 (Sitting)  Wt. 139 Lbs. Height 69 In. Pulse: 90 (Sitting)  Resp.: 18 /
min Temp: 96.7 (Oral)
**CASE SUMMARY**
**Problems:**

**Cars:**
     Medical Cars 3 First Observed 03/30/2006 07:47AM
     Mental Health Cars 3 First Observed 12/01/2008 02:36PM

**Dental:**
     Dental Examination First Observed 04/17/2007 06:57AM
     Hard Tissue Disease First Observed 10/09/2007 08:48AM

**Mental Health:**
     Mh Death Row Patient First Observed 07/10/2007 06:53AM

**Mh Other:**
     Behavioral Problems First Observed 03/24/2005 02:38PM
     Mental Status Exam First Observed 04/08/2005 05:01PM
     Mental Health Behavioral Observations First Observed 05/11/2005 06:00PM
     Mental Health Case Mgmt Problems And Trmt Objectives First Observed 04/07/2006 03:27PM
     Mental Health Suicide Risk Assessment First Observed 06/07/2006 04:27PM

**Nurse Protocol:**

**Exhibit 186**

TDCJ-HSA00147

Np - Eye/ear/nose/throat Complaints First Observed 06/04/2008 07:52AM
Np - Psychiatric Symptoms First Observed 07/14/2008 09:57PM

**Not Specified:**
Brief Psychiatric Rating Scale First Observed 03/24/2005 02:49PM
Misc Diagnosis First Observed 03/27/2005 07:46AM
Hiv High Risk Screening Completed First Observed 03/27/2005 07:46AM
Screening Exam For Suspected Condition First Observed 03/27/2005 07:47AM
Respiratory System And Chest Symptoms Nec First Observed 01/05/2006 04:12PM
Np - Chest Pain First Observed 03/07/2006 08:17AM
Annual Ppd Skin Test First Observed 03/23/2006 03:40PM
Observation- Cond Not Found First Observed 03/30/2006 07:47AM
Np - Burns/wounds/bites First Observed 05/03/2006 09:31PM
Pre-segregation/lock-up Physical Exam First Observed 06/07/2006 04:16PM
Vision First Observed 11/21/2006 07:20AM
Lipoma First Observed 04/27/2007 07:48AM
Dental Cars 1 First Observed 10/09/2007 08:47AM
Schizoaffective Disorder First Observed 02/26/2008 04:00PM
Tb Class 0 (no Exposure Pulm. Tuberculosis) First Observed 04/29/2008 09:11AM
Tetanus Toxoid Vaccination First Observed 04/29/2008 09:11AM
Offender Returning From I/p Psych Facility First Observed 07/31/2008 05:22PM
Blindness, Complete First Observed 12/10/2008 02:49PM

**Treatment Track:**

| | |
|---|---|
| _____ | Crisis Management |
| _____ | D&E |
| __b1__ | Acute Care |
| _____ | Chronic Care |
| _____ | Partial Remission Psychotic |
| _____ | Mood Disorder |
| _____ | Impulsive Behavior |
| _____ | Organic |

**PSYCHIATRIC/MEDICAL/SOCIAL HISTORY:**
Schizoaffective disorder
Blindness in both eyes
**SUBJECTIVE:**
I'm still hearing voices , unknown woman, she is, telling me to hurt myself. She emphasize that life is a game. 4 years ago, I had open-heart surgery after I had stabbed myself in the chest. I wanted to save the world. I thought that the angles will come out if I let my blood come out from my heart.   I was reading Bible.

I'm taking my medications.  I do not have any side effects.  I do not want to hurt myself or the others.  I am waiting to go to program of A-1. I will take blood test and higher dosage of Haldol with other medications.

**OBJECTIVE:**

Security staff reports:

2 of 7

This patient remains cooperative, follows given directives, showers, and maintains his ADLs including eating his offered meals.

**Mental Status:**

| | | | | | |
|---|---|---|---|---|---|
| Orientation | x | Intact to person, place, time, and situation | | Other | |
| Appearance: | x | Appropriate | | Other | |
| Hygiene: | x | Well kept | | Other | |
| Psychomotor: | x | Not increased or decreased | | Other | |
| Behavior: | x | Cooperative | | Other | |
| Eye Contact: | x | Good | | Other | |
| Speech: | x | Spontaneous, NL Rate and Volume | | Other | |
| Mood: | x | Euthymic | | Other | |
| Affect: | x | NL range& intensity, stable & appropriate | | Other | |
| Sensorium | x | Clear | | Other | |
| Thought process: | | Coherent, logical, and goal directed | | Other | illogical |
| Thought content: | | Appropriate | | Other | inappropriate |
| Hallucinations | | None expressed | | Other | auditory |
| Delusions: | | None expressed | | Other | paranoid grandiose, and bizarre |
| Suicidal ideations: | x | None expressed | | Other | |
| Homicidal ideations: | x | None expressed | | Other | |
| Judgement | | Unimpaired | | Other | poor |
| Insight: | | Unimpaired | | Other | poor |

**COMPLIANCE: (# doses taken/ #ordered)**

**Comment re compliance:**
**Please review current medications**
**ADVERSE EFFECTS:**
**No adverse effects noticed**
**LAB/EKG Comments:**
**I explained the significance of available laboratory tests results including those were abnormal.**

| CHEMISTRY | 01/12/2009 20:07 | 01/12/2009 19:25 | 12/30/2008 12:59 | 12/29/2008 18:56 |
|---|---|---|---|---|
| BILI T | <0.1 [~] | | <0.1 [~] | |
| ALBUMIN | | 4.7 | | 4.4 |
| ALK PHOS | | 62 | | 58 |
| ALT | | 30 | | 29 |
| AST | | 24 | | 25 |
| BILIRUBIN CONJU | | 0 | | |
| BILIRUBIN UNCON | | 0.2 | | |
| TOTAL PROTEIN | | 7.8 | | 7.4 |
| ANION GAP | | | | 14 |
| BUN | | | | 16 |
| CHLORIDE | | | | 99 |
| CO2 TOTAL | | | | 29 |
| POTASSIUM | | | | 4.5 |
| SODIUM | | | | 142 |
| CALCIUM | | | | 9.7 |
| CREATININE | | | | 0.97 |
| GLU | | | | 54 [L] |

TDCJ-HSA00149

| HEMATOLOGY | 01/12/2009 18:43 | 12/29/2008 18:06 | 07/28/2008 20:17 |
|---|---|---|---|
| WBC | 5.2 | 4.5 | 4.9 |
| BASO ABS | 0 | 0.1 | 0.1 |
| BASO% | 0.6 | 2 | 1.2 |
| EOSINO ABS | 0.3 | 0.3 | 0.2 |
| EOSINO% | 6.1 [H] | 6.5 [H] | 4.1 |
| GRAN ABS | 2.2 | 1.9 | 2.2 |
| GRAN% | 43 | 42.9 | 44.9 |
| HCT | 45.7 | 44.9 | 46.4 |
| HEMOGLOBIN | 16.1 | 15.7 | 15.5 |
| LYMPH ABS | 2.1 | 1.8 | 2 |
| LYMPH% | 40.1 | 39.2 | 40.4 |
| MCHC | 35.2 | 35 | 33.4 |
| MCV | 91.2 | 92 | 92.1 |
| MEAN CORP HGB | 32.1 [H] | 32.2 [H] | 30.8 |
| MEAN PLATELET V | 9.6 | 9.5 | 10.5 |
| MONO ABS | 0.5 | 0.4 | 0.5 |
| MONO% | 10.2 | 9.4 | 9.4 |
| PLT | 289 | 354 | 325 |
| RBC | 5.01 | 4.88 | 5.04 |
| RDW | 11.5 [L] | 11.6 | 12.5 |

| POINT OF CARE TESTS | 04/29/2008 09:16 |
|---|---|
| PPD | 0 |

| RIA | 12/30/2008 13:28 | 07/28/2008 20:30 |
|---|---|---|
| TSH | 1.87 | 2.46 |

| SEROLOGY | 05/02/2008 15:39 | 05/02/2008 15:26 | 05/02/2008 15:17 | 05/02/2008 14:46 |
|---|---|---|---|---|
| HBsAb | NEGATIVE | | | |
| HBsAg | | NEGATIVE | | |
| HCV | | | NEGATIVE | |
| HIV | | | | NEGATIVE |
| RPR QL | | | | |

| TDM/TOX | 09/06/2008 00:02 | 08/27/2008 22:45 |
|---|---|---|
| VALPROIC TIME | N/A [~] | N/A [~] |

| TOXICOLOGY | 01/12/2009 19:10 | 12/29/2008 18:40 | 09/11/2008 00:40 | 09/06/2008 00:02 |
|---|---|---|---|---|
| CARBAMAZE | 5.7 | 4.8 | | |
| VALPROIC A | | | 42 | 133 [H] |

| URINALYSIS | 07/28/2008 22:41 | 07/28/2008 22:40 |
|---|---|---|
| BACTERIA | NEGATIVE | |
| EPITHELIAL CELL | 1 | |
| MUCOUS URINE | SLT [~] | |
| RBC UR | <1 | |
| WBC URINE | 1 | |
| APPEARANCE | | SLCLDY [~] |
| COLOR | | YELLOW |
| PH URINE | | 8 |
| AMORPHOUS MAT U | | MODERATE [~] |
| BILIRUBIN URINE | | NEGATIVE |
| BLOOD URINE | | TRACE [~] |
| GLUCOSE QUAL UR | | NEGATIVE |
| KETONES URINE | | NEGATIVE |
| LEUKOCYTE ESTER | | NEGATIVE |
| NITRITE URINE | | NEGATIVE |
| PROTEIN URINE | | NEGATIVE |
| SPEC GRAVITY UR | | 1.01 |
| UROBILINOGEN UR | | 0.2 |

TDCJ-HSA00150

**AIMS:**

Complete examination procedure outlined in the instructions before making rating.  Rate highest severity observed.  Movements occurring upon activation rate one less that those occurring spontaneously.

0=None          1=Minimal          2=Mild          3=Moderate          4=Severe

| | | |
|---|---|---|
| 1. | Muscles of facial expression<br>e.g. movements of forehead, eyebrow, preorbital area, cheeks,<br>include frowning, blinding, smiling, grimacing | 0 |
| 2. | Lips and perioral area<br>e.g. puckering, pouting, smacking | 0 |
| 3. | Jaw<br>e.g. biting, clenching, chewing, mouth opening, lateral movement | 0 |
| 4. | Tongue<br>Rate only increase in movement both in and out of mouth, not<br>inability to sustain movement | 0 |
| 5. | Upper (arms, wrists, hands, fingers)<br>Include choreic movements (i.e., rapid, objectively purposeless,<br>irregular, spontaneous); athetoid movements (i.e., slow, irregular,<br>complex, serpentine).  DO NOT include tremor (i.e., repetitive,<br>regular, rhythmic). | 0 |
| 6. | Lower (legs, knees, ankles, toes)<br>e.g. lateral knee movement, foot tapping, heel dropping, foot<br>squirming, inversion & eversion of foot | 0 |
| 7. | Neck, shoulders, hips<br>e.g. rocking, twisting, squirming, pelvic gyrations | 0 |
| 8. | Severity of abnormal movements | 0 |
| 9. | Incapacitation due to abnormal movements | 0 |
| | Patient's awareness of abnormal movements Rate only<br>patient's report:  No awareness=0  Aware, no distress=1  Aware,<br>mild distress=2 Aware, moderate distress=3 Aware, severe<br>distress=4 | 0 |
| 10. | Current problems with teeth &/or dentures?<br>No=0  Yes=1 | 0 |
| 11. | Does patient usually wear dentures?<br>No=0  Yes=1 | 0 |
| | Total | 0 |

**ASSESSMENT:**

**Relevant Brief Psychiatric Rating Scale Items**  (Use BPRS decision tree and paste here)

BRIEF PSYCHIATRIC RATING SCALE
Depression
1-Not Present
Sucidality
1-Not Present
Emotional Withdrawal
1-Not Present
Motor Retardation
1-Not Present
Anxiety
1-Not Present
Somatic Concern
1-Not Present

5 of 7

TDCJ-HSA00151

Elevated Mood
    1-Not Present
Grandiosity
    1-Not Present
Excitement
    1-Not Present
Distractibility
    1-Not Present
Motor Hyperactivity
    1-Not Present
Impulsiveness
    1-Not Present
Hostility
    1-Not Present
Uncooperativeness
    1-Not Present
Hallucinations
    4-Mod-Verbal, Visual, Other >3x Or Freq Non-Verbal, No Impair
Unusual Thought Content
    4-Mod-Delusional But No Functional Impairment
Conceptual Disorganization
    1-Not Present
Mannerisms & Posturing
    1-Not Present
Bizarre Behavior
    1-Not Present
Suspiciousness
    5-Mod-Malicious Talk, Others Intend To Harem, No Delusions
Self-Neglect
    1-Not Present
Blunted Affect
    1-Not Present
Disorientation
    1-Not Present

**Diagnosis:**
**Axis I:** schizoaffective disorder, DSM code 295.7
**Axis II:**
**Axis III:** blindness in both eyes

**PLAN:**

**MEDICATION:**

**Stop following medications:**

Haloperidol 15 mg p.o. b.i.d.

6 of 7

**Start following medications for 30 days with 11 refills:**

Haloperidol 20 milligram p.o. b.i.d.

**Continue currently prescribed other medications to include: carbamazepine 400-mg p.o. b.i.d., benztropine 2-mg p.o. b.i.d. and, citalopram 20 mg p.o. q.a.m.**

I encouraged him to adhere with prescribed medications.  I explained him of likelihood of relapse of symptoms of his current diagnosis if he becomes noncompliant to medications.

**Lab/EKG//PROCEDURE ORDERS:**

Procedures Ordered:
    MH IP ASSESSMENT/EVALUATION:    schizoaffective disorder
    HALOPERIDOL (HALO):   schizoaffective disorder

I have discussed with the patient the risks, benefits and alternatives to the treatment plan as specified above and he/she agrees to the recommended treatment(s).

    ___xxx_____ Yes          _____ No          _____ N/A

    Electronically Signed by PATEL, HEMANT S M.D. on 01/21/2009.
    Electronically Signed by LAURY, STACEY R L.V.N. on 01/21/2009.
    Electronically Signed by BUNDY, GWENDOLYN  MA, LPC, SP on 01/21/2009.
    Electronically Signed by RENZETTI, MONICA  R.N. on 01/21/2009.
    Electronically Signed by BARRIENTOS, ROXSANDRA  CCA on 02/02/2009.
    ##And No Others##

TDCJ-HSA00153

# Exhibit 187

## 01-27-09 Correctional Managed Care report - Individualized Treatment Plan for Psychiatry Chronic Care

CORRECTIONAL MANAGED CARE
INPATIENT MENTAL HEALTH SERVICES

**Individualized Treatment Plan for Psychiatry Chronic Care (Initial or Follow-up)**

**Patient Name:** THOMAS, ANDRE    **TDCJ#:** 999493    **Date:** 01/27/2009 10:30
**Facility:** JESTER IV   **Date of Birth:** ▮▮▮▮▮▮   **Age:** 25 Years  **Race:** B **Sex:** Male
|  Patient Language: **ENGLISH**    Name of interpreter, if required: |
**Most recent vitals from 12/30/2008:** BP: 108 / 66 (Sitting) ; Wt: 139 Lbs.; Height: 69 In.; Pulse: 90 (Sitting) ; Resp: 18 / min;
Temp: 96.7 (Oral)

**Allergies:** NO KNOWN ALLERGIES

_____    INITIAL PSYCHIATRIC EVALUATION
_xxx_____    FOLLOW-UP PSYCHIATRIC EVALUATION

_xx____ Patient seen
_____ Patient **not** seen
                        Reason not seen:

**Current Medications:**
Carbamazepine 400-mg p.o. b.i.d.---49 out of 52
benztropine 2-mg p.o. b.i.d.--- 22 out of 23
citalopram 20 mg p.o. q.a.m.--- 12 out of 13
haloperidol 20-mg p.o. b.i.d.-- 35 out of 38

**Allergies:** NO KNOWN ALLERGIES
**Most recent vitals from 12/30/2008:** BP: 108 / 66 (Sitting)  Wt. 139 Lbs. Height 69 In. Pulse: 90 (Sitting)  Resp.: 18 /
min Temp: 96.7 (Oral)
**CASE SUMMARY**
**Problems:**

**Cars:**
        Medical Cars 3 First Observed 03/30/2006 07:47AM
        Mental Health Cars 3 First Observed 12/01/2008 02:36PM

**Dental:**
        Dental Examination First Observed 04/17/2007 06:57AM
        Hard Tissue Disease First Observed 10/09/2007 08:48AM

**Mental Health:**
        Mh Death Row Patient First Observed 07/10/2007 06:53AM

**Mh Other:**
        Behavioral Problems First Observed 03/24/2005 02:38PM
        Mental Status Exam First Observed 04/08/2005 05:01PM
        Mental Health Behavioral Observations First Observed 05/11/2005 06:00PM
        Mental Health Case Mgmt Problems And Trmt Objectives First Observed 04/07/2006 03:27PM
        Mental Health Suicide Risk Assessment First Observed 06/07/2006 04:27PM

**Nurse Protocol:**
        Np - Eye/ear/nose/throat Complaints First Observed 06/04/2008 07:52AM

**Exhibit 187**

TDCJ-HSA00138

**Np - Psychiatric Symptoms First Observed 07/14/2008 09:57PM**

**Not Specified:**

**Brief Psychiatric Rating Scale First Observed 03/24/2005 02:49PM**
**Misc Diagnosis First Observed 03/27/2005 07:46AM**
**Hiv High Risk Screening Completed First Observed 03/27/2005 07:46AM**
**Screening Exam For Suspected Condition First Observed 03/27/2005 07:47AM**
**Respiratory System And Chest Symptoms Nec First Observed 01/05/2006 04:12PM**
**Np - Chest Pain First Observed 03/07/2006 08:17AM**
**Annual Ppd Skin Test First Observed 03/23/2006 03:40PM**
**Observation- Cond Not Found First Observed 03/30/2006 07:47AM**
**Np - Burns/wounds/bites First Observed 05/03/2006 09:31PM**
**Pre-segregation/lock-up Physical Exam First Observed 06/07/2006 04:16PM**
**Vision First Observed 11/21/2006 07:20AM**
**Lipoma First Observed 04/27/2007 07:48AM**
**Dental Cars 1 First Observed 10/09/2007 08:47AM**
**Schizoaffective Disorder First Observed 02/26/2008 04:00PM**
**Tb Class 0 (no Exposure Pulm. Tuberculosis) First Observed 04/29/2008 09:11AM**
**Tetanus Toxoid Vaccination First Observed 04/29/2008 09:11AM**
**Offender Returning From I/p Psych Facility First Observed 07/31/2008 05:22PM**
**Blindness, Complete First Observed 12/10/2008 02:49PM**

**Treatment Track:**

| | |
|---|---|
| _____ | Crisis Management |
| _____ | D&E |
| _a1_ | Acute Care |
| _____ | Chronic Care |
| _____ | Partial Remission Psychotic |
| _____ | Mood Disorder |
| _____ | Impulsive Behavior |
| _____ | Organic |

**PSYCHIATRIC/MEDICAL/SOCIAL HISTORY:**

Schizoaffective disorder
**SUBJECTIVE:**
I'm taking my medications.  I do not have any side effects.  The voices are improving.  I did not hear voices in last two days. I'm still dreaming, in which I find myself being chased by unfamiliar males who are trying to hurt me. I don't want to hurt myself or the others. I think the government is mad at me because I plucked my eyes out. I wanted to defeat the devils. I wanted to save the world. I'm okay now. I want my ID, so that I can get commissary.
**OBJECTIVE:**

**Security staff reports:**

This patient remains cooperative, follows given directives, showers, and maintains his ADLs including eating his offered meals.

**Mental Status:**

2 of 7

TDCJ-HSA00139

| Category | | Description | | Other | |
|---|---|---|---|---|---|
| Orientation | x | Intact to person, place, time, and situation | | Other | |
| Appearance: | x | Appropriate | | Other | |
| Hygiene: | x | Well kept | | Other | |
| Psychomotor: | x | Not increased or decreased | | Other | |
| Behavior: | x | Cooperative | | Other | |
| Eye Contact: | x | Good | | Other | |
| Speech: | x | Spontaneous, NL Rate and Volume | | Other | |
| Mood: | x | Euthymic | | Other | |
| Affect: | x | NL range& intensity, stable & appropriate | | Other | |
| Sensorium | x | Clear | | Other | |
| Thought process: | | Coherent, logical, and goal directed | | Other | illogical |
| Thought content: | | Appropriate | | Other | inappropriate |
| Hallucinations | x | None expressed | | Other | |
| Delusions: | x | None expressed | | Other | paranoid, grandiose |
| Suicidal ideations: | x | None expressed | | Other | |
| Homicidal ideations: | x | None expressed | | Other | |
| Judgement | | Unimpaired | | Other | poor |
| Insight: | | Unimpaired | | Other | poor |

**COMPLIANCE: (# doses taken/ #ordered)**

**Comment re compliance:**
**Please review current medications**
**ADVERSE EFFECTS:**
**No adverse effects noticed**
**LAB/EKG Comments:**
**I explained the significance of available laboratory tests results including those were abnormal.**

| CHEMISTRY | 01/12/2009 20:07 | 01/12/2009 19:25 | 12/30/2008 12:59 | 12/29/2008 18:56 |
|---|---|---|---|---|
| BILI T | <0.1 [~] | | <0.1 [~] | |
| ALBUMIN | | 4.7 | | 4.4 |
| ALK PHOS | | 62 | | 58 |
| ALT | | 30 | | 29 |
| AST | | 24 | | 25 |
| BILIRUBIN CONJU | | 0 | | |
| BILIRUBIN UNCON | | 0.2 | | |
| TOTAL PROTEIN | | 7.8 | | 7.4 |
| ANION GAP | | | | 14 |
| BUN | | | | 16 |
| CHLORIDE | | | | 99 |
| CO2 TOTAL | | | | 29 |
| POTASSIUM | | | | 4.5 |
| SODIUM | | | | 142 |
| CALCIUM | | | | 9.7 |
| CREATININE | | | | 0.97 |
| GLU | | | | 54 [L] |

| HEMATOLOGY | 01/12/2009 18:43 | 12/29/2008 18:06 | 07/28/2008 20:17 | |
|---|---|---|---|---|
| WBC | 5.2 | 4.5 | 4.9 | |
| BASO ABS | 0 | 0.1 | 0.1 | |
| BASO% | 0.6 | 2 | 1.2 | |
| EOSINO ABS | 0.3 | 0.3 | 0.2 | |
| EOSINO% | 6.1 [H] | 6.5 [H] | 4.1 | |

3 of 7

| | | | |
|---|---|---|---|
| GRAN ABS | 2.2 | 1.9 | 2.2 |
| GRAN% | 43 | 42.9 | 44.9 |
| HCT | 45.7 | 44.9 | 46.4 |
| HEMOGLOBIN | 16.1 | 15.7 | 15.5 |
| LYMPH ABS | 2.1 | 1.8 | 2 |
| LYMPH% | 40.1 | 39.2 | 40.4 |
| MCHC | 35.2 | 35 | 33.4 |
| MCV | 91.2 | 92 | 92.1 |
| MEAN CORP HGB | 32.1 [H] | 32.2 [H] | 30.8 |
| MEAN PLATELET V | 9.6 | 9.5 | 10.5 |
| MONO ABS | 0.5 | 0.4 | 0.5 |
| MONO% | 10.2 | 9.4 | 9.4 |
| PLT | 289 | 354 | 325 |
| RBC | 5.01 | 4.88 | 5.04 |
| RDW | 11.5 [L] | 11.6 | 12.5 |

| POINT OF CARE TESTS | 04/29/2008 09:16 | | |
|---|---|---|---|
| PPD | 0 | | |

| RIA | 12/30/2008 13:28 | 07/28/2008 20:30 | |
|---|---|---|---|
| TSH | 1.87 | 2.46 | |

| SEROLOGY | 05/02/2008 15:39 | 05/02/2008 15:26 | 05/02/2008 15:17 | 05/02/2008 14:46 |
|---|---|---|---|---|
| HBsAb | NEGATIVE | | | |
| HBsAg | | NEGATIVE | | |
| HCV | | | NEGATIVE | |
| HIV | | | | NEGATIVE |
| RPR QL | | | | |

| TDM/TOX | 09/06/2008 00:02 | 08/27/2008 22:45 | | |
|---|---|---|---|---|
| VALPROIC TIME | N/A [~] | N/A [~] | | |

| TOXICOLOGY | 01/12/2009 19:10 | 12/29/2008 18:40 | 09/11/2008 00:40 | 09/06/2008 00:02 |
|---|---|---|---|---|
| CARBAMAZE | 5.7 | 4.8 | | |
| VALPROIC A | | | 42 | 133 [H] |

| URINALYSIS | 07/28/2008 22:41 | 07/28/2008 22:40 |
|---|---|---|
| BACTERIA | NEGATIVE | |
| EPITHELIAL CELL | 1 | |
| MUCOUS URINE | SLT [~] | |
| RBC UR | <1 | |
| WBC URINE | 1 | |
| APPEARANCE | | SLCLDY [~] |
| COLOR | | YELLOW |
| PH URINE | | 8 |
| AMORPHOUS MAT U | | MODERATE [~] |
| BILIRUBIN URINE | | NEGATIVE |
| BLOOD URINE | | TRACE [~] |
| GLUCOSE QUAL UR | | NEGATIVE |
| KETONES URINE | | NEGATIVE |
| LEUKOCYTE ESTER | | NEGATIVE |
| NITRITE URINE | | NEGATIVE |
| PROTEIN URINE | | NEGATIVE |
| SPEC GRAVITY UR | | 1.01 |
| UROBILINOGEN UR | | 0.2 |

**AIMS:**

Complete examination procedure outlined in the instructions before making rating.  Rate highest severity observed.  Movements occurring upon activation rate one less that those occurring spontaneously.

0=None        1=Minimal        2=Mild        3=Moderate        4=Severe

4 of 7

| | | |
|---|---|---|
| 1. | Muscles of facial expression<br>e.g. movements of forehead, eyebrow, preorbital area, cheeks, include frowning, blinding, smiling, grimacing | 0 |
| 2. | Lips and perioral area<br>e.g. puckering, pouting, smacking | 0 |
| 3. | Jaw<br>e.g. biting, clenching, chewing, mouth opening, lateral movement | 0 |
| 4. | Tongue<br>Rate only increase in movement both in and out of mouth, not inability to sustain movement | 0 |
| 5. | Upper (arms, wrists, hands, fingers)<br>Include choreic movements (i.e., rapid, objectively purposeless, irregular, spontaneous); athetoid movements (i.e., slow, irregular, complex, serpentine). DO NOT include tremor (i.e., repetitive, regular, rhythmic). | 0 |
| 6. | Lower (legs, knees, ankles, toes)<br>e.g. lateral knee movement, foot tapping, heel dropping, foot squirming, inversion & eversion of foot | 0 |
| 7. | Neck, shoulders, hips<br>e.g. rocking, twisting, squirming, pelvic gyrations | 00 |
| 8. | Severity of abnormal movements | 0 |
| 9. | Incapacitation due to abnormal movements | 0 |
| | Patient's awareness of abnormal movements Rate only patient's report:  No awareness=0  Aware, no distress=1  Aware, mild distress=2  Aware, moderate distress=3  Aware, severe distress=4 | 0 |
| 10. | Current problems with teeth &/or dentures?<br>No=0   Yes=1 | 0 |
| 11. | Does patient usually wear dentures?<br>No=0   Yes=1 | 0 |
| | Total | 0 |

## ASSESSMENT:

**Relevant Brief Psychiatric Rating Scale Items**  (Use BPRS decision tree and paste here)

BRIEF PSYCHIATRIC RATING SCALE
Depression
1-Not Present
Sucidality
1-Not Present
Emotional Withdrawal
1-Not Present
Motor Retardation
1-Not Present
Anxiety
1-Not Present
Somatic Concern
1-Not Present
Elevated Mood
1-Not Present
Grandiosity
1-Not Present
Excitement

TDCJ-HSA00142

                1-Not Present
Distractibility
                1-Not Present
Motor Hyperactivity
                1-Not Present
Impulsiveness
                1-Not Present
Hostility
                1-Not Present
Uncooperativeness
                1-Not Present
Hallucinations
                1-Not Present
Unusual Thought Content
                4-Mod-Delusional But No Functional Impairment
Conceptual Disorganization
                1-Not Present
Mannerisms & Posturing
                1-Not Present
Bizarre Behavior
                1-Not Present
Suspiciousness
                5-Mod-Malicious Talk, Others Intend To Harem, No Delusions
Self-Neglect
                1-Not Present
Blunted Affect
                1-Not Present
Disorientation
                1-Not Present

**Diagnosis:**
**Axis I:schizoaffective disorder, DSM code 29 5.7**
**Axis II:**
**Axis III:**

**PLAN:**

**MEDICATION:**
Continual currently prescribed medications without any changes.
**Lab/EKG//PROCEDURE ORDERS:**


Procedures Ordered:
      MH IP ASSESSMENT/EVALUATION:   schizoaffective disorder


I have discussed with the patient the risks, benefits and alternatives to the treatment plan as specified above and he/she agrees to the recommended treatment(s).

      \_\_\_xxxx\_\_\_\_\_ Yes         _____ No        _____ N/A

TDCJ-HSA00143

Electronically Signed by PATEL, HEMANT S M.D. on 01/27/2009.
Electronically Signed by BUNDY, GWENDOLYN  MA, LPC, SP on 01/27/2009.
Electronically Signed by TWINE, BARBARA  L.V.N. on 01/27/2009.
Electronically Signed by BARRIENTOS, ROXSANDRA  CCA on 02/02/2009.
##And No Others##

TDCJ-HSA00144

# Exhibit 188

## 01-27-09 Correctional Managed Care – Inpatient Psychiatric Evaluation

**CORRECTIONAL MANAGED CARE**
**Mental Health Services**

**Inpatient Clinic Note (Psychologist/Psychotherapist)**

**Patient Name:** THOMAS, ANDRE     **TDCJ#:** 999493     **Date:** 01/27/2009 16:03     **Facility:** JESTER IV

Age:25  Race: B  Sex: Male

| Patient Language: ENGLISH   Name of interpreter, if required: |

**Treatment Track:**

_____  Crisis Management
_____  D&E
__x__   Acute Care
__ __   Chronic Care
_____  Partial Remission Psychotic
_____  Mood Disorder
_____  Impulsive Behavior
_____  Organic

**Progress Check**

S: "I am not doing too good.  They won't find my identification.  They are checking in property.  But I can't go to commissary."

"I feel like someone is hunting me."

O:

| Orientation:  Ox3, person, location, and situation | Behavior: Cooperative, but not focused on interview |
|---|---|
| Mood/Affect: "Okay" with congruent mood | Appearance: Eyes missing, AA, slender |
| Insight/Judgment: Limited | Speech: Clear with normal rate, rhythm, and volume |
| Thought Process: Tangential | S/H ideations: Denied thoughts of harm to self and others; currently contracts for safety |
| Thought Content: Not interview appropriate, some paranoid themes noted | Hallucinations: Denied current |

Offender Thomas was seen cell- side at A1- 34 and a progress check was conducted.  The offender was cooperative with the writer and talkative.  However, he was not focused on the interview topics and was more concerned about making commissary.  The offender claims that he has been compliant with his psychotropic medications and states that his auditory hallucinations, while not gone, have been "silenced."  He expressed briefly that he believes he is being hunted, but then returned to solving the problem of his delayed commissary privileges.

A: 295.70

P: Acute Care Protocol

1 of 2

**Exhibit 188**

TDCJ-HSA00145

**CORRECTIONAL MANAGED CARE**
**Mental Health Services**

**Inpatient Clinic Note (Psychologist/Psychotherapist)**

**Patient Name:** THOMAS, ANDRE        **TDCJ#:** 999493        **Date:** 01/27/2009 16:03        **Facility:** JESTER IV

Procedures Ordered:
    MH IP ASSESSMENT/EVALUATION:    schizoaffective disorder

    Electronically Signed by SAMUELS, KIMBERLY C MA, SP on 01/27/2009.
    ##And No Others##

TDCJ-HSA00146

# Exhibit 189

## 01-27-09 Correctional Managed Care Clinic Notes - Nursing

## CORRECTIONAL MANAGED CARE
## CLINIC NOTES - NURSING

**Patient Name:** THOMAS, ANDRE   **TDCJ#:** 999493   **Date:** 01/27/2009 13:11   **Facility:** JESTER IV

**Age:** 25 Years   **Race:** B   **Sex:** Male

**Most recent vitals from 12/30/2008:** BP: 108 / 66 (Sitting) ; Wt: 139 Lbs.; Height: 69 In.; Pulse: 90 (Sitting) ; Resp: 18 / min; Temp: 96.7 (Oral)

**Allergies:** NO KNOWN ALLERGIES

| Patient Language:   ENGLISH   Name of interpreter, if required: |
|---|

LATE ENTRY FOR TODAY AT 0835

**Today's Problem:** ROUNDS.

S: " I'M STILL HAVING DREAMS. SOMEBODY IS HUNTING ME DOWN IN MY DREAM. I THINK IT'S A GUY AFTER ME. I THINK THE GOVERNMENT IS MAD AT ME FOR PUTTING MY EYES OUT. I THOUGHT I COULD SAVE THE WORLD BY DEFEATING THE DEVIL. NO, NO THOUGHTS TO HURT MYSELF. I FEEL I JUST SLEEP A LOT. I'M EATING GOOD. YES, I SHOWER. NO, I DON'T HAVE ANY MEDICAL PROBLEMS. "

O: SEEN FOR ROUNDS ALONG WITH PSYCH DOCTOR. PT. RESTING IN SUPINE POSITION. NO DISTRESS NOTED. RESPONDS TO VERBAL STIMULI AND FOLLOW DIRECTIONS FOR APPROACHING CELL DOOR. NOTED TO FOLLOW DIRECTIONS WELL. PT. IS ALERT. SPEECH IS CLEAR. GAIT IS STEADY. NO DRAINAGE FROM EYE SOCKETS. BREATHING IS UNLABORED. DENIES SUICIDAL/HOMICIDAL IDEATION. DENIES HAVING ANY MEDICAL CONCERNS.

A: CALM AND COOPERATIVE.

Plan is as follows: INFORMED TO NOTIFY MEDICAL IF NEEDING ANY ASSISTANCE. VERBALIZE UNDERSTANDING. WILL MONITOR HEALTH, SAFETY AND BEHAVIOR PRN.

Procedures Ordered:
   NURSING LEVEL 1 COMPLETE VISIT: mental health behavioral observations
      Electronically Signed by TWINE, BARBARA  L.V.N. on 01/27/2009.
      ##And No Others##

1 of 1

**Exhibit 189**

TDCJ-HSA00654