# Exhibit 190

## 02-02-09 Correctional Managed Care – Individualized Treatment Plan for Psychiatry Chronic Care

Procedures Ordered:
>       MH IP ASSESSMENT/EVALUATION:    schizoaffective disorder

**CORRECTIONAL MANAGED CARE**
**INPATIENT MENTAL HEALTH SERVICES**

**Individualized Treatment Plan for Psychiatry Chronic Care (Initial or Follow-up)**

**Patient Name:** THOMAS, ANDRE   **TDCJ#:** 999493   **Date:** 02/02/2009 17:24
**Facility:** JESTER IV   **Date of Birth:** ▮▮▮▮▮   **Age:** 25 Years   **Race:** B   **Sex:** Male
| Patient Language:  ENGLISH   Name of interpreter, if required: |
**Most recent vitals from 12/30/2008:** BP: 108 / 66 (Sitting) ; Wt: 139 Lbs.; Height: 69 In.; Pulse: 90 (Sitting) ; Resp: 18 / min;
Temp: 96.7 (Oral)

**Allergies:** NO KNOWN ALLERGIES

```
_____      INITIAL PSYCHIATRIC EVALUATION
____x___      FOLLOW-UP PSYCHIATRIC EVALUATION
```

```
___x__ Patient seen
_____ Patient not seen
              Reason not seen:
```

**Current Medications:**
Cogentin 2 mg bid 35/36
Citalopram 20 mg am 18/19
Haldol 20 mg bid 24/24
Carbamazepine 400 mg bid 8/8, 54/57

**Allergies:**  NO KNOWN ALLERGIES
**Most recent vitals from 12/30/2008:** BP: 108 / 66 (Sitting)  Wt. 139 Lbs. Height 69 In. Pulse: 90 (Sitting)  Resp.: 18 /
min Temp: 96.7 (Oral)
**CASE SUMMARY**
**Problems:**

**Cars:**
>       **Medical Cars 3 First Observed 03/30/2006 07:47AM**
>       **Mental Health Cars 3 First Observed 12/01/2008 02:36PM**

**Dental:**
>       **Dental Examination First Observed 04/17/2007 06:57AM**
>       **Hard Tissue Disease First Observed 10/09/2007 08:48AM**

**Mental Health:**
>       **Mh Death Row Patient First Observed 07/10/2007 06:53AM**

**Mh Other:**
>       **Behavioral Problems First Observed 03/24/2005 02:38PM**
>       **Mental Status Exam First Observed 04/08/2005 05:01PM**
>       **Mental Health Behavioral Observations First Observed 05/11/2005 06:00PM**

**Exhibit 190**

TDCJ-HSA00131

Procedures Ordered:
   MH IP ASSESSMENT/EVALUATION:    schizoaffective disorder

   Mental Health Case Mgmt Problems And Trmt Objectives First Observed 04/07/2006 03:27PM
   Mental Health Suicide Risk Assessment First Observed 06/07/2006 04:27PM

Nurse Protocol:
   Np - Eye/ear/nose/throat Complaints First Observed 06/04/2008 07:52AM
   Np - Psychiatric Symptoms First Observed 07/14/2008 09:57PM

Not Specified:
   Brief Psychiatric Rating Scale First Observed 03/24/2005 02:49PM
   Misc Diagnosis First Observed 03/27/2005 07:46AM
   Hiv High Risk Screening Completed First Observed 03/27/2005 07:46AM
   Screening Exam For Suspected Condition First Observed 03/27/2005 07:47AM
   Respiratory System And Chest Symptoms Nec First Observed 01/05/2006 04:12PM
   Np - Chest Pain First Observed 03/07/2006 08:17AM
   Annual Ppd Skin Test First Observed 03/23/2006 03:40PM
   Observation- Cond Not Found First Observed 03/30/2006 07:47AM
   Np - Burns/wounds/bites First Observed 05/03/2006 09:31PM
    Pre-segregation/lock-up Physical Exam First Observed 06/07/2006 04:16PM
   Vision First Observed 11/21/2006 07:20AM
   Lipoma First Observed 04/27/2007 07:48AM
   Dental Cars 1 First Observed 10/09/2007 08:47AM
   Schizoaffective Disorder First Observed 02/26/2008 04:00PM
   Tb Class 0 (no Exposure Pulm. Tuberculosis) First Observed 04/29/2008 09:11AM
   Tetanus Toxoid Vaccination First Observed 04/29/2008 09:11AM
   Offender Returning From I/p Psych Facility First Observed 07/31/2008 05:22PM
   Blindness, Complete First Observed 12/10/2008 02:49PM


Treatment Track:

_____   Crisis Management
_____   D&E
  A1         Acute Care
_____   Chronic Care
_____   Partial Remission Psychotic
_____   Mood Disorder
_____   Impulsive Behavior
_____   Organic

PSYCHIATRIC/MEDICAL/SOCIAL HISTORY:   The patient was transferred to Jester 4 after plucking out his left eye and eating it. The patient had removed his right eye in the past.


SUBJECTIVE: The patient stated he was on level 3 at his unit and the lady was complaining he was not consistent in taking his meds, he says he was taking it and he was paranoid, heard a voice, he was in psych oobs thinking about the

TDCJ-HSA00132

Procedures Ordered:
   MH IP ASSESSMENT/EVALUATION:    schizoaffective disorder

bible and "walked yb faith not by sight, he did not want to lust after another woman in his hear. He keeps hearing voices, sometimes his own voice telling him to commit suicide whenever he thinks about life, misstakes and embarassing thing. He says he still has voices but does not pay attention because he is in control. He is eating and sleeping well, and does not feel the need for more medications.

**OBJECTIVE:**
**Mental Status:**

| | | | | |
|---|---|---|---|---|
| Orientation | x | Intact to person, place, time, and situation | | Other |
| Appearance: | x | Appropriate | | Other |
| Hygiene: | x | Well kept | | Other |
| Psychomotor: | x | Not increased or decreased | | Other |
| Behavior: | x | Cooperative | | Other |
| Eye Contact: | | Good | x | Other    NA |
| Speech: | x | Spontaneous, NL Rate and Volume | | Other |
| Mood: | x | Euthymic | | Other |
| Affect: | x | NL range& intensity, stable & appropriate | | Other |
| Sensorium | x | Clear | | Other |
| Thought process: | x | Coherent, logical, and goal directed | | Other |
| Thought content: | x | Appropriate | | Other |
| Hallucinations | | None expressed | x | Other    Auditory |
| Delusions: | x | None expressed | | Other |
| Suicidal ideations: | x | None expressed | | Other |
| Homicidal ideations: | x | None expressed | | Other |
| Judgement | x | Unimpaired | | Other |
| Insight: | x | Unimpaired | | Other |

**COMPLIANCE: (# doses taken/ #ordered)**
Cogentin 2 mg bid 35/36
Citalopram 20 mg am 18/19
Haldol 20 mg bid 24/24
Carbamazepine 400 mg bid 8/8, 54/57

**Comment re compliance:**
Excellent

**ADVERSE EFFECTS:**
None

**LAB/EKG Comments:**
3/8/06 NSR

| CHEMISTRY | 01/12/2009 20:07 | 01/12/2009 19:25 | 12/30/2008 12:59 | 12/29/2008 18:56 |
|---|---|---|---|---|
| BILI T | <0.1 [~] | | <0.1 [~] | |
| ALBUMIN | | 4.7 | | 4.4 |

3 of 7

Procedures Ordered:
MH IP ASSESSMENT/EVALUATION:    schizoaffective disorder

| | | | |
|---|---|---|---|
| ALK PHOS | 62 | | 58 |
| ALT | 30 | | 29 |
| AST | 24 | | 25 |
| BILIRUBIN CONJU | 0 | | |
| BILIRUBIN UNCON | 0.2 | | |
| TOTAL PROTEIN | 7.8 | | 7.4 |
| ANION GAP | | | 14 |
| BUN | | | 16 |
| CHLORIDE | | | 99 |
| CO2 TOTAL | | | 29 |
| POTASSIUM | | | 4.5 |
| SODIUM | | | 142 |
| CALCIUM | | | 9.7 |
| CREATININE | | | 0.97 |
| GLU | | | 54 [L] |

| HEMATOLOGY | 01/12/2009 18:43 | 12/29/2008 18:06 | 07/28/2008 20:17 |
|---|---|---|---|
| WBC | 5.2 | 4.5 | 4.9 |
| BASO ABS | 0 | 0.1 | 0.1 |
| BASO% | 0.6 | 2 | 1.2 |
| EOSINO ABS | 0.3 | 0.3 | 0.2 |
| EOSINO% | 6.1 [H] | 6.5 [H] | 4.1 |
| GRAN ABS | 2.2 | 1.9 | 2.2 |
| GRAN% | 43 | 42.9 | 44.9 |
| HCT | 45.7 | 44.9 | 46.4 |
| HEMOGLOBIN | 16.1 | 15.7 | 15.5 |
| LYMPH ABS | 2.1 | 1.8 | 2 |
| LYMPH% | 40.1 | 39.2 | 40.4 |
| MCHC | 35.2 | 35 | 33.4 |
| MCV | 91.2 | 92 | 92.1 |
| MEAN CORP HGB | 32.1 [H] | 32.2 [H] | 30.8 |
| MEAN PLATELET V | 9.6 | 9.5 | 10.5 |
| MONO ABS | 0.5 | 0.4 | 0.5 |
| MONO% | 10.2 | 9.4 | 9.4 |
| PLT | 289 | 354 | 325 |
| RBC | 5.01 | 4.88 | 5.04 |
| RDW | 11.5 [L] | 11.6 | 12.5 |

| POINT OF CARE TESTS | 04/29/2008 09:16 | | |
|---|---|---|---|
| PPD | 0 | | |

| RIA | 12/30/2008 13:28 | 07/28/2008 20:30 | |
|---|---|---|---|
| TSH | 1.87 | 2.46 | |

| SEROLOGY | 05/02/2008 15:39 | 05/02/2008 15:26 | 05/02/2008 15:17 | 05/02/2008 14:46 |
|---|---|---|---|---|
| HBsAb | NEGATIVE | | | |
| HBsAg | | NEGATIVE | | |
| HCV | | | NEGATIVE | |
| HIV | | | | NEGATIVE |
| RPR QL | | | | |

| TDM/TOX | 09/06/2008 00:02 | 08/27/2008 22:45 | | |
|---|---|---|---|---|
| VALPROIC TIME | N/A [~] | N/A [~] | | |

| TOXICOLOGY | 01/12/2009 19:10 | 12/29/2008 18:40 | 09/11/2008 00:40 | 09/06/2008 00:02 |
|---|---|---|---|---|
| CARBAMAZE | 5.7 | 4.8 | | |
| VALPROIC A | | | 42 | 133 [H] |

TDCJ-HSA00134

Procedures Ordered:
## MH IP ASSESSMENT/EVALUATION:   schizoaffective disorder

| | | |
|---|---|---|
| URINALYSIS | 07/28/2008 22:41 | 07/28/2008 22:40 |
| BACTERIA | NEGATIVE | |
| EPITHELIAL CELL | 1 | |
| MUCOUS URINE | SLT [~] | |
| RBC UR | <1 | |
| WBC URINE | 1 | |
| APPEARANCE | | SLCLDY [~] |
| COLOR | | YELLOW |
| PH URINE | | 8 |
| AMORPHOUS MAT U | | MODERATE [~] |
| BILIRUBIN URINE | | NEGATIVE |
| BLOOD URINE | | TRACE [~] |
| GLUCOSE QUAL UR | | NEGATIVE |
| KETONES URINE | | NEGATIVE |
| LEUKOCYTE ESTER | | NEGATIVE |
| NITRITE URINE | | NEGATIVE |
| PROTEIN URINE | | NEGATIVE |
| SPEC GRAVITY UR | | 1.01 |
| UROBILINOGEN UR | | 0.2 |

## AIMS:

Complete examination procedure outlined in the instructions before making rating.  Rate highest severity observed.  Movements occurring upon activation rate one less that those occurring spontaneously.
0=None        1=Minimal        2=Mild        3=Moderate        4=Severe

| | |
|---|---|
| 1.   Muscles of facial expression<br>e.g. movements of forehead, eyebrow, preorbital area, cheeks, include frowning, blinding, smiling, grimacing | 0 |
| 2.   Lips and perioral area<br>e.g.  puckering, pouting, smacking | 0 |
| 3.   Jaw<br>e.g.  biting, clenching, chewing, mouth opening, lateral movement | 0 |
| 4.   Tongue<br>Rate only increase in movement both in and out of mouth, not inability to sustain movement | 0 |
| 5.   Upper (arms, wrists, hands, fingers)<br>Include choreic movements (i.e., rapid, objectively purposeless, irregular, spontaneous); athetoid movements (i.e., slow, irregular, complex, serpentine).  DO NOT include tremor (i.e., repetitive, regular, rhythmic). | 0 |
| 6.   Lower (legs, knees, ankles, toes)<br>e.g. lateral knee movement, foot tapping, heel dropping, foot squirming, inversion & eversion of foot | 0 |
| 7.   Neck, shoulders, hips<br>e.g. rocking, twisting, squirming, pelvic gyrations | 0 |
| 8.   Severity of abnormal movements | 0 |
| 9.   Incapacitation due to abnormal movements | 0 |
| Patient's awareness of abnormal movements Rate only patient's report:  No awareness=0  Aware, no distress=1  Aware, mild distress=2  Aware, moderate distress=3  Aware, severe distress=4 | 0 |
| 10.  Current problems with teeth &/or dentures?<br>No=0   Yes=1 | 0 |

TDCJ-HSA00135

Procedures Ordered:
 MH IP ASSESSMENT/EVALUATION:   schizoaffective disorder

| 11.  Does patient usually wear dentures?<br>No=0   Yes=1 | | 0 |
| --- | --- | --- |
| | Total | |

ASSESSMENT:  Stable, still with auditory hallucinations, pending Haldol level

Relevant Brief Psychiatric Rating Scale Items  (Use BPRS decision tree and paste here)

BRIEF PSYCHIATRIC RATING SCALE
Depression
2-Very Mild-Feels Sad/Unhappy More Than Usual
Sucidality
1-Not Present
Emotional Withdrawal
1-Not Present
Motor Retardation
1-Not Present
Anxiety
1-Not Present
Somatic Concern
1-Not Present
Elevated Mood
1-Not Present
Grandiosity
1-Not Present
Excitement
1-Not Present
Distractibility
1-Not Present
Motor Hyperactivity
1-Not Present
Impulsiveness
1-Not Present
Hostility
1-Not Present
Uncooperativeness
1-Not Present
Hallucinations
4-Mod-Verbal, Visual, Other >3x Or Freq Non-Verbal, No Impair
Unusual Thought Content
1-Not Present
Conceptual Disorganization
1-Not Present

TDCJ-HSA00136

Procedures Ordered:
    MH IP ASSESSMENT/EVALUATION:   schizoaffective disorder

        Mannerisms & Posturing
            1-Not Present
        Bizarre Behavior
            1-Not Present
        Suspiciousness
            1-Not Present
        Self-Neglect
            1-Not Present
        Blunted Affect
            1-Not Present
        Disorientation
            1-Not Present

**Diagnosis:**
**Axis I:  295.7 Schizoaffective Disorder**
**Axis II: Deferred**
**Axis III: Blind OU due to self enucleation**

**PLAN:  Pending Haldol level**

**MEDICATION:**
**Continue:**
**Cogentin 2 mg bid**
**Citalopram 20 mg am**
**Haldol 20 mg bid**
**Carbamazepine 400 mg bid**

**Lab/EKG//PROCEDURE ORDERS:**

I have discussed with the patient the risks, benefits and alternatives to the treatment plan as specified above and he/she agrees to the recommended treatment(s).

    ____x___ Yes      _____ No      _____ N/A
    Electronically Signed by JUNG, PAUL  PA-C on 02/02/2009.
    Electronically Signed by SAMUELS, KIMBERLY C MA, SP on 02/03/2009.
    Electronically Signed by TOMY, ANIE  L.V.N. on 02/03/2009.
    ##And No Others##

TDCJ-HSA00137

# Exhibit 191

## 02-03-09 Correctional Managed Care-Inpatient Clinic Note (Psychologist / Psychotherapist)

**CORRECTIONAL MANAGED CARE**
**Mental Health Services**

**Inpatient Clinic Note (Psychologist/Psychotherapist)**

**Patient Name:** THOMAS, ANDRE     **TDCJ#:** 999493     **Date:** 02/03/2009 17:00     **Facility:** JESTER IV

Age:25  Race: B  Sex: Male

| Patient Language: ENGLISH   Name of interpreter, if required: |

**Treatment Track:**

_____  Crisis Management
_____  D&E
___x___  Acute Care
_____  Chronic Care
_____  Partial Remission Psychotic
_____  Mood Disorder
_____  Impulsive Behavior
_____  Organic

**Progress Check**

S: "I am having dreams that my wife isn't dead and is alive.  I was at a casino and she was at the other table drinking.  I am mad because it never would have happened if she gave me a divorce.  I am mad because I am still locked up for no reason if she is alive.  I believe she is really alive sometimes because of all of this deja vu.

O:

| | |
|---|---|
| Orientation:  Ox3, person, location, and situation | Behavior: Cooperative |
| Mood/Affect: "Agitated" with congruent mood | Appearance: Eyes missing, AA, slender, over-grown stubble.  Dirty. |
| Insight/Judgment: Limited | Speech: Clear with normal rate, rhythm, and volume |
| Thought Process: Illogical | S/H ideations: Denied thoughts of harm to self and others; currently contracts for safety |
| Thought Content: Not based on reality | Hallucinations: Denied current |

Offender Thomas was seen cell- side at A1- 34 and a progress check was conducted.  The writer is serving as a substitute for Ms. Knight on this date.  The client was sleeping upon the writer's arrival.  When he approached the door, he stated he has been suffering from dreams.  He claims his dreams tell him that his wife is alive, and he expressed genuine anger at his wife for his prison sentence.  He is not taking responsibility for his own behavior and states that had his wife behaved differently, he would not have had to kill her.  He then reported
he is not sure she is really dead and expressed more anger towards his theory that he is serving time for a crime he did not commit.  The offender is not rational and his thoughts are not based on reality.

A: 295.70

P: Acute Care Protocol

**Exhibit 191**

TDCJ-HSA00129

**CORRECTIONAL MANAGED CARE**
**Mental Health Services**

**Inpatient Clinic Note (Psychologist/Psychotherapist)**

**Patient Name:** THOMAS, ANDRE        **TDCJ#:** 999493        **Date:** 02/03/2009 17:00        **Facility:** JESTER IV

Procedures Ordered:
        MH IP ASSESSMENT/EVALUATION:   schizophrenia, paranoid type

        Electronically Signed by SAMUELS, KIMBERLY C MA, SP on 02/03/2009.
        ##And No Others##

2 of 2

TDCJ-HSA00130

# Exhibit 192

## Findings of Fact and Conclusions of Law

NO. 051858-15-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 15th DISTRICT COURT |
| | § | OF |
| ANDRE THOMAS | § | GRAYSON COUNTY, TEXAS |

### ORDER ON APPLICANT'S MOTIONS

After considering Applicant's Motion to Reconsider Denial of Applicant's Motion for Discovery and Evidentiary Hearing and Applicant's Motion to Show Cause Why The State Should Not Be Sanctioned the Court finds that the Motions should be denied.

SIGNED and entered this __28th__ day of __MARCH__ , 2008.

JUDGE PRESIDING
15TH DISTRICT COURT
GRAYSON COUNTY, TEXAS

FILE FOR RECORD

MAR 2 8 2008

By _____ Clerk
Grayson County

66

**Exhibit 192**

NO. 051858-15-A

| | | |
|---|---|---|
| *EX PARTE* | § | IN THE 15th JUDICIAL |
| | § | DISTRICT COURT OF |
| ANDRE THOMAS | § | GRAYSON COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## REGARDING APPLICANT'S POST JUDGMENT APPLICATION
## FOR WRIT OF HABEAS CORPUS

After reviewing the Application and Response thereto as well as the proposed Findings of Fact and Conclusions of the Law by both sides, as well as the Court's personal recollection, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.      Applicant Mr. Thomas is confined at the Polunsky Unit of the Texas Department of Criminal Justice, Institutional Division, in Livingston, Texas.

2.      Mr. Thomas is confined pursuant to a Judgment entered on March 14, 2005, by the 15th Judicial District Court of Grayson County, Texas, the Honorable James R. Fry, sitting by assignment in the 15th Judicial District Court.  Clerk's Record (C.R.) Volume (Vol.) 5, Page (P.) 1696-1698.

3.      A grand jury impaneled in Grayson County, Texas in and for the 336th Judicial District of Texas, indicted Mr. Thomas in Cause No. 51858 on or about June 30, 2004,

1

FILE FOR RECORD

MAR 2 3 2008

By
Grayson County

for the capital murder of ████████████.  C.R. Vol. 1, P. 9.  Mr. Thomas pled not guilty by reason of insanity to the charge in Cause No. 51858.  C.R. Vol. 1, P. 1.

4.      Prior to the issuance of the above-described indictment against Mr. Thomas, on March 30, 2004, the 336th Court of Grayson County, Texas appointed R.J. Hagood to represent Mr. Thomas as lead counsel or "1st Chair."  Supplementary (Supp.) C.R. Vol. 1, P. 14.  The next day, March 31, 2004, the 15th District Court of Grayson County, Texas appointed Ms. Peterson as co-counsel or "2nd-Chair."  Supp. C.R. Vol. 1, P. 15.

5.      On July 22, 2004, the State moved to transfer Cause No. 51858 from the 336th Judicial District to the 15th Judicial District for Grayson County, Texas.  C.R. Vol. 1, P. 5.

6.      Jury selection for Mr. Thomas's capital murder trial began on January 10, 2005, and ended on February 4, 2005.  Reporter's Record ("R.R.") Volume ("Vol.") 11-26.  The trial itself commenced on February 15, 2005.  R.R. Vol. 27.  On March 7, 2005, the jury returned a guilty verdict.  C.R. Vol. 1, P. 6; C.R. Vol. 5, P. 1674-81; R.R. Vol. 38, P. 6-7.

7.      The penalty phase of Mr. Thomas's trial began on March 7, 2005.  R.R. Vol. 38-42.  The jury answered two special issues, as required by law, resulting in a sentence of death for Mr. Thomas.  C.R. Vol. 1, P. 7; C.R. Vol. 5, P. 1690-95; R.R. Vol. 42, P. 85-87.  The Court immediately sentenced Mr. Thomas based upon the jury's verdict.  R.R. Vol. 42, P. 91-92.  Thereafter, on March 14, 2005, the court formally entered "Judgment of Conviction by Jury; Sentence by Court to Death."  C.R. Vol. 5, P. 1696-1698.

8.      On July 5, 2005, the court appointed Garland Cardwell as Mr. Thomas's counsel for his direct appeal.  C.R. Vol. 5, P. 1709.

2

9.     Mr. Thomas's case is on automatic direct appeal before the Court of Criminal Appeals for the State of Texas, Case No. AP-75,218 pursuant to Tex. R. App. Proc. 25.2(a)(2)(b) & 71.1.

10.    The Court of Criminal Appeals for the State of Texas has yet to issue an Order addressing the issues raised in Mr. Thomas's direct appeal.

11.    On the morning of March 27, 2004 Andre Thomas and his wife, Laura Christine (Boren) Thomas were separated and she was living with their four year old son, █████████, and ███████'s thirteen and one-half month old half-sister, ████.

12.    In the days and weeks leading up to the murders of his wife and her two children, Mr. Thomas had been abusing marijuana, alcohol, and a cold medication called Coricidin, containing the drug Dextromethorphan ("DXM")..

13.    On the morning of March 27, 2004 Andre Thomas was psychotic.

14.    On the morning of March 27, 2004 Andre Thomas went to the apartment of his wife, Laura Christine Thomas, his four year old son, ████████, and ████'s thirteen and one-half month old half-sister, ████ and killed each of them with a different knife

15.    Mr. Thomas attempted to cut each of his victim's hearts out, but was only partially successful. He removed the hearts of the children, but only managed to remove a part of one of Laura's lungs. See generally R.R. Vol. 28, P. 123-149; R.R. Vol. 45 at State's Exs. 51-60.

16.    While still at the crime scene, Mr. Thomas turned one of his knives on

3

himself, stabbing himself in the chest, in an attempt to commit suicide. Surprised that he was not dead, Mr. Thomas did not flee, but simply walked home. Just a few hours later, he would need emergency surgery to save his life. R.R. Vol. 36, P. 6-14; Vol. 44, Supp. Hrg. State's Ex. 21 at 21 and State's Ex. 23 at 3-4 and 8.

       17.   Upon arriving at his home he "went and . . . got a Wal-Mart sack and put the hearts into" it and then "put the hearts in the trash" and then "went and changed clothes." R.R. Vol. 44, at Supp. Hrg. State's Ex. 23. at 4-5. He put the murder weapons – the three knives – in his kitchen sink and left his bloody clothes on the floor of his bedroom. R.R. Vol. 27, P. 141-144; R.R. Vol. 45 at State's Ex. 66.

       18.   Despite just having killed Laura, Mr. Thomas next went over to his dad's trailer nearby to call her, because he "didn't believe what had happened" and was "gonna call her." R.R. Vol. 44 at Supp. Hrg. State's Ex. 23 at 5. Unable to locate Laura's phone number in his wallet, however, he used his dad's phone instead to call Laura's parents. He did not reach them, but left them the following message:

> Um, Sherry, this is Andre. I need yall's help. Something bad is happening to me and it keeps happenin' and I don't know what's going on. I need some help. I, I think I'm in hell, and um, I need help. Somebody needs to come and help me. I need help bad. I'm desperate and, um, I'm afraid to go to sleep. So, when you get this message, come by the house, please. Hello?

R.R. Vol. 30, P. 143-148; R.R. Vol. 45 at State's Exs. 85 & 86.

       19.   Andre Thomas turned himself into the Sherman Police Department later that morning.

       20.   The blood samples and a urine test from Mr. Thomas on the morning of the crime did not reveal any evidence of intoxication due to Mr. Thomas's ingestion of either

4

marijuana or Coricidin on the evening of March 25, 2004.  *See* Ex. 63 at DPS 0160; Ex. 64 at

DPS0137; Ex. 159 at DPS0123; Ex. 83 at AT 018949.  *See also* Ex. 23 at ¶ 10.  As stipulated by

the State at trial, a less than measurable amount of Dextromethorphan ("DXM") was found in

Mr. Thomas's blood.  R.R. Vol. 45, State's Ex. 93. *See also* R.R. Vol. 29, P. 73-74; R.R. Vol. 32,

7-8.

21.   On March 27, 2004, Mr. Thomas had emergency open heart surgery to

repair damage caused by his self-inflicted stab wounds to his heart and was re-arrested for the

murders of Laura█████, and█████.  R.R. Vol. 36, P. 6-14; R.R. Vol. 7, P. 111; R.R. Vol. 14

at State's Supp. Hrg. Exs. 18 and 19.

22.   After spending two days in the hospital, Mr. Thomas was discharged to

the Sherman Police Department for a videotaped interview and statement.  R.R. Vol. 7, P. 134.

*See generally* R.R. Vol. 7, P. 119-131, R.R. Vol. 10, P. 4-14.

23.   Mr. Thomas gave a videotaped statement to the police on March 29,

2004.

24.   On March 30, 2004, Mr. Thomas was transferred to the Grayson County

Jail and gave an audiotaped statement to Detective Ditto, Texas Ranger Tony Bennie, and

Grayson County Jail Nurse Natalie Sims.  R.R. Vol. 44, State Ex. 23.  *See generally* R.R. Vol.

32, P. 9, 22; R.R. Vol. 44 at Supp. Hrg. State's Ex. 23; R.R. Vol. 45 at State's Exs. 91 and 92.

25.   On March 30, 2004, the 336th Court of Grayson County, Texas appointed

R.J. Hagood to represent Thomas as lead counsel or "1st Chair."  Supp. C.R. Vol. 1, P. 14.  The

next day, March 31, 2004, the 15th District Court of Grayson County, Texas appointed Bobbie

Peterson (Cate) as co-counsel or "2nd-Chair."  Supp. C.R. Vol. 1, P. 15.

26.     Mr. Hagood and Ms. Peterson (Cate) were working on other cases in state and federal court while representing Mr. Thomas. Ex. 15 (Hagood Aff.) at ¶ 6.

27.     Prior to and during trial, Mr. Hagood suffered from chronic pancreatitis.

28.     Following his return from Wilson N. Jones Hospital, Mr. Thomas was held in Grayson County Jail. *See generally* R.R. Vol. 33, 98, 100-103; R.R. Vol. 46 at Def. Trial Ex. 8.

29.     On April 2, 2004, Mr. Thomas was in his cell reading his Bible. After reading a Bible verse to the effect that, "If the right eye offends thee, pluck it out," Mr. Thomas removed his right eye with his fingers, blinding himself in that eye. *See generally* R.R. Vol. 33, 19, 31-32, 111; R.R. Vol. 46 at Def. Exs. 9-13.

30.     On or about April 5, 2004, Mr. Hagood brought a motion for a competency examination of Mr. Thomas. Supp. C.R. Vol. 1, P. 21-22. The Court granted the motion the same day and appointed Psychologist Dr. James Harrison to evaluate whether Mr. Thomas was competent to stand trial. Supp. C.R. Vol., P. 23-24. Dr. Harrison concluded that Mr. Thomas was incompetent to stand trial. Ex. 60.

31.     On April 26, 2004, the State brought its own motion to have Mr. Thomas examined for trial competency by its expert Dr. Peter Oropeza. Supp. C.R. Vol. 1, P. 25-26

32.     Dr. Oropeza also found Mr. Thomas incompetent to stand trial and recommended that he receive psychiatric treatment. Ex. 65 at 8.

33.     The parties waived a trial on competency and at a June 16, 2004 hearing, the Court declared Mr. Thomas to be incompetent. C.R. Vol. 3, P. 1025-1033. The next day, the Court ordered Mr. Thomas to the North Texas State Hospital – Vernon Maximum Security Unit

6

("Vernon") in Vernon, Texas, a maximum security psychiatric facility of the Mental Health

Mental Retardation ("MHMR") network. Supp. C.R. Vol. I, P. 11-12; C.R. Vol. 3, P. 00981-982.

34.     On July 23, 2004 Dr. B. Thomas Gray, a Clinical Psychologist at Vernon

concluded that Mr. Thomas was now competent to stand trial. Ex. 70 at AT 002029.

35.     Mr. Hagood's and Ms. Bobbie Peterson (Cate's) trial strategy was to

prove that the applicant was insane at the time of the offense, not because of intoxication, but

because of his prior medical and mental history.

36.     The State's position was that the Applicant either knew right from wrong

or that any psychosis he had was substance induced.

37.     For the guilt/innocence phase of the trial, the State primarily relied on

Drs. David Axelrad and Victor Scarano and psychologist Dr. Peter Oropeza. *See generally* C.R.

Vol. 1, P. 20-22, 51; R.R. Vol. 2, P. 3.

38.     The State called two experts for the punishment phase of the trial that

were disclosed on its expert witness list, Brent O'Bannon, a licensed professional counselor

who interacted with Mr. Thomas back in 1999, when he was 16, and Royce Smithey, the Chief

Investigator for the Special Prosecution Unit for the State of Texas that helps Texas district

attorneys prosecute crimes committed in prisons. *See generally* R.R. Vol. 40, P. 19-53; R.R.

Vol. 41, P. 161-216.

39.     The defense team also retained three core experts for the guilt/innocence

phase of the trial: psychiatrists Dr. Edward Gripon and Dr. Jay Crowder and psychologist

Richard Rogers. Ex. 72. None had specific credentials as a neuropharmacologist and only Dr.

Gripon was called at trial. The defense team did not initially retain any experts for the

mitigation phase of the case. *Id.*; Ex. 27 at ¶ 31.

40.     On December 6, 2006, the defense team filed a motion entitled, "Motion for Discovery, Production and Rule 702/705 Hearing" in the related case, Cause No. 51483, involving Laura and ▆▆▆▆ to preserve the right to challenge the State's experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *See* Supp. C.R. Vo. 1, P. 76-86.

41.     The Defense neither retained nor called a neuropharmacologist or a toxicologist.

42.     Jury selection in Mr. Thomas's capital case began on January 10, 2005. The venire was seated in the East and West courtrooms of the old Grayson County Courthouse. *See generally* R.R. Vol. 11, P. 21-23.

43.     Prior to commencement of voir dire, potential jury instructions were read to the entire venire assembled for Mr. Thomas's trial. The defense made no objection. *See generally* R.R. Vol. 11, P. 67-75, 79-86.

44.     Texas Law provides that "Voluntary intoxication does not constitute a defense to the commission of crime" and "intoxication" means "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." Texas Penal Code § 8.04(a) & (d).

45.     The defense and the State agreed on a joint Power Point presentation that stated "Insanity caused by the aggravation of a pre-existing mental condition by alcohol or drugs is *not* a defense to a crime." Ex. 41 (emphasis added). *See, e.g.*, R.R. Vol. 21, P. 84-87.

46.     Prosecutor Kerye Ashmore made references to the law of voluntary intoxication in his opening statement. The defense did not object. R.R. Vol. 27, P. 35-36.

8

47.     Mr. Hagood was aware that the State's experts had diagnosed the applicant with substance-induced psychosis.

48.     On direct examination, Dr. Victor Scarano set out his opinion that the applicant's use of drugs and alcohol precipitated the applicant's psychotic episode.  (RR vol. 31, p. 94; State's Response Appendix ex. L)

49.     The instruction on voluntary intoxication given by the court and referred to during the entire trial was taken almost verbatim from the Texas Code of Criminal Procedure.

50.     The applicant has failed to plead facts that establish the jurors or attorneys had difficulty in understanding the instructions.

51.     There was no instruction that if voluntary intoxication was found, the applicant could never be considered insane.

52.     The court's instruction on voluntary intoxication was supported in that: (1) the evidence showed that the applicant told Dr. Peter Oropeza that he smoked marijuana the night before the murder (RR Vol. 36, p. 106); (2) the medical records of the applicant showed that there was marijuana in his urine. There was insufficient blood to test for marijuana in the blood as what blood that was left from the hospital was used to test for DXM; (3) there was DXM still in the applicant's blood at the time his blood was drawn several hours after the murders; (4) there was evidence from nurse Natalie Sims that the applicant had told her that if it hadn't been for the drugs the crime would not have happened. The defense expert, Dr. Harrison, was also questioned about this (RR Vol. 35, p. 42); and (5) the defense expert Dr. Gripon, admitted during cross examination that the combined use of marijuana, alcohol, and DXM would aggravate and exacerbate a pre-existing condition of schizophrenia (RR Vol. 36, p. 111). Numerous witnesses testified to the applicant's drug and/or alcohol abuse.  (RR vol. 27, pp.

9

185-187, vol. 29, pp. 113, 137-140, 186, 203-204, 221-224, 226, 234-235; vol. 31, pp. 92-94)

The State's expert psychiatrists also found that the applicant's psychosis was substance-induced.

(RR vol 31, pp. 54, 112; vol. 34, p. 78-79)

       53.     The jury heard evidence that applicant was intoxicated off and on in the

days and weeks leading up to the murders.

       54.     Dr. Victor Scarano testified that the applicant told the doctor that the

applicant was a heavy user of marihuana in 2004 and that he had begun mixing the marihuana

with alcohol and Coricidin, a cold medicine which contained Dextromethorphan (hereinafter,

DXM). (RR vol. 31, pp. 92-94)   The applicant specifically told the doctor that he had mixed

those substances on either March 4 or 5 of 2004, and the 25th into the 26th of March 2004.  (RR

vol. 31, p. 94) According to the applicant, he had consumed all three substances approximately

36 hours before murdering his wife and her two children.  (RR vol. 31, pp. 113-115)

       55.     After a day and a half, the applicant used enough Coricidin to still have a

trace of DXM in his blood.  (RR vol. 29, pp. 76-79, 82, 85-86, 88)

       56.     During opening statements, the State set out a time line setting out the

drug use and intoxication by the applicant prior to the murders.  (RR vol. 27, pp. 27-28, 30-31)

The prosecutor, Kerye Ashmore, specifically set out the definition of voluntary intoxication and

emphasized that it did not only apply to the exact time of an offense, but also to *any* disturbance

of mental of physical disturbance resulting from the introduction of any substance into the body.

(RR vol. 27, p. 35) Mr. Ashmore set out that he expected the evidence to show that in the days

and weeks leading up to the murders, the applicant had been smoking "blunts," containing

marihuana, drinking and taking Coricidin, a cold medicine containing DXM on a daily basis.

(RR vol. 27, p. 36-38) The prosecutor also described the anticipated testimony of Dr. Victor

Scarano, M.D., regarding the applicant's psychotic state and the fact that it was substance induced.  (RR vol. 27, pp. 38-39) The State stated that the evidence would show that the mental state of the applicant at the time of the murders was not only substance induced, but that even in that mental state, the applicant knew right from wrong.  (RR vol. 27, p. 39, 44-45) In fact, Mr. Ashmore stated in no uncertain terms that the facts of the case surrounding the murders would show that the applicant knew his conduct was wrong and still he killed 13 month old ████ ███████ her four year old brother and their mother.  (RR vol. 27, pp. 47-62)

       57.    Dr. Victor Scarano, M.D., testified about the applicant's mental state at the time he murdered the victims.  During direct examination, Dr. Scarano testified that a person can be mentally ill and delusional and still be sane according to the legal definition of sanity in Texas.  (RR vol. 31, pp. 83-84) Dr. Scarano described how mental illnesses can be substance-induced. (RR vol. 31, p. 85) The doctor also explained to the jury that a substance-induced mental illness or psychosis does not disappear when the substance is taken away from a subject. Instead, the "psychosis can continue once it is precipitated by a substance for a longer period of time, even when that substance is removed." (RR vol. 31, pp. 86-87, 116-120)  The doctor testified that the applicant was psychotic when he killed his wife and her two children, but that the psychosis was triggered by his substance abuse in the preceding days and weeks.  (RR vol. 31. pp. 92-111, 113-115)  The doctor also set out the facts of the case, some of which had been given to him by the defendant, and applied those facts to the legal definition of sanity.  In Dr. Scarano's medical opinion, the applicant new that his conduct was wrong and was not legally insane at the time he murdered his wife and her two children. (RR vol. 31, pp. 94-101)

       58.    Dr. A. David Axelrad's diagnosis was essentially the same as Dr. Scarano.

11

59.    During closing arguments, the State argued that the applicant knew right from wrong.  The state also argued that the definition of intoxication precluded the applicant from claiming insanity even if he did not know right from wrong at the time of the murders, because his psychosis was substance induced.  (RR vol. 37, pp. 86, 89-92)

60.    Dr. Jay Crowder, a psychiatrist hired by the defense but not called at trial, informed the defense that he could not rule out the possibility that the psychotic episode leading up to the murders was induced by his use of a combination of drugs and alcohol.

61.    Neither the State nor its experts alleged that the applicant's system still contained significant amounts of drugs or alcohol during the murder.

62.    Mr. Hagood had gone over the discovery and the reports from both of the State's experts, and was aware of the State's theory of the case.

63.    Mr. Hagood was aware of the lab results from the applicant's blood.

64.    Neither the State nor its experts presented "false or misleading" evidence.

65.    The State timely requested a jury shuffle.

66.    There were more African-Americans in the first one hundred venire men prior to the shuffle.

67.    The State requested the shuffle based on the appearance of several of the venire men in the first one hundred.

68.    There is no evidence that the request for a shuffle was racially motivated.

69.    The Applicant did not object to the shuffle.

70.    As a result of the State's shuffle, only two of the 102 potential jurors questioned during voir dire were African American.  Ex. 27 at ¶ 18; R.R. Vol. 23, P. 115.

12

71.     All members of Mr. Thomas's jury were white. Ex. 27 at ¶ 18.

72.     There is no evidence that the jury's decision was racially motivated.

73.     No objection was ever made by the Applicant to the purported racial bias of any juror that was seated.

74.     Dr. Shannon Miller is a psychiatrist who has written extensively about DXM addiction, is a specialist on the effects of drug addiction, and is certified in addiction medicine. *See* Ex. 39.

75.     In January 2005, the State formally retained Dr. Miller, signed a modified version of his retainer agreement and sent him a retainer check for ten hours work. *See supra*, Part I-L.

76.     The State Prosecutors telephoned Dr. Miller and recounted the basic facts of the case to him, including the State's position. During that conversation, Dr. Miller preliminarily questioned whether DXM could have played a part in the kind of psychotic episode Mr. Thomas experienced on March 27, 2004. State's Resp. To App. for Writ of Habeas Corpus at 23.

77.     There was no evidence from Dr. Shannon Miller, exculpatory or otherwise.

78.     Dr. Shannon Miller states in his affidavit that he did not form an opinion concerning the applicant, his mental state, his psychosis, the cause thereof, or his sanity because he never performed a complete evaluation of the applicant or examined all of the records.

79.     Mr. Ashmore's and Mr. Brown's  decision was not to use Dr. Miller because of several factors including: (1) the attendant cost of having Dr. Miller come to

13

Grayson County to evaluate and subsequently to testify, and (2) the fact that the applicant had already been fully tested and evaluated by three expert witnesses the State had already hired.

80.    The affidavit of J. Kerye Ashmore is credible.

81.    The affidavit of Joseph D. Brown is credible.

82.    Mr. Ashmore and Mr. Brown believed the applicant had been seen by enough experts for the State and doubted that the defense team would allow them to bring another expert in during the voir dire in this case to do another evaluation.

83.    Dr. Miller was not requested to prepare a report.

84.    Mr. Ashmore and Mr. Hagood met to discuss  the State's list of expert witnesses which had previously been provided to the defense prior to or during voir dire. Mr. Ashmore went through the list of the State's potential expert witnesses and advised Mr. Hagood who the State anticipated would be called to testify.  During this meeting, Mr. Ashmore advised Mr. Hagood that the State would not be calling Shannon Miller.  Mr. Hagood inquired as to why and was advised of the reasoning for the State not using Dr. Miller.  During this conversation, Mr. Ashmore advised Mr. Hagood that Dr. Miller could not give an opinion without examining the defendant and Dr. Miller indicated the cases he had dealt with generally involved larger doses of DXM.

85.    Bobbie Peterson (Cate) represented the State in a juvenile proceeding regarding Applicant when he was a juvenile.

86.    Applicant was aware of this representation.

87.    Mr. Hagood never noticed a lack of loyalty to the applicant or the

14

applicant's case by Ms. Peterson (Cate).  Mr. Hagood states that Ms. Peterson (Cate) showed a tremendous dedication towards the applicant and was zealous in his defense.

88.    The applicant indicated that he understood his attorney's previous role as the prosecutor in his prior convictions and after acknowledging on the record that he understood his attorney's previous role, the applicant stated that he had no problem with Ms. Peterson (Cate) continuing her representation.

89.    Both Ms. Peterson (Cate) and the applicant acknowledged on the record that the applicant had previously discussed this problem with his attorney.

90.    The Court of Criminal Appeals has previously rejected an invitation to extend the federal constitutional proscription against execution of the insane to the greater category of mentally ill defendants.  The applicant has failed to state a compelling reason to do so in this case.

91.    Dr. Gripon's testimony that the applicant was competent at the time of trial was credible.

90.    Initially, the applicant was found incompetent and sent to Vernon State Hospital for treatment.  (Appendix ex. K)  The applicant was returned to Grayson County to stand trial after doctors at Vernon State Hospital found that he was then competent to stand trial. (11.071 Application, Appendix ex. 71)

91.    No second claim of incompetency was raised.

92.    The trial court specifically asked Mr. Hagood if the applicant was claiming incompetency.  Mr. Hagood told the judge that the applicant was not challenging competency at that time.

15

93.     The trial court on at least one occasion addressed the applicant directly and asked him a question regarding Ms. Peterson (Cate's) representation. Ms Cate had told the court that she had explained to the applicant that while Ms. Peterson (Cate) was a prosecutor she had worked on a case against the applicant, that he understood and wished Ms. Peterson (Cate) to continue as co-counsel. (RR vol. 7, p. 4-5) This court did not observe the applicant to be incompetent.

94.     At no time did Ms. Peterson (Cate) suggest that the applicant was unable to understand her.

95.     During trial, Mr. Thomas was treated for his schizophrenia with an antipsychotic drug called Zyprexa. As is widely recognized, antipsychotic drugs can have a "sedation-like" effect, and in severe cases, may affect thought processes. *Riggins v. Nevada*, 504 U.S. 127, 143 (1992); *see also University of Maryland Medical Center online Health Library* at http://www.umm.edu/altmed/drugs /olanzapine-094026.htm#Overdosage/Toxicology.

96.     As Mr. Hagood explains, the defense team should have objected to the competency finding when Mr. Thomas returned from the state hospital. Ex. 15 at ¶ 10. While his attorney recognized that the report should have been objected to, the defense team did not object to the findings.

97.     Defendant was competent to stand trial.

98.     Prior to the beginning of the trial on the merits, Mr. Hagood was presented with a memorandum on the admissibility of evidence of the defendant's diminished mental capacity to counter State evidence aimed at proving that Mr. Thomas had the requisite *mens rea* to be found guilty of capital murder. *See* Ex. 15 at ¶ 12.

16

99.    Mr. Hagood did not share this information with co-counsel, *see* Ex.27 at ¶ 12, nor did he further investigate, or attempt to present a diminished capacity option to the jury. Ex. 15 at ¶ 12.

100.    The court granted a motion in limine prohibiting witnesses from using titles or terms including the word "mitigation" or any other form of that word and that Dr. Kate Allen not be allowed to testify to hearsay statements from the applicant.

101.    The trial court sustained the objections by the State to Dr. Allen, an expert with a degree in family counseling, from making medical conclusions regarding the applicant's treatment.

102.    Mr. Hagood states that their trial strategy involved straight insanity. Although it is permissible to request conflicting defensive instructions in a jury charge, it is not always prudent.   In front of a jury in a death penalty trial telling a jury "he did it, but he was insane", then saying in the next breath, "but if he wasn't insane he was just reckless or criminally negligent" might seem deceitful and manipulative to a jury.  Mr. Hagood states that even if he believed that the facts of this case warranted a lesser included instruction, he might not have requested one.  Mr. Hagood states that he certainly would not have labeled it a "diminished capacity" defense as that carries with it a different connotation.

103.    Applicant has not indicated what admissible evidence indicated that if guilty, the applicant was only guilty of a lesser-included offense of capital murder.

104.    Applicant attempted to negate the State's evidence regarding mens rea by introducing evidence of the applicant's history of mental illness through the testimony of Dr. Gripon.

17

105.    The jury was able to hear all of this evidence, determine the weight of the

evidence, and choose whether or not Applicant possessed the requisite *mens rea* to commit this

offense or whether he was insane and did not know the difference between right and wrong.

106.    On March 4, 2005, Mr. Hagood submitted a motion for a Requested Jury

Instruction Defining Reasonable Doubt. C.R. Vol. 5, P. 1619-21. Mr. Hagood requested the

Court give the jury the following definition of reasonable doubt:

> "Reasonable doubt" is a doubt based upon reason and common
> sense after careful and impartial consideration of all the evidence
> in the case.  Proof beyond a reasonable doubt, therefore, is proof of
> such a convincing character that you would be willing to rely and
> act upon it without hesitation in the most important of your own
> affairs.

This definition comes from the Fifth Circuit's Criminal Pattern Jury Charge. *See United States*

*v. Williams*, 20 F.3d 125, 129 n.1 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 239 (1994).

107.    On the same date, the Court asked the parties if there were any objections

to the Court's jury charge. Mr. Hagood raised an objection that mirrored the motion for the

requested jury charge, citing the specific instruction requested.  The Court denied the request.

R.R. Vol. 37, P. 6.

108.    This claim is barred because it was raised on direct appeal, which is still

pending.

109.    The applicant has failed to plead facts which justify raising in his 11.071

application an issue which has been raised on direct appeal.

110.    The jury foreperson, ███████, stated that he and others on the jury

did not feel there was evidence of true remorse. R.R. Vol. 43, P. 16. ██████ stated that he,

18

and possibly others on the jury, wanted something to "hang their hat on," such as evidence of true remorse.

111.   The applicant has failed to plead facts that the jury violated the applicant's right against self-incrimnation.

112.   The State used prior convictions based on acts committed by Mr. Thomas when he was a juvenile to establish aggravating circumstances during the penalty phase of his case.

113.   Specifically, the State offered prior offense evidence regarding the following:

- felony criminal mischief over $750 that occurred when Mr. Thomas was 11;

- two separate offenses of criminal trespass when Mr. Thomas was 11;

- a curfew violation citation at age 13;

- three felony offenses of vehicle theft at age 14;

- curfew violations at 14 and 15; and,

- arrest and detention for evading arrest while using a vehicle at age 17.

R.R. Vol. 38, P. 24-25; R.R. Vol. 38, P. 104-106; R.R. Vol. 38, P. 28-32, 101-102, 109-112 & R.R. Vol. 39, P. 34-38; R.R. Vol. 39, P. 26-29, P. 34; R.R. Vol. 39, P. 129-131.

114.   During the penalty phase, the trial court instructed the jury that it could consider Mr. Thomas's background and evidence that he had committed other acts or participated in other transactions.  R.R. Vol. 42, P. 30-31.

115.   Applicant did not object to the admission of his juvenile convictions.

116.    The defense team also did not seek to conduct neuropsychological testing of Mr. Thomas. *See generally* Ex. 35 & Ex. 14.

117.    To conclude the defense's mitigation case, Mr. Hagood called Mr. Fitzgerald. R.R. Vol. 41, P.  Mr. Fitzgerald did not testify after the State's voir dire. R.R. Vol. 41, P. 148.

118.    The State identified Dr. Victor Scarano as a potential expert witness, and Dr. Scarano was one of the experts that examined Mr. Thomas.

119.    Trial counsel did not raise a *Daubert* challenge to Dr. Scarano or Dr. Axelrod.

120.    During the State's case in chief, Dr. Scarano testified that his opinion was that a combination of alcohol, marijuana, and Coricidin "pushed Mr. Thomas into a delusional psychosis" on Saturday morning March 27, 2004. R.R. Vol. 31, P. 94.

121.    The State identified Dr. David Axelrad as a potential expert witness, and Dr. Axelrad was one of the State's experts who examined Mr. Thomas.

122.    Dr. Axelrad was named on the State's pre-trial witness list and prepared a 68-page report concluding that Mr. Thomas's psychosis was drug-induced.

123.    The defense chose to call Dr. David Axelrad as its initial expert witness to help the defense to try and prove their case. *See* R.R. Vol. 34, P. 55-166.

124.    Mr. Royce Smithey is an employee of the state special prosecution unit, and investigates felonies that are committed within the Texas penal system. R.R. Vol. 41, 149-150.  During the penalty phase of Mr. Thomas's trial, Mr. Smithey was called to testify for the State regarding the risk of Mr. Thomas committing future acts of violence.  He also testified on the broad subjects of prison classification and prison violence. *Id.* at 152-153.

20

125.    Defense counsel retained Mr. Larry Fitzgerald to testify, on behalf of Mr. Thomas, about the safeguards taken by the TDCJ to ensure that prisoners would not pose a risk of future dangerousness to other incarcerated individuals and prison employees. *See* Ex. 11 at ¶ 5.

126.    Defense counsel waived the Rule 705 hearing with respect to Dr. Oropeza.

127.    Defense counsel did not object to Dr. Oropeza's testimony that Mr. Thomas had Antisocial Personality Disorder.

128.    Defense counsel had intended to present videotape evidence through Mr. Fitzgerald to undermine the State's case on Mr. Thomas's future dangerousness, but instead presented this evidence through the State's witness, Mr. Smithey.  Ex. 27 at ¶ 28.

129.    Members of Mr. Thomas's family, friends and community leaders were available at the time of Mr. Thomas's trial to inform counsel, experts, and jurors about Mr. Thomas's life. *Id.*

130.    The defense team did not contact all of Mr. Thomas' family members. Nor did Ms. Schade draft a social history or mitigation report.

131.    Mr. Hagood spent many months preparing all aspects of the case.  He states that he had talked to several family members regarding the applicant's background and childhood.

132.    The applicant's mother was angry at the applicant for killing her grandson.  Although Mr. Hagood states that he could have gleaned useful background information from the mother's testimony, Mr. Hagood did not do so.  She had left the state and

21

Mr. Hagood states he made no attempt to subpoena her or get her back to Grayson County, Texas for the trial.  Mr. Hagood states that this was because he was too afraid of what might come out of her mouth and the further damage she might do to the applicant.  Mr. Hagood states that he had no intention of putting her on the stand and preferred that the state not have that opportunity either.

       133.    Mr. Hagood believed the applicant's aunt, Doris Gonzalez, would be the primary defense witness regarding mitigation.  When Mr. Hagood interviewed her she was articulate and passionate about the trial and obstacles faced by the applicant.  Once on the stand, however, she collapsed.  She was unable to relate to the jury despite Mr. Hagood's best attempts as she had during trial preparation.

       134.    Mr. Hagood also prepared two of the applicant's brothers and his father. They, too, had done a much better job in Mr. Hagood's office than they were able to in court. Mr. Hagood states that once he realized that they were not coming across well, he abandoned his questioning of those three witnesses.

       135.    Ms. Peterson (Cate) procured Kate Allen with Mr. Hagood's consent.  Mr. Hagood did not know about Ms. Allen until shortly before she testified, although he was glad Ms. Peterson (Cate) had contacted Ms. Allen.  Mr. Hagood was disappointed with Ms. Allen's performance because her demeanor did not translate well to the rural community from which our jurors were selected.

       136.    Ms. Schade was employed based on a recommendation from the Texas Defender's Service.

       137.    Mr. Hagood states that he instructed Ms. Schade to do as much background as possible.  All materials possessed by the defense were available to her.

22

138.   Mr. Hagood was disappointed in Ms. Schade's performance.  Mr. Hagood states that having worked well with Amanda Maxwell, a mitigation specialist also recommended by the Texas Defender Service, in another case, he can now see what Ms. Schade should have done.

139.   Mr. Hagood also states that Ms. Schade allowed her personal feelings about the death penalty to affect her performance.

140.   Ms. Schade was admonished by the court to restrain herself because a juror had complained about her action in the courtroom.

141.   Mr. Hagood was aware of the family background and history of mental problems and alcohol abuse.

142.   Mr. Hagood felt that such information to a juror could cut both ways.

143.   Mr. Hagood did not want the jury to think that the applicant's background and propensity for drug use and mental instability would make him more of a future danger.

144.   Mr. Hagood concentrated on relatives and friends with current close relationships to the applicant.  Strategically, Mr. Hagood states that he did not want to introduce childhood anecdotes or the history of distant relations.

145.   Through his investigation and interviews and friends and family members, Mr. Hagood had been told that the applicant had engaged in the conduct as a child long before any onset of mental illness that involved cruelty to animals or setting fires.

146.   Mr. Hagood was afraid that the jury could see this as a sure sign that the applicant would be a future danger as such, Mr. Hagood did not seek out all friends and relatives.

23

147.    The court appointed Garland Cardwell as Mr. Thomas's counsel for his direct appeal. C.R. Vol. 5, P. 1709. Mr. Cardwell submitted appellant's brief on September 29, 2006. *See State v. Thomas,* No. 51858 (appellant's brief on appeal from the 15th District Court).

148.    This court observed R.J. Hagood during the course of the entire trial and did not discern any issues with Mr. Hagood's performance attributable to an illness.

149.    During Ms. ███'s initial examination by the state she indicated that she understood that the state had the burden of proving the applicant committed an offense, even if insanity was involved. Ms. ███ also indicated that she understood the burden of proof regarding insanity and the law regarding involuntary intoxication. The question by the state regarding outside evidence from personal knowledge she agree that she could not consider the outside evidence. When the applicant examined her, she first agreed in order to find insanity would be by preponderance of the evidence. She then agreed with Mr. Hagood that she would need clear and convincing evidence then backed up and stated that she did not know at that time. After first stating that she did not know how much evidence she would need to find the applicant insane she then agreed with Mr. Hagood that she would hold the defense to a higher burden of proof than of preponderance of the evidence. The state asked Ms. ███ again whether she understood that insanity had to be proven by believing more evidence was presented by the state than was by the defense, she agreed. . She then agreed with Mr. Hagood that she would need proof beyond a reasonable doubt to find that insanity, then stated that she was confused. The state then explained the difference between reasonable doubt and preponderance of the evidence and Ms. ███ stated that there was a fine line between the two standards. At this point the juror became clearly confused about the respective definitions of

24

preponderance and reasonable doubt and the court intervened and attempted to explain to her the differences between the two standards.  After that explanation Ms.███ indicated that the difference made sense and that she could follow the law.  (RR vol .12, pp.14-88)

150.   Ms.███ vacillated or equivocated on her understanding of the burden of proof regarding insanity.

151.   Ms.███'s answers were credible that she would be able to follow the law.

152.   During voir dire the defense moved to strike Ms.███ for cause.  The court denied the motion and the applicant exercised his first peremptory strike.  The applicant asked for two additional strikes regarding Ms.███ in voir dire person███.  The court denied the request at that time.  The defense renewed their request three times.  The trial court denied each request and told the applicant that the request was premature because the applicant had yet to exhaust all of his original peremptory strikes.

153.   The applicant did not exhaust his fifteen statutory peremptory challenges during voir dire.

154.   The applicant requested strikes for cause and additional strikes on several occasions but was told the requests for additional strikes were premature.  (RR vol. 12, p. 90, 163; vol. 15, p. 242; vol. 17, pp. 227-228; vol. 20, p. 96) In chambers, the court indicated that he was going to grant two more strikes for the defense.  (RR vol. 26, pp. 66-67)  However, this did not happen solely because the defense did not exhaust its strikes, having one left.  (RR vol. 26, p. 67)

155.   After twelve jurors were seated, the parties then proceeded to pick

25

two alternate jurors.  Each side was given one strike for purposes of picking the two alternates.  (RR vol. 26, p. 66)  The State and the applicant accepted the next panel member who became the first alternate.  (RR vol. 26, p. 146)  The next venire person was ███████, upon whom the applicant exercised his sole strike in the alternate selection phase.  There were no grounds to strike Ms. ███ for cause.  (RR vol. 26, p. 196)  The next juror, ██████, was the one the applicant refers to as an "objectionable juror" in his application.  The applicant had used his sole strike regarding alternates.  There were no grounds to strike Mr. ███ for cause.

156.    Mr. ███ was the second alternate juror and never deliberated on the case. (RR vol. 26, pp. 241-242; vol. 37, pp. 112-113).

157.    Prior to Dr. Scarano's testimony, the defense had been provided a copy of Dr. Scarano's curriculum vitae and his report containing his findings, diagnosis and the facts relied on to make those decisions.

158.    The defense was not surprised by Dr. Scarano's testimony.

159.    The defense was surprised that the State called Dr. Scarano during the State's case-chief rather than at rebuttal.

160.    Dr. Scarano was a medical doctor who had been licensed since 1961.  Dr. Scarano's prior training and practice had included psychiatry and pediatric surgery.  Dr. Scarano had been doing forensic psychiatry since 1998 and had graduated from law school.

161.    Dr. Jay Crowder, an expert hired by the defense had indicated to Mr. Hagood that he could not rule out that the applicant's psychosis was substance induced.

162.    As a medical doctor and a psychiatrist, part of a doctor's education and training would include the pharmacological effect of drugs and alcohol on the brain and

26

relating to psychotic behavior.

163.    Dr. Scarano's testimony was consistent with what the defense expert, Dr. Crowder, had told Mr. Hagood.

164.    Mr. Hagood felt requesting a *Daubert/Kelly* hearing regarding Scarano and Axelrad would be frivolous.

165.    The majority of Dr. Scarano's work as a full-time forensic psychiatrist is in the examination and evaluation of individuals involved in the criminal justice system, as was the case with the applicant.

166.    Dr. Scarano is often appointed as a forensic psychiatric expert by courts.  In addition, his services are employed as a consulting and/or testifying expert by the prosecution and the defense in criminal cases.  A large portion of the defendants on whom he performs forensic psychiatric examinations/evaluations have a history of drug abuse.  Evaluation of the defendant's abuse of drugs is an integral and important part of the forensic psychiatric examination/evaluation.

167.    A significant and important part of a psychiatrist's and forensic psychiatrist's training is learning and understanding the effects of medications, alcohol, and illicit drugs upon the central nervous system.  In clinical practice, experienced forensic psychiatrists utilize and apply their knowledge and expertise in evaluating the mental state of criminal defendants.

168.    This court finds that Dr. Scarano is a qualified expert in forensic psychiatry.

169.    Neuropharmacologists or psychopharmacologists are not the only individuals who should be allowed to testify in court in regards to the effects of drugs on the

27

central nervous system.  These individuals are not physicians, but rather are consultants whose services may be requested by the physician responsible for the evaluation and/or treatment of the patient.  Many physicians, including family physicians, emergency room physicians, internists, pediatricians, and psychiatrists, have expertise in identifying the effects of drugs or their absence on human behavior.

170.    Based on the facts of the case and the information provided to the defense, Mr. Hagood did not believe the trial court would have prevented Dr. Axelrad's testimony.

171.    Neuropharmicological findings were not the sole basis of Dr. Axelrad's diagnosis.

172.    Applicant's habeas attorneys retained Dr. Ruben C. Gur to interview and test the applicant.

173.    Dr. Gur is a neurophyschologist with a PhD from Michigan State University, a masters from Michigan State University, and has done a post doctoral fellowship from Stanford University.

174.    Dr. Gur reviewed Mr. Thomas' medical and social history as well as standard and computerized neuropsychological evaluations, as well as a personal interview of Mr. Thomas.  Dr. Gur concludes that Mr. Thomas has schizophrenia of the paranoid type superimposed on a neuro-developmental brain disorder.  He further concludes that he was under the delusions that his acts would save himself and the world and his behavior before, during, and after the crime is controlled by this symptom of paranoid schizophrenia.  He states Mr. Thomas's

28

ability to respond to appropriate to his environment or deficits associated with acquired brain injury.

175.    Applicant's habeas counsel also retained Dr. Mila H. Young, a board certified clinical psychologist with a specialty in neurophysiology and neuropsychological assessments.  She has a doctorate in clinical psychology from Alliant International University in San Francisco, California, a master's degree in experimental psychology from Towson State University in Baltimore, Maryland, and a bachelor of arts with a major in psychology from the University of Guam.  Dr. Young did a neuropsychological and psychological evaluation of Andre Thomas in May of 2007, which included neuropsychological testing.

176.    Dr. Young concludes that "There is substantiating evidence that Andre experienced psychotic symptoms before the deaths of his wife and children, there is convincing evidence that Andre continues to experience psychotic symptoms."  She further concludes that "Andre's performance crossed multiple neuropsychological test of brain functioning are impaired and the impairment is consistent with the brain impairment known to be experienced in schizophrenia."

177.    Applicant's habeas counsel retained Janet Vogelsang, who has a master's degree in social work from the University of South Carolina, and bachelors in psychology from Pepperdine University.

178.    Jan Vogelsang reviewed "a social history prepared by Andre Thomas's habeas defense team."  She concluded that Andre was completely deprived of the cohesive family environment that would provide a crucial support for someone with his mental

29

illness." She further finds that she has "no doubt that any competent clinical social worker conducting a comprehensive psycho social assessment could have presented a formable picture of Andre's life and his family which have directly and strongly supported the severe genetically deviated mental illness corroborated by current neuropsychological testing."

179.     Applicant's habeas corpus counsel retained Dr. Jonathan Lipman, a Neuropharmacologist with a doctoral degree from the University of Wales.

180.     Dr. Lipman's opinion was that "the behaviors exhibited by Thomas before, during, and after 27 March 2004 do not resemble the known toxicity of dextromythorathan. Dr. Lipman concludes to a reasonable degree of neuropharamachological certainty that Mr. Thomas appears to suffer from an endogenous schizophreniform psychotic illness.

181.     Ruben Gur, Mila Young, Jan Vogelsang, and Jonathan Lipman have been qualified as experts in state and federal courts.

182.     Ruben Gur, Mila Young, Jan Vogelsang, and Jonathan Lipman did not testify at trial.

183.     Dr. Victor Scarano, Dr. David Axelrad, both psychiatrists and Dr. Peter Orapeza, a psychologist, testified at the trial of Andre Thomas.

184.     Larry Pollock, PhD, psychologist specializing in neuropsychology, did not testify at the trial but was hired by the state to review the findings of Dr. Mila Young and Ruben Gur.

185.     The State's experts take issue with both the findings and methodology

30

used by the applicant's post trial experts. All of the state's experts have been qualified to testify in state and federal courts as experts. Dr. Scarano, Dr. Axelrad, and Dr. Orapeza interviewed the applicant and evaluated him on at least one occasion prior to trial.

186.   Mr. Hagood's recollection is that the defense gave Dr. Gripon a copy of everything they had received in discovery.

187.   Ms. Peterson (Cate) states that on her way to Grayson County, Dr. Gripon requested from her several items he told her he had not been provided, although she cannot remember what those items were at this time.

188.   Mr. Hagood handled Dr. Gripon's testimony.

189.   Ms. Peterson (Cate) says she cannot speak for Mr. Hagood as to why he did or did not ask certain questions.

190.   Mr. Hagood states that Dr. Gripon never complained to him that items were missing from the materials sent to the doctor.

191.   Mr. Hagood also states that he was never given a list of questions from Dr. Gripon, but did spend a considerable time going over the questions the defense would be asking Dr. Gripon.

192.   Mr. Hagood states that he spent a couple of hours with Dr. Gripon in his hotel room the night before he testified going back over questions and issues.

193.   Mr. Hagood states that he made sure the doctor knew that he would be asked about his qualifications, interviews and examinations of the applicant and would then illicit  his opinion regarding sanity.

194.   Mr. Hagood states that he does not know which questions Dr. Gripon specifically asked Mr. Hagood to use that were not used in some manner.

31

195.    Dr. Gripon is not specific about which questions Mr. Hagood should have asked.

196.    Mr. Hagood states that strategically there may have been some questions the defense did not ask.

197.    Mr. Hagood states that during the examination of Dr. Gripon, Hagood was being careful not to illicit information from Gripon which the state's experts could use against the applicant.

198.    The decision to call Dr. Axelrad as part of the defense case was done to examine him and attempt to frame questions in a way more favorable to the applicant as well as to attempt to discredit his opinion prior to the State examining him. Strategically, Mr. Hagood states he felt this was the best course of action rather than attempting to exclude his testimony.

199.    Mr. Hagood's decision to call two of the state's witnesses during the defenses case was deliberate.  Mr. Hagood states that his strategy was to illicit certain information and to attempt to diffuse some of the more damaging testimony against the applicant.  Mr. Hagood was able to get Dr. Scarano to admit that psychoses triggered by marihuana or alcohol was rare.  Further, the defense illlicited information that alcohol induced psychoses generally occurred in chronic alcoholics and the applicant did not appear to be a chronic alcoholic.

200.    Mr. Hagood also states that he attempted to get the doctor to give information that would minimize the testimony against the applicant.  Dr. Scarano admitted that this was his first case involving DXM.

201.    Mr. Hagood states in his affidavit that he wanted to be the first to

32

question Dr. Axelrad in order to frame the questions in a way more beneficial to the applicant.

202.   Mr. Hagood states that he pressed both doctors, after hearing the state's theory, in order to make them back down from their diagnosis or to at least admit that they could not rule out schizophrenia that was not precipitated by drug and alcohol use.

203.   Neither Dr. James Harrison or Dr. Cactus McGirk had examined the applicant with the purpose of determining sanity.

204.   Harrison stated in his first report that he could not rule out that a substance had induced the applicant's psychotic episode. (States' Response, appendix ex. O)

205.   Harrison testified that he did not have enough evidence to make a determination of insanity.

206.   Dr. Harrison's affidavit does not comport with his sworn trial testimony. During cross examination of Dr. Harrison, Mr. Ashmore specifically asked him whether after interviewing the applicant on a number of occasions, reviewing all of the experts reports in this case (which were quite detailed) and looking at the other information that  he indicated he had taken into consideration both during direct examination and on voir dire prior to cross, whether he felt like he had sufficient information to give an opinion about the applicant's sanity at the time of the offense.  Dr. Harrison responded he did not feel like he had sufficient information to render an opinion (RR vol.35, pp. 50-51).

207.   Cactus McGirk had been hired by the jail to determine if the applicant needed medication or was a danger to himself.  McGirk has never been hired to determine competency or sanity.  (RR vol. 35, pp.184, 188-189).

208.   Mr. Hagood knew that Harrison had stated in his report that he could not rule out that a substance had induced the applicant's psychotic episode.

209.    Harrison also testified that he could not make a determination regarding sanity when asked by the prosecution. (RR vol. 35, p.51)

210.    After being examined by prosecutor, Kerye Ashmore, Mr. Hagood states that McGirk came across as biased against the state and incompetent.

211.    Mr. Hagood did not believe McGirk had any credibility with the jury and was not going to hang the applicant's insanity on McGirk.

212.    Dr. Axelrad is a practicing psychiatrist who specializes in Adult Psychiatry, Neuropsychiatry, Pain Medicine, Psychoanalysis, and Forensic Psychiatry. He is Board-certified by the American Board of Psychiatry and Neurology in General Psychiatry (April1978, Certificate #17308); Forensic Psychiatry (Certificate #22), and Pain Medicine (Certificate #102).

213.    The records provided to Dr. Axelrad indicated that Thomas was a heavy drinker and used marihuana almost daily in the form of a blunt (a hollowed out cigar filled with marihuana).

214.    The testimony reflects that both the applicant and his girlfriend Carmen Hayes stated in the records provided to Dr. Axelrad that the applicant had recently started adding DXM to the alcohol and marihuana.

215.    Thomas exhibited psychotic behavior after showing up at MHMR on one occasion and the emergency room at a local hospital on a different day. On both occasions, the testimony and the records provided to Dr. Axelrad indicated that Thomas was using a combination of DXM, marihuana and alcohol the previous night. The testimony reflected that there was no indication from the records or from Dr. Axelrad's interviews with Thomas that he exhibited the same acute psychotic symptoms when DXM was not added to the

34

other substances he was using.

216.   Dr. Axelrad interviewed Mr. Thomas and took a history from him including his scholastic history, his marriage to Laura Boren and the birth of their son Andre, his work history and his lack of a history of psychiatric issues prior to two months before the murder.  The applicant admitted abusing alcohol since age 10, marihuana since age thirteen and the addition of Dextromethorphan, in the form of the cold medicine Coricidin, in the days leading up to the murder.

217.   Mr. Fitzgerald had been questioned by the State out of the presence of the jury.  The State had him admit that he was retired from the Texas Department of Criminal Justice where he had been employed as a public information officer. (RR vol. 41, p. 142)  The State established that Fitzgerald did not aid in the development of TDCJ policies, had never investigated crimes in the penitentiary, and had not gathered any statistics of his own. (RR vol.41, pp. 141-146) Fitzgerald also testified that the video tape he intended to show was provided by the Texas Defender Service. (RR vol.41, pp. 144-145)

218.   Mr. Hagood believed that Fitzgerald did not come off as a respected expert.

219.   Mr. Hagood decision not to call Fitzgerald as a witness was trial strategy.

220.   The defense did not challenge Smithey's credentials because they intended to get much of the information Fitzgerald was to provide in through the State's witness. Through Smithey, the defense was able to get a video tape of the conditions at prison into evidence and establish that the applicant would be sent to the Connally Unit which was maximum security, the different classifications within the unit, security precautions in the unit,

35

and that the applicant could never reach the best classification of G1.  The defense was able to have Smithey testify that an inmate serving life in a capital case is not housed in open housing with other inmates, are ineligible for furloughs and trustee status and cannot work out side of the facility.  Smithey also testified that there was a psychiatric unit available and to the homicide rate at TDCJ.

221.   Dr. Peter Oropeza states that he has testified numerous times in different courts both for the State and the defense.  Dr. Oropeza has always been found to be an expert.  Dr. Oropeza has never had a challenge to his expertise sustained.

222.   Dr. Oropeza was a psychologist licensed in this state who has a Doctoral degree in psychology prior to 2004.

223.   Dr. Oropeza had at least 24 hours of specialized forensic training relating to incompetency or insanity evaluations prior to 2004.

224.   Dr. Oropeza had completed six hours of required continuing education in courses in forensic psychiatry or psychology, as appropriate, in either of the reporting periods in the 24 months preceding the appointment prior to 2004.

225.   The exams before the Texas Board of Examiners of Psychologists consists of a jurisprudence written examination, the national examination (EPPP), and an oral examination.  An examinee must pass all three tests to become a licensed psychologist.  On the jurisprudence written examination Dr. Oropeza he received a score of 98, and on the national examination a score of 81.  The oral boards include a review of a case vignette that involves a host of issues regarding a hypothetical case.  Dr. Oropeza's practice was in the area of assessment and the board noted his weakness regarding therapy issues.  Dr. Oropeza addressed

36

these issues in the next examination and passed.  Applicants do not receive scores from the oral

examination, rather, feedback is provided on areas to address and a simple pass or fail is given.

        226.    Dr. Oropeza only testified during the punishment phase of the applicant's

case.

        227.    Mr. Hagood knew that under 46B.022, Dr. Oropeza met the qualifications

set out in subsections (a)(1), (a)(2)(B)(i) and (b), he was licensed by the appropriate board, had

training consisting of 24 hours of specialized training relating to incompetency or insanity

evaluations and he met his continuing education requirements.

## CONCLUSIONS OF LAW

        1.    An applicant is entitled to relief for ineffective assistance of

counsel if he satisfies the two prongs set forth in *Strickland v. Washington*:

> (1) that trial counsel's performance was deficient, meaning that the performance fell below an objective standard of reasonableness—a standard determined with reference to prevailing professional standards and from counsel's actual point of view during the representation; and
>
> (2) that but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different.

466 U.S. 668, 687–91 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

        2.    Under *Strickland's* first prong, the question is "whether counsel's

assistance was reasonable [after] considering all the circumstances."  *Strickland*, 466 U.S. at 688

(emphasis added).

        3.    Under *Strickland's* second prong, a "reasonable probability" the

result would have been different is merely "probability sufficient to undermine confidence in the

outcome" of trial. *Strickland*, 446 U.S. at 695; *Thompson*, 9 S.W.3d at 812; *Mitchell v. State*, 68 S.W.3d at 642 (emphasis added).

       4.      The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") have been cited by the United States Supreme Court as one acceptable "guide[ ] to determining what is reasonable" for defense counsel (*Wiggins v. Smith*, 539 U.S. 510, 524 (2003)), and have also served as a model for the Texas Guidelines and Standards For Texas Capital Counsel ("Texas Guidelines"), adopted by the Texas State Bar in 2006. The ABA Guidelines state that defense counsel "must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination." ABA Guidelines 1.1, commentary at 5 (Rev. Ed. 2003) (emphasis added); *see also* Texas Guidelines §§ 3.1(A)(2); 4.1(B)(2)(e). The Texas Guidelines further provide that trial counsel "at every stage [has] an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *Id.* at § 11.1(A). Additionally, "[c]ounsel at every stage of the case, exercising professional judgment in accordance with [the Texas Guidelines], should [inter alia]: (1) Consider all legal claims potentially available; and (2) Thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted…" *Id.* at § 11.2(A).

       5.      The purpose of the constitutional requirement of effective counsel is to ensure a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Thus, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced

a just result." *Id.*

6.      A defendant must show, by a preponderance of the evidence, that counsel's performance was constitutionally deficient. The applicant must prove counsel was not acting as "a reasonably competent attorney," and his advice was not "within the range of competence demanded of attorneys in criminal cases." *Strickland v. Washington,* 466 U.S. 668, 687(1984); *Ex parte White,* 160 S.W.3d 46, 50-51 (Tex.Crim.App. 2004).

7.      The applicant must show that this constitutionally deficient performance prejudiced his defense.  He must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.  Under this two-pronged analytical framework, an applicant must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Thompson v. State,* 9 S.W.3d 808, 813 (Tex.Crim.App. 1999). Moreover, a "review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone v. State,* 77 S.W.3d 828, 833 (Tex.Crim.App. 2002).

8.      The practice of law is an art, not a science, "and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland,* 466 U.S. at 693.  The existence of an adversary system guarantees there will always be lawyers who disagree on almost any issue. Since law is not an exact science, no level of skill or excellence exists at which all differences of opinion or doubts will be removed from the minds of legal professionals. 3 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice §§ 18.17, at 57 (5th ed.2000).  Thus, when a legal proposition or a strategic course of conduct is one on which

39

reasonable lawyers could disagree, "an error that occurs despite the lawyer's informed judgment should not be gauged by hindsight or second-guessed." *Id.* at 59.

9.   In evaluating the effectiveness of counsel under the first prong, the totality of the representation and the particular circumstances of each case are reviewed. *Thompson,* 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *Strickland,* 466 U.S. at 688-89.

10.   "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. An allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson,* 9 S.W.3d at 814.

11.   Scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight. *Strickland,* 466 U.S. at 689.

12.   The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, *i.e.,* a trial whose result is reliable. *Id.* at 687. In other words, an applicant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of the inquiry must be on the fundamental fairness of the

40

proceeding whose result is being challenged. *Id.* at 697.

13.     Under *Strickland,* the appellate courts must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Delrio v. State,* 840 S.W.2d 443, 447 (Tex.Crim.App. 1992) (quoting *Strickland,* 466 U.S. at 690); *see also Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App. 1994) (reaffirming same proposition).

14.     The right to "reasonably effective assistance of counsel" does not guarantee errorless counsel, or counsel whose competency is to be judged by hindsight. *Saylor v. State,* 660 S.W.2d 822, 824 (Tex.Crim.App. 1983). Rather, the right to counsel affords an accused an attorney "reasonably likely to render and rendering reasonably effective assistance." *Cannon v. State,* 668 S.W.2d 401, 402 (Tex.Crim.App. 1984). A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances, and to evaluate the conduct from counsel's perspective at the time. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 688-689. Strategic choices made after a thorough investigation of law and facts relevant to plausible options are thus virtually unchallengeable.

15.     Issues raised solely under state law are not cognizable under habeas corpus review unless the conviction is void. *Ex parte Truong,* 770 S.w.2d 810

(Tex.Crim.App. 1989).

16.     The "failure of petitioner, as defendant, to object at the trial, and to pursue vindication of a constitutional right of which he was put on notice on appeal, constitutes a waiver of the position he now asserts" on a writ of habeas corpus; *see also Ex parte Boyd,* 58 S.W.3d 134, 136 (Tex.Crim.App. 2001) (citing *Bagley* and noting that "[o]rdinarily, the writ of habeas corpus may not be used to litigate matters that could have been raised at trial and on direct appeal").

17.     To prevail upon a post-conviction writ of habeas corpus, applicant bears the burden of proving, by a preponderance of the evidence, the facts that would entitle him to relief. *Ex parte Morrow,* 952 S.W.2d 530, 534 (Tex.Crim.App.1997);  *Ex parte Thomas,* 906 S.W.2d 22, 24 (Tex.Crim.App.1995); *Ex parte Kimes,* 872 S.W.2d 700, 703 (Tex.Crim.App.1993); *Ex parte Adams,* 768 S.W.2d 281, 287-88 (Tex.Crim.App.1989); *Ex parte Maldonado,* 688 S.W.2d 114, 116 (Tex.Crim.App.1985).

18.     Although voluntary intoxication is never a defense, an instruction for the jury's guilt/innocence determination on the law applicable to voluntary intoxication may be warranted when the record includes evidence of intoxication sufficient under the *Nethery* standard. *Taylor v. State*, 885 S.W.2d at 157-58 (applying *Nethery*, 692 S.W.2d at 711-12).  A voluntary intoxication instruction given in the guilt/innocence phase is erroneous if the record is devoid of sufficient intoxication evidence. *Taylor*, 885 S.W.2d at 158.

19.     The *Taylor* court held regarding voluntary intoxication in the guilt/innocence phase that "if there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions, an instruction is

42

appropriate." *Id.* at 158.  Numerous other cases have quoted this holding.  *See, e.g., Robinson v. State*, 971 S.W.2d 96, at *97-98 (Tex. App. Beaumont 1998); *Haynes v. State*, 85 S.W.3d 855, 858 (Tex. App. Waco 2002); *Miller v. State*, No. 01-03-00819-CR, 2005 WL 825762, at *7 (Tex. App. Hous. 2005); *McGrew v. State*, No. 14-04-00321-CR, 2005 WL 3116240, at *3 (Tex. App. Hous. 2005).

20.     The applicant has waived the complaint that he was denied his constitutional rights to Due Process under the Sixth and Fourteenth Amendments to the United States Constitution due to the trial court's substantive law preliminary instructions to the entire voir dire panel, the specific instructions at voir dire regarding voluntary intoxication, the power point display regarding the definition of voluntary intoxication, the use of the definition of voluntary intoxication in the State's opening statement and closing arguments and the instructions regarding voluntary intoxication in the jury charge.

21.     There is no requirement that all legal issues to be discussed at voir dire must be contained in the charging instrument.

22.     A trial court has wide discretion in conducting voir dire, and its rulings are reviewed under an abuse of discretion standard. *See Atkins v. State,* 951 S.W.2d 787, 790 (Tex.Crim.App.1997); *Camacho v. State,* 864 S.W.2d 524, 531 (Tex.Crim.App.1993). If the subject could possibly be raised during trial, the attorneys are entitled to voir dire on that issue. Generally speaking, a voir dire topic is proper if it seeks to discover a juror's views on an issue applicable to the case.  *See Robison v. State,* 720 S.W.2d 808, 810-11 (Tex.Crim.App.1986); *Campbell v. State,* 685 S.W.2d 23, 25 (Tex.Crim.App.1985).

23.     It was proper for voluntary intoxication to be discussed

43

during voir dire and the opening statements.

24.      The Court's voluntary intoxication instruction was not erroneous, misleading or a misstatement of the law.  The definition of "intoxicated" in the statute regarding voluntary intoxication, referred to whether the applicant's mental state at the time of the offense was induced solely or in part because of the introduction of any substance into the body.  Tex. Code Crim. Proc. Art. 8.04 (Vernon's 2003)  The definition does not require that the substance still be in the body at the time of the criminal act nor does it preclude mental states that still exist a significant amount of time after the introduction, but still because, of substances to the body.

25.      The court explained the law properly, did not preclude a finding of insanity if the applicant was intoxicated and duly protected the applicant's rights.

26.      The facts of the case raised the issue of voluntary intoxication.

27.      If a preexisting condition of mind of the accused was not such as would have rendered him legally insane in and of itself, recent use of intoxicants causing stimulation or aggravation of such preexisting condition to the point of insanity could not be relied upon as a defense to the commission of a crime.  *Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex.Crim.App. 1972).

28.      The applicant has failed to prove by a preponderance of the evidence that the trial court's substantive law preliminary instructions to the entire voir dire panel, the specific instructions at voir dire regarding voluntary intoxication, the power point display regarding the definition of voluntary intoxication, the use of the definition of voluntary intoxication in the State's opening statement and closing arguments and the instructions

44

regarding voluntary intoxication in the jury charge were improper or misleading.

29.     The applicant has failed to prove by a preponderance of the evidence that the decisions by the applicant's counsel regarding these grounds were based on anything less than a thorough and complete investigation of the facts and law at the time of trial.

30.     The applicant has failed to prove by a preponderance of the evidence that his trial attorney was ineffective and denied the applicant his right to counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution for failing to object to the trial court's substantive law preliminary instructions to the entire voir dire panel, the specific instructions at voir dire regarding voluntary intoxication, the power point display regarding the definition of voluntary intoxication, the use of the definition of voluntary intoxication in the State's opening statement and closing arguments and the instructions regarding voluntary intoxication in the jury charge.

31.     The applicant has failed to prove by a preponderance of the evidence that, but for his attorneys' failure to object to the voluntary intoxication instruction, the objection would have been granted and the outcome of his trial would have been different.

32.     Section 8.04(d) defines "intoxication" as a "disturbance of mental or physical capacity resulting from the introduction of any substance into the body."

33.     The explanation of the law of voluntary intoxication was proper and correct.  The lab tests taken hours after the murder were irrelevant in regards to the issue of intoxication under Section 8.04(d).

45

34.     The applicant has failed to prove by a preponderance of the

evidence that the State knowingly presented false and misleading testimony about whether the

applicant was intoxicated at the time he murdered his estranged wife, his son with her and her

baby daughter.

35.     There are three components to a *Brady* violation: (1) the state

failed to disclose evidence regardless of the prosecutor's good faith or bad faith; (2) the withheld

evidence is favorable to the defendant; and (3) the evidence is material to guilt or punishment.

*See Youngblood v. West Virginia*, 126 S.Ct. 2188, 2190 (2006); *Strickler v. Greene*, 527 U.S.

263, 280-82 (1999); *Kyles v. Whitley*, 514 U.S. 419,432-433 (1995); *United States v. Bagley*, 473

U.S. 667, 683 (1985); *East v. Johnson*, 123 F.3d 235, 237 (5th Cir. 1997); *Flores v. State*, 940

S.W.2d 189, 191 (Tex. App. 1996).

36.     The due process clause of the Fourteenth Amendment places

upon the prosecution in a criminal case the affirmative duty to disclose evidence favorable to the

accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This is commonly referred to as the *Brady*

rule, and exculpatory evidence is referenced as *Brady* material. Favorable evidence includes both

that which tends to exculpate the accused, and impeachment evidence, *United States v. Bagley*,

473 U.S. 667, 676 (1985), because such evidence is "favorable to the accused," so that, if

disclosed and used effectively, it may make the difference between conviction and acquittal.

*Thomas v. State*, 841 S.W.2d 399, 403 (Tex.Crim.App.1992) (quoting *Bagley*, 473 U.S. at 676).

37.     Where, as here, the applicant claims that the prosecution suppressed

exculpatory evidence and thereby violated his right to due process applicant must satisfy a three

pronged test. *Brady v. Maryland*, 373 U.S. 83, 83 (1963) (prosecution has affirmative duty to

46

disclose material, exculpatory evidence to an accused; prosecution's suppression of co

defendant's confession violated Due Process Clause of the Fourteenth Amendment); *Ex parte*

*Kimes,* 872 S.W.2d at 702.  Applicant must first show that the State failed to disclose evidence,

regardless of the prosecution's good or bad faith.  *Id.*  He must then show that the withheld

evidence is favorable to applicant. *Id.*  Finally, the applicant must show that the evidence is

material, that is, there is a reasonable probability that had the evidence been disclosed, the

outcome of the trial would have been different. *Id.* at 702-03.

> 38.    A habeas applicant demonstrates that he is entitled to relief for

a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the

whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,*

514 U.S. at 435; *Ex parte Adams,* 768 S.W.2d at 290. "The question is not whether the defendant

would more likely than not have received a different verdict with the evidence, but whether in its

absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

*Kyles,* 514 U.S. at 434.

> 39.    However, a habeas corpus applicant's sworn allegations in his

petition are insufficient to sustain his burden of proof, if those allegations are the sole "proof"

offered.   As in any habeas proceeding, the applicant must prove the constitutional violation and

his entitlement to habeas relief by a preponderance of the evidence . *See Ex parte Empey,* 757

S.W.2d 771, 775 (Tex.Crim.App. 1988).

> 40.    The applicant has failed to satisfy any of the three prongs set

out in *Brady* and followed in *Kimes*.

47

41.     There was no evidence from Dr. Shannon Miller, exculpatory or otherwise.

42.     The applicant has failed to prove that there was any evidence suppressed by the State.

43.     The applicant has failed to prove by a preponderance of the evidence that Dr. Miller gave evidence favorable to the applicant.

44.     The applicant has failed to prove by a preponderance of the evidence the prong regarding materiality and that but for that material evidence the results of his trial would have been different.

45.     In ground 15, the applicant claims that he was denied due process because he was not competent to stand trial. This ground was not objected to at trial and has been waived. In *Ex parte Bagley,* 509 S.W.2d 332, 334 (Tex.Crim.App.1974), the Court of Criminal Appeals held that "the failure of petitioner, as defendant, to object at the trial, and to pursue vindication of a constitutional right of which he was put on notice on appeal, constitutes a waiver of the position he now asserts" on a writ of habeas corpus; *see also Ex parte Boyd,* 58 S.W.3d 134, 136 (Tex.Crim.App.2001) (citing *Bagley* and noting that "[o]rdinarily, the writ of habeas corpus may not be used to litigate matters that could have been raised at trial and on direct appeal").

46.     Under Texas law, the applicant was competent to stand trial.

47.     A person is legally incompetent to stand trial if he lacks either (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational

48

understanding or (2) a rational as well as factual understanding of the proceedings against him. *See* Tex.Code Crim. Proc. Ann. art. 46.02, §§ 1A (Vernon Supp.2001); *Moore v. State,* 999 S.W.2d 385, 392 (Tex.Crim.App.1999; *Guzman v. State,* 923 S.W.2d 792, 795 (Tex.App.-Corpus Christi 1996, no pet.). Evidence of mental impairment alone does not require that a competency hearing where no evidence indicates that a defendant is incapable of consulting with counsel or understanding the proceedings against him. *Townsend v. State,* 949 S.W.2d 24, 26-27 (Tex.App. -- San Antonio 1997, no pet.) (evidence that defendant was depressed and suicidal did not warrant an incompetency hearing); *Lingerfelt v. State,* 629 S.W.2d 216 (Tex.App.-Dallas 1982, pet. ref'd) (testimony from psychiatrist that defendant suffered from schizophrenia did not warrant a competency hearing). Generally, to raise the issue of incompetency, there must be evidence of recent severe mental illness or bizarre acts by the defendant or evidence of moderate retardation. *Guzman v. State,* 923 S.W.2d 792, 797-98 (Tex.App.-Corpus Christi 1994, no pet.).

48.    The record does not support the applicant's claim that he was incompetent to stand trial or that his attorney was ineffective for failing to raise the competency issue a second time.

49.    The applicant has failed to prove that he was incompetent to stand trial or that his attorney was ineffective for failing to raise the competency issue a second time.

50.    Under ground 17, the applicant does not actually state an error upon which he could receive relief.

51.    The applicant did not make an objection at trial regarding ground 17 and has waived this issue.

49

52.     The applicant has failed to present by a preponderance of the evidence any proof of purposeful prosecutorial or jury discrimination in his particular case. *County v. State,* 812 S.W.2d 303, 308 (Tex.Crim.App.1989).

53.     *Strickland* encompasses the prohibition against second-guessing counsel's trial strategy on voir dire. Not every attorney will conduct voir dire in the same manner, and, with hindsight, every attorney may have wished that additional questions were asked. However, the fact that another attorney might have pursued other areas of questioning during voir dire will not support a finding of ineffective assistance. *See Delrio v. State,* 840 S.W.2d 443, 445 (Tex.Crim.App. 1992); *Owens v. State,* 916 S.W.2d 713, 717(Tex.App. -- Waco 1996).

54.     The applicant has failed to overcome the presumption that trial counsel was effective during voir dire questioning. *See Shilling v. State,* 977 S.W.2d 789, 791 (Tex.App.-Fort Worth 1998, pet. ref'd) (ineffectiveness claim fails where record is devoid of reasoning counsel employed during voir dire); *Suniga v. State,* 733 S.W.2d 594, 600 (Tex.App.-San Antonio 1987, no pet.) (overruling complaint regarding brief voir dire that failed to include certain questions based on absence of indication that trial counsel's decision was unsupported).

55.     The applicant has not demonstrated that his counsel's performance fell below a reasonable objective standard, and he has not demonstrated that any alleged error prejudiced his defense.

56.     The applicant did not object to the jury shuffle and waived any rights under that issue.

57.     In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),

50

the Supreme Court held that a prosecutor violates a defendant's equal protection rights if he uses peremptory strikes to eliminate members of defendant's race from the jury.

58.     Texas Courts have declined to make the broad extension of *Batson* that applicant seeks. *See Ladd v. State,* 3 S.W.3d 547, 563 (Tex.Crim.App. 1999), cert. denied, 529 U.S. 1070 (2000).

59.     The applicant has failed to prove by a preponderance of the evidence any fact which would establish purposeful discrimination by the court and has failed to cite any law which would support the extension of *Batson* to jury shuffle requests.  As such, the applicant has also failed to prove by a preponderance of the evidence that his attorneys were ineffective for not objection to the State's request for a jury shuffle.

60.     The defense and the state are entitled to a shuffle, if requested.

61.     The failure to shuffle when timely requested is reversible error.

62.     The requested shuffle did not constitute reversible error.

63.     *Batson* does not apply to a jury shuffle.

64.     The applicant did not object to those jurors on the grounds set out in Ground 20.

65.     If a juror vacillates or equivocates on the juror's ability to follow the law, the reviewing court must defer to the trial court's judgment. *Brown v. State,* 913 S.W.2d 577, 580 (Tex.Crim.App.1996); *Riley v. State,* 889 S.W.2d 290, 300 (Tex.Crim.App.1993).

66.     Because the trial court was in the best position to judge the credibility of

51

the prospective juror's responses, the reviewing court must give deference to the trial courts

decision. *Swearingen*, 101 S.W.3d at 99.

      67.     Ms. ████ vacillated or equivocated on her understanding of the burden of

proof regarding insanity, the Court intervened and made the difference between preponderance

and reasonable doubt clear to Ms. ████, her vacillation ended, the juror gave an unequivicable

response that she would be able to follow the law, therefore the trial court did not err in denying

the applicant's motion to strike for cause against Ms ████.

      68.     There was no harm to the applicant regarding his use of a strike on Ms.

Long.   When the trial court erroneously overrules a challenge against a venireperson,

the defendant is harmed only if he uses a peremptory strike to remove the venireperson and

thereafter suffers a detriment from the loss of the strike. *Demouchette v. State*, 731 S.W.2d 75,

83 (Tex.Crim.App.1986), *cert. denied*, 482 U.S. 920 (1987). *See also Jones v. State*, 833 S.W.2d

118, 123 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 921.   Error is preserved for review by

this Court only if applicant (1) used all of his peremptory strikes, (2) asked for and was refused

additional peremptory strikes, and (3) was then forced to take an identified objectionable juror

whom applicant would not otherwise have accepted had the trial court granted his challenge for

cause (or granted him additional peremptory strikes so that he might strike the juror). *Id.*

      69.     Because the applicant did not exhaust his fifteen statutory peremptory

challenges during voir dire, and because the applicant has failed to allege an objectionable juror

who actually sat on the jury and deliberated as a part of that jury, the applicant has failed to

prove by a preponderance of the evidence that he was harmed by the court's decision to overrule

the motion to strike for cause on Ms. ███

70.     The applicant failed to prove by a preponderance of the evidence that counsel was not acting as a reasonably competent attorney and his advice was not within the range of competence demanded of attorneys in criminal cases.

71.     The applicant has failed to prove that a constitutionally deficient performance prejudiced his defense and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

72.     The applicant has failed to satisfy either prong of *Strickland* or prove by a preponderance of the evidence that his attorney was ineffective regarding ground 23.

73.     The applicant has failed to prove by a preponderance of the evidence that Dr. Scarano was not qualified to render a diagnosis involving substance-induced psychosis.

74.     The applicant has failed to prove by a preponderance of the evidence that the Court would have excluded Dr. Scarano's testimony.

75.     The applicant has failed to prove by a preponderance of the evidence that defense counsel was ineffective for not requesting a *Daubert/Kelly* hearing regarding Dr. Scarano.

76.     The applicant has failed to prove by a preponderance of the evidence that Dr. Axelrad was not qualified to render a diagnosis involving substance-induced psychosis.

77.     The applicant has failed to prove by a preponderance of the evidence that

53

the Court would have excluded Dr. Axelrad's testimony.

78.    The applicant has failed to prove by a preponderance of the evidence that defense counsel was ineffective for not requesting *Daubert/Kelly* hearing on Dr. Axelrad.

80.    The applicant has failed to prove both prongs of *Strickland* in regards to ground 26.

81.    Defense counsel has set out reasonable trial strategy to justify these decisions.

82.    The applicant has failed to prove by a preponderance of the evidence that Dr. Peter Oropeza was not legally qualified or competent to testify to the applicant's competency or sanity.

83.    The applicant has failed to prove by a preponderance of the evidence that by choosing not to attack Dr. Oropeza's qualifications on non-existent grounds, counsel was not acting as a reasonably competent attorney, and his advice was not within the range of competence demanded of attorneys in criminal cases.

84.    The applicant has failed to prove by a preponderance of the evidence that if defense counsel had challenged Dr. Oropeza's qualifications, the challenge would have been sustained and that there is a reasonable probability that the result of the proceeding would have been different.

85.    Dr. Young's conclusions in her affidavit do not prove by a preponderance of the evidence that the opinions and diagnosis of the State's experts are

54

erroneous.

86.     Dr. Gur's conclusions in his affidavit do not prove by a preponderance of the evidence that the opinions and diagnosis of the State's experts are erroneous.

87.     Dr. Lipman's conclusions in his affidavit do not prove by a preponderance of the evidence that the opinions and diagnosis of the State's experts are erroneous.

88.     The applicant has failed to prove by a preponderance of the evidence, that counsel's failure to hire a neuropharmacologist or to have a neuropharmicological exam performed on the applicant was constitutionally deficient.

89.     The applicant has failed to prove by a preponderance of the evidence exactly which questions Mr. Hagood did not ask Dr. Gripon.

90.     The applicant has failed to prove by a preponderance of the evidence that the decision not to ask certain questions was not trial strategy.

91.     The applicant has failed to prove by a preponderance of the evidence that his alleged deficient performance prejudiced his defense and that based on the opinions of Gur, Young, and Littman there is a reasonable probability that, but for counsels unprofessional errs the results of the proceeding would have been different."

92.     The applicant has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient and was not acting as a reasonably competent attorney, and his advice was not within the range of competence demanded of attorneys in criminal cases.

55

93.     The applicant has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense and that there is a reasonably probability but for counsel's unprofessional errs the results of the proceeding would have been different.

94.     The applicant has failed to prove by a preponderance of the evidence that Mr. Hagood was not employing trial strategy in calling two of the State's experts in the defense's case-in-chief.

95.     The applicant has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient and that he was not acting as a reasonably competent attorney, and that his trial strategy was not within the range of competence demanded of attorneys in criminal cases.

96.     The applicant has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense and that there is a reasonable probability that, but for counsel's decision to use Dr. Scarano and Dr. Axelrad in the defense's case-in-chief, the result of the proceeding would have been different.

97.     The applicant has failed to prove by a preponderance of the evidence that  Mr. Hagood was not employing trial strategy in not requesting sanity opinions from Dr. Harrison or Dr. McGirk.

98.     The applicant has failed to prove by a preponderance of the evidence that Mr. Hagood's decision not to call Larry Fitzgerald was not trial strategy.

56

99.     The applicant has failed to prove by a preponderance of the evidence that counsel was not acting as a reasonably competent attorney and his advice was not within the range of competence demanded by attorneys in criminal case by not introducing the testimony of Larry Fitzgerald.

100.     The applicant has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense or that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would be different.

102.     The applicant has failed to prove by a preponderance of the evidence that Mr. Hagood was not employing trial strategy in his selection of punishment witnesses.

103.     The applicant has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient and that he was not acting as a reasonably competent attorney in that his trial strategy was not in the range of competence required of attorneys in criminal cases in his selection and handling of punishment witnesses.

104.     The applicant has failed to prove by a preponderance of the evidence that his attorney was ineffective for not objecting to every objectionable question asked by the State.

105.     The applicant has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient or that appellate counsel was not acting as "a reasonably competent attorney," and his advice was not "within the range of competence demanded of attorneys in criminal cases."

57

106.    The applicant has failed to prove by a preponderance of the evidence that any of Grounds 1 through 36 were actually error.  As such they cannot accumulate into reversible error.  See *Chamberlain v. State*, 998 SW 2nd 230, 238 (Tex.Crim App, 1999)

107.    The applicant has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient or the appellate counsel was not acting as a reasonably competent attorney and his advice was not within the range of competence demanded of attorneys in criminal cases.

108.    The applicant has failed to prove that Cardwell did not preserve an issue for "exhaustion" which was constitutionally deficient and prejudiced his defense.

109.    The applicant has failed to prove by a preponderance of the evidence that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

110.    The Sixth Amendment guarantees the right of individuals to have counsel without conflicts of interest.  *Gray v. Estelle*, 616 F.2d 801, 803 (5th Cir. 1980); *see also Ex Parte Prejean*, 625 S.W.2d 731, 733 (Tex. Crim. App. 1981) (*en banc*).  If an actual conflict exists, "it need not be shown that the divided loyalties actually prejudiced the defendant in the conduct of his trial." *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979).

111.    Although a defendant can waive his or her right to conflict-free counsel, a valid waiver "requires an 'intentional relinquishment or abandonment of a known right.'" *Gray*, 616 F.2d at 803 (*quoting Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  A valid waiver "must be both voluntary and 'knowing, intelligent acts done with sufficient awareness of

58

the relevant circumstances and likely consequences.'" *Gray*, 616 F.2d at 803 (quoting Brady v. United States, 397 U.S. 742, 748 (1970)). Texas courts require that "[s]uch a waiver of right to conflict-free counsel should include a showing that the defendant is aware of the conflict of interest, realizes the consequences of continuing with such counsel, and is aware of his right to obtain other counsel." *Prejean*, 625 S.W.2d at 733.

112.    The applicant has failed to show how his attorney's former role as the prosecutor in his prior convictions raised anything other than a speculative conflict of interest.

113.    The applicant failed to prove an actual conflict of interest by a preponderance of the evidence.

114.    The applicant has waived his right to complain of any conflict.

115.    Texas Rule of Evidence 702 instructs that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In order to testify about scientific, technical, or other specialized matter, a witness must be qualified as an expert. The initial burden of establishing a witness's qualifications lies with the party offering the testimony. *Holloway v. State,* 613 S.W.2d 497, 501 (Tex.Crim.App.1981).

116.    The trial court properly limited Dr. Allen from testifying that she believed evidence was "mitigating" or referring to a "mitigation time line" compiled by a "mitigation expert."

117.    The trial court properly prevented Dr. Allen from testifying that the

applicant had expressed remorse to her the night before Dr. Allen testified.  The Court of Criminal appeals has decided that the federal constitution does not require admission of a defendant's self-serving, out-of-court declarations of remorse when they are inadmissible under state law even when these declarations meet the test of constitutional "relevancy." *See Lewis v. State*, 815 S.W.2d 560, 568 (Tex.Crim.App.1991) (defendant's hearsay expressions of remorse not admissible at punishment phase of capital murder trial); *Thomas*, 638 S.W.2d at 484 (defendant's self-serving hearsay declarations offered by defendant in mitigation are ordinarily inadmissible).  Although "[r]emorse following commission of a serious crime may well be a circumstance tending in some measure to mitigate the degree of a criminal's fault, but it must be presented in a form acceptable to the law of evidence before he is entitled to insist that it be received over objection." *Renteria v. State*, 206 S.W.3d 689, 697 (Tex.Crim.App. 2006).

118.    The court properly sustained the State's objection to a witness testifying in the narrative.

119.    A trial court is responsible for exercising reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) make the interrogation and presentation effective for the ascertainment of the truth; (2) avoid needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. *See* Tex.R.Crim.Evid. 610(a); *Jasper v. State*, 61 S.W.3d 413, 421 (Tex.Crim.App.2001).

120.    The trial court was correct in sustaining the objections by the State to Dr. Allen, with a degree in social work, from making medical conclusions regarding the applicant's treatment.

60

121.    Texas does not recognize diminished capacity as an affirmative defense i.e., a lesser form of the defense of insanity.

122.    The diminished-capacity doctrine argued by the applicant in this case is a failure-of-proof defense in which the applicant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense.

123.    The applicant has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient.

124.    The applicant has failed to prove by a preponderance of the evidence that counsel was not acting as a reasonably competent attorney when he did not request an instruction on "diminished capacity" or a lesser-included offense or that this decision was not within the range of competence demanded of attorneys in criminal cases.

125.    In *Paulson v. State*, 28 S.W.3d 570 (Tex.Crim.App. 2000), issued years before the trial in this case, The Court of Criminal Appeals overruled that portion of *Geesa* which required a definition of "beyond a reasonable doubt" to be included in the court's charge. In fact, they stated "that the better practice is to give no definition of reasonable doubt at all to the jury." *Id.* at 573.  The Court in *Paulson* cited *Victor v. Nebraska*, 511 U.S. 1 (1994), for the proposition that "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Id.* at 5, 114 S.Ct. at 1243.  Citing *Jackson v. Virginia*, 443 U.S. 317 (1979), the Court concluded, "indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the

61

government's burden of proof." *Id.*

126.     Ground 41 is barred.  Issues raised and rejected on direct appeal are generally not cognizable on habeas corpus. *Ex parte McFarland,* 163 S.W.3d 743, 748 (Tex.Crim.App.2005). An exception to that rule occurs when there is a change in a legal principle relevant to the applicant's claim, and that legal principle would apply retroactively to cases on habeas corpus. *Id.; Ex parte Drake,* 883 S.W.2d 213, 215 (Tex.Crim.App.1994). But when there has been no change, an applicant should not again urge the exact same basis that was raised on direct appeal unless the legal basis for the claim "could not have been reasonably formulated" at the time the direct appeal was filed.  It serves judicial economy and conforms to common sense: issues that can be litigated on direct appeal, should be litigated there, and not re-litigated on habeas corpus. Texas Code of Criminal Procedure 11.071 § 5 bars claims and issues that *have been* presented in an earlier application, not just claims and issues that *could have been presented.*  Art. 11.071, §§ 5(a)(1)("the current claims and issues have not been and could not have been presented previously").

127.     The applicant, in order to avoid the procedural bar, merely claims that appellate counsel did not brief the issue sufficiently.  Because the direct appeal has yet to be ruled on, this issue is not ripe for review.  There is no ruling to address in this case yet and the applicant has failed to plead that there has been a change in a legal principle relevant to the applicant's claim, and that legal principle would apply retroactively to cases on habeas corpus.

128.     The applicant has failed to prove by a preponderance of the evidence that the United States Constitution requires a full definition of reasonable doubt be included in the court's jury charge.

129.    Consistent with due process, the State is required to prove each

element of an offense beyond a reasonable doubt. *See* Tex.Pen.Code Ann. §§ 2.01 (Vernon

2003); The United States Supreme Court held that the federal constitution neither requires nor

prohibits the giving of a definition of reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

So long as the court instructs the jury on the necessity that the defendant's guilt be proved

beyond a reasonable doubt, the Constitution does not require that any particular form of words be

used in advising the jury of the government's burden of proof. *Id.*

130.    In ground 42, the applicant alleges that the jury used the applicant's

failure to testify against him in a manner that deprived the applicant of his right against self

incrimination.  This issue was raised on direct appeal and is barred. In *Ex Parte Drake*, the Court

of Appeals stated that habeas corpus should generally not be used to re-litigate matters which

were addressed on appeal, 883 S.W.2d 213, 215 (Tex.Crim.App.1994), *citing Ex Parte*

*Schuessler*, 846 S.W.2d 850 (Tex.Crim.App.1993).

131.    The applicant has failed to prove by a preponderance of the evidence

facts which justify raising in his 11.071 application an issue which has been raised on direct

appeal.

132.    The failure to testify at trial shall not be used against any defendant, nor

shall counsel comment on the defendant's right to remain silent and failure to testify. Tex.Code

Crim. Proc. Ann. art. 38.08 (Vernon Supp.2004).  A jury's discussion of the defendant's failure to

testify – and using that circumstance to find guilt would be impermissible. Under rule 606(b),

however, jurors are not competent to testify that they discussed the defendant's failure to testify

and used that failure as a basis for convicting him. *Hines v. State,* 3 S.W.3d 618, 620-621

(Tex.App.-Texarkana 1999, no pet.) ; *see also* Tex.R.App. P. 21.3.

      133.     The applicant has failed to prove by a preponderance of the evidence that

the jury discussed the applicant's failure to testify or used the fact that the applicant did not

testify against the applicant.

      134.     *Roper v. Simmons* prohibits the State from assessing the death penalty

against a defendant who was under 18 years of age at the time he committed the offense. *Roper*

*v. Simmons*, 543 U.S. 551 (2005).

      135.     In the punishment phase of a capital murder trial, the admission of prior

offenses committed when the defendant was a juvenile does not violate the Eighth Amendment if

he was assessed the death penalty for a charged offense that occurred when he was at least

eighteen years old. *See Corwin v. State,* 870 S.W.2d 23 (Tex.Crim.App.1993).

      136.     Neither the Supreme Court of the United States nor the Texas Court of

Criminal Appeals has extended the holding in *Roper v. Simmons* to prohibit the use of juvenile

offenses in the punishment stage of a capital case. *See e.g., Matthews v. State,* 2006 WL

1752169 (Tex.Crim.App. 2006) (not designated for publication).

      137.     The execution of mentally retarded persons and insane persons violates

the Eighth Amendment. *Atkins v. Virginia,* 536 U.S. 304 (2002); *Ford v. Wainwright,* 477 U.S.

399 (1986).   There is no Supreme Court authority or authority from the Texas Court of Criminal

appeals suggesting that mental illness is enough to render one immune from execution under the Eighth Amendment.

138.    The Court of Criminal Appeals has previously rejected an invitation to extend the federal constitutional proscription against execution of the insane to the greater category of mentally ill defendants. *Colburn v. State,* 966 S.W.2d 511 (Tex.Crim.App.1998).

139.    The applicant has failed to prove by a preponderance of the evidence that  the Court of Criminal Appeals should extend the prohibition in *Atkins* to those who are mentally ill.

The District Clerk is directed to immediately transmit to the Court of Criminal Appeals a copy of all those documents required under 11.071 Section 9(f).

Signed and entered on this 28th day of _MARCH_, 2008.

FILE FOR RECORD

MAR 28 2008

By_____
Tracy _____, District Clerk
Grayson County

_____
JAMES R. FRY, Judge Presiding

65

# Exhibit 193

## Family Tree



# Thomas/Ross Family Tree

**Legend:**
- Mental Illness
- Alcohol/Drug Abuse
- Suspected Mental Illness
- **abc** Incarcerated
- **abc** Abused

**Aunts/Uncles**
- Craig Thomas
- Emmett Thomas
- Teresa (Thomas) Baker
- Terry Joe Thomas
- Konta (Thomas) Johnson
- Ronnie "Boo" Thomas
- Doris (Thomas) Gonzalez
- Angel Thomas (deceased)
- Danny Thomas — **Father**

**Cousins**
- _____ Thomas
- Floyd Patterson
- Brandon Patterson → Tyrone
- Rose Thomas → Freena
- Princess (Thomas) Johnson → Tasha
- Precious (Thomas) Johnson

**Grandparents**
- Marvin Thomas
- Emma Thomas

**Brothers**
- James Thomas
- Brian Thomas
- Andre Thomas
- Danny Ross (Half Brother)
- Eric M. Ross (Half Brother)
- ▊▊▊ (Half Brother)
- Mary Ross
- Mariah
- Naomi
- Jalen

**Mother**
- Rochelle (Ross) Thomas
- Pam (Ross) Borens
- Gregory Ross (deceased)
- Ronnie Brinson (Half Brother)
- Kevin Ross (Half Brother)
- Alice (Ross) Harris
- Denise (Ross) Wade (Half Sister)
- Margie Ross (Half Sister)
- Roscoe Johnson, Jr. (Half Brother)

**Grandparents**
- Mr. Ross
- Vivian Ross → **Great-Uncle** Walter Johnson

- Briana Ross → Kalicia
- Leola Ross → Jamiel
- Nici Ross
- Letitia (Tootie) (Ross) Borens
- Kevin (Ross) DeShaun
- Kiki (Ross) Harris
- Elvin (Ross) McCoy

**Exhibit 193**