# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### SHERMAN DIVISION

**ANDRE LEE THOMAS, #999493,**     §

         **Petitioner,**     §

         §

**VS.**     §          **CIVIL ACTION NO. 4:09cv644**

         §

**DIRECTOR, TDCJ-CID,**     §

         **Respondent.**     §

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

Petitioner Andre Lee Thomas, an inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is challenging his capital murder conviction and death sentence imposed by the 15th Judicial District Court of Grayson County, Texas in Cause Number 051858, in a case styled *The State of Texas v. Andre Thomas*. For reasons set forth below, the Court finds that the petition is not well-taken and that it will be denied.

### Procedural History of the Case

In March 2005, Petitioner was convicted of the capital murder of thirteen month old Leyha Marie Hughes, by cutting or stabbing her with a knife, in violation of Tex. Penal Code § 19.03(a)(8). He was found guilty after the jury rejected his plea of not guilty by reason of insanity. The Texas Court of Criminal Appeals ("TCCA") affirmed the conviction and death sentence. *Thomas v. State*, No. AP-75218, 2008 WL 4531976 (Tex. Crim. App. Oct. 8, 2008) (unpublished). Petitioner did not file a petition for a writ of certiorari.

Petitioner filed his first application for a writ of habeas corpus in state court on June 8, 2007. The state trial court issued extensive findings of fact and conclusions of law on March 28, 2008. The TCCA subsequently denied relief based on the trial court's findings and conclusions and on its own

review.  *Ex parte Thomas*, No. WR-69859-01, 2009 WL 693606 (Tex. Crim. App. March 18, 2009) (unpublished).

Petitioner began the present proceedings on December 27, 2009.  He filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 16, 2010 (docket entry #7).  On April 22, 2010, the Court granted his unopposed motion to stay and hold the proceedings in abeyance while he pursued a second application for a writ of habeas corpus in state court.  The application was dismissed as successive pursuant to Texas Code of Criminal Procedure Article 11.071 § 5.  *Ex parte Thomas*, No. WR-69859-02, 2010 WL 1795738 (Tex. Crim. App. May 5, 2010) (unpublished).  On June 9, 2010, the Director was ordered to show cause why relief should not be granted.  He filed an answer (docket entry #23) on May 11, 2011.  Petitioner filed a reply (docket entry #35) on March 21, 2012.

## Factual Background of the Case

The facts of the case were summarized in the concurring opinion denying habeas relief in state court as follows:

> [Petitioner] has a severe mental illness.  He suffers from psychotic delusions and perhaps from schizophrenia.  He also has a long history of drug and alcohol abuse.  Because of his drug abuse, he was frequently truant, quit school in the ninth grade, and had a series of juvenile and adult arrests.  Dr. Axelrad, called by both the State and defense, testified that the twenty-one-year-old [Petitioner] told him that he had been abusing alcohol since age ten and marijuana since age thirteen, and, in the month before the murders, had been taking large doses of Coricidin, a cold medicine, for recreational purposes.

> [Petitioner's] behavior in the months before the killings became increasingly "bizarre": He put duct tape over his mouth and refused to speak; he talked about how the dollar bill contains the meaning of life; he stated that he was experiencing *deja vu* and reliving events time and again; he had a religious fixation and heard the voice of God.  In the weeks before the murders, [Petitioner] was heard by others talking about his auditory and visual hallucinations of God and demons.

> About twenty days before the killings, he took Coricidin and then tried to commit suicide by overdosing on other medications.  He was taken to the local MHMR facility, but then walked away before he could be treated.  Two days before the killings, he drank vodka and took about ten Coricidin tablets and then stabbed himself.  His mother took him to the local hospital.  But again, [Petitioner] left the hospital before he could be committed for observation or psychiatric treatment.  On two occasions in the days before the killings, [Petitioner] was seen by friends to be highly intoxicated; they described him as vomiting, delirious, incapacitated, and lying on the floor.

> At around 7:00 p.m. on March 26th, just one day after stabbing himself, [Petitioner] went to his estranged wife's apartment where she and her boyfriend, Bryant Hughes, were listening to religious audiotapes.  According to [Petitioner's] statement to police, he had come

2

to believe that God wanted him to kill his wife, Laura, because she was "Jezebel," to kill his four-year-old son, Andre, Jr., because he was the "Anti-Christ," and to kill his wife's daughter, thirteen-month old Leyha, because she, too, was evil. That evening, [Petitioner] saw Bryant twisting an extension cord as they listened to the religious tapes, and he thought that Bryant also wanted to strangle Laura and the children. [Petitioner] wanted to make "the first move," so he walked into Laura's kitchen to find a knife, but then decided that it was not the right time. Bryant drove applicant home around 10:00 p.m.

[Petitioner] reported that the next morning he woke up and heard a voice that he thought was God telling him that he needed to stab and kill his wife and the children using three different knives so as not to "cross contaminate" their blood and "allow the demons inside them to live." He walked over to Laura's apartment. He saw Bryant drive by and wave, so [Petitioner] believed that this was a signal that he was doing "the right thing" by killing his wife and the children.

He burst into the apartment, then stabbed and killed Laura and the two children. He used a different knife on each one of the victims, and then he carved out the children's hearts and stuffed them into his pockets. He mistakenly cut out part of Laura's lung, instead of her heart, and put that into his pocket. He then stabbed himself in the heart which, he thought, would assure the death of the demons that had inhabited his wife and the children. But he did not die, so he walked home, changed his clothes, and put the hearts into a paper bag and threw them in the trash. He walked to his father's house with the intention of calling Laura, whom he had just killed. He called Laura's parents instead and left a message on their answering machine:

Um, Sherry, this is Andre. I need y'alls help, something bad is happening to me and it keeps happening and I don't know what's going on. I need some help, I think I'm in hell. I need help. Somebody needs to come and help me. I need help bad. I'm desperate. I'm afraid to go to sleep. So when you get this message, come by the house, please. Hello?

[Petitioner] then walked back to his trailer where his girlfriend, Carmen Hayes, and his cousin, Isaiah Gibbs, were waiting for him. He told them that he had just killed his wife and the two children. Ms. Hayes took him to the Sherman Police Department and he told the police what he had done. After he was hospitalized for his chest wound, he was taken to jail, and he gave a videotaped statement to the police. In that videotaped statement, [Petitioner] gives a very calm, complete, and coherent account of his activities and his reasons for them.

Five days after the killings, [Petitioner] was in his cell with his Bible. After reading a Bible verse to the effect that, "If thy right eye offends thee, pluck it out," [Petitioner] gouged out his right eye. [Petitioner] was examined for competency to stand trial by two psychologists and was evaluated by a treating psychologist in jail, all of whom agreed that [Petitioner] was not then competent to stand trial. All three provided a diagnosis or opinion of "Schizophreniform Disorder with a Rule out of Substance Induced Psychotic Disorder due to [Petitioner's] recent history of abusing Coricidin."

After approximately five weeks of treatment and medication in the Vernon State Hospital, [Petitioner] was found to have regained his competency to stand trial. During his stay at Vernon, [Petitioner] was placed on Zyprexa, a strong anti-psychotic medication, and did not display "bizarre or unusual behaviors," but he did make "hyper-religious statements throughout his stay." The attending psychiatrist at Vernon updated applicant's diagnosis as being Substance-Induced Psychosis with Delusions and Hallucinations. He also diagnosed [Petitioner] as malingering (as did a psychologist).

[Petitioner] was returned to Grayson County to stand trial. Several different psychiatrists and psychologists-both for the State and [Petitioner]-interviewed and tested [Petitioner] in anticipation for the capital murder trial. By that time, [Petitioner] was fully alert, conversant, and attentive. His memory tested well, he spoke at a level consistent with his tested I.Q. of 112, and he behaved appropriately during the interviews. He told one psychiatrist in December 2004 that he had not experienced any hallucinations since September, although he was severely depressed.

At trial, the jury rejected his insanity plea and found [Petitioner] guilty of the capital murder of thirteen-month-old Leyha. Based upon the jury's answers to the special punishment issues, the trial judge sentenced him to death.

*Ex parte Thomas*, 2009 WL 693606, at *1-3 (Cochran, J., concurring) (footnotes omitted).

## Grounds for Relief

Petitioner brings the following grounds for relief:

1. Petitioner was deprived of his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution because he was not competent to stand trial.

2. Defense counsels' failure to move for a competency hearing following Petitioner's return from Vernon State Hospital was constitutionally ineffective.

3. Race dynamics pervaded every aspect of Petitioner's trial in violation of the Sixth and Fourteenth Amendments.

4. Petitioner's jury was selected in a racially discriminatory manner in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

5. The Defense's failure to challenge the State's jury shuffle and disparate questioning of the only African American venire member to make it to voir dire constituted ineffective assistance of counsel under the Sixth and Fourteenth Amendments.

6. The presence of jurors opposed to interracial relationships deprived Petitioner of a fair trial and violated his right to equal protection under the Sixth and Fourteenth Amendments.

7. Defense counsels' failure to inquire into racial prejudice deprived Petitioner of his constitutional right to effective assistance of counsel.

8. The State withheld evidence that undermined Petitioner's theory of substance-induced psychosis in violation of *Brady v. Maryland*.

9. Defense counsels' failure to hire an expert in neuropharmacology was constitutionally ineffective.

10. Defense counsels' failure to obtain a neuropsychological examination and the testimony of a neuropsychologist was constitutionally ineffective.

11. Defense counsels' reliance on the State's experts to prove key issues was constitutionally ineffective.

12. Defense counsels' failure to elicit opinions on sanity from Drs. Harrison and McGirk further rendered its counsel constitutionally ineffective.

13. Defense counsels' failure to present evidence of or seek a jury instruction on diminished capacity constituted constitutionally ineffective assistance of counsel.

14. Defense counsels' performance at the punishment phase of Petitioner's trial was constitutionally ineffective.

15. The trial court placed unconstitutional limitations on Petitioner's presentation of mitigating evidence.

16. Sentencing Petitioner to death violates the prohibition on cruel and unusual punishment set forth in the Eighth Amendment to the United States Constitution because Petitioner is indisputably and severely mentally ill.

17. As Petitioner is no longer a future danger, his death sentence violates the Eighth and Fourteenth Amendments.

18. Defense counsels' copious failures in handling expert witnesses further deprived Petitioner of effective assistance of counsel.

19. Defense counsels' repeated failures to object to inadmissible evidence was constitutionally ineffective.

20. Counsel was constitutionally ineffective for failing to object to the court's erroneous instruction on, and the entire evidence regarding, voluntary intoxication as there was no intoxication, and it should have never been allowed to infect the trial.

21. The cumulative evidence of counsel's failures at both phases of Petitioner's trial unequivocally constitutes constitutionally ineffective assistance of counsel.

22. The State violated Petitioner's due process rights under the Fifth, Sixth and Fourteenth Amendments when the State knowingly presented false and misleading testimony in violation of *Napue v. Illinois* and its progeny.

23. The trial court's refusal to define "reasonable doubt" denied Petitioner of his right to due process under the Fourteenth Amendment.

24. Petitioner was deprived of his Fifth Amendment privilege against self-incrimination because the jury used Petitioner's decision not to testify against him in imposing a sentence of death.

25. Petitioner's death sentence is unconstitutional under *Roper v. Simmons* because the State used prior convictions based on acts committed by Petitioner when he was a juvenile to establish an aggravating factor.

26. Petitioner was deprived of his right to a fair trial under the Sixth Amendment because his attorney had a conflict of interest that was not waived.

27. Petitioner's appellate counsel was constitutionally ineffective.

**Standard of Review**

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242 (1997). Federal courts do "not sit as a super state supreme court on a habeas corpus proceeding to review error under state law." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (citations omitted), *cert. denied*, 552 U.S. 1314 (2008); *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983), *cert. denied*, 469 U.S. 873 (1984).

The petition was filed in 2010, thus review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and internal quotation marks omitted). With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts."

*Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)), *cert. denied*, 551 U.S. 1141 (2007). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). As such, "evidence later introduced in federal court is irrelevant to § 2254(d)(1) review." *Id.* at 184. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 105 (2012). The Supreme Court has specified that a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing 28 U.S.C. § 2254(e)(1)). The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation and internal quotation marks omitted). More recently, the Supreme Court held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). *See also Clark v. Thaler*, 673 F.3d 410, 421-22 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 179 (2012). The Supreme Court has explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Federal habeas corpus relief is not available just because a state court decision may have been incorrect; instead, a petitioner must show that a state court decision was unreasonable. *Id.* at 694. Furthermore, when a state court provides alternative reasons for denying relief, a federal court may not grant relief "unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." *Wetzel v. Lambert*, 565 U.S. ___, ___, 132 S. Ct. 1195, 1199 (2012) (emphasis in original).

<u>**Discussion and Analysis**</u>

**Claim Number 1:       Petitioner was deprived of his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution because he was not competent to stand trial.**

Petitioner initially argues that he is entitled to relief because he was not competent to stand trial.  He stressed that the Supreme Court has specified that "[i]t is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992).  He noted that the test for competency is whether the defendant has the ability to understand the charges against him and the ability to communicate effectively with defense counsel. *Dusky v. United States*, 362 U.S. 402, 402 (1960).  He asserts that a defendant must prove incompetence only by a preponderance of the evidence. *Cooper v. Oklahoma*, 517 U.S. 348, 355-56 (1996).

In support of the claim, Petitioner observed that he had plucked out one of his eyes just prior to trial and had been declared to be schizophrenic and psychotic.  He states that members of the defense team had reported that he was unable to communicate effectively with them.  Shelli Schade, a mitigation specialist, stated that Petitioner was very childlike, quiet and sad, and it was difficult to engage him in conversation.  She observed that he appeared drugged during trial.  He asserted that Bobbie Peterson, who sat second chair as defense counsel, stated that he was unresponsive, disinterested, and unhelpful.  Leah Eastep, legal assistant to the defense, stated that he just ate Skittles, or anything else sweet, all day long.  Petitioner noted that he was given Zyprexa, a drug used for acute and maintenance treatment of schizophrenia and related psychotic disorders.  He started out on 10 mg. of Zyprexa on June 24, 2004.  Within a matter of two weeks, he was receiving the maximum dosage of 40 mg. per day.

The record in this case reveals that the issue of whether Petitioner was competent to stand trial was a major concern at trial, and the trial court went to great lengths to make sure that he was competent before going forward with the  trial.  There was no doubt at the time of trial that he suffered from schizophrenia, but his condition did not mean that he was incompetent to stand trial.  "A defendant can be both mentally ill and competent to stand trial." *Mays v. Stephens*, 757 F.3d 211, 216

(5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015).   On direct appeal, the TCCA addressed Petitioner's claim that he was not competent at the time of his trial as follows:

> In April 2004, defense counsel and the prosecutor both filed motions requesting that [Petitioner] be examined to determine his competency to stand trial.   The trial court ordered two psychologists to examine and evaluate [Petitioner] for competency, both of whom subsequently filed reports determining [Petitioner] to be incompetent to stand trial.   On June 16, 2004, the trial court, having considered the psychological reports, found [Petitioner] to be incompetent to stand trial and ordered him to be committed to the Texas Department of Mental Health and Mental Retardation—Vernon Campus for restoration to competency.   In late July 2004, [Petitioner] was returned to Grayson County.   A report that [Petitioner] was competent was filed by Dr. Joseph Black, Chief Psychiatrist for the Competency Program at the Vernon Campus, with copies for both parties.   At trial in February 2005, after the State rested, defense counsel moved for a directed verdict because the trial court had proceeded to trial without determining that [Petitioner's] competency had been restored.   The trial court overruled [Petitioner's] motion for a directed verdict, and found, pursuant to Article 46B.084 and after having taken judicial notice of Dr. Black's report, that [Petitioner] was competent to stand trial.
> . . .
>
> [D]efense counsel specifically told the trial court he was not claiming [Petitioner] was not competent to stand trial.   Without an objection or a claim of incompetency, the trial court was authorized to make the determination of competency as directed by Art 46B.084(a).
>
> Point of error seven is overruled.

*Thomas v. State*, 2008 WL 4531976, at *13-14 (footnotes omitted).

The issue was raised again in the state habeas corpus proceedings in claim number fifteen.   1 SHCR 152-54.[1]   In claim sixteen, Petitioner also claimed that his attorney was ineffective on this issue. 1 SHCR 154-58.   In response, defense counsel and other members of the defense team, as well as the prosecutors, filed affidavits with the state habeas court.

Lead counsel R. J. Hagood filed two affidavits.   In his first affidavit, dated June 13, 2007, he stated: "We should have filed an objection to the competency report and should have urged a new competency hearing.   When the State rested its case and I was asked whether the defense wanted to raise an incompetency issue in the middle of the trial and I said no I do not have any new evidence regarding competency."   2 SHCR 495 (¶ 10).   The second, dated November 30, 2007, provided the following response to this issue:

---

[1]"SHCR" refers to the state habeas clerk's record preceded by the volume number and followed by the page number.

> [Petitioner] claims in his fifteenth ground that [he] was incompetent to stand trial. In his sixteenth ground he claims that he received ineffective assistance of counsel because we did not request a new competency hearing. The reason for this was simple: [Petitioner] was not incompetent when we begun his trial. Although heavily medicated and still suffering from mental illness, I was able to talk to [Petitioner] and discuss the case with him. [Petitioner] was able to participate in our conversations and help me with his defense. In fact, based on some of our conversations and [Petitioner's] ability to recall events and make suggestions, there was no question at that time that [Petitioner] was competent to stand trial. The trial court specifically asked me if I was claiming incompetency. I avoided the question as much as I could, but eventually had to tell the judge that we were not challenging competency at that time because I had no new evidence to dispute the findings at Vernon or suggest [Petitioner] was incompetent. Although I will work diligently for my clients, I will not lie to the court or file motions, the basis of which I know are not true.

6 SHCR 2145-46. In the remainder of this section of his affidavit, counsel noted that Ms. Schade disagreed with his assessment, but he expressed the opinion that her vehement beliefs against the death penalty clouded her judgment. *Id.* at 2146.

Co-counsel Bobbie Peterson also filed two affidavits. In her second affidavit, she specified that she "never stated that [she] believed [Petitioner] was incompetent. Although heavily medicated and completely disinterested in the proceeding, under the limited definition of competency in Texas, I cannot say with certainty that he was incompetent." 6 SHCR 2163 (¶ 14).

Mitigation specialist Shelli Schade provided the following observations about Petitioner's competency in her affidavit:

> 12. [Petitioner's] ability to assist me was severely limited. He always had mittens on and was in a glass cell, on display twenty-four hours a day. He was extremely depressed. He was very childlike, quiet and sad, and it was not easy to start a conversation with him. He did not understand what we needed and could not identify or help locate witnesses. I know [Petitioner] was on a maximum dose of drugs before and during trial.

> 17. I heard they were giving [Petitioner] a high dose of a new drug, a psychotropic. I could tell he was drugged because he had such a flat affect, he was child-like and soft spoken, and did not make a lot of eye contact. [Petitioner] had been maintained on the drug for months.

1 Supp. SHCR 24, 25.

Leah Eastep, a legal assistant to the defense, stated that "Petitioner was on the maximum dosage of Zyprexa during the trial and wore leg braces during court. During the trial, he ate only [S]kittles, or anything sweet, all day long." 2 SHCR 432 (¶ 37).

10

Lead prosecutor Joseph Brown responded to the claim Petitioner was incompetent as follows in his affidavit:

> 9.      [Petitioner] claims in his fifteenth ground that he was incompetent to stand trial.  In his sixteenth ground he claims that he received ineffective assistance of counsel because defense counsel did not request a new competency hearing.  I personally observed [Petitioner] during trial.  Although he was medicated, he was able to communicate with his attorneys and the court.  He was not actively psychotic.  The trial court specifically asked Mr. Hagood if [Petitioner] was claiming incompetency.  Mr. Hagood told the judge that they were not challenging competency at that time because he had no new evidence to dispute the findings at Vernon Hospital or suggest that [Petitioner] was incompetent.  Had I believed that [Petitioner] was incompetent, I myself would have recommended that the court hold a hearing.

7 SHCR 2340.

The final relevant affidavit before the state trial court was provided by Kerye Ashmore, the second chair for the prosecution, who gave the following statement:

> [Petitioner] claims in his fifteenth ground that he was incompetent to stand trial.  In his sixteenth ground he claims that he received ineffective assistance of counsel because defense counsel did not request a new competency hearing.

> [Petitioner] was evaluated by three experts retained by the State after his obtaining competency at Vernon State Hospital.  None of those experts in any way suggested that [Petitioner] was anything but competent to stand trial.

> More importantly, I asked defense psychiatrist, Dr. Gripon, whether [Petitioner] was competent to stand trial during Gripon's testimony in front of the jury.  His response was an unequivocal 'yes.'[2]

> It is difficult to understand now how [Petitioner] maintains that he was not competent to stand trial when even the defense's own star expert psychiatric witness indicated that he was.

6 SHCR 2327 (¶ 12).  He likewise specified that he would have recommended a hearing if he had believed that Petitioner was incompetent.  *Id.* at 2328 (¶ 13).

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact:

> 91.      Dr. Gripon's testimony that [Petitioner] was competent at the time of trial was credible.

---

[2]36 RR 101.

90.[3]    Initially, [Petitioner] was found incompetent and sent to Vernon State Hospital for treatment. [] [Petitioner] was returned to Grayson County to stand trial after doctors at Vernon State Hospital found that he was then competent to stand trial. []

91.    No second claim of competency was raised.

92.    The trial court specifically asked Mr. Hagood if [Petitioner] was claiming incompetency. Mr. Hagood told the judge that [Petitioner] was not challenging competency at that time.

93.    The trial court on at least one occasion addressed [Petitioner] directly and asked him a question regarding Ms. Peterson (Cate's) representation. Ms. Cate had told the court that she had explained to [Petitioner] that while Ms. Peterson (Cate) was a prosecutor she had worked on a case against [Petitioner], that he understood and wished Ms. Peterson (Cate) to continue as co-counsel. ([7 RR 4-5]). This court did not observe [Petitioner] to be incompetent.

94.    At no time did Ms. Peterson (Cate) suggest that [Petitioner] was unable to understand her.

95.    During trial, [Petitioner] was treated for his schizophrenia with an antipsychotic drug called Zyprexa. As is widely recognized, antipsychotic drugs can have a "sedation-like" effect, and in severe cases, may affect thought processes. *Riggins v. Nevada*, 504 U.S. 127, 143 (1992) [].

96.    As Mr. Hagood explains, the defense team should have objected to the competency when [Petitioner] returned from the state hospital. [] While his attorney recognized that the report should have been objected to, the defense team did not object to the findings.

97.    Defendant was competent to stand trial.

10 SHCR 3539-40 (some citations omitted as indicated by brackets).

The state trial court went on to issue the following conclusions of law:

45.    In ground 15, [Petitioner] claims that he was denied due process because he was not competent to stand trial. This ground was not objected to at trial and has been waived. In *Ex parte Bagley*, 509 S.W.2d 332, 334 (Tex. Crim. App. 1974), the Court of Criminal Appeals held that "the failure of petitioner, as defendant, to object at trial, and to pursue vindication of a constitutional right of which he was put on notice on appeal, constitutes a waiver of the position he now asserts" on a writ of habeas corpus; *see also Ex parte Boyd*, 58 S.W.3d 134, 136 (Tex. Crim. App. 2001) (citing *Bagley* and noting that "[o]rdinarily, the writ of habeas corpus may not be used to litigate matters that could have been raised at trial and on direct appeal").

46.    Under Texas law, [Petitioner] was competent to stand trial.

47.    A person is legally incompetent to stand trial if he lacks either (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding

---

[3]It is noted that the state court findings are misnumbered.

or (2) a rational as well as factual understanding of the proceedings against him. *See* Tex. Code Crim. Proc. Ann. art. 46.02 §§ 1A (Vernon Supp. 2001); *Moore v. State*, 999 S.W.2d 385, 392 (Tex. Crim. App. 1999); *Guzman v. State*, 923 S.W.2d 792, 795 (Tex. App. - Corpus Christi 1996, no pet.). Evidence of mental impairment alone does not require a competency hearing where no evidence indicates that a defendant is incapable of consulting with counsel or understanding the proceedings against him. *Townsend v. State*, 949 S.W.2d 24, 26-27 (Tex. App. - San Antonio 1997, no pet.) (evidence that defendant was depressed and suicidal did not warrant an incompetency hearing); *Lingerfelt v. State*, 629 S.W.2d 216 (Tex. App. - Dallas 1982, pet. ref'd) (testimony from psychiatrist that defendant suffered from schizophrenia did not warrant a competency hearing). Generally, to raise the issue of incompetency, there must be evidence of recent severe mental illness or bizarre acts by the defendant or evidence of moderate retardation. *Guzman v. State*, 923 S.W.2d 792, 797-98 (Tex. App. - Corpus Christi 1994, no pet.).

48.     The record does not support [Petitioner's] claim that he was incompetent to stand trial or that his attorney was ineffective for failing to raise the competency issue a second time.

49.     [Petitioner] has failed to prove that he was incompetent to stand trial or that his attorney was ineffective for failing to raise the competency issue a second time.

10 SHCR 3572-73. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

The analysis of the present ground for relief must begin with the fact that Petitioner did not raise the competency issue when the trial began or at any time during the trial. The TCCA on direct appeal observed that "counsel specifically told the trial court he was not claiming [Petitioner] was not competent to stand trial." *Thomas v. State*, 2008 WL 4531976, at *14. In the state habeas proceedings, the trial court made the conclusion of law that the ground was not objected to and was waived. 10 SHCR 3572 ¶ 45. The TCCA adopted the trial court's findings and conclusions in denying relief.

The Director argues that the competency claim is procedurally defaulted in light of the decisions issued by the state courts. The procedural default doctrine was announced by the Supreme Court in *Coleman v. Thompson*, 501 U.S. 722 (1991). The Court explained the doctrine as follows:

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

13

*Id.* at 750. Applying this principle, the Fifth Circuit has held that the "procedural-default doctrine precludes federal habeas review when the last reasoned state-court opinion addressing a claim explicitly rejects it on a state procedural ground." *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004) (citation omitted), *cert. denied*, 543 U.S. 1124 (2005). With this in mind, the Fifth Circuit has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent ground that procedurally bars federal habeas review of a petitioner's claims. *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir.), *cert. denied*, 551 U.S. 1193 (2007); *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005), *cert. denied*, 548 U.S. 925 (2006); *Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir. 2000) ("[T]he Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims, and is therefore an adequate procedural bar."), *cert. denied*, 532 U.S. 915 (2001). The state habeas court explicitly rejected the competency claim because Petitioner did not object to it at trial. Petitioner made no attempt to overcome the procedural default by demonstrating either cause and prejudice or a fundamental miscarriage of justice; thus, the claim in procedurally defaulted. *See Turner*, 481 F.3d at 301.

In the alternative, the state habeas court considered the claim on the merits and found that Petitioner was competent. It is abundantly clear that the Constitution "does not permit trial of an individual who lacks 'mental competency.'" *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (citing *Dusky*, 362 U.S. at 402). The test for competence is (1) whether the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Id.* The test on collateral review is "whether, in light of what was then known [by the state trial court], the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial." *Drope v. Missouri*, 420 U.S. 162, 174-75 (1975). A state court's factual finding of competency is presumed to be correct. *Deville v. Whitley*, 21 F.3d 654, 656 (5th Cir.), *cert. denied*, 513 U.S. 968 (1994).

In the present case, the trial court was clearly concerned with the issue of Petitioner's competency. The trial court had him sent to Vernon State Hospital when told that he was incompetent.

The trial was begun only after doctors at Vernon State Hospital informed the trial court that he had been restored to competency. During the trial, the judge specifically asked Mr. Hagood if he was claiming that Petitioner was incompetent. The trial continued because Mr. Hagood said that he was not challenging competency at that time. The trial court fulfilled its responsibility of inquiring into the issue of whether Petitioner was competent.

Moreover, the finding that Petitioner was competent was supported by the record before the state court. First of all, Petitioner was returned to Grayson County from Vernon State Hospital after Dr. Black found that he was competent. Dr. B. Thomas Gray, a clinical psychologist, reported that Petitioner had been diagnosed as "malingering" and that it was "possible he may engage in gestures or behaviors, including possibly those involving self-harm, in a bid to appear more seriously mentally ill than he is, and to avoid the consequences of the current charges he faces." 3 SHCR 894. Petitioner's own expert, Dr. Gripon, testified that he was competent. 36 RR 101. Petitioner's lead counsel, R. J. Hagood, specified that Petitioner was not incompetent when the trial began. Although heavily medicated, Petitioner was able to talk to his attorney and discuss the case with him. Counsel stressed that Petitioner was able to participate in conversations and help with the defense. He added that Petitioner had the ability to recall events and make suggestions. Counsel was of the opinion that "there was no question at that time that [Petitioner] was competent to stand trial." 6 SHCR 2146. Co-counsel Peterson likewise stated that she was of the opinion that he was competent. Similarly, the prosecutors were of the opinion that he was competent. Petitioner attempts to counter this evidence by citing the opinions of Leah Eastep and Shelli Schade. He has not, however, rebutted the finding of fact that he was competent with clear and convincing evidence. With respect to the conclusion of law that Petitioner was competent, he at best has only shown that fairminded jurists could disagree about the correctness of the state court's decision; thus, the decision was not unreasonable. *Coleman v. Thaler*, 716 F.3d 895, 902 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1306 (2014). Overall, with respect to the first ground for relief, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted

in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The first ground for relief is procedurally defaulted and, in the alternative, lacks merit. Petitioner also failed to overcome § 2254(d). All relief should be denied.

**Claim Number 2:** **Defense counsels' failure to move for a competency hearing following Petitioner's return from Vernon State Hospital was constitutionally ineffective.**

Petitioner's second ground for relief is a continuation of his first ground for relief. This time, he alleges that his attorney was ineffective for failing to move for a competency hearing when he returned to Grayson County from the state mental hospital.

Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687. Under the first prong, he must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 690. Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In the present case, although counsel indicated, and the state court found, that counsel should have raised the issue of competency a second time when Petitioner was returned from Vernon State Hospital, the fact remains that counsel did not have a basis for raising the issue. Dr. Black found that Petitioner's competency had been restored. Dr. Gray observed that Petitioner was found to be

16

malingering, and lead counsel Hagood was of the opinion that he was not incompetent when the trial began. Mr. Hagood further specified that during the course of the trial he "had no new evidence to dispute the findings at Vernon or suggest [Petitioner] was incompetent." 6 SHCR 2146. Even though Petitioner was suffering from schizophrenia, the case law was clear at the time of trial that the "presence or absence of mental illness or brain disorder is not dispositive" of competency. *See Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000). *See also Patterson v. Cockrell*, 69 F. App'x 658, at *4-6 (5th Cir.), *cert. denied*, 540 U.S. 1008 (2003). "A defendant can be both mentally ill and competent to stand trial." *Mays*, 757 F.3d at 216. In light of counsel's opinion that Petitioner was not incompetent and there was no new evidence to support a claim of incompetency, his representation was not deficient for failing to raise the issue. Counsel appropriately explained in his affidavit that "[a]lthough I will work diligently for my clients, I will not lie to the court or file motions, the basis of which I know are not true." 6 SHCR 2146. The case law is abundantly clear that counsel was not required to make frivolous or futile motions or objections. *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002), *cert. denied*, 538 U.S. 926 (2003); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990). Petitioner has not shown that counsel's representation was deficient because he failed to raise the competency issue a second time at the beginning of the trial. Moreover, in light of the conclusion in the first ground for relief that Petitioner was competent, Petitioner cannot show that he was prejudiced by counsel's failure to file a motion for a competency hearing. He has not satisfied either *Strickland* prong.

In addition to the foregoing, the claim should be rejected in light of the findings by the state court. The state habeas court issued the following two conclusions of law in response to Petitioner's claim that his attorney was ineffective for failing to move for a competency hearing:

48. The record does not support [Petitioner's] claim that he was incompetent to stand trial or that his attorney was ineffective for failing to raise the competency issue a second time.

49. [Petitioner] has failed to prove that he was incompetent to stand trial or that his attorney was ineffective for failing to raise the competency issue a second time.

10 SHCR 3572-73. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner argues in his reply that the affidavits of Hagood, Peterson, Eastep and Schade were sufficient for the state court to find that he did not understand the charges against him and was unable to communicate effectively with counsel. He argues that there was more than enough evidence before the state court to establish prejudice for his attorneys' failure to raise the issue of competency. Nonetheless, there was abundant evidence to support the state court's findings. Petitioner has not satisfied his burden of rebutting the presumption of correctness that must be accorded to the state court's findings of fact with clear and convincing evidence, as required by 28 U.S.C. § 2254(e)(1). With respect to the state court's conclusions of law, Petitioner at best has only shown that fairminded jurists could disagree about the correctness of the state court's decision; thus, the decision was not unreasonable. *Coleman*, 716 F.3d at 902. Overall, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Finally, in the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded state court decisions, which has been referred to as "doubly" deferential. *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 102. *Also see Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir.), *cert. denied*, 134 S. Ct. 393 (2013). Petitioner has not satisfied his burden of overcoming the "doubly" deferential standard that must be accorded to counsel in conjunction with § 2254(d). He has not shown that he is entitled to relief based on ineffective assistance of counsel. The second ground for relief lacks merit.

**Claim Number 3:** **Race dynamics pervaded every aspect of Petitioner's trial in violation of the Sixth and Fourteenth Amendments.**

In his third ground for relief, Petitioner asserts that race dynamics pervaded every aspect of his trial in violation of the Sixth and Fourteenth Amendments. He supports the claim by observing that he is an African-American man convicted of murdering his estranged Caucasian wife, their son, and her mixed-race daughter by another man. It should be noted that he was actually convicted only of the capital murder of thirteen month old Leyha Marie Hughes. He complains that he was convicted by an all-white jury. He stressed that four of the jurors stated that they opposed interracial marriages.

In support of the claim, Petitioner discussed the history of racism in Grayson County. He placed special emphasis on the lynching of an African-American man 77 years earlier who had been accused of raping a white woman. In both his state and federal petitions, he relied on little more than studies and statistics, along with anecdotal stories. He argues that the studies "support the common-sense assertion that the fact that [Petitioner] is African-American and the victims were white and mixed-race had an influence on the outcome of the trial." *See* petition, page 49.

In evaluating the claim, the most noteworthy aspect of the ground for relief is that Petitioner relies on an incident that occurred 77 years earlier, along with generalized studies and statistics - none of which gives rise to an inference that racism played any role in this case. The claim is conclusory, which does not support a petition for a writ of habeas corpus. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000); *Koch*, 907 F.2d at 530; *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("We are thus bound to re-emphasize that mere conclusory allegations do not raise a constitutional issue in a habeas proceeding."). He also claims that his rights under the Sixth and Fourteenth Amendments were violated, but he failed to cite any case law in support of this allegation. By comparison, the Director appropriately observed that the type of approach being employed by Petitioner was rejected in *McClesky v. Kemp*, 481 U.S. 279 (1986). In order to establish an equal protection violation, Petitioner "must prove that the decisionmakers in *his* case acted with a discriminatory purpose." *Id.* at 292 (emphasis in original). The Supreme Court held that it would not "infer" a discriminatory purpose on the part of the State; thus, the equal protection claim was rejected.

*Id.* at 299. In the present case, Petitioner's conclusory allegations that race dynamics pervaded every aspect of his trial fares no better. He has not shown that the decision makers in his case acted with a discriminatory purpose. He has not shown that he is entitled to relief on this claim.

In addition to the foregoing, the ground for relief should be denied for reasons provided by the state habeas court. The ground for relief was presented as ground number seventeen in the state habeas corpus proceedings. The trial court gave the following reasons for rejecting the claim:

50. Under ground 17, [Petitioner] does not actually state an error upon which he could receive relief.

51. [Petitioner] did not make an objection at trial regarding ground 17 and has waived this issue.

10 SHCR 3573. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

The second reason articulated by the state court concerns the contemporaneous objection rule, which was fully discussed on pages 13-14 of this opinion. Petitioner has made no attempt to overcome the procedural default by demonstrating either cause and prejudice or a fundamental miscarriage of justice; thus, the claim is procedurally defaulted. *See Turner*, 481 F.3d at 301.

The first reason articulated by the state habeas court is essentially the same as this Court's analysis. The state court found that he "does not actually state an error upon which he could receive relief." 10 SHCR 3573. Similarly, this Court has found that he has offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller*, 200 F.3d at 282; *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011. Petitioner simply has not shown that he is entitled to relief on this claim. Furthermore, he has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Overall, Petitioner has not shown that he is entitled to relief on his third ground for relief.

**Claim Number 4:**     **Petitioner's jury was selected in a racially discriminatory manner in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.**

**Claim Number 5:**     **The Defense's failure to challenge the State's jury shuffle and disparate questioning of the only African American venire member to make it to voir dire constituted ineffective assistance of counsel under the Sixth and Fourteenth Amendments.**

In claim number four, Petitioner asserts that the State's request for a jury shuffle in his case was made with the intent to remove African-Americans from the portion of the venire most likely to be presented for individual voir dire. He further asserts that the State's disparate questioning of the only African-American venire member reached during voir dire (as a result of the jury shuffle) similarly violated his constitutional rights. He argues that separately and in combination, these actions by the State violated his rights under the Sixth and Fourteenth Amendments to an impartial jury and equal protection. In claim number five, Petitioner argues that trial counsel's failure to object to the State's request to shuffle and the disparate questioning was constitutionally ineffective. He added that the failure to object precluded the errors from being raised on direct appeal, which prejudiced him.

The analysis of this claim begins with the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986). The Court held that the Equal Protection Clause forbids the State from challenging potential jurors solely on the basis of their race. *Id.* at 89. Under *Batson*, a defendant must establish a prima facie case that the State exercised its peremptory challenges on the basis of race. *Id.* at 96. Once the defendant has established a prima facie case of discrimination, the burden shifts to the State to provide a race-neutral reason for each strike. *Id.* at 97. The trial court then makes a determination of whether the defendant has established purposeful discrimination. *Id.* at 98. A state court's finding of the absence of discriminatory intent is "a pure issue of fact" that is accorded great deference and will not be overturned unless clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991).

The Supreme Court analyzed the State's use of jury shuffles in the context of *Batson* in *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322 (2003). Texas provides that either party, based solely upon visual inspection of the venire, may request the court to shuffle or randomly reseat the entire panel. *See* Tex. Code Crim. Proc. art. 35.11. Both the State and the defendant have the absolute right

to one jury shuffle. *Smith v. State*, 648 S.W.2d 695, 696 (Tex. Crim. App. 1983). In *Miller-El I*, the Supreme Court held that "the prosecution's decision to seek a jury shuffle when a predominant number of African-Americans were seated in the front of the panel, along with its decision to delay a formal objection to the defense's shuffle until after the new racial composition was revealed, raise[d] a suspicion that the State sought to exclude African-Americans from the jury." 537 U.S. at 346. The Supreme Court noted, however, that the jury shuffle alone "might not be denominated as a *Batson* claim because it does not involve a peremptory challenge." *Id.* A reviewing court's role is to "determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary." *Id.* at 341. The case was remanded for further development.

In *Miller-El II*, the Supreme Court reiterated its finding in *Miller-El I* that a prosecutor's request to shuffle a jury when a predominant number of African-Americans were seated near the front of the panel "raise[d] a suspicion that the State sought to exclude African-Americans from the jury." 545 U.S. at 253-54. The Court went on to hold that where the State fails to offer any racially neutral reason for shuffling the jury, "nothing stops the suspicion of discriminatory intent from rising to an inference." *Id.* at 254. Overall, the Court found three factors supported a finding that the State violated *Batson*: (1) the prosecution's use of the jury shuffle when members of a protected class are disproportionately seated near the front of the venire, (2) disparate questioning, and (3) evidence of official office policy or long-standing customs systematically excluding a protected class from juries. *Id.* 253-66.

More recently, the Fifth Circuit discussed the use of jury shuffles in the context of the *Miller-El* line of cases in *Fields v. Thaler*, 588 F.3d 270 (5th Cir. 2009), *cert. denied*, 562 U.S. 901 (2010). In *Fields*, unlike *Miller-El*, all courts rejected the *Batson* claim. The Fifth Circuit distinguished the cases as follows:

> Although Fields, like Miller-El and Reed, was tried in Dallas County, the similarities end there. Fields's trial took place in Dallas County in October 2002, long after the trials of Miller-El and Reed in 1986 and 1983, respectively. *See Miller-El I*, 537 U.S. at 328, 123 S.Ct. 1029; *Reed*, 555 F.3d at 366, 371. There is no evidence that the now infamous Sparling Manual, outlining the reasoning for excluding minorities from jury service, was still in use by Dallas County

prosecutors when Fields's case was tried. *See Miller-El II,* 545 U.S. at 264, 125 S.Ct. 2317; *Reed,* 555 F.3d at 382. There were no jury shuffles like the ones found to have been used for discriminatory reasons in Miller-El's case. *See Miller-El II,* 545 U.S. at 254, 125 S.Ct. 2317. There were no "trick" questions by the prosecutor, *id.* at 261, 125 S.Ct. 2317, and the prosecutor did not use different "scripts" for jurors of different races. *Id.* at 255-57, 125 S.Ct. 2317. The transcript of the voir dire examination in Fields's case indicates that the prosecutor asked nearly identical questions of all of the prospective jurors. The trial judge, noticing that the prosecutor had peremptorily struck all five of the blacks remaining after agreed strikes, invited defense counsel to make a *Batson* challenge. When the prosecutor said that he struck Randy Williams because of gold teeth and gold chains, the trial judge pressed the prosecutor for further explanation as to why his reasons for the strike were not racially motivated. Fields's counsel was invited to cross-examine the prosecutor after the prosecutor gave his reasons, but declined, and only challenged the prosecutor's reasons for striking Green, Williams, and Peterson. In sum, the strongest evidence of racial discrimination in this case is the fact that the prosecutor struck all five of the blacks remaining in the venire after challenges for cause and agreed strikes. Although that is indeed convincing statistical evidence, *see Miller-El II,* 545 U.S. at 241, 125 S.Ct. 2317, it is not enough to support the granting of habeas relief, where the habeas petitioner fails to rebut the State's race-neutral reason for striking a juror.

*Id.* at 281. The Fifth Circuit found that the state court's decision that a prospective juror was not peremptorily struck because of her race was not an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.*

With the case law in mind, the analysis of claim number four should begin with a comparison of the claim as it was presented in the state habeas proceedings to the way it has been presented in the present proceedings. Claim number four was presented as claim number eighteen in the state habeas corpus proceedings. Petitioner argued only that the State's jury shuffle violated his rights under the Sixth and Fourteenth Amendments. In the present proceeding, Petitioner's claim goes beyond a complaint about the State's shuffle to include complaints about the State's allegedly disparate questioning of African-American venire members.

Petitioner's embellishment of the claim raises exhaustion issues. State prisoners bringing petitions for a writ of habeas corpus are required to exhaust state remedies before proceeding in federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective. 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a state prisoner must "fairly present" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1981). This means that a petitioner must have informed the state court system of the same facts and legal theories upon which he bases his assertions in his federal habeas petition. *Id.* at 276-77; *Dispensa v.*

*Lynaugh*, 847 F.2d 211, 217-18 (5th Cir. 1988). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (citation omitted). "It is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Rather, the petitioner must have presented the substance of his federal constitutional claim to the state courts. *Id.; Picard*, 404 U.S. at 513. The state court must have been apprised of all of the facts and legal theories upon which the petitioner bases his assertions. *Picard*, *supra*; *Dispensa*, 847 F.2d at 217; *Rodriguez v. McKaskle*, 724 F.2d 463, 466 (5th Cir.), *cert. denied*, 469 U.S. 1039 (1984). Where a petitioner makes the same legal claim to a federal court which he presented to the state courts, but supports that claim with factual allegations which he did not make to the state courts, he has failed to satisfy the exhaustion requirement. *Rodriguez*, 724 F.3d at 466; *Burns v. Estelle*, 695 F.2d 847, 849 (5th Cir. 1983). In Texas, all claims must be presented to and ruled on by the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985); *Deters v. Collins*, 985 F.2d 789, 797 (5th Cir. 1993). When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in the Fifth Circuit have dismissed the entire petition for failure to exhaust. *Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (*en banc*).

As a result of *Coleman*'s procedural default doctrine, federal courts have dismissed unexhausted claims in a mixed petition as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). *See also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims would be procedurally barred because if a petitioner attempted to exhaust them in state court they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642. The Fifth Circuit has held that the procedural bar contained in Tex. Code Crim. Proc. Ann art. 11.071 § 5 is an adequate state ground for finding procedural bars in light of decisions by the Texas Court of Criminal Appeals. *Ibarra v. Thaler*, 691 F.3d 677, 684-85 (5th Cir. 2012); *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010), *cert. denied*, 564 U.S. 1006 (2011). The procedural bar

may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Fearance*, 56 F.3d at 642 (citing *Coleman*, 501 U.S. at 750-51).

In the present case, Petitioner extended claim number four to include complaints about the State's allegedly disparate questioning of African-American venire members. The new arguments were not presented to the state courts and are unexhausted. Petitioner made no attempt to overcome the procedural default by demonstrating either cause and prejudice or a fundamental miscarriage of justice; thus, his allegation that the State engaged in disparate questioning of African-American venire members is procedurally defaulted.

The portion of claim number four that is exhausted and is properly before the Court is Petitioner's complaint that the State's jury shuffle violated his rights under the Sixth and Fourteenth Amendments. Petitioner acknowledges, however, that he did not object to the jury shuffle at trial; thus, the issue was not preserved for review on direct appeal. In the state habeas corpus proceedings, the trial court made a finding of fact that Petitioner did not object to the shuffle. 10 SHCR 3536 (¶ 69). The trial court went on to issue the conclusion of law that he did not object to the jury shuffle and that he waived his rights regarding the issue. 10 SHCR 3574 (¶ 56). The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and its own review. *Ex parte Thomas*, 2009 WL 693606, at *1. The ground for relief was procedurally defaulted in light of the contemporaneous objection rule. Petitioner made no attempt to overcome the procedural default by demonstrating either cause and prejudice or a fundamental miscarriage of justice; thus, the claim must be rejected as procedurally defaulted.

Despite the waiver, the state habeas court, in the alternative, discussed the claim on the merits. The issue was fully developed in the state habeas corpus proceedings. Affidavits from all of the attorneys addressed the issue. While the first affidavits from both defense counsel indicated that they remember some minorities in the first three rows, neither states with any certainty how many. 2 SHCR 496 (¶ 14) (Hagood); 1 Supp. SHCR 10 (¶ 16) (Peterson). Petitioner's reply includes both a pre-shuffle and post-shuffle seating chart. *See* reply, pages 25-26. The pre-shuffle seating chart shows

two African-Americans in the first row, while the post-shuffle shows no African-Americans in the first row. In his second affidavit, lead counsel Hagood states that his "recollection of the original panel was that there was many younger people in the front of the panel as well as several people who had the appearance of those who might use drugs. It was not surprising that those would have been unacceptable jurors to the State. I was certainly not surprised when the State requested a shuffle nor did I think it was racially motivated." 6 SHCR 2146.

Prosecutor Ashmore explained the decision requesting a shuffle in his affidavit as follows:

The decision to request a shuffle was not based on race. As the jury was seated, my recollection is that there might have been two black veniremen in [the] first three rows, but I am not sure of the exact number. I do know that there were not "numerous" black veniremen seated early in the original call of the jury. As Mr. Hagood noted in his affidavit, there were a number of "scruffy looking" white veniremen in the first several rows. Mr. Brown and I discussed this fact, and no mention was ever made about attempting to shuffle minorities.

Both Mr. Brown and I thought that there were a number of white veniremen that appeared rough looking and because of this, a shuffle was asked for. I think that I commented that some of the white veniremen looked like they had just come from jail. In any event, trying to adjust the venire as to where minorities may have been seated had nothing to do with the request of the State.

6 SHCR 2328. Lead prosecutor Brown's comments were similar to those expressed by Ashmore: "When the jury panel was first seated, we noticed a relatively large number of jurors in the first few rows were of a rough appearance. I believe that almost all of these rough jurors were white. My memory is that we checked our listings of the criminal histories of the jurors in the front and that a relatively high percentage of jurors in front had criminal histories as opposed to jurors in the back." 7 SHCR 2340 (¶ 10).

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact:

65.    The State timely requested a jury shuffle.

66.    There were more African-Americans in the first one hundred venire men prior to the shuffle.

67.    The State requested the shuffle based on the appearance of several of the venire men in the first one hundred.

68.    There is no evidence that the request for a shuffle was racially motivated.

69. [Petitioner] did not object to the shuffle.

70. As a result of the State's shuffle, only two of the 102 potential jurors questioned during voir dire were African American. Ex. 27 at ¶ 18; R.R. Vo. 23, P. 115.

71. All members of [Petitioner's] jury were white. Ex. 27 at ¶ 18.

72. There was no evidence that the jury's decision was racially motivated.

73. No objection was ever made by [Petitioner] to the purported racial bias of any juror that was seated.

10 SHCR 3536-37.

The state trial court went on to issue the following conclusions of law:

52. [Petitioner] has failed to present by a preponderance of the evidence any proof of purposeful prosecutorial or jury discrimination in his particular case. *County v. State*, 812 S.W.2d 303, 308 (Tex. Crim. App. 1989).

56. [Petitioner] did not object to the jury shuffle and waived any rights under that issue.

57. In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a prosecutor violates a defendant's equal protection rights if he uses peremptory strikes to eliminate members of defendant's race from the jury.

58. Texas Courts have declined to make the broad extension of *Batson* that [Petitioner] seeks. *See Ladd v. State*, 3 S.W.3d 547, 563 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000).

59. [Petitioner] has failed to prove by a preponderance of the evidence any fact which would establish purposeful discrimination by the court and has failed to cite any law which would support the extension of *Batson* to jury shuffle requests. As such, [Petitioner] has also failed to prove by a preponderance of the evidence that his attorneys were ineffective for not object[ing] to the State's request for a jury shuffle.

60. The defense and the state are entitled to a shuffle, if requested.

61. The failure to shuffle when timely requested is reversible error.

62. The requested shuffle did not constitute reversible error.

63. *Batson* does not apply to a jury shuffle.

10 SHCR 3574-75. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Overall, the state habeas court found that the State's request for a shuffle was based on the appearance of several of the venire men in the first one hundred. There was no evidence presented to

27

the court that the shuffle was racially motivated. Petitioner has not overcome the presumption of correctness that must be accorded to these findings by clear and convincing evidence. In conclusion, claim number four must be rejected because it was procedurally defaulted and because it lacks merit.

In claim number five, Petitioner presents claim number four in the context of an ineffective assistance of counsel claim. In the state habeas corpus proceedings, lead counsel Hagood explained that it was his "recollection of the original panel was that there was many younger people in the front of the panel as well as several people who had the appearance of those who might use drugs. It was not surprising that those would have been unacceptable jurors to the State. I was certainly not surprised when the State requested a shuffle nor did I think it was racially motivated." 6 SHCR 2146.

In the aftermath of the *Miller-El* line of cases, the Fifth Circuit dealt with a claim of ineffective assistance for failing to object to a jury shuffle in *Blanton v. Quarterman*, 543 F.3d 230 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009). The Fifth Circuit noted that *Miller-El I* stood for the proposition "that a racially-motivated jury shuffle, along with other factors indicating intent to exclude African-Americans, can 'raise a suspicion' of purposeful discrimination and rebut a prosecutor's race-neutral justification for a peremptory strike." *Id.* at 242. The Fifth Circuit further noted, however, that the jury shuffle alone "might not be denominated as a *Batson* claim because it does not involve a peremptory challenge." *Id.* (quoting *Miller-El I*, 537 U.S. at 346).

*Miller-El I* was decided before the trial began in the present case. As such, the prosecutors and defense counsel were on notice of the decision issued in *Miller-El I*. Nonetheless, the attorneys on both sides agreed that race had nothing to do with the shuffle. Defense counsel stated that he was not surprised that the State requested a shuffle in light of the appearance of people in the front of the original panel. He did not think the request for a shuffle was racially motivated. In light of his impressions, his representation was not deficient for failing to object to the shuffle. It is again noted that counsel was not required to make frivolous or futile motions or objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527. Furthermore, Petitioner cannot show prejudice in light of the state court finding that the shuffle was not racially motivated. The ineffective assistance of counsel claim lacks merit.

In addition to the foregoing, the claim must be rejected for the reasons provided by the state court. In light of the evidence before the state habeas court, the court issued the following specific conclusions of law regarding whether counsel was ineffective on this issue:

> 55.    [Petitioner] has not demonstrated that his counsel's performance fell below a reasonable objective standard, and he has not demonstrated that any alleged error prejudiced his defense.

> 59.    [Petitioner] has failed to prove by a preponderance of the evidence any fact which would establish purposeful discrimination by the court and has failed to cite any law which would support the extension of *Batson* to jury shuffle requests. As such, [Petitioner] has also failed to prove by a preponderance of the evidence that his attorneys were ineffective for not object[ing] to the State's request for a jury shuffle.

10 SHCR 3574-75. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and its own review. *Ex parte Thomas*, 2009 WL 693606, at *1. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. At best, he has only shown that fairminded jurists could disagree about the correctness of the state court's decision; thus, the decision was not unreasonable. Overall, relief should be denied on Petitioner's fourth and fifth grounds for relief.

One last issue should be mentioned regarding the ineffective assistance of counsel claim. In *Miller-El II*, the prosecution's use of the jury shuffle was just one of the factors that led to the conclusion that the State violated *Batson*. A second factor was the State's use of disparate questioning. Petitioner did not raise the disparate questioning aspect of *Miller-El II* in his state application for a writ of habeas corpus, but he added it in the present proceedings. His inclusion of the disparate questioning aspect of *Miller-El II* was not properly exhausted and was procedurally defaulted. Since the pleadings were filed in this case, the Supreme Court decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). The Supreme Court opened the door slightly for a showing of cause and prejudice to excuse the procedural default in *Martinez* and *Trevino*. The Fifth Circuit summarized the rule announced in *Martinez* and *Trevino* as follows:

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014). The Fifth Circuit subsequently reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014).

In the present case, Petitioner's underlying claims of ineffective assistance of trial counsel with respect to the jury shuffle were not substantial. Similarly, his initial state habeas counsel was not ineffective even though he did not include a disparate questioning argument in presenting state claim number eighteen. Petitioner has not satisfied the requirements to overcome the procedural default as set forth in *Martinez* and *Trevino*. Overall, Petitioner is not entitled to relief on either claim number four or claim number five, and the ineffective assistance of counsel claim is not saved by the rule announced in *Martinez/Trevino.*

**Claim Number 6:     The presence of jurors opposed to interracial relationships deprived Petitioner of a fair trial and violated his right to equal protection under the Sixth and Fourteenth Amendments.**

**Claim Number 7:     Defense counsels' failure to inquire into racial prejudice deprived Petitioner of his constitutional right to effective assistance of counsel.**

Claims six and seven involve the interracial dynamics of the case. Prospective jurors were required to fill out lengthy jury questionnaires before voir dire. Petitioner observed that four members of the jury openly admitted in their responses that they "oppose people of different racial backgrounds marrying and/or having children." In claim number six, Petitioner argues that it is highly likely that the self-proclaimed racial biases of these four impaneled jurors "prevent[ed] or substantially impair[ed] the performance of [their] duties . . . in accordance with [their] instructions and [their] oath." Petition at 83 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). In claim number seven, Petitioner argues that his attorney was ineffective for failing to inquire into racial prejudice.

The jury questionnaire mentioned by Petitioner contained the following question:

The Defendant in this case, Andre Thomas, and his ex-wife, Lauren Boren Thomas, are of different racial backgrounds. Which of the following best reflects your feelings or opinions about people of different racial backgrounds marrying and/or having children.

(\_\_\_)  I vigorously oppose people of different racial backgrounds marrying and/or having children and am not afraid to say so.

(\_\_\_)  I oppose people of different racial backgrounds marrying and/or having children, but I try to keep my feelings to myself.

(\_\_\_)  I do not oppose people of different racial backgrounds marrying or being together, but I do oppose them having children.

(\_\_\_)  I think people should be able to marry or be with anyone they wish.

3 SHCR 922 (question 105). The following three jurors and one alternate juror checked either the first or second option: Barbara Armstrong (3 SHCR 941), Charles William Copeland (3 SHCR 964), Marty Glenn Ulmer (3 SHCR 989), and Norma Sue Hintz (3 SHCR 1015). Marty Glenn Ulmer checked the first option while the remaining three checked the second option. The first three individuals served as jurors. Norma Sue Hintz was chosen as an alternate juror and was excused at the close of trial. Petitioner argues that the inclusion of these four people on his jury violated his right to a fair trial and equal protection under the Sixth and Fourteenth Amendments.

The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). The right to an impartial jury consists of nothing more than the quest for "jurors who will conscientiously apply the law and find the facts." *Wainwright*, 469 U.S. at 423; *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due Process means a jury capable and willing to decide the case solely on the evidence before it"); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."). The Supreme Court "firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror." *Georgia v. McCollum*, 505 U.S. 42, 59 (1992). A prospective juror may not be rejected merely because of "the racial stereotypes held by that party." *Id.* Instead, a prospective juror may be excluded if the juror's views would "prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath." *Morgan*, 504 U.S. at 728 (quoting *Wainwright*, 469 U.S. at 424).

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id.* at 729 (citations omitted). "*Voir dire* examination serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). Under the Due Process Clause of the Fourteenth Amendment, a trial court may not deny an African-American defendant the opportunity to question prospective jurors on the subject of racial bias when the circumstances suggest the need for such questioning. *Ham v. South Carolina*, 409 U.S. 524, 527 (1973). Furthermore, a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Turner v. Murray*, 476 U.S. 28, 36-37 (1986). On the other hand, there is no per se rule requiring *voir dire* on racial bias or prejudice in every case in which the defendant and the victim are of different races. *Ristaino v. Ross*, 424 U.S. 589, 596 n.8 (1976). Instead, whether such *voir dire* is necessary requires "an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as (they stand) unsworne.'" *Id.* at 596 (quoting Coke on Littleton 155b (19th ed. 1832)).

The facts of this case reveal that the trial court conducted a lengthy voir dire. Each prospective juror was questioned individually. The attorneys were permitted to question them about racial bias. Of the four jurors in question, the first prospective juror to be questioned was Marty Glenn Ulmer. The record reveals that the trial court and the attorneys questioned him extensively in order to determine whether he should be on the jury. He informed the court that "until I've seen the proof of it, I wouldn't -- I could not form an opinion." 16 RR 11. When questioned by the State, he specified that he had not formed an opinion in this case even though his ex-wife knew Petitioner's mother-in-law. *Id.* at 15-16. He repeatedly specified that he would have to listen to all of the evidence before making up his mind. *Id.* at 17, 19. He stated that he could presume Petitioner to be innocent until proven guilty. *Id.* at 22. He repeatedly stated that he would follow the law. *Id.* at 22, 25, 30.

When questioned by the defense, Ulmer stated that he could say "yes" to imposing the death penalty if the defendant was proven guilty and proven sane. *Id.* at 53. On the other hand, he stated that he would have a hard time sentencing a man to death if there was something wrong with him. *Id.* Defense counsel questioned him about racial bias as follows:

| | |
|---|---|
| MS. PETERSON: | Well, how would -- how do you feel about, if you are sitting on a case where the defendant or a defendant accused of capital murder was a black male, and the victim, his wife, was a white female. |
| VENIREPERSON: | Well, I think -- I think it's wrong to have those relationships, my view, but we are all human beings and God made every one of us. And, you know, as far as -- I don't care if it is white/white, black/black, that don't matter to me. If you've done it, you are a human being, you have got to own up to your responsibility. |
| MS. PETERSON: | So, the color of anyone's skin would not have any impact or bearing upon your deliberations? |
| VENIREPERSON: | No, not according to that, no. |
| MS. PETERSON: | Okay. |
| VENIREPERSON: | Not whether they were guilty or innocent. |
| MS. PETERSON: | Would the race of either the defendant or the victim be something that you would take into consideration in determining, or considering, answering these special issues, or considering either the death penalty or life imprisonment? |
| VENIREPERSON: | No, I wouldn't judge a man for murder or something like that according to something like that, no, I would not. |

16 RR 64-66. Following this exchange, both the State and the defense specified that they were not challenging Ulmer for cause and were accepting him as a juror. *Id.* at 67-68.

The second of the four jurors to be questioned was Barbara Armstrong. The state trial court thoroughly questioned her in order to determine is she was impartial:

| | |
|---|---|
| THE COURT: | Okay. What I am asking you is, can you listen to the evidence in this case and make up your mind based on the evidence, or based on what you've already heard and read, do you think you have already formed an opinion as to his guilt or innocence? |
| VENIREPERSON: | Well, I haven't formed an opinion. But, I mean, all I can go by is just what I've heard. It is just hearsay. . . . |

| THE COURT: | So, what I'm telling you is, whatever you have heard before, whether from friends, or heard about it on the news, or read it in the newspaper, you've got to be able to tell me you can set that aside, not consider that for any purpose, and just make up your mind in this case based on the evidence that you hear in this courtroom if you are chosen as a juror. |
| --- | --- |
| VENIREPERSON: | I think I can do that. |
| THE COURT: | I can't have you just think. |
| VENIREPERSON: | I can do that. |
| THE COURT: | Okay. I apologize for that. Let me get into it before the lawyers have to. We got to be certain in these things. This is a very serious case, obviously, and so, we need to know for sure that you can do that. |
| VENIREPERSON: | I can. |
| THE COURT: | If you can, that's fine. And if you can't, that's fine, but we just need to know. |
| VENIREPERSON: | I can. |

16 RR 127-28.

The attorneys followed-up with an extensive line of questioning to determine whether Armstrong would follow the law and be an impartial juror. After going over the charges against Petitioner, the state prosecutor and Armstrong had the following exchange:

| MR. ASHMORE: | Is there anything in the fact that -- those allegations, where you do not feel like you could apply the law we've gone over in this case? |
| --- | --- |
| VENIREPERSON: | I don't think so. I think I can sit and listen to the evidence. |

16 RR 177. A similar question was posed by Petitioner's co-counsel:

| MS. PETERSON: | And I gather, throughout all of this, and it is my impression that you're going to listen to the evidence and render a verdict -- |
| --- | --- |
| VENIREPERSON: | Of course, I am. I mean, I'm not coming in here with my mind made up or, anything. I have no idea. Yes, I would listen to all of the evidence. |

16 RR 197. Both sides then chose to forego a challenge to Armstrong, and both sides stipulated that they would accept her as a juror. *Id.* at 198.

Christopher Copeland was the next prospective juror to be questioned who had stated that he opposed people of different racial backgrounds marrying and/or having children. The trial court asked him the following questions regarding the issue of impartiality:

| | |
|---|---|
| THE COURT: | Is there anything that you have read or heard about this case previously that would cause you to already have formed an opinion regarding this man's guilt or innocence. |
| VENIREPERSON: | No, sir. |
| THE COURT: | Could you, if chosen as a juror, listen to the evidence from the witness stand and make up your mind based solely upon the evidence that you hear? |
| VENIREPERSON: | Yes. |

16 RR 258. The state prosecutor likewise asked him questions to determine if he would be impartial:

| | |
|---|---|
| MR. BROWN: | Anything you are thinking about -- anything you're thinking that you need to tell us about whether you could serve as a juror in this case? |
| VENIREPERSON: | You know, you just -- you have to listen to both sides. |
| MR. BROWN: | Okay. |
| VENIREPERSON: | You've got to prove he did it. They prove he didn't, whatever, insanity. You know, that's what a jury does, isn't it? They listen to both sides and they make up their mind as to -- |
| MR. BROWN: | You haven't made up your mind on anything yet, have you? |
| VENIREPERSON: | No. |

16 RR 294. He subsequently told defense counsel that he would not make up his mind until he hears both sides of the story. *Id.* at 299. Neither the State nor the defense challenged him for cause, and both accepted him as a juror. *Id.* at 300-01.

The final juror in question was Norma Hintz, the alternate juror who was ultimately excused from jury deliberations. She told the trial court that she had not already formed an opinion regarding the guilt or innocence of Petitioner based on anything she had read in the newspaper or heard. 26 RR 100. She specified that she thought she could make up her mind based just upon the evidence that she would hear in court. *Id.* at 101. She stated that she could follow the law. *Id.* at 118. Neither the State nor the defense challenged her for cause, and both accepted her as an alternate juror. *Id.* at 146.

The record reveals that Petitioner was fully permitted to question the prospective jurors in the quest to obtain an impartial jury. He was accorded all of his rights under the Sixth and Fourteenth Amendments. It is again noted that Petitioner argued that it is highly likely that the self-proclaimed racial biases of these four jurors prevented or substantially impaired the performance of their duties in accordance with their instructions and their oath. Petition at 83. However, his assertion is speculative. He has offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller*, 200 F.3d at 282; *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011. Moreover, apart from being conclusory, the claim must also be rejected because the Supreme Court "firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror. . . 'we may not accept as a defense to racial discrimination the very stereotype the law condemns.'" *McCollum*, 505 U.S. at 59 (citation omitted). A person may not be removed as a juror based merely on "the racial stereotypes held by that party." *Id.* Petitioner had every opportunity to explore whether a prospective juror should be disqualified as impartial under the law. He was accorded all of his rights under the Sixth and Fourteenth Amendments in order to pick an impartial jury. Claim number six lacks merit.

With respect to Petitioner's related ineffective assistance of counsel claim, the Fifth Circuit has found that an "attorney's actions during voir dire are considered to be a matter of trial strategy." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). *See also Seigfried v. Greer*, 372 F. App'x 536, 540 (5th Cir.), *cert. denied*, 562 U.S. 1066 (2010). Competent counsel need not engage in searching investigations of potential jurors during voir dire where no suspicion of juror bias is raised by previous testimony. *See Fuller v. Johnson*, 158 F.3d 903, 907 (5th Cir. 1998), *cert. denied*, 526 U.S. 1133 (1999). Moreover, where the record indicates that trial counsel questioned prospective jurors in detail, a petitioner is not entitled to relief where there is no reasonable probability that further questions would have produced a different result. *Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir.), *cert. denied*, 517 U.S. 1227 (1996). The issue of whether counsel was obligated to explore the jury's racial attitudes when the victim was white and the defendant was African-American was considered by the Fifth Circuit in *Moore v. Maggio*, 740 F.2d 308 (5th Cir. 1984), *cert. denied*, 472 U.S. 1032 (1985). The Fifth Circuit

found that counsel's decision not to bring up the subject of racial bias before the jury "might be considered sound trial strategy" when there was no showing that the trial was attended by any racial animosity. *Id.* at 317-18. More recently, the Fifth Circuit rejected an ineffective assistance of counsel claim based on counsel's failure to question potential jurors about racial bias when there was no showing that counsel should have been aware of racial bias or prejudice among the venire. *Preyor*, 537 F. App'x at 423. The finding was made even though the defendant was African-American and the victim was white. *Id.* at 422. The ultimate inquiry is whether trial counsel's failure to ask questions rendered a defendant's trial fundamentally unfair. *Mu'Min*, 500 U.S. at 425-26. A petitioner must also show that "but for his attorneys failure to inquire into racial bias of prospective jurors, his trial would have reached a different result." *Clark v. Collins*, 19 F.3d 959, 965 (5th Cir. 1994), *cert. denied*, 513 U.S. 966 (1994). A state court's resolution of this issue is presumed correct, and a habeas petitioner must rebut this presumption by clear and convincing evidence. *Varga v. Quarterman*, 321 F. App'x 390, 395 (5th Cir. 2009), *cert. denied*, 558 U.S. 1078 (5th Cir. 2009).

The ineffective assistance of counsel claim was fully developed during the state habeas corpus proceedings. The ineffective assistance of counsel claim was presented as claim number 21 in the state habeas corpus proceedings. Mr. Hagood provided the following response in his affidavit:

> Under [Petitioner's] arguments, no white juror in Grayson County, Texas, would be able to sit in judgment on a black defendant. I do not believe that is the case. I have had many black defendants found not guilty by all-white jurys. I take issue with [Petitioner's] decision to race-bait. It appears that the prosecutors and jurors are being accused of racial prejudice without any basis in the record. [Petitioner] seeks to claim racial discrimination, then speculates and cherry-picks items from the record in order to support the proposition they wish the courts to believe. I believe that this sort of unfounded accusation cheapens the judicial system and threatens the ideology behind all jury trials.
>
> Next, under ground 21, [Petitioner] states that we were ineffective for failing to inquire into the racial bias of each juror. Strategically, I would never ask pointed questions regarding racial bias from a juror without a real basis to do so. Voir dire can be delicate in that you do not want to alienate a juror who may end up on the jury. Accusing someone of racism is a good way to do that. . . . For those jurors who expressed some problem with interracial relationships, either Ms. Peterson or I questioned them to the extent necessary for us to request a strike for cause or make a decision to use a strike against them. Often time, there were much worse jurors upon whom we exercised our strikes.

6 SHCR 2147.

Co-counsel Peterson provided the following response in her affidavit:

18.    Next, under ground 21, [Petitioner] states that defense counsel was ineffective for failing to inquire into the racial bias of each juror. Strategically, I am cautious in asking questions regarding racial bias of each juror so that I do not sound like I am accusing a juror of being racist and angering a potential juror. Nona Dodson had suggested several questions to pose to jurors. Mr. Hagood and I followed some of her advise which, based on many years as a trial attorney, we believed would be useful. We did not take all of her suggestions.

19.    For those jurors who expressed some problem with interracial relationships, either Mr. Hagood or I questioned them to the extent necessary for us to request a strike for cause or make a decision to use a strike against them.

6 SHCR 2163-64. The record makes it clear that the attorneys questioned the prospective jurors extensively to determine whether they should be disqualified. When appropriate, they questioned jurors about racial bias, such as when they questioned Mr. Ulmer. Mr. Hagood observed that there was not any basis in the record of racial prejudice. Petitioner has not shown otherwise. Defense counsels' decision to forego questioning three of the four jurors about racial bias was simply a matter of trial strategy. Counsels' decision not to object to them was likewise trial strategy, particularly when they thought there were worse jurors to strike.

After accumulating all of the evidence necessary to make a decision on these two claims, the state trial court issued the following findings of fact:

71.    All members of [Petitioner's] jury were white.

72.    There is no evidence that the jury's decision was racially motivated.

73.    No objection was ever made by [Petitioner] to the purported racial bias of any juror that was seated.

10 SHCR 3537. Petitioner has not overcome the presumption of correctness that must be accorded to these findings of fact with clear and convincing evidence.

The state trial court also issued the following conclusions of law:

52.    [Petitioner] has failed to present by a preponderance of the evidence any proof of purposeful prosecutorial or jury discrimination in his particular case. *County v. State*, 812 S.W.2d 303, 308 (Tex. Crim. App. 1989).

53.    *Strickland* encompasses the prohibition against second guessing counsel's trial strategy on voir dire. Not every attorney will conduct voir dire in the same manner, and, with hindsight, every attorney may have wished that additional questions were asked. However, the fact that another attorney might have pursued other areas of questioning

during voir dire will not support a finding of ineffective assistance. *See Delrio v. State*, 840 S.W.2d 443, 445 (Tex. Crim. App. 1992); *Owens v. State*, 916 S.W.2d 713, 716 (Tex. App. - Waco 1996).

54. [Petitioner] has failed to overcome the presumption that trial counsel was effective during voir dire questioning. *See Shilling v. State*, 977 S.W.2d 789, 791 (Tex. App. - Ft. Worth 1998, pet. ref'd) (ineffectiveness claim fails where record is devoid of reasoning counsel employed during voir dire); *Sungia v. State*, 733 S.W.2d 594, 600 (Tex. App. - San Antonio 1987, no pet.) (overruling complaint regarding brief voir dire that failed to include certain questions based on absence of indication that trial counsel's decision was unsupported).

55. [Petitioner] has not demonstrated that his counsel's performance fell below a reasonable objective standard, and he has not demonstrated that any alleged error prejudiced the defense.

10 SHCR 3574. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. He made the conclusory claim that the trial court's findings and conclusions on this matter are both unsupported by the evidence and contrary to clearly established law. However, the findings and conclusions are supported by the record and consistent with clearly established law. At best, he has only shown that fairminded jurists could disagree about the correctness of the state court's decision; thus, the decision was not unreasonable. Overall, the Petitioner's sixth and seventh grounds for relief lack merit and should otherwise be rejected because he has not satisfied the requirements of § 2254(d).

**Claim Number 8:       The State withheld evidence that undermined Petitioner's theory of substance-induced psychosis in violation of *Brady v. Maryland*.**

Petitioner next alleges that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Petitioner asserts that he was high on dextromethorphan ("DXM") at the time of the offense. DXM is the active ingredient in Coricidin. The State retained Dr. Shannon

Miller, an expert on DXM. Petitioner claims that Dr. Miller would have provided information favorable to him. He further alleges that the State chose to bury its contacts with Dr. Miller. He alleges that the State violated *Brady* by failing to disclose its information regarding Dr. Miller.

The Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The duty to provide favorable evidence includes impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). In order to prevail on a *Brady* claim, the Fifth Circuit requires a petitioner to show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or innocence. *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008) (citations omitted). "Evidence is 'material' only when there exists 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citing *Bagley*, 473 U.S. at 682). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *West*, 92 F.3d at 1399 (citation omitted). The State in under no duty "to make a complete and detailed accounting to defense counsel of all investigatory work done." *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir.), *cert. denied*, 513 U.S. 1060 (1994).

Petitioner's *Brady* claim was fully developed during the state habeas corpus proceedings. Kerye Ashmore, one of the prosecutors, responded to the claim as follows:

> Dr. Shannon Miller was contacted by me about the possibility of testifying at trial. This contact occurred several months before any type of retainer was paid to him. As best I remember, at the time Dr. Miller was originally contacted, the State was still awaiting the results of evaluation and testing of [Petitioner] by Drs. Scarano, Axelrad and Oropeza. Initially, Dr. Miller indicated that he did not feel that he could be involved in any testing or evaluation of [Petitioner] or testify in his case without being licensed to practice medicine in the State of Texas. He indicated he would expect the State to bear the cost of any such certification and needed to check further on that. For a period of time there was really no discussion between the prosecutors or Dr. Miller concerning his involvement in the case.

Dr. Miller was in possession of the basic facts of the case, including the State's position of what activities demonstrated that [Petitioner] knew his conduct was wrong.

Finally, after paying the retainer fee, Dr. Miller was contacted by Joe Brown and myself. This was during voir dire in this case and after the submission of reports to us (which we in turn provided to the defense) concerning [Petitioner] and to which these experts testified. In talking with Dr. Miller he indicated that the cases that he had dealt with where he had seen psychosis did involve larger amounts of DXM and he questioned whether the amount of DXM in this case could produce a psychosis. However, Dr. Miller indicated that he would not be able to form an opinion concerning [Petitioner], his mental state, his psychosis, the cause thereof, or his sanity unless and until he could perform a complete evaluation of [Petitioner].

It was decided to not do this because of several factors: (1) attendant cost of having Dr. Miler come to Grayson County to evaluate and subsequently to testify, and (2) the fact that [Petitioner] had already been fully tested and evaluated by three expert witnesses the State had already hired. Joe and I felt that [Petitioner] had probably been seen by at least one, probably more than that, defense experts for purposes of evaluation. We felt like [Petitioner] had been seen enough and we doubted that the defense team would allow us to bring another expert in during voir dire in this case to do another evaluation. We therefore indicated to the doctor that we would not be needing further involvement from him.

Dr. Miller was not requested to prepare a report.

Defense attorney R. J. Hagood requested that I meet with him to discuss our expert witnesses and who we anticipated would be called at trial. This was one reason that a decision had to be made concerning Dr. Miller. Therefore, as I remember, the following day I met with Mr. Hagood with the State's list of expert witnesses which had previously been provided to the defense. It was a rather lengthy list, and I was attempting to accommodate the defense request to narrow down the list.

At this meeting, I went through the list of the State's potential expert witnesses and advised Mr. Hagood who I anticipated would in reality be called to testify. During this meeting, I advised Mr. Hagood that the State would not be calling Shannon Miller. Of course, Mr. Hagood inquired as to why and he was advised of the above conversation and reasoning for us not using Dr. Miller. In fact, during this conversation, when I advised Mr. Hagood that Dr. Miller was not going to be used and the reasons for that, Mr. Hagood indicated that did not surprise him as he had been doing a lot of reading, particularly on the Internet, about DXM. He further stated that the position that the drugs did not cause psychosis was going to be the position of defense experts, including Dr. Harrison, at the trial. I took from that that the defense already had expert witnesses who could testify whatever mental problems [Petitioner] may have had prior to and at the time of the murder were not substance induced. Accordingly, it came as no surprise that the defense in fact put this testimony on through expert witnesses.

6 SHCR 2325-37. Mr. Ashmore's statement was consistent with the statements provided by Joe Brown, the lead prosecutor. 7 SHCR 2339-40. Mr. Brown specified that this information was disclosed to the defense team by Mr. Ashmore, although he was not present during the conversation. *Id.* at 2340.

Mr. Hagood, in turn, provided the following statement in his affidavit:

> [P]etitioner claims that the State suppressed *Brady* material. I am unaware of any proof, including that in [Petitioner's] 11.071 writ application and attachments, which establishes that Shannon Miller ever made any finding regarding [Petitioner], much less a finding favorable to [Petitioner]. I recall sitting down with the State prosecutor, Kerye Ashmore, and sorting out which of the State's experts would actually testify, but do not remember the substance of that conversation other than that Miller would not be brought to testify. I have known Mr. Ashmore for a considerable time, and have handled numerous cases which he prosecuted. I have never known Mr. Ashmore to be dishonest or unethical. I have no reason to believe differently based on the supporting information in this 11.071 application.

6 SHCR 2145. Co-counsel Bobbie Peterson likewise stated that she was "unaware of any fact regarding a person named Shannon Miller ever having made a finding regarding [Petitioner], much less a finding favorable to [Petitioner]." 6 SHCR 2162. She further stated that she had never known Mr. Ashmore to withhold *Brady* evidence. *Id.*

Pursuant to an order of the trial court, Dr. Miller also provided a statement. He noted that he was contacted by Joe Brown and Kerye Ashmore. 9 SHCR 3226. He was given basic facts about the case. He advised the prosecutors that he would not be able to form an opinion about Petitioner unless he reviewed records pertaining to that period of time, and he never received the records. *Id.* at 3227. He specified that he never made a diagnosis in the case nor came to any final conclusions about Petitioner. *Id.* He was never asked to prepare a report. *Id.* He was subsequently informed that the case was closed and asked to return any unused portion of the retainer. *Id.*

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact:

> 74. Dr. Miller is a psychiatrist who has written extensively about DXM addiction, is a specialist on the effects of drug addiction, and is certified in addiction medication. *See* Ex. 39.

> 75. In January 2005, the State formally retained Dr. Miller, signed a modified version of his retainer agreement and sent him a retainer check for ten hours work. *See supra*, Part I-I.

> 76. The State Prosecutors telephoned Dr. Miller and recounted the basic facts of the case to him, including the State's position. During that conversation, Dr. Miller preliminarily questioned whether DXM could have played a part in the kind of psychotic episode [Petitioner] experienced on March 27, 2004. State's Resp. to App. for Writ of Habeas Corpus at 23.

> 77. There was no evidence from Dr. Shannon Miller, exculpatory or otherwise.

78. Dr. Shannon Miller states in his affidavit that he did not form an opinion concerning [Petition], his mental state, his psychosis, the cause thereof, or his sanity because he never performed a complete evaluation of [Petitioner] or examined all of the records.

79. Mr. Ashmore's and Mr. Brown's decision was not to use Dr. Miller because of several factors including: (1) the attendant cost of having Dr. Miller come to Grayson County to evaluate and subsequently to testify, and (2) the fact that [Petitioner] had already been fully tested and evaluated by three expert witnesses the State had already hired.

80. The affidavit of J. Kerye Ashmore is credible.

81. The affidavit of Joseph D. Brown is credible.

82. Mr. Ashmore and Mr. Brown believed that [Petitioner] had been seen by enough experts for the State and doubted that the defense team would allow them to bring another expert in during the voir dire in the case to do another evaluation.

83. Dr. Miller was not requested to prepare a report.

84. Mr. Ashmore and Mr. Hagood met to discuss the State's list of expert witnesses which had previously been provided to the defense prior to or during voir dire. Mr. Ashmore went through the list of the State's potential expert witnesses and advised Mr. Hagood who the State anticipated would be called to testify. During this meeting, Mr. Ashmore advised Mr. Hagood that the State would not be calling Shannon Miller. Mr. Hagood inquired as to why and was advised of the reasoning for the State not using Dr. Miller. During this conversation, Mr. Ashmore advised Mr. Hagood that Dr. Miller could not give an opinion without examining the defendant and Dr. Miller indicated the cases he had dealt with generally involved larger doses of DXM.

10 SHCR 3537-38. Petitioner questions the credibility of the State prosecutors, but he failed to overcome the presumption of correctness that must be accorded to the state court findings with clear and convincing evidence. In his reply, he merely characterized Mr. Ashmore's assertions as highly suspect and incredible.

The state trial court went on to discuss the law surrounding *Brady*. After discussing the law, the court issued the following conclusions of law:

40. [Petitioner] has failed to satisfy any of the three prongs set out in *Brady* . . .

41. There was no evidence from Dr. Shannon Miller, exculpatory or otherwise.

42. [Petitioner] has failed to prove that there was any evidence suppressed by the State.

43. [Petitioner] has failed to prove by a preponderance of the evidence that Dr. Miller gave evidence favorable to [Petitioner].

44. [Petitioner] has failed to prove by a preponderance of the evidence the prong regarding materiality and that but for that material evidence the results of his trial would have been different.

43

10 SHCR 3571-72. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

The state court's discussion of the law adhered to clearly established law as determined by the Supreme Court. In light of the evidence before it, the state court appropriately found that none of the three *Brady* prongs were satisfied. Petitioner at best has only shown that fairminded jurists could disagree about the correctness of the state court's decision; thus, the decision was not unreasonable. *Coleman*, 716 F.3d at 902. Overall, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner has not shown that he is entitled to relief on claim number eight.

### Claim Number 9: Defense Counsel's failure to hire an expert in neuropharmacology was constitutionally ineffective.

Petitioner took the position at trial that he was not guilty by reason of insanity. The State took the position that Petitioner either knew right from wrong or that any psychosis he was experiencing at the time of the offense was substance induced. With respect to the latter position, it should be noted that voluntary intoxication under Texas law does not constitute a defense to the commission of a crime. Tex. Penal Code § 8.04(a) & (d). Defense counsels' trial strategy was to prove that Petitioner was insane at the time of the offense, not because of voluntary intoxication, but because of his prior medical and mental history.

In the present claim, Petitioner argues that counsel was ineffective for failing to hire a neuropharmacologist to educate the team prior to trial or to oppose the State's experts at trial. He submitted an affidavit from Dr. Jonathan Lipman, a neuropharmacologist, who specified that he would have been available to the defense team at the time of trial. 2 SHCR 547, ¶¶ 1, 4 ("I am Board Certified in neuropharmacology . . . I was available to consult with the attorneys representing

44

[Petitioner] following his arrest in 2004 and subsequently, and was, in fact, consulting with attorneys in Texas in this period of time."). He asserted that "there was and is no affirmative forensic toxicological support for the view that [Petitioner] was intoxicated by alcohol, marijuana or Coricidin's ingredients at the time of the offenses." *Id.* at 548, ¶ 10. Petitioner argues that if the defense team had hired a neuropharmacologist, like Dr. Lipman, the jury would have heard that his behavior before, during, and after the murders did not resemble intoxication-induced psychosis, but was consistent with paranoid psychotic mental illness. *Id.* at 550, ¶ 15. He further argues that if the defense team had made this argument, then there would have been no basis for the State's experts to offer testimony on the voluntary intoxication theory.

Petitioner notes that instead of calling a neuropharmacologist, counsel called Dr. Edward B. Gripon, a forensic psychiatrist, who addressed the substance-induced psychosis theory. In an affidavit, Dr. Gripon expressed the opinion that "[d]etailed opinions regarding specific pharmacological issues should have been directed to a pharmacologist, i.e., a pharmacist." 2 SHCR 447, ¶ 14.

In response, the Director noted that the Fifth Circuit has held that where a petitioner claims counsel failed to impeach a witness or cast doubt on the credibility of a witness' testimony, then any arguable weakening of the State's evidence must be viewed in light of the totality of the State's evidence. *Leal v. Dretke*, 428 F.3d 543, 549 (5th Cir. 2005), *cert. denied*, 547 U.S. 1073 (2006). The Director proceeded to review the relevant evidence, particularly the evidence submitted by the State's experts.

The record reveals that Petitioner's ineffective assistance of counsel claim was fully developed during the state habeas corpus proceedings. Mr. Hagood's affidavit included the following response to Dr. Lipman's affidavit:

> I have read the affidavit by Jonathan Lipman. I understand his conclusion, I just don't [think it] has anything to do with this case. Neither the State nor any of its experts alleged that substances which triggered [Petitioner's] psychotic episode were still in his system at the time he murdered his wife and her children. It appears that Mr. Lipman's conclusions were based on that assumption. I believe that Mr. Lipman was working under the premise that the [word] "intoxicated" had its vernacular meaning rather than the specific meaning assigned to it in [the] Texas Code of Criminal Procedure. Lipman does not address the combination of DXM, alcohol and marijuana nor does he give any opinion about the amount of drugs and alcohol in [Petitioner's] system *at the time of the psychotic break*. Lipman's opinion, as set [out in] his

affidavit, would not have been beneficial to [Petitioner] because it fails to address [the] core issues in this case: first, whether [Petitioner] understood that his actions were wrong when he murdered his wife and her children and second, whether the psychosis he was experiencing at the time of the murder had been premeditated by his drug and alcohol abuse prior to the day of the murder.

6 SHCR 2150 (emphasis in original). Mr. Hagood went on to specifically address the claim that he was ineffective for failing to hire a neuropharmacologist:

[Petitioner] argues that I was ineffective for failing to hire a neuropharmacologist and request a neuropsychological examination for [him]. As stated above, [Petitioner] is missing the point of the State's case. The issue was not whether [Petitioner] was psychotic. He was. The issue was not whether he had a large amount of DXM, alcohol and marihuana in his system when he committed the triple murder. He did not, and no one claimed that he did. The issue was whether [Petitioner], in a psychotic state, still understood that his conduct was wrong when he murdered his wife and her two children and if not, was the psychotic state caused or aggravated by the use of a substance. I am not aware of a neuropharmacologist who is qualified to diagnose schizophrenia as opposed to substance induced behavior or who could extrapolate the amount of drugs in his system at the exact moment of the psychotic break.

6 SHCR 2152. Citing the affidavit, the Director emphasized Mr. Hagood's conclusion that he was not aware of a neuropharmacologist who could address the core issue of whether Petitioner knew right from wrong at the time of the incident and, if not, was the psychotic state caused or aggravated by the use of a substance.

In addition to Mr. Hagood's affidavit, the three state psychiatrists/psychologists who testified at trial submitted affidavits. Dr. Victor R. Scarano observed that Dr. Lipman did not interview nor evaluate Petitioner. 6 SHCR 2182, ¶ 13. He added that Dr. Lipman misconstrued his central point in his report and testimony, which was Petitioner "at the time of the murders was suffering from a drug induced psychosis." *Id.* Dr. Scarano went on to provide a thorough explanation for his conclusion and the shortcomings in Dr. Lipman's analysis. Dr. David Axelrad likewise discussed the shortcomings in Dr. Lipman's analysis and how his "conclusions were not relevant to [his] diagnosis." 6 SHCR 2278, ¶ 54. Finally, Dr. Peter Oropeza, like the two psychiatrists, observed that Dr. Lipman's use of the term "intoxication" was not the term as defined in the Texas Penal Code. 6 SHCR 2295, ¶ 54. He asserted that Petitioner's statement that "[h]ad the defense team hired a neuropharmacology expert, the jury would have learned that there was no scientific support for the State's theory that Mr. Thomas

was intoxicated by alcohol, marijuana or DXM at the time of the murders," was false, misleading and a misrepresentation of his diagnosis. *Id.* at 2296, ¶ 58.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the findings of fact that included the following:

20. The blood samples and a urine test from [Petitioner] on the morning of the crime did not reveal any evidence of intoxication due to [Petitioner's] ingestion of either marijuana or Coricidin on the evening of March 25, 2004. [] As stipulated by the State at trial, a less than measurable amount of Dextromethorphan ("DXM") was found in [Petitioner's] blood. []

35. Mr. Hagood's and Ms. Bobbie Peterson (Cate's) trial strategy was to prove that [Petitioner] was insane at the time of the offense, not because of intoxication, but because of his prior medical and mental history.

36. The State's position was that [Petitioner] either knew right from wrong or that any psychosis he had was substance induced.

37. For the guilt/innocence phase of the trial, the State primarily relied on Drs. David Axelrad and Victor Scarano and psychologist Dr. Peter Oropeza. []

39. The defense team also retained three core experts for the guilt/innocence phase of the trial: psychiatrist Dr. Edward Gripon and Dr. Jay Crowder and psychologist Richard Rogers. Ex. 72. None had specific credentials as a neuropharmacologist and only Dr. Gripon was called at trial. The defense team did not initially retain any experts for the mitigation phase of the case. []

41. The Defense neither retained nor called a neuropharmacologist or a toxicologist.

44. Texas Law provides that "Voluntary intoxication does not constitute a defense to the commission of crime" and "intoxication" means "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." Texas Penal Code § 8.04(a) & (d).

48. On direct examination, Dr. Victor Scarano set out his opinion that [Petitioner's] use of drugs and alcohol precipitated [Petitioner's] psychotic episode.

52. The court's instruction on voluntary intoxication was supported in that: (1) the evidence showed that [Petitioner] told Dr. Peter Oropeza that he smoked marijuana the night before the murder []; (2) the medical records of [Petitioner] showed that there was marijuana in his urine. There was insufficient blood to test for marijuana in the blood as what blood was left from the hospital was used to test for DXM; (3) there was DXM still in [Petitioner's] blood at the time his blood was drawn several hours after the murders; (4) there was evidence from nurse Natalie Sims that [Petitioner] had told her that if it hadn't been for the drugs the crime would not have happened. The defense expert, Dr. Harrison, was also questioned about this []; and (5) the defense expert Dr. Gripon, admitted during cross-examination that the combined use of marijuana, alcohol, and DXM would aggravate and exacerbate a pre-existing condition of schizophrenia []. Numerous witnesses testified to [Petitioner's] drug and/or alcohol

abuse. [] The State's expert psychiatrists also found that [Petitioner's] psychosis was substance-induced. []

57.     Dr. Victor Scarano, M.D., testified about [Petitioner's] mental state at the time he murdered the victims. During direct examination, Dr. Scarano testified that a person can be mentally ill and delusional and still be sane according to the legal definition of sanity in Texas. [ ] Dr. Scarano described how mental illness can be substance-induced. [] The doctor also explained to the jury that a substance-induced mental illness or psychosis does not disappear when the substance is taken away from a subject. Instead, the "psychosis can continue once it is precipitated by a substance for a longer period of time, even when the substance is removed." [] The doctor testified that [Petitioner] was psychotic when he killed his wife and her two children, but that the psychosis was triggered by his substance abuse in the preceding days and weeks. [] The doctor also set out the facts of the case, some of which had been given to him by [Petitioner], and applied those facts to the legal definition of sanity. In Dr. Scarano's medical opinion, [Petitioner] knew that his conduct was wrong and was not legally insane at the time he murdered his wife and her two children. []

60.     Dr. Jay Crowder, a psychiatrist hired by the defense but not called at trial, informed the defense that he could not rule out the possibility that the psychotic episode leading up to the murders was induced by his use of a combination of drugs and alcohol.

162.    As a medical doctor and a psychiatrist, part of a doctor's education and training would include the pharmacological effect of drugs and alcohol on the brain and relating to psychotic behavior.

169.    Neuropharmacologists are not the only individuals who should be allowed to testify in court in regards to the effects of drugs on the central nervous system. These individuals are not physicians, but rather are consultants whose services may be requested by the physician responsible for the evaluation and/or treatment of the patient. Many physicians, including family physicians, emergency room physicians, internists, pediatricians, and psychiatrists, have expertise in identifying the effects of drugs or their absence on human behavior.

10 SHCR 3529, 3531-36, 3550-52 (some citations omitted as indicated by brackets).

The state trial court also issued the following conclusions of law:

87.     Dr. Lipman's conclusions in his affidavit do not prove by a preponderance of the evidence that the opinions and diagnosis of the State's experts are erroneous.

88.     [Petitioner] has failed to prove by a preponderance of the evidence, that counsel's failure to hire a neuropharmacologist or to have a neuropharmacological exam performed on [him] was constitutionally deficient.

10 SHCR 3579. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

The specific issue before the Court in claim number nine is whether defense counsel was ineffective for failing to hire a neuropharmacologist, such as Dr. Lipman. In *Strickland*, the Supreme Court described defense counsel's duty to investigate as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. *See also Williams v. Taylor,* 529 U.S. 362 (2000); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Rompilla v. Beard,* 545 U.S. 374 (2005). The Supreme Court subsequently observed that these three post-*Strickland* cases, each of which granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Pinholster,* 563 U.S. at 195. *See also Brown v. Thaler*, 684 F.3d 482, 490-91 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1244 (2013). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter,* 562 U.S. at 108. Petitioner's counsel were "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 107. "A fair assessment of attorney performance requires every effort be made to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

In the present case, defense counsel hired three psychiatrists and/or psychologists. The state trial court appropriately observed that neuropharmacologists are not the only individuals who can testify in court regarding the effects of drugs on the central nervous system. Both Dr. Edward Gripon and Dr. Jay Crowder had sufficient training and expertise in identifying the effects of drugs or their absence on human behavior. Dr. Crowder, in turn, advised the defense team that he could not rule out the possibility that the psychotic episode leading up to the murders was induced by his use of a combination of drugs and alcohol. Overall, defense counsel formulated a strategy that was reasonable

in recognizing the possible issues regarding Petitioner's mental state and employing three experts. "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up." *Rompilla*, 545 U.S. at 383. Counsel was not deficient by not canvassing the field to find a more favorable defense expert. *Dowthitt*, 230 F.3d at 748.

In an analogous situation, the Fifth Circuit observed that defense counsel perhaps could have investigated more or hired different experts; nonetheless, courts "must be particularly wary of arguments that come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir.) (citations omitted), *cert. denied,* 136 S. Ct. 86 (2015). Defense counsel possibly could have employed another expert. Nonetheless, counsel acted reasonably in this case by recognizing the need for experts and, in fact, hiring several experts. Petitioner has not shown that their representation fell below an objective standard of reasonableness and was otherwise deficient by failing to also hire a neuropharmacologist.

The Director also appropriately noted that the omitted testimony should be viewed in light of the totality of the State's evidence. State differently, the question of prejudice should be considered. To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter,* 562 U.S. at 112 (citation omitted).

As an initial matter, Dr. Lipman's affidavit does not show that the outcome of the case would have been different. Mr. Hagood's assessment of Dr. Lipman's affidavit astutely observed that it does not have "anything to do with this case." 6 SHCR 2150. Dr. Axelrad similarly observed that Dr. Lipman's conclusions were not relevant to his diagnosis. 6 SHCR 2278, ¶ 54. Dr. Lipman's analysis simply did not address the legal issues in this case. Thus the state court appropriately found, as a conclusion of law, that his "conclusions in his affidavit do not prove by a preponderance of the evidence that the opinions and diagnosis of the State's experts are erroneous." 10 SHCR 3579.

Overall, the State's evidence that Petitioner's psychosis was substance induced was substantial, and he has not established that the testimony that could have been offered by a neuropharmacologist, like Dr. Lipman, would not have changed the results.

Overall, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). He has not satisfied his burden of showing that counsel was ineffective on this issue. Claim number nine lacks merit.

**Claim Number 10: Defense Counsel's failure to obtain a neuropsychological examination and the testimony of a neuropsychologist was constitutionally ineffective.**

Claim number ten, like the previous claim, is an allegation that defense counsel was ineffective for failing to obtain the services of another expert - this time one dealing in neuropsychology. He asserts that counsel should have hired a neuropsychologist to provide evidence of his mental impairment. He stresses that his mental impairment is entirely separate from and in addition to his paranoid schizophrenic mental illness. In support of the claim, Petitioner provided affidavits from Dr. Ruben C. Gur, Ph.D, and Dr. Myla H. Young, Ph.D. He specifically cited the following comments by Dr. Gur:

> Based upon my observation and work and a review of Dr. Young's work, it is my opinion that [Petitioner] suffers from schizophrenia of the paranoid type and, significantly, he has brain impairments in addition to those associated with that mental illness. This "double whammy" is most likely a result of genetic and environmental facts and has substantially impaired his judgment and hold on reality during commission of the crimes at issue in this case.

*See* PX 14 (Gur); PX 35 (Young). Petitioner argues that the omission rises to the level of ineffective assistance of counsel.

This issue was fully developed during the state habeas corpus proceedings. Competing affidavits were provided by Dr. Victor Scarano, M.D., Dr. David Axelrad, M.D., and Dr. Peter Oropeza. Dr. Scarano reviewed the reports submitted by Doctors Young and Gur. He initially

51

discussed Dr. Young's report. 6 SHCR 2176-78 ¶ 11. He observed that "[m]ost well trained psychologists who perform neuropsychological testing will suggest that their results must be considered in association with the overall clinical findings of the treating and/or evaluating physician, be he/she a neurologist or psychiatrist." *Id.* Dr. Young, however, failed to do so. He noted that Dr. Young's evaluation took place in May 2007, some three years after the murders. He observed that the report completely avoids comments or opinions as to the emotional or psychological effects of being locked up on death row for two years. He observed that prescribed medications can skew the results of neuropsychological tests, but Dr. Young makes no comment about that. He observed that Dr. Young found Petitioner to be actively psychotic in 2007 even though he had been on antipsychotic medication for three years. He expressed the opinion that Dr. Young was not objective.

Dr. Scarano next evaluated the report provided by Dr. Gur. 6 SHCR 2178-82 ¶ 12. He pointed out that Dr. Gur could not say when the brain impairment manifested itself. He noted that Dr. Gur could not determine that Petitioner's present paranoid schizophrenia was not related to long term drug abuse and a drug induced psychosis in a person with a genetic vulnerability for the development of schizophrenia. He observed that it was evident that Dr. Gur was not a trained forensic psychologist and had little, if any, experience in forensic psychological evaluations. "The examination/evaluation of an individual's state of mind at the time of the criminal act is a discipline in which a trained forensic psychiatrist or forensic psychologist looks into the past and applies his/her skills in providing a learned opinion." *Id.* He observed that Dr. Gur was unable to do so. He observed that Dr. Gur's opinion that Petitioner had paranoid schizophrenia and brain impairments in June 2007 did not establish the cause of Petitioner's mental illness on March 27, 2004. He criticized Dr. Gur's avoidance of linking any brain injury to Petitioner's long history of substance abuse and its damaging effect on the young, developing brain. He opined that, in reality, Dr. Gur "has no idea what was going on in the brain of [Petitioner] at the time he murdered his ex-wife and her two children. Gur's conclusion is, in fact, speculation, pure and simple." *Id.* at 2182 ¶ 12.

After summarizing all of the evidence provided by Petitioner's experts, Dr. Scarano summarized the evidence as follows:

> Regardless of whether [Petitioner] was in the throes of a drug induced or schizophrenic delusional psychosis at the time he murdered his wife and her two children, [Petitioner] by his actions and statements knew that what he was doing was wrong.

6 SHCR 2185 ¶ 15.

Dr. Axelrad likewise reviewed Dr. Young's report. 6 SHCR 2273-76 ¶¶ 27-39. He observed that Dr. Young prepared the extensive report in her capacity as a clinical psychologist specializing in neuropsychology and neuropsychological assessments. He asserted that although her resume was impressive, her report was flawed. He observed that Petitioner was taking the following three drugs at the time of her assessment: Navane (antipsychotic), Trazodone (antidepressant) and Cogentin (for antipsychotic side effects). However, she made no attempt to explain how the drugs DXM, marihuana and alcohol he was using prior to the murders can contribute to Petitioner's current symptomology or might explain his current physical and mental characteristics. He observed that many of the sensory and motor impairments, attention and concentration deficits cited by her can just as easily be caused by Petitioner's prescription drugs as schizophrenia.

Dr. Axelrad reiterated that there is no issue that Petitioner was psychotic at the time he committed the murders. He observed that Dr. Young never addressed whether Petitioner, in his psychotic state, understood that his actions in killing his ex-wife and her two small children were wrong. He stressed he testified that there were numerous actions by Petitioner showing he understood that killing his ex-wife and her two children was wrong. He observed that Dr. Young does not dispute his analysis surrounding the murder nor disagree with his assertion that an individual can be psychotic yet still know right from wrong. He asserted that Dr. Young's statement that Petitioner was actively psychotic at the time she examined him did not make any sense since he had been on medication and receiving treatment for over two years. He concluded his assessment of Dr. Young's report by stating that her blatant lack of research, preparation and methodology invalidated her assessment of Petitioner.

Dr. Axelrad went on to review Dr. Gur's report. 6 SHCR 2273-76 ¶¶ 40-52. He noted that Dr. Gur acknowledged that Petitioner's neuropsychological test results could not be explained by the neurology of schizophrenia alone, so he speculated that Petitioner had an overlay of a serious neurological event such as severe head trauma or a brain tumor. He noted that Dr. Gur could not

identify anything in Petitioner's medical history that could account for his severe neuropsychological impairments. He observed that Dr. Gur's description of Petitioner as "clearly psychotic" was not based on any mental status examination. He reiterated that Petitioner's medication should have controlled the psychosis. He stressed that Dr. Gur made no mention of either Petitioner's prior drug use or the medications that he was taking at the time of the examination. He observed that neither Dr. Young nor Dr. Gur acknowledged that Petitioner's self-reporting might be inaccurate, exaggerated, incomplete or self-serving. He noted that Dr. Gur speculated about possible causes of Petitioner's brain dysfunction. While there was no evidence to support the speculation, there was ample evidence that Petitioner exhibited psychotic behavior during the time of his excessive drug use in the two month period before the murders. He observed that Dr. Gur never concluded in his report that Petitioner was legally insane when he committed the murders under the definition provided by the Texas Penal Code, nor does Dr. Gur dispute his findings regarding sanity. He finally observed that Dr. Gur's report is irrelevant since it does not, cannot and makes no attempt to address Petitioner's sanity or functioning in 2004.

Dr. Oropeza likewise assessed Dr. Young's report. 6 SHCR 2290-93 ¶¶ 30-41. He provided criticisms similar to those provided by Dr. Scarano and Dr. Axelrad. He stressed that Dr. Young's use of subjective testing to rule out symptoms of malingering was not reliable. He finally characterized her report as lacking objectivity. He went on to critique Dr. Gur's report. 6 SHCR 2393-95 ¶¶ 42-51. As observed by Dr. Scarano and Dr. Axelrad, Dr. Oropeza observed that Dr. Gur made no mention of what effect Petitioner's heavy drug use or the medications he was using. He expressed the opinion that Petitioner's psychotic episode on March 27, 2004 was precipitated by voluntary intoxication as defined by the Texas Penal Code.

As was noted in conjunction with the previous ground for relief, lead counsel Hagood provided the following response to the claim that he was ineffective for failing to request a neuropsychological examination:

> [Petitioner] argues that I was ineffective for failing to hire a neuropharmacologist and request a neuropsychological examination for [him]. As stated above, [Petitioner] is missing the point of the State's case. The issue was not whether [Petitioner] was psychotic. He was.

The issue was not whether he had a large amount of DXM, alcohol and marihuana in his system when he committed the triple murder. He did not, and no one claimed that he did. The issue was whether [Petitioner], in a psychotic state, still understood that his conduct was wrong when he murdered his wife and her two children and if not, was the psychotic state caused or aggravated by the use of a substance. I am not aware of a neuropharmacologist who is qualified to diagnose schizophrenia as opposed to substance induced behavior or who could extrapolate the amount of drugs in his system at the exact moment of the psychotic break.

6 SHCR 2152.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued findings of fact and conclusions of law regarding the claim that counsel was ineffective for failing to request a neuropsychological examination. Many of the findings listed regarding claim number nine on pages 47 through 48 of this memorandum opinion apply equally to the present claim. Two findings bear repeating:

> 35. Mr. Hagood's and Ms. Bobbie Peterson (Cate's) trial strategy was to prove that [Petitioner] was insane at the time of the offense, not because of intoxication, but because of his prior medical and mental history.

> 36. The State's position was that [Petitioner] either knew right or wrong or that any psychosis he had was substance induced.

10 SHCR 3531. The evidence presented by the defense attorneys was consistent with their strategy. The affidavits by Drs. Scarano, Axelrad and Oropeza explained why the affidavits submitted by Drs. Young and Gur did not undermine nor address the State's position that Petitioner either knew right or wrong or that any psychosis was substance induced. The state trial court accordingly issued the following conclusion of law:

> 91. [Petitioner] has failed to prove by a preponderance of the evidence that [counsel's] alleged deficient performance prejudiced his defense and that based on the opinions of Gur, Young and Lipman there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different.

10 SHCR 3579. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

In the petition, Petitioner goes no further than to say that the evidence provided by Drs. Young and Gur would have amounted to a persuasive case that he was not guilty by reason of insanity, sparing him a death sentence. He erroneously argues that the state court's decision was conclusory,

unreasoned and unsupported. The record reveals that there was substantial evidence to support the state court's findings. He did not satisfy his burden of rebutting the presumption of correctness that must be accorded the state court findings by clear and convincing evidence. Overall, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). He has not satisfied his burden of showing that counsel was ineffective on this issue. Claim number ten lacks merit.

### Claim Number 11: Defense counsels' reliance on the State experts to prove key issues was constitutionally ineffective.

In claim number eleven, Petitioner alleges that his attorneys were ineffective for calling Drs. Axelrad and Scarano during the defense's case-in-chief. He argued that calling these two State's experts adversely as defense witnesses shows that his attorneys were not pursuing a strategy but, rather, were grasping at straws. He noted that his attorneys had an expert, Dr. Gripon, to testify that he was not sane at the time of the murder, along with neutral fact witnesses Drs. McGirk and Harrison at their disposal.

This issue was fully developed during the state habeas corpus proceedings. Mr. Hagood provided the following explanation for calling Drs. Axelrad and Scarano:

> [P]etitioner claims that I was ineffective for calling experts hired by the State in the defense case. I was aware of both Dr. Scarano's and Dr. Axelrad's diagnoses long before the trial started. I was somewhat taken aback that the court allowed the State to go into sanity issues prior to our witnesses regarding insanity. However, my decision to call two of the State's witnesses during our case was deliberate. My strategic decision to do so was to elicit certain information and to attempt to diffuse some of the more damaging testimony against [Petitioner]. I was able to get Dr. Scarano to admit that psychoses triggered by marihuana or alcohol was rare. Further, I elicited information that alcohol induced psychoses generally occurred in chronic alcoholics and [Petitioner] did not appear to be a chronic alcoholic. I also attempted to get the doctor to give information that would minimize the testimony against [Petitioner]. Dr. Scarano admitted that this was his first case involving DXM. As for Dr. Axelrad, after the State was able to call Scarano first and set out the prosecutions's theory through the expert, I wanted first shot at Dr. Axelrad. This would allow me to frame the questions in a way more beneficial to [Petitioner]. I pressed both doctors, after hearing the

State's theory, in order to make them back down from their diagnosis or to at least admit that they could not rule out schizophrenia that was not precipitated by drug and alcohol use.

6 SHCR 2153-54. With respect to his failure to elicit opinions from Drs. McGirk and Harrison, Mr. Hagood noted that neither had examined Petitioner for the purpose of determining insanity. *Id.* at 2154. Moreover, Dr. Harrison had specified in his affidavit that he could not rule out that Petitioner had experienced a substance induced psychotic episode. *Id.*

Petitioner complains that "[i]nstead of forcing the State to rebut the defense's insanity case, the dynamics were such that the defense found themselves rebutting the State's sanity presentation." Petition at 121. Prosecutor Ashmore, however, discussed his reaction to the defense team's decision calling the doctors as adverse witnesses as follows:

> I thought it was important trial strategy to put Dr. Scarano on as early as possible in the case. I also believed that the defense team felt it would be damaging to their case to present their experts in their case-in-chief only to have me present the State's experts' opinion in rebuttal, perhaps leaving the last thing heard by the jury as being experts who indicated that [Petitioner] was sane at the time of the offense. Therefore, I believe it was trial strategy on the part of the defense to call Scarano and Axelrad in order to have their testimony immediately rebutted by the defense expert witnesses. Based on my years of trial work, particularly these type of cases, I thought that was sound strategy on the part of the defense.

6 SHCR 2332 ¶ 23.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding the claim that counsel was ineffective for calling Drs. Scarano and Axelred during the defense's case-in-chief:

> 198. The decision to call Dr. Axelred as part of the defense case was done to examine him and attempt to frame questions in a way more favorable to [Petitioner] as well as to attempt to discredit his opinion prior to the State examining him. Strategically, Mr. Hagood states he felt this was the best course of action rather than attempting to exclude his testimony.

> 199. Mr. Hagood's decision to call two of the state's witnesses during the defense case was deliberate. Mr. Hagood states that his strategy was to illicit certain information and attempt to diffuse some of the more damaging testimony against [Petitioner]. Mr. Hagood was able to get Dr. Scarano to admit that psychoses triggered by marihuana or alcohol was rare. Further, the defense illicited information that alcohol induced psychoses generally occurred in chronic alcoholics and [Petitioner] did not appear to be a chronic alcoholic.

> 200. Mr. Hagood also states that he attempted to get the doctor to give information that would minimize the testimony against [Petitioner]. Dr. Scarano admitted that this was his first case involving DXM.

201.    Mr. Hagood states in his affidavit that he wanted to be the first to question Dr. Axelrad in order to frame the question in a way more beneficial to [Petitioner].

202.    Mr. Hagood states that he pressed both doctors, after hearing the state's theory, in order to make them back down from their diagnosis or to at least admit that they could not rule out schizophrenia that was not precipitated by drug and alcohol use.

10 SHCR 3556-57. The state trial court went on to issue the following conclusions of law:

94.    [Petitioner] has failed to prove by the preponderance of the evidence that Mr. Hagood was not employing trial strategy calling two of the State's experts in the defense's case-in-chief.

95.    [Petitioner] has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient and that he was not acting as a reasonably competent attorney, and that his trial strategy was not within the range of competence demanded of attorneys in criminal cases.

96.    [Petitioner] has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense and that there is a reasonable probability that, but for counsel's decision to use Dr. Scarano and Dr. Axelrad in the defense's case-in-chief, the result of the proceeding would have been different.

10 SHCR 3580. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner acknowledges that counsel's decision to call two of the State's experts during the defense's case-in-chief was trial strategy, but he disagrees with the strategy. Nonetheless, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Counsel was aware of the anticipated testimony of these witnesses. He called them in order to lessen the impact of their testimony. The Court would note that the practice of calling the other side's witness in order to get the first shot at that witness is a trial strategy regularly employed by attorneys. Petitioner has not shown that Mr. Hagood's decision to call Drs. Scarano and Axelrad in the defense's case-in-chief was outside the range of objective reasonableness demanded of attorneys in criminal cases. *See Richter*, 562 U.S. at 110. His arguments to the contrary are fallacious.

Overall, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). In particular, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. Claim number eleven lacks merit.

**Claim Number 12: Defense counsels' failure to elicit opinions on sanity from Drs. Harrison and McGirk rendered its counsel constitutionally ineffective.**

Drs. Harrison and McGirk were the first two psychologists who had contact with Petitioner after the crimes for the purpose of evaluating his mental state. Petitioner argues that the failure to even elicit their opinions regarding his sanity at the time of crimes violated both *Strickland* prongs. In support of the claim, Petitioner offers affidavits from both doctors. Dr. Harrison states that he would have testified that Petitioner was insane on the morning of March 24, 2004, because he was suffering from psychosis and further that he did not understand what he did on that morning. 2 SHCR 508-508. Dr. McGirk similarly states that if he had been asked, he would have testified that Petitioner was insane on that morning and that he did not know what he was doing was wrong at the time he committed the murders. Petitioner's Exhibit 25 ¶¶ 10-11.

This issue was raised in both the direct appeal and in the state habeas corpus proceedings. The TCCA rejected the claim on direct appeal as follows:

> [Petitioner] complains that "counsel failed to request and obtain evaluations and opinions from Dr. James Harrison and Dr. Robin McGirk on the issue of [Petitioner's] sanity at the time the offense was committed." The trial court appointed Harrison to examine [Petitioner] for the sole purpose of determining his competency to stand trial. Dr. McGirk met with [Petitioner] several times in his capacity as the jail psychologist; he was not hired by either the State or the defense. Both were called to testify by the defense. Dr. Harrison believed that [Petitioner] was schizophrenic, but he testified that he did not have enough information to render an opinion regarding [Petitioner's] sanity at the time of the offense. Dr. McGirk also diagnosed [Petitioner] as schizophrenic, but declined to give an opinion as to [Petitioner's] sanity at the time of the offense.

> Petitioner has not shown how counsel's representation was deficient. Article 46.03, Sec. 3(g) permits the same expert to be appointed to evaluate competency and insanity, provided that the expert files separate reports. But counsel was by no means required or

59

expected to solicit the same expert's opinion, in this case Dr. Harrison's, regarding both issues. [Petitioner] also overlooks the fact that, in addition to obtaining approval for the appointment of Dr. Edward Gripon, counsel requested and was granted the services of another psychologist, Dr. Richard Rogers, to assist [Petitioner] in preparing his insanity defense. Dr. Rogers evaluated [Petitioner] and prepared a report but was never called to testify, for reasons that the record does not reveal.

[Petitioner] has also failed to prove how counsel's performance prejudiced his defense. There is nothing to indicate that Dr. Harrison or Dr. McGirk would have testified to [Petitioner's] legal insanity at the time of the offense had they been appointed specifically for the purpose of such an evaluation. In fact, Dr. Harrison testified under cross-examination that people with schizophrenia could still be legally sane. . .

[Petitioner] has failed to meet his burden to demonstrate deficient performance and prejudice. He has failed to show a reasonable probability that the result of the proceeding would have been different if counsel had also requested sanity evaluations from Dr. Harrison and Dr. McGirk.

*Thomas v. State*, 2008 WL 4531976, at *17-18. The TCCA appropriately noted that the defense called both doctors. They both declined to offer an opinion regarding Petitioner's sanity.

This issue was developed further during the state habeas proceedings. In response to Dr. Harrison's affidavit, prosecutor Ashmore observed that Dr. Harrison's affidavit did not comport with his sworn trial testimony:

During cross-examination of Dr. Harrison, I specifically asked him whether, after interviewing [Petitioner] on a number of occasions, reviewing all of the expert's reports in this case (which were quite detailed) and looking at the other information that he indicated that he had taken into consideration both during direct examination and on voir dire prior to his cross, whether he felt like he had insufficient information to give an opinion about [Petitioner's] sanity at the time of the offense. Dr. Harrison responded that he did not feel like he had sufficient information to render an opinion (RR Vol. 35, p. 50-51). At no time did Dr. Harrison indicate that he would not render an opinion because he was under some mistaken belief that he would be precluded from rendering such an opinion. The reasoning at trial was that he had insufficient information to provide an opinion.

6 SHCR 2331 ¶ 20. On the other hand, Dr. McGirk's testimony was that he was only hired by the jail to determine if Petitioner needed medication or was a danger to himself, and that he was never hired to determine competency or sanity. 35 RR 184, 188-89. Dr. McGirk specifically testified that he was not going to offer an opinion on Petitioner's sanity and that it was for the jury to decide. 35 RR 171-82.

Mr. Hagood offered the following response to this claim of ineffective assistance of counsel:

[Petitioner] complains . . . that I was ineffective for not eliciting opinions on sanity from Cactus McGirk and James Harrison. Neither psychologist had examined [Petitioner] with

the purpose of determining insanity. Harrison had stated in his report that he could not rule out that a substance had induced [Petitioner's] psychotic episode. He also testified that he could not make a determination regarding sanity when asked by the prosecution. Coupled with the fact that Harrison had never been sent to determine sanity, I did not think it a good idea to query him on that issue. As for Cactus McGirk, he had only been hired by the jail to determine if [Petitioner] needed medication or was a danger to himself. After being examined by prosecutor Kerye Ashmore, McGirk came across as biased against the State and incompetent. I did not believe that McGirk had any credibility with the jury and was not about to hang [Petitioner's] insanity theory on McGirk.

6 SHCR 2154. The Director argues that counsel's decisions with respect to these witnesses are entitled to deference.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding the claim that counsel was ineffective for failing to elicit opinions on sanity from Drs. Harrison and McGirk:

203. Neither Dr. James Harrison or Dr. Cactus McGirk had examined [Petitioner] with the purpose of determining sanity.

204. Harrison stated in his first report that he could not rule out that a substance had induced [Petitioner's] psychotic episode. (State's Response, appendix ex. O)

205. Harrison testified that he did not have enough evidence to make a determination of sanity.

206. Dr. Harrison's affidavit does not comport with his sworn testimony. During cross examination of Dr. Harrison, Mr. Ashmore specifically asked him whether after interviewing [Petitioner] on a number of occasions, reviewing all of the expert reports in this case (which were quite detailed) and looking at the other information that he indicated he had taken into consideration both during direct examination and on voir dire prior to cross, whether he felt like he had sufficient information to give an opinion about [Petitioner's] sanity at the time of the offense. Dr. Harrison responded he did not feel like he had sufficient information to render an opinion (RR vol. 35, pp. 50-51).

207. Cactus McGirk had been hired by the jail to determine if [Petitioner] needed medication or was a danger to himself. McGirk has never been hired to determine competency or sanity. (RR vol. 35, pp. 184, 188-189).

208. Mr. Hagood knew that Harrison had stated in his report that he could not rule out that a substance had induced [Petitioner's] psychotic episode.

209. Harrison also testified that he could not make a determination regarding sanity when asked by the prosecution. (RR vol. 35, p. 51)

210. After being examined by prosecutor, Kerye Ashmore, Mr. Hagood states that McGirk came across as biased against the state and incompetent.

211. Mr. Hagood did not believe McGirk had any credibility with the jury and was not going to hang [Petitioner's] insanity on McGirk.

61

10 SHCR 3557-58. The state trial court then proceeded to issue the following conclusion of law:

> 97.     [Petitioner] has failed to prove by the preponderance of the evidence that Mr. Hagood was not employing trial strategy in not requesting sanity opinions from Dr. Harrison or Dr. McGirk.

10 SHCR 3580. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

In the present petition, Petitioner simply asserts that defense counsel should have elicited sanity opinions from Drs. Harrison and McGirk. With respect to the issue of whether counsel's representation was deficient on this issue, the dispositive factor is that defense counsel chose not to elicit opinions from the doctors because of trial strategy. Mr. Hagood knew that Dr. Harrison had stated in his report that he could not rule out that a substance had induced Petitioner's psychotic episode. Mr. Hagood was also of the opinion that Dr. McGirk did not have any credibility with the jury, and he was not going to hang the issue of Petitioner's insanity on Dr. McGirk. Once again, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. With respect to the prejudice prong, the Court finds the claim to be somewhat incredible because both doctors were asked whether they would offer opinions, albeit by the State, and both declined. Petitioner cannot show harm. Overall, Petitioner has not shown that Mr. Hagood's representation on this matter was outside the range of objective reasonableness demanded of attorneys in criminal cases. *See Richter*, 562 U.S. at 110.

In addition to the foregoing, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s

deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. Claim number twelve lacks merit.

**Claim Number 13:** **Defense counsels' failure to present evidence of or seek a jury instruction on diminished capacity constituted ineffective assistance of counsel.**

In claim number thirteen, Petitioner argues that counsel should have pursued a diminished capacity defense. He erroneously asserts that Texas recognizes a diminished capacity defense.

Before the pleadings were ever filed in this case, the Fifth Circuit discussed the diminished capacity defense in *Coble v. Quarterman*, 496 F.3d 430 (2007). The Fifth Circuit found that "counsel was not ineffective for failing to present a diminished capacity defense because diminished capacity is not cognizable in Texas. *See, e.g., Jackson v. State*, 115 S.W.3d 326, 328 (Tex. App. - Dallas 2003)." *Id.* at 437-38.

The *Jackson* case cited by the Fifth Circuit was decided by the state intermediate appellate court in Dallas, Texas. The case was subsequently considered by the TCCA. Discretionary review was granted "to determine whether the doctrine of diminished capacity exists in the jurisprudence of Texas." *Jackson v. State*, 160 S.W.3d 568, 569 (Tex. Crim. App. 2005). In affirming the Dallas appellate court, the TCCA provided the following analysis:

> [T]he evidence of mental illness in this case does not negate *mens rea*. Rather, the evidence presented an excuse for the crime[.] In fact, this evidence makes it even more apparent that Appellant intended to cause serious bodily injury or death to his brother. The evidence of appellant's paranoia simply provides a motive for an intentional act. The evidence presented was the type of excuse-based evidence that would be raised as an affirmative defense. . . . The court of appeals correctly stated that Texas does not recognize diminished capacity as an affirmative defense i.e., a lesser form of insanity.

*Id.* at 572-73. Much like the situation in *Jackson*, Petitioner committed murder, and he raised the excuse of insanity. A diminished capacity defense was unavailable. More recently, the Eastern District of Texas rejected diminished capacity arguments in two death penalty cases. *Mays v. Director, TDCJ-CID*, No. 6:11cv135, 2013 WL 6677373, at *25 (E.D. Tex. Dec. 18, 2013), *c.o.a. denied*, 757 F.3d 211 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015); *Roberson v. Director, TDCJ-CID*, No. 2:09cv327, 2014 WL 5343198, at *58 (E.D. Tex. Sept. 30, 2014), *aff'd*, 619 F. App'x 353 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1177 (2016).

Mr. Hagood responded to this ineffective assistance of counsel claim as follows:

> [Petitioner] complains that we did not request a jury instruction on diminished capacity. There is no "diminished capacity" defense in Texas. The case law cited by [Petitioner] refers to the State's proof of specific intent and a "failure of proof" defense. That language was submitted to the jury as one of the elements the State had to prove beyond a reasonable doubt. I would disagree with [Petitioner's] assertion that I should have requested a lesser-included charge to capital murder. Our trial strategy involved straight insanity. Although it is permissible to request conflicting defensive instructions in a jury charge, it is not always prudent. In front of a real jury, in a real death penalty trial, with real dead babies, telling a jury "he did it, but he was insane" then saying in the next breath, "but if he wasn't insane he was just reckless or criminally negligent" might seem deceitful and manipulative to a jury. Even if I believed that the facts of this case warranted a lesser included instruction, I might not have requested one. I certainly would not have labeled it a "diminished capacity" defense as that carries with it a different connotation."

6 SHCR 2158.

The state trial court proceeded to issue the following conclusions of law on this claim:

121. Texas does not recognize diminished capacity as an affirmative defense i.e., a lesser form of the defense of insanity,

122. The diminished-capacity doctrine argued by [Petitioner] in this case is a failure-of-proof defense in which [Petitioner] claims that the State failed to prove that the defendant had the required state of mind at the time of the offense.

123. [Petitioner] has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient.

10 SHCR 3585. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

In the present petition, Petitioner merely reasserts his claim that counsel should have pursued a diminished capacity defense and that he was ineffective for failing to do so. The claim may be summarily dismissed in light of clearly established Fifth Circuit case law that "counsel was not ineffective for failing to present a diminished capacity defense because diminished capacity is not cognizable in Texas." *Coble*, 496 F.3d at 437-38. The claim lacks any basis in law in Texas. The claim may also be dismissed in light of § 2254(d). Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceedings. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Counsel was not ineffective for failing to pursue a defense that was unavailable under Texas law. As such, Petitioner failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. Claim number thirteen lacks merit.

**Claim Number 14: Defense counsels' performance at the punishment phase of Petitioner's trial was constitutionally ineffective.**

Claim number fourteen concerns the mitigating evidence presented by defense counsel during the punishment phase of the trial. An argument is made that the story of Petitioner's tragic life was never told due to ineffective assistance of counsel. He asserts that his life is a case study of mental illness, neglect and abuse. He adds that it is not surprising that the triad of mental illness, neglect and abuse was seen in both his life and that of his siblings, parents, aunts, uncles, grandparents, and great aunts and uncles.[4] He asserts that counsel should have investigated and offered mitigating evidence from additional family members, although he admits that the minimal number of family members who testified for the defense in the punishment phase of the trial did more harm than good.

The Director argues that the defense team conducted a constitutionally sufficient investigation and presented ample mitigating evidence. He notes that counsel's failure to investigate will not rise to the level of ineffective assistance of counsel where the evidence in question is cumulative, unknown, or possibly harmful to the defense. *Anderson v. Collins*, 18 F.3d 1208, 1220-21 (5th Cir. 1994). He opines that Petitioner does not argue that something should have been done better, but that something should have been done differently. *See* Answer, pages 112-13. He notes that the Fifth Circuit has recognized that it "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those

---

[4]The Court observes that the presentation of the claim in state court differs somewhat from the way it has been presented in this Court. Petitioner, through a different attorney, embellishes on the claim from the way it was presented in state court. Review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 181; *Blue*, 665 F.3d at 656.

questions are even less susceptible to judicial second-guessing." *Dowthitt,* 230 F.3d at 743 (internal quotation marks and citation omitted). The Director argues that Petitioner has not satisfied either *Strickland* prong on this matter.

The case law is abundantly clear that "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)), *cert. denied*, 537 U.S. 1104 (2003). *See also Woods v. Thaler*, 399 F. App'x 884, 891 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2444 (2011). "Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and the ultimate determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir.2003) (citation omitted), *cert. denied*, 543 U.S. 1056 (2005). In assessing whether counsel's performance was deficient, courts look to such factors as what counsel did to prepare for sentencing, what mitigation evidence he had accumulated, what additional "leads" he had, and what results he might reasonably have expected from those leads. *Neal*, 286 F.3d at 237. The reasonableness of counsel's investigation involves "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. *See also Blanton*, 543 F.3d at 236. "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.8.6, at 133 (1989)). The Supreme Court stressed in *Wiggins* that the "investigation into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.* (emphasis in original).

The Supreme Court added, however, that the investigation into mitigating evidence has limits:

[We] emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at

> sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.* at 690-91, 104 S.Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.*, at 691, 104 S.Ct. 2052.

*Id.* at 533. In *Wiggins*, the Supreme Court held that counsel's representation "fell short of . . . professional standards" for not expanding the investigation beyond the investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. *Id.* at 524-25. More recently, the Court found counsel's representation deficient when he failed "to conduct *some* sort of mitigation investigation" even though his client was fatalistic and uncooperative. *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (emphasis in original). *See also Rompilla*, 545 U.S. at 381-82 (counsel's investigation was unreasonable because counsel failed to review a prior conviction file used by the prosecution, a file that would have alerted counsel that further investigation was necessary). On the other hand, the Supreme Court has found that counsel's performance was not deficient where he gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources. *Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009). Similarly, in *Strickland*, the Court found that counsel's decision not to seek more character or psychological evidence than was already in hand was reasonable. *Strickland*, 466 U.S. at 699. In order to establish that counsel was ineffective due to a failure to investigate the case, a petitioner must do more than merely allege a failure to investigate; instead, he must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the evidence would have altered the outcome of the trial. *Anderson*, 18 F.3d at 1221.

A court determines whether a petitioner was prejudiced by counsel's deficient performance by "reweigh[ing] the evidence in aggravation against the totality of the available mitigating evidence" and asking whether the petitioner "has shown that, had counsel presented all the available mitigating evidence, there is a reasonable probability that a juror would have found that the mitigating evidence outweighed the aggravating evidence." *Gray v. Epps*, 616 F.3d 436, 442 (5th Cir. 2010) (quoting *Wiggins*, 539 U.S. at 534), *cert. denied*, 563 U.S. 905 (2011).

The transcript in this case reveals that abundant evidence that could have been presented by Petitioner in mitigation during the sentencing phase of the trial had already been presented during the guilt/innocence phase of the trial. Danny Thomas, Petitioner's father, testified extensively about Petitioner's childhood. 28 RR 153-62. He noted that he had been separated from Petitioner's mother, Rochelle Thomas, since between 1985 and 1989. *Id.* at 151. He stated that he provided guidance to Petitioner and described him as very intelligent. *Id.* at 153. He testified that Petitioner made good grades. *Id.* at 153-54. His contact with Petitioner did not "drop off" after Rochelle left him. *Id.* at 157. Mr. Thomas testified that Rochelle took Petitioner to church "every time the door opened." *Id.* at 159. He specified that he was aware that Petitioner smoked marijuana, but he did not know how much marijuana he smoked. *Id.* at 162. He described Petitioner as a moderate drinker. Id. at 165. He agreed that Petitioner had mental problems. *Id.* at 167. He testified that Petitioner's behavior changed for the worse during the two or three months leading up to the murders. *Id.* at 169.

The State also took steps to have Petitioner's mother testify at the trial. She was subpoenaed to attend the trial, but she failed to appear and was held in contempt. 28 RR 149.

The State called Carmen Hayes, Petitioner's girlfriend at the time of the murders, during the guilt/innocence phase of the trial. She testified that they were smoking marijuana and taking Coricidin Cough and Cold medicine during the days just prior to the murders. 27 RR 185. She described him as a regular drinker. *Id.* at 187. He would talk about religion when they were smoking and taking Coricidin. *Id.* at 195. In particular, he would talk about the book of Revelation. *Id.* She testified that Petitioner "believed that all women were Jezebel." *Id.* She explained that he thought all women were lustful. *Id.* at 196. She described how he stabbed himself in the chest just two days before the murders. *Id.* at 232-34. Petitioner told her just before stabbing himself that he wanted to be forgiven of his sins and fly with the angels. *Id.* at 234-35. She subsequently testified that on other occasions he placed duct tape on his mouth to stop talking. 28 RR 26. He told her that "he felt like he was the devil, and if he stopped talking for 24 hours, then the world would be right." *Id.* at 27. She added, however, that he would remove the duct tape "not to speak, but to smoke dope." *Id.* at 28. Around the time of the murders, Rochelle Thomas occasionally spent the night at Petitioner's house. *Id.* at 71.

Ms. Hayes also discussed Petitioner's regular use of the term "deja vu." "He thought he was -- God was making him relive days because he was smoking marijuana. Punishment I suppose." *Id.* at 89.

The State also called Isaiah Gibbs, Petitioner's life long friend. 29 RR 106. He testified that Petitioner thought of him as one of his best friends. *Id.* at 127. He testified about a number of experiences involving Petitioner. Near the beginning of his testimony, he stated that Petitioner came over to his house and confessed to him that he had killed his ex-wife and her two kids. 29 RR 111-12. He noted that Petitioner was in tears at the time. *Id.* at 112. Mr. Gibbs testified that he did not believe him and "told him to quit playing." *Id.* at 112-13. He discussed Petitioner's relationship with Laura and how they first started going together in middle school. *Id.* at 121. He discussed how Petitioner thought that his cousin, Floyd Patterson, was having an affair with Laura. *Id.* at 122-23. On another occasion, Petitioner had told him that he thought Laura had slept with his brother Brian. *Id.* at 126. Petitioner had also accused him of sleeping with Laura. *Id.* at 127.

On cross-examination, Isaiah Gibbs was questioned extensively about Petitioner's relationship with his mother, Rochelle Thomas. 29 RR 154-56. Mr. Gibbs noted that Rochelle Thomas regularly talked about church. *Id.* at 155. If Petitioner brought around a girl that she did not like, she would refer to the girl as Jezebel. *Id.* He noted that Mrs. Thomas treated him just like Petitioner, and she would discipline them both and give them whippings. *Id.* at 156. The State objected to defense counsel discussing Petitioner's upbringing as irrelevant, but the trial court overruled the objection. *Id.* at 157. The trial court gave Petitioner a full opportunity to present evidence about his background.

Numerous other witnesses talked about Petitioner's character. When questioned by the defense, Ms. Rae Baird, a friend, testified about Petitioner's hyper-religious nature. 29 RR 193-94. She did not see him after January 2004, but before then he told her that God talked to him. *Id.* at 194. He told her that God had told him that he needed to get back with Laura. *Id.*

Clifford Adams testified that he and Petitioner were very good friends for a long time. 29 RR 200. He testified that Petitioner used marijuana. *Id.* As far as quantities were concerned, "if he had it, he would smoke it." *Id.* Mr. Adams testified that Petitioner got back at Floyd Patterson for sleeping with Laura by sleeping with Floyd's girlfriend, Amy Ingle. *Id.* at 202. He believed that Petitioner

engaged in actions to get attention, such as refusing to talk. *Id.* at 203. He would act "weepy" and "goofy" around girls to get them to sleep with him. *Id.* at 205.

Bryant Hughes, Laura's boyfriend at the time of the murders, also talked about Petitioner's hyper-religious nature when questioned by the defense. 30 RR 66-67, 68-70. Mr. Hughes added that "[o]nce he came over with a dollar bill showing me the pyramid on the back of it and saying, That is one of their [Illuminati] symbols." *Id.* at 78. When questioned by the defense, he admitted that he told the police that Petitioner was crazy and always talking about weird things. *Id.* at 85.

Don Bowling testified that he knew Petitioner as a co-worker with the City of Sherman. 30 RR 90. He discussed Petitioner's alleged odd behavior. The only thing that Petitioner did to make him question his mental status was dying his hair from one color to another. *Id.* at 92. His impression was that Petitioner was just seeking attention from people. *Id.* at 92-93.

Paul Boren, Laura's father, also testified. He stated that he encouraged Petitioner to get a job, and he offered to help him. 30 RR 128, 139-40. He likewise testified about Petitioner's obsession with religion. *Id.* at 137-38, 155-56. He witnessed Petitioner tear up money as if it was nothing. *Id.* at 157. He was aware that Petitioner smoked marijuana. *Id.* at 158. He also heard Petitioner talk about his feeling of "deja vu." *Id.* at 160.

Amy Ingle, who was Petitioner's friend and a former girlfriend of Floyd Patterson, likewise talked about his strange behavior and obsession with religion and the Bible. She testified that he talked about God a lot and thought that God had a purpose for him. 33 RR 190. She noted that on one occasion "he took the Bible and, you know, cut out the words in Revelations to reword it." *Id.* She further testified that "he thought certain people had demons and that demons were kind of around us, but he also did believe in angels and that angels were here" and that "they had power -- super powers over everybody." *Id.* at 190-91. She characterized him as a "different type of person," who "had his own thoughts on everything and expressed them." *Id.* at 192. She described his mother as "eccentric." *Id.* at 193. She added that Petitioner's mother was "real Godly and just overboard with it, I'd say." *Id.* He became upset when his mother moved to Oklahoma and cried over it. *Id.* He also discussed the dollar bill and the eye symbol over the pyramid with her. *Id.* at 197-98. Like the other witnesses,

she testified that he used the term "deja vu" and felt like everything was "happening over and over again." *Id.* at 198. She also testified that she had seen him with duct tape on his mouth. *Id.* at 200.

The defense called Rose Soto Caballero, a former girlfriend, who testified that she had been friends with Petitioner since kindergarten and that they started dating in fifth grade. 3 RR 18. Like other witnesses, she testified that she saw him smoke marijuana and drink alcohol. *Id.* at 20. She explained that Petitioner had dyed his hair green for an Incredible Hulk themed birthday party for Andre, Jr. *Id.* at 27, 46. She stated that she had spent a good amount of time with Rochelle Thomas and described her as sweet. *Id.* at 29. She noted that Petitioner was upset when his mother moved away. *Id.* She added that "[n]obody will ever understand her, but she has her own quirks and her own ways of doing things." *Id.* at 30. She stated that Petitioner discussed religion with her. *Id.* at 31. She added that "[h]e had told her that he thought that he had spirits, demons in him from the cemetery." *Id.* at 28. Their conversations about demons and being evil and seeking forgiveness occurred about two months before the murders. *Id.* at 34. He also talked "about how everything was deja vu, and about living the same days over and over again." *Id.* On cross-examination, she testified that she loved him greatly and still loved him. *Id.* at 45.

During the sentencing phase of the trial, the State called Eric Ross, Petitioner's older brother, as a witness. He testified that Rochelle Thomas was his mother, and Danny Thomas was his stepfather. 40 RR 53. He stated that he was self-employed. *Id.* He had previously worked at Popeye's for eleven years and had been a manager. *Id.* at 54. He stated that his mother and the elders of the church were the greatest influences on him. *Id.* at 55. He testified in depth about Petitioner's childhood. *Id.* at 55-57. He specified that his mother raised him the same way she raised Petitioner and that he had never been arrested nor neglected. *Id.* at 56.

With the backdrop of all of this evidence concerning Petitioner's character and his background, the defense team finally had the opportunity to present mitigating evidence for the purpose of persuading the jury to spare his life. The jury had heard all of the previous evidence, which was the same type of evidence that could have been presented by defense counsel during the punishment phase of the trial. With this in mind, defense counsel called Steve Atkins, Leander Williford, Danny Ross,

Wendy Ross, Scott Hamel, Doris Gonzales, Roger Braziel, Dr. Kate Allen and Larry Fitzgerald during the punishment phase of the trial. Of these, three were family members: brother Danny Ross, sister-in-law Wendy Ross and paternal aunt Doris Gonzales.

Danny Ross testified that he was Rochelle Thomas' second oldest child and Petitioner's older brother. 40 RR 88. He started working at Popeye's when he was sixteen and was still working there. *Id.* He worked with his older brother Eric. *Id.* Danny Ross testified extensively about Petitioner's childhood. He described Petitioner as a good kid. *Id.* at 90. He noted that Petitioner strived for knowledge in school. *Id.* at 91. He testified that he had never seen a violent side to Petitioner. *Id.* at 97.

Defense counsel next called Wendy Ross, Danny Ross' wife. 40 RR 117. She testified that she had been married to Danny for eight years and that they had three children. *Id.* She described her husband's family as close. *Id.* at 119. Members of the family were protective of each other and did not reveal their family problems to others. *Id.* at 120. She was not really aware of problems that were being experienced by members of the family. *Id.* at 120-21. She stated that she loved Petitioner. *Id.* at 124. He watched her kids for her, and she never had any concerns or fears because he was watching them. *Id.* She observed changes in him in the months just prior to the murders, which she attributed to anxiety. *Id.* at 125. Wendy Ross characterized her mother-in-law, Rochelle Thomas, as loving and caring and good to her. *Id.* at 126. She testified that she had observed Petitioner's relationship with his mother. *Id.* at 131. She loved him, and he loved her. *Id.* She never observed them get into a fight. *Id.*

Doris Gonzalez, Petitioner's paternal aunt, testified that she and Rochelle lived together a few times. Rochelle came to stay with her once for a few weeks in Oklahoma without the kids, who stayed with their dad. 40 RR 159-60. She observed Petitioner interacting with his brothers by "[l]aughter, happiness, joking, kidding." *Id.* at 161. She described Petitioner as very loving, kind and analytical. *Id.* at 163. She testified that she was responsible for taking care of Brian Ross, one of Petitioner's older bothers. *Id.* at 163-64. The trial court initially would not permit the defense to question her about Brian's mental illness and the issue of family genetics. *Id.* at 164-65. Nonetheless, she was

subsequently permitted to testify that Brian Ross was diagnosed with a mental illness, and she signed the papers for him to obtain professional help. *Id.* at 171. She observed Petitioner being "very distraught, crying a lot" in the months just prior to the murders. *Id.* at 165. He would not talk to her about it. *Id.* She went on to talk about Petitioner's loving relationships with other members of the family. She also discussed some concerns she had, including Rochelle's inappropriate attire around her sons and Danny Thomas' drinking. *Id.* at 168-69.

Steve Atkins testified that he had previously been employed at the Crockett House, which is a MHMR outpatient facility. 40 RR 74-75. He knew Petitioner from seeing him at the facility visiting his older brother, Brian. *Id.* at 74. Leander Williford, Jr., testified that he knew Petitioner when they worked together for three years at the cemetery. *Id.* at 83. He stated that Petitioner had a good disposition with no problems. *Id.* at 86. Scott Anthony Hamel testified that Petitioner had been his friend since childhood. *Id.* at 136. He ran around with him until about one and one-half months before the murders. *Id.* at 139. He stopped hanging out with him because of the people Petitioner "was running with. . . . Like Carmen and Zack and Kim." *Id.* He noticed changes in Petitioner's behavior when he started hanging out with them. *Id.* He characterized Petitioner as being depressed. *Id.* at 141. He testified that he had never seen Petitioner be violent. *Id.* at 142. Corporal Roger Braziel testified about Petitioner's conduct and behavior while confined at the Grayson County Jail. *Id.* at 176-178. The final witness was Dr. Kate Allen, a clinical social worker and family sociologist, who testified extensively about her findings regarding Petitioner. Petitioner complains, however, that counsel did not adequately prepare Dr. Allen to testify at trial.

Despite all of the foregoing testimony, Petitioner now complains that many additional witnesses were not contacted by the defense team who knew him as he was growing up and descending into increasingly severe mental illness, and/or had detailed information about him and the family's multi-generational pattern of health issues. These witnesses include Walter Johnson (Petitioner's great-uncle), Kevin Ross (uncle), Pam Ross Borens (aunt), Alice Harris (aunt), Denise Ross Wade (aunt), Konta Johnson (aunt), Todd Johnson (Konta's husband), Roscoe Johnson (uncle), Christopher Bennett (childhood friend), McCloud Luper (one of Rochelle's boyfriends), Clifton Eaton (minister

at Petitioner's church), Wanda Banks (church director), Floyd Patterson (cousin) or Christopher Smith (childhood friend). In support of his claim, he attached affidavits from family and friends.

The Director observed that these affidavits reveal that Petitioner did not have a stable father figure, that his family was poor and often without money to pay the utilities, that they moved around a lot, that his mother did not provide much guidance and was unstable, that his bothers were mean and aggressive towards him, that people suspected that he was mentally ill even as a young child and teenager, that his brother was a diagnosed schizophrenic, that he behaved oddly (putting duct tape on his mouth), that he was hyper-religious, and that he was affected by the deaths of his grandmother and aunt. The Director appropriately observed that all of this information was in front of the jury in some form, having been testified to either at the guilt/innocence or punishment phases of the trial, or both. The Director persuasively argued that because much of the evidence cited by Petitioner was actually presented in some form to the jury, any additional evidence would have been cumulative of evidence already admitted at trial. *See Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997) (Petitioner has not shown prejudice in that omitted testimony was duplicative), *cert. denied*, 525 U.S. 969 (1998); *Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir.) ("[N]on-record *Penry* evidence merely corroborated the substantial trial testimony."), *cert. denied*, 513 U.S. 960 (1994); *Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir. 1992) ("[T]estimony would merely have been duplicative and could not have had an effect on the jury's decision to assess the death penalty."), *cert. denied*, 506 U.S. 957 (1992). The Director thus argues that the omission of such cumulative evidence was not prejudicial.

The Director also appropriately observed that Petitioner did not demonstrate how much of the evidence he claims should have been presented during punishment would have been helpful to his case. First of all, evidence regarding his mother's upbringing - as deplorable as it was - and her mother's upbringing - as deplorable as it was - has only marginal relevance to Petitioner or his own childhood. The Supreme Court's Eighth Amendment jurisprudence demands only that the capital sentencing jury not be precluded from considering, as a mitigating factor, the character and the record of the individual offender, as well as the circumstances of the particular offense. *E.g., Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*); *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*); *Eddings v. Oklahoma*, 455 U.S.

104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality op.). The Director appropriately argued that the focus of this case was on Petitioner, as opposed to his ancestors or distant relatives. By comparison, the evidence found "powerful" by the Supreme Court in *Wiggins* was that of abuse and neglect suffered specifically by the petitioner. *Wiggins*, 539 U.S. at 535.

The Director further noted that much of the additional evidence cited by Petitioner of his upbringing was double-edged. The Fifth Circuit has often denied claims for lack of prejudice due to the double-edged nature of the evidence. *See Gray*, 616 F.3d at 449 (Petitioner "cannot show prejudice because much of the new evidence is 'double edged' in that it could also be interpreted as aggravating."); *Miniel v. Cockrell*, 339 F.3d 331, 346-48 (5th Cir. 2002) (upholding the state court's conclusion that petitioner suffered no prejudice from counsel's failure to investigate and present evidence of abuse and neglect during childhood), *cert. denied*, 540 U.S. 1179 (2004); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (failure to present evidence of troubled childhood, mental retardation diagnosis as a child, low IQ test score, being placed on a psychomotor inhibitor, and good behavior in institutional settings not prejudicial because some of the evidence was double-edged, and the rest had only "minimal" mitigating value); *Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("[W]e have repeatedly rejected IAC claims where alleged failures to investigate mitigating evidence did not prejudice the defendant because of the double-edged nature of the evidence available."), *cert. denied*, 563 U.S. 991 (2011).

The Court observes that Petitioner claims that the mitigating evidence was not investigated nor developed because the defense team was leaderless, fractured and lethally unprepared. In support of this allegation, he placed special emphasis on the affidavit provided by Shelli Schade, the mitigation specialist, who was experiencing her first capital murder case. Petitioner's Ex. 30 ¶ 2. Ms. Schade claims that Mr. Hagood did not give her any guidance with respect to what he expected of her or what he wanted her to do. *Id.* at ¶¶ 3-4, 8-9. Petitioner also cites other affidavits from members of the defense team and members of his family that purportedly attacks Mr. Hagood's preparation for the punishment phase of the trial.

Lead counsel Hagood responded to the claim that he was not prepared as follows:

> [Petitioner] attacks me as unprepared and inept. [Petitioner] claims that we were not prepared to present our punishment case. This is patently false. Ms. Peterson and I spent many months preparing all aspects of the case. I had talked to several family members regarding [Petitioner's] background and childhood.
>
> Ms. Peterson and I never divided duties in this case in a manner that was set in stone. By and large, I handled voir dire and most of the experts. This was because I had experience of having done so in the past. Ms. Peterson procured Kate Allen with my consent. I did not know about Ms. Allen until shortly before she testified although I was glad Ms. Peterson had contacted Ms. Allen. Unfortunately, I was disappointed in Ms. Allen's performance. Her demeanor did not translate well to the rural community from which our jurors were selected. Likewise, Ms. Schade was employed based on a recommendation from the Texas Defender Service. I instructed Ms. Schade to do as much background as possible. All materials possessed by Ms. Peterson and myself were available to her. At no time did she request more documents from us or tell us that she needed more information to do her job. I was disappointed in her performance. Having worked with Amanda Maxwell, a mitigation specialist also recommended by the Texas Defender Service, in another case, I can now see what Ms. Schade should have done. Ms. Schade allowed her personal feelings about the death penalty to effect her performance. While I would not hesitate to hire Ms. Maxwell again, I cannot say the same for Ms. Schade.

6 SHCR 2155. In her affidavit, Ms. Peterson added to Mr. Hagood's statement by noting that she "procured Kate Allen with Mr. Hagood's consent." *Id.* at 2166 ¶ 31.

With respect to the claim that counsel did not prepare the witnesses that he did call and the additional claim that he failed to call Petitioner's mother, Mr. Hagood responded as follows:

> [P]etitioner's mother was angry at [him] for killing her grandson. Although I could have gleaned useful background information from her testimony, I did not do so. She left the state and I made no attempt to subpoena her or get her back to Grayson County, Texas for the trial. I was too afraid of what might come out of her mouth and further damage she might [do] to [Petitioner]. I had no intention of putting her on the stand and preferred that the State not have the opportunity either.
>
> I believed [Petitioner's] aunt, Doris Gonzales, would be my primary witness regarding mitigation. When I interviewed her she was articulate and passionate about the trial and obstacles faced by [Petitioner]. Once on the stand, however, she collapsed. She was unable to relate to the jury, despite my best attempts, in as clear and convincing a manner as she had during trial preparation.
>
> I had also prepared two of [Petitioner's] brothers and his father. They, too, had done a much better job in my office than they were able to do in court. Once I realized that they were not coming across well, I abandoned my questioning of those three witnesses.

*Id.* at 2154-55. Ms. Peterson likewise stated that Petitioner's mother was not cooperative. *Id.* at 2166 ¶ 31.

With respect to strategy and investigative findings, Mr. Hagood provided the following response:

> I was also aware of the family background and history of mental problems and alcohol abuse. That information to a jury could cut both ways. I certainly didn't want the jury to think that [Petitioner's] background and propensity for drug use and mental instability would make him more of a future danger. Additionally, I concentrated on relatives and friends with current, close relationships to [Petitioner]. Strategically, I did not want to introduce childhood anecdotes or the history of distant relations. Through my investigation and interviews with friends and family members, I had been told that [Petitioner] had engaged in conduct as a child, long before any onset of mental illness, that involved cruelty to animals and setting fires. I am aware of the MacDonald triad which refers to the three major personality traits in children that are said to be warning signs for the tendency to become a serial killer: the three are bedwetting, firestarting and cruelty to animals. They were first described by J. M. MacDonald in his article "The Threat to Kill" in the American Journal of Psychiatry. Not all children who exhibit these signs grow up to develop antisocial personality disorder, but these signs are found in significantly higher proportions than in the general population. Generally, two out of three indicates a very strong tendency towards sociopathy. Although some researchers have called the triad into question, these three traits were included in the Diagnostic and Statistical Manual of Mental Disorders IV-TR under conduct disorder at the time of [Petitioner's] trial. I was afraid that the jury would see this as a sure sign that [Petitioner] would be a future danger. As such, I did not seek out all friends and relatives. Although I would have liked Ms. Schade to come up with more mitigating evidence, I felt that I was presenting the case to the jury most likely to sway them.

*Id.* at 2155-56. Petitioner's reply to the answer asserts that Mr. Hagood's affidavit is not credible. He refers to the affidavit as "revisionist history," which should be rejected.

After accumulating all of the aforementioned evidence and conducting oral arguments, the state trial court issued lengthy findings of fact regarding the claim that counsel was ineffective during the punishment phase of the trial:

129. Members of [Petitioner's] family, friends and community leaders were available at the time of [his] trial to inform counsel, experts, and jurors about [his] life.

130. The defense team did not contact all of [Petitioner's] family members. Nor did Ms. Schade draft a social history or mitigation report.

131. Mr. Hagood spent many months preparing all aspects of the case. He states that he talked to several family members regarding [Petitioner's] background and childhood.

132. [Petitioner's] mother was angry at [him] for killing her grandson. Although Mr. Hagood states that he could have gleaned useful background information from the mother's testimony, Mr. Hagood did not do so. She had left the state and Mr. Hagood states he made no attempt to subpoena her or get her back to Grayson County, Texas for trial. Mr. Hagood states that this was because he was too afraid of what might come out of her mouth and the further damage she might do to [Petitioner]. Mr. Hagood states that he had no intention of putting her on the stand and preferred that the state not have that opportunity either.

133.    Mr. Hagood believed [Petitioner's] aunt, Doris Gonzalez, would be the primary defense witness regarding mitigation. When Mr. Hagood interviewed her she was articulate and passionate about the trial and obstacles faced by [Petitioner]. Once on the stand, she collapsed. She was unable to relate to the jury despite Mr. Hagood's best attempts as she had during trial preparation.

134.    Mr. Hagood also prepared two of [Petitioner's] brothers and his father. They, too, had done a much better job in Mr. Hagood's office than they were able to do in court. Mr. Hagood states that once he realized that they were not coming across well, he abandoned his questioning of those three witnesses.

135.    Ms. Peterson (Cate) procured Kate Allen with Mr. Hagood's consent. Mr. Hagood did not know about Ms. Allen until shortly before she testified, although he was glad Ms. Peterson (Cate) had contacted Ms. Allen. Mr. Hagood was disappointed with Ms. Allen's performance because her demeanor did not translate well to the rural community from which our jurors were selected.

136.    Ms. Schade was employed based on a recommendation from the Texas Defender's Service.

137.    Mr. Hagood states that he instructed Ms. Schade to do as much background as possible. All materials possessed by the defense were available to her.

138.    Mr. Hagood was disappointed in Ms. Schade's performance. Mr. Hagood states that having worked well with Amanda Maxwell, a mitigation specialist also recommended, by the Texas Defender Service, in another case, he can now see what Ms. Schade should have done.

139.    Mr. Hagood also states that Ms. Schade allowed her personal feelings about the death penalty to affect her performance.

140.    Ms. Schade was admonished by the court to restrain herself because a juror had complained about her action in the courtroom.

141.    Mr. Hagood was aware of the family background and history of mental problems and alcohol abuse.

142.    Mr. Hagood felt that such information to a juror could cut both ways.

143.    Mr. Hagood did not want the jury to think that [Petitioner's] background and propensity for drug use and mental instability would make him more a future danger.

144.    Mr. Hagood concentrated on relatives and friends with current close relationships to [Petitioner]. Strategically, Mr. Hagood states that he did not want to introduce childhood anecdotes or the history of distant relations.

145.    Through his investigation and interviews [with] friends and family members, Mr. Hagood had been told that [Petitioner] had engaged in the conduct as a child long before any onset of mental illness that involved cruelty to animals and setting fires.

146.    Mr. Hagood was afraid that the jury could see this as a sure sign that [Petitioner] would be a future danger as such, Mr. Hagood did not seek out all friends and relatives.

10 SHCR 3545-47. Petitioner has not rebutted the presumption of correctness that must be accorded to these findings of fact with clear and convincing evidence. *See Miller-EL*, 545 U.S. at 240.

The state trial court proceeded to issue the following conclusions of law on this claim:

100. [Petitioner] has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense or that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different.

102. [Petitioner] has failed to prove by a preponderance of the evidence that Mr. Hagood was not employing trial strategy in his selection of punishment witnesses.

103. [Petitioner] has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient and that he was not acting as a reasonably competent attorney in that his trial strategy was not in the range of competence required of attorneys in criminal cases in his selection and handling of punishment witnesses.

10 SHCR 3581. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

In the present petition, Petitioner presents a long list of additional witnesses who could have been interviewed and called as witnesses during the punishment phase of the trial. However, "there comes a point at which evidence from more distant relatives can be expected to be only cumulative, and the search for it distractive from more important duties." *Bobby*, 558 U.S. at 11. *See also Simon v. Epps*, 394 F. App'x 138, 144 (5th Cir. 2010), *cert. denied*, 562 U.S. 1290 (2011). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In the present case, defense counsel's strategy was to concentrate on close friends and relatives, who, in fact, testified. The anticipated testimony of the proposed additional witnesses would have been cumulative. Similarly, testimony from additional expert witnesses would have been cumulative. Counsel's representation was not deficient for failing to present cumulative testimony.

To the extent Petitioner argues that counsel should have presented evidence of problems experienced by other family members, *Wiggins* requires counsel to investigate evidence of abuse and disadvantages experienced by him. *Wiggins*, 539 U.S. at 535. If his mother or grandmother or cousins

were on trial, then their history would have been relevant. Nonetheless, evidence was presented about problems experienced by other family members to the extent that Petitioner was affected by their experiences, including evidence of poverty, an unstable home, his father's drinking and Brian's mental problems. Counsel's representation was not deficient for failing to present mitigating evidence regarding other family members that did not directly impact Petitioner.

Furthermore, to the extent that these witnesses would have offered "double-edged" testimony, Mr. Hagood engaged in reasonable trial strategy in deciding to forego calling them as witnesses. He sensibly wanted to avoid presenting testimony providing the jury a sure sign that Petitioner would be a future danger. The decision to forego presenting "double-edged" evidence is a reasonable trial strategy. *See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.) (holding "that a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable"), *cert. denied*, 540 U.S. 968 (2003); *Mann v. Scott*, 41 F.3d 968, 984 (5th Cir.) (noting the heavy deference owed trial counsel when deciding as a strategical matter to forego admitting evidence of a 'double-edged nature' which might harm defendant's case), *cert. denied*, 514 U.S. 1117 (1994); *Rodriguez v. Quarterman*, 204 F. App'x. 489, 500 (5th Cir. 2006) (The decision to forego presenting double-edged evidence regarding petitioner's permanent brain damage was reasonable since it could have bolstered the State case regarding future dangerousness.), *cert. denied*, 549 U.S. 1350 (2007). Counsel's tactical decision to forego presenting double-edged testimony was objectively reasonable and does not amount to deficient performance. *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citations omitted), *cert. denied*, 528 U.S. 1013 (1999).

In conclusion with respect to this claim, Petitioner has not shown that counsel's representation was deficient in his selection of punishment witnesses. Moreover, since the evidence the additional witnesses would have presented was cumulative, he cannot show prejudice. Finally, to the extent that their testimony would have been double-edged, their testimony would have had limited mitigating value, if any, which would have been outweighed by the aggravating nature of such evidence. Overall, having reweighed the evidence in aggravation against the totality of available mitigating evidence, the Court finds that Petitioner has not shown that, had counsel presented all of the available mitigating

evidence, there is a reasonable probability that a juror would have found that the mitigating evidence outweighed the aggravating evidence. Petitioner has not shown that counsel was ineffective during the punishment phase.

In addition to the foregoing, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. In particular, he failed to show that the state court's finding that he had not shown prejudice was unreasonable. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to overcome the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. Claim number fourteen lacks merit.

**Claim Number 15:  The trial court placed unconstitutional limitations on Petitioner's presentation of mitigating evidence.**

In claim number fifteen, Petitioner complains that the trial court limited the testimony of his expert, Dr. Kate Allen. More specifically, the trial court granted the State's motion *in limine* and instructed Dr. Allen to "avoid anything that says mitigation or moral culpability." 41 RR 124. The trial court also held that Dr. Allen could not be called a "mitigation specialist" in open court; instead, she was to be referred to as a "social worker." *Id.* at 24. Finally, she was prohibited from testifying as to any conversations she had with Petitioner one day earlier, wherein he expressed remorse for the killing, because such testimony was inadmissible hearsay. *Id.* 26-27.

The Director argued that the trial court properly limited Dr. Allen's testimony under evidentiary rules. Petitioner did not address the response in his reply.

The state trial court issued the following conclusions of law on this claim:

116.  The trial court properly limited Dr. Allen from testifying that she believed evidence was "mitigating" or referring to a "mitigation time line" compiled by a "mitigation expert."

117.   The trial court properly prevented Dr. Allen from testifying that [Petitioner] had expressed remorse to her the night before Dr. Allen testified. The Court of Criminal Appeals has decided that the federal constitution does not require admission of a defendant's self-serving, out-of-court declarations of remorse when they are inadmissible under state law even when these declarations meet the test of constitutional "relevancy." *See Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991) (defendant's hearsay expressions of remorse not admissible at punishment phase of capital murder trial); *Thomas*, 638 S.W.2d at 484 (defendant's self-serving hearsay declarations in mitigation are ordinarily inadmissible). Although "[r]emorse following commission of a serious crime may well be a circumstance tending in some measure to mitigate the degree of a criminal's fault, but it must be presented in a form acceptable to the law of evidence before he is entitled to insist that it be received over objection." *Renteria v. State*, 206 S.W.3d 689, 697 (Tex. Crim. App. 2006).

10 SHCR 3583-84. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

"The use of mitigation evidence is the product of the requirement of individualized sentencing." *Kansas v. Marsh*, 548 U.S. 163, 174 (2006) (citations omitted). In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), a plurality of the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (emphasis in original). The Court held that the sentencer must have full access to "highly relevant" information. *Id.* at 603. A majority of the Court adopted the *Lockett* ruling in *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The *Lockett* and *Eddings* decisions were revisited in *Johnson v. Texas*, 509 U.S. 350 (1993). The Court read these cases narrowly:

> *Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all.

*Id.* at 361 (citations omitted). *Lockett* "does not deprive the State of its authority to set reasonable limits on the evidence a defendant can submit, and to control the manner in which it is submitted." *Oregon v. Guzek*, 546 U.S. 517, 526 (2006). "States are free to structure and shape consideration of

mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty." *Id.* (citations and internal quotation marks omitted).

In the present case, the trial court's ruling did not cut off in an absolute manner the presentation of mitigating evidence; instead, the trial court required the presentation of the evidence in a manner consistent with evidentiary rules. The TCCA has repeatedly held that only the individual juror can decide what mitigating weight, if any, is to be given to particular evidence. *See Curry v. State*, 910 S.W.2d 490, 495 (Tex. Crim App. 1995). "Although technically a 'factual question,' the mitigation issue is in reality a normative determination left to the subjective conscience of each juror." *Howard v. State*, 941 S.W.2d 101, 119 (Tex. Crim. App. 1996). The Director persuasively argued that Dr. Allen was not qualified to give such an opinion and that the trial court's limits were appropriate.

The trial court likewise reasonably prohibited Dr. Allen from telling the jury that Petitioner had expressed remorse to her. As was noted by the trial court, the TCCA has consistently held that the Constitution does not require the admission of a criminal defendant's self-serving, out-of-court declarations of remorse when they are inadmissible under state law. *See Lewis v. State*, 815 S.W.2d at 568 (defendant's hearsay expressions of remorse not admissible at punishment phase of capital murder trial); *Thomas*, 638 S.W.2d at 484 (defendant's self-serving hearsay declarations in mitigation are ordinarily inadmissible); *Renteria*, 206 S.W.3d at 697 (Although "[r]emorse following commission of a serious crime may well be a circumstance tending in some measure to mitigate the degree of a criminal's fault, but it must be presented in a form acceptable to the law of evidence before he is entitled to insist that it be received over objection."). Furthermore, even if Dr. Allen should have been allowed to testify to Petitioner's self-serving declarations of remorse, he cannot show harm since several other witnesses had already testified that he was sorry and worried about forgiveness. Overall, the trial court's rulings were consistent with the Supreme Court's holding that states can structure and shape the consideration of mitigating evidence. States are not required to disregard their evidentiary rules in capital cases. The fifteenth ground for relief lacks merit.

In addition to the foregoing, Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. He has not satisfied the requirements of § 2254(d); thus, all relief on claim number fifteen must be denied.

**Claim Number 16:** **Sentencing Petitioner to death violates the prohibition on cruel and unusual punishment set forth in the Eighth Amendment to the United States because Petitioner is indisputably and severely mentally ill.**

Petitioner's sixteenth ground for relief is a claim that he should not be executed because he is mentally ill. He supports his claim by citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 609-10 (1999), and *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). *Olmstead*, however, concerns confining mentally disabled patients in a segregated environment. It has nothing to do with the execution of mentally ill inmates. Petitioner's reliance on *Atkins* is likewise misplaced. *Atkins* prohibits the execution of mentally retarded inmates. It does not cover the execution of mentally ill inmates separate and apart from mental retardation. The Director correctly observed that the Fifth Circuit has held that the Supreme Court has not "created a new rule of constitutional law, made retroactive by the Supreme Court, making the execution of mentally ill persons unconstitutional." *In re Neville*, 440 F.3d 220, 221 (5th Cir.), *cert. denied*, 546 U.S. 1161 (2006). *See also In re Woods*, 155 F. App'x 132, 136 (5th Cir. 2005) ("*Atkins* did not cover mental illness separate and apart from mental retardation, and [petitioner] points to no Supreme Court case creating such a rule."). Since the pleadings were filed in this case, the Fifth Circuit rejected yet another claim by a death row inmate that the Eighth Amendment prohibits the execution of the mentally ill. *Mays*, 757 F.3d at 219. The ground for relief lacks merit and is foreclosed by Fifth Circuit precedent. The Director also properly observed that relief must be denied because Petitioner is attempting to rely on a new rule of law, which is barred by *Teague v. Lane*, 489 U.S. 288 (1989).

In addition to the foregoing, the claim should be denied for reasons explained by the state court. The trial court issued the following conclusion of law:

> 137.   The execution of mentally retarded persons and insane persons violates the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304 (2002); *Ford v. Wainwright*, 477 U.S. 399 (1986). There is no Supreme Court authority or authority from the Texas Court

of Criminal Appeals suggesting that mental illness is enough to render one immune from execution under the Eighth Amendment.

138. The Court of Criminal Appeals has previously rejected an invitation to extend the federal constitutional proscription against execution of the insane to the greater category of mentally ill defendants. *Colburn v. State*, 966 S.W.2d 511 (Tex. Crim. App. 1998).

139. [Petitioner] has failed to prove by a preponderance of the evidence that the Court of Criminal Appeals should extend the prohibition in *Atkins* to those who are mentally ill.

10 SHCR 3588-89. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. He has not satisfied the requirements of § 2254(d); thus, all relief on claim number sixteen must be denied.

### Claim Number 17: As Petitioner is no longer a future danger, his death sentence violates the Eighth and Fourteenth Amendments.

Petitioner argues that he should not be executed because he is no longer a future danger in light of the fact that he plucked out both of his eyes and is completely blind. The claim was presented for the first time in Petitioner's second state application for a writ of habeas corpus. The TCCA dismissed the application as an abuse-of-the-writ pursuant to Texas Code of Criminal Procedure Article 11.071 § 5. The TCCA included the following remarks in dismissing the claim:

[Petitioner] alleges that due to his blindness there is no longer a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. *See* Art. 37.071, § 2(b)(1). But our law imposes no such requirement. The question was whether there was such a probability when he was convicted. The jury found that there was, and this application contains no claim that would make the judgment of the trial court improper. Accordingly, the application is dismissed.

*Ex parte Thomas*, 2010 WL 1795738, at *1.

The Director argues that the dismissal of the claim as an abuse-of-the-writ by the TCCA operates as a procedural bar. The procedural default doctrine announced in *Coleman* was previously

discussed on pages thirteen through fourteen and again on page twenty-four of this memorandum opinion. "A district court must deny federal habeas relief on procedurally defaulted claims dismissed 'pursuant to an independent and adequate state procedural rule,' such as Texas's abuse-of-the-writ doctrine." *Reed* 739 F.3d at 767. Petitioner has not attempted to overcome the procedural bar by showing cause and prejudice or a fundamental miscarriage of justice; thus, the claim is procedurally barred.

The Director also appropriately observed that the Fifth Circuit has rejected a challenge to a finding of future dangerousness premised on a change of circumstances over time as *Teague*-barred. *Hughes v. Johnson*, 191 F.3d 607, 623-24 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000). Petitioner's claim that he is no longer a continuing threat to society because of his self-inflicted blindness would likewise create a new rule of law that is barred by *Teague's* non-retroactivity doctrine.

Relief on claim number seventeen is thus foreclosed as procedurally barred and by *Teague's* non-retroactivity doctrine.

### Claim Number 18: Defense counsels' copious failure in handling expert witnesses further deprived Petitioner of effective assistance of counsel.

Petitioner argues that the evidence makes it clear that his actions were not those of a sane and rational person. He stresses that he was mentally ill and suffering from schizophrenia at the time of the murders. As a result of his mental illness, he acted under the psychotic delusion that he was doing God's will. He complains that the State obtained a conviction with surprising ease despite this evidence. He blames his counsel for failing to develop and implement any meaningful strategy with regard to expert witnesses or failing to investigate the facts relevant to their opinions.

### A. Counsel was ineffective for failing to prepare and present essential testimony from psychiatric expert Dr. Edward Gripon.

Petitioner initially argues that counsel was ineffective with respect to his star expert, Dr. Edward Gripon. He asserts that counsel "failed completely to prepare" and "provide Dr. Gripon with available information" regarding his sanity. Petition at 245. He characterized counsel as incompetent and disorganized.

Lead counsel Hagood provided the following response:

> [Petitioner] attaches an affidavit from Dr. Gripon stating that he did not remember reviewing all of the materials we were given by the State in discovery. My recollection is that we gave him a copy of everything we had received in discovery. The offense reports clearly reference recordings being placed into evidence. Because Dr. Gripon reviewed all of the materials, had he seen that evidence existed, such as recorded interviews, but not provided to him, I would have expected him to inquire as to their location. Dr. Gripon never complained that items were missing from materials sent to him. I discussed the case with Dr. Gripon originally and instructed him to do everything necessary for his evaluation. I was never given a list of questions from Dr. Gripon, but I did spend a considerable time going over the questions I would be asking Dr. Gripon. I even spent a couple of hours with Dr. Gripon in his hotel room the night before he testified going back over questions and issues. I made sure the doctor knew that I would ask him about his qualifications, his interviews and examinations of [Petitioner] and would then elicit his opinion regarding sanity. I do not know which questions Dr. Gripon specifically asked me to use that were not use in some manner. Strategically, there may have been some questions I did not ask. Our position was always that [Petitioner's] psychosis was not caused by a substance but was organic. However, I had discussed the case with Dr. Crowder and Dr. Richard Rogers. I attempted to avoid any questions of Dr. Gripon which would highlight that [Petitioner] was willingly taking drugs prior to the murders as well as anything that would make [Petitioner] more blameworthy or less sympathetic in front of the jury. Dr. Crowder had been unable to rule out substance induce psychosis and Dr. Rogers indicated that testing showed [Petitioner] was manipulative and "blew the top off" the questions indicating malingering. I was being careful not to elicit information from our expert which the State's experts could use against [Petitioner].

6 SHCR 2152-53.

At trial, Dr. Gripon was asked by defense counsel what items he had reviewed in reaching his evaluation of Petitioner's sanity. Dr. Gripon provided the following answer:

> I have reviewed offense reports, crime scene photographs, witness statements, videotapes, audiotapes, information from those who interviewed this individual around or about the time of the arrest and subsequent to that. I've reviewed jail records. I reviewed medical records. I've reviewed treatment records of his treatment once he was begun on treatment using psychotic medication. I reviewed reports of other people who have examined him and interviewed him and whatever opinion or conclusion they have come to. I've read expert reports in regard to this particular case of people who have testified. I've read anything that was provided to me that would help me have some kind of understanding of this man in these circumstances.

36 RR 73. He added that he had been told that he had been provided everything the defense had. *Id.*

It is noted that Dr. Gripon specified in his affidavit that counsel provided him with numerous materials, although he also noted a few items that he did not receive. 2 SHCR 445 ¶¶ 4, 6.

Regardless of any omissions that may have occurred, the transcript from the trial reveals that Dr. Gripon effectively discussed schizophrenia, delusions associated with schizophrenia, and hallucinations. 36 RR 77-83. He opined that Petitioner's treatment in jail was "most consistent with

treating a chronic schizophrenic condition." *Id.* at 83. He testified that he had considered drug-induced psychosis, but he ruled it out. *Id.* at 92. Dr. Gripon was of the opinion that Petitioner was still in a state of psychosis at the time he plucked out his eye. *Id.* at 96. After discussing all of the reasons upon which he formed his opinion, Dr. Gripon finally gave his opinion as to Petitioner's mental status at the time of the murders as follows:

> I believe that he was operating under the effect of a psychotic illness at that time, specifically schizophrenia, in which he believed that he was doing what was directed by or that he was at least operating under the direction of God in fighting these demons, saving the world; that that was all based on psychosis, and that based upon that psychosis, he did not know that that conduct at that time was wrong.

*Id.* at 99-100. On cross-examination, he acknowledged that Drs. Scarano and Axelrad were highly qualified and they were of the opinion that Petitioner's psychosis was substance induced. *Id.* at 102. In his affidavit, Dr. Gripon noted that there were additional questions that could have been asked that would have supported a finding of insanity. 2 SHCR 446 ¶ 11. Overall, a review of the record reveals that Dr. Gripon effectively presented a basis for the jury to find that Petitioner was insane at the time of the offense, but the jury believed the State's witnesses. Counsel's representation with respect to Dr. Gripon was not deficient simply because the jury found against Petitioner on this issue.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding the claim that counsel was ineffective with respect to Dr. Gripon:

> 186. Mr. Hagood's recollection is that the defense gave Dr. Gripon a copy of everything they had received in discovery.

> 188. Mr. Hagood handled Dr. Gripon's testimony.

> 190. Mr. Hagood states that Dr. Gripon never complained to him that items were missing from the materials sent to the doctor.

> 191. Mr. Hagood also states that he was never given a list of questions from Dr. Gripon, but did spend a considerable time going over the questions the defense would be asking Dr. Gripon.

> 192. Mr. Hagood states that he spent a couple of hours with Dr. Gripon in his hotel room the night before he testified going back over questions and issues.

193. Mr. Hagood states that he made sure the doctor knew that he would be asked about his qualifications, interviews and examinations of [Petitioner] and would then illicit [sic] his opinion regarding sanity.

194. Mr. Hagood states that he does not know which questions Dr. Gripon specifically asked Mr. Hagood to use that were not used in some manner.

195. Dr. Gripon is not specific about which questions Mr. Hagood should have asked.

196. Mr. Hagood states that strategically there may have been some questions the defense did not ask.

197. Mr. Hagood states that during the examination of Dr. Gripon, Hagood was being careful not to illicit [sic] information from Gripon which the state's experts could use against [Petitioner].

10 SHCR 3555-56. Petitioner complains that the state court's findings were based solely on Mr. Hagood's recollection; nonetheless, the findings of fact were supported by the evidence even though there was some evidence to the contrary. Petitioner has not overcome the presumption of correctness that must be accorded to the state court findings with clear and convincing evidence.

The state trial court proceeded to issue the following conclusions of law:

89. [Petitioner] has failed to prove by a preponderance of the evidence exactly what questions Mr. Hagood did not ask Dr. Gripon.

90. [Petitioner] has failed to prove by a preponderance of the evidence that the decision not to ask certain questions was not trial strategy.

92. [Petitioner] has failed to prove by a preponderance of the evidence that counsel's performance was constitutionally deficient and was not acting as a reasonably competent attorney, and his advice was not within the range of competence demanded of attorneys in criminal cases.

93. [Petitioner] has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense and that there is a reasonabl[e] probability but for counsel's unprofessional err[or]s the results of the proceeding would have been different.

10 SHCR 3579-80. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner disputes these findings, but he has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted

in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. His first ineffective assistance of counsel claim under claim number eighteen regarding Dr. Gripon must be rejected because it lacks merit and because he has not satisfied the requirements of § 2254(d).

> **B.**     **Defense counsel's failure to lodge a *Daubert/Kelly* objection to Dr. Victor Scarano's testimony constituted ineffective assistance of counsel.**

> **C.**     **Defense counsel's failure to lodge a *Daubert/Kelly* objection to Dr. David Axelrad's testimony likewise constituted ineffective assistance of counsel.**

Petitioner argues that defense counsel was ineffective for failing to lodge objections to the testimony of Dr. Victor Scarano and Dr. David Axelrad pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and the *Kelly/Frye* standard, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Daubert* and *Frye* did not, however, set a constitutional standard for the admissibility of expert testimony. *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995). *Daubert* simply examined the standard of the admissibility of scientific evidence under the Federal Rules of Evidence. A violation of *Daubert* does not equal a constitutional violation. After the petition was filed in this case, the Fifth Circuit, in another capital murder case, rejected a claim based on *Daubert* with the explanation that such claims are "squarely foreclosed by Supreme Court and circuit precedent." *Rivas v. Thaler*, 432 F. App'x 395, 404 (5th Cir.) (citations omitted), *cert. denied*, 132 S. Ct. 850 (2011). More recently, in yet another capital murder case, the Fifth Circuit held that *"Daubert* does not apply" and rejected an ineffective assistance of counsel claim based on counsel's failure to challenge the State's psychiatric and psychological experts based on *Daubert*. *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015). The Fifth Circuit subsequently rejected similar claims based on *Daubert* in *Gonzales v. Stephens*, 606 F. App'x 767, 774-75 (5th Cir. 2015), and *Holiday v. Stephens*, 587 F. App'x 767, 783 (5th Cir. 2014),

*cert. denied*, 135 S. Ct. 2893 (2015). There is no legal basis to Petitioner's claim that defense counsel was ineffective for failing to lodge objections to the testimony of Dr. Scarano and Dr. Axelrad based on *Daubert*, *Frye* and related cases.

In addition to the foregoing, the claim lacks merit because counsel did not have a basis to object to Drs. Scarano and Axelrad testifying. Mr. Hagood noted in his affidavit that he was provided their credentials and was aware of their qualifications before trial. 6 SHCR 2149. He was present when they examined Petitioner, and he observed their professionalism. *Id.* at 2149-50. They appeared knowledgeable and followed the protocol most doctors use. *Id.* at 2150. He consulted with his expert, Dr. Jay Crowder, and their testimony was consistent with the information provided by his expert. *Id.* Mr. Hagood concluded that requesting a *Daubert/Kelly* hearing would have been frivolous. *Id.* Counsel was not required to make frivolous objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527. "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark*, 19 F.3d at 966.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding the claim that counsel was ineffective with respect to Dr. Scarano and Dr. Axelrad:

119.   Trial counsel did not raise a *Daubert* challenge to Dr. Scarano or Dr. Axelrad.

163.   Dr. Scarano's testimony was consistent with what the defense expert, Dr. Crowder, had told Mr. Hagood.

164.   Mr. Hagood felt requesting a *Daubert/Kelly* hearing regarding Scarano and Axelrad would be frivolous.

165.   The majority of Dr. Scarano's work as a full-time forensic psychiatrist is in the examination and evaluation of individuals involved in the criminal justice system, as was the case with [Petitioner].

166.   Dr. Scarano is often appointed as a forensic psychiatrist expert by courts. In addition, his services are employed as a consulting and/or testifying expert by the prosecution and the defense in criminal cases. A large portion of the defendants on whom he performs forensic psychiatric examinations/evaluations have a history of drug abuse. Evaluation of the defendant's abuse of drugs is an integral and important part of the forensic psychiatrist examination/evaluation.

168.   This court finds that Dr. Scarano is a qualified expert in forensic psychiatry.

170. Based on the facts of the case and the information provided to the defense, Mr. Hagood did not believe the trial court would have prevented Dr. Axelrad's testimony.

10 SHCR 3554, 3551-52. Petitioner criticizes these findings by saying that the state habeas court's findings were issued without consideration of the salient facts. The findings, however, were based on the facts before the court. Petitioner has not overcome the presumption of correctness that must be accorded to the state court findings with clear and convincing evidence.

The state trial court accordingly issued the following conclusions of law:

73. [Petitioner] has failed to prove by a preponderance of the evidence that Dr. Scarano was not qualified to render a diagnosis involving substance-induced psychosis.

74. [Petitioner] has failed to prove by a preponderance of the evidence that the Court would have excluded Dr. Scarano's testimony.

75. [Petitioner] has failed to prove by a preponderance of the evidence that defense counsel was ineffective for not requesting a *Daubert/Kelly* hearing regarding Dr. Scarano.

76. [Petitioner] has failed to prove by a preponderance of the evidence that Dr. Axelrad was not qualified to render a diagnosis involving substance-induced psychosis.

77. [Petitioner] has failed to prove by a preponderance of the evidence that the Court would have excluded Dr. Axelrad's testimony.

78. [Petitioner] has failed to prove by a preponderance of the evidence that defense counsel was ineffective for not requesting [a] *Daubert/Kelly* hearing on Dr. Axelrad.

10 SHCR 3577-78. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner disputes these findings, but he has gone no further than to argue that the state habeas court's conclusions were cursory and unreasonable. Nonetheless, the conclusions were reasonable in light of the evidence before the state court. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to

satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. Furthermore, his second and third ineffective assistance of counsel claims under claim number eighteen regarding Dr. Scarano and Dr. Axelrad must be rejected in light of clearly established Fifth Circuit precedent and because he has not satisfied the requirements of § 2254(d).

### D. Defense counsel's failure to call expert Larry Fitzgerald during the punishment phase denied [Petitioner] effective assistance of counsel.

Petitioner next complains that defense counsel was ineffective for failing to call Larry Fitzgerald during the punishment phase of the trial. He initially complained that Ms. Peterson hired Larry Fitzgerald at the last minute, and then he complained that defense counsel did not call him as a witness to show that he would not be a danger to society.

Larry Fitzgerald was initially questioned on voir dire outside of the presence of the jury. He testified that he had been the public information officer for the Texas Department of Criminal Justice, but he had retired by time of the trial. 41 RR 139. He stated that he had testified in about twelve capital murder trials. *Id*. at 140. On cross-examination, he testified that he did not develop any of the policies at the prison system. *Id*. at 141. He had not written any media articles; instead, he had testified about articles. *Id.* at 142. He stated that his qualifications to testify were based on spending "a lot of time down there inside the prison in my capacity." *Id.* at 143. His intent was to show a video prepared by the Texas Defender Service. *Id.* at 144. He described the Texas Defender Service as an advocacy group against the death penalty. *Id.* at 145. The group had sought him out, presumably because of his experience at the prison system. *Id.* at 146. The State specified that it did not object to Mr. Fitzgerald testifying, but defense counsel chose not to call him as a witness. *Id.* at 148.

Mr. Hagood reviewed Mr. Fitzgerald's testimony in his affidavit. He expressed the opinion that "Fitzgerald, under the blistering [] examination by the State did not come off as a respected expert. Instead, he looked like a bureaucrat who was being used by a defense oriented organization. I did not want a repeat of Fitzgerald's performance in front of the jury." 6 SHCR 2151. The Director observed

that prosecutor Ashmore stated in his affidavit that he was hoping that Mr. Fitzgerald would testify so that he could discredit him in front of the jury. *Id.* at 2331 ("I thought he was one of the worst witnesses I have seen in some time and felt that he would be very damaging if the defense used him."). The Court notes that following the trial in this case the Fifth Circuit upheld a state trial court's decision prohibiting Mr. Fitzgerald from testifying during the punishment phase about the future dangerousness of a capital murder defendant. *Fuller v. Dretke*, 161 F. App'x 413, 416 (5th Cir.), *cert. denied*, 548 U.S. 936 (2006).

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding the claim that counsel was ineffective with respect to Larry Fitzgerald:

> 217. Mr. Fitzgerald had been questioned by the State out of the presence of the jury. The State had him admit that he was retired from the Texas Department of Criminal Justice where he had been employed as a public information officer. (RR vol. 41, p. 142) The State established that Fitzgerald did not aid in the development of TDCJ policies, had never investigated crimes in the penitentiary, and had not gathered any statistics of his own. (RR vol. 41, pp. 141-146) Fitzgerald also testified that the video tape he intended to show was provided by the Texas Defender Service. (RR vol 41, pp. 144-145)

> 218. Mr. Hagood believed that Fitzgerald did not come off as a respected expert.

> 219. Mr. Hagood's decision not to call Fitzgerald as a witness was trial strategy.

10 SHCR 3559. Petitioner did not attempt to overcome the presumption of correctness that must be accorded to the state court findings with clear and convincing evidence.

The state trial court proceeded to issue the following conclusions of law:

> 98. [Petitioner] has failed to prove by a preponderance of the evidence that Mr. Hagood's decision not to call Larry Fitzgerald was not trial strategy.

> 99. [Petitioner] has failed to prove by a preponderance of the evidence that counsel was not acting as a reasonably competent attorney and his advice was not within the range of competence demanded by attorneys in criminal case[s] by not introducing the testimony of Larry Fitzgerald.

10 SHCR 3580-81. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

94

Petitioner disputes Mr. Hagood's assessment of Larry Fitzgerald and argues that he should have been called as a witness. Nonetheless, Mr. Hagood observed the State question him on voir dire. He was of the opinion that Mr. Fitzgerald would not be a good witness. Mr. Hagood engaged in reasonable trial strategy in deciding not to use Larry Fitzgerald as a witness. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Indeed, there was a reasonable argument that Mr. Hagood did not call Larry Fitzgerald as a witness because he did not think he would be a good defense witness. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. His fourth ineffective assistance of counsel claims under claim number eighteen regarding Larry Fitzgerald should be denied because it lacks merit and because Petitioner has not satisfied the requirements of § 2254(d).

### E. Defense counsel's failure to investigate the qualifications of Royce Smithey or object to his inadmissible testimony constituted ineffective assistance of counsel.

Petitioner next complains that counsel did not investigate the qualifications of Royce Smithey or object to his testimony. The State called Mr. Smithey as an expert during the sentencing phase of the trial. Petitioner argues that Mr. Smithey was not qualified under the *Daubert* standard. The focus of the claim is Petitioner's argument that counsel was ineffective for failing to conduct even a basic investigation into Smithey's qualifications. He argues that he was not afforded relief in state court because of the state court's unreasonable application of federal law and unreasonable findings of fact.

As an initial matter, the Court again notes that the Fifth Circuit has rejected *Daubert* claims in the context of capital murder cases with the explanation that such claims are "squarely foreclosed by Supreme Court and circuit precedent." *Rivas*, 432 F. App'x at 404. Moreover, ineffective

assistance of counsel claims based on *Daubert* in the context of capital murder cases have been rejected. *Williams*, 761 F.3d at 571 ("*Daubert* does not apply"); *Gonzales*, 606 F. App'x at 774-75; *Holiday*, 587 F. App'x at 783. There is no basis to Petitioner's claim that defense counsel was ineffective for failing to challenge Mr. Smithey's testimony based on *Daubert*.

In addition to the foregoing, the claim lacks merit because Mr. Smithey was qualified as a witness, and counsel had no reason to object to him as a witness. At the time of the trial, Mr. Smithey was the chief investigator for the Texas Special Prison Prosecution Unit. He had regularly testified in death penalty cases. *See, e.g., Sells v. Stephens*, 536 F. App'x 483, 487 (5th Cir. 2013); *Fuller v. Johnson*, 114 F.3d 491, 497 (5th Cir. 1997); *Jones v. Cockrell*, 74 F. App'x 317, 321 (5th Cir. 2003). *See also Garcia v. Director, TDCJ-CID*, 73 F. Supp.3d 693, 751-762 (E.D. Tex. 2014); *Williams v. Thaler*, No. 1:09cv271, 2013 WL 1249773, at *9-12 (E.D. Tex. Mar. 26, 2013); *Simpson v. Quarterman*, Civil Action No. 1:04cv485, 2007 WL 1008193, at *21-23 (E.D. Tex. Mar. 29, 2007). The TCCA has found that his testimony regarding general prison conditions is both relevant and permissible. *Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008). Despite his extensive record of testifying in death penalty and non-death penalty criminal cases, Petitioner now alleges that counsel should have objected to Mr. Smithey testifying. Counsel, however, was not required to make frivolous or futile objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527. In light of the extensive case law finding that Mr. Smithey was an appropriate witness, Petitioner cannot show he was prejudiced by counsel's alleged failure to investigate Mr. Smithey's background or his failure to object to Mr. Smithey's testimony.

In addition to the foregoing, Mr. Hagood responded to the claim that he was ineffective with respect to Mr. Smithey as follows:

> [T]he State had announced its intention to call Royce Smithey. We did not challenge the witness' credentials because we intended to get much of the information Fitzgerald was to provide in through the State's witness. It would make no sense to seek to exclude a State's witness needed by the defense as well. We were successfully able to get our video tape into evidence and establish that [Petitioner] would be sent to the Connally Unit which was maximum security, the different classifications within the unit, security precautions in the unit, and that [Petitioner] could never reach the best classification of G1. We also were able to have Smithey testify that an inmate serving life in a capital case is not housed in open housing with other inmates, are ineligible for furloughs and trustee status and cannot work out side of the

facility. Smithey also testified that there was a psychiatric unit available and the homicide rate at TDCJ.

6 SHCR 2151. Mr. Hagood's response makes it clear that he actually wanted Mr. Smithey to testify. The decision not to challenge Mr. Smithey was reasonable trial strategy.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding the claim that counsel was ineffective with respect to Royce Smithey:

> 220. The defense did not challenge Smithey's credentials because they intended to get much of the information Fitzgerald was to provide in through the State's witness. Through Smithey, the defense was able to get a video tape of the conditions at prison into evidence and establish that [Petitioner] would be sent to the Connally Unit which was maximum security, the different classifications within the unit, security precautions in the unit and that [Petitioner] could never reach the best classification of G1. The defense was able to have Smithey testify that an inmate serving life in a capital case is not housed in open housing with other inmates, are ineligible for furloughs and trustee status and cannot work out side of the facility. Smithey also testified that there was a psychiatric unit available and to the homicide rate at TDCJ.

10 SHCR 3559-60. Petitioner did not overcome the presumption of correctness that must be accorded to the state court findings with clear and convincing evidence.

The state trial court proceeded to issue the following conclusions of law:

> 100. [Petitioner] has failed to prove by a preponderance of the evidence that a constitutionally deficient performance prejudiced his defense or that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would be different.

> 102. [Petitioner] has failed to prove by a preponderance of the evidence that Mr. Hagood was not employing trial strategy in his selection of punishment witnesses.

10 SHCR 3581. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner disputes Mr. Hagood's assessment of the situation and the state court's findings and conclusions; nonetheless, the findings and conclusions were supported by the evidence before the state court. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. His fifth ineffective assistance of counsel claims under claim number eighteen regarding Royce Smithey should be denied because it lacks merit and because Petitioner has not satisfied the requirements of § 2254(d).

F. **Defense counsel's failure to challenge the qualifications and testimony of Dr. Peter Oropeza constituted constitutionally ineffective assistance of counsel.**

Petitioner also challenges counsel's representation with respect to one last State expert, Dr. Peter Oropeza. He complains that counsel failed to challenge Dr. Oropeza's assessment of his competency and mental state at the time of the offense. During the state habeas proceedings, Dr. Oropeza provided an affidavit fully setting out his credentials, training and expertise. At the time of the trial, he was a clinical psychologist and an expert mitigation specialist. He was well qualified to testify at the time of the trial. In his affidavit, Mr. Hagood stressed that he did not have any reason to challenge Dr. Oropeza's qualifications. 6 SHCR 2151-52. Counsel was not required to make frivolous or futile objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding the claim that counsel was ineffective with respect to Dr. Peter Oropeza:

221. Dr. Peter Oropeza states that he has testified numerous times in different courts both for the State and the defense. Dr. Oropeza has always been found to be an expert. Dr. Oropeza has never had a challenge to his expertise sustained.

222. Dr. Oropeza was a psychologist licensed in this state who has a Doctoral degree in psychology prior to 2004.

223. Dr. Oropeza had at least 24 hours of specialized forensic training relating to incompetency or insanity evaluations prior to 2004.

224. Dr. Oropeza had completed six hours of required continuing education in courses in forensic psychiatry or psychology, as appropriate, in either of the reporting periods in the 24 months preceding the appointment prior to 2004.

225. The exams before the Texas Board of Examiners of Psychologists consists of a jurisprudence written examination, the national examination (EPPP), and an oral examination. An examinee must pass all three tests to become a licensed psychologist. On the jurisprudence written examination Dr. Oropeza [] received a score of 98, and on the national examination a score of 81. The oral boards include a review of a case vignette that involves a host of issues regarding a hypothetical case. Dr. Oropeza's practice was in the area of assessment and the board noted weaknesses regarding therapy issues. Dr. Oropeza addressed these issues in the next examination and passed. Applicants do not receive scores from the oral examination, rather, feedback is provided on areas to address and a simple pass or fail is given.

226. Dr. Oropeza only testified during the punishment phase of [Petitioner's] case.

227. Mr. Hagood knew that under 46B.022, Dr. Oropeza met the qualifications set out in subsections (a)(1), (a)(2)(B)(I) and (b), he was licensed by the appropriate board, had training consisting of 24 hours of specialized training relating to incompetency or insanity evaluations and he met his continuing education requirements.

10 SHCR 3560-61. Petitioner has not overcome the presumption of correctness that must be accorded to the state court findings with clear and convincing evidence.

The state trial court proceeded to issue the following conclusions of law:

82. [Petitioner] has failed to prove by a preponderance of the evidence that Dr. Peter Oropeza was not legally qualified or competent to testify to [his] competency or sanity.

83. [Petitioner] has failed to prove by a preponderance of the evidence that by choosing not to attack Dr. Oropeza's qualifications on non-existent grounds, counsel was not acting as a reasonably competent attorney, and his advice was not within the range of competence demanded of attorneys in criminal cases.

84. [Petitioner] has failed to prove by a preponderance of the evidence that if defense counsel had challenged Dr. Oropeza's qualifications, the challenge would have been sustained and that there is a reasonable probability that the result of the proceeding would have been different.

10 SHCR 3581. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner challenges Mr. Hagood's assessment of the situation and asserts that Dr. Oropeza's testimony was very damaging. Nonetheless, the record reveals that Dr. Oropeza was qualified to testify. Counsel did not have a legitimate basis upon which to challenge his qualifications or

testimony. The state trial court reasonably found that Mr. Hagood was not ineffective with respect to Dr. Oropeza. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective on this issue. His final ineffective assistance of counsel claims under claim number eighteen regarding Dr. Peter Oropeza should be denied because it lacks merit and because Petitioner has not satisfied the requirements of § 2254(d).

As a final matter with respect to claim number eighteen, Petitioner criticized counsel's representation with respect to each and every witness, expert or otherwise. His nitpicking of counsel's handling of each and every witness lessens the overall effectiveness of the claim. The Supreme Court has observed that "[f]ocusing on a small number of key points may be more persuasive than a shotgun approach." *Yarborough v. Gentry*, 540 U.S. 1, 7 (2003). Petitioner has employed a shotgun approach. None of his arguments in this claim are persuasive. None satisfy the requirements of § 2254(d).

### Claim Number 19: Defense counsel's repeated failures to object to inadmissible evidence was constitutionally ineffective.

In claim number nineteen, Petitioner argues that counsel was ineffective for failing to object to inadmissible evidence. In particular, he complains that counsel failed to object to unfounded lay opinion testimony, overtly leading questioning by the State, and hearsay.

### A. Lay opinion testimony

With respect to lay opinion testimony, Petitioner focused on testimony provided by Nurse Nancy Sims, Counselor Jennifer Loyless and Texas Ranger William Bennie. Petitioner asserts that the prosecution inappropriately sought to extrapolate lay opinions based on lay witnesses' perceptions

of Petitioner before or after the murders. He stressed that none of the lay witnesses actually witnessed or perceived anything at the time of the murders on March 27, 2004.

Nurse Sims was called during the defense's case-in-chief. Petitioner complains that Ms. Peterson elicited narrative, repetitive testimony that he had overcome his mental illness. The record reveals that Nurse Sims testified that Petitioner appeared more stable and less of a threat after his return from Vernon State Hospital. 33 RR 124. Petitioner told her that he no longer heard voices and that he wanted to go home and use Coricidin. *Id.* at 125. Petitioner complains that this line of questioning enabled the State to obtain, without objection, the following lay opinion from Nurse Sims on cross-examination:

> Q. On the evening of March 29th of 2004, after the defendant had been placed into the jail, he was in holding cell 3, correct?
>
> A. Correct.
>
> Q. And he asked to speak with you, correct?
>
> A. Yes.
>
> Q. And you walked up to holding cell 3, and the defendant said, I'm sorry.
>
> A. Correct.
>
> Q. Correct? You asked him what he was sorry for, he hadn't done anything to you. And he responded, I cut their hearts out. After I stabbed them, I cut their hearts out. I didn't mean to hurt anybody. Please, Ms. Natalie, as God as my witness, I didn't mean it.
>
> A. Correct.
>
> Q. Okay, Indicating -- does that indicate to you in any manner, shape, or form the defendant knew that cutting the hearts out of Laura Thomas, Andre Boren and Leyha Hughes that he had done something wrong?
>
> A. It indicates, yes, sir, that he does know.
>
> Q. And this is on March 29th of 2004, correct?
>
> A. Yes, sir.
>
> Q. And I think that you indicated, at least on the 30th, as I recall -- the 31st he indicated some delusional thinking.
>
> A. Yes.

Q.      So, even during the time he was going through some delusional thought process, he still was able to indicate to you that he knew what he had done was wrong.

A.      Yes, sir.

33 RR 130-31. *See also id.* at 133 (testimony that Petitioner's statement, "I'm sorry for everything I have done. I have let my family down" was an indication that he knew what he had done was wrong); *id.* at 136 (testimony that after Petitioner had pulled his eye out, he was still concerned about forgiveness - another indication that he knew what he had done was wrong); *id.* at 146 (even though Petitioner continued to exhibit delusional behavior, he continued "to recognize that he -- his actions were wrong in killing Laura Thomas and those two kids"). Petitioner complains that Nurse Sims provided lay opinion testimony, through egregiously leading questions, regarding his "mental state at the time of the murders - testimony which she had no basis to give." Petition at 282.

Petitioner next complains that Texas Ranger William Bennie expressed the opinion Petitioner took the quickest and easiest route, which was through Fairview Park, because he just committed a crime. 27 RR 171. The Director correctly observed that this testimony was actually provided by Sergeant Bruce Dawsey of the Sherman Police Department.

Petitioner also complains about the following testimony provided by defense witness Jennifer Loyless, a professional counselor and triage specialist at MHMR Services of Texoma, on cross-examination:

Q.      Are you familiar with Dextromethorphan?

A.      No, I'm not.

Q.      It is Coricidin. It is contained in Coricidin cold tablets, Cough and Cold.

A.      Yes.

Q.      And, of course, you are aware that that can cause problems in behavior in co -- in perception and cognition.

A.      I'm not a physician, but any substance could change that, yes. Correct.

Q.      So, it would be -- have been important to you insofar as knowing why the defendant was exhibiting this behavior or why he was saying what he did, to know whether he had been doing Coricidin, antipsychotic drugs, drinking, and smoking marijuana, prior to coming in and seeing you, right?

A.    Yes.

34 RR 24-25.

Lead counsel Hagood responded to the present ground for relief as follows:

[Petitioner] accuses me . . . of being ineffective for failing to object to lay opinion testimony. The complained of lay opinions were to my recollections actually questions about the witnesses' personal observations rather than medical diagnoses. There was no reason to object to her qualifications. In fact, I am personally familiar with Ms. Sims, and I believe the court would have allowed her to testify to [Petitioner's] actions since she has treated more than one mentally disturbed person in jail during her years as jail nurse.

6 SHCR 2156. The Director appropriately observed that Ms. Loyless simply agreed with the statement that substances can effect cognition and perception. The statement was nothing more than basic common knowledge that did not require scientific, technical or specialized knowledge. It is also noted that Drs. Scarano, Axelrad and Oropeza had testified at length that there is basic knowledge in the medical community. Finally, the Director opined that Sgt. Dawsey merely explained that he had walked the route described by Petitioner.

The Fifth Circuit has observed that "the distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *United States v. Ebron*, 683 F.3d 105, 136-37 (5th Cir. 2012) (citations omitted), *cert. denied*, 134 S. Ct. 512 (2013). "A witness who provides only lay testimony may give limited opinions that are based on the witness's perception and that are helpful in understanding the testimony or in determining a fact in issue, but the witness may not opine based on scientific, technical, or other specialized knowledge." *United States v. McMillan*, 600 F.3d 434, 456 (5th Cir.), *cert. denied*, 562 U.S. 1006 (2010). None of the opinions offered by these three witnesses were of a type based on scientific, technical or specialized knowledge. Defense counsel did not have a basis to object to their testimony. Counsel was not required to make frivolous or futile objections. *Johnson* , 306 F.3d at 255; *Koch*, 907 F.2d at 527. Counsel's failure to make meritless objections does not result in the ineffective assistance of counsel. *Clark*, 19 F.3d at 966 ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

103

In addition to the foregoing, the claim must be rejected because the state habeas court reasonably concluded that Petitioner has not shown that counsel was ineffective on this issue. 10 SHCR 3581 ¶¶ 104-05. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective for failing to object to the lay opinion testimony.

### B.    Leading questions

Petitioner also complains that counsel failed to object to the State's leading questions. For example, counsel did not object when the State suggested the answer to Ranger William Bennie (actually Sergeant Bruce Dawsey) regarding Petitioner's escape route from the murder scene. 27 RR 171. He also complained that the State asked Dr. Scarano to accede to the contention that Petitioner met the legal definition of voluntary intoxication prior to the murders. 31 RR 120. He asserts that the State continued to propound leading questions to other witnesses, such as questions to his father. He cites 28 RR 155 of the trial transcript, but the record shows that Ms. Peterson objected to the State's leading questions, and the trial court admonished the prosecutor not to lead the witness. Petitioner argues that he was prejudiced by counsel allowing the prosecutor to testify on his own.

Mr. Hagood responded to the claim as follows:

> Often, even if you can object, you do not to avoid annoying the jury or delaying the trial. This is particularly true if the information does not harm [Petitioner] or merely restates previous evidence. Often jurors think you are trying to hide something if you object to everything. In this case there were several instances where I chose not to object even if I had a legal basis to do so.

First, he claims that I allowed the prosecution to lead Ranger William A. Bennie. Having looked at the citation given by [Petitioner] in his application (vol. 27, p. 171) it is clear that I did not. Ranger Bennie's testimony is not contained at that location nor was Ranger Bennie ever asked a question regarding the "quickest route." The question regarding the quickest route was actually asked of Officer Dawsey. The information had been elicited by Ms. Peterson (vol. 27, p. 167) that the officer had walked what he believed to be the quickest route. There was simply no reason to object to a leading question when that evidence was already before the jury.

[Petitioner] also complains about leading questions to Dr. Scarano and my failure to object. Dr. Scarano had already testified about his diagnosis and his conclusions regarding [Petitioner]. There was no doubt that the court would allow the doctor to opine on whether [Petitioner's] illness and his subsequent conduct while in a psychotic state would be admissible. I strategically chose not to object to information that was admissible. I hoped the trial would move more rapidly and would prevent the State from dwelling at greater length on hurtful facts that would have been shown inevitably by questions in proper form.

Finally, [Petitioner] criticized us for not objecting to leading questions by Kerye Ashmore of [Petitioner's] father, Danny Thomas. First, Ashmore did not examine Mr. Thomas. That was done by Joe Brown. Second, Ms. Peterson and I did object to some leading questions throughout the case. The section cited by [Petitioner] (vol 28, p. 155) contains only one leading question which was objected to by Ms. Peterson. The other questions were of the "yes" or "no" variety and did not suggest the answer. Further, Mr. Thomas was a terrible witness. Leading questions often produce very short answers from a witness. The shorter his answers were, the better I believed it would be for [Petitioner]. For that reason alone Ms. Peterson and I should have allowed leading questions to pass without objection.

6 SHCR 2156-57. Co-counsel Peterson's response mirrored the comments by Mr. Hagood. *Id.* at 2166-67.

The first thing that stands out in evaluating defense counsels' responses is that they noted factual errors in Petitioner's state application, such as Officer Dawsey testifying as opposed to Ranger Bennie and Ms. Peterson's alleged failure to object to leading questions, but Petitioner repeated the same factual mistakes in the present petition. To that extent, Petitioner's claim lacks any basis in fact. Furthermore, the claim lacks merit because the Fifth Circuit has repeatedly held that the "failure to object to leading questions and the like is generally a matter of trial strategy as to which [the court] will not second guess counsel." *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993); *Villanueva v. Stephens*, 555 F. App'x 300, 308 (5thCir. 2014). Indeed, Mr. Hagood stated that he often had no reason to object to the question or that he chose, as a matter of trial strategy, not to object. Petitioner's failure to object to leading questions claim lacks merit.

In addition to the foregoing, the claim must be rejected because the state habeas court reasonably concluded that Petitioner has not shown that counsel was ineffective on this issue. 10 SHCR 3581 ¶¶ 104-05. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective for failing to object to leading questions.

### C.     Hearsay

Petitioner finally alleges that counsel was ineffective for failing to object to hearsay. In particular, he complains that counsel did not object to questions that elicited a hearsay response from Bryant Hughes aimed at developing "a rational motive for [Petitioner's] irrational murders: that [Petitioner] allegedly wanted Laura Boren back, and was enraged after she rejected him over the telephone." Petition at 285.

Mr. Hagood provided the following response to this claim:

The portion of Bryant Hughes testimony referenced by [Petitioner] (vol. 30, p. 39-43) may not have been hearsay. The statements attributed to the murder victim, Laura Hughes, were admitted to show that they were spoken, but not necessarily for the truth of the matter. Additionally, if Laura's phone conversation and subsequent statements were hearsay, they would qualify as an exception to the hearsay rule because it was a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling ...). Because I believed the court would let Laura's statements in, I certainly would not have objected because it would appear we were hiding something from the jury and because there would be many other ways that same evidence, regarding discord between [Petitioner] and his estranged wife, Laura, would come into evidence. If I had felt an objection was strategically warranted, I would have prompted Ms. Peterson to object.

6 SHCR 2157-58.

To the extent that the statement was admissible, counsel was not required to make frivolous or futile objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527. Counsel's failure to make meritless objections does not result in the ineffective assistance of counsel. *Clark*, 19 F.3d at 966 ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Moreover, the claim ultimately lacks merit because counsel engaged in reasonable trial strategy in not objecting to the testimony. The claim must also be rejected because the statement was "neither crucial to the prosecution nor devastating to the defense in the context of the trial as a whole." *Gochicoa v. Johnson*, 238 F.3d 278, 282 (5th Cir. 2000) (citation omitted). Furthermore, Petitioner cannot show prejudice arising from his claim of failure to object to harmless hearsay. *Id.* at 283. His claim is without merit.

In addition to the foregoing, the claim must be rejected because the state habeas court reasonably concluded that Petitioner has not shown that counsel was ineffective on this issue. 10 SHCR 3581 ¶¶ 104-05. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to show that there was no reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his burden of showing that counsel was ineffective for failing to object to allegedly hearsay testimony.

Overall, Petitioner has not shown that he is entitled to relief on claim number nineteen. All relief on this claim should be denied.

**Claim Number 20:** **Counsel was constitutionally ineffective for failing to object to the court's erroneous instruction on, and the entire evidence regarding, voluntary intoxication as there was no intoxication, and it should have never been allowed to infect the trial.**

In claim number twenty, Petitioner complains about the State's focus on the argument that he was voluntarily intoxicated at the time of the murders. He argues that counsel was ineffective with respect to this issue in the following four respects: (1) the trial court's preliminary instructions regarding the issue of voluntary intoxication, (2) the joint power point presentation made during voir dire, (3) the State's opening statement, and (4) the State's closing argument.

The record in this case clearly reveals that the defense strategy in this case was to show that Petitioner was not guilty by reason of insanity and that his psychosis was organic. The State countered the defense by presenting a case showing that Petitioner's psychosis was substance induced, arising from his combined use of alcohol, marijuana and DXM in the days, weeks and months leading up to the murders. Despite Petitioner's claims to the contrary, the State presented evidence supporting its counter argument. The issue of voluntary intoxication was properly before the jury.

The jury was charged as follows:

> It is an affirmative defense to the conduct charged that, at the time of conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

> The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial behavior.

> The burden of proof is on the defendant to prove such a defense by a preponderance of the evidence. The term "preponderance of the evidence" means the greater weight of credible evidence.

> You are further instructed that voluntary intoxication does not constitute a defense to the commission of a crime.

> "Intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

5 CR 1675-76. The instruction comports with state law. *See* Tex. Penal Code § 8.04. State law expressly provides that "[w]hen temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section." Tex. Penal Code § 8.04(c).

108

Petitioner contends that this was error because the record is "devoid of any proof that [he] was intoxicated at the time of the crime." The Director persuasively argued that the assertion simply is not true. As the State explained in its opening statement, "intoxication" applies not just to the exact time of the offense but also to any mental or physical disturbance resulting from the introduction of any substance into the body. 27 RR 35. The record fully supports the conclusion that Petitioner's psychosis was drug induced: (1) Petitioner told Dr. Oropeza that he smoked marijuana the night before the murders, 36 RR 106; (2) tests showed marijuana metabolites in Petitioner's urine; (3) a blood test revealed the presence of DXM several hours after the murders; (4) Petitioner told Nurse Sims that if he had not been on drugs, the murders would not have happened, 35 RR 42; and (5) Dr. Gripon admitted on cross-examination that the combined use of marijuana, alcohol and DXM could exacerbate a pre-existing condition of schizophrenia, 36 RR 111. Furthermore, numerous witnesses testified to Petitioner's alcohol and/or drug use. 27 RR 185-87; 29 RR 113, 137-40, 186, 203-04, 221-24, 226, 235; 31 RR 92-94. The State's experts also concluded that Petitioner's psychosis was substance induced. 31 RR 54, 112; 34 RR 78-79. Dr. Scarano testified that Petitioner admitted to consuming marijuana, alcohol and DXM approximately thirty-six hours before the murders. 31 RR 113-15. Based on the record, the jury instruction was entirely proper.

Further, to the extent that Petitioner contends that the voluntary intoxication instruction precluded the jury from finding insanity, his contention is fallacious. The jury could still have found Petitioner insane as long as: (1) they believed that his mental illness was not substance induced; and, (2) they believed that as a result of that mental illness, he did not know that what he was doing on the morning of March 27, 2004, was wrong. The bottom line is that the jury simply did not believe Petitioner's side of the story and rejected his defense that he was not guilty by reason of insanity.

Because voir dire was conducted with this in mind, and because the power point was presented to assist the jury understand the law, and because the State's opening and closing statements did not in any way misstate the law, counsel was not ineffective for failing to object. Counsel was not required to make frivolous or futile objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527.

The state court's conclusions of law on this issue include the following:

18.     Although voluntary intoxication is never a defense, an instruction for the jury's guilt/innocence determination on the law applicable to voluntary intoxication may be warranted when the record includes evidence of intoxication sufficient under the *Nethery*[5] standard. *Taylor v. State*, 885 S.W.2d at 157-58 (*applying Nethery*, 692 S.W.2d at 711-12). A voluntary intoxication instruction given in the guilt/innocence phase is erroneous if the record is devoid of sufficient intoxication evidence. *Taylor*, 885 S.W.2d at 158.

19.     The *Taylor* court held regarding voluntary intoxication in the guilt/innocence phase that "if there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions, an instruction is appropriate." *Id.* at 159. Numerous other cases have quoted this holding. *See, e.g., Robinson v. State*, 971 S.W.2d 96, 97-98 (Tex. App. Beaumont 1998); *Haynes v. States*, 85 S.W.3d 855, 858 (Tex. App. Waco 2002); *Miller v. State*, No. 01-03-00819-CR, 2005 WL 825762, at *7 (Tex. App. Hous. 2005); *McGrew v. State*, No. 14-04-00321-CR, 2005 WL 3116240, at *3 (Tex. App. Hous. 2005).

22.     A trial court has wide discretion in conducting voir dire, and its rulings are reviewed under an abuse of discretion standard. *See Atkins v. State*, 951 S.W.2d 787, 790 (Tex. Crim. App. 1997); *Camacho v. State*, 864 S.W.2d 524, 531 (Tex. Crim. App. 1993). If the subject could possibly be raised during trial, the attorneys are entitled to voir dire on that issue. Generally speaking, a voir dire topic is proper if it seeks to discover a juror's views on an issue applicable to the case. *See Robinson v. State*, 720 S.W. 808, 810-11 (Tex. Crim. App. 1986); *Campbell v. State*, 685 S.W.2d 23, 25 (Tex. Crim. App. 1985).

23.     It was proper for voluntary intoxication to be discussed.

24.     The Court's voluntary intoxication instruction was not erroneous, misleading or a misstatement of the law. The definition of "intoxicated" in the statute regarding voluntary intoxication, referred to whether [Petitioner's] mental state at the time of the offense was induced solely or in part because of the introduction of any substance into the body. Tex. Code Crim. Proc. Art. 8.04 (Vernon's 2003).[6] The definition does not require that the substance still be in the body at the time of the criminal act nor does it preclude mental states that still exist a significant amount of time after the introduction, but still because, of substances to the body.

25.     The court explained the law properly, did not preclude a finding of insanity if [Petitioner] was intoxicated and duly protected [Petitioner's] rights.

26.     The facts of the case raised the issue of voluntary intoxication.

27.     If a preexisting condition of mind of the accused was not such as would have rendered him legally insane in and of itself, recent use of intoxicants causing stimulation or

---

[5]*Nethery v. State*, 692 S.W.2d 686 (Tex. Crim. App. 1985) (en banc), *cert. denied*, 474 U.S. 1110 (1986).

[6]It is noted that the state court cited Art. 8.04 of the Texas Code of Criminal Procedure when it was actually § 8.04 of the Texas Penal Code.

aggravation of such preexisting condition to the point of insanity could not be relied upon as a defense to the commission of a crime. *Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex. Crim. App. 1972).

28.     [Petitioner] has failed to prove by a preponderance of the evidence that the trial court's substantive preliminary instructions to the entire voir dire panel, the specific instructions at voir dire regarding voluntary intoxication, the power point display regarding the definition of voluntary intoxication, the use of the definition of voluntary intoxication in the State's opening statement and closing arguments and the instructions regarding voluntary intoxication in the jury charge were improper or misleading.

29.     [Petitioner] has failed to prove by a preponderance of the evidence that the decisions by [Petitioner's] counsel regarding these grounds were based on anything less than a thorough and complete investigation of the facts and law at the time of trial.

30.     [Petitioner] has failed to prove by a preponderance of the evidence that his trial attorney was ineffective and denied [Petitioner] his right to counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution for failing to object to the trial court's substantive law preliminary instructions to the entire voir dire panel, the specific instructions at voir dire regarding voluntary intoxication, the power point display regarding the definition of voluntary intoxication, the use of the definition of voluntary intoxication in the State's opening statement and closing arguments and the instructions regarding voluntary intoxication in the jury charge.

31.     [Petitioner] has failed to prove by a preponderance of the evidence that, but for his attorneys' failure to object to the voluntary intoxication instruction, the objection would have been granted and the outcome of his trial would have been different.

10 SHCR 3566-69. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner simply disagrees with the state court's findings, but he has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, he failed to overcome the "doubly" deferential standard that must be accorded counsel in the context of § 2254(d). Indeed, he failed to satisfy the requirement of showing that there was not any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Petitioner has not satisfied his

burden of showing that counsel was ineffective on this issue. Claim number twenty should be denied because it lacks merit and because Petitioner has not satisfied the requirements of § 2254(d).

**Claim Number 21:    The cumulative evidence of counsel's failures at both phases of Petitioner's trial unequivocally constitutes constitutionally ineffective assistance of counsel.**

Petitioner argues next that he should be granted habeas corpus relief because of cumulative errors committed by defense counsel. The Fifth Circuit has regularly rejected cumulative error claims while noting that federal habeas relief is available only for cumulative errors that are of constitutional dimension. *Coble*, 496 F.3d at 440; *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir.), *cert. denied*, 522 U.S. 880 (1997); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993). The Fifth Circuit has emphasized that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *Derden v. McNeel*, 978 F.2d 1453, 1461 (5th Cir. 1992)), *cert. denied*, 519 U.S. 1094 (1997). Because all of Petitioner's ineffective assistance of trial counsel claims lack merit, he has failed to show that he was denied due process as a result of cumulative errors. *United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992); *Derden*, 978 F.2d at 1454. The claim lacks merit.

**Claim Number 22:    The State violated Petitioner's due process rights under the Fifth, Sixth and Fourteenth Amendments when the State knowingly presented false and misleading testimony in violation of *Napue v. Illinois* and its progeny.**

Petitioner continues with the same basic theme presented in claim number twenty by arguing that the State presented false and misleading testimony that he was intoxicated at the time of the murders. He correctly observed that a state denies a criminal defendant due process when it knowingly uses false evidence, including false testimony, to obtain a conviction. *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997). In support of the claim, he alleges that the "State began its indoctrination of the jurors with the false impression that (1) he was intoxicated on the day of the murders, and (2) such intoxication nullified the availability of the insanity defense." Petition at 301-02. He further alleges that the State elicited false and misleading testimony from Dr. Axelrad and

Dr. Scarano that he was intoxicated on the day of the slayings. He asserts that the State's questions gave the impression that he was taking drugs, particularly Coricidin, everyday leading up to March 27, 2004. Petitioner argues that the State's experts and others falsely testified that his intoxication and delusions flowed principally from the use of Coricidin.

The Supreme Court found that a the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio*, 405 U.S. at 153 (citations omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* (citations omitted). To obtain relief, Petitioner must show that (1) the testimony was actually false; (2) the State knew that it was false; and (3) the testimony was material. *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (citations omitted). False testimony is material if there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. *Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). Perjury is not established by mere contradictory testimony from witnesses, inconsistencies within a witness' testimony and conflicts between reports, written statements and the trial testimony of prosecution witnesses. *Koch*, 907 F.2d at 531. Contradictory trial testimony merely establishes a credibility question for the jury. *Id.*

The Director persuasively argued that the present claim flows from Petitioner's general misunderstanding of the definition of "intoxication." As was noted in conjunction with claim number twenty, the Texas Penal Code defines "intoxication" as a "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." Tex. Penal Code § 8.04(d); *see also* 5 CR 1675-76 (jury charge). In its conclusions of law, the state habeas court observed that this definition "does not require that the substance be in the body at the time of the criminal act nor does it preclude mental states that still exist a significant amount of time after the introduction, but still because, of substances to the body." 10 SHCR 3568 ¶ 24. The State's theory of the case was that even though Petitioner was psychotic at the time of the murders, he was not insane such that he did not know right from wrong. As part of the case, the State argued and presented evidence proving that

Petitioner's psychosis was substance induced - as opposed to organic as Petitioner sought to prove - having been triggered by his use of marijuana, alcohol and Coricidin (DXM) in the days and weeks leading up to the murders.

During opening statements, the State set out the time line of Petitioner's drug and alcohol use prior to the murders. 27 RR 27-28, 30-31. Further, the State emphasized that state law did not require proof of "intoxication" at the exact time of the murders; rather, it required proof of "any disturbance of mental or physical capacity resulting from the introduction of any substance into the body." *Id.* at 35. This is the area where Petitioner misunderstands the law. His *Giglio* claim is premised on the erroneous belief that "intoxication" requires that the substances still be in his body at the time of the murders.

Dr. Scarano testified during the State's case-in-chief. He explained to the jury that mental illness can be substance induced, and even when a person stops using the particular substance or substances that sparked the mental illness, the mental illness does not necessarily disappear. 31 RR 83-85. Dr. Scarano opined that Petitioner's psychosis was substance induced, having been triggered by his use of marijuana, alcohol and DXM in the days and weeks leading up to the murder. *Id.* at 92-111, 113-15. Ultimately, Dr. Scarano testified that Petitioner was not legally insane at the time of the murders. *Id.* at 94-101. Dr. Axelrad, although called first by the defense, reached the same conclusion. Their testimony was not false or misleading in light of the definition of "intoxication" under Texas law, and the State did not violate *Napue/Giglio* because their testimony did not comport to his erroneous understanding of the definition of "intoxication."

During closing arguments, the State emphasized that Petitioner knew right from wrong when he savagely murdered Leyha, Andre, Jr., and Laura. The State further argued that because petitioner was voluntarily intoxicated as defined by state law, he was precluded from claiming insanity - because his psychosis at the time of the murders was substance induced. 37 RR 86, 89-92.

Petitioner relies on blood tests taken hours after the murders to establish his *Napue/Giglio* claim, but those tests are irrelevant. Neither the State nor its experts contended that significant amounts of drugs and/or alcohol were in Petitioner's system at the time of the murders or that he was

"intoxicated" as that term is used in the vernacular. Instead, the State and its witnesses properly used the term "intoxicated" as defined by the Texas Penal Code. The *Napue/Giglio* claim lacks merit.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following findings of fact regarding this claim:

> 61. Neither the State nor its experts alleged that [Petitioner's] system still contained significant amounts of drugs or alcohol during the murder.

> 62. Mr. Hagood had gone over the discovery and the reports from both of the State's experts, and was aware of the State's theory of the case.

> 63. Mr. Hagood was aware of the lab results from [Petitioner's] blood.

> 64. Neither the State nor its experts presented "false or misleading" evidence.

10 SHCR 3536. Petitioner has not overcome the presumption of correctness that must be accorded to the state court findings with clear and convincing evidence.

The state trial court proceeded to issue the following conclusion of law:

> 34. [Petitioner] has failed to prove by a preponderance of the evidence that the State knowingly presented false and misleading testimony about whether [Petitioner] was intoxicated at the time he murdered his estranged wife, his son and her baby daughter.

10 SHCR 3570. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner's claim is simply based on his misunderstanding of Texas law regarding intoxication. He has not satisfied any of the elements of a *Napue/Giglio* claim. Moreover, he is not entitled to relief because he has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner is not entitled to relief on claim number twenty-two.

**Claim Number 23:** **The trial court's refusal to define "reasonable doubt" denied Petitioner his right to due process under the Fourteenth Amendment.**

Claim number twenty-three is an oft seen complaint in capital murder cases about trial courts not providing definitions of basic terms, such as "reasonable doubt." The Constitution does not require courts to define reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). The Fifth Circuit has held that "attempts by trial courts to define 'reasonable doubt' have been disfavored by this court." *Thompson v. Lynaugh*, 821 F.2d 1054, 1061 (5th Cir.), *cert. denied*, 483 U.S. 1035 (1987). *See also Lackey v. Scott*, 28 F.3d 486, 491 (5th Cir. 1994), *cert. denied*, 513 U.S. 1086 (1995); *Garcia*, 73 F. Supp. 3d at 769. The claim lacks merit in light of clearly established federal law.

In addition to the foregoing, the claim should be rejected because of the reasons provided by the state court. The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In *Paulson v. State*, we overruled the portion of *Geesa* [*v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991)] that required a trial court to instruct the jury on the definition of "beyond a reasonable doubt." [28 S.W.3d 570, 573 (Tex. Crim. App. 2000)]. We quoted the Supreme Court's holding in *Victor v. Nebraska* that "'the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.'" [*Id.* at 573 (quoting *Victor*, 511 U.S. at 50]. And we stated that "the better practice is to give no definition of reasonable doubt at all to the jury." [*Id.*]

*Thomas*, 2008 WL 4531976, at *15. In the state habeas proceedings, the trial court rejected the claim for essentially the same reasons as the TCCA on direct appeal. 10 SHCR 3585-86 ¶ 125. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Relief on claim number twenty-three should be denied.

**Claim Number 24:** **Petitioner was deprived of his Fifth Amendment privilege against self-incrimination because the jury used Petitioner's decision not to testify against him in imposing a sentence of death.**

Petitioner correctly observes that the Fifth Amendment to the United States Constitution guarantees a criminal defendant both the right to remain silent during trial and the right not to have the jury draw any adverse inferences from the defendant's exercise of this privilege. *Carter v. Kentucky*,

450 U.S. 288, 305 (1981). The scope of this Fifth Amendment privilege applies equally to the guilt/ innocence and punishment phases of a capital trial. *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981).

After the trial, the foreperson stated that he and others on the jury considered the fact that Petitioner did not express true remorse during the penalty phase of the trial. 43 RR 16. He stated that he, and possibly others on the jury, wanted something to "hang their hat on," such as Petitioner's expression of true remorse, to decide against imposing a sentence of death. *Id.* Petitioner sought a new trial, arguing that this amounted to a violation of his right against self-incrimination. 5 CR 1702-05. The State, anticipating that Petitioner would call jurors to testify, objected pursuant to Texas Rule of Evidence 606(b). The trial court sustained the objection and denied the motion for new trial. On direct appeal, the TCCA found that the application of Rule 606(b) prevented proof of the alleged violation. *Thomas*, 2008 WL 4531976, at *19-21. The TCCA held that the application of Rule 606(b) did not violate Petitioner's constitutional rights, and the judgment of the trial court was affirmed. *Id.* at *21.

The issue was raised again in the state habeas corpus proceedings. The state trial court rejected the claim and issued the following conclusions of law:

132.    The failure to testify at trial shall not be used against any defendant, nor shall counsel comment on the defendant's right to remain silent and failure to testify. Tex. Code Crim. Proc. Ann. art. 38.08 (Vernon Supp. 2004). A jury's discussion of the defendant's failure to testify - and using that circumstance to find guilt would be impermissible. Under rule 606(b), however, jurors are not competent to testify that they discussed the defendant's failure to testify and used that failure as a basis for convicting him. *Hines v. State*, 3 S.W.3d 618, 620-21 (Tex. App. - Texarkana 1999, no pet.); *see also* Tex. R. App. P. 21.3.

133.    [Petitioner] has failed to prove by a preponderance of the evidence that the jury discussed [Petitioner's] failure to testify or used the fact that [Petitioner] did not testify against [him].

10 SHCR 3587-88. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

"The constitutional right of a defendant to choose not to testify is a fundamental tenet of our system of justice." *United States v. Johnston*, 127 F.3d 380, 399 (5th Cir. 1997), *cert. denied*, 522

U.S. 1152 (1998). On the other hand, it has been long held that a post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate. *See Mattox v. United States*, 146 U.S. 140, 149 (1892) ("[T]he evidence of jurors, as to motives and influences which affected their deliberations, is inadmissible either to impeach or support the verdict."); *see also Tanner v. United States*, 483 U.S. 107, 117-21 (1987) (discussing policy behind federal common law rule against admission of jury testimony to impeach verdict); *Cunningham v. United States*, 356 F.2d 454, 455 (5th Cir.) ("well-settled general rule that a juror will not be heard to impeach his own verdict"), *cert. denied*, 384 U.S. 952 (1966). In *Cunningham*, the Fifth Circuit upheld the trial court's refusal to consider an affidavit by one juror who stated that the jurors discussed the defendant's failure to testify in his own behalf.

This basic tenet that courts generally will not inquire into a jury's deliberative process is encapsulated in Rule 606(b) of both the Federal Rules of Civil Procedure and the Texas Rules of Civil Procedure. The Fifth Circuit has accordingly found that the "post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate and precluded by Federal Rules of Evidence 606(b)." *Williams v. Collins*, 16 F.3d 626, 636 (5th Cir.), *cert. denied*, 512 U.S. 1289 (1994). *Williams*, like the present case, involved a Texas death row inmate challenging his conviction in a habeas corpus proceeding. In affirming the denial of habeas corpus relief, the Fifth Circuit found that the "district court did not abuse its discretion in disallowing the requested testimony." *Id.* The Fifth Circuit subsequently held that both Fed. R. Evid. 606(b) and Tex. R. Evid. 606(b) "bar all juror testimony concerning the juror's subjective thought process." *Salazar v. Dretke*, 419 F.3d 384, 402 (5th Cir. 2005), *cert. denied*, 547 U.S. 1006 (2006). The Court ultimately found that it could not say the "state habeas court's application of Texas Rule 606(b) to bar testimony by jurors concerning their internal discussion . . . was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court." *Id.* at 403. More recently, the Fifth Circuit refused to grant a certificate of appealability with respect to a district court's rejection of a claim that jurors took into consideration a defendant's failure to testify because courts "will not inquire into the jury's deliberative process absent a showing of external influences on the jurors." *Greer v. Thaler*, 380 F. App'x 373, 382 (5th Cir.) (citing *Tanner*, 483 U.S. at 120-21), *cert. denied*, 562 U.S. 986 (2010). In light of *Williams*,

*Salazar* and *Greer,* this Court likewise cannot say that the state court's rejection of Petitioner's claim based on Rule 606(b) was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court. Moreover, apart from the state court findings, the Court further finds that Petitioner's claim impermissibly seeks to delve into a juror's deliberative process. Federal habeas corpus relief is unavailable on claim number twenty-four.

> **Claim Number 25: Petitioner's death sentence is unconstitutional under *Roper v. Simmons* because the State used prior convictions based on acts committed by Petitioner when he was a juvenile to establish an aggravating factor.**

The Supreme Court has held that the execution of individuals who were under eighteen years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments. *Roper v. Simmons*, 543 U.S. 551 (2005). Petitioner complains that the State introduced a number of prior offenses committed by him as a juvenile, including felony criminal mischief in an amount over $750 (age eleven), two separate criminal trespass offenses (age eleven), three curfew violations (ages thirteen, fourteen and fifteen), and evading arrest/detention (age seventeen). The State introduced such evidence during the sentencing phase of the trial to establish future dangerousness.

*Roper*, however, only prohibits the imposition of the death penalty for offenders who were under eighteen when their crimes were committed. *Id.* at 578. The dividing line of eighteen established a "categorical rule." *Ebron*, 683 F.3d at 156. The Fifth Circuit has accordingly observed that *Roper* "established a lower boundary: No one under eighteen may be executed, meaning only that, . . ." *Doyle v. Stephens*, 535 F. App'x 391, 395 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1294 (2014). The Fifth Circuit rejected the efforts to "undermine" *Roper*. *Id.* at 396 n.3.

Juvenile admissions and confessions are generally admissible under Texas law during the punishment phase of a trial where the defendant faces the death penalty. *See East v. State*, 702 S.W.2d 606, 615 (Tex. Crim. App. 1985) ("[Texas Code of Criminal Procedure] Article 37.071 provides that during the punishment phase of a capital murder trial, evidence may be presented as to any matter that the trial court deems relevant to sentence."). *Also see Garcia*, 73 F.Supp.3d at 793 (observing that juvenile record may be considered under Texas law in determining future dangerousness).

The Director appropriately cited numerous cases rejecting attempts by appellants to contort *Roper* to prohibit the consideration of juvenile records as an aggravating factor. *Mitchell v. State*, 235 P.3d 640, 659 (Okla. Crim. App. 2010) ("Nothing in the language of *Roper* suggests that the State is prohibited from relying on prior juvenile adjudications to support an aggravating circumstance."), *cert. denied*, 562 U.S. 1293 (2011); *People v. Bramit*, 210 P.3d 1171, 1186 (Cal.) ("[*Roper*] says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile."), *cert. denied*, 558 U.S. 1031 (2009); *State v. Garcell*, 678 S.E.2d 618, 645 (N.C.) ("Here, defendant committed a capital crime after he turned eighteen years old, and that simple fact carries defendant's case over the bright line drawn by *Roper*. Defendant was sixteen when he committed common law robbery and two counts of second-degree kidnapping, but he is not being sentenced to death as an additional punishment for those crimes."), *cert. denied*, 558 U.S. 999 (2009); *Lowe v. State*, 2 So.3d 21, 46 (Fla. 2008) ("Lowe attempts to expand this prohibition to preclude the State from using as an aggravating factor a conviction for a crime committed by a defendant before he turned eighteen. However, *Roper* does not stand for this proposition."); *United States v. Wilks*, 464 F.3d 1240, 1243 (11th Cir.) ("It is one thing to prohibit capital punishment for those under the age of eighteen, but an entirely different thing to prohibit consideration of prior youthful offenses when sentencing criminals who continue their illegal activity into adulthood. *Roper* does not mandate that we wipe clean the records of every criminal on his or her eighteenth birthday."), *cert. denied*, 549 U.S. 1066 (2006).

Since the original petition was filed in this case, the Fifth Circuit provided the following discussion in rejecting the type of argument being presented by Petitioner:

> While the *Roper* decision clearly establishes that the death penalty may not be imposed as punishment for an offense committed as a juvenile, it does not clearly establish that such an offense may not be used to elevate murder to capital murder. Here, [petitioner] is not being punished for his earlier crime but is instead being punished for a murder that he committed as an adult.

*Taylor v. Thaler*, 397 F. App'x 104, 108 (5th Cir. 2010), *cert. denied*, 563 U.S. 939 (2011). *Roper* simply did not prohibit the State from presenting evidence of Petitioner's juvenile record to establish future dangerousness. The claim lacks merit.

The state trial court rejected the claim and issued the following conclusions of law:

134.     *Roper v. Simmons* prohibits the State from assessing the death penalty against a defendant who was under 18 years of age at the time he committed the offense. *Roper v. Simmons*, 543 U.S. 551 (2005).

135.     In the punishment phase of a capital murder trial, the admission of prior offenses committed when the defendant was a juvenile does not violate the Eighth Amendment if he was assessed the death penalty for a charged offense that occurred when he was at least eighteen years old. *See Corwin v. State*, 870 S.W.2d 23 (Tex. Crim. App. 1993).

136.     Neither the Supreme Court nor the Texas Court of Criminal Appeals has extended the holding in *Roper v. Simmons* to prohibit the use of juvenile offenses in the punishment stage of a capital case. *See e.g., Matthews v. State*, 2006 WL 1752169 (Tex. Crim. App. 2006) (not designated for publication).

10 SHCR 3588. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner argues that *Roper* should be extended, but he has not shown that either the Supreme Court or the Fifth Circuit has done so. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Relief on claim number twenty-five should be denied.

**Claim Number 26:     Petitioner was deprived of his right to a fair trial under the Sixth Amendment because his attorney had a conflict of interest that was not waived.**

Petitioner alleges that co-counsel Bobbie Peterson (Cate) had an "actual conflict of interest due to her involvement as an assistant county attorney in a juvenile prosecution of [him]." He asserts that the conflict was not properly waived. In support of the claim, he notes that she was a prosecutor in Grayson County before going into private practice. She prosecuted him in juvenile delinquency proceedings in Grayson County. He specifically cites a prosecution for vehicle theft, which resulted in a term of probation for eighteen months.

The issue was raised during a suppression hearing as follows:

ASHMORE: Your Honor, before we get started, there is one thing we discussed in chambers that I wanted of record. The defendant as a juvenile was placed on probation on two different times. The last time being, I believe, in 1997 for the theft of three different automobiles on three different times. In the course of the County Attorney's office of Grayson County prosecuting the juvenile in those various juvenile matters, I had noted that Bobbie Peterson had signed several pleadings of the state in her capacity as Assistant County Attorney at that time. Mrs. Peterson and I had talked about that and my understanding was that is that Mrs. Peterson had made the defendant aware of that situation and that he has no problem with it, but I wanted the Court to discuss that with him and to have that clear on the record.

THE COURT: Okay.

PETERSON: That is correct, Your Honor. I have spoken to Mr. Thomas about the fact that I was a prosecutor and I did sign off on some petitions that he was the juvenile and he has indicated that he was aware of that and he has no problems or concerns about my representing him now and the difference in our capacities.

THE COURT: Is that correct, Mr. Thomas?

THOMAS: Yes.

THE COURT: You are satisfied to have Mrs. Peterson continue as your co-counsel?

THOMAS Yes, Sir.

THE COURT: Let's have the witnesses sworn. . . .

7 RR 4-5.

This issue was raised again in the state habeas corpus proceedings. Lead counsel Hagood addressed the issue as follows:

[Petitioner] also attacks Ms. Peterson's loyalty to [him]. Specifically, [Petitioner] states that because Ms. Peterson signed juvenile petitions regarding [him] many years ago, and those items were used in punishment, [Petitioner] claims Mr. Peterson had a conflict. During the suppression hearing prior to voir dire, the court addressed that matter and personally asked [Petitioner] if he agreed with a statement by Ms. Peterson on the record that she had discussed the issue with him and he had no problem with her continuing to act as defense attorney. The court specifically asked if [Petitioner] was satisfied to have Ms. Peterson continue as co-counsel. [Petitioner] stated, "yes, sir." (RR vol. 7, p. 5). I personally never noticed a lack of loyalty to [Petitioner] or [his] case. In fact, Ms. Peterson showed a tremendous dedication towards [Petitioner] and zealousness towards [his] defense.

6 SHCR 2158. Mr. Ashmore also noted in his affidavit that Petitioner specified that he wanted Ms. Peterson to continue as counsel and that he did not observe any lack of loyalty. 6 SHCR 2330 ¶ 19.

122

In *Cuyler v. Sullivan,* 446 U.S. 335 (1980), the Supreme Court announced the general rule with respect to conflicts of interest between attorneys and clients. In that case, a state defendant had filed a federal writ of habeas corpus alleging his trial attorney was operating under a conflict of interest because he represented Sullivan and his two co-defendants in three separate criminal trials. The Supreme Court held that the mere *possibility* of a conflict of interest is insufficient to overturn a conviction. Rather, in order for a criminal defendant to demonstrate a violation of Sixth Amendment rights that would entitle him to relief, the defendant must establish that his attorney was actively representing conflicting interests and that an actual conflict of interest adversely affected his attorney's performance. Once a criminal defendant demonstrates such a conflict, prejudice is presumed. *Id.* at 349-50. Since *Cuyler* was decided, the Supreme Court has reiterated that a defendant is not entitled to a presumption that the prejudice prong of the *Strickland* standard has been met where there existed a conflict of interest on his attorney's part, unless that conflict affected the attorney's performance. *Mickens v. Taylor,* 535 U.S. 162, 172-73 (2002).

In *Beets v. Scott,* 65 F.3d 1258 (5th Cir.1995), *cert. denied,* 517 U.S. 1157 (1996), the Fifth Circuit held that *Cuyler* was only applicable in situations where an attorney was representing multiple interests. The Fifth Circuit further held in *Beets* that the *Cuyler* standard for ineffective assistance of counsel did not extend to conflicts between an attorney's personal interest and his client's interest, as those types of situations were best analyzed under the *Strickland* standard for ineffective assistance of counsel. *Beets,* 65 F.3d at 1269-72. The Fifth Circuit has also held that, in order to show there has been an adverse effect, a petitioner must show "some plausible defense strategy or tactic [that] might have been pursued but was not, because of the conflict of interest." *Hernandez v. Johnson,* 108 F.3d 554, 560 (5th Cir.1997) (citation omitted), *cert. denied,* 522 U.S. 984 (1997).

More recently, the Fifth Circuit dealt with an analogous situation in *United States v. Villarreal*, 324 F.3d 319 (5th Cir. 2003). The Fifth Circuit found that the mere fact that counsel was employed in the district attorney's office at the time of Villarreal's prior conviction did not represent a conflict of interest. *Id.* at 327-28 (citing *Hernandez*, 108 F.3d at 559-60). Moreover, there was no showing that counsel failed to pursue a defense due to the conflict of interest. The Fifth Circuit rejected the

claim for the additional reason that counsel made Villarreal aware of the potential conflict of interest before trial, and Villarreal chose to continue being represented by counsel. *Id.* at 328.

The situation in the present case is the same as in *Villareal*. Petitioner has not shown an actual conflict of interest; instead, he only showed a potential conflict of interest. Moreover, he failed to show that Ms. Peterson failed to pursue some plausible defense strategy or tactic that might have been pursued because of the conflict of interest. Finally, the potential conflict of interest was made known to Petitioner before trial, and he chose to continue being represented by Ms. Peterson. He waived his right to conflict free defense counsel by his voluntary and intelligent waiver. *See United States v. Plewniak*, 947 F.2d 1284, 1287 (5th Cir. 1991), *cert. denied*, 502 U.S. 1120 (1992). Petitioner has not shown that he is entitled to relief based on a conflict of interest.

After accumulating all of the evidence and conducting oral arguments, the state trial court issued the following conclusions of law:

110. The Sixth Amendment guarantees the right of individuals to have counsel without conflicts of interest. *Gray v. Estelle*, 616 F.2d 801, 803 (5th Cir. 1980); *see also Ex parte Prejean*, 625 S.W.2d 731, 733 (Tex. Crim. App. 1981) (*en banc*). If an actual conflict exists, "it need not be shown that the divided loyalties actually prejudiced the defendant in the conduct of his trial." *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979).

111. Although a defendant can waive his or her right to conflict-free counsel, a valid waiver "requires an 'intentional relinquishment or abandonment of a known right." *Gray*, 616 F.2d at 803 (*quoting Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A valid waiver "must be both voluntary and 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Gray*, 616 F.2d at 803 (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). Texas courts require that "[s]uch a waiver of right to conflict-free counsel should include a showing that the defendant is aware of the conflict of interest, realizes the consequences of continuing with such counsel, and is aware of his right to obtain other counsel." *Prejean*, 625 S.W.2d at 733.

112. [Petitioner] has failed to show his attorney's former role as the prosecutor in his prior convictions raised anything other than a speculative conflict of interest.

113. [Petitioner] failed to prove an actual conflict of interest by a preponderance of the evidence.

114. [Petitioner] has waived his right to complain of any conflict.

10 SHCR 3582-83. The TCCA subsequently denied Petitioner's state application for a writ of habeas corpus on the trial court's findings and conclusions and on its own review. *Ex parte Thomas*, 2009 WL 693606, at *1.

Petitioner does nothing more than make a conclusory claim that there was an actual conflict of interest. He did not, however, show that he is entitled to relief for the exact same reasons discussed by the Fifth Circuit in *Villarreal*. He also complains about the conclusion that he waived his conflict of interest; nonetheless, the situation was fully discussed in court, and he voluntarily and clearly waived any conflict. 7 RR 5. Petitioner has not shown, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Relief on claim number twenty-six should be denied.

**Claim Number 27:     Petitioner's appellate counsel was constitutionally ineffective.**

In his final claim, Petitioner argues that his appellate counsel was ineffective for failing to raise a number of claims on appeal. He presents a laundry list of claims that purportedly should have been raised on direct appeal, including the following:

1.     Failure to challenge the State's opening statement;

2.     Failure to voir dire jurors adequately, who stated they were opposed to interracial relationships;

3.     Failure to object to the giving of substantive law instruction to the venire;

4.     Failure to challenge the voluntary intoxication instruction offered by the State and the Court;

5.     Failure to object to the giving of an erroneous voluntary instruction to the venire;

6.     Failure to object to erroneous instructions on the issues of insanity and voluntary intoxication, or a clarifying instruction explicating the interplay between;

7.     Failure to object to the use of a powerpoint display before the venire, when that powerpoint reflected an erroneous statement of the law;

8.     Failure to object to the State's reference in opening statement to jury instructions generally, and to the erroneous voluntary intoxication instruction in particular;

9.      Failure to object to the voluntary intoxication instruction in the court's charge;

10.     Calling the State's expert witnesses in an attempt to prove insanity;

11.     Repeated instances of failing to object to leading or otherwise inappropriate questions or to understand the application of the evidentiary rules in the courtroom; and

12.     Trial counsel's failure to request a diminished capacity defense.

The two-prong *Strickland* test applies to claims of ineffective assistance of counsel by both trial and appellate counsel. *Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). An indigent defendant does not have a constitutional right to compel appointed counsel to include every nonfrivolous point requested by him; instead, an appellate attorney's duty is to choose among potential issues, using professional judgment as to their merits. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent." *Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir.) (citation omitted), *cert. denied*, 555 U.S. 990 (2008); *Adams v. Thaler*, 421 F. App'x 322, 332 (5th Cir.), *cert. denied*, 132 S. Ct. 399 (2011). To demonstrate prejudice, a petitioner must "show a reasonable probability that, but for his counsel's unreasonable failure . . ., he would have prevailed on his appeal." *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001) (citations omitted).

In the present case, Petitioner essentially presents the same meritless claims previously raised in his petition and rejected earlier in this memorandum opinion. He has not shown that, but for appellate counsel's unreasonable failure to raise these claims, he would have prevailed on appeal. The claim lacks merit.

Moreover, Petitioner's laundry list of claims that allegedly should have been raised on direct appeal focus on ineffective assistance of trial counsel claims. Such arguments generally lack merit for reasons explained by the Supreme Court as follows:

> [T]he Texas procedural system - as a matter of its structure, design, and operation - does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal.

*Trevino*, 133 S. Ct. at 1921. The Supreme Court recognized that most ineffective assistance of trial counsel claims must be raised and developed in habeas corpus proceedings. Petitioner's argument that

such ineffective assistance of trial counsel claims should have been raised on direct appeal shows a basic misunderstanding of the "structure, design and operation" of the Texas procedural system. His claim lacks any basis in theory and in practice. Petitioner's final claim lacks merit and should be denied.

## Conclusion

Having carefully considered all of Petitioner's claims, the Court is of the opinion, and so finds, that he has not shown that he is entitled to federal habeas corpus relief and his petition should be denied.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a federal habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). The Court thus finds that Petitioner is not entitled to a certificate of appealability as to his claims. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

**It is SO ORDERED**.

**SIGNED this 19th day of September, 2016.**


MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE