**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **ANDRE LEE THOMAS,** | § | **CIVIL ACTION NO. 4:09-CV-644** |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **\* CAPITAL CASE \*** |
| | § | |
| **LORIE DAVIS, Director, TDCJ-ID,**[1] | § | |
| **Respondent.** | § | |

---

## PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT

COMES NOW Petitioner, ANDRE THOMAS, by and through counsel and pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, hereby respectfully moves this Court to alter or amend the judgment in this action entered on September 19, 2016 denying his Petition for a Writ of Habeas Corpus, denying *sua sponte* a Certificate of Appealability, and dismissing this case. The Court's Order contains manifest errors of law and fact which, if corrected, compel a determination that Mr. Thomas is entitled to relief, or, at the very least, a Certificate of Appealability. As such, Petitioner requests that the Court alter or amend its judgment.

## INTRODUCTION

In the face of a record filled with dramatic indicia of (1) a psychotic defendant incompetent to stand trial, (2) pervasive racial misconduct, and (3) demonstrably ineffective – indeed non-existent – preparation for a meaningful defense, the Court credits, essentially to the exclusion of all else, self-serving affidavits of the prosecutors and a contradictory "second

---

[1] The previous named respondent, William Stephens, has since been replaced by Lorie Davis as the Director of the Texas Department of Criminal Justice, Institutional Division.

affidavit" of a defense counsel to deny Petitioners' habeas claims.  Adherence to post hoc rationalizations that "reek[] of afterthought," *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005), however, is not a "reasonable application" of the facts to law, and is not permitted of a "fairminded jurist."

While Petitioner respectfully believes that the Court's determinations as to each of his grounds for relief are incorrect (and reserves all rights of appeal with regard to those grounds for relief), consistent with the principles of a Rule 59(e) motion, Petitioner does not reargue each and every one of those points here.  Rather, there are three specific categories of constitutional violations where the Court's analysis raises particularly egregious manifest errors of law and fact.

Moreover, as to these issues, while the Court's own analysis acknowledges the potential for disagreement, the Court nonetheless categorically denied a Certificate of Appealability as to these or any issues.  This was in error.

## STANDARD OF REVIEW

Motions to alter or amend a judgment under Rule 59(e) "allow[] a party to correct manifest errors of law or fact or to present newly discovered evidence."  *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 473 (5th Cir. 1989) (internal quotations omitted).  This Court has "considerable discretion" in deciding whether to reopen a case under Rule 59(e).  *Edward H. Bohlin Co. v. Banning Co.,* 6 F.3d 350, 355 (5th Cir. 1993).

For a Certificate of Appealability ("COA") to issue, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2254(d)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  To determine whether a COA should issue, a court conducts only a "threshold inquiry," asking if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000);

*accord Miller-El*, 537 U.S. at 336.  This Court's task is not to determine the ultimate merits of the case, but only whether the petitioner has demonstrated that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Smith v. Dretke*, 422 F.3d 269, 273 (5th Cir. 2005). "Because the present case involves the death penalty, any doubts as to whether a certificate of appealability should [be] issued must be resolved in [the petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

## ARGUMENT

**I.     MR. THOMAS, WHO WAS SENT TO THE STATE MENTAL HOSPITAL AFTER REMOVING HIS OWN EYE SHORTLY AFTER HE TURNED HIMSELF IN FOR THE INSTANT OFFENSE, AND WAS RETURNED TO STAND TRIAL FORTY-FIVE DAYS LATER, WAS NOT COMPETENT TO STAND TRIAL; TRIAL COUNSEL'S FAILURE TO RE-RAISE COMPETENCY WAS CONSTITUTIONALLY INEFFECTIVE.**

In Claims 1 & 2 of his Petition, Mr. Thomas asserts that he was incompetent to stand trial, and that trial counsel was constitutionally ineffective in failing to re-raise the question of his incompetence before trial.  The District Court's adjudication of these claims reflects manifest errors of fact and law.

**A.  Mr. Thomas, Schizophrenic, Half-Blind, and Catatonic from Anti-Psychotic Medication, Was Not Competent To Stand Trial.**

The Court's denial of Mr. Thomas' claim that he was not competent to stand trial begins with a mischaracterization of the claim and relevant facts:

> The record in this case reveals that the issue of whether Petitioner was competent to stand trial was a major concern at trial, and the trial court went to great lengths to make sure that he was competent before going forward with the trial. **There was no doubt at the time of trial that he suffered from schizophrenia, but his condition did not mean that he was incompetent to stand trial.**

*Thomas v. Davis,* 6:09cv644 (E.D. Tex.), ECF 57 at p. 8 (hereinafter "Order").

Contrary to these findings, Mr. Thomas was not asserting he was incompetent to stand trial based upon the fact that he is and was schizophrenic at the time.  His claim – as discussed in the Petition, pp. 36-39 and Reply, pp. 11-14 - is that he was incompetent because he was so heavily medicated that he could not function or communicate effectively with his defense team. *See Dusky v. United States*, 362 U.S. 402 (1960).

Nor does the record bear out the Court's assertion – notably lacking any citation - that competence was a "major concern" at trial.  Mr. Thomas' lead trial counsel, R.J. Hagood ("Hagood") allowed that competency was not even a minor concern at trial: "we did not seek a pretrial hearing on competency. Our focus was on the insanity issue. If I talked to any of the doctors at Vernon State Hospital it was only briefly."  Petition Ex. 15 at 9.  He then concedes the issue: *"we should have filed an objection to the competency report and should have sought a new competency hearing."  Id*. at 10 (emphasis added).

Mr. Thomas' second chair counsel, Bobbie Peterson ("Peterson"), averred:

> 23. The issue of Andre's competency to stand trial was addressed initially by Mr. Hagood. I never talked to the doctors at Vernon State Hospital regarding competency, and I do not know whether or not Mr. Hagood did.
> 24. Mr. Hagood did not raise an incompetency claim after the State rested its case. I do not know why we did not challenge competency then or much earlier. In retrospect, I believe that we were so caught up in the insanity issue we did not think about it.

Petition, Ex. 27. [2]  Thus, the Court's assertion that Mr. Thomas' competency was "a major concern at trial" is belied by the affidavits of the two people responsible for identifying and asserting the claim.

This pattern – crediting only the evidence that supports the state's version of events and failing to credit or in some cases even acknowledge Mr. Thomas' evidence – is present

---

[2] The Court fails to mention Peterson's first affidavit – the one supporting Mr. Thomas' claim – but does note her second, which supports the state's version of events.  Order, p. 10.

throughout the Court's treatment of the claim.  While Hagood's initial affidavit support's Mr. Thomas' claim, it is the second affidavit that the Court credits – despite the fact that pivotal facts are clearly belied by the first averment Mr. Hagood proffered.  *See* Order at p. 9-10, 15. Although the Court notes that Ms. Peterson filed two affidavits, it only discusses the second – the one reciting facts that support the state's case. Order at 10.   The Court also fails to credit the affidavits of the two other members of the defense team.[3]   Finally, the Court cites to affidavits of the prosecutors – Order at 11 - despite their obvious self-serving nature, or the fact that the central tenet of a trial competency claim is the client's inability to communicate with *defense counsel.  See Dusky*.  This skewed and unsupported assessment of the evidence  - similarly reflected in the trial court's unreasonable findings and conclusions – pervades and undermines the Court's findings, and its deference to the trial court.

The second primary error in the Court's treatment of this claim, as well as the state court's findings and conclusion, is reflected in the discussion of the "default" of the claim for lack of a contemporaneous objection at trial.  *See* Order at 13-14.  What the Court fails altogether to note is Mr. Thomas' claim of ineffective assistance of counsel for failure to raise the

---

[3] The Court's analysis of the statement of mitigation specialist Shelly Shade is telling. The Court only quoted this portion of Ms. Shade's affidavit: "Petitioner was very childlike, quiet and sad, and it was difficult to engage him in conversation. She observed that he appeared drugged during trial."  What the Court failed to note or cite was Ms. Shade's statement that Mr. Thomas "did not understand what we needed and could not identify or help locate witnesses." Petition, Ex. 30 at 12.  This statement – unmentioned by the Court - goes to the core of competency and the ability to assist in a defense.

Ms. Estep noted that Mr. Hagood took "between 7-8, up to possibly a dozen" pain pills a day to get through the trial and at times "appeared to not be focused on the trial."  The jury took note of Mr. Hagood's state of mind, asking Ms. Estep after the trial what was wrong with him. Petition, Ex. 9 at 10-11.   Thus, a *fair* reading of the affidavits of those present at the defense table was that the two attorneys were not focused on competency, one because he himself, as lead counsel, was heavily medicated on pain pills and the other because she did not think it was her job. The other two observers stated that Mr. Thomas could not assist in his own defense.

competency issue – a claim that, under clearly established law, provides cause for any default. The conclusions of the Court – and the trial court below – that Mr. Thomas "made no attempt to overcome the default" – Order at 14 - are thus clearly erroneous.

The Court's findings and conclusions on this claim cannot stand.  At a bare minimum he has "shown that fairminded jurists could disagree about the correctness of the state court's decision," Order at 15, and a Certificate of Appealability on this issue should issue.

**B.  Trial Counsel Were Ineffective in Failing to Raise the Issue of Mr. Thomas'
Incompetence.**

The Court begins analysis of this claim by stating:

> In the present case, although counsel indicated, and the state court found, that counsel
> should have raised the issue of competency a second time when Petitioner was returned
> from Vernon State Hospital, the fact remains that counsel did not have a basis for raising
> the issue.

Order at 16.  This statement should have ended the analysis, and led to a grant of relief.   Yet, although the Court starts with a clear statement warranting relief, it continues – as in its treatment of Claim I - to selectively credit only affidavits that support the state's theory, despite the existence of overwhelming contrary evidence.   Unsupported by the record, the Court's findings cannot stand.

The second piece of the Court's analysis relies on a mischaracterization of Mr. Thomas' underlying claim of incompetence.  Thus, the Court states that "even though Petitioner was suffering from schizophrenia, the case law was clear at the time of trial that the 'presence or absence of mental illness or brain disorder is not dispositive' of competency."  Order at 17.  This was not Petitioner's claim.  *See supra.*

The Court's final conclusion relies on its findings with respect to the first claim: Petitioner cannot show prejudice from trial counsel's failures if he cannot show that he was incompetent in the first instance.  Order at 17.   Although Mr. Thomas asserts, as detailed above,

that his claim regarding his incompetence was highly meritorious, it is important to note that this

is not the appropriate standard. When the claim is ineffective assistance of counsel with respect

to a defendant's competence to stand trial, the petitioner "need only demonstrate a 'reasonable

probability' that he was incompetent, 'sufficient to undermine confidence in the outcome.'"

*Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997) (citing *Strickland*, 466 U.S. at 694).

Mr. Thomas has demonstrated more than a reasonable probability he was incompetent.

Trial counsel were ineffective in failing to raise the claim.  This Court's findings, unsupported by

the record, and conclusions, misapprehending Mr. Thomas' claim and applying erroneous legal

standards, are in error.  At a bare minimum, Mr. Thomas is entitled to a COA on both Claims I

and II.

**II.      RACIAL BIAS IN THE TRIAL AND IN THE JURY SELECTION WAS
          DEMONSTRABLE, AND TRIAL COUNSEL WAS INEFFECTIVE IN FAILING
          TO OBJECT TO, AND OTHERWISE ADDRESS, OBVIOUS RACIAL
          PREJUDICE.  THE DISTRICT COURT'S ORDER REJECTING THESE
          CLAIMS (III – VII) CONTAINS NUMEROUS MANIFEST ERRORS OF FACT
          AND LAW; AT A MINIMUM, MR. THOMAS IS ENTITLED TO A
          CERTIFICATE OF APPEALABILITY.**

There are multiple fundamental errors in the manner the district court decision addressed

and rejected Mr. Thomas' multiple claims pertaining to the racial prejudice underlying the

selection of his jury, his trial, and his sentence of death.   Petitioner addresses three broad

categories of error reflected in Claims three through seven below.   However, the overarching

errors in the Court's analysis of these claims can be seen in (1) the manner in which the Court

considers each claim separately, without regard to how Mr. Thomas pleads them, including

discussion of the interlocking nature of the claims, and how each provides evidence of the race

bias underlying the entire trial and the other claims;[4] (2) the Court's repeated findings that the

_____

[4] *See, e.g.*, Order pp. 16-39.

claims raised are defaulted for lack of contemporaneous objection – when, in fact, the next claim considered raises ineffective assistance of trial counsel for failure to raise exactly those objections;[5] (3) the Court's repeated myopic reliance on the affidavits of the prosecutors and the second affidavit of trial counsel Hagood without consideration of the conflicting affidavits of Mr. Hagood's earlier affidavit or those of second counsel and other members of the defense team;[6] and (4) the conclusion – contrary to Fifth Circuit precedent – that supplemental facts that do not fundamentally alter the existing claims are not required to be exhausted in the state courts.[7]

Each of these overarching errors – in addition to those discussed and detailed below – reflect manifest errors of law, and inappropriate deference to the state habeas court's decision, which unreasonably applies the facts in light of the evidence presented, and is contrary to or an unreasonable application of clearly established law.  *See* 28 U.S.C. s. 2254(d).

### A.  The Court Ignored Evidence In The Record Establishing The Prosecutors' Pretextual Reason for the Jury Shuffle

#### 1.  False Denials, and Demonstrable Lies, Are Relevant Proof of Discriminatory Intent

A prosecutor's request to reshuffle a jury in order to attempt to exclude non-whites from a jury is a factor demonstrating racial discrimination in the jury selection process.  *See Miller-El v. Cockrell ("Miller-El I")*, 537 U.S. 322, 346 (2003); *Miller-El v. Dreke* (*"Miller-El II"*), 545

---

[5] *See, e.g.*, Order pp. 20, 25

[6] The Court – and state court below – rely on Mr. Hagood's second affidavit throughout, with barely a nod to the first affidavit he gave, which contradicts in numerous material respects the affidavit he gave to the state.  At the very least, the existence of two conflicting affidavits undermines Mr. Hagood's credibility generally, and the Court's exclusive reliance on only the affidavit provided to the State.  *See generally* Reply pp. 65-67.

[7] This is particularly so where the delayed disclosure of the pre-shuffle seating chart – when the state was squarely responsible for its prior unavailability, *See* Reply, fn. 9 – raised additional issues that could not have been included in the original petition.  Moreover, the State's Answer to Petitioner's Petition raised defenses – such as a lack of animus – that compelled Mr. Thomas' Reply, which submitted ample evidence revealing the falseness of the state's assertion. Petitioner cannot be faulted for not presenting those facts at an earlier juncture.

U.S. 231, 255-256 (2005).  Indeed, the fact that the prosecutor requested a jury shuffle when a predominant number of African-Americans are seated near the front of the panel raises the suspicion of a constitutional violation, and compels the State to offer a race-neutral reason for the shuffle.  *See Miller-El I, 537 U.S. at 346; "Miller-El II,"* 545 U.S. at 253-54.  The ensuing three-step process, which permits Petitioner to demonstrate the pretext of the proffered race-neutral reason, is identical to a *Batson* challenge.[8]  As the Supreme Court recently reiterated, in resolving the issue of pretext, "all of the circumstances that bear upon the issue of racial animosity must be consulted."  *Foster v. Chatman*, __ U.S. ___, 136 S. Ct. 1737, ___, 195 L. Ed. 2d 1, 13 (May 23, 2016).

More specifically, when the race-neutral excuses told by the prosecutor have "no grounding in fact," and when the prosecutor misrepresents the record, those facts are very significant in demonstrating that the proffered race-neutral excuse was pretextual.  *Id.* 1 L. Ed. at 14-18.  Credibility can be measured by, among other factors, . . . how reasonable, or how improbable, the [State's] explanations are."  *Id*.

The chief difficulty – and the manifest error of fact – in the Court's analysis, is that the Court ignores the demonstrable falsehoods in the prosecutors' proffered, allegedly, race-neutral excuses.  As detailed fully in the record, *see* Reply Brief pp. 21-25, the State's original response to the racially motivated jury shuffle was to claim it simply didn't happen.  *See* Answer at 67 (claiming that there were not numerous African-Americans near the front of the original jury

---

[8] The Court twice notes that a racially motivated jury shuffle "might not be denominated as a Batson claim because it does not involve a peremptory challenge."  *E.g.*, Order at 28 (quoting Miller-El I, 527 U.S. at 346.  However, it is perfectly clear that the three-step procedure of a *Miller-El* challenge is identical to a *Batson* challenge, and the invidious intent of both *Batson* and *Miller-El* misconduct is the same – to unconstitutionally remove jurors from the jury based on race.  The fact that a *Miller-El* challenge is not "denominated" a *Batson* challenge makes no difference to the analysis.

pool).  Inexplicably, the original jury pools were not in the State's file, but when the records finally appeared, the prosecutors' accounts of racial composition of the original jury pool were demonstrably untrue.  *See* Reply, pp. 22-26.

The prosecutors also offered an exceptionally vague excuse that there were "scruffy looking" persons near the front of the jury pool, but again, the Court does nothing to address the fact that Petitioner presented credible proof that the venire men seated near the front of the original jury pool were not "scruffy looking."  *See* Reply, pp. The prosecutors submitted still another excuse, that some venire men near the front of the pool had criminal records, again demonstrably false.  *See* Reply, pp. 26-28.

In refusing to grant relief regarding the jury shuffle, the Court not only ignores the record, it fails to grasp the obvious import of the record as held by *Foster*:  The demonstrable *lies* are themselves telling evidence of discriminatory intent.  Reliance on state court findings that suffer the same errors is only further evidence of the manifest errors in the Court's Order.

## 2. Supplemental Evidence of Racial Prejudice in the form of Disparate Questioning Is Not Subject to Exhaustion

The Court cites *Miller-El II* to posit three indicia of discriminatory intent, Order at 22, but then treats those indicia each as its own separate basis for Petitioner's claims.  *See id.*  Then the Court uses this piecemeal treatment to truncate consideration of the "disparate questioning" indicia of discriminatory intent altogether by errantly declaring the "embellishment of the claim" non-exhausted.  *See id.* at 25.  The Court manifestly misstates the law in this analysis.

First and foremost, *Miller-El II* does not stand for the proposition that "disparate questioning" is either a necessary element of a *Miller-El*-type claim, nor that "disparate questioning" is somehow a unique legal theory of habeas relief.  Rather, as *Miller-El* itself reveals, the Supreme Court had before it a multitude of evidence regarding discriminatory intent, including the three categories of evidence identified by this Court, but also several other indicia

of discriminatory intent as well (such as "comparative juror analysis," prosecutorial mischaracterization of the record, and the overall observation by the Supreme Court that the prosecutors' excuses that "reek[ed] of afterthought").  *See id.* at 241-48 .  Nothing in *Miller-El II* suggests that there is only one prescribed way to demonstrate the improper racial motive of a jury shuffle, or that "disparate questioning" presents a "new" or different claim from the unconstitutionally racial motivations infecting the jury selection process.

Rather, just as in *Miller-El II,* there exists in this case an array of evidence of unconstitutional motivation to exclude non-whites from the jury.  Evidence of racially disparate questioning is not a "new legal theory," *Rodriguez v. McKaskle*, 724 F. 2d 463, 466 (5th Cir. 1984), or "entirely new factual claims," *id.,* such that exhaustion issues would arise.  It is simply a part of "all of the circumstances that bear upon the issue of racial animosity," that the Supreme Court has held must be consulted.  *Foster*, 195 L. Ed. 2d at 13.

The Court expressly ignores prosecutorial misconduct here, citing a string of cases generally holding that a petitioner may not raise a new federal constitutional claim for the first time in federal court.  But it is equally clear that not every fact, even if "new," or even if adduced at a federal evidentiary hearing, gives rise to non-exhaustion.  *See*, *e.g.*, *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988).  Even assuming the "disparate questioning facts were "new," "[a]s a general rule dismissal is not required when evidence presented for the first time in a habeas proceedings *supplements*, but does not *fundamentally alter* the claim presented to the state courts." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (emphasis in original).  The Court simply applied the wrong standard in declining to consider the evidence of disparate questioning.  Such evidence, however, further compels a finding that the prosecutors' race-neutral excuses were a pretext, that the state court findings and conclusions were an unreasonable application of the facts and the relevant law, and that habeas relief is warranted.

### 3. Defense Counsel's Complicit "Second Affidavit," Furthering the False, Pretextual Claims, Compels the Conclusion that Counsel Was Ineffective

It is no answer to say, as the Court does, that defense counsel failed to object, and that Petitioner therefore waived the issue. Defense counsel was demonstrably complicit in this post hoc "afterthought" story, claiming that the front of the original jury pool had "several people who had the appearance of those who might use drugs," when there is, in fact, no evidence of such an appearance. The Court, while it recites defense counsel's second affidavit, makes a manifest factual error in failing to note that actual evidence of the composition of the original jury pool is demonstrably inconsistent with defense counsel's testimony.

To any fair-minded jurist, defense counsel's demonstrably suspect second affidavit is supportive of Petitioner, both in terms of trial counsel's credibility (or lack thereof), ineffectiveness, the underlying racial motivations of the prosecutors. The District Court's Order, which relies heavily on that affidavit, demonstrates manifest error.

### B. The Court Manifestly Misapplies Supreme Court and Fifth Circuit Precedent in Dismissing Clear, Expressions of Prejudice As Mere Speculation and Stereotype.

The Court's and findings and conclusion regarding the inclusion of four clearly biased jurors, and trial counsel's failure to object to same, also reflect manifest factual and legal errors.

First, the Court makes a number of astonishing findings, clearly belied by the record, that there Mr. Thomas offers only speculative evidence that prospective jurors (including those who stated on their questionnaires that they were opposed to interracial relationships) were racially biased. Thus, noting Petitioner's argument that the four jurors who expressed their animosity toward African American and Caucasian people having an intimate relationship (in a case where a black man was accused of killing his estranged, Caucasian, wife) was evidence of racial bias, the Court states that "his assertion is speculative. He has offered nothing other than conclusory allegations and bald assertions . . .." Order, p. 36.

Ironically, the Court then relies on the Supreme Court's decision in *Georgia v. McCollum*, 505 U.S. 42 (1992):  "The Supreme Court 'firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror . . .. [a] prospective juror may not be rejected merely because of 'the racial stereotypes held by that party.'"  Order at 36, citing *McCollum*, 505 U.S. at 59.  The Court misses the point.  The jurors subject to Petitioner's claim for relief are not infirm because of Petitioner's stereotypical assumptions about *them*; they are infirm because of their own expressed biases – which reveal clear bias, not "assumptions of partiality."

The second chief failing of the Court's analysis can be seen most directly on page 37 of the Court's Order, where the Court cites *Preyor v. Stephens*, 537 Fed. Apps. 412, 423 (5th Cir. 2013), for the proposition that defense counsel cannot have been ineffective in failing to question potential jurors about race where "there was no showing that counsel should have been aware of racial bias or prejudice among the venire."  Order at 37.  Whatever else might be said, it is indisputably true that racial bias was present within the venire, and reflected on the prospective jurors' questionnaires.  Defense counsel who had not read those questionnaires would be clearly deficient.  The generic questioning eliciting assurance that the juror would "follow the law" – recounted in the Court's Order at pp. 33-35, does not come close to curing counsel's deficiency in failing to exclude or at least meaningfully question those four jurors about their bias.  The state court's findings and conclusions – cited by the District Court's Order, pp.38-39 – are similarly unsupported and in contravention of the facts and law.

Lastly, the standard cited by the District Court for evaluating prejudice is clearly erroneous.  The Court cites to *Mu'Min v. Virginia*, 500 U.S. 415, 425-426 (1991) for the proposition that the appropriate standard (for Mr. Thomas' claim of ineffective assistance of counsel) is "whether trial counsel's failure to ask questions rendered a defendant's trial

fundamentally unfair." Order at p. 37.  In fact, *Mu'Min* does not address a claim of ineffective assistance of counsel, but the right to an impartial jury under the Sixth Amendment.   The appropriate standard does not require that petitioner show that his counsel's deficient performance rendered his trial fundamentally unfair – only that there is a reasonable probability that the outcome would have been different.  *See Strickland v. Washington*, 466 U.S.  668, 694 (1984).

On these claims discussing the manner in which race bias, and counsel's failure to address, challenge or cure it, pervaded Mr. Thomas' trial and death sentence, the District Court's Order reflects numerous manifest errors.  At a minimum, a Certificate of Appealability is warranted.

**II.  DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE AT BOTH THE GUILT AND PUNISHMENT PHASES OF MR. THOMAS'S CAPITAL TRIAL.  THE DISTRICT COURT'S ORDER REJECTING THESE CLAIMS (IX, X, AND XIV) CONTAINS NUMEROUS MANIFEST ERRORS OF FACT AND LAW; AT A MINIMUM, MR. THOMAS IS ENTITLED TO A CERTIFICATE OF APPEALABILITY.**

As set forth above, the Court made manifest errors of fact and/or law on the issue of defense counsel's efficacy with respect to the racial bias that permeated Mr. Thomas's trial and the critical issue of his competency.  In his petition, Mr. Thomas proffered copious additional evidence – in particular, with respect to claims nine, ten, and fourteen – of counsel's failures at both the guilt and punishment trial phases rising to the level of constitutionally ineffective assistance.  The Court, however, failed to acknowledge both key facts and relevant law Mr. Thomas presented.  Instead, in rejecting Mr. Thomas's claims for relief on ineffectiveness grounds, the Court credited self-serving evidence presented by defense counsel R.J. Hagood and the State, despite the existence of voluminous contrary evidence proffered by Mr. Thomas.  In so doing, the Court's analysis involved manifest factual and legal errors, most egregiously so with respect to the following: 1) counsels' failure to investigate appropriate experts given the complex

and nuanced issues relevant to his insanity defense; and 2) counsels' wholesale neglect of the

punishment phase.

> **A.   The Court Ignored Evidence Establishing that Defense Counsel Unreasonably Failed to Investigate Appropriate Experts in the Fields of Neuropharmacology and Neuropsychology**

As the Court observed, "'[i]n any ineffectiveness case, a particular decision not to

investigate must be directly assessed for reasonableness in all the circumstances.'"  Order at 49,

quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984).  In Mr. Thomas's case,

voluntary intoxication was the State's *primary theory* for rebutting his insanity defense.

Accordingly, it was critical for the defense to refute this theory by showing that Mr. Thomas's

organic mental illness and impairment caused his behavior and prevented him from knowing this

behavior was wrong.  In short, defense counsel had a duty to persuasively explain to the jury that

any alcohol, Coricidin and/or marijuana that Mr. Thomas may have ingested did not induce his

underlying psychosis and, in turn, that he was legally insane under Texas law.  Under these

circumstances, counsel had a duty to investigate a range of experts with sufficient expertise to

educate counsel and to testify persuasively on these core – and complex – issues related to Mr.

Thomas's mental state at the time of his crimes.

It is well settled that Counsel's duty to investigate extends to the identification of

appropriate and competent expert witnesses to support the defense's theory of the case.  *Soffar v.

Dretke*, 368 F.3d 441, 478 (5th Cir. 2004).  Regarding this duty, the ABA Guidelines specify that

counsel "should choose experts who are tailored specifically to the needs of the case, rather than

relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify

persuasively."  ABA Commentary to Guideline 10.11, 108 (rev. ed. 2003); *see also* Guideline

5.1(e)-(f) (providing that defense counsel must be skilled in the use of expert witnesses and in

the presentation of evidence bearing on the mental status of the defendant).  In claims 9 and 10,

Mr. Thomas presented ample evidence that counsel unreasonably failed to investigate experts with backgrounds in neuropharmacology and neuropsychology —areas of expertise that were critical in order to persuasively address the specific and nuanced issue of "voluntary intoxication," as defined under Texas law, and the State's related theory that Mr. Thomas's psychosis was substance induced.

As the Court acknowledged, Dr. Edward B. Gripon, the defense team's only psychiatric expert the defense retained who could address the substance-induced psychosis theory, specifically stated in an affidavit that "[d]etailed opinions regarding specific pharmacological issues should have been directed to a pharmacologist, i.e., a pharmacist." (Order at 45.)  The Court further acknowledged that Dr. Jonathan Lipman, a neuropharmacologist, was available to the defense.  *Id.* at 44.  Dr. Lipman's affidavit shows that he would have been able to testify that Mr. Thomas's behavior before, during and after the murders *did not resemble intoxication-induced psychosis*; rather, it was consistent with an organic paranoid psychotic mental illness. (Petition Ex. 23 (Lipman Aff.) ¶ 15.)  Dr. Lipman's testimony, in turn, was critical to persuasively demonstrate to the jury that the State had no scientific basis for its theory that Mr. Thomas was intoxicated *or that his behavior could have been caused by intoxication.  Id.*

Mr. Thomas additionally demonstrated that beyond the foregoing, an expert in the field of neuropsychology, such as Dr. Ruben Gur, would have been able to offer empirical evidence of Mr. Thomas's organic mental impairment.  Specifically, Dr. Gur – through testing conducted on Mr. Thomas in the prison environment, which also could have been affirmed through structural and functional neuroimaging – could have persuasively demonstrated to the jury that Mr. Thomas has significant brain damage due to previous injuries and organic factors.  (*See* Petition Ex. 14.)  Empirical evidence of organic mental impairment was crucial to bolster the defense's argument that Mr. Thomas's mental state at the time of his crimes was caused by organic factors,

and not by substance-induced psychosis.  Yet the defense failed to retain *any* expert capable of providing such empirical evidence during Mr. Thomas's capital trial.

The Court ignored the foregoing salient facts regarding the specific and critical background and evidence that experts in the fields of neuropharmacology and neuropsychology would have brought to Mr. Thomas's defense.  With respect to the defense's failure to retain a neuropharmacologist, the Court erroneously relied upon defense counsel Hagood's affidavit in concluding that counsel's failure in this regard was reasonable.  Hagood's affidavit, however, misrepresents the substance of Dr. Lipman's affidavit as follows:

> I have read the affidavit by Jonathan Lipman. I understand his conclusion, I just don't [think it] has anything to do with this case. Neither the State nor any of its experts alleged that substances which triggered [Petitioner's] psychotic episode were still in his system at the time he murdered his wife and her children. It appears that Mr. Lipman's conclusions were based on that assumption. I believe that Mr. Lipman was working under the premise that the [word] "intoxicated" had its vernacular meaning rather than the specific meaning assigned to it in [the] Texas Code of Criminal Procedure.

(Order at 45-46 (emphasis in original).).

To begin:  Defense counsel's affidavit is not a statement of the law.  Indeed, as Petitioner set forth in his Reply, "[i]n order to receive a mitigation instruction based on voluntary intoxication there must be evidence the defendant <u>was actually intoxicated at or near the time of the commission of the alleged offense</u>." *Howard v. State*, 239 S.W.3d 359, 365 (Tex. Ct. App. 2007) (emphasis added).  Reply, p. 54.  Moreover, as noted above, Dr. Lipman's affidavit evidences that his expertise was *not* limited to the issue of whether any intoxicants were in Mr. Thomas's system at the time of the murders.  Rather, Dr. Lipman was able to offer a critical opinion that Mr. Thomas's behavior *did not resemble* intoxication-induced psychosis and that there was *no scientific basis* for any theory that his behavior could have been caused by intoxication.

Based solely on Mr. Hagood's post-hoc, self-serving, and erroneous assessment of Dr. Lipman's affidavit, the Court determined that "defense counsel formulated a strategy that was reasonable in recognizing the possible issues regarding Petitioner's mental state and employing three [psychiatrists and/or psychologists]." (Order at 49-50.)  In reaching this conclusion, the Court relied on *Rompilla* for the proposition that the duty to investigate "'does not force defense lawyers to scour the globe on the off chance something will turn up.'"  (Order at 50 (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005))).   The Court in turn opined "Counsel was not deficient by not canvassing the field to find a more favorable defense expert." *Id*.  This conclusion, however, misconstrues the foundation of Mr. Thomas's argument.

The issue is not whether counsel "scour[ed] the globe" to turn up a "more favorable" expert; the issue is whether counsel conducted a *reasonable investigation* of experts qualified in disciplines tailored specifically to the needs of the case.  A trial strategy in a case such as this, given the state's theory, which does not prepare by retaining such qualified experts, educating counsel themselves with the aid of such experts, and then calling them to offer persuasive rebuttal testimony at trial is manifestly unreasonable and incompetent.

The Court, however, concluded:  "[d]efense counsel possibly could have employed another expert," but that "counsel acted reasonably in this case by recognizing the need for experts and, in fact, hiring several experts." (Order at 50.)  In reaching this conclusion, the District Court cites *Ward v. Stephens* as an "analogous" case.  *See id*.  The decision in *Ward*, however, is inapposite.  In that case, the petitioner did not argue, as Mr. Thomas does here, that his counsel failed to investigate and retain experts with the particular expertise necessary to address the specific issues in the case.  On this point, the *Ward* court stated as follows:

> Several defense experts diagnosed Ward with antisocial personality disorder. Ward does not direct this Court to evidence in the record indicating this diagnosis was wrong, and we are aware of none. **Ward instead finds fault with the extent of defense**

> **counsel's mitigation investigation on which these diagnoses**
> **were rendered**.

*Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015).

Unlike in *Ward*, Mr. Thomas presented evidence from the *very experts defense counsel relied upon* opining that counsel should have retained more specialized expertise from a neuropharmacologist.   Mr. Thomas additionally presented evidence that an expert in the field of neuropsychology could have provided critical empirical evidence of organic brain impairment. Combined, experts in these particular fields were essential to refute the State's substance-induced psychosis theory.

Regarding counsel's failure to retain a neuropsychologist or other expert capable of providing empirical evidence of Mr. Thomas's organic mental impairment, the Court credited the affidavits Dr. Victor Scarano, Dr. David Axelrad, and Dr. Peter Oropeza.  (*See* Order at 51-55.) These affidavits primarily assert that Dr. Gur's opinions are "irrelevant" since he made "no attempt to address Petitioner's sanity" back in 2004 and did not address the potential effects of Mr. Mr. Thomas's medications over the intervening years.  (*See id.*)  Such arguments, however, miss the mark – and fail to consider or take into account the evidence proffered by Mr. Thomas' witnesses.

The evidence Mr. Thomas presented was sufficient to show that, had his defense obtained an expert neuropsychologist at the time of his trial, such an expert would have been able to present empirical evidence that Mr. Thomas has organic brain impairments that affected his judgment and his perception of reality at the time of his crimes.  Certainly the State would have presented contrary testimony from its own experts, as set forth in the affidavits on which the Court relied.  The evidence from a neuropsychologist such as Dr. Gur, however – when coupled with the evidence that Dr. Lipman could have offered – is sufficient to raise a strong probability that at least one juror would have found Mr. Thomas legally insane.

The District Court's application of and deference to the legal standard for prejudice set out by the state court is legally erroneous, and compounds the errors surrounding the assessment of deficient performance.  Crediting, once again, solely the state's evidence (including Mr. Hagood's second affidavit, without consideration of the numerous ways it conflicted with the first), the Court stated that the "state court appropriately found" that "'conclusions in [Dr. Lipman's] affidavit do not prove by a preponderance of the evidence that the opinions and diagnosis of the State's experts are erroneous.'"  Order at 50.   Of course, that is not the applicable standard for a claim of ineffective assistance of counsel.  What is required – a threshold Mr. Thomas easily cleared – is a showing that there is a reasonable probability that the outcome of the trial might have been different.  *See Strickland*, 466 U.S. at 695.

At bottom, counsel in Mr. Thomas's trial did not fulfill their duty to investigate experts who were reasonably able to educate them on complex issues regarding Mr. Thomas's underlying diagnosis so that they could develop a reasonable strategy to refute the State's primary theory.   In this regard, defense counsel employed *no strategy at all* because they simply were not sufficiently prepared to make a strategic decision.   *See Soffar*, 368 F.3d at 476, 479 ("Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult.").

In the foregoing respects, the District Court made manifest errors regarding both the factual underpinnings of Mr. Thomas's ineffectiveness arguments with respect to counsel's failure to investigate appropriate experts and the application of relevant law to his related claims. These errors were dependent on deference to the state court's findings and conclusions, which were unreasonable in light of the evidence presented, and contrary to clearly established law.  At the very least, Mr. Thomas was entitled to a Certificate of Appealability on this claim.

### B. The Court Further Ignored Evidence Showing Counsel's Admitted, Profound and Unconstitutional Neglect of the Punishment Phase of Trial.

The Court's determination regarding defense counsel's wholesale neglect of the punishment phase ignores both the record and applicable law.  Evidence shows that in Mr. Thomas's capital case, defense counsel *did not even consider* a strategy for the punishment phase until well into the trial, and only shortly before the second phase began.  Co-counsel for the defense Bobbie Peterson attested that late in the guilt phase of the trial, she became aware that the team was "not prepared for punishment," stating as follows:

> Late in the trial, Mr. Hagood asked me who we had for the punishment phase.  I was completely taken aback because my understanding was that Mr. Hagood was responsible for mitigation and punishment phase.  At that point, I realized that we were not prepared for the punishment phase.

(Petition Ex. 27 ¶ 29.)   Another member of the defense team, Leah Eastep, corroborated Ms. Peterson's assessment of the defense's lack of preparedness:

> Ms. Peterson and I understood that Mr. Hagood was preparing the punishment phase case.  We only found out that was not true very late in the trial, and had to scramble to try to get something ready – all while we were in trial everyday – working up to 20 hours a day during the weekends.

(Petition Ex. 9 ¶ 24.)

In sum, Ms. Peterson and Ms. Eastep both believed that lead counsel Hagood, as the most experienced member of the defense team, was responsible and had been preparing for the punishment phase.  (Petition Exs. 27, 30.)  However, Hagood had done little beyond hiring Shelli Schade – an inexperienced mitigation specialist, who had never before worked on a capital case.  *Id.*  Lacking experience, and without any direction from Hagood or others on the defense team, Ms. Schade interviewed only four people for mitigation purposes.  *Id.*  Aside from these four individuals, in the end, not a single-family member, friend, church official, teacher, or community member was contacted by the defense.  As a result, an effective and detailed history

of the myriad mitigating circumstances that riddled Mr. Thomas's life – including, but not limited to, Mr. Thomas's abysmal childhood marked by abuse, neglect and extreme poverty; early and severe signs of his own mental illness; and the deep history of mental illness in his family, which permeated his experience and upbringing – was not presented to the jury.  This failure was *not* a result of strategy, but rather was solely the result of the defense's fundamental lack of coordination and preparation.   Furthermore, due to the defense's fundamental failures in these regards, even the four individuals Ms. Schade did contact were poorly prepared to testify on Mr. Thomas's behalf.  *Id.*

Ignoring this clear record evidence, the Court relied once again on Hagood's self-serving and revisionist affidavit to conclude that defense counsel had a reasonable "strategy" for the punishment phase.  (*See* Order at 79.)  Specifically, the Court determined that this "strategy was to concentrate on close friends and relatives, who, in fact, testified" and that "[t]he anticipated testimony of the proposed additional witnesses would have been cumulative."  (Order at 79-80; *see also* Order at 68 ("The transcript in this case reveals that abundant evidence that could have been presented by Petitioner in mitigation during the sentencing phase of the trial had already been presented during the guilt/innocence phase of the trial.").)  The Court's conclusions in these regards ignore the salient facts and law.

As set forth in Mr. Thomas's Petition, the Supreme Court recently took great pains to flesh out the *Strickland* standard in three key cases addressing ineffectiveness claims regarding the punishment phase of a capital trial: *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Williams v. Taylor*, 529 U.S. 362 (2000).  *Wiggins* makes clear that in evaluating such ineffectiveness claims, it is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision to introduce mitigation evidence . . . was *itself reasonable*."  *Wiggins v. Smith*, 123 S. Ct. 2527, 2536 (2003)

(emphasis in original).  At a bare minimum, defense counsel must – in every capital case – engage in a thorough social history investigation.  *Wiggins*, 539 U.S. at 524-25; *Rompilla*, 545 U.S. at 380.  Federal courts – even under the deferential scheme of the AEDPA – should scrutinize assertions regarding counsel's alleged strategy in light of a close reading of the record; any state-court finding of strategic purpose for an omission *should be disregarded* if it cannot withstand such scrutiny.  *Wiggins*, 539 U.S. at 526-27.

In Mr. Thomas's case, the minimal investigation that did occur was a far cry from "reasonable."  The Court's reliance on counsel Hagood's assertions that the defense team spent "many months preparing all aspects of the case," Order at 76, is belied by his own prior affidavit, the affidavits of every other member of the defense team, of the mitigation witnesses who were contacted by defense counsel, and the affidavits of family members who Hagood did contact for the most cursory of conversations.  *See* Reply, pp. 68-70.

Similarly, the Court's conclusion that Hagood engaged in "reasonable strategy in deciding to forego calling [witnesses who may have offered "double-edged" testimony]" cannot be countenanced.  *See* Order at 76-77.  On this point, the Court once again relies upon Hagood's affidavit, in which he states: "[t]hrough [his] investigation and interviews with friends and family members, [he] had been told" of purported facts that could have worked against Mr. Thomas.  *Id.* at 77.  Notably, however, Hagood does not identify which potential witnesses he purportedly excluded on such grounds, nor does this purported "strategy" explain the defense's failure to even interview, let alone call, copious available witnesses.

The reason is simple:  his contention that he interviewed and strategically decided not to introduce the testimony of multiple family and friends is imagined.  The record is clear that Hagood did not, in fact, develop *any meaningful strategy whatsoever* regarding mitigation, let alone one that rested upon a reasonable investigation.  The Court's reliance on Hagood's one

- Page 23

affidavit, which has no evidence of credibility and multiple reasons to find it incredible, is an unreasonable application of the facts in light of the evidence presented, and clearly erroneous. To rely on that same affidavit to conclude – as a reviewing court must under the applicable Supreme Court case law – that that there was an investigation that supported counsel's purportedly strategic decision – is a fundamental error of fact and law.

The Court's prejudice analysis suffers in similar ways.  As an initial matter, any scattered evidence regarding Mr. Thomas's history that was presented during the guilt phase – primarily through witnesses presented by the state[9] - failed to fully and meaningfully present the range of relevant mitigating circumstances, including those surrounding Mr. Thomas's abysmal childhood, the evolution of his mental illness, and his family's deep history of mental illness and other problems.  In his Petition, Mr. Thomas offered a lengthy list of potential witnesses who could have been interviewed and called to testify on the foregoing and other mitigating factors. The Court's finding that Hagood made a decision that such witnesses would have been cumulative of other testimony presented, Order at 79, is belied by the record, and cannot withstand the scrutiny mandated by *Wiggins*.  *See Id.*, 539 U.S. at 526-27.

Nor does the conclusion that such evidence would have been "cumulative" withstand scrutiny in light of the actual facts and the applicable law.  Contrary to the Court's assertions otherwise, the history of Mr. Thomas's family members' own struggles with mental illness, poverty, and other factors certainly was relevant to Mr. Thomas's mitigation case.  These histories would have shown the jury that Mr. Thomas was raised and surrounded by people undergoing challenges similar to his own, and thus had no stable influences (or even

---

[9] The Court's Order discussing these witnesses obscures the fact that almost all were state witnesses, presented for the purpose of buttressing the State's case for a conviction.  *See* Order pp. 68-73.

comparators).  Such histories additionally would have lent credibility to the evidence of Mr.

Thomas's own mental illness and other challenges, demonstrating that these factors were part of

an ongoing familial cycle.  This evidence was a far cry from the testimony that came in through

the state's witnesses at the guilt phase of trial, or the minimal poorly prepared defense witnesses

presented at the punishment phase.  Once again, the Court's conclusions regarding the prejudice

resulting from defense counsel's failures are contrary both to the record and to applicable law.

As explained at length in Mr. Thomas's Petition, pp. 213-216, and Reply, pp. 70-74, the

defense's wholesale lack of preparedness for the punishment phase unequivocally was

prejudicial.

     In light of the foregoing, the Court's conclusions regarding Mr. Thomas's ineffectiveness

claims with respect to the punishment phase are based upon manifest legal and factual errors.  At

a bare minimum, Mr. Thomas is entitled to a Certificate of Appealability.

## CONCLUSION

     Accordingly, for the reasons set forth above, Mr. Thomas respectfully requests that this

Court alter or amend its judgment to grant him relief, or to grant him a Certificate of

Appealability.

Dated:  October 17, 2016

Respectfully submitted,

_____

Maurie Levin
maurielevin@gmail.com
State Bar No. 00789452
614 South 4th Street, #346
Philadelphia, PA  19147
(512) 294-1540
215-733-9225 - facsimile

Marilyn Clark*
Clark.Marilyn@Dorsey.com
MN State Bar No. 386615
Dorsey & Whitney, LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
512.340.2600


Don Bailey
Donbailey46@hotmail.com
State Bar No. 01520480
Attorney at Law
309 N. Willow
Sherman, Texas 75090
(903) 892-9185

* Admitted pro hac vice


**_Counsel for Andre Lee Thomas_**

## CERTIFICATE OF SERVICE

I hereby certify that this 17th day of October 2016 the foregoing Motion was filed using the electronic case filing system of this Court.  Thus, counsel of record for Respondent, Assistant Attorney General Fredericka Sargent, Fredericka.sargent@oag.state.tx.us, who has consented to accept this Notice as service by electronic means, was served via the electronic filing system.


_____

Maurie Levin